Nos. 2023-1850, -2038

# United States Court of Appeals
*for the*
# Fourth Circuit

HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC.;
METROLOGIC INSTRUMENTS, INC.,

*Plaintiffs-Appellants/Cross-Appellees,*

*v.*

OPTO ELECTRONICS CO., LTD.,

*Defendant-Appellee/Cross-Appellant.*

**On Appeal from the United States District Court
for the Western District of North Carolina
Case No. 3:21-cv-506-KDB-DCK**

**JOINT APPENDIX
VOLUME 2 OF 16 (PAGES 546-1088)**

<table>
<tr><td>

Kirk T. Bradley
M. Scott Stevens
S. Benjamin Pleune
Stephen R. Lareau
Nicholas C. Marais
Lauren N. Griffin
Brandon C.E. Springer
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Ste. 300
Charlotte, NC 28203
(704) 444-1000

*Attorneys for Plaintiffs-Appellants
Honeywell International Inc.;
Hand-Held Products, Inc.; and
Metrologic Instruments, Inc.*

</td><td>

York M. Faulkner
YORKMOODYFAULKNER
711
Tensho Building, 7F
3-17-11 Shibaura
Tokyo, Minato-Ku, 108-0023
Japan
(202) 251-0837

Brian D. Schmalzbach
MCGUIREWOODS, LLP
800 East Canal Street
Richmond, Virginia 23219
(804) 775-4746

*Attorneys for Defendant-Appellee
Opto Electronics Co., Ltd.*

</td></tr>
</table>

April 1, 2024

| **VOLUME 1 OF 16** | | |
|---|---|---|
| **Date** | **Description** | **Page** |
| | Docket Sheet | JA1 |
| 2021.09.24 | Complaint for Breach of Contract | JA51 |
| 2022.04.14 | Order on Motion to Dismiss | JA102 |
| 2022.08.29 | Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Admission | JA108 |
| 2023.02.16 | Order on Discovery Disputes | JA121 |
| 2023.02.22 | Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA125 |
| 2023.02.22 | EXHIBIT C – MDL-2001 Product Specification | JA128 |
| 2023.03.08 | Defendant OPTO Electronics Co., Ltd.'s Motion for Summary Judgment | JA131 |
| 2023.03.08 | EXHIBIT 1 – ITC Complaint | JA134 |
| 2023.03.08 | EXHIBIT 2 – ITC Order | JA189 |
| 2023.03.08 | EXHIBIT 3 – ITC Order and Honeywell's Response | JA194 |
| 2023.03.08 | EXHIBIT 4 – Claim Chart Excerpts | JA206 |
| 2023.03.08 | EXHIBIT 5 – ISO-IEC 15415 | JA209 |
| 2023.03.08 | EXHIBIT 6 – Honeywell Website | JA262 |
| 2023.03.08 | EXHIBIT 7 – U.S. Patent No. 5,243,655 | JA271 |
| 2023.03.08 | EXHIBIT 8 – ISO-IEC 15438 | JA300 |
| 2023.03.08 | EXHIBIT 9 – Accurate Data | JA417 |
| 2023.03.08 | EXHIBIT 10 – Honeywell Tech Support Page | JA421 |
| 2023.03.15 | EXHIBIT D – Wang Expert Report | JA424 |
| 2023.03.15 | EXHIBIT E – MDI-4050 Product Datasheet | JA437 |
| 2023.03.21 | Order denying OPTO's Objections to Magistrate Judge's Decision (Dkt. 125) | JA440 |
| 2023.03.22 | EXHIBIT A – L-22X Marketing Materials | JA452 |
| 2023.03.22 | EXHIBIT B – U.S. Patent No. 10,140,490 | JA455 |
| 2023.03.29 | Defendant's Reply in Support of Motion for Summary Judgment | JA470 |
| 2023.03.28 | OPTO Cover Motion for Summary Judgment on Patent Misuse | JA487 |
| 2023.03.29 | EXHIBIT 2 – U.S. Patent No. 7,159,783 | JA490 |
| 2023.04.20 | Summary Judgment Order | JA512 |

| | VOLUME 2 OF 16 | |
|---|---|---|
| **Date** | **Description** | **Page** |
| 2023.05.01 | Honeywell's Motion for Reconsideration and Offer of Proof of Dkt. 195 | JA546 |
| 2023.05.01 | EXHIBIT S - OPTO Electronics Audit Report | JA549 |
| 2023.06.02 | Order Denying Honeywell's Motion for Reconsideration | JA565 |
| 2023.06.20 | Joint Stipulation of Facts | JA575 |
| 2023.07.05 | OPTO's Motion to Strike Honeywell's Second Amended Objections and Responses to OPTO's First Set of Interrogatories | JA579 |
| 2023.07.10 | EXHIBIT D – June 5, 2023 E-Mail from J. O'Brien | JA583 |
| 2023.07.10 | EXHIBIT E – OPTO's Amended Exhibit List | JA585 |
| 2023.07.10 | EXHIBIT H – Honeywell's First Amended Exhibit List | JA629 |
| 2023.07.13 | Transcript from July 11, 2023 Pre-Trial Conference | JA643 |
| 2023.07.13 | Order on Motions in Limine and Pretrial Matters | JA762 |
| 2023.07.18 | Order Granting OPTO's Motion to Strike Honeywell's Second Amended Objections and Responses to OPTO's First Set of Interrogatories | JA776 |
| 2023.07.19 | Verdict Form | JA781 |
| 2023.07.20 | Judgment in Case | JA783 |
| 2023.07.25 | Stipulation Regarding Jury Verdict Damages | JA784 |
| 2023.07.26 | Amended Judgment | JA787 |
| 2023.08.03 | Honeywell's Motion for Fees and Costs | JA788 |
| 2023.08.03 | Memorandum in support of Honeywell's Motion for Fees and Costs | JA791 |
| 2023.08.03 | EXHIBIT C – June 26, 2023 E-Mail from R. Muckenfuss | JA807 |
| 2023.08.03 | EXHIBIT D – OPTO Summary of Financial Results for Fiscal Year End 2022 | JA810 |
| 2023.08.03 | EXHIBIT E – OPTO Financial Statement | JA849 |
| 2023.08.03 | EXHIBIT F – Honeywell International Inc. et al v. Opticon, Inc. et al, C.A. 1:19-cv-1019-CFC (D. Del.) Complaint | JA870 |

| 2023.07.17 | Trial Transcript - Volume I | JA903 |
|---|---|---|
| | Testimony of Taylor Smith: | |
| | Direct Examination by Mr. Pleune | JA966 |
| | Cross Examination by Mr. Muckenfuss | JA973 |
| | Testimony of Jeremy Christopher Whitley: | |
| | Direct Examination by Mr. Stevens | JA976 |
| | Cross Examination by Mr. VanHoutan | JA1001 |
| | Redirect Examination by Mr. Stevens | JA1009 |
| | Testimony of Craig Smith: | |
| | Direct Examination by Mr. Marais | JA1017 |
| | Voir Dire Examination by Ms. Lehman | JA1026 |
| | Direct Examination by Mr. Marais | JA1030 |
| | Cross Examination by Ms. Lehman | JA1055 |
| | Redirect Examination by Mr. Marais | JA1078 |

**VOLUME 3 OF 16**

| Date | Description | Page |
|---|---|---|
| 2023.07.18 | Trial Transcript - Volume II | JA1089 |
| | Testimony of Adam Doane: | |
| | Direct Examination by Mr. Muckenfuss | JA1102 |
| | Cross Examination by Mr. Stevens | JA1170 |
| | Redirect Examination by Mr. Muckenfuss | JA1193 |
| | Testimony of Paul Chartier: | |
| | Direct Examination by Mr. VanHoutan | JA1214 |
| | Cross Examination by Mr. Stevens | JA1262 |
| | Redirect Examination by Mr. VanHoutan | JA1292 |
| | Recross Examination by Mr. Stevens | JA1293 |
| | Testimony of Rie Ashihara: | |
| | Direct Examination by Mr. VanHoutan | JA1297 |
| | Cross Examination by Mr. Stevens | JA1302 |
| | Testimony of Cornelis Stoop: | |
| | Direct Examination by Mr. Stevens | JA1309 |
| | Cross Examination by Mr. VanHoutan | JA1323 |
| | Redirect Examination by Mr. Stevens | JA1328 |
| | Recross Examination by Mr. VanHoutan | JA1330 |

|  |  |  |
|---|---|---|
|  | Testimony of Rie Ashihara: | |
|  | Direct Examination by Mr. Stevens | JA1331 |
|  | Cross Examination by Mr. VanHoutan | JA1335 |
|  | Redirect Examination by Mr. Stevens | JA1336 |
| 2023.07.19 | Trial Transcript - Volume III | JA1341 |
|  | Testimony of Yoshiaki Kohmo: | |
|  | Direct Examination by Mr. Stevens | JA1346 |
|  | Testimony of Jeremy Whitley: | |
|  | Direct Examination by Mr. VanHoutan | JA1439 |
|  | Cross Examination by Mr. Stevens | JA1465 |
|  | Redirect Examination by Mr. VanHoutan | JA1487 |
|  | Testimony of Gregory Adams: | |
|  | Direct Examination by Mr. Houghton | JA1492 |
|  | Cross Examination by Mr. Stevens | JA1546 |

| **VOLUME 4 OF 16** | | |
|---|---|---|
| **Date** | **Description** | **Page** |
| 2023.07.20 | Trial Transcript - Volume IV | JA1597 |
|  | Testimony of Shigeaki Tanaka: | |
|  | Direct Examination by Mr. Stevens | JA1601 |
|  | Testimony of David Taylor: | |
|  | Direct Examination by Mr. Springer | JA1611 |
|  | Voir Dire Examination by Mr. McCamey | JA1618 |
|  | Direct Examination by Mr. Springer | JA1619 |
|  | Cross Examination by Mr. McCamey | JA1636 |
|  | Redirect Examination by Mr. Springer | JA1645 |
|  | Testimony of Ryan N. Herrington: | |
|  | Direct Examination by Mr. Lareau | JA1646 |
|  | Cross Examination by Mr. VanHoutan | JA1660 |
| 2023.08.14 | Honeywell's Notice of Appeal to the Fourth Circuit | JA1688 |
| 2023.08.17 | EXHIBIT 3 – Zebra License and Settlement Agreement | JA1691 |
| 2023.08.17 | OPTO Motion for Judgment as a Matter of Law | JA1712 |
| 2023.08.17 | Trial Transcript Excerpt | JA1716 |
|  | Testimony of Jeremy Christopher Whitley: | |
|  | Direct Examination by Mr. Stevens | JA1720 |
|  | Cross Examination by Mr. VanHoutan | JA1723 |

| | | |
|---|---|---|
| 2023.08.17 | Trial Transcript Excerpt | JA1725 |
| | Testimony of Adam Doane:<br>Direct Examination by Mr. Muckenfuss<br>Cross Examination by Mr. Stevens | JA1732<br>JA1735 |
| | Testimony of Rie Ashihara:<br>Direct Examination by Mr. VanHoutan<br>Redirect Examination by Mr. Stevens | JA1738<br>JA1740 |
| 2023.08.17 | Trial Transcript Excerpt<br>Closing Argument by Mr. Stevens. | JA1742 |
| 2023.08.24 | Reply in Support of Motion for Fees and Costs | JA1746 |
| 2023.08.24 | EXHIBIT A – E-mail from Z. McCamey | JA1764 |
| 2023.08.31 | Honeywell's Response to OPTO's Motion for Judgment as a Matter of Law | JA1767 |
| 2023.09.27 | Order on Post-Trial Motions | JA1797 |
| 2023.10.02 | Honeywell's Amended Notice of Appeal to the United States Court of Appeals for the Fourth Circuit | JA1814 |
| 2023.10.04 | Notice of Appeal of Defendant OPTO Electronics Co., Ltd. to the United States Court of Appeals for the Fourth Circuit | JA1817 |
| 2023.10.27 | Honeywell's Notice of Appeal to the United States Court of Appeals for the Federal Circuit | JA1820 |
| 2023.11.07 | OPTO's Notice of Appeal to the United States Court of Appeals for the Federal Circuit | JA1823 |

| Exhibit | Description | Page No. |
|---|---|---|
| PX-5 | ISO/IEC 15438 | JA1827 |
| PX-12 | ISO/IEC 15415 | JA1943 |
| PX-17 | U.S. Patent No. 5,304,786 | JA1995 |
| PX-18 | MDL-2001 Datasheet | JA2046 |
| PX-19 | OPR-2001Z Leaflet | JA2048 |
| PX-62 | Auditor's Report and Internal Control Audit Report | JA2050 |
| PX-63 | Notice Regarding Filing of Lawsuit, Recording of Extraordinary Loss, and Revision of Consolidated Earnings Forecast for the Fiscal Year Ending November 2021,<br>OPTO Press Release, November 30, 2021 | JA2072 |
| PX-87 | NLV-1001 Product Specification | JA2078 |
| PX-125 | MDL-1000 Specification | JA2080 |

| PX-188 | *In the Matter of Certain Barcode Scanners, Scan Engines, Products Containing the Same, and Components Thereof*, Complaint, Investigation No. 337-TA-1165 | JA2082 |

**VOLUME 5 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| PX-206 | U.S. Patent No. 9,465,970 | JA2136 |
| PX-207 | U.S. Patent No. 10,140,490 | JA2201 |
| PX-212 | U.S. Patent No. 7,159,783 | JA2215 |
| PX-214 | U.S. Patent No. 8,752,766 | JA2236 |
| PX-215 | U.S. Patent No. 9,230,140 | JA2266 |
| PX-216 | U.S. Patent No. 10,846,498 | JA2280 |
| PX-218 | U.S. Patent No. 10,235,547 | JA2308 |
| PX-225 | U.S. Patent No. 8,587,595 | JA2336 |
| PX-226 | U.S. Patent No. 9,092,686 | JA2348 |
| PX-227 | U.S. Patent No. 9,659,203 | JA2361 |
| PX-228 | U.S. Patent No. 9,384,378 | JA2374 |
| PX-319 | 3Q JASDAQ Regulatory Filing (Sept. 22, 2022) | JA2387 |
| PX-325 | OPTO's Objections and Responses to Honeywell's First Requests for Admission | JA2410 |
| DX-816 | US Patent No 7,387,253 | JA2423 |
| DX-818 | US Patent No 7,104,456 | JA2486 |

**VOLUME 6 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| DX-838 | US Patent No 7,472,831 | JA2546 |
| DX-848 | P. Chartier Trial Exhibit 1001 | JA2713 |
| DX-849 | P. Chartier Trial Exhibit 1002 | JA2857 |
| DX-850 | P. Chartier Trial Exhibit 1003 | JA2987 |

**VOLUME 7 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| DX-851 | P. Chartier Trial Exhibit 1004 | JA3031 |
| DX-852 | P. Chartier Trial Exhibit 1005 | JA3083 |
| DX-853 | P. Chartier Trial Exhibit 1006 | JA3199 |
| DX-854 | P. Chartier Trial Exhibit 1007 | JA3201 |

| **VOLUME 8 OF 16 – SEALED** | | |
|---|---|---|
| **Date** | **Description** | **Page No.** |
| 2022.01.05 | Answer, Affirmative Defenses, and Counterclaims | JA3215 |
| 2022.04.11 | Hearing Transcript on Motion to Dismiss | JA3249 |
| 2022.08.11 | Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories | JA3293 |
| 2022.09.06 | Honeywell's Objections and Responses to Defendant's First Set of Interrogatories | JA3336 |
| 2022.09.06 | Honeywell's Objections and Responses to Defendant's First Set of Requests for Admission | JA3375 |
| 2022.09.21 | Deposition Transcript of J. Whitley | JA3393 |
| 2022.09.26 | Deposition Transcript of R. Ashihara | JA3574 |
| **VOLUME 9 OF 16 – SEALED** | | |
| **Date** | **Description** | **Page No.** |
| 2022.09.27 | Deposition Transcript of Y. Kohmo | JA3683 |
| 2022.09.29 | Defendant's Objections and Responses to Plaintiffs' Second Set of Interrogatories | JA3757 |
| 2022.09.29 | Defendant's Supplemental and Amended Objections and Responses to Plaintiffs' First Set of Interrogatories | JA3769 |
| 2022.09.30 | Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA3815 |
| 2022.10.21 | Expert Report of Mr. Ryan N. Herrington | JA3857 |
| 2022.11.18 | Expert Report of Dr. Greg Adams | JA3923 |
| 2023.02.22 | Memorandum in Support of Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA3950 |
| 2023.02.02 | EXHIBIT A – License and Settlement Agreement | JA3973 |
| 2023.02.22 | EXHIBIT B – July 1, 2019 Correspondence | JA4005 |
| 2023.02.22 | EXHIBIT D – September 21, 2022 J. Whitley Deposition Excerpts | JA4015 |
| 2023.02.22 | EXHIBIT E – September 29, 2022 OPTO's Supplemental Responses to First Interrogatories | JA4022 |
| 2023.02.22 | EXHIBIT F – September 29, 2022 OPTO's Objections and Responses to Second Interrogatories | JA4029 |
| 2023.02.22 | EXHIBIT G - G. Adams Expert Report Excerpts | JA4034 |

| 2022.02.25 | Transcript of February 15, 2022 Status Hearing and Discovery Conference | JA4043 |
|---|---|---|

### VOLUME 10 OF 16 – SEALED

| Date | Description | Page No. |
|---|---|---|
| 2023.03.02 | OPTO's Objections to Discovery Rulings | JA4223 |
| 2023.03.08 | Defendant's Memorandum in Support of Its Motion for Summary Judgment | JA4250 |
| 2023.03.08 | EXHIBIT 1 – First Amendment to License and Settlement Agreement | JA4282 |
| 2023.03.08 | EXHIBIT 2 – Second Amendment to License and Settlement Agreement | JA4285 |
| 2023.03.08 | EXHIBIT 3 – Application and Declaration for Remittance | JA4291 |
| 2023.03.08 | EXHIBIT 4 – Application and Declaration for Remittance | JA4293 |
| 2023.03.08 | EXHIBIT 5 – Quarterly Royalty Reports and Wire Transfer Receipts | JA4295 |
| 2023.03.08 | Defendant's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA4333 |
| 2023.03.15 | Reply in Support of Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA4364 |
| 2023.03.15 | EXHIBIT A – OPTO's Supplemental and Amended Objections and Responses to First Set of Interrogatories | JA4381 |
| 2023.03.15 | EXHIBIT B – ISO/IEC 15438 | JA4398 |
| 2023.03.15 | EXHIBIT C – September 27, 2022 Excerpts from Deposition of Yoshiaki Kohmo | JA4515 |
| 2023.03.16 | Honeywell's Response to OPTO's Objections to Magistrate Judge's Decision | JA4523 |
| 2023.03.22 | Honeywell's Response in Opposition to OPTO's Motion for Summary Judgment | JA4551 |
| 2023.03.28 | Honeywell's Memo in Support of Motion for Partial Summary Judgment Regarding Patent Misuse | JA4576 |
| 2023.03.28 | EXHIBIT C – July 1, 2019 Correspondence from B. Pleune to K. Chu | JA4595 |

| | | |
|---|---|---|
| 2023.03.28 | EXHIBIT D – Defendant's Supplemental and Amended Objections and Responses to Plaintiff's First Set of Interrogatories | JA4605 |
| 2023.03.29 | OPTO's Memorandum in Support of Motion for Summary Judgment Regarding Patent Misuse | JA4616 |
| 2023.04.10 | Honeywell's Opposition to OPTO's Motion for Summary Judgment Regarding Patent Misuse | JA4632 |
| 2023.04.10 | EXHIBIT A – September 30, 2022 Honeywell's First Amended Objections & Responses to OPTO's First Set of Interrogatories | JA4655 |
| 2023.04.10 | OPTO's Response to Honeywell's Patent Misuse Motion for Summary Judgment | JA4674 |

### VOLUME 11 OF 16 – SEALED

| Date | Description | Page No. |
|---|---|---|
| 2023.04.10 | EXHIBIT A – OPTO's Supplemental Responses to Plaintiffs' First Set of Interrogatories | JA4695 |
| 2023.05.01 | Memorandum in Support of Honeywell's Motion for Reconsideration of Dkt. 195 | JA4742 |
| 2023.05.01 | EXHIBIT A – License and Settlement Agreement | JA4769 |
| 2023.05.01 | EXHIBIT B – Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA4801 |
| 2023.05.01 | EXHIBIT C – Expert Report of Ryan N. Herrington | JA4844 |
| 2023.05.01 | EXHIBIT D – September 8, 2020 Letter to OPTO Electronics | JA4911 |
| 2023.05.01 | EXHIBIT E – September 16, 2020 E-mail from Counsel for OPTO | JA4914 |
| 2023.05.01 | EXHIBIT F – October 23, 2020 E-mail from Counsel for OPTO | JA4917 |
| 2023.05.01 | EXHIBIT G – December 16, 2020 Letter to Counsel for OPTO | JA4927 |
| 2023.05.01 | EXHIBIT H – January 1, 2021 E-mail from Counsel for OPTO | JA4929 |
| 2023.05.01 | EXHIBIT I – Non-Disclosure & Confidentiality Agreement | JA4936 |
| 2023.05.12 | EXHIBIT J – January 4, 2021 E-mail from Matsuzawa | JA4940 |

| 2023.05.12 | EXHIBIT K – January 6, 2021 E-mail from Matsuzawa | JA4952 |
|---|---|---|
| 2023.05.12 | EXHIBIT L – January 11, 2021 E-mail to Matsuzawa | JA4964 |
| 2023.05.12 | EXHIBIT M – January 15, 2021 E-mail to Matsuzawa | JA4980 |
| 2023.05.12 | EXHIBIT N – January 26, 2021 E-mail to Matsuzawa | JA4989 |
| 2023.05.12 | EXHIBIT O – February 1, 2021 and February 10, 2021 E-mails to Matsuzawa | JA5001 |
| 2023.05.12 | EXHIBIT P – February 3, 2021 E-mail to Matsuzawa | JA5012 |
| 2023.05.12 | EXHIBIT Q – March 31, 2021 E-mail to Matsuzawa | JA5018 |
| **VOLUME 12 OF 16 – SEALED** | | |
| **Date** | **Description** | **Page No.** |
| 2023.05.01 | EXHIBIT R – Deposition transcript of Rie Ashihara | JA5146 |
| 2023.05.01 | EXHIBIT S – April 13, 2023 Excerpts of Motions | JA5255 |
| 2023.05.10 | Hearing Transcript from Motions Heard on April 13. 2023 | JA5398 |
| 2023.05.15 | Defendant's Response in Opposition to Plaintiffs' Motion for Reconsideration of Dkt. 195 and Offer of Proof | JA5540 |
| 2023.05.22 | Honeywell's Reply in Support of Its Motion for Reconsideration and Offer of Proof | JA5568 |
| 2023.06.20 | OPTO's Proposed Findings of Fact and Conclusions of Law re Patent Misuse | JA5586 |
| 2023.06.20 | OPTO's Trial Brief | JA5605 |
| **VOLUME 13 OF 16 – SEALED** | | |
| **Date** | **Description** | **Page No.** |
| 2023.06.20 | Honeywell's Trial Brief Regarding Jury Trial | JA5626 |
| 2023.06.20 | Honeywell's Trial Brief Regarding Patent Misuse | JA5647 |
| 2023.06.20 | Honeywell's Proposed Findings of Fact and Conclusions of Law | JA5671 |
| 2023.07.05 | OPTO's Memorandum in Support of Motion to Strike | JA5690 |
| 2023.07.05 | EXHIBIT 1 – Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5706 |

| | | |
|---|---|---|
| 2023.07.10 | Honeywell's Response to Motion to Strike | JA5753 |
| 2023.07.10 | EXHIBIT A – Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5770 |
| 2023.07.10 | EXHIBIT B - Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5813 |
| 2023.07.10 | EXHIBIT C - Redlined Version of Honeywell's Interrogatory Responses | JA5860 |
| 2023.07.10 | EXHIBIT F – December 27, 2022 OPTO's Second Supplemental Responses to Honeywell's First Set of Interrogatories | JA5908 |
| 2023.07.10 | EXHIBIT G – April 12, 2023 Rebuttal Expert Report of Ryan H. Herrington | JA5956 |
| 2023.07.10 | EXHIBIT I – October 21, 2022 Expert Report of David O. Taylor | JA6014 |
| 2023.08.03 | EXHIBIT A – License and Settlement Agreement | JA6072 |

### VOLUME 14 OF 16 – SEALED

| Date | Description | Page No. |
|---|---|---|
| 2023.08.03 | EXHIBIT B – Declaration of M. Scott Stevens | JA6104 |
| 2023.08.17 | OPTO's Opposition to Honeywell's Motion for Attorney Fees and Costs | JA6263 |
| 2023.08.17 | EXHIBIT 1 – Fees and Costs Analysis | JA6295 |
| 2023.08.17 | EXHIBIT 2 – Metrologic Settlement and License Agreement | JA6317 |
| 2023.08.17 | EXHIBIT 4 – Doc Production Invoice | JA6333 |
| 2023.08.17 | EXHIBIT 5 – Invoice | JA6336 |
| 2023.08.17 | OPTO Memo in Support of Motion for Judgment as a Matter of Law | JA6338 |
| 2023.08.31 | EXHIBIT A – Defendant's Second Supplemental Objections and Responses to Plaintiff's Frist Set of Interrogatories | JA6369 |
| 2023.09.12 | OPTO Reply in Support of Motion for Judgment as a Matter of Law | JA6417 |

| **VOLUME 15 OF 16 – SEALED** | | |
|---|---|---|
| Exhibit | Description | Page No. |
| JX-1 | License and Settlement Agreement | JA6432 |
| JX-2 | First Amendment to License and Settlement Agreement | JA6436 |
| JX-3 | Second Amendment to License and Settlement Agreement | JA6465 |
| PX-4 | ISO/IEC 15438 | JA6470 |
| PX-8 | ISO/IEC 24728 | JA6586 |
| PX-10 | ISO/IEC 24723 | JA6710 |
| PX-13 | European Pre-Standard, ENV12925 | JA6762 |
| **VOLUME 16 OF 16 – SEALED** | | |
| Exhibit | Description | Page No. |
| PX-61 | Table of OPTO Interrogatory Response No. 3 | JA6878 |
| PX-243 | Letter from B. Pleune to Quinn Emanuel (dated July 1, 2019) | JA6925 |
| PX-244 | Pleune Correspondence to Goldstein (May 21, 2021) | JA6934 |
| PX-245 | Report Draft OP EU 4 April2021.xlsx (Enclosure to Audit Letter) | JA6936 |
| PX-246 | Report Draft OP-1 0220.xlsx (Enclosure to Audit Letter) | JA6969 |
| PX-247 | Report Draft OP US_20210414.xlsx (Enclosure to Audit Letter) | JA7068 |
| PX-259 | E-Mail Chain with R. Goldstein (October 23, 2020) | JA7096 |
| PX-261 | E-Mail Chain with R. Goldstein (January 12, 2021) | JA7105 |
| PX-288 | Pleune June 2021 correspondence to Goldstein | JA7111 |
| PX-289 | Matsuzawa & Co. Invoice in Japanese | JA7113 |
| DX-095 | September 16, 2020 Email from Goldstein to Pleune | JA7118 |
| DX-096 | September 16, 2020 Letter from Goldstein to Pleune | JA7120 |
| DX-098 | Sales Spreadsheets Sent by Goldstein to Pleune | JA7121 |
| DX-111 | September 30 – December 16 Email Thread Goldstein and Pleune | JA7175 |
| DX-769 | Honeywell's ITC Claims Charts | JA7184 |

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> OPTO ELECTRONICS CO., LTD., <br><br> *Defendant and Counterclaim Plaintiff*, <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Counterclaim Defendants*. | **HONEYWELL'S MOTION FOR RECONSIDERATION AND OFFER OF PROOF** <br><br> Case No. 3:21-cv-00506 |

Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. ("Honeywell") move the Court for the following relief:

1. That the Court reconsider its Summary Judgment Order and vacate the section discussing Section 5.1 on pgs. 11–17 of that Order (Dkt. 195).

The grounds for this Motion for Reconsideration and Offer of Proof are more fully set forth in Honeywell's accompanying Memorandum in Support. Honeywell respectfully requests a hearing on the present motion at the Court's convenience.

JA546

Submitted May 1, 2023

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**ALSTON & BIRD LLP**
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

JA547

## CERTIFICATE OF SERVICE

I certify that on May 1, 2023 I filed a copy of this Motion for Reconsideration and Offer of Proof using the Court's CM/ECF system, which automatically provides service to all counsel of record.

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
ben.pleune@alston.com

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

3

JA548

# EXHIBIT S

JA549

Independent Auditor's Report and Internal Control Audit Report

February 24, 2022

To: The Board of Directors.
Optoelectronics, K.K.

Sanyu Audit Corporation
Tokyo Office

Designated Partner
        Certified Public Accountant        Suzue MASUDA
Engagement Partner

Designated Partner
        Certified Public Accountant        Hirofumi KAWAMURA
Engagement Partner

Financial Statement Audit

Audit Opinion

For the purpose of audit certification under the provisions of Article 193-2, Paragraph 1 of the Financial Instruments and Exchange Law, our audit corporation has conducted an audit of the consolidated financial statement of Optoelectronics, Inc. listed in the "Status of Accounting" section of the Securities Registration Report for the consolidated fiscal year from December 1, 2020 to November 30, 2021, including the consolidated balance sheet, the consolidated profit and loss statement, the consolidated statement of comprehensive income, the consolidated statement of changes in net assets, the consolidated statement of cash flows, important items forming the basis for creating the consolidated financial statement, and other notes and consolidated supplementary statements.

Our audit corporation finds that the aforementioned consolidated financial statements, in conformity with accounting principles generally accepted in Japan, fairly present in all material respects the financial position of Optoelectronics, K.K. and its consolidated subsidiaries as of November 30, 2021, and the results of their operations and their cash flows for the year then ended.

Basis for Audit Opinion

We conducted our audit in accordance with auditing standards generally

1

JA550

accepted in Japan. The responsibilities of our audit corporation are set forth in "Responsibilities of Auditors in a Consolidated Financial Statement Audit." We are independent of the Company and its consolidated subsidiaries, and have performed our other ethical duties as auditors in accordance with the provisions of the Code of Professional Ethics in Japan. We judge that we have obtained sufficient and appropriate audit evidence to provide a basis for our opinion.

Key Audit Considerations

Major audit considerations are those matters that the auditors, as professional experts, considered to be of particular importance in the audit of the consolidated financial statements for the current consolidated fiscal year. Major audit considerations are matters addressed in the course of performing an audit of the consolidated financial statements as a whole and in forming our audit opinion, and the auditors do not separately express opinions on those matters.

2

| Appropriateness of dead stock asset valuation outside the operating cycle process | |
|---|---|
| Details of major audit considerations and reasons for decisions | Audit Responses |
| In the consolidated balance sheet for the subject consolidated fiscal year, merchandise and finished goods of 1,135 million yen, work in process of 144 million yen, and raw materials and supplies of 718 million yen were recorded, accounting in total for 15.7% of total assets.<br><br>As stated in the Consolidated Financial Statement [Notes] (Significant Accounting Estimates), the company calculates the balance sheet value of inventories by writing down book values based on reduced profitability, and dead stock outside the operating cycle process is calculated by writing down book value by a certain percentage.<br><br>The percentage of devaluation of the carrying amount requires a long-term sales forecast by management, and the determination of expected disposal involves the judgment of the management regarding holding policies based on actual sales and actual disposals, so the uncertainty of the estimate is relatively high.<br><br>Based on the above, the present auditors judged that the valuation of dead stock inventories outside the business cycle constitutes an "important matter for audit consideration." | In order to consider the appropriateness of dead stock asset valuations, the present auditors conducted primarily the following audit procedures.<br>- We evaluated the status and operation of internal controls pertaining to the evaluation of inventory dead stock evaluations.<br>- We asked management whether they have changed inventory holding policies in light of changes in inventory sales and related market conditions or the like.<br>- To confirm the holding status of inventories, we analyzed actual sales and dead stock status of inventories.<br>- We evaluated the reasonableness of the key assumptions used by management in determining certain percentage devaluations of book value, based on actual sales and dispositions in prior and the subject consolidated fiscal year.<br>- In calculating valuation losses for dead stock, we reviewed the accuracy and completeness of the balance data and receipts/payments data used for prior periods and recalculated the valuation losses.<br>- We confirmed that inventories whose book values were individually written down were accounted for in accordance with the accounting policies.<br>- For consolidated subsidiaries Opticon Sensors Europe B. V. and Opticon, Inc., we made use of the auditors of the component units, and reviewed the involvement of said unit auditors in risk assessment, as well as the audit procedures and conclusions reached, to evaluate whether sufficient and appropriate audit evidence was acquired in order to obtain a basis for opinions expressed. |
| Estimated Provision for Litigation Losses | |
| Major audit considerations and reasons for decisions | Audit Responses |

3

JA552

| A provision for litigation losses of 640 million yen was **recorded** on the consolidated balance sheet for the current consolidated fiscal year.<br><br>As described in Consolidated Financial Statements **[Notes]** (significant accounting estimates), the Company has been sued for damages for default on royalty obligations by Honeywell International, Inc. **and two other companies (hereinafter "Honeywell"), and at the meeting of the Board of Directors on 11.30.2021 a decision was taken to respond to the Honeywell lawsuit, and a written answer was submitted; a provision for litigation losses was recorded in preparation for possible payment obligations resulting from a judgment or settlement.**<br><br>A provision for litigation losses is **recorded** when it is probable that such losses will be incurred and it becomes possible to reasonably estimate the amount of such losses. However [these] have a high uncertainty because the likelihood of incurring such losses and a reasonable estimation of the amount of such losses involves judgement by management.<br><br>For the above reason, the auditors have judged that the recorded estimated provision for litigation losses is a "major audit consideration." | The auditors primarily performed the following audit procedures to **assess the** reasonableness of the estimated provision for litigation losses.<br>- In order to understand the details of the lawsuit claiming damages for default of royalty obligation, we **examined the** complaint, the documents that form the basis of the lawsuit, and records of consultations with attorneys.<br>- In addition to questioning management about the circumstances leading to the lawsuit, the points of dispute in the lawsuit, and the planned response and outlook, we reviewed minutes of Board of Directors meetings and other documents to examine the appropriateness of estimated amounts.<br>- [We] checked in writing the views of legal counsel handling the lawsuit, conducted interviews, considered the content of the responses, and considered the reasonableness of management's judgments concerning potential losses.<br>- The amount of the provision for litigation losses was reviewed by comparison with and the like against evidentiary documents. |
|---|---|

Management and Audit and Supervisory Committee Responsibility for Consolidated Financial Statements

Management is responsible for the preparation and fair presentation of consolidated financial statements in accordance with **accounting** principles **generally accepted** in Japan. This includes establishing and operating such internal controls as management determines necessary to enable the preparation and fair presentation of consolidated financial statements free from material misstatement, whether due to fraud or error.

In preparing consolidated financial statements, management considers whether it is appropriate to prepare the consolidated financial statements on a going concern basis, and discloses said items when required to disclose items pertaining to a going concern in accordance with accounting principles generally accepted in Japan.

4

JA553

The responsibility of the Audit and Supervisory Committee is to monitor the performance of the directors' duties to maintain and operate the financial reporting process.

Auditors' Responsibility in Auditing a Consolidated Financial Statement

The auditor's responsibility is to obtain reasonable assurance based on the audit performed by the auditor as to whether the consolidated financial statement as a whole is free of material misstatement, whether due to fraud or error, and to express an opinion in the auditor's report from an independent stance relative to the consolidated financial statement. A misstatement is considered to be material if it could have been caused by fraud or error and, individually or in the aggregate, could reasonably be expected to influence the decisions of users of the consolidated financial statement.

The auditor shall exercise professional judgment throughout the audit process in accordance with auditing standards generally accepted as fair and appropriate in Japan, and shall conduct the following with professional skepticism.

- Identify and assess the risk of material misstatement due to fraud or error. Propose and implement audit procedures that address the risk of material misstatements. Selection and application of audit procedures are at the auditor's discretion. In addition, sufficient and appropriate audit evidence is obtained to provide a basis for expressing an opinion.

- The purpose of an audit of consolidated financial statements is not to express an opinion on the effectiveness of internal control, however in order to propose audit procedures appropriate to the circumstances, the auditor considers internal controls relevant to the audit when assessing risk.

- Evaluate the appropriateness of accounting policies and methods of application thereof adopted by management and the reasonableness of accounting estimates made by management and the appropriateness of related notes.

- Conclude whether it is appropriate for management to prepare a consolidated financial statement on a going concern basis and, based on audit evidence obtained, [conclude] whether there is material uncertainty regarding events or circumstances that might cast significant doubt on the entity's ability to continue as a going concern. If a material uncertainty regarding the entity's ability to continue as a going concern is found, [the auditor] should draw attention [thereto] in the notes to the consolidated financial statement in the auditor's report or, if a note regarding in the consolidated financial statement regarding material uncertainty is not appropriate, should express

5

an opinion with the excluded item regarding the consolidated financial statement. The auditor's conclusion is based on audit evidence obtained up to the date of the auditor's report, however future events or circumstances may cause the entity to become unable to continue as a going concern.

- Evaluate whether the presentation and notes to consolidated financial statements conform with accounting principles generally accepted in Japan, and whether the presentation, organization, and content of the consolidated financial statements, including related notes, as well as the transactions and accounting events based on those consolidated financial statements, are appropriately presented.

- To express opinions about the consolidated financial statement, [the auditor] obtains sufficient and reliable audit evidence concerning the financial information of the Company and its affiliates. The auditor is responsible for directing, supervising, and performing the audit of consolidated financial statements. The auditor is solely responsible for the audit opinion.

The auditor shall report to the Audit and Supervisory Committee on the scope and timing of the planned audit, significant audit findings including material deficiencies in internal control identified during the course of the audit, and other matters required by the audit standards.

The auditor shall report to the Audit and Supervisory Committee on the auditor's compliance with the rules of professional ethics in Japan regarding independence, as well as any matters reasonably believed to influence the auditor's independence, and safeguards, if any, taken to remove or mitigate any impeding factors.

Of the matters discussed with the Audit and Supervisory Committee, the auditor shall determine those matters considered particularly important to the audit of the consolidated financial statements for the current fiscal year to be major audit considerations and shall include them in the auditor's report. However, the auditor shall not include such matters in the auditor's report if the disclosure of such matters is prohibited by law or if, in extremely limited [circumstances], the auditor determines that such matters should not be reported because the disadvantages of reporting such matters in the auditor's report are reasonably expected to outweigh the public interest.

Internal   Control   Audits
Audit Opinions

6

We have conducted an audit of the Company's internal control report as of November 30, 2021 for the purpose of certifying the audit in accordance with Article 193-2, Paragraph 2 of the Financial Instruments and Exchange Law.

The auditors find that the internal control report referred to above, in which Optoelectronics, Inc. indicated that internal controls over financial reporting as of November 30, 2021 were effective, conforms to the criteria for assessment of internal control over financial reporting generally accepted in Japan, and fairly presents the results of an assessment of internal controls relative to financial reporting in all material respects.

Basis for Audit Opinion

The auditors conducted our internal control audit in accordance with standards for the auditing of internal controls over financial reporting generally accepted in Japan. The responsibilities of the auditors in the criteria for auditing internal controls relative to financial reporting are set forth in "Auditor's Responsibilities in Internal Control Audits." The present auditors, in accordance with the rules on professional ethics in Japan, are independent of the Company and its consolidated subsidiaries, and fulfill our other ethical responsibilities as auditors. We judge that we have obtained sufficient and appropriate audit evidence to provide a basis for our opinion.

7

JA556

Management and the Audit and Supervisory Committee Responsibilities for the Internal Control Report

Management is responsible for maintaining and operating internal controls over financial reporting, and for preparing and properly presenting internal control reports in accordance with the evaluation standards generally accepted in Japan for internal controls over financial reporting.

The Audit and Supervisory Committee is responsible for monitoring and verifying the maintenance and operation of internal controls over financial reporting.

Note that internal control over financial reporting may not completely prevent or detect misstatements in financial reporting.

Auditor's Responsibility for Internal Control Audits

The auditor is responsible for obtaining reasonable assurance about whether the internal control report is free of material misstatement based on the internal control audit performed by the auditor, and for expressing an opinion on the internal control report from an independent standpoint in the internal control audit report.

In accordance with auditing standards for internal control over financial reporting generally accepted in Japan, the auditor, throughout the audit process, exercises professional judgment and maintains professional skepticism while performing the following.

- Perform audit procedures to obtain audit evidence regarding results of assessments of internal controls over financial reporting in the internal control report. Internal control auditing procedures are selected and applied based on the auditor's judgment of their importance to the reliability of financial reporting.

- Consider the presentation of the internal control report as a whole, including written statements made by management regarding the scope of evaluation of internal control over financial reporting, evaluation procedures, and evaluation results.

- Obtain sufficient and appropriate audit evidence regarding the results of the assessment of internal controls over financial reporting in the internal control report. The auditor has responsibility for the direction, supervision, and implementation of the audit of the internal control report. Auditors are solely responsible for their audit opinions.

The auditor shall report to the Audit and Supervisory Committee on the scope and

8

JA557

timing of the planned internal control audit, the results of the internal control audit, any identified material deficiencies in internal control that should be disclosed, results of corrective measures thereto, and any other matters required by the audit standards for internal control.

The auditor shall report to the Audit and Supervisory Committee on the auditor's compliance with the rules of professional ethics in Japan regarding independence, as well as any matters reasonably believed to influence the auditor's independence, and safeguards, if any, taken to remove or mitigate any impeding factors.

Conflict of Interest

There is no interest between the Company or its consolidated subsidiaries and this audit corporation or its engagement partners that requires disclosure pursuant to the provisions of the Certified Public Accountants Act.

---

*1. The above is a digitized version of the information contained in the original Audit Report, the original of which is kept separately by the Company (the company submitting the Annual Securities Report).
2. XBRL data is not included in the scope of the audit.

9

JA558

Independent Auditor's Report

February 24, 2022

To: The Board of Directors.
Optoelectronics, K.K.

Sanyu Audit Corporation
Tokyo Office

Designated Partner
　　　　Certified Public Accountant　　　Suzue MASUDA
Engagement Partner


Designated Partner
　　　　Certified Public Accountant　　　Hirofumi KAWAMURA
Engagement Partner


Financial Statement Audit

Audit Opinion

For the purpose of audit certification under the provisions of Article 193-2, Section 1 of the Financial Instruments and Exchange Law, our audit corporation has conducted an audit of the financial statement of Optoelectronics, Inc. listed in the "Status of Accounting" section of the Securities Registration Report for the 46th business fiscal year from December 1, 2020 to November 30, 2021, including the balance sheet, the profit and loss statement, the statement of comprehensive income, the consolidated statement of changes in net assets, the consolidated statement of cash flows, important items forming the basis for creating the consolidated financial statement, and other notes and supplementary statements.

Our audit corporation finds that the aforementioned financial statements, in conformity with accounting principles generally accepted in Japan, fairly present in all material respects the financial position of Optoelectronics, K.K. as of November 30, 2021, and the results of its operations for the business year then ended.


Basis for Audit Opinion

We conducted our audit in accordance with auditing standards generally accepted in Japan. The responsibilities of our audit corporation are set forth in

10

JA559

"Responsibilities of Auditors in a Consolidated Financial Statement Audit." We are independent of the Company, and have performed our other ethical duties as auditors in accordance with the provisions of the Code of Professional Ethics in Japan. We judge that we have obtained sufficient and appropriate audit evidence to provide a basis for our opinion.

Key Audit Considerations

Major audit considerations are those matters that the auditors, as professional experts, considered to be of particular importance in the audit of financial statements for the current business year. Major audit considerations are matters addressed in the course of performing an audit of the financial statements as a whole and in forming our audit opinion, and the auditors do not separately express opinions on those matters.

| Appropriateness of dead stock asset valuation outside the operating cycle process | |
|---|---|
| Details of major audit considerations and reasons for decisions | Audit Responses |
| In the balance sheet for the subject business year, merchandise and finished goods of 369 million yen and raw materials and supplies of 144 million yen were recorded, accounting in total for 15.7% of total assets.<br><br>As stated in the Consolidated Financial Statement [Notes] (Significant Accounting Estimates), the company calculates the balance sheet value of inventories by writing down book values based on reduced profitability, and dead stock outside the operating cycle process is calculated by writing down book value by a certain percentage.<br><br>The percentage of devaluation of the carrying amount requires a long-term sales forecast by management, and the determination of expected disposal involves the judgment of the management regarding holding policies based on actual sales and actual disposals, so the uncertainty of the estimate is relatively high.<br><br>Based on the above, the present auditors judged that the valuation of dead stock inventories outside the business cycle constitutes an "important matter for audit consideration." | In order to consider the appropriateness of dead stock asset valuations, the present auditors conducted primarily the following audit procedures.<br>- We evaluated the status and operation of internal controls pertaining to the evaluation of inventory dead stock evaluations.<br>- We asked management whether they have changed inventory holding policies in light of changes in inventory sales and related market conditions or the like.<br>- To confirm the holding status of inventories, we analyzed actual sales and dead stock status of inventories.<br>- We evaluated the reasonableness of the key assumptions used by management in determining certain percentage devaluations of book value, based on actual sales and dispositions in prior and the subject business years.<br>- In calculating valuation losses for dead stock, we reviewed the accuracy and completeness of the balance data and receipts/payments data used for prior periods and recalculated the valuation losses.<br>- We confirmed that inventories whose book values were individually written down were accounted for in accordance with the accounting policies. |
| Estimated Provision for Litigation Losses | |
| [Note]   As noted in (significant accounting estimates), a provision for litigation losses of 213 million yen was recorded in the balance sheet for the current business year.<br>    As the details of major audit considerations, the reasons for their determination, and the audit responses are the same as the major audit considerations (estimate of provision for litigation losses) stated in the auditor's report of the consolidated financial statement, those have been omitted from this report. | |

Management and Audit and Supervisory Committee Responsibility for Financial Statements

Management is responsible for the preparation and fair presentation of financial statements in accordance with accounting principles generally accepted in Japan. This includes establishing and operating such internal controls as management determines necessary to enable the preparation and fair presentation of financial statements free from material misstatement, whether due to fraud or error.

In preparing financial statements, management considers whether it is appropriate to prepare the financial statements on a going concern basis, and discloses said items when required to disclose items pertaining to a going concern in accordance with accounting principles generally accepted in Japan.

JA561

The responsibility of the **Audit and Supervisory Committee** is to **monitor the** performance of the directors' duties to maintain and operate the financial reporting process.

Auditors' Responsibility in Financial Statement Audits

The auditor's responsibility is to obtain reasonable assurance based on the audit performed by the auditor as to whether the financial statement as a whole is free of material misstatement, whether due to fraud or error, and to express an opinion in the auditor's report from an independent stance relative to the financial statement. A **misstatement is considered to be** material if it could have been caused by fraud or error and, individually or in the aggregate, could reasonably be expected to influence the decisions of users of the financial statement.

The auditor shall exercise professional judgment throughout the audit process in accordance with auditing standards generally accepted as fair and appropriate in Japan, and shall conduct the following with professional skepticism.

- Identify and assess the risk of material misstatement due to fraud or error. Propose and implement audit procedures that address the risk of material misstatements. **Selection** and application of audit procedures are at the auditor's discretion. In addition, sufficient and appropriate audit evidence is obtained to provide a basis for expressing an opinion.

- The purpose of an audit of consolidated financial statements is not to express an opinion on the effectiveness of internal control, however in order to propose audit procedures appropriate to the circumstances, the auditor considers internal controls relevant to the audit when assessing risk.

- Evaluate the appropriateness of accounting policies and methods of application thereof adopted by management and the reasonableness of accounting estimates made by management and the appropriateness of related notes.

- Conclude whether it is appropriate for management to prepare a financial statement on a going concern basis and, based on audit evidence obtained, [conclude] whether there is material uncertainty regarding events or circumstances that might cast significant doubt on the entity's ability to continue as a going concern. If a material uncertainty regarding the entity's ability to continue as a going concern is found, [the auditor] should draw attention [thereto] in the notes to the financial statement in the auditor's report or, if a note regarding in the financial statement regarding material uncertainty is not appropriate, should express an opinion with the excluded item

13

JA562

regarding the financial statement. The auditor's conclusion is based on audit evidence obtained up to the date of the auditor's report, however future events or circumstances may cause the entity to become unable to continue as a going concern.

- Evaluate whether the presentation and notes to financial statements conform with accounting principles generally accepted in Japan, and whether the presentation, organization, and content of the financial statements, including related notes, as well as the transactions and accounting events based on those financial statements, are appropriately presented.

The auditor shall report to the Audit and Supervisory Committee on the scope and timing of the planned audit, significant audit findings including material deficiencies in internal control identified during the course of the audit, and other matters required by the audit standards.

The auditor shall report to the Audit and Supervisory Committee on the auditor's compliance with the rules of professional ethics in Japan regarding independence, as well as any matters reasonably believed to influence the auditor's independence, and safeguards, if any, taken to remove or mitigate any impeding factors.

Of the matters discussed with the Audit and Supervisory Committee, the auditor shall determine those matters considered particularly important to the audit of the consolidated financial statements for the current fiscal year to be major audit considerations and shall include them in the auditor's report. However, the auditor shall not include such matters in the auditor's report if the disclosure of such matters is prohibited by law or if, in extremely limited [circumstances], the auditor determines that such matters should not be reported because the disadvantages of reporting such matters in the auditor's report are reasonably expected to outweigh the public interest.

Conflict of Interest

There is no interest between the Company and this audit corporation or its engagement partners that requires disclosure pursuant to the provisions of the Certified Public Accountants Act.

---

*1. The above is a digitized version of the information contained in the original Audit Report, the original of which is kept separately by the Company (the company submitting the Annual Securities Report).
2. XBRL data is not included in the scope of the audit.

14

JA563

**Christopher Field**
**Japanese Technical Interpreting and Translation**
**52 Sherman's Bridge Rd., Wayland MA 01778 Tel. 617-905-6060**
*www.christopherfield.com*



Verify at www.atanet.org/verify

## CERTIFICATION OF TRANSLATION

I, Christopher L. Field, residing at 52 Sherman's Bridge Rd., Wayland MA, 01778, United States of America, declare and state as follows:

I am well acquainted with the English and Japanese languages. I have translated numerous Japanese documents of legal and/or technical content into English. I am fully accredited by the American Translators Association (ATA) for Japanese to English translation, and my ATA certification number is 423514.

I have personally translated the attached document, entitled **"Optoelectronic Audit Report"** from Japanese into English. I hereby certify that the English translation of the attached documents is an accurate translation to the best of my knowledge and ability.

I further declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed at Wayland, Massachusetts, 14 February, 2023.

Signed, _____

Christopher Field

ATA Certified Translator, Japanese to English, Certificate No. 423514

JA564

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:21-CV-00506-KDB-DCK

| | |
|---|---|
| **HONEYWELL INTERNATIONAL INC., ET AL.,** | |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| **OPTO ELECTRONICS CO., LTD.,** | |
| **Defendant.** | |

**THIS MATTER** is before the Court on Plaintiffs' Motion for Reconsideration (Doc. No. 196) in which Plaintiffs (collectively "Honeywell") ask the Court to reconsider a portion of its ruling on the parties' various motions for summary judgment (Doc. No. 195) and proffer an "Offer of Proof" with respect to the additional arguments it seeks to present. The Court has carefully considered this motion and the parties' briefs and exhibits. Because the Court finds that Honeywell already had a fair chance to present its arguments on the issues for which it seeks reconsideration, the Court will **DENY** the motion.

As discussed further below, Honeywell not only had notice of these issues and an opportunity to put "its best foot forward," it jumped in with both feet to argue in favor of its own positions and against OPTO on all the issues it now claims it is "surprised" that the Court decided. While Honeywell may not have expected and is disappointed that the Court wouldn't accept its arguments, to say that the disputed issues related to Section 5.1 of the parties' Agreement weren't fully before the Court - ***and squarely placed there by Honeywell itself*** - is just revisionist history.

1

JA565

As the saying goes, Honeywell quite deliberately made its litigation bed and now it must lie in it, for good  or for ill.[1]

## I.      LEGAL STANDARD

While the Federal Rules of Civil Procedure do not specifically contain a "motion for reconsideration," such motions are allowed in certain, limited circumstances. Unless certified as final, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). Yet, "the discretion Rule 54(b) provides is not limitless," *id.*, and the power to reconsider or modify interlocutory rulings is committed to the discretion of the district court. *See Fayetteville Investors v. Commercial Builders, Inc*., 936 F.2d 1462, 1473 (4th Cir. 1991).

Courts treat interlocutory rulings as the "law of the case," which, while important for the Court and the parties' interests in promoting finality, are not subject to the strict standards applicable to motions for reconsideration of a final judgment. *Carlson*, 856 F.3d at 325 (citing *Am. Canoe Ass'n v. Murphy Farms, Inc*., 326 F.3d 505, 514-515 (4th Cir. 2003). Thus, grounds for Rule 54(b) reconsideration include: (1) an intervening change in the law, (2) new evidence that was not previously available, or (3) correction of a clear error of law or to prevent manifest injustice. *Wootten v. Commonwealth of Va.*, 168 F. Supp. 3d 890, 893 (W.D. Va. 2016). Notably,

---

[1] In the Court's Summary Judgment rulings, the Court's interpretation of the Agreement on the first major section contested by the parties went in Honeywell's favor (and, of course, Honeywell does not ask the Court to reconsider that ruling). *See* Doc. No. 195. Thus, Honeywell's repeated suggestions that the Court has acted rashly and treated it unfairly is, to say the least, puzzling.

2

JA566

such motions are "not meant to re-litigate issues already decided, provide a party the chance to craft new or improved legal positions, highlight previously available facts, or otherwise award a proverbial 'second bite at the apple' to a dissatisfied litigant." *Id; DIRECTV, INC. v. Hart*, 366 F. Supp. 2d 315, 317 (E.D.N.C. 2004). The motion is also inappropriate where it "merely reiterates previous arguments." *Univ. of Va. Patent Found. V. Gen. Elec. Co*., 755 F.Supp. 2d 738, 744 (W.D. Va. 2011).

With respect to the entry of summary judgment against Honeywell challenged in this motion, "district courts may enter summary judgment *sua sponte*[2] 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'" *Velasquez v. Salsas & Beer Rest., Inc.*, 735 F. App'x 807, 809 (4th Cir. 2018), quoting *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 661 (4th Cir. 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The notice must be sufficient to provide the losing party with an adequate opportunity to demonstrate a genuine issue of material fact and it must, in view of the procedural, legal, and factual complexities of the case, allow the party a reasonable opportunity to present all material pertinent to the claims under consideration. *Velasquez*, 735 F. App'x at 809, citing *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735 (4th Cir. 1989).

In the relevant context of a ruling in favor of a nonmovant in a motion for summary judgment brought by the opposing party, the Fourth Circuit (citing other circuits) has refined this "notice" requirement to permit entry of summary judgment "sua sponte" without issuing a separate

---

[2] OPTO also moved for Summary Judgment on Honeywell's "breach of contract" claim, which includes Honeywell's claim under Section 5.1 of the Agreement. *See* Doc. No. 132. So, a cross motion for Summary Judgment on that claim was in fact pending. However, OPTO limited its arguments in its own Summary Judgment motion to Honeywell's Section 1.4 rather than Section 5.1 claim (which it addressed in response to Honeywell's motion); therefore, the Court will, for purposes of this motion, consider the Court's entry of summary judgment as *sua sponte* even though strictly viewed it was not.

3

JA567

notice where the circumstances establish that the party reasonably should have understood summary judgment could be entered against it.   *See Velasquez*, 735 F. App'x at 809 (affirming district court *sua sponte* grant of summary judgment without independent notice, with the court noting that the opposing party's position that it was entitled to prevail on the contested issue was clear from its opposition to moving party's motion and answer and the need to prevail on the contested issue would have been known to the initial moving party); *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 223–24 (3d Cir. 2004) (described with approval in *Velasquez* as holding that adequate notice "mean[s] that the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward"); *Portsmouth Square Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985) (cited by *Velasquez* as holding "*[S]ua sponte* summary judgment is appropriate where one party moves for summary judgment and, after the hearing, it appears from all the evidence presented that there is no genuine issue of material fact and the *non-moving* party is entitled to judgment as a matter of law.") (emphasis in original).[3] So, the question before the Court is whether, in the particular context of this case, should Honeywell have known that Summary Judgment might be entered against it such

---

[3] Honeywell criticizes OPTO's citation of *Velasquez* as inapt, but it rather appears to the Court that Honeywell's cited Fourth Circuit cases are distinguishable. In both *Moore v. Equitrans*, 27 F.4th 211, 224 (4th Cir. 2022), and *U.S. Dev. Corp. v. Peoples*, the court, quite unlike the facts here, entered summary judgment against a party "without any summary judgment motions before it and without giving proper notice to the parties." *See Moore*, 27 F.4th at 224; *U.S. Dev. Corp.* 873 F.2d at 735–36 ("The facts of this case demonstrate conclusively that appellant was not afforded sufficient notice. The district court entered summary judgment against the fourth count by the identical order in which it allowed the claim to be added to the complaint. No notice is clearly not sufficient notice."). How a court gives proper "notice" to parties when it decides totally on its own accord to consider entry of summary judgment – *even though no summary judgment motion has been filed* – is a very different issue from the present situation where Honeywell itself moved for summary judgment and was undoubtedly aware that the issues it presented (and the parties repeatedly briefed and argued to the Court) could be decided in OPTO's favor.

4

that it had a fair opportunity to put its "best foot forward." *See Gibson*, 355 F.3d at 224 ("Given that it was [plaintiff] who moved for summary judgment on the issues of vagueness and overbreadth, he certainly had the opportunity to put his 'best foot forward.'").

## II.    DISCUSSION

As discussed above, in the interest of the finality of its rulings and to discourage unending litigation, the Court should exercise its discretion to reconsider a prior order only where there is: (1) an intervening change in the law, (2) new evidence that was not previously available, or (3) clear error causing "manifest injustice." *See Carlson*, 856 F.3d at 325.  Honeywell has not argued that there has been any change in the applicable law nor that any of the copious "new" evidence it proffers was unavailable during the Court's consideration of summary judgment. Rather, although it does not directly address the applicable elements of a motion for reconsideration, Honeywell apparently contends that "clear error" and "manifest injustice" may be found in the Court allegedly "ma[king] a decision outside the adversarial issues presented to the Court by the parties." Specifically, Honeywell argues that the Court made two "out of bounds" rulings: (1) the Court's alternative[4] holding that the Agreement precludes a claim of contractual breach related to the reporting of sales in Section 5.1 outside of the parties' negotiated process and limits for pursuing additional payments for such underreporting and (2) that Honeywell failed to comply with Section

_____

[4] The Order's primary holding was that OPTO is entitled to summary judgment on the claim for breach of Section 5.1 made by Honeywell in the Complaint; that is, that OPTO is obligated to pay the "monetary damages specified in the Agreement," i.e., the additional payments due as a consequence of a timely audit that established the required amount of underreported sales. *See* Doc. No. 1 at ¶ ¶ 24, 34; Doc. No. 195 at 11-15. As discussed in the Order, Honeywell did not (despite its current citation to vague and/or summary allegations that merely refer to its actually plead claim under Section 5.1) assert a separate, different claim for breach of contract untethered to the Agreement's audit provisions and the Court will not exercise its discretion to permit a new claim so close to trial. *See* Doc. No. 195 at 16-17. So, even if Honeywell was entitled to pursue a separate claim for breach of Section 5.1, it failed to do so.

5.1's audit provision. The Court disagrees and will accordingly deny the motion for reconsideration.

First, as to whether Honeywell was required to pursue the agreed audit process to obtain any recovery for breach of Section 5.1, that issue was first directly put at issue by Honeywell in its moving brief in support of its Motion for Partial Summary Judgment, then argued by OPTO in its response, and addressed again in Honeywell's reply. No one, least of all Honeywell, should have been surprised that the Court ruled on the issue. For example:

- "OPTO now suggests that Honeywell was required to conduct and complete an audit within one year of the Effective Date as a condition precedent to bringing suit. Dkt. 14 at pp. 8–10. But that is simply not what the Agreement says." Doc. No. 118 (Moving brief) at 18.

- "Because OPTO takes issue with the details of how the audit was conducted, it avers that Section 5.1 *required* Honeywell to conduct an audit by an independent auditor before it could file a suit for breach of contract. But Section 5.1 is devoid of any requirement that Honeywell perform an audit before filing a breach-of-contract suit … In sum, the Agreement simply does not require Honeywell to exercise its optional audit right before it can bring an action for breach." Doc. No. 118 at 20 (emphasis in original).

- "Now, OPTO seeks to go far beyond the words of the Agreement and suggest that the audit was an absolute requirement to filing this suit altogether. That is incorrect." Doc. No. 118 at 20, n.5.

- "In sum, the Agreement simply does not require Honeywell to exercise its optional audit right before it can bring an action for breach." Doc. No. 118 at 20.

- "Similarly, Section 5.1 of the Agreement imposed strict conditions on Honeywell's ability to recover any sum based on a divergence from OPTO's represented 2D Barcode Products sales amounts—an independent audit conducted within one year of the Agreement's Effective Date. That was the bargained for procedure for *any remedy* directed to OPTO's represented pre-settlement sales of 2D Barcode Products, and that procedure must be strictly enforced." Doc. No. 135 (Response brief) at 28 (emphasis added).

- "Th[e] … terms [related to the audit] were a condition precedent to *any* recovery concerning OPTO's representation and warranty of its pre-

settlement sales of 2D Barcode Products." Doc. No. 135 at 29 (emphasis in original).

- "OPTO contends that Section 5.1 of the Agreement "expressly prescribed the procedure by which Honeywell could recover *any additional payment* due from OPTO's underreporting of its total pre-settlement sales." Dkt. 135 at 21 (emphasis added). This is not what Section 5.1 says." Doc. No. 144 at 12 (Reply brief citing OPTO response)

- "There is no language in Section 5.1 or elsewhere in the Agreement that required Honeywell to perform an audit before bringing a breach of contract action and OPTO points to no such language in its Response." Doc. No. 144 at 14

In sum, Honeywell had abundant opportunities to "put its best foot forward" on this issue and took full advantage of them. While Honeywell's arguments ultimately fell short in the Court's view, there has been no clear error nor is there manifest injustice in the Court declining to reconsider its considered Order. Therefore, the Motion for Reconsideration on this point will be denied.[5]

Similarly, Honeywell was on notice from the beginning of the action that OPTO alleged that Honeywell's audit was untimely and argued its contrary position throughout the litigation. As noted above, in the very first sentence in the Section 5.1 portion of its summary judgment brief, Honeywell cited to OPTO's First Affirmative Defense (Nonperformance of Condition Precedent), "Dkt. 14 at pp. 8-10." In that pleading, OPTO clearly stated its belief that Honeywell's audit was untimely and unexcused, alleging:

> Honeywell neither conducted, nor substantially conducted, the audit referenced in Paragraphs 20 to 23 of the Complaint within the calendar year ending on January 22, 2021, and therefore failed to perform an express condition precedent to the relief provided for in Section 5.1 of the Agreement and as demanded in the Complaint. …

---

[5] The remainder of Honeywell's arguments on this first topic are either relitigation of the merits of the Court's ruling or different arguments that Honeywell could have but chose not to raise throughout the extensive briefing described above. In the absence of a proper showing that the Court should reconsider its Order, it need not further address these arguments.

[Honeywell] likewise fails to provide sufficient detail justifying Honeywell's undue delay in noticing the audit until approximately one month before the January 22, 2021 deadline.

Doc. No. 14 at 9. *See also id.* at 10 ("Honeywell therefore did not conduct, or even substantially conduct, the audit within the January 22, 2021 deadline…"); Doc. No. 135 at 23 ("**Substantial compliance is not sufficient**.")(bolded in original).

In its Reply brief in support of its summary judgment motion, Honeywell directly responded to OPTO's argument as to the timeliness of the audit, contending that the Court should read the Agreement to require "only … that the audit is to be "conducted" (not completed) within one (1) calendar year," Doc. No. 144 at 14, and that Honeywell's audit was timely because "[a]s OPTO concedes, the audit was initiated within one year of the Effective Date." *Id.* At oral argument, Doc. No. 204 at 61-64, Honeywell reprised this argument that the Agreement should be interpreted to equate "conducting" with "initiating":

- "I don't agree that it had to have been completely finished and wrapped up within a calendar year."

- "So let me grammatically read it a little bit different, because I don't think that's what it actually says. It says, "Such audit may be conducted no more than one time within one calendar year." We did not conduct an audit more than one time within one calendar year. That's what it says. We didn't do that."

- "Honeywell had 12 months to inform them and take an audit, and that's what happened in this case."

- "And the fact that they didn't give us the last document until, you know, a couple months later, I don't think that means that we didn't "conduct" an audit within one year. I don't view the word "conduct" means completely finalize, put in a bow and hand it to somebody else within one year."

- "And it is true that some of the documents they provided didn't come in until the March time frame. That's true. But I don't think that means we didn't conduct the audit within one year. I would absolutely disagree with any characterization of that."

So, again, Honeywell had an ample opportunity to make its arguments on whether it timely completed its audit. To be sure, it made a calculated litigation choice to argue that the Agreement should be read to equate "conducted" with "initiated" rather than to claim "substantial compliance," which OPTO had specifically denied from the beginning of the case, or make some other argument.[6] Once the Court declined to accept Honeywell's interpretation and accepted OPTO's argument that the Agreement required the audit to be completed within a year, the undisputed facts, as acknowledged by Honeywell above and elsewhere in the record, make clear that the audit was untimely because the parties did not complete the audit until March 31, 2021, months after the deadline. *See* Doc. 197 at 19 (noting hundreds of emails sent after the one year period ended). Therefore, the Court did not commit clear error and there is no manifest injustice in affirming the Court's entry of Summary Judgment in favor of OPTO on Honeywell's claims under Section 5.1 of the Agreement.

---

[6] Although it argues it was not fully permitted to do so, Honeywell did repeatedly argue that OPTO's delays in providing information impacted its ability to complete the audit within one year (although it never made a claim in the Complaint that OPTO violated the Agreement with respect to providing information). *See, e.g.*, Doc. No. 118 at 8. However, rather than make any legal argument that such conduct excused Honeywell's failure to timely complete the audit (or assert the "waiver" argument it raises for the first time in its briefing), it chose instead to argue that it did in fact timely "conduct" the audit based on its interpretation of the Agreement. A motion for reconsideration is not a path for a party to make new arguments after it is unsuccessful with the arguments it chooses to make on summary judgment.

9

JA573

### III.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Plaintiffs' Motion for Reconsideration (Doc. No. 196) is **DENIED**; and

2.  This case shall proceed to trial on the merits of the remaining claims in this action

    (and only those claims) in the absence of a voluntary resolution of the dispute

    among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 2, 2023

Kenneth D. Bell
United States District Judge

10

JA574

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | |
| *Plaintiffs*, | |
| v. | |
| OPTO ELECTRONICS CO., LTD., | |
| *Defendant and Counterclaim Plaintiff*, | Case No. 3:21-cv-00506 |
| v. | |
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | |
| *Counterclaim Defendants*. | |

## JOINT STIPULATION OF FACTS

Pursuant to this Court's Revised Pretrial Order and Case Management Plan (Dkt. 131), Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. ("Honeywell") and Defendant OPTO Electronics Co., LTD. ("OPTO") submit the following Joint Stipulation of Facts for trial:

1.    Honeywell International Inc. is a Delaware corporation with its principal place of business at 855 S. Mint Street, Charlotte, North Carolina 28202.

2.    Hand Held Products, Inc. is a Delaware corporation and a wholly owned subsidiary of Honeywell International Inc., with its principal place of business at 855. S. Mint Street, Charlotte, North Carolina 28202.

JA575

3.      Metrologic Instruments, Inc. is a New Jersey corporation and wholly owned subsidiary of Honeywell International Inc., with its principal place of business at 855. S. Mint Street, Charlotte, North Carolina 28202.

4.      OPTO Electronics Co., Ltd. is a Japanese company with its principal place of business at 12-17 Tsukagoshi 4-chome, Warabi-city Saitama Pref., 335-0002, Japan.

5.      Honeywell and OPTO entered into a License and Settlement Agreement (the "Agreement") with an effective date of January 22, 2020.

6.      A true and correct copy of the Agreement is presented as JX-1.

7.      On September 8, 2020, Honeywell and OPTO executed the First Amendment to the Agreement.

8.      A true and correct copy of the First Amendment is presented as JX-2.

9.      On February 3, 2021, Honeywell and OPTO executed the Second Amendment to the Agreement.

10.     A true and correct copy of the Second Amendment is presented as JX-3.

JA576

Submitted June 20, 2023

**McGuireWoods LLP**

*/s/ Robert A. Muckenfuss*
Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com

Tyler T. VanHoutan
McGuireWoods LLP
Texas Tower, Ste 2400
845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com

Christine E. Lehman
Connor S. Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

York M. Faulkner
YorkMoodyFaulkner
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

**Alston & Bird LLP**

*/s/ S. Benjamin Pleune*
 S. Benjamin Pleune (NC Bar No. 28748)
 M. Scott Stevens (NC Bar No. 37828)
 Michael R. Hoernlein (NC Bar No. 40419)
 Stephen R. Lareau (NC Bar No. 42992)
 Brandon Springer (NC Bar No. 54523)
 Nicholas C. Marais (NC Bar No. 53533)
 Lauren N. Griffin (NC Bar No. 54766)
 Alston & Bird LLP
 101 S. Tryon Street, Suite 4000
 Charlotte, NC 28280
 Telephone: (704) 444-1000
 Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

3

JA577

## CERTIFICATE OF SERVICE

I certify that on June 20, 2023 I filed a copy of this JOINT STIPULATION OF FACTS

using the Court's CM/ECF system, which automatically provides service to all counsel of record.

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748
ALSTON & BIRD LLP
Bank of America Plaza, Suite 4000
101 South Tryon Street
Charlotte, NC 28280
Tel: (704) 444-1000
Fax: (704) 444-1111
ben.pleune@alston.com

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

4

JA578

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:21-cv-00506 |
| v. | ) ) | JURY TRIAL DEMANDED |
| OPTO ELECTRONICS CO., LTD., | ) ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION TO STRIKE HONEYWELL INTERNATIONAL INC.'S SECOND AMENDED OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26(e) and 37(c)(1) of the Federal Rules of Civil Procedure, Defendant OPTO Electronics Co. LTD. ("OPTO"), by and through its undersigned counsel, hereby requests that the Court enter an order striking Honeywell International Inc.'s, Hand Held Products, Inc.'s, and Metrologic Instruments, Inc.'s (collectively, "Honeywell") June 7, 2023 Second Amended Objections and Responses to Defendant's First Set of Interrogatories ("Second Amendments") as untimely under the Court's Revised Case Management and Pretrial Order. Dkt. 131. The grounds for this relief are more fully set forth in OPTO's accompanying brief in support of its Motion to Strike.

Pursuant to Local Civil Rule 7.1(b), OPTO requested this afternoon that Honeywell withdraw it Second Amendments, and that if Honeywell did not respond to OPTO's request, or otherwise agree to the withdrawal, OPTO would file the present Motion. As of the filing of this Motion, Honeywell has not responded to OPTO's email. Due to the impending Pretrial Conference with the Court, as well as the upcoming trial in this matter, OPTO files this Motion

1

JA579

while its request to Honeywell remains pending to allow the Court time to review and decide the issues raised in OPTO's Motion to Strike prior to the Pretrial Conference. If Honeywell subsequently agrees to withdraw its Second Amendments, OPTO will promptly file a notice of withdrawal of its Motion.

Wherefore, OPTO respectfully requests that the Court enter an Order striking Honeywell's Second Amended Responses and Objections to Defendant's First Set of Interrogatories.

Dated: July 5, 2023

Respectfully submitted,

**McGuireWoods LLP**

*/s/ Robert A. Muckenfuss*
Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com

Tyler T. VanHoutan
McGuireWoods LLP
Texas Tower, Ste 2400 | 845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com

Christine E. Lehman
Connor S. Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

JA580

York M. Faulkner
YORKMOODYFAULKNER
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

3

JA581

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of July 2023, the foregoing was served upon all counsel of record via the Court's CM/ECF System.

*/s/ Robert A. Muckenfuss*
Robert A. Muckenfuss

4

JA582

# EXHIBIT D

JA583

| | |
|---|---|
| **From:** | O'Brien, Jessica L. <JOBrien@mcguirewoods.com> |
| **Sent:** | Monday, June 5, 2023 7:28 PM |
| **To:** | Griffin, Lauren; Stevens, Scott; Springer, Brandon; Pleune, Ben; Lareau, Stephen; Marais, Nic; Hoernlein, Michael |
| **Cc:** | Muckenfuss, Robert; VanHoutan, Tyler; McCamey, Zach; Guerrero, Candy M.; Faulkner, York; Connor Houghton; Christine E. Lehman |
| **Subject:** | Honeywell v. OPTO - Document Production |

**EXTERNAL SENDER – Proceed with caution**

Counsel,

Shortly you will receive an automated email from MWFiles, which contains a link to OPTO's latest document production.

The production is labeled OPTO_00016581 – OPTO_00016596 and it contains documents labeled Confidential and Highly Confidential- Attorneys' Eyes Only under the Protective Order in this case.

Please let us know if you have issues accessing the production.

Best,
Jessica

**Jessica L. O'Brien**
Associate
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
T:  +1 704 343 2395
M: +1 910 386 1618
F:  +1 704 444 8895
jobrien@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com



---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT E

JA585

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 1 | HONEYWELL-00000369 | Second Amendment to License and Settlement Agreement |
| 2 | HONEYWELL-00001670 | L-46X Datasheet |
| 3 | HONEYWELL-00001804 | OPL-6854R Datasheet |
| 4 | HONEYWELL-00002999 | NLB-1000 Datasheet |
| 5 | HONEYWELL-00003280 | L-46X_Datasheet |
| 6 | HONEYWELL-00003284 | L-50_Datasheet |
| 7 | HONEYWELL-00003984 | L-46R Leaflet |
| 8 | HONEYWELL-00003986 | L-46X Leaflet |
| 9 | HONEYWELL-00004008 | OPR-3001 Leaflet |
| 10 | HONEYWELL-00004020 | OPR-2001 Leaflet |
| 11 | HONEYWELL-00004069 | OPR-3201 Leaflet |
| 12 | HONEYWELL-00004165 | OPN-2006 Leaflet |
| 13 | HONEYWELL-00004324 | OPL-9815 Leaflet |
| 14 | HONEYWELL-00004361 | OPH-1005 Leaflet |
| 15 | HONEYWELL-00004522 | Settlement Agreement |
| 16 | HONEYWELL-00004577 | NLV-1001 Leaflet |
| 17 | HONEYWELL-00004579 | RLB-1000 Leaflet |
| 18 | HONEYWELL-00004581 | L-46R Leaflet |
| 19 | HONEYWELL-00004583 | OPH-1005 Leaflet |
| 20 | HONEYWELL-00004585 | OPH-3001 Leaflet |

1

JA586

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 21 | HONEYWELL-00004613 | OPL6845R Leaflet |
| 22 | HONEYWELL-00004615 | OPL-9813 Leaflet |
| 23 | HONEYWELL-00004617 | OPL-9815 Leaflet |
| 24 | HONEYWELL-00004619 | OPR-2001Z Leaflet |
| 25 | HONEYWELL-00004621 | OPR-2001 Leaflet |
| 26 | HONEYWELL-00004623 | OPR-3201 |
| 27 | HONEYWELL-00004625 | OPR-3201Z Leaflet |
| 28 | HONEYWELL-00004629 | MDL-1500 Leaflet |
| 29 | HONEYWELL-00004631 | MSL-1000 Leaflet |
| 30 | HONEYWELL-00004635 | OPR3101 Leaflet |
| 31 | HONEYWELL-00004766 | OPR-3201Z Leaflet |
| 32 | HONEYWELL-00004786 | MDL-1500 Leaflet |
| 33 | HONEYWELL-00004818 | MDL-2001 Leaflet |
| 34 | HONEYWELL-00014494 | Honeywell Scanner Comparison Guide |
| 35 | HONEYWELL-00034421 | Honeywell Datalogic Cross License |
| 36 | HONEYWELL-00034436 | Honeywell Jadak 3d Amendment to Source Code License Agreement |
| 37 | HONEYWELL-00034445 | 1st Amendment - Jadak - Source Code License Agreement |
| 38 | HONEYWELL-00034447 | 2nd Amendment - Jadak - Source Code License Agreement |
| 39 | HONEYWELL-00034471 | Honeywell Code Corp License and Settlement Agreement |
| 40 | HONEYWELL-00071740 | Honeywell Product Sales Detail 2014-2019 |

2

JA587

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 41 | HONEYWELL-00251915 | Honeywell Brady License Agreement |
| 42 | HONEYWELL-00251954 | First Amendment to License and Settlement Agreement |
| 43 | HONEYWELL-00252042 | OPTO EU Sales 2015-2019 |
| 44 | HONEYWELL-00252043 | OPTO Japan Sales 2015-2020 |
| 45 | HONEYWELL-00252044 | OPTO US Sales 2014 -2020 |
| 46 | HONEYWELL-00252045 | Pleune Correspondence to Goldstein (5-21-21) |
| 47 | HONEYWELL-00258743 | VDC RESEARCH - 2014 - Enterprise Mobility Management Global Market |
| 48 | HONEYWELL-00258769 | VDC RESEARCH - 2014 - Enterprise Mobility, Q4 Vendor Shares.pptx |
| 49 | HONEYWELL-00258792 | VDC RESEARCH - 2014 - Enterprise Mobility, Q4 Vendor Shares |
| 50 | HONEYWELL-00258793 | VDC RESEARCH - 2014 - Enterprise Mobility, Mobility Hardware Dataset |
| 51 | HONEYWELL-00258794 | VDC RESEARCH - 2014 - Global Market for Mobile Development Platforms |
| 52 | HONEYWELL-00258836 | VDC RESEARCH - 2014 - Handheld Barcode Scanners |
| 53 | HONEYWELL-00258863 | VDC RESEARCH - 2014 - Passive UHF RFID, Vendor Shares |
| 54 | HONEYWELL-00258864 | VDC RESEARCH - 2014 - Handheld Barcode Scanners |
| 55 | HONEYWELL-00258865 | VDC RESEARCH - 2014 - Stationary POS Barcode Scanners Global Market |
| 56 | HONEYWELL-00258884 | VDC RESEARCH - 2014 - Stationary POS Barcode Scanners Global Market |
| 57 | HONEYWELL-00258885 | VDC RESEARCH - 2014 - Scan Engines, Vendor Shares 2013 Full Year |
| 58 | HONEYWELL-00258886 | VDC RESEARCH - 2014 - Stationary POS Barcode Scanners, Q1-Q2 Vendor Shares |
| 59 | HONEYWELL-00258887 | VDC RESEARCH - 2014 - Stationary POS Barcode Scanners, Q3 Vendor Shares |
| 60 | HONEYWELL-00258888 | VDC RESEARCH - 2014 - Stationary Thermal Barcode Printers Global Market |

3

JA588

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 61 | HONEYWELL-00259056 | VDC RESEARCH - 2015 - Handheld Scanners Global Market |
| 62 | HONEYWELL-00259631 | VDC RESEARCH - 2016 - Handheld Barcode Scanners |
| 63 | HONEYWELL-00259727 | VDC RESEARCH - 2016 - Stationary POS Barcode Scanners |
| 64 | HONEYWELL-00260047 | VDC RESEARCH - 2017 - Global Handheld Barcode Scanners Market |
| 65 | HONEYWELL-00260601 | VDC RESEARCH - 2018 - The Global Market for Handheld Barcode Scanners |
| 66 | HONEYWELL-00260625 | VDC RESEARCH - 2018 - The Global Market for Handheld Barcode Scanners (1) |
| 67 | HONEYWELL-00260626 | VDC RESEARCH - 2018 - The Global Market for Handheld Barcode Scanners |
| 68 | HONEYWELL-00260627 | VDC RESEARCH - 2019 - META Market Report |
| 69 | HONEYWELL-00260777 | VDC RESEARCH - 2020 (June) - The Global Market for Handheld Barcode Scanners |
| 70 | HONEYWELL-00261254 | Honeywell End User Sales Data for 10+ years |
| 71 | HONEYWELL-00261469 | Honeywell Financial Review 2013 PPT |
| 72 | HONEYWELL-00264042 | Honeywell Customer Presentation |
| 73 | HONEYWELL-00264099 | Federal Register FTC Announcement re Honeywell Consent Order |
| 74 | HONEYWELL-00264106 | FTC Case Software License Omniplanar and Perceptive Software |
| 75 | HONEYWELL-00264160 | FTC Case Software License Omniplanar and Aperio |
| 76 | HONEYWELL-00264163 | FTC Case Software License Amendment Omniplanar and Perceptive Software |
| 77 | HONEYWELL-00264164 | FTC Case Software License Agreement HW and Mars Tohken |
| 78 | HONEYWELL-00264335 | FTC Case Software License Agreement Omniplanar and Microscan |
| 79 | HONEYWELL-00264478 | FTC Case Software License Agreement Omniplanar and Two Tech |
| 80 | HONEYWELL-00264502 | FTC Case Software License Agreement HW and RJS Tech |

4

JA589

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 81 | HONEYWELL-00264759 | FTC Case Software Support Agreement HW |
| 82 | HONEYWELL-00265005 | FTC Case Honeywell Financial Review Presentation April 2013 |
| 83 | HONEYWELL-00265310 | FTC Case  Software License Agreement HW and Aperio |
| 84 | HONEYWELL-00265427 | FTC Case Software License Agreement HW and Panasonic |
| 85 | HONEYWELL-00265750 | FTC Case Software License Agreement Addendum Hand Held and Jadak |
| 86 | HONEYWELL-00266115 | FTC Case Software License Agreement Hand Held and Intralot |
| 87 | HONEYWELL-00266197 | FTC Case VDC 2011 Research Handheld Scanners |
| 88 | HONEYWELL-00266353 | FTC Case Software License Agreement Amendment 3 Omniplanar and Aperio |
| 89 | HONEYWELL-00266653 | FTC Case Software License Agreement Amendment 2 Omniplanar and Microscan |
| 90 | HONEYWELL-00266978 | FTC Case Software License Ageement Amendment 1 HW and Skycore |
| 91 | HONEYWELL-00267057 | FTC Case Software License Agreement Amendment 4 Omniplanar and Code Corp. |
| 92 | HONEYWELL-00267092 | FTC Case Software License Agreement HW and Finn ID |
| 93 | HONEYWELL-00267310 | RE: Opticon - Letter to Ryan Goldstein from Pleune 9/9/20 |
| 94 | HONEYWELL-00267311 | September 8, 2020 Letter from Pleune to Goldstein |
| 95 | HONEYWELL-00267316 | September 16 2020 Email from Goldstein to Pleune |
| 96 | HONEYWELL-00267318 | September 16 2020 Letter from Goldsteing to Pleune |
| 97 | HONEYWELL-00267323 | US, EU, and JP Total Sales |
| 98 | HONEYWELL-00267324 | Sales spreadsheets sent by Goldstein to Pleune |
| 99 | HONEYWELL-00267326 | Japan Sales 2D |
| 100 | HONEYWELL-00267327 | September 2020 Ashihara Verification |

5

JA590

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 101 | HONEYWELL-00267328 | Spetember 29 Email from Pleune to Goldstein |
| 102 | HONEYWELL-00267332 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 103 | HONEYWELL-00267335 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 104 | HONEYWELL-00267338 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 105 | HONEYWELL-00267343 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 106 | HONEYWELL-00267349 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 107 | HONEYWELL-00267356 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 108 | HONEYWELL-00267363 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 109 | HONEYWELL-00267371 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 110 | HONEYWELL-00267379 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 111 | HONEYWELL-00267387 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 112 | HONEYWELL-00267396 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 113 | HONEYWELL-00267405 | September 30 - December 16 Email Thread Goldstein and Pleune |
| 114 | HONEYWELL-00267414 | December 16, 2020 Letter from Pleune to Goldstein |
| 115 | HONEYWELL-00267415 | December 17, 2020 Email from Goldstein to Pleune |
| 116 | HONEYWELL-00267425 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 117 | HONEYWELL-00267427 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 118 | HONEYWELL-00267429 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 119 | HONEYWELL-00267431 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 120 | HONEYWELL-00267433 | May 28, 2021 Letter from Goldstein to Pleune |

6

JA591

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 121 | HONEYWELL-00267435 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 122 | HONEYWELL-00267438 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 123 | HONEYWELL-00267441 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 124 | HONEYWELL-00267444 | June 8, 2021 Letter from Pleune to Goldstein |
| 125 | HONEYWELL-00267446 | May 25 - June 11 2021 Email Thread Goldstein and Pleune |
| 126 | HONEYWELL-00267449 | June 10, 2021 Letter from Goldstein to Pleune |
| 127 | HONEYWELL-00268758 | Honeywell Scanner Pricebook |
| 128 | HONEYWELL-00268782 | December 2019 Goldstein Stevens Email Thread |
| 129 | HONEYWELL-00268784 | January 2020 Goldstein Stevens Email Thread |
| 130 | HONEYWELL-00268787 | January 2020 Goldstein Stevens Email Thread |
| 131 | HONEYWELL-00268789 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 132 | HONEYWELL-00268804 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 133 | HONEYWELL-00268819 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 134 | HONEYWELL-00268820 | Draft Settlement Agreement |
| 135 | HONEYWELL-00268837 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 136 | HONEYWELL-00268838 | Draft Settlement Agreement |
| 137 | HONEYWELL-00268855 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 138 | HONEYWELL-00268857 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 139 | HONEYWELL-00268859 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 140 | HONEYWELL-00268861 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |

7

JA592

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.

**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 141 | HONEYWELL-00268863 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 142 | HONEYWELL-00268864 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 143 | HONEYWELL-00268865 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 144 | HONEYWELL-00268866 | Draft Settlement Agreement |
| 145 | HONEYWELL-00268881 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 146 | HONEYWELL-00268882 | Draft Settlement Agreement |
| 147 | HONEYWELL-00268897 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 148 | HONEYWELL-00268898 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 149 | HONEYWELL-00268899 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 150 | HONEYWELL-00268900 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 151 | HONEYWELL-00268901 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 152 | HONEYWELL-00268904 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 153 | HONEYWELL-00268907 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 154 | HONEYWELL-00268910 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 155 | HONEYWELL-00268911 | Draft Settlement Agreement |
| 156 | HONEYWELL-00268942 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 157 | HONEYWELL-00268974 | February 2020 Email Thread with Stevens and Goldstein |
| 158 | HONEYWELL-00268976 | December 2020 Email Thread with Pleune and Goldstein re Audit |
| 159 | HONEYWELL-00268978 | December 2020 Email Thread with Pleune and Goldstein re Audit |
| 160 | HONEYWELL-00268984 | May 2021 Email between Goldstein and Pleune |

8

JA593

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 161 | HONEYWELL-00268987 | May 2021 Email between Goldstein and Pleune |
| 162 | HONEYWELL-00268991 | June 2021 Email between Goldstein and Pleune |
| 163 | HONEYWELL-00268994 | July 2021 Email between Goldstein and Pleune |
| 164 | HONEYWELL-00268998 | July 2021 Email between Goldstein and Pleune |
| 165 | HONEYWELL-00269002 | July 2021 Email between Goldstein and Pleune |
| 166 | HONEYWELL-00269007 | August 2021 Email between Goldstein and Pleune |
| 167 | HONEYWELL-00269012 | August 2021 Email between Goldstein and Pleune |
| 168 | HONEYWELL-00269018 | August 2021 Email between Goldstein and Pleune |
| 169 | HONEYWELL-00269024 | August 2021 Email between Goldstein and Pleune |
| 170 | HONEYWELL-00269055 | December 2019 Emal Thread with Stevens and Goldstein |
| 171 | HONEYWELL-00269059 | December 2019 Emal Thread with Stevens and Goldstein |
| 172 | HONEYWELL-00269063 | December 2019 Emal Thread with Stevens and Goldstein |
| 173 | HONEYWELL-00269064 | December 2019 Emal Thread with Stevens and Goldstein |
| 174 | HONEYWELL-00269066 | December 2019 Emal Thread with Stevens and Goldstein |
| 175 | HONEYWELL-00269068 | December 2019 Emal Thread with Stevens and Goldstein |
| 176 | HONEYWELL-00269071 | January 2020 Email Thread with Stevens and Goldstein |
| 177 | HONEYWELL-00269074 | January 2020 Email Thread with Stevens and Goldstein |
| 178 | HONEYWELL-00269077 | January 2020 Email Thread with Stevens and Goldstein |
| 179 | HONEYWELL-00269081 | January 2020 Email Thread with Stevens and Goldstein |
| 180 | HONEYWELL-00269085 | January 2020 Email Thread with Stevens and Goldstein |

9

JA594

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 181 | HONEYWELL-00269086 | January 2020 Email Thread with Stevens and Goldstein |
| 182 | HONEYWELL-00269087 | January 2020 Email Thread with Stevens and Goldstein |
| 183 | HONEYWELL-00269088 | January 2020 Email Thread with Stevens and Goldstein |
| 184 | HONEYWELL-00269089 | January 2020 Email Thread with Stevens and Goldstein |
| 185 | HONEYWELL-00269095 | January 28, 2020 Email from Goldstein to Stevens |
| 186 | HONEYWELL-00269096 | Draft Settlement Agreement |
| 187 | HONEYWELL-00269152 | January 2020 Email Thread with Stevens, Goldstein, and Pleune |
| 188 | HONEYWELL-00269155 | January 2020 Email Thread with Stevens, Goldstein, and Pleune |
| 189 | HONEYWELL-00269161 | January 30, 2020 Email from Stevens to Goldstein |
| 190 | HONEYWELL-00269162 | Draft Settlement Agreement |
| 191 | HONEYWELL-00269176 | January 2020 Email Thread with Stevens, Goldstein, and Pleune |
| 192 | HONEYWELL-00269186 | February 1, 2020 Email from Goldstein to Stevens |
| 193 | HONEYWELL-00269187 | Draft Settlement Agreement |
| 194 | HONEYWELL-00269201 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 195 | HONEYWELL-00269216 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 196 | HONEYWELL-00269220 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 197 | HONEYWELL-00269221 | Draft Settlement Agreement |
| 198 | HONEYWELL-00269238 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 199 | HONEYWELL-00269240 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 200 | HONEYWELL-00269242 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |

10

JA595

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 201 | HONEYWELL-00269244 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 202 | HONEYWELL-00269245 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 203 | HONEYWELL-00269246 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 204 | HONEYWELL-00269247 | Draft Settlement Agreement |
| 205 | HONEYWELL-00269262 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 206 | HONEYWELL-00269263 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 207 | HONEYWELL-00269269 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 208 | HONEYWELL-00269275 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 209 | HONEYWELL-00269277 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 210 | HONEYWELL-00269278 | Draft Settlement Agreement |
| 211 | HONEYWELL-00269293 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 212 | HONEYWELL-00269294 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 213 | HONEYWELL-00269295 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 214 | HONEYWELL-00269297 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 215 | HONEYWELL-00269300 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 216 | HONEYWELL-00269303 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 217 | HONEYWELL-00269319 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 218 | HONEYWELL-00269331 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 219 | HONEYWELL-00269332 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 220 | HONEYWELL-00269376 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |

11

JA596

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 221 | HONEYWELL-00269378 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 222 | HONEYWELL-00269390 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 223 | HONEYWELL-00269394 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 224 | HONEYWELL-00269399 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 225 | HONEYWELL-00269404 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 226 | HONEYWELL-00269410 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 227 | HONEYWELL-00269416 | February 2020 - Email Thread with Pleune, Stevens and Goldstein |
| 228 | HONEYWELL-00269423 | September 2020 Email Thread with Pleune and Goldstein |
| 229 | HONEYWELL-00269490 | US, EU, and JP Total Sales |
| 230 | HONEYWELL-00269491 | 2015 - 2019 EU 2D Sales |
| 231 | HONEYWELL-00269492 | 2014-2019 2D Sales |
| 232 | HONEYWELL-00269493 | Sales in Japan Japanese Language |
| 233 | HONEYWELL-00269494 | Ashihara September 2020 Sales Verification |
| 234 | HONEYWELL-00269774 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 235 | HONEYWELL-00269794 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 236 | HONEYWELL-00269804 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 237 | HONEYWELL-00269844 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 238 | HONEYWELL-00269847 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 239 | HONEYWELL-00269853 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 240 | HONEYWELL-00269856 | December 2020 Email Thread with Goldstein, Pleune and Stevens |

12

JA597

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 241 | HONEYWELL-00269865 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 242 | HONEYWELL-00269877 | December 2020 Email Thread with Goldstein, Pleune and Stevens |
| 243 | HONEYWELL-00269880 | December 2020 Email Thread with Goldstein and Pleune |
| 244 | HONEYWELL-00269882 | December 2020 Email Thread with Goldstein and Pleune |
| 245 | HONEYWELL-00269884 | December 2020 Email Thread with Goldstein and Pleune |
| 246 | HONEYWELL-00269886 | December 2020 Email Thread with Goldstein and Pleune |
| 247 | HONEYWELL-00269889 | December 2020 Email Thread with Goldstein and Pleune |
| 248 | HONEYWELL-00269892 | December 2020 Email Thread with Goldstein and Pleune |
| 249 | HONEYWELL-00269896 | December 2020 Email Thread with Goldstein and Pleune |
| 250 | HONEYWELL-00269900 | January 2021 Email Thread with Goldstein and Pleune |
| 251 | HONEYWELL-00269904 | January 2021 Email Thread with Goldstein and Pleune |
| 252 | HONEYWELL-00269908 | January 2021 Email Thread with Goldstein and Pleune |
| 253 | HONEYWELL-00269913 | January 2021 Email Thread with Goldstein and Pleune |
| 254 | HONEYWELL-00269918 | January 2021 Email Thread with Goldstein and Pleune |
| 255 | HONEYWELL-00269925 | January 2021 Email Thread with Goldstein and Pleune |
| 256 | HONEYWELL-00269932 | January 2021 Email Thread with Goldstein and Pleune |
| 257 | HONEYWELL-00269937 | January 2021 Email Thread with Goldstein and Pleune |
| 258 | HONEYWELL-00269942 | January 2021 Email Thread with Goldstein and Pleune |
| 259 | HONEYWELL-00269947 | January 2021 Email Thread with Goldstein and Pleune |
| 260 | HONEYWELL-00269952 | January 2021 Email Thread with Goldstein and Pleune |

Case 3:21-cv-00506-KDB-DCK    Document 325-6    Filed 07/10/23    Page 14 of 44

JA598

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 261 | HONEYWELL-00269970 | January 2021 Email Thread with Goldstein and Pleune |
| 262 | HONEYWELL-00269978 | January 2021 Email Thread with Goldstein and Pleune |
| 263 | HONEYWELL-00269986 | January 2021 Email Thread with Goldstein and Pleune |
| 264 | HONEYWELL-00269998 | January 2021 Email Thread with Goldstein and Pleune |
| 265 | HONEYWELL-00270012 | May 2021 Email Thread between Goldstein and Pleune |
| 266 | HONEYWELL-00270013 | May 2021 Email Thread between Goldstein and Pleune |
| 267 | HONEYWELL-00270019 | June 2021 Email between Pleune and Goldstein |
| 268 | HONEYWELL-00270022 | July 2021 Email between Goldstein and Pleune |
| 269 | HONEYWELL-00270026 | July 2021 Email between Goldstein and Pleune |
| 270 | HONEYWELL-00270030 | July 2021 Email between Goldstein and Pleune |
| 271 | HONEYWELL-00270035 | August 2021 Email between Goldstein and Pleune |
| 272 | HONEYWELL-00270040 | August 2021 Email between Goldstein and Pleune |
| 273 | HONEYWELL-00270046 | August 2021 Email between Goldstein and Pleune |
| 274 | HONEYWELL-00270052 | August 2021 Email between Goldstein and Pleune |
| 275 | HONEYWELL-00270073 | December 2020 Email with Goldstein, Pleune and Matsuawa |
| 276 | HONEYWELL-00270118 | December 2019 Email Thread with Stevens and Goldstein |
| 277 | HONEYWELL-00270122 | December 2019 Email Thread with Stevens and Goldstein |
| 278 | HONEYWELL-00270126 | December 2019 Email Thread with Stevens and Goldstein |
| 279 | HONEYWELL-00270127 | December 2019 Email Thread with Stevens and Goldstein |
| 280 | HONEYWELL-00270128 | December 2019 Email Thread with Stevens and Goldstein |

14

JA599

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 281 | HONEYWELL-00270129 | December 2019 Email Thread with Stevens and Goldstein |
| 282 | HONEYWELL-00270130 | December 2019 Email Thread with Stevens and Goldstein |
| 283 | HONEYWELL-00270131 | December 2019 Email Thread with Stevens and Goldstein |
| 284 | HONEYWELL-00270133 | December 2019 Email Thread with Stevens and Goldstein |
| 285 | HONEYWELL-00270135 | December 2019 Email Thread with Stevens and Goldstein |
| 286 | HONEYWELL-00270137 | December 2019 Email Thread with Stevens and Goldstein |
| 287 | HONEYWELL-00270141 | December 2019 Email Thread with Stevens and Goldstein |
| 288 | HONEYWELL-00270143 | December 2019 Email Thread with Stevens and Goldstein |
| 289 | HONEYWELL-00270146 | January 2020 Email Thread with Stevens and Goldstein |
| 290 | HONEYWELL-00270149 | January 2020 Email Thread with Stevens and Goldstein |
| 291 | HONEYWELL-00270152 | January 2020 Email Thread with Stevens and Goldstein |
| 292 | HONEYWELL-00270155 | January 2020 Email Thread with Stevens and Goldstein |
| 293 | HONEYWELL-00270158 | January 2020 Email Thread with Stevens and Goldstein |
| 294 | HONEYWELL-00270162 | January 2020 Email Thread with Stevens and Goldstein |
| 295 | HONEYWELL-00270166 | January 2020 Email Thread with Stevens and Goldstein |
| 296 | HONEYWELL-00270170 | January 2020 Email Thread with Stevens and Goldstein |
| 297 | HONEYWELL-00270175 | January 2020 Email Thread with Stevens and Goldstein |
| 298 | HONEYWELL-00270177 | January 2020 Email Thread with Stevens and Goldstein |
| 299 | HONEYWELL-00270178 | January 2020 Email Thread with Stevens and Goldstein |
| 300 | HONEYWELL-00270179 | January 2020 Email Thread with Stevens and Goldstein |

15

JA600

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 301 | HONEYWELL-00270180 | January 2020 Email Thread with Stevens and Goldstein |
| 302 | HONEYWELL-00270185 | January 2020 Email Thread with Stevens and Goldstein |
| 303 | HONEYWELL-00270186 | January 2020 Email Thread with Stevens and Goldstein |
| 304 | HONEYWELL-00270215 | January 2020 Email Thread with Stevens and Goldstein |
| 305 | HONEYWELL-00270220 | February 2020 Email Thread with Stevens and Pleune |
| 306 | HONEYWELL-00270223 | February 2020 Email Thread with Stevens and Goldstein |
| 307 | HONEYWELL-00270226 | February 2020 Email Thread with Stevens and Goldstein |
| 308 | HONEYWELL-00270238 | February 2020 Email Thread with Stevens and Goldstein |
| 309 | HONEYWELL-00270242 | February 2020 Email Thread with Stevens and Goldstein |
| 310 | HONEYWELL-00270246 | February 2020 Email Thread with Stevens and Goldstein |
| 311 | HONEYWELL-00270250 | February 2020 Email Thread with Stevens and Goldstein |
| 312 | HONEYWELL-00270255 | February 2020 Email Thread with Stevens and Goldstein |
| 313 | HONEYWELL-00270260 | February 2020 Email Thread with Stevens and Goldstein |
| 314 | HONEYWELL-00270265 | February 2020 Email Thread with Stevens and Goldstein |
| 315 | HONEYWELL-00270270 | February 2020 Email Thread with Stevens and Goldstein |
| 316 | HONEYWELL-00270276 | February 2020 Email Thread with Stevens and Goldstein |
| 317 | HONEYWELL-00270282 | February 2020 Email Thread with Stevens and Goldstein |
| 318 | HONEYWELL-00270288 | February 2020 Email Thread with Stevens and Goldstein |
| 319 | HONEYWELL-00270294 | February 2020 Email Thread with Stevens and Goldstein |
| 320 | Honeywell-00270364 | December 2020 Email Thread with Pleune and Kubota Law Firm |

16

JA601

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 321 | HONEYWELL-00270368 | December 2020 Email Thread with Pleune and Kubota Law Firm |
| 322 | HONEYWELL-00270371 | December 2020 Email Thread with Pleune and Kubota Law Firm |
| 323 | HONEYWELL-00270375 | October 2020 Email with Kubota Law Firm and Auditor |
| 324 | HONEYWELL-00270416 | June 2021 Email Thread with Kubota Law Firm and Auditor |
| 325 | HONEYWELL-00270424 | June 2021 Email Thread with Kubota Law Firm and Auditor |
| 326 | HONEYWELL-00270431 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 327 | HONEYWELL-00270440 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 328 | HONEYWELL-00270448 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 329 | HONEYWELL-00270454 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 330 | HONEYWELL-00270459 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 331 | HONEYWELL-00270467 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 332 | HONEYWELL-00270475 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 333 | HONEYWELL-00270480 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 334 | HONEYWELL-00270484 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 335 | HONEYWELL-00270488 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 336 | HONEYWELL-00270490 | May 2021 Email Thread with Kubota Law Firm and Auditor |
| 337 | HONEYWELL-00270495 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 338 | HONEYWELL-00270496 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 339 | HONEYWELL-00270503 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 340 | HONEYWELL-00270509 | March 2021 Email Thread with Kubota Law Firm and Auditor |

17

JA602

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 341 | HONEYWELL-00270515 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 342 | HONEYWELL-00270521 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 343 | HONEYWELL-00270526 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 344 | HONEYWELL-00270532 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 345 | HONEYWELL-00270536 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 346 | HONEYWELL-00270539 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 347 | HONEYWELL-00270542 | May 2021 Email Thread with Kubota Law Firm and Auditor |
| 348 | HONEYWELL-00270547 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 349 | HONEYWELL-00270549 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 350 | HONEYWELL-00270551 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 351 | HONEYWELL-00270564 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 352 | HONEYWELL-00270576 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 353 | HONEYWELL-00270587 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 354 | HONEYWELL-00270601 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 355 | HONEYWELL-00270615 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 356 | HONEYWELL-00270627 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 357 | HONEYWELL-00270638 | February 2021 Email Thread with Pleune, Auditor, and Kubota Lawfirm |
| 358 | HONEYWELL-00270648 | May 2021 Email Thread with Kubota Law Firm and Auditor |
| 359 | HONEYWELL-00270652 | May 26, 2021 Audit Draft |
| 360 | Honeywell-00270653 | May 26, 2021 description by Matuzawa of audit conducted |

18

JA603

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 361 | HONEYWELL-00270660 | February 2021 Email Thread with Auditor, and Kubota Law firm |
| 362 | HONEYWELL-00270668 | February 2021 Email Thread with Auditor, and Kubota Law firm |
| 363 | HONEYWELL-00270677 | February 2021 Email Thread with Auditor, and Kubota Law firm |
| 364 | HONEYWELL-00270686 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 365 | HONEYWELL-00270696 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 366 | HONEYWELL-00270704 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 367 | HONEYWELL-00270712 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 368 | HONEYWELL-00270719 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 369 | HONEYWELL-00270725 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 370 | HONEYWELL-00270728 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 371 | HONEYWELL-00270730 | May 2021 Email Thread with Auditor and Kubota Law Firm |
| 372 | HONEYWELL-00270737 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 373 | HONEYWELL-00270739 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 374 | HONEYWELL-00270741 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 375 | HONEYWELL-00270751 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 376 | HONEYWELL-00270761 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 377 | HONEYWELL-00270770 | January 2021 Email Thread with Auditor, and Kubota Law Firm |
| 378 | HONEYWELL-00270781 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 379 | HONEYWELL-00270794 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 380 | HONEYWELL-00270800 | December 2020 Email Thread with Auditor and Kubota Law Firm |

19

JA604

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 381 | HONEYWELL-00270806 | November 6, 2020 Letter from Pleune to Goldstein |
| 382 | HONEYWELL-00270807 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 383 | HONEYWELL-00270813 | May 2021 Email Thread with Auditor and Kubota Law Firm |
| 384 | HONEYWELL-00270814 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 385 | HONEYWELL-00270820 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 386 | HONEYWELL-00270826 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 387 | HONEYWELL-00270831 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 388 | HONEYWELL-00270836 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 389 | HONEYWELL-00270841 | October 2020 Email with Kubota Law Firm and Auditor |
| 390 | HONEYWELL-00270843 | October 2020 Email with Kubota Law Firm and Auditor |
| 391 | HONEYWELL-00270845 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 392 | HONEYWELL-00270856 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 393 | HONEYWELL-00270866 | January 2021 Email Thread with Pleune, Auditor, and Kubota Law Firm |
| 394 | HONEYWELL-00270874 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 395 | HONEYWELL-00270883 | December 2020 Email Thread with Pleune, Auditor, and Kubota Law Firm |
| 396 | HONEYWELL-00270885 | June 2021 Email Thread with Kubota Law Firm and Auditor |
| 397 | HONEYWELL-00270892 | Audit Invoice |
| 398 | HONEYWELL-00270894 | June 2021 Email Thread with Kubota Law Firm and Auditor |
| 399 | HONEYWELL-00270900 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 400 | HONEYWELL-00270905 | March 2021 Email Thread with Kubota Law Firm and Auditor |

JA605

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 401 | HONEYWELL-00270910 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 402 | HONEYWELL-00270918 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 403 | HONEYWELL-00270923 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 404 | HONEYWELL-00270930 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 405 | HONEYWELL-00270932 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 406 | HONEYWELL-00270933 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 407 | HONEYWELL-00270940 | March 2021 Email Thread with Kubota Law Firm and Auditor |
| 408 | HONEYWELL-00270946 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 409 | HONEYWELL-00270951 | May 2021 Email Thread with Kubota Law Firm and Auditor |
| 410 | HONEYWELL-00270956 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 411 | HONEYWELL-00270967 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 412 | HONEYWELL-00270971 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 413 | HONEYWELL-00270974 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 414 | HONEYWELL-00270976 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 415 | HONEYWELL-00270988 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 416 | HONEYWELL-00271000 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 417 | HONEYWELL-00271011 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 418 | HONEYWELL-00271026 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 419 | HONEYWELL-00271035 | February 2021 Email Thread with Kubota Law Firm and Audtor |
| 420 | HONEYWELL-00271047 | May 2021 Email Thread with Kubota Law Firm and Auditor |

21

JA606

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 421 | HONEYWELL-00271051 | February 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 422 | HONEYWELL-00271059 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 423 | HONEYWELL-00271067 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 424 | HONEYWELL-00271075 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 425 | HONEYWELL-00271079 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 426 | HONEYWELL-00271082 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 427 | HONEYWELL-00271084 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 428 | Honeywell-00271086 | January 2021 Email Thread with Auditor, and Kubota Lawfirm |
| 429 | HONEYWELL-00271096 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 430 | HONEYWELL-00271104 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 431 | HONEYWELL-00271115 | May 2021 Email Thread with Auditor and Kubota Law Firm |
| 432 | HONEYWELL-00271118 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 433 | HONEYWELL-00271124 | December 2020 Email Thread with Auditor and Kubota Law Firm |
| 434 | HONEYWELL-00271131 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 435 | Honeywell-00271136 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 436 | HONEYWELL-00271140 | November 2020 Email Thread with Auditor and Kubota Law Firm |
| 437 | HONEYWELL-00271146 | October 2020 Email with Kubota Law Firm and Auditor |
| 438 | HONEYWELL-00271149 | October 2020 Email with Kubota Law Firm and Auditor |
| 439 | HONEYWELL-00271151 | May 2021 Email Thread with Auditor and Kubota Law Firm |
| 440 | HONEYWELL-00271153 | May 2021 Email Thread with Auditor and Kubota Law Firm |

22

JA607

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 441 | HONEYWELL-00271154 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 442 | HONEYWELL-00271162 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 443 | HONEYWELL-00271171 | April 2021 Email Thread with Kubota Law Firm and Auditor |
| 444 | HONEYWELL-00272122 | 2019 Honeywell  LS Sales_US&C |
| 445 | HONEYWELL-00272123 | 2020-2022 LS Sales_US |
| 446 | HONEYWELL-00272124 | Engine Summary Sales_2019 |
| 447 | HONEYWELL-00272125 | Engine Summary Sales_2020-2022 |
| 448 | HONEYWELL-00272126 | Mobility Summary Worldwide |
| 449 | HONEYWELL-00272127 | Mobility_US&C |
| 450 | HONEYWELL-00272128 | Scan20192020_US |
| 451 | HONEYWELL-00272129 | Scan20212022_US&C |
| 452 | HONEYWELL-00272130 | Scanner Summary Sales_2019-2020 |
| 453 | HONEYWELL-00272131 | Scanner Summary Sales_2021-2022_ |
| 454 | HONEYWELL-00272132 | Voyager Transactional.xlsb |
| 455 | OPTO_00000001 | EUR sales 2015~2021_20220712 |
| 456 | OPTO_00000002 | Japan sales 2015~2021_20220712 |
| 457 | OPTO_00000003 | US sales 2015~2021_20220712 |
| 458 | OPTO_00006997 | H-13 Quick Start Guide |
| 459 | OPTO_00007001 | H-27 Sales Guide |
| 460 | OPTO_00007007 | MDL-1000 Leaflet |

23

JA608

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 461 | OPTO_00007009 | MDL-2001 Leaflet |
| 462 | OPTO_00007011 | NLB RLB 1000 Leaflet |
| 463 | OPTO_00007013 | NLV-1001 Leaflet |
| 464 | OPTO_00007015 | NLV2001 Leaflet |
| 465 | OPTO_00007017 | OPH-1005 Leaflet |
| 466 | OPTO_00007019 | OPH-3001 Leaflet |
| 467 | OPTO_00007021 | OPL-9815 Leaflet |
| 468 | OPTO_00007023 | OPN-2006 Leaflet |
| 469 | OPTO_00007025 | OPR-3301 User Manual |
| 470 | OPTO_00007049 | RS-2006 Leaflet |
| 471 | OPTO_00007051 | 2015 - 2019  Sales Data for OPTO |
| 472 | OPTO_00007052 | 2015 - 2019  Sales Data for OPTO |
| 473 | OPTO_00007053 | 2016 Sales Data England and Denmark |
| 474 | OPTO_00007054 | 2015 Listing of Products |
| 475 | OPTO_00007055 | 2016 EU Sales Data |
| 476 | OPTO_00007056 | 2019 EU and Asia Sales Data |
| 477 | OPTO_00007057 | 2015-2020 Sales Data |
| 478 | OPTO_00007058 | Japanese-language |
| 479 | OPTO_00007059 | Sales Data for Certain Products |
| 480 | OPTO_00007060 | 2016, 2019, 2020 Japanese Language Data |

24

JA609

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 481 | OPTO_00007061 | 2016 - 2020 Japanese Language Data |
| 482 | OPTO_00007062 | 2016 - 2020 Japanese Language Data |
| 483 | OPTO_00007063 | 2014 -2020 Japanese Language Data |
| 484 | OPTO_00007064 | 2016 - 2020 Japanese Language Data |
| 485 | OPTO_00007065 | 2016 - 2020 Japanese Language Data |
| 486 | OPTO_00007066 | Japanese-language Data |
| 487 | OPTO_00007067 | 2016 - 2020 Japanese Language Data |
| 488 | OPTO_00007068 | 2016 - 2020 Japanese Language Data |
| 489 | OPTO_00007069 | 2016 - 2020 Japanese Language Data |
| 490 | OPTO_00007070 | Japanese-language |
| 491 | OPTO_00007071 | Japanese-language |
| 492 | OPTO_00007072 | Japanese-language |
| 493 | OPTO_00007073 | 2016 - 2020 Japanese Language Data |
| 494 | OPTO_00007074 | 2015 - 2020 Sales Data |
| 495 | OPTO_00007075 | 2016  EU Sales Data |
| 496 | OPTO_00007076 | 2017 EU Sales Data |
| 497 | OPTO_00007077 | 2018 EU Sales Data |
| 498 | OPTO_00007078 | 2019 EU Sales Data |
| 499 | OPTO_00007079 | 2020 EU Sales Data |
| 500 | OPTO_00007080 | 2015-2020 Sales Data |

25

JA610

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 501 | OPTO_00007081 | 2014 -2020 Japanese Language Data |
| 502 | OPTO_00007082 | 2014 Sales Data |
| 503 | OPTO_00007083 | 2015-2020 Japense Language Data |
| 504 | OPTO_00007084 | 2015-2020 Japense Language Data |
| 505 | OPTO_00007085 | 2014 Sales Data |
| 506 | OPTO_00007086 | 2015-2018 Japanese Language Data |
| 507 | OPTO_00007087 | 2015-2020 Japense Language Data |
| 508 | OPTO_00007088 | 2015-2020 Japense Language Data |
| 509 | OPTO_00007089 | 2015 Japanese Language Data |
| 510 | OPTO_00007090 | 2015 Japanese Language EU Data |
| 511 | OPTO_00007091 | OSE Sales Data with Royalty Totals |
| 512 | OPTO_00007092 | Jan 22 - March 31 2020 Royalties Report |
| 513 | OPTO_00007093 | April Royalties Report |
| 514 | OPTO_00007094 | Royalties with April and May Correction Report |
| 515 | OPTO_00007095 | May Royalties Report |
| 516 | OPTO_00007096 | Royalties Report |
| 517 | OPTO_00007097 | 2020 Japanese Language Data |
| 518 | OPTO_00007098 | August 2020 Royalty Payment Wire |
| 519 | OPTO_00007099 | February 2021 Royalty Payment Wire |
| 520 | OPTO_00007101 | May 2020 Royalty Payment Wire |

26

JA611

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 521 | OPTO_00007102 | November 2020 Royalty Payment Wire |
| 522 | OPTO_00007103 | 2016 OPTO Invoice to EET Group Denmark |
| 523 | OPTO_00007104 | 2016 OPTO Invoice to Varlink Ltd UK |
| 524 | OPTO_00007110 | 2016 OPTO Invoice to Ingram Micro Germany |
| 525 | OPTO_00007111 | 2015-2019 Invoice Level Sales Data |
| 526 | OPTO_00007112 | January 2021 Email with Auditor and Japanese recipient |
| 527 | OPTO_00007113 | 2020 Japanese Language Data |
| 528 | OPTO_00007114 | January 2021 Email with Auditor and OPTO |
| 529 | OPTO_00007116 | 2016 - 2020 Japanese Language Data |
| 530 | OPTO_00007117 | Japanese Language Data |
| 531 | OPTO_00007118 | 2016 - 2020 Japanese Language Data |
| 532 | OPTO_00007119 | 2016 - 2020 Japanese Language Data |
| 533 | OPTO_00007120 | January 2021 Email with Auditor and OPTO |
| 534 | OPTO_00007126 | 2016 - 2020 Japanese Language Data |
| 535 | OPTO_00007127 | January 2021 Email with Auditor and OPTO |
| 536 | OPTO_00007129 | 2020 Japanese Language Data |
| 537 | OPTO_00007130 | January 2021 Email with Auditor and OPTO |
| 538 | OPTO_00007134 | 2016 - 2020 Japanese Language Data |
| 539 | OPTO_00007135 | January 2021 Email with Auditor and OPTO |
| 540 | OPTO_00007139 | 2016 - 2020 Japanese Language Data |

27

JA612

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 541 | OPTO_00007140 | January 2021 Email with Auditor and OPTO |
| 542 | OPTO_00007145 | 2016 - 2020 Japanese Language Data |
| 543 | OPTO_00007146 | January 2021 Email with Auditor and OPTO |
| 544 | OPTO_00007152 | 2016, 2019 and 2020 Japanese Language Data |
| 545 | OPTO_00007153 | January 2021 Email with Auditor and OPTO |
| 546 | OPTO_00007155 | 2016 - 2020 Japanese Language Data |
| 547 | OPTO_00007156 | February 2021 Email with Auditor and OPTO |
| 548 | OPTO_00007158 | 2019 Japanese Language Data |
| 549 | OPTO_00007159 | February 2021 Email with Auditor and OPTO |
| 550 | OPTO_00007165 | Janapese Language Invoice |
| 551 | OPTO_00007186 | February 2021 Email with Auditor and OPTO |
| 552 | OPTO_00007187 | 2015 - 2020 Japanese Language Data |
| 553 | OPTO_00007188 | 2015 - 2020 Sales Data |
| 554 | OPTO_00007189 | February 2021 Email with Auditor and OPTO |
| 555 | OPTO_00007192 | 2015, 2016, 2019, and 2020 Sales Data |
| 556 | OPTO_00007193 | February 2021 Email with Auditor and OPTO |
| 557 | OPTO_00007194 | 2016 EU Japanese Language Sales Data |
| 558 | OPTO_00007195 | 2017 EU Japanese Language Sales Data |
| 559 | OPTO_00007196 | 2018 EU Japanese Language Sales Data |
| 560 | OPTO_00007197 | 2019 EU Japanese Language Sales Data |

28

JA613

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 561 | OPTO_00007198 | 2020 EU Japanese Language Sales Data |
| 562 | OPTO_00007199 | February 2021 Email with Auditor and OPTO |
| 563 | OPTO_00007203 | 2015 -2020 Sales Data |
| 564 | OPTO_00007204 | 2014-2020 Japanese Language Sales Data |
| 565 | OPTO_00007205 | 2014 Sales Data |
| 566 | OPTO_00007206 | February 2021 Email with Auditor and OPTO |
| 567 | OPTO_00007211 | 2014, 2015, 2018 and 2020 Sales Data |
| 568 | OPTO_00007212 | February 2021 Email with Auditor and OPTO |
| 569 | OPTO_00007213 | 2015 - 2020 Japanese Language Data |
| 570 | OPTO_00007214 | 2015 - 2020 Japanese Language Data |
| 571 | OPTO_00007215 | February 2021 Email with Auditor and OPTO |
| 572 | OPTO_00007220 | 2014 Sales Data |
| 573 | OPTO_00007221 | February 2021 Email with Auditor and OPTO |
| 574 | OPTO_00007224 | 2015-2018 Japanese Language Data |
| 575 | OPTO_00007225 | 2015 - 2020 Japanese Language Data |
| 576 | OPTO_00007226 | 2015 - 2020 Japanese Language Data |
| 577 | OPTO_00007227 | February 2021 Email with Auditor and OPTO |
| 578 | OPTO_00007228 | 2015 Data |
| 579 | OPTO_00007229 | February 2021 Email with Auditor and OPTO |
| 580 | OPTO_00007230 | 2015 Japanese Language Data |

29

JA614

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 581 | OPTO_00007231 | March 2021 Email with Auditor and OPTO |
| 582 | OPTO_00007239 | 2015- EU Sales Data |
| 583 | OPTO_00007240 | March 2021 Email with Auditor and OPTO |
| 584 | OPTO_00007253 | March 2021 Email with Auditor and OPTO |
| 585 | OPTO_00007280 | 2016 EU Data |
| 586 | OPTO_00008744 | December 2019 Goldstein Stevens Email Thread |
| 587 | OPTO_00008747 | December 2019 Goldstein Stevens Email Thread |
| 588 | OPTO_00008750 | December 2019 Goldstein Stevens Email Thread |
| 589 | OPTO_00008751 | December 2019 Goldstein Stevens Email Thread |
| 590 | OPTO_00008753 | December 2019 Goldstein Stevens Email Thread |
| 591 | OPTO_00008755 | January 2020 Goldstein Stevens Email Thread |
| 592 | OPTO_00008759 | January 2020 Goldstein Stevens Email Thread |
| 593 | OPTO_00008763 | January 2020 Goldstein Stevens Email Thread |
| 594 | OPTO_00008764 | January 2020 Goldstein Stevens Email Thread |
| 595 | OPTO_00008766 | January 2020 Goldstein Stevens Email Thread |
| 596 | OPTO_00008796 | January 2020 Goldstein Stevens Email Thread |
| 597 | OPTO_00008797 | January 2020 Goldstein Stevens Email Thread |
| 598 | OPTO_00008821 | January 2020 Goldstein Stevens Email Thread |
| 599 | OPTO_00008839 | January 2020 Goldstein Stevens Email Thread |
| 600 | OPTO_00008911 | February 2020 Goldstein Stevens Email Thread |

JA615

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.

**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 601 | OPTO_00008913 | February 2020 Goldstein Stevens Email Thread |
| 602 | OPTO_00008951 | February 2020 Goldstein Stevens Email Thread |
| 603 | OPTO_00008953 | February 2020 Goldstein Stevens Email Thread |
| 604 | OPTO_00008956 | February 2020 Goldstein Stevens Email Thread |
| 605 | OPTO_00008978 | Joint Motion to Terminatie ITC Investigation |
| 606 | OPTO_00008987 | February 2020 Goldstein Stevens Email Thread |
| 607 | OPTO_00008989 | February 2020 Goldstein Stevens Email Thread |
| 608 | OPTO_00009009 | February 2020 Goldstein Stevens Email Thread |
| 609 | OPTO_00009012 | February 2020 Goldstein Stevens Email Thread |
| 610 | OPTO_00009015 | February 2020 Goldstein Stevens Email Thread |
| 611 | OPTO_00009018 | Draft Settlement Agreement |
| 612 | OPTO_00009044 | February 2020 Goldstein Stevens Email Thread |
| 613 | OPTO_00009047 | February 2020 Goldstein Stevens Email Thread |
| 614 | OPTO_00009051 | Draft Settlement Agreement |
| 615 | OPTO_00009083 | Draft Settlement Agreement |
| 616 | OPTO_00009114 | February 2020 Goldstein Stevens Email Thread |
| 617 | OPTO_00009116 | February 2020 Goldstein Stevens Email Thread |
| 618 | OPTO_00009120 | Draft Settlement Agreement |
| 619 | OPTO_00009153 | February 10 2020 Letter from Stevens to Goldstein |
| 620 | OPTO_00009166 | February 2020 Goldstein Stevens Email Thread |

31

JA616

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 621 | OPTO_00009169 | February 2020 Goldstein Stevens Email Thread |
| 622 | OPTO_00009173 | February 2020 Goldstein Stevens Email Thread |
| 623 | OPTO_00009209 | February 2020 Goldstein Stevens Email Thread |
| 624 | OPTO_00009213 | February 2020 Goldstein Stevens Email Thread |
| 625 | OPTO_00009218 | February 2020 Goldstein Stevens Email Thread |
| 626 | OPTO_00009223 | February 2020 Goldstein Stevens Email Thread |
| 627 | OPTO_00009229 | February 2020 Goldstein Stevens Email Thread |
| 628 | OPTO_00009235 | February 2020 Goldstein Stevens Email Thread |
| 629 | OPTO_00009242 | February 2020 Goldstein Stevens Email Thread |
| 630 | OPTO_00009243 | February 2020 Goldstein Stevens Email Thread |
| 631 | OPTO_00009487 | February 2022 Japanese Language Email |
| 632 | OPTO_00009555 | December 2021 Japanese Language Email |
| 633 | OPTO_00009848 | December 2021 Japanese Language Email |
| 634 | OPTO_00010405 | December 2020 Email with Auditor and Goldstein |
| 635 | OPTO_00010408 | December 2020 Email with Auditor and Goldstein |
| 636 | OPTO_00010412 | December 2020 Email with Auditor and Goldstein |
| 637 | OPTO_00010417 | January 2021 Email with Auditor and OPTO |
| 638 | OPTO_00010418 | 2020 Japanese Language Data |
| 639 | OPTO_00010419 | January 2021 Email with Auditor and OPTO |
| 640 | OPTO_00010421 | January 2021 Email with Auditor and OPTO |

32

JA617

## Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
### DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 641 | OPTO_00010424 | January 2021 Email with Auditor and OPTO |
| 642 | OPTO_00010426 | January 2021 Email with Auditor and OPTO |
| 643 | OPTO_00010429 | January 2021 Email with Auditor and OPTO |
| 644 | OPTO_00010433 | January 2021 Email with Auditor and OPTO |
| 645 | OPTO_00010435 | 2016-2020 Japanese Language Sales Data |
| 646 | OPTO_00010436 | Japanese Language Data |
| 647 | OPTO_00010437 | 2016 - 2020 Japanese Language Data |
| 648 | OPTO_00010438 | 2016 - 2020 Japanese Language Data |
| 649 | OPTO_00010439 | January 2021 Email with Auditor and OPTO |
| 650 | OPTO_00010627 | 2016 - 2020 Japanese Language Sales Data |
| 651 | OPTO_00010628 | January 2021 Email with Auditor and OPTO |
| 652 | OPTO_00010634 | 2016 - 2020 Japanese Language Sales Data |
| 653 | OPTO_00010635 | January 2021 Email with Auditor and OPTO |
| 654 | OPTO_00010636 | January 2021 Email with Auditor and OPTO |
| 655 | OPTO_00010638 | January 2021 Email with Auditor and OPTO |
| 656 | OPTO_00010641 | January 2021 Email with Auditor and OPTO |
| 657 | OPTO_00010645 | January 2021 Email with Auditor and OPTO |
| 658 | OPTO_00010649 | January 2021 Email with Auditor and OPTO |
| 659 | OPTO_00010654 | 2016 - 2020 Japanese Language Data |
| 660 | OPTO_00010655 | January 2021 Email with Auditor and OPTO |

33

JA618

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 661 | OPTO_00010656 | January 2021 Email with Auditor and OPTO |
| 662 | OPTO_00010659 | January 2021 Email with Auditor and OPTO |
| 663 | OPTO_00010660 | 2020 Japanese Language Data |
| 664 | OPTO_00010661 | February 2021 Email with Auditor and OPTO |
| 665 | OPTO_00010663 | 2019 Japanese Language Data |
| 666 | OPTO_00010664 | February 2021 Email with Auditor and OPTO |
| 667 | OPTO_00010671 | February 2021 Email with Auditor and OPTO |
| 668 | OPTO_00010675 | February 2021 Email with Auditor and OPTO |
| 669 | OPTO_00010677 | February 2021 Email with Auditor and OPTO |
| 670 | OPTO_00010681 | 2019 EU Sales Japanese Language |
| 671 | OPTO_00010682 | February 2021 Email with Auditor and OPTO |
| 672 | OPTO_00010685 | 2015 - 2020 Japanese Language Data |
| 673 | OPTO_00010686 | February 2021 Email with Auditor and OPTO |
| 674 | OPTO_00010691 | February 2021 Email with Auditor and OPTO |
| 675 | OPTO_00010696 | February 2021 Email with Auditor and OPTO |
| 676 | OPTO_00010702 | February 2021 Email with Auditor and OPTO |
| 677 | OPTO_00010703 | 2016 EU Sales Japanese Language |
| 678 | OPTO_00010704 | 2017 EU Sales Japanese Language |
| 679 | OPTO_00010705 | 2018 EU Sales Japanese Language |
| 680 | OPTO_00010706 | 2019 EU Sales Japanese Language |

34

JA619

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 681 | OPTO_00010707 | 2020 EU Sales Japanese Language |
| 682 | OPTO_00010708 | February 2021 Email with Auditor and OPTO |
| 683 | OPTO_00010709 | February 2021 Email with Auditor and OPTO |
| 684 | OPTO_00010713 | February 2021 Email with Auditor and OPTO |
| 685 | OPTO_00010714 | February 2021 Email with Auditor and OPTO |
| 686 | OPTO_00010720 | February 2021 Email with Auditor and OPTO |
| 687 | OPTO_00010722 | February 2021 Email with Auditor and OPTO |
| 688 | OPTO_00010725 | February 2021 Email with Auditor and OPTO |
| 689 | OPTO_00010729 | February 2021 Email with Auditor and OPTO |
| 690 | OPTO_00010731 | February 2021 Email with Auditor and OPTO |
| 691 | OPTO_00010738 | March 2021 Email with Auditor and OPTO |
| 692 | OPTO_00010739 | March 2021 Email with Auditor and OPTO |
| 693 | OPTO_00010747 | March 2021 Email with Auditor and OPTO |
| 694 | OPTO_00010756 | 2015-2020 Japanese Sales Data |
| 695 | OPTO_00010757 | March 2021 Email with Auditor and OPTO |
| 696 | OPTO_00010766 | 2016 EU Sales Japanese Language |
| 697 | OPTO_00010767 | March 2021 Email with Auditor and OPTO |
| 698 | OPTO_00010777 | March 2021 Email with Auditor and OPTO |
| 699 | OPTO_00010789 | March 2021 Email with Auditor and OPTO |
| 700 | OPTO_00010802 | March 2021 Email with Auditor and OPTO |

35

JA620

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 701 | OPTO_00010815 | March 2021 Email with Auditor and OPTO |
| 702 | OPTO_00010832 | March 2021 Email with Auditor and OPTO |
| 703 | OPTO_00010849 | March 2021 Email with Auditor and OPTO |
| 704 | OPTO_00010877 | 2016 Sales Data England and Denmark |
| 705 | OPTO_00010878 | March 2021 Email with Auditor and OPTO |
| 706 | OPTO_00010907 | March 2021 Email with Auditor and OPTO |
| 707 | OPTO_00010943 | 2016 Invoice Ingram Micro Pan Germany |
| 708 | OPTO_00010944 | March 2021 Email with Auditor and OPTO |
| 709 | OPTO_00010973 | March 2021 Email with Auditor and OPTO |
| 710 | OPTO_00011072 | 2015 - 2019 Sales Data EU |
| 711 | OPTO_00011073 | March 2021 Email with Auditor and OPTO |
| 712 | OPTO_00011172 | March 2021 Email with Auditor and OPTO |
| 713 | OPTO_00011298 | March 2021 Email with Auditor and OPTO |
| 714 | OPTO_00011397 | March 2021 Email with Auditor and OPTO |
| 715 | OPTO_00011523 | March 2021 Email with Auditor and OPTO |
| 716 | OPTO_00011649 | March 2021 Email with Auditor and OPTO |
| 717 | OPTO_00011710 | 2015 - 2019 Invoice Level Sales Data |
| 718 | OPTO_00011711 | March 2021 Email with Auditor and OPTO |
| 719 | OPTO_00011773 | March 2021 Email with Auditor and OPTO |
| 720 | OPTO_00011835 | Euro Sales Data 2015-2022 |

36

JA621

## Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 721 | OPTO_00011836 | Japan Salaes Data 2015 - 2022 |
| 722 | OPTO_00011837 | US Sales 2014 - 2022 |
| 723 | OPTO_00011842 | November 2021 Email Kamio and Stoop |
| 724 | OPTO_00011843 | Product SW Codes |
| 725 | OPTO_00011844 | Euro Sales Data 2015-2022 |
| 726 | OPTO_00011845 | Japan Sales Data 2015-2022 |
| 727 | OPTO_00011846 | US Sales 2014 - 2022 |
| 728 | OPTO_00011847 | Accurate Data Webpage - Difference Between 1D and 2D |
| 729 | OPTO_00011850 | Honeywell Support Page - Can Laser Scanners Decode 2D |
| 730 | OPTO_00011854 | Honeywell Scanner Comparison Guide |
| 731 | OPTO_00011865 | Honeywell Scanner Supported Symbology Page |
| 732 | OPTO_00011873 | Honeywell Voyager 1400g Upgradable Scanner Page |
| 733 | OPTO_00011883 | Honeywell Support Page |
| 734 | OPTO_00011887 | Meticulous Research Global and Auto ID 2021 Report |
| 735 | OPTO_00012082 | Meticulous Research Auto ID Market Assessment by Vendor 2021 |
| 736 | OPTO_00012083 | ISO/IEC 15438 PDF417 bar code symbolody specification (2015) |
| 737 | OPTO_00012553 | ISO/IEC 24728 MicroPDF417 Specification |
| 738 | OPTO_00012697 | ISO/IEC 15415 - Print Quality Standards (2011) |
| 739 | OPTO_00012795 | May 21, 2021 Letter from Pleune to Goldstein |
| 740 | OPTO_00012928 | February 2020 4.5m Wire Payment |

37

JA622

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 741 | OPTO_00012929 | January 2021 4.5m Wire Payment |
| 742 | OPTO_00012930 | 2020 - 2022 Japanese Language Sales Data |
| 743 | OPTO_00012931 | February 2021 OSE Royalty Payment PDF |
| 744 | OPTO_00012934 | April - June 2020 Royalty Totals |
| 745 | OPTO_00014123 | EUR sales and quantity 2015 - July 2022 |
| 746 | OPTO_00014124 | Meticulous Research Global and Auto ID 2022 Report |
| 747 | OPTO_00014130 | Japan sales and quantity 2015 - July 2022 |
| 748 | OPTO_00014131 | US sales and quantity 2014 - July 2022 |
| 749 | OPTO_00014132 | Meticulous Research Auto ID Market Assessment by Vendor 2022 |
| 750 | | Honeywell/Zebra License Agreement |
| 751 | | US Patent 8,526,720 |
| 752 | | US Patent 8,629,926 |
| 753 | | US Patent 8,602,309 |
| 754 | | Honeywell's September 30, 2022 ROG Responses |
| 755 | | Honeywell's June 7, 2023 Amended ROG Responses |
| 756 | | BS ISO/IEC 18004:2015 |
| 757 | | US Patent 10,140,490 |
| 758 | | BS ISO/IEC 16022:2006 |
| 759 | | ISO/IEC 15416 (2016) |
| 760 | | ISO/IEC 24723 (2010) |

38

JA623

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 761 | | ISO/IEC 24724 (2011) |
| 762 | | US Patent Application 2008/0296393 A1 |
| 763 | | US Patent 7,416,125 |
| 764 | | US Patent 9,235,741 |
| 765 | | US Patent 8,302,866 |
| 766 | | US Patent 7,007,849 |
| 767 | | US Patent 7,325,740 |
| 768 | | US Patent 8,226,009 |
| 769 | | Honeywell's ITC Claims Charts |
| 770 | | Complaint |
| 771 | | July - September 2022 Royalty Totals |
| 772 | | October 27 2022 Royalty Payment |
| 773 | | October - December 2022 Royalty Totals |
| 774 | | January 26 2023 Royalty Payment |
| 775 | | US Patent 8,226009 Maintenance Fee Page |
| 776 | | US Patent 7,325,740 Maintenance Fee Page |
| 777 | | US Patent 7,007,849 Maintenance Fee Page |
| 778 | HONEYWELL-00252020 | ITC Order No. 13 |
| 779 | | Claimants' Response to Order No. 13 |
| 780 | HONEYWELL-00192331 | US Patent 7,159,783 |

39

JA624

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 781 | | Herrington Report-- Exhibit 5A |
| 782 | | Herrington Report-- Exhibit 5B |
| 783 | | Herrington Report-- Exhibit 5C |
| 784 | | Adams' Report-- Table 4 |
| 785 | | Physical Barcode Scanners |
| 786 | HONEYWELL-00228996 | US Patent 9,033,242 |
| 787 | OPTO_00012935 | April - June 2021 Royalty Totals |
| 788 | OPTO_00012936 | April - June 2022 Royalty Totals |
| 789 | OPTO_00012937 | January - March 2020 Royalty Totals |
| 790 | OPTO_00012938 | January - March 2021 Royalty Totals |
| 791 | OPTO_00012939 | January - March 2022 Royalty Totals |
| 792 | OPTO_00012940 | July - September 2020 Royalty Totals |
| 793 | OPTO_00012941 | July - September 2021 Royalty Totals |
| 794 | OPTO_00012942 | October - December 2020 Royalty Totals |
| 795 | OPTO_00012943 | October - December 2021 Royalty Totals |
| 796 | OPTO_00012944 | April 13 2022 Royalty Payment |
| 797 | OPTO_00012946 | August 7 2020 Royalty Payment |
| 798 | OPTO_00012947 | August 25 2022 Royalty Payment |
| 799 | OPTO_00012948 | February 11 2021 Royalty Payment |
| 800 | OPTO_00012950 | February 28 2022 Royalty Payment |

JA625

<u>Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.</u>
**DEFENDANT OPTO'S AMENDED EXHIBIT LIST**

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 801 | OPTO_00012953 | May 7 2020 Royalty Payment |
| 802 | OPTO_00012954 | May 14 2021 Royalty Payment |
| 803 | OPTO_00012955 | November 6 2020 Royalty Payment |
| 804 | OPTO_00012956 | November 12 2021 Royalty Payment |
| 805 | HONEYWELL-00195715 | US Patent No. 7,699,227 |
| 806 | HONEYWELL-00186256 | US Patent No. 7,147,159 |
| 807 | | US DOJ Antitrust Horizontal Merger Guidelines |
| 808 | | Honeywell Website Boarding Pass Scanning |
| 809 | | US DOJ Atitrust Guidelines for Licensing of IP |
| 810 | | US DOJ Antitrust Division - HHI |
| 811 | HONEYWELL-00152370 | US Patent No 5,773,806 |
| 812 | HONEYWELL-00152715 | US Patent No 5,929,418 |
| 813 | HONEYWELL-00152768 | US Patent No 5,900,613 |
| 814 | HONEYWELL-00153421 | US Patent No 5,965,863 |
| 815 | HONEYWELL-00154105 | US Patent No 6,015,088 |
| 816 | HONEYWELL-00157742 | US Patent No 7,387,253 |
| 817 | HONEYWELL-00160701 | US Patent No 6,491,223 |
| 818 | HONEYWELL-00161615 | US Patent No 7,104,456 |
| 819 | HONEYWELL-00162136 | US Patent No 6,578,766 |
| 820 | HONEYWELL-00163300 | US Patent No 6,722,569 |

41

JA626

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
## DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 821 | HONEYWELL-00164147 | US Patent No 7,111,787 |
| 822 | HONEYWELL-00179528 | US Patent No 7,077,317 |
| 823 | HONEYWELL-00180033 | US Patent No 7,059,525 |
| 824 | HONEYWELL-00180339 | US Patent No 6,834,807 |
| 825 | HONEYWELL-00184026 | US Patent No 7,077,321 |
| 826 | HONEYWELL-00184739 | US Patent No 7,124,948 |
| 827 | HONEYWELL-00185306 | US Patent No 7,287,697 |
| 828 | HONEYWELL-00185420 | US Patent No 7,275,694 |
| 829 | HONEYWELL-00186691 | US Patent No 7,428,998 |
| 830 | HONEYWELL-00187559 | US Patent No 7,357,325 |
| 831 | HONEYWELL-00187911 | US Patent No 7,320,431 |
| 832 | HONEYWELL-00188424 | US Patent No 7,360,706 |
| 833 | HONEYWELL-00189396 | US Patent No 7,325,738 |
| 834 | HONEYWELL-00189960 | US Patent No 7,270,272 |
| 835 | HONEYWELL-00190787 | US Patent No 7,490,774 |
| 836 | HONEYWELL-00191343 | US Patent No 7,347,374 |
| 837 | HONEYWELL-00191996 | US Patent No 7,383,998 |
| 838 | HONEYWELL-00192845 | US Patent No 7,472,831 |
| 839 | HONEYWELL-00196433 | US Patent No 7,837,113 |
| 840 | HONEYWELL-00196709 | US Patent No 8,038,054 |

JA627

Honeywell International, Inc., et al. v. OPTO Electronics Co., Ltd.
### DEFENDANT OPTO'S AMENDED EXHIBIT LIST

| Exhibit No. | Bates Number | Document Description |
|---|---|---|
| 841 | | Adams' Report - Table 1 |
| 842 | | Adams' Report - Table 2 |
| 843 | | Adams' Report - Table 3 |

43

JA628

# EXHIBIT H

JA629

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

        *Plaintiffs*,

v.

OPTO ELECTRONICS CO., LTD.,

        *Defendant and*
        *Counterclaim Plaintiff*,

v.

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

        *Counterclaim Defendants*.

Case No. 3:21-cv-00506

## HONEYWELL'S FIRST AMENDED EXHIBIT LIST

      Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. hereby serve their First Amended Exhibit List, attached hereto as Exhibit A.

1

JA630

Served July 3, 2023

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**ALSTON & BIRD LLP**
1120 S. Tryon Street, Suite 300
Charlotte, NC 28203
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

2

JA631

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 3, 2023 counsel for Honeywell served a copy of this FIRST

AMENDED EXHIBIT LIST via e-mail on all counsel of record.


/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

3

JA632

# EXHIBIT A

JA633

| Honeywell v OPTO Electronics | Case No. 3:21-cv-00506 | | | |
|---|---|---|---|---|
| **Exhibit Number** | **Brief Description** | **Starting Bates # (if any)** | **Identified By** | **Admitted** |
| 1 | License and Settlement Agreement dated 1/22/20 | HONEYWELL-00251961 | | |
| 2 | First Amendment to License and Settlement Agreement | HONEYWELL-00251954 | | |
| 3 | Second Amendment to License Agreement and Settlement Agreement dated 2021-02-03 | HONEYWELL-00268777 | | |
| 4 | ISO/IEC 15438 (2015) (PDF417) | HONEYWELL-00271319 | | |
| 5 | ISO/IEC 15438 (2015) (PDF417) | OPTO_00012083 | | |
| 6 | ISO/IEC 15438 (2006) (PDF417) | HONEYWELL-00000001 | | |
| 7 | ISO/IEC 15438 (2001) (PDF417) | OPTO_00007281 | | |
| 8 | ISO/IEC 24728 (Mirco PDF417) | HONEYWELL-00000113 | | |
| 9 | ISO/IEC 24728 (Mirco PDF417) | OPTO_00007433 | | |
| 10 | ISO/IEC 24723 (2010) (Composite Codes) | HONEYWELL-00271560 | | |
| 11 | ISO/IEC 24723 (2010) (Composite Codes) | OPTO_00007391 | | |
| 12 | ISO/IEC 15415 - 2D Print Quality Specification | OPTO_00012697 | | |
| 13 | European pre-standard, ENV12925 | | | |
| 14 | GS1 General Specifications Release | | | |
| 15 | MIL-STD-129R, 2014 | | | |
| 16 | U.S. Patent No. 5,243,655 | OPTO_00011893 | | |
| 17 | U.S. Patent No. 5,304,786 | | | |
| 18 | MDL-2001 Datasheet | HONEYWELL-00003377 | | |
| 19 | OPR-20012 Leaflet | HONEYWELL-00004619 | | |
| 20 | DA53J01_log.txt | OPTO_00008367 | | |
| 21 | Japan sales 2015"until July 2022_20220831.xlsx | OPTO_00011836 | | |
| 22 | EUR sales 2015"until July 2022_20220831.xlsx | OPTO_00011835 | | |
| 23 | US sales 2014"until July 2022_20220831.xlsx | OPTO_00011837 | | |
| 24 | EUR sales 2015"until July 2022_20220922_r.xlsx | OPTO_00011844 | | |
| 25 | Japan sales 2015"until July 2022_20220922_r.xlsx | OPTO_00011845 | | |
| 26 | US sales 2014"until July 2022_20220922_r.xlsx | OPTO_00011846 | | |
| 27 | 2019.11.20 Signed Kohmo Declaration.pdf | OPTO_00016583 | | |
| 28 | 2017.04.26 (HW Patents)[20000028997].xlsx | OPTO_00016582 | | |
| 29 | 10000237722.[20000014850].xlsx | OPTO_00016593 | | |
| 30 | Honeywell[??]220170807[20000014847].xlsx | OPTO_00016594 | | |
| 31 | [?????????] US ([???·????).xls | OPTO_00016595 | | |
| 32 | [?????????] US ([???·????).xls | OPTO_00016596 | | |
| 33 | 2017.04.18 (628 Patent Family 21 patents).xlsx | OPTO_00016581 | | |
| 34 | カシオ様への特許見解書（修正）20170905.docx | OPTO_00016398 | | |
| 35 | カシオ様への特許見解書 20170830.docx | OPTO_00016399 | | |
| 36 | カシオ様への特許見解書 20170905対応 (1).docx | OPTO_00016400 | | |

JA634

| # | Description | Bates |
|---|---|---|
| 37 | グローバルシャッタ特許に関する見解書20170412.docx | OPTO_00016401 |
| 38 | 米国特許の調査内容20151222.docx | OPTO_00016403 |
| 39 | OPTO Patent Analysis | OPTO_00016404 |
| 40 | OPTO Patent Analysis | OPTO_00016407 |
| 41 | OPTO Patent Analysis | OPTO_00016408 |
| 42 | OPTO Patent Analysis | OPTO_00016410 |
| 43 | OPTO Patent Analysis | OPTO_00016481 |
| 44 | OPTO Patent Analysis | OPTO_00016483 |
| 45 | OPTO Patent Analysis | OPTO_00016485 |
| 46 | 特許調査中間報告.docx | OPTO_00016565 |
| 47 | OPTO Patent Analysis | OPTO_00016566 |
| 48 | OPTO Patent Analysis | OPTO_00016567 |
| 49 | OPTO Patent Analysis | OPTO_00016568 |
| 50 | OPTO Patent Analysis | OPTO_00016569 |
| 51 | OPTO Patent Analysis | OPTO_00016570 |
| 52 | MDI-3301と他社特許の相違点（修正）.docx | OPTO_00016571 |
| 53 | OPTO Patent Analysis | OPTO_00016575 |
| 54 | Exhibit 3 - Opticon 2D Barcode Product Models | |
| 55 | Exhibit 5A - U.S. Gross Revenue of 2D Barcode Products subject to the Agreement (in USD) | |
| 56 | Exhibit 5B - Europe Gross Revenue of 2D Barcode Products subject to the Agreement (in EUR) | |
| 57 | Exhibit 5C - Japan Gross Revenue of 2D Barcode Products subject to the Agreement (in JPY) | |
| 58 | Exhibit 7A - U.S. Gross Revenue Summary of Opticon 2D Barcode Products Subject to Breach of Section 4.3 | |
| 59 | Exhibit 7B - Royalties Paid by Opticon on Certain 2D Barcode Products | |
| 60 | Table of OPTO Interrogatory No. 2 | |
| 61 | Table of OPTO Interrogatory No. 3 | |
| 62 | Auditor's Report and Internal Control Audit Report | |
| 63 | Notice Regarding Filing of Lawsuit, Recording of Extraordinary Loss, and Revision of Consolidated Earnings Forecast for the Fiscal Year Ending November 2021, OPTO Press Release, November 30, 2021 | |
| 64 | CV of Ryan Herrington | |
| 65 | CV of Craig Smith | |
| 66 | CV of David O. Taylor | |
| 67 | CV of Yrijiun Wang, PhD | |
| 68 | Free Opticon Barcode Generator Tool | HONEYWELL-00271185 |

JA635

| | | |
|---|---|---|
| 69 | OPTO's First Source Code Production | OPTO_HONEYWELL_SRC_00000001 - OPTO_HONEYWELL_SRC_00000089 |
| 70 | OPTO's Second Source Code Production | OPTO_0016581 to OPTO_0016881 |
| 71 | L-46X Datasheet | HONEYWELL-00001670 |
| 72 | L-46X Datasheet | HONEYWELL-00003280 |
| 73 | L-50 Datasheet | HONEYWELL-00003284 |
| 74 | L-46R Leaflet | HONEYWELL-00003984 |
| 75 | L-46X Leaflet | HONEYWELL-00003986 |
| 76 | OPN-2006 Leaflet | HONEYWELL-00004165 |
| 77 | OPH-1005 Leaflet | HONEYWELL-00004361 |
| 78 | RS-2061 Leaflet | HONEYWELL-00004627 |
| 79 | OPR-32012 Leaflet | HONEYWELL-00004766 |
| 80 | MDL-1500 Leaflet | HONEYWELL-00004786 |
| 81 | MDL-2001 Leaflet | HONEYWELL-00004818 |
| 82 | OPI-68455 Specifications | HONEYWELL-00004027 |
| 83 | H-27 Specifications | HONEYWELL-00004234 |
| 84 | H-27 Sales Guide | HONEYWELL-00004236 |
| 85 | OPL-9815 Specifications | HONEYWELL-00004324 |
| 86 | OPH-3001 Specifications | HONEYWELL-00004351 |
| 87 | NLV-1001 Specifications | HONEYWELL-00004577 |
| 88 | RLB-1000 Specifications | HONEYWELL-00004579 |
| 89 | L-46R Specifications | HONEYWELL-00004581 |
| 90 | OPH-1005 Specifications | HONEYWELL-00004583 |
| 91 | OPL6845R Specifications | HONEYWELL-00004613 |
| 92 | OPL-9815 Specifications | HONEYWELL-00004617 |
| 93 | OPR 2001 Specifications | HONEYWELL-00004621 |
| 94 | OPR-3201 Specifications | HONEYWELL-00004623 |
| 95 | MDL-1500 Specifications | HONEYWELL-00004629 |
| 96 | MSL-1000 Specifications | HONEYWELL-00004631 |
| 97 | OPR3101 Specifications | HONEYWELL-00004635 |
| 98 | NLV 1001 Specifications Manual | HONEYWELL-00004689 |
| 99 | MDL-1000 Laser Scanner | HONEYWELL-00004781 |
| 100 | L-22x 2D CMOS Imager | HONEYWELL-00271754 |
| 101 | MDI-3100 2D CMOS Imager | HONEYWELL-00271761 |
| 102 | OPR-2001 Specifications | HONEYWELL-00004020 |
| 103 | OPR-3001 Specifications | HONEYWELL-00004008 |
| 104 | OPR3001, 3004, 3101 Info/ Specifications | HONEYWELL-00004010 |

JA636

| | | |
|---|---|---|
| 105 | OPR-3201 Specifications | HONEYWELL-00004069 |
| 106 | NLB-1000 / RLB-1000 Specifications printout | HONEYWELL-00003712 |
| 107 | NLV-1001 Specifications printout | HONEYWELL-00003722 |
| 108 | OPL-6845V Specifications printout | HONEYWELL-00003823 |
| 109 | OPR-2001V Specifications printout | HONEYWELL-00003812 |
| 110 | H-27 Specifications | HONEYWELL-00000563 |
| 111 | NLB-1000 Specifications | HONEYWELL-00001279 |
| 112 | NLV-1001 Specifications | HONEYWELL-00001335 |
| 113 | OPL-6845R Specifications | HONEYWELL-00001804 |
| 114 | OPR-2001 Specifications | HONEYWELL-00001853 |
| 115 | OPR 3001 Specifications | HONEYWELL-00001860 |
| 116 | OPR 3001 Specifications Manual | HONEYWELL-00001862 |
| 117 | OPR-3201 Specifications | HONEYWELL-00001909 |
| 118 | OPH-1005 Specifications | HONEYWELL-00002057 |
| 119 | OPH-3001 Specifications | HONEYWELL-00002105 |
| 120 | OPL 9815 Specifications Manual | HONEYWELL-00002153 |
| 121 | H-27 Specifications | HONEYWELL-00002403 |
| 122 | MDL-1500 Specifications | HONEYWELL-00002615 |
| 123 | NLV-1001 Specifications | HONEYWELL-00002666 |
| 124 | MDL-2001 Specifications | HONEYWELL-00002774 |
| 125 | MDL-1000 Specifications | HONEYWELL-00002784 |
| 126 | NLB-1000 Specifications | HONEYWELL-00002999 |
| 127 | NLV-1001 Specifications | HONEYWELL-00003073 |
| 128 | OPH-1005 Specifications Manual | HONEYWELL-00003251 |
| 129 | OPL-9815 Specifications | HONEYWELL-00003293 |
| 130 | OPL-6845R Specifications | HONEYWELL-00003304 |
| 131 | OPR-2001 Specifications | HONEYWELL-00003307 |
| 132 | OPR 3201 Specifications Manual | HONEYWELL-00003314 |
| 133 | MDL-1000 Specifications | HONEYWELL-00003374 |
| 134 | OPL-6845 Specifications | OPTO_00000018 |
| 135 | OPL-6845R Specifications | OPTO_00000020 |
| 136 | OPR-3001 Specifications | OPTO_00000032 |
| 137 | OPR-3101 Specifications | OPTO_00000034 |
| 138 | OPR3-201 Specifications | OPTO_00000036 |
| 139 | H-27 Info/Specifications | OPTO_00007001 |
| 140 | TC03110_log.txt | OPTO_00008355 |
| 141 | TC06J04_log.txt | OPTO_00008356 |
| 142 | TC09J05_log.txt | OPTO_00008357 |
| 143 | TC15J04_log.txt | OPTO_00008359 |
| 144 | TC21J04_log.txt | OPTO_00008360 |
| 145 | TC26J03_log.txt | OPTO_00008361 |
| 146 | TC27J04_log.txt | OPTO_00008362 |
| 147 | TC32J03_log.txt | OPTO_00008363 |

JA637

| # | Document | Bates |
|---|---|---|
| 148 | TCS2J01_log.txt | OPTO_00008364 |
| 149 | TCS4J01_log.txt | OPTO_00008365 |
| 150 | DAS5J01_log.txt | OPTO_00008368 |
| 151 | TC16J05_TM09J05_log.txt | OPTO_00008369 |
| 152 | TF05J07_log.txt | OPTO_00008370 |
| 153 | TM07J10_log.txt | OPTO_00008371 |
| 154 | TM14J01_log.txt | OPTO_00008373 |
| 155 | TS06J13_log.txt | OPTO_00008375 |
| 156 | MDC-210 Specification | OPTO_00011158 |
| 157 | MDL 2501 Specification | OPTO_00002177 |
| 158 | NLB/RLB-1000 Specification | OPTO_00002408 |
| 159 | NLB/RLB-1000 Specification | OPTO_00002449 |
| 160 | NLB/RLB-1000 Specification | OPTO_00002490 |
| 161 | NLB/RLB-1000 Specification | OPTO_00002533 |
| 162 | NLB/RLB-1000 Specification | OPTO_00002611 |
| 163 | NLB/RLB-1000 Specification | OPTO_00002652 |
| 164 | NLB/RLB-1000 Specifications Manual | OPTO_00002693 |
| 165 | NLB/RLB-1000 Specifications Manual | OPTO_00002735 |
| 166 | NLB/RLB-1000 Specifications Manual | OPTO_00002777 |
| 167 | NLB/RLB-1000 Specification sheet | OPTO_00002819 |
| 168 | NLB/RLB-1000 Specification sheet | OPTO_00002899 |
| 169 | SS07076_NLB RLB-1000_ENG_8th_DM-220306E | OPTO_00007744 |
| 170 | NLV 1001 Specifications Manual | OPTO_00003025 |
| 171 | NLV 1001 Specifications Manual | OPTO_00003234 |
| 172 | NLV 2001 Specifications Manual | OPTO_00003847 |
| 173 | OPL 6845R Specifications Manual | OPTO_00004402 |
| 174 | OPR 3101 Specifications Manual | OPTO_00006194 |
| 175 | OPR 3201 Specifications Manual | OPTO_00006326 |
| 176 | OPH-3001 Leaflet | HONEYWELL-00004585 |
| 177 | SVN Changelog MDL_SVN.txt | OPTO_00008409 |
| 178 | NLB/RLB-1000 Specifications Manual | OPTO_00002777 |
| 179 | L-22X Leaflet | HONEYWELL-00271754 |
| 180 | L-46X Leaflet | HONEYWELL-00271756 |
| 181 | OPR-3101 Specifications Manual | OPTO_00006258 |
| 182 | OPR-20012 Leaflet | HONEYWELL-00004761 |
| 183 | スタッフ ユーザ非対応化ヒビデンス_220314a | OPTO_00010052 |
| 184 | OPTO_00008479 Unredacted.pdf | OPTO_00012985 |
| 185 | 一次元製品の読み取り対応コードの変更のご案内.pptx | OPTO_00010387 |
| 186 | Doc_Apload - Opticon Technical Support Portal.pdf | HONEYWELL-00003447 |
| 187 | Doc_Data Wizard - Opticon Technical Support Portal.pdf | HONEYWELL-00003463 |
| 188 | Complaint for ITC Investigation (dated May 31, 2019) | |
| 189 | Complaint for Patent Infringement from USDC Delaware (dated May 31, 2019) | HONEYWELL-00268173 |

JA638

| | | |
|---|---|---|
| 200 | Final, Executed Confidential Settlement Agreement | HONEYWELL-00251864 |
| 201 | Code License Agreement Global Shutter Amendment | HONEYWELL-00251911 |
| 202 | Zebra Settlement Agreement | HONEYWELL-00260852 |
| 203 | Software License Agreement | HONEYWELL-00264106 |
| 204 | Software License Agreement | HONEYWELL-00264502 |
| 205 | Software License Agreement Amendment | HONEYWELL-00265310 |
| 206 | U.S. Patent No. 9,465,970 | HONEYWELL-00230373 |
| 207 | U.S. Patent No. 10,140,490 | HONEYWELL-00271270 |
| 208 | U.S. Patent No. 8,978,985 | HONEYWELL-00230936 |
| 209 | U.S. Patent No. 7,148,923 | HONEYWELL-00163964 |
| 210 | U.S. Patent No. 7,527,206 | HONEYWELL-00198429 |
| 211 | U.S. Patent No. 9,659,199 | HONEYWELL-00238513 |
| 212 | U.S. Patent No. 7,159,783 | HONEYWELL-00192331 |
| 213 | U.S. Patent No. 8,296,754 | HONEYWELL-00220048 |
| 214 | U.S. Patent No. 8,752,766 | HONEYWELL-00228966 |
| 215 | U.S. Patent No. 9,230,140 | HONEYWELL-00235088 |
| 216 | U.S. Patent No. 10,846,498 | HONEYWELL-00248609 |
| 217 | U.S. Patent No. 7,190,257 | HONEYWELL-00185550 |
| 218 | U.S. Patent No. 10,235,547 | HONEYWELL-00240644 |
| 219 | U.S. Patent No. 10,803,264 | HONEYWELL-00250404 |
| 220 | U.S. Patent No. 10,171,767 | HONEYWELL-00242288 |
| 221 | U.S. Patent No. 9,578,269 | HONEYWELL-00236752 |
| 222 | U.S. Patent No. 8,733,660 | HONEYWELL-00102445 |
| 223 | U.S. Patent No. 9,418,270 | HONEYWELL-00223989 |
| 224 | U.S. Patent No. 8,794,520 | HONEYWELL-00219984 |
| 225 | U.S. Patent No. 8,587,595 | HONEYWELL-00268032 |
| 226 | U.S. Patent No. 9,092,686 | HONEYWELL-00228474 |
| 227 | U.S. Patent No. 9,659,203 | HONEYWELL-00238857 |
| 228 | U.S. Patent No. 9,384,378 | HONEYWELL-00234827 |
| 229 | U.S. Patent No. 8,628,015 | HONEYWELL-00268085 |
| 230 | U.S. Patent No. 9,990,520 | HONEYWELL-00238419 |
| 231 | U.S. Patent No. 8,646,692 | HONEYWELL-00224939 |
| 232 | U.S. Patent No. 9,087,249 | HONEYWELL-00230664 |
| 233 | U.S. Patent No. 9,734,370 | HONEYWELL-00234795 |
| 234 | U.S. Patent No. 8,479,994 | HONEYWELL-00225138 |
| 235 | U.S. Patent No. 9,231,644 | HONEYWELL-00233545 |
| 236 | U.S. Patent No. 8,141,784 | HONEYWELL-00268044 |
| 237 | U.S. Patent No. 9,485,802 | HONEYWELL-00236030 |
| 238 | U.S. Patent No. 8,708,236 | HONEYWELL-00226707 |
| 239 | U.S. Patent No. 9,775,190 | HONEYWELL-00239551 |
| 240 | U.S. Patent No. 8,919,654 | HONEYWELL-00230913 |
| 241 | U.S. Patent No. 7,926,721 | HONEYWELL-00217934 |
| 242 | U.S. Patent No. 8,196,832 | HONEYWELL-00217272 |

JA639

| | | |
|---|---|---|
| 243 | Letter from B. Pleune to Quinn Emanuel (dated July 1, 2019) | HONEYWELL-00267507 |
| 244 | Pleune Correspondence to Goldstein (5-21-21) | HONEYWELL-00252045 |
| 245 | Report Draft OP EU 4 April2021.xlsx (Enclosure to Audit Letter) | HONEYWELL-00252042 |
| 246 | Report Draft OP-1　0220.xlsx (Enclosure to Audit Letter) | HONEYWELL-00252043 |
| 247 | Report Draft OP US_20210414.xlsx (Enclosure to Audit Letter) | HONEYWELL-00252044 |
| 248 | Pleune Ltr to OPTO re Sales Information, Royalty Payments and Reports.pdf | HONEYWELL-00269430 |
| 249 | RE: Opticon – Letter to Ryan Goldstein | HONEYWELL-00269447 |
| 250 | Letter from R. Goldstein (September 16, 2020) | HONEYWELL-00267318 |
| 251 | Royalty Payment August 2020 | HONEYWELL-00267319 |
| 252 | Royalty Payment May 2020 | HONEYWELL-00267320 |
| 253 | First Amendemnt to License and Settlement | HONEYWELL-00267321 |
| 254 | TotalUS&EU&JP20200125.xlsx | HONEYWELL-00267323 |
| 255 | SalesInEurope.xls | HONEYWELL-00267324 |
| 256 | 6 year sales recap Opticon USA 2D_2014-2019.xlsx | HONEYWELL-00267325 |
| 257 | 2015-2019売上2D_Japan_5years.xls | HONEYWELL-00267326 |
| 258 | verification 20200915.pdf | HONEYWELL-00267327 |
| 259 | E-mail Chain with R. Goldstein (October 23, 2020) | HONEYWELL-00269702 |
| 260 | Letter from B. Pleune (December 16, 2020) | HONEYWELL-00269783 |
| 261 | E-Mail Chain with R. Goldstein (January 12, 2021) | HONEYWELL-00269952 |
| 262 | Non-Disclosure and Confidentiality Agreement | HONEYWELL-00269958 |
| 263 | 20210104_御社監査に関する資料（公認会計士　松澤英雄）.msg | OPTO_00007112 |
| 264 | 資料20200104.xlsx | OPTO_00007113 |
| 265 | RE_御社監査に関する資料（公認会計士　松澤英雄）.msg | OPTO_00010417 |
| 266 | 資料20200104.xlsx | OPTO_00010418 |
| 267 | Re_御社監査に関する資料（公認会計士　松澤英雄）.msg | OPTO_00010421 |
| 268 | RE_NDA（公認会計士　松澤英雄）(11).msg | OPTO_00010429 |
| 269 | 20210115 RE_御社監査に関する資料（公認会計士　松澤英雄）.msg | OPTO_00007114 |
| 270 | OPTO在庫20210115.xlsx | OPTO_00007116 |
| 271 | OPTO製品一覧20210115.xlsx | OPTO_00007117 |
| 272 | OPTO売上20210115.xlsx | OPTO_00007118 |
| 273 | OPTO売上まとめ20210115.xlsx | OPTO_00007119 |
| 274 | RE_御社監査に関する資料（公認会計士　松澤英雄）(30).msg | OPTO_00010638 |
| 275 | 20210201 RE_確認事項.msg | OPTO_00007156 |

| # | Description | Bates |
|---|---|---|
| 276 | 欧州・その他 2019年度.xlsx | OPTO_00007158 |
| 277 | 20210210 欧州・その他地域機種別売上.msg | OPTO_00007193 |
| 278 | 欧州・その他 2016年度.xlsx | OPTO_00007194 |
| 279 | 欧州・その他 2017年度.xlsx | OPTO_00007195 |
| 280 | 欧州・その他 2018年度.xlsx | OPTO_00007196 |
| 281 | 欧州・その他 2019年度.xlsx | OPTO_00007197 |
| 282 | 欧州・その他 2020年度.xlsx | OPTO_00007198 |
| 283 | 20210203 米国機種別売上.msg | OPTO_00007186 |
| 284 | 米国売上まとめ20210203.xlsx | OPTO_00007187 |
| 285 | 米国売上明細2015~2020.xlsx | OPTO_00007188 |
| 286 | RE_ çﾏﾞﾊﾞﾙé…(24).msg | OPTO_00011711 |
| 287 | Auditor further detail_2.xlsx | OPTO_00011772 |
| 288 | Pleune Correspondence to Goldstein (6-8-21) | |
| 289 | ﾚﾍﾞｧ ｾ… M&Co (Matsuzawa & Co invoice in Japanese) | HONEYWELL-00270892 |
| 290 | Zebra Datasheet | |
| 291 | List of all exhibits identified in De Winter Exhibit 4 | |
| 292 | User's Manual for NLV-5201 | |
| 293 | DataEdit Wiki | |
| 294 | PRG 0005, Program 5 | |
| 295 | Document titled OPN-4000I Bluetooth Quick Start Guide | |
| 296 | Voyager Transactional | OPTO_00010439 |
| 297 | Brady License Agreement - Executed Version | OPTO_00010443 |
| 298 | RE_御社営業に関する資料（公認会計士　松澤英雄）(17).msg | OPTO_00010472 |
| 299 | SS13054_OPN-4000i 第2版_DM-180901.pdf | HONEYWELL-00271763 |
| 300 | SS15053_OPN-3102i 第4版_DM-191209.pdf | HONEYWELL-0003467 |
| 301 | SS16017_OPN-2102i 第4版_DM-191210.pdf | HONEYWELL-00003494 |
| 302 | SS16032_L-46R_標準仕様書_第2版_DM-170901.pdf | HONEYWELL-00271935 |
| 303 | SS17019_L-46X_Master Spec_Eng1_DM-170206E.pdf | HONEYWELL-00272132 |
| 304 | 20210215 RE_米国機種別売上.msg | HONEYWELL-00251915 |
| 305 | Sales details US_0211r.xlsx | OPTO_00010506 |
| 306 | 米国売上まとめ20210203_2.xlsx | OPTO_00010535 |
| 307 | 米国売上明細2014.xlsx | OPTO_00010579 |
| 308 | Re_1次元スキャナコードの読取機能に関するご連絡.msg | OPTO_00007199 |
| 309 | 製品変更通知書（ソフト4M）オプト標準書(68455).pdf | OPTO_00007203 |
| 310 | 弊先回答.msg | OPTO_00007204 |
| 311 | 1次元製品の読み取り対応コードの変更案内.pdf | OPTO_00007205 |
| 312 | Software License Agreement | HONEYWELL-00264164 |
| 313 | Antitrust Guidelines for the Licensing of Intellectual Property dated January 12, 2017. | OPTO_00009487 |
| 314 | Product Specification for OPH-1005 | OPTO_00009678 |
| 315 | Product Specification for OPR-20012 | OPTO_00009848 |
| 316 | Product Specification for OPR-3201Z | OPTO_00009428 |

| | | | |
|---|---|---|---|
| 317 | Product Specification for MDL-1000 | | |
| 318 | User's Manual for NLV-5201 | | |
| 319 | 3Q JASDAQ regulatory filing dated 9-22-22 | | |
| 320 | R. Ashihara Designations | | |
| 321 | K. Stoop Designations | | |
| 322 | R. De Winter Designations | | |
| 323 | S. Tanaka Designations | | |
| 324 | Y. Kohmo Designations | | |
| 325 | OPTO's Objections and Responses to HW's First RFAs | | |
| 326 | MIL-STD-129P, 2002 | | |
| 327 | MIL-STD-129R, 2019 | | |

JA642

```
                     UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                           CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL,          )
INC.; HAND HELD PRODUCTS,         )
INC.; AND METROLOGIC              )
INSTRUMENTS, INC.,                )
                                  )
              Plaintiffs,         )    No. 3:21-cv-506
                                  )
          vs.                     )
                                  )
OPTO ELECTRONICS COMPANY,         )
LTD.,                             )
                                  )
              Defendant.          )
_____ )
```

```
                   TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE KENNETH D. BELL
              UNITED STATES DISTRICT COURT JUDGE
                          JULY 11, 2023
```

<u>APPEARANCES:</u>

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28280

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

JA643

APPEARANCES (Cont'd.)

        TYLER T. VanHOUTAN, ESQ.
        McGuireWoods, LLP
        Texas Tower, Suite 2400
        845 Texas Avenue
        Houston, Texas 77002

        CHRISTINE E. LEHMAN, ESQ.
        CONNOR S. HOUGHTON, ESQ.
        Reichman Jorgensen Lehman & Feldberg, LLP
        1909 K Street, NW
        Suite 800
        Washington, DC 20006

        YORK M. FAULKNER, ESQ.
        YorkMoodyFaulkner
        Tensho Building, 7F
        3-17-11 Shibaura, Suite 711
        Tokyo, Japan

                        CHERYL A. NUCCIO, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        Charlotte, North Carolina

JA644

3

```
 1                    P R O C E E D I N G S
 2   TUESDAY AFTERNOON, JULY 11, 2023
 3             (Court called to order at 2:00 PM.)
 4             THE COURT:  Good afternoon.
 5             ALL COUNSEL:  Good afternoon, Your Honor.
 6             THE COURT:  All right.  Before we get into the many
 7   pending motions, I want to -- excuse me for sniffling.  I've
 8   got a granddaughter cold.  I've had it for a week.  Didn't
 9   seem to hit her that long, but so be it.
10             I want to better understand what some of the
11   expected evidence is, particularly -- well, let's just start
12   with the Section 4 claims for post-agreement unpaid royalties.
13   It seems to me that that's a pretty straightforward question
14   as to whether the contested OPTO products are or are not
15   within the definition of 1.4.
16             Am I right about that, gentlemen?
17             MR. STEVENS:  Yes, Your Honor.
18             THE COURT:  It seems to me that's just a battle of
19   the experts.  Is that what the evidence is going to be?
20             MR. MUCKENFUSS:  Your Honor, I do think there is --
21   there is other evidence beyond the experts that would be
22   relevant as to whether the definition applies to that
23   particular product.
24             THE COURT:  Well, we're talking about the -- your
25   hope for extrinsic evidence, I take it?
```

JA645

4

 1         MR. MUCKENFUSS:  I think there is some extrinsic
 2   evidence, yes, Your Honor.  The parties' understanding -- and
 3   again, it's not to reinterpret the 1.4, which I know Your
 4   Honor has ruled on that, but there is extrinsic evidence as to
 5   the application of that definition, and certainly with regard
 6   to the symbology and also the product itself as to whether it
 7   applies to the product in question here.  So there is
 8   extrinsic -- in our view, extrinsic evidence that is relevant
 9   to that issue.
10         THE COURT:  Be a little more specific for me, if you
11   would.  What is this extrinsic evidence?
12         MR. MUCKENFUSS:  For example, I think one of the
13   documents, there is the claim chart, the ITC claim chart, in
14   which Honeywell itself categorized the laser scanners at issue
15   here, the scanners that can decode PDF417, labeled them as 1D
16   barcode scanners.  I think their contention is, well, it's not
17   relevant because that relates to a description of the product
18   itself, not the symbology.
19         It's our position, though, it's still an issue for
20   the jury to decide if the definition of -- under 1.4 applies
21   to that product.  Certainly the parties' characterization of
22   the product in that document is relevant as to whether it's a
23   1D or 2D product and whether the definition applies to it.
24   That has a direct impact on our defense.  We have a couple of
25   defenses where that's relevant.  One is --

JA646

5

1          THE COURT:  I can see where that might be relevant
2    with respect to the affirmative defenses.  I'm more than a
3    little uncertain it has anything to do with whether the
4    contested products meet the definition of 1.4.
5          MR. MUCKENFUSS:  Well, on that point, Your Honor, I
6    believe it is relevant.  There -- after the Court's ruling,
7    obviously, under -- for the definition, the two sentences that
8    apply here, the first sentence which relates to whether the
9    product is operable to decode a 2D symbology, certainly --
10   we're not -- I concede after the Court's ruling that
11   sentence -- we're not saying it's ambiguous, but the question
12   for the jury is whether that sentence along with the second
13   sentence that relates to the symbology applies to that
14   product.
15         Whether the parties -- when the parties understood
16   or characterized the product as a 1D product is directly
17   relevant as to whether it's operable to decode a 2D symbology;
18   and, in fact, whether the symbology is two-dimensional.  They
19   disagree with that, but that's an issue for the jury.
20   Describing the product as 1D relates to how that product reads
21   a symbology.  It's not apples and oranges.  It's not a
22   distinctly different thing.
23         So if -- when Honeywell describes the product as a
24   one-dimensional barcode scanner, that is directly relevant as
25   to whether it fits within the definition of the 2D Barcode

JA647

6

1  Products and also whether PDF417 is, in fact, a 2D symbology.

2      THE COURT:  Well, I'm still not getting there

3  because what the parties asserted at any given time may well

4  come into evidence, especially with respect to your

5  affirmative defenses, but I can't get past the idea that it

6  seems like it's a yes or no to be decided by people with

7  technical expertise to apply this unambiguous definition to a

8  given product and say it is or it isn't.

9      MR. MUCKENFUSS:  The other type of evidence --

10     THE COURT:  It really doesn't matter what the

11  parties thought for this purpose, what the parties thought

12  prior to signing the agreement.

13     MR. MUCKENFUSS:  Well, I -- Your Honor, I think in a

14  footnote in your order --

15     THE COURT:  I did say may.

16     MR. MUCKENFUSS:  You did say may, I understand that.

17  But there -- I think both parties concede, for example, with

18  regard to PDF417, whether it's a 2D or 1D symbology is

19  ambiguous.  Your Honor did not rule on that particular issue

20  in the definition as to whether it is, in fact, a 2D symbology

21  or 1D symbology.  There is evidence, obviously, that goes

22  beyond just did the parties call it symbology 1D or 2D.

23     But there is evidence, for example, there are emails

24  from Honeywell's counsel where they are expressly telling OPTO

25  that laser scanners that can decode PDF417 are not included

JA648

7

1    under the definition, were not included in the revenue under

2    the agreement.  That is directly relevant, Your Honor, to --

3    for the jury to decide whether the definition -- even if it's

4    unambiguous, there is still a question of whether that

5    definition applies to the product in question.  It's not just

6    experts, but the parties' statements about it.  The parties'

7    conduct relating to that issue should be considered, should be

8    presented to the jury.  It's not just an expert issue.

9            THE COURT:  So in addition to the claim chart, what

10   else are you referring to as evidence that you would like to

11   put on with respect to this?

12           MR. MUCKENFUSS:  So there are -- yes, Your Honor.

13           THE COURT:  Some emails?

14           MR. MUCKENFUSS:  There are emails.  There are emails

15   from Alston & Bird.  Mr. Pleune -- as you may recall, there

16   are emails to OPTO's counsel where they are discussing the

17   revenue, the calculation of the revenue under the agreement

18   and what products are included and what products are not.  And

19   Mr. Pleune states very clearly -- well, first of all, OPTO's

20   lawyer tells Honeywell's counsel in that email that laser

21   scanners are not included.  He tells them that.  So Honeywell

22   has that knowledge.  Mr. Pleune's response on behalf of

23   Honeywell is very relevant to that issue.  He responds and

24   acknowledges it.

25           Obviously, this is part of how we're going to try

JA649

1  our case, but that evidence -- in terms of Honeywell's
2  understanding through their counsel, their acknowledgment of
3  that issue is directly relevant as to whether that definition
4  applies to the products in question here because that's still
5  an issue for the jury.
6          THE COURT:  What was the response?
7          MR. MUCKENFUSS:  So the response -- I don't have the
8  email directly in front of me.  Mr. Pleune responded and
9  acknowledged that he understood that the parties had a
10 different understanding as to global sales.  And basically
11 said, you know, I understand these products are not included.
12 The parties had a different understanding of global sales at
13 the time of the mediation, at the time the agreement was
14 signed.
15         And what he didn't say was, hey, you're wrong.  You
16 know, that's a breach of the contract.  Why are you doing
17 that?  I mean, he didn't say that.  He understood it, he
18 acknowledged it, and did nothing else after that.
19         So obviously, that piece of evidence is relevant as
20 to whether the definition -- 1.4 under the agreement actually,
21 in Honeywell's and OPTO's understanding and their view,
22 actually applies to the laser scanners that can decode PDF417,
23 which it's our position that they do not -- they are not
24 included under the definition.  Honeywell understood that and
25 acknowledged it.  I mean, that -- I think that's relevant

1  evidence for the jury to consider in deciding whether the
2  definition under the agreement, putting aside the affirmative
3  defense, but whether the definition actually applies to that
4  product.  The parties' understanding, how they acted, what
5  they said about that is relevant to -- as to whether the
6  definition applies to the product.
7          THE COURT:  Anything else you were wanting to offer?
8  I want to understand the scope of the extrinsic evidence.
9          MR. MUCKENFUSS:  Yes, Your Honor.
10         (Defense counsel conferred.)
11         MR. MUCKENFUSS:  So, Your Honor, there is also
12 evidence -- putting aside the description of the product.
13 Honeywell's patents, for example, describe the symbology at
14 issue here, PDF417, as a 1D symbology.  So they have actually
15 filed patents where they describe the symbology that they are
16 now contending in this case are 2D symbologies, actually
17 describe them as 1D symbologies.
18         So again, that goes back to the issue -- I think in
19 your footnote you referenced there is still an issue as to
20 whether -- a fact issue as to whether PDF417 is 2D or 1D.  Any
21 of the evidence, the patents -- for example, there are also
22 marketing materials that we intend to use.  But those --
23 that's a specific example of Honeywell in its patents
24 describing the symbology PDF417 as a 1D symbology.
25         THE COURT:  All right.  What says the plaintiff?

1          MR. STEVENS:  Good afternoon, Your Honor.  Scott

2    Stevens on behalf of the plaintiff.

3          First off, on the claim chart there were several

4    things said that weren't accurate.  It did not use the same

5    language as the agreement, as Mr. Muckenfuss said.  This is a

6    document that came before the agreement was signed applying a

7    completely different definition.  It's extrinsic evidence.

8    It's parol evidence.  And the agreement that's actually at

9    play here supercedes expressly anything that came beforehand.

10   So there should be no relevance to that document whatsoever.

11   It's not talking about the same thing.  It's not applying the

12   same tests at all.

13         There's also other evidentiary reasons why it

14   shouldn't come in, as we've said in our motion in limine.  It

15   was never produced by them.

16         THE COURT:  Yeah, we'll get to all that.

17         MR. STEVENS:  Okay.  So that's that document.

18         But I was very interested to hear, because this is

19   the first time I've heard it, that there's going to be a

20   dispute about PDF417 and whether it's one-dimensional or

21   two-dimensional because we have an RFA in this case that says

22   it's a two-dimensional code type.  They have admitted to an

23   RFA.  That's a judicially binding admission that cannot be

24   taken back.

25         So I'm going to put on your screen, Your Honor, that

11

1  very answer.  They go on to say that the reading of any --
2  like a particular word might be linear.  But if you see -- can
3  you scroll up just a little bit.  They admitted that PDF417 is
4  a continuous multi-row two-dimensional code type, and it goes
5  on from there.

6          So they can't take it back and say that it's a
7  one-dimensional code type.  They've already said in an RFA
8  that it's a two-dimensional code type.  So it's strange for me
9  to hear now that that's going to be their change of position.

10         But at any rate, there's nothing in that claim chart
11  that speaks to PDF417.  That is a figment of Mr. Muckenfuss's
12  imagination, with all due respect.  Never talks about it.
13  That patent did not have anything to do with underlying
14  symbologies.  You can read that entire document, you won't
15  find anything to do with symbologies.

16         MR. MUCKENFUSS:  Your Honor, out of fairness, I
17  think we should read the entire response.

18         MR. STEVENS:  I am happy to.  And I said it goes on
19  from there and I said right at the beginning that it says in
20  here that the reading of any individual code word within the
21  symbology is a linear process.  They said that.  That's fine.
22  But they said it's a continuous multi-row two-dimensional code
23  type.  If he intends to tell the jury it's a one-dimensional
24  code type or a one-dimensional symbology, he can't do that
25  because they signed a paper in this case saying that it was a

JA653

1  two-dimensional code type.  So this change of position I don't
2  think should be allowed.
3          But at any rate, the ITC document itself never talks
4  about PDF417, never applies the test of 1.4 as Your Honor has
5  construed it in this case.  Simply, that's just not the case
6  at all.
7          On the second set of documents, the emails after the
8  fact, with all due respect, I think they were entirely
9  mischaracterized by my friends at the other table.  Mr. Pleune
10 never said that there was a disagreement regarding the scope
11 of products themselves.  We had believed that the number would
12 have been higher, but there was no disagreement about what was
13 in scope and out of scope.  The documents show that.
14         So this particular email is not in any way an
15 acknowledgment of what they're saying.  Yes, they do disclose
16 in the email for the first time that they had withheld the
17 products in question here, that's true.  And then the emails
18 go on to say, okay, well, we need the sales records and let's
19 start the audit process and get into all of that.  There was
20 no acquiescence or sort of acknowledgment.  We wanted to see
21 what the numbers were that they were hiding from us.  And
22 that's what the email is about.  There is nothing in that
23 email that's an acknowledgment of anything to the sort
24 Mr. Muckenfuss was saying.  So that doesn't have anything to
25 do with the case either.

13

1          And then the Honeywell patents that were mentioned
2    there at the end, two issues here.  Again, completely
3    extrinsic.  Two, it's parol evidence.  They want to cite to
4    patents that are 10, 15 years old, old patents that are
5    largely expired.  They don't say that it's 1D.  They talk
6    about it being a stacked -- a stacked symbology, and the
7    patents go on to define that as a two-dimensional symbology.
8          But none of that has anything to do with the
9    contract.  Again, the contract the parties signed in 2020 says
10   it supercedes anything prior to this.  And so -- and it
11   explicitly says -- the second sentence of 1.4, if Your Honor
12   will remember, specifically says to look to the standards to
13   define what's one-dimensional and two-dimensional.
14         So this whole charade about, oh, let's go look at
15   everything else except for the contract, let's go look at
16   everything else except for the standard, that's not what the
17   contract says.  The contract tells us how to answer this
18   question.  And our expert looked at the standard.  Their
19   expert looked at the standard.  In fact, their expert is one
20   of the authors of the standard.
21         And so Your Honor is right.  When it comes down
22   simply to the question of breach, the parties will present
23   fact evidence in their experts to show that they withheld
24   documents -- I'm sorry, they withheld sales that were within
25   the ambit of the scope of the agreement.  That should be a

JA655

14

 1  straightforward question.  Everything else is an attempt to
 2  take us away from the agreement and do some sort of a test of
 3  10-, 15-year-old documents that have nothing to do with the
 4  agreement.
 5          THE COURT:  So is plaintiff's evidence on this point
 6  going to be just the expert testimony?
 7          MR. STEVENS:  Well, we have standards themselves,
 8  right.  The agreement refers to the standards.  So we
 9  anticipate offering the standards themselves.  We would offer
10  the actual, of course, sales records of the products in
11  question.  We would offer the specifications of the products
12  in question, you know, to prove that, in fact, they did
13  support those symbologies.  I think there's some deposition
14  testimony that confirms that those products were, in fact,
15  able to support those symbologies during the relevant time
16  frame.
17          I'm trying to think if there's anything else.  I
18  mean, product documentation specifications, their own
19  testimony confirming the functionality of the products.
20  That's what comes to my mind, Your Honor.
21          MR. MUCKENFUSS:  Your Honor, if I may?
22          THE COURT:  Yes.
23          MR. MUCKENFUSS:  I don't quite understand the
24  difference.  They want to use evidence where their
25  standards -- evidence outside the contract to say this is a 2D

JA656

1  symbology, but we can't use any extrinsic evidence, for

2  example, the fact that they call the same symbology 1D.  You

3  know, with all --

4         THE COURT:  Well, the standards are specifically

5  referenced as part of the definition.

6         MR. MUCKENFUSS:  They are.

7         THE COURT:  So it seems reasonable to say, well,

8  let's see what the standards say.

9         MR. MUCKENFUSS:  Well, it's one aspect of the

10  evidence.  It's not the only evidence in the case so -- and he

11  talked about --

12         THE COURT:  It seems like all the evidence you've

13  offered is that at some time prior to the agreement, other

14  than these emails, sometime prior to the agreement, parties

15  were using definitions that are not this definition to discuss

16  1D and 2D products.  So to offer evidence about, well, there

17  was a time when the words we were using, which are not these

18  words, were thought to mean these things by the parties --

19         MR. MUCKENFUSS:  But --

20         THE COURT:  -- I don't know how that informs the

21  question that's here.

22         MR. MUCKENFUSS:  Because there's still a question --

23  there's still a question of whether PDF417 is a 2D symbology.

24  If that wasn't a question, then that could have been ruled on

25  at summary judgment.  Your Honor in the footnote noted that

16

1   that was an open issue.  I understand you said may.  But there
2   is evidence where PDF417 is called 2D and it's also called 1D,
3   so this is an issue for the jury.
4           THE COURT:  I agree that whether it's symbology -- I
5   think I agree.  I'll probably get quoted against myself at
6   some point.  But somebody is going to have to testify whether
7   it is or isn't and why it is or isn't.  But to talk about,
8   well, before the agreement we said this and they said that
9   about it, that -- once the agreement is signed, you've got
10  this definition and that's the only question to be answered.
11          MR. MUCKENFUSS:  Well, I agree.  And I don't think
12  the other evidence -- of course, the claim chart is the only
13  one it's referencing before the agreement.  These emails come
14  after the agreement.  It's the parties' -- Honeywell's and
15  OPTO's discussion about what's included under the definition
16  in the agreement.  So it's -- the parties -- it's not
17  contradicting the definition because what's still open is you
18  have a -- so you have a definition of what products are under
19  2D Barcode Products.  Okay.  That's being tried, obviously,
20  next week.  So there is evidence as to what both parties
21  believed or said what products are included in that
22  definition.
23          The definition is unambiguous.  I concede that as
24  per Your Honor's ruling.  But how that definition is applied
25  to particular products is an open issue for the jury.  The

JA658

17

1  parties discussing -- and he went through -- and they've --
2  Mr. VanHoutan can discuss a deposition where they've already
3  used extrinsic evidence in a trial deposition in this case to
4  try to prove their point.

5        But there is extrinsic -- there is other evidence as
6  to the parties' conduct and what they said in terms of that
7  definition, whether it applies to laser scanners that can
8  decode PDF417.  It's not contradicting the definition.  It's
9  taking the understanding of the definition and whether it
10 applies to this particular product, which is the issue for the
11 jury.  We're not trying to provide evidence that there's a
12 different definition or any of that.

13       But I think it's relevant if Honeywell describes a
14 product in its patent and says that the symbology they're
15 trying to tell the jury is 2D, they described it as 1D.  That
16 directly contradicts the position they're taking in this case.
17 If the standards are the be-all of what this is about, then
18 the case -- I agree.  I mean, if that's -- if we're -- our
19 hands are tied and they can just throw up whatever they want
20 to show the jury that's a 2D symbology, that's -- I don't
21 understand that dynamic.  There is direct evidence that's
22 relevant to Honeywell understanding, number one, there are
23 patents that say it's not a 2D symbology, it's 1D, and then
24 directly stating that laser scanners that can decode PDF417
25 are not included in the revenue and under the definition.

JA659

1        I mean, this is a trial.  I expect Mr. Stevens to
2   get up and disagree with me, but that's -- we should be
3   allowed to present this evidence for the jury to decide, not
4   if there's a different definition, but whether the definition
5   under the agreement, 1.4, applies to this product either
6   because of the way the product works, the way it reads a
7   symbology, and whether that symbology fits within the
8   definition.  Those are all open issues for the jury.
9        THE COURT:  I agree with that last part, but it
10  seems like some of the evidence you want to use to prove that
11  is what the parties said about it in the past before the
12  agreement.
13       MR. MUCKENFUSS:  Well, I think it has to do with the
14  parties' understanding of whether a laser scanner that can
15  decode PDF417 is, in fact, a 1D or 2D product.  Okay.  That
16  has to do with how the product functions.  So we're trying to
17  decide whether this definition applies to this product.  So
18  the parties before the agreement and after the agreement are
19  making statements in their conduct relating to whether that
20  product fits within the def -- it's not -- we're not talking
21  about statements about the agreement right before it's signed.
22  What I'm talking about is their characterization of that
23  product which is directly relevant as to whether it fits
24  within the definition.  We're not trying to change the
25  definition.  We're not trying to say there's some other

19

1  version of it.

2          But if they describe it as a 1D product, that is

3  directly relevant as to whether functionally, right, in terms

4  of the actual technology, whether it fits within the

5  definition, which is unambiguous.  They know that.  They know

6  they've called it a 1D product.  They know they've called the

7  symbology 1D.  Obviously, they want to keep that out.  But it

8  is a fact that they have done that.  It doesn't contradict the

9  definition.  It merely informs the jury as to whether that

10 definition would, in fact, apply to that product.

11         THE COURT:  All right.  Well, I'll think about this

12 some more because obviously there are lots of opportunities

13 for the jury to become confused during this trial, and a lot

14 of what you say I think we'll have to talk about again when we

15 get to the evidence -- the admissible evidence in your

16 affirmative defenses.  I just want the jury to have as

17 straightforward set of evidence as possible but necessary for

18 both parties to resolve this particular question.

19         MR. STEVENS:  I share that same desire, Your Honor,

20 but I can't let something he just said go unrebutted.

21         He said that there's an email where someone at

22 Honeywell said that a laser product that's operable to decode

23 PDF417 is not included in the definition in the contract.  I

24 don't -- I think he just told the Court something that he

25 knows to be untrue and I would ask the Court to ask him to

JA661

20

1   proffer whatever evidence that he believes exists to support

2   that statement.

3            THE COURT:  Do you want to respond, Mr. Muckenfuss?

4            MR. MUCKENFUSS:  Absolutely.  Obviously, I am

5   talking about --

6            MR. STEVENS:  I'd like to see it.

7            MR. MUCKENFUSS:  It's Pleune's email.  He has a

8   different interpretation of Pleune's email.  But Pleune's

9   email is -- okay.  I know he doesn't want to talk about this.

10  But OPTO's lawyer tells Alston & Bird, the lawyers sitting

11  here today who are trying this case, told them unequivocally

12  that laser scanners are not 2D and they're not included in the

13  calculation of the revenue, right, which directly comes under

14  the definition of 1.4.

15           Pleune's response -- we can debate how you interpret

16  Pleune's response.  Our interpretation of his response is he

17  acknowledges it.  He acknowledges OPTO had that understanding

18  at the time the agreement is signed.  He doesn't say you're

19  wrong.  Laser scanners are 2D.  What are you doing?  My client

20  disagrees.  We're going to sue you.  Any of the things that a

21  lawyer, a litigator would do when they found out -- by the

22  way, they drafted this agreement.  When they found out that

23  they did something that's contrary to the agreement, yes,

24  we're going to argue to the jury that Mr. Pleune's response is

25  an acknowledgment.  They understand it.  They conceded that

JA662

1   laser scanners were not included and they knew -- OPTO knew
2   that.  I don't expect Mr. Stevens to agree with how I'm going
3   to present that to the jury.  But that is the email.  Any
4   suggestion that I'm lying to the Court -- the only email I've
5   talked about is the Pleune email which is a critical email.  I
6   understand why he's fighting tooth and nail to keep it out.  I
7   would too if I were him.  But that is the email where they
8   knew it and they acknowledged it and they didn't do anything
9   about it.
10          MR. STEVENS:  Except for we sued you.
11          THE COURT:  Okay.
12          MR. MUCKENFUSS:  Like nine months later.
13          THE COURT:  All right.  Let's move on.
14          So let's discuss what claims by Honeywell are going
15   to be tried.  Obviously, the 4.3 paragraph, which is what this
16   is all about, the unpaid royalties.
17          4.5 seems a little redundant in that, yeah, okay,
18   the reason you were underpaid is because you didn't get the
19   reports.  But that wasn't pled in the complaint and I'm not
20   sure that that's really a separate claim.  It's part of the
21   evidence, I don't doubt, but it's not been a claim that's been
22   made in the complaint.  Not to say that there won't be
23   evidence about it, but that's not a separate claim.
24          4.6, failure to pay.  Obviously, that's part of the
25   complaint and that will be considered by the jury.

```
 1            4.7, of course, applies to damages and fees
 2   associated with collection efforts.  I will note -- I don't
 3   think anybody has brought this up yet.  The provision says
 4   costs and fees.  It doesn't say attorney's fees, which is a
 5   phrase that's used in other parts of the agreement which I
 6   don't know -- well, I'm sure you will fight over that because
 7   it's yet another opportunity to fight.  But I just make note
 8   of it for these purposes.
 9            MR. STEVENS:  May I ask a question, Your Honor?
10            THE COURT:  Sure.
11            MR. STEVENS:  We had assumed or we had understood
12   that you would take up the request for attorney's fees after
13   the case.  Is that how you intend to do that?
14            THE COURT:  I assume that's the way the parties
15   would want it done.
16            MR. STEVENS:  That's how we would like it done, Your
17   Honor.
18            THE COURT:  And that will give us lots of time to
19   think about whether fees includes attorney's fees.
20            Now the 5.3 claim for covenant not to challenge is
21   not a pled claim.  It is certainly a defense to the patent
22   misuse allegation, but it's not an affirmative claim pled in
23   the complaint, so there's no expectation that's going to go
24   for a jury question, right, Mr. Stevens?
25            MR. STEVENS:  If you're telling us that that's not
```

 1   part of this case, then we understand that.

 2           THE COURT:  That's what I'm telling you.

 3           MR. STEVENS:  Okay.

 4           THE COURT:  And also, just to forecast on this

 5   motion to strike thing, there's not going to be evidence

 6   presented to the jury about damages with respect to copycat

 7   litigation or reputational harm.  That's not coming anywhere

 8   near the jury for a host of reasons.

 9           I will ask, just to sort of forecast a little bit,

10   Mr. Muckenfuss, how -- how can you pursue a patent misuse

11   claim with that provision in the agreement?

12           MR. MUCKENFUSS:  Your Honor, if I may --

13           THE COURT:  I don't think this was squarely

14   presented during the summary judgment portion of the case.

15           MR. MUCKENFUSS:  If I may pass it over to

16   Mr. VanHoutan.

17           THE COURT:  Certainly.

18           MR. VanHOUTAN:  Good afternoon, Your Honor.  Tyler

19   VanHoutan for the defendant.

20           So what we sought in summary judgment was not an

21   order rendering enforceable any patents.  What we sought, and

22   this was supported by the *Brulotte* case and others, where

23   you've got a license agreement being asserted that creates a

24   situation of patent misuse, and the remedy for that is that

25   the particular provision in the license agreement is rendered

24

1    unenforceable.  That's why 5.3 doesn't apply.  It's not

2    seeking a remedy and we're not seeking a remedy, and we noted

3    this in our findings of fact and conclusions of law on this

4    issue, of a finding of unenforceability of any patent.  Only

5    the assertion by Honeywell of a royalty obligation in this

6    Settlement License Agreement relating to these particular

7    products that are in dispute.

8             THE COURT:  Okay.  Well, obviously, we don't have to

9    get to that today since that will be part of the patent misuse

10   claim.

11            Let me ask just to make sure I'm working from the

12   right last agreement because I may not be.  Just for my

13   working purposes, I've been using document 51-2 which is a

14   copy of the agreement, attached to what I forget now.  And the

15   thing that caught my eye about it, this 5.3 has an obvious

16   typo in it, it seems to me, because OPTICON is covenanting not

17   to challenge OPTICON's patents or licenses.  Was that later

18   revised by --

19            MR. STEVENS:  It was later revised by the second --

20            THE COURT:  Can you point me -- and you don't have

21   to do it right this second.  Just point me to the last

22   operative agreement because I immediately got the sense in

23   preparing for this that I bet this is not the final say.

24            MR. STEVENS:  It is not.  There was a second

25   amendment to the agreement where the typos were caught and the

JA666

25

1  parties acknowledge that they were caught sort of nunc pro
2  tunc going back to the signing date.
3          THE COURT:  Well, if one of you would just email a
4  record cite for where I can find that to Mr. Brenner, that
5  will be helpful.  Thank you.
6          MR. STEVENS:  We can do that.
7          Your Honor, when you were going through -- I don't
8  know if you've finished --
9          THE COURT:  I haven't.
10         MR. STEVENS:  -- but when you were going through --
11 oh, sorry.
12         THE COURT:  The alleged breach of 3.1 which is the
13 release.  Again, this is not an affirmative claim by
14 Honeywell.  It's a defense, I assume is the way you are
15 thinking of this, right, Mr. Stevens?  It's not an independent
16 claim for breach.
17         MR. STEVENS:  That's correct, Your Honor.
18         THE COURT:  Same with 9.9, the no admission, that's
19 a defense, not an affirmative claim of breach.
20         MR. STEVENS:  I don't know that I would necessarily
21 agree with that.  I do think -- while it did not happen before
22 the complaint so it wasn't in the complaint.  By their filing
23 and pursuing the patent misuse claim, that is an affirmative
24 breach.  I concede you're not going to find it in the
25 complaint.

JA667

```
 1              THE COURT:  Right, it's unpled.
 2              MR. STEVENS:  Well, it didn't happen until after the
 3    complaint was filed.
 4              THE COURT:  There are ways to amend complaints.
 5              MR. STEVENS:  Okay.  Well, listen, we can take that
 6    up in a different way.  But if you're telling me that -- if
 7    you're telling me that we're not going to hear about that in
 8    front of the jury, then 9.9 would rise and fall with what we
 9    talked about earlier.
10              THE COURT:  That's what I'm telling you.
11              MR. STEVENS:  Okay.
12              THE COURT:  That's not an affirmative claim that
13    will be put to the jury.
14              Now, the 5.1 recently alleged breach is for failure
15    to provide sales reports and failing to comply with the audit
16    provisions.  Those issues are not going to be presented to the
17    jury.  The Court has ruled on 5.1.  And the remedy for
18    pre-agreement revenues was provided for in 5.1.  The Court has
19    granted motions for summary judgment with respect to that.
20    Not sua sponte.  You can stop saying that.  You can save that
21    for your client relations and in your efforts to persuade the
22    court of appeals that it is something other than what it was,
23    but don't say that to this Court again.  It was not sua
24    sponte.
25              So the 5.1 claims will not be going to the jury.
```

```
 1              Now, is there anything from the audit that was
 2    eventually conducted pursuant to 5.1, although not timely, but
 3    is there any evidentiary value to the audit itself for the
 4    claims that are going forward?
 5              MR. STEVENS:  No, Your Honor.  We don't think that
 6    should be allowed in.
 7              THE COURT:  Mr. Muckenfuss, do you disagree with
 8    that?
 9              MR. MUCKENFUSS:  We agree.
10              THE COURT:  And so if we get to damages on this
11    Section 4 breach, is that something that really needs jury
12    thought?  I mean, it seems pretty mathematical to me.  You get
13    the reports.  You multiply it by seven and a point and a half
14    for late fees.  Is that really something for the jury or...
15              MR. STEVENS:  I mean, there's not a contest on the
16    number of damages.  I mean, we have our damages expert testify
17    to it.  They have not put forward any opposition to that with
18    the exception of they challenge whether there should be any
19    interest whatsoever.  They don't necessarily disagree with our
20    math, but they do challenge whether there should be any late
21    fees slash interest.  That's the only dispute as I'm aware
22    when it comes to the damages side of the case.
23              THE COURT:  Yes, sir.
24              MR. VanHOUTAN:  I would agree with that with one
25    caveat.  I mean, we are not certain that the damages expert
```

JA669

28

1    for Honeywell has included the appropriate products and/or

2    excluded the appropriate products from the calculation.  So

3    the math is fine, but whether certain products are in or out

4    based on their functionality at the time, we may have an issue

5    with and want to cross their expert.

6        THE COURT:  And of course, we may not know that

7    until we get the jury's verdict.  I don't know what people

8    have in mind for a verdict sheet.  But if they're having to

9    examine 50 products and say yea or nay to 1.4, is that it?

10   How many products are there?

11       MR. STEVENS:  To our mind, Your Honor, it's just one

12   question.  They all rise and fall together.  This is the first

13   I've ever heard that there's any sort of -- there's nobody on

14   their side up until this point in time in this litigation that

15   has held their hand up and said that there's anything not a

16   hundred percent accurate with our damages calculation and the

17   precise products in the time frame.  That's brand new news to

18   me.

19       THE COURT:  Maybe I'm misstating it.  Is there a

20   possibility that some of the products for which royalties were

21   not paid could be found to be outside of 1.4 and some found to

22   be within 1.4?

23       MR. MUCKENFUSS:  I don't think that's what we're

24   saying.  We're not suggesting that there would be all these

25   products.  The jury has to decide that.  I think it's a little

JA670

29

1    more nuanced issue.  We're not disputing that.  I think they
2    do all rise and fall together.
3            THE COURT:  I'm just trying to anticipate what to
4    tell the jury and how long this thing might go.  Are there
5    going to be damages issues presented to the jury in the event
6    that a breach is found and that none of the affirmative
7    defenses are accepted?
8            MR. STEVENS:  We intend to.  I don't know about -- I
9    can't speak for them.
10           MR. VanHOUTAN:  We don't anticipate doing much with
11   damages.  I agree that the math is pretty clean.  It's set
12   forth in the agreement and you just follow it.  But whether a
13   particular product post-settlement agreement, post-litigation
14   had a particular functionality would impact whether that's
15   included in the total or not included in the total.  And we
16   believe that Mr. Herrington, their damages expert, makes
17   mistakes about which products are included in the total.
18           THE COURT:  So you're saying the timing of
19   functionalities among these products might be different?
20           MR. VanHOUTAN:  Whether it was included in the
21   product or not included in the product at a particular time.
22           THE COURT:  Okay.  I understand.
23           Let me move on to some of the affirmative defenses.
24           The unilateral mistake -- which, by the way, is --
25   the burden on that is clear and convincing.  What will be

JA671

1  the -- what's the forecast evidence for that defense?

2         MR. MUCKENFUSS:  So, Your Honor, I think much of the

3  evidence that we just talked about is going to be relevant to

4  that issue.  Obviously, you know, we have a series of -- we

5  have the emails that we talked about.  We have the claim

6  chart.  We have other aspects of evidence that would show that

7  OPTO -- for example, in the Pleune email, that OPTO knew and

8  Mr. Pleune stated in his email that he knew OPTO had this

9  understanding at the time the agreement was signed.  And that,

10  you know, OPTO acted consistently from the time of the

11  agreement through when they initiated the audit, all the way

12  through the second amendment in terms of actually telling

13  Honeywell that laser scanners were not included.  They knew

14  that.

15         So the evidence as it relates to the conduct of the

16  parties, the email, Mr. Pleune's email, will be relevant to

17  that issue.

18         THE COURT:  All right.  Well, obviously, we'll let

19  you present your evidence.  I'll note, although I'm sure

20  you're aware of it, that under Delaware law, that it's a

21  pretty rare and difficult defense to mount.  And as I look at

22  the elements necessary for it, I think it will be

23  particularly -- as I understand the evidence, it will be

24  particularly difficult to prove that there is a specific prior

25  understanding that differed materially from the written

31

1    agreement, but we'll see how the evidence goes.

2         MR. STEVENS:  I have one question on that, Your

3    Honor.  What Mr. Muckenfuss pointed to right there is not

4    something that OPTO ever saw or relied on.  So the ITC claim

5    chart, to the best of our knowledge, OPTO never saw it.  We

6    asked them several times --

7         THE COURT:  We'll get to that.

8         MR. STEVENS:  Okay.

9         THE COURT:  Quasi-estoppel defense, is the evidence

10   essentially the same?  Is there something more or different?

11        MR. MUCKENFUSS:  No, Your Honor.

12        MR. STEVENS:  So I do have a comment on that as

13   well.  That's an equitable defense.  That should be tried to

14   the bench, not the jury.

15        THE COURT:  Well, I was surprised when our research

16   showed otherwise.  That was my gut, that's an equitable

17   remedy.

18        MR. STEVENS:  Right.

19        THE COURT:  But Delaware says that when there are

20   contested facts, again, by clear and convincing, that those

21   facts are decided by the jury.

22        MR. STEVENS:  Okay.

23        THE COURT:  Good faith and fair dealing.  Anything

24   new or different with the anticipated evidence?

25        MR. MUCKENFUSS:  No, Your Honor.

JA673

```
 1          THE COURT:  All right.  Let's move on to the --
 2   well, let me first take up the motion to strike Honeywell's
 3   second amended responses.
 4          MR. STEVENS:  Your Honor, if I could ask one
 5   question.  You didn't talk about laches.  That's another
 6   one --
 7          THE COURT:  Yeah, that's another one for the Court.
 8          MR. STEVENS:  Okay.  That's not to be tried to the
 9   jury.
10          THE COURT:  It's not contested.  That's for the
11   Court, right?  The reason I was so sure of this is I think
12   it's the only thing you've agreed to at all, that that's an
13   issue for the Court, right?
14          MR. STEVENS:  I can't speak for that table.  I'm not
15   sure they do.
16          MR. MUCKENFUSS:  I don't think we disagree with
17   that.
18          MR. STEVENS:  Okay.
19          THE COURT:  So on the motion to strike Honeywell's
20   second amended responses to interrogatories, the motion is
21   denied, but the Court has already excluded from presentation
22   to the jury claims with respect to Section 5 and the damages
23   with respect to reputational harm and copycat lawsuit.  So
24   it's in the record, but there's not going to be any evidence
25   about those things.
```

JA674

33

```
 1          MR. VanHOUTAN:  Your Honor, may I ask a
 2   clarification on that?
 3          THE COURT:  Sure.
 4          MR. VanHOUTAN:  So one of the issues in this goes to
 5   something that's specific to the bench trial, which is the
 6   amended response to rog 13 which specifically asks them,
 7   Honeywell, to identify what patents of theirs claim the
 8   specific functionality that's in dispute, the ability to
 9   decode what I'll call stack, the multi-row symbologies.  And
10   prior to June 7th they identified really nothing, but the only
11   patent they identified by number was one patent, the '783,
12   which we briefed during summary judgment and we talked about
13   it at the hearing.  And now in this rog 13, you can take a
14   look at their opposition to our motion to strike where they
15   set forth what they did.
16          THE COURT:  I did.  I read the redlined version page
17   to page this morning.
18          MR. VanHOUTAN:  They added a hundred thousand pages,
19   almost 2500 patents, to that rog response after the close of
20   fact discovery, after the close of expert discovery, after
21   summary judgment.  So now it's not one patent that they
22   identify that has now expired that claimed the functionality
23   that's in direct dispute for patent misuse, it's 2500.  And we
24   have no ability to take any discovery or deal with any expert
25   issues or file summary judgment on that issue.
```

JA675

```
 1          So I would say that's something specific to the
 2   bench trial that we need to have sort of looked at more
 3   closely because we prepared this case up to this point, and
 4   now days away from trial, with one understanding that they try
 5   to pull the rug out from us under -- basically with a month
 6   left.  Completely different case, turns it up on its head,
 7   because they lost summary judgment.  And so now the '783
 8   patent, which they know doesn't claim this functionality, has
 9   now expired.  Now they have 2500 patents that their witnesses
10   can dodge and weave and duck behind.  So we believe that's an
11   issue that I would ask the Court to reconsider.
12          THE COURT:  Mr. Stevens, is there anything you want
13   to say on that that you didn't say in your response?
14          MR. STEVENS:  Nothing in addition to the response.
15   We identified all those patents as part of either that rog or
16   a different rog response.  Again, the burden is on them by
17   clear and convincing evidence with patent misuse.  They've
18   never tried to come forward and say that their products don't
19   infringe.  As you remember from the hearing a couple months
20   ago, Mr. VanHoutan agreed that all of their products infringed
21   perhaps scores of Honeywell's patents.  So there's nothing new
22   here.  It's the same part of a rog that we just copied and put
23   into another rog.  There's absolutely nothing new here.
24          THE COURT:  I'll take another look at interrogatory
25   13.  If I change my mind about it, I'll let you know.
```

JA676

35

```
 1            MR. VanHOUTAN:  Thank you, Your Honor.
 2            THE COURT:  All right.  Let's turn to the motions in
 3     limine.
 4            All right.  The first one from Honeywell being to
 5     exclude testimony about information learned solely from
 6     communications between OPTO and its counsel.
 7            So what testimony does OPTO intend to put in through
 8     its witnesses that it learned from its counsel?
 9            MR. VanHOUTAN:  So this only applies to Mr. Tanaka
10     who was going to be brought live, but unfortunately I think he
11     popped his Achilles or something and had to have surgery.
12     He's in Japan and he can't now arrive so we've designated his
13     deposition transcript.
14            The only thing that's been identified by plaintiff
15     and that we've argued about in this MIL is questions about how
16     OPTO understood and how Mr. Tanaka specifically understood
17     that certain claims had been dropped from the ITC
18     investigation.  Now, Mr. Stevens is going to jump up and say
19     they weren't dropped, that's not true.  I'm not arguing about
20     semantics.  Whether they were retained for the purpose of the
21     ITC evidentiary hearing such that those were going to be
22     argued at the hearing or not and what those patents were drawn
23     to, whether they were image sensor products, patents and
24     claims, or laser scanners, and that's the distinction.
25            And we properly let Mr. Tanaka answer his
```

JA677

 1  understanding of what had happened at the hearing and during

 2  the case which had to come from his lawyer.  Number one, he

 3  doesn't speak English and this is a U.S. proceeding, the ITC

 4  investigation.  And clients always learn what happens from

 5  lawyers.  You may say, you know, what happened with this

 6  particular motion and your lawyer says we lost.  The client

 7  knows we lost.  That is not privileged information.

 8          What Mr. Stevens did in the deposition then goes one

 9  step further and said, What's your understanding?  The witness

10  answered.  He said, What's the basis for your understanding?

11  The witness said, My lawyers told me.  And then Mr. Stevens

12  said, What did he tell you?  What specifically did he tell

13  you?  And then he was given a privilege objection and told not

14  to answer.

15          So it's non-privileged facts that he testified

16  about.  And then when the question went into a privileged

17  communication with a lawyer specifically, he was told not to

18  answer.

19          THE COURT:  And the issue to which this evidence

20  would be put is what?  The breach itself or the affirmative

21  defense of...

22          MR. VanHOUTAN:  A little bit of both.  It's OPTO's

23  understanding of the scope of the ITC investigation at the

24  time the settlement was negotiated and reached.

25          THE COURT:  And that somehow informs whether these

```
 1   products are or are not 1.4 products?
 2            MR. VanHOUTAN:  Yes.  It goes to the parties'
 3   understanding of what they were settling.
 4            THE COURT:  But more pointedly, so the -- his
 5   testimony was that he learned of these supposed drops of
 6   patents as a matter of fact from his counsel.
 7            MR. VanHOUTAN:  Correct.
 8            THE COURT:  And you agree that if an attorney tells
 9   his client a fact, there's nothing privileged about that
10   communication.
11            MR. VanHOUTAN:  About the fact, no.  About the
12   communication, specifically what was said about that fact,
13   yes, that is privileged.
14            THE COURT:  Well, what distinction are you trying to
15   make there?
16            MR. VanHOUTAN:  The fact versus the communication.
17            The fact is these patents were not retained.  I'm
18   using language from Honeywell.  But let's just say they were
19   dropped.  And the only patents that were maintained were
20   patents which met sensor requirements.  The communication is
21   what exactly the lawyer said about it.  So he's testifying
22   about a fact, a public fact.  It's in a public filing in the
23   ITC investigation.
24            THE COURT:  But it wouldn't -- it's not a privileged
25   communication if you say such and such, such and such, and
```

JA679

38

```
1  such and such patents were dropped in the ITC.  That's not a
2  privileged communication, right?
3            MR. VanHOUTAN:  As to the facts, that's not.
4            THE COURT:  Okay.  So what I'm looking at is
5  Honeywell's reply to the response on this, which is document
6  292, and I'm looking at page 7 of the filed document where it
7  lists three questions that they were not permitted to ask.
8            "What is the -- and what is the basis for your
9  understanding that 'many patents were withdrawn in the ITC
10 investigation'?"
11           Another example, "What is the basis for your
12 knowledge of the statement you made moments ago that 'many
13 patents were withdrawn'?  I want to know the foundation, the
14 factual foundation for that statement you made under oath."
15           And third, "So am I correct that the entire factual
16 basis that you have for the statements you gave on behalf of
17 the company a few moments ago that 'many patents were
18 withdrawn,' your entire factual basis for that is something an
19 attorney told you; is that right?"
20           And at least according to this document, he was not
21 permitted to answer on the basis of attorney/client privilege.
22           MR. VanHOUTAN:  So I would say that those are a lot
23 of short cites, Your Honor.  If you go to our opposition to
24 the motion, document 278, at the bottom of page 3, and we've
25 got several cites here.  It's all the same material.  It's
```

JA680

39

1   whether these patents were withdrawn from the ITC

2   investigation, dropped, not retained, whatever, and what those

3   patents had claims to.

4           So at the bottom of page 3, the question is from

5   Mr. Stevens, "Okay.  What attorney -- what attorney told you

6   that 'many patents were withdrawn'?

7           "Answer:  It was Ryan who reported on that matter.

8           "Question:  Ryan Goldstein of Quinn Emanuel," who

9   was counsel for Optco at the time.

10          "Answer:  Yes.

11          "And what did Mr. Goldstein tell you that led you to

12  believe that many patents had been withdrawn?"

13          THE COURT:  Is it your position that elicits a

14  privileged answer?

15          MR. VanHOUTAN:  Yes.

16          THE COURT:  It sounds like a fact question to me.

17          MR. VanHOUTAN:  Well, you have to be very careful

18  because there's the underlying fact and then there's what he

19  told you about the fact.  What the attorney told a client

20  about the fact is attorney/client communication.  The fact

21  itself is not privileged.  That's the distinction we drew in

22  the deposition.  That's what he testified to.  One, the

23  patents were withdrawn.  Two, his basis for that was that his

24  attorney told him.  And when Mr. Stevens asked what

25  specifically did he tell you, that's when he was given the

JA681

1    instruction.

2           And we're not going to try to elicit that testimony
3    at trial.  It's already in.  This is a depo designation that
4    we're going to have for trial, so there's not going to be a
5    witness.  What's in the depo designation is the record that
6    we're going to put forward.

7           THE COURT:  There's at least one place in here where
8    Honeywell's counsel asks a question that would have clearly
9    elicited a privileged response.  But it seems to me that you
10   cut the cake a little too thin on having a witness testify
11   that I came to understand certain facts, but I'm not going to
12   tell you what facts I came to understand.

13          MR. VanHOUTAN:  I would object to that argument.  He
14   did say what the facts were.  What he wouldn't say, when he
15   was instructed not to answer I should say, was what your
16   attorney told you about those facts.  He gave the facts.  The
17   facts are patents were withdrawn.  And my understanding is
18   that the only patents that were remaining were the ones that
19   had image scanners in the claims.  That's what he was told.

20          Now, what specifically did your attorney tell you
21   when he told you that?  That is privileged information.  He
22   testified as to the facts.  And he was instructed not to
23   reveal attorney/client communications about those facts.
24   That's where we're slicing the cake.

25          THE COURT:  And the relevance of this, again, is

41

1  that somehow it informs whether or not these disputed products

2  fit the definition of 1.4?

3        MR. VanHOUTAN:  OPTO's understanding of the scope of

4  the dispute at the time of the settlement and the resulting

5  settlement agreement.

6        THE COURT:  Mr. Stevens.

7        MR. STEVENS:  So it doesn't inform those facts

8  whatsoever.  There's nothing about 1.4 in any of these

9  communications.  And the fact that he had this or that

10 understanding about the ITC, the scope of the agreement, if

11 you look in the preamble, Sections A, B, and D clearly say

12 this is going to resolve everything at the ITC, all seven

13 original patents.  Paragraph B says this resolves the entire

14 Delaware case.  And paragraph D says this agreement resolves

15 all other disputes between Honeywell and OPTO.

16       So the notion that somebody would believe that the

17 agreement was limited to a very specific slice of something at

18 the ITC is sort of beyond reason.  And nobody has said -- in

19 fact, the gentleman who we're talking about in his testimony

20 said he fully understood that they were settling more than the

21 ITC, that they were also settling Delaware and other issues.

22       So the notion that this somehow informs the jury

23 either about the dispute of 1.4 or what they thought they were

24 signing beforehand, which is all parol evidence that Your

25 Honor has taken care of, it's completely irrelevant.

JA683

1          Now, to the actual merits here, Your Honor, I think,
2    hit the nail on the head with the problem.  He's wanting to
3    tell facts and then not let us know what fact he was told.  I
4    mean, you can't -- that is slicing the salami too thin.
5    They've got to go one way or the other.
6          Now, if the attorney is simply providing factual
7    information to the client, for example, we do a lot of patent
8    prosecution and we send a letter to the client saying the
9    patent office rejected the application on such and such date.
10   There's nothing privileged about that.  But you have to show
11   the underlying communication, right?  You can't just say my
12   attorney told me this and then not show what your attorney
13   said.  I mean, this is classic sword and the shield.  If the
14   facts aren't privileged -- and I'm not necessarily going to
15   dispute that.  But if the facts aren't privileged, the
16   communication of the fact isn't privileged either.
17         If he went further in another email and provided
18   advice to the client, that's totally different.  But here the
19   issue is I asked him, you know, what is the basis for this?
20   He says, The basis is my attorney told me so.  Okay.  Well,
21   what did your attorney tell you about this very thing?
22   Privileged; instruct you not to answer.
23         So we have no way of probing whether the attorney
24   actually told him that or whether the attorney told him
25   something completely different and this was his interpretation

1  of the attorney's words.

2          So this is a sword and shield.  Or you can see my

3  comment in the deposition.  They should have gone one way or

4  the other.  Either this was all privileged and he shouldn't be

5  talking about attorneys or it's not privileged and he needs to

6  show the underlying communications that form the basis of this

7  factual information.  You can't just say, oh, the attorneys

8  told me this.  Well, what did the attorneys tell you?

9  Privileged.  We can't have someone come to this court and tell

10 a jury my attorneys told me so, thus it must be.  Well, what

11 specifically did they tell you?  The jury can't hear that.

12 That's privileged.

13         Now, one thing Mr. VanHoutan --

14         THE COURT:  Isn't one of the issues also that they

15 would have to establish whatever opinion, belief,

16 understanding this witness formed was a reasonable belief,

17 opinion, and understanding, which is hard to measure if you

18 don't actually know what he was told.

19         MR. STEVENS:  That's a hundred percent true.  Have

20 no way to probe that.  Have no way to gauge what he was told

21 or was not told, so I have no way to actually probe at trial

22 or at the deposition whether his reliance upon that

23 information was correct or a completely misplaced

24 understanding of what information was being conveyed to him.

25 So you're a hundred percent right about this.

JA685

44

1          Now, the good news of this dispute is because

2    Mr. Tanaka is not coming, it's all in the deposition.  So Your

3    Honor can actually see the actual questions and answers in the

4    deposition that they have put forward and our objections

5    thereto.  So this is not sort of a theoretical problem that

6    may or may not arise.  We now know exactly the questions

7    they're trying to get in and exactly the fact that they were

8    followed up by an instruction not to answer.  And so if Your

9    Honor wants to actually see exactly what happened, it's all

10   before you in what the parties filed in relation to

11   Mr. Tanaka's deposition.

12          Now, with that said, I also don't expect the witness

13   to come to trial, sit in the box and say, Your Honor, the

14   attorneys told me blobbity blah.  I don't expect that to

15   happen.  So there could be broader impact of this MIL, but the

16   main target was the Tanaka testimony which now is very much

17   more finite than it was at the time we filed the MIL.

18          THE COURT:  Yes.

19          MR. VanHOUTAN:  A couple of brief comments, Your

20   Honor.

21          One, they didn't move for a MIL on whether this

22   information was relevant to the issues.  They moved for a MIL

23   only on the attorney/client communication issue.  So that's

24   really all we should be talking about.

25          And I agree with Mr. Stevens that I think the best

JA686

1   course of action is for the Court to review the specific

2   answers -- excuse me, questions and answers that the parties

3   have designated for use at this trial and make the

4   determination.  Is he testifying about facts?  Does he

5   indicate where that information came from?  And is the next

6   question:  Tell me exactly what your attorney told you?

7           I mean, I guarantee if I was taking the deposition

8   of one of their witnesses who was a non-attorney, or even if

9   he was an attorney, and I said, What happened in this case

10  with regard to summary judgment?  Oh, we lost.  Who told you

11  that?  Oh, my attorney told me.  I didn't read it yet.  What

12  did he tell you?  I'm getting an objection and he's not going

13  to let me answer that question and that's appropriate because

14  what happened in the case, it's a fact.  And he indicated

15  where he heard it from.  His lawyer.  What did your lawyer say

16  about it?

17          He's talking about a litigation.  I mean, this was

18  an active litigation that was ongoing at the time where an

19  attorney was giving a report -- the attorney for --

20  representing the party in the litigation was giving a report

21  to the board about what happened.  How can that not be an

22  attorney/client communication?

23          THE COURT:  My guess is some of that communication

24  was quite privileged and some of it was not, and I'm of a mind

25  that the questioning was cut off too close to the defense side

46

1  of it and not close enough to the middle as it should have
2  been.  I have read it.  I'll go back and read it again and
3  we'll get, obviously, written orders out on these.  But I
4  expect to grant the first motion in limine by Honeywell.
5          The second motion, to bar interpretations of the
6  definitions of 2D Barcode Products under 1.4.  So this, I
7  think, wraps back in to what we were talking at the very
8  beginning what the parties have in mind and what you're trying
9  to achieve by this motion with respect to interpretation of
10  the definitions.
11          MR. PLEUNE:  Yes, Your Honor.  Ben Pleune on behalf
12  of plaintiff Honeywell.
13          Your Honor was very clear in the motion for summary
14  judgment as to the definition for 2D Barcode Products:  Any
15  device or article of manufacture that is operable to code at
16  least one or more two-dimensional barcode symbologies into
17  human-readable text.  And I was encouraged by the presentation
18  earlier through counsel for OPTO where they said that they
19  don't plan to revisit that definition.  They don't plan to
20  change that definition.  But as we said in our motion, we have
21  concerns that they have an intention to do just that, and we
22  saw that in some deposition designations for one of their
23  witnesses, Mr. Ronny De Winter, who now is planning to appear
24  in person at trial.
25          And just to give you a little bit of context, this

JA688

1  is a software engineer for Opticon Sensors Europe.  He's a

2  relatively new face to this dispute, who was originally going

3  to be Mr. Kerkowa [phonetic] who was going to be the 30(b)(6)

4  deponent for this area.  They substituted for a different

5  witness, which is fine.  It was Mr. De Winter.  And we learned

6  about him for the first time about a month ago.  That's when

7  his deposition took place.

8          Now, during his deposition, Mr. De Winter testified,

9  he said, "I'm a bit annoyed by the fact that all the focus was

10  on whether a symbology was 2D," whether or not a particular

11  symbology was 2D.  He was annoyed by that despite the fact

12  that I think, as we all discussed this morning, that really is

13  the operative issue that needs to be decided here by the jury.

14          But then he went on and he said, "Clearly" --

15  looking at the definition, 1.4, and focusing on the third

16  sentence, "Clearly, that says that for any avoidance of doubt,

17  the term 2D Barcode Products shall include engines and other

18  products that include a 2D image sensor."  And then he went on

19  to explain that "clearly, neither of these properties apply to

20  one or all of Opticon laser products."

21          And so that should sound familiar to Your Honor.

22  That was the exact argument that OPTO made during the summary

23  judgment arguments in support of their competing definition

24  for 2D Barcode Products.

25          This deposition was, of course, after Your Honor

48

1   ruled on the motion for summary judgment.  Mr. De Winter said
2   during the deposition that the first time he ever read the
3   agreement was in preparation for the deposition.  And so there
4   shouldn't be an OPTO witness that's never seen the agreement
5   until his deposition basically speaking in support of the
6   competing definition that you rejected during summary
7   judgment.  And so that's what we are trying to keep out of
8   this case.  It should be an application of Your Honor's
9   definition, not an attempt to offer testimony to change what
10  that definition is.

11          MR. MUCKENFUSS:  Totally agree.  Have no problem
12  with that.  That is not how we're going to use the evidence.
13  I agree Mr. De Winter can't talk about the third sentence and
14  try to alter the definition.  I have no problem with that.

15          The evidence that we talked about earlier relates to
16  the application of the definition to the product.  For
17  example, when Honeywell describes the product as a 1D product,
18  not trying to redefine it.  Not trying to alter the definition
19  in the agreement.  It relates to exactly whether a product is
20  operable to decode a 2D symbology.  When the plaintiff itself
21  describes that product as a 1D product, that is relevant as to
22  whether that definition, both whether it's operable to the
23  code, the 2D symbology, and whether it's in fact a 2D
24  symbology, it's relevant to that issue.

25          So I actually have no problem with what Mr. Pleune

JA690

1   said.  We are not going to offer any evidence to redefine 2D

2   Barcode Products.  Mr. De Winter is not going to do anything

3   to talk about the third sentence.  I understand he testified

4   to that.  I mean, he said it.  They were asking the questions.

5   But we're not going to do anything to alter the definition

6   that Your Honor has already ruled on.

7           But it is very relevant and very much a fact issue

8   as to whether this definition from a technology standpoint

9   applies to laser scanners that can decode PDF417.  And that's

10  what the evidence will be used for.

11          THE COURT:  I think probably on this we're just

12  going to have to hear the testimony and either not allow it or

13  have some sort of instruction with respect to it.  I'll just

14  have to react to it.

15          All right.  Honeywell's third motion in limine to

16  exclude evidence or argument regarding Honeywell's

17  infringement contentions from the ITC.

18          Mr. Stevens, is that yours?

19          MR. STEVENS:  It is, Your Honor, and you've heard

20  most of these arguments already earlier today.

21          Again, this document is a document that nobody at

22  OPTO saw or relied on.  Now, we've asked them in emails over

23  the past month to confirm that nobody at OPTO ever saw this

24  document before they signed the agreement.  They won't get

25  back to us on that.  They won't respond to us.  But as far as

50

1   my understanding is, nobody ever saw this document.  So
2   there's no world where anyone at OPTO ever relied on it.  So
3   it has nothing to do with anyone's state of mind at OPTO.
4           Moreover, it's a document that's parol evidence and
5   extrinsic evidence.  It came before the agreement.  The
6   agreement says it explicitly supercedes anything beforehand,
7   be it correspondence or emails or anything said.  So this is
8   one of those things where the integration clause, the
9   superseding clause, should absolutely bar its admission into
10  the case.
11          Moreover, I have very serious concerns that the
12  ITC's protective order has been violated by the use of this
13  document in this case.  They have taken a little small excerpt
14  of something that was probably hundreds of pages, if not maybe
15  a hundred pages.  Didn't produce it at any time in this case,
16  and then all of a sudden in briefing it just shows up.
17          So for several different reasons it should not come
18  in.  It's parol evidence.  It should not be allowed in.  They
19  can't make any proffer that anyone at OPTO ever saw it and
20  relied upon it.
21          It's evidence that should be stricken because of the
22  integration or superseding clause of the actual agreement
23  because our agreement has exactly that clause.
24          It's violative of a -- not a sister court, but a
25  government agency's protective order.

JA692

1           And it wasn't produced in discovery in this case.  I
2    never got a chance to put it in front of any of their
3    witnesses to say, You never saw this, did you?  No, I didn't.
4    Never had the chance to do that.
5           THE COURT:  Have you seen whatever they purport to
6    use for an exhibit?
7           MR. STEVENS:  I have now because they used it at a
8    deposition of our expert last month and I think they attached
9    it to a filing that they made to this Court.  So I've seen it
10   now, but I've only seen it from them within the past two to
11   three months.  Discovery here ended at the end of September.
12   I think it was September 30th of 2022 was the close of
13   discovery.  It was never produced before then.
14          THE COURT:  Is what you were shown an accurate copy
15   of what was actually used at the ITC?
16          MR. STEVENS:  I have no reason to think that it's
17   not accurate of the excerpt.  It's certainly not an accurate
18   representation of the entire document.  But I don't have any
19   way to know that for certain, Your Honor.  But I have no
20   reason to doubt that the excerpt itself is an accurate and
21   faithful excerpt of a larger document that was used at the ITC
22   back in 2019.
23          THE COURT:  Mr. Muckenfuss, is this yours?
24          MR. MUCKENFUSS:  Your Honor, Christine Lehman will
25   handle it.

52

```
1          THE COURT:  And the question I have about this is,
2   is there evidence to show that anyone at OPTO knew of this
3   claim chart, had ever seen it?
4          MS. LEHMAN:  Well, I mean, Your Honor, I think part
5   of the confusion of Mr. Stevens is -- and I think this infects
6   this case throughout just because of the nature of the
7   dispute, is the role of outside counsel and the clients in a
8   lot of these cases with sort of high, very detailed protective
9   orders.
10          I mean, this document, the claim chart, only has
11   OPTO information.  This is a chart with Honeywell's patent
12   claims on one column and very detailed OPTO information about
13   OPTO products, how OPTO products operate, excerpts from OPTO
14   product documents, excerpts from OPTO source codes all in
15   there.  This document was drafted by Alston & Bird.  This is
16   an Alston & Bird created document.  They were not allowed to
17   keep it after the ITC case ended because it contains OPTO
18   confidential information.
19          THE COURT:  My question was --
20          MS. LEHMAN:  So has anybody from OPTO -- so I don't
21   think anybody from -- an OPTO employee ever sat down and read
22   the entire...
23          (Defense counsel conferred.)
24          MS. LEHMAN:  Whether they saw the final compiled
25   version -- I mean, what we would have done necessarily in a
```

JA694

53

1   patent infringement case, the other side tells you, hey, this
2   is all the detailed analysis using your detailed technical
3   documents about how it infringes.
4           I mean, I'm a patent lawyer.  I have an engineering
5   degree.  Do I understand all the source code and barcode
6   scanners?  No.  What you do is, yes, you go and you sit down
7   with your engineers and say, okay, the allegation is this part
8   of the source code does this function.  Is that right?  Can
9   you explain to me why that's not true?
10          So I was not counsel in that ITC investigation, but
11  that is the normal way that we would use such a document,
12  absolutely, is to understand -- we have to understand the
13  infringement allegations.  So whether it was the exact form or
14  we used the allegations sort of page by page and said, look,
15  Honeywell says that this functionality on this page of this
16  document corresponds to this part of their patent claim, is
17  that right?  What technical arguments can -- information can
18  you give me to help respond?  I mean, that's how it works.
19          THE COURT:  But it's the use of this claim chart
20  that's at issue.  And for it to be relevant to anything, none
21  of what you said, I think, makes any of it relevant.  The
22  question would have to be that somehow it informed -- this
23  chart, having been put before the ITC in that proceeding
24  somehow informed OPTO's understanding of the agreement they
25  were about to sign.  And if they were forever ignorant of this

JA695

54

1   chart -- sure, they knew what went into it in part because

2   it's their information.  But what is this chart -- how did

3   this chart possibly inform their thinking as to what agreement

4   they were about to execute?

5           MS. LEHMAN:  First of all, there is no reliance

6   required for the defense in quasi-estoppel.  So to the extent

7   that there is any allegation that we need this explicit

8   reliance from an OPTO witness to come here and say I reviewed

9   the entire claim chart.  What we do know is -- I mean, outside

10  counsel for both sides were the ones sitting there negotiating

11  this settlement agreement with the client and the information

12  that, hey, these are the products that are accused, you know,

13  and, oh, these are the ones that were dropped and the fact

14  that these were 1D, and all of that, absolutely.

15          This was Honeywell's state of mind.  You know, this

16  shows what Honeywell thought was these are 1D products.  The

17  products that are operable, that decode the types of codes

18  that are in these claim charts, those are 1D.  It's absolutely

19  relevant to show what Honeywell's state of mind was.

20          And then for -- and that's why, you know, we think

21  it's very important to this quasi-estoppel defense because

22  this very much is an example of a party saying one thing to --

23  in the ITC case to the party saying one thing and then now

24  saying something else.

25          THE COURT:  Well, that's where I was when we first

JA696

1  got here.  I can sort of understand the argument for this

2  exhibit with respect to the affirmative defenses.  But I --

3  neither from you nor Mr. Muckenfuss have I been able to figure

4  out how it is applicable to the breach of contract claim.

5        MR. MUCKENFUSS:  If I may add, Your Honor, so there

6  is an issue, again, outside of -- there's an issue as to the

7  technology and whether it's covered under -- right, the

8  definition would cover this technology.  When Honeywell

9  describes it as a 1D product is directly relevant as to

10  whether it's operable to decode a 2D symbology.

11        So we're not using it to say, hey, there's a

12  different meaning to the definition.  It is their admission.

13  It's their statement that this technology is a 1D barcode

14  scanner.  It doesn't change the definition.  But it is the

15  plaintiff's admission, it is their statement that it is, in

16  fact, a technology that is not operable to decode a 2D

17  symbology.  That's how it's relevant.

18        We're not trying to change the contract.  We're not

19  trying to say, oh, there was a different understanding than

20  what the contract says.  Look at this.  No.  When the jury is

21  trying to decide -- I'm looking at the definition.  The judge,

22  Your Honor, has told me what the definition is.  It's not

23  ambiguous.  But I'm trying to figure out is this laser scanner

24  that can decode a PDF417, does it fit within the definition?

25  And I see evidence where Honeywell describes it as a 1D

1  barcode scanner.  The argument there is they are saying it is
2  not operable to decode a 2D symbology.
3          We're going to fight about that.  But it is relevant
4  to the application of the definition to the technology.  Even
5  though it comes before the agreement, it relates to the
6  parties' statement about what the technology is, and that is
7  very relevant as to whether this definition covers that
8  product.
9          THE COURT:  But isn't one of the problems here that
10  the definition being used or asserted in front of the ITC is
11  not the same definition that wound up in the agreement?
12          MR. MUCKENFUSS:  I'm not -- to be honest, I'm not
13  focused on the definition that's asserted in front of the ITC.
14  What I'm focused on is how they're describing a technology.
15  It has nothing to do, in my view, right -- there are many
16  other instances where the parties describe laser scanners,
17  including Honeywell.  In their own marketing documents they
18  describe laser scanners as 1D barcode scanners.
19          I'm not talking about what definitions shown to the
20  ITC or anything like that.  What I'm talking about is
21  Honeywell views the laser scanners at issue here as 1D barcode
22  scanners.  That has nothing to do with the definition in front
23  of the ITC.  That's their view of what the technology is.
24  That is directly relevant as to whether it's operable to
25  decode a 2D symbology because a 1D scanner is not operable --

57

1  this is our position.  A 1D laser scanner that they describe

2  as 1D is not, in fact, operable to decode a 2D symbology.

3       THE COURT:  Do you want to respond to Honeywell's

4  argument that OPTO shouldn't even have this document?  It

5  should have been destroyed pursuant to the protective order.

6       MS. LEHMAN:  Yes, I'd like to respond to that, Your

7  Honor.  I used to work for the ITC.  I've been trying cases

8  there for 30 years.  That's not an accurate representation.

9  The only information in this document that is confidential

10 information is OPTO information.  There are no Honeywell

11 documents cited in here.  I mean, the way ITC cases work, each

12 side produces documents and information.  You don't see a

13 single Honeywell document cited in here.  There's no testimony

14 of a Honeywell witness in here.  I was surprised to see them

15 say in their brief that this contains Honeywell information

16 because we've asked them repeatedly to identify any Honeywell

17 confidential information in here and they have not been able

18 to.

19       THE COURT:  I understood their argument to be not

20 that it contained their information but that the claim chart

21 and whatever it was part of, pursuant to the protective order,

22 were not supposed to be maintained by either party after the

23 action.

24       MS. LEHMAN:  Only if it contains the other side's

25 confidential information.  So as -- you know, this document

JA699

58

1  only contains OPTO confidential information.  So OPTO is

2  absolutely permitted to retain information where it's

3  documents that only contain its own confidential information.

4          THE COURT:  Mr. Stevens.

5          MR. STEVENS:  Would you like me to address that or

6  everything?

7          THE COURT:  Just that.

8          MR. STEVENS:  That's incorrect.  This document as a

9  whole had plenty of Honeywell confidential information in it.

10  She has an excerpt.  I don't know what she has in her hand,

11  but the document as a whole had contentions about our own

12  products and source code about our products.  So that's not

13  correct.

14          The ITC protective order doesn't say anything about

15  whose confidential.  It says the designating party has the

16  right to designate something.  If the receiving party wants to

17  de-designate it, they have to file a motion.

18          Now, sometimes in ITC cases there's email between

19  counsel saying, hey, do you mind if we show this one document

20  to our client?  That happens.  And sometimes you say, yeah,

21  that's fine.  That didn't happen here.  This document should

22  not have been -- should not be retained right now and should

23  have been destroyed.  It violates the ITC protective order.

24  It's a document that Honeywell disclosed as containing CBI.

25  The entirety of the document does, in fact, have Honeywell's

JA700

59

1  CBI, confidential business information, Opticon CBI, and very

2  well may have even had third-party CBI.  So I don't think it

3  should be here.

4        Moreover, I've had two different judges at the ITC,

5  and I suspect Ms. Lehman has as well, judges at the ITC saying

6  you don't get to make that decision.  Even if you think this

7  document has your information only in it, if you didn't write

8  it, you don't get to make that decision unilaterally.  There's

9  mechanisms in the protective order to go to your adversary or

10 to go to the Court and move for it to be de-designated and

11 that never happened here.

12       MS. LEHMAN:  Your Honor, we raised this ITC claim

13 chart.  And it's clear we've always been consistent and

14 referenced only Exhibit F3, which is just the exhibit that

15 only addresses the OPTO 1D products, that only contains OPTO

16 information.  We raised this in our answer to the complaint.

17 We described how they've characterized this.  If they wanted

18 to raise this at the ITC, they could have done it any time

19 that this case has been pending and they've not.

20       THE COURT:  And how do you plan to authenticate that

21 document?

22       MS. LEHMAN:  Well, this is, like I said, an Alston &

23 Bird document.  It was created by the attorneys on that side

24 of the table.  This also relates to the pending motions to

25 quash for either Mr. Doane or one of the Alston & Bird's

JA701

1    custodians.

2          MR. STEVENS:  Can I speak a little bit more to the

3    substance of the document?

4          THE COURT:  Yes.

5          MR. STEVENS:  So Mr. Muckenfuss again said that the

6    document talks about decoding barcode symbologies.  If it did,

7    they would have showed that to you because it doesn't say

8    that.  There's no point in that document where it talks about

9    decoding.  This particular patent that this F3 or F4 is in

10   relation to is about something called data editing.  So a

11   barcode reader sometimes when the data comes out, you can set

12   it to do different things with the data, like drop the first

13   three digits or, you know, put Starbucks in front of it.

14   That's what this is talking about.  Had nothing to do with

15   barcode symbology.  So that's simply not in this document

16   whatsoever.

17          Again, the point is nobody at OPTO ever saw it or

18   relied upon it.  Now, they say, well, you know, reliance isn't

19   necessary for quasi-estoppel.  There's two problems with that

20   argument.  Quasi-estoppel has to be something that happened

21   once the agreement came into place.  It has to be we had an

22   agreement and after the fact Honeywell said, oh, yeah, don't

23   worry about laser scanners.  That would be a quasi-estoppel

24   situation.  It's not something that was said beforehand that

25   the agreement in question explicitly supercedes, so it can't

JA702

61

1    be relevant based upon that.

2              The second thing is Honeywell never saw the document

3    either.  Honeywell's in-house people weren't allowed to see it

4    and haven't seen it.  So it can't be relevant to

5    quasi-estoppel because it never informed anything Honeywell

6    did either.

7              So again, this document didn't inform either party's

8    position.  You know, what I think is happening here is they

9    have realized they got caught with their hand in the cookie

10   jar and they've gone through the file and said, gosh, can we

11   find anything that somehow makes it look different.  That's

12   the reason that we have an integration clause, so that you

13   don't come back later with some random thing that you found in

14   a drawer and be able to say that that's something different

15   than the agreement.  There is nothing in this chart that

16   informs the analysis of the 1.4 test that's in the actual

17   agreement.  It's simply not there.  If it was there, they

18   would have showed it to you.

19             THE COURT:  And so the exhibit you're talking about,

20   I think you referred to it as it's an exhibit called F3 to

21   some larger document?  Is that...

22             MS. LEHMAN:  Yes.  It's the infringement claim

23   chart, Exhibit F3.  So it's only the claim chart showing

24   infringement of the '783 patent by the OPTO 1D product.

25             THE COURT:  And how many pages is it?

JA703

1              MS. LEHMAN:  Forty-five.

2              THE COURT:  And has that been provided to the

3    plaintiffs?

4              MS. LEHMAN:  We have offered when we've tried to do

5    the motions to seal.  And we did provide the whole thing, yes,

6    we have.

7              THE COURT:  All right.  I want two copies of it in

8    my chambers by 12:00 tomorrow.

9              MS. LEHMAN:  I have some copies here we can hand up.

10             THE COURT:  That would be even better.

11             MR. MUCKENFUSS:  Your Honor, if I may very briefly

12   just correct something.  I never said that the document talked

13   about symbologies.  What I said was, and I've been consistent,

14   I think, in my argument.  They describe the product as 1D.

15   That is very relevant as to whether, again, it's operable to

16   decode a 2D symbology.

17             THE COURT:  See, here's where I keep -- I understand

18   your argument, Mr. Muckenfuss.  What I'm wrestling with is

19   that if they said this was 1D in that document for those

20   purposes, that doesn't necessarily mean that the definition

21   agreed to by the parties to resolve a huge amount of disputed

22   claims didn't use some other definition, like 1.4, that said,

23   well, for those purposes it was 1D, but for these two purposes

24   it's 2D.

25             MR. MUCKENFUSS:  Well, I'm not trying to contradict

1   the definition.  The definition describes products as being
2   operable to decode 2D symbologies.  Actually, in their
3   briefing in this case in response, I think, in the MILs, they
4   actually concede that a laser scanner that can decode PDF417
5   is a 1D scanner.  Now, we disagree on what that means, right,
6   but our position is they want to say it's about the hardware.
7   Oh, it's about how the laser scanner reads a symbology.

8          They admit, and this is what -- it's not that 1D is
9   a different definition than what's in this -- in 1.4.  What
10  it's informing is, is it operable to decode a 2D symbology?
11  We're trying to figure out -- the jury is going to try to
12  figure out whether this definition applies to this product.
13  We're not trying to change the definition.  When they call it
14  a 1D barcode scanner, it's not a different definition than
15  this.  It's actually informing whether it can actually decode,
16  it's operable to decode a 2D symbology.

17         In their own briefing -- actually, I'm a little
18  surprised they said this, but they admit that a laser scanner
19  that decodes PDF417 is a 1D scanner, a 1D scanner that can
20  only read in one dimension.  That is very relevant to whether
21  the jury can decide whether this definition applies to those
22  products.  They'll disagree with that and that's fine, but
23  that's our case.  And it's not changing the definition.  We're
24  not trying to say there's a different definition.  But it's
25  informing the jury whether this definition from a technology

1   standpoint applies to that product.

2          THE COURT:  All right.

3          MR. STEVENS:  Let me just state for the record.  I

4   can't let that go unsaid.  We didn't say anything close to

5   what he just said about a laser product that can decode PDF417

6   is a 1D barcode product for the agreement.  We never said

7   anything in the zip code of that statement.  That's just

8   simply not true.

9          The claim chart doesn't talk about decoding.  It

10  doesn't inform anything about whether the products are capable

11  of decoding PDF417 or not.  That's simply not in there.

12  Didn't even use the same term.  Didn't even use the term 1D

13  Barcode Product or 2D Barcode Product.  That's a term from the

14  agreement.  That's not even the term that is used in the ITC

15  chart that Your Honor will see.  Just simply not there.

16          (The Court and Mr. Brenner conferred.)

17          THE COURT:  Is there a part of that 45-page document

18  that I should be paying particular attention to or should I

19  read it and try to figure it out?

20          MS. LEHMAN:  You know, Your Honor, it's really the

21  title and the first paragraph where they describe, you know,

22  what they're characterizing as Opticon 1D products.  That is

23  really -- the fact that, you know, some of these are the same

24  products that they are -- that are also accused in this case

25  as being in this middle ground where they say the royalties

65

1    were due and we say the royalties were not due.

2            THE COURT:  Is there some place in there where they

3    specifically name products?

4            MS. LEHMAN:  In this first paragraph, yes.

5            THE COURT:  In the first paragraph.  But not in the

6    other 44-1/2 pages.

7            MS. LEHMAN:  The other 44-1/2 pages are detailed

8    claim charts.

9            (Defense counsel conferred.)

10           MS. LEHMAN:  Right, there's a section about the 2D

11   products.

12           THE COURT:  Does it list products of OPTO'S that at

13   least in that document Honeywell was saying were 1D products?

14           MS. LEHMAN:  Yes.

15           THE COURT:  And are some of those products the same

16   ones that now Honeywell says are 2D royalty-bearing?

17           MS. LEHMAN:  Yes, they are.

18           THE COURT:  Can you explain to me why, and maybe you

19   can't, why somebody didn't attach a list of products to the

20   settlement agreement so that people have a clue as to what

21   1.4 -- no doubt drafted by a very smart IP attorney -- why

22   somebody didn't list the products that fell into 1D and 2D?

23           MS. LEHMAN:  Probably would have saved us all a lot

24   of time.

25           THE COURT:  Yeah.  Okay.

JA707

66

 1          All right.  Let's move on to OPTO's motions in
 2    limine.
 3          Motion number one, to exclude evidence related to
 4    turning off certain functionalities.  That's granted.  It's
 5    nice of Honeywell to not want to confuse the jury, but I don't
 6    believe for a minute that's why you wanted to put that
 7    evidence in there, to avoid confusion.  I think you wanted to
 8    put it in there exactly so the jury would draw the inference
 9    that there had been an admission on OPTO's part and we're not
10    going to let that happen.
11          MR. PLEUNE:  Your Honor, can I just point to Exhibit
12    A from our response to that motion and just at least explain
13    our thoughts on this.  And I'll do it very briefly, Your
14    Honor.
15          THE COURT:  If the hole is hip deep, might as well
16    go for the shoulder.
17          MR. PLEUNE:  Yes, Your Honor.  And I just want to
18    very briefly point out that this is not being offered to show
19    culpable conduct.  This is the change and this is -- we've
20    heard all morning counsel for OPTO talk about what is at issue
21    here.  And the question is, is PDF417 a 2D barcode or is
22    PDF417 not a 2D barcode?  In addition, can a laser scanner
23    read a 2D barcode or can it not read a 2D barcode?
24          So this is the change that was made to their source
25    code and this is the firmware for one of their laser scanner

JA708

67

1  products, and this is exactly what they said.  They said the

2  2D code reading command is no longer supported.  This is how

3  they described it when they took this feature out.  The very

4  next bullet, they deleted the PDF417 read permission.

5          This is not to show culpable conduct.  This is to

6  show that what they are arguing, what OPTO is arguing, that

7  PDF417 is not a 2D barcode, is completely inconsistent with

8  the way their firmware reads.

9          THE COURT:  Second motion by OPTO is to exclude

10  evidence regarding discovery disputes.  Is somebody intending

11  to put on evidence regarding discovery disputes?

12          MR. VanHOUTAN:  I think that's agreed as between the

13  parties, Your Honor.

14          THE COURT:  Started to remind me of the --

15          MR. STEVENS:  Agreed, yes.

16          THE COURT:  Started to remind me of a big white

17  collar criminal case I had where the government filed a

18  38-page motion in limine that essentially said follow the

19  rules and the law.  We asked the Court to direct the other

20  side to follow the rules and the law.

21          That's granted.

22          All right.  Third, litigation reserve.  That's

23  granted.

24          Testimony of David Taylor.  We had fun with this

25  last time.  I guess we can again.

JA709

68

1          To the extent that you have forecast evidence from
2    Mr. Taylor that you think the Court might consider, it seems
3    to me it all goes to -- if at all, to the patent misuse issue.
4    Do you dispute that?  Do you still say there's something the
5    jury could benefit from from Mr. Taylor?
6          MR. STEVENS:  I will let my colleague address this
7    one.
8          MR. SPRINGER:  Good afternoon, Your Honor.
9    Appreciate your bearing with us during some musical chairs
10   here.  Brandon Springer with Alston & Bird.
11         To keep it really brief here, I think there's one
12   key issue which is OPTO's mischaracterization of the prior ITC
13   action and whether patents were dropped or are otherwise
14   dismissed by Honeywell in that action.
15         And Professor Taylor in his rebuttal report -- I'll
16   direct you just to paragraph 67 of that, which is docket
17   138-2.  He opines that OPTO's factual premise is false.  And
18   it's not based on the language of the agreement.  It's based
19   on his understanding of how patent litigation works, his
20   understanding of ITC.
21         And so he says, "To drop patents and/or claims of
22   patents in an ITC investigation, a complainant files a motion
23   to partially terminate the investigation as to certain claims
24   and/or patents.  The administrative law judge then enters an
25   order either granting or denying such a motion.  The ITC then

JA710

69

1    issues a notice indicating whether it has determined to

2    review."  Going down a little bit further, "I understand none

3    of this had begun at the time of the agreement."

4         And so we only intend to offer him as a rebuttal

5    witness to the extent that OPTO intends to put forward

6    evidence saying, hey, we understood XY and Z patents were

7    dropped in the ITC.  We understood that Honeywell dismissed

8    those.  Those were not at issue at the time of the settlement.

9    We think that his testimony is essential to rebutting that as

10   an expert who has practiced in that area, who understands

11   patent licenses and disputes, and who has reviewed the docket

12   and the relevant pleadings in that case.

13        OPTO argues that, you know, any juror could just

14   read the documents and understand.  I think, you know, this

15   dispute shows that that's not necessarily true and the jury

16   would absolutely benefit from his expert testimony on that

17   point.

18        THE COURT:  Mr. Muckenfuss, as I understand your

19   theory on this, it's that it doesn't really matter whether

20   OPTO had a correct understanding of what it meant to drop

21   patents at the ITC, but it merely served to inform their

22   thinking leading up to the execution of the agreement, right?

23        MR. VanHOUTAN:  I'll handle that, Your Honor.

24        Yes, that's exactly correct.  And this is just

25   semantics.  I mean, the order from the ALJ in the ITC said

JA711

1    you're going to drop some patents.  Drop.  And then they filed
2    a motion to say that we are retaining these.  These are the
3    ones we're going to the evidentiary hearing with.
4         We don't intend to argue about dropped or dismissed
5    or retained.  All that matters, and this is not in dispute, is
6    they went forward with patents at the ITC evidentiary hearing
7    that were all related to claims -- that all had claims related
8    to image scanners.  And the evidentiary hearing was going to
9    be only about these patents.  And any outcome from that
10   evidentiary hearing, like an importation ban, would only be to
11   those patents and products which were all two-dimensional.
12        THE COURT:  Yeah, but you want to put on evidence
13   that OPTO understood that patents were dropped.
14        MR. VanHOUTAN:  We don't need to say dropped.  I'm
15   happy to say that these other patents --
16        THE COURT:  Well, that's what's in the deposition
17   that we're going to have to live with because he's not going
18   to be here, and he said dropped.
19        MR. VanHOUTAN:  I'm happy to take a look at that and
20   potentially we can remove that.
21        THE COURT:  See, that's the whole problem with this,
22   though, because where I'm going with my question was that your
23   argument is, you agreed with my restatement of it, that it
24   doesn't matter if OPTO really perfectly understood the whole
25   ITC process.  They were working from an understanding that

1   patents had been dropped.  But they weren't allowed to answer
2   what made you think that and what did you -- what do you mean
3   by dropped and what's the effect?  They weren't allowed to ask
4   questions like that.

5          MR. VanHOUTAN:  They were asked what's your
6   understanding for that and he said counsel told me.

7          THE COURT:  Yeah, we've explored this.  That's
8   probably not going to go very far.

9          All right.

10         MR. SPRINGER:  If I may just briefly, Your Honor.
11  We agree with that.  That because we were unable to explore
12  the full basis of Mr. Tanaka's knowledge of that, there's no
13  way for us to probe whether or not he actually did believe
14  that they were dropped, what he believed as far as the scope
15  of the settlement agreement at the time.  And again, this is
16  only relevant, you know, to their affirmative defenses.  It's
17  not relevant at all to the actual breach itself.

18         THE COURT:  Or the significance of.  It seems to me
19  when you came to this privilege issue, if you were going to
20  have as part of your defense, here's what we were thinking
21  when we executed this agreement, this is what we understood
22  was in dispute in this universal fight that we were having and
23  here's why we -- you probably were going to have to waive
24  privilege and didn't.  That's fine.  That's your decision.
25  But what I'm getting at is my guess is that you, by not

1   waiving privilege and asserting selective privilege in a
2   certain way, that you probably removed some of that evidence
3   and defense from your case.  I know you don't agree with that.
4   I wasn't asking for an agreement.
5           MR. VanHOUTAN:  Yeah.  So I don't want to reargue
6   the issue, but the facts are the facts.  And if those facts
7   come into evidence through some other means, they're the
8   facts.  Now, they can complain that they didn't get to ask
9   Mr. Tanaka about conversations with his lawyers, but those are
10  clearly privileged.
11          So the fact that these guys -- and I'm saying these
12  guys meaning Honeywell -- were told to drop patents, and
13  that's what the ALJ's order said, drop patents, and they said
14  we retain these four and these four had certain claims and
15  they were claims only with image scanners and they were
16  accused only against OPTO's 2D products, those are facts.  So
17  if those come in some other way, so be it.
18          THE COURT:  Okay.  I think you over argue the scope
19  and the importance of all that because it leaves out all of
20  the entirety of the dispute between the parties that resulted
21  in this agreement.  You act as if that agreement did nothing
22  more than resolve the four remaining patents before the ITC.
23  That is not what that agreement achieved.  Everybody
24  understood that's not what that agreement achieved.
25          MR. VanHOUTAN:  You're correct.

JA714

73

1          THE COURT:  That was one small piece of the pie.

2          MR. VanHOUTAN:  And the second amendment resolved

3     European litigations as between the parties which is an

4     integral part of the contract as well.

5          THE COURT:  So Mr. Taylor, if he's a witness at all,

6     will be a rebuttal witness to OPTO's case, correct?

7          MR. SPRINGER:  Yes, Your Honor.

8          THE COURT:  Well, we'll wait and see if there's

9     anything that he's qualified to rebut.

10          All right.  Fifth, motion in limine by OPTO, any

11     evidence or testimony concerning the theories of breach of

12     contract that Honeywell failed to include in its operative

13     complaint.

14          I think we've gone through that earlier about this

15     section is a claim, that section is not a claim.  Any further

16     discussion needed to be had about that?

17          MR. STEVENS:  No, Your Honor.  I think you resolved

18     this one.

19          MR. MUCKENFUSS:  Agreed.

20          THE COURT:  Number six, testimony of trial counsel

21     concerning the claim chart.

22          We've danced around this a little bit.  Who would

23     like to address that?

24          MS. LEHMAN:  I'll address that, Your Honor.

25     Christine Lehman.

JA715

```
 1          Again, we thought it was going to be a fairly
 2    noncontroversial request.  Just, you know, as I said, this is
 3    an unusual case where now trial counsel was personally
 4    involved in a lot of the actions that happened that were --
 5    that are in dispute now.  And so, you know, we understood your
 6    prior ruling on the motion to compel.  We did not depose
 7    Mr. Stevens and Mr. Pleune.  And so we just don't want the
 8    testimony to sort of come in as argument and just sort of in
 9    the form of, well, I was involved in that audit and let me
10    tell you this is what happened.
11          So I don't think it's terribly controversial.  We
12    just wanted to try to get some guidance on where that line
13    would be for trial.
14          THE COURT:  I expect that counsel for Honeywell
15    would anticipate a thorough thrashing if you made an argument
16    like that to the jury.  Is that understood?
17          MR. STEVENS:  It is understood.
18          MS. LEHMAN:  Thank you, Your Honor.
19          THE COURT:  Number seven, previous attempts by
20    Honeywell to license its patents to OPTO.
21          What would be the relevance of that?
22          MS. GRIFFIN:  Yes, Your Honor.  Lauren Griffin on
23    behalf of Honeywell.
24          So it's relevant to many of the issues that will be
25    before the jury.
```

75

1          The first is just relevant background of why are we

2     here?  How did the parties come to know each other?  And the

3     opening line of OPTO's trial brief says, "This case is the

4     latest installment in Honeywell's litigation campaign against

5     OPTO that dates back more than four years."

6          Well, that's not true.  The parties have been

7     talking about this for a while.  And to properly rebut that

8     and to tell the full story, Honeywell needs to be able to say,

9     look, we've been talking to them.  They've known about our

10    patents.  We've told them about our patents.

11         And moreover, as you've heard ad nauseam today, OPTO

12    contends that their laser and CCD products that are operable

13    to decode 2D barcode symbologies are not royalty-bearing

14    products.  This shows that from the very beginning Honeywell

15    has been crystal clear.  Every single one of OPTO's products

16    infringes one or more of Honeywell's patents.  Their laser and

17    CCD products have always been in play and have always been

18    accused.

19         Moreover, these are relevant to OPTO's counterclaims

20    and defenses.  Each of their unilateral mistake,

21    quasi-estoppel, and implied covenant of breach of fair dealing

22    deals with some sort of knowledge component.  This evidence

23    shows that Honeywell has always again been consistent.  The

24    laser and CCD products have always been accused of infringing.

25    They've always been contended to be royalty-bearing products.

JA717

76

1  Honeywell has not taken any inconsistent positions there and

2  OPTO knows that.  So that is why it is directly relevant to

3  the issues that will be before the jury, Your Honor.

4          THE COURT:  Who's got this one?

5          MR. YORK:  York Faulkner for OPTO.

6          First of all, there really will be no relevance.

7  There were two instances of negotiation concerning licensing

8  between OPTO and Honeywell.  The first was in September, began

9  in September of 2011, nine years before the settlement

10  agreement.  It involved Honeywell post-OPTO.  They wanted to

11  license a certain patent family, the so-called '628 patent

12  family.  All the claims in that patent family concerned

13  products that had a 2D image sensor.  These are products that

14  are not in dispute in this case.  They're not the laser

15  products.  They're not the CCD products that are being

16  disputed in this case.  OPTO has paid all royalties on its

17  sales of its 2D imaging products on time every quarter.  There

18  is no dispute about that.  That's what that negotiation was

19  about.

20          And a little bit about the negotiation.  Honeywell

21  contacted OPTO.  There was some email exchanges and

22  communications.  And then Honeywell went dark.  They just

23  dropped off the map.  It ended not because OPTO refused to

24  take a license, but because the communications simply ended.

25          The second episode began in 2013 in July.  One of

JA718

77

1   Honeywell's executives showed up at OPTO's headquarters and
2   wanted to license 14 patents to OPTO.  Again, they started
3   negotiations and spoke, and then Honeywell disappeared.  OPTO
4   didn't refuse to take a license.  Honeywell just stopped
5   negotiating.

6           We don't know why Honeywell stopped negotiating the
7   first time, but we do the second time.  At that time Honeywell
8   was acquiring a barcode company and they were under FTC
9   investigation.  As a condition of the acquisition, the FTC
10  required them to license some of their patents to the
11  industry.  So they were out shopping, trying to license their
12  patents to somebody.  The assumption that OPTO has is they
13  found another company to license the patents to and the
14  negotiations ended.

15          And again, there were 14 patents.  They related to
16  products with the 2D image sensor; not products in dispute
17  here, not laser products, not CCD products.  Those
18  negotiations have nothing to do with this case and they're far
19  removed in time, seven years before and nine years before the
20  settlement in this case, even longer to this trial.

21          THE COURT:  The Court finds the relevance of such
22  evidence would be tenuous at best, probably none at all.  And
23  there's tremendous risk of juror confusion by allowing that
24  in.  And I don't think the jury needs to know the whole
25  history of the disagreements between Honeywell and OPTO.  So

JA719

78

1    number seven is granted.

2            MR. STEVENS:  May I ask one point of clarification

3    on that, Your Honor?  I understood your ruling.  I'm assuming

4    that that means they can't suggest to the jury that we're a

5    litigious company and we're a snake in the grass, that we

6    filed a complaint out of nowhere.  I'm assuming they can't

7    come and say that.

8            THE COURT:  I don't know what their intentions are.

9    I am confident that they will act within the bounds of

10   professionalism; and if they don't, the jury will be

11   instructed by the Court accordingly.

12           MR. STEVENS:  Thank you, Your Honor.

13           THE COURT:  That goes to both sides.  The animosity

14   and acrimony is -- I would prefer it calm a little bit, but

15   especially in front of the jury.  You'll be doing a disservice

16   to your clients and I will have no hesitation informing the

17   jury of any inappropriate conduct and how to treat it.

18           Number eight, testimony and evidence concerning

19   OPTO's alleged knowledge of infringement of Honeywell's

20   patents.

21           I think it's not disputed that OPTO was aware that

22   Honeywell believed that it was infringing and, in fact, OPTO

23   apparently sort of agreed that they were infringing because

24   they signed this agreement and licensed a portfolio.  What's

25   the evidentiary value of evidence that OPTO knew it was

JA720

1    infringing?

2          MR. LAREAU:  Thank you, Your Honor.  Stephen Lareau

3    of Alston & Bird on behalf of Honeywell.

4          This evidence is directly relevant to what we heard

5    earlier today that OPTO intends to tell the jury about its

6    affirmative defenses:  That it had a subjective belief that it

7    did not need to take a license or did not -- would not owe

8    money for certain products because certain allegations with

9    respect to those products were no longer at issue.

10          What this evidence shows is that OPTO, going back

11   nearly a decade, if not more, had assigned an internal person

12   at their company to monitor Honeywell's patent portfolio and

13   to try to determine whether its products infringed Honeywell's

14   patents.

15          And the evidence will show, and I'm speaking of

16   Mr. Kohmo, who you've heard of through some of the discovery

17   disputes undoubtedly.  He came to the conclusion and was

18   certainly aware of, and OPTO was aware of as a result, that

19   OPTO's products were at great risk of infringing Honeywell's

20   patents.

21          So if OPTO intends to present evidence to the jury

22   that they had no reason to believe that these laser and CCD

23   products would be royalty-bearing because of these external

24   factors, that claims had been dropped or that there was no

25   infringement of these products, this evidence will directly

 1  contradict and impeach that testimony.

 2      THE COURT:  I'm not sure that I understand how it

 3  would do that because, again, I keep trying to come back to

 4  it's the agreement and its language that controls.  And so,

 5  you know, ten years ago OPTO is thinking, look, some of our

 6  products may be infringing on their patents.  The parties get

 7  together and say, look, here's how we're going to fix this.

 8  We're going to have this agreement.  We're going to license

 9  your portfolio.  We're going to pay royalties on certain

10  products and not on others.

11      I'm having difficulty getting to, oh, but it matters

12  that they knew they were infringing at one time.

13      MR. LAREAU:  Certainly, Your Honor.  And I would

14  agree with your position, but that calls into question the

15  veracity and the relevance of the testimony they intend to

16  offer to support their affirmative defenses.  They intend to

17  tell the jury that we had no reason to believe that our

18  products were royalty-bearing because allegations were

19  dropped; not because they didn't fall under the definition of

20  1.4, which is the right test.  Your Honor is correct, and has

21  mentioned many times today, that is the correct test.  I would

22  agree with you.  But they want to deviate from that test and

23  they want to introduce this other extrinsic evidence that

24  informed their belief as to what was at issue with respect to

25  their products and whether they infringed certain patents

```
1   because that's the evidence they've told us today they intend
2   to tell the jury will prove their affirmative defenses.  The
3   subjective belief that they had with respect to all three of
4   their affirmative defenses, we've heard it today.  They think
5   it's relevant.  And if it's relevant -- if it's not
6   introduced -- you know, if they drop their affirmative
7   defenses, we won't pursue this testimony and this evidence.
8   But this evidence and testimony directly contradicts what they
9   told the Court today they intend to tell the jury.
10            THE COURT:  Who's up?
11            MR. YORK:  In their paper I think they made it a
12  little more clear what is being argued:  That somehow OPTO is
13  saying they're not -- OPTO's laser products are not
14  royalty-bearing because they don't infringe a patent, and I
15  think that's what we were just hearing here.  That's not
16  OPTO's position and never has been.
17            OPTO's position in this litigation is the laser
18  products are not royalty-bearing because they fall within the
19  definition of 1D barcode products and therefore they fall
20  within the scope of the covenant not to sue in the agreement.
21  They may infringe other Honeywell patents, but because they
22  fall within the definition of 1D Barcode Products, even though
23  they infringe, they're within the covenant not to sue and
24  they're not royalty-bearing.  We're not arguing they're not
25  royalty-bearing because they don't infringe a patent.  That's
```

1  not the argument.

2          THE COURT:  I understand.  I understand all that.

3          MR. YORK:  That's not the argument at all.

4          Moreover, just to follow up, the patent analyses

5  that Mr. Kohmo did that they would introduce, they really all

6  concern the 2D image products that are not at issue in this

7  case.  And there again, there's really no analysis of laser

8  products.  If they have one, they could show it; but I don't

9  think they can.

10          THE COURT:  I think what I'm going to have to do

11  with this one is just see what evidence comes in and then see

12  whether there's -- this rebuttal evidence has any merit to it

13  or not.  I don't think I'm in a position to make a ruling.

14          MR. YORK:  And the last point on this, Your Honor,

15  is Mr. Kohmo never concluded that OPTO had no defenses to any

16  royalty patent.  The conclusions were always they had

17  non-infringement defenses and patent invalidity defenses.

18          THE COURT:  So are we talking about this -- is this

19  whole motion in limine geared towards the Kohmo report?

20          MR. YORK:  That's my understanding.

21          THE COURT:  The audit done by the outside auditor?

22          MR. LAREAU:  No, Your Honor, this is not about the

23  outside auditor at all.  This is a separate issue.  Mr. Kohmo

24  is not the outside auditor for OPTO.  He was an in-house

25  non-lawyer patent professional that worked for OPTO that

83

1  analyzed Honeywell's patents for nearly a decade, if not more.

2  He was deposed in this litigation.  We've been informed by

3  OPTO that sometime at the end of last year he retired and so

4  he is unavailable for trial.  He will not be attending trial.

5  We have submitted deposition designations for Mr. Kohmo.  And

6  I suspect this MIL will -- the outcome of this motion in

7  limine will directly resolve many of the disputes with respect

8  to the potentially designated testimony there.

9          There is also a motion to compel and we received

10  additional documents from OPTO very recently, this spring,

11  after the Court's hearing.  There were additional documents

12  related to Mr. Kohmo's analysis.  And Mr. Kohmo -- there's

13  many documents -- there's a lot of documents in there.  We

14  don't believe we've received all of them, for the record.

15  We've raised that issue with OPTO.  But in any event, there

16  are -- there is analysis within those documents regarding

17  patents that will cover laser and CCD products.

18          THE COURT:  Well, again, I'll have to see how the

19  evidence comes in.  I think it is likely that I will not allow

20  the evidence as you describe it.  But certainly, if they

21  create an opening for it to be used, it will be used.  But I

22  think that it will in general be granted unless you convince

23  me otherwise.

24          All right.  Deposition objection rulings.

25  Obviously, we probably have resolved some of this with the

JA725

84

 1 | motion in limine rulings.  I think we were getting close to
 2 | having examined all of those.  It might be helpful, if you all
 3 | have the time, if there are objections to deposition rulings
 4 | that are no longer in play, if you would just let us know that
 5 | so in case we haven't gotten to something, we don't waste our
 6 | time looking at something that we really don't have to.  But
 7 | we'll get something out on that as soon as we can.
 8 |         Motions to quash trial subpoenas.  Let's start with
 9 | the Honeywell records custodian.  What are you looking for and
10 | why do you need it?  I mean, is this about admitting that each
11 | other's productions are authentic?
12 |         MR. LAREAU:  I don't believe so, Your Honor.
13 | Honeywell and Alston & Bird both received subpoenas aimed to
14 | identify records custodians.  Again, Stephen Lareau on behalf
15 | of Honeywell.
16 |         And just to be clear, Your Honor, are we just
17 | talking about the Honeywell records custodian subpoena?
18 |         THE COURT:  All right.  Go ahead.
19 |         MR. YORK:  Okay.  Because I'm also going to speak to
20 | the Alston & Bird one.  There are some separate nuances there
21 | that I can address as well.
22 |         But Honeywell is not going to contest the
23 | authenticity of any Honeywell document that was produced by
24 | Honeywell in this case with a Honeywell Bates stamp.  It's the
25 | only thing we can possibly speak to.  But we're not going to

JA726

1    contest the authenticity of any of those documents.  So I

2    don't understand these subpoenas to merely be an authenticity,

3    you know, everything you produced is a real and accurate copy

4    of whatever it is you produced.  We don't understand these

5    subpoenas to be that issue.

6             Instead, we understand, and I think the briefing

7    shows, that OPTO intends to put a Honeywell records

8    custodian -- which we'll get to the fact that this is just an

9    improper trial subpoena under Rule 45 as a threshold issue

10   that really requires quashing.  But putting that aside, what

11   they intend to do is put a records custodian of Honeywell, who

12   they admit in their briefing would have little to no

13   substantive knowledge of any of the documents that were

14   produced in this case, to say -- presumably elicit a whole

15   bunch of I don't knows to these documents to make Honeywell

16   look bad in front of the jury.  That's the only reason we can

17   possibly imagine they're going to do this.

18            Or what they're going to try to do is try to

19   authenticate either the email communication that

20   Mr. Muckenfuss was describing earlier or the claim chart.

21   Well, the claim chart isn't a document that's in Honeywell's

22   records custodian's custody or control so they wouldn't have

23   any ability to do that.  We've already heard from counsel that

24   we don't have that document and so there's no way that

25   Honeywell could authenticate that document.

1        And so we don't really understand the purpose of
2   this trial subpoena, particularly as it relates to a, quote,
3   records custodian of Honeywell.
4        Now, taking a step back.  As a threshold issue, as I
5   mentioned, a trial subpoena for testimony cannot be issued to
6   an unnamed person.  It's not a way to -- a trial subpoena for
7   testimony is not a way to get 30(b)(6) testimony from a
8   corporation for the first time.  That's an improper subpoena.
9        And OPTO hasn't cited a single case in support of
10  what it's trying to do here.  In fact -- if I can see the
11  ELMO.  I want to point out something to Your Honor in their
12  briefing.  And we just got this so I apologize that I don't
13  have a slide and a more efficient way of showing you this.
14  But if there is any way I can get the ELMO, I want to point
15  out what Honeywell said in its briefing -- I mean, excuse me,
16  what OPTO said in its briefing and its response that we
17  received yesterday -- last night, I suspect.
18        So it says, "However" -- this is -- they're quoting.
19  These are the three cases that they rely on to support the
20  proposition that it's proper to subpoena -- issue a trial
21  subpoena to a corporation to a records custodian.
22        "However, it is generally proper to address a
23  subpoena to a corporation's records custodian..."
24        I'll tell Your Honor, the dot dot dot there is doing
25  a lot of work.  Here we see the actual case -- we'll get it

1   into focus -- what's actually said.  I've highlighted what
2   they have cited and I underlined what they omitted.  I'll read
3   it for the record.  "However, it is generally proper to
4   address a subpoena to a corporation's records custodian or the
5   corporation itself, requiring that it produce documents on
6   behalf of the corporation."
7            This isn't a case about a trial subpoena for
8   testimony.  This is a case talking about a deposition -- a
9   trial subpoena to issue -- or produce documents.  This is a
10  very different issue here.
11           Again, the next quote in their case that they rely
12  on, "Rule 45 clearly allows parties to subpoena... records
13  custodians at trial."
14           And again, when we actually look at the *Perry v.*
15  *Shelby* case that they are citing, we see what the quote
16  actually says.  "Rule 45 clearly allows parties to subpoena
17  the production of documents by records custodians at trial."
18           These cases do not stand for the proposition that a
19  party can issue a trial subpoena under Rule 45 to a records
20  custodian to force them to put someone on the stand to
21  authenticate and, quote, lay the foundation for, and that's
22  what they said in their response, to an untold number of
23  documents that were produced by Honeywell.  They don't
24  identify with specificity any document in response to our
25  motion to quash as to what they are trying to authenticate or

1  lay the foundation for.

2        THE COURT:  Well, let's just ask them.

3        MR. LAREAU:  I would love to hear the answer, Your

4  Honor.

5        MR. McCAMEY:  Your Honor, Zach McCamey on behalf of

6  OPTO.

7        Your Honor, I think what we're doing is not nearly

8  as nefarious as being suggested.  There are a number of

9  documents that were created by Honeywell, some of which have

10 been produced by Honeywell, some of which are things like

11 screen shots from Honeywell's website and those sorts of

12 things.  Honeywell controlled documents and information.  We

13 need someone under the rules to authenticate those; and, of

14 course, Honeywell folks are the proper people to authenticate

15 those.  So the authentication issue -- as I understand my

16 colleagues, they're not going to contest the authenticity of

17 documents that they've produced.

18        THE COURT:  Have you asked them whether they contest

19 the authenticity of the documents you're seeking to have

20 authenticated?

21        MR. McCAMEY:  There have been some objections that

22 have been served, some of which relate to authenticity.

23 Standing here right now, I don't know if those overlap or not.

24 I do take them for their statement that if they produce the

25 document, they're not going to contest authenticity; however,

1  that only moves the ball half the way.  It's not hard to

2  imagine that we put forth a document that's clearly a

3  Honeywell-created document or clearly a Honeywell-controlled

4  document and they object to hearsay because of the language

5  that's included within the document.  We need a records

6  custodian of Honeywell to be able to lay the foundation for,

7  like, business records exception or something similar.

8          So while I don't anticipate that this is going -- as

9  it relates to a Honeywell custodian specifically.  This is a

10  little bit of a different issue as it relates to Alston & Bird

11  and Mr. Doane's trial subpoena, which I'm sure we'll get into.

12          THE COURT:  Well, again, let me ask you, have the

13  parties gotten together -- have you asked Honeywell's counsel

14  whether they will stipulate to the authenticity of whatever

15  documents you're hoping a Honeywell custodian will

16  authenticate?

17          MR. McCAMEY:  Not specifically.  And, Your Honor, my

18  understanding is that the deadline is Thursday to submit those

19  and we've got to discuss authenticity, so that is coming down

20  the pike.  So in some ways that piece of it may be premature.

21          THE COURT:  Well, I don't want to waste my time

22  reading all this stuff and thinking about it and hearing from

23  you about it when there may not be, and, frankly, there

24  shouldn't be, an issue to fight about.  I expect both parties

25  to freely stipulate to the authenticity of each other's

90

1  exhibits unless there's a real dispute as to whether something

2  is authentic.  No gamesmanship.  All right.

3          MR. McCAMEY:  Understood, Your Honor.

4          THE COURT:  So hopefully we won't have to rule on

5  that one.

6          Now, the subpoena to the Alston & Bird custodian.

7          MR. LAREAU:  Thank you, Your Honor.  Stephen Lareau

8  again on behalf of Alston & Bird.  We've made a limited

9  appearance here on behalf of Alston & Bird to move to quash

10  this subpoena, so separately from Honeywell.

11         Much of what I just said also applies to the Alston

12  & Bird subpoena, particularly with respect to the idea of it

13  being an improper subpoena --

14         THE COURT:  Let me skip over you and ask them again,

15  what's the goal here?

16         MR. McCAMEY:  Your Honor, I think there are sort of

17  two goals, and one of which is the ITC claim chart that we've

18  been discussing and the other is the -- and more -- perhaps

19  more specifically, is the emails that have been produced.  But

20  I understand from Your Honor's instruction that the

21  authenticity of that may be put aside.  But we still have to

22  have someone that we can ask about it.

23         We moved to depose Mr. Pleune and Mr. Stevens.  And

24  as it relates to the emails, Mr. Pleune is the relevant

25  witness.  We moved to depose him because his emails are

JA732

91

 1  directly relevant to the case here.  As it relates to those
 2  emails, he's a material witness.  He's the person to ask.  We
 3  understand Your Honor's ruling.  We're not going to try to
 4  fight that.  He's not going to take the stand.  That shouldn't
 5  preclude OPTO from being able to ask someone about those
 6  emails.
 7          THE COURT:  What's a custodian of records going to
 8  know about Mr. Pleune's emails?
 9          MR. McCAMEY:  The custodian would be able to answer
10  is this, in fact -- was this on Alston's servers?  Is this, in
11  fact, the correct email addresses that are involved here?
12  Were these emails truly maintained on the server?  We've got
13  to have somebody that can actually put these in front of the
14  jury.  That's what we've ultimately tried to do on a number of
15  different occasions throughout this and this is the latest
16  installment.
17          We -- there's -- I believe, Your Honor, the trial
18  subpoena to Mr. Doane probably resolves all of these issues
19  and we're prepared to discuss that further, but the end-all of
20  all of this is simply we've got to have a witness that can
21  say, yes, these are documents, to get them in.  We're not
22  going to -- or we don't anticipate trying to get substantive
23  testimony out of a records custodian as we said in our brief.
24          MR. LAREAU:  And if I may, Your Honor, just briefly.
25  What you didn't hear the other side say is that there is no

JA733

1   other way for them to get this evidence in through the course

2   of fact discovery; and there was and they specifically chose

3   not to pursue it.  There's another party to all of those

4   communications.  All the communications they keep talking

5   about, the emails from Mr. Pleune, he was sending them and

6   receiving them from Mr. Ryan Goldstein at Quinn Emanuel.  OPTO

7   could have subpoenaed Ryan Goldstein to get his information

8   for him to authenticate these emails, for him to say I sent

9   this, I received this, this is the correspondence between the

10  parties.  They chose not to do that.  If these emails were so

11  critical to their case this entire time and they were trying

12  to serve or move to compel testimony from Alston & Bird trial

13  counsel, they had a non-trial counsel lawyer who had factual

14  knowledge about this that they could have called.  They could

15  have subpoenaed him.  They chose not to.  And so now they're

16  trying to burden Alston & Bird and Honeywell records

17  custodians to make up for discovery failures that they had a

18  year ago.

19         THE COURT:  And what's the issue here with

20  Mr. Doane?

21         MR. LAREAU:  Thank you, Your Honor.

22         MR. MUCKENFUSS:  Your Honor --

23         THE COURT:  I was wondering whether it would be more

24  helpful to hear what you're trying to get before I hear, you

25  know, why you shouldn't get it.

JA734

93

1      MR. MUCKENFUSS:  Yeah, I think Mr. Doane is a little
2  more straightforward.  He's on the emails.  He is a witness to
3  the emails.  So, I mean, that's a straightforward subpoena to
4  a person who's on the emails to ask him substantive questions
5  about the emails.  I think they object saying he was not
6  disclosed.  He wasn't on the initial disclosures.  It is
7  their -- right, it's their employee.  It's Honeywell's
8  employee.  They knew about Mr. Doane.  There are emails with
9  Mr. Doane.  They've known the emails that he's on.  There's
10  certainly no prejudice to Honeywell for us to subpoena
11  Mr. Doane and have him come to trial.
12      Usually -- I had another case where, you know, there
13  was a late disclosure and usually the issue is, well, the
14  other side hasn't had a chance to depose that witness.  They
15  don't know what that witness is going to say.  This is a
16  witness in their control.  They obviously would not depose
17  Mr. Doane.  There is no prejudice to Honeywell.
18      We are -- so Mr. Doane, in addition to Mr. Pleune,
19  right, is a person that's on the emails and he's on the email
20  that I have described today in other arguments.  So he's very
21  relevant.  He's a witness.  This is different than a records
22  custodian.  So we -- I think it's perfectly proper to subpoena
23  him for trial.
24      THE COURT:  All right.  It should have been
25  noticed -- not noticed, but he should have been designated or

JA735

94

1  otherwise made known to the plaintiffs before it was, but the

2  Court's not going to quash the subpoena.  He'll be allowed to

3  testify at trial.

4            MR. MUCKENFUSS:  Thank you.

5            THE COURT:  I'm sure that we'll all have fun dancing

6  around any privilege issues there.

7            Now, the other two with the custodians, do you still

8  need --

9            MR. MUCKENFUSS:  I think if --

10           THE COURT:  -- an Alston & Bird custodian if you've

11  got Mr. Doane?

12           MR. MUCKENFUSS:  No, I think we're fine on that

13  issue.

14           THE COURT:  Okay.  So that's denied as moot.

15           Now, with respect to the Honeywell custodian -- I

16  mean this.  Get together.  I will not tolerate meaningless,

17  needless disputes over the authenticity of exhibits.

18           MR. MUCKENFUSS:  Your Honor, we will go through all

19  of the exhibits with opposing counsel -- with the other side

20  and I think we can get through that.

21           THE COURT:  All right.  Notices or objections to

22  pretrial disclosures.  We've probably handled some of these in

23  our discussions about motions in limine, but we'll get

24  something out on what's left.

25           Let me just ask for my own curiosity.  OPTO objects

JA736

95

1  to the introduction of the patents, correct?

2        MR. McCAMEY:  Your Honor, we noted objection to

3  those, and I'll -- I think -- at least my understanding was

4  that we were preserving those objections for trial.  And

5  obviously a lot of them are relevancy-based or hearsay-based

6  from both parties, some of which are authenticity-based as

7  well.  So at least my understanding was not to get a

8  preemptive ruling, at least on most of them, from the Court,

9  but rather, just to sort of provide guideposts for the

10 parties:  This is where there may be issues; this is where

11 there shouldn't be issues.

12       THE COURT:  All right.

13       (The Court and Mr. Brenner conferred.)

14       THE COURT:  Okay.  So understanding how this works,

15 by default we object to everything.  If there's something

16 that's really going to be contested that the Court really

17 ought to think about, could you let us know which ones those

18 are somehow.  By email would be fine.

19       MR. MUCKENFUSS:  Yes, Your Honor.

20       THE COURT:  Because assuming, not sure this is true,

21 but assuming everybody wants this to be an error-free trial,

22 giving me a little bit of a heads up and some time to think

23 about things would be helpful.

24       MR. STEVENS:  So one of the impediments is the

25 length of the exhibit list.  I'm going to say that our house

JA737

96

 1  isn't totally clean either.  But there's 800 and some exhibits
 2  on their exhibit list, many of which are in duplicate or
 3  triplicate.  It would be very nice if Your Honor between now
 4  and Thursday would instruct us, perhaps, to revisit that and
 5  hone it down to just the exhibits that people actually might
 6  use at trial.
 7        THE COURT:  Well, to that end, that is actually on
 8  the list here along with a couple of questions about the
 9  witnesses, especially with the ones that are objected to
10  because we've been through this before where two things:
11        We prepared ourselves for objections to exhibits
12  that no one had any intention of putting into evidence.  So we
13  spent time thinking about and wondering about, things like
14  that.
15        And then also, be certain about your deposition
16  designations and objections thereto because we wasted a week
17  one time going through multiple objections to designations
18  only to hear, oh, no, we're not going to put that on.  Sorry
19  about that, Judge.  So try to cut down on our time.
20        Also, you've exchanged witness lists, right?  What
21  the Court would like to have, because, again, I like to be
22  prepared.  If you would submit -- and again, it can just be
23  done by email; it doesn't have to be filed -- your witness
24  list and just a topic summary of what each witness is going to
25  testify to.  You know, an expert witness with respect to this

JA738

1  or just whatever it is.  So that when they're called, I can
2  have some idea of what it is I'm about to hear.
3          MR. MUCKENFUSS:  Yes, Your Honor.
4          THE COURT:  If you could do that sort of at your
5  convenience, tomorrow would be great, but I can live with
6  Thursday too.
7          MR. STEVENS:  Understood.
8          THE COURT:  How many witnesses are there for each
9  side?
10          MR. STEVENS:  I believe we intend --
11          THE COURT:  Real witnesses, not listed witnesses.
12          MR. STEVENS:  I believe we intend to call five
13  people, and we'll probably call their corporate rep adversely.
14  I don't know who their corporate rep is.  I hope that would be
15  disclosed as well.  But I think that we -- if I'm not
16  miscounting, I think we have five, plus their corporate rep.
17          THE COURT:  Mr. Muckenfuss?
18          MR. MUCKENFUSS:  I believe we will have two live
19  witnesses.
20          THE COURT:  And how do you -- how are you going to
21  present the depositions to the jury?  What's the plan there?
22          MR. STEVENS:  Your Honor, my intention would be to,
23  when we call the person, we would announce to the Court who
24  that person is, that person's title, nothing more, and just
25  hit play on the video.  I don't think, at the end of the day,

98

1  there's going to be a ton of depo designations.  Obviously,

2  Your Honor is aware of the de bene depo that we took of their

3  expert and that's going to be played.  And that one is lengthy

4  because it's his entire trial testimony.  But I suspect the

5  rest of them are going to be cut down such that they're not

6  going to be unwielding.

7           THE COURT:  And they're all videos, right?

8           MR. MUCKENFUSS:  Yes.

9           THE COURT:  And they'll be presented to the jury

10  that way.

11           MR. MUCKENFUSS:  Yes.

12           THE COURT:  Everybody schooled up on the courtroom

13  technology so that this can run smoothly?

14           MR. MUCKENFUSS:  I think we are, Your Honor.

15           THE COURT:  I understand you want to set up some

16  extra space behind you all during the trial.

17           MR. STEVENS:  Yes, Your Honor.

18           THE COURT:  My IT guy dropped by right before this

19  hearing to let me know that.

20           MR. STEVENS:  The gentleman that does our trial

21  graphics would like to set up a table either right here or

22  right outside the box which will require just a wire that

23  we'll cover up and run to the table, if that's all right.

24           THE COURT:  Yeah, that's fine.  Things like that

25  always make my IT people nervous, but you need to do what you

JA740

1   need to do.

2           All right.  So let's get to some of the

3   administrative issues and see if we can wind this up.  Given

4   those numbers of witnesses, what's the projected -- see,

5   here's what I would like to do and I don't know if we can do

6   it because of the rulings still out there.  I would like the

7   evidence to be such that we could present to the jury the core

8   issue of a Section 4 breach.  Let them hear that, send them

9   out and get an answer.  Bring them back out and present the

10  affirmative defenses and counterclaims.  Send them out and get

11  an answer to that.  And then whatever damages are, we'll do it

12  again.

13          Now, that's my goal.  I don't know if we're going to

14  be able to do that because there's some dispute about what the

15  evidence is on what I consider the core claim, which is the

16  Section 4 breach.  And again, that bleeds back in, to a

17  certain extent, to this extrinsic evidence.  Delaware law is

18  not in favor of extrinsic evidence in contract cases where the

19  operative language is not ambiguous.  And the Court, I think,

20  has indicated that it has struggled all along to see how some

21  of the suggested extrinsic evidence should come in.

22          But we are going to have sort of an all or nothing

23  approach to this.  If there is extrinsic evidence offered by

24  Honeywell in establishing that claim, the barn door is wide

25  open to having your extrinsic evidence too.  Now, that may be

1    in the eye of the beholder and fortunately for me I'm the
2    beholder.  So Honeywell be warned:  Open the door to extrinsic
3    evidence and you're going to get some things that you've been
4    fighting to keep out.  So everyone be warned.
5            I assume -- yes, sir.
6            MR. STEVENS:  Should we understand that that's the
7    way it's going to happen, that there's going to be sort of a
8    trifurcated issue?
9            THE COURT:  Yes.
10           MR. STEVENS:  That's fine.  I'm just trying to --
11           THE COURT:  Yes.
12           MR. STEVENS:  Okay.
13           THE COURT:  I mean, unless somebody right now -- and
14   you can think about it and we can talk about it some more, I
15   guess.  But if somebody says, look, Judge, that's just not
16   going to work.
17           But I think the best way to avoid jury confusion is
18   to get an answer to the first question:  Was there a breach?
19   And if there was, is there an affirmative defense to it?
20           MR. STEVENS:  I think we're okay with that, Your
21   Honor.  Honeywell has no objection.
22           MR. MUCKENFUSS:  Your Honor, I think -- I mean, we
23   do take a different view.  I think the evidence overlaps.  It
24   goes back to the discussion I think we had earlier.  I think
25   the jury should hear all of the evidence and consider -- we

JA742

1  haven't talked about the verdict form, but I think they should

2  consider the breach and affirmative defenses in the same --

3  with the same evidence, same discussion.  It's hard -- I think

4  it's impossible in the presentation of the evidence to really

5  separate that out.

6        THE COURT:  Well, that's the way I want to do it.

7  I'll think about it some more because, you know, it would be

8  the first time I've done it that way.  It would be so much

9  easier and better for the jury.  I understand some of the

10  tactical reasons for OPTO not wanting to do it that way.  So

11  we'll put something in one of the orders we're going to put

12  out about the order of evidence.

13        Witnesses will be sequestered, I assume, right?  Do

14  any of you intend to have a witness sit with you during the

15  trial?

16        MR. STEVENS:  We don't intend to invoke the rule,

17  Your Honor.

18        THE COURT:  Does either party want witnesses

19  sequestered?

20        MR. MUCKENFUSS:  No objection to that.

21        THE COURT:  All right.  So no sequestration is what

22  you're saying.

23        MR. MUCKENFUSS:  No.

24        THE COURT:  For either side.  Nobody wants it.

25        Okay.  I'm almost afraid to ask this question.  How

JA743

1   long does counsel want for opening statements?  I know it may

2   be different if we are able to split this up into three

3   phases, but give me your best guess if we were only talking

4   about breach or if we're talking about breach and affirmative

5   defenses and counterclaims.

6         MR. STEVENS:  Thirty to 45.  I think if it's just

7   breach, 30 is fine.  I think 45 would be the outer limit under

8   any circumstance.  But I think even if we were just to talk

9   about breach, to do the typical introduction, that's probably

10   a 30-minute exercise.

11         MR. MUCKENFUSS:  I agree, Your Honor.  I don't

12   foresee -- I was thinking 20 to 30 minutes.  Again -- I know

13   Your Honor is going to consider this, but, again, the evidence

14   is duplicative, I think, in both of these issues.  It would be

15   inefficient.  But, you know, the opening and the narrative of

16   what we're going to say, I think, is around 30 minutes.

17         THE COURT:  Yeah, the rub here that I'll continue to

18   deal with is that there is some evidence that OPTO thinks

19   should come in -- extrinsic evidence that should come in

20   during the breach part of the trial that also informs the

21   affirmative defenses, and the Court is just not persuaded yet

22   that that evidence does inform on the breach issue.  So that's

23   what I'm going to give some thought to in the next day or so.

24         All right.  Jury selection.  The Court will ask all

25   the questions of the jury.  That was my inclination before.

JA744

1  But even after I saw proposed jury questions, I'm more
2  convinced than ever that the Court is going to ask all of the
3  questions.  The proposed questions are chocked full of
4  argument, which I don't blame you for.  If you can get away
5  with it, you should; but you're not going to get away with it.
6          So I'm going to cut and paste from our usual jury
7  selection questions and then take the questions that you've
8  submitted and decide which ones to give even if I reword some
9  of them in some way.
10          We'll put 14 in the box.  We're going to find a jury
11 of eight.  And so the way the Court conducts selection is that
12 I'll ask all the questions.  And at the end of that, I will
13 ask whether either party wants a sidebar.  Only say yes if you
14 want to challenge someone for cause.  If you don't want to
15 challenge someone for cause, just say no, Your Honor.  And
16 then I'll ask you to do what I call make your submissions, by
17 which I just mean write on a piece of paper which jurors you
18 want to strike.  You each get three.  And exercise them 1
19 through 14 because the first 8 that make it are our jury.  If
20 you like the first eight, that's fine, but strike the ones
21 behind them because they might come up on the list.  And we
22 should be able to get this done in just one go-round.
23          MR. STEVENS:  A couple questions, if I might, Your
24 Honor.
25          THE COURT:  Yes, sir.

1          MR. STEVENS:  You said eight.  That's not a six plus
2    two situation.  That's eight, no alternates.
3          THE COURT:  We're going to do eight; and if we lose
4    a couple, we've still got a jury.
5          MR. STEVENS:  Understood.  We would request that if
6    it's possible, and I understand that it may or may not be
7    logistically possible, that if the jury questionnaires are
8    available before Monday morning, that we would have access to
9    them later this week if the Court is in a position to have
10   those available to us.
11         THE COURT:  Well, my concern with that always is,
12   and, of course, more so in a criminal case, is that the use
13   that gets made of those early disclosures is everybody's lives
14   and social media gets investigated.  These people didn't sign
15   up to get investigated.  So probably not.
16         MR. STEVENS:  Okay.  The other thing, Your Honor,
17   that we do is just to make sure that there's no criminal
18   record or anything that would disqualify them as a juror that
19   might not be disclosed on there.  Obviously, there's some
20   things --
21         THE COURT:  Yeah, we try to handle that too.
22         MR. STEVENS:  Understood.
23         THE COURT:  All right.  So on Monday, the 17th,
24   we'll start jury selection at 9:30.  That gives the clerk's
25   office a little bit longer to get the jury panel squared away

1  and oriented and up here from downstairs.  But after that

2  we'll start trial at 9:00 every day and quit around 5:00

3  whenever it makes sense.  I like to let a witness conclude

4  their either direct or cross, or whatever, but have a logical

5  stopping point.  You know, if we quit 15 minutes early, that's

6  fine.  If we quit 15 minutes, late that's fine too.  But we'll

7  try to do it around 5:00.

8           Total estimated trial time?  Did I ask that already?

9  I don't think I did.

10          MR. STEVENS:  You asked it via email, Your Honor.  I

11  don't see any way that the presentation of evidence in this

12  case will take more than three days to the jury.  I just don't

13  see it.

14          THE COURT:  Both sides, is that the thought?

15          MR. MUCKENFUSS:  I think that's fair.  I think I've

16  said before three to four days, but I think that's fair.

17          THE COURT:  Okay.  And it's my intention to move

18  right into the patent misuse part of the case as well.  Do you

19  have a projection on what that will take?

20          MR. MUCKENFUSS:  The only question, I assume that

21  Your Honor wouldn't wait for a verdict or you would wait for a

22  resolution of the jury?

23          THE COURT:  Is there a need to?  Is the patent

24  misuse issue dependent upon what the jury tells us on any of

25  that?

```
 1              MR. MUCKENFUSS:  No, Your Honor, from our
 2    standpoint.
 3              THE COURT:  I mean, do you need time in between
 4    those things to reorganize yourselves while the jury is out?
 5              MR. MUCKENFUSS:  We don't.
 6              MR. STEVENS:  No, Your Honor.
 7              THE COURT:  I'd be willing, you know, 1:00 in the
 8    afternoon, the jury just went out, let's get going.  But if
 9    that's not going to work for you, I'll listen.
10              MR. MUCKENFUSS:  That's fine with us.
11              MR. STEVENS:  And one of the things -- we do have an
12    updated witness list.  It would be very nice if the parties
13    could identify whether it's the jury trial or the bench trial.
14    We did that on ours.  We would just like to know --
15    Mr. Muckenfuss said there's two witnesses.  I don't know if
16    they're both going to retestify at the bench trial.  But it
17    might be that the bench trial is going to just have --
18              THE COURT:  I'm hoping some of that for my purposes
19    can be achieved when you just do like a topic heading for each
20    of the witnesses.  You know, you can put in there bench trial
21    only, would be nice to know.
22              MR. MUCKENFUSS:  Your Honor, while we're on the
23    topic of witnesses.  Mr. De Winter, I'll have to -- I have
24    emailed Mr. Stevens about this.  And I'm, you know, obviously
25    throwing myself at the mercy of the Court here.  But he is
```

1  traveling from Amsterdam in the middle of -- you know how
2  Europe does their holidays.  It's a very serious lengthy thing
3  as I've discovered.  Mr. De Winter is leaving his family from
4  holiday and is very much -- wants to complete any testimony on
5  Tuesday.  I understand -- we don't know where we would be,
6  right, in the trial Tuesday.  If it's a three-day trial,
7  possibly that could work.  You know --

8          THE COURT:  Where is he in your order of --

9          MR. MUCKENFUSS:  He would be the first witness we
10 would call.  I mean, he would be the first guy.

11         THE COURT:  So you're just hopeful that they're able
12 to finish by --

13         MR. MUCKENFUSS:  I'm hoping --

14         THE COURT:  All the more reason to just do the
15 breach issue first and then we can almost be sure of it.

16         MR. MUCKENFUSS:  Yes, Your Honor.  I think if we had
17 to go out of order or something for Mr. De Winter, I would
18 certainly ask that.  But he has to get back Tuesday evening.
19 I wanted to just let the Court know that, you know, let
20 Mr. Stevens know that.  Anyway...

21         THE COURT:  Okay.  Let's see how it goes.  We'll
22 even think about calling him out of order if that makes sense.

23         MR. STEVENS:  Just one thing that might clarify that
24 issue a little bit is if they'll disclose, is he going to be
25 the corporate representative or is the other witness going to

108

1   be the corporate representative?

2        MR. MUCKENFUSS:  Well, I mean, he is the

3   corporate -- when you say corporate representative, I'm not

4   sure I understand what you're asking.  Like, is he sitting at

5   the table with us?

6        MR. STEVENS:  Right, is he going to sit at counsel

7   table?

8        MR. MUCKENFUSS:  Very briefly because he's getting

9   back to -- he's getting back to his family in Europe.  He

10   would not be sitting with us right through the duration.

11        THE COURT:  Okay.  I think the courthouse opens,

12   Meg, is it 8:00 every morning?  Is that when the CSOs are out

13   there?

14        THE CLERK:  They're out there at 8:00.

15        THE COURT:  We can arrange to have the doors

16   unlocked so that you can use your war rooms, if you will.

17   Obviously, you can leave whatever you want in here at night,

18   but it's not on me if something happens to it, but it will be

19   locked up.  And I leave things here.  That's on you.

20        Has there been appropriate discussion on stipulating

21   to the admissibility of certain exhibits as opposed to just

22   authenticity?  Will I need to anticipate lots of objections on

23   admissibility issues?

24        MR. MUCKENFUSS:  Well, that's where I hope we can

25   make some progress when we go through these exhibits.  I think

JA750

```
 1   it's really helpful for trial.  Like, if we can just cut
 2   through stuff and say why do we really need to fight about
 3   that?  Hopefully we can do that this week.
 4             THE COURT:  Okay.
 5             MR. STEVENS:  I concur with that.  Hundreds of the
 6   exhibits on each party's list are related to the audit and
 7   your telling us that there's not going to be testimony about
 8   the audit, I think, will cut down the objections.  I think
 9   more than 50 percent just got resolved by that one sentence.
10             THE COURT:  Great.  Anything else that we haven't --
11   apparently there's something else that we haven't addressed.
12             MR. VanHOUTAN:  Sorry, Your Honor.  Regarding the
13   bench trial and logistics, just a few questions.  Are you
14   expecting openings, closings from the lawyers on that?
15             THE COURT:  I like to let lawyers try their cases.
16   If you want an opening statement and you think it will be
17   helpful to the Court, I'll listen.
18             MR. VanHOUTAN:  And as far as keeping the record, I
19   guess, together and clean for that, are you anticipating that
20   we can potentially refer to testimony or evidence from the
21   jury trial to be used at the bench trial?  Are we going to
22   need to play it again if it overlaps maybe regarding
23   background technology or...
24             THE COURT:  It won't be necessary for my purposes.
25   If you start worrying about the clarity of the record, you
```

JA751

1    know, do what you think you need to do.  But for my purposes,
2    I'll be more than happy to accept by reference testimony that
3    the Court was already present for.
4                MR. VanHOUTAN:  Okay.  And last question, I promise.
5    Post-trial briefing summarizing the evidence after the bench
6    trial?
7                THE COURT:  Yes.  I would have mentioned that then,
8    but yeah, I would assume you would want to conform your
9    proposals to what the actual evidence was.
10               MR. VanHOUTAN:  Thank you, Your Honor.
11               THE COURT:  Mr. Stevens.
12               MR. STEVENS:  So a few questions, Your Honor.
13               First off, was Your Honor intending to, and if not,
14   would Your Honor entertain playing the Federal Judicial
15   Center's patent video for the venire or for the seated jurors?
16   Typically in patent cases there's a 17-minute video that the
17   Federal Judicial Center put together about ten years ago.  As
18   far as my understanding, it's played before every single jury
19   that ever hears a patent case.  Of course, this is not,
20   strictly speaking, a Title 35 patent case, but obviously
21   patents are going to come up.  So we would ask Your Honor to
22   play for the venire or for the seated jurors the 17-minute,
23   agreed upon by many courts across the country, the Federal
24   Judicial Center patent video.
25               MR. MUCKENFUSS:  We would object to that.  This is

```
 1  not a patent case.  I don't know how this is going to help the
 2  jury.  Obviously, they're going to hear about patents, but
 3  this is not about patent infringement or anything -- or any
 4  type of technical aspect of a patent infringement case.  So we
 5  would object to that.
 6            THE COURT:  Well, I'll say it's likely that I won't
 7  play that for them; but for my own curiosity, I'm going to
 8  watch it.  And if I think, oh, the jury could really benefit
 9  from this, then I'll relook at that.
10            MR. STEVENS:  It's on their website.  It's also on
11  YouTube if you just search for Federal Judicial Center patent
12  video.
13            THE COURT:  I have pretty good access to the FJC.
14            MR. STEVENS:  So we talked about time limits for
15  opening.  Do we need to discuss that for closings or for the
16  presentation of evidence?
17            THE COURT:  No, because I don't know whether a
18  request for a lengthy closing will be reasonable until I hear
19  the evidence.
20            MR. STEVENS:  Okay.  Understood.
21            We were instructed to ask you about the seating
22  arrangement at our table.  Obviously, we have fewer seats.  If
23  we find a way to cram a fourth seat in to our counsel table,
24  does Your Honor have any problem with that?
25            THE COURT:  No.  Because with the eight we'll move
```

JA753

1  them down towards the witness stand, so we'll create some
2  space at the end so it won't get too crowded there and the
3  jurors won't be sitting in your laps.
4        MR. STEVENS:  The next thing on my list is of the
5  two witnesses that Mr. Muckenfuss mentioned, I believe one is
6  going to speak in a foreign language.  Is the Court going to
7  employ the translator or is the Court going to direct the
8  parties to discuss that?
9        THE COURT:  Thank you for bringing that up because I
10 meant to ask because the Court does not appoint translators in
11 civil cases.  I assume -- I meant to ask this.  Has a
12 translator been selected and is there an agreement about the
13 qualifications of that translator?  Are you each going to have
14 your own to make sure the translator is being accurate?
15 What's the plan there?
16       MR. MUCKENFUSS:  We do have a translator.  So we
17 have one that we've retained.  We can discuss with Mr. Stevens
18 about how that's going to work.
19       THE COURT:  Thank you for reminding me of that.  Try
20 to come to an agreement, if you can, that this translator will
21 actually accurately translate.
22       Anything else?
23       MR. STEVENS:  I think that gets through my
24 questions, Your Honor.
25       THE COURT:  Great.

JA754

1            MR. STEVENS:  Oh, I'm sorry, I do have one.  The
2    bench trial at the end, there is one of your MIL rulings that
3    I think affects that and I just want to make sure that I
4    understand what's expected of us.

5            You said that we can't introduce evidence of the
6    fact that they changed their product.  That's the entire basis
7    of their economic prong argument at the bench trial.  I just
8    want to understand if that MIL applies to the whole case or if
9    it's just the bench trial.

10            THE COURT:  Well, generally speaking, I'm much less
11    concerned about the motions in limine for the bench trial.  I
12    know what I should consider and what I shouldn't; what to pay
13    attention to, what not to pay attention to.

14            MR. STEVENS:  I'm sure you do.  The issue is, Your
15    Honor, that if we're not allowed to present that evidence to
16    the jury and it's the entire basis for their case in the bench
17    trial, we think that would be improper.  This is not a small
18    issue that I think someone is going to try to get past the
19    Court.  I'm sure that your filter for getting rid of
20    irrelevant evidence is better than anyone's.

21            But the issue here is this is their whole defense.
22    I mean, if you say that we can't have any evidence during the
23    jury trial of the fact that they made any change to the
24    product, their whole patent misuse case goes away.  It's gone,
25    poof.  So what I don't think is fundamentally fair to the

114

1  parties is for us to not be allowed to use that evidence at
2  all and then on whatever day we begin the bench trial, that
3  becomes the whole focal point of the case.  That I don't think
4  is fundamentally fair.
5          THE COURT:  I'm not sure I understand.  You want to
6  be able to put on during the bench trial the evidence with
7  regard to turning off the functionality?
8          MR. STEVENS:  No, sir, the other way around.  If we
9  can't do it during the jury trial, they should be bound by
10 that same rule during the bench trial.  The entire basis for
11 their patent misuse argument is that they took the
12 functionality out of their product somehow because Honeywell
13 has market power.  If you take that fact away that they -- if
14 nobody, be it the jury or Your Honor, is going to hear
15 evidence about the fact that they took that functionality out
16 of the product, then they don't have a patent misuse claim.
17 It's gone.  That is the crux -- I mean, their whole argument
18 for the economic prong of patent misuse is the thing that
19 somehow happened in the market was that they had to take the
20 functionality out of their product.  That is the crux of their
21 whole position.
22         All I'm saying is that fair is fair.  If we can't
23 talk about that --
24         THE COURT:  So why is it that the jury is not
25 permitted to hear it but the Court is?

JA756

1          MR. STEVENS:  I don't think -- I'm advocating that
2     that should not be the rule.  Either nobody --
3          THE COURT:  I'm asking why it should not be the
4     rule?  There are lots of reasons why juries hear some evidence
5     and only the Court other evidence.
6          MR. STEVENS:  I don't necessarily disagree with
7     that, but it's either relevant to this dispute or it's not
8     relevant to this dispute.  If we can't bring it up for any
9     purpose that we would want to bring it up for, even just
10    simply to show the fact that when they issued the order, it
11    said take out the 2D functionality.  If we can't say anything
12    like that and then we get to the bench part of the trial and
13    that is their showcase evidence, that does strike me as
14    fundamentally unfair.
15         MR. VanHOUTAN:  So, Your Honor, these are apples and
16    oranges.  The remediation issue and the MIL which you granted,
17    which is our MIL, that's before the jury and that's to keep
18    the jury from being confused and think that by removing a
19    measure, then you are liable and culpable for that conduct.
20    And the patent misuse trial before Your Honor is a wholly
21    different animal.  And Mr. Stevens is correct.  One of the
22    issues that we're going to put on that you wanted to hear
23    about and you indicated in summary judgment was whether the
24    market power has been shown.  One of the ways you show market
25    power is by excluding competition.  One of the ways that we're

1  going to show that competition was excluded is when they

2  demanded the 7 percent royalty, OPTO removed this

3  functionality.

4          So this is just an apples and oranges issue.

5  There's no confusing Your Honor.  You know what the issues

6  are.  We set them forth very cleanly and plainly in our

7  findings of fact and conclusions of law.  I get Mr. Stevens is

8  very enthusiastic to gut our case and say it over and over

9  again, but it's not appropriate to limit that evidence out

10 before Your Honor.

11         MR. STEVENS:  One further point.  Mr. De Winter is

12 the one that ordered the code red.  He's the one that made the

13 change.  And so now their witness is going to magically be

14 here for the first two days, but when this issue is allegedly

15 relevant for the Court's consideration, poof, he's gone to

16 Amsterdam.  So there's real issues --

17         THE COURT:  Well, that is a problem.  If he's a

18 witness for that part of the bench trial and you want to talk

19 about that and they want to talk about it as well, he's not

20 going to be in Amsterdam.

21         MR. VanHOUTAN:  I'll need to check the witness list,

22 but I'm not sure that he's on there for them.  So I don't

23 think they had any intention of calling him for that purpose.

24         And the fact that we removed this functionality is

25 not in dispute.  I mean, that's not a disputed issue.  We

1   removed it at a certain time and they can say whether it was

2   about the litigation or not.  They can make that argument.

3   They have made that argument.  But the fact that it was

4   removed is not in dispute.  It was removed.  And frankly, it

5   was removed so OPTO didn't have to continue paying royalties

6   on 4.3.  Very clear.

7            MR. STEVENS:  And that's not what Mr. De Winter told

8   their customers.  He told their customers it was removed for a

9   fundamentally different purpose.  So this is a little bit of,

10  you know, magic that's being told here.  In court we want Your

11  Honor to think that we removed it for one reason.  Oh,

12  customers, we want you to know that we removed it for another

13  reason.

14           So I don't think it's fair for them during the jury

15  trial to call this gentleman and have him come up here and

16  talk about things.  And then when it comes to the bench trial

17  where this is their showcase piece of evidence, because it is,

18  that we can't cross examine the gentleman that actually made

19  the decision to -- or actually implemented the change.  That

20  again --

21           THE COURT:  He'll be here to cross examine on that

22  issue.

23           MR. STEVENS:  Thank you, Your Honor.

24           THE COURT:  I hope he can live with perhaps an extra

25  day lost on vacation because they only get a couple of months

1    a year over there.

2           MR. VanHOUTAN:  Exactly.  I was going to suggest

3    that we could do his cross, if they're so inclined, while he's

4    here outside the jury's presence.  I'm sure it's not going to

5    take that long.

6           THE COURT:  We'll see.  We'll see.

7           All right.  We're in recess until next Monday.

8           (End of proceedings at 4:31 PM.)

9                              *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA760

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10 the foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is

13 in conformance with the regulations of the Judicial Conference

14 of the United States.

15

16          Dated this 13th day of July 2023.

17

18

19                          s/Cheryl A. Nuccio

20                          Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter

21

22

23

24

25

JA761

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:21-CV-00506-KDB-DCK**

| | |
|---|---|
| **HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC. AND METROLOGIC INSTRUMENTS, INC.,** | |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| **OPTO ELECTRONICS CO., LTD.,** | |
| **Defendant.** | |

**THIS MATTER** is before the Court on numerous pretrial motions, including the Parties' Motions in Limine (Doc. Nos. 233, 239, 244 and 251); Defendant's Motion to Strike Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories (Doc. No. 307); and motions to quash trial subpoenas to Honeywell, Alston & Bird and Adam Doane (Doc. Nos. 315, 317 and 319). The Court has carefully considered these motions, the parties' briefs and exhibits and oral argument on the motion from the parties' counsel at the pretrial conference and hearing held on July 11, 2023. For the reasons stated during the hearing and further discussed below, the Court will **GRANT** and **DENY** the motions as follows:

1

JA762

## I.    MOTIONS IN LIMINE

### A.    Honeywell's First Motion In Limine (Doc. No. 233)

In its first motion in limine, Honeywell seeks to "Exclude Testimony or Argument About Information Learned Solely from Communications Between OPTO and Its Counsel." Specifically, Honeywell asks the Court to exclude the portions of the testimony of OPTO's 30(b)(6) witness Mr. Shigeaki Tanaka in which he testified that he and the other members of the OPTO Board of Directors had an "understanding" or "believed" that some patents had been "withdrawn" in the parties' ITC dispute and that the remaining patents required use of a "2D image scanner." *See, e.g.*, Doc. 301-2 at deposition pp. 31-34. At Mr. Tanaka's deposition, he testified that this belief was based on information provided to the board by OPTO's legal counsel. However, when Honeywell asked the witness "what did [the lawyer] tell you that led you to believe that many patents had been withdrawn," (and similar questions) Mr. Tanaka was instructed not to answer the questions on the grounds of attorney-client privilege. *Id.* at p.34.

Honeywell argues that because OPTO did not allow the witness to testify to the full factual basis for OPTO's belief with respect to the withdrawal of patents in the ITC proceedings, OPTO should be precluded from offering this testimony. The Court agrees. In offering testimony as to the OPTO Board's "belief" or "understanding" as to the withdrawal of patents, etc. in the ITC action, OPTO necessarily opens the door to questions as to how the Board reached those conclusions, which inquiry includes, at least,[1] the entire factual basis on which the Board relied. And, Honeywell is entitled to that information even if the information was provided to the Board

---

[1] The Court need not and does not reach the thornier issue of whether OPTO waived any attorney-client privilege as to any legal advice (as distinguished from factual information) that OPTO's attorney provided the Board. Here, OPTO instructed Mr. Tanaka not to testify about anything the attorney said, whether it be factual information or legal advice.

2

JA763

by an attorney. Simply put, OPTO cannot offer testimony that it held a belief on some subject then effectively deny Honeywell an opportunity to explore the basis for the belief, so that the finder of fact can determine, among other things, if the belief was reasonable in light of what was actually said to the Board. Accordingly, the Court will grant Honeywell's first motion in limine as it relates to the challenged portions of Mr. Tanaka's deposition.[2]

**B.    Honeywell's Second Motion in Limine (Doc. No. 239)**

In its second motion in limine Honeywell seeks to "Exclude Evidence or Argument About the Interpretation of '2D Barcode Products' or '1D Barcode Products.'" By this motion, Honeywell asks the Court to limit the "extrinsic" evidence that OPTO may introduce in support of its defense of Honeywell's claims of breach of contract,[3] specifically the claim that OPTO failed to pay all royalties due under Section 4 of the Agreement. Honeywell argues that the Court has already ruled that the relevant Section 1.4 of the Agreement (that describes which products are royalty bearing) is unambiguous so OPTO should not be permitted to introduce evidence that contradicts the Court's interpretation (citing as an example the testimony of an OPTO witness that the focus of Section 1.4 should be on the third sentence, an argument that the Court has previously rejected). In response, OPTO disclaims any intent to offer evidence that contradicts the Court's interpretation of the terms of the Agreement. Rather, it says that it intends to limit its evidence to proof that its challenged products are not royalty bearing using the Court's interpretation of the terms of the

---

[2] The Court will enter a separate Order with respect to the specific deposition designations that details the scope of this ruling.

[3] The Parties acknowledge that the analysis of the relevance of some of the disputed evidence may not be the same for OPTO's affirmative defenses, which raise different issues. The discussion here relates only to the introduction of evidence on Honeywell's Section 4 affirmative breach of contract claim. If the Court decides at trial to permit the introduction of evidence that is only properly admitted with respect to OPTO's affirmative defenses, it will give an appropriate limiting instruction to the jury.

JA764

Agreement.  The Court agrees with both parties. That is, it will not permit the introduction of

evidence that promotes a contradictory interpretation of the Agreement;[4] however, it will permit

OPTO to present relevant evidence[5] in support of its position that its products should not be found

to be royalty bearing under the Agreement, as construed by the Court. Accordingly, Honeywell's

second motion in limine is denied, without prejudice to Honeywell raising specific objections at

trial consistent with this Order.

**C.    Honeywell's Third Motion in Limine (Doc. No. 244)**

Honeywell's third and final motion in limine seeks to exclude evidence related to two

"claim charts" that Honeywell's current trial counsel Alston & Bird prepared and produced in the

ITC proceeding. The charts are entitled "Claim Chart Showing Infringement of U.S. Patent No.

7,159,783 by the 1D Products" (the "1D Claim Chart") (OPTO's proposed Exhibit 6) and "Claim

Chart Showing Infringement of U.S. Patent No. 7,159,783 by the Accused Devices" (the "2D

Claim Chart") (OPTO's proposed Exhibit 7). OPTO seeks to introduce the charts to support its

positions on both Honeywell's breach of contract claim and its affirmative defenses. More

specifically, OPTO alleges that the language of the 1D Claim Chart referring (by specific product

numbers) to several of the products  in dispute as "Opticon 1D Products" is evidence that those

---

[4] For example, the Court does not (at this time) intend to instruct the jury on "course of performance," "course of dealing" or "usage of trade" with respect to the breach of contract claim. The jury must decide the question of breach based on the language of the Agreement, as construed by the Court.

[5] At the pretrial hearing, the Court discussed at length with the Parties the issues related to what evidence may or may not be relevant to Honeywell's royalty claims (some of which is addressed elsewhere in this Order). The Court reiterates that truly "extrinsic" evidence should not be offered on these claims. However, the Court wants to make clear to the Parties that the introduction of evidence on this issue will not be a one-way street. If one party introduces (without objection or over an objection) what the Parties referred to as "extrinsic" evidence (i.e., evidence of a party's reference to "1D" or "2D" products unrelated to the Agreement) then the other party will be permitted to do likewise.

products (and other similar products) were considered by Honeywell to be "1D" products on which royalties are not due under the Agreement. OPTO intends to use the "2D Claim Chart," which lists a number of OPTO products which are admitted by all to be "2D" and not in dispute, to show that Honeywell separately characterized those products as "2D." Honeywell seeks to exclude the claim charts as irrelevant, because admission is allegedly barred by the ITC Protective Order, and the lack of "production" and "authentication" of the document in discovery (the document was served but not filed in the ITC proceedings).

The Court finds that the documents may be admitted, but only with respect to the jury's consideration of OPTO's affirmative defenses.[6],[7] The question before the jury on Honeywell's breach of contract claim centers on whether OPTO's disputed products are "2D" or "1D" *as defined in the Agreement*. Honeywell referring to some of those products in a patent claim chart as "1D Products" without any reference to the Agreement or, perhaps more to the point, to the issue of "symbologies" raised by the relevant definition in the Agreement does not make it more or less likely that the products in fact are (or are not) royalty bearing products.[8] That must be determined based on the language of the Agreement. Thus, the claim charts are not (currently) admissible with respect to the breach of contract claim.

However, Honeywell's characterization of specific products as "1D" and "2D" in the ITC proceedings may be relevant to OPTO's affirmative defenses of quasi-estoppel and unilateral

---

[6] Again, the exclusion of the ITC claim charts on the breach of contract claim will be reconsidered (and reversed) if Honeywell "opens the door" as discussed above.

[7] To the extent the claim charts are alleged to be relevant to the patent misuse claim being tried to the Court, the claim charts will be admitted and the Court will give them such weight as it determines is appropriate.

[8] Indeed, the only reference the Court could find in the 1D Claim Chart related to "symbologies" states that the "Opticon OPN-4000i data sheet [shows that] … "[the product] supports a number of symbologies."

5

JA766

mistake. As to those issues, the claim charts are relevant to show whether Honeywell's representation of specific products as "1D" and "2D" in the ITC action unfairly led OPTO to believe that those same products would be considered "1D" and "2D" under the Agreement and whether Honeywell either itself believed the products were "1D" or "2D" or stayed silent knowing OPTO believed otherwise.[9]  Therefore, Honeywell's third motion in limine will be denied to the extent that the claim charts are offered as evidence on OPTO's affirmative defenses.[10]

### D.    OPTO's Motions in Limine (Doc. No. 251)

#### 1.    OPTO's Removal of Functionality from its Products

OPTO's first motion in limine asks the Court to exclude evidence or argument about OPTO's removal of the ability of certain products to read stacked linear barcodes as a result of this litigation as a "subsequent remedial measure" under Federal Rule of Evidence 407. In response, Honeywell argues that changing a product to reduce liability under a licensing agreement does not come within the scope of Rule 407 and the change has relevance beyond the improper argument

---

[9] To be clear, Honeywell's "belief" about whether a particular product is in fact "1D" or "2D" under the Agreement is different than whether the product actually comes within the Agreement's definition. If Honeywell believed that the disputed products that it now contends are royalty bearing 2D products were non-royalty bearing 1D products at the time the Agreement was executed then there would be a mutual mistake. If instead, Honeywell agreed that the products were 1D products but in fact knew that the language of the Agreement would be read to make them 2D products and stayed silent, those facts could form the basis for reformation of the Agreement based on the defense of unilateral mistake.

[10] With respect to Honeywell's arguments other than relevance the Court is persuaded 1) that the ITC Protective Order was not intended to prevent a party from retaining or disclosing its own confidential information (and Honeywell has not identified any of its own confidential information in the claim charts); 2) Honeywell was well aware in discovery that the documents were being relied upon by OPTO and had access to the documents (in their own lawyer's document system) if it wanted to use them in discovery; and 3) OPTO should be able to readily "authenticate" the document through Honeywell or its counsel (which conceded at oral argument that it had no reason to believe the documents did not accurately reflect the claim charts served in the ITC action).

6

that the change reflects OPTO's belief that the products are royalty bearing if the functionality in dispute is not removed.[11] The Court disagrees with Honeywell and will grant the motion.

First, OPTO's modification of the products does qualify as a subsequent remedial measure. The reasoning behind Rule 407, to permit accused defendants to make product changes subsequent to the filing of an action without fear that the change will be used to prove their liability for conduct prior to the change, applies to contracts as well as torts claims. *See, e.g.*, *Reynolds v. Univ. of Pennsylvania*, 747 F. Supp. 2d 522, 535 (E.D. Pa. 2010) (finding that "[b]ecause a breach of contract is culpable conduct . . . the plain language of Rule 407 indicates that it applies to breach of contract cases," and that "the purpose of Rule 407 applies with equal force to both tort cases and breach of contract cases.") (citing *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1045 (7th Cir. 2007)), *aff'd*, 483 F. App'x 726 (3d Cir. 2012) ("the District Court did not err in holding that Rule 407 barred evidence of . . . subsequent remedial measures in this breach of contract action."). Indeed, it would be an absurd result if a defendant could only reduce its potential liability under a patent licensing agreement (by changing a product or other means) at the risk of being held to essentially making an admission of liability. Post-litigation product changes in this context do not necessarily make liability any more or less likely; rather, they affect *damages* (the amount and timing of which is not really in dispute here).

Moreover, even if there was some limited relevance to the product changes, the probative value of the evidence is far outweighed by the danger of prejudice and jury confusion in allowing the evidence to be admitted. Accordingly, the motion is granted.

---

[11] Notwithstanding its protestations to the contrary, the Court finds that the primary reason Honeywell seeks to offer this evidence is to have the jury believe that OPTO's modification of the products is an implicit admission of liability.

7

JA768

### 2.    Discovery Disputes

The parties have represented to the Court that this dispute has been resolved; therefore, OPTO's second motion in limine will be denied as moot.

### 3.    OPTO's Litigation Reserve

OPTO's third motion in limine asks the Court to exclude any evidence or argument concerning OPTO's litigation reserve as reflected in its financial statements. The Court agrees with OPTO that such evidence is irrelevant to the merits of this case. First, the litigation reserve reflects the judgment of an auditor as to the likely outcome of the trial (not the merits of the claims). As such, it makes no material fact in dispute either more or less likely. Further, it is clear that the auditor's conclusion includes consideration of claims on which the Court has granted summary judgment for OPTO as well as OPTO's own attorneys' fees, which cannot be an element of Honeywell's recovery. In opposition to OPTO's motion, Honeywell argues that the evidence should be admitted because it is "publicly available." However, whether business information is readily known or confidential has no bearing on its relevance to the issues to be decided by the jury. Finally, to the extent this evidence has any probative value (and it appears to have none), such value is substantially outweighed by the risk of unfair prejudice and confusing the issues for the jury. As such, the evidence will be excluded under Federal Rules of Evidence 401, 402, and 403.

### 4.    David Taylor's Testimony

OPTO's fourth motion in limine relates to the testimony of David Taylor, Honeywell's legal expert who it proposes to "educate" the jury on various issues. The Court has previously expressed its skepticism over the propriety of Mr. Taylor's testimony and ruled that he may not testify as to certain topics. *See* Doc. No. 195 at pp. 24-26. The Court continues to believe that it is

8

unlikely that Mr. Taylor's testimony would assist the jury; however, Honeywell represented at oral argument that Mr. Taylor would, at most, serve as a rebuttal witness and thus may not even testify to the jury.[12] Accordingly, the Court will defer ruling on this motion until it becomes necessary to do so and the specifics of Mr. Taylor's testimony can be proffered to the Court.

### 5.     Honeywell's Unpled Breach of Contract Theories

OPTO's fifth motion in limine asks the Court to limit the presentation of claims to the jury to those alleged breaches of contract that Honeywell pled in its Complaint (which it chose never to amend). The Court has previously limited Honeywell's claims to those pled in the Complaint, *see* Doc. No. 195, and will do so again here. At oral argument, the Court informed Honeywell that it would be permitted to present to the jury its pled claims for breach of contract and related damages under Sections 4.3[13] and 4.6 of the Agreement. Also, the Parties agreed that Honeywell's claim for "fees and costs" under Section 4.7 would be handled later by the Court.   However, Honeywell is not permitted to present evidence on or argue to the jury[14] any claim of breach of contract under Sections 3.1, 5.1, 5.3 or 9.9, none of which are pled in the Complaint.

### 6.     Honeywell's Trial Attorney "Testimony" During Argument

OPTO's sixth motion in limine asks the Court to prohibit Honeywell's trial counsel, who were also involved in the earlier ITC proceedings, the preparation of the ITC claim charts and

---

[12] To the extent Honeywell intends to have Mr. Taylor testify in the bench trial, the Court is likely to allow his testimony and give it such weight as the Court finds appropriate. However, the Court will first require a proffer of his testimony so that the Court can direct Honeywell towards a proper scope for his examination.

[13] With respect to Honeywell's unpled (but related) claim under Section 4.5 (alleged failure to provide accurate royalty reports) the Court finds that while the substance of the claim will be evidence in support of Honeywell's Section 4.3 claim for unpaid royalties, it would be duplicative and confusing to the jury to permit Honeywell to assert it as a separate claim.

[14] This ruling does not limit Honeywell's ability to assert any portion of the Agreement, including the listed sections, in defense against OPTO's claims of patent misuse in the bench portion of the trial.

JA770

negotiation of the Settlement Agreement, from "testifying" during attorney argument. In response, Honeywell's counsel represented that they well understood that such conduct would be improper and draw a strong rebuke from the Court. With that representation, the Court finds that there is no need for a ruling on this motion at this time.

**7.      Honeywell's Previous Licensing Discussions with OPTO**

OPTO's seventh motion in limine seeks to preclude Honeywell from presenting any testimony or evidence related to any previous attempts by Honeywell to license any of its patents to OPTO. The Court understands that the earlier discussions between the Parties occurred in 2011 and 2013, long before the litigation and Agreement in dispute here. Accordingly, the previous licensing communications have little or, more likely, no relevance to the issues to be presented to the jury. Also, to the extent these discussions have any tenuous probative value, such value is substantially outweighed by the risk of unfair prejudice and confusing the issues for the jury. Therefore, the Court will grant OPTO's motion and exclude this evidence under Federal Rules of Evidence 401, 402, and 403.

**8.      OPTO's Analysis of Potential Infringement of Honeywell Patents**

OPTO's final motion in limine asks the Court to exclude evidence or testimony related to OPTO's analysis of its potential infringement of Honeywell's patents. OPTO contends, and the Court agrees, that evidence of whether or not OPTO believed it infringed Honeywell's patents (and, relatedly, why it settled the ITC and Delaware actions) is unlikely to be relevant to the merits of the issues before the jury. However, at oral argument Honeywell represented that this evidence, if it is presented, would be rebuttal evidence. Accordingly, as with Mr. Taylor's testimony above, the Court will defer ruling on this motion until it becomes necessary to do so and the specifics of the testimony can be proffered to the Court.

JA771

II.    **OPTO's MOTION TO STRIKE HONEYWELL DISCOVERY (Doc. No. 307)**

In addition to its motions in limine, OPTO filed, on July 5, 2023,[15] a motion requesting that the Court strike Honeywell's Second Amendments to OPTO's First Set of Interrogatories served on June 7, 2023, as untimely and unfair. The Court will not belabor its analysis of this motion as it appears that, with one exception discussed below, it will have little practical effect on the Parties' preparation for trial. Since the earliest case management orders entered in this action, the deadline for the Parties to supplement their interrogatory responses under Rule 26(e) has been set for June 7, 2023. *See* Doc. Nos. 40, 131.  Thus, Honeywell's "supplementation" of its discovery responses was timely and will not be stricken. Moreover, several of the challenged modifications to Honeywell's discovery responses relate to unpled claims that the Court has ruled will not be part of the case presented to the jury or to the Court; therefore, any improper (as distinguished from untimely) supplementation is moot and need not be addressed.

There is, however, one supplemented interrogatory that the Court finds it must address to prevent unfairness to OPTO. In response to Interrogatory 13, which asked Honeywell to "identify all patents, whether active or expired, owned by or assigned to Honeywell, that You contend claim decoding of PDF417, MicroPDF417, composite codes, or GS1 stacked codes by laser scanning," Honeywell modified its earlier response (which had only listed one patent and generally noted that Honeywell owns "thousands" of relevant patents) to identify over 100,000 pages of documents "from which additional responsive information may be ascertained." No specific additional patents were identified within the additional 100,000 pages. The Court agrees with OPTO that "supplementation" in this manner is plainly unfair.

---

[15] While the Court understands that the Parties have been busy with preparation for trial during June 2023, OPTO's delay of almost a month in seeking to strike this discovery in some respects belies the urgency and unfairness suggested by its motion.

11

Honeywell defends its response on the grounds that the same 100,000 pages were cited months earlier in response to a different Interrogatory, No. 1. However, Interrogatory No. 1 asks Honeywell only to "Identify all patents that You contend are licensed to OPTO under the Settlement Agreement, setting forth all facts upon which You base Your contention and identifying all Documents and other evidence that support Your contention." Honeywell's earlier identification of 100,000 pages and thousands of patents thus did not necessitate OPTO's review of the cited pages; instead, it merely delineated the universe of patents which might be relevant in the action. In sum, adding the same entire patent universe to an interrogatory that requests identification of specific patents directed to a particular art is very different and, in the Court's view, goes beyond the limits of proper "supplementation" under Rule 26(e).

Accordingly, the Court directs Honeywell to identify to OPTO, on or before, 5 p.m. on July 14, 2023, any specific patents in addition to the 7,159,783 Patent that it intends to offer at trial (whether to the jury or to the Court) with respect to the subject of Interrogatory 13 (i.e. "patents that claim decoding of PDF417, MicroPDF417, composite codes, or GS1 stacked codes by laser scanning.") In the absence of such identification, the Court will grant OPTO's motion only with respect to the "supplementation" of Interrogatory 13.

## III.     MOTIONS TO QUASH

In addition to its motions in limine, Honeywell has filed three motions to quash trial subpoenas issued to Honeywell (Doc. No. 315), Alston & Bird (Doc. No. 319) and Adam Doane (Doc. No. 317), an in-house attorney at Honeywell who formerly worked at Alston & Bird and served as one of Honeywell's counsel in the ITC action. OPTO issued the subpoenas for the purpose of seeking testimony authenticating and providing the evidentiary foundation (e.g. that documents are admissible as business records under Federal Rule of Evidence 803(6)) for

12

JA773

documents produced by Honeywell. These documents include the ITC Claim Charts discussed above as well as communications involving Alston & Bird.

Honeywell challenges the subpoenas to Honeywell and Alston & Bird on several grounds, including the lack of a named person being subpoenaed in the entity subpoenas and the risk of the disclosure of work product and privileged communications. Based on the representations of counsel at oral argument, however, it appears that the Court need not resolve the motions as to these entities at this time. First, Honeywell represents that it does not intend to contest the authenticity of any document produced from Honeywell's files (with a Honeywell bates number). Further, the Parties together represented to the Court that they would meet in good faith to resolve any remaining dispute about the admissibility of their exhibits. The Court expects that the Parties can identify their own business records and agree on the admissibility of such records in that process. Also, with respect to the subpoena of Alston & Bird, OPTO agreed that the need for the subpoena would be satisfied if Mr. Doane's subpoena was not quashed (which is the Court's ruling below). Therefore, the Court will defer ruling on the motions to quash the subpoenas to Honeywell and Alston & Bird, which may well be moot.

With respect to the subpoena to Mr. Doane, Honeywell raises two issues. First, it expresses its legitimate concern that Mr. Doane will be required to disclose privileged attorney-client communications. In response, OPTO represents that it does not intend to seek privileged information from Mr. Doane, intending to question him about the ITC claim charts and communications with OPTO's counsel, neither of which are privileged communications. Further, the Court will, of course, respond at trial to any improper effort to elicit privileged testimony from Mr. Doane. Therefore, Honeywell's objection to the subpoena based on the potential disclosure of privileged communications will be overruled.

JA774

Honeywell's second challenge to the subpoena is that Mr. Doane was not properly disclosed in OPTO's Rule 26 discovery disclosures or otherwise identified as a potential trial witness until OPTO served its list of trial witnesses in June 2023. While the Court agrees with Honeywell that OPTO should have identified Mr. Doane as a potential witness earlier in the litigation (and OPTO does not argue otherwise), it also agrees with OPTO that Mr. Doane should not be precluded from testifying under Federal Rule of Civil Procedure 37(c)(1) because the failure to disclose him is harmless in these circumstances. *See* Fed. R. Civ. Proc. 37(c)(1). Honeywell is not prejudiced by allowing Mr. Doane to testify. Mr. Doane is clearly identified as a participant in communications which Honeywell has long understood are a central part of OPTO's arguments so it should not be a surprise to Honeywell that he might be asked to testify. Also, in his role overseeing the litigation, he is intimately familiar with the case so the time for him to prepare to testify should be minimal. Finally, of course, this is not a situation in which a party has no means to depose or otherwise determine what a late identified witness will say at trial. Honeywell has full access to Mr. Doane, its own employee. Accordingly, the Court will deny the motion to quash the subpoena to Mr. Doane.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: July 13, 2023

Kenneth D. Bell
United States District Judge

14

JA775

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:21-CV-00506-KDB-DCK**

HONEYWELL
INTERNATIONAL INC.;
HAND HELD PRODUCTS, INC.;
AND METROLOGIC
INSTRUMENTS, INC.,

      **Plaintiffs,**

      **v.**                           **ORDER**

OPTO ELECTRONICS CO.,
LTD.,

      **Defendant.**

 

     **THIS MATTER** is before the Court on Defendant's Motion to Continue the Patent Misuse

Bench Trial and Reopen Discovery (Doc. No. 341) and, relatedly, reconsideration of the Court's

Order on Defendant's Motion to Strike Honeywell's Second Amended Objections and Responses

to Defendant's First Set of Interrogatories (Doc. Nos. 307, 330). Specifically, OPTO moves the

Court to continue the bench trial adjudicating OPTO's patent misuse counterclaim, and to reopen

fact and expert discovery relating to that claim, based on Plaintiffs' recent identification of seven

new Honeywell patents that allegedly cover decoding of the barcode symbologies at issue in this

action.  Having carefully considered and reconsidered these motions, the parties' briefs and

exhibits, and the full course of Honeywell's unprofessional discovery conduct, the Court orders

1

JA776

that Honeywell be prohibited from introducing the disputed evidence at the upcoming bench trial[1] and denies the motion for a continuance of the trial as moot.

On July 5, 2023, OPTO filed a motion requesting that the Court strike Honeywell's Second Amendments to OPTO's First Set of Interrogatories served on June 7, 2023, as untimely and unfair. On July 13, 2023 (following a lengthy Pretrial Conference and Hearing on July 11, 2023), the Court denied the motion to strike[2] with the exception that the Court found that it was required to address one of the "supplemented" interrogatory responses to prevent unfairness to OPTO. In response to Interrogatory 13, which asked Honeywell to "identify all patents, whether active or expired, owned by or assigned to Honeywell, that You contend claim decoding of PDF417, MicroPDF417, composite codes, or GS1 stacked codes by laser scanning," Honeywell modified its earlier response (which had only listed one patent and generally noted that Honeywell owns "thousands" of relevant patents) to identify over 100,000 pages of documents "from which additional responsive information may be ascertained." No specific additional patents were identified within the additional 100,000 pages. The Court easily determined that Honeywell's purported "supplementation" in this manner was "plainly unfair," violating both the letter and spirit of Rule 26(e). *See* Doc. No. 330.

Honeywell was ordered to identify to OPTO, on or before 5 p.m. on July 14, 2023, any specific patents in addition to the 7,159,783 Patent that it intended to offer at trial with respect to the subject of Interrogatory 13 (i.e. "patents that claim decoding of PDF417, MicroPDF417,

---

[1] Honeywell has only forecast its intent to use the patents in dispute in connection with the bench trial on patent misuse. If Honeywell seeks to use the patents at the jury trial it will similarly be barred from doing so.

[2] The Court's brief ruling as to most of the motion to strike focused on the lack of any need for the discovery responses to be struck because of the Court's other rulings on which claims could be presented at trial and the facial timeliness of the "supplemented" responses under the Court's Case Management Order.

2

JA777

composite codes, or GS1 stacked codes by laser scanning"). *Id.* In initially allowing Honeywell to rectify its inadequate responses, the Court expected that either Honeywell would not identify additional patents or any identification would be a *de minimis* burden on OPTO. But, Honeywell again dashed the Court's hopes for fair play. Shortly before 5 p.m. on July 14, 2023, Honeywell identified seven patents (with over 132 claims)[3] as responsive to Interrogatory 13. *See* Doc. No. 340.

The next day OPTO filed its motion for a continuance of the trial, arguing that it would be unfair to require it and the Court to prepare for trial on so many patents on such short notice. In response, Honeywell makes two arguments. First, Honeywell says that the subject of Interrogatory No. 13 – patents that claim "decoding of PDF417, MicroPDF417, composite codes, or GS1 stacked codes by laser scanning" – is "entirely irrelevant" to OPTO's patent misuse counterclaim and affirmative defense. Second, without even a modicum of contrition for its conduct, Honeywell claims that it "produced the patents" earlier in discovery and it was OPTO's fault, not Honeywell's, if OPTO was unprepared for trial.

The Court agrees with OPTO. As to Honeywell's first point – that the patents are allegedly irrelevant – Honeywell's obligation was to answer OPTO's discovery appropriately, regardless of its view of the relevancy of the subject matter of the Interrogatory. Indeed, Honeywell could have moved for relief from having to respond, but what it could not do was what it did – wait until the last business day before trial to give a meaningful response (other than identification of the '183 Patent) and even then only because the Court ordered it to do so. However, the asserted lack of

---

[3] After the Court required it to do so, Honeywell further identified on July 16, 2023, more than 20 specific independent claims in these seven patents that it intended to assert against OPTO in the bench trial. *See* Doc. No. 344.

3

relevance has one silver lining for Honeywell – it won't be prejudiced (in its own view)[4] by being prohibited from introducing the "irrelevant" patents into evidence.

Also, Honeywell's disingenuous attempts to deflect its plainly unprofessional discovery conduct continue to ring hollow to the Court. Honeywell misleadingly seeks to excuse its lack of any true response to OPTO's interrogatory by pointing to its production of literally "hundreds" of patents in fact discovery, all without any indication that apparently only seven of those patents were in fact responsive to Interrogatory 13. Further, notwithstanding the Court's earlier rejection of this specious argument, Honeywell again argues that its identification of "thousands" of patents buried among over 100,000 pages of documents on September 30, 2022, in response to OPTO's very different Interrogatory No. 1 (asking Honeywell to "[i]dentify all patents that You contend are licensed to OPTO under the Settlement Agreement") should be somehow exculpatory (which it is not). *See* Doc. No. 330 at p.11. Honeywell's other excuses that the patents were listed by its expert among "a large list" and identified as trial exhibits (again undifferentiated among dozens of other patents) fall similarly short of showing anything other than Honeywell's ongoing effort to obfuscate and obscure its intent to use these specific patents in defense of the patent misuse claim. In sum, the Court has seen enough of Honeywell's misdirection and lack of candor to OPTO and the Court to reach the inescapable conclusion that Honeywell's plan all along was to ambush OPTO at trial with the disputed patents. Therefore, the Court will order the only appropriate remedy for such conduct, which is to prohibit Honeywell from introducing the patents into evidence at trial.

---

[4] Of course, OPTO has a different position on the relevance of whether or not Honeywell has patents covering the symbologies in dispute, but the point is that Honeywell retains its primary arguments, even without the additional patents.

4

Having decided that Honeywell will not be permitted to rely on the patents that are the grounds for OPTO's motion to continue, there is no basis for the bench trial to be continued or for further discovery to be had on the patents. Accordingly, the Court will deny OPTO's motion to continue the trial as moot.

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion to Strike Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories (Doc. No. 307) is **GRANTED** as to Honeywell's response to Interrogatory 13;

2. Honeywell will not be permitted to introduce into evidence at trial the seven patents that it identified to OPTO on July 14, 2023, in response to the Court's Order dated July 13, 2023; and

3. Defendant's Motion to Continue the Patent Misuse Bench Trial and Reopen Discovery (Doc. No. 341) is **DENIED** as moot.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: July 18, 2023

Kenneth D. Bell
United States District Judge

5

JA780

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:21-CV-00506-KDB-DCK**

| | |
|---|---|
| **HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC. AND METROLOGIC INSTRUMENTS, INC.,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**OPTO ELECTRONICS CO., LTD.,**<br><br>    **Defendant.** | **FILED**<br>Charlotte, NC<br><br>JUL 1 9 2023<br><br>Clerk, US District Court<br>Western District NC |

**Verdict Sheet – Causes of Action**

1. Did OPTO breach the Parties' Settlement Agreement by failing to timely pay Honeywell all royalties due under the Agreement?

   _✓_ Yes    _____ No

2. Is OPTO entitled to succeed on its defense of Unilateral Mistake?

   _____ Yes    _✓_ No

3. Is OPTO entitled to succeed on its defense of Quasi-Estoppel?

   _____ Yes    _✓_ No

JA781

Answer question four only if you answered question 1 "no" or answered either question 2 or 3 "yes."

**4.**    Did Honeywell breach the implied covenant of good faith and fair dealings in its contract with OPTO?

_____ Yes        _____ No

FOREPERSON

$8 / 19 / 2023$

DATE

JA782

# United States District Court
## Western District of North Carolina
## Charlotte Division

| | | |
|---|---|---|
| Hand Held Products, Inc. | ) | JUDGMENT IN CASE |
| Honeywell International Inc. | ) | |
| Metrologic Instruments, Inc.**,** | ) | |
| | ) | |
| Plaintiff(s), | ) | 3:21-cv-00506-KDB-DCK |
| | ) | |
| vs. | ) | |
| | ) | |
| OPTO Electronics Co., Ltd.**,** | ) | |
| | ) | |
| Defendant(s). | ) | |

DECISION BY COURT. This action having come before the Court by Jury Trial and Bench Trial and a decision having been rendered;

IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in accordance with the Jury Verdict dated July 19, 2023 and the Court's July 20, 2023 oral findings.

July 20, 2023

Katherine Hord Simon, Clerk
United States District Court

JA783

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br>     *Plaintiffs*, <br><br> v. <br><br> OPTO ELECTRONICS CO., LTD., <br><br>     *Defendant and* <br>     *Counterclaim Plaintiff*, <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br>     *Counterclaim Defendants*. | CIVIL ACTION NO. 3:21-cv-00506 |

## STIPULATION REGARDING JURY VERDICT DAMAGES

Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. ("Honeywell" or "Plaintiff") and Defendant OPTO ELECTRONICS CO., LTD., ("OPTO" or "Defendant") hereby stipulate that the computation of the royalties under Section 4.3 and the late fees under Section 4.6 of the License and Settlement Agreement directed to the accused products in this matter is $859,741.[1]

---

[1] As addressed during the pre-trial hearing, Honeywell will pursue fees and costs pursuant to Section 4.7 of the License and Settlement Agreement in post-trial briefing.

JA784

Submitted July 25, 2023

/s/ Robert Muckenfuss

Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com
Tyler T. VanHoutan
McGuireWoods LLP
Texas Tower, Ste 2400
845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com
Christine E. Lehman
Connor S. Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

York M. Faulkner
YorkMoodyFaulkner
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

/s/ S. Benjamin Pleune

S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**Alston & Bird LLP**
1120 S. Tryon Street, Suite 300
Charlotte, NC 28203
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

2

JA785

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 25, 2023, I filed and served a copy of STIPULATION REGARDING

JURY VERDICT DAMAGES using the CM/ECF system on all counsel of record.

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

JA786

# United States District Court
## Western District of North Carolina
## Charlotte Division

| | | |
|---|---|---|
| Hand Held Products, Inc. | ) | AMENDED JUDGMENT |
| Honeywell International Inc. | ) | |
| Metrologic Instruments, Inc., | ) | |
| | ) | |
| Plaintiff(s), | ) | 3:21-cv-00506-KDB-DCK |
| | ) | |
| vs. | ) | |
| | ) | |
| OPTO Electronics Co., Ltd., | ) | |
| | ) | |
| Defendant(s). | ) | |

DECISION BY COURT. This action having come before the Court by Jury Trial and Bench Trial and decisions having been rendered -- first, a Jury Verdict and the Court's findings of fact and conclusion of law stated on the record on July 20, 2023, and then, on July 26, 2023, an Order amending the Judgment to reflect stipulated damages awarded in favor of Plaintiffs on the Jury Verdict;

IT IS ORDERED AND ADJUDGED that the Judgment entered on July 20, 2023, is hereby amended, pursuant to the Court's July 26, 2023, Order, and an Amended Judgment is entered as follows: Plaintiff is awarded damages on the Jury Verdict in the amount of $859,741.

July 26, 2023

Katherine Hord Simon, Clerk
United States District Court

JA787

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> OPTO ELECTRONICS CO., LTD., <br><br> *Defendant and Counterclaim Plaintiff,* <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Counterclaim Defendants*. | **HONEYWELL'S MOTION FOR FEES AND COSTS** <br><br> Case No. 3:21-cv-00506 |

Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. ("Honeywell") move the Court under Federal Rules of Civil Procedure 54 and 59 for the following relief:

1.    An order granting Honeywell $2,647,577.87 in fees and costs as provided by Section 4.7 of the parties' License and Settlement Agreement.

The grounds for this Motion are more fully set forth in Honeywell's accompanying Memorandum in Support. Honeywell requests a hearing on this Motion.

JA788

Submitted August 3, 2023

/s/ *S. Benjamin Pleune*

S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**ALSTON & BIRD LLP**
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

JA789

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 3, 2023 I filed a copy of this Motion for Fees and Costs using the

Court's CM/ECF system, which automatically provides service to all counsel of record.


/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

3

JA790

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

      *Plaintiffs*,

v.

OPTO ELECTRONICS CO., LTD.,

      *Defendant and*
      *Counterclaim Plaintiff*,

v.

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

      *Counterclaim Defendants*.

CIVIL ACTION NO. 3:21-cv-00506

## MEMORANDUM IN SUPPORT OF HONEYWELL'S
## MOTION FOR FEES AND COSTS

JA791

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 2

        A.      The Agreement ................................................................................... 2

        B.      Procedural History ............................................................................. 2

III.    LEGAL STANDARD ......................................................................................... 3

IV.     THE AGREEMENT ENTITLES HONEYWELL TO AN AWARD OF ITS
        FEES AND COSTS ASSOCIATED WITH THIS LITIGATION ....................... 4

        A.      Section 4.7 Is a Valid and Enforceable Fee-Shifting Provision Under
                Delaware Law ..................................................................................... 4

        B.      Section 4.7 Entitles Honeywell to All of Its Fees and Costs in This
                Action ................................................................................................. 5

V.      HONEYWELL'S $2.65M IN FEES AND COSTS ARE REASONABLE ........... 7

        A.      Honeywell's Fees Are Reasonable Especially in Light of OPTO's
                Conduct in This Litigation and the Significantly Reduced Rates
                Billed by Honeywell's Counsel ......................................................... 8

        B.      Honeywell's Fees and Costs Are Likely Materially Less Than
                OPTO's ............................................................................................... 9

VI.     CONCLUSION .................................................................................................. 10

i

JA792

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Aveta Inc. v. Bengoa*,
    No. 3598-VCL, 2010 WL 3221823 (Del. Ch. Aug. 13, 2010) ...................................................6

*Balt. Pile Driving & Marine Constr., Inc. v. Wu & Assocs.*,
    No. N19L-07-090, 2022 WL 3466066 (Del. Super. Ct. Aug. 18, 2022) ..................................4

*Comrie v. Enterasys Networks, Inc.*,
    No. 19254, 2004 WL 936505 (Del. Ch. Apr. 27, 2004) ...................................................3, 4, 7

*Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*,
    Nos. 3158-VCL, 3406-VCL, 2009 WL 1111179 (Del. Ch. Apr. 27, 2009) ...........................7

*Knight v. Grinnage*,
    No. 14823, 1997 WL 633299 (Del. Ch. Oct. 7, 1997) .....................................................3, 4

*Kuhn Constr., Inc. v. Diamond State Port Corp.*,
    990 A.2d 393 (Del. 2010) ...............................................................................................5, 6

*L&W Ins., Inc. v. Harrington*,
    Civil Action No. 2730-VCP, 2007 WL 1756540 (Del. Ch. June 6, 2007) ..............................3

*Estate of Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) .......................................................................................................5

*Seidensticker v. Gasparilla Inn, Inc.*,
    2007 WL 4054473 (Del. Ch. Nov. 8, 2007) ...........................................................................6

*SIGA Techs., Inc. v. PharmAthene, Inc.*,
    67 A.3d 330 (Del. 2013) ...........................................................................................................4

*Transched Sys. v. Versyss Transit Sols., LLC*,
    No. 07C-08-286 WCC, 2012 WL 1415466 (Del. Super. Ct. Mar. 29, 2012) ...........................3

*W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*,
    No. 2742-VCN, 2009 WL 458779 (Del. Ch. Feb. 23, 2009) ...................................................7

**Statutes**

35 U.S.C. § 285 ........................................................................................................................6

N.C. Gen. Stat. § 75-1.1 ...........................................................................................................2

ii

JA793

N.C. Gen. Stat. § 75-1.1 (4) ....................................................................................7

North Carolina Unfair and Deceptive Trade Practices Act ......................................1, 8

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ...............................................................5

Fed. R. Civ. P. 54(d)(2)...........................................................................................3

JA794

## I.    INTRODUCTION

When the parties negotiated their Agreement, they specifically included a fee-shifting provision: "In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action." Ex. A at § 4.7 (the Agreement). Under Delaware law, courts are to enforce fee-shifting provisions as written. Here, Honeywell was forced to incur $2.65 million in fees and costs to collect the overdue royalty payments that a jury found OPTO failed to make. Pursuant to the plain terms of the parties' Agreement—and the notion that fee-shifting provisions are to place the plaintiff in the economic position that it would have been absent a breach—Honeywell respectfully requests that the Court enforce the fee-shifting provision and award it its actual incurred fees and costs.

Honeywell's fees and costs are reasonable. According to OPTO's own public disclosures, it likely incurred over $3.5 million in fees and costs just through May 2023. Honeywell's fees and costs through the same pre-trial period were less than $1.9 million. Moreover, while Honeywell's Complaint asserted straightforward claims of breach of contract, OPTO chose to plead affirmative defenses of laches, unilateral mistake, and equitable estoppel as well as counterclaims of patent misuse, breach of the implied covenant of good faith and fair dealing, and violation of North Carolina's Unfair and Deceptive Trade Practices Act. Thus, the level of investment by both parties in this action is largely the result of OPTO's own litigation decisions. Importantly, Honeywell prevailed on its breach claim, all of OPTO's affirmative defenses, and each of OPTO's counterclaims. Thus, an award of $2.65 million—reflecting Honeywell's actual fees and costs (excluding fees and costs related solely to Honeywell's § 5.1 breach claim) is appropriate here and consistent with the fee-shifting provision of the Agreement.

## II.    BACKGROUND

### A.  The Agreement

In February 2020, Honeywell and OPTO executed the License and Settlement Agreement resolving Honeywell's claims for patent infringement. *See* Ex. A (the Agreement). That Agreement is a product of weeks of negotiation between two sophisticated law firms and mediation with a world-renowned patent mediator. Ultimately, the parties included a provision for fees and costs in the event a party is forced to institute an action when the other party fails to make the necessary payments due under the Agreement. That provision, § 4.7, states that "[i]n the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action." Ex. A at § 4.7 (the Agreement).

### B.  Procedural History

On September 24, 2021, Honeywell filed a complaint against OPTO alleging a single count for breach of contract. As part of that count, Honeywell sought to collect payment for: (1) OPTO's breach of its representation and warranty, and (2) OPTO's overdue royalty payments. *See, e.g.*, Dkt. 1 at ¶ 35 ("Opticon has not paid, and continues to fail to pay, the full royalty delineated in Section 4 of the Agreement."); *id*. at ¶ 36 ("Due to Opticon's breach of Section 4 of the Agreement, it owes Honeywell the missing royalties defined in that section."). OPTO answered on January 5, 2022, asserting counterclaims of (1) violation of N.C. Gen. Stat. § 75-1.1;[1] (2) patent misuse; and (3) breach of the implied covenant of good faith and fair dealing.

During the week of July 17, 2023, Honeywell's claim for breach of contract and OPTO's claim for breach of the implied covenant of good faith and fair dealing was tried to a jury. On

---

[1]    On January 26, 2022, Honeywell moved to dismiss OPTO's claim for violation of N.C. Gen. Stat. § 75-1.1. *See* Dkt. 20. On April 14, 2022, the Court granted Honeywell's motion and dismissed OPTO's claim. *See* Dkt. 37 at 4.

July 19, the jury returned a verdict in Honeywell's favor. *See* Dkt. 350. On July 19 and 20, the Court held a bench trial on OPTO's counterclaim of patent misuse. On July 20, the Court ruled in Honeywell's favor on OPTO's patent misuse counterclaim. *See* Dkt. 353.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 54(d)(2) allows for a court to award attorneys' fees where a "statute, rule, or other grounds" entitle a movant to such an award. FED. R. CIV. P. 54(d)(2). Consistent with Rule 54(d)(2), the general rule under Delaware law is that litigants must pay their own attorneys' fees, unless a statute or contract provides otherwise. *Transched Sys. v. Versyss Transit Sols., LLC*, No. 07C-08-286 WCC, 2012 WL 1415466, at *1 (Del. Super. Ct. Mar. 29, 2012).

When a contract provides for attorneys' fees, Delaware courts look solely to the document in determining whether to grant such an award. *Comrie v. Enterasys Networks, Inc.*, No. 19254, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004). Delaware law assumes that "[t]he parties who enter[ed] into a contract [had] the opportunity during the course of their negotiations to add to the contract any provision appropriately bargained for which would place the responsibility for payment of attorney's fees on any part who either breaches the contract or fails to perform in accordance with the terms of the contract." *Knight v. Grinnage*, No. 14823, 1997 WL 633299, at *3 (Del. Ch. Oct. 7, 1997).

"Where a contract places the responsibility for payment of attorneys' fees on any party who either breaches the contract or fails to perform in accordance with the terms of the contract, courts will enforce the bargained-for provision absent evidence of an ambiguity or contrary intent." *L&W Ins., Inc. v. Harrington*, Civil Action No. 2730-VCP, 2007 WL 1756540, at *3 (Del. Ch. June 6, 2007) (internal quotation marks omitted). As a result, "Delaware law and equity courts routinely enforce provisions of a contract allocating costs of legal actions arising from the breach of a

contract." *Knight*, 1997 WL 633299, at *3; *see also SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013) ("In contract litigation, where the contract contains a fee-shifting provision, we will enforce that provision.").

## IV.    THE AGREEMENT ENTITLES HONEYWELL TO AN AWARD OF ITS FEES AND COSTS ASSOCIATED WITH THIS LITIGATION

The parties' Agreement is explicit: "In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action." Ex. A at § 4.7 (the Agreement). This mutually-agreed-to provision[2] unambiguously provides for all "fees and costs" incurred in an action to collect any overdue payments. The present action is an action to collect overdue payments. *See, e.g.*, Dkt. 1 at ¶¶ 35–36. Therefore, Honeywell respectfully requests that the Court enforce § 4.7 and award Honeywell its fees and costs incurred in recovering OPTO's overdue royalty payments.

### A.  Section 4.7 Is a Valid and Enforceable Fee-Shifting Provision Under Delaware Law

The Agreement establishes a valid and enforceable fee-shifting provision under Delaware law. To establish a valid and enforceable fee-shifting provision, Delaware law does not require "magic" words. Indeed, "[u]nder Delaware law, there is no 'bright-line language' to establish a fee-shifting provision." *Balt. Pile Driving & Marine Constr., Inc. v. Wu & Assocs.*, No. N19L-07-090, 2022 WL 3466066, at *2 (Del. Super. Ct. Aug. 18, 2022). Delaware law treats each provision as "unique" and that it "must be decided under the facts of that particular case." *Id.* In analyzing a fee-shifting provision, Delaware courts *must* "look[] solely to the [contract] in determining" whether to award fees and costs. *Comrie*, 2004 WL 936505, at *2. And Delaware courts *must also* "give [that]

---

[2]      The parties also agreed that "This Agreement shall be construed as if equally drafted by the Parties hereto." Ex. A at § 9.4 (the Agreement).

provision term and effect, so as to not render any part of the contract mere surplusage." *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010).

Section 4.7 states: "In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action." Ex. A at § 4.7 (the Agreement). Here, Honeywell instituted an action to collect overdue royalty payments due to it under § 4.3. *See, e.g.*, Dkt. 1 at ¶¶ 35–36. An objective and reasonable third party would understand that, because Honeywell instituted an action to collect overdue royalty payments, Honeywell is "entitled to its fees and costs incurred with respect to such an action." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party.").

Put simply, § 4.7 establishes a valid and enforceable fee shifting provision under Delaware law.

**B.  Section 4.7 Entitles Honeywell to All of Its Fees and Costs in This Action**

Based on the ordinary understanding of § 4.7, Honeywell is entitled to *all* fees and costs it incurred in recovering OPTO's overdue payments.

The Agreement is clear and unambiguous that "fees and costs" includes attorneys' fees, expert fees/costs, and costs. Indeed, an objective and reasonable third party would understand "fees" to be not limited to any one type of fee, but rather to include any fee incurred, including attorneys' and expert fees. This understanding is confirmed by, for example, *Black's Law Dictionary*, which defines "fee" as "a charge or payment for labor or services, esp. professional services." *See FEE*, BLACK'S LAW DICTIONARY (11th ed. 2019). *Black's Law Dictionary* goes on to provide examples of "fees" and specifically includes "attorney's fees" and "expert-witness fee[s]" within the

5

definition. This common understanding of "fees" is further confirmed by its use in Delaware courts. For example, in *Aveta Inc. v. Bengoa*, in which the plaintiff moved to enforce a "fee award," the court's opinion enforcing the fee award repeatedly refers to "fees" and a "fee award" as including attorneys' fees. No. 3598-VCL, 2010 WL 3221823 (Del. Ch. Aug. 13, 2010). To read the term "fees" to mean anything less than any fee incurred by a party when recovering overdue payments, would render the word "fees" superfluous and mere surplusage. Such a reading cannot stand under Delaware law. *Kuhn Constr.*, 990 A.2d at 396-97 ("[Delaware courts] will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

The context of the Agreement as a whole also supports awarding Honeywell its costs and fees—including *both* attorneys' fees and expert witness fees. In the "Background" of the Agreement, the parties explained that in the preceding Delaware Action, Honeywell "sought a declaration of infringement, damages, interest, attorney fees, and accounting of damages, costs of suit, and equitable relief." Ex. A at Background ¶ B. That language reflected Honeywell's Request for Relief in the Delaware Action, which sought (among other things) "a determination that this is an exceptional case, and an award to Honeywell of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285." *See* Ex. F (Delaware Complaint). Based on that language, the parties agreed that "[e]ach Party shall bear its own . . . attorneys' fees" in resolving the Delaware and ITC Actions. Ex. A at Section 3.2. But the parties expressly used the **broader** term "fees" in Section 4.7— capturing attorneys' fees *and* other fees incurred with respect to an action to collect overdue payments. If the term "fees" in Section 4.7 were limited to just "attorneys' fees," that would render the use of the word "attorney" in in Section 3.2 superfluous. *See Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at * (Del. Ch. Nov. 8, 2007) ("When interpreting contracts, this Court

6

gives meaning to every word in the agreement and avoids interpretations that would result in 'superfluous verbiage.'"). Said another way, the term "fees" is necessarily broader than the term "attorneys' fees," which includes just one type of fees. There is no grammatical or other support for the notion that "fees" somehow would exclude "attorneys' fees."[3]

Simply put, under the ordinary understanding of the Agreement, Honeywell is entitled to its fees and costs—including attorneys' fees and expert fees.

## V.     HONEYWELL'S $2.65M IN FEES AND COSTS ARE REASONABLE

While the Agreement does not include a reasonableness requirement, Honeywell's fees are reasonable and customary for this action. After subtracting certain fees, Honeywell's fees "incurred with respect to such an action" were $2.05 million and its incurred costs were $800,000. Indeed, while the Agreement does not require any fees to be removed, this motion does not seek fees for time entries dedicated solely to: (1) pursuit of the § 5.1 claim independent from tasks that were agnostic between § 5.1 and § 4.3, (2) the parties' discovery disputes concerning the audits, (3) summary judgment briefing regarding § 5.1, and (4) Honeywell's motion for reconsideration.[4]

In sum, Honeywell seeks $2.65 million in "fees and costs" pursuant to the fee-shifting provision of Section 4.7 of the parties' Agreement.

---

[3]     The Agreement in question here does not invoke the Delaware precedent regarding "prevailing party" clauses in contracts—Delaware courts *must* "look[] solely to the [contract] in determining" whether to award fees and costs. *Comrie*, 2004 WL 936505 at *2. Moreover, the Court's summary judgment determinations do not alter who is the prevailing party in this case. Delaware law does not look to the damages sought in a complaint versus the damages received in determining the prevailing party. Indeed, "Delaware law is clear that in the usual case, and absent contractual language to the contrary, whether a party has prevailed is determined by looking at the outcome of the substantive issues, not damages." *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, Nos. 3158-VCL, 3406-VCL, 2009 WL 1111179, at *14 (Del. Ch. Apr. 27, 2009); *see also W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, No. 2742-VCN, 2009 WL 458779, at *9 (Del. Ch. Feb. 23, 2009) (same). Here, Honeywell prevailed on every issue presented to the jury, and so is the prevailing party.

[4]     These excluded tasks summed to $237,970 in fees. Ex. B at ¶ 5 (declaration of S. Stevens).

**A. Honeywell's Fees Are Reasonable Especially in Light of OPTO's Conduct in This Litigation and the Significantly Reduced Rates Billed by Honeywell's Counsel**

As shown in the attached declaration and redacted invoices, the fees and costs Honeywell incurred were reasonable. *See* Ex. B at ¶ 4 (declaration of S. Stevens). As the Court is keenly aware, OPTO fought Honeywell's claims with full vigor. The case involved a motion to dismiss, twenty-three discovery disputes (the majority of which Honeywell prevailed on), dueling summary judgment motions, a jury trial, and a bench trial. Honeywell sought relief for straightforward claims of breach of contract; in response, OPTO injected affirmative defenses of unilateral mistake of fact, quasi-estoppel, laches, and patent misuse, along with counterclaims of patent misuse, breach of the implied covenant of good faith and fair dealing, and violations of the North Carolina Unfair and Deceptive Trade Practices Act. As OPTO once noted to the Court, "Opto has multiple [affirmative] defenses in the case which will require a longer presentation of evidence likely than Honeywell's case." Ex. C (email from R. Muckenfuss to I. Brenner). That proved true. Honeywell rested its breach-of-contract case-in-chief after only a few hours of evidence in the very first day of trial. The remaining days of the jury and bench trial stemmed from OPTO's defenses and counterclaims. The number of hours billed for Honeywell's claim, as well as defense against all of OPTO's affirmative defenses and counterclaims was reasonable.

Moreover, the rates charged to Honeywell are likely below the mean rates charged for either IP litigation or general corporate litigation for similar matters. Based on many factors, including the fact that this case sounded in contract law and not patent law, Alston & Bird provided Honeywell very significant discounts in its hourly rates. As detailed in the accompanying declaration, for this matter Alston provided Honeywell discounts generally on the order of 35%–45% off Alston's typical firm rates. *See* Ex. B at ¶ 6 (declaration of S. Stevens). Honeywell respectfully submits that

8

these rates are plainly reasonable for this action and likely less than the effective rates charged by OPTO's counsel.

### B. Honeywell's Fees and Costs Are Likely Materially Less Than OPTO's

Honeywell's fees are very reasonable as compared to what OPTO has publicly disclosed about its own fees and costs. In its annual report covering the period from December 1, 2021 through November 20, 2022, OPTO reported that, "[S]elling, general and administrative expenses increased by 257 million yen from the previous fiscal year . . . . This was mainly due to the progress of proceedings and the impact of the yen's depreciation on the costs of US attorneys involved in the lawsuit against HONEYWELL, Inc., which has continued since the previous fiscal year." Ex. D at 2 (machine translation of OPTO's 2022 Fiscal Year End Report). Using OPTO's reported exchange rate during the period,[5] that equates to $2.05 million spent during the reported fiscal year. Assuming, conservatively, that 75% of OPTO's reported selling, general, and administrative expenses increase was attorney-fee or cost spend, OPTO's fees and expenses were $1.5 million over that year. During the same period, Honeywell's incurred fees and costs were only $999,000.[6]

For the first half of OPTO's current fiscal year, *i.e.*, December 1, 2022 through May 31, 2023, OPTO reports that, "Selling, general and administrative expenses increased by 286 million yen from the previous fiscal year due to an increase in attorney's fees associated with legal proceedings."[7] Ex. E at 2 (machine translation of OPTO's second quarter financial report). Using

---

[5]     "1 US dollar = 125.64 yen". Ex. D at 2 (machine translation of OPTO's 2022 Fiscal Year End Report).

[6]     For purposes of this section and the comparison with OPTO's reports, Honeywell's incurred fees and expenses include all charges, even those not sought to be reimbursed by this motion.

[7]     OPTO's public filings identify no "legal proceeding" other than the instant litigation with Honeywell.

OPTO's reported exchange rate during the period[8], that amount equates to $2.09 million spent during those six months. During the same time frame, Honeywell's fees and costs were only $892,000.

In sum, OPTO's public reporting suggests that OPTO incurred fees and costs of over $3.5 million from December 2021 through May 2023 (which does not include the month of trial or the month immediately preceding it). During the same period, Honeywell's incurred fees and costs were just below $1.9 million. Given OPTO's decision to employ three law firms in June and July 2023, Honeywell expects that OPTO's incurred fees and costs greatly exceeded those of Honeywell for that period of time as well.

## VI.   CONCLUSION

For the foregoing reasons, Honeywell respectfully request that the Court enforce the fee-shifting provision of § 4.7 of the parties' Agreement and award Honeywell its fees and costs in the amount of $2.65 million.

---

[8]    "1 US dollar = 136.69 yen". Ex. E at 2 (machine translation of OPTO's second quarter financial report).

10

JA804

Dated: August 3, 2023

Respectfully submitted,

_/s/ S. Benjamin Pleune_
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim
Defendants Honeywell International Inc.,
Hand Held Products, Inc., and
Metrologic Instruments, Inc.*

JA805

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 3, 2023, a copy of the foregoing Memorandum was served on counsel of record by filing the same with the Court's ECF system.

*/s/ S. Benjamin Pleune*
S. Benjamin Pleune

12

JA806

# EXHIBIT C

JA807

| | |
|---|---|
| **From:** | Muckenfuss, Robert |
| **Sent:** | Monday, June 26, 2023 7:33 PM |
| **To:** | Stevens, Scott |
| **Cc:** | Irving Brenner; Griffin, Lauren; Pleune, Ben; O'Brien, Jessica L.; VanHoutan, Tyler; clehman@reichmanjorgensen.com; choughton@reichmanjorgensen.com; Faulkner, York |
| **Subject:** | Re: Honeywell v. OPTO Trial |

**EXTERNAL SENDER – Proceed with caution**

---

We would anticipate 4-5 days for jury trial and 2 days for the bench trial. We don't think a time limit would be appropriate but if the Court were to consider time limits, 8 hrs would be too short in our estimation. Opto has multiple defenses in the case which will require a longer presentation of evidence likely than Honeywell's case. Respectfully, Opto would request that no time limits be imposed.

Robert

**Robert A. Muckenfuss**
Partner
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
T:  +1 704 343 2052
M: +1 704 517 5949
F:  +1 704 444 8707
rmuckenfuss@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com



On Jun 26, 2023, at 5:33 PM, Stevens, Scott <Scott.Stevens@alston.com> wrote:

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Hi Mr. Brenner-

Honeywell anticipates the jury portion of the trial to take 3 days and anticipates the bench portion to take 1 day.

Honeywell respectfully requests that the Court impose a time limitation on each party. Honeywell proposes 8 hours per side for the jury trial (not including openings and closings) and 3 additional hours per side for the bench trial.

Best, Scott

---

**From:** Irving Brenner <Irving_Brenner@ncwd.uscourts.gov>
**Sent:** Monday, June 26, 2023 4:55 PM
**To:** Stevens, Scott <Scott.Stevens@alston.com>; Griffin, Lauren <Lauren.Griffin@alston.com>; Pleune, Ben <Ben.Pleune@alston.com>; O'Brien, Jessica L. <JOBrien@mcguirewoods.com>; Muckenfuss, Robert <rmuckenfuss@mcguirewoods.com>; VanHoutan, Tyler <TVanHoutan@mcguirewoods.com>; clehman@reichmanjorgensen.com; choughton@reichmanjorgensen.com; Faulkner, York <york.faulkner@ymf-law.com>
**Subject:** Honeywell v. OPTO Trial

**EXTERNAL SENDER – Proceed with caution**

---

Good afternoon. I hope you are all well. For our planning purposes, please let me know how long the parties expect the trial of this case to last. It would be helpful to have a separate estimate of the portions to be tried to the jury and to the Court. Thank you.

Irving

 Irving M. Brenner
Law Clerk to the Honorable Kenneth D. Bell
United States District Court
for the Western District of North Carolina
401 W. Trade Street, Room 210
Charlotte, NC 28202
704-350-7443

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT D

JA810

Machine Translated by Google





January 26, 2023

everybody

Company name: Optoelectronics Co., Ltd. Representative:
Masami Tawara, President and Representative Director
(Standard Code: 6664) Contact: Katsutoshi
Ishikawa, General Manager of Administration Department
Telephone: 048-446-1181

(Correction/Correction of Numerical Data)

Partial Correction of "Summary of Financial Results for the Fiscal Year Ended November 30, 2022 [Japanese GAAP] (Consolidated)"

We would like to inform you that we have identified some matters that should be corrected in the "Summary of Financial Results for the Fiscal Year Ending November 30, 2022 [Japanese GAAP] (Consolidated)" announced on December 27, 2022. We would also like to inform you that there have been corrections to the numerical data.

—

1. Reasons for

Correction (1) Inventory valuation error of U.S. sub-subsidiary Opticon, Inc.

After the disclosure on December 27, 2022, in the process of audit procedures for overseas subsidiaries that had been delayed, an inventory valuation error was newly confirmed at U.S. subsidiary Opticon, Inc. (hereinafter referred to as "OPTICON"). As a result, the cost of sales decreased by 13 million yen from the disclosed figure to 4,206 million yen. As a result of this revision, operating income and ordinary income each increased by 13 million yen, resulting in operating income of 315 million yen and ordinary income of 178 million yen.

(2) Reversal of deferred tax assets at European subsidiary Opticon Sensors Europe BV Due to the

reversal of deferred tax assets at European subsidiary Opticon Sensors Europe BV (hereinafter referred to as "OSE"), the parent company Net income attributable to shareholders decreased by 154 million yen from the previously disclosed figures, resulting in a net loss attributable to owners of the parent of 47 million yen.

For details on the reversal of deferred tax assets, please refer to "Notice Concerning Reversal of Deferred Tax Assets" announced today. Please refer to

As of today, all audit procedures for overseas subsidiaries have been completed.

(3) Correction of cash flows from investing activities

As OPTICON's cash and cash equivalents included time deposits with a deposit term of more than 3 months, the expenditure for deposits in time deposits has been revised to 223 million yen. As a result of this revision, cash flow from investing activities was an outflow of 250 million yen, and the balance of cash and cash equivalents at the end of the period was 6,278 million yen.

2. Correction

Corrections are indicated with __ lines. Due to the large number of corrections, only the main items in the summary are shown before and after the corrections, and for other parts, only the corrected information is shown in full.

JA811

Machine Translated by Google

[Before correction]

(Rounded down to the nearest million yen)

1. Consolidated financial results for the fiscal year ending November 2022 (December 1, 2021 to November 30, 2022)

(1) Consolidated operating results

(% indicates year-on-year change)

| | amount of sales | | Operating income | | Ordinary income | | Attributable to parent company shareholders Net interest profit | |
|---|---|---|---|---|---|---|---|---|
| | million yen | % Fiscal year | million yen | ÿ | million yen | % 165 -85.6 | million yen | ÿ |
| ending November 2022 | 7,211 (13.3) Fiscal year ending | | 302 -74.3 | | 1,151 | | 106 -76.2 | |
| November 2021 | 8,317 27.0 (Note) Comprehensive income | | 1,177 | | | | 448 | |

Fiscal year ending November 2022 1,000 million yen (33.9%)    Fiscal year ending November 2021 747 million yen (-%)

| | per share Net interest profit | After adjusting for diluted shares Net income per share | own capital current net interest rate | Total assets Ordinary profit margin | amount of sales Operating margin |
|---|---|---|---|---|---|
| | Yen | Yen | ÿ | ÿ | ÿ |
| Fiscal year ending | 17.24 | | 1.9 | 1.2 | 4.2 |
| November 2022 Fiscal | 72.55 | | 9.6 | 9.1 | 14.2 |

year ending November 2021 (Reference) Equity in earnings of affiliates Fiscal year ending November 2022 - million yen Fiscal year ending November 2021 - million yen

(2) Consolidated financial position

| | Total assets | net worth | own capital ratio | Book value per share |
|---|---|---|---|---|
| | million | million | ÿ | Yen |
| yen Fiscal year ending November 2022 6,046 | | Fiscal year ending November 2021 5,045 | 39.4 | 978.66 |
| 15,328 12,769 | | | 39.5 | 816.73 |

(3) Status of Consolidated Cash Flows

| | by sales activities Cash flow | by investment activity Cash flow | by financial activity Cash flow | cash and cash equivalents Ending balance |
|---|---|---|---|---|
| | million yen | million yen | million yen | One million yen |
| November 2022 issue | | | | 6,491 |
| November 2021 issue | -121 1,369 | -37 -239 | 453 -119 | 5,625 |

ÿAfter revisionÿ

(Rounded down to the nearest million yen)

1. Consolidated financial results for the fiscal year ending November 2022 (December 1, 2021 to November 30, 2022)

(1) Consolidated operating results

(% indicates year-on-year change)

| | amount of sales | | Operating income | | Ordinary income | | Attributable to parent company shareholders Net interest profit | |
|---|---|---|---|---|---|---|---|---|
| | million yen | % Fiscal | million yen | % 315 -73.2 | million yen | % 178 -84.5 | million yen | ÿ |
| ending November 2022 | 7,211 (13.3) Fiscal year ending | | 1,177 | | 1,151 | | yen | |
| November 2021 | 8,317 27.0 (Note) Comprehensive income | | | | | | -47 448 | |

Fiscal year ending November 2022 839 million yen (12.3%)    Fiscal year ending November 2021 747 million yen (-%)

| | per share Net interest profit | After adjusting for diluted shares Net income per share | own capital current net interest rate | Total assets Ordinary profit margin | amount of sales Operating margin |
|---|---|---|---|---|---|
| | Yen | Yen | ÿ | ÿ | ÿ |
| Fiscal year ending | -7.69 | | ÿ0.9 | 1.3 | 4.4 |
| November 2022 Fiscal | 72.55 | | 9.6 | 9.1 | 14.2 |

year ending November 2021 (Reference) Equity in earnings of affiliates Fiscal year ending November 2022 - million yen Fiscal year ending November 2021 - million yen

(2) Consolidated financial position

| | Total assets | net worth | own capital ratio | Book value per share |
|---|---|---|---|---|
| | million | million yen | % Fiscal year ending November | Yen |
| 2022 5,885 38.8 Fiscal year ending November 2021 | 6,045 39.5 | | | 952.60 |
| 15,157 12,769 | | | | 816.73 |

(3) Status of Consolidated Cash Flows

| | by sales activities Cash flow | by investment activity Cash flow | by financial activity Cash flow | cash and cash equivalents Ending balance |
|---|---|---|---|---|
| | million yen | million yen | million yen | One million yen |
| November 2022 issue | | | | 6,278 |
| November 2021 issue | -123 1,369 | -250 -239 | 453 -119 | 5,625 |

above

JA812

Machine Translated by Google

After revision

**≡ OPTICON**



November 2022 financial statement [Japanese basis] (link)

December 27, 2022

Listed company name Optoelectronics Co., Ltd. Code number 6664 URL                                          Listed Exchange Higashi

https://www.opto.co.jp/

Representative (Title) Representative Director and President (Name) Masami Tawara

Contact person (Title) Executive Officer, General Manager of Management Department (Name) Katsutoshi Ishikawa TEL 048 (446) 1181

Scheduled date of the Ordinary General Meeting of Shareholders: February 24,                     Scheduled start date of dividend payment ý

2023 Scheduled date of submission of annual securities report: February 24, 2023

Presence or absence of supplementary explanatory materials for financial results: None

Holding financial results briefings: None

(Rounded down to the nearest million yen)

1. Consolidated financial results for the fiscal year ending November 2022 (December 1, 2021 to November 30, 2022)

(1) Consolidated operating results                                                           (% indicates year-on-year change)

| | amount of sales | | Operating income | | Ordinary income | | Attributable to parent company shareholders Net interest profit | |
|---|---|---|---|---|---|---|---|---|
| | million yen % Fiscal year | | million yen % 315 -73.2 million | | million yen % 178 -84.5 | | One million yen % | |
| ending November 2022 7,2 1 (13.3) Fiscal year ending November 2021 | | | 1,177 839 | | 1,151 | | ý47 | |
| 8,317 27.0 (Note) Comprehensive income Fiscal year ending November | | | yen | | | | 448 | |
| 2022 | (12.3%) | | | Fiscal year ending November 2021 747 million yen (-%) | | | | |

| | per share Net interest profit | After adjusting for diluted shares Net income per share | own capital current net interest rate | Total assets Ordinary profit margin | amount of sales Operating margin |
|---|---|---|---|---|---|
| | Yen | Yen | ý | ý | % |
| November 2022 issue | -7.69 | | ý0.9 9.6 | 1.3 | 4.4 |
| November 2021 issue | 72.55 | | | 9.1 | 14.2 |

(Reference) Equity in earnings of affiliates Fiscal year ending November 2022 - million yen Fiscal year ending November 2021 - million yen

(2) Consolidated financial position

| | Total assets | net worth | own capital ratio | Book value per share |
|---|---|---|---|---|
| | million | Millions of yen % Fiscal year ending November | | Yen |
| 2022 5,885 38.8 Fiscal year ending November 2021 6,045 39.5 | | | | 952.60 |
| 15,157 12,769 | | | | 816.73 |

(3) Status of Consolidated Cash Flows

| | by sales activities Cash flow | by investment activity Cash flow | by financial activity Cash flow | cash and cash equivalents Ending balance |
|---|---|---|---|---|
| | million | million | million | One million yen |
| November 2022 issue | yen -123 | yen -250 | yen 458 | 6,278 |
| November 2021 issue | 1,369 | ý239 | ý119 | 5,625 |

2. Dividend status

| | annual dividend | | | | | Total dividend (total) | payout ratio (Linking) | Dividend on equity rate (link) |
|---|---|---|---|---|---|---|---|---|
| | End of first quarter | End of second quarter | End of third quarter | End of period Yen Yen | Total | One million yen | ý | ý |
| | Yen Yen 0.00 0.00 | | | | Yen 0.00 | | | |
| Fiscal year ending November 2021 Fiscal year ending | | 0.00 | | 0.00 | 0.00 | | | |
| November 2022 Fiscal year ending November 2023 (forecast) | | 0.00 | | 0.00 | 0.00 | | | |

3. Consolidated earnings forecast for the fiscal year ending November 2023 (December 1, 2022 to November 30, 2023)

(% indicates year-on-year change)

| | amount of sales | | Operating income | | Ordinary income | | Attributable to parent company shareholders net income | | per share Net interest profit |
|---|---|---|---|---|---|---|---|---|---|
| | million yen | % | million yen | % | million yen | % | million yen | % | Yen |
| full year | 7,892 | 9.4 | 417 | 32.4 | 407 | 128.7 | 353 | _ | 57.14 |

JA813

Machine Translated by Google

* Notes

(1) Changes in significant subsidiaries during the period (changes in specified subsidiaries resulting in changes in the scope of consolidation): None

(2) Changes in accounting policies, changes in accounting estimates, and restatements

(1) Changes in accounting policies due to revisions to accounting standards, etc.: Yes

(2) Changes in accounting policies other than (1): None

(3) Changes in accounting estimates: None

ÿ Correction and re-expression: None

(Note) For details, please refer to "3. Consolidated financial statements and main notes (5) Notes (Changes in accounting policies)" on page 11 of the attachment
when.

(3) Number of issued shares (common stock)

| (1) Number of shares issued at the end of the period (including treasury stock) Fiscal year ending November 2022 (2) Number of | 6,578,000 November 2021 issue 400,047 | 6,578,000 shares |
| --- | --- | --- |
| treasury stock at the end of the fiscal year ending November 2022 (3) Average number of shares during the period Fiscal year | November 2021 issue 6,177,953 | 400,047 shares |
| ending November 2022 | November 2021 issue | 6,177,953 shares |

(Reference) Overview of individual performance

1. Non-consolidated performance for the fiscal year ending November 2022 (December 1, 2021 to November 30, 2022)

(1) Non-consolidated operating results                                                                                      (% indicates year-on-year change)

| | Sales | | Operating | | Ordinary | | Net interest profit | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | million yen % | | profit million yen % | | income million yen % | | One million yen % | |
| November 2022 issue | 2,997 -8.0 | | 18 | | -49 | | ÿ76 | |
| November 2021 issue | 3,258 13.2 | | -95.2 381 | | 400 | | 201 | |

| | per share | After adjusting for diluted shares |
| --- | --- | --- |
| | Net interest profit | Net income per share |
| | Yen | Yen |
| November 2022 issue | -12.36 32.61 | |
| November 2021 issue | | |

(2) Individual financial position

| | Total assets | net worth | own capital ratio | Book value per share |
| --- | --- | --- | --- | --- |
| | million | million | ÿ | Yen |
| yen Fiscal year ending November 2022 -730 Fiscal year ending November 2021 -655 | | | ÿ11.7 | ÿ118.25 |
| | 6,256 5,394 | | ÿ12.2 | ÿ106.11 |

* Financial statements are not subject to audits by certified public accountants or auditing firms.

*Explanation regarding the appropriate use of earnings forecasts and other special notes

Forward-looking statements such as performance forecasts contained in this material are forecasts based on currently available information.

and contains many uncertainties. Actual results may differ significantly due to changes in business conditions and other factors.

The Company does not intend to promise its realization.

JA814

Machine Translated by Google

• Contents of attached materials

1. Overview of operating results, etc. ................................................................................ 2 (1)
Current term Overview of operating results ................................................................ 2 (2)
Overview of financial position for the current fiscal year ... ................................................................
2 (3) Overview of Cash Flows for the Fiscal Year ........................................ 2 (4) Basic policy on
profit distribution and dividends for the current and next fiscal years ........................ 3 (5) Future prospects
................................................................ 3 ........................ 3 2. Basic Approach to
Selection of Accounting Standards ................................................ 4 3. Consolidated financial statements_
and major notes ................................................................................ 5 (1) Consolidated balance sheet (2)_
Consolidated Statement of Income and Consolidated Comprehensive Income Statements
................................................................................ 7 Consolidated Statements of Income _
................................................ ................................................................. 7 Consolidated _
Statement of Comprehensive Income ................................................................................ _
8 (3) Consolidated Statement of Changes in Equity ........................................ 9 (4)_
Consolidated Statement of Cash Flows ................................................ 11 (5) Notes
................................................................................ 12 (Going Concern Notes on Assumptions) __
........................................................ 12 (Changes in Accounting Policies) __
.................... ........................................................ 12 (Segment information,
etc.) ................................................................................ 13 (Per
share information) ........................................................ .......................... 15 (Significant
Subsequent Events) ................................................................ ................................. 15

JA815

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

1. Overview of operating results, etc. (1) Overview

of operating results for the fiscal year under review

In the current consolidated fiscal year (December 1, 2021 to November 30, 2022), the global economy is expected to see rising resource and energy prices due to the

prolonged situation in Russia and Ukraine, as well as lower parts and raw material prices due to supply chain disruptions. Soaring is progressing. At the same time, the

depreciation of the yen progressed in Japan, and the procurement price from overseas increased rapidly. In addition, the manufacturing industry is affected by the tight

supply and demand of parts such as semiconductors, and production stoppages and delivery delays due to soaring raw material prices, and the future is uncertain. In the

fiscal year ended March 31, 2019, the Group's

sales and profits decreased compared to the previous fiscal year. The Group's net sales were 7,211 million yen

(down 13.3% from the previous year). Breakdown of sales by segment is as follows: Japan: 2,997 million yen

(down 8.0% year on year), US: 1,396 million yen (44.8% year on year)

decreased, and sales in Europe, Asia and others amounted to 2,817 million yen (an increase of 11.5% from the previous fiscal year).

In Japan, the impact of parts procurement difficulties and soaring parts prices became apparent. We continue to manufacture and sell as much as possible with production

as our top priority, but we have lost business opportunities due to delivery delays due to parts shortages at our company and our customers, and we have been affected by a

decrease in orders. In addition, there was an increase in demand from major customers in the previous fiscal year in order to secure inventories, and this was also a factor in

the decrease in sales for these customers as a reaction to this.

In the United States, the end of the special demand project for 2D handy scanners, which contributed to sales in the previous fiscal year, resulted in a significant year-on-

year decline in sales. In Europe, Asia and other regions, sales increased year on year in some regions such as Italy. In terms of profits, operating income was 315 million yen

(down

73.2% year-on-year), ordinary income was 178 million yen (down 84.5% year-on-year), and parent company

Net loss attributable to shareholders was 47 million yen (net income attributable to owners of parent was 448 million yen in the previous fiscal year). In addition to

the above-mentioned decrease in sales, the difficulty in obtaining raw materials such as semiconductor parts and soaring prices have led to a rapid rise in the cost of sales

ratio of each group company. Furthermore, selling, general and administrative expenses increased by 257 million yen from the previous fiscal year, resulting in a significant

drop in operating income. This was mainly due to the progress of proceedings and the impact of the yen's depreciation on the costs of US attorneys involved in the lawsuit

against HONEYWELL, Inc., which has continued since the previous fiscal year. In addition, a foreign exchange loss of 95 million yen was posted, resulting in an increase

in non-operating expenses of 100 million yen from the previous fiscal year. This was mainly due to revisions to the reserve for loss on litigation recorded in the previous

fiscal year due to the further depreciation of the yen. In addition, as a result of considering the Group's business performance, soaring raw material prices, and the impact

of lawsuits, etc., we reversed deferred tax assets at overseas subsidiaries and recorded corporate tax deferred of 175 million yen. It was a loss. The current consolidated

fiscal year for overseas

subsidiaries is from October 1, 2021 to September 30, 2022, and the average exchange rates are calculated at 1 US dollar = 125.64 yen and 1 euro = 135.10 yen. increase.

(2) Overview of financial position for the fiscal year under

review (Assets)

Current assets at the end of the current consolidated fiscal year increased by 2,466 million yen from the end of the previous consolidated fiscal year to 12,166 million yen.

This was mainly due to an increase of 816 million yen in cash and deposits, an increase of 358 million yen in goods and finished goods due to the rise in raw material

prices, and an increase of 779 million yen in raw materials and supplies. is. Fixed assets decreased by 78 million yen from the end of the previous consolidated fiscal year

to 2,991 million yen. This was mainly due to a decrease of 79 million yen in deferred tax assets. (liabilities)

Regarding liabilities, current liabilities increased by 1,185 million yen from the end of the previous consolidated fiscal year to 5,247 million yen. This was mainly due to

an increase of 803 million yen in notes and accounts payable-trade, an increase of 160 million yen in short-term loans payable, and an increase of 146 million yen in

provision for loss on litigation. Fixed liabilities increased by 362 million yen from the end of the previous consolidated fiscal year to 4,024 million yen. This was mainly due

to an increase in long-term loans payable of 361 million yen.

(net assets)

Net assets increased by 839 million yen from the end of the previous consolidated fiscal year to 5,885 million yen. This was mainly due to an increase of 885 million yen in

foreign currency translation adjustments due to the effects of the weaker yen. As a result of the above, total

assets increased by 2,387 million yen from the end of the previous consolidated fiscal year to 15,157 million yen.

(3) Overview of cash flow for the current fiscal year

Cash and cash equivalents (hereinafter referred to as "funds") at the end of the current consolidated fiscal year increased by 866 million yen from the end of the previous

consolidated fiscal year, and the balance at the end of the current consolidated fiscal year was 6,491

million yen. 10,000 yen. The status of each cash flow in the current consolidated fiscal year and their factors are as follows.

JA816

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

(Cash flow from operating activities)

Cash flows from operating activities resulted in an outflow of 123 million yen (income of 1,369 million yen in the same period of the previous fiscal year). main

The major factor was an increase of 1,060 million yen in inventories and an increase of 745 million yen in trade payables due to the rise in inventory prices.

(Cash flow from investment activities)

Cash flow from investing activities was an outflow of 250 million yen (239 million yen outflow in the same period of the previous fiscal year). fixed

223 million yen in payments for term deposits, 64 million yen in payments for acquisition of tangible fixed assets, and 50 million yen in proceeds from withdrawal of restricted deposits

10,000 yen, etc.

(Cash flows from financing activities)

Cash flow from financing activities was an income of 453 million yen (expenditure of 119 million yen in the same period of the previous fiscal year). short

Net increase in long-term loans payable of ¥160 million, proceeds from long-term loans payable of ¥2,950 million, repayments of long-term loans payable of ¥2,652 million, etc.

is the main factor.

[Trends in cash flow-related indicators]

| | 2018 November issue | 2019 November issue | 2020 November issue | 2021 November issue | 2022 November issue |
|---|---|---|---|---|---|
| Own capital ratio (%) | 41.1 | 41.2 | 34.5 | 39.5 | 38.8 |
| Equity ratio based on market value (%) | 54.6 | 31.4 | 19.4 | 28.5 | 15.4 |
| Cash flow to interest-bearing debt ratio (Year) | 4.7 | 54.8 | | 4.5 | |
| Interest coverage ratio (times) | 76.7 | 8.1 | | 35.9 | |

Equity ratio: equity/total assets

Equity ratio based on market value: Market capitalization / total assets

Interest-Bearing Debt to Cash Flow Ratio: Interest-Bearing Debt/Cash Flow

Interest coverage ratio: cash flow/interest payment

* All indicators are calculated using financial figures on a consolidated basis.

* Market capitalization is calculated by multiplying the closing stock price at the end of the period by the total number of outstanding shares at the end of the period.

*For cash flow, we use the cash flow from operating activities in the consolidated statement of cash flow.

For interest payment, the amount of interest paid in the consolidated statement of cash flows is used.

* Interest-bearing debt covers all debts on which interest is paid among the debts recorded on the consolidated balance sheet.

* Cash flow to interest-bearing debt ratio and interest coverage ratio are based on operating cash flow

Eggplants are not listed.

(4) Basic Policy on Profit Distribution and Dividends for Current and Next Fiscal Years

The Company considers the return of profits to shareholders to be an important management issue, and its basic policy is to provide stable dividends on an ongoing basis.

increase. However, due to the recording of a large net loss in the fiscal year ended November 30, 2020, and a net loss in the fiscal year ended November 30, 2020,

The company's retained earnings are in a negative state, and the company alone is in a state of excess debt. In the current consolidated fiscal year

However, the retained earnings have not reached the amount that can be distributed, so no dividend will be paid. Please refer to page 2 for the summary of our non-consolidated performance.

Please refer to "Non-consolidated performance for the fiscal year ending November 30, 2022" on the second page.

Regarding the dividend for the next fiscal year ending November 30, 2023, we would like to focus our management resources on business activities and strive to improve our performance.

Unfortunately, we do not anticipate a dividend.

(5) Future outlook

Shortages and soaring prices of parts, etc. are gradually improving, but the impact will continue in the fiscal year ending November 30, 2023.

As a result, the external environment surrounding the Group remains severe.

In order to respond to this situation, we are making our main module products more affordable and cost-effective.

We are promoting the development of new products with high price competitiveness and high added value that use our products. In addition, some products have already been

Although we have already responded, we will review the product design and work to reduce costs. Regarding these new products and products after design changes,

are expected to be replaced sequentially from the fiscal year ending November 30, 2024.

In addition, regarding the lawsuit with HONEYWELL in the United States, which is a factor in the increase in selling, general and administrative expenses,

It is expected to be completed by the third quarter of the fiscal year.

Based on the above, the outlook for the fiscal year ending November 30, 2023 assumes exchange rates of 1 US dollar = 130.00 yen and 1 euro = 136.00 yen.

Marie's "Consolidated Earnings Forecast for the Fiscal Year Ending November 2023" is as follows.

In order to set earnings forecasts from a medium- to long-term perspective, the Company has decided not to disclose earnings forecasts for the second quarter, and will announce full-year consolidated results.

Only earnings forecasts are announced.

JA817

Machine Translated by Google

2. Basic Approach to Selecting Accounting Standards

Many of our group's stakeholders are domestic shareholders, creditors, business partners, etc. As there is little need to procure funds from overseas, we apply Japanese accounting standards.

JA818

Machine Translated by Google

3. Consolidated financial statements and major notes

(1) Consolidated balance sheet

(Unit: thousand yen)

| | Previous consolidated fiscal year (November 30, 2021) | Current consolidated fiscal year (November 30, 2022) |
|---|---|---|
| **assets** | | |
| current assets | | |
| Cash and deposits Notes | 5,835,051 | 6,651,953 |
| and accounts receivable Notes and | 1,498,446 | — |
| accounts | — | 491,342 |
| receivable | — | 1,213,546 |
| Merchandise and | 1,135,866 | 1,494,500 |
| finished | 144,613 | 169,223 |
| goods Work in progress Raw | 718,708 | 1,497,745 |
| materials | 417,426 | 665,015 |
| and supplies Other | ÿ49,874 | ÿ16,967 |
| Allowance for doubtful | 9,700,238 | 12,166,360 |
| accounts Total current assets Fixed assets | | |
| Tangible fixed assets | | |
| Buildings and structures | 3,272,705 | 3,314,638 |
| Accumulated | ÿ1,833,043 | ÿ1,902,387 |
| depreciation Buildings and | 1,439,662 | 1,412,251 |
| structures, net Machinery, | 437,171 | 449,956 |
| equipment and vehicles | ÿ323,084 | ÿ357,439 |
| Accumulated depreciation Machinery, | 114,086 | 92,516 |
| equipment and vehicles, net | 2,312,715 | 2,253,425 |
| Tools, furniture and | ÿ2,176,145 | ÿ2,144,458 |
| fixtures Accumulated depreciation Tools, | 136,570 | 108,966 |
| | 554,178 | 554,178 |
| furniture and | 22,796 | 25,809 |
| fixtures, net Land | ÿ13,845 | ÿ17,626 |
| Leased assets Accumulated | 8,951 | 8,182 |
| depreciation | 9,298 | 85,204 |
| Leased assets, net | 2,262,748 | 2,261,300 |
| Construction in progress Total property, plant and equipment Intangible assets | | |
| Other | 287,651 | 277,772 |
| Total intangible assets | 287,651 | 277,772 |
| Investments and other assets | | |
| Investment | 3,327 | 4,701 |
| securities Deferred | 372,761 | 293,373 |
| tax assets | 143,236 | 153,877 |
| Other Total investments and | 519,324 | 451,951 |
| other assets Total | 3,069,725 | 2,991,025 |
| fixed assets Total assets | 12,769,963 | 15,157,385 |

JA819

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

(Unit: thousand yen)

| | Previous consolidated fiscal year (November 30, 2021) | Current consolidated fiscal year (November 30, 2022) |
|---|---|---|
| Liabilities section | | |
| Current liabilities | | |
| Notes and accounts payable Short- | 426,778 | 1,230,593 |
| term loans payable | 163,337 | 323,341 |
| Current portion of long-term loans payable Lease | 2,306,730 | 2,243,319 |
| obligations Income | 3,929 | 4,634 |
| taxes payable Provision | 87,806 | 37,253 |
| for loss on litigation Other | 640,000 | 786,000 |
| Total | 433,968 | 622,617 |
| current liabilities Long- | 4,062,550 | 5,247,758 |
| term liabilities | | |
| Long-term | 3,619,096 | 3,980,355 |
| borrowings Lease | 6,070 | 4,586 |
| obligations Deferred | 30,786 | 32,580 |
| tax | 5,713 | 7,010 |
| liabilities Other Total | 3,661,666 | 4,024,533 |
| long-term | 7,724,216 | 9,272,291 |
| liabilities Total liabilities Net assets | | |
| Shareholders' equity | | |
| Common | 942,415 | 942,415 |
| stock Capital | 219,136 | 219,136 |
| surplus Retained | 4,401,764 | 4,354,226 |
| earnings | ÿ212,441 | ÿ212,441 |
| Treasury stock Total | 5,350,873 | 5,303,335 |
| shareholders' equity Accumulated other comprehensive income | | |
| Valuation difference on available-for-sale securities | ÿ170 | 1,202 |
| Foreign currency translation | ÿ304,955 | 580,555 |
| adjustments Total accumulated other comprehensive | ÿ305,126 | 581,758 |
| income Total net | 5,045,747 | 5,885,094 |
| assets Total liabilities and net assets | 12,769,963 | 15,157,385 |

JA820

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

(2) Consolidated Statement of Income and Consolidated Statement of Comprehensive Income

(Linked Profit and Loss Calculations)

(Unit: thousand yen)

| | Previous consolidated fiscal year (From December 1, 2020 until November 30, 2021) | Current consolidated fiscal year (From December 1, 2021 until November 30, 2022) |
|---|---|---|
| Net sales | 8,317,580 | 7,211,482 |
| Cost of sales | 4,707,764 | 4,206,697 |
| Gross profit Selling, | 3,609,815 | 3,004,784 |
| general and administrative expenses | 2,431,921 | 2,689,178 |
| Operating | 1,177,894 | 315,606 |
| income Non-operating income | | |
| Interest income | 1,518 | 4,729 |
| Dividend income | 169 | 218 |
| Rent income Foreign | 18,905 | 14,653 |
| exchange gain | 3,987 | |
| Others | 6,096 | 1,224 |
| Total non-operating income | 30,677 | 20,826 |
| Non-operating expenses | | |
| Interest expense | 37,835 | 40,419 |
| Loss on disposal of fixed | 1,258 | 2,752 |
| assets Foreign | | 95,411 |
| exchange loss | 17,545 | 19,023 |
| Commissions | 1 | 2 |
| paid Other Total non-operating | 56,640 | 157,609 |
| expenses | 1,151,931 | 178,823 |
| Ordinary income Extraordinary loss | | |
| Provision for loss on litigation | 640,000 | |
| Total extraordinary | 640,000 | |
| loss Income before income taxes | 511,931 | 178,823 |
| Income tax, inhabitant tax and | 213,390 | 50,396 |
| enterprise tax Income | ¥149,663 | 175,964 |
| tax deferred Total | 63,727 | 226,361 |
| income tax Net income (loss) Current year | 448,204 | ¥47,538 |
| attributable to owners of parent net profit or | | |
| Net loss attributable to owners of parent (¥) | 448,204 | ¥47,538 |

JA821

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

(Links include Benefit Calculations)

(Unit: thousand yen)

| | Previous consolidated fiscal year (From December 1, 2020 until November 30, 2021) | Current consolidated fiscal year (From December 1, 2021 until November 30, 2022) |
|---|---|---|
| Net income or net loss (ÿ) Other comprehensive income | 448,204 | ÿ47,538 |
| Valuation difference on available-for-sale securities | 287 | 1,373 |
| Foreign currency translation adjustments Total other comprehensive income | 298,649 | 885,511 |
| | 298,936 | 886,885 |
| income | 747,140 | 839,347 |
| Comprehensive income (breakdown) | | |
| Comprehensive Income Relating to Parent Company Shareholders | 747,140 | 839,347 |
| Comprehensive Income Relating to Non-Controlling Shareholders | | |

JA822

Machine Translated by Google

(3) Consolidated Statement of Changes in Equity

Previously linked fiscal year (from December 1, 2020 to November 30, 2021)

(Unit: thousand yen)

| | Shareholders' equity | | | | |
|---|---|---|---|---|---|
| | capital | capital surplus | an earned surplus | own company | Total shareholders' equity |
| Balance at beginning of period | 942,415 | 219,136 | 3,953,559 | ¥212,441 | 4,902,669 |
| Changes during the period | | | | | |
| Current period attributable to parent company shareholders Net income | | | 448,204 | | 448,204 |
| Current period for items other than shareholders' equity Change (net) | | | | | |
| Total changes during the period | | | 448,204 | | 448,204 |
| Balance at end of period | 942,415 | 219,136 | 4,401,764 | ¥212,441 | 5,350,873 |

| | Accumulated other comprehensive income | | | Total net assets |
|---|---|---|---|---|
| | Valuation difference on available-for-sale securities | Foreign currency translation adjustments | Accumulated other comprehensive income total | |
| Balance at beginning of period | ¥458 | ¥603,605 | ¥604,063 | 4,298,606 |
| Changes during the period | | | | |
| Current period attributable to parent company shareholders Net income | | | | 448,204 |
| Current period for items other than shareholders' equity Change (net) | 287 | 298,649 | 298,936 | 298,936 |
| Total changes during the period | 287 | 298,649 | 298,936 | 747,140 |
| Balance at end of period | ¥170 | ¥304,955 | ¥305,126 | 5,045,747 |

JA823

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

When linking fiscal year (from December 1, 2021 to November 30, 2022)

(Unit: thousand yen)

|  | Shareholders' equity | | | | |
|---|---|---|---|---|---|
|  | capital | capital surplus | an earned surplus | own company | Total shareholders' equity |
| Balance at beginning of period | 942,415 | 219,136 | 4,401,764 | ÿ212,441 | 5,350,873 |
| Changes during the period |  |  |  |  |  |
| Current period attributable to parent company shareholders Net loss (ÿ) |  |  | ÿ47,538 |  | ÿ47,538 |
| Current period for items other than shareholders' equity Change (net) |  |  |  |  |  |
| Total changes during the period |  |  | ÿ47,538 |  | ÿ47,538 |
| Balance at end of period | 942,415 | 219,136 | 4,354,226 | ÿ212,441 | 5,303,335 |

|  | Accumulated other comprehensive income | | | Total net assets |
|---|---|---|---|---|
|  | Valuation difference on available-for-sale securities | Foreign currency translation adjustments | Accumulated other comprehensive income total |  |
| Balance at beginning of period | ÿ170 | ÿ304,955 | ÿ305,126 | 5,045,747 |
| Changes during the period |  |  |  |  |
| Current period attributable to parent company shareholders Net loss (ÿ) |  |  |  | ÿ47,538 |
| Current period for items other than shareholders' equity Change (net) | 1,373 | 885,511 | 886,885 | 886,885 |
| Total changes during the period | 1,373 | 885,511 | 886,885 | 839,347 |
| Balance at end of period | 1,202 | 580,555 | 581,758 | 5,885,094 |

JA824

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

(4) Consolidated statement of cash flows

(Unit: thousand yen)

| | Previous consolidated fiscal year (From December 1, 2020 until November 30, 2021) | Current consolidated fiscal year (From December 1, 2021 until November 30, 2022) |
|---|---|---|
| Cash flow from operating activities | | |
| Income before income taxes and | 511,931 | 178,823 |
| minority interests | 185,384 | 152,307 |
| Depreciation Increase (decrease) in allowance | 3,556 | ÿ35,698 |
| for doubtful accounts Increase (decrease) in | 640,000 | |
| allowance for losses on litigation | ÿ1,688 | ÿ4,948 |
| Interest and | 37,835 | 40,419 |
| dividend income Interest | ÿ34,775 | 111,251 |
| expenses Foreign exchange gains (losses) | 1,258 | 2,752 |
| Loss (loss) on sales of fixed assets (loss) | 66,754 | ÿ138,788 |
| Increase (loss) in trade receivables | 1,086,313 | ÿ1,060,787 |
| (increase) Increase (decrease) in inventories | ÿ543,181 | 745,728 |
| (increase) Increase (decrease) in trade payables | 121,504 | ÿ266,920 |
| (decrease) Increase (decrease) in other assets | ÿ50,400 | 146,709 |
| | 2,024,492 | ÿ129,151 |
| (increase) (Increase) Increase | 1,688 | 4,948 |
| (decrease) in other | ÿ38,124 | ÿ40,225 |
| liabilities Subtotal Interest and dividends received Interest | ÿ205,225 | 33,792 |
| paid Income taxes | 53,977 | 7,380 |
| paid or refunded (Decrease | ÿ467,775 | |
| paid) Subsidy received Litigation settlement amount paid Cash flow from operating activities | 1,369,033 | ÿ123,256 |
| Cash flow from investing activities | | |
| Payments from time deposits Proceeds | ÿ10,000 | ÿ223,201 |
| from withdrawal of time deposits | 10,000 | 10,000 |
| Payments for purchase of property, plant | ÿ35,175 | ÿ64,519 |
| and equipment Payments for purchases of | ÿ3,948 | ÿ22,211 |
| intangible assets Payments for deposits | ÿ200,000 | |
| into restricted deposits Proceeds from | | 50,000 |
| withdrawal | | ÿ628 |
| of restricted deposits Other Cash flows from investing activities | ÿ239,123 | ÿ250,560 |
| Cash flow from financing activities | | |
| Net increase (decrease) in short-term loans | ÿ36,663 | 160,004 |
| payable Proceeds from long- | 2,820,000 | 2,950,000 |
| term loans payable Repayments of | ÿ2,898,881 | ÿ2,652,152 |
| long-term loans payable Repayments | ÿ3,838 | ÿ4,138 |
| of lease obligations Cash flows from financing activities | ÿ119,382 | 453,713 |
| Exchange differences on cash and cash equivalents | 217,334 | 573,804 |
| Increase (decrease) in cash and cash equivalents Cash | 1,227,862 | 653,699 |
| and cash equivalents at beginning of period | 4,397,188 | 5,625,051 |
| Cash and cash equivalents at end of period | 5,625,051 | 6,278,751 |

JA825

Machine Translated by Google

(5) Notes (Notes on

going concern assumption) Not applicable.

(Change in accounting policy)

　(Application of Accounting Standards for Revenue Recognition,

etc.) The Accounting Standards for Revenue Recognition (ASBJ Statement No. 29, March 31, 2020; hereinafter referred to as the "Accounting Standard for Revenue When control of the promised goods

or services is transferred to the customer, revenue will be recognized at the amount expected to be received in exchange for the promised goods or services. As a result, the Company will continue to

recognize inventory assets as financial transactions for paid supply transactions for which it is determined that the Company has a substantial repurchase obligation, and at the same time, will continue

to recognize financial liabilities for the end-of-period inventories of supplies remaining at the paid supply recipient. I recognize. The application of revenue recognition accounting standards, etc. follows

the transitional treatment stipulated in the proviso of paragraph 84 of the revenue recognition accounting standards. amount

to retained earnings at the beginning of the current consolidated fiscal year, and the new accounting policy is applied from the beginning balance of the current fiscal year. Retained earnings balance

at the beginning of the period has not been adjusted.

　　As a result, the impact of the application of revenue recognition accounting standards on profit and loss for the current consolidated fiscal year is 20,157,000 yen. Due to the

adoption of revenue recognition accounting standards, etc., "notes and accounts receivable," which was presented as "current assets" in the consolidated balance sheet for the previous

consolidated fiscal year, will be changed to "notes and accounts receivable" and "accounts receivable" from the current consolidated fiscal year. are included and displayed.

　(Application of Accounting Standards, etc. for Calculation of Market Value)

"Accounting Standards for Market Value Calculation" ("Accounting Standards Board of Japan No. 30 July 4, 2019; hereinafter referred to as "Accounting Standards for Market Value Calculations"), etc.

will be applied from the beginning of the current consolidated fiscal year, and accounting standards for market value calculations 19th and "Accounting Standard for Financial Instruments" (Accounting

Standards Board of Japan No. 10, July 4, 2019), paragraph 44-2, the new accounting policy stipulated by the market value accounting standards, etc. We decided to apply it in the future. This change

has no impact on the consolidated financial statements.

JA826

Machine Translated by Google

(segment information, etc.)

[Segment information]

1. Overview of reportable segments

The Company's reportable segments are the Company's constituent units for which separate financial information is available and management

They are subject to periodic reviews in order to determine distributions and evaluate performance.

Our group manufactures and sells barcode readers.

Opticon Sensors Europe BV and its subsidiaries (USA, Europe, Asia, etc.) are in charge of sales.

Since the market scale of the United States is huge, we regard it as an important area on par with Japan, Europe and Asia, etc., and promote sales through Opticon Sensors Europe BV and our subsidiary in the United States.

Hokkaido Denshi Kogyo Co., Ltd. (a consolidated subsidiary) manufactures barcode readers in Japan.

Therefore, our group consists of regional segments based on our manufacturing and sales systems.

We have three reportable segments: "United States" and "Europe/Asia, etc."

2. Calculation method for sales, profit or loss, assets, liabilities and other items for each reportable segment

The method of accounting for the reported geographic segments is consistent with the accounting policies adopted to prepare the consolidated financial statements.

It's the way I did it.

Reportable segment income is based on operating income.

Internal sales and transfers between segments are based on current market prices.

As stated in the change in accounting policy, from the beginning of the current consolidated fiscal year, we will apply the accounting standards for revenue recognition, etc., and

Due to the change in processing method, the calculation method for business segment profit or loss has also changed.

Or the impact on loss is minor.

3. Information on the amount of sales, profit or loss, assets, liabilities and other items by reportable segment, and disaggregated information on earnings

Previously linked fiscal year (from December 1, 2020 to November 30, 2021)

(Unit: thousand yen)

| | Reportable segments | | | | Adjustment (Note 1) | link financial Listed amount (Note 2) |
|---|---|---|---|---|---|---|
| | Japan | usa | Europe/ Asia etc. | count | | |
| amount of sales | | | | | | |
|   Sales to external customers | 3,258,674 | 2,532,092 | 2,526,813 | 8,317,580 | | ÿ 8,317,580 |
|   Inter-segment sales or | 1,043,653 | 60,106 | 815,314 | 1,919,074 | ÿ1,919,074 | |
| is the transfer amount | | | | | | |
| count | 4,302,328 | 2,592,198 | 3,342,127 | 10,236,655 | ÿ1,919,074 | 8,317,580 |
| Segment profit | 490,150 | 487,303 | 159,814 | 1,137,267 | 40,626 | 1,177,894 |
| Segment assets | 6,503,012 | 1,659,514 | 4,920,934 | 13,083,461 | ÿ313,497 | 12,769,963 |
| Other items | | | | | | |
|   depreciation | 153,004 | 6,216 | 26,162 | 185,384 | | 185,384 |
|   Interest expense | 26,199 | 1,601 | 10,034 | 37,835 | | 37,835 |
|   special interest | | | | | | |
|   special loss | 213,000 | 213,000 | 214,000 | 640,000 | | 640,000 |
|   tax expense | 19,212 | 53,597 | ÿ24,892 | 47,918 | 15,809 | 63,727 |
|   Property, plant and equipment and intangible assets (Notes) 1. | 40,447 | 2,221 | 4,950 | 47,619 | | 47,619 |

Adjustments are as follows.

(1) Segment income adjustments are mainly due to elimination of inter-segment transactions and inter-segment unrealized gains.

(2) Segment asset adjustments are primarily due to elimination of intersegment transactions and intersegment unrealized gains.

(3) Tax expense adjustments are primarily due to elimination of intersegment transactions and elimination of intersegment unrealized gains.

2. Segment profit is adjusted with operating profit in the consolidated statements of income.

JA827

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

When connecting fiscal year (from December 1, 2021 to November 30, 2022)

(Unit: thousand yen)

| | Reportable segments | | | | Adjustment (Note 1) | link financial Listed amount (Note 2) |
|---|---|---|---|---|---|---|
| | Japan | usa | Europe/ Asia etc. | count | | |
| amount of sales | | | | | | |
| Revenue from contracts with customers | 2,997,549 | 1,396,547 | 2,817,385 | 7,211,482 | | ¥ 7,211,482 |
| Sales to external customers | 2,997,549 | 1,396,547 | 2,817,385 | 7,211,482 | | ¥ 7,211,482 |
| Inter-segment sales or is the transfer amount | 942,499 | 290,980 | 655 | 1,234,135 | ¥1,234,135 | |
| count | 3,940,048 | 1,687,528 | 2,818,041 | 8,445,618 | ¥1,234,135 | 7,211,482 |
| Segment profit or loss (¥) | 63,533 | ¥83,743 | 312,199 | 291,989 | 23,616 | 315,606 |
| Segment assets | 7,529,878 | 2,329,138 | 5,770,958 | 15,629,975 | ¥472,589 | 15,157,385 |
| Other items | | | | | | |
| depreciation | 126,512 | 7,055 | 18,739 | 152,307 | | 152,307 |
| Interest expense | 30,346 | | 10,072 | 40,419 | | 40,419 |
| special interest | | | | | | |
| special loss | | | | | | |
| tax expense | 30,561 | ¥17,653 | 202,900 | 215,808 | 10,552 | 226,361 |
| Property, plant and equipment and intangible assets | 121,986 | 1,077 | 14,954 | 138,018 | | 138,018 |

(Notes) 1. Adjustments are as follows.

(1) Adjustments to segment profit or loss are mainly due to elimination of inter-segment transactions and inter-segment unrealized gains. It is.

(2) Segment asset adjustments are primarily due to elimination of intersegment transactions and intersegment unrealized gains.

(3) Tax expense adjustments are primarily due to elimination of intersegment transactions and elimination of intersegment unrealized gains.

2. Segment profit or loss is adjusted with operating profit in the consolidated statement of income.

[Information on impairment losses on fixed assets by reportable segment]
Previously linked fiscal year (from December 1, 2020 to November 30, 2021)
Not applicable.

When linking fiscal year (from December 1, 2021 to November 30, 2022)
Not applicable.

[Information on goodwill amortization and unamortized balance by reportable segment]
Previously linked fiscal year (from December 1, 2020 to November 30, 2021)
Not applicable.

When linking fiscal year (from December 1, 2021 to November 30, 2022)
Not applicable.

[Information on gain on negative goodwill by reportable segment]
Previously linked fiscal year (from December 1, 2020 to November 30, 2021)
Not applicable.

When linking fiscal year (from December 1, 2021 to November 30, 2022)
Not applicable.

JA828

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Earnings Report for the Fiscal Year Ending November 2022

(Per share information)

| | Previous consolidated fiscal year<br>(From December 1, 2020<br>until November 30, 2021) | | Current consolidated fiscal year<br>(From December 1, 2021<br>until November 30, 2022) | |
| --- | --- | --- | --- | --- |
| Net assets per share Net | | 816.73 yen | Net assets per share Net | 952.60 yen |
| income per share | | 72.55 yen | loss per share (ÿ) | ÿ7.69 yen |
| Please note that diluted net income per share<br>are not listed because there are no potential shares. | | | Please note that diluted net income per share<br>is the net loss per share and the existence of potential shares.<br>It is not listed because it does not. | |

(Note) The basis for calculating net income or net loss per share is as follows.

| project | Previous consolidated fiscal year<br>(From December 1, 2020<br>until November 30, 2021) | Current consolidated fiscal year<br>(From December 1, 2021<br>until November 30, 2022) |
| --- | --- | --- |
| Net income or loss per share<br>lost (ÿ) | | |
| Net income attributable to parent company shareholders or parent company<br>Net loss attributable to shareholders (ÿ) (thousand yen) | 448,204 | ÿ47,538 |
| Amount not attributable to common shareholders (thousand yen) | | |
| Net attributable to owners of parent related to common stock<br>Profit or net loss attributable to parent company shareholders<br>(ÿ) (thousand yen) | 448,204 | ÿ47,438 |
| Average number of shares during the period (1,000 shares) | 6,177 | 6,177 |

(Significant Subsequent Events)

    Not applicable.

JA829

**☰ OPTICON**



2023 年 1 月 26 日

各　　位

会 社 名　株式会社オプトエレクトロニクス
代表者名　代表取締役社長　俵　政美
（スタンダード・コード６６６４）
問合せ先　管理部部長　　　石川　勝利
電　　話　０４８－４４６－１１８１

**（訂正・数値データ訂正）**
**「2022 年 11 月期　決算短信〔日本基準〕（連結）」の一部訂正について**

　2022 年 12 月 27 日に公表した「2022 年 11 月期決算短信〔日本基準〕（連結）」において、一部訂正すべき事項が判明したため、お知らせいたします。また、数値データにも訂正がありましたので、あわせてお知らせいたします。

記

**１．訂正理由**
（１）米国孫会社 Opticon, Inc.の棚卸資産評価誤り
　　2022 年 12 月 27 日の開示後、遅延していた海外子会社の監査手続の過程で、新たに米国孫会社 Opticon, Inc.（以下「OPTICON」といいます。）において棚卸資産の評価誤りが確認され、開示済みの数値から売上原価が 13 百万円減少し、42 億 6 百万円となりました。この訂正に伴い、営業利益及び経常利益がそれぞれ 13 百万円増加し、営業利益が 3 億 15 百万円、経常利益が 1 億 78 百万円となりました。

（２）欧州子会社 Opticon Sensors Europe B.V.の繰延税金資産取崩し
　　欧州子会社 Opticon Sensors Europe B.V.（以下「OSE」といいます。）において繰延税金資産の取崩しにより法人税等調整額を追加計上したことから、親会社株主に帰属する当期純利益が開示済みの数値から 1 億 54 百万円減少し、47 百万円の親会社株主に帰属する当期純損失となりました。
　　繰延税金資産の取崩しの詳細については本日公表の「繰延税金資産の取崩しに関するお知らせ」を参照ください。
　　なお、本日現在において、海外子会社の監査手続きは全て終了しております。

（３）投資活動によるキャッシュ・フローの訂正
　　OPTICON の現金及び現金同等物の中に預入期間が 3 ヶ月を超える定期預金が含まれていたことから、定期預金の預入による支出を 2 億 23 百万円に訂正いたしました。この訂正に伴い、投資活動によるキャッシュ・フローは 2 億 50 百万円の支出となり、現金及び現金同等物の期末残高は 62 億 78 百万円となりました。

**２．訂正内容**
　訂正箇所は＿＿＿線を付して表示しております。なお、訂正箇所が多数に及ぶことから、訂正事項についてはサマリーの主要な項目のみ訂正前後の情報を掲載し、その他の箇所については訂正後の情報のみ全文を記載しております。

JA830

【訂正前】

（百万円未満切捨て）

1．2022 年 11 月期の連結業績（2021 年 12 月 1 日～2022 年 11 月 30 日）

（1）連結経営成績

（％表示は対前期増減率）

| | 売上高 | | 営業利益 | | 経常利益 | | 親会社株主に帰属する<br>当期純利益 | |
|---|---|---|---|---|---|---|---|---|
| | 百万円 | % | 百万円 | % | 百万円 | % | 百万円 | % |
| 2022 年 11 月期 | 7,211 | △13.3 | 302 | △74.3 | 165 | △85.6 | 106 | △76.2 |
| 2021 年 11 月期 | 8,317 | 27.0 | 1,177 | ― | 1,151 | ― | 448 | ― |

（注）包括利益　2022 年 11 月期　1,000百万円　（33.9%）　2021 年 11 月期　747百万円　（―%）

| | 1株当たり<br>当期純利益 | 潜在株式調整後<br>1株当たり当期純利益 | 自己資本<br>当期純利益率 | 総資産<br>経常利益率 | 売上高<br>営業利益率 |
|---|---|---|---|---|---|
| | 円　銭 | 円　銭 | % | % | % |
| 2022 年 11 月期 | 17.24 | ― | 1.9 | 1.2 | 4.2 |
| 2021 年 11 月期 | 72.55 | ― | 9.6 | 9.1 | 14.2 |

（参考）持分法投資損益　2022 年 11 月期　―百万円　2021 年 11 月期　―百万円

（2）連結財政状態

| | 総資産 | 純資産 | 自己資本比率 | 1株当たり純資産 |
|---|---|---|---|---|
| | 百万円 | 百万円 | % | 円　銭 |
| 2022 年 11 月期 | 15,328 | 6,046 | 39.4 | 978.66 |
| 2021 年 11 月期 | 12,769 | 5,045 | 39.5 | 816.73 |

（参考）自己資本　2022 年 11 月期　6,046百万円　2021 年 11 月期　5,045百万円

（3）連結キャッシュ・フローの状況

| | 営業活動による<br>キャッシュ・フロー | 投資活動による<br>キャッシュ・フロー | 財務活動による<br>キャッシュ・フロー | 現金及び現金同等物<br>期末残高 |
|---|---|---|---|---|
| | 百万円 | 百万円 | 百万円 | 百万円 |
| 2022 年 11 月期 | △121 | △37 | 453 | 6,491 |
| 2021 年 11 月期 | 1,369 | △239 | △119 | 5,625 |

【訂正後】

（百万円未満切捨て）

1．2022 年 11 月期の連結業績（2021 年 12 月 1 日～2022 年 11 月 30 日）

（1）連結経営成績

（％表示は対前期増減率）

| | 売上高 | | 営業利益 | | 経常利益 | | 親会社株主に帰属する<br>当期純利益 | |
|---|---|---|---|---|---|---|---|---|
| | 百万円 | % | 百万円 | % | 百万円 | % | 百万円 | % |
| 2022 年 11 月期 | 7,211 | △13.3 | 315 | △73.2 | 178 | △84.5 | △47 | ― |
| 2021 年 11 月期 | 8,317 | 27.0 | 1,177 | ― | 1,151 | ― | 448 | ― |

（注）包括利益　2022 年 11 月期　839百万円　（12.3%）　2021 年 11 月期　747百万円　（―%）

| | 1株当たり<br>当期純利益 | 潜在株式調整後<br>1株当たり当期純利益 | 自己資本<br>当期純利益率 | 総資産<br>経常利益率 | 売上高<br>営業利益率 |
|---|---|---|---|---|---|
| | 円　銭 | 円　銭 | % | % | % |
| 2022 年 11 月期 | △7.69 | ― | △0.9 | 1.3 | 4.4 |
| 2021 年 11 月期 | 72.55 | ― | 9.6 | 9.1 | 14.2 |

（参考）持分法投資損益　2022 年 11 月期　―百万円　2021 年 11 月期　―百万円

（2）連結財政状態

| | 総資産 | 純資産 | 自己資本比率 | 1株当たり純資産 |
|---|---|---|---|---|
| | 百万円 | 百万円 | % | 円　銭 |
| 2022 年 11 月期 | 15,157 | 5,885 | 38.8 | 952.60 |
| 2021 年 11 月期 | 12,769 | 5,045 | 39.5 | 816.73 |

（参考）自己資本　2022 年 11 月期　5,885百万円　2021 年 11 月期　5,045百万円

（3）連結キャッシュ・フローの状況

| | 営業活動による<br>キャッシュ・フロー | 投資活動による<br>キャッシュ・フロー | 財務活動による<br>キャッシュ・フロー | 現金及び現金同等物<br>期末残高 |
|---|---|---|---|---|
| | 百万円 | 百万円 | 百万円 | 百万円 |
| 2022 年 11 月期 | △123 | △250 | 453 | 6,278 |
| 2021 年 11 月期 | 1,369 | △239 | △119 | 5,625 |

以　上

JA831

訂正後

≡ OPTICON



## 2022年11月期　決算短信〔日本基準〕（連結）

2022年12月27日

| 上場会社名 | 株式会社オプトエレクトロニクス | 上場取引所　東 |
| --- | --- | --- |

コード番号　6664　　ＵＲＬ　https://www.opto.co.jp/
代表者　　　（役職名）代表取締役社長　　　（氏名）俵　政美
問合せ先責任者　（役職名）執行役員管理部部長　　（氏名）石川　勝利　　ＴＥＬ　048（446）1181
定時株主総会開催予定日　2023年2月24日　　配当支払開始予定日　－
有価証券報告書提出予定日　2023年2月24日
決算補足説明資料作成の有無　：無
決算説明会開催の有無　　　：無

（百万円未満切捨て）

１．2022年11月期の連結業績（2021年12月1日～2022年11月30日）
　（１）連結経営成績　　　　　　　　　　　　　　　　　　　（％表示は対前期増減率）

| | 売上高 | | 営業利益 | | 経常利益 | | 親会社株主に帰属する当期純利益 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 百万円 | % | 百万円 | % | 百万円 | % | 百万円 | % |
| 2022年11月期 | 7,211 | △13.3 | 315 | △73.2 | 178 | △84.5 | △47 | － |
| 2021年11月期 | 8,317 | 27.0 | 1,177 | － | 1,151 | － | 448 | － |

（注）包括利益　2022年11月期　839百万円（12.3%）　2021年11月期　747百万円（－%）

| | 1株当たり当期純利益 | 潜在株式調整後1株当たり当期純利益 | 自己資本当期純利益率 | 総資産経常利益率 | 売上高営業利益率 |
| --- | --- | --- | --- | --- | --- |
| | 円　銭 | 円　銭 | % | % | % |
| 2022年11月期 | △7.69 | － | △0.9 | 1.3 | 4.4 |
| 2021年11月期 | 72.55 | － | 9.6 | 9.1 | 14.2 |

（参考）持分法投資損益　2022年11月期　－百万円　2021年11月期　－百万円

　（２）連結財政状態

| | 総資産 | 純資産 | 自己資本比率 | 1株当たり純資産 |
| --- | --- | --- | --- | --- |
| | 百万円 | 百万円 | % | 円　銭 |
| 2022年11月期 | 15,157 | 5,885 | 38.8 | 952.60 |
| 2021年11月期 | 12,769 | 5,045 | 39.5 | 816.73 |

（参考）自己資本　2022年11月期　5,885百万円　2021年11月期　5,045百万円

　（３）連結キャッシュ・フローの状況

| | 営業活動によるキャッシュ・フロー | 投資活動によるキャッシュ・フロー | 財務活動によるキャッシュ・フロー | 現金及び現金同等物期末残高 |
| --- | --- | --- | --- | --- |
| | 百万円 | 百万円 | 百万円 | 百万円 |
| 2022年11月期 | △123 | △250 | 453 | 6,278 |
| 2021年11月期 | 1,369 | △239 | △119 | 5,625 |

２．配当の状況

| | 年間配当金 | | | | | 配当金総額（合計） | 配当性向（連結） | 純資産配当率（連結） |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 第1四半期末 | 第2四半期末 | 第3四半期末 | 期末 | 合計 | | | |
| | 円　銭 | 円　銭 | 円　銭 | 円　銭 | 円　銭 | 百万円 | % | % |
| 2021年11月期 | － | 0.00 | － | 0.00 | 0.00 | | | |
| 2022年11月期 | － | 0.00 | － | 0.00 | 0.00 | | － | － |
| 2023年11月期（予想） | － | 0.00 | － | 0.00 | 0.00 | | － | |

３．2023年11月期の連結業績予想（2022年12月1日～2023年11月30日）

（％表示は対前期増減率）

| | 売上高 | | 営業利益 | | 経常利益 | | 親会社株主に帰属する当期純利益 | | 1株当たり当期純利益 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 百万円 | % | 百万円 | % | 百万円 | % | 百万円 | % | 円　銭 |
| 通期 | 7,892 | 9.4 | 417 | 32.4 | 407 | 128.7 | 353 | － | 57.14 |

JA832

※　注記事項
（１）期中における重要な子会社の異動（連結範囲の変更を伴う特定子会社の異動）：無

（２）会計方針の変更・会計上の見積りの変更・修正再表示
　　① 会計基準等の改正に伴う会計方針の変更：有
　　② ①以外の会計方針の変更　　　　　　　：無
　　③ 会計上の見積りの変更　　　　　　　　：無
　　④ 修正再表示　　　　　　　　　　　　　：無
　　（注）詳細は、添付資料11ページ「３．連結財務諸表及び主な注記（５）注記事項（会計方針の変更）」をご覧ください。

（３）発行済株式数（普通株式）

|  |  | | |  | |
|---|---|---|---|---|---|
| ① 期末発行済株式数（自己株式を含む） | 2022年11月期 | 6,578,000株 | 2021年11月期 | 6,578,000株 |
| ② 期末自己株式数 | 2022年11月期 | 400,047株 | 2021年11月期 | 400,047株 |
| ③ 期中平均株式数 | 2022年11月期 | 6,177,953株 | 2021年11月期 | 6,177,953株 |

（参考）個別業績の概要
１．2022年11月期の個別業績（2021年12月１日～2022年11月30日）
（１）個別経営成績　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　（％表示は対前期増減率）

|  | 売上高 | | 営業利益 | | 経常利益 | | 当期純利益 | |
|---|---|---|---|---|---|---|---|---|
|  | 百万円 | ％ | 百万円 | ％ | 百万円 | ％ | 百万円 | ％ |
| 2022年11月期 | 2,997 | △8.0 | 18 | △95.2 | △49 | － | △76 | － |
| 2021年11月期 | 3,258 | 13.2 | 381 | － | 400 | － | 201 | － |

|  | 1株当たり当期純利益 | 潜在株式調整後1株当たり当期純利益 |
|---|---|---|
|  | 円　銭 | 円　銭 |
| 2022年11月期 | △12.36 | － |
| 2021年11月期 | 32.61 | － |

（２）個別財政状態

|  | 総資産 | 純資産 | 自己資本比率 | 1株当たり純資産 |
|---|---|---|---|---|
|  | 百万円 | 百万円 | ％ | 円　銭 |
| 2022年11月期 | 6,256 | △730 | △11.7 | △118.25 |
| 2021年11月期 | 5,394 | △655 | △12.2 | △106.11 |

（参考）自己資本　　2022年11月期　　△730百万円　　2021年11月期　　△655百万円

※　決算短信は公認会計士又は監査法人の監査の対象外です

※　業績予想の適切な利用に関する説明、その他特記事項
　　本資料に記載されている業績見通し等の将来に関する記述は、現時点で入手可能な情報に基づき判断した見通しであり、多分に不確定な要素を含んでおります。また、実際の業績は業況の変化等により大きく異なる可能性があります。当社としてその実現を約束する趣旨のものではありません。

JA833

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

○添付資料の目次

１．経営成績等の概況 ……………………………………………………………………………………… 2
　（１）当期の経営成績の概況 ………………………………………………………………………… 2
　（２）当期の財政状態の概況 ………………………………………………………………………… 2
　（３）当期のキャッシュ・フローの概況 ………………………………………………………… 2
　（４）利益配分に関する基本方針及び当期・次期の配当 ……………………………………… 3
　（５）今後の見通し ……………………………………………………………………………………… 3
２．会計基準の選択に関する基本的な考え方 ……………………………………………………… 4
３．連結財務諸表及び主な注記 ………………………………………………………………………… 5
　（１）連結貸借対照表 …………………………………………………………………………………… 5
　（２）連結損益計算書及び連結包括利益計算書 ………………………………………………… 7
　　　連結損益計算書 ……………………………………………………………………………………… 7
　　　連結包括利益計算書 ……………………………………………………………………………… 8
　（３）連結株主資本等変動計算書 …………………………………………………………………… 9
　（４）連結キャッシュ・フロー計算書 …………………………………………………………… 11
　（５）注記事項 …………………………………………………………………………………………… 12
　　　（継続企業の前提に関する注記）……………………………………………………………… 12
　　　（会計方針の変更）………………………………………………………………………………… 12
　　　（セグメント情報等）……………………………………………………………………………… 13
　　　（１株当たり情報）………………………………………………………………………………… 15
　　　（重要な後発事象）………………………………………………………………………………… 15

JA834

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

## 1．経営成績等の概況

### (1) 当期の経営成績の概況

当連結会計年度（2021年12月１日～2022年11月30日）の世界経済は、ロシア・ウクライナ情勢の長期化による資源・エネルギー価格の上昇及びサプライチェーンの混乱による部品・原材料価格の高騰が進んでおります。あわせて、日本国内においては円安が進行し、海外からの調達価格が急速に上昇しております。また、製造業においては半導体をはじめとする部品の需給逼迫や原材料価格の高騰による生産停止及び納期遅延等の影響を受けており、先行きの不透明な状況となっております。

当社連結会計年度における当社グループは、前年度比で減収減益となりました。

当社グループの売上高は、72億11百万円（前年度比13.3%減）となりました。

セグメントの売上高の内訳は、日本は29億97百万円（前年度比8.0%減）、米国は13億96百万円（前年度比44.8%減）、欧州・アジア他は28億17百万円（前年度比11.5%増）となりました。

日本においては、部品調達難及び部品価格高騰の影響が顕在化いたしました。生産を最優先事項として可能な限り製造・販売を継続しておりますが、当社または顧客の部品不足による納入遅延等で取引機会が喪失し、受注減の影響を受けております。また、主要取引先において前年度に在庫確保のための需要増が生じており、この反動で当該顧客の売上が減少したことも一因となりました。

米国においては前年度の売上に寄与した２次元ハンディスキャナの特需案件が終了したことにより、前年同期比で大幅な売上減となりました。欧州・アジア他においては、イタリア等の一部地域において前年度比で売上増となりました。

利益面では、営業利益３億15百万円（前年度比<u>73.2%</u>減）、経常利益１億78百万円（前年度比<u>84.5%</u>減）、親会社株主に帰属する当期純<u>損失47</u>百万円（前年度<u>は親会社株主に帰属する当期純利益４億48百万円</u>）となりました。

前述の売上減に加え、半導体部品をはじめとする原材料の入手難及び価格高騰の影響により、グループ各社において売上原価率が急速に上昇いたしました。さらに、販売費及び一般管理費が前年度比で２億57百万円増加し、営業利益が大幅に減少いたしました。主な要因は、前年度から継続している米国HONEYWELL社との訴訟にかかる米国弁護士の費用について、手続きの進行及び円安の影響を受けたこと等によるものです。また、為替差損を95百万円計上することとなり、営業外費用が前年度比で１億円増加いたしました。主な要因は、円安の進行を受け、訴訟損失に計上した訴訟損失引当金を改定したこと等によるものです。<u>あわせて、当社グループの業績、原材料価格の高騰及び訴訟等の影響を考慮した結果、海外子会社において繰延税金資産を取り崩し、法人税等調整額１億75百万円を計上したため、当期純損失となりました。</u>

なお、海外子会社の当連結会計年度は2021年10月１日から2022年９月30日までとなっており、平均為替相場は、１ドル=125.64円、１ユーロ=135.10円で算出しております。

### (2) 当期の財政状態の概況

（資産）

当連結会計年度末の資産につきましては、流動資産は前連結会計年度末と比較して24億<u>66</u>百万円増加し、121億66百万円となりました。これは主として、現金及び預金が８億16百万円増加、原材料価格の高騰により商品及び製品が３億<u>58</u>百万円増加、原材料及び貯蔵品が７億79百万円増加したこと等によるものです。固定資産は前連結会計年度末と比較して<u>78</u>百万円<u>減少</u>し、29億91百万円となりました。これは主として、繰延税金資産が<u>79</u>百万円<u>減少</u>したこと等によるものです。

（負債）

負債につきましては、流動負債は前連結会計年度末と比較して、11億<u>85</u>百万円増加し、52億<u>47</u>百万円となりました。これは主として、支払手形及び買掛金が８億<u>3</u>百万円増加、短期借入金が１億60百万円増加、訴訟損失引当金が１億46百万円増加したこと等によるものです。固定負債は前連結会計年度末と比較して、３億62百万円増加し、40億24百万円となりました。これは主として、長期借入金が３億61百万円増加したこと等によるものです。

（純資産）

純資産は前連結会計年度末と比較して<u>８億39</u>百万円増加し、58億<u>85</u>百万円となりました。これは主として、円安の影響により為替換算調整勘定が８億85百万円増加したこと等によるものです。

以上により総資産は前連結会計年度末と比較して<u>23億87</u>百万円増加し、<u>151億57</u>百万円となりました。

### (3) 当期のキャッシュ・フローの概況

当連結会計年度における現金及び現金同等物（以下「資金」という。）は、前連結会計年度末と比較して８億66百万円増加し、当連結会計年度の期末残高は64億91百万円となりました。

当連結会計年度における各キャッシュ・フローの状況とそれらの要因は次のとおりであります。

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（営業活動によるキャッシュ・フロー）

　営業活動によるキャッシュ・フローは、1億23百万円の支出（前年同期は13億69百万円の収入）となりました。主な要因は、在庫価格の上昇を受けた棚卸資産の増加10億60百万円、仕入債務の増加7億45百万円等によるものです。

（投資活動によるキャッシュ・フロー）

　投資活動によるキャッシュ・フローは、2億50百万円の支出（前年同期は2億39百万円の支出）となりました。定期預金の預入による支出2億23百万円、有形固定資産の取得による支出64百万円、拘束性預金の払戻による収入50百万円等が主な要因であります。

（財務活動によるキャッシュ・フロー）

　財務活動によるキャッシュ・フローは、4億53百万円の収入（前年同期は1億19百万円の支出）となりました。短期借入金の純増額1億60百万円、長期借入れによる収入29億50百万円、長期借入金の返済による支出26億52百万円等が主な要因であります。

　〔キャッシュ・フロー関連指標の推移〕

| | 2018年<br>11月期 | 2019年<br>11月期 | 2020年<br>11月期 | 2021年<br>11月期 | 2022年<br>11月期 |
|---|---|---|---|---|---|
| 自己資本比率（％） | 41.1 | 41.2 | 34.5 | 39.5 | 38.8 |
| 時価ベースの自己資本比率（％） | 54.6 | 31.4 | 19.4 | 28.5 | 15.4 |
| キャッシュ・フロー対有利子負債比率（年） | 4.7 | 54.8 | － | 4.5 | － |
| インタレスト・カバレッジ・レシオ（倍） | 76.7 | 8.1 | － | 35.9 | － |

自己資本比率：自己資本／総資産
　時価ベースの自己資本比率：株式時価総額／総資産
　キャッシュ・フロー対有利子負債比率：有利子負債／キャッシュ・フロー
　インタレスト・カバレッジ・レシオ：キャッシュ・フロー／利払い
※　各指標は、いずれも連結ベースの財務数値により算出しております。
※　株式時価総額は、期末株価終値×期末発行済株式総数により算出しております。
※　キャッシュ・フローは連結キャッシュ・フロー計算書の営業活動によるキャッシュ・フローを使用しております。
　　また、利払いについては連結キャッシュ・フロー計算書の利息の支払額を使用しております。
※　有利子負債は連結貸借対照表に計上されている負債のうち利子を支払っている全ての負債を対象としております。
※　キャッシュ・フロー対有利子負債比率及びインタレスト・カバレッジ・レシオは、営業キャッシュ・フローがマイナスの場合は記載しておりません。

(4) 利益配分に関する基本方針及び当期・次期の配当

　当社は、株主に対する利益還元を経営の重要課題と考え、安定した配当を継続的に行うことを基本方針としております。しかし、2020年11月期に多額の純損失を計上したこと、当期も純損失となったことから、配当の原資となる単体の利益剰余金がマイナスの状態となっており、当社単体では債務超過の状態であります。当連結会計年度においても利益剰余金は配当可能な金額に至っておらず、無配となります。当社単体の業績につきましては、サマリー2ページの「2022年11月期の個別業績」をご参照ください。

　また、次期2023年11月期の配当につきましても、経営資源を事業活動に集中し業績の向上に努めたく、まことに遺憾ながら、無配の予想としております。

(5) 今後の見通し

　部品等の不足・価格高騰については徐々に改善されつつありますが、2023年11月期においても未だ影響が継続しており、当社グループを取り巻く外部環境は依然として厳しい状況となっております。

　当社では、このような状況に対応するため、主力のモジュール製品について、より入手しやすくコストを抑えた部品を使用した、価格競争力と付加価値の高い新製品の開発を進めております。あわせて、既に一部製品については対応済みですが、製品設計の見直しを実施し原価低減を図ってまいります。これらの新製品及び設計変更後の製品については、翌2024年11月期より順次入れ替えとなる見込みです。

　また、販売費及び一般管理費の引き上げの要因となっていた米国HONEYWELL社との訴訟につきましては、2023年11月期第3四半期までに終了する見通しとなっております。

　以上を踏まえ、2023年11月期の見通しにつきましては、為替を1ドル=130.00円、1ユーロ=136.00円と想定し、サマリーの「2023年11月期の連結業績予想」のとおりといたします。

　なお、当社は、中長期的な視点にて業績予想を設定いたしたく、第2四半期業績予想の開示を取りやめ、通期連結業績予想のみの公表としております。

JA836

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

２．会計基準の選択に関する基本的な考え方

　　当社グループの利害関係者の多くは、国内の株主、債権者、取引先等であり、海外からの資金調達の必要性が乏しい
　ため、会計基準につきましては日本基準を適用しております。

JA837

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

## ３．連結財務諸表及び主な注記

### （１）連結貸借対照表

（単位：千円）

| | 前連結会計年度<br>（2021年11月30日） | 当連結会計年度<br>（2022年11月30日） |
|---|---|---|
| 資産の部 | | |
| 流動資産 | | |
| 　現金及び預金 | 5,835,051 | 6,651,953 |
| 　受取手形及び売掛金 | 1,498,446 | － |
| 　受取手形 | － | 491,342 |
| 　売掛金 | － | 1,213,546 |
| 　商品及び製品 | 1,135,866 | 1,494,500 |
| 　仕掛品 | 144,613 | 169,223 |
| 　原材料及び貯蔵品 | 718,708 | 1,497,745 |
| 　その他 | 417,426 | 665,015 |
| 　貸倒引当金 | △49,874 | △16,967 |
| 　流動資産合計 | 9,700,238 | 12,166,360 |
| 固定資産 | | |
| 　有形固定資産 | | |
| 　　建物及び構築物 | 3,272,705 | 3,314,638 |
| 　　減価償却累計額 | △1,833,043 | △1,902,387 |
| 　　建物及び構築物（純額） | 1,439,662 | 1,412,251 |
| 　　機械装置及び運搬具 | 437,171 | 449,956 |
| 　　減価償却累計額 | △323,084 | △357,439 |
| 　　機械装置及び運搬具（純額） | 114,086 | 92,516 |
| 　　工具、器具及び備品 | 2,312,715 | 2,253,425 |
| 　　減価償却累計額 | △2,176,145 | △2,144,458 |
| 　　工具、器具及び備品（純額） | 136,570 | 108,966 |
| 　　土地 | 554,178 | 554,178 |
| 　　リース資産 | 22,796 | 25,809 |
| 　　減価償却累計額 | △13,845 | △17,626 |
| 　　リース資産（純額） | 8,951 | 8,182 |
| 　　建設仮勘定 | 9,298 | 85,204 |
| 　　有形固定資産合計 | 2,262,748 | 2,261,300 |
| 　無形固定資産 | | |
| 　　その他 | 287,651 | 277,772 |
| 　　無形固定資産合計 | 287,651 | 277,772 |
| 　投資その他の資産 | | |
| 　　投資有価証券 | 3,327 | 4,701 |
| 　　繰延税金資産 | 372,761 | 293,373 |
| 　　その他 | 143,236 | 153,877 |
| 　　投資その他の資産合計 | 519,324 | 451,951 |
| 　固定資産合計 | 3,069,725 | 2,991,025 |
| 資産合計 | 12,769,963 | 15,157,385 |

JA838

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（単位：千円）

| | 前連結会計年度<br>（2021年11月30日） | 当連結会計年度<br>（2022年11月30日） |
|---|---|---|
| 負債の部 | | |
| 流動負債 | | |
| 　支払手形及び買掛金 | 426,778 | 1,230,593 |
| 　短期借入金 | 163,337 | 323,341 |
| 　１年内返済予定の長期借入金 | 2,306,730 | 2,243,319 |
| 　リース債務 | 3,929 | 4,634 |
| 　未払法人税等 | 87,806 | 37,253 |
| 　訴訟損失引当金 | 640,000 | 786,000 |
| 　その他 | 433,968 | 622,617 |
| 　流動負債合計 | 4,062,550 | 5,247,758 |
| 固定負債 | | |
| 　長期借入金 | 3,619,096 | 3,980,355 |
| 　リース債務 | 6,070 | 4,586 |
| 　繰延税金負債 | 30,786 | 32,580 |
| 　その他 | 5,713 | 7,010 |
| 　固定負債合計 | 3,661,666 | 4,024,533 |
| 負債合計 | 7,724,216 | 9,272,291 |
| 純資産の部 | | |
| 株主資本 | | |
| 　資本金 | 942,415 | 942,415 |
| 　資本剰余金 | 219,136 | 219,136 |
| 　利益剰余金 | 4,401,764 | 4,354,226 |
| 　自己株式 | △212,441 | △212,441 |
| 　株主資本合計 | 5,350,873 | 5,303,335 |
| その他の包括利益累計額 | | |
| 　その他有価証券評価差額金 | △170 | 1,202 |
| 　為替換算調整勘定 | △304,955 | 580,555 |
| 　その他の包括利益累計額合計 | △305,126 | 581,758 |
| 純資産合計 | 5,045,747 | 5,885,094 |
| 負債純資産合計 | 12,769,963 | 15,157,385 |

JA839

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（２）連結損益計算書及び連結包括利益計算書
（連結損益計算書）

（単位：千円）

| | 前連結会計年度<br>（自　2020年12月１日<br>至　2021年11月30日） | 当連結会計年度<br>（自　2021年12月１日<br>至　2022年11月30日） |
|---|---|---|
| 売上高 | 8,317,580 | 7,211,482 |
| 売上原価 | 4,707,764 | 4,206,697 |
| 売上総利益 | 3,609,815 | 3,004,784 |
| 販売費及び一般管理費 | 2,431,921 | 2,689,178 |
| 営業利益 | 1,177,894 | 315,606 |
| 営業外収益 | | |
| 受取利息 | 1,518 | 4,729 |
| 受取配当金 | 169 | 218 |
| 受取賃貸料 | 18,905 | 14,653 |
| 為替差益 | 3,987 | － |
| その他 | 6,096 | 1,224 |
| 営業外収益合計 | 30,677 | 20,826 |
| 営業外費用 | | |
| 支払利息 | 37,835 | 40,419 |
| 固定資産除却損 | 1,258 | 2,752 |
| 為替差損 | － | 95,411 |
| 支払手数料 | 17,545 | 19,023 |
| その他 | 1 | 2 |
| 営業外費用合計 | 56,640 | 157,609 |
| 経常利益 | 1,151,931 | 178,823 |
| 特別損失 | | |
| 訴訟損失引当金繰入額 | 640,000 | － |
| 特別損失合計 | 640,000 | － |
| 税金等調整前当期純利益 | 511,931 | 178,823 |
| 法人税、住民税及び事業税 | 213,390 | 50,396 |
| 法人税等調整額 | △149,663 | 175,964 |
| 法人税等合計 | 63,727 | 226,361 |
| 当期純利益又は当期純損失（△） | 448,204 | △47,538 |
| 親会社株主に帰属する当期純利益又は<br>親会社株主に帰属する当期純損失（△） | 448,204 | △47,538 |

JA840

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

(連結包括利益計算書)

(単位：千円)

| | 前連結会計年度<br>(自　2020年12月 1 日<br>至　2021年11月30日) | 当連結会計年度<br>(自　2021年12月 1 日<br>至　2022年11月30日) |
|---|---|---|
| 当期純利益又は当期純損失（△） | 448,204 | △47,538 |
| その他の包括利益 | | |
| その他有価証券評価差額金 | 287 | 1,373 |
| 為替換算調整勘定 | 298,649 | 885,511 |
| その他の包括利益合計 | 298,936 | 886,885 |
| 包括利益 | 747,140 | 839,347 |
| (内訳) | | |
| 親会社株主に係る包括利益 | 747,140 | 839,347 |
| 非支配株主に係る包括利益 | － | － |

JA841

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（３）連結株主資本等変動計算書
前連結会計年度（自2020年12月 1日　至2021年11月30日）

（単位：千円）

| | 株主資本 | | | | |
|---|---|---|---|---|---|
| | 資本金 | 資本剰余金 | 利益剰余金 | 自己株式 | 株主資本合計 |
| 当期首残高 | 942,415 | 219,136 | 3,953,559 | △212,441 | 4,902,669 |
| 当期変動額 | | | | | |
| 親会社株主に帰属する当期純利益 | | | 448,204 | | 448,204 |
| 株主資本以外の項目の当期変動額（純額） | | | | | |
| 当期変動額合計 | － | － | 448,204 | － | 448,204 |
| 当期末残高 | 942,415 | 219,136 | 4,401,764 | △212,441 | 5,350,873 |

| | その他の包括利益累計額 | | | 純資産合計 |
|---|---|---|---|---|
| | その他有価証券評価差額金 | 為替換算調整勘定 | その他の包括利益累計額合計 | |
| 当期首残高 | △458 | △603,605 | △604,063 | 4,298,606 |
| 当期変動額 | | | | |
| 親会社株主に帰属する当期純利益 | | | | 448,204 |
| 株主資本以外の項目の当期変動額（純額） | 287 | 298,649 | 298,936 | 298,936 |
| 当期変動額合計 | 287 | 298,649 | 298,936 | 747,140 |
| 当期末残高 | △170 | △304,955 | △305,126 | 5,045,747 |

JA842

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

当連結会計年度（自2021年12月 1日　至2022年11月30日）

（単位：千円）

| | 株主資本 | | | | |
|---|---|---|---|---|---|
| | 資本金 | 資本剰余金 | 利益剰余金 | 自己株式 | 株主資本合計 |
| 当期首残高 | 942,415 | 219,136 | 4,401,764 | △212,441 | 5,350,873 |
| 当期変動額 | | | | | |
| 親会社株主に帰属する当期純損失（△） | | | △47,538 | | △47,538 |
| 株主資本以外の項目の当期変動額（純額） | | | | | |
| 当期変動額合計 | － | － | △47,538 | － | △47,538 |
| 当期末残高 | 942,415 | 219,136 | 4,354,226 | △212,441 | 5,303,335 |

| | その他の包括利益累計額 | | | 純資産合計 |
|---|---|---|---|---|
| | その他有価証券評価差額金 | 為替換算調整勘定 | その他の包括利益累計額合計 | |
| 当期首残高 | △170 | △304,955 | △305,126 | 5,045,747 |
| 当期変動額 | | | | |
| 親会社株主に帰属する当期純損失（△） | | | | △47,538 |
| 株主資本以外の項目の当期変動額（純額） | 1,373 | 885,511 | 886,885 | 886,885 |
| 当期変動額合計 | 1,373 | 885,511 | 886,885 | 839,347 |
| 当期末残高 | 1,202 | 580,555 | 581,758 | 5,885,094 |

JA843

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（４）連結キャッシュ・フロー計算書

（単位：千円）

| | 前連結会計年度<br>（自　2020年12月 1 日<br>至　2021年11月30日） | 当連結会計年度<br>（自　2021年12月 1 日<br>至　2022年11月30日） |
|---|---|---|
| 営業活動によるキャッシュ・フロー | | |
| 税金等調整前当期純利益 | 511,931 | 178,823 |
| 減価償却費 | 185,384 | 152,307 |
| 貸倒引当金の増減額（△は減少） | 3,556 | △35,698 |
| 訴訟損失引当金の増減額（△は減少） | 640,000 | － |
| 受取利息及び受取配当金 | △1,688 | △4,948 |
| 支払利息 | 37,835 | 40,419 |
| 為替差損益（△は益） | △34,775 | 111,251 |
| 固定資産除売却損益（△は益） | 1,258 | 2,752 |
| 売上債権の増減額（△は増加） | 66,754 | △138,788 |
| 棚卸資産の増減額（△は増加） | 1,086,313 | △1,060,787 |
| 仕入債務の増減額（△は減少） | △543,181 | 745,728 |
| その他の資産の増減額（△は増加） | 121,504 | △266,920 |
| その他の負債の増減額（△は減少） | △50,400 | 146,709 |
| 小計 | 2,024,492 | △129,151 |
| 利息及び配当金の受取額 | 1,688 | 4,948 |
| 利息の支払額 | △38,124 | △40,225 |
| 法人税等の支払額又は還付額（△は支払） | △205,225 | 33,792 |
| 補助金の受取額 | 53,977 | 7,380 |
| 訴訟和解金の支払額 | △467,775 | － |
| 営業活動によるキャッシュ・フロー | 1,369,033 | △123,256 |
| 投資活動によるキャッシュ・フロー | | |
| 定期預金の預入による支出 | △10,000 | △223,201 |
| 定期預金の払戻による収入 | 10,000 | 10,000 |
| 有形固定資産の取得による支出 | △35,175 | △64,519 |
| 無形固定資産の取得による支出 | △3,948 | △22,211 |
| 拘束性預金の預入による支出 | △200,000 | － |
| 拘束性預金の払戻による収入 | － | 50,000 |
| その他 | － | △628 |
| 投資活動によるキャッシュ・フロー | △239,123 | △250,560 |
| 財務活動によるキャッシュ・フロー | | |
| 短期借入金の純増減額（△は減少） | △36,663 | 160,004 |
| 長期借入れによる収入 | 2,820,000 | 2,950,000 |
| 長期借入金の返済による支出 | △2,898,881 | △2,652,152 |
| リース債務の返済による支出 | △3,838 | △4,138 |
| 財務活動によるキャッシュ・フロー | △119,382 | 453,713 |
| 現金及び現金同等物に係る換算差額 | 217,334 | 573,804 |
| 現金及び現金同等物の増減額（△は減少） | 1,227,862 | 653,699 |
| 現金及び現金同等物の期首残高 | 4,397,188 | 5,625,051 |
| 現金及び現金同等物の期末残高 | 5,625,051 | 6,278,751 |

JA844

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（5）注記事項
（継続企業の前提に関する注記）
　該当事項はありません。

（会計方針の変更）
　（収益認識に関する会計基準等の適用）
　「収益認識に関する会計基準」（企業会計基準第29号　2020年3月31日。以下「収益認識会計基準」という。）等を当連結会計年度の期首から適用し、約束した財又はサービスの支配が顧客に移転した時点で、当該財又はサービスと交換に受け取ると見込まれる金額で収益を認識することといたしました。これにより、当社が実質的に買戻し義務を負っていると判断される有償支給取引について、金融取引として棚卸資産を引き続き認識するとともに、有償支給先に残存する支給品の期末棚卸高について金融負債を認識しております。
　収益認識会計基準等の適用については、収益認識会計基準第84項ただし書きに定める経過的な取扱いに従っており、当連結会計年度の期首より前に新たな会計方針を遡及適用した場合の累積的影響額を、当連結会計年度の期首の利益剰余金に加減し、当該期首残高から新たな会計方針を適用しておりますが、利益剰余金の当期首残高への影響が軽微であることから、期首の利益剰余金残高の調整を行っておりません。
　この結果、収益認識会計基準等の適用が当連結会計年度の損益に与える影響は20,157千円であります。
　収益認識会計基準等を適用したため、前連結会計年度の連結貸借対照表において、「流動資産」に表示していた「受取手形及び売掛金」は、当連結会計年度より「受取手形」及び「売掛金」に含めて表示しております。

　（時価の算定に関する会計基準等の適用）
　「時価の算定に関する会計基準」（企業会計基準第30号　2019年7月4日。以下「時価算定会計基準」という。）等を当連結会計年度の期首から適用し、時価算定会計基準第19項及び「金融商品に関する会計基準」（企業会計基準第10号　2019年7月4日）第44-2項に定める経過的な取扱いに従って、時価算定会計基準等が定める新たな会計方針を、将来にわたって適用することといたしました。これによる連結財務諸表に与える影響はありません。

JA845

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（セグメント情報等）

【セグメント情報】

１．報告セグメントの概要

　　当社の報告セグメントは、当社の構成単位のうち分離された財務情報が入手可能であり、経営者が、経営資源の分配の決定及び業績を評価するために、定期的に検討を行う対象となっているものであります。

　　当社グループは、バーコードリーダの製造並びに販売を行っており、国内においては当社が、海外においてはOpticon Sensors Europe B.V. 及びその子会社（米国、欧州及びアジア他）が、それぞれ販売を担当しております。

　　なお、米国は市場規模が巨大であることから国内、欧州・アジア他と並ぶ重要エリアと捉え、Opticon Sensors Europe B.V. 及び米国子会社で販売を推進しております。

　　また、北海道電子工業株式会社（連結子会社）は、国内において、バーコードリーダの製造を行っております。

　　したがって、当社グループは、製造・販売体制を基礎とした地域別のセグメントから構成されており、「日本」、「米国」、「欧州・アジア他」の３つを報告セグメントとしております。

２．報告セグメントごとの売上高、利益又は損失、資産、負債その他の項目の金額の算定方法

　　報告されている地域別セグメントの会計処理の方法は、連結財務諸表を作成するために採用される会計方針に準拠した方法であります。

　　報告セグメントの利益は、営業利益ベースの数値であります。

　　セグメント間の内部売上高及び振替高は市場実勢価格に基づいております。

　　会計方針の変更に記載のとおり、当連結会計年度の期首から収益認識会計基準等を適用し、収益認識に関する会計処理方法を変更したため、事業セグメントの利益又は損失の算定方法を同様に変更しておりますが、セグメント利益又は損失に与える影響は軽微であります。

３．報告セグメントごとの売上高、利益又は損失、資産、負債その他の項目の金額に関する情報及び収益の分解情報

　　前連結会計年度（自　2020年12月１日　至　2021年11月30日）

（単位：千円）

| | 報告セグメント | | | | 調整額<br>（注1） | 連結財務諸表計上額<br>（注2） |
|---|---|---|---|---|---|---|
| | 日本 | 米国 | 欧州・アジア他 | 計 | | |
| 売上高 | | | | | | |
| 　外部顧客への売上高 | 3,258,674 | 2,532,092 | 2,526,813 | 8,317,580 | － | 8,317,580 |
| 　セグメント間の内部売上高又は振替高 | 1,043,653 | 60,106 | 815,314 | 1,919,074 | △1,919,074 | － |
| 　　　計 | 4,302,328 | 2,592,198 | 3,342,127 | 10,236,655 | △1,919,074 | 8,317,580 |
| セグメント利益 | 490,150 | 487,303 | 159,814 | 1,137,267 | 40,626 | 1,177,894 |
| セグメント資産 | 6,503,012 | 1,659,514 | 4,920,934 | 13,083,461 | △313,497 | 12,769,963 |
| その他の項目 | | | | | | |
| 　減価償却費 | 153,004 | 6,216 | 26,162 | 185,384 | － | 185,384 |
| 　支払利息 | 26,199 | 1,601 | 10,034 | 37,835 | － | 37,835 |
| 　特別利益 | － | － | － | － | － | － |
| 　特別損失 | 213,000 | 213,000 | 214,000 | 640,000 | － | 640,000 |
| 　税金費用 | 19,212 | 53,597 | △24,892 | 47,918 | 15,809 | 63,727 |
| 　有形固定資産及び無形固定資産の増加額 | 40,447 | 2,221 | 4,950 | 47,619 | － | 47,619 |

（注）1．調整額は以下の通りであります。

　　　　(1)セグメント利益の調整額は、主にセグメント間取引消去およびセグメント間未実現利益消去によるものです。

　　　　(2)セグメント資産の調整額は、主にセグメント間取引消去およびセグメント間未実現利益消去によるものです。

　　　　(3)税金費用の調整額は、主にセグメント間取引消去およびセグメント間未実現利益消去によるものです。

　　　2．セグメント利益は、連結損益計算書の営業利益と調整を行っております。

JA846

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

当連結会計年度（自　2021年12月1日　至　2022年11月30日）

(単位：千円)

| | 報告セグメント | | | | 調整額<br>(注1) | 連結財務諸<br>表計上額<br>(注2) |
|---|---|---|---|---|---|---|
| | 日本 | 米国 | 欧州・<br>アジア他 | 計 | | |
| 売上高 | | | | | | |
| 　顧客との契約から生じる収益 | 2,997,549 | 1,396,547 | 2,817,385 | 7,211,482 | － | 7,211,482 |
| 　外部顧客への売上高 | 2,997,549 | 1,396,547 | 2,817,385 | 7,211,482 | － | 7,211,482 |
| 　セグメント間の内部売上高又<br>は振替高 | 942,499 | 290,980 | 655 | 1,234,135 | △1,234,135 | － |
| 　　計 | 3,940,048 | 1,687,528 | 2,818,041 | 8,445,618 | △1,234,135 | 7,211,482 |
| セグメント利益又は損失（△） | 63,533 | △83,743 | 312,199 | 291,989 | 23,616 | 315,606 |
| セグメント資産 | 7,529,878 | 2,329,138 | 5,770,958 | 15,629,975 | △472,589 | 15,157,385 |
| その他の項目 | | | | | | |
| 　減価償却費 | 126,512 | 7,055 | 18,739 | 152,307 | | 152,307 |
| 　支払利息 | 30,346 | － | 10,072 | 40,419 | | 40,419 |
| 　特別利益 | － | － | － | － | | － |
| 　特別損失 | － | － | － | － | | － |
| 　税金費用 | 30,561 | △17,653 | 202,900 | 215,808 | 10,552 | 226,361 |
| 　有形固定資産及び無形固定資<br>産の増加額 | 121,986 | 1,077 | 14,954 | 138,018 | － | 138,018 |

(注)　1.　調整額は以下の通りであります。
　　　　(1)セグメント利益又は損失の調整額は、主にセグメント間取引消去およびセグメント間未実現利益消去によるも
　　　　　のです。
　　　　(2)セグメント資産の調整額は、主にセグメント間取引消去およびセグメント間未実現利益消去によるものです。
　　　　(3)税金費用の調整額は、主にセグメント間取引消去およびセグメント間未実現利益消去によるものです。
　　　2.　セグメント利益又は損失は、連結損益計算書の営業利益と調整を行っております。

【報告セグメントごとの固定資産の減損損失に関する情報】
　　前連結会計年度（自2020年12月1日　至2021年11月30日）
　　　該当事項はありません。

　　当連結会計年度（自2021年12月1日　至2022年11月30日）
　　　該当事項はありません。

【報告セグメントごとののれんの償却額及び未償却残高に関する情報】
　　前連結会計年度（自2020年12月1日　至2021年11月30日）
　　　該当事項はありません。

　　当連結会計年度（自2021年12月1日　至2022年11月30日）
　　　該当事項はありません。

【報告セグメントごとの負ののれん発生益に関する情報】
　　前連結会計年度（自2020年12月1日　至2021年11月30日）
　　　該当事項はありません。

　　当連結会計年度（自2021年12月1日　至2022年11月30日）
　　　該当事項はありません。

JA847

㈱オプトエレクトロニクス（6664）2022年11月期　決算短信

（１株当たり情報）

| 前連結会計年度<br>（自　2020年12月１日<br>至　2021年11月30日） | 当連結会計年度<br>（自　2021年12月１日<br>至　2022年11月30日） |
|---|---|
| １株当たり純資産額　　　　　　　　816.73円<br>１株当たり当期純利益　　　　　　　72.55円<br>　なお、潜在株式調整後１株当たり当期純利益については、潜在株式が存在しないため記載しておりません。 | １株当たり純資産額　　　　　　　<u>952.60円</u><br><u>１株当たり当期純損失（△）</u>　　　<u>△7.69円</u><br>　なお、潜在株式調整後１株当たり当期純利益については、<u>１株当たり当期純損失であり、また、潜在株式が存在</u><br><u>しないため記載しておりません。</u> |

（注）　１株当たり当期純利益又は<u>１株当たり当期純損失</u>の算定上の基礎は、以下のとおりであります。

| 項目 | 前連結会計年度<br>（自　2020年12月１日<br>至　2021年11月30日） | 当連結会計年度<br>（自　2021年12月１日<br>至　2022年11月30日） |
|---|---|---|
| <u>１株当たり当期純利益又は１株当たり当期純損<br>失（△）</u> | | |
| 親会社株主に帰属する当期純利益又は<u>親会社</u><br><u>株主に帰属する当期純損失（△）</u>（千円） | 448,204 | <u>△47,538</u> |
| 普通株主に帰属しない金額（千円） | － | － |
| 普通株式に係る<u>親会社株主に帰属する当期純</u><br><u>利益又は親会社株主に帰属する当期純損失</u><br><u>（△）</u>（千円） | 448,204 | <u>△47,438</u> |
| 期中平均株式数（千株） | 6,177 | 6,177 |

（重要な後発事象）
　該当事項はありません。

JA848

# EXHIBIT E

JA849

Machine Translated by Google

 **OPTICON** 

Text message for the second and fourth half of the November 2023 financial statements [Japanese basis] (link)

June 27, 2023

Listed company name Optoelectronics Co., Ltd. Code number 6664 URL                    Listed Exchange Higashi

https://www.opto.co.jp/

Representative (Title) Representative Director and President          (Name) Masami Tawara

Inquiries (Title) Senior Managing Executive Officer Quarterly          (Name) Katsutoshi Ishikawa TEL 048-446-1181

Report Submission Date June 27, 2023 Preparing Supplementary          Scheduled start date of dividend payment ÿ

Materials for Quarterly Financial Results: None

Quarterly financial results briefing held: None

(Rounded down to the nearest million yen)

1. Consolidated financial results for the second quarter of the fiscal year ending November 2023 (December 1, 2022 to May 31, 2023)

(1) Consolidated operating results (cumulative)                    (Percentages are year-on-year changes)

| | amount of sales | | Operating income | | Ordinary income | | Attributable to parent company shareholders Quarterly net income | |
|---|---|---|---|---|---|---|---|---|
| | million yen | % | million yen | % | million yen | % | million yen | % |
| 2nd quarter of the fiscal year ending November 2023 | 3,423 | ÿ3.3 | 3,557 | ÿ53 | | ÿ123 | | ÿ146 | |
| 2nd quarter of the fiscal year ending November 2022 | ÿ21.9 | | | 297 | ÿ60.6 | 209 | ÿ71.2 | 127 | ÿ77.4 |

(Note) Comprehensive Income 2nd Quarter of the Fiscal Year Ending November 2023          -204 million yen (-%)          Second Quarter of the Fiscal Year Ending November 2022          527 million yen (-38.0%)

| | per share Quarterly net income | After adjusting for diluted shares per share Quarterly net income |
|---|---|---|
| | Yen | Yen |
| 2nd quarter of the fiscal year ending November 2023 | -23.74 | . |
| 2nd quarter of the fiscal year ending November 2022 | 20.64 | . |

(2) Consolidated financial position

| | Total assets | net worth | own capital ratio |
|---|---|---|---|
| | million | million | ÿ |
| yen FY2023/11 2nd Quarter 5,680 FY2022/11 5,885 | yen 15,337 15,157 | | 37.0 38.8 |

5,885 million yen

2. Dividend status

| | annual dividend | | | | |
|---|---|---|---|---|---|
| | 1st Quarter End | 2nd Quarter End | 3rd Quarter End | Year-end | total |
| | Yen | Yen | Yen | Yen | Yen |
| Fiscal year ending November 2022 Fiscal | . | 0.00 | . | 0.00 | 0.00 |
| | | 0.00 | | | |
| year ending November 2023 Fiscal | | | | 0.00 | 0.00 |

year ending November 2023 (forecast) (Note) Revisions to the most recently announced dividend forecast: None

3. Consolidated earnings forecast for the fiscal year ending November 2023 (December 1, 2022 to November 30, 2023)

(Percentages are year-on-year changes)

| | amount of sales | | Operating income | | Ordinary income | | Attributable to parent company shareholders net income | | per share Net interest profit |
|---|---|---|---|---|---|---|---|---|---|
| | million yen | % | million yen | % | million yen | % | | | Yen |
| full year | | 9.4 | 417 | | 407 128.7 | 7,892 32.4 | 353 | . | 57.14 |

Machine Translated by Google

* Notes

    (1) Changes in significant subsidiaries during the current consolidated cumulative period (changes in specified subsidiaries resulting in changes in the scope of consolidation): None

    (2) Application of accounting treatment specific to the preparation of quarterly consolidated financial statements: None

    (3) Changes in accounting policies, changes in accounting estimates, and restatements

        (1) Changes in accounting policies due to revisions to accounting standards, etc.: None

        (2) Changes in accounting policies other than (1): None

        (3) Changes in accounting estimates: None

        ÿ Correction and re-expression: None

    (4) Number of shares issued (common stock)

| | | | |
|---|---|---|---|
| (1) Number of shares issued at the end of the period (including treasury stock) 2Q of the fiscal year ending November 2023 ( 2) | | 6,578,000 plants November 2022 | 6,578,000 shares |
| Number of treasury stock at the end of the | November 2023 2Q | 400,047 plants November 2022 | 400,047 shares |
| period (3) Average number of shares during the period (cumulative quarterly) | November 2023 2Q | 6,177,953 shares 2Q of the fiscal year ending November 2022 | 6,177,953 shares |

* Quarterly earnings reports are not subject to quarterly reviews by certified public accountants or audit firms.

*Explanation regarding the appropriate use of earnings forecasts and other special notes

    Forward-looking statements such as performance forecasts contained in this material are forecasts based on currently available information.

    and contains many uncertainties. Actual results may differ significantly due to changes in business conditions and other factors.

    The Company does not intend to promise its realization.

JA851

Machine Translated by Google

• Contents of attached materials

1. Qualitative Information on Quarterly Financial Results ......................................................................... 2

   (1) Explanation of operating results .......................................................................... 2

   (2) Explanation of financial position .......................................................................... 2

   (3) Explanation of Future Forecast Information such as Consolidated Earnings Forecasts ...................................................

2 2. Quarterly Consolidated Financial Statements and Major Notes ......................................................... 3

   (1) Quarterly Consolidated Balance Sheets ....................................................... 3

   (2) Quarterly Consolidated Statements of Income and Quarterly Consolidated Statements of Comprehensive Income ................................................ 5

      Quarterly Consolidated Income Statement

      Consolidated cumulative second quarter ............................................................. 5

      Quarterly Consolidated Statement of Comprehensive Income

      2nd Quarter Consolidated Cumulative Period ............................................................ 6

   (3) Quarterly Consolidated Statement of Cash Flows ........................................................ 7

   (4) Notes to Quarterly Consolidated Financial Statements ................................................. 8 (Notes on Going

      Concern Assumption) ............................................................................... 8

      (Note when there is a significant change in the amount of shareholders' equity) ................................................. 8

      (Segment information, etc.) ........................................................................ 8

JA852

Machine Translated by Google

1. Qualitative Information on Quarterly Financial Results

(1) Explanation of Operating Results

During the six months ended September 30, 2022 (December 1, 2022 to May 31, 2023), the supply and demand balance for parts such as semiconductors and the price of raw materials are gradually improving. Problems with delivery times are also being resolved for parts used in modular products. During the first half of the

fiscal year ending March 31, 2019, the Group's sales and profits decreased compared to the same period of the previous year. Net sales for the second quarter consolidated cumulative period were 3,423 million yen (down 3.8% year-on-year).

Looking at the segment breakdown, sales in Japan were 1,534 million yen (up 0.4% year-on-year), sales in the United States were 648 million yen (down 5.4% year-on-year), and sales in Europe, Asia, etc. were 1,240 million yen. million yen (down 7.7% year-on-year). In Japan, despite the impact of inventory adjustments by business partners, etc., sales were strong centering on handy scanner products.

In the United States,

Europe, Asia and other regions, sales decreased due to intensifying price competition with other companies. In terms of profits, operating loss was 53 million yen (operating profit of 297 million yen in the same period last year), ordinary loss was 123 million yen (ordinary profit of 209 million yen in the same period last year), Net loss attributable to owners of the parent company was 146 million yen (net profit attributable to owners of the parent company was 127 million yen in the same period of the previous fiscal year). Selling, general and administrative expenses increased by 286 million yen from the previous fiscal year due to an increase in attorney's

fees associated with legal proceedings. The exchange rates for the second quarter consolidated cumulative period are calculated as follows: 1 US dollar = 136.69 yen, 1 euro = 144.09 yen.

(2) Explanation of financial position

Total assets at the end of the second quarter consolidated accounting period were 15,337 million yen, an increase of 180 million yen from the end of the previous consolidated fiscal year. The main factors were a decrease of 700 million yen in cash and deposits, a decrease of 170 million yen in notes and accounts receivable, an increase of 594 million yen in marketable securities, and an increase of 365 million yen in merchandise and finished goods. This was due to an increase of 139 million yen in current assets due to

an increase of 144 million yen in raw materials and supplies. Liabilities were 9,656 million yen, an increase of 384 million yen from the end of the previous consolidated fiscal year. The main factors were a 315 million yen decrease in notes and accounts payable, a 219 million yen decrease in short-term loans payable, and a 332 million yen decrease in total current liabilities, as well as an increase in long-term loans payable. This is due to an increase of 716 million yen in total fixed liabilities due to 719 million yen. Net assets were 5,680 million yen, down 204 million yen from the end of the previous consolidated fiscal year. This was mainly due to a decrease of 146 million yen in retained earnings.

(Cash flow situation)

Cash flow for the second quarter consolidated cumulative period decreased by 461 million yen from operating activities, decreased by 476 million yen from investing activities, and increased by 663 million yen from financing activities. As a result, the balance of cash and cash equivalents at the end of the second quarter consolidated accounting period was 5,841 million yen, a decrease of 437 million yen from the end of the previous consolidated fiscal year. The status of each cash flow for the second quarter consolidated cumulative period is as follows. (Cash flows from operating activities) Cash flows from

operating activities amounted to 461 million yen (26 million yen used in the same period of the previous fiscal year). The main factors were an increase of 488 million yen in inventories and a decrease of 285 million yen in trade payables. (Cash Flows from Investing Activities) Cash flows from investing

activities amounted to 476 million yen (income of 21 million yen in the same period of the previous fiscal year). This was mainly due to the purchase of marketable securities of 582 million yen. (Cash flows from financing activities)

Cash flows from financing activities amounted to 663 million yen (income of 384 million yen in the same period of the previous fiscal year). The main factors were proceeds from long-term loans payable of 2,200 million yen and repayments of long-term loans payable of 1,313 million yen.

(3) Explanation of future forecast information such as consolidated

earnings forecasts As the situation improves, it is expected that the delay in delivery will be resolved. Regarding the increase in cost of sales, we are promoting the development of new products with high price competitiveness and high added value that use more easily available and lower cost parts for our main module products. We will focus on developing these new products in the fiscal year ending November 2023, and aim to replace them with existing products from the fiscal year ending November 2024. Regarding the consolidated earnings forecast for the fiscal year ending November 30, 2023, please refer

to the "Notice Concerning Revisions to Consolidated Earnings Forecast for the Fiscal Year Ending November 2023" announced on January 26, 2023.

I'm sorry. Looking at the future situation, if it becomes necessary to revise the earnings forecast, we will promptly disclose it.

JA853

Machine Translated by Google

2. Quarterly Consolidated Financial Statements and Major Notes

(1) Quarterly Consolidated Balance Sheet

(Unit: thousand yen)

| | Previous consolidated fiscal year (November 30, 2022) | Current second quarter consolidated accounting period (May 31, 2023) |
|---|---|---|
| **assets** | | |
| current assets | | |
| Cash and deposits | 6,651,953 | 5,951,367 |
| Notes and accounts receivable | 1,704,889 | 1,534,167 |
| Securities | | 594,537 |
| Merchandise and | 1,494,500 | 1,860,342 |
| finished | 169,223 | 182,070 |
| goods Work in process Raw | 1,497,745 | 1,642,590 |
| materials | 665,015 | 562,795 |
| and supplies Other | ÿ16,967 | ÿ21,798 |
| Allowance for doubtful | 12,166,360 | 12,306,071 |
| accounts Total current assets Fixed assets | | |
| Tangible fixed assets | | |
| Buildings and structures, net | 1,412,251 | 1,398,472 |
| Machinery, equipment and vehicles, | 92,516 | 124,402 |
| net Tools, furniture and fixtures, net | 108,966 | 100,761 |
| Land | 554,178 | 554,178 |
| Lease assets, net | 8,182 | 6,091 |
| Construction in | 85,204 | 98,291 |
| progress Total property, | 2,261,300 | 2,282,198 |
| plant and equipment Intangible assets | | |
| Other | 277,772 | 277,369 |
| Total intangible assets | 277,772 | 277,369 |
| Investments and other assets | | |
| Investment | 4,701 | 4,547 |
| securities Deferred | 293,373 | 316,700 |
| tax assets | 153,877 | 150,729 |
| Other Total investments and | 451,951 | 471,976 |
| other assets Total | 2,991,025 | 3,031,544 |
| fixed assets Total assets | 15,157,385 | 15,337,616 |

JA854

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Financial Results for the Second Quarter of the Fiscal Year Ending November 2023

(Unit: thousand yen)

| | Previous consolidated fiscal year (November 30, 2022) | Current second quarter consolidated accounting period (May 31, 2023) |
|---|---|---|
| Liabilities section | | |
| Current liabilities | | |
| Notes and accounts payable | 1,230,593 | 915,190 |
| Short-term loans | 323,341 | 103,343 |
| payable Current portion of long-term loans | 2,243,319 | 2,410,500 |
| payable Income taxes | 37,253 | 82,745 |
| payable Provision | | 58,621 |
| for bonuses Provision for | 786,000 | 791,000 |
| loss on | 627,251 | 554,167 |
| litigation Other Total | 5,247,758 | 4,915,567 |
| current liabilities Fixed liabilities | | |
| Long-term | 3,980,355 | 4,699,469 |
| borrowings Lease | 4,586 | 2,221 |
| obligations Deferred | 32,580 | 32,502 |
| tax | 7,010 | 7,178 |
| liabilities Other Total | 4,024,533 | 4,741,370 |
| long-term | 9,272,291 | 9,656,938 |
| liabilities Total liabilities Net assets | | |
| Shareholders' equity | | |
| Common | 942,415 | 942,415 |
| stock Capital | 219,136 | 219,136 |
| surplus Retained | 4,354,226 | 4,207,579 |
| earnings | ÿ212,441 | ÿ212,441 |
| Treasury stock Total | 5,303,335 | 5,156,688 |
| shareholders' equity Accumulated other comprehensive income | | |
| Valuation difference on available-for-sale securities | 1,202 | 1,049 |
| Foreign currency translation | 580,555 | 522,940 |
| adjustments Total accumulated other comprehensive | 581,758 | 523,989 |
| income Total net | 5,885,094 | 5,680,678 |
| assets Total liabilities and net assets | 15,157,385 | 15,337,616 |

JA855

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Financial Results for the Second Quarter of the Fiscal Year Ending November 2023

(2) Quarterly Consolidated Statements of Income and Quarterly Consolidated Statements of Comprehensive Income

(Quarterly Consolidated Income Statement)

(Second quarter consolidated cumulative period)

(Unit: thousand yen)

| | Previous second quarter consolidated cumulative period (From December 1, 2021 until May 31, 2022) | Second quarter consolidated cumulative period (From December 1, 2022 until May 31, 2023) |
|---|---|---|
| Net sales | 3,557,542 | 3,423,540 |
| Cost of sales | 2,002,247 | 1,933,103 |
| Gross profit | 1,555,294 | 1,490,437 |
| Selling, general and administrative | 1,257,577 | 1,543,775 |
| expenses Operating income or operating | 297,717 | ÿ53,338 |
| loss (ÿ) Non-operating income | | |
| Interest income | 2,084 | 16,380 |
| Rent income Other | 8,557 | 6,209 |
| Total non- | 498 | 989 |
| operating income Non- | 11,140 | 23,580 |
| operating expenses | | |
| Interest | 22,123 | 22,361 |
| expense | 67,223 | 61,888 |
| Foreign exchange loss | 578 | 573 |
| Loss on disposal | 9,000 | 9,000 |
| of fixed | | 0 |
| assets Commissions | 98,925 | 93,822 |
| paid Other Total non-operating expenses | 209,931 | ÿ123,580 |
| Ordinary income or ordinary loss (ÿ) Income before income taxes or quarterly income before taxes Net loss (ÿ) | 209,931 | ÿ123,580 |
| Income tax, inhabitant tax and | 85,948 | 40,608 |
| business tax Income | ÿ3,545 | ÿ17,542 |
| tax deferred | 82,403 | 23,065 |
| Income tax total Net income or net loss (ÿ) Net | 127,528 | ÿ146,646 |
| income attributable to owners of the parent or shareholders of the parent Quarterly net loss attributable to | 127,528 | ÿ146,646 |

JA856

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Financial Results for the Second Quarter of the Fiscal Year Ending November 2023

(Quarterly Consolidated Statement of Comprehensive Income)

(Second quarter consolidated cumulative period)

(Unit: thousand yen)

|  | Previous second quarter consolidated cumulative period (From December 1, 2021 until May 31, 2022) | Second quarter consolidated cumulative period (From December 1, 2022 until May 31, 2023) |
|---|---|---|
| Net income or net loss (ÿ) Other comprehensive income | 127,528 | ÿ146,646 |
| Valuation difference on available-for-sale securities | 352 | ÿ153 |
| Foreign currency translation | 399,993 | ÿ57,615 |
| adjustments Total other comprehensive | 400,346 | ÿ57,768 |
| income Comprehensive | 527,874 | ÿ204,415 |
| income (breakdown) | | |
| Quarterly comprehensive income attributable to shareholders of parent company | 527,874 | ÿ204,415 |

JA857

Machine Translated by Google

Optoelectronics Co., Ltd. (6664) Financial Results for the Second Quarter of the Fiscal Year Ending November 2023

(3) Quarterly Consolidated Statement of Cash Flows

(Unit: thousand yen)

| | Previous second quarter consolidated cumulative period (From December 1, 2021 until May 31, 2022) | Second quarter consolidated cumulative period (From December 1, 2022 until May 31, 2023) |
|---|---|---|
| Cash flow from operating activities | | |
| Income before income taxes or quarterly income before taxes Net loss (ÿ) | 209,931 | ÿ123,580 |
| Depreciation | 74,728 | 67,932 |
| Increase (decrease) in allowance for doubtful | ÿ3,296 | 4,396 |
| accounts Increase (decrease) in allowance | 60,374 | 58,621 |
| for bonuses Interest and dividend | ÿ2,243 | ÿ16,489 |
| income | 22,123 | 22,361 |
| Interest expenses Foreign | 64,288 | 7,730 |
| exchange gains (losses) Fixed assets | 578 | 573 |
| Gain (loss) on sales and disposal Increase | ÿ95,941 | 188,353 |
| (increase) in trade receivables Increase | ÿ701,523 | ÿ488,700 |
| (increase) in inventories Increase | 499,036 | ÿ285,543 |
| (decrease) | ÿ48,417 | 25,787 |
| in | 79,640 | ÿ538,557 |
| trade payables Other subtotal | 2,243 | 11,054 |
| Interest and | ÿ21,885 | ÿ22,960 |
| dividend income Interest income Amount paid Amount of | ÿ93,624 | 76,933 |
| income tax paid or | 7,380 | 12,165 |
| refunded (ÿ indicates payment) Amount of subsidies received Cash flows from operating activities | ÿ26,246 | ÿ461,365 |
| Cash flow from investing activities | | |
| Payments from time deposits Proceeds | ÿ10,000 | ÿ10,000 |
| from withdrawal of time deposits | 10,000 | 227,954 |
| Payments for purchase of marketable | | ÿ582,663 |
| securities Payments for purchases of property, | ÿ10,576 | ÿ156,547 |
| plant and equipment Payments for purchases | ÿ18,144 | ÿ5,619 |
| of intangible assets Proceeds from | 50,000 | 50,000 |
| withdrawals of restricted deposits Cash flows from investing activities | 21,279 | ÿ476,876 |
| Cash flow from financing activities | | |
| Net increase (decrease) in short-term loans | ÿ19,998 | ÿ219,998 |
| payable Proceeds from long- | 1,750,000 | 2,200,000 |
| term loans payable Repayments of long- | ÿ1,343,334 | ÿ1,313,705 |
| term loans payable Repayments of | ÿ1,953 | ÿ2,301 |
| lease obligations Cash flows from financing activities | 384,714 | 663,995 |
| Exchange differences on cash and cash | 309,117 | ÿ163,136 |
| equivalents Increase (decrease) in cash and cash | 688,864 | ÿ437,383 |
| equivalents Cash and cash equivalents at | 5,625,051 | 6,278,751 |
| beginning of period Cash and cash equivalents at end of quarter | 6,313,916 | 5,841,367 |

JA858

Machine Translated by Google

(4) Notes to Quarterly Consolidated Financial Statements

(Notes on going concern assumption)

Not applicable.

(Note when there is a significant change in the amount of shareholders' equity)

Not applicable.

(segment information, etc.)

[Segment information]

ÿ Accumulation period of the previous 2nd and 4th half-term linkage (from December 1, 2021 to May 31, 2022)

1. Information on the amount of sales and profit or loss by reportable segment, and disaggregated information on earnings

(Unit: thousand yen)

| | Reportable segment | | | | Adjustment (Note) 1 | Quarterly consolidated profit and loss statement Recorded amount (Note) 2 |
|---|---|---|---|---|---|---|
| | Japan | usa | Europe/Asia he | total | | |
| amount of sales | | | | | | |
| Revenue from contracts with customers | 1,527,641 | 685,584 | 1,344,316 | 3,557,542 | ÿ | 3,557,542 |
| (1) Sales to external customers | 1,527,641 | 685,584 | 1,344,316 | 3,557,542 | ÿ | 3,557,542 |
| (2) Internal sales between segments or transfer amount | 465,972 | 66,875 | 164,795 | 697,643 | ÿ697,643 | |
| count | 1,993,613 | 752,459 | 1,509,112 | 4,255,186 | ÿ697,643 | 3,557,542 |
| Segment profit or loss (ÿ) Notes: 1. | 196,100 | ÿ14,402 | 142,555 | 324,253 | ÿ26,536 | 297,717 |

Segment profit or loss (ÿ) adjustments are eliminations of inter-segment transactions.

2.Segment profit or loss (ÿ) is adjusted with operating profit in the quarterly consolidated statements of income.

2. Information on impairment losses on fixed assets or goodwill, etc. for each reportable segment

Not applicable.

ÿ When the 2nd and 4th half-terms are linked and accumulated (from December 1, 2022 to May 31, 2023)

1. Information on the amount of sales and profit or loss by reportable segment, and disaggregated information on earnings

(Unit: thousand yen)

| | Reportable segment | | | | Adjustment (Note) 1 | Quarterly consolidated profit and loss statement Recorded amount (Note) 2 |
|---|---|---|---|---|---|---|
| | Japan | usa | Europe/Asia he | total | | |
| amount of sales | | | | | | |
| Revenue from contracts with customers | 1,534,048 | 648,622 | 1,240,869 | 3,423,540 | ÿ | 3,423,540 |
| (1) Sales to external customers | 1,534,048 | 648,622 | 1,240,869 | 3,423,540 | ÿ | 3,423,540 |
| (2) Internal sales between segments or transfer amount | 681,831 | 38,701 | ÿ | 720,533 | ÿ720,533 | |
| count | 2,215,880 | 687,324 | 1,240,869 | 4,144,073 | ÿ720,533 | 3,423,540 |
| Segment profit or loss (ÿ) | 202,400 | ÿ154,805 | ÿ26,345 | 21,249 | ÿ74,587 | ÿ53,338 |

(Notes) 1. Segment profit (loss) adjustments are eliminations of inter-segment transactions.

2.Segment income (loss) is adjusted to the operating loss in the quarterly consolidated statements of income.

2. Information on impairment losses on fixed assets or goodwill, etc. for each reportable segment

Not applicable.

JA859

≡ OPTICON



## 2023年11月期　第2四半期決算短信〔日本基準〕（連結）

2023年6月27日

上場会社名　　株式会社オプトエレクトロニクス　　　　　　　　　上場取引所　東
コード番号　6664　　URL　https://www.opto.co.jp/
代表者　　　（役職名）代表取締役社長　　　　　　（氏名）俵　政美
問合せ先責任者　（役職名）専務執行役員　　　　（氏名）石川　勝利　　ＴＥＬ　048-446-1181
四半期報告書提出予定日　2023年6月27日　　　　　配当支払開始予定日　－
四半期決算補足説明資料作成の有無　：無
四半期決算説明会開催の有無　　　　：無

（百万円未満切捨て）

### 1．2023年11月期第2四半期の連結業績（2022年12月1日～2023年5月31日）

（1）連結経営成績（累計）　　　　　　　　　　　　　　　　　　　　（％表示は、対前年同四半期増減率）

| | 売上高 | | 営業利益 | | 経常利益 | | 親会社株主に帰属する四半期純利益 | |
|---|---|---|---|---|---|---|---|---|
| | 百万円 | ％ | 百万円 | ％ | 百万円 | ％ | 百万円 | ％ |
| 2023年11月期第2四半期 | 3,423 | △3.8 | △53 | － | △123 | － | △146 | － |
| 2022年11月期第2四半期 | 3,557 | △21.9 | 297 | △60.6 | 209 | △71.2 | 127 | △77.4 |

（注）包括利益　2023年11月期第2四半期　△204百万円（－％）　2022年11月期第2四半期　527百万円（△38.0%）

| | 1株当たり四半期純利益 | 潜在株式調整後1株当たり四半期純利益 |
|---|---|---|
| | 円 銭 | 円 銭 |
| 2023年11月期第2四半期 | △23.74 | － |
| 2022年11月期第2四半期 | 20.64 | － |

（2）連結財政状態

| | 総資産 | 純資産 | 自己資本比率 |
|---|---|---|---|
| | 百万円 | 百万円 | ％ |
| 2023年11月期第2四半期 | 15,337 | 5,680 | 37.0 |
| 2022年11月期 | 15,157 | 5,885 | 38.8 |

（参考）自己資本　2023年11月期第2四半期　5,680百万円　2022年11月期　5,885百万円

### 2．配当の状況

| | 年間配当金 | | | | |
|---|---|---|---|---|---|
| | 第1四半期末 | 第2四半期末 | 第3四半期末 | 期末 | 合計 |
| | 円 銭 | 円 銭 | 円 銭 | 円 銭 | 円 銭 |
| 2022年11月期 | － | 0.00 | － | 0.00 | 0.00 |
| 2023年11月期 | | 0.00 | | | |
| 2023年11月期（予想） | | | － | 0.00 | 0.00 |

（注）直近に公表されている配当予想からの修正の有無：無

### 3．2023年11月期の連結業績予想（2022年12月1日～2023年11月30日）

（％表示は、対前期増減率）

| | 売上高 | | 営業利益 | | 経常利益 | | 親会社株主に帰属する当期純利益 | | 1株当たり当期純利益 |
|---|---|---|---|---|---|---|---|---|---|
| | 百万円 | ％ | 百万円 | ％ | 百万円 | ％ | 百万円 | ％ | 円 銭 |
| 通期 | 7,892 | 9.4 | 417 | 32.4 | 407 | 128.7 | 353 | － | 57.14 |

（注）直近に公表されている業績予想からの修正の有無：無

JA860

※　注記事項
　（１）当四半期連結累計期間における重要な子会社の異動（連結範囲の変更を伴う特定子会社の異動）：無

　（２）四半期連結財務諸表の作成に特有の会計処理の適用：無

　（３）会計方針の変更・会計上の見積りの変更・修正再表示
　　　①　会計基準等の改正に伴う会計方針の変更　　：無
　　　②　①以外の会計方針の変更　　　　　　　　　：無
　　　③　会計上の見積りの変更　　　　　　　　　　：無
　　　④　修正再表示　　　　　　　　　　　　　　　：無

　（４）発行済株式数（普通株式）

| | | | | |
|---|---|---|---|---|
| ①　期末発行済株式数（自己株式を含む） | 2023年11月期２Ｑ | 6,578,000株 | 2022年11月期 | 6,578,000株 |
| ②　期末自己株式数 | 2023年11月期２Ｑ | 400,047株 | 2022年11月期 | 400,047株 |
| ③　期中平均株式数（四半期累計） | 2023年11月期２Ｑ | 6,177,953株 | 2022年11月期２Ｑ | 6,177,953株 |

※　四半期決算短信は公認会計士又は監査法人の四半期レビューの対象外です

※　業績予想の適切な利用に関する説明、その他特記事項
　　本資料に記載されている業績見通し等の将来に関する記述は、現時点で入手可能な情報に基づき判断した見通しであ
　　り、多分に不確定な要素を含んでおります。また、実際の業績は業況の変化等により大きく異なる可能性があります。
　　当社としてその実現を約束する趣旨のものではありません。

JA861

○添付資料の目次

１．当四半期決算に関する定性的情報 ……………………………………………………………………………… 2

（１）経営成績に関する説明 ……………………………………………………………………………………… 2

（２）財政状態に関する説明 ……………………………………………………………………………………… 2

（３）連結業績予想などの将来予測情報に関する説明 ……………………………………………………… 2

２．四半期連結財務諸表及び主な注記 …………………………………………………………………………… 3

（１）四半期連結貸借対照表 ……………………………………………………………………………………… 3

（２）四半期連結損益計算書及び四半期連結包括利益計算書 …………………………………………… 5

　　　四半期連結損益計算書

　　　　　第２四半期連結累計期間 ……………………………………………………………………………… 5

　　　四半期連結包括利益計算書

　　　　　第２四半期連結累計期間 ……………………………………………………………………………… 6

（３）四半期連結キャッシュ・フロー計算書 …………………………………………………………………… 7

（４）四半期連結財務諸表に関する注記事項 …………………………………………………………………… 8

　　　（継続企業の前提に関する注記） ………………………………………………………………………… 8

　　　（株主資本の金額に著しい変動があった場合の注記） ……………………………………………… 8

　　　（セグメント情報等） ………………………………………………………………………………………… 8

JA862

㈱オプトエレクトロニクス（6664）2023年11月期　第2四半期決算短信

## 1．当四半期決算に関する定性的情報

### （1）経営成績に関する説明

当第2四半期連結累計期間（2022年12月1日～2023年5月31日）においては、半導体をはじめとする部品の需給逼迫や原材料価格は徐々に改善されてきており、当社の主要なモジュール製品に使用されている部品についても、納期問題が解消しつつあります。

当第2四半期連結累計期間における当社グループは、前年同期比にて減収減益となりました。

当第2四半期連結累計期間の売上高は、34億23百万円（前年同期比3.8％減）となりました。

セグメントの内訳を示しますと、日本では15億34百万円（前年同期比0.4％増）、米国は6億48百万円（前年同期比5.4％減）、欧州・アジア他は12億40百万円（前年同期比7.7％減）となりました。

日本国内においては、取引先の在庫調整等の影響等が生じているものの、ハンディスキャナ製品を中心に堅調に推移しております。

米国及び欧州・アジア他においては、競合他社との価格競争が激化したこと等により、売上が減少しております。

利益面では、営業損失が53百万円（前年同期は2億97百万円の営業利益）、経常損失が1億23百万円（前年同期は2億9百万円の経常利益）、親会社株主に帰属する四半期純損失が1億46百万円（前年同期は1億27百万円の親会社株主に帰属する四半期純利益）となりました。訴訟手続に伴い弁護士費用が増加したこと等から、販売費及び一般管理費が前年度比で2億86百万円増加しました。

なお、当第2四半期連結累計期間においての為替レートは、1ドル136.69円、1ユーロは144.09円で算出しております。

### （2）財政状態に関する説明

当第2四半期連結会計期間末の総資産は153億37百万円となり、前連結会計年度末と比較して1億80百万円増加いたしました。主な要因は、現金及び預金の減少7億円、受取手形及び売掛金の減少1億70百万円、有価証券の増加5億94百万円、商品及び製品の増加3億65百万円並びに原材料及び貯蔵品の増加1億44百万円等により流動資産が1億39百万円増加したことによるものです。

負債は96億56百万円となり、前連結会計年度末と比較して3億84百万円増加いたしました。主な要因は、支払手形及び買掛金の増加3億15百万円、短期借入金の減少2億19百万円等により流動負債合計が3億32百万円減少したこと、長期借入金の増加7億19百万円等により固定負債合計が7億16百万円増加したことによるものです。

なお、純資産は56億80百万円となり、前連結会計年度末と比較して2億4百万円減少いたしました。主な要因は、利益剰余金の減少1億46百万円等によるものです。

（キャッシュ・フローの状況）

当第2四半期連結累計期間におけるキャッシュ・フローは、営業活動により4億61百万円減少、投資活動により4億76百万円減少、財務活動により6億63百万円増加となりました。この結果、当第2四半期連結会計期間末における現金及び現金同等物の残高は58億41百万円となり、前連結会計年度末と比較して2億7百万円減少となりました。

当第2四半期連結累計期間における各キャッシュ・フローの状況は次のとおりであります。

（営業活動によるキャッシュ・フロー）

営業活動によるキャッシュ・フローは4億61百万円の支出（前年同期は26百万円の支出）となりました。

主な要因は、棚卸資産の増加4億88百万円及び仕入債務の減少2億85百万円等によるものです。

（投資活動によるキャッシュ・フロー）

投資活動によるキャッシュ・フローは4億76百万円の支出（前年同期は21百万円の収入）となりました。

主な要因は、有価証券の取得による支出5億82百万円等によるものです。

（財務活動によるキャッシュ・フロー）

財務活動によるキャッシュ・フローは6億63百万円の収入（前年同期は3億84百万円の収入）となりました。

主な要因は、長期借入れによる収入22億円及び長期借入金の返済による支出13億13百万円等によるものです。

### （3）連結業績予想などの将来予測情報に関する説明

当社は、前年度より原材料及び部品価格の需給逼迫及び価格高騰により納期遅延及び売上原価の増加等の影響を受けておりましたが、需給状況の改善に伴い、納期遅延は解消される見通しであります。売上原価の増加については、主力のモジュール製品についてより入手しやすくコストを抑えた部品を使用した価格競争力と付加価値の高い新製品の開発を進めております。2023年11月期はこれらの新製品開発に注力し、2024年11月期より現行製品との入替を目標としております。

2023年11月期の連結業績予想につきましては、2023年1月26日に公表した「2023年11月期通期連結業績予想の修正等に関するお知らせ」のとおりであり、現在のところ業績予想の変更はございません。

今後の状況をみて、新たに業績予想の修正が必要となった場合は、速やかに開示する予定であります。

JA863

㈱オプトエレクトロニクス（6664）2023年11月期　第2四半期決算短信

## ２．四半期連結財務諸表及び主な注記

### （１）四半期連結貸借対照表

（単位：千円）

| | 前連結会計年度<br>（2022年11月30日） | 当第2四半期連結会計期間<br>（2023年5月31日） |
|---|---|---|
| 資産の部 | | |
| 流動資産 | | |
| 現金及び預金 | 6,651,953 | 5,951,367 |
| 受取手形及び売掛金 | 1,704,889 | 1,534,167 |
| 有価証券 | ― | 594,537 |
| 商品及び製品 | 1,494,500 | 1,860,342 |
| 仕掛品 | 169,223 | 182,070 |
| 原材料及び貯蔵品 | 1,497,745 | 1,642,590 |
| その他 | 665,015 | 562,795 |
| 貸倒引当金 | △16,967 | △21,798 |
| 流動資産合計 | 12,166,360 | 12,306,071 |
| 固定資産 | | |
| 有形固定資産 | | |
| 建物及び構築物（純額） | 1,412,251 | 1,398,472 |
| 機械装置及び運搬具（純額） | 92,516 | 124,402 |
| 工具、器具及び備品（純額） | 108,966 | 100,761 |
| 土地 | 554,178 | 554,178 |
| リース資産（純額） | 8,182 | 6,091 |
| 建設仮勘定 | 85,204 | 98,291 |
| 有形固定資産合計 | 2,261,300 | 2,282,198 |
| 無形固定資産 | | |
| その他 | 277,772 | 277,369 |
| 無形固定資産合計 | 277,772 | 277,369 |
| 投資その他の資産 | | |
| 投資有価証券 | 4,701 | 4,547 |
| 繰延税金資産 | 293,373 | 316,700 |
| その他 | 153,877 | 150,729 |
| 投資その他の資産合計 | 451,951 | 471,976 |
| 固定資産合計 | 2,991,025 | 3,031,544 |
| 資産合計 | 15,157,385 | 15,337,616 |

JA864

㈱オプトエレクトロニクス（6664）2023年11月期　第２四半期決算短信

（単位：千円）

| | 前連結会計年度<br>（2022年11月30日） | 当第２四半期連結会計期間<br>（2023年５月31日） |
|---|---|---|
| 負債の部 | | |
| 流動負債 | | |
| 　支払手形及び買掛金 | 1,230,593 | 915,190 |
| 　短期借入金 | 323,341 | 103,343 |
| 　１年内返済予定の長期借入金 | 2,243,319 | 2,410,500 |
| 　未払法人税等 | 37,253 | 82,745 |
| 　賞与引当金 | － | 58,621 |
| 　訴訟損失引当金 | 786,000 | 791,000 |
| 　その他 | 627,251 | 554,167 |
| 　流動負債合計 | 5,247,758 | 4,915,567 |
| 固定負債 | | |
| 　長期借入金 | 3,980,355 | 4,699,469 |
| 　リース債務 | 4,586 | 2,221 |
| 　繰延税金負債 | 32,580 | 32,502 |
| 　その他 | 7,010 | 7,178 |
| 　固定負債合計 | 4,024,533 | 4,741,370 |
| 負債合計 | 9,272,291 | 9,656,938 |
| 純資産の部 | | |
| 株主資本 | | |
| 　資本金 | 942,415 | 942,415 |
| 　資本剰余金 | 219,136 | 219,136 |
| 　利益剰余金 | 4,354,226 | 4,207,579 |
| 　自己株式 | △212,441 | △212,441 |
| 　株主資本合計 | 5,303,335 | 5,156,688 |
| その他の包括利益累計額 | | |
| 　その他有価証券評価差額金 | 1,202 | 1,049 |
| 　為替換算調整勘定 | 580,555 | 522,940 |
| 　その他の包括利益累計額合計 | 581,758 | 523,989 |
| 　純資産合計 | 5,885,094 | 5,680,678 |
| 負債純資産合計 | 15,157,385 | 15,337,616 |

JA865

㈱オプトエレクトロニクス（6664）2023年11月期　第2四半期決算短信

（2）四半期連結損益計算書及び四半期連結包括利益計算書
　　（四半期連結損益計算書）
　　（第2四半期連結累計期間）

（単位：千円）

| | 前第2四半期連結累計期間<br>（自　2021年12月 1 日<br>至　2022年 5 月31日） | 当第2四半期連結累計期間<br>（自　2022年12月 1 日<br>至　2023年 5 月31日） |
|---|---|---|
| 売上高 | 3,557,542 | 3,423,540 |
| 売上原価 | 2,002,247 | 1,933,103 |
| 売上総利益 | 1,555,294 | 1,490,437 |
| 販売費及び一般管理費 | 1,257,577 | 1,543,775 |
| 営業利益又は営業損失（△） | 297,717 | △53,338 |
| 営業外収益 | | |
| 　受取利息 | 2,084 | 16,380 |
| 　受取賃貸料 | 8,557 | 6,209 |
| 　その他 | 498 | 989 |
| 　営業外収益合計 | 11,140 | 23,580 |
| 営業外費用 | | |
| 　支払利息 | 22,123 | 22,361 |
| 　為替差損 | 67,223 | 61,888 |
| 　固定資産除却損 | 578 | 573 |
| 　支払手数料 | 9,000 | 9,000 |
| 　その他 | — | 0 |
| 　営業外費用合計 | 98,925 | 93,822 |
| 経常利益又は経常損失（△） | 209,931 | △123,580 |
| 税金等調整前四半期純利益又は税金等調整前四半期純損失（△） | 209,931 | △123,580 |
| 法人税、住民税及び事業税 | 85,948 | 40,608 |
| 法人税等調整額 | △3,545 | △17,542 |
| 法人税等合計 | 82,403 | 23,065 |
| 四半期純利益又は四半期純損失（△） | 127,528 | △146,646 |
| 親会社株主に帰属する四半期純利益又は親会社株主に帰属する四半期純損失（△） | 127,528 | △146,646 |

JA866

㈱オプトエレクトロニクス（6664）2023年11月期　第2四半期決算短信

（四半期連結包括利益計算書）
（第2四半期連結累計期間）

（単位：千円）

| | 前第2四半期連結累計期間<br>（自　2021年12月1日<br>至　2022年5月31日） | 当第2四半期連結累計期間<br>（自　2022年12月1日<br>至　2023年5月31日） |
|---|---|---|
| 四半期純利益又は四半期純損失（△） | 127,528 | △146,646 |
| その他の包括利益 | | |
| その他有価証券評価差額金 | 352 | △153 |
| 為替換算調整勘定 | 399,993 | △57,615 |
| その他の包括利益合計 | 400,346 | △57,768 |
| 四半期包括利益 | 527,874 | △204,415 |
| （内訳） | | |
| 親会社株主に係る四半期包括利益 | 527,874 | △204,415 |

JA867

㈱オプトエレクトロニクス（6664）2023年11月期　第２四半期決算短信

（３）四半期連結キャッシュ・フロー計算書

（単位：千円）

| | 前第２四半期連結累計期間<br>（自　2021年12月１日<br>至　2022年５月31日） | 当第２四半期連結累計期間<br>（自　2022年12月１日<br>至　2023年５月31日） |
|---|---|---|
| 営業活動によるキャッシュ・フロー | | |
| 税金等調整前四半期純利益又は税金等調整前四半期純損失（△） | 209,931 | △123,580 |
| 減価償却費 | 74,728 | 67,932 |
| 貸倒引当金の増減額（△は減少） | △3,296 | 4,396 |
| 賞与引当金の増減額（△は減少） | 60,374 | 58,621 |
| 受取利息及び受取配当金 | △2,243 | △16,489 |
| 支払利息 | 22,123 | 22,361 |
| 為替差損益（△は益） | 64,288 | 7,730 |
| 固定資産除却損益（△は益） | 578 | 573 |
| 売上債権の増減額（△は増加） | △95,941 | 188,353 |
| 棚卸資産の増減額（△は増加） | △701,523 | △488,700 |
| 仕入債務の増減額（△は減少） | 499,036 | △285,543 |
| その他 | △48,417 | 25,787 |
| 小計 | 79,640 | △538,557 |
| 利息及び配当金の受取額 | 2,243 | 11,054 |
| 利息の支払額 | △21,885 | △22,960 |
| 法人税等の支払額又は還付額（△は支払） | △93,624 | 76,933 |
| 補助金の受取額 | 7,380 | 12,165 |
| 営業活動によるキャッシュ・フロー | △26,246 | △461,365 |
| 投資活動によるキャッシュ・フロー | | |
| 定期預金の預入による支出 | △10,000 | △10,000 |
| 定期預金の払戻による収入 | 10,000 | 227,954 |
| 有価証券の取得による支出 | － | △582,663 |
| 有形固定資産の取得による支出 | △10,576 | △156,547 |
| 無形固定資産の取得による支出 | △18,144 | △5,619 |
| 拘束性預金の払戻による収入 | 50,000 | 50,000 |
| 投資活動によるキャッシュ・フロー | 21,279 | △476,876 |
| 財務活動によるキャッシュ・フロー | | |
| 短期借入金の純増減額（△は減少） | △19,998 | △219,998 |
| 長期借入れによる収入 | 1,750,000 | 2,200,000 |
| 長期借入金の返済による支出 | △1,343,334 | △1,313,705 |
| リース債務の返済による支出 | △1,953 | △2,301 |
| 財務活動によるキャッシュ・フロー | 384,714 | 663,995 |
| 現金及び現金同等物に係る換算差額 | 309,117 | △163,136 |
| 現金及び現金同等物の増減額（△は減少） | 688,864 | △437,383 |
| 現金及び現金同等物の期首残高 | 5,625,051 | 6,278,751 |
| 現金及び現金同等物の四半期末残高 | 6,313,916 | 5,841,367 |

JA868

㈱オプトエレクトロニクス（6664）2023年11月期　第2四半期決算短信

（4）四半期連結財務諸表に関する注記事項
　（継続企業の前提に関する注記）
　該当事項はありません。

　（株主資本の金額に著しい変動があった場合の注記）
　該当事項はありません。

（セグメント情報等）
【セグメント情報】
Ⅰ　前第2四半期連結累計期間（自　2021年12月1日　至　2022年5月31日）
1．報告セグメントごとの売上高及び利益又は損失の金額に関する情報並びに収益の分解情報

（単位：千円）

| | 報告セグメント | | | | 調整額（注）1 | 四半期連結損益計算書計上額（注）2 |
|---|---|---|---|---|---|---|
| | 日本 | 米国 | 欧州・アジア他 | 合計 | | |
| 売上高 | | | | | | |
| 　顧客との契約から生じる収益 | 1,527,641 | 685,584 | 1,344,316 | 3,557,542 | － | 3,557,542 |
| 　(1) 外部顧客への売上高 | 1,527,641 | 685,584 | 1,344,316 | 3,557,542 | － | 3,557,542 |
| 　(2) セグメント間の内部売上高又は振替高 | 465,972 | 66,875 | 164,795 | 697,643 | △697,643 | － |
| 計 | 1,993,613 | 752,459 | 1,509,112 | 4,255,186 | △697,643 | 3,557,542 |
| セグメント利益又は損失（△） | 196,100 | △14,402 | 142,555 | 324,253 | △26,536 | 297,717 |

（注）1.セグメント利益又は損失（△）の調整額は、セグメント間の取引消去であります。
　　　2.セグメント利益又は損失（△）は、四半期連結損益計算書の営業利益と調整を行っております。

2．報告セグメントごとの固定資産の減損損失又はのれん等に関する情報
　該当事項はありません。

Ⅱ　当第2四半期連結累計期間（自　2022年12月1日　至　2023年5月31日）
1．報告セグメントごとの売上高及び利益又は損失の金額に関する情報並びに収益の分解情報

（単位：千円）

| | 報告セグメント | | | | 調整額（注）1 | 四半期連結損益計算書計上額（注）2 |
|---|---|---|---|---|---|---|
| | 日本 | 米国 | 欧州・アジア他 | 合計 | | |
| 売上高 | | | | | | |
| 　顧客との契約から生じる収益 | 1,534,048 | 648,622 | 1,240,869 | 3,423,540 | － | 3,423,540 |
| 　(1) 外部顧客への売上高 | 1,534,048 | 648,622 | 1,240,869 | 3,423,540 | － | 3,423,540 |
| 　(2) セグメント間の内部売上高又は振替高 | 681,831 | 38,701 | － | 720,533 | △720,533 | － |
| 計 | 2,215,880 | 687,324 | 1,240,869 | 4,144,073 | △720,533 | 3,423,540 |
| セグメント利益又は損失（△） | 202,400 | △154,805 | △26,345 | 21,249 | △74,587 | △53,338 |

（注）1.セグメント利益又は損失（△）の調整額は、セグメント間の取引消去であります。
　　　2.セグメント利益又は損失（△）は、四半期連結損益計算書の営業損失と調整を行っております。

2．報告セグメントごとの固定資産の減損損失又はのれん等に関する情報
　該当事項はありません。

JA869

# EXHIBIT F

JA870

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL, INC., | ) | |
| HAND HELD PRODUCTS, INC., and | ) | |
| METROLOGIC INSTRUMENTS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | |
| OPTICON, INC., | ) | **JURY TRIAL DEMANDED** |
| OPTICON SENSORS EUROPE B.V., and | ) | |
| OPTO ELECTRONICS CO., LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Honeywell International, Inc., Hand Held Products, Inc. and Metrologic Instruments, Inc. (collectively, "Honeywell" or "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendants Opticon, Inc., Opticon Sensors Europe B.V., and OPTO Electronics Co., Ltd. (Collectively "Opticon" or "Defendants") and allege on knowledge as to their own actions, and upon knowledge and information and belief as to the actions of others, as follows:

## NATURE OF THE ACTION

1.      This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, from Defendants' infringement of United States Patent No. 9,465,970 (the "970 Patent"), United States Patent No. 8,978,985 (the "985 Patent"), United States Patent No. 7,148,923 (the "923 Patent"), United States Patent No. 7,527,206 (the "206 Patent"), United States Patent No. 9,659,199 (the "199 Patent"), United States Patent No. 7,159,783 (the "783 Patent"), and United States Patent No. 8,794,520 (the "520 Patent") (collectively, the "Asserted Patents").

{01454250;v1 }

JA871

## THE PARTIES

2.      Plaintiff Honeywell International, Inc. is a Delaware corporation with its principal place of business at 115 Tabor Road, Morris Plains, NJ 07950.

3.      Plaintiff Hand Held Products, Inc. is a Delaware corporation and a wholly owned subsidiary of Honeywell International Inc., with its principal place of business at 9680 Old Bailes Road, Fort Mill, South Carolina 29707.

4.      Plaintiff Metrologic Instruments, Inc. is a New Jersey corporation and a wholly owned subsidiary of Honeywell International Inc., with its principal place of business at 9680 Old Bailes Road, Fort Mill, South Carolina 29707.

5.      Defendant Opticon, Inc. ("Opticon USA") is a company organized and existing under the laws of the State of Delaware, having a principal place of business at 2220 Lind Ave. SW, Suite 100, Renton, WA 98057-3327.

6.      Defendant Opticon Sensors Europe B.V. ("Opticon Sensors") is, upon information and belief, a company organized and existing under the laws of The Netherlands, having a principal place of business at Opaallaan 35, 2132 XV Hoofddorp, Netherlands.

7.      Defendant OPTO Electronics Co., Ltd. ("OPTO") is, upon information and belief, a company organized and existing under the laws of Japan, having a principal place of business at 12-17, Tsukagoshi 4-chrome, Warabi-city Saitama Pref., 335-0002, Japan.

## JURISDICTION AND VENUE

8.      This action arises under the Patent Act, Title 35 of the United States Code, and is an action for patent infringement under § 271.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

JA872

10.    This Court has personal jurisdiction over Defendants under the laws of this State and consistent with the underlying due process principles of the U.S. Constitution.  As stated, Defendant Opticon USA is incorporated in this State.  *See supra* at ¶ 5.  Opticon Sensors and OPTO are subject to jurisdiction in the United States, and specifically in the State of Delaware, pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure.  Upon information and belief, Defendants are doing business in this State and District, have significant contacts in this State and District, have offered for sale and sold infringing products in this State and District, and have committed acts in this State and District that are the subject of the counts set forth herein.

11.    Upon information and belief, Defendants manufacture, import, offer for sale, and sell image-based barcode reading systems and imaging engines to resellers, label manufacturers, and barcode printer and reader distributors throughout the United States, including in this District.

12.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(c)(3) and 1400(b).

## HONEYWELL'S HIGH-PERFORMANCE SCANNERS AND ITS HISTORY OF INNOVATION

13.    Honeywell has been a pioneer in the barcode scanning industry since the 1960s. Since that time, thousands of retailers, distributors, healthcare providers and industrial organizations have used Honeywell's barcode scanners to improve efficiency, speed, and accuracy in their operations.  The Asserted Patents, described in more detail below, are a reflection of the breadth of Honeywell's extensive dedication and investment in barcode scanning technology.

14.    Early barcode scanners were designed only to read linear, one-dimensional (1D) barcodes.  1D barcodes use a series of lines and spaces and variable lengths to encode data. These linear barcodes can contain only a handful of characters.  Accordingly, to encode longer

{01454250;v1 }                                    3

JA873

strings of data, a 1D barcode would need to be physically enlarged or extended, which is not suitable for all circumstances.

  

  

15.     As a result, various two-dimensional (2D) barcodes, which use shapes to encode data, were designed.  Because data can be encoded based both on a vertical and horizontal arrangement of shapes, 2D barcodes can encode exponentially more data in the same amount of space compared to their 1D counterparts.

16.     The advent of 2D barcodes ushered in a new era with a need for advanced barcode scanners that could decode these complex arrangements of shapes and sizes.  As a pioneer in advanced 2D barcode scanners, Honeywell developed an array of products with technologies that allowed barcode scanners to seamlessly read 2D and 1D barcodes.  Because of the complexity of 2D barcodes and the complexity in reading such barcodes, even the slightest change in lighting, user hand-jitter, or angle of scanning can dramatically affect the ability to effectively and efficiently decode these barcodes.  This complexity, coupled with the need for speed of decoding, especially in healthcare, retail, and manufacturing settings, underscores the importance of Honeywell's technological advances.

17.     One of Honeywell's key innovations was the development of global-shutter technology in CMOS-based barcode scanners.  Traditionally, CMOS image sensors used a rolling shutter technique in which individual rows of pixels in the image sensor were activated and read out in sequence.  This meant that, for example, the top row of pixels in the image sensor was exposed before the bottom row of pixels.  Because rolling shutter involved exposing rows of pixels sequentially at different times, rolling shutter suffers from two disadvantages: image distortion and image blur.  To overcome these drawbacks, Honeywell engineers developed the use of global shutter technology in the CMOS image sensor, in which all or substantially all of the pixels are simultaneously exposed.  Exposing all pixels in the sensor simultaneously addresses each drawback because pixels are not exposed at different points in time during image capture.  Products incorporating global shutter were and still are far superior to scan engines utilizing rolling shutter, and this innovation resulted in significant commercial success for Honeywell's global-shutter products.

18.     Honeywell has developed technology and software programming that allows these barcode scanners to adjust automatically, in real-time, to various environmental conditions. For example, Honeywell developed barcode scanners that can adjust exposure (light) settings on a frame-by-frame basis, which allows a barcode reader to capture higher-quality images.  An additional innovation was the development of barcode readers capable of adjusting exposure settings in a real-time fashion in a multitasking operating system environment.  Honeywell also developed barcode reader technology that improves the user experience by reducing apparent flicker from the illumination LEDs that are utilized during scanning operations while also improving the ability of the reader to read images on LCD screens.  Moreover, Honeywell developed barcode reader technology that allows the reader to determine the location of a

barcode within the frame and use information regarding the quality of the image at that location in order to obtain an improved subsequent image.  One Honeywell innovation even allows barcode scanners to be customized using a script-interpreter program.  Combined, these technologies lead to faster decode time and more accurate, concise character output.  Barcode scanners, because of Honeywell's advancements, can now quickly decode any type of barcode, regardless of environment, and can automatically adjust to different users to provide quick and accurate scanning and decoding.

## OPTICON'S INFRINGING ACTIVITIES

19.    Opticon has entered the barcode scanning market, and rather than develop its own technology, Opticon has incorporated Honeywell's patented technology into its scanning products.  Opticon unfairly competes with Honeywell in the marketplace by offering for sale and selling these infringing products throughout the United States, and in Delaware.  These infringing products include, but are not limited to, the Opticon L-50X ("L-50X").  The L-50X is used as a representative infringing product for illustration purposes in this Complaint.

20.    The Opticon L-50X is a "2D Imager barcode scanner" that "scans and decodes a wide variety of 1D or 2D barcodes" using a "CMOS area imager sensor." The L-50X utilizes a CMOS area image sensor with a scan rate of 60 frames per second.



21. The L-50X includes a MDI-3100 scan engine. This scan engine includes a bar code decoding module configured to decode representations of at least a two-dimensional bar code in image data captured by an image reader. For example, the MDI-3100 data sheet states that the MDI-3100 includes a "decoder" that "reads 1D and 2D barcodes." The scan engine includes imaging optics and a CMOS global shutter image sensor. Indeed, Opticon advertises that the MDI-3100 uses "fast global shutter technology providing exceptional motion tolerance for moving applications."



22.     The MDI-3100 includes two red illumination LEDs that project an illumination pattern on the substrate containing a barcode in order to obtain a properly exposed image.  The MDI-3100 also includes a green aiming LED for projecting an aiming pattern on the target barcode.



Illumination light sources





23. The MDI-3100 also includes a memory module and a processor, the Atmel AT91SAM9G20.

JA879



Processor

24.     This processor is part of the ARM926EJ-S platform, which is described as "targeted at multi-tasking applications where full memory management, high performance, low die size, and low power are all important."



The SAM9G20 embedded microprocessor unit is based on the integration of an Arm926EJ-S™ processor with fast ROM and RAM memories and a wide range of peripherals.



25. Additionally, the MDI-3100 has an "exposure time" data field that can range from 50 to 500000 and a "brightness index value" that can range from 0 to 1023. Upon information and belief, these values are set in accordance with measurements obtained by the MDI-3100 in order to capture and decode barcodes. The MDI-3100 includes an "auto trigger" function that automatically detects a scanned target and starts reading barcodes. Additionally, the MDI-3100 has automatic illumination switching, which memorizes a condition in which a code can be read. The MDI-3100 is described by Opticon to operate in a reading cycle where the MDI-3100 starts reading a barcode, gets a decoded image, and if a code is not decoded the MDI-3100 runs through the reading cycle until a code is decoded. The MDI-3100 is also optimized to be able to read LCD screens. Further, the MDI-3100 determines the location of a barcode and provides a "coordinate output" that "allows the data output to be sent with the pixel location of where the symbol was found."



26.    Opticon also provides tools such as the "Universal Config Tool," which can be used to configure the MDI-3100 and is described by Opticon as a "Windows-based application that performs utility functions such as firmware loading on the MDI3x00 and MDI4x00 imager scan engine based products."



27.     The Universal Config Tool allows a user to create and send scripts to the MDI-3100.





28.     Opticon offers for sale and sells its infringing products throughout the United States and in this District.  In particular, and as stated, Opticon USA is incorporated in this District and, thus, is a resident and Opticon Sensors and OPTO are subject to jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure.  *See*, *supra*, at ¶ 10.

29.     Opticon unfairly competes with Honeywell in the marketplace by selling the infringing products to customers throughout the United States and in this District, including to Honeywell's own customers.

30.     Through its infringing activities, Opticon has caused direct injury to Honeywell throughout the United States and in Delaware.

## THE ASSERTED PATENTS[1]

31.     The 970 Patent, entitled "Image Reader Comprising CMOS Based Image Sensor Array," issued on October 11, 2016, naming inventors Ynjiun P. Wang and William H. Havens. The 970 Patent issued from U.S. Patent Application Serial No. 14/221,903, filed on March 21, 2014.  The 970 Patent is directed to the use of global-shutter technology to expose substantially all of the pixels at once in a CMOS-based image sensor, limiting image distortion and blur.  A true and accurate copy of the 970 Patent is attached hereto as Exhibit 1.

32.     Hand Held Products, Inc. is the owner and assignee of the entire right, title, and interest in and to the 970 Patent and holds the right to sue and recover damages for infringement thereof.

---

[1] All descriptions of the inventions herein are presented to give a general background of those inventions.  Such statements are not intended to be used, nor should be used, for purposes of patent claim interpretation.  Honeywell presents these statements subject to, and without waiver of, its right to argue that claim terms should be construed in a particular way, as contemplated by claim interpretation jurisprudence and the relevant evidence.

JA884

33.     The 985 Patent, entitled "Image Reader Comprising CMOS Based Image Sensor Array," issued on March 17, 2015, naming inventors Ynjiun P. Wang and William H. Havens. The 985 Patent issued from U.S. Patent Application Serial No. 14/273,631, filed on May 19, 2014.  The 985 Patent discloses, for example, a barcode reading device using a CMOS image sensor in a global-shutter mode to decode a 1D or 2D barcode.  A true and accurate copy of the 985 Patent is attached hereto as Exhibit 2.

34.     Hand Held Products, Inc. is the owner and assignee of the entire right, title, and interest in and to the 985 Patent and holds the right to sue and recover damages for infringement thereof.

35.     The 923 Patent, entitled "Methods and Apparatus for Automatic Exposure Control," issued on December 12, 2006, naming inventors Jeffrey D. Harper, Robert M. Hussey, Matthew W. Pankow, and Timothy P. Meier.  The 923 Patent issued from U.S. Patent Application Serial No. 09/903,300, filed on July 11, 2001.  The 923 Patent is directed to barcode reading devices with automated, real-time exposure control in multi-tasking environments and methods of execution thereof.  A true and accurate copy of the 923 Patent is attached hereto as Exhibit 3.

36.     Hand Held Products, Inc. is the owner and assignee of the entire right, title, and interest in and to the 923 Patent and holds the right to sue and recover damages for infringement thereof.

37.     The 206 Patent, entitled "Method of Setting the Time Duration of Illumination From an LED-Based Illumination Array Employed in a Digital Imaging-Based Code Symbol Reader, Using an Image-Processing Based Illumination Metering Program Executed Therewithin," issued on May 5, 2009, naming inventors Xiaoxun Zhu, Yong Liu, Ka Man Au,

Rui Hou, Hongpeng Yu, Xi Tao, Liang Liu, Wenhua Zhang, and Anatoly Kotlarsky. The 206 Patent issued from U.S. Patent Application Serial No. 11/607,114, filed on November 30, 2006. The 206 Patent is directed to illumination duration measuring and variation within barcode readers to process and decode optimally illuminated indicia bearing substrates. A true and accurate copy of the 206 Patent is attached hereto as Exhibit 4.

38.    Metrologic Instruments, Inc. is the owner and assignee of the entire right, title, and interest in and to the 206 Patent and holds the right to sue and recover damages for infringement thereof.

39.    The 199 Patent, entitled "Terminal with Flicker-Corrected Aimer and Alternating Illumination," issued on May 23, 2017, naming inventors Daniel Van Volkinburg, Stephen Patrick Deloge, Kevin Bower, Matthew Pankow, and Ryan Kather. The 199 Patent issued from U.S. Patent Application Serial No. 15/176,366, filed on June 8, 2016. The 199 Patent is directed to a device and method for activating a screen reading mode with reduced flickering to read an indicia. A true and accurate copy of the 199 Patent is attached hereto as Exhibit 5.

40.    Hand Held Products, Inc. is the owner and assignee of the entire right, title, and interest in and to the 199 Patent and holds the right to sue and recover damages for infringement thereof.

41.    The 783 Patent, entitled "Customizable Optical Reader," issued on January 9, 2007, naming inventors Joseph Walczyk, Dieter Fauth, David Holzhauer, Robert M. Hussey, Barry Keys, Joseph Livingston, and Michael D. Robinson. The 783 Patent issued from U.S. Patent Application Serial No. 11/203,667, filed on August 12, 2005. The 783 Patent is directed to a device and method of customizing an optical reader. A true and accurate copy of the 783 Patent is attached hereto as Exhibit 6.

JA886

42.     Hand Held Products, Inc. is the owner and assignee of the entire right, title, and interest in and to the 783 Patent and holds the right to sue and recover damages for infringement thereof.

43.     The 520 Patent, entitled "Method and Apparatus for Operating Indicia Reading Terminal Including Parameter Determination," issued on August 5, 2014, naming inventors Ynjiun P. Wang and Shulan Deng.  The 520 Patent issued from U.S. Patent Application Serial No. 12/242,244, filed on September 30, 2008.  The 520 Patent is directed to a device and method of determining a parameter in a hand-held barcode reader.  A true and accurate copy of the 520 Patent is attached hereto as Exhibit 7.

44.     Hand Held Products, Inc. is the owner and assignee of the entire right, title, and interest in and to the 520 Patent and holds the right to sue and recover damages for infringement thereof.

## COUNT ONE – INFRINGREMENT OF THE 970 PATENT

45.     Paragraphs 1 to 44 are incorporated herein by reference as if fully stated herein.

46.     Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 970 Patent in violation of 35 U.S.C. § 271.

47.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the 970 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 970 Patent, including, but not limited to, at least the L-50X.  As discussed, the L-50X includes the MDI-3100 scan engine that reads both 1D and 2D barcodes using a CMOS image sensor and that has a two-dimensional array of 752 x 480 pixels.  The CMOS image sensor in the MDI-3100 operates in a global shutter mode and the MDI-3100 has illumination light sources in the form of red illumination LEDs.

JA887

48.     Defendants directly infringe one or more claims of the 970 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, infringing devices such as the L-50X, and thus directly infringe the 970 Patent.

49.     Defendants have had knowledge and notice of the 970 Patent at least as early as the filing of this Complaint.

50.     Upon information and belief, defendants indirectly infringe the 970 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants' customers directly infringe through their use of the inventions claimed in the 970 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation.  As a result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend, and directly infringe the 970 Patent.  Defendants have performed and continue to perform these affirmative acts with knowledge of the 970 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 970 Patent.

51.     Defendants also indirectly infringe the 970 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States.  Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale, contribute to

Defendants' customers' use of the infringing products, such as the L-50X, such that the 970 Patent is directly infringed.  Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 970 Patent and with intent, or willful blindness, that they cause the direct infringement of the 970 Patent.

52.     Defendants' infringement of the 970 Patent has damaged and will continue to damage Honeywell.

### COUNT TWO – INFRINGREMENT OF THE 985 PATENT

53.     Paragraphs 1 to 52 are incorporated herein by reference as if fully stated herein.

54.     Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 985 Patent in violation of 35 U.S.C. § 271.

55.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the 985 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 985 Patent, including, but not limited to, at least the L-50X.  As discussed, the L-50X includes the MDI-3100 scan engine that reads both 1D and 2D barcodes using a CMOS image sensor and that has a two-dimensional array of 752 x 480 pixels.  The CMOS image sensor in the MDI-3100 operates in a global shutter mode and the MDI-3100 has illumination light sources in the form of red illumination LEDs.  The MDI-3100 can be set to read specific barcodes by discriminating between different barcode symbologies.

56.     Defendants directly infringe one or more claims of the 985 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, infringing devices, such as the L-50X, and thus directly infringe the 985 Patent.

57.     Defendants have had knowledge and notice of the 985 Patent at least as early as the filing of this Complaint.

58.     Upon information and belief, Defendants indirectly infringe the 985 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants' customers directly infringe through their use of the inventions claimed in the 985 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation.  As a result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend, and directly infringe the 985 Patent.  Defendants have performed and continue to perform these affirmative acts with knowledge of the 985 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 985 Patent.

59.     Defendants also indirectly infringe the 985 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States.  Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale, contribute to Defendants' customers' use of the infringing products, such as the L-50X, such that the 985 Patent is directly infringed.  Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 985 Patent and with intent, or willful blindness, that they cause the direct infringement of the 985 Patent.

60.    Defendants' infringement of the 985 Patent has damaged and will continue to damage Honeywell.

## COUNT THREE – INFRINGREMENT OF THE 923 PATENT

61.    Paragraphs 1 to 60 are incorporated herein by reference as if fully stated herein.

62.    Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 923 Patent in violation of 35 U.S.C. § 271.

63.    Defendants infringe, contribute to the infringement of, and/or induce infringement of the 923 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 923 Patent, including, but not limited to, at least the L-50X.  As discussed, the Opticon L-50X is a barcode reading device incorporating the Opticon MDI-3100 scan engine.  The MDI-3100 has an optics imaging system in connection with a CMOS image sensor, a memory for storing image data, and a processor (Atmel AT91SAM9G20) for decoding the image data.  The processor includes a multitasking OS with high and low priority modules that provide imaging system control processing and image decoding capabilities, respectively.

64.    Defendants directly infringe one or more claims of the 923 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, infringing devices, such as the L-50X, and thus directly infringe the 923 Patent.

65.    Defendants have had knowledge and notice of the 923 Patent at least as early as the filing of this Complaint.

66.    Upon information and belief, Defendants indirectly infringe the 923 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants'

customers directly infringe through their use of the inventions claimed in the 923 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation.  As a result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend, and directly infringe the 923 Patent.  Defendants have performed and continue to perform these affirmative acts with knowledge of the 923 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 923 Patent.

67.     Defendants also indirectly infringe the 923 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States.  Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale, contribute to Defendants' customers' use of the infringing products, such as the L-50X, such that the 923 Patent is directly infringed.  Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 923 Patent and with intent, or willful blindness, that they cause the direct infringement of the 923 Patent.

68.     Defendants' infringement of the 923 Patent has damaged and will continue to damage Honeywell.

## COUNT FOUR – INFRINGREMENT OF THE 206 PATENT

69.     Paragraphs 1 to 68 are incorporated herein by reference as if fully stated herein.

JA892

70.     Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 206 Patent in violation of 35 U.S.C. § 271.

71.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the 206 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 206 Patent, including, but not limited to, at least the L-50X. As discussed, the Opticon L-50X is a barcode reading device incorporating the Opticon MDI-3100 scan engine.  The L-50X has a housing with a transmission window for the MDI-3100, which includes an image formation and detection subsystem made up of an optics imaging assembly and a CMOS image sensor that has a particular field of view relative to the transmission window.  The L-50X further includes a trigger switch to generate a trigger event when actuated.  The MDI-3100 also includes an illumination subsystem made up of LEDs, where the illumination projected by the LEDs can be measured and, subsequently, controlled based on said measurement.  The MDI-3100 additionally has a processor that is operable to decode barcodes and control the subsystems discussed above.

72.     Defendants directly infringe one or more claims of the 206 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, these devices and thus directly infringe the 206 Patent.

73.     Defendants have had knowledge and notice of the 206 Patent at least as early as the filing of this Complaint.

74.     Upon information and belief, Defendants indirectly infringe the 206 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants' customers directly infringe through their use of the inventions claimed in the 206 Patent.

Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation.  As a result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend and directly infringe the 206 Patent.  Defendants have performed and continue to perform these affirmative acts with knowledge of the 206 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 206 Patent.

75.    Defendants also indirectly infringe the 206 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States.  Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products, such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale contribute to Defendants' customers' use of the infringing products, such as the L-50X, such that the 206 Patent is directly infringed.  Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 206 Patent and with intent, or willful blindness, that they cause the direct infringement of the 206 Patent.

76.    Defendants' infringement of the 206 Patent has damaged and will continue to damage Honeywell.

## COUNT FIVE – INFRINGREMENT OF THE 199 PATENT

77.    Paragraphs 1 to 76 are incorporated herein by reference as if fully stated herein.

78.     Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 199 Patent in violation of 35 U.S.C. § 271.

79.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the 199 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 199 Patent, including, but not limited to, at least the L-50X.  As discussed, the Opticon L-50X is a barcode reading device incorporating the Opticon MDI-3100 scan engine.  The MDI-3100 has an imaging subsystem made up of a CMOS image sensor, an imaging optics assembly situated in connection with the image sensor, and a processor to decode the bar codes.  Further, the MDI-3100 is operable to project an illumination pattern and a separate aiming pattern using LEDs.  The illumination LEDs are operable to alternate between illuminated and unilluminated modes, allowing the MDI-3100 to acquire frames of image data both while illumination is on and while illumination is off.

80.     Defendants directly infringe one or more claims of the 199 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, infringing devices, such as the L-50X, and thus directly infringe the 199 Patent.

81.     Defendants have had knowledge and notice of the 199 Patent at least as early as the filing of this Complaint.

82.     Upon information and belief, Defendants indirectly infringe the 199 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants' customers directly infringe through their use of the inventions claimed in the 199 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-

50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation.  As a result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend and directly infringe the 199 Patent.  Defendants have performed and continue to perform these affirmative acts with knowledge of the 199 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 199 Patent.

83.     Defendants also indirectly infringe the 199 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States.  Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale, contribute to Defendants' customers' use of the infringing products, such as the L-50X, such that the 199 Patent is directly infringed.  Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 199 Patent and with intent, or willful blindness, that they cause the direct infringement of the 199 Patent.

84.     Defendants' infringement of the 199 Patent has damaged and will continue to damage Honeywell.

## COUNT SIX – INFRINGEMENT OF THE 783 PATENT

85.     Paragraphs 1 to 84 are incorporated herein by reference as if fully stated herein.

86.     Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 783 Patent in violation of 35 U.S.C. § 271.

JA896

87.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the 783 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 783 Patent, including, but not limited to, at least the L-50X.  As discussed, the Opticon L-50X is a barcode reading device incorporating the Opticon MDI-3100 scan engine.  The MDI-3100 has a control circuit to control a CMOS image sensor, a memory, a processor and firmware, where the processor executes a main operating program storing instructions in the memory and firmware.  Further, Opticon provides a configuration program called Universal Config Tool, which provides instructions that are executed by a script interpreter program by the processor.

88.     Defendants directly infringe one or more claims of the 783 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, infringing products, such as the L-50X, and thus directly infringe the 783 Patent.

89.     Defendants have had knowledge and notice of the 783 Patent at least as early as the filing of this Complaint.

90.     Upon information and belief, Defendants indirectly infringe the 783 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants' customers directly infringe through their use of the inventions claimed in the 783 Patent. Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation. As a

result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend, and directly infringe the 783 Patent. Defendants have performed and continue to perform these affirmative acts with knowledge of the 783 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 783 Patent.

91.     Defendants also indirectly infringe the 783 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products, such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale contribute to Defendants' customers' use of the infringing products, such as the L-50X, such that the 783 Patent is directly infringed. Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 783 Patent and with intent, or willful blindness, that they cause the direct infringement of the 783 Patent.

92.     Defendants' infringement of the 783 Patent has damaged and will continue to damage Honeywell.

## COUNT SEVEN – INFRINGREMENT OF THE 520 PATENT

93.     Paragraphs 1 to 92 are incorporated herein by reference as if fully stated herein.

94.     Defendants have directly and indirectly infringed, and continue to directly and indirectly infringe, the claims of the 783 Patent in violation of 35 U.S.C. § 271.

95.     Defendants infringe, contribute to the infringement of, and/or induce infringement of the 520 Patent by making, using, selling, offering for sale, and/or importing into the United States products covered by one or more claims of the 520 Patent, including, but not limited to, at least the L-50X. The Opticon L-50X is a barcode reading device incorporating the Opticon

JA898

MDI-3100 scan engine.  The MDI-3100 includes an optics assembly in connection with a CMOS image sensor.  The L-50X has a handheld housing surrounding the MDI-3100, including the MDI-3100 image sensor, and a trigger to initiate a decode attempt.  The L-50X is capable of determining the location of a barcode in an image frame by determining the coordinates of the barcode.  Further, upon information and belief, it uses the frame image data of the determined barcode location to determine an imaging parameter, including at least the exposure period, gain, and illumination level parameter.  Finally, upon information and belief, it is operable to use the determined imaging parameter to capture a subsequent frame of image data, where it adjusts the imaging parameter based on the determination.

96.     Defendants directly infringe one or more claims of the 520 Patent.  Defendants make, use, sell, offer for sale, and/or import, in this District and elsewhere in the United States, infringing products, such as the L-50X, and thus directly infringe the 520 Patent.

97.     Defendants have had knowledge and notice of the 520 Patent at least as early as the filing of this Complaint.

98.     Upon information and belief, Defendants indirectly infringe the 520 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers, in this District and elsewhere in the United States.  For example, Defendants' customers directly infringe through their use of the inventions claimed in the 520 Patent.  Defendants induce this direct infringement through their affirmative acts of manufacturing, selling, distributing, and/or otherwise making available the infringing products, such as the L-50X, and providing instructions, documentation, and other information to customers suggesting they use the infringing products, such as the L-50X, in an infringing manner, including online technical support, marketing, product manuals, advertisements, and online documentation.  As a

result of Defendants' inducement, Defendants' customers use the infringing products, such as the L-50X, in the way Defendants intend, and directly infringe the 520 Patent. Defendants have performed and continue to perform these affirmative acts with knowledge of the 520 Patent and with the intent, or willful blindness, that the induced acts directly infringe the 520 Patent.

99.    Defendants also indirectly infringe the 520 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as customers, in this District and elsewhere in the United States. Defendants' affirmative acts of selling and offering to sell, in this District and elsewhere in the United States, infringing products, such as the L-50X, and causing these products to be manufactured, used, sold, and offered for sale, contribute to Defendants' customers' use of the infringing products, such as the L-50X, such that the 520 Patent is directly infringed. Upon information and belief, Defendants have performed and continue to perform these affirmative acts with knowledge of the 520 Patent and with intent, or willful blindness, that they cause the direct infringement of the 520 Patent.

100.    Defendants' infringement of the 520 Patent has damaged and will continue to damage Honeywell.

## DAMAGES

101.    As a result of Opticon's acts of infringement, Honeywell has suffered actual and consequential damages. However, Honeywell does not yet know the full extent of the infringement and its extent cannot be ascertained except through discovery and special accounting. To the fullest extent permitted by law, Honeywell seeks recovery of damages at least for reasonable royalties, unjust enrichment, and benefits received by Opticon as a result of using misappropriated Honeywell technology. Honeywell further seeks all other damages to which Honeywell is entitled under law or in equity.

JA900

**DEMAND FOR JURY TRIAL**

102.   Honeywell hereby respectfully requests a jury trial for all issues so triable.

**REQUEST FOR RELIEF**

WHEREFORE, Honeywell respectfully requests the following relief:

A.  the entry of judgment on the Complaint, including all claims, causes of action, and requests for relief therein, in favor of Honeywell and against Opticon;

B.  the entry of judgment that Opticon infringes the Asserted Patents;

C.  the entry of judgment that Opticon's infringement of the Asserted Patents has been and continues to be willful;

D.  the entry of judgment against Opticon, awarding Honeywell actual damages in an amount sufficient to compensate Honeywell for Opticon's direct and indirect infringement of the Asserted Patents, until such time as Opticon ceases its infringing conduct;

E.  the entry of judgment against Opticon, awarding Honeywell enhanced damages pursuant to 35 U.S.C. § 284;

F.  the entry of judgment against Opticon, awarding Honeywell pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs;

G.  a determination that this is an exceptional case, and an award to Honeywell of its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

H.  an order for an accounting of damages for Opticon's acts of infringement;

I.  an award to Honeywell of its costs of suit;

J.  the entry of a permanent injunction, enjoining Defendants, their officers, directors, agents, employees, parents, subsidiaries, affiliates, licensees, successors, and assigns, and

those acting in concert or participation with them, from further acts of direct and/or

indirect infringement of the Asserted Patents; and

K.    an award to Honeywell of such further and additional relief, whether legal or equitable,

that Honeywell requests, that the Court determines Honeywell to be entitled, or that the

Court deems just and proper.

<table>
<tr><td></td><td>ASHBY & GEDDES</td></tr>
</table>

*Of Counsel:*                                           /s/ Steven J. Balick

                                                        _____
M. Scott Stevens                                        Steven J. Balick (#2114)
Adam D. Swain                                           Andrew C. Mayo (#5207)
**ALSTON & BIRD LLP**                                   500 Delaware Avenue, 8th Floor
950 F Street NW                                         P.O. Box 1150
Washington, DC 20004                                    Wilmington, DE  19899
Telephone:  (202) 239-3025                              (302) 654-1888
Facsimile:   (704) 654-4825                             sbalick@ashbygeddes.com
                                                        amayo@ashbygeddes.com

S. Benjamin Pleune
Stephen R. Lareau                                       *Attorneys for Plaintiffs Honeywell*
Adam J. Doane                                           *International, Inc., Hand Held*
**ALSTON & BIRD LLP**                                   *Products, Inc., and Metrologic*
101 South Tryon Street                                  *Instruments, Inc.*
Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1098
Facsimile: (704) 444-1698

Patrick J. Flinn
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7920
Facsimile: (404) 253-8370

Dated:  May 31, 2019

{01454250;v1 }                          32

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL,　　　)
INC.; HAND HELD PRODUCTS,　　　)
INC.; AND METROLOGIC　　　　　　)
INSTRUMENTS, INC.,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　 )　　No. 3:21-cv-506
　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　 )　　VOLUME I
　　　　　　　　　　　　　　　　)
OPTO ELECTRONICS COMPANY,　　　)
LTD.,　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　)
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 17, 2023


<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

　　　MATTHEW SCOTT STEVENS, ESQ.
　　　S. BENJAMIN PLEUNE, ESQ.
　　　LAUREN NICHOLE GRIFFIN, ESQ.
　　　NICHOLAS CHRISTOPHER MARAIS, ESQ.
　　　BRANDON C.E. SPRINGER, ESQ.
　　　STEPHEN RICHARD LAREAU, ESQ.
　　　Alston & Bird, LLP
　　　101 South Tryon Street, Suite 4000
　　　Charlotte, North Carolina 28202

On Behalf of the Defendant:

　　　ROBERT MUCKENFUSS, ESQ.
　　　ZACHARY L. McCAMEY, ESQ.
　　　JESSICA LYNN O'BRIEN, ESQ.
　　　McGuireWoods, LLP
　　　201 North Tryon Street, Suite 3000
　　　Charlotte, North Carolina 28202

JA903

APPEARANCES (Cont'd.)

        TYLER T. VanHOUTAN, ESQ.
        McGuireWoods, LLP
        Texas Tower, Suite 2400
        845 Texas Avenue
        Houston, Texas 77002

        CHRISTINE E. LEHMAN, ESQ.
        CONNOR S. HOUGHTON, ESQ.
        Reichman Jorgensen Lehman & Feldberg, LLP
        1909 K Street, NW
        Suite 800
        Washington, DC 20006

        YORK M. FAULKNER, ESQ.
        YorkMoodyFaulkner
        Tensho Building, 7F
        3-17-11 Shibaura, Suite 711
        Tokyo, Japan

                        CHERYL A. NUCCIO, RMR, CRR
                           Official Court Reporter
                        United States District Court
                          Charlotte, North Carolina

JA904

1                          I N D E X

2    PLAINTIFF'S WITNESSES                            PAGE

3    TAYLOR SMITH
         Direct Examination By Mr. Pleune              64
4        Cross Examination By Mr. Muckenfuss           71

5
     JEREMY CHRISTOPHER WHITLEY
6        Direct Examination By Mr. Stevens             74
         Cross Examination By Mr. VanHoutan            99
7        Redirect Examination By Mr. Stevens          107

8
     CRAIG SMITH
9        Direct Examination By Mr. Marais             115
         Voir Dire Examination By Ms. Lehman          124
10       Direct Examination By Mr. Marais             128
         Cross Examination By Ms. Lehman              153
11       Redirect Examination By Mr. Marais           176

12

13                       E X H I B I T S

14   JOINT EXHIBITS

15   NUMBER                                        ADMITTED

16   1 ...........................................70

17

18   PLAINTIFF'S EXHIBITS

19   NUMBER                                        ADMITTED

20   4 ..........................................132
     8 ..........................................132
     10 .........................................132
21   61 .........................................143
     243 .........................................79
22   288 .........................................95
     325 ........................................134
23   838 ........................................180

24

25

JA905

4

1                         E X H I B I T S

2    DEFENDANT'S EXHIBITS

3    <u>NUMBER</u>                                          <u>ADMITTED</u>

4    816 ..............................................174
     818 ..............................................174

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA906

5

1           P R O C E E D I N G S

2           (Court back in session at 10:10 AM.)

3           (Jury not present.)

4           THE COURT:  Let me ask if the parties have discussed

5     the handling of exhibits during cross examination?  Obviously,

6     normally the defense can't put into evidence exhibits during

7     the plaintiff's case in chief.  And, of course, we can't show

8     it to the jury unless it's been admitted.  But if we deal with

9     that strictly, it would mean that the defendants would have

10    the right to recall witnesses just for the purpose of showing

11    and perhaps replowing testimony.

12           So have you discussed what to do with defense

13    exhibits if they want to show plaintiff's witnesses?

14           MR. MUCKENFUSS:  Your Honor, we haven't discussed

15    that.  I could discuss it very quickly.  I will say my thought

16    was, because it would be -- we are going to have witnesses in

17    their case where we would want to introduce exhibits.  So I

18    think it would be very inefficient, probably, to bring them

19    back.  But I have not discussed it with Mr. Stevens.

20           THE COURT:  Well, most of the cases that I've tried

21    the parties do agree, just for efficiency purposes and to

22    avoid recalling witnesses, that defense exhibits can be

23    offered into evidence and shown to the jury during cross

24    examination.  It gets really awkward otherwise.

25           Mr. Stevens, do you have thoughts about that?

JA907

6

```
 1          MR. STEVENS:  This is the first I've thought about
 2   it.  My understanding is that they only reserved the right to
 3   call one of our witnesses back in their case in chief, so it's
 4   a little bit of a surprise to me that they might recall people
 5   for that purpose.  In my mind we were going to proceed under
 6   the normal rule that, you know, during our case in chief we
 7   enter our evidence.
 8          THE COURT:  Well, if there is no agreement for the
 9   offering into evidence and showing to the jury exhibits of the
10   defense during cross examination of plaintiff's witnesses,
11   they will be allowed to recall that witness.  That's what I'm
12   trying to avoid.
13          MR. STEVENS:  Okay.
14          (Counsel conferred.)
15          MR. MUCKENFUSS:  Your Honor, I think we -- and
16   Mr. Stevens can speak for himself.  I think we have an
17   agreement to -- for me to introduce exhibits through his
18   witnesses.  I think there may be objections to relevancy.
19   There's some extrinsic evidence issues, obviously, that we're
20   still dealing with.  I think Mr. Stevens, depending on what
21   the purpose of the exhibits is, whether it's for breach or a
22   defense, I think that could be an issue.  But I think -- in
23   principle, I think we agree that we could try to do it that
24   way.
25          MR. STEVENS:  Let me -- I don't have any problem if
```

JA908

1  they want to enter an exhibit that goes straight to the

2  subject matter of our case in chief.  I do -- I would have an

3  objection if they intend to begin their affirmative defenses

4  during our case in chief.  I do think the witness would need

5  to be recalled for that purpose.

6          My understanding here is that the real issue is

7  patents.  They want to put up a whole bunch of old Honeywell

8  patents.  My understanding from Your Honor is that that's

9  extrinsic evidence and that they're not allowed to do that.

10  And, frankly, I think that's going to be the biggest question

11  about these cross exhibits.

12          THE COURT:  Yeah, the Court would restrict the

13  admission of defense evidence during cross examination to the

14  issue of Honeywell's claim for breach.  To the extent that the

15  exhibits in cross examination would go to the affirmative

16  defenses, the exhibits and any witness testimony would have to

17  wait until your case.

18          MR. MUCKENFUSS:  So, Your Honor, just to be clear,

19  we would have the right to recall that witness if it's

20  relevant to the defense.

21          THE COURT:  Yes.

22          MR. MUCKENFUSS:  Yes.  Obviously, it depends -- I

23  don't know what he's going to do with his witnesses, if he

24  opens the door or what may happen, but understood.

25          THE COURT:  But in general, if it goes to

8

1  Honeywell's claim of breach, you agree to allow the defense to
2  offer exhibits with respect to that cross examination on that
3  issue subject to, obviously, admissibility and relevance
4  objections.
5         MR. STEVENS:  Subject to all those things and with
6  the understanding that Your Honor is not going to allow them
7  to bring up extrinsic evidence.
8         THE COURT:  Not until you do.  Not until you do.
9         MR. STEVENS:  I understand that.  But my
10 understanding is that they want, with our first witness, to
11 bring up old Honeywell patents.  My understanding is that's
12 extrinsic.
13        MR. MUCKENFUSS:  Well, Your Honor, my understanding,
14 too, he's going -- we've got to see what he's going to do, of
15 course, but he's going to try to put in extrinsic evidence as
16 to whether the symbology is 2D or not, which is the purpose of
17 my documents.  So obviously, I think that goes to the issue
18 relating to breach.
19        THE COURT:  Well, when I talk about extrinsic
20 evidence, what I mean by that is things like in that marketing
21 material you handed up today.  If somebody in the marketing
22 department wants to tell their customers, hey, folks, look at
23 the great things this does and they use the phrase 2D, for
24 instance.  But that marketing piece is untethered to the
25 definition in the agreement which the Court has already found

9

1   is not ambiguous.  That's extrinsic evidence.

2         So I don't know what your use of these patents would

3   be, but if they're -- if you want to put on evidence regarding

4   patents that are untethered to the definition in the

5   agreement, then that would be impermissible extrinsic

6   evidence.

7         MR. STEVENS:  And just -- because I want --

8         THE COURT:  And I don't know whether they are or

9   not, Mr. Muckenfuss.

10        MR. MUCKENFUSS:  Sure.  I mean, I can make the

11   argument when we get to that point, which is fine.

12        MR. STEVENS:  Well, frankly, I think it serves

13   everyone better if we just understand the rules.  I mean, my

14   understanding from your comments the other day -- and if I

15   misunderstood, correct me if I'm wrong -- that it's okay to

16   talk about the standards because the contract specifically

17   talks about them.  And then I think, as far as anything else

18   Your Honor's concerned, everything else is extrinsic on the

19   question of what's 1D and 2D.  Am I understanding that right?

20        THE COURT:  The two examples that come most readily

21   to mind are the marketing materials, which the Court had

22   already said was extrinsic, or, for instance, the claim charts

23   from the prior litigation.  That would be extrinsic.  Those

24   claim charts are untethered to the definition used in the

25   agreement that however people were thinking of in describing

JA911

```
 1   those products at that time, the agreement went on to create a
 2   definition of 1D and 2D.  And so that is extrinsic and that is
 3   not going to be allowed with respect to Honeywell's claim of
 4   breach.
 5           MR. MUCKENFUSS:  If I may, Your Honor --
 6           THE COURT:  Unless, of course --
 7           MR. MUCKENFUSS:  Understood.
 8           THE COURT:  -- the door gets opened.
 9           MR. MUCKENFUSS:  So if I may, Your Honor.  My
10   understanding from your prior ruling is -- certainly the
11   definition states that -- relates to a symbology if it's 2D
12   and it refers to the standards.  My understanding, though, was
13   in determining whether a particular symbology is 2D, we could
14   submit extrinsic evidence as to that issue because it is not
15   clear in the definition as to whether a particular symbology
16   is 2D or not.  I understand they're going to reference the
17   standards, but that's not the only evidence as to whether the
18   particular symbology may be 2D or not.
19           THE COURT:  What's the -- because that seems to me
20   like subject matter for experts, whether it's certain
21   symbologies that fit the definition or not.
22           MR. MUCKENFUSS:  Well --
23           THE COURT:  So I'm trying to understand what the
24   extrinsic -- how any extrinsic evidence would inform that
25   issue.
```

11

1          MR. MUCKENFUSS:  Well, first of all, Honeywell in
2     their own statements have called it -- have called it 1D.  We
3     do think that is relevant.  It's not purely an expert issue
4     because Honeywell obviously has its own -- it's a technical
5     company.  It manufactures the barcode scanners that we're
6     talking about.
7          So for the party itself to describe the symbology
8     they're trying to convince the jury is 2D and they've
9     described it as 1D, for example, whether it's before or after,
10    is relevant as to whether a symbology is in fact 1D or 2D.  I
11    do think that's relevant because it's not -- it's not
12    unambiguous as to whether the symbology is 2D or not.
13         So we have a lot of evidence relating to that.
14    Actually, Mr. Stevens has shown the Court one piece of
15    evidence that they're going to try to use to show that it's
16    2D, and it's the same kind of evidence.  The patents relate to
17    the same thing.
18         MR. STEVENS:  I mean, I showed the Court something
19    to ask for clarification.  I understood from Your Honor that
20    you view that as extrinsic, so now I'm not going to use it to
21    prove a point.
22         I mean, as far as I'm concerned, the question of 1D
23    or 2D, you look to the standards.  If they're going to bring
24    up Honeywell patents from 10 or 15 years ago, that has to be
25    extrinsic to the agreement.  I don't really understand what

JA913

12

1  falls within the ambit of extrinsic evidence more
2  fundamentally than what Mr. Muckenfuss is talking about.
3      THE COURT:  Let me see if I can figure out a clearer
4  way to say this.  How the parties use the terms 1D and 2D in
5  the past prior to the agreement is extrinsic evidence.  The
6  parties came together, very sophisticated companies, very
7  sophisticated law firms, and sought to define what 1D and 2D
8  will mean for here ever after.
9      And so if there's a technical aspect to these things
10 so that -- and again, I keep coming back because in my mind
11 this is an expert dispute.  This device, this patent,
12 whatever, is capable of doing these things which fit or do not
13 fit the definition of -- in the agreement.  And the fact that
14 either party called its own products 2D at one point prior to
15 the agreement or even perhaps inaccurately called certain
16 products 2D afterwards, it doesn't matter what they called it
17 at any various time unless it's connected to the definition in
18 the agreement.
19     MR. MUCKENFUSS:  Well, Your Honor, if I may.  So it
20 is connected to the definition because there is a dispute as
21 to whether a symbology -- the definition doesn't refer, for
22 example, to PDF417, right?  This is a symbology that Honeywell
23 has picked to say, oh, because your laser scanner can decode
24 that symbology, it's 2D.
25     So the symbology is not named in the definition.

JA914

1   All the definition says -- it refers to the standards, but
2   it's not limited to the standards.  It refers to the
3   standards, but not the specific symbology.

4           So, Your Honor, we would contend that in trying to
5   determine if that particular symbology is 2D or 1D requires
6   other evidence -- I mean, the standards, obviously, they're
7   going to look to that.  But there is other relevant evidence,
8   including what the parties themselves refer to it as, in
9   addition to other documents like the patents.

10          So I don't think this case is simply they put up the
11  standards and then they sit down and we can't show the jury
12  there are other documents that contradict the position that
13  PDF417 is 2D.

14          THE COURT:  So what would be your evidence -- as I
15  understand it, you want to put on some evidence to say what a
16  two-dimensional barcode symbology is.

17          MR. MUCKENFUSS:  That's correct.  For example, in
18  the patents -- I understand the time frame, but we're talking
19  about the same symbology.  So in the patents, for example,
20  Honeywell has referred to them as 1D symbologies.  They've
21  also referred -- in their own technical documents, they've
22  actually referred to them as 1D, or not being 2D, and have
23  actually referred to laser scanners as being 1D.

24          So again, the purpose of that is to help the jury
25  understand whether that particular symbology, which is not

 1    identified in the definition, is in fact a 2D or 1D symbology.

 2          It also helps the jury understand -- the other part

 3    of the definition is whether that particular laser scanner is

 4    operable to decode a 2D symbology, and that's in the

 5    definition.

 6          So if Honeywell, the plaintiff in this case, is

 7    going to refer to that technology as a 1D -- 1D scanner, it's

 8    relevant as to whether it's operable to decode a 2D symbology.

 9    So there are two elements of helping the jury understand if

10    that definition applies to that product.  I think that goes

11    directly to breach.  To restrict us from doing that, the

12    entire case would simply be show them the standards and that's

13    it.  But there's more to it than just the standards.

14          Again, the definition doesn't say anything about

15    PDF417.  And there's a real factual dispute as to whether it's

16    in fact a 2D symbology or not and whether the laser scanners

17    at issue here actually are operable to decode that symbology

18    as a 2D symbology.

19          THE COURT:  Well, again, whether the parties at any

20    time before or after the agreement classified or characterized

21    something as 1D or 2D untethered from this agreed-to

22    definition, it doesn't inform the question with respect to

23    breach.

24          Now, if you have evidence that you want to say,

25    ladies and gentlemen of the jury, here's what a

1  two-dimensional barcode symbology is, okay, that informs the

2  contract.  If you want to say, members of the jury, here is --

3  this is what this image sensor is capable or not capable of,

4  okay, that's informative to the definition.  But again, to

5  just say, well, at some other time this was labeled by either

6  party.  We used the phrase 1D and 2D.  It doesn't have

7  anything to do with this definition.

8        Now, the evidence you're suggesting I think would

9  probably be admissible with respect to the unilateral mistake

10  defense because, as I understand, you're saying, look, we had

11  a far different understanding of what was meant to be covered

12  by 1.4.  Okay.  I can see some of that evidence coming in,

13  perhaps.  But not in the breach.  I mean, it either is or

14  isn't.  Maybe I'm being simpleminded here, but these

15  questioned devices either can or cannot do the things that 1.4

16  says.

17        MR. MUCKENFUSS:  So I agree the question is simple,

18  and I'm not going to -- I don't want to fight with Your Honor,

19  obviously, if that's your ruling.  But I think the evidence in

20  answering the question is a little more complex because,

21  again, what they want to say is, look, just look at the

22  standards.  That's it.

23        But again, the definition is not clear as to whether

24  the particular symbology that they've decided to pick out is

25  in fact 2D or 1D or whether the product is operable to decode

```
 1   it.  If the plaintiff has made an admission as to the specific
 2   symbology -- so we're not talking about some random reference
 3   to 1D or 2D.  We're talking about the same symbology that's at
 4   issue in this case they have called a 1D symbology.  So it is
 5   tied to the contract definition because it is the same
 6   symbology that they are trying to convince the jury is 2D.  So
 7   if the plaintiff itself has described it in a technical way as
 8   1D, that's very relevant as to whether it is or is not a 2D
 9   symbology.
10          THE COURT:  Do you have an expert witness that will
11   describe that difference, the symbologies and the --
12          MR. MUCKENFUSS:  Absolutely, yes.
13          THE COURT:  And will part of the basis of that
14   opinion be what you've just alluded to?
15          MR. MUCKENFUSS:  Yes.
16          MR. STEVENS:  If Your Honor meant by your question,
17   will part of their expert's analysis suggest that anyone was
18   ever informed by some document ten years ago, the answer to
19   that is no.  We know what their expert said because we had to
20   go over and take his de bene deposition in England.  He didn't
21   say anything like that.  He does what he should have done.  He
22   walked through the standard, a whole bunch of different
23   standards, and he provides his expert technical opinion about
24   the application of the standards.  That's exactly what he
25   should have done.  That's what he did.  He didn't bring up any
```

1    of these documents that Mr. Muckenfuss is talking about now.

2           MR. MUCKENFUSS:  Well, we can be -- again, I

3    understand why they only want to look at the standards.  But,

4    again, there are comments about the same symbology, the exact

5    symbology they're going to be telling the jury is a 2D

6    symbology.  They have talked about -- it doesn't matter about

7    the time frame.  It's the same technical symbology.  It's the

8    same.  They admit that.

9           So if Honeywell in a patent, which is a technical

10   patent, under oath to the U.S. Patent Office, they've said

11   this is a 1D symbology, and actually they've listed 2D

12   symbologies that don't include PDF417, the same symbology, I

13   don't understand why that's not relevant to breach as to

14   whether it's a 2D symbology.

15          THE COURT:  And so you're wanting to put in the

16   patents themselves for that purpose?

17          MR. MUCKENFUSS:  Right.  Yes, Your Honor.  As well

18   as other documents.  They have other technical documents that

19   go to the same issue, as to whether that particular symbology

20   and the product can read it as a 2D symbology.

21          MR. STEVENS:  So, Your Honor, there's a ton of

22   documents in this case, right?  I can pull up 50 of their

23   documents that behind the scenes call PDF417 2D.  We're going

24   to have testimony here where they do that behind the scenes.

25   And so this is opening Pandora's box to all of that.

18

1           But I had understood from your ruling in the order

2    and from what you told us last week that that doesn't inform

3    what the parties sat down and did in the contract.  And it

4    doesn't.  And their expert hasn't said that it does.  It's

5    just not particularly relevant to that, what some party might

6    have said 20 years ago about something.

7           The parties did two things in this agreement that

8    are germane to this dispute.

9           First off, the parties gave the bread crumbs, right;

10   where to go find the answer.  The parties explicitly said you

11   look to the standard.  And in fairness, I understand why, but

12   they want to do anything but look at the standard.  Okay.  So

13   I understand that, but that's against what the agreement said.

14          Moreover, the agreement says it supercedes any and

15   all prior discussions or understandings or anything like that.

16   So whatever happened beforehand was not supposed to be part of

17   the question.  The contract tells us to look to the standards.

18   That's the case that we intend to present.  And if you do

19   that, it becomes very clear that these are two-dimensional

20   symbologies.

21          THE COURT:  All right.  Well, I'm sure that I'll be

22   invited to review this witness by witness, question by

23   question, document by document.  I'll just give the best

24   guidance I can.

25          Again, this seems to me a technical argument whether

JA920

19

1  those who are experts in the field will describe for us
2  whether these things are or aren't within the definition,
3  having little or nothing to do with how they were described in
4  any prior or even later document or patent or anything else.
5  It's the -- now, I can see why -- how an expert could say,
6  look, I've looked at the patent and the patent claims to do X,
7  Y and Z and that's why it is or isn't capable of doing these
8  various things.
9          But without seeing it and hearing it live, my guess
10 is some of what you want to do during the breach claim will
11 not be permitted.
12         MR. MUCKENFUSS:  So I will say, Your Honor, their --
13 my understanding is their first witness is not an expert.
14 It's their employee who is a technical expert in the sense
15 that this is what he does at Honeywell.  Our understanding is
16 he's going to testify ad nauseam that this -- I took his
17 deposition -- that this is a 2D symbology.  I mean, that's
18 what he -- he's not an expert.  He's their employee.  And he's
19 Honeywell.
20         So I'm -- you know, if they're going to put up a
21 witness from Honeywell who's not an expert who's going to talk
22 about how this symbology is a 2D symbology and I can't show
23 him Honeywell documents, like technical documents -- these
24 aren't marketing documents.  I mean, these are technical
25 documents that describe the scanner he's talking about and

JA921

20

1    also the symbology as 1D.  That seems unfair because they're

2    bringing their client here to tell the jury that it's a 2D

3    symbology.

4            THE COURT:  All right.  I'm just going to have to

5    hear the witness rather than this back and forth.

6            MR. MUCKENFUSS:  Thank you, Your Honor.

7            THE COURT:  I've tried to rephrase my thoughts about

8    this as many ways as I can.  We have a failure to communicate

9    so we'll just hear it how it goes.

10           All right.  Bring the jury.

11           (Jury entered the courtroom.)

12           THE COURT:  Members of the jury, I don't want you to

13   think that we just took an early lunch.  Lots of times we can

14   streamline the trial if I spend some time with the lawyers

15   discussing various rules of evidence or scheduling issues or

16   things like that and we don't have to keep sending you in and

17   out; we can just do it while you're out.  So rest assured that

18   if you're back there longer than I said you'd be, it's because

19   we're actually working trying to save you time.

20           Please impanel the jury.

21           (All eight jurors were duly impaneled.)

22           THE COURT:  All right.  Members of the jury, now

23   that you've been impaneled, I want to give you just some

24   preliminary -- everyone please sit down.  I want to give you

25   just some preliminary instructions that I hope will help you

JA922

1   during this trial.

2          I instruct you that during the trial you are not to

3   discuss this case with anyone or permit anyone to discuss it

4   with you, even with each other.  Until you all retire to the

5   jury room to deliberate your verdict, you must not discuss

6   this case with anyone.

7          Do not tell your family, close friends, or anybody

8   else anything about this case.  If you need to let an employer

9   or somebody at home, or something, know why you are not where

10  you usually are, you can tell them you were selected to serve

11  on a federal jury and that's it.  Don't tell them anything

12  about it.  Don't tell them civil or criminal.  Don't tell them

13  the nature of the case.  Just tell them that you're doing jury

14  service and you're not permitted to talk about it.

15         Don't do any independent research, get on the

16  internet, or any other kind of research trying to figure out

17  anything about these companies or any of the individuals in

18  this case or any of the issues that you've heard discussed.

19  Okay.  Everything you'll need to know to make your decision

20  will come from the witness stand and from the exhibits.

21         Do not form any opinion about this case until all of

22  the evidence is in, you've heard the closing arguments of the

23  attorneys, and you've received your instructions from the

24  Court about the law you are to apply.  Keep an open mind.

25  Form no opinions.

JA923

22

1        Of course, if you would like to during the trial,
2   you can take notes.  But remember that your notes are not a
3   substitute for your memory.  They're an aid to your memory.
4   And we rely on each of you to remember all of the evidence.
5   And if you choose not to take notes, you can't rely on
6   somebody who did.  It's your memory that is going to have to
7   guide your verdict in this case.
8        I don't permit jurors to ask questions of witnesses
9   or of the lawyers.  This has never happened to me.  But don't
10  try to interrupt and ask the witness a question or ask one of
11  the lawyers questions.  That's not how we do things here.
12       You are the sole and exclusive judges of the facts.
13  You determine the credibility of the witnesses and resolve
14  such conflicts as there may be in the testimony.  You draw
15  whatever reasonable inferences you decide to draw from the
16  facts as you have determined them and you determine the weight
17  of the evidence.  You are to perform this duty without bias,
18  prejudice or sympathy for or against either party.
19       Also, you should not take anything that I say or do
20  during the course of the trial to indicate what I think your
21  verdict should be.  I am required to be fair and impartial in
22  this case and I will do my very best to do that.  So don't try
23  to guess what I think.  I don't have an opinion.
24       Of course, it is my role as the judge to be the
25  judge of the law.  And if I instruct you as to any particular

JA924

23

1   area of the law, which may even happen during presentation of
2   the evidence, then you are to follow the Court's instructions
3   on that irrespective of whether you think it's a good decision
4   or a bad decision.  That's the decision and you'll go with it.
5          The evidence from which you will find in this case,
6   of course we've discussed before, will come from the witness
7   stand through the witnesses, the exhibits that will be
8   displayed for you, and any stipulations or agreements as to
9   what the facts are that the parties have reached.  But certain
10  things are not evidence.
11         The statements, arguments and questions by the
12  lawyers are not evidence.  For instance, the trial will begin
13  with opening statements by the lawyers.  That is not evidence.
14  Opening statements are designed so that the attorneys can
15  forecast for you what they think the evidence will be.  They
16  know a lot about this case.  You don't know anything.  And so
17  every trial proceeds one witness at a time, one exhibit at a
18  time, and it would be difficult to understand what any of it
19  means as you're just getting into the case.  So their job is
20  to try to tell you what they think the evidence will be and
21  how it tells a story and fits into their theory of the case.
22  But it's not an argument.  It's just a forecast of the
23  evidence.  And it is certainly not evidence.
24         The questions of a lawyer are not evidence.
25  Sometimes a lawyer inserts into a question a presumed fact.

JA925

1  Was it raining that day?  That is not evidence that it was

2  raining that day.  If the witness says yes, now you've got

3  evidence that it was raining that day.  But just because a

4  lawyer asks a question, that is not evidence unless the

5  witness either adopts the answer or accedes to the answer or

6  accepts it.

7          Objections to questions are not evidence.  Lawyers

8  have a duty to object if they believe that a question has been

9  asked that should not be answered within the rules of

10  evidence, and then it's my job to determine whether the

11  question should or should not be answered.  But just because

12  an attorney objects, that's not evidence.  And you shouldn't

13  hold it against the lawyers.  As I say, they have a duty to

14  object if they think something is being offered contrary to

15  the rules of evidence.

16          If I sustain the objection, the witness isn't going

17  to be allowed to answer.  Don't try to guess what the answer

18  was.  That's not evidence.  But if I overrule the objection,

19  the witness will be allowed to answer the question and you

20  should hear the answer just as you would any other.

21          If I exclude any testimony during the course of the

22  trial, you are to abide by that instruction.  Sometimes

23  something gets by me.  Sometimes there's a question and the

24  answer is given before the objection can be made and I can

25  rule on it and it shouldn't have come in.  So if that happens,

25

1  I instruct you to ignore that answer because it shouldn't have

2  been given.  I know that's a difficult thing to do.  It's like

3  unringing the bell.  But sometimes that happens.

4         There are two types of evidence in all trials:

5  direct evidence and circumstantial evidence.

6         Direct evidence is what you would think it is.  It's

7  like eyewitness testimony.  I saw the little blue car run into

8  the little red car.  I saw it.  I was right there.  That's

9  direct evidence.

10        Circumstantial evidence, the classic example of that

11 is you parked your car in the garage, put the groceries away

12 and came out and noticed that your driveway was dry when you

13 pulled in and now it's wet and you don't have a sprinkler

14 system on your driveway.  That would be circumstantial

15 evidence that it rained.

16        The law doesn't make any distinction between direct

17 and circumstantial evidence.  Just that whatever evidence

18 comes in is satisfactory to you to find and reach your

19 verdict.  There's no distinction between direct and

20 circumstantial evidence.

21        In deciding this case you may have to decide which

22 testimony to believe and which testimony not to believe.  You

23 may believe everything a witness says, some of what a witness

24 says, or none of what a witness says.  It's entirely up to

25 you.

JA927

26

1        And the evidence is not determined by the number of
2   witnesses testifying for either party or the number of
3   witnesses testifying to any particular fact.  You may find the
4   testimony of a smaller number of witnesses on one side more
5   credible than the testimony of a greater number of witnesses.
6   It's entirely up to you to decide the weight of the testimony
7   that comes in.

8        In considering the testimony of a witness, you
9   should use all the tests for truthfulness that you would use
10  in determining matters of importance to you in your daily
11  life.  You should consider any bias or hostility the witness
12  displays for or against one or the other party, as well as any
13  interest the witness has in the outcome of the case.  You
14  should consider the witness's opportunity to see, hear, and
15  know the things about which he or she testifies, the accuracy
16  of the witness's memory, their candor or lack of candor, their
17  intelligence, the reasonableness and probability of the
18  testimony, and its consistency or lack of consistency and its
19  corroboration with other facts that are not called into
20  question.  Always remember that you should use your common
21  sense and good judgment.

22       Now, as I mentioned to you, the exhibits will be
23  displayed on the screens in front of you.  There will be times
24  when everybody is looking at their screen and seeing something
25  and you won't be.  It's because the way the process works is

JA928

1  that the attorneys will ask a witness to identify an exhibit
2  and they'll put it up on the witness's screen and on my
3  screen.  And they'll get the witness to describe what it is
4  and a little background on it.  And then the party will offer
5  it into evidence, at which point it will either come in or
6  there might be an objection to offering it and the Court will
7  have to decide whether it's admissible under the rules of
8  evidence.  If the Court admits the exhibit, then it will be
9  shown to you.  And the reason for that is you should not be
10 seeing or considering things that are not in evidence, that
11 are not supposed to be in evidence.  So don't think your
12 screens aren't working just because we're looking at ours and
13 you're not.
14        Also, some of the testimony, I believe, will be by
15 video deposition.  We can't do this in criminal cases, but in
16 civil cases some witnesses are permitted to testify without
17 being in court.  The parties take a deposition where the
18 witness is put under oath and it's videotaped and they play
19 the witness's testimony that way.  So that's perfectly
20 permissible in a civil case, just not in a criminal case.  So
21 you should take that witness's testimony just as you would any
22 other.  Don't try to draw any negative inferences from the
23 fact the witness isn't here.  That's permitted.
24        The lawyers, nor anyone else -- and you can see we
25 have a full courtroom here.  They're not allowed to speak to

28

1  you during the trial, and neither is anyone else.  And the
2  reason for that is we just want to not only have an unbiased,
3  uninfluenced jury, we want the appearance of a fair and
4  impartial jury.  So if one side saw somebody from the other
5  side talking to you in the hallway, that would concern them.
6  Everybody in the courtroom, especially the lawyers, if they
7  treat you like you've got the plague, they're not being rude.
8  They just don't want any appearance of any impropriety
9  whatsoever.  But if anyone does try to contact you, especially
10 to discuss this case with you, let one of the court personnel
11 know that and I'll address it immediately.
12         There will also be some witnesses in this case that
13 the Court will recognize as expert witnesses in particular
14 fields.  Usually witnesses are not allowed to give opinions.
15 They tell you what the facts are, what they saw or observed or
16 something like that, but they're not allowed to give opinions.
17 But expert witnesses are allowed to give opinions.  An expert
18 is permitted to testify in the form of an opinion in the field
19 where he purports to have specialized skill or knowledge.  But
20 still, you remain the sole judges of the credibility of each
21 witness, including an expert witness.  You need not accept the
22 opinion of an expert just because they're an expert.
23         In making this determination as to the testimony of
24 the expert, you should consider, in addition to all the other
25 tests we've already discussed, the witness's training,

JA930

29

1   qualifications and experience, or the lack thereof; and the

2   reasons, if any, given for the opinion; whether or not the

3   opinion is supported by facts that you find from the evidence;

4   and whether or not the opinion is reasonable; and whether or

5   not it is consistent with the other believable evidence in

6   this case.  Thus, you should consider the testimony of an

7   expert witness as you would any other witness and you are not

8   bound to accept it just because they're experts.

9            So the trial will begin with opening statements, and

10  counsel for Honeywell will go first.  They're the plaintiff in

11  this case.  And then counsel for OPTO will have their opening

12  statement.  And then my guess is by that time we'll be ready

13  for lunch.  We'll take a break and then we'll start the

14  evidence after that.

15           The jury is with Honeywell.

16           MR. STEVENS:  Thank you, Your Honor.  May I approach

17  the podium?

18           THE COURT:  You may.

19           MR. STEVENS:  And may I have permission to publish

20  my slide deck to the jury?

21           THE COURT:  Yes.

22           MR. STEVENS:  Thank you.

23           So, ladies and gentlemen, I'm sure there's no doubt

24  that when you walked through that door this morning, you

25  probably said to yourself:  What am I doing here?  What's this

JA931

30

1  going to be all about?  And this case is about holding people
2  accountable to their contract, to their word.  This case is
3  about holding OPTO Electronics, the defendant in this case,
4  accountable for not honoring its contract with Honeywell.
5        A few years ago OPTO wanted to be able to have
6  access to Honeywell's technology, to it's patented technology,
7  to put it into its products and to use that technology that
8  Honeywell had spent millions of dollars developing over the
9  years.  And Honeywell said okay, and they entered into an
10  agreement.  The agreement required OPTO to pay 7 percent
11  royalty on 2D Barcode Products -- and I'll talk about that in
12  a little bit -- and they simply haven't done that for all the
13  products.  There's some they've paid us for, but there's a
14  whole lot that they haven't paid us for, and that's why we're
15  here today.  We ask you to hold them accountable and make sure
16  that they honor their word and live up to the commitment they
17  made to Honeywell.
18        So let me reintroduce myself.  Again, my name is
19  Scott Stevens.  I'm with a law firm here in town.  There's a
20  bunch of my colleagues here:  Ben Pleune, Nick Marais, Lauren
21  Griffin, Brandon Springer, and Stephen Lareau.  And it's
22  really our honor to be able to talk to you guys today on
23  behalf of Honeywell and all the men and women that work at
24  Honeywell, including Taylor Smith who's joined us right here
25  at counsel table.

JA932

31

1        So opening statements, there's a couple purposes to
2    them.  For you guys, it's the first you're hearing about this
3    case whatsoever, right?  It's a road map to the evidence in
4    this case.  And so in a few minutes I'll show you the contract
5    and we'll walk through parts of the contract.  I'll show you
6    documents about these barcodes and the documents that define
7    what barcodes are.  Those are called standards.  I'll show you
8    that.  And I'll show you some other documents showing that
9    they did not pay us for the products.
10       Now, for Honeywell it's a little bit of a different
11   perspective.  This is our opportunity.  We've been working to
12   bring this case to the eight of you and this is our
13   opportunity simply to be able to present our evidence and tell
14   you guys the story of why we think you should hold them
15   accountable for not paying us the money that they agreed to
16   pay.
17       So if you sign a contract with somebody and that
18   other person chooses for whatever reason just not to pay you,
19   not to honor what they said they were going to do, you really
20   don't have any choice other than come to a courthouse like
21   this and ask folks like you to be the arbiter of that dispute.
22   That's how we got to the courthouse here today.
23       Actually, trial by jury is protected by the Bill of
24   Rights in the Constitution.  It's the Seventh Amendment.  So
25   we go way back to the framers of the country who decided folks

JA933

1  like you were going to be the ones that were going to resolve
2  disputes between companies.
3          But to really sort of tell the full story of how we
4  got here today, how all of us are in this room together, we
5  have to turn back the clock a little bit further.
6          So Honeywell is an American innovation company and
7  it was founded over a thousand -- I'm sorry, over a hundred
8  years ago.  Now, you may have heard of Honeywell.  You might
9  have used a Honeywell branded thermostat or a heater or a fan
10 over the years.  But their innovations today are much more.
11 One of Honeywell's specialties is in the safety field.  They
12 want to keep workers safe.  They have a lot of innovations for
13 folks in warehouses to be able to keep them safe and to be
14 able to help their productivity.
15         And the group that we're going to talk about today
16 within Honeywell is the Safety and Productivity Solutions
17 Group.  They make things as simple as hard hats to more
18 innovative fire protection clothing and other materials, and
19 Honeywell makes things all the way up to autopilots that will
20 land your plane in the event that the weather is terrible.
21 Honeywell is a company about safety and keeping workers safe.
22         And up on the screen you'll see some of the
23 innovations over the years just in the barcode sector.  The
24 things at the top there are just two different types of
25 barcodes.  And you're going to hear all of us say the word

1    "symbology" a whole bunch today.  That's just a fancy word for

2    saying that's the name of a particular barcode.  The one on

3    the upper left says "Code 39."  So when you hear symbology,

4    just think that's the name for any particular barcode.

5              And down in the lower part, you'll see Honeywell was

6    the first company to come up with a handheld barcode reader

7    and the first company to have a wearable barcode reader.

8              Honeywell is responsible for many different

9    innovations over the years and currently holds over 10,000

10   U.S. patents alone.  Let me pause on that.  This company has

11   spent millions of dollars over the years and has over 10,000

12   United States patents to show for their work.

13             And they're based right down the street.  The global

14   headquarters is on Mint Street right across from the Panthers

15   stadium.

16             Now, of course we think Honeywell makes the best

17   barcode readers in the world.  And I put eight of them up

18   there on the screen right there.  And for all of their hard

19   work and all of the research and development that Honeywell

20   has spent just in the barcoding field, Honeywell has over 2500

21   patents across the world and somewhere between a thousand and

22   1200 patents just in the United States alone.  So just for the

23   work they've done on barcode readers, to make them faster, to

24   make them more rugged, to make them do a better job, they have

25   over a thousand United States patents.

JA935

34

1          So let me pause there in the story and I want to
2     talk a little bit about what a patent is.
3          So I mentioned the Founding Fathers and the
4     Constitution a few moments ago.  Not only did they put the
5     right to trial by jury in the Bill of Rights, but in the very
6     Constitution is the creation of our patent system.  The
7     framers thought it was so important to reward people for
8     innovation, it's put right there in Article I, Section 8 of
9     the Constitution.
10          So what is a patent?  So I would suggest that you
11    can think of a patent like a deed to a piece of property.  So
12    much like a real estate deed, the deed to your house, for
13    example, tells you the exact boundaries of your piece of land,
14    right?  It will carve out exactly sort of your land compared
15    to your neighbor or someone else.  And a patent is much like
16    that.  It ends with things called claims where that's what the
17    government has said is your patent rights and what you
18    exclusively can control.
19          Patents generally run for about 20 years from the
20    date that you file them.  Now, if somebody trespasses on your
21    land, right -- let's say that you own a house and somebody
22    keeps trespassing on your land.  You really have two options,
23    right?  You can call the police and try to kick them off or
24    you can charge them rent.
25          And the same thing is pretty true for a patent.  If

JA936

1    somebody tries to use your patent -- and the fancy legal word
2    for that is infringe.  If somebody is infringing your patent,
3    you have to come to a courthouse just like this and you have
4    two options.  You can ask a judge to force them to take it out
5    of their product or you can agree upon a royalty, a payment
6    much like rent, for the use of that technology.  And this case
7    is about an agreement that Honeywell and OPTO made for OPTO to
8    pay royalties.
9            Now, Honeywell and OPTO have been competitors in the
10   market for barcode scanners for a long time, for several
11   decades.  But over time, Honeywell, you know, once in a while
12   would go out to the store and purchase one of OPTO's barcode
13   readers to see how it worked.  And they noticed over time,
14   gosh, they're working more and more like a Honeywell product.
15   And so they looked into it and found that OPTO was infringing
16   a bunch of their patents; not just a few, but OPTO was ripping
17   off Honeywell's technology without paying for it.  And so
18   Honeywell had no choice but to bring two lawsuits in 2019
19   against OPTO relating to patent infringement.
20           The first was a lawsuit -- and you'll hear about
21   this later -- a lawsuit filed in Delaware in order to recoupe
22   the money from the past to compensate Honeywell for its
23   invention.  Honeywell spent, like I said, millions of dollars
24   in research and development.  OPTO had been using the patents
25   without paying.

JA937

1          There was also an action in Washington, DC.  It's a
2    government investigation at a place called the International
3    Trade Commission where the government will look into products
4    that are imported from abroad into this country to see whether
5    they infringe.  And if they do, the government will just put a
6    ban; say these products can't come into the country.
7          So that's what OPTO was facing:  A ban from the
8    government as well as a litigation from Honeywell in which it
9    was seeking money damages.
10          In addition to those two litigations, Honeywell sent
11   OPTO a letter identifying 69 other United States patents and a
12   whole bunch of foreign patents, but a letter saying there's 69
13   additional patents that we think you're using and we would
14   like you to stop doing that.
15          Now, as the litigations kept going and we're
16   approaching trial, OPTO again was faced with the likely
17   prospect that the government would remove all its products,
18   all its barcode products from the United States.  The parties
19   finally had a mediation and a discussion and ended up settling
20   the dispute.  They entered into an agreement that was entered
21   into on January 22, 2020.  So you're going to hear us talk a
22   lot this week about an agreement or the January 2020
23   agreement.
24          So I said that the mediation, the first negotiation,
25   took place on January 22, as you can see there.  But the

1   parties didn't just sign an agreement that day.  There was
2   about two and a half to three weeks where the parties worked
3   together to come up with the words of what that agreement
4   would be.  And both parties were represented by counsel.  My
5   firm represented Honeywell.  And a different firm, who's not
6   here, called Quinn Emanuel, who specializes in patent cases,
7   represented OPTO.  And the folks representing OPTO included
8   people that were fluent in both English and Japanese and
9   included people that were based in the United States and
10  lawyers based in Japan so that nothing would be lost in
11  translation.
12          And over those three weeks there was a back and
13  forth between the parties.  OPTO wanted certain things put in.
14  For example, they wanted the right to make certain
15  improvements to their products.  And Honeywell said that's
16  fine, no problem, we can put that into the agreement.
17          But there wasn't a dispute about the scope of the
18  products for which OPTO was supposed to pay Honeywell the
19  7 percent.  It was always these 2D Barcode Products; any
20  barcode reader that can decode a two-dimensional barcode.
21  I'll talk about that just a little bit more in a minute.
22          So the agreement was signed, as you can see on the
23  screen, February 8.  OPTO paid Honeywell $9 million for the
24  past, for its infringement in the past, and agreed to pay a
25  7 percent royalty on products going forward from that day.

1    And that 7 percent promise wasn't lived up to.  That's why
2    we're here.
3            So let's look at the agreement together.  It's a
4    long agreement and I'm just going to show you a little bit in
5    the time I have today.
6            So this is the background section.  Paragraph A
7    talks about this ITC action that I mentioned a moment ago.
8    Lists the seven patents that were originally involved in that
9    ITC action.  So the parties were clear that they were trying
10   to settle the whole thing there.
11           In paragraph B it talks about the Delaware action.
12   It says we're also settling the same patents that were
13   involved in the Delaware action.  So we all agree the
14   agreement covers everything at the ITC, everything in
15   Delaware.
16           And then D, the parties said they wanted a, quote,
17   "final business resolution and settlement of the legal
18   actions," that's Delaware and the ITC, "and any and all other
19   claims which were, or could have been, asserted by the parties
20   in the legal actions, all on the terms and conditions set
21   forth below."
22           The parties wanted the words of this agreement, the
23   terms and conditions of this agreement, to govern going
24   forward.
25           And they put something else in the agreement that I

1    want to direct your attention to.  This is Section 9.2, and
2    I'm going to read that first sentence.

3            "This Agreement and its Exhibits, constitute and
4    contain the entire agreement among the Parties respecting the
5    subject matter hereof, and supersede any and all prior
6    negotiations, conversations, correspondence, understandings,
7    and letters."

8            Okay.  So what does that mean?  That means that the
9    parties agreed that what they put in this piece of paper is
10   what was going to govern.  Nobody wanted anyone -- in the
11   event that there was ever a dispute, nobody wanted anyone to
12   come to a jury like the eight of you and say, well, I thought
13   it meant something else.  Oh, gosh, I had a prior
14   understanding, or I saw a prior correspondence and it might
15   have said something else.  Neither party wanted that because
16   that would be unfair.  The parties in this agreement decided
17   that if it ever comes to folks like you to make a resolution,
18   they wanted you to focus on the language of the agreement
19   because that's something that both parties agreed to.

20           Now, I'd also like to direct your attention to
21   Section 1.4 of this agreement, and this is the definition of
22   2D Barcode Products, two-dimensional barcode products.  It's
23   the products for which OPTO owes Honeywell a royalty.  And I
24   want to read this first sentence here.

25           "The term '2D Barcode Products' shall mean any

1   device or article of manufacture that is operable to decode at

2   least one or more two-dimensional barcode symbologies into

3   human-readable text."

4           I'm going to walk through this, but to start here,

5   any device that is operable to decode at least one 2D symbol,

6   at least one 2D symbology.  Doesn't matter what the hardware

7   is.  There's different ways of making barcode devices.  You'll

8   hear today -- or this week there's laser devices.  There's

9   something called a CCD device.  There's something called an

10  imaging device.  You don't see any of those words in this

11  sentence.  As long as it's operable to decode a

12  two-dimensional symbology, that's what OPTO agreed to

13  compensate us with a royalty for because they were using our

14  patents.

15          Okay.  So let me turn away from the agreement just

16  for a second.  How do we know what is a 1D symbology versus a

17  2D symbology?  Well, before we even get there, again, what is

18  this crazy word "symbology"?  What is a barcode symbology?

19  And again, as I mentioned at the beginning, just think of that

20  as the name of a particular type of barcode.

21          So I put six different symbologies, six different

22  names for barcodes on the screen here.

23          At the top I put three different symbologies of

24  one-dimensional barcodes.  And you can see that they're

25  one-dimensional because if you sort of drew an imaginary line

41

1    across it anywhere, you're going to get all the data with one
2    line.  That's all you have to do.

3            And then I put three additional symbologies or names
4    of barcodes at the bottom.  There's DataMax on the left,
5    something called PDF417 in the middle -- and you're going to
6    hear that a lot; I'm going to talk about that more in just a
7    minute -- and QR on the right.  These are three different
8    examples of two-dimensional codes because the data is
9    presented in two dimensions.  There's columns and rows with
10   different data.

11           So let's look at a 1D or a one-dimensional symbol.
12   This is a UPC code.  I'm sure you've interacted with it.
13   Everything you buy at the grocery store, anything you get at a
14   retail establishment has a UPC code on it.  And it's
15   one-dimensional because if you draw an imaginary line, it's
16   all the same.  You're going to capture the data with one
17   singular row.

18           Now I want to talk a little bit more about PDF417.
19   Now, I'm going to guess that none of the eight of you had
20   heard of PDF417 before I just said it.  I might be wrong, but
21   that's my guess.  But I bet you've interacted with it.  Any
22   time you've ever gotten a printed boarding pass at an airport,
23   you've had a PDF417 code.  And that's it there on the left
24   side of the screen.  And it encodes all the data about your
25   trip:  When the plane leaves, when the plane arrives, your

JA943

1   seat number, your confirmation code.  It encodes everything

2   they need to know, the airline needs to know about you, the

3   traveler, all in that one barcode.

4           Moreover, if you have a North Carolina driver's

5   license or, frankly, a driver's license from almost any state,

6   you're carrying around a PDF417 barcode.  So on the right over

7   there, that's the back of a North Carolina driver's license.

8   You see the PDF417 barcode.  And that contains all the data

9   that's on the front of your driver's license in a barcode

10  format.

11          So, for example, you know, how is this used?  Well,

12  one thing that it's used for is if you, you know, try to go

13  purchase alcohol, you can just scan that code and the computer

14  will know whether you're 21 or not.

15          So I bet each one of you has interacted a good bit

16  in your lives with a PDF417 barcode even if you've never heard

17  that name itself.

18          So I put them both up on the screen now.  There's

19  the one-dimensional UPC on the left and the two-dimensional

20  PDF417 on the right.  So I was urging you earlier to sort of

21  draw that imaginary line in your head.  Now I've done it for

22  you.

23          So on the left you can see that one line.  It

24  doesn't matter which way you -- if you do it exactly

25  horizontal or a little bit slanted, it doesn't really matter;

1 you're going to capture all of the data with one pass.  That's
2 what makes it one-dimensional.
3            But that's not the case with PDF417.  You can see
4 there where I've drawn the line, I'm going to catch that one
5 singular row of information, but I'm going to miss everything
6 above it and everything below it.  In order to capture the
7 data of the two-dimensional barcode, you have to capture all
8 of those little white and black spaces in all of the different
9 rows and columns.
10            So here I've shaded all the things that you would
11 miss by just doing one row of a PDF417 barcode.  You have to
12 do every single row.  And that's what makes it
13 two-dimensional.  One scan on the left captures all the data
14 with one row.  On the right you see a whole bunch of different
15 rows.
16            This is a blown-up version of PDF417 from the actual
17 sort of, I'll call it the dictionary that defines what PDF417
18 is.  Again, you can see there with my red line across the top
19 row, I might capture the data in that row, which, by the way,
20 I can't make any sense of without knowing what's below it.
21 It's all sort of one thing.  But you can see all the different
22 white and black spaces and how all that different data is put
23 into that one two-dimensional barcode.
24            Okay.  So I've just spent a few minutes walking you
25 through what a one-dimensional barcode is versus a

1  two-dimensional barcode.  But the truth is the task that we
2  have this week is actually much easier than that because the
3  parties wrote down in the agreement how they wanted this
4  dispute resolved:  What's a 1D code versus what's a 2D code?
5      So the second sentence in this definition of 1.4
6  says, "Two-dimensional ('2D') barcode symbologies include, but
7  are not limited to, any two-dimensional barcode symbology
8  defined by one or more standards setting organizations such as
9  the ISO, IEC, and AIM."
10      So we look to these standards setting organizations
11 to see what they say about whether it's one-dimensional or
12 two-dimensional.  Now, I suspect at least some of you are
13 saying to yourself:  What in the world is a standards setting
14 organization?  Well, that's also something that you have
15 interacted with without perhaps even knowing it.
16      So every plug in this country looks about the same,
17 right?  If I go buy a charge cord for my cell phone, if I go
18 buy a blender, I'm going to be able to plug it into the same
19 plug.  It's going to have that same sort of three prong or
20 just the two prongs that you see there on the left.  Well, why
21 is that?  Is that just happenstance?  Do we all just get
22 lucky?  No.  It's because decades ago engineers and other
23 folks came together and said we don't need every house to have
24 a different plug and every device you buy to have a different
25 plug.  We want to standardize it.  We can all agree that this

1   is the answer and go forward together.

2        And the same thing is true for cellular networks.

3   I'm sure on TV you've heard of 4G and 5G.  It's not just 4G

4   equals fourth generation.  There's actually a standards body

5   that actually sits down with all the engineers from all the

6   cell phone companies in the world and comes together and makes

7   these standards.

8        So when our agreement here talks about these three

9   standards setting organizations, they're talking about those

10  groups:  People that come together where all the different

11  companies can be a part of it and come up with a standard and

12  decide these questions.

13       So let's look at the actual standard for PDF417.  So

14  again, I just want to go back here.  It references in the

15  agreement ISO and IEC.  So this is the joint standard for

16  PDF417 from ISO and IEC.  So this is the exact document that

17  the contract between Honeywell and OPTO was talking about.

18       Well, what does it say about whether it's

19  one-dimensional or two-dimensional?  It tells us right in

20  there when it goes through the type of code it is and the

21  specifications for the code, no dispute, no doubt, it says

22  those words in black and white.  "Code type:  Continuous,

23  multi-row two-dimensional."  So your eyes tell you it's

24  two-dimensional and the standard tells you it's

25  two-dimensional.

JA947

46

1         And, folks, I suggest that's just how easy this case
2    is.  If their products can decode PDF417 or any other
3    two-dimensional symbology -- and you're not going to hear a
4    dispute in this case about whether the products can do it or
5    not -- then they were supposed to pay us the agreed amount
6    because they're using Honeywell's technology.  And they
7    haven't done it.  They have breached the agreement.
8         So what are they going to say, right?  Because this
9    case is really so simple, I suspect that the folks at the
10   other table are going to try to confuse you and bring up all
11   kinds of other things other than the very straightforward
12   analysis that the parties agreed to years ago when we signed
13   the agreement.
14        So one thing I suspect you're going to hear a lot
15   is, well, PDF417, it's a stacked code, s-t-a-c-k-e-d.  It's a
16   stacked code.  It's not one-dimensional.  It's not
17   two-dimensional.  It's something else called a stacked code.
18        Well, let's see what the standard actually says
19   about that.  The standard for two-dimensional symbols says
20   symbology specifications may be categorized into those for
21   linear symbols on the one hand, linear/1D on the one hand, and
22   two-dimensional symbols on the other.  Okay.  So we've got two
23   groups, linear and two-dimensional.  That makes sense.
24        The latter, in other words, the two-dimensional
25   group, may in turn be subdivided into, quote, "multi-row

JA948

1  barcode symbols, sometimes referred to as stacked barcode

2  symbols, and two-dimensional matrix symbols."

3        So the specification itself tells us that stacked

4  codes are two-dimensional.  No doubt about it.  Says it right

5  there in black and white.

6        THE COURT:  Five minutes, Mr. Stevens.

7        MR. STEVENS:  Thank you, Your Honor.

8        And so that's the answer and this dispute is that

9  simple.

10        So what else do I think you're going to hear this

11  week?  I think you're going to hear three different things.

12  And I suspect that my friends at the other table are going to

13  try to turn your attention away from the agreement.  I suspect

14  they're going to try to turn your attention away from the

15  standards.  I don't think they're going to want to talk about

16  the words of the agreement or the standard very much at all.

17  Instead, they're going to try to point to other things.

18        You know, one thing that they might try to say is,

19  well, let's look at how the barcode reader decodes it, right?

20  I mean, a barcode reader might decode it this way, it might

21  decode it some other way.  It doesn't say that in that

22  sentence right there.  There is nothing about how you

23  accomplish the goal of decoding a two-dimensional symbol.  If

24  it's able to do it, that's what counts; not whether it does it

25  one way or another way.

1            And they might point to a whole bunch of other

2  documents that came before this agreement.  Again, I suspect

3  they're going to try to divert your attention away from the

4  agreement.  But I want to remind you of something I went

5  through a moment ago.  The parties actually contemplated this

6  when we made the agreement three years ago.  The parties said

7  this agreement supercedes, this counts over everything that

8  came in the past, right?  If there's ever a dispute between

9  us, we want the folks that are going to resolve it to look to

10  the words of this agreement; not something else that might

11  have been floating around in someone else's head beforehand.

12            And then third, I suspect the other side is going to

13  tell you, oh, we didn't sue them soon enough once we figured

14  this out.  We should have sued them the day that we figured it

15  out.  It's a little bit of a strange argument.  But once we

16  found out that there were products from their royalty reports

17  that were missing, we didn't just haul off and come down to

18  the courthouse the next day.  Honeywell wanted to do an

19  investigation.  It could have been that it was just one

20  dollar's worth of sales, right?  And if that's the case, we

21  wouldn't have bothered you with the time.

22            After that investigation, which took the better part

23  of five to six months to be able to actually get their sales

24  information and learn the magnitude of what they had not been

25  telling us, we sent them a letter in June of 2021 saying, hey,

49

1  you're not paying us for these 2D Barcode Products.  They read
2  2D symbologies and you should have been paying us.  Why
3  haven't you paid us and we'd like you to do that.

4          The contract required that we give them 30 days sort
5  of as a grace period to come back into compliance with the
6  agreement.  We gave them 90 days.  At the time if they had --
7  we were trying to problem solve.  If they had just said to us,
8  okay, you're right, we'll pay you what we owe you, we would
9  have said, all right, don't worry about penalties or interest
10 or anything like that.  Even though the agreement allows us to
11 ask for those, we would have said, okay, that's fine.  No
12 harm, no foul.  But that's not the decision that OPTO made.
13 They said no, we're not going to pay you.

14         So again, I suggest this dispute is just this
15 simple.  The definition on the left, if it's operable to
16 decode one or more two-dimensional symbologies as defined by
17 the standards, the standard tells us it's two-dimensional on
18 the right.

19         This is another symbology you're going to hear
20 about:  composite codes.  Again, look to the standard on the
21 left and the standard on the right.  It says right there it
22 has a two-dimensional component.

23         And these are the 17 products that you're going to
24 hear about.  These are the products that are operable to
25 decode PDF417, another two-dimensional symbology called

JA951

1  MicroPDF417, and then two-dimensional composite codes, for
2  which they have not given us the royalty.
3          And I just want to, again, go back to that comment I
4  made earlier about hardware.  Now, you can take whatever
5  hardware you want and choose to put whatever functionality you
6  want into it.  You could have laser scanners or CCD products
7  or area imagers that do read only one-dimensional codes.
8  Those exist in the world.  There's plenty of them.  But that's
9  not what we're talking about in this agreement.  But each of
10  those three pieces of hardware could also be programmed to
11  read two-dimensional codes.  And if that's what you choose to
12  do, then that's exactly what falls within the scope of the
13  agreement.
14          THE COURT:  Please conclude.
15          MR. STEVENS:  So my 30 minutes is up this morning
16  and I want to end where I started by saying a very sincere
17  thanks to each one of you.  I appreciate, and Honeywell
18  appreciates, that this is an imposition; but this is a very
19  important case to us and we wouldn't be here if it wasn't.  So
20  members of the jury, thank you very much.  We look forward to
21  presenting our case to you this week.
22          Thank you, Your Honor.
23          THE COURT:  Thank you.
24          The jury is with OPTO.
25          MR. MUCKENFUSS:  Thank you, Your Honor.

JA952

51

1          May it please the Court:

2          Good morning.  Again, my name is Robert Muckenfuss

3   and I represent OPTO.

4          This case is not about one symbol or one barcode.

5   That's not what this case is about.  The question that you're

6   going to be asked to answer is whether OPTO's one-dimensional

7   or 1D laser scanners are two-dimensional or 2D Barcode

8   Products.  That's the question you'll have to answer.

9          In this case Honeywell admits that it has called

10  these laser scanners one-dimensional.  They've called this

11  symbol, PDF417, one-dimensional.  What the evidence is going

12  to show, it's going to -- the evidence is going to show three

13  critical points.

14         First, it's going to show that OPTO always

15  understood and acted consistently with its understanding that

16  its one-dimensional laser scanners, its 1D scanners, were not

17  included as two-dimensional or 2D Barcode Products.

18         The second critical point the evidence is going to

19  show is that OPTO told Honeywell and Honeywell knew that OPTO

20  had the understanding that its one-dimensional or 1D laser

21  scanners were not two-dimensional or 2D Barcode Products under

22  the agreement.

23         And thirdly, and possibly most importantly, the

24  parties entered into a settlement agreement, and Honeywell

25  agreed in the agreement that it understood that OPTO was not

JA953

1  including its one-dimensional or 1D laser scanners as
2  two-dimensional barcode products.
3          So I want to stop there and talk a little bit about
4  why we're here.  So my client is OPTO Electronics.  OPTO is a
5  company based in Tokyo, Japan.  It's a company that's been in
6  business for about 50 years.  It was founded in 1976.  It has
7  offices in Europe and in this country, in the United States.
8  It has about -- it's a modest company.  It has about two
9  hundred employees.  You heard Mr. Stevens talk about
10  Honeywell.  Certainly not the size of Honeywell, which I think
11  has over a hundred thousand employees.  OPTO is a smaller, you
12  know, modest company.
13          You're going to hear from one of its employees.
14  Ms. Ashihara is flying here from Tokyo and will testify
15  through an interpreter in this case.
16          OPTO is in the business of manufacturing and selling
17  barcode scanners.  These barcode scanners -- and you've heard
18  a little bit about this technology.  I don't have a fancy
19  PowerPoint.  My kids give me a hard time about that.  But I'm
20  going to try to draw a little bit if I can.
21          But the technology that you're most familiar with,
22  like if you go in Harris-Teeter like I do -- sometimes I'll go
23  late at night and there's not a person there to check me out
24  so I have to go through the self-checkout.  We've all taken
25  the milk jug that has the barcode on it and you struggle to

1   try to get it over the barcode scanner.  But that code that

2   you see on your milk is a UPC code, sort of a basic code.  And

3   when you run it over the scanner, the scanner takes

4   information about the product, price, other information about

5   the product.

6           You've also probably seen the handheld type of

7   scanners.  I've seen them in Home Depot, for example.  You can

8   take it, aim it at the barcode and the same thing happens.

9           So that's the type of technology that we're talking

10  about.  That's the type of technology that OPTO manufactures

11  and sells.

12          Honeywell sells the same kind of products.  They're

13  competitors.  In 2019 and 2020 Honeywell sued OPTO.  They sued

14  OPTO in the United States and in Europe.  Now, Honeywell

15  claimed in these lawsuits that OPTO was infringing some

16  patents related to this barcode scanning technology.  OPTO

17  denied this.  It did not admit that it was infringing any

18  patents owned by Honeywell.  In fact, OPTO brought its own

19  actions against Honeywell in Europe seeking to invalidate

20  Honeywell's patents.  And in the United States litigation,

21  OPTO asserted defenses to invalidate Honeywell's patents.  So

22  the companies were fighting with each other over these

23  patents.  Eventually they settled the litigation.  They

24  settled the United States litigation and the Europe

25  litigation.

1          Now, in that settlement what OPTO agreed to is they
2   would pay royalties on two-dimensional or 2D Barcode Products.
3   What was in the agreement as well was they would not have to
4   pay any royalties on 1D or one-dimensional barcode products.
5   So they didn't have to pay any royalties on that.
6          Now, the benefit that Honeywell received from the
7   settlement is OPTO dismissed the actions they had brought to
8   invalidate Honeywell's patents, so those got dismissed.
9          Now, in this litigation Honeywell has sought to
10  claim that OPTO's one-dimensional or 1D laser scanners are 2D
11  Barcode Products simply because they can decode PDF417.  And
12  you've heard a little bit about that barcode and I'm going to
13  talk about PDF417.
14         The evidence is going to show that OPTO always
15  understood and acted consistently with the understanding that
16  its one-dimensional, 1D laser scanners were not
17  two-dimensional or 2D Barcode Products.  Honeywell knew this
18  and they agreed to that in the settlement agreement.
19         So I want to talk a little bit about the barcodes
20  that you guys have seen.  I'm going to attempt to draw a UPC
21  code.  I don't have it on your screen.  But you've seen the
22  UPC codes and it's a bunch of lines like on your milk carton
23  that go across like that, right?  And it's referred to as a
24  one-dimensional barcode.
25         So what a laser scanner does, when you point the

JA956

1    laser scanner at it when you're in the Harris-Teeter, it reads
2    this from left to right.  That's how it reads the barcode.
3    It's one-dimensional.  And so that's how OPTO's laser scanners
4    read a one-dimensional barcode.
5           Now, that's in contrast to a two-dimensional
6    barcode.  Now, probably the most common two-dimensional
7    barcode that you've seen is a QR code, and that may sound
8    familiar.  But when I saw it during the pandemic, you'd go
9    into a restaurant and you couldn't get a physical menu, right?
10   So it would have a little sign with a QR code.  So you would
11   take your phone out and you would take a picture of the QR
12   code.
13          And the QR codes that you've seen, it's a square.
14   I'm not going to try to draw it.  I probably wouldn't do a
15   good job doing that.  But it's like a checkerboard pattern or
16   black and white square.  So the phone actually takes a picture
17   of the QR code.  That's different than the laser reading the
18   UPC code that reads it from left to right.  Your phone takes a
19   picture of the entire code.  So that is a two-dimensional
20   barcode.  Okay.
21          So there are actually two-dimensional barcode
22   scanners.  So maybe you've seen a handheld scanner that can
23   take a picture of a QR code.  That's what it's doing.  It's
24   taking an image of the QR code.
25          Now, a laser scanner cannot read a QR code.  The

1    reason a laser scanner cannot read a QR code is because --
2    just to go back to the UPC code.  The way this stores the
3    information is -- the way it reads the information is the
4    laser scanner actually measures the widths of the bars and the
5    spaces between the bars.  That's how the scanner gets the
6    information.  A QR code does not store information that way.
7    A QR code does not store information with bars and spaces.
8    Okay.
9            So I want to talk about PDF417.  You're going to
10   hear a lot about that from Honeywell in this case.  All a
11   PDF417 does, it takes a UPC code like this and it just puts it
12   on several rows like that.  So it is stacked on top of each
13   other.  Okay.
14           Now, imagine the UPC code is like reading a sentence
15   in a book, right?  From left to right you read the sentence.
16   PDF417 is giving you a paragraph.  So you still have sentences
17   from left to right, but it's in a paragraph.
18           The laser scanner -- the reason a laser scanner, a
19   one-dimensional laser scanner can still read a PDF417 code is
20   because it still reads it the same way.  It reads it from left
21   to right.  It just does it like a paragraph.  It reads the
22   next row from left to right.  That's why the laser scanner is
23   one-dimensional.
24           Now, a fact that will not be disputed in this case
25   is that the laser scanner, the one-dimensional laser scanner

57

1  that can read a barcode like this cannot read a QR code.  So a

2  laser scanner cannot read popular 2D symbologies like a QR

3  code and Data Matrix.  That will not be disputed in this case.

4          Now, what Honeywell is doing in this case, they've

5  brought this lawsuit to change the deal that they entered

6  into.  Honeywell wants to convince you and use this case to

7  say that one symbol, PDF417, converts a one-dimensional laser

8  scanner into a two-dimensional barcode product.  Again, the

9  evidence is going to show three things.

10         It's going to show that, one, that OPTO always

11  understood that its one-dimensional laser scanners that read

12  these types of codes, barcodes, in one dimension were never

13  going to be two-dimensional barcode products.  That's number

14  one.  OPTO always acted consistently with that belief.  They

15  never hid that belief or that understanding from Honeywell.

16  In fact, OPTO told Honeywell -- before the settlement

17  agreement was finalized, OPTO told Honeywell that its

18  one-dimensional laser scanners, the products at issue in this

19  case, the products that Honeywell claims that OPTO has to pay

20  money on, OPTO told Honeywell that those scanners were not

21  included as two-dimensional barcode products before the

22  settlement agreement was finalized.

23         So Honeywell knew it.  Honeywell didn't say anything

24  about it.  But what did Honeywell do?  Honeywell signed the

25  settlement agreement knowing that the one-dimensional laser

JA959

58

1  scanners were not included in the 2D Barcode Products and were
2  not being included in the royalty payments that OPTO was going
3  to make.  They signed the agreement knowing that.  And they
4  put into the agreement that they understood it.  The evidence
5  will show that.
6          So, ladies and gentlemen, Honeywell is trying to use
7  this lawsuit to change the deal with OPTO.  We would ask you
8  not to let them do that.  Thank you.
9          THE COURT:  All right.  Members of the jury, it's a
10 little bit early for lunch.  You probably don't mind that
11 much.  But I don't want to interrupt the flow of the testimony
12 and break 30, 45 minutes into the testimony of the first
13 witness.  So we're going to take our lunch break now.  I'd ask
14 you to be back at 1:00.  We can't start without you.  You can
15 come back to the jury room up here.  You don't have to go back
16 to the jury assembly room.  Leave your notes in the jury room.
17         Obviously, you can come back at any time you want.
18 If you want to leave something here and come back, if you want
19 to get lunch and bring it back here and eat it in the jury
20 room, that's fine too.
21         Do not discuss this case -- I'm going to sound like
22 a broken record, but it's just so important.  Do not discuss
23 this case among yourselves or let anyone else discuss it with
24 you.  And don't start making up your mind and don't do any
25 independent research.  And so we'll see you back here at 1:00.

JA960

59

```
 1              Everyone remain seated while the jury leaves.
 2              (Jury exited the courtroom.)
 3              THE COURT:  Anything to discuss before we take our
 4   lunch break?
 5              MR. MUCKENFUSS:  Nothing from the defendant.
 6              MR. STEVENS:  Nothing from the plaintiff.
 7              THE COURT:  All right.  Everyone remain in the
 8   courtroom until the CSOs let you know the jury has cleared the
 9   floor.
10              We'll be in recess until 1:00.
11              (Lunch recess at 11:47 AM.)
12   MONDAY AFTERNOON, JUNE 17, 2023
13              (Court back in session at 12:54 PM.)
14              (Jury not present.)
15              THE COURT:  All right.  Well, at my peril, I wanted
16   to continue the discussion about extrinsic versus intrinsic
17   evidence.
18              Mr. Muckenfuss, you're making an argument that the
19   claims in the patents underlying this would be intrinsic
20   rather than extrinsic?
21              MR. MUCKENFUSS:  So, Your Honor, we're not saying
22   that the patents that we would seek to introduce would be
23   in -- well, let me explain it maybe in a different way.  So
24   the issue in the case is whether PDF417 is 2D.  There are
25   patents, Honeywell patents, that discuss that same symbology
```

JA961

1  and describe it as a 1D symbology.  So it would be intrinsic

2  in the sense that it's a document, a Honeywell document, a

3  patent, a technical document describing the same symbology

4  that's at issue in front of the jury.

5          THE COURT:  Is this what was referenced during the

6  opening statements as stacked 1D?

7          MR. MUCKENFUSS:  Yes, Your Honor, that's correct.

8          THE COURT:  Mr. Stevens, what do you say?

9          MR. STEVENS:  They're clearly not intrinsic.  I

10  mean, if his definition of intrinsic is anything at Honeywell,

11  then every record Honeywell has is intrinsic.

12          These old patents are 10, 15, 20 years ago.  They

13  are not referred to in any way, shape, or form in the

14  agreement.  They're not the patents that were at issue at the

15  ITC case or the Delaware case or in discussions between the

16  parties.  They literally just dug them out and found some

17  patents and want to talk about them.  I mean, they were never

18  discussed with any witness during this case.  It's just

19  something they've come to over the past week or two and they

20  want to use in front of the jury.

21          So are they intrinsic or extrinsic to the contract?

22  There can't be any legal question about that.  They're

23  extrinsic.  Certainly not in the four corners of the

24  agreement.  They're not attached to the agreement.  They're

25  not referred to.  There's no reference made to them in the

1    agreement.  It's clearly extrinsic evidence.

2         THE COURT:  Well, what I was wondering -- and, of

3    course, I don't know.  You know, you all know the exhibits.  I

4    haven't seen any of them.  But if there's a claim in a patent

5    that a stacked barcode is a 1D device, wouldn't that be

6    informative as to what 1D versus 2D means?

7         MR. MUCKENFUSS:  And, Your Honor, just to be a finer

8    point.  So, again, it's the same symbology.  We don't -- they

9    don't dispute that.  So the symbology in the patent that's

10   being discussed, PDF417, same symbology that he showed a

11   picture to the jury, their Honeywell patent describes it as a

12   1D stacked symbology and actually separates it from 2D

13   symbologies.  Whether it was -- the time frame doesn't matter.

14   We're talking about the same symbology.  It's the same

15   symbology.  So it's not that we're talking about something

16   irrelevant, some marketing document.  It is a Honeywell patent

17   talking about the same technical symbology that's at issue in

18   this case.

19        MR. STEVENS:  Again, the agreement says you look to

20   the standards to answer that question.  And I forewent in my

21   opening walking through all their documents that consistently

22   call PDF417 2D.  I forewent that opportunity because that's

23   what I had understood the rules were that we were going to

24   play by.

25        THE COURT:  Isn't there a difference, though,

62

1  between a claimed patent for which a patent was granted --

2          MR. STEVENS:  I don't think --

3          THE COURT:  -- and just whatever internal marketing

4  or even technical documents a company claims to label

5  something?

6          MR. STEVENS:  I think the answer is no.  But if

7  they're going to proffer any claim that says that PDF417 is

8  1D, I'd like to see it because I'm completely unaware of that.

9  The only --

10         THE COURT:  Well, that's what I'm asking.  If

11 there's a claim made --

12         MR. STEVENS:  The claim says PDF417 is a

13 two-dimensional symbology.  The only claim in a Honeywell

14 patent that talks about whether it's 1D or 2D says it's 2D.

15 That's the only claim I'm aware of.  Now, if he's got one, I

16 think he should proffer it and let us all see it because I'm

17 not aware of any Honeywell patent claims where it says that

18 it's 1D.  I don't think that exists.

19         MR. MUCKENFUSS:  We can look at the patent, but it's

20 in the technical specifications for the patent, which I don't

21 know why that's any less significant.  But in the technical

22 specifications it discusses the symbology, same symbology, and

23 says PDF417 is a 1D stacked symbology plain as day.  And that

24 is sworn under oath.  It's a patent, Honeywell's patent.

25         THE COURT:  Is it just one patent we're discussing

JA964

1  here?

2          MR. MUCKENFUSS:  No, we have several.

3          THE COURT:  Well, I want them produced for my review

4  when you're able.

5          MR. MUCKENFUSS:  Yes, Your Honor.

6          THE COURT:  We'll get around that for now.  We'll

7  act as if they're not going to come in.  I'm just at a

8  disadvantage not having seen the things you're arguing over.

9          MR. MUCKENFUSS:  I will say, it was my plan -- I

10  don't want to upset the Court.  Obviously, with their next

11  witness it would be something I would try to get to in the

12  middle of cross.  Now, obviously, the direct is going to

13  happen.  I just, you know, want to forecast for the Court, I

14  think with their first witness that would be a witness I would

15  want to use it with.

16          THE COURT:  How long is your direct examination of

17  your first witness?

18          MR. PLEUNE:  Given the direction that you've given

19  us, Your Honor, it is very short.  My understanding is that no

20  extrinsic evidence is to come in.  We are not including any

21  extrinsic evidence in the direct examination; and as a result,

22  it is very short.  Now, if the door gets opened, then I don't

23  know what we're going to do.  We're going to have maybe a

24  lengthy redirect and then more evidence on top of that.

25          THE COURT:  All right.  Call the jury, please.

JA965

64

TAYLOR SMITH - DIRECT

1          MR. McCAMEY:  Your Honor, we can hand up a copy of
2    the exhibit now if that's helpful.
3          THE COURT:  Yes, it would be.  Mr. Brenner can start
4    looking at it while I'm thinking.
5          (Jury entered the courtroom.)
6          THE COURT:  All right.  Welcome back.
7          Please call your first witness.
8          MR. PLEUNE:  Your Honor, Honeywell calls Taylor
9    Smith.
10         TAYLOR SMITH, PLAINTIFF'S WITNESS, SWORN,
11                DIRECT EXAMINATION
12   BY MR. PLEUNE:
13   Q.  Good afternoon, Mr. Smith.  Can you please introduce
14   yourself to the jury.
15   A.  Yes.  My name is Taylor Smith.  Born in New Hampshire --
16   or born in Massachusetts.  Grew up in New Hampshire.  Went to
17   college up in New Hampshire.  And then had a series of jobs
18   bringing me down here, so outside of Boston, outside of
19   Philadelphia.  And since 2010 have lived here locally in
20   Charlotte with my wife and two kids.  And currently work at
21   Honeywell.
22   Q.  Mr. Smith, who is your employer?
23   A.  Honeywell International.
24   Q.  And what do you do for Honeywell?
25   A.  I'm currently the vice president and general manager of a

JA966

TAYLOR SMITH - DIRECT

1 division that we call Connected Supply Chain.

2 Q.   And what do you do for the Connected Supply Chain,

3 Mr. Smith?

4 A.   As the general manager, I'm responsible for all of the

5 sales, R&D investments, marketing, expenses; but to drive the

6 overall business results for that division.

7 Q.   I believe you said that you started with Honeywell

8 several years ago.  What roles have you had at Honeywell over

9 the years?

10 A.   Yes.  I actually joined a company back in 2005 called

11 Metrologic, and Honeywell acquired that company in 2008.

12 Initially I was a product manager for barcode scanning

13 equipment.  And that basically means we would set the feature

14 requirements that the engineering team would develop towards

15 as far as what meets our customer expectations.

16      Over several years I kind of grew up in that product

17 management function, gaining a larger product portfolio, more

18 people reporting to me.  And then in maybe around 2015 or '16,

19 I took a more general management responsibility where I became

20 chief marketing officer of that division of Honeywell, and

21 then chief technology officer, so responsible for the

22 engineering team, and then my current role which I started

23 last October.

24 Q.   Thank you, Mr. Smith.

25      Can you tell the jury a little bit more about Honeywell.

JA967

TAYLOR SMITH - DIRECT

1  A.    Yes.  So Honeywell is a hundred-year-old American

2  company, I think you heard in the opening, regarding -- many

3  of you may have seen the Honeywell brand or logo on your

4  thermostats.  Those are one of the products that we brought to

5  market over the hundred years.  But we really started in the

6  water heating, furnace-type markets, but have really played in

7  a number of sectors over that hundred-year tenure.

8       But today we're organized in four primary business

9  segments.

10      One is our Aerospace Group which provides technology into

11 the aerospace and defense industries.

12      Second is a Buildings Technology Division which helps

13 buildings like this drive energy efficiency, security and

14 access control, and kind of climate, HVAC equipment-type

15 control.

16      The third group is Performance Materials which provide

17 solutions to the oil and gas and energy industries.

18      And then lastly, there's a Safety and Productivity

19 Solutions Business which helps provide technology that

20 protects workers and makes what they do more efficient and

21 productive.

22 Q.   Which of these divisions is responsible for barcode

23 products?

24 A.   The Barcode Product Division is specifically called

25 Productivity Solutions and Services, and that resides in the

TAYLOR SMITH - DIRECT

1    Safety and Productivity Solutions Business Group that I
2    mentioned.
3    Q.   And where is that group headquartered, Mr. Smith?
4    A.   Right here in Charlotte, North Carolina.
5    Q.   Now, I'd like to talk a bit more about the development of
6    Honeywell's barcode business.  I understand that you created
7    some demonstratives to assist with your testimony today; is
8    that right?
9    A.   Yes, I did.
10   Q.   I would like to pull up the first demonstrative in your
11   set, Mr. Smith.
12        Can you tell me what's depicted on this slide.
13   A.   Yes.  These are three organizations.  I mentioned I came
14   into Honeywell through an acquisition.  These are one of those
15   organizations as well as two others that Honeywell has
16   acquired over the last 15 or so years that really gained our
17   entry and built the division, Productivity Solutions and
18   Services, that specializes in barcode scanning equipment.
19        So the first, Hand Held Products, that was actually
20   headquartered right here in Ft. Mill, South Carolina.
21   Incorporated in 1980, 1981.  And specialized in what's called
22   kind of mobile computing barcode scanners.  And that's
23   equipment or technology -- think of companies like UPS or
24   FedEx that deliver your packages.  It's those mobile devices
25   that they're scanning the barcodes on those packages as they

TAYLOR SMITH - DIRECT

1   deliver them to your door.

2       Metrologic, where I started and joined, was a

3   manufacturer and designer of barcode scanning equipment

4   primarily for retail checkout.  So we've heard people comment

5   about Harris-Teeter or other retail chains.  At the cash

6   register and checkout, those types of retail barcode scanners

7   are what Metrologic specialized in.

8       And then Intermec, which we acquired, Honeywell, back in

9   2013, was again a provider of both the mobile computer-type

10  barcode scanners and traditional barcode scanners, as well as

11  barcode printers and other equipment.

12  Q.   And now I'd like to turn just briefly to some of

13  Honeywell's innovations in this space.

14          MR. PLEUNE:  Could you please turn to the next

15  demonstrative slide.

16  Q.   What is depicted in this slide, Mr. Smith?

17  A.   Yes.  This shows a few of our key innovations in

18  technology investments.

19      So the top two are barcodes that we've helped invent.

20  The top left is Code 39.  That's commonly used in warehouse

21  and inventory control where the shelf label may actually

22  contain that barcode to identify the location to help organize

23  product in a warehouse.

24      The top right is something called an Aztec barcode which

25  is commonly used in the health care industry.  So the patient

JA970

TAYLOR SMITH - DIRECT

1  information will be encoded into that barcode, printed on a

2  wristband around their wrist to be sure that when medication

3  is administered or when any sort of medical service is being

4  administered, they're scanning that patient wristband to

5  ensure that the right service or medications go into the right

6  patient.

7      On the bottom you get into some of our product

8  development.  And we were the first company to really make a

9  first portable mobile -- fully incapsulated portable barcode

10  reader, and that's what you see on the bottom left there where

11  all of the electronics, all of the software to be able to read

12  a barcode could be done in a handheld fashion.

13      And on the bottom right is where we began incorporating

14  barcode scanning technology into wearable devices that may be

15  worn as a person walks around a facility to augment other

16  types of applications, such as voice-directed work.

17  Q.    Does Honeywell have an R&D team?

18  A.    Yes, we do.

19  Q.    And how big is Honeywell's research and development team?

20  A.    We have tens of thousands of engineers globally.

21  Q.    And are any of those engineers local?

22  A.    Yes, they are.  Actually, specifically this barcode

23  scanning group, we have a sizable engineering team based in

24  Ft. Mill, South Carolina.

25  Q.    Are you familiar with OPTO, Mr. Smith?

JA971

TAYLOR SMITH - DIRECT

1  A.    Yes.

2  Q.    And who is OPTO?

3  A.    OPTO is a Japanese-based company that competes with

4  Honeywell in this barcode scanning space and would provide

5  competitive products in the realm of barcode scanning.

6        MR. PLEUNE:  I would like to pull up for the witness

7  Joint Exhibit 1.

8  Q.    Mr. Smith, can you tell me what this is.

9  A.    This is our licensing agreement with OPTO.

10  Q.    Have you reviewed this agreement?

11  A.    Yes, I have.

12        MR. PLEUNE:  Your Honor, plaintiff would move to

13  admit Exhibit JX1 into the record and to publish JX1 to the

14  jury.

15        THE COURT:  It's admitted.

16        (Joint Exhibit Number 1 was received into evidence.)

17  Q.    Mr. Smith, I would like to draw your attention to

18  Section 4.3 on page 7.

19        And can you read that first sentence of Section 4.3.

20  A.    Yes.  "In consideration of the license granted by

21  HONEYWELL to OPTICON pursuant to Section 2.1, OPTICON shall

22  pay to HONEYWELL INTERNATIONAL a royalty of seven percent of

23  Opticon Gross Revenue derived from the sales of 2D Barcode

24  Products in the United States."

25  Q.    And did OPTO pay Honeywell what they owed under the terms

TAYLOR SMITH - CROSS

1   of this agreement?

2   A.   No.

3   Q.   And what does Honeywell want from OPTO?

4   A.   Just the fair compensation that's stated here of the

5   7 percent royalty on all 2D Barcode Products.

6          MR. PLEUNE:  We don't have any additional questions

7   of this witness at this time, Your Honor.

8          THE COURT:  You may cross examine.  And let me know

9   if you intend to use any exhibits under question.

10          MR. MUCKENFUSS:  Thank you, Your Honor.

11                    CROSS EXAMINATION

12   BY MR. MUCKENFUSS:

13   Q.   Mr. Smith, are you familiar with the typical 1D

14   symbologies:  UPC, EAN, and Code 128?

15   A.   Yes.

16   Q.   Okay.  And those are commonly referred to as

17   one-dimensional symbologies, correct?

18   A.   Yes.

19   Q.   And you would agree with me that for those 1D

20   symbologies, laser scanners can read or decode those

21   symbologies, correct?

22   A.   Laser scanners, amongst other types of technology, can

23   read those, yes, sir.

24   Q.   Sure.  But specifically laser scanners, one-dimensional

25   laser scanners can read those one-dimensional symbologies,

TAYLOR SMITH - CROSS

1  correct?

2  A.   A laser scanner can read those one-dimensional

3  symbologies if they have the software to properly decode it.

4  Q.   Okay.  Are you familiar with the popular two-dimensional

5  symbologies:  QR code and Data Matrix?

6  A.   Yes, I'm aware of those symbologies, as well as other 2D

7  symbologies.

8  Q.   Okay.  And just QR code, if you could describe -- it's

9  like a square with a sort of checkered pattern, black and

10  white kind of code, correct?

11  A.   The QR symbology typically, yes, you'll see four -- or

12  sorry, three squares in three of the corners and then lots of

13  other checkered patterns.

14  Q.   And you would agree with me that no laser scanner can

15  read or decode a QR code.

16  A.   I am not aware of laser scanners that can read the QR

17  code.

18  Q.   Okay.  And you are familiar with Data Matrix, that

19  two-dimensional barcode.

20  A.   Yes.

21  Q.   Okay.  And it's a popular two-dimensional barcode,

22  correct?

23  A.   Among other 2D symbologies, yes.

24  Q.   And you would agree with me that laser scanners cannot

25  read or decode Data Matrix.

73

JEREMY WHITLEY - DIRECT

1  A.    Again, I'm not aware of any laser, single line
2  laser-based products that can read the Data Matrix symbology.
3  Q.    Now, to be clear, Mr. Smith, you testified that you
4  reviewed the settlement agreement that was shown to you.  You
5  were not involved in any communication with OPTO or OPTO's
6  counsel about the settlement, correct?
7  A.    That is correct.
8  Q.    And specifically, you were not involved with any
9  communication with OPTO's counsel relating to litigation in
10  Europe, correct?
11  A.    That is correct.
12  Q.    And obviously, Honeywell has counsel here today.  Are you
13  aware that the same counsel today representing Honeywell was
14  representing Honeywell in the litigation that led to the
15  settlement?
16  A.    Yes.
17         MR. MUCKENFUSS:  No further questions, Your Honor.
18         THE COURT:  Thank you.
19         Any redirect?
20         MR. PLEUNE:  No questions, Your Honor.
21         THE COURT:  Thank you.  You may stand down.
22         (Witness stepped down.)
23         THE COURT:  Call your next witness.
24         MR. STEVENS:  We next call Jeremy Whitley, Your
25  Honor.

JA975

JEREMY WHITLEY - DIRECT

1    JEREMY CHRISTOPHER WHITLEY, PLAINTIFF'S WITNESS, SWORN,

2                    DIRECT EXAMINATION

3    BY MR. STEVENS:

4    Q.   Good afternoon, Mr. Whitley.  Can you please introduce

5    yourself to the jury.

6    A.   Certainly.  My name is Jeremy Christopher Whitley.  I

7    grew up in Columbia, South Carolina.  I went to Furman

8    University in Greenville, South Carolina, for undergrad.  And

9    I went to the University of South Carolina for law school.  I

10   have two daughters, 15 and 12.  We've been here in Charlotte

11   since 2010.  I also have two dogs.

12   Q.   By whom are you employed, sir?

13   A.   Honeywell International.

14   Q.   And what do you do for Honeywell?

15   A.   So up until recently I was the chief IP counsel of --

16   which is the chief intellectual property counsel of the

17   division that Mr. Smith mentioned called Safety and

18   Productivity Solutions.  I have recently been promoted to be a

19   vice president and general counsel of IP for all of Honeywell,

20   managing different aspects of IP across the company.

21   Q.   So we've heard a little bit about the Safety and

22   Productivity Solutions Division.  Can I just refer to that as

23   SPS for short?

24   A.   Sure.

25   Q.   Tell us a little bit more about SPS.

JA976

JEREMY WHITLEY - DIRECT

1  A.   Sure.  As Mr. Smith mentioned, it makes equipment that
2  helps workers stay safe and perform their activities
3  efficiently.  SPS is made up of five divisions that offer
4  things such as safety equipment, personal protection
5  equipment, barcode scanners, mobile computers, and workflow
6  management.
7  Q.   Now, Mr. Whitley, is intellectual property -- are patents
8  important to Honeywell?
9  A.   Yes.  Honeywell holds over 30,000 global patents, 9,000
10  patent applications.  It's what protects the commercial
11  advantageous features of our products.
12  Q.   And of all those patents you mentioned, how many of them
13  relate in general to barcode scanners or barcode readers?
14  A.   About 2500 of the global patents are directed to barcode
15  scanning technology.
16  Q.   And how many United States patents are directed to that
17  technology?
18  A.   I believe it's around 1200.
19  Q.   Now, does Honeywell actually make and sell barcode
20  scanners as well?
21  A.   They do.
22  Q.   And are those products popular in the industry?
23  A.   Yes.  As Mr. Smith mentioned, you will see them in the
24  logistics companies like UPS and FedEx.  You'll see the
25  handheld scanners at grocery stores, Target, gas stations.

JA977

76

JEREMY WHITLEY - DIRECT

1  Q.   Is Honeywell the biggest provider of barcode scanners in
2  the United States?
3  A.   No, unfortunately it's not.  That title goes to a company
4  called Zebra Technologies.
5  Q.   Now, has Zebra ever done anything to acknowledge the
6  strength of Honeywell's patents?
7  A.   Yes.  Zebra recently took a license to the barcode
8  scanning technology portfolio for which they paid
9  $360 million.
10 Q.   Are there other folks in the industry that have taken a
11 license and compensated Honeywell fairly for Honeywell's
12 inventions?
13 A.   Yes, several others.  Datalogic and Code Corporation to
14 name a few.
15 Q.   So I'd like to change course and talk a little bit about
16 OPTO and the reason that we're here today.  Is that okay?
17 A.   Sure.
18 Q.   Are Honeywell and OPTO competitors?
19 A.   In certain markets and geographies, yes.
20 Q.   And did Honeywell and OPTO have a dispute about OPTO's
21 infringement of Honeywell's patents a few years ago?
22 A.   Yes.
23 Q.   And could you please tell the jury about that dispute.
24 A.   So we identified that all of OPTO's barcode scanners
25 infringed at least one of our patents.  So we did an analysis

JA978

JEREMY WHITLEY - DIRECT

1    and we came to the conclusion that the infringement was

2    actually rampant.  At that point we filed an action in

3    Delaware federal district court for infringement of seven

4    patents seeking recovery of the damage that it had done to

5    Honeywell.  Simultaneously, we filed a complaint with the

6    International Trade Commission, or the ITC, asking them to

7    investigate OPTO's barcode scanners and find that they were

8    infringing; and we asked them to prevent importation of those

9    devices into the United States.

10   Q.   Did the government institute that investigation?

11   A.   It did.

12   Q.   So tell me a little bit more about the International

13   Trade Commission, the ITC.  What do they do?

14   A.   It is a government body designed to protect domestic

15   industries, such as Honeywell's barcode scanning, by

16   investigating -- one of the actions they perform is

17   investigating patent infringement for devices that are being

18   imported into the United States.

19   Q.   And if the government finds that those devices do

20   infringe, what happens?

21   A.   It issues an exclusion order preventing importation of

22   those devices.

23   Q.   And again, you might have said it, but how many patents

24   were originally involved in the ITC action and how many of

25   them were involved in institution?

78

JEREMY WHITLEY - DIRECT

1  A.    So seven were filed in the complaint to the ITC asking
2  them to investigate; six were initiated in that investigation.
3  Q.    And did that investigation in Delaware, was it about just
4  some of OPTO's products or was it all of OPTO's barcode
5  readers?
6  A.    It accused all of OPTO's barcode readers of patent
7  infringement.
8  Q.    And what was Honeywell seeking by virtue of filing the
9  two lawsuits?
10 A.    Just compensation for the damages that had occurred to
11 Honeywell and a -- the right value for going forward.  In the
12 ITC we were originally going after an exclusion order.
13 Q.    And how many patents were involved in the Delaware
14 litigation?
15 A.    Seven patents, the same seven patents that were filed in
16 the ITC investigation.
17 Q.    And again, is it just a subset of OPTO's products or was
18 it all of OPTO's products at issue in the Delaware case?
19 A.    The Delaware case also accused all of OPTO's barcode
20 scanners of patent infringement.
21 Q.    Did there come a point in time where Honeywell identified
22 additional patents to OPTO that it believed were infringing?
23 A.    Yes.  So after those two actions were initiated,
24 Honeywell sent a letter to OPTO identifying a little over 150
25 additional patents that Honeywell believed OPTO's barcode

JA980

79

JEREMY WHITLEY - DIRECT

1  scanners infringed.

2  Q.   And of those patents, how many of them were United States

3  patents?

4  A.   At least 69 U.S. patents.

5        MR. STEVENS:  Could we publish to the witness and

6  well PX243, please.

7  Q.   Mr. Whitley, do you recognize what's on the screen, sir?

8  A.   I do.

9  Q.   And could you tell us what it is.

10 A.   So this is the letter that I mentioned that Honeywell

11 sent to OPTO putting it on notice of -- in addition to the

12 actions that we had filed in Delaware and the ITC, that

13 Honeywell considered there was rampant infringement of a lot

14 more patents.

15       MR. STEVENS:  Your Honor, we'd move the admission of

16 Plaintiff's 243.

17       THE COURT:  It's admitted.

18       (Plaintiff's Exhibit Number 243 was received into

19 evidence.)

20       MR. STEVENS:  And if we could publish that to the

21 jury.

22       THE COURT:  You may.  Once an exhibit is admitted,

23 you may publish at your pleasure.

24       MR. STEVENS:  Thank you, Your Honor.

25       If we could just scroll through it.

JEREMY WHITLEY - DIRECT

1  Q.   And as we're doing that, Mr. Whitley, can you just
2  describe to us the list that we're going to see going from
3  page to page.
4  A.   Yes.  So the list is the first -- the list starts with
5  the 69 patents that I mentioned for the U.S. patents that
6  includes their number, the title, and the issue date.  And
7  again, these are 69 patents that Honeywell believed Opticon's
8  barcode devices infringed.
9       You will then progress to global worldwide patents, which
10 I think it begins with the United Kingdom.  And again, each
11 one is enumerated by the patent number.  These have the
12 jurisdiction and the title and the issue date.
13 Q.   And why did Honeywell send this letter?
14 A.   We wanted to ensure that OPTO knew that the dispute
15 between the parties went well beyond the seven patents that
16 were filed in the Delaware district court case and the ITC
17 investigation.
18 Q.   Mr. Whitley, what ultimately happened with both the
19 Delaware and the ITC cases?
20 A.   So they came to a resolution when the two parties met for
21 a mediation subject to the ITC case.  The two parties met,
22 mediated, resolved their differences, and entered into a
23 settlement agreement.
24 Q.   And when was that?
25 A.   That was in January of 2020.

JEREMY WHITLEY - DIRECT

1  Q.   You mentioned the word "mediation."  What is a mediation?
2  A.   Mediation is where parties who have a dispute come
3  together.  They typically hire a third-party facilitator who's
4  independent and neutral, and he helps explore options and
5  avenues for resolution of the conflict between the two
6  parties.
7  Q.   And is that a person that the parties hire together?
8  A.   Yes.
9  Q.   In this particular instance who was the mediator?
10 A.   His name was Tony Piazza.
11 Q.   And again, is that somebody that OPTO approved of?
12 A.   Yes.
13 Q.   And talk me through sort of what the mediation looked
14 like.  And I mean geography, different rooms.  How did that
15 work?
16 A.   Sure.  The parties originally came together in the same
17 room with the mediator.  He kicked it off and introduced the
18 parties.  Each party had the ability to make introduction
19 remarks about what they felt the case was, what they were
20 looking for.  And then they were separated into two separate
21 rooms and the mediation officially began where the mediator
22 would pass back and forth between the parties to see if there
23 was a resolution that could be reached.
24 Q.   An at this mediation, were both Honeywell and OPTO
25 represented by lawyers?

82

JEREMY WHITLEY - DIRECT

1   A.   Yes.
2   Q.   Who was there from OPTO?
3   A.   So --
4   Q.   Let me take that back.
5        Who was there for Honeywell?
6   A.   So I attended along with my manager at the time.  His
7   name was Brian Rudick.  And we had three lawyers attend from
8   Alston & Bird, all of whom are in the courtroom today.
9   Q.   Okay.  Who was there from OPTO?
10  A.   So OPTO, I believe, had two corporate representatives
11  from Japan and they also had two lawyers from the law firm of
12  Quinn Emanuel.
13  Q.   And are you familiar with the law firm of Quinn Emanuel?
14  A.   I am.  It is a very prestigious patent infringement law
15  firm.
16  Q.   Are any of the folks that were at the mediation on behalf
17  of OPTO -- I'd like for you to look around the courtroom and
18  tell me if you see any of them in this room here today.
19  A.   No.
20  Q.   Any of the OPTO corporate representatives in this room?
21  A.   No corporate representatives, none of their lawyers, no.
22  Q.   Now, during the course of the mediation, what was the
23  primary thing in dispute between the parties?
24  A.   The amount of revenue of the addressable products.
25  Q.   Describe that a little bit more for me, please.

JA984

83

JEREMY WHITLEY - DIRECT

 1  A.   So Honeywell had an estimate of what they believed the
 2  revenue of the addressable products were going into mediation
 3  based on public information that we could obtain, which I
 4  believe included OPTO's annual report, some third-party
 5  publications about what they thought of the industry, who was
 6  in the industry, and how much revenue they derived.  And we
 7  had based our assumptions on some internal calculations,
 8  comparing OPTO's revenue to how our revenue broke down in the
 9  same sectors.
10       And when we got there and we said this is what we believe
11  to be the right number of revenue, OPTO disagreed and said
12  it's drastically lower than that.
13            MR. VanHOUTAN:  Your Honor, I'm going to object to
14  all this as in violation of Rule 408, the mediation privilege.
15  Things that occurred during the mediation are not to be
16  revealed outside of the mediation.
17            THE COURT:  The witness can describe the process and
18  what was at issue, but do not get into specifically what
19  either side represented as its position.
20  Q.   Was there a dispute among the parties regarding the scope
21  of the products that would be covered by the agreement itself?
22  A.   No.
23  Q.   And at the end of the day, did something happen?
24  A.   Yes.  We came to a resolution.  We had reached an
25  agreement in principle.

JA985

84

JEREMY WHITLEY - DIRECT

1  Q.   Now, did you sign on the dotted line the full blown
2  agreement that we saw earlier or was that a different point in
3  time?
4  A.   No.  Lawyers don't move that fast.  So over the course of
5  the next two and a half weeks, we sent drafts back and forth
6  between the parties via the law firms of Alston & Bird and
7  Quinn Emanuel and negotiated the agreement until we reached
8  the final resolution.
9  Q.   I'm going to focus now on that
10 two-and-a-half-to-three-week period.  Again, was OPTO
11 represented by lawyers at that time?
12 A.   Yes, the same law firm, Quinn Emanuel.
13 Q.   And did every single draft go through their lawyers?
14 A.   Yes.
15 Q.   And during that two-and-a-half-to-three-week period, was
16 OPTO allowed to make edits or changes to the agreement?
17 A.   Yes.  They were allowed to negotiate, revise.  In fact,
18 they made changes to the product definition.  They wanted to
19 include improvements so if there was a natural evolution of a
20 product, they didn't find themselves back in a courtroom
21 against Honeywell.
22 Q.   And after they proposed that, is that something that
23 Honeywell agreed to?
24 A.   Yes.
25 Q.   And during that two-and-a-half-to-three-week period where

JA986

JEREMY WHITLEY - DIRECT

1  the parties and their law firms were working on the agreement,

2  was there any dispute about the scope of products to be

3  covered by the royalty provision?

4  A.   No.  I don't believe the definition of 2D Barcode

5  Products or 1D Barcode Products was changed during that time.

6  Q.   At any point during the mediation or the following three

7  weeks, is there any point in time where OPTO had any objection

8  to the definition of 2D Barcode Products that we have all seen

9  in the agreement?

10 A.   No.

11         MR. STEVENS:  So I'd like to publish to the witness

12 and the jury JX1 that we saw a few minutes ago with Mr. Smith.

13 Q.   Mr. Whitley, can you identify this agreement, please.

14 A.   Yes.  This is the License and Settlement Agreement that I

15 spoke of that the parties negotiated over the three-week time

16 period and eventually executed.

17 Q.   I'd like to walk through some of the terms of the

18 agreement, if that's all right with you.

19 A.   Okay.

20 Q.   First I'd like to turn to subpart A at the bottom of the

21 first page.

22      Sir, were the parties attempting to settle just a little

23 slice of something or were they trying to settle the entirety

24 of the ITC case?

25 A.   The entirety of the ITC case and beyond that, actually.

JA987

JEREMY WHITLEY - DIRECT

1   But this background section refers to the ITC case
2   specifically.
3   Q.    And if I count correctly, I believe there are seven
4   specific patent numbers referenced there.  What are those
5   seven patents?
6   A.    Those are the seven patents that I mentioned were filed
7   in the Delaware district case and put in the complaint to the
8   ITC to ask the ITC to investigate OPTO's barcode scanners,
9   scan engines, and all their products that read barcodes.
10          MR. STEVENS:  If we could look at paragraph B to the
11  background.
12  Q.    Again, I see here a reference to Delaware and the same
13  patents so I'm going to ask you the same question.  Were the
14  parties trying to negotiate and settle just a little sliver of
15  the litigation or were they trying to come up with an
16  agreement for all of OPTO's products?
17  A.    The parties were trying to reach peace by settling any
18  claim that was out there, including the Delaware district
19  action as well.
20          MR. STEVENS:  If we can look down now at paragraph
21  D.
22  Q.    What does this tell us about the scope that the parties
23  wanted to settle?
24  A.    This mentions and specifically was the target of the
25  settlement agreement which is to reach a final business

JEREMY WHITLEY - DIRECT

1   resolution, settlement of all the legal actions, which

2   included Delaware and the ITC, and all other claims which

3   includes the ones that were identified in the letter, the 150

4   global patents, the 69 U.S. patents, which were or could have

5   been asserted by the parties in the legal actions.

6   Q.   And what document was going to set forth the terms and

7   conditions of that resolution?

8   A.   The settlement agreement.  The License and Settlement

9   Agreement had all of the terms and conditions that were going

10  to govern the relationship of the parties after they reached

11  the settlement.

12  Q.   So to make sure I understand, were all of the different

13  products and patents involved in the ITC and in the Delaware

14  actions all resolved by this agreement?

15  A.   Yes.

16  Q.   And were the allegations of infringement of those 69

17  additional U.S. patents and 150 worldwide patents, was that

18  all attempted to be put into this agreement?

19  A.   Yes.

20  Q.   Now I'd like to go to Section 1.4 which is the definition

21  of 2D Barcode Products.

22       Why did Honeywell and OPTO decide to agree to an explicit

23  definition?

24  A.   So that there was no confusion by the parties of what

25  product was royalty-bearing and what product was not

JA989

88

JEREMY WHITLEY - DIRECT

1  royalty-bearing.

2  Q.   What does this paragraph tell us about what products

3  would be royalty-bearing?

4  A.   So the definition for 2D Barcode Products, which are the

5  products that were royalty-bearing, are specifically meaning

6  "any device or article of manufacture that is operable to

7  decode at least one or more two-dimensional symbologies into

8  human-readable text."

9  Q.   A couple questions.  Does it have to be able to decode

10 every single two-dimensional symbology under the sun?

11 A.   No, just one -- at least one two-dimensional barcode.

12 Q.   And does it matter what the hardware is?  In other words,

13 does it matter whether the barcode reader is a laser product

14 or a CCD product or an imager product?

15 A.   No.  This definition is clear that it's hardware

16 agnostic.

17 Q.   And what did you and OPTO at the time decide where should

18 we look to figure out whether a symbology is one-dimensional

19 or two-dimensional?

20         MR. VanHOUTAN:  Objection, Your Honor.  Lack of

21 foundation.  He doesn't know what OPTO did or did not do.

22         THE COURT:  Correct.  You can say what you on behalf

23 of Honeywell did or thought, but don't characterize OPTO's

24 thinking.

25         MR. STEVENS:  Let me withdraw the question.  I'll

JA990

JEREMY WHITLEY - DIRECT

1   ask a more precise one.

2   Q.   In this agreement what did Honeywell and OPTO jointly

3   express was where the parties wanted someone to look to be

4   able to resolve any dispute about whether a symbology is 1D or

5   2D?

6   A.   In the second sentence it describes that a

7   two-dimensional barcode symbology includes "any

8   two-dimensional barcode symbology defined by one or more

9   standards."

10        MR. STEVENS:  Now, I'd like to look at the next

11   definition in 1.5 of 1D Barcode Products.  If we could pull

12   that up.

13   Q.   And I'd ask you to explain to the jury, why did you also

14   define 1D Barcode Products?

15   A.   So as I mentioned, the 2D Barcode Products were the ones

16   that were subject to a royalty for future sales.  The 1D

17   Barcode Products were subject to something called a covenant

18   not to sue, which means if OPTO continued to offer those in

19   the United States, Honeywell would not bring an action against

20   them on products that fell in the definition of 1D Barcode

21   Products.

22   Q.   So looking at this definition, if the product is able to

23   decode just one two-dimensional symbology regardless of its

24   hardware, just one, does it fit within this definition of 1D

25   Barcode Products or does that make it a 2D Barcode Product?

JEREMY WHITLEY - DIRECT

1  A.   2D Barcode Product because it is operable to decode a 2D

2  barcode symbology, which puts it in the definition of 2D

3  Barcode Products.  And we put in the definition with OPTO 1D

4  Barcode Products clearly exclude anything that is a 2D barcode

5  -- that can decode a 2D barcode symbology.

6  Q.   Now, you had mentioned that there was a covenant not to

7  sue for no additional money.  Does that mean that Honeywell

8  didn't think that these products infringed?

9  A.   Not at all.  We thought all of their products infringed.

10  Q.   And can you explain to me why the parties agreed for

11  there to be a royalty on 2D Barcode Products, but there's not

12  to be a further royalty on 1D Barcode Products.

13  A.   So the focus for Honeywell is on 2D Barcode Products,

14  products that decode 2D symbologies.  Providing a covenant not

15  to sue on a 1D Barcode Product was a bargaining chip that we

16  gave if we could get the right value on the 2D Barcode

17  Products.

18  Q.   And did Honeywell and OPTO agree that the 7 percent

19  royalty was the right value for Honeywell's portfolio on those

20  2D products?

21  A.   Yes.

22        MR. STEVENS:  I'd like to turn down to Section 1.10

23  for a moment.

24  Q.   Did OPTO receive a license just to those patents in the

25  litigation or just those patents in the letter, or was it

91

JEREMY WHITLEY - DIRECT

1  something different?

2  A.    No.  They received a license to any and all U.S. patents

3  that their products were using.

4  Q.    So I think you mentioned earlier there's over a thousand

5  U.S. patents on barcode readers.  If OPTO is using all

6  thousand of them, did they get a license to a thousand

7  patents?

8  A.    Yes.

9         MR. STEVENS:  And if we look forward to Section 4,

10 please.

11 Q.    How much did OPTO pay Honeywell in regard to its past

12 infringement?  And when I say past, I mean past as of the day

13 the parties signed the agreement.

14 A.    Sure.  $9 million.

15 Q.    And then in Section 4.3, how much was OPTO supposed to

16 pay Honeywell for the 2D Barcode Products going forward from

17 the date of the agreement?

18 A.    A royalty of 7 percent of Opticon's gross revenue from

19 the sale of 2D Barcode Products.

20 Q.    And have they done that for all of their 2D Barcode

21 Products?

22 A.    No.

23 Q.    So let's go forward to Section 9.2, and this is a section

24 that I showed the jury in the opening.  I'd like you to

25 explain -- I'm going to read the first sentence and ask you to

JEREMY WHITLEY - DIRECT

1  explain it to the jury.

2      The first sentence says, "This Agreement and its

3  Exhibits, constitute and contain the entire agreement among

4  the Parties respecting the subject matter hereof, and

5  supersede any and all prior negotiations, conversations,

6  correspondence, understandings, and letters."

7      What does that mean, sir?

8  A.   This is a typical integration clause where it's supposed

9  to get rid of arguments or disputes based on issues or

10 thoughts or understandings that existed prior to this

11 agreement being negotiated, drafted, and signed by the

12 parties.

13 Q.   And so if there ever were to come a day down the road

14 where the parties had a dispute and it had to go to a jury,

15 what did the parties express in this agreement that they were

16 going to ask the jury to focus on?

17 A.   So this agreement is supposed to be the dictionary for

18 any dispute, the placemat, the map for any dispute between the

19 two parties.  This is where you're supposed to look to figure

20 out the answer.

21 A.   And did this 9.2 and the rest of the agreement, again,

22 did it come after that two to three weeks of their attorneys

23 combing through every word of the agreement?

24 A.   Yes.

25           MR. STEVENS:  So we can take that down.

JA994

93

JEREMY WHITLEY - DIRECT

1  Q.   I'd like to now talk about the time frame after you and
2  OPTO signed the agreement, if that's okay.
3  A.   Sure.
4  Q.   Did OPTO immediately provide the royalty reports that it
5  was supposed to provide for products after the agreement?
6  A.   No.  I think there was some technical issues with
7  providing those to us.
8  Q.   But did there come a point in time where OPTO did start
9  to provide those?
10 A.   Yes, eventually we started to receive the royalty
11 reports.
12 Q.   And was there something missing when you got those?
13 A.   Yes.  We noticed that there were a number of products
14 that we believed fell into the definition of 2D Barcode
15 Products because they were operable to decode at least one 2D
16 barcode symbology that were missing from the royalty reports.
17 Q.   Now, did you run off and file a lawsuit the next day or
18 did you do something different?
19 A.   No.  We actually asked OPTO to provide information about
20 the products that were being withheld from the royalty
21 reports.
22 Q.   And why would you do that?  If you had a suspicion that
23 not all the products were there, why did you want more
24 information?
25 A.   Well, we didn't have all the facts.  Like, we didn't know

JA995

JEREMY WHITLEY - DIRECT

1   if those products were actually still being offered, were they
2   being offered in the United States, to what extent, how much
3   revenue, et cetera.  There's a bunch of material we needed to
4   figure out was this a material issue or not.
5   Q.   So once they said, hey, we're not including these
6   products in the royalty reports, did Honeywell do any sort of
7   investigation to figure out, hey, what are we really talking
8   about here?
9   A.   Yes.  We actually asked for that financial information so
10  that we could determine is this a big deal or not.
11  Q.   And how long did that process take?
12  A.   I think maybe six months.
13  Q.   And --
14  A.   Eight months.
15  Q.   And at the end of that, once Honeywell had that
16  information, what did it do?
17  A.   It sent a couple of letters to OPTO saying, hey, we have
18  identified products that fall clearly within the definition of
19  2D Barcode Products.  We'd like you to compensate us for
20  those, and asked them to do so.
21          MR. STEVENS:  If we could publish to the well and
22  the witness PX288.
23  Q.   Once that comes up on your screen, can you identify this
24  document for me, please.
25  A.   Yes.  This is one of those letters that I talked about

JEREMY WHITLEY - DIRECT

1  where we say we've reviewed your sales information.  We think
2  there are products that clearly fall in the definition of 2D
3  Barcode Products because, and we listed the definition:
4  They're operable to decode at least one or more
5  two-dimensional symbologies.  And we told them that they
6  needed to compensate us for those based on the agreement that
7  the parties had executed.
8          MR. STEVENS:  Your Honor, we'd move for the
9  admission of Plaintiff's 288.
10          THE COURT:  Admitted.
11          (Plaintiff's Exhibit Number 288 was received into
12  evidence.)
13  Q.   Again, is this the letter that we were just talking
14  about, sir?
15  A.   Yes.
16  Q.   And on the bottom two paragraphs of the first page, what
17  are you telling OPTO in those paragraphs?
18  A.   So again, that was that we had identified products that
19  were -- that squarely fall in the -- fell in the definition of
20  2D Barcode Products because they were operable to decode at
21  least one two-dimensional barcode.  And we said that those
22  were missing from the royalty reports and we need you to pay
23  us for them per the agreement between the parties.
24  Q.   And if we look at the paragraph on the next page, again,
25  did you identify for OPTO that there were unpaid royalties

JA997

JEREMY WHITLEY - DIRECT

1  that they needed to get up to date on?

2  A.   Yes, we said pay those overdue royalties.

3  Q.   Now, the agreement required that you give them 30 days'

4  notice.  Is that all you gave them before you filed this

5  lawsuit?

6  A.   No.  It was actually 90 days.

7  Q.   And if OPTO had come to Honeywell and said, all right,

8  you know what, you're right, we'll just -- we'll write you the

9  check, but no penalties, no interest, anything like that, what

10 would Honeywell have said?

11 A.   We would have accepted the payment.  We were entitled to

12 contractually interest and fees, but we would have accepted

13 the payment and put this matter behind us.

14 Q.   And would we ever be all together in this courtroom today

15 if they had done that then?

16 A.   No.

17 Q.   And over that 90-day period, what did OPTO do?

18 A.   They told us no.

19 Q.   So what other choice did Honeywell have?

20 A.   This is the only other means of redress.

21 Q.   So I'd like to ask you a few wrap-up questions, sir.

22      When you entered into the agreement that we looked at,

23 was there any disagreement between the parties about what

24 qualified as a 2D Barcode Product?

25 A.    No.  Hence why the definition is written the way it is.

JEREMY WHITLEY - DIRECT

1  Q.   And are all the OPTO products involved in this case, the
2  ones that I put up during opening, are they operable to decode
3  2D symbologies such as PDF417, MicroPDF417, and composite
4  codes?
5  A.   As I understand it, yes.
6  Q.   And so did the agreement require OPTO to --
7           THE COURT:  Hold on, Mr. Stevens.
8           MR. VanHOUTAN:  I'm going to object to that as
9  extrinsic evidence, Your Honor.  And I would suggest that they
10 just opened the door to the inclusion of that.
11          THE COURT:  No, overruled.
12          And only answer the question to the extent you
13 actually know.  I don't know your technical expertise so if
14 you don't know, say you don't know.
15          THE WITNESS:  Okay.
16 Q.   And so did the agreement require OPTO to pay you
17 royalties on those products?
18 A.   Yes.
19 Q.   And did they in fact do that?
20 A.   No.
21 Q.   Now, there -- were you here for the opening statement
22 that counsel for OPTO gave?
23 A.   Yes.
24 Q.   I don't have his exact words, but I believe he said that
25 in the agreement somewhere it says that laser products don't

JEREMY WHITLEY - CROSS

1  count.  Is that right?

2  A.   I don't think the word "laser" shows up and I don't think

3  there's a discussion of hardware and what definition the

4  hardware falls into.  I think it's devoid from anywhere in the

5  agreement.

6  Q.   Is there any point in time where Honeywell said to OPTO,

7  hey, you don't have to pay us for laser-based products?

8  A.   No.

9  Q.   I think there was also a statement in opening that

10 somehow you knew that they saw the world differently.  Is that

11 right or is that wrong?

12 A.   No.  I can't imagine how -- again, the definition is

13 clear-cut.

14 Q.   And how long did OPTO have to review that definition?

15 A.   That definition was in there from the first draft that

16 went to OPTO, so they had two and a half months.  They combed

17 every word.  They responded.  They provided their drafts.

18 Never changed.

19 Q.   Never changed a word of that definition?

20 A.   No.

21            MR. STEVENS:  Thank you, Mr. Whitley.

22            I pass the witness, Your Honor.

23            THE COURT:  You may cross examine.

24            MR. VanHOUTAN:  Thank you, Your Honor.

25                          CROSS EXAMINATION

JA1000

99

JEREMY WHITLEY - CROSS

1  BY MR. VanHOUTAN:
2  Q.   Good afternoon, Mr. Whitley.
3  A.   Hello.
4  Q.   I was going to ask, you are the chief IP counsel of
5  Honeywell Safety and Productivity Solutions Division, but
6  congratulations on the promotion.
7  A.   Thank you.
8  Q.   You did hold that position during the course of events
9  that led to this litigation, correct?
10 A.   Yes.
11 Q.   And in that role you were involved in the ITC
12 investigation that led to this litigation, correct?
13 A.   Yes.
14 Q.   And in fact, you managed that litigation on a day-to-day
15 basis for Honeywell in-house, correct?
16 A.   Yes.
17 Q.   I believe you testified you attended personally the
18 mediation between Honeywell and OPTO, correct?
19 A.   Yes.
20 Q.   And there were actually several lawyers that attended
21 that mediation on behalf of Honeywell, both in-house and
22 outside counsel, correct?
23 A.   Yes.
24 Q.   And you were involved in the negotiation of the License
25 and Settlement Agreement that we saw, I believe it's JX1, on

JA1001

JEREMY WHITLEY - CROSS

1  behalf of Honeywell, correct?

2  A.   Yes.

3  Q.   And you reviewed the License and Settlement Agreement on

4  behalf of Honeywell before it was signed, right?

5  A.   Yes.

6  Q.   And not only you, but other in-house lawyers at Honeywell

7  did the same, correct?

8  A.   Yes.

9  Q.   And not only lawyers, but also business people within

10 Honeywell reviewed the License and Settlement Agreement before

11 it was signed, right?

12 A.   Reviewed the agreement, no.

13 Q.   So Taylor Smith, he never reviewed the License and

14 Settlement Agreement before it was signed?

15 A.   No.

16 Q.   You did have outside counsel, some of which is sitting at

17 this table, review the License and Settlement Agreement before

18 it was signed, correct?

19 A.   Yes.

20 Q.   Mr. Stevens, Mr. Pleune, correct?

21 A.   Yes.

22 Q.   And that wouldn't apply just to the License and

23 Settlement Agreement, but also to any amendments to that

24 agreement, correct?

25 A.   Yes.

JA1002

JEREMY WHITLEY - CROSS

 1  Q.   And in fact, there are two amendments to the License and
 2  Settlement Agreement, correct?
 3  A.   Yes.
 4  Q.   Amendment One and Amendment Two, correct?
 5  A.   Yes.
 6  Q.   And same answers with regard to those amendments, right?
 7  A.   I can't say for sure which attorney reviewed them, but,
 8  yes, we reviewed them and A&B reviewed them.
 9  Q.   Multiple in-house attorneys at Honeywell reviewed them,
10  correct?
11  A.   Correct.
12  Q.   Multiple business people reviewed them at Honeywell,
13  correct?
14  A.   No, I don't think any business people reviewed the
15  amendments.
16  Q.   Okay.  Outside counsel for Honeywell, including some of
17  the individuals sitting at counsel table, reviewed the
18  amendments before they were signed, correct?
19  A.   Again, I don't know which specifically or both of them,
20  but, yes, Alston & Bird did review the amendments.
21  Q.   And those amendments incorporate the same terms from the
22  License and Settlement Agreement, correct?
23  A.   My memory -- I haven't reviewed the amendments in detail
24  recently.  I believe there's a statement that says all the
25  terms are the same.  But they are amendments to the agreement

JA1003

JEREMY WHITLEY - CROSS

1  so it would mean that they used the same language as the

2  agreement.

3  Q.   You would agree that the License and Settlement Agreement

4  and the First and Second Amendments are all part of the same

5  agreement, correct?

6  A.   Yes.

7  Q.   You were talking with your counsel about payments that

8  OPTO either made or didn't make under this agreement.  Do you

9  recall that?

10 A.   Yes.

11 Q.   And you would agree that OPTO made all of the payments

12 required for its image-based sensor products, correct?

13 A.   I believe that is correct.  I don't know if I've ever,

14 like, confirmed that, but I believe that's correct.

15 Q.   You have no reason to believe it's not correct, correct?

16 A.   I just don't have any recollection.

17 Q.   Understood.

18      The only products that you're saying that OPTO did not

19 pay under the License and Settlement Agreement are laser and

20 CCD scanners with particular functionality, correct?

21 A.   Any device that's operable to decode.  I don't know the

22 hardware in those devices.

23 Q.   So is it your position that OPTO's products with image

24 sensors without that functionality, no royalty would be owed,

25 correct?

JEREMY WHITLEY - CROSS

1  A.   As long as they did not fall into the definition of 2D
2  Barcode Products.
3  Q.   Okay.  But OPTO paid all the royalties it was obligated
4  to pay under Section 4.3 for its image-based sensor products,
5  correct?
6  A.   I cannot say that's an issue in this case, but I honestly
7  can't confirm that today.
8  Q.   You were talking a little bit about the ITC investigation
9  and also the Delaware case with your counsel.  Do you recall
10  that?
11  A.   Yes.
12  Q.   When the ITC investigation was instituted, the Delaware
13  case was stayed, correct?
14  A.   Not -- you made it sound like it was at the same time.
15  No, the Delaware case was stayed a little bit later after the
16  filing of the ITC investigation.
17  Q.   Okay.  And so that case was not going forward when the
18  ITC investigation was being litigated, correct?
19  A.   Correct.
20  Q.   You talked about the number of patents that were asserted
21  in both those cases.  You said, I believe, seven initially; is
22  that correct?
23  A.   Yes.
24  Q.   And then one was dropped during the course of the ITC
25  investigation; is that right?

JA1005

JEREMY WHITLEY - CROSS

1  A.   No.  One was removed at the request of the ITC asking us
2  not to have seven patents in a case.
3  Q.   So at one point the ITC ALJ, which is the judge in the
4  ITC investigation, told you to eliminate a certain number of
5  patents and retain only four to go forward to trial; is that
6  correct?
7  A.   She said to -- yes.  She said to pick four patents and,
8  like, 12 to 15 claims that you want to proceed to at the main
9  hearing.
10 Q.   And so Honeywell did that, right?
11 A.   We identified the four patents.  I don't know that we
12 identified the claims, if we got to that point, or if we
13 settled by then.
14 Q.   And so those four patents were the only ones that were
15 going to be litigated at the trial at the ITC, correct?
16 A.   I don't know because we didn't get there.  But it was set
17 up that those were the four we were proceeding on.
18 Q.   And so any exclusion order that Honeywell would get at
19 the ITC would be limited to those four claims -- I'm sorry,
20 four patents, correct?
21 A.   I don't think that's correct because we could have had
22 another hearing on the other two patents that were still
23 active in that case and I think they would fall under the same
24 exclusion order if they weren't broken up into two
25 investigations.

JEREMY WHITLEY - CROSS

1  Q.   There was no second hearing on the schedule in the ITC
2  investigation, was there?
3  A.   I don't think we reached that point yet.
4  Q.   And you would know because you were managing the
5  day-to-day of that investigation, correct?
6  A.   I think someone would have told me if it was broken into
7  two cases, yes.
8  Q.   And there was several patents.  We saw Mr. Stevens list
9  them.  One of them was referred to, just the last three
10 digits, as the '783 patent, correct?
11 A.   Correct.
12 Q.   And that patent was accused in the investigation against
13 OPTO's laser 1D products and OPTO's 2D image sensor products,
14 correct?
15 A.   I believe it went to all products.
16 Q.   Okay.  That would include laser and CCD-based products,
17 correct?
18 A.   Yes.
19 Q.   But that wasn't one of the patents that Honeywell elected
20 to go forward at the ITC investigation, was it?
21 A.   Well, not for the hearing.
22 Q.   Okay.  And the hearing is the basis of the ruling from
23 the ITC judge, correct?
24 A.   Correct.
25 Q.   And that was the only patent against which Honeywell

JEREMY WHITLEY - CROSS

1  asserted laser-based and CCD-based products were infringing,
2  right?
3  A.    I don't think I'm privy to those infringement
4  contentions.
5  Q.    So you don't know as you sit here today.
6  A.    I don't know.
7  Q.    Even though you were managing the case on a day-to-day
8  basis.
9  A.    Correct.  There's a protective order that doesn't allow
10 me to see everything in that case.
11 Q.    Would you have attended the evidentiary hearing if it had
12 gone forward?
13 A.    Yes.
14 Q.    Just a couple more questions, Mr. Whitley.
15     You were talking about after the License and Settlement
16 Agreement was executed, there was some royalty reports
17 provided from OPTO; is that right?
18 A.    Yes.
19 Q.    And then you were reviewing those and you had some
20 questions about those; is that correct?
21 A.    I think our -- we have this business unit inside
22 Honeywell that reviews royalty reports.  They would have
23 reviewed the royalty reports.  We had questions about the
24 missing products.
25 Q.    Okay.  And the missing products, you addressed that with

JEREMY WHITLEY - REDIRECT

1  OPTO's counsel, didn't you?

2  A.   I believe our counsel addressed it with OPTO's counsel,

3  yes.

4  Q.   And that counsel asked OPTO's counsel questions, right?

5  A.   I believe so, yes.

6          MR. VanHOUTAN:  Thank you, Mr. Whitley.  No further

7  questions.

8          THE COURT:  Thank you.

9          Any redirect?

10         MR. STEVENS:  Yes, Your Honor.

11         I just want to look at the agreement, so if you can

12  pull up JX1 one more time and again look at paragraph A.

13                    REDIRECT EXAMINATION

14  BY MR. STEVENS:

15  Q.   Again, in the settlement agreement does it list four

16  patents or does it list seven patents at the ITC that OPTO

17  wanted to get a license to?

18  A.   Seven patents from the ITC investigation.

19  Q.   Okay.  And there was a mention of the '783 patent, if I

20  have the number right, by Mr. VanHoutan a moment ago.  Was

21  that included in this agreement?

22  A.   Yes.  It's the second to last one, 7,159,783.  It's

23  included in the license agreement.

24  Q.   And does the '783 patent apply to products regardless of

25  whether they're laser-based or CCD-based or image

JEREMY WHITLEY - REDIRECT

1  sensor-based?

2  A.   Yes.

3         MR. STEVENS:  If we can look at the top of the next

4  page, B, Section B here.

5         There we go.

6  Q.   Now, again, what does it say about the patents in

7  Delaware?  Was it just a limited subset or was it all those

8  seven patents?

9  A.   It's the same patents, the same seven patents that were

10  in the ITC investigation.

11  Q.   Okay.  So was the '783 patent in Delaware as well?

12  A.   Yes.

13  Q.   Okay.  So the '783 patent, while it wasn't going to be in

14  the first hearing, was still active at the ITC; is that right?

15  A.   Correct.

16  Q.   And it was active in the Delaware litigation?

17  A.   Yes.

18  Q.   It's one of the patents that they explicitly wanted in

19  the settlement agreement; is that right?

20  A.   Yes.

21         MR. STEVENS:  Thank you, Mr. Whitley.

22         THE COURT:  You may stand down.

23         (Witness stepped down.)

24         THE COURT:  Please call your next witness.

25         MR. MARAIS:  Your Honor, may we have a couple of

JEREMY WHITLEY - REDIRECT

1  minutes to pass out witness binders?

2          THE COURT:  Sure.

3          MR. MUCKENFUSS:  Your Honor, we may need a

4  housekeeping item real quick prior to this witness, if we

5  could have a moment.

6          THE COURT:  Long enough to justify asking the jury

7  to step out or is a sidebar enough to...

8          MR. MUCKENFUSS:  I think so, if that --

9          THE COURT:  Which?

10          MR. MUCKENFUSS:  For the jury to go out, I

11  apologize.

12          THE COURT:  All right.  Members of the jury, when we

13  do this we're actually trying to speed up the trial.  As you

14  can tell already, the Court has not seen the exhibits.  That's

15  just not the way it works.  And so when there's a dispute over

16  whether something is admissible, I've got to take the time to

17  look at it and make a decision.

18          So we'll get back with you as soon as we can.

19  Remember the usual rules while you're on recess.

20          (Jury exited the courtroom.)

21          MR. STEVENS:  I forgot to ask, but may Mr. Whitley

22  be excused, Your Honor?

23          THE COURT:  Is there objection?

24          MR. MUCKENFUSS:  Your Honor, we have a subpoena for

25  Mr. Whitley.  Obviously, we have the right to recall him.

JA1011

JEREMY WHITLEY - REDIRECT

1  Just for the record, that would apply also to Mr. Smith with
2  the prior discussion we had in terms of calling him back,
3  obviously.
4        THE COURT:  The Court will not excuse any witness
5  absent consent from the other party throughout this trial.
6        All right.  Yes, you had something you wanted to
7  bring up.
8        MR. MUCKENFUSS:  Yes, Your Honor.  There is a
9  demonstrative device, I think, that we were told about not
10 long ago, so I think we just need to figure out how to deal
11 with that.  Ms. Lehman is going to handle that with this
12 witness.  So I think we just need to figure that out.
13       MS. LEHMAN:  We just wanted to take a look at the
14 demonstrative.  We haven't had a chance to look at it.  That
15 will take just two seconds.
16       There's also an issue.  Mr. Smith in his expert
17 report talked a lot about OPTO's source code.  So I don't know
18 what he's going to say in his direct, but we just might want
19 the courtroom sealed if he's actually going to address OPTO
20 source code.  We just don't want that in open court.
21       THE COURT:  Will he be addressing that?
22       MR. MARAIS:  Your Honor, he will address source code
23 at a high level.  He will not identify any specific functions
24 of source code.
25       MR. STEVENS:  He's going to say that he's reviewed

JEREMY WHITLEY - REDIRECT

1  the source code and he can confirm the product's functionality
2  based on his review of the source code.
3            THE COURT:  Then there's no need to seal the
4  courtroom for that.
5            So is the only other thing we're waiting for is your
6  review of the demonstrative?
7            MS. LEHMAN:  Yes, Your Honor.
8            And, Your Honor, the patent issue may come up as
9  well with -- this is an expert.  So this expert is going to
10  take the stand and, if he testifies consistent with his expert
11  report, say, you know, in my opinion PDF417 is a 2D symbology.
12  And so we would like the chance to challenge his -- the basis
13  for his opinion with the statements by Honeywell in its
14  patents that have called PDF417 a 1D stacked symbology.
15           THE COURT:  Only from the patents?  That's the only
16  thing you would use to cross examine, the patents themselves?
17           MS. LEHMAN:  Yes.  Depending on what he says,
18  perhaps some language in some of the standards as well.  But
19  yes, the statements in the Honeywell --
20           THE COURT:  You mean the standards cited in the
21  agreement?
22           MS. LEHMAN:  Yes.  I mean, it's a broad category.
23           THE COURT:  I get a little uncomfortable when you
24  won't say yes.
25           MS. LEHMAN:  Yes.

JA1013

112

JEREMY WHITLEY - REDIRECT

1          THE COURT:  When you start talking about, well, it's
2     kind of broad --
3          MS. LEHMAN:  I'm just thinking the standards aren't
4     all listed by number per se like in the agreement.  But yes,
5     the standards that are referenced in the agreement.  But I
6     imagine he's going to testify about those on direct.
7          MR. MUCKENFUSS:  I've handed Mr. Stevens the patents
8     that I can hand to Mr. Brenner, but he's reviewing them right
9     now.
10         THE COURT:  Because I want to look at them.  I mean,
11    it's all well and good for everybody else to look at them, but
12    I would kind of like my own chance.  So we have them all
13    already.  Let's take a recess while I do that.
14         Do we have everything you might use in your cross,
15    all the patents?
16         MS. LEHMAN:  I mean, that's only three of them.  I
17    can give you the others.
18         THE COURT:  Well, that's probably enough for us to
19    get started.
20         MR. MUCKENFUSS:  May I approach, Your Honor?
21         THE COURT:  Yes.
22         (Documents were tendered to the Court.)
23         (Brief recess at 2:04 PM.)
24         (Court back in session at 2:12 PM.)
25         (Jury not present.)

JA1014

JEREMY WHITLEY - REDIRECT

1          THE COURT:  All right.  Some of these patents will
2   be permitted for cross examination as I anticipate how the
3   evidence is projected.
4          For instance, patent number 7,387,253 BI, which is
5   Defense Exhibit 816, the paragraph in the background of the
6   invention, which is at Bates number ending in 781,
7   specifically -- or sufficiently addresses the 1D stacked
8   barcode symbology to be relevant to the cross examination.
9   And there's at least one other of a similar nature, which is
10  Defense Exhibit 818.
11         The patent in Defense Exhibit 840 at Bates number
12  721 talks about what one-dimensional symbologies may include
13  and then may again include something else.  That's too
14  disconnected from any scientific or technical relation to the
15  definition in the agreement and cross examination with respect
16  to such patent would not be allowed.  Clear?
17         (No response.)
18         THE COURT:  Clear?
19         MS. LEHMAN:  Not entirely, Your Honor, because there
20  are a couple other patents and I hadn't expected you to split
21  those three down the middle.
22         THE COURT:  Well, that's what happens when you hand
23  me an exhibit in the middle of trial --
24         MS. LEHMAN:  Understood, Your Honor.
25         THE COURT:  -- and indicate what it is you want me

JA1015

JEREMY WHITLEY - REDIRECT

1  to look at.  So that's what I've looked at and that's the
2  ruling I've made.
3            MS. LEHMAN:  Understood, Your Honor.
4            THE COURT:  All right.  Call the jury.
5            Well, wait a minute.  You object to the
6  qualifications of Mr. Smith to testify as an expert?
7            MS. LEHMAN:  To the one aspect about his having an
8  expertise, I believe it was, in barcodes, yeah, we do.
9            THE COURT:  Hold her off.
10           MS. LEHMAN:  I'm sorry.
11           THE COURT:  So do we need to have a *Daubert* hearing
12  on his qualifications?
13           MR. STEVENS:  We're willing to limit it to PDF417,
14  MicroPDF417, and composite codes instead of all barcode
15  symbologies, if that makes life easier.
16           MS. LEHMAN:  Your Honor, so the first time he became
17  familiar with these symbologies was in connection with
18  litigation for Honeywell.  We're going to object to him being
19  an expert in PDF417 very much.  He's an expert in source code.
20  He's testified about source code in a number of cases.  I have
21  no objection to him testifying about technical aspects of
22  source code.  But he is not a barcode expert.
23           THE COURT:  Well, we'll hear his -- you can put his
24  qualifications on in front of the jury.  You can offer his
25  qualification as an expert in whatever field you suggest and

JA1016

CRAIG SMITH - DIRECT

 1  the Court will make a ruling.  If you want to examine him

 2  prior to him giving substantive testimony to thwart the Court

 3  qualifying him as an expert in the proffered materials, you

 4  let me know that.

 5          MS. LEHMAN:  Thank you, Your Honor.

 6          THE COURT:  And then we'll see how far the testimony

 7  goes.

 8          (Jury entered the courtroom.)

 9          THE COURT:  Okay.  We really have been working, I

10  promise you.

11          All right.  Call your next witness.

12          MR. MARAIS:  We call Mr. Craig Smith.

13           CRAIG SMITH, PLAINTIFF'S WITNESS, SWORN,

14          MR. MARAIS:  Your Honor, I have a binder for

15  Mr. Smith.  May I approach?

16          THE COURT:  You may.

17                    DIRECT EXAMINATION

18  BY MR. MARAIS:

19  Q.   Good afternoon, Mr. Smith.

20  A.   Good afternoon.

21  Q.   Can you please state your name for the jury.

22  A.   My name is Craig Smith.

23  Q.   And did you help prepare any demonstratives for your

24  presentation today?

25  A.   Yes, I did.

CRAIG SMITH - DIRECT

1  Q.   And, Mr. Smith, are these your demonstratives?

2  A.   Yes, they are.

3  Q.   Can you please tell the jury a little bit about yourself.

4  A.   Certainly.  First of all, I'm married.  I've been married

5  for 42 years.  I have two children, three grandchildren.  I

6  live in a small town in upstate New York called Spencerport,

7  New York, which is along the Erie Canal just a little bit west

8  of Rochester, New York.

9  Q.   And where did you go to school?

10 A.   I went to school to get my bachelor's degree at the

11 University of Cincinnati.  I got a degree in electrical

12 engineering in 1985.  And then I went to school at the

13 Rochester Institute of Technology to get my Master's Degree in

14 Computer Engineering in 1993.

15 Q.   And then what was your first job in the industry?

16 A.   Right after graduating from Cincinnati, I got a job at

17 Eastman Kodak Company.

18 Q.   And how long were you at Eastman Kodak?

19 A.   I was there for 27 years, from 1985 until 2012.

20 Q.   Now, can you tell us a little bit about Eastman Kodak.

21 Who are they; who were they?

22 A.   Eastman Kodak Company was photography.  They did

23 everything in the field of photography for many years.  If

24 you've ever had a phone camera, you know all about Eastman

25 Kodak.  In fact, the founder of Eastman Kodak, George Eastman,

CRAIG SMITH - DIRECT

1  invented the very first camera that had a roll -- a film you

2  could put in so you could actually advance to the next one,

3  and that made photography much easier for everybody going

4  forward.  And that was in the 1800s, a long time ago.

5       But then in the '70s, about almost a hundred years later,

6  an inventor in Kodak's research labs named Steve Sasson

7  invented the very first digital camera, which was a big box

8  that he'd carry around and take pictures; and the pictures

9  were terrible, but he could actually take pictures.  And it

10  was the very first digital camera, and it's now in the

11  National Museum, the Smithsonian National Museum.

12       And I actually had a chance to work for many years in

13  the -- in Kodak's research labs along with a lot of other of

14  the world's best inventors and engineers and things like that,

15  and I had a chance to learn from some of those people over all

16  those years.

17  Q.   Thank you, Mr. Smith.

18       Now, you said something a little interesting to me there

19  and that was that the first digital camera is in the

20  Smithsonian.  How do you know that?

21  A.   Well, I'm actually the person that drove it from

22  Rochester, New York, to Washington, DC, so that they could put

23  it in there.  So I know it's there.

24  Q.   Thank you.

25       And what did you do for Kodak?

118

CRAIG SMITH - DIRECT

1   A.   I did lots of cool things.  I worked on, you know -- when
2   I first started in digital imaging, I worked on one of the
3   very first digital copiers.  I worked on things like digital
4   microfilm readers.  I worked on what was at the time the
5   highest resolution satellite that could take pictures of the
6   earth for commercial purposes.  I designed an image
7   compression algorithm so you could download that information
8   to the earth.  I worked on inkjet printers.  I worked on high
9   speed document scanners.
10       And I worked on digital cameras.  In fact, in -- I
11  started working on digital cameras in 1993 when nobody knew
12  what a digital camera was.  Nobody -- I would walk around with
13  a digital camera and say it has no film and people were
14  shocked.  So I worked on probably more than a hundred
15  different models of Kodak digital cameras over the years.
16  Q.   And how does all of your work at Kodak and all of that
17  experience relate to decoding a barcode?
18  A.   Well, the things I did at Kodak were all image processing
19  algorithms.  In these cameras I worked on the image processing
20  algorithms.  In the satellite that I talked about, I helped to
21  design the compression algorithm that could send the
22  information to the earth and the decompression algorithm that
23  could then reconstruct the images once they got to the earth.
24       I worked -- and really, barcode decoding algorithms are
25  image processing algorithms just like the ones I've worked on

JA1020

CRAIG SMITH - DIRECT

1  for years.  In fact, if you just get the standard and open it
2  up, it has all the steps just like the steps that I've worked
3  on for many, many years.
4  Q.   Now, one word I heard you say a lot there was the word
5  "algorithm."  What exactly is an algorithm?
6  A.   An algorithm is, you know, a big word, but it really
7  means just a set of steps that you execute to do something, to
8  perform some task.  And I want to give you a real quick
9  example of an algorithm.
10      If you've ever used a camera and pointed it at friends or
11  family and you've seen it put like a square around a person's
12  face, there's an algorithm that does that, and the algorithm
13  is pretty simple.  All you have to do is search the image for
14  things that look like skin color.  That's step one.  And then
15  you go through and take all those skin-colored places and find
16  the ones that are connected together, clumped together in a
17  region.  And then you go through those and you throw away the
18  ones that are too big or too small.  And then you throw away
19  the ones that don't look like an oval like a person's face.
20  And then you look for things that look like eyes or a nose and
21  throw out anything that doesn't have those.  Everything that's
22  left you put a box around because it's probably a face.
23  That's an algorithm.
24  Q.   Thank you.
25      And what did you do after you left Kodak?

JA1021

CRAIG SMITH - DIRECT

1  A.    After I left Kodak I started my own company called

2  Chaotic Inertia, LLC.

3  Q.    And what do you do at Chaotic Inertia?

4  A.    Well, I do a lot of the same things because, you know,

5  after I left Kodak -- I was pretty well-known at Kodak as

6  being the person that did image processing in products.  And

7  so when I left Kodak, a lot of the people that knew me from

8  Kodak, you know, were working for other companies at that

9  point and they would call me up and say could you help us do

10 this kind of thing now that you're not working at Kodak

11 anymore.  So I've been busy ever since working on the same

12 kinds of things but just for other companies.

13 Q.    And can you give us an example of one of those more

14 recent projects that you might have done while you were at

15 Chaotic Inertia rather than Kodak.

16 A.    Yes.  One of the companies that I worked with had an idea

17 for a new kind of image sensor that could be used in the next

18 generation cell phone to make even better pictures.  So I

19 worked for them to help design the sensor and I worked with

20 them to help to design the image processing algorithms that

21 would go into it to use all the extra information coming from

22 the sensor to make even better images.

23 Q.    And since you started working at Chaotic Inertia, have

24 you done any other work related to actually assessing barcode

25 decoding source code?

CRAIG SMITH - DIRECT

1  A.   Yes, I have.  I've had the opportunity to review source

2  code as a part of several litigations, several cases.  So I've

3  actually looked at the source code for several of the biggest

4  players in the barcode scanning industry, and that includes

5  all the source code, the software, that does their barcode

6  decoding.

7  Q.   You just mentioned that you were a consultant in certain

8  litigations.  Have you ever done any consulting work for the

9  folks at Honeywell or my law firm, Alston & Bird?

10  A.   Yes, I have.

11  Q.   Now, has all of your work that involves litigation been

12  for Honeywell or my law firm?

13  A.   No, I've represented other law firms and companies.

14  Q.   And were you compensated for your time in this case and

15  those cases?

16  A.   Yes, I was.  Definitely.

17  Q.   And was the compensation you received contingent on any

18  opinion that you ultimately gave in those cases or in this

19  case?

20  A.   No.  I'm paid for my work, not for my opinions.

21  Q.   Thank you.

22       Now, Mr. Smith, do you have any patents?

23  A.   I do.  I have -- I actually have 43 patents in the field

24  of digital imaging and digital image processing algorithms.

25  Q.   And generally speaking, what are those patents directed

JA1023

CRAIG SMITH - DIRECT

1  to?

2  A.   As I said, they're all in the field of digital imaging

3  and digital image processing algorithms.

4  Q.   And how about technical publications and technical

5  journals, do you have any of those that are recent or date

6  further back?

7  A.   Yes, I've had several, approximately four.  I know I've

8  had two in the last ten years.

9  Q.   So once again, Mr. Smith, are you familiar with how

10  decoding a barcode works?

11  A.   Yes, I am.

12  Q.   And at a high level, where does your familiarity come

13  from in understanding how that actually works and how that

14  functions?

15  A.   It comes from 37 years of doing that kind of thing for

16  all kinds of products.

17  Q.   Now, Mr. Smith, were you deposed in this case?

18  A.   I was.

19  Q.   And for the jury, can you explain at just a high level

20  what it means that you were actually deposed in this case.

21  A.   It means that as a part of this case, OPTO's attorneys

22  were allowed to ask me questions about the opinions that I'm

23  going to be discussing today, and I had to answer all those

24  questions while under oath exactly the same as I'm under oath

25  today.

CRAIG SMITH - DIRECT

1   Q.   Now, do you recall that in that deposition, one of OPTO's
2   lawyers sitting over there actually gave you a bit of a pop
3   quiz?  Does that sound familiar?
4   A.   Yes, he did.
5   Q.   And I think what they did was they got a blank PDF417
6   barcode just on a blank white piece of paper and they put that
7   in front of you.  Does that sound about right?
8   A.   Yes, they did.
9   Q.   And is this that little pop quiz that they gave you?
10  A.   Yes, it is.
11  Q.   Now, when they put that blank PDF417 in front of you,
12  what questions did they ask you about it?
13  A.   Well, they asked me to find a bar, a module, and I
14  circled that with the pink -- the pink circle.
15       And then they asked me to find the left row indicator.
16  Well, I informed them there's not just one left row indicator,
17  there's several left row indicators, one for each of the left
18  rows.  And so I drew the green box around the part of the
19  barcode that has the left row indicators.
20       And then they asked me about the start and the stop
21  characters in the barcode.  And I drew the yellow boxes around
22  the start and stop characters in the barcode.
23  Q.   And how did you do on their pop quiz, Mr. Smith?
24  A.   I aced it.
25  Q.   Thank you.

124

CRAIG SMITH - VOIR DIRE

1      MR. MARAIS:  Your Honor, I move that Mr. Smith be
2 admitted as an expert in the field of source code, imaging
3 algorithms, decoding algorithms, and barcode symbologies.
4      THE COURT:  Would you like to examine the witness on
5 those qualifications?
6      MS. LEHMAN:  If I could briefly, Your Honor.
7      THE COURT:  You may.
8                  VOIR DIRE EXAMINATION
9 BY MS. LEHMAN:
10 Q.  So, Mr. Smith, it sounds like you have a lot of
11 experience on image processing from Kodak and -- and that
12 makes sense.  When we use our phone, like an iPhone, to get
13 that menu off the QR code, that works because our phone has an
14 image sensor, right?
15 A.  Yes, it does.
16 Q.  And you understand that products with image sensors are
17 not the products at issue here today?
18 A.  I do.
19 Q.  And laser scanners don't capture images, right?
20 A.  Well, laser scanners can capture images.  I didn't work
21 on laser scanner products at Kodak, but laser scanners can
22 certainly capture images.
23 Q.  The laser scanner barcode products at issue here today,
24 OPTO's products.
25 A.  OPTO's products specifically --

JA1026

125

CRAIG SMITH - VOIR DIRE

1  Q.   That are accused here.

2  A.   -- that are accused here don't scan images, but you could

3  make a -- like a mounted barcode --

4  Q.   Mr. Smith, I'm not interested in the --

5         THE COURT:  He's going to answer the question.

6         Go ahead, you can finish your answer.

7         THE WITNESS:  But OPTO at any point could make a

8  mounted barcode scanner with a laser that -- it's called

9  scanning in a raster fashion.  You can scan -- with a laser

10 you can scan linearly just back and forth and you have a photo

11 diode that will get the light that comes back from the laser

12 and record the value at that point, every point.

13        But there are also lasers that scan in what's called

14 a raster where you go back and forth and cover an entire image

15 and you can cover the same area of an image as other types of

16 sensors, and what you end up with is an image that can be used

17 to decode barcodes in general.

18 Q.   Of the products at issue here, those products that were

19 put up on the screen by Honeywell's counsel, are any of

20 those -- do any of those capture images?

21 A.   Those capture images in a line.  They capture imaged data

22 from the scene that they're scanning in a line.

23        THE COURT:  For our purposes now, please examine him

24 just on his qualifications, not your general cross

25 examination.

JA1027

CRAIG SMITH - VOIR DIRE

1  Q.   So, Mr. Smith, that whole time you were at Kodak, you
2  didn't work on any products that specifically decoded bar
3  codes, right?
4  A.   I didn't work on any products where I did the barcode
5  decoding.  As I've mentioned, the products -- there were
6  products at Kodak that could decode barcodes.  For example, I
7  worked on a cell phone camera.  Now, I worked on the part of
8  the camera that actually made really high quality images, you
9  know, sharp edges, not very noisy, vibrant colors, things like
10 that.  But the same product could certainly decode a barcode
11 just the same as your cell phones today can decode a barcode.
12      There was also a very high speed document scanner that I
13 worked on where you had a CCD array, similar to the CCD arrays
14 in some of OPTO's products, and paper would fly by, like two
15 and a half pages per second, 150 pages a minute, and the
16 sensor would capture it as it's flying by and create these
17 very high quality two-dimensional images.  And we used to
18 have -- there was a feature in there where you could have
19 barcodes that would switch options for the barcode scanner as
20 it was going by.
21      Now, I didn't work on the decoding of that.  I worked on
22 those products.  I worked, again, on the high speed -- or the
23 high speed software for making very high quality images and I
24 worked on lots of algorithms in those particular products to
25 do all kinds of really cool things, but not particularly the

CRAIG SMITH - VOIR DIRE

1  barcode decoding algorithm.

2  Q.    And setting aside your work for Honeywell and the law

3  firms, for your technical clients you've never done any work

4  with a PDF417 symbology; isn't that right?

5  A.    I've never done any development, no.  Although, I have

6  had clients ask me to specifically look for third-party

7  software that we might be able to put in very quickly to be

8  able to pull out some barcode information from some of the

9  images that customers would input into his system.  He wasn't

10  asking me to develop it at that point because there's already

11  software that you can buy, so that would be much cheaper than

12  having him pay me to actually write all the code.  But, you

13  know, if the customer wanted me to develop it, it's the kind

14  of thing that I could develop easily.

15  Q.    Right.  You could have, but you never did; is that

16  correct?

17  A.    I have not had a customer ask me to actually develop that

18  kind of software specifically.

19          MS. LEHMAN:  No more questions, Your Honor.

20          THE COURT:  All right.  The Court recognizes

21  Mr. Smith as an expert in the areas for which he has been

22  proffered.  If you would, for the benefit of the jury, repeat

23  those, please.

24          MR. MARAIS:  Certainly, Your Honor.  Source code,

25  imaging algorithms, decoding algorithms, and barcode

CRAIG SMITH - DIRECT

1  symbologies.

2          THE COURT:  Members of the jury, at the very

3  beginning I told you that you would be hearing from some

4  expert witnesses and gave you an instruction about considering

5  their testimony, and this is one of those instances.  So if

6  you'll recall the Court's instruction.

7          You may proceed.

8          MR. MARAIS:  Thank you, Your Honor.

9              DIRECT EXAMINATION (Cont'd.)

10 BY MR. MARAIS:

11 Q.   Mr. Smith, what were you asked to evaluate in this case?

12 A.   Specifically, I was asked about two questions:  First of

13 all, are PDF417, MicroPDF417, and composite codes 2D

14 symbologies, 2D barcodes?  And secondly, I was asked whether

15 the OPTO barcode products that are in question today are

16 operable to decode PDF417, MicroPDF417, and/or composite

17 codes.

18 Q.   And what did you conclude starting with that first one on

19 whether PDF417, MicroPDF417, and composite codes are 2D

20 symbologies, what was your ultimate conclusion on that

21 question?

22 A.   I concluded that they are 2D symbologies.

23 Q.   And for the second one, whether OPTO's barcode products

24 that are at issue in this case, are they capable -- or

25 operable to decode PDF417, MicroPDF417, and composite codes?

JA1030

CRAIG SMITH - DIRECT

1   A.   Yes, they're operable to decode those symbologies.
2   Q.   Now, you've mentioned the term "PDF417" a few times here,
3   and we've heard it a few times today.  Can you give a real
4   life example of where someone might actually run into that.
5   A.   Yes.  On the back of a license -- or back of a driver's
6   license, there's a PDF417 that has all the information -- all
7   of your personal information.  It's on the other side, but
8   it's there so that a machine can very quickly read it and
9   accurately get all that information about you when it needs
10  to.
11  Q.   Thank you.
12       Now, I want to start with your first question here.  What
13  did you rely on in making your assessment as to whether these
14  three symbologies are two-dimensional barcodes?
15  A.   I relied on the global industry standard.
16  Q.   And are these them up on the screen here?
17  A.   Yes, ISO/IEC.
18  Q.   Which stands for International Organization for
19  Standardization/International Electrotechnical Commission.
20  Q.   And who exactly is ISO?
21  A.   By the way, I'm going to call this ISO.  This is a long
22  name.  People typically called it I-S-O or ISO.  It's commonly
23  called ISO in the industry.
24       I apologize, what was the question again?
25  Q.   Of course.  Who exactly is ISO?

JA1031

CRAIG SMITH - DIRECT

1   A.   Yes.  Who is ISO?  ISO is an international body.  It
2   consists of more than 160 countries around the world and they
3   bring together experts in whatever technology they need to
4   define a standard.  And they need to do that because products
5   from multiple countries or multiple companies need to be able
6   to work together and they need to be able to agree upon how
7   those technologies work exactly so that there's no question
8   about, you know, when something doesn't work, whose fault is
9   it?  Well, you go back to the standard and you say that didn't
10  work and it's your fault because your product doesn't work.
11       So there are standards for everything.
12  Q.   Now, during the course of your career, outside of this
13  litigation, have you ever had to review ISO standards?
14  A.   Yes, often.
15  Q.   And can you provide one example of when you had to review
16  them as a part of your prior jobs.
17  A.   Certainly.  When you're taking pictures with a camera,
18  you might have heard people say -- talk about JPEGs.  Can you
19  upload your JPEGs to the internet or to your Facebook page or
20  whatever?  JPEG is an image processing algorithm for
21  compressing images and putting them into a file, into, you
22  know, the smallest possible file they can fit into so that you
23  can upload it very quickly to Facebook, or whatever.  But it's
24  also, since it's going to be created by a camera and then used
25  by Facebook or by your computer that's going to put it on the

131

CRAIG SMITH - DIRECT

1    screen, there needs to be a standard so that everybody agrees

2    on how it's going to work.  And there's an ISO standard for

3    that and I've used it many, many times.

4    Q.    Thank you, Mr. Smith.

5          Can you please open that exhibit binder that's in front

6    of you.

7    A.    Okay.

8    Q.    And within that binder you can see tabs labeled 4, 8, and

9    10.

10   A.    Yes.

11   Q.    Can you please flip through each of those and let me know

12   once you've done that.

13   A.    (Witness complied.)  Yes.

14   Q.    And what exactly are Plaintiff's Exhibits 4, 8, and 10?

15   A.    These are the ISO standards for the three barcode

16   symbologies that we're discussing today.

17   Q.    And more particularly, what is Plaintiff's Exhibit 4?

18   A.    Plaintiff's Exhibit 4 is the standard for the PDF417

19   barcode symbology specification.

20   Q.    And how about 8 and 10?

21   A.    Eight is the MicroPDF417 barcode symbology specification.

22         And 10 is the GS1 composite barcode symbology

23   specification.

24   Q.    And did you rely on these three standard specifications

25   in forming the opinion that you're going to be giving the jury

JA1033

CRAIG SMITH - DIRECT

1  today?

2  A.   Yes, I did.

3  Q.   And do these exhibits accurately reflect or depict the

4  standards that you actually relied on when you formed that

5  opinion?

6  A.   Yes, they do.

7         MR. MARAIS:  Your Honor, I move into evidence

8  Plaintiff's Exhibits 4, 8, and 10.

9         THE COURT:  They're admitted.

10         MR. MARAIS:  Thank you.

11         (Plaintiff's Exhibits Numbers 4, 8, and 10 were

12  received into evidence.)

13  Q.   Mr. Smith, what did your review tell you about whether

14  these barcode symbologies are two-dimensional symbologies?

15  A.   It's -- my review concluded that they are two-dimensional

16  symbologies.

17  Q.   And you first mentioned PDF417, so what in the actual ISO

18  standard for PDF417 leads you to believe that it is a

19  two-dimensional symbology?

20  A.   Well, it specifically says that it's a two-dimensional

21  symbology.  As you can see on the screen, under the section

22  about symbology basic characteristics, the code type for a

23  PDF417 is listed as continuous, multi-row two-dimensional in

24  the international specification.

25  Q.   Now, Mr. Smith, were you in the courtroom this morning

CRAIG SMITH - DIRECT

1  for the opening presentations that each of the attorneys gave?

2  A.    Yes, I was.

3  Q.    Did you ever hear the term "stacked symbol" in either of

4  those presentations?

5  A.    Yes, I believe I did.

6  Q.    Now, what's the difference between stacked symbol and

7  this continuous, multi-row two-dimensional symbol?

8  A.    There is no difference.  They're the same thing.  It's a

9  two-dimensional multi-row symbol.  And stacking just means

10  that it's multi-row in exactly the same way as the term

11  "multi-row."  So stacking -- stacked symbols, multi-row

12  symbols, they're both two-dimensional.

13  Q.    Thank you.

14      Can you please open your exhibit binder to Exhibit 325.

15  Let me know when you get there, please.

16  A.    (Witness complied.)  Okay.  I'm there.

17  Q.    And what exactly is this exhibit?

18  A.    This exhibit is -- it's an admission from -- well, the

19  exhibit itself is answers from OPTO from questions that

20  Honeywell was allowed to ask them.

21  Q.    And did you rely on this exhibit in forming the opinion

22  that you were going to be delivering today?

23  A.    Yes, I did.

24  Q.    And does the document you have there, that particular

25  answer/question -- or question and answer, properly depict the

CRAIG SMITH - DIRECT

1  question and answer that you relied on in forming that
2  opinion?
3  A.   Yes, it does.
4         MR. MARAIS:  Your Honor, I move into evidence
5  Plaintiff's Exhibit 325.
6         THE COURT:  It's admitted.
7         (Plaintiff's Exhibit Number 325 was received into
8  evidence.)
9  Q.   Mr. Smith, up on the screen here, is this a portion of
10 that document that is in front of you there?
11 A.   Yes, it is.
12 Q.   And what exactly are we looking at on Slide 7 up here?
13 A.   This is OPTO admitting that PDF417 is a continuous,
14 multi-row two-dimensional code type symbol.
15 Q.   And is that the same definition that we just saw in the
16 ISO standard?
17 A.   Yes, it is.
18 Q.   Now, how do you know that this is OPTO actually admitting
19 that PDF417 is a continuous, multi-row two-dimensional symbol?
20 A.   As I understand it, as a part of this litigation,
21 Honeywell was allowed to ask OPTO questions and OPTO had to
22 answer those questions.  And one of the questions that
23 Honeywell asked was whether OPTO would admit that PDF417 is a
24 continuous, multi-row two-dimensional code type.  And the
25 official corporate answer for that was that "PDF417 is a

JA1036

CRAIG SMITH - DIRECT

1  continuous, multi-row two-dimensional code type symbol," as I
2  have highlighted on this slide.
3  Q.    Now, reading through this paragraph if we continue down,
4  I see that -- and I'll highlight it here -- there's something
5  called a linear barcode symbol character.  Can you please
6  explain to the jury what that is.
7  A.    Yes.  As this paragraph points out, a PDF417 is made up
8  of a bunch of little linear code symbol characters and those
9  things are put together in a matrix, a two-dimensional matrix,
10 to form the full PDF417 symbology or barcode for a specific
11 symbol.
12 Q.    So does the inclusion of this language, "linear barcode
13 symbol character," change your opinion that PDF417 is a
14 two-dimensional barcode?
15 A.    No, not at all.  Clearly -- clearly, the pieces are --
16 there are pieces in there that are linear barcode symbol
17 characters, but they're arranged in this two-dimensional
18 matrix of rows and columns so that it's definitely a
19 two-dimensional symbol as the international specification
20 says.
21 Q.    Now, is there anything else in the ISO standard for
22 PDF417 that leads you to believe that this is in fact a
23 two-dimensional symbol?
24 A.    Yes.  The standard also lists the number of rows and
25 columns, and that's important because there has to be more

CRAIG SMITH - DIRECT

1  than one row.  You need to have at least three rows in a
2  matrix to be able to have a PDF417.
3  Q.    And do you have an example of a PDF417 that you can show
4  the jury today?
5  A.    Yes.  The next slide is an example that's taken directly
6  from the international standard.  And it shows all the
7  different pieces, including the data words columns in the
8  middle.
9  Q.    So looking at this image on the slide here, particularly
10 that PDF417 graphic, what are we looking at that actually
11 indicates that it is a two-dimensional symbol as opposed to a
12 one-dimensional symbol?
13 A.    Well, it's obviously a two-dimensional symbol because
14 there are multiple rows, right?  So if I highlight the first
15 row, you can see there's information on that row.  But then
16 the next row down has different information, and the row below
17 that has even different information.
18      So it's the fact that there are multiple rows, it has to
19 be two-dimensional, right?  It has to have a second dimension
20 to be able to encode all that data.
21 Q.    And how did that differ from a one-dimensional code?
22 A.    Well, a one-dimensional code only has one row.  And so
23 basically, if you draw a line across this and only look at the
24 image under that one line, you have everything you need to be
25 able to decode that barcode.  And in fact, the line could be

CRAIG SMITH - DIRECT

1   at the top of the barcode.  The line could be at the bottom of

2   the barcode.  It doesn't matter.  The line can even be at an

3   angle.  Any line that goes from one side of the barcode to the

4   other side of the barcode has all the information.  The image

5   under that line has all the information you need to decode

6   that barcode.

7   Q.   So then again, comparing the two, how does that actually

8   differ from the PDF417 barcode we see on the screen here?

9   A.   Well, as I said, the PDF417 barcode has multiple lines.

10  You can't just read one line.  You have to actually be able to

11  go through the image and get information out of the

12  two-dimensional structure of the image to be able to decode

13  the symbol.

14  Q.   And, Mr. Smith, did you do the same analysis for

15  MicroPDF417?

16  A.   I did.

17  Q.   And what did the ISO standard tell you about MicroPDF417?

18  A.   Well, very similar to the PDF417, the standard says that

19  a MicroPDF417 is a multi-row symbology and it's utilized by

20  applications needing to encode a moderate amount of data in a

21  two-dimensional symbol.

22       And as with the PDF417, you have to have rows and

23  columns.  And so at the bottom of the paragraph there, I've

24  highlighted the maximum number -- the maximum -- it has up to

25  a maximum of 4 data columns and 44 rows.  And so that creates

CRAIG SMITH - DIRECT

1  the two-dimensional structure that is a MicroPDF417.

2  Q.   And again, for MicroDF417, do you have an example of that

3  barcode?

4  A.   Yes.  Yes, I do.

5       This is another example that's taken directly from the

6  international standard for MicroPDF417s.  In fact, it shows

7  here if you actually decode that barcode, you can see the

8  string on the right beside it that is encoded by that barcode,

9  and it's just the alphabet repeated a little more than four

10 times.

11 Q.   And what are we looking at in this MicroPDF417 barcode

12 that, again, indicates that it's a two-dimensional barcode?

13 A.   Well, you might guess that as with the PDF417, it has

14 multiple rows.  And so I've highlighted three of those rows.

15 You can see that the information in those three rows is all

16 completely different from -- completely different and

17 obviously not the same as a one-dimensional barcode.

18 Q.   And did you do the same analysis for composite codes?

19 A.   I did.

20 Q.   And what did the ISO standard tell you when you assess

21 composite codes?

22 A.   Well, as you see on this slide, the standard says that a

23 composite code is comprised of two or more components.  That's

24 what makes it a composite.  And then one composite is a linear

25 symbol and the other composite is a two-dimensional symbol.

CRAIG SMITH - DIRECT

1  Q.  Is there anything else in the composite ISO standard that
2  indicates to you that this is a 2D symbology?
3  A.  Yes.  On this next slide under the basic
4  characterizations -- or basic characteristics of composite
5  symbols, it says that the 2D component must be a continuous,
6  multi-row barcode symbology using basically the same language
7  as the PDF417 and MicroPDF417 standards.
8  Q.  Mr. Smith, I noticed that you said the words "composite
9  codes."  Does that mean that there are multiple composite
10  codes?
11  A.  Yes.  So the standard actually defines three different
12  types of composite codes, and they're called CCA, CCB, and
13  CCC.  CC is basically just composite code.  But CCA, CCB, and
14  CCC.
15  Q.  And again, do you have an example that you can show the
16  jury of a composite code?
17  A.  Yes, I do.  So this next slide is actually an example of
18  a CCC barcode.  You have a one-dimensional barcode on the
19  bottom and then you have a two-dimensional barcode above it.
20  And in this case the two-dimensional barcode is actually a
21  PDF417.
22  Q.  And looking at this image and looking at this composite
23  code, again, what in this composite code indicates to you that
24  it's a two-dimensional symbology?
25  A.  Well, as I said, there is a two-dimensional symbol at the

CRAIG SMITH - DIRECT

1  top, a PDF417, and it has multiple rows.  So as with the other

2  ones, I've highlighted two of those rows so you can see that

3  the data is different in each row.

4  Q.   Just as a quick summary, what is your opinion regarding

5  whether PDF417, MicroPDF417, and composite codes, reviewing

6  the ISO standards, are two-dimensional symbologies?

7  A.   It's my opinion that they are very clearly

8  two-dimensional barcodes.

9  Q.   Now, Mr. Smith, you know in this case that OPTO actually

10  hired their own expert, right?

11  A.   Yes, I do.

12  Q.   And do you recall that expert's name?

13  A.   His name is Mr. Chartier, I believe.

14  Q.   And do you know if Mr. Chartier would agree with you on

15  all these opinions that you just gave today?

16  A.   He actually does agree with me.  He was -- Mr. Chartier

17  was asked the question, "And you have no disagreement with the

18  way that Mr. Smith characterized PDF417; is that right?"

19       And he answered, "That's correct."

20       And then he was asked the same question with respect to

21  MicroPDF417, and he said "correct."

22  Q.   Thank you.

23       So I'd like to talk -- or turn to the second point that

24  you raised and that is whether OPTO's products are actually

25  operable to decode any of these barcode symbologies that we

CRAIG SMITH - DIRECT

1  just talked about.  Is that okay?

2  A.   Yes.

3  Q.   Now, did you assess a range of OPTO's products?

4  A.   I did.

5  Q.   And of those products that you assessed, which ones are

6  you going to be talking about today?

7  A.   I'll be talking about the list on this page.  And I

8  apologize, I need to read these into the record.  It's going

9  to take a minute so if you will just bear with me for a

10 second -- or for a minute.

11 A.   The products are C-41; C-42; F-70; L-46R; L-50C;

12 MDC-200A; MDL-1000; MDL-2001; NLB-1000; NLV-1001; NLV-4001;

13 OPH-1005; OPH-3001; OPL-6845S; OPR-2001; OPR-2001Z; OPR-3201Z;

14 and RLB-1000.

15 Q.   And are these products that you assessed and you're

16 talking about today representative of the rest of the products

17 you assessed throughout the course of this case?

18 A.   Yes, they are.

19 Q.   And in your assessment, were each of those products

20 capable of decoding at least one of PDF417, MicroPDF417, or a

21 composite code?

22 A.   Yes, they were.

23 Q.   Now, Mr. Smith, what did you do in actually making your

24 assessment as to whether OPTO's products could decode these

25 barcodes?

CRAIG SMITH - DIRECT

 1  A.   Well, I did a few things.
 2       First of all, OPTO told us that they did, so I used that
 3  information.
 4       Secondly, I reviewed OPTO's source code to confirm it.
 5       And lastly, I picked up a scanner and tried it.
 6  Q.   So let's start with this first one:  OPTO told us so.
 7  What do you mean by that?
 8  A.   Well, as a part of the litigation, as I said before,
 9  Honeywell was allowed to ask questions of OPTO.  And so one of
10  the questions that was asked was which of your products
11  actually support these technologies?  And they gave us a list
12  of all of those products.
13  Q.   Mr. Smith, can you please open your exhibit binder to
14  Exhibit 61.
15  A.   (Witnessed complied.)  Okay.
16  Q.   And is this that document that you were just referencing?
17  A.   Yes, it is.
18  Q.   And did you rely on this document in forming the opinions
19  that you're giving today?
20  A.   Yes, I did.
21  Q.   And does this document accurately reflect the actual
22  document you relied on when you formed those opinions?
23  A.   Yes, it does.
24       MR. MARAIS:  Your Honor, I move into evidence
25  Exhibit 61.

CRAIG SMITH - DIRECT

1      THE COURT:  It's admitted.

2      (Plaintiff's Exhibit Number 61 was received into

3  evidence.)

4      MR. MARAIS:  Just for clarification, Your Honor, we

5  discussed with the other side and determined there was no need

6  to seal the courtroom for this exhibit.

7      THE COURT:  All right.

8      MR. MARAIS:  Mr. Rudling, can you please go to page

9  11.

10 Q.  Now, Mr. Smith, I understand this might be a bit of a

11 tenuous exercise, but I'd like to walk through exactly what

12 OPTO told you in these interrogatories.  Is that okay?

13 A.  Yes.

14 Q.  Now, you have some demonstratives which are in your

15 actual slide deck that are sitting in your binder.  Do you

16 mind pulling those out.  And in there you should have a -- the

17 slide that lists all those products that you just talked about

18 and there's 18 different products there.  Let me know once

19 you've found that, please.

20 A.  Okay.  I have it.

21 Q.  So what I'd like to do is just walk through this

22 demonstrative as quickly as I -- or this exhibit as quickly as

23 I can.  And while I go, if you don't mind just checking off

24 the products as we go along to make sure that we talk about

25 every product you actually assessed.  Is that okay?

CRAIG SMITH - DIRECT

1  A.   Okay.

2  Q.   So looking at page 11 of PX61, do you see NLB-1000?

3  A.   I do.

4  Q.   Is that one of the products that you assessed in this

5  case?

6  A.   Yes.

7  Q.   And --

8  A.   And just so it's clear, I'm putting a check mark on my

9  slide here, the same slide I read a minute ago, that shows

10  that that's one of the ones that's been read.

11  Q.   Thank you, Mr. Smith.

12      Now, what about this disclosure of NLB-1000 indicates to

13  you that OPTO's firmware or barcode products were operable to

14  decode PDF417, MicroPDF417, and composite codes?

15  A.   So this -- where it lists the NLB-1000, the column beside

16  it is the software version.  So there were several software

17  versions that were used in that product.  It even continues on

18  to the next page.

19      And then beside that there's a column that shows the

20  dates for which that software was valid and could do PDF417

21  decoding.

22      And then beside that the column shows MicroPDF417 and

23  then GS1 composite codes.

24          MR. MARAIS:  And if we could please go to page 12.

25  And if we could zoom in on NLV-1001.

CRAIG SMITH - DIRECT

1  Q.    Now, Mr. Smith, is NLV-1001 one of the products you
2  assessed?
3  A.    Yes, it is.
4  Q.    And does the same apply to this product as what you just
5  talked about with the last?
6  A.    Yes.  It lists the software versions.  And then the
7  columns beside it list dates for the various symbologies, when
8  the product was able to use that software to decode those
9  symbologies.
10 Q.    And moving down the page to RLB-1000, does the same apply
11 to that barcode product?
12 A.    Yes, it does, and in the same way.
13         MR. MARAIS:  And if we can go to page 13, please.
14 Q.    There's a product listed L-46R.  Do you see that, Mr.
15 Smith?
16 A.    Yes, I do.
17 Q.    And did the same apply to that product?  Can it also
18 decode these barcode symbologies?
19 A.    Yes, and in the same way.
20 Q.    And moving down to OPH-1005.  Does the same apply to this
21 barcode symbology -- or to this barcode product, excuse me?
22 A.    Yes, in exactly the same way.
23 Q.    And then moving to the next one, OPH-3001.  Does the same
24 apply to that symbology?
25 A.    Yes, in the same way.

CRAIG SMITH - DIRECT

1      MR. MARAIS:  If we can go to page 14, please.
2  Q.   Now, there's a product called OPL-6845S.  Does the same
3  apply to that barcode product?
4  A.   Yes, and in the same way.
5  Q.   Moving down to OPR-2001Z.  Again, does the same apply to
6  that product?
7  A.   Yes, in the same way.
8  Q.   Moving further down to OPR-2001.  Again, does the same
9  apply to that product?  Can it decode these barcode
10 symbologies?
11 A.   Yes, in the same way.
12     MR. MARAIS:  Moving to page 15, please.
13 Q.   There's a product listed OPR-3201Z.  Does the same apply
14 to this barcode product?
15 A.   Yes, in the same way.
16 Q.   Then moving to MDL-1000 at the bottom of the page.  Does
17 the same apply to that barcode product?
18 A.   Yes, and in the same way.
19 Q.   Moving to page 16, there's a product listed MDL-2001.
20 Does the same apply to that barcode product?
21 A.   Yes, and in the same way.
22 Q.   Thank you.  And I promise we are on the last page.
23     MR. MARAIS:  Page 17, please.
24 Q.   Starting with L-50C.  Does the same apply to that barcode
25 product?

CRAIG SMITH - DIRECT

 1  A.   Yes, in the same way.

 2  Q.   Moving to C-41.  Does the same apply to that product?

 3  A.   Yes, in the same way.

 4  Q.   Moving to C-42.  Again, does the same apply to that

 5  product?

 6  A.   Yes, in the same way.

 7  Q.   Then MDC-200A?

 8  A.   Yes, in the same way.

 9  Q.   And how about NLV-4001?

10  A.   Yes, in the same way.

11  Q.   Finally, how about F-70?

12  A.   Yes, in the same way.

13  Q.   Now, Mr. Smith, have you checked off every product that

14  you listed earlier?

15  A.   Yes, I did.  Every product is checked off.  That is the

16  full list that I read earlier.

17  Q.   So just to be clear, for every single product that you're

18  talking about in this case, OPTO actually told you that they

19  had the barcode decoding functionality for PDF417,

20  MicroPDF417, and composite codes; is that right?

21  A.   Yes, it is.

22       THE COURT:  Let me just ask a question.

23       I assume you're not, like, right next to finishing

24  your direct, correct?

25       MR. MARAIS:  About ten more minutes, Your Honor.

CRAIG SMITH - DIRECT

1       THE COURT:  Okay.  Go ahead.

2       MR. MARAIS:  Thank you.

3       Can we please go back to that demonstrative.

4  Q.   Now, Mr. Smith, you also said you reviewed OPTO's source

5  code.

6  A.   Yes, I did.

7  Q.   And what did you use to guide your review of OPTO's

8  source code?

9  A.   I used this demonstrative that we've been talking

10  about -- or this list we've been talking about that had all

11  the software versions and the dates.

12  Q.   And again, what's listed on that exhibit that we just

13  talked about that helped you in your review?

14  A.   Well, this is the list of the products that actually are

15  operable to decode all three of the symbols -- or symbologies

16  that we're talking about today.  So it has the product name,

17  it has the software version number, and it has the dates.  And

18  so I could find the product and then look up the software

19  version number and extract that so I could look at that

20  version of the software.

21  Q.   And what did you find in your review of OPTO's source

22  code?

23  A.   I couldn't find any differences between what they told me

24  and what was actually in the software.

25  Q.   So do you have any reason to believe, based on your

JA1050

CRAIG SMITH - DIRECT

1  source code assessment, that what OPTO told you was wrong?

2  A.   No, I don't.

3  Q.   Now, is OPTO's source code something that you can access

4  from home on your own computer?

5  A.   No, not at all.

6  Q.   How did you have to access it, then?

7  A.   To access the software, I had to go to the law firm for

8  OPTO and they gave me a special laptop that had the source

9  code on it and I was allowed to be in a room by myself to

10  access that source code.

11  Q.   Now, doing the totality of your review of the source code

12  review, is that something you were able to complete in an

13  afternoon?

14  A.   No.  I spent three days in a room going through all the

15  software.

16  Q.   And it looks like the last thing you have listed here is

17  that you personally tested an OPTO product; is that right?

18  A.   I did.

19  Q.   And what product did you test?

20  A.   It was the OPR-3201Z.

21  Q.   And is this the product up on the screen that you

22  actually tested?

23  A.   Yes, it is.

24  Q.   And what barcode product did you use to test this

25  product?

CRAIG SMITH - DIRECT

1  A.   I used a PDF417.

2  Q.   Now, in actually scanning that PDF417, is there anything

3  you had to do that indicated to you that this product was

4  operating according to the way the standards told it to?

5  A.   Yes.  When you want to decode using one of these

6  barcodes, you have to point to the barcode, pull the trigger

7  and a red line appears   And then you have to scan across that

8  barcode so that you are able to scan and the barcode is able

9  to read the entire two-dimensional area of the barcode so that

10 it can decode the symbol.

11 Q.   Mr. Smith, did you bring an OPR-3201Z with you today?

12 A.   Yes, I did.

13 Q.   Would you be able to test it for the jury?

14 A.   Certainly.

15       MR. MARAIS:  Your Honor, I have a physical

16 demonstrative.  May I approach the witness?

17       THE COURT:  You may.

18 Q.   Mr. Smith, can you please confirm for me what barcode

19 scanning product I just handed you.

20 A.   Just a minute.

21 Q.   That's okay.  Take your time.

22 A.   It's written really small on the product.

23      But it is an OPR-3201Z.

24 Q.   Now, I also handed you a laptop computer.  Can you please

25 explain to the jury exactly what's on that laptop.

JA1052

CRAIG SMITH - DIRECT

1  A.   So this is a Notepad window, just a basic text editor, so
2  if I typed on the keyboard, the text would appear in the
3  window.
4  Q.   And then previously I pointed you to those demonstrative
5  slides, so your own slide deck that you printed out that's in
6  your binder.  Could you please find those and then find a
7  PDF417 barcode in there.
8  A.   So this is the PDF417 barcode that I showed earlier.  And
9  it's the one that's taken directly from the international
10 standard, the ISO standard.
11 Q.   Now, Mr. Smith, can you please walk the jury through how
12 you would actually go about scanning this PDF417 barcode.
13 A.   Certainly.  So what I'm going to do in just a second is
14 point here and pull the trigger and you'll see a red line
15 appear.  And I'll pass that red line across the
16 two-dimensional structure of the PDF417 symbol.  And as I'm
17 going down through it, you will hear a bunch of little beeps,
18 beep beep beep beep beep, as it's reading information from the
19 barcode.  And then you'll hear a louder beep, which means that
20 it's gotten the information it needs so that it can decode the
21 symbol.  And then text will appear in the window as if I typed
22 it.  The text string that this barcode is encoding will appear
23 in the Notepad window.
24 Q.   Please proceed with showing them.
25 A.   Okay.  First I'm going to plug it in.  And it makes a

152

CRAIG SMITH - DIRECT

1  noise because it's connected.  And then as I said, I point to
2  it and you hear the little chirps.  And then when I get enough
3  information, it beeps.  And in the window it says "PDF417
4  symbology standard" because this is the one that came from the
5  standard.
6  Q.   Thank you, Mr. Smith.
7        Now, I don't want there to be any doubt that the PDF417
8  barcode we actually scanned or that you just scanned is
9  somehow not a real PDF417 barcode.  So can you please find
10 that demonstrative that had that pop quiz for me.
11 A.   Yes.  This is it here.
12 Q.   Can you please try to scan that.
13 A.   So, yes.  And even though there's other things drawn on
14 here, if I pass over the -- it reads the barcode and it says
15 "Wikipedia."
16           MR. MARAIS:  Your Honor, may I publish this to the
17 jury?
18           THE COURT:  You may.
19           MR. MARAIS:  Thank you.
20 Q.   Mr. Smith, in conclusion, what is your -- what did you
21 ultimately determine whether OPTO's products that are at issue
22 in this case today can decode PDF417, MicroPDF417, or a
23 composite code?
24 A.   My conclusion was that the evidence clearly shows that
25 OPTO's products are able to decode those barcode symbologies.

JA1054

CRAIG SMITH - CROSS

1          MR. MARAIS:  Thank you, Mr. Smith.

2          I pass the witness, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Members of the jury, before we begin cross

5   examination, you've had a break or two, but we haven't since

6   1:00.  So we're going to take about a 15-minute break now and

7   so you can too.  Please remember my instructions about your

8   conduct while you're on recess, and we'll see you back here in

9   about 15 minutes.

10          (Jury exited the courtroom.)

11          THE COURT:  We're in recess.

12          (Brief recess at 3:16 PM.)

13          (Court back in session at 3:30 PM.)

14          THE COURT:  Bring the jury.

15          (Jury entered the courtroom.)

16          THE COURT:  You may cross examine.

17          MS. LEHMAN:  Thank you.

18                      CROSS EXAMINATION

19   BY MS. LEHMAN:

20   Q.  Mr. Smith, let's go back to some of the standards that

21   you referenced in your testimony.

22          MS. LEHMAN:  Could we have PX4 at page 8.

23   Q.  And you recall that you testified about PX4 in your

24   direct.  It's the standard 15438.

25   A.  15438.  That's the PDF standard, correct?  I don't have

154

CRAIG SMITH - CROSS

1  the numbers.

2  Q.   Yes, it's the PDF417 barcode symbology specification.

3  A.   Yes.

4         MS. LEHMAN:   And if we look at -- let's go to page 8

5  as marked on the document.

6         There we go.

7  Q.   Paragraph 5.3.1, symbol character structure.

8  A.   Yes.

9  Q.   So that first sentence states, "Each PDF417 symbol

10 character shall consist of four bar elements and four space

11 elements, each of which can be one to six modules wide."

12 Right?

13 A.   Yes.

14 Q.   And is it correct that PDF417 decodes data using bars and

15 spaces?

16 A.   Yes.  It uses these symbol characters -- as I mentioned

17 earlier, these symbol characters arranged in a two-dimensional

18 matrix to encode the data.

19 Q.   But each PDF symbol character has those four bar elements

20 and four space elements according to the standard, correct?

21 A.   Yes.  And there's an example shown here of one symbol

22 character.  These are called symbol characters as they've

23 shown them here.

24 Q.   And so, Dr. Smith, looking at that last sentence of the

25 first paragraph under 5.3.1, "PDF417 symbol characters can be

JA1056

CRAIG SMITH - CROSS

1  decoded by measuring the e-distances within the character."
2  Right?
3  A.    Yes.
4  Q.    And that's your understanding of how PDF417 works, right?
5  A.    Yes.  They can be coded using the e-distances.
6        MS. LEHMAN:  And now let's turn to PX8, which is
7  another one of the standards that you talked about in your
8  direct testimony.  And let's go to the page that's marked 6,
9  please.
10 Q.    And PX6 is the standard for MicroPDF417.  Do you recall
11 that from your direct testimony?
12 A.    You said PX6, is that what you said?
13 Q.    PX8, sorry.
14 A.    PX8.  Where is the PX8 that I'm reading?
15 Q.    It's just not a stamped copy here.  It's also in that
16 binder that you used in your direct.
17 A.    Oh, I'm sorry.  So this ISO 24728 that is on the screen
18 right now is the MicroPDF417 barcode symbology specification.
19 Q.    Right, that you just testified about in your direct,
20 right?
21 A.    Yes.
22        MS. LEHMAN:  So now let's turn to the page marked
23 Number 6 in the bottom left-hand corner.
24 Q.    And at the top of page 6 it states that the "symbol
25 character structure: (n, k, m) characters of 17 modules (n), 4

CRAIG SMITH - CROSS

1  bar and 4 space elements (k), with the largest element 6

2  modules wide (m)."

3      And is that your understanding of the symbol character

4  structure for MicroPDF417?

5  A.   Yes.  It's the same symbol character structure, yes.

6  Q.   Because MicroPDF417 also decodes data by detecting the

7  width between bars and spaces; is that right?

8  A.   Yes, it measures the width between the bars and the

9  spaces.

10 Q.   I had a question I was -- I think I might have misheard

11 something that you said on direct so I just want to check.

12     Would you agree with me that those symbol characters in

13 PDF417 have the characteristics of a linear barcode symbol

14 character?

15 A.   I would say that they are, as I described them, a linear

16 symbol character, yes.

17 Q.   And each row in a PDF417 has the characteristics of a

18 linear barcode symbol.  Would you agree with me with that?

19 A.   Each row is made up of multiple of these symbol

20 characters, yes.

21 Q.   Right.  And each row has the characteristics of a linear

22 barcode symbol.

23 A.   Well, it looks like it.  I mean, there's actually other

24 characteristics.  If you -- when you get technically inside of

25 it, there are things like right row indicators and left row

CRAIG SMITH - CROSS

1  indicators and things like that that you just don't need in a
2  one-dimensional code, right?  You only need them there because
3  they're -- it's a two-dimensional code so when you're scanning
4  them, you need to know where you are in the code.  But you
5  just don't need things like that.  It kind of looks like a
6  one-dimensional barcode because it's made up of several of
7  these things, but there's a whole structure in there that is
8  completely different from the -- a normal one-dimensional
9  code.
10 Q.   But you would still agree with me that each row has the
11 characteristics of a linear barcode symbol, would you not?
12 A.   As I said, I would agree that each of the symbol
13 characters have a characteristic of a one-dimensional linear
14 character.  As far as whether it's the same -- the same as a
15 one-dimensional code, there's a lot of other structural
16 differences in what it's encoding and how that's used to put
17 the data together in a two-dimensional fashion that's
18 completely different from what you would encode in a
19 one-dimensional barcode because there's only one row in one
20 dimension so you just don't need to have all that extra
21 structure in there.
22      It's all that extra complication that you have to put
23 into a two-dimensional code.  That's basically the reason why
24 you have to call it a two-dimensional code because you have to
25 have all this extra stuff in there.  You can't just have

JA1059

CRAIG SMITH - CROSS

1   software that says, oh, I'm going to read this one line and

2   get something.  You have to have software that has the ability

3   to get this extra information that's encoded and put it

4   together so that you can get the data out or you're never

5   going to get it out.

6   Q.   Let's look at another standard, then.

7        MS. LEHMAN:  Can we have DX738 to the well and to

8   the witness, please.

9   Q.   Mr. Smith, DX738 is ISO 15415.  Is this a standard that

10  you reviewed in reaching your opinion in this litigation?

11  A.   Well, it's a standard that I've reviewed.  It wasn't

12  involved in my opinion because -- well, as this says, just to

13  be clear, this is a Barcode Symbol Print Quality Test

14  Specification, Two-Dimensional Symbols.  And so this is

15  something you would use for a product that prints barcodes so

16  that you can evaluate whether a reader will actually be able

17  to use the thing you printed.  And since the products

18  aren't -- in question today aren't printers, they're scanners,

19  I didn't rely on this.  But I have reviewed it.  I've seen

20  this before.

21  Q.   Okay.  In the context of this litigation?

22  A.   Yes.

23       MS. LEHMAN:  Your Honor, can I move to admit?

24       THE COURT:  I believe the testimony was he didn't

25  rely on it, so no.

CRAIG SMITH - CROSS

 1  Q.   So you recall I asked you the question of whether each

 2  row in PDF417 has the characteristics of a linear barcode

 3  symbol; and you disagreed with me on that, right?

 4  A.   Well, that's a summary of it.  I said that the pieces

 5  look like little -- they're called symbol characters -- look

 6  like linear barcode symbols.  But you have all this extra

 7  information that's encoded that makes it fundamentally

 8  different from a one-dimensional barcode product -- or barcode

 9  symbol.

10  Q.   But, Mr. Smith, I mean, did you not rely on this document

11  because it disagrees with you?

12  A.   I'm sorry, which document?  The document on the screen

13  here?

14  Q.   Yes, the document on the screen.

15  A.   Well, I didn't rely on it because this is for printers,

16  things that print.  It -- it says on it that this is a Barcode

17  Symbol Print Quality Test Specification.  And as it's -- you

18  know, I've looked at this document.  And it's so that when you

19  print a barcode, when you have a product that's printing, like

20  an inkjet printer or something like that, and you want to be

21  able to print barcodes, you have to make sure that a scanner

22  is going to be -- one of the fundamental things is when you

23  print things -- I've worked on inkjet printers.  So when you

24  print things the ink spreads out on the paper and so that can

25  affect the widths of the bars and the spaces.  And so you need

CRAIG SMITH - CROSS

1  to have a specification like this that will tell you when you

2  print things, are scanners actually going to be able to decode

3  it?  And so that's what this is for.

4      But since none of the products that we're looking at

5  today are printers, they're only scanners, I didn't need to

6  rely on this for my opinions.

7          MS. LEHMAN:  If you could turn to the page marked

8  little V little I.

9  Q.  In the second paragraph in the second sentence, it's

10 talking about multi-row barcode symbols.  It says, "Each

11 symbol character has the characteristics of a linear barcode

12 symbol character and each row has those of a linear barcode

13 symbol; each row, therefore, may be read by linear symbol

14 scanning techniques."

15     Would you agree with that statement?

16 A.  Well, I think that agrees with what I said.  Each of the

17 symbol characters is a -- it's like a linear symbol

18 character -- it's a linear symbol character as this paragraph

19 says -- or as this sentence says that's highlighted on the

20 screen.  And the row is made up of a bunch of those and so you

21 can read each individual one.

22     But what I said was that the information that those

23 symbols represent -- in a normal 1D barcode symbol, all the

24 information on the line is used to decode just that one string

25 that's encoded.  For instance, when you go to the grocery

CRAIG SMITH - CROSS

1  store and you read a UPC code, everything on there is so you
2  can read the number that represents a product.
3       Whereas in a PDF417, the difference isn't in the fact
4  that each individual piece kind of looks like a little linear
5  symbol.  It's the fact that the data that's encoded in there
6  is just different because you have to be able to tell it,
7  since it's a two-dimensional symbol, where are you in the
8  symbol.  So there's a right row indicator and a left row
9  indicator.
10      I mean, if you just think about when you're scanning, if
11  you just don't get quite perfect, the right side might be
12  different from the left side.  So you need to know exactly
13  where you are.  And it's that extra information that's encoded
14  in the symbol that makes it fundamentally different from a 1D
15  barcode symbol.
16 Q.   And the very first -- well, the very first sentence on
17  this page vi under Introduction states that "the technology of
18  barcoding is based on the recognition of patterns encoded, in
19  bars and spaces or in a matrix of modules of defined
20  dimensions."
21      You would agree with that, right?
22 A.   Yeah, I think that's accurate.  I mean, each of the
23  symbol characters that we've talked about today is basically a
24  bunch of bars and spaces, and the information that is in there
25  is interpreted from those bars and spaces.

CRAIG SMITH - CROSS

1    There is still -- I talked about -- there's a lot of
2  technical things that go into it and I don't want to bore you
3  too much.  But there's -- I mentioned the right and left row
4  indicators.  There are error correction codes.  There's all
5  kinds of extra stuff in there that you have to have from the
6  two-dimensional symbol to actually decode it.  But each
7  individual piece kind of looks like a little linear code.
8  Q.   And I think you had this demonstrative that was -- it was
9  Slide 16, if you want to look at the hard copy that you had.
10 And mostly I remember it because you had like a UPC code on
11 one side with the red X going across and this red line
12 actually, like, moved slowly down --
13 A.   Yes.
14 Q.   -- on the slide when we saw it, again, moving.
15    And that's the way a laser scanning device would read a
16 PDF417 barcode, right?  It reads one horizontal line at a
17 time.
18 A.   Well, so that's one way it can be read.  But the reality
19 is it's really hard -- if you watched me while I was doing
20 this, it's kind of hard to -- like, your hand shakes a little
21 bit and the line waves.  And again, that's why you have these
22 right and left row indicators because the line can go across
23 multiple rows.  And so you have to be able to know what row
24 you're on on one side and what row you're on on the other side
25 so that you can -- so that when you're reading symbols, you

CRAIG SMITH - CROSS

1  actually know what row you're on and at what point.

2      And there's actually -- I mean, I'm sorry, I didn't

3  mean -- I don't mean to bore you with all the technical

4  details that go in here.  But the symbol characters that are

5  used on one row, there's a whole different set of symbol

6  characters that are used on the next row below it and on the

7  next row above it.  And this is something that's done

8  specifically for a 2D barcode like a PDF417.  Because when

9  that line goes from one row to another, because you just can't

10  hold your hand as absolutely straight as this line shows, it's

11  going to cross into another row.  And so you don't want to

12  accidentally read a symbol from the wrong row and use it in

13  the wrong place.  It would destroy everything.  You'd never be

14  able to get anything.  So every third row has a different set

15  of symbols -- symbol characters, the bars and spaces, so that

16  you can tell when you cross from one row to another so you

17  know when you're in a different part of the PDF417.

18      And so, you know, it's easy to show it as a straight line

19  simply moving down through; but in fact, often in real life

20  the line is tilted one way or another a little bit.  So you're

21  getting information from one side and a little information

22  from the other side; and as you move down through, it just

23  puts all that stuff together in a little matrix inside the

24  software in the memory of the -- in the memory of the computer

25  that's inside the product.  You take all those values, you put

CRAIG SMITH - CROSS

1  them in a matrix, and it's not until you fill that matrix up
2  with all kinds of data that you can actually decode the
3  symbol.
4  Q.   Mr. Smith, during your 38 years as an engineer before
5  being involved with this litigation, did you have occasion to
6  review or use the ISO standard for PDF417?
7  A.   Thirty-eight years is a long time.  Actually, 37 years is
8  in digital imaging.  I don't recall using -- reading the
9  PDF417 specifically.  I've read the QR code and the Aztec and
10 the Data Matrix and things like that.  But I don't remember
11 the PDF417 specifically before -- before this litigation.
12 Q.   Right.  Because QR code and Data Matrix, those involve
13 image processing and that's what you were working on was image
14 processing, right?
15 A.   Well, decoding this is image processing too.  I mean,
16 this is all the same -- it's all the same math.  I mean,
17 you're getting information from an image and it's a bunch of
18 edges.  In this case with these particular products -- and
19 we're talking about lasers right now, but we could be talking
20 about CCDs, kind of like the high speed document scanners I
21 talked about earlier.  You're getting one row of an image at a
22 time.  In the case of this where you have to actually scan
23 across something, you're getting one row of an image at a
24 time.  And so that image comes into the digital part of the
25 system as numbers.  And then there's a bunch of math that

CRAIG SMITH - CROSS

1  happens.  And the math might seem like magic, but it's just

2  math.  And so that's what image processing is.

3      And if you actually look at the standards in here, the

4  standards simply are describing all the math that has to

5  happen to take all those things that you've read from the

6  image and interpret them as something else, like text that you

7  can then pop up on a screen in a text pad window -- or a

8  Notepad window, I'm sorry.

9  Q.   Are you done?

10 A.   Yes.

11 Q.   Okay.  The products in this case do not have image

12 processors in them; is that your understanding?

13 A.   I disagree with that completely.

14 Q.    The laser scanners, the accused OPTO laser scanners, is

15 it your testimony that those have image processors as opposed

16 to laser scannings or CCD?

17 A.   These products have a processor in them that executes

18 software that does image processing.

19 Q.   And so that is your definition of an image processor?

20 A.   So that is -- so I don't want to get into, you know,

21 picking words on is it image processor.  I don't know what

22 your definition of an image processor is.  There are several

23 different kinds of processors out there.  There's things

24 called DSP, digital signal processors, things like that.  I've

25 written software on all kinds of processors, including the

CRAIG SMITH - CROSS

1  kinds of processors that are in this particular -- maybe not
2  exactly the processor that's in these products, but very
3  similar processors to what's in these products.
4      And, you know, you certainly -- you know, the processor
5  that's in here, you wouldn't be able to do something like
6  video compression or anything like that.  There's simply not
7  enough computing horsepower to do anything like that.  But you
8  can do things like take the numbers that are coming out from
9  each one of these scans as you're going down across a PDF417
10  symbol and get the -- do the image processing that you might
11  need to do -- that you definitely need to do to interpret that
12  data.
13      And part of it is image processors, as you might be
14  describing image processors, are really fast things.  So like
15  your graphics board in your computer so you can play really
16  fast games, those things have an incredible amount of compute
17  technology in them so they can do things unbelievably fast.
18  Whereas, the processors in this particular barcode scanner is
19  much, much, much slower.
20      But then again, the math that you have to do to get this
21  is much, much, much simpler than the math you need to do to
22  play some racecar game on your screen at high speed.
23      And so -- but this is definitely, without a doubt, doing
24  image processing to decode these symbols.
25  Q.   Mr. Smith, we were very far afield from my question so

CRAIG SMITH - CROSS

1  I'll try to ask you simpler questions.

2      You were not involved in the standard setting committees

3  for any of the ISO standards that you testified about in your

4  direct testimony, true?

5  A.   That is true.

6  Q.   And this case is the first time you've ever attempted to

7  classify PDF417 as either a 1D or a 2D symbology, true?

8  A.   Yes, that's true.  I never knew that -- I've never been

9  asked that question before.

10 Q.   And you have actually provided expert testimony in four

11 proceedings; is that right?

12 A.   Yes, I think it's four.

13 Q.   And in each of those four cases, your testimony was for

14 Honeywell or one of its subsidiaries; is that right?

15 A.   Yes, it was.

16 Q.   And how much are you being compensated in this case?

17 A.   I'm being paid $400 an hour.

18 Q.   And about how many hours have you worked on this case?

19 A.   Oh, man.  I don't know.  I haven't kept track of it.

20 Q.   Well, we heard about the three days in the source code

21 room.  So more than a hundred?

22 A.   More than a hundred.  Probably a few hundred.  Two

23 hundred, 250 maybe.  I don't know.  I'm just guessing here.  I

24 really don't know.

25 Q.   And you were one of Honeywell's technical experts in the

JA1069

CRAIG SMITH - CROSS

1  underlying ITC litigation also, right?

2  A.    I was a source code person in that case.

3  Q.    Right.  And you had an opportunity in that case to go and

4  review OPTO's source code, correct?

5  A.    Yes, I had that opportunity, yes.

6  Q.    And you did.  You reviewed OPTO's source code as part of

7  that case.

8  A.    I did.

9  Q.    And how much were you compensated by Honeywell for your

10 work on the underlying ITC case?

11 A.    That was in 2019 and I think I was paid $350 an hour then

12 and I raised it up to 400 because of inflation during COVID

13 and all that stuff.  So I think it was 350.  I'm not sure.  I

14 think it was 350.

15 Q.    And about how many hours did you work on the ITC case?

16 A.    How many hours?  I was busy for a while on that case.  I

17 don't know.  Maybe hundreds of hours.  Maybe like 400, 500

18 hours.  It's hard to come up with an estimate here.

19 Q.    All right.  I mean, do you recall your total compensation

20 by Honeywell for the underlying ITC case?

21 A.    No, because I do -- I do these technical cases and I

22 have -- or I do these legal cases and I have technical cases

23 and -- or technical customers for which I do regular

24 engineering work and product development and things like that.

25 And so I don't -- in my taxes, it's not like I go through and

CRAIG SMITH - CROSS

1  say here's what I made in legal stuff and here's what I made

2  in -- so I just don't know what the breakdown is, I'm sorry.

3  Q.   Because you were also an expert for Honeywell in their

4  litigations against Zebra, right?

5  A.   I was.

6  Q.   And about how many hours did you work on that litigation?

7  A.   It was probably similar to the OPTO case.

8  Q.   So, I mean, probably safe to say you've been paid over a

9  hundred thousand dollars by Honeywell for your work on these

10  litigations in the past few years?

11  A.   Yes.

12  Q.   Now, Mr. Smith, I think you testified on direct that you

13  have a number of patents of your own, right?

14  A.   Yes, I do.

15  Q.   None of your patents is on PDF417, though, is it?

16  A.   None of them with PDF417.

17  Q.   Are any of them on stacked barcode symbology at all?

18  A.   None of them are related to symbologies.

19  Q.   Based on your experience as an inventor filing patents

20  with the patent office, you understand it's important to be

21  technically correct in the statements that you make to the

22  patent office in a patent application, right?

23  A.   Yes.

24  Q.   And you reviewed, gosh, it was a long list of materials

25  in reaching your opinions in this case, right?

CRAIG SMITH - CROSS

1  A.   Yes.

2  Q.   And who -- did the lawyers send you all the materials for

3  you to review?

4  A.   For the most part, yes.  A lot of the materials came from

5  discovery and I don't have access to all that stuff, so yes.

6  Q.   And the sort of long list of materials didn't include any

7  Honeywell patents in it, did it?

8  A.   I don't recall any Honeywell patents in that list.

9  Q.   And when you were reaching your opinions in this case

10  about whether PDF417 was a 1D symbology or a 2D symbology, did

11  you consider that Honeywell itself had described PDF417 as a

12  1D symbology in its own patents?

13          MR. MARAIS:  Objection, Your Honor.  Foundation.

14          THE COURT:  Overruled.  Just asked if you

15  considered.

16          THE WITNESS:  I didn't consider it.  I was looking

17  at the worldwide industry standard instead.

18          MS. LEHMAN:  Let's have DX818.

19  Q.   And, Mr. Smith, DX818 is a patent.  You see the assignee

20  is Hand Held Products, Inc., which is one of the plaintiffs in

21  this case, right?

22  A.   Yes.

23          MS. LEHMAN:  And if we could have page 37 of this

24  exhibit.

25          And looking on the left-hand side of that page in

CRAIG SMITH - CROSS

 1  the first column, the fourth paragraph down, it starts "in
 2  order to allow."
 3  Q.  So this patent states, "In order to allow the encoding of
 4  larger" --
 5          THE COURT:  Let him read it instead of reading to
 6  him.
 7          MS. LEHMAN:  Okay.  Sorry.
 8          THE WITNESS:  (Witness peruses document.)  Okay.
 9  Q.  Okay.  So would you agree with me that this patent
10  describes PDF417 as an example of a 1D stacked barcode
11  symbology?
12  A.  I would agree that it says 1D stacked barcode symbologies
13  and it's doing that to describe PDF417.  But as I testified
14  earlier, stacked just means that there's a second dimension.
15  So I mean, it's really saying it's a 1D/2D symbology.  So I
16  don't think it's the best terminology in the world, but the
17  stacked part of it is still 2D.  It's still talking about all
18  the same things we talked about earlier with -- in fact --
19  well, I don't want to speculate what the inventor was thinking
20  when he wrote this down.
21      But we also talked about the symbol characters being
22  linear.  And it's a stack of those.  So that's what he's
23  referring to here.  It appears to be what he's referring to.
24      I don't know -- I didn't -- I haven't reviewed this in
25  the past and so I haven't read the entire -- the entire

JA1073

CRAIG SMITH - CROSS

1  document, the entire description so I'm taking this one thing

2  out of context and I can only guess at what they're meaning.

3  But to me reading this, I'm guessing the inventor was talking

4  about the the linear symbol characters that we discussed and

5  then stacking those up into a two-dimensional array.

6  Q.   Let's look at the next paragraph down which contrasts 2D

7  symbologies.  Can you please just review that and then I have

8  a question for you.

9  A.   (Witness peruses document.)  Okay.

10  Q.   Okay.  So in describing 2D matrix symbologies, is it fair

11  to say that PDF417 would not fall under this definition of 2D

12  matrix symbologies in DX818?

13  A.   Well, from this one -- so this is talking about

14  two-dimensional matrix symbologies.  And the PDF417 has been

15  described as a two-dimensional multi-row symbology.

16      You know, the matrix symbologies -- and again, I'm -- I

17  haven't -- I don't have the rest of this as context, but I've

18  seen other places where the two-dimensional codes are broken

19  down into, like, multi-row stacked type symbols and matrix

20  symbols, but they're all two-dimensional.

21      And so this is -- this paragraph appears to be describing

22  two-dimensional matrix symbologies.  And it's saying that

23  there -- they have more data capacity than a normal 1D would

24  have, which, you know, is kind of the same as a PDF417 in that

25  a PDF417 can encode much, much, much more data than a normal

CRAIG SMITH - CROSS

1 barcode, normal 1D barcode would be able to have.

2 Q.   So did you answer my question?

3 A.   I think so.  I said that this is a -- this is describing

4 a two-dimensional matrix symbology and comparing that to a

5 one-dimensional symbology and talking about the data

6 capacities between the two of them.

7 Q.   Right.  But my question was this description is not

8 PDF417, fair?

9 A.   Well, that was part of my answer is that this is

10 discussing matrix technologies and PDF417 has been described

11 as a two-dimensional multi-row technology.  And so this

12 wouldn't be talking about PDF417s directly because PDF417s are

13 a multi-row two-dimensional technology, not -- they're

14 normally not listed as a two-dimensional matrix symbology.

15 Q.   So no.  That's the answer:  No, this paragraph is not

16 describing PDF417.

17 A.   This paragraph is not talking about PDF417 because it's a

18 matrix.

19 Q.   Just trying to get the "no."  Thank you.

20        MS. LEHMAN:  Your Honor, I would move to admit

21 DX818.

22        MR. MARAIS:  Objection, Your Honor.  He did not rely

23 on this document in forming his opinion.  He stated that at

24 the beginning of his testimony.

25        THE COURT:  That's fine.  You can admit and only

CRAIG SMITH - CROSS

 1  publish the two paragraphs that have been shown to the jury.
 2  The rest of the exhibit may not be published to the jury.
 3          (Defendant's Exhibit Number 818 was received into
 4  evidence.)
 5          MS. LEHMAN:  Can we go back and show the paragraph
 6  above.
 7  Q.   So when you're mentioning the stacked symbols that are
 8  described in this patent, it's describing specifically PDF417
 9  as a 1D stacked barcode symbology, right?
10  A.   Yes.  As I mentioned earlier, it's 1D stacked, and
11  stacked just means 2D as we've discussed -- as I testified
12  earlier.  So I don't really like the terminology 1D stacked
13  because it's like 1D/2D, but that's the technology that this
14  inventor used.  The terminology that he used, sorry.
15          MS. LEHMAN:  Could we have DX816.  And DX816 is
16  another patent to Hand Held Products.
17          Could we have page 40 of DX816.  And the second to
18  the last paragraph on the left.
19  Q.   Mr. Smith, is this similar language that we just reviewed
20  that was in the prior patent?
21  A.   Yes, it's very, very similar.
22          MS. LEHMAN:  Your Honor, move to admit DX816.
23          THE COURT:  It's admitted to the extent of this
24  paragraph may be published.
25          (Defendant's Exhibit Number 816 was received into

CRAIG SMITH - CROSS

1   evidence.)

2        MS. LEHMAN:  All right.  You can take that down.

3   Q.   So, Mr. Smith, as part of reaching your opinions in this

4   case, you did review some public OPTO product documentation,

5   didn't you?

6   A.   I did.

7   Q.   And that -- and those documents identified which products

8   were capable of reading PDF417 symbologies, correct?

9   A.   Yes, that's correct.

10  Q.   So it was not like a big confidential secret which OPTO

11  products decoded PDF417 and which ones didn't, right?  That's

12  something that you're able to easily figure out from public

13  documents.

14  A.   So it's available publicly.  And, as I said, we just

15  asked OPTO and they gave us an entire list of all the products

16  that were operable to decode the three symbologies.

17  Q.   And you personally haven't spoken to anybody at OPTO

18  about how they classify symbologies, right?

19  A.   No, I haven't.

20  Q.   And you haven't talked to anybody who was from OPTO or

21  from OPTO's attorneys who was involved in the mediation or on

22  the settlement agreement.

23  A.   No.

24        MS. LEHMAN:  Pass the witness, Your Honor.

25        THE COURT:  Any redirect?

CRAIG SMITH - REDIRECT

1          MR. MARAIS:  Yes, Your Honor.
2                    REDIRECT EXAMINATION
3    BY MR. MARAIS:
4    Q.   Mr. Smith, what was it that you were hired to do in this
5    case?
6    A.   I was hired to offer opinions about the two things that I
7    mentioned in my earlier testimony:  To determine whether the
8    evidence shows that PDF417, MicroPDF417, and composite codes
9    are in fact 2D symbologies and whether OPTO's products that
10   are in question today are capable of decoding PDF417,
11   MicroPDF417, and/or composite codes.
12   Q.   And again, was your compensation that you received in
13   this case at all contingent on the opinion that you gave in
14   this case?
15   A.   No, not at all.
16   Q.   Now, I want to go back to the slide that you had in your
17   demonstrative earlier.
18          MR. MARAIS:  Mr. Rudling, if we could please pull
19   PDX3 and put up Slide 24, I believe it is.
20   Q.   Mr. Smith, can you remind us, what are we looking at on
21   Slide 24 here?
22   A.   This slide shows that OPTO's expert, Mr. Chartier, who I
23   believe you'll hear from a little later, doesn't -- he agrees
24   with my characterization of the three different barcode
25   symbologies.  I'm sorry, I don't want to misrepresent.  He

CRAIG SMITH - REDIRECT

1    agrees with two of those.

2         He was asked, "And you have no disagreement with the way

3    Mr. Smith characterized PDF417; is that right?"

4         And he replied, "That's correct."

5         And then he was asked the same exact question about

6    MicroPDF417 and he said "correct."

7         So he also agrees with my characterization of those

8    symbologies.

9    Q.    So if OPTO's own expert agrees with you, agrees with the

10   opinions that you gave today, do you think it's fair to say

11   that the opinions you gave were perhaps unbiased?

12              MS. LEHMAN:  Your Honor, objection.  Leading.

13              THE COURT:  Sustained.

14              MR. MARAIS:  I'll withdraw the question.

15              THE COURT:  You do not have to answer that.

16              MR. MARAIS:  Can we please pull PX738.

17   Q.    Now, in your cross examination, Ms. Lehman asked you or

18   showed you the print quality standard.  Do you recall that?

19   A.    Yes, I do.

20   Q.    And I think she pointed to the first part of the title

21   here that says "Barcode Symbol Print Quality Test

22   Specification"; is that right?

23   A.    I remember seeing that, yes.

24   Q.    Can you read the rest of the title for me, Mr. Smith.

25   A.    It says "Information Technology - Automatic

CRAIG SMITH - REDIRECT

1  Identification and Data Capture Techniques - Barcode Symbol
2  Print Quality Test Specification - Two-Dimensional Symbols."
3  Q.    Is this the print quality standard for two-dimensional
4  symbols?
5  A.    It is the international standard from the ISO committee
6  for print quality specifications for two-dimensional symbols.
7  Q.    Now, Ms. Lehman also pointed you to the introduction
8  which was on page little vi.
9          MR. MARAIS:  And if you can zoom in on the first
10  paragraph of the introduction.
11  Q.    Now, I believe Ms. Lehman asked you to read the first
12  sentence of that paragraph; is that right?
13  A.    Right underneath the introduction?
14  Q.    That's right.
15  A.    Yes, I think so.
16  Q.    Did she ask you to read the second sentence?
17  A.    No, she didn't.
18  Q.    Can you please go ahead and read the second sentence of
19  the introduction of the two-dimensional standard, Mr. Smith.
20  A.    Yes.  "Symbology specifications may be characterized into
21  those for linear symbols, on the one hand, and two-dimensional
22  symbols on the other; the latter may in turn be subdivided
23  into 'multi-row barcode symbols,' sometimes referred to as
24  'stacked barcode symbols,' and 'two-dimensional matrix
25  symbols.'"

CRAIG SMITH - REDIRECT

1    And when it says "the latter," it seems clear to me that
2    they're talking about that two-dimensional symbols are
3    subdivided into multi-row barcode symbols and -- or stacked
4    barcode symbols and two-dimensional matrix symbols.
5    Q.    Now, in the Honeywell patent that you were just talking
6    about and where you were directed to this paragraph that talks
7    about two-dimensional symbols, what did it call those
8    two-dimensional symbols specifically?
9    A.    It called them 1D stacked symbols.  And this clearly says
10   that stacked barcode symbols are the same as multi-row code --
11   barcode symbols, which are two-dimensional symbols in the
12   international specification.
13   Q.    And then in the second paragraph of that patent that you
14   were pointed to, it went on to talk about another form of
15   two-dimensional symbols.  What form of two-dimensional symbols
16   did that second paragraph talk about?
17   A.    It talked about the matrix, two-dimensional matrix
18   barcodes, the same as are listed here:  Two-dimensional matrix
19   symbols.
20           MR. MARAIS:  Can we please go to DX818.
21           And if we can please turn to the first column of
22   this patent.  Can you please highlight the line starting at
23   line 37.  Highlight that single paragraph.
24   Q.    Mr. Smith, is this the paragraph that you were just shown
25   by OPTO's counsel?

JA1081

CRAIG SMITH - REDIRECT

1  A.   I believe it is, yes.

2           MR. MARAIS:  Can we please keep this up on the

3  screen and then open DX838.

4           And can we please go to the first column of this

5  patent.

6           MS. LEHMAN:  Your Honor, I don't think this patent

7  is admitted.

8           THE COURT:  No, and that's why it's not being shown

9  to the jury.

10           MR. MARAIS:  That's correct, Your Honor.

11  Q.   Now, Mr. Smith, can you please compare the first couple

12  sentences of the paragraph on the left, which is the patent

13  that you were shown by OPTO, and the language of the patent on

14  the right.

15  A.   They appear to be the same.

16           MR. MARAIS:  Your Honor, I would ask to publish just

17  this portion to the jury.

18           THE COURT:  It's admitted just for that paragraph.

19           MR. MARAIS:  Thank you, Your Honor.

20           (Plaintiff's Exhibit Number 838 was received into

21  evidence.)

22           MR. MARAIS:  Now, Mr. Rudling, in the '831 patent,

23  can you please move down to column 2, line 45.

24  Q.   Now, Mr. Smith, you agree with me that the language in

25  that first patent is the same as the language in the second

JA1082

CRAIG SMITH - REDIRECT

1   patent that I just showed you, correct?

2   A.   Are you talking about when we compared the two?

3   Q.   Yes, sir.

4   A.   Yes, they were the same.

5   Q.   Now, can you please read the language in the second

6   patent that had that exact same language as the patent you

7   were shown by OPTO.  What does the language now in this other

8   Honeywell patent say?

9   A.   The highlighted sentence says, "They are more capable of

10  reading stacked 2D symbologies, such as PDF417 symbology."

11          MR. MARAIS:  Your Honor, may I publish this to the

12  jury, please?

13          THE COURT:  You may publish this.  And this is the

14  last one we're going to talk about.

15          MR. MARAIS:  That's fine.  Thank you, Your Honor.

16          You can take that down.

17  Q.   Now, Mr. Smith, Ms. Lehman mentioned some OPTO public

18  documents.  Do you recall that?

19  A.   Yes, I do.

20  Q.   And she asked if those were available to the public.

21  A.   Yes, she did.

22  Q.   And that you could have accessed those.

23  A.   Yes.

24  Q.   Mr. Smith, did you access OPTO's public documents?

25  A.   Yes.

CRAIG SMITH - REDIRECT

1    Q.    Did you review those public documents?

2    A.    Yes.

3    Q.    What did those public documents say about whether OPTO's

4    barcode products at issue in this case could decode PDF417,

5    MicroPDF417, and composite codes?

6              THE COURT:  Sustained.  We're not going there.

7              MR. MARAIS:  Your Honor, they opened the door.

8              THE COURT:  We're not going there.

9              MR. MARAIS:  Thank you, Your Honor.

10             No further questions.

11             THE COURT:  Thank you.  You may stand down.

12             THE WITNESS:  Thank you, sir.

13             (Witness stepped down.)

14             THE COURT:  Please call your next witness.

15             MR. STEVENS:  Plaintiff rests, Your Honor.

16             THE COURT:  All right.  Members of the jury, it's

17   way early to be quitting for the day so we won't quit, but you

18   will.  So let me send you home for the night.  I wouldn't have

19   wanted to keep you past 5:00 and there are a couple of things

20   at this stage of trial I have to take up with the parties.  So

21   rather than try to squeeze in another few minutes of

22   testimony, we'll just quit for the day.

23             Now, when you get home tonight, if you live with

24   anyone or if you see anyone after this, they're going to be

25   awfully inquisitive about how your day went.  And you're not

183

1  going to tell them anything.  You can say I've been sitting on

2  a case all day and I will be again tomorrow, and that's it.

3  Because if you start talking to them at all about what

4  happened today, they're going to have a lot of opinions.

5  Based on what, I don't know because they don't know anything

6  about this case, but they'll have opinions.  And we don't want

7  you being influenced by anyone's opinions, especially ignorant

8  people.

9          So abide by the rules strictly tonight with respect

10 to no research.  Don't start making up your mind.  Don't start

11 talking about this case with anyone.  Don't let anyone talk

12 with you about it.  Leave your notepads in the jury room.  And

13 we'll see you again tomorrow morning at 9:00.

14          Everyone remain seated while the jury leaves.

15          (Jury exited the courtroom.)

16          THE COURT:  Part of the reason I was willing to quit

17 early was I thought that it might have caught you off-guard a

18 little bit them resting this quickly and didn't know if it

19 would be fair to ask you to call your first witness right now.

20          Anything from the parties?

21          MR. STEVENS:  Your Honor, I do think one door has

22 been opened today.  And we had submitted deposition

23 designations to you where the 30(b)(6) representative of OPTO

24 had asked the engineer whether he viewed PDF417 as

25 two-dimensional, and he said yes.  You excluded that as

JA1085

1  hearsay.  It's a 30(b)(6) rep talking on behalf of the

2  company.  The speaker was the R&D director of the company

3  who's also, of course, the employee of the company.  Now that

4  this door has been opened, I'd ask Your Honor to reconsider

5  that and let us play that deposition designation.

6          THE COURT:  And the door has been opened by what?

7  Talking about the patents?

8          MR. STEVENS:  Yes, sir.

9          THE COURT:  Well, of course, both sides played it a

10  little fast and loose and went beyond where I think the

11  evidence should have been allowed; but out of fairness to both

12  sides, I let them talk about those portions of the patents

13  that they thought was applicable.  But we're not going to go

14  beyond that so that motion is denied.

15          MR. STEVENS:  Just to make sure I understand the

16  contours --

17          THE COURT:  No.

18          MR. STEVENS:  Okay.

19          THE COURT:  You can explain it to the circuit if you

20  want to, but I'm not going to explain it any further.

21          Is there anything else to take up tonight?

22          MR. MUCKENFUSS:  Your Honor, we just reserve the

23  motion on judgment as a matter of law for the morning.

24          THE COURT:  Yeah, you can make it now or -- it's

25  unlikely to be granted.

```
 1            MR. MUCKENFUSS:  I totally understand.  That's why I
 2   want to just think about it overnight, but understood.
 3            THE COURT:  That's fine.  We can reserve that until
 4   the morning.
 5            MR. STEVENS:  Can Mr. Smith be released, Your Honor?
 6            THE COURT:  It's up to OPTO.
 7            MR. MUCKENFUSS:  We will call him in our case.
 8            THE COURT:  So no.
 9            MR. STEVENS:  I'm sorry, Mr. Craig Smith.
10            MR. MUCKENFUSS:  Yeah, I'm sorry.  I think that's
11   correct.  Craig Smith we're okay with.  It's Taylor Smith we
12   will call.
13            THE COURT:  Okay.  Mr. Craig Smith is released.
14            All right.  We'll be in recess until 9:00 tomorrow
15   morning.
16            (Evening recess at 4:31 PM.)
17                         *****
18
19
20
21
22
23
24
25
```

JA1087

```
 1  UNITED STATES DISTRICT COURT
 2  WESTERN DISTRICT OF NORTH CAROLINA
 3  CERTIFICATE OF REPORTER
 4
 5
 6          I, Cheryl A. Nuccio, Federal Official Realtime Court
 7  Reporter, in and for the United States District Court for the
 8  Western District of North Carolina, do hereby certify that
 9  pursuant to Section 753, Title 28, United States Code, that
10  the foregoing is a true and correct transcript of the
11  stenographically reported proceedings held in the
12  above-entitled matter and that the transcript page format is
13  in conformance with the regulations of the Judicial Conference
14  of the United States.
15
16          Dated this 6th day of August 2023.
17
18
19                          s/Cheryl A. Nuccio
20                          Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter
21
22
23
24
25
```

JA1088