Nos. 2023-1850, -2038

# United States Court of Appeals
*for the*
# Fourth Circuit

HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC.; METROLOGIC INSTRUMENTS, INC.,

*Plaintiffs-Appellants/Cross-Appellees,*

*v.*

OPTO ELECTRONICS CO., LTD.,

*Defendant-Appellee/Cross-Appellant.*

**On Appeal from the United States District Court
for the Western District of North Carolina
Case No. 3:21-cv-506-KDB-DCK**

**JOINT APPENDIX
VOLUME 3 OF 16 (PAGES 1089-1596)**

Kirk T. Bradley
M. Scott Stevens
S. Benjamin Pleune
Stephen R. Lareau
Nicholas C. Marais
Lauren N. Griffin
Brandon C.E. Springer
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Ste. 300
Charlotte, NC 28203
(704) 444-1000

*Attorneys for Plaintiffs-Appellants
Honeywell International Inc.;
Hand-Held Products, Inc.; and
Metrologic Instruments, Inc.*

York M. Faulkner
YORKMOODYFAULKNER
711
Tensho Building, 7F
3-17-11 Shibaura
Tokyo, Minato-Ku, 108-0023
Japan
(202) 251-0837

Brian D. Schmalzbach
MCGUIREWOODS, LLP
800 East Canal Street
Richmond, Virginia 23219
(804) 775-4746

*Attorneys for Defendant-Appellee
Opto Electronics Co., Ltd.*

April 1, 2024

| | VOLUME 1 OF 16 | |
|---|---|---|
| **Date** | **Description** | **Page** |
| | Docket Sheet | JA1 |
| 2021.09.24 | Complaint for Breach of Contract | JA51 |
| 2022.04.14 | Order on Motion to Dismiss | JA102 |
| 2022.08.29 | Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Admission | JA108 |
| 2023.02.16 | Order on Discovery Disputes | JA121 |
| 2023.02.22 | Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA125 |
| 2023.02.22 | EXHIBIT C – MDL-2001 Product Specification | JA128 |
| 2023.03.08 | Defendant OPTO Electronics Co., Ltd.'s Motion for Summary Judgment | JA131 |
| 2023.03.08 | EXHIBIT 1 – ITC Complaint | JA134 |
| 2023.03.08 | EXHIBIT 2 – ITC Order | JA189 |
| 2023.03.08 | EXHIBIT 3 – ITC Order and Honeywell's Response | JA194 |
| 2023.03.08 | EXHIBIT 4 – Claim Chart Excerpts | JA206 |
| 2023.03.08 | EXHIBIT 5 – ISO-IEC 15415 | JA209 |
| 2023.03.08 | EXHIBIT 6 – Honeywell Website | JA262 |
| 2023.03.08 | EXHIBIT 7 – U.S. Patent No. 5,243,655 | JA271 |
| 2023.03.08 | EXHIBIT 8 – ISO-IEC 15438 | JA300 |
| 2023.03.08 | EXHIBIT 9 – Accurate Data | JA417 |
| 2023.03.08 | EXHIBIT 10 – Honeywell Tech Support Page | JA421 |
| 2023.03.15 | EXHIBIT D – Wang Expert Report | JA424 |
| 2023.03.15 | EXHIBIT E – MDI-4050 Product Datasheet | JA437 |
| 2023.03.21 | Order denying OPTO's Objections to Magistrate Judge's Decision (Dkt. 125) | JA440 |
| 2023.03.22 | EXHIBIT A – L-22X Marketing Materials | JA452 |
| 2023.03.22 | EXHIBIT B – U.S. Patent No. 10,140,490 | JA455 |
| 2023.03.29 | Defendant's Reply in Support of Motion for Summary Judgment | JA470 |
| 2023.03.28 | OPTO Cover Motion for Summary Judgment on Patent Misuse | JA487 |
| 2023.03.29 | EXHIBIT 2 – U.S. Patent No. 7,159,783 | JA490 |
| 2023.04.20 | Summary Judgment Order | JA512 |

| VOLUME 2 OF 16 | | |
|---|---|---|
| Date | Description | Page |
| 2023.05.01 | Honeywell's Motion for Reconsideration and Offer of Proof of Dkt. 195 | JA546 |
| 2023.05.01 | EXHIBIT S - OPTO Electronics Audit Report | JA549 |
| 2023.06.02 | Order Denying Honeywell's Motion for Reconsideration | JA565 |
| 2023.06.20 | Joint Stipulation of Facts | JA575 |
| 2023.07.05 | OPTO's Motion to Strike Honeywell's Second Amended Objections and Responses to OPTO's First Set of Interrogatories | JA579 |
| 2023.07.10 | EXHIBIT D – June 5, 2023 E-Mail from J. O'Brien | JA583 |
| 2023.07.10 | EXHIBIT E – OPTO's Amended Exhibit List | JA585 |
| 2023.07.10 | EXHIBIT H – Honeywell's First Amended Exhibit List | JA629 |
| 2023.07.13 | Transcript from July 11, 2023 Pre-Trial Conference | JA643 |
| 2023.07.13 | Order on Motions in Limine and Pretrial Matters | JA762 |
| 2023.07.18 | Order Granting OPTO's Motion to Strike Honeywell's Second Amended Objections and Responses to OPTO's First Set of Interrogatories | JA776 |
| 2023.07.19 | Verdict Form | JA781 |
| 2023.07.20 | Judgment in Case | JA783 |
| 2023.07.25 | Stipulation Regarding Jury Verdict Damages | JA784 |
| 2023.07.26 | Amended Judgment | JA787 |
| 2023.08.03 | Honeywell's Motion for Fees and Costs | JA788 |
| 2023.08.03 | Memorandum in support of Honeywell's Motion for Fees and Costs | JA791 |
| 2023.08.03 | EXHIBIT C – June 26, 2023 E-Mail from R. Muckenfuss | JA807 |
| 2023.08.03 | EXHIBIT D – OPTO Summary of Financial Results for Fiscal Year End 2022 | JA810 |
| 2023.08.03 | EXHIBIT E – OPTO Financial Statement | JA849 |
| 2023.08.03 | EXHIBIT F – Honeywell International Inc. et al v. Opticon, Inc. et al, C.A. 1:19-cv-1019-CFC (D. Del.) Complaint | JA870 |

| | | |
|---|---|---|
| 2023.07.17 | Trial Transcript - Volume I | JA903 |
| | Testimony of Taylor Smith:<br>Direct Examination by Mr. Pleune<br>Cross Examination by Mr. Muckenfuss | JA966<br>JA973 |
| | Testimony of Jeremy Christopher Whitley:<br>Direct Examination by Mr. Stevens<br>Cross Examination by Mr. VanHoutan<br>Redirect Examination by Mr. Stevens | JA976<br>JA1001<br>JA1009 |
| | Testimony of Craig Smith:<br>Direct Examination by Mr. Marais<br>Voir Dire Examination by Ms. Lehman<br>Direct Examination by Mr. Marais<br>Cross Examination by Ms. Lehman<br>Redirect Examination by Mr. Marais | JA1017<br>JA1026<br>JA1030<br>JA1055<br>JA1078 |

**VOLUME 3 OF 16**

| Date | Description | Page |
|---|---|---|
| 2023.07.18 | Trial Transcript - Volume II | JA1089 |
| | Testimony of Adam Doane:<br>Direct Examination by Mr. Muckenfuss<br>Cross Examination by Mr. Stevens<br>Redirect Examination by Mr. Muckenfuss | JA1102<br>JA1170<br>JA1193 |
| | Testimony of Paul Chartier:<br>Direct Examination by Mr. VanHoutan<br>Cross Examination by Mr. Stevens<br>Redirect Examination by Mr. VanHoutan<br>Recross Examination by Mr. Stevens | JA1214<br>JA1262<br>JA1292<br>JA1293 |
| | Testimony of Rie Ashihara:<br>Direct Examination by Mr. VanHoutan<br>Cross Examination by Mr. Stevens | JA1297<br>JA1302 |
| | Testimony of Cornelis Stoop:<br>Direct Examination by Mr. Stevens<br>Cross Examination by Mr. VanHoutan<br>Redirect Examination by Mr. Stevens<br>Recross Examination by Mr. VanHoutan | JA1309<br>JA1323<br>JA1328<br>JA1330 |

| | Testimony of Rie Ashihara: | |
|---|---|---|
| | Direct Examination by Mr. Stevens | JA1331 |
| | Cross Examination by Mr. VanHoutan | JA1335 |
| | Redirect Examination by Mr. Stevens | JA1336 |
| 2023.07.19 | Trial Transcript - Volume III | JA1341 |
| | Testimony of Yoshiaki Kohmo: | |
| | Direct Examination by Mr. Stevens | JA1346 |
| | Testimony of Jeremy Whitley: | |
| | Direct Examination by Mr. VanHoutan | JA1439 |
| | Cross Examination by Mr. Stevens | JA1465 |
| | Redirect Examination by Mr. VanHoutan | JA1487 |
| | Testimony of Gregory Adams: | |
| | Direct Examination by Mr. Houghton | JA1492 |
| | Cross Examination by Mr. Stevens | JA1546 |

| **VOLUME 4 OF 16** | | |
|---|---|---|
| **Date** | **Description** | **Page** |
| 2023.07.20 | Trial Transcript - Volume IV | JA1597 |
| | Testimony of Shigeaki Tanaka: | |
| | Direct Examination by Mr. Stevens | JA1601 |
| | Testimony of David Taylor: | |
| | Direct Examination by Mr. Springer | JA1611 |
| | Voir Dire Examination by Mr. McCamey | JA1618 |
| | Direct Examination by Mr. Springer | JA1619 |
| | Cross Examination by Mr. McCamey | JA1636 |
| | Redirect Examination by Mr. Springer | JA1645 |
| | Testimony of Ryan N. Herrington: | |
| | Direct Examination by Mr. Lareau | JA1646 |
| | Cross Examination by Mr. VanHoutan | JA1660 |
| 2023.08.14 | Honeywell's Notice of Appeal to the Fourth Circuit | JA1688 |
| 2023.08.17 | EXHIBIT 3 – Zebra License and Settlement Agreement | JA1691 |
| 2023.08.17 | OPTO Motion for Judgment as a Matter of Law | JA1712 |
| 2023.08.17 | Trial Transcript Excerpt | JA1716 |
| | Testimony of Jeremy Christopher Whitley: | |
| | Direct Examination by Mr. Stevens | JA1720 |
| | Cross Examination by Mr. VanHoutan | JA1723 |

| | | |
|---|---|---|
| 2023.08.17 | Trial Transcript Excerpt | JA1725 |
| | Testimony of Adam Doane:<br>Direct Examination by Mr. Muckenfuss<br>Cross Examination by Mr. Stevens | JA1732<br>JA1735 |
| | Testimony of Rie Ashihara:<br>Direct Examination by Mr. VanHoutan<br>Redirect Examination by Mr. Stevens | JA1738<br>JA1740 |
| 2023.08.17 | Trial Transcript Excerpt<br>    Closing Argument by Mr. Stevens. | JA1742 |
| 2023.08.24 | Reply in Support of Motion for Fees and Costs | JA1746 |
| 2023.08.24 | EXHIBIT A – E-mail from Z. McCamey | JA1764 |
| 2023.08.31 | Honeywell's Response to OPTO's Motion for Judgment as a Matter of Law | JA1767 |
| 2023.09.27 | Order on Post-Trial Motions | JA1797 |
| 2023.10.02 | Honeywell's Amended Notice of Appeal to the United States Court of Appeals for the Fourth Circuit | JA1814 |
| 2023.10.04 | Notice of Appeal of Defendant OPTO Electronics Co., Ltd. to the United States Court of Appeals for the Fourth Circuit | JA1817 |
| 2023.10.27 | Honeywell's Notice of Appeal to the United States Court of Appeals for the Federal Circuit | JA1820 |
| 2023.11.07 | OPTO's Notice of Appeal to the United States Court of Appeals for the Federal Circuit | JA1823 |

| Exhibit | Description | Page No. |
|---|---|---|
| PX-5 | ISO/IEC 15438 | JA1827 |
| PX-12 | ISO/IEC 15415 | JA1943 |
| PX-17 | U.S. Patent No. 5,304,786 | JA1995 |
| PX-18 | MDL-2001 Datasheet | JA2046 |
| PX-19 | OPR-2001Z Leaflet | JA2048 |
| PX-62 | Auditor's Report and Internal Control Audit Report | JA2050 |
| PX-63 | Notice Regarding Filing of Lawsuit, Recording of Extraordinary Loss, and Revision of Consolidated Earnings Forecast for the Fiscal Year Ending November 2021, OPTO Press Release, November 30, 2021 | JA2072 |
| PX-87 | NLV-1001 Product Specification | JA2078 |
| PX-125 | MDL-1000 Specification | JA2080 |

| PX-188 | *In the Matter of Certain Barcode Scanners, Scan Engines, Products Containing the Same, and Components Thereof*, Complaint, Investigation No. 337-TA-1165 | JA2082 |
|---|---|---|

**VOLUME 5 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| PX-206 | U.S. Patent No. 9,465,970 | JA2136 |
| PX-207 | U.S. Patent No. 10,140,490 | JA2201 |
| PX-212 | U.S. Patent No. 7,159,783 | JA2215 |
| PX-214 | U.S. Patent No. 8,752,766 | JA2236 |
| PX-215 | U.S. Patent No. 9,230,140 | JA2266 |
| PX-216 | U.S. Patent No. 10,846,498 | JA2280 |
| PX-218 | U.S. Patent No. 10,235,547 | JA2308 |
| PX-225 | U.S. Patent No. 8,587,595 | JA2336 |
| PX-226 | U.S. Patent No. 9,092,686 | JA2348 |
| PX-227 | U.S. Patent No. 9,659,203 | JA2361 |
| PX-228 | U.S. Patent No. 9,384,378 | JA2374 |
| PX-319 | 3Q JASDAQ Regulatory Filing (Sept. 22, 2022) | JA2387 |
| PX-325 | OPTO's Objections and Responses to Honeywell's First Requests for Admission | JA2410 |
| DX-816 | US Patent No 7,387,253 | JA2423 |
| DX-818 | US Patent No 7,104,456 | JA2486 |

**VOLUME 6 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| DX-838 | US Patent No 7,472,831 | JA2546 |
| DX-848 | P. Chartier Trial Exhibit 1001 | JA2713 |
| DX-849 | P. Chartier Trial Exhibit 1002 | JA2857 |
| DX-850 | P. Chartier Trial Exhibit 1003 | JA2987 |

**VOLUME 7 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| DX-851 | P. Chartier Trial Exhibit 1004 | JA3031 |
| DX-852 | P. Chartier Trial Exhibit 1005 | JA3083 |
| DX-853 | P. Chartier Trial Exhibit 1006 | JA3199 |
| DX-854 | P. Chartier Trial Exhibit 1007 | JA3201 |

| VOLUME 8 OF 16 – SEALED | | |
|---|---|---|
| **Date** | **Description** | **Page No.** |
| 2022.01.05 | Answer, Affirmative Defenses, and Counterclaims | JA3215 |
| 2022.04.11 | Hearing Transcript on Motion to Dismiss | JA3249 |
| 2022.08.11 | Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories | JA3293 |
| 2022.09.06 | Honeywell's Objections and Responses to Defendant's First Set of Interrogatories | JA3336 |
| 2022.09.06 | Honeywell's Objections and Responses to Defendant's First Set of Requests for Admission | JA3375 |
| 2022.09.21 | Deposition Transcript of J. Whitley | JA3393 |
| 2022.09.26 | Deposition Transcript of R. Ashihara | JA3574 |
| VOLUME 9 OF 16 – SEALED | | |
| **Date** | **Description** | **Page No.** |
| 2022.09.27 | Deposition Transcript of Y. Kohmo | JA3683 |
| 2022.09.29 | Defendant's Objections and Responses to Plaintiffs' Second Set of Interrogatories | JA3757 |
| 2022.09.29 | Defendant's Supplemental and Amended Objections and Responses to Plaintiffs' First Set of Interrogatories | JA3769 |
| 2022.09.30 | Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA3815 |
| 2022.10.21 | Expert Report of Mr. Ryan N. Herrington | JA3857 |
| 2022.11.18 | Expert Report of Dr. Greg Adams | JA3923 |
| 2023.02.22 | Memorandum in Support of Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA3950 |
| 2023.02.02 | EXHIBIT A – License and Settlement Agreement | JA3973 |
| 2023.02.22 | EXHIBIT B – July 1, 2019 Correspondence | JA4005 |
| 2023.02.22 | EXHIBIT D – September 21, 2022 J. Whitley Deposition Excerpts | JA4015 |
| 2023.02.22 | EXHIBIT E – September 29, 2022 OPTO's Supplemental Responses to First Interrogatories | JA4022 |
| 2023.02.22 | EXHIBIT F – September 29, 2022 OPTO's Objections and Responses to Second Interrogatories | JA4029 |
| 2023.02.22 | EXHIBIT G - G. Adams Expert Report Excerpts | JA4034 |

| 2022.02.25 | Transcript of February 15, 2022 Status Hearing and Discovery Conference | JA4043 |

| **VOLUME 10 OF 16 – SEALED** | | |
| --- | --- | --- |
| **Date** | **Description** | **Page No.** |
| 2023.03.02 | OPTO's Objections to Discovery Rulings | JA4223 |
| 2023.03.08 | Defendant's Memorandum in Support of Its Motion for Summary Judgment | JA4250 |
| 2023.03.08 | EXHIBIT 1 – First Amendment to License and Settlement Agreement | JA4282 |
| 2023.03.08 | EXHIBIT 2 – Second Amendment to License and Settlement Agreement | JA4285 |
| 2023.03.08 | EXHIBIT 3 – Application and Declaration for Remittance | JA4291 |
| 2023.03.08 | EXHIBIT 4 – Application and Declaration for Remittance | JA4293 |
| 2023.03.08 | EXHIBIT 5 – Quarterly Royalty Reports and Wire Transfer Receipts | JA4295 |
| 2023.03.08 | Defendant's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA4333 |
| 2023.03.15 | Reply in Support of Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA4364 |
| 2023.03.15 | EXHIBIT A – OPTO's Supplemental and Amended Objections and Responses to First Set of Interrogatories | JA4381 |
| 2023.03.15 | EXHIBIT B – ISO/IEC 15438 | JA4398 |
| 2023.03.15 | EXHIBIT C – September 27, 2022 Excerpts from Deposition of Yoshiaki Kohmo | JA4515 |
| 2023.03.16 | Honeywell's Response to OPTO's Objections to Magistrate Judge's Decision | JA4523 |
| 2023.03.22 | Honeywell's Response in Opposition to OPTO's Motion for Summary Judgment | JA4551 |
| 2023.03.28 | Honeywell's Memo in Support of Motion for Partial Summary Judgment Regarding Patent Misuse | JA4576 |
| 2023.03.28 | EXHIBIT C – July 1, 2019 Correspondence from B. Pleune to K. Chu | JA4595 |

| Date | Description | Page No. |
|---|---|---|
| 2023.03.28 | EXHIBIT D – Defendant's Supplemental and Amended Objections and Responses to Plaintiff's First Set of Interrogatories | JA4605 |
| 2023.03.29 | OPTO's Memorandum in Support of Motion for Summary Judgment Regarding Patent Misuse | JA4616 |
| 2023.04.10 | Honeywell's Opposition to OPTO's Motion for Summary Judgment Regarding Patent Misuse | JA4632 |
| 2023.04.10 | EXHIBIT A – September 30, 2022 Honeywell's First Amended Objections & Responses to OPTO's First Set of Interrogatories | JA4655 |
| 2023.04.10 | OPTO's Response to Honeywell's Patent Misuse Motion for Summary Judgment | JA4674 |

### VOLUME 11 OF 16 – SEALED

| Date | Description | Page No. |
|---|---|---|
| 2023.04.10 | EXHIBIT A – OPTO's Supplemental Responses to Plaintiffs' First Set of Interrogatories | JA4695 |
| 2023.05.01 | Memorandum in Support of Honeywell's Motion for Reconsideration of Dkt. 195 | JA4742 |
| 2023.05.01 | EXHIBIT A – License and Settlement Agreement | JA4769 |
| 2023.05.01 | EXHIBIT B – Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA4801 |
| 2023.05.01 | EXHIBIT C – Expert Report of Ryan N. Herrington | JA4844 |
| 2023.05.01 | EXHIBIT D – September 8, 2020 Letter to OPTO Electronics | JA4911 |
| 2023.05.01 | EXHIBIT E – September 16, 2020 E-mail from Counsel for OPTO | JA4914 |
| 2023.05.01 | EXHIBIT F – October 23, 2020 E-mail from Counsel for OPTO | JA4917 |
| 2023.05.01 | EXHIBIT G – December 16, 2020 Letter to Counsel for OPTO | JA4927 |
| 2023.05.01 | EXHIBIT H – January 1, 2021 E-mail from Counsel for OPTO | JA4929 |
| 2023.05.01 | EXHIBIT I – Non-Disclosure & Confidentiality Agreement | JA4936 |
| 2023.05.12 | EXHIBIT J – January 4, 2021 E-mail from Matsuzawa | JA4940 |

| 2023.05.12 | EXHIBIT K – January 6, 2021 E-mail from Matsuzawa | JA4952 |
| 2023.05.12 | EXHIBIT L – January 11, 2021 E-mail to Matsuzawa | JA4964 |
| 2023.05.12 | EXHIBIT M – January 15, 2021 E-mail to Matsuzawa | JA4980 |
| 2023.05.12 | EXHIBIT N – January 26, 2021 E-mail to Matsuzawa | JA4989 |
| 2023.05.12 | EXHIBIT O – February 1, 2021 and February 10, 2021 E-mails to Matsuzawa | JA5001 |
| 2023.05.12 | EXHIBIT P – February 3, 2021 E-mail to Matsuzawa | JA5012 |
| 2023.05.12 | EXHIBIT Q – March 31, 2021 E-mail to Matsuzawa | JA5018 |

**VOLUME 12 OF 16 – SEALED**

| Date | Description | Page No. |
| --- | --- | --- |
| 2023.05.01 | EXHIBIT R – Deposition transcript of Rie Ashihara | JA5146 |
| 2023.05.01 | EXHIBIT S – April 13, 2023 Excerpts of Motions | JA5255 |
| 2023.05.10 | Hearing Transcript from Motions Heard on April 13. 2023 | JA5398 |
| 2023.05.15 | Defendant's Response in Opposition to Plaintiffs' Motion for Reconsideration of Dkt. 195 and Offer of Proof | JA5540 |
| 2023.05.22 | Honeywell's Reply in Support of Its Motion for Reconsideration and Offer of Proof | JA5568 |
| 2023.06.20 | OPTO's Proposed Findings of Fact and Conclusions of Law re Patent Misuse | JA5586 |
| 2023.06.20 | OPTO's Trial Brief | JA5605 |

**VOLUME 13 OF 16 – SEALED**

| Date | Description | Page No. |
| --- | --- | --- |
| 2023.06.20 | Honeywell's Trial Brief Regarding Jury Trial | JA5626 |
| 2023.06.20 | Honeywell's Trial Brief Regarding Patent Misuse | JA5647 |
| 2023.06.20 | Honeywell's Proposed Findings of Fact and Conclusions of Law | JA5671 |
| 2023.07.05 | OPTO's Memorandum in Support of Motion to Strike | JA5690 |
| 2023.07.05 | EXHIBIT 1 – Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5706 |

| | | |
|---|---|---|
| 2023.07.10 | Honeywell's Response to Motion to Strike | JA5753 |
| 2023.07.10 | EXHIBIT A – Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5770 |
| 2023.07.10 | EXHIBIT B - Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5813 |
| 2023.07.10 | EXHIBIT C - Redlined Version of Honeywell's Interrogatory Responses | JA5860 |
| 2023.07.10 | EXHIBIT F – December 27, 2022 OPTO's Second Supplemental Responses to Honeywell's First Set of Interrogatories | JA5908 |
| 2023.07.10 | EXHIBIT G – April 12, 2023 Rebuttal Expert Report of Ryan H. Herrington | JA5956 |
| 2023.07.10 | EXHIBIT I – October 21, 2022 Expert Report of David O. Taylor | JA6014 |
| 2023.08.03 | EXHIBIT A – License and Settlement Agreement | JA6072 |

**VOLUME 14 OF 16 – SEALED**

| Date | Description | Page No. |
|---|---|---|
| 2023.08.03 | EXHIBIT B – Declaration of M. Scott Stevens | JA6104 |
| 2023.08.17 | OPTO's Opposition to Honeywell's Motion for Attorney Fees and Costs | JA6263 |
| 2023.08.17 | EXHIBIT 1 – Fees and Costs Analysis | JA6295 |
| 2023.08.17 | EXHIBIT 2 – Metrologic Settlement and License Agreement | JA6317 |
| 2023.08.17 | EXHIBIT 4 – Doc Production Invoice | JA6333 |
| 2023.08.17 | EXHIBIT 5 – Invoice | JA6336 |
| 2023.08.17 | OPTO Memo in Support of Motion for Judgment as a Matter of Law | JA6338 |
| 2023.08.31 | EXHIBIT A – Defendant's Second Supplemental Objections and Responses to Plaintiff's Frist Set of Interrogatories | JA6369 |
| 2023.09.12 | OPTO Reply in Support of Motion for Judgment as a Matter of Law | JA6417 |

| **VOLUME 15 OF 16 – SEALED** | | |
| --- | --- | --- |
| **Exhibit** | **Description** | **Page No.** |
| JX-1 | License and Settlement Agreement | JA6432 |
| JX-2 | First Amendment to License and Settlement Agreement | JA6436 |
| JX-3 | Second Amendment to License and Settlement Agreement | JA6465 |
| PX-4 | ISO/IEC 15438 | JA6470 |
| PX-8 | ISO/IEC 24728 | JA6586 |
| PX-10 | ISO/IEC 24723 | JA6710 |
| PX-13 | European Pre-Standard, ENV12925 | JA6762 |
| **VOLUME 16 OF 16 – SEALED** | | |
| **Exhibit** | **Description** | **Page No.** |
| PX-61 | Table of OPTO Interrogatory Response No. 3 | JA6878 |
| PX-243 | Letter from B. Pleune to Quinn Emanuel (dated July 1, 2019) | JA6925 |
| PX-244 | Pleune Correspondence to Goldstein (May 21, 2021) | JA6934 |
| PX-245 | Report Draft OP EU 4 April2021.xlsx (Enclosure to Audit Letter) | JA6936 |
| PX-246 | Report Draft OP-1 0220.xlsx (Enclosure to Audit Letter) | JA6969 |
| PX-247 | Report Draft OP US_20210414.xlsx (Enclosure to Audit Letter) | JA7068 |
| PX-259 | E-Mail Chain with R. Goldstein (October 23, 2020) | JA7096 |
| PX-261 | E-Mail Chain with R. Goldstein (January 12, 2021) | JA7105 |
| PX-288 | Pleune June 2021 correspondence to Goldstein | JA7111 |
| PX-289 | Matsuzawa & Co. Invoice in Japanese | JA7113 |
| DX-095 | September 16, 2020 Email from Goldstein to Pleune | JA7118 |
| DX-096 | September 16, 2020 Letter from Goldstein to Pleune | JA7120 |
| DX-098 | Sales Spreadsheets Sent by Goldstein to Pleune | JA7121 |
| DX-111 | September 30 – December 16 Email Thread Goldstein and Pleune | JA7175 |
| DX-769 | Honeywell's ITC Claims Charts | JA7184 |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL,      )
INC.; HAND HELD PRODUCTS,     )
INC.; AND METROLOGIC          )
INSTRUMENTS, INC.,            )
                             )
            Plaintiffs,       )    No. 3:21-cv-506
                             )
        vs.                   )    VOLUME II
                             )
OPTO ELECTRONICS COMPANY,     )
LTD.,                         )
                             )
            Defendant.        )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 18, 2023

<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

JA1089

APPEARANCES (Cont'd.)

TYLER T. VanHOUTAN, ESQ.
McGuireWoods, LLP
Texas Tower, Suite 2400
845 Texas Avenue
Houston, Texas 77002

CHRISTINE E. LEHMAN, ESQ.
CONNOR S. HOUGHTON, ESQ.
Reichman Jorgensen Lehman & Feldberg, LLP
1909 K Street, NW
Suite 800
Washington, DC 20006

YORK M. FAULKNER, ESQ.
YorkMoodyFaulkner
Tensho Building, 7F
3-17-11 Shibaura, Suite 711
Tokyo, Japan

CHERYL A. NUCCIO, RMR, CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA1090

1                              I N D E X

2     DEFENDANT'S WITNESSES                                    PAGE

3     ADAM DOANE
          Direct Examination By Mr. Muckenfuss           199
4         Cross Examination By Mr. Stevens               267
          Redirect Examination By Mr. Muckenfuss         290
5

6     PAUL CHARTIER
          Direct Examination By Mr. VanHoutan            311
7         Cross Examination By Mr. Stevens               359
          Redirect Examination By Mr. VanHoutan          389
8         Recross Examination By Mr. Stevens             390

9
      RIE ASHIHARA
10        Direct Examination By Mr. VanHoutan            394
          Cross Examination By Mr. Stevens               399
11

12    CORNELIS STOOP
          Direct Examination By Mr. Stevens              405
13        Cross Examination By Mr. VanHoutan             420
          Redirect Examination By Mr. Stevens            425
14        Recross Examination By Mr. VanHoutan           427

15
16    PLAINTIFF'S REBUTTAL WITNESSES                          PAGE

      RIE ASHIHARA
17        Direct Examination By Mr. Stevens              428
          Cross Examination By Mr. VanHoutan             432
18        Redirect Examination By Mr. Stevens            433

19

20

21

22

23

24

25

JA1091

```
1                        E X H I B I T S

2    PLAINTIFF'S EXHIBITS

3    NUMBER                                    ADMITTED

4    5 .............................................393
     12 ............................................393
5    13 ............................................393
     17 ............................................393
6    18 ............................................393
     19 ............................................393
7    87 ............................................431
     125 ...........................................430
8    188 ...........................................272
     206 ...........................................274
9    207 ...........................................393

10

11   DEFENDANT'S EXHIBITS

12   NUMBER                                    ADMITTED

13   95 ............................................222
     96 ............................................253
14   98 ............................................227
     111 ...........................................229
15   769 ...........................................262
     848 ...........................................393
16   849 ...........................................393
     850 ...........................................393
17   851 ...........................................393
     852 ...........................................393
18   853 ...........................................393
     854 ...........................................393

19

20   JOINT EXHIBITS

21   NUMBER                                    ADMITTED
     3 .............................................212
22

23

24

25
```

1                  P R O C E E D I N G S
2    TUESDAY MORNING, JULY 18, 2023
3              (Court called to order at 8:56 AM.)
4              (Jury not present.)
5              THE COURT:  Good morning.
6              ALL COUNSEL:  Good morning.
7              THE COURT:  Mr. Muckenfuss, do you have a motion
8    you'd like to make?
9              MR. MUCKENFUSS:  Yes, Your Honor.
10             The defense would move for judgment as a matter of
11   law on the breach claim.
12             Very briefly, the plaintiff has not met its burden
13   to show specifically what products it's complained of that
14   royalties have not been paid.  I think the testimony that came
15   in from Mr. Whitley and Mr. Smith, they very generally
16   testified that they thought the complete royalties had not
17   been paid on 2D Barcode Products.  But they failed to connect
18   that to any specific products that they complain should have
19   been included in the definition of 2D Barcode Products and
20   actually show that royalties had not been paid.
21             THE COURT:  Mr. Stevens.
22             MR. STEVENS:  In addition to the testimony of
23   Mr. Taylor Smith and Mr. Whitley, our expert Mr. Craig Smith
24   went through each of the 18 products, went through their
25   interrogatory response and showed that each one of those was

1  operable to decode PDF417, MicroPDF417, and composite codes.

2       So there's specific testimony in this case of each

3  of the 18 SKUs.  In fact, he took the time to read each one of

4  them, go through their interrogatory response about each one

5  of them, and show that those are the products that we're here

6  to talk about that haven't been paid for.  Of course, in the

7  damages phase we'll actually talk about the numbers.

8       Moreover, a 50(a) motion is untimely at this point

9  in time.  The federal rules were amended about ten years ago

10  to move it to the close of all evidence.

11       THE COURT:  The Court agrees with Honeywell's

12  position on this that there is sufficient evidence from which

13  a reasonable jury could find by a preponderance all the

14  elements necessary for the claim.

15       Mr. Muckenfuss, do you have a best guess as to how

16  long your evidence will take?

17       MR. MUCKENFUSS:  So we have -- let's see.  We have

18  three live witnesses.  I think the first witness will probably

19  take the better part of the morning.  I think the other two

20  live witnesses will be short.  I believe we have a deposition

21  video that's two hours.  And I think there is one deposition

22  video that's 30 minutes.  So I think we probably can get

23  through our case -- we should get through our case today.

24       THE COURT:  All right.  Well, that gives us some

25  time to deal with some other issues.

192

1          Do you know when during your evidence you will begin

2    presenting on the affirmative defenses as opposed to the

3    breach claim?

4          MR. MUCKENFUSS:  Immediately with the first witness.

5          THE COURT:  Well, what I intend to do is instruct

6    the jury -- and hopefully I'll recognize it -- that that

7    evidence is not being offered and shall not be considered by

8    them with respect to Honeywell's breach of contract claim.  It

9    may be considered by them with respect to the defendant's

10   affirmative defenses which they may be asked to consider

11   during their deliberations.

12          And I don't intend to go through at that point and

13   define or describe for them what those affirmative defenses

14   are, but I'd be glad to hear from the parties about that

15   intention.

16          MR. MUCKENFUSS:  Just so I understand, do you intend

17   to give that limiting instruction at the time the evidence is

18   coming in or...

19          THE COURT:  Yes.

20          MR. MUCKENFUSS:  Okay.  I guess, depending on the

21   evidence, Your Honor, we probably want to be heard just in

22   terms of whether that evidence should be considered for

23   breach.  I mean, there will be overlap, I think, in terms of

24   the evidence.

25          THE COURT:  That's one of the difficulties I'm

JA1095

1  anticipating that -- I mean, there may well be, because I
2  don't know what the evidence is, some of it applicable to the
3  breach claim.  But I do need to give a limiting instruction
4  when it's not applicable to the breach claim but only to the
5  affirmative defenses.
6         So you can -- you said you wanted to be heard on it.
7  We can do that now.  Or I can just take my best shot during
8  the trial.
9         MR. MUCKENFUSS:  And just -- I think -- I think it
10  would probably be better to do it when the evidence comes in
11  in the context of the testimony.  Not to forecast every --
12  obviously, every question I'm going to ask and the exhibits,
13  but I think with the first witness will probably be the most,
14  I think, pertinent with regard to it overlapping because we're
15  going to be talking about the contract.  We're going to be
16  talking about the agreement.  We're also going to be looking
17  at extrinsic evidence.  But I think it's best in the context
18  of the testimony.
19         THE COURT:  All right.  Let's try to keep sidebars
20  or moving the jury back to the jury room to an absolute
21  minimum.  I don't like bouncing them in and out.
22         Of course, not knowing what the evidence will
23  support by way of substantive jury instructions, are there any
24  objections to the proposed instructions if they are given?
25  You don't have to say -- I mean, I'm just wondering whether we

1  need to set aside some time for such a discussion.

2          MR. STEVENS:  We did have some objections, Your

3  Honor.  I don't think it's something that's going to take a

4  long period of time, but we did have some objections.

5          MR. McCAMEY:  Very minimal, but we do have one or

6  two as well, Your Honor.

7          THE COURT:  So since we're surely going to get past

8  the lunch hour, maybe we'll just give the jury an extra 15

9  minutes for lunch and we can take it up then.

10          MR. McCAMEY:  Thank you, Your Honor.

11          MR. MUCKENFUSS:  Thank you, Your Honor.

12          THE COURT:  Are we ready for the jury?

13          (No response.)

14          THE COURT:  All right.  Bring the jury in, Ms. Kirk.

15          MR. MUCKENFUSS:  Your Honor...

16          THE COURT:  Yes.  Hold on.

17          MR. MUCKENFUSS:  I apologize.  I feel like this is

18  one of those -- I've seen a movie like this, but our

19  audio/visual guy has had a problem in traffic.  I think he's

20  literally going through security right now.  I just don't want

21  disruption with the jury.  I apologize to the Court.

22          THE COURT:  No, that's all right.  We can wait for

23  that.

24          MR. MUCKENFUSS:  Thank you, Your Honor.

25          MR. STEVENS:  Since we have the time, I just want to

1   forecast one thing for you so you don't hear it for the first

2   time in the middle of the testimony.  I do believe that the

3   theory that you're going to hear with this first witness is a

4   brand new theory for this case, unpleaded by them, never

5   mentioned in an interrogatory, never disclosed in any way,

6   shape, or form.  This is a witness that's never been deposed

7   in this case.  And so I just -- there's likely going to be

8   objections once we get into this testimony as something that's

9   never been disclosed in this case before.

10          THE COURT:  All right.  So what's the new theory

11  you're anticipating?

12          MR. STEVENS:  I think -- during the pretrial

13  conference you told us that we weren't allowed to talk about

14  the details of the audit or the sales reports that they owed

15  us after the fact of the contract.  And I think that's what

16  he's going to get into.  I suspect he's going to get into

17  those sales reports and talk about them and go into detail in

18  those sales reports.

19          THE COURT:  Post-agreement sales reports?

20          MR. STEVENS:  Yes, Your Honor.

21          THE COURT:  Weren't those raised yesterday during

22  your case in chief that there were sales reports that were

23  received and that that raised the whole issue and brought to

24  the attention of Honeywell that certain royalties were not

25  being paid?

 1          MR. STEVENS:  Those are royalty reports, not the

 2    sales reports.  Honeywell never could see those.  What our

 3    witnesses talked about are the royalty reports that OPTO must

 4    actually give to Honeywell proper.  They actually submit them

 5    not even through the lawyers.  Someone at OPTO submits royalty

 6    reports to Honeywell directly.  That's what the testimony was

 7    about yesterday.  That has nothing to do with Section 5 of the

 8    agreement.  There is a separate requirement in Section 5.1 of

 9    the agreement that there were -- that sales reports went to

10    outside counsel's eyes only.  They were very insistent that

11    none of that information could ever be shared with Honeywell.

12    And that's what he's going to get into.  That's not something

13    that we talked about at any point in time in our case in

14    chief.

15          THE COURT:  These are sales reports related to

16    pre-agreement royalties?

17          MR. STEVENS:  That's right, Your Honor.  Sales

18    reports pre-agreement that go to the second sentence of 5.1

19    which you told me in the pretrial we can't bring up.

20          MR. MUCKENFUSS:  We're not getting into 5.1,

21    obviously, with regard to the damages.  Obviously, they know

22    about this theory as he just articulated it.

23          But we've gone through these emails ad nauseam.  It

24    was in summary judgment.  We've talked about this a lot.  The

25    sales reports go to the understanding of the parties as what's

1  included under the definition of 1.4.  We're not going to be

2  talking about the specifics of the damages or things that

3  relate to that 5.1.

4          But, yes, as Honeywell's counsel -- and it's not

5  just their counsel.  It's their general counsel too.  They

6  received information from OPTO where it was clear that these

7  scanners were not included under the definition of 1.4.

8          Yes, it's in the context of providing that

9  information to Honeywell's counsel.  But that is our -- that's

10  our entire case on that point.  It goes to the defense.  It

11  definitely goes to the defense as to the understanding of

12  what's included under 1.4, that they knew it, they understood

13  it as Honeywell's counsel because OPTO told them.  And that's

14  what I said in opening -- my opening statement.  He knows

15  about it.  That's sort of the point.

16          So yes, that is the evidence that's going to come

17  in.

18          THE COURT:  Well, the numbers from the sales report

19  are irrelevant, right?

20          MR. MUCKENFUSS:  They are relevant just to the point

21  that they understood that OPTO was giving them very specific

22  information about laser scanners that were not included under

23  the definition of 1.4.  They knew that.

24          So it's not relevant for damages.  It's not relevant

25  for the jury in terms of -- from that standpoint.  But it is

1  relevant that they had knowledge that OPTO was telling them
2  that these specific products that they're now claiming are 2D
3  Barcode Products, OPTO was not including them in that
4  definition.
5           THE COURT:  Well, that far I can see that OPTO's
6  position was we were identifying for Honeywell products upon
7  which we were not paying royalties.  But the sales reports,
8  I'm not seeing how those are relevant for the jury's
9  consideration.
10          MR. MUCKENFUSS:  See, this is where it's difficult
11  without, obviously, being in the context of, you know, showing
12  it to Your Honor, but they know this.  The spreadsheets
13  actually note which exact products are 2D and which are not.
14  That's what they received.  So the spreadsheets actually have
15  the notation that OPTO gave them that specifically note what's
16  2D under 1.4 and what are not.  That's in the spreadsheet.
17          THE COURT:  I'm just going to have to deal with it
18  as it comes up.
19          But your point is well taken, Mr. Stevens, that you
20  weren't allowed to address this and we'll keep a close eye on
21  it being appropriate for the affirmative defense only.
22          MR. STEVENS:  Thank you, Your Honor.  And just to
23  clarify, it's not in their counterclaims, not in their
24  affirmative defenses, not even in their trial brief.
25          MR. MUCKENFUSS:  Well...

ADAM DOANE - DIRECT

1          THE COURT:  That's all right.

2          (Pause.)

3          THE COURT:  Let me know when you're ready.

4          MR. MUCKENFUSS:  I think we're okay.  I think he'll

5    be up and going by the time they come in.

6          THE COURT:  Okay.

7          (Jury entered the courtroom.)

8          THE COURT:  Good morning, members of the jury.

9          THE JURY:  Good morning.

10         THE COURT:  I trust you withstood the onslaught of

11   the curious last night and abided by the Court's instructions

12   to not discuss this case.

13         The defense may call its first witness.

14         MR. MUCKENFUSS:  Thank you, Your Honor.

15         Defense calls Adam Doane.

16          ADAM DOANE, DEFENDANT'S WITNESS, SWORN,

17         MR. MUCKENFUSS:  Your Honor, with the Court's

18   indulgence, would it be okay if I place the flip chart next to

19   the witness?  I may be writing some dates on it.

20         THE COURT:  Sure, that's fine.

21         MR. MUCKENFUSS:  Thank you, Your Honor.

22                    DIRECT EXAMINATION

23   BY MR. MUCKENFUSS:

24   Q.   Mr. Doane, can you state your full name.

25   A.   Adam Doane.

JA1102

200

ADAM DOANE - DIRECT

 1  Q.   Thank you.

 2       And where are you currently employed?

 3  A.   Honeywell.

 4  Q.   And just so the jury understands, you're a lawyer,

 5  correct?

 6  A.   I am.

 7  Q.   And so I know there are a lot of lawyers in this case.

 8  We've been talking about a lot of different types of lawyers.

 9  And just for the jury's benefit, you're a lawyer that works at

10  Honeywell, correct?

11  A.   That's correct.

12  Q.   A lot of people know lawyers that work in law firms.

13       Are you sometimes referred to as an in-house lawyer?

14  A.   Yes, that's fair.

15  Q.   Okay.  And you're an intellectual property attorney,

16  correct?

17  A.   That's also correct, yes.

18  Q.   Also called an IP attorney?

19  A.   That's right.

20  Q.   Okay.  Do you specialize in patent law?

21  A.   That's where the majority of my work focuses on, so yes.

22  Q.   Okay.  You went -- if my understanding is correct, you

23  went to Ohio State.

24  A.   I did.

25  Q.   Okay.  Hopefully no Michigan people in the courtroom.

JA1103

ADAM DOANE - DIRECT

1    A.    That's what I was hoping.

2    Q.    All right.  And prior to -- when did you join Honeywell?

3    A.    In July of 2021.

4    Q.    Okay.  And prior to joining Honeywell in 2021, did you

5    work at Alston & Bird?

6    A.    I did work at Alston & Bird before Honeywell, yes.

7    Q.    Okay.  So Alston & Bird is the law firm representing

8    Honeywell in this case, correct?

9    A.    That is correct.

10   Q.    All right.  And when did you start working at Alston &

11   Bird?

12   A.    That would have been January of 2017.

13   Q.    January of 2017.  Okay.

14   A.    Yes.

15   Q.    And in 2017 did you join the firm as an IP lawyer?

16   A.    I believe my official title was associate, but I was in

17   the IP litigation group.

18   Q.    Okay.  And you started out your career -- or I'm sorry,

19   you started out at Alston & Bird focusing on patent law; is

20   that correct?

21   A.    And just to be clear, you said I started my career.  I

22   started my career at a different law firm.  I just want to be

23   completely accurate.

24   Q.    I appreciated that.  I think I corrected my question.  I

25   appreciate that.

ADAM DOANE - DIRECT

1    But when you started at Alston & Bird, did you start out
2    as a patent lawyer?
3    A.   I did, yes.
4    Q.   And were you focused on patent litigation?
5    A.   Yes.  I was in the IP litigation group so my practice
6    focused on patent litigation.
7    Q.   And you were working at Alston & Bird in 2019 as a patent
8    litigator, correct?
9    A.   That's correct, yes.
10   Q.   And you were part of a team in 2019 that was representing
11   Honeywell.
12   A.   In 2019 I was part of a team that did represent
13   Honeywell, yes.
14   Q.   And we'll come back to that.
15        I want to just come back to your position at Honeywell.
16   Is your title Assistant Intellectual Property Counsel?
17   A.   I believe my official title was Assistant General
18   Counsel, Intellectual Property.
19   Q.   Thank you.
20        Is -- I assume you have a boss.  Who is your boss at
21   Honeywell?
22   A.   Jeremy Whitley.
23   Q.   Okay.  Mr. Whitley is in the courtroom today.
24   A.   Yes, he is.
25   Q.   All right.  And you were in the courtroom yesterday,

JA1105

ADAM DOANE - DIRECT

1  correct?

2  A.   Yes, I was here yesterday.

3  Q.   And you heard Mr. Whitley testify in this case, correct?

4  A.   I did.

5  Q.   All right.  Now, as intellectual property counsel at

6  Honeywell -- Honeywell is a big company, right?

7  A.   It's a fairly large corporation, yes.

8  Q.   Right.  I think -- does it have more than a hundred

9  thousand employees?

10 A.   I don't know, but I would assume so, yes.

11 Q.   In terms of the lawyers, what I would call in-house

12 lawyers at Honeywell, does it have more than a hundred?

13 A.   I don't know, but I would probably say no.

14 Q.   Okay.  Is it around a hundred?

15 A.   I don't think so.  I think it's less than that.

16 Q.   Okay.  How many lawyers do you think work at Honeywell?

17 A.   I don't know.  Less than a hundred would be my guess.

18 Q.   All right.  Now, when you were at Alston & Bird in 2019,

19 were you put on a case where Honeywell was suing OPTO?

20 A.   I represented Honeywell in a case in 2019.

21 Q.   Okay.  Was that -- did that case involve Honeywell suing

22 OPTO?

23 A.   Yes.

24 Q.   And is it the same case that's been referred to as the

25 ITC litigation?

ADAM DOANE - DIRECT

 1   A.   Yes, that was one of them.  There was a Delaware action
 2   as well, but, yes, ITC was one of them.
 3   Q.   And you were part of a bigger team at Alston & Bird
 4   representing Honeywell in that litigation, correct?
 5   A.   Yes.  There was a team.  I don't remember how many there
 6   were, but there was a team of us.
 7   Q.   Were there more than ten?
 8   A.   Ten lawyers -- no, it would have been less than ten
 9   lawyers probably.
10   Q.   How about around eight?
11   A.   Around eight is probably fair, maybe a little less.  But
12   six to eight is probably fair.
13   Q.   Okay.  And were the lawyers representing Honeywell in
14   2019 in that litigation, are some of them here in the
15   courtroom today?
16   A.   Yes.
17   Q.   Okay.  Mr. Stevens, who's to the right of me, was he part
18   of that team?
19   A.   He was.
20   Q.   Mr. Pleune, Ben Pleune, to the right of Mr. Stevens, was
21   he part of that team?
22   A.   He was.
23   Q.   Okay.  Any other lawyers in the courtroom today
24   representing Honeywell in that litigation?
25   A.   Mr. Lareau represented Honeywell in that litigation.

ADAM DOANE - DIRECT

1  Ms. Griffin, I believe, was also representing Honeywell in
2  that litigation.  And I believe that is it.
3  Q.   Okay.  Now, as part of that team, the Alston & Bird team
4  representing Honeywell in that litigation, were you part of
5  the team involved that ultimately led to the settlement of
6  that litigation?
7  A.   Yes.  I mean, the settlement covered the ITC and Delaware
8  actions and I was involved in both those actions.  I was part
9  of the team on the litigations that ultimately led to that
10 settlement agreement.
11 Q.   Right.  And again, just for the jury, this was the team
12 representing Honeywell, correct, in that litigation?
13 A.   The team we just discussed represented Honeywell in that
14 litigation, yes.
15 Q.   Okay.  And just for the -- just to take a step back too
16 for a second.  I'm not a patent lawyer so I just want to ask a
17 few questions about -- it's not uncommon for patent lawyers to
18 have other science degrees, things like that, correct?
19 A.   It's not required, but it's not uncommon.
20 Q.   Right.  Do you have an economics degree?
21 A.   That is one of my degrees, yes.
22 Q.   All right.  Other members of the Alston & Bird team have
23 science degrees?
24 A.   Yes.
25 Q.   Now, as part of being on the Alston & Bird team

ADAM DOANE - DIRECT

1  representing Honeywell in the litigation, you were involved in
2  reviewing or analyzing OPTO's products, correct?
3  A.   Yes.  My work at Alston & Bird included reviewing and
4  analyzing OPTO products.
5  Q.   And that started back in 2019, correct?
6  A.   It would have started, you know, at the start of the
7  litigation which I believe was in 2019.
8  Q.   And you were in the courtroom yesterday when Mr. Whitley
9  talked about there was a document shown to him where Alston &
10  Bird sent a letter to OPTO listing a bunch of products that it
11  claimed infringed Honeywell's patents.  Do you remember that?
12  A.   Are you referring to the list that had the patents on it?
13  Q.   Yes.
14  A.   Okay.  You said had lots of products.  I think it was a
15  list of patents that OPTO --
16  Q.   I apologize.  But in the course of that, Honeywell was
17  taking the position that certain OPTO products infringed those
18  patents, correct?
19  A.   Yes.  Honeywell's position was that all of OPTO's
20  products infringed many Honeywell patents.
21  Q.   And again, you were part of the Alston & Bird team
22  reviewing those products that Honeywell claimed infringed the
23  patents, correct?
24  A.   Yes, that would have been part of my job.
25  Q.   Now, you were in the courtroom yesterday when the

JA1109

ADAM DOANE - DIRECT

1  settlement agreement was shown to Mr. Smith.  Do you recall
2  that?
3  A.   I do.
4  Q.   And we're going to look at that in a second.
5       Was that the complete settlement agreement?
6  A.   The document we looked at yesterday, I'm not sure if it
7  had both amendments to it so I can't say for sure.  But there
8  were two amendments to that agreement.
9  Q.   Right.  And in fact, the settlement agreement that
10 Honeywell put into evidence was not the complete settlement
11 agreement because it did not include the two amendments,
12 correct?
13 A.   I don't know the exact exhibit that was introduced.  I do
14 know that -- I believe all amendments are included in this
15 litigation, though.
16 Q.   Right.  So you would agree with me that the two
17 amendments that have been referred to are part of the entire
18 settlement agreement.
19 A.   They are part of the entire settlement agreement, yes.
20 Q.   And you would agree with me that those amendments should
21 be considered or reviewed if someone is looking at the entire
22 settlement agreement, correct?
23 A.   They are part of the entire settlement agreement so they
24 should be reviewed in totality as a settlement agreement.
25 Q.   Do you know why Honeywell only looked at the first part

208

ADAM DOANE - DIRECT

1  of the settlement agreement yesterday?

2  A.   I believe there were some discussions of the amendment so

3  I'm not sure I would agree with we only looked at one part of

4  it.

5       MR. MUCKENFUSS:   Okay.   Let's put up the document

6  that was put into evidence, JX1.

7  Q.   So you can see on the screen this is the License and

8  Settlement Agreement.   It's dated January 22, 2020, correct?

9  A.   It is, correct.   And I'm noticing now this says JX1,

10  which is a joint exhibit, so I believe both parties put this

11  document into evidence.

12  Q.   Okay.   So you think yesterday OPTO put this document into

13  evidence?

14  A.   Well, it's a joint exhibit so both parties would have

15  agreed to this exhibit.

16  Q.   Certainly.   I don't -- I'm not disputing with you that we

17  agree that this part of the settlement agreement should come

18  into evidence.   But you would also agree that the other two

19  amendments should come into evidence, correct?

20  A.   I believe that's for the judge to decide.   But I mean,

21  they're part of this agreement.

22  Q.   All right.   So let's go to the end of this agreement.

23       I'll represent to you, and feel free to look through it,

24  but the two amendments are not attached to the exhibit that

25  was introduced yesterday.

JA1111

ADAM DOANE - DIRECT

1    A.   It doesn't appear so.  I'm obviously not able to flip

2    through and go further.  But if you say the last page is what

3    you're showing me, then they're not included in what you're

4    showing me right now.

5    Q.   Okay.  Let's go back to the top again.  I want to keep

6    track of the timeline, if we could here.

7        So this -- the License and Settlement Agreement that OPTO

8    and Honeywell ultimately entered into was effective on

9    January 22, 2020, correct?

10   A.   That is correct, yes.

11            MR. MUCKENFUSS:  Your Honor, may I approach just

12   to --

13            THE COURT:  You may.

14            MR. MUCKENFUSS:  -- write on the flip chart?

15            Thank you.

16            So I'm just going to keep track of the dates on this

17   flip chart.  You'll have to excuse my writing.

18            So I just want to look at a couple of -- well, one

19   thing in particular in this agreement.  If we could go to

20   Section 1.4.

21   Q.   Now, we saw this yesterday in Honeywell's case.  You're

22   familiar with Section 1.4, correct?

23   A.   I'm familiar with this, yes.

24   Q.   And you reviewed this previously, correct?

25   A.   Yes.

ADAM DOANE - DIRECT

 1  Q.   You reviewed it when you were counsel at Alston & Bird
 2  representing Honeywell, correct?
 3  A.   Yes, I would have seen this when I was at Alston & Bird.
 4  Q.   And you reviewed it as in-house counsel at Honeywell,
 5  correct?
 6  A.   Yes, I would have reviewed this while at Honeywell as
 7  well.
 8  Q.   Right.  And you've been part of -- at Honeywell you've
 9  been part of the in-house team helping to manage this case,
10  correct?
11  A.   That's correct.
12  Q.   All right.  You're aware that Honeywell's position is
13  that this definition of 1.4 is the complete definition of any
14  products that are included in the royalty requirement for
15  OPTO, correct?
16  A.   So this definition is for 2D Barcode Products and any
17  products that meet this definition would be subject to the
18  license and the royalties.
19  Q.   Thank you.  You said it better than I did.
20       So any products that would fall under this definition,
21  OPTO would have to pay royalties, correct?
22  A.   Yes.  If a product meets this definition, OPTO would have
23  to pay royalties.
24  Q.   Okay.  And as your review -- as part of the Alston & Bird
25  team and as in-house counsel at Honeywell, you're aware that

ADAM DOANE - DIRECT

1  Honeywell contends that OPTO's laser scanners fall within --
2  OPTO's laser scanners that can decode PDF417 fall within this
3  definition, correct?
4  A.   That's correct.  If a laser scanner can decode a PDF417,
5  then it falls within this definition.
6  Q.   Okay.  And it is Honeywell's position that OPTO's failure
7  to pay royalties on those laser scanners would breach the
8  contract, correct?
9  A.   Yes.  The failing to pay royalties on laser products that
10 read PDF417 is a breach of the agreement.
11 Q.   Mr. Doane, you're aware that Honeywell also sued OPTO in
12 Europe.
13 A.   Yes, I'm aware that Honeywell sued OPTO in Europe.
14 Q.   Okay.  And you were part of the Alston & Bird team, the
15 same team representing Honeywell in that litigation, correct?
16 A.   I was part of the team.  I'm not sure the team is exactly
17 the same, but I was working on those matters, yes.
18 Q.   And again, same function.  As a patent litigator, you
19 were representing Honeywell to review OPTO's products relating
20 to that litigation.  That was one of your roles, correct?
21 A.   Yes, it was.
22 Q.   Okay.  And you're aware that the Europe litigation
23 settled as well with OPTO.
24 A.   Yes, it did.
25 Q.   Now, going back to my questions before about the

ADAM DOANE - DIRECT

1  amendments to the settlement agreement.  The settlement for

2  the European litigation is not contained in this document,

3  correct?

4  A.  It's part of the agreement.  As I mentioned, I couldn't

5  flip through to see if it's in this exact document; but I have

6  not seen it yet on the screen.

7  Q.  Right.  And that was not introduced yesterday during

8  Honeywell's case, correct?

9  A.  I'm not sure I saw the document on the screen, but I

10  believe it was discussed yesterday.

11  Q.  Mr. Whitley didn't say anything about settling the

12  European litigation, did he?

13  A.  I don't recall everything that was said yesterday.  But

14  if it didn't come up, then it didn't come up.

15  Q.  Right.  And you're aware, again, as part of the Alston &

16  Bird team representing Honeywell, that the Second Amendment to

17  the settlement agreement settled the European litigation.

18  A.  Yes, I'm aware of that.

19         MR. MUCKENFUSS:  Show the witness JX3.

20  Q.  I'm showing you on the screen JX3, Second Amendment.

21         MR. MUCKENFUSS:  Your Honor, move this into

22  evidence.

23         THE COURT:  It's admitted.

24         (Joint Exhibit Number 3 was received into evidence.)

25  Q.  Showing you on the screen a document entitled Second

213

ADAM DOANE - DIRECT

1  Amendment to License and Settlement Agreement.
2      Do you see that?
3  A.   Yes, I do.
4  Q.   And you're aware, Mr. Doane, that this is the Second
5  Amendment that settled the litigation in Europe.
6  A.   Yes.
7  Q.   Okay.  And if you look at the top at the date, it
8  references the same date of the first settlement agreement,
9  the license agreement, January 22, 2020, and then states that
10 the Second Amendment is effective February 3, 2021.
11     Do you see that?
12 A.   I do.
13         MR. MUCKENFUSS:  Your Honor, may I approach?
14         THE COURT:  You may.
15         MR. MUCKENFUSS:  Thank you.
16 Q.   So almost a year after the first settlement agreement was
17 executed, the parties settled the litigation in Europe,
18 correct?
19 A.   Yes, that's correct.
20 Q.   All right.  You're aware that Honeywell filed the
21 litigation in Europe in about January of 2020.
22 A.   I don't remember when it was filed.  That sounds about
23 right, though.
24 Q.   Okay.  And just for the jury, just to focus on a couple
25 of things, if you'd look at Section A.

JA1116

214

ADAM DOANE - DIRECT

1    So just very briefly, it references, "Honeywell filed the
2    following litigations (collectively, the 'Europe litigations')
3    alleging patent infringement in Europe."
4        Do you see that?
5    A.    I do.
6            MR. MUCKENFUSS:  All right.  Let's go to Section B.
7    Q.    Section B states, "Opticon filed the following nullity
8    actions alleging invalidity against certain Honeywell
9    patents."
10       Do you see that?
11   A.    I do.
12   Q.    Now, again, I'm not a patent lawyer, but these actions
13   called nullity actions, were those actions filed by OPTO
14   seeking to have Honeywell's patents invalidated?
15   A.    That's correct.  Let me explain.
16       So in most patent litigations in most countries, the
17   infringement and invalidity are decided by the same court.  In
18   certain countries you file an invalidity action in a separate
19   action in a different court.
20       And so what we're seeing here is OPTO filing invalidity
21   against certain Honeywell patents in just a separate court.
22   Q.    Thank you.  I appreciate that.
23       In the United States litigation, OPTO asserted those
24   defenses in that litigation, correct?
25   A.    Yes.  I believe OPTO alleged that each of the Honeywell

JA1117

ADAM DOANE - DIRECT

 1  patents asserted were invalid.
 2  Q.   Okay.  So both in the U.S. litigation and in the Europe
 3  litigation, OPTO was asserting that the Honeywell patents were
 4  invalid, correct?
 5  A.   That was OPTO's belief, yes.
 6  Q.   Right.  And it was Honeywell's belief that OPTO was
 7  infringing its patents, correct?
 8  A.   Correct.
 9  Q.   Right.  The parties had obviously different beliefs,
10  correct?
11  A.   They did, yes.
12       MR. MUCKENFUSS:  You can take that down.
13       Let's look at Section C.
14  Q.   Section C states, "In the Europe Litigations, Opticon has
15  denied infringement of all asserted claims."
16       Do you see that?
17  A.   I do see that.
18  Q.   And you're aware that OPTO has never admitted
19  infringement of the patents, correct?
20  A.   Yes.  I'm not aware of OPTO ever admitting infringement.
21  Q.   Right.
22       MR. MUCKENFUSS:  Okay.  Look at Section D.
23  Q.   And for fairness, Section D states, "In the nullity
24  Actions, Honeywell has denied the invalidity of all asserted
25  claims."  Correct?

ADAM DOANE - DIRECT

1   A.   That's correct.

2   Q.   So Honeywell didn't admit that their patents were invalid

3   either, right?

4   A.   That's correct.

5        MR. MUCKENFUSS:  And so go to Section E.

6   Q.   And so Section E states the parties wanted to avoid

7   further litigation and so they settled the case, correct?

8   A.   That's part of what E says, yes.

9   Q.   Right.

10       MR. MUCKENFUSS:  Take that down.

11       So I want to go to Section 4.9.

12  Q.   So this is sort of on two different pages, but we'll look

13  at the title of 4.9.  States, "OPTICON'S Royalties to

14  HONEYWELL for HONEYWELL'S EX-U.S. Patent Portfolio."

15       Do you see that?

16  A.   I do.

17  Q.   And it starts out, "In consideration of the license

18  granted by HONEYWELL to OPTICON" -- and just for the jury, I

19  know we use -- I talk about OPTO, but Opticon is OPTO,

20  correct?

21  A.   Yes.  We can refer to them as the same entity for

22  purposes of this.

23  Q.   Thank you.

24       MR. MUCKENFUSS:  So we can go to the next page.

25  Q.   So at the top continuing, "pursuant to Section 2.7,

ADAM DOANE - DIRECT

1   OPTICON shall pay to HONEYWELL INTERNATIONAL an annual royalty

2   payment of $425,000."

3       Do you see that?

4   A.  I do.

5   Q.  And it goes on in that first paragraph to describe the

6   timing of royalty payments, correct?

7   A.  Yeah, it goes on to explain when certain royalty payments

8   are due.

9   Q.  Okay.

10          MR. MUCKENFUSS:  Now I want to go to the second

11  paragraph.  If you could -- okay.  That's fine.  You can leave

12  it.  Thank you.

13  Q.  So in the second paragraph it states, "The above annual

14  royalty payments cumulatively comprise the full monetary

15  consideration for the license granted pursuant to Section 2.7

16  regardless of future sales or revenue."

17      Do you see that?

18  A.  I do.

19  Q.  Okay.  The second sentence is where I want to focus.

20  "Honeywell understands that Opticon's revenue from 2D Barcode

21  Products in Europe in 2019 was €4.4 million."

22      Do you see that?

23  A.  I do.

24  Q.  Now, we're used to seeing a dollar sign.  The weird

25  symbol next to 4.4, does that indicate euros?

218

ADAM DOANE - DIRECT

1  A.   It does.

2  Q.   Okay.  Thank you.

3       Now, there's a familiar term in this sentence:  "2D

4  Barcode Products."  We've seen that term before, correct?

5  A.   We have.

6  Q.   Okay.  And we've seen that term in Section 1.4 of the

7  agreement, correct?

8  A.   That's correct.

9  Q.   Okay.  So that term, "2D Barcode Products," is defined in

10 Section 1.4.

11 A.   That's correct.

12 Q.   It's the same section that Honeywell contends that OPTO's

13 laser scanners are included, correct?

14 A.   So just to be clear, laser scanners that decode PDF417,

15 MicroPDF417, or composite codes.

16 Q.   Thank you.

17 A.   But yes.

18 Q.   I appreciate that.  Thank you.

19      And I'll clarify to restate it.  So that's the same

20 section, 2D Barcode Products, as defined in Section 1.4 that

21 Honeywell contends that OPTO's laser scanners that can decode

22 PDF417 fall under that definition, correct?

23 A.   Yes.  The products that can decode PDF417 fall under that

24 definition.

25 Q.   All right.  So in this document it states that Honeywell

JA1121

ADAM DOANE - DIRECT

1  understands that the revenue from those products in Europe in
2  2019 was €4.4 million, correct?
3  A.   That's what the sentence says, yes.
4         MR. MUCKENFUSS:  Okay.  Let's go to the signature
5  page real quick.
6         If you could highlight the left side.
7  Q.   So the person who signed for Honeywell, the individual's
8  name is Brian Rudick.
9       Do you know who he is?
10 A.   Rudick.  But yes, I know Mr. Rudick.
11 Q.   I apologize, Rudick.
12      Do you know who Brian Rudick is?
13 A.   I do.
14 Q.   Who is he?
15 A.   He is currently the vice president and general counsel of
16 Honeywell's Performance Materials & Technologies Division.
17 Q.   Is he in the same division you are?
18 A.   He is not.
19 Q.   Okay.  But he's pretty high up; is that fair?
20 A.   He's general counsel of a business unit.  It's pretty
21 high up.
22 Q.   Okay.  And he signed this agreement, the Second
23 Amendment, correct?
24 A.   He did sign it here, yes.
25         MR. MUCKENFUSS:  Okay.  Let's go back to

ADAM DOANE - DIRECT

1  Section 4.9.

2  Q.  Now, Mr. Doane, when this agreement was signed and

3  executed, you knew that the €4.4 million stated here did not

4  include OPTO's laser scanners that could decode PDF417.

5          MR. STEVENS:  Objection to that, Your Honor.  Could

6  we have a sidebar?

7          THE COURT:  Yes.

8          (Sidebar conference as follows:)

9          MR. STEVENS:  Two problems.

10          First, he's now getting into attorney/client

11  privileged information.  What Mr. Doane knew or was analyzing

12  as outside counsel is privileged.  So if he's going to try to

13  get into what he knew or what he told Honeywell, that's all

14  privileged information from that point forward.

15          Second, the information that he's about to get into

16  was something that they said could never be shared with

17  Honeywell.  Never, never, never.  When they gave it to us,

18  they said don't share it with Honeywell.  They followed up

19  later saying we want to confirm that you never shared it with

20  Honeywell.  That was -- that was the confines of this

21  information.  It could never ever be shared with Honeywell.

22  So Mr. Doane's interaction with it is 100 percent as outside

23  counsel and within the scope of his work product he was doing

24  in a litigation.

25          Moreover, the documents he says they're going to

JA1123

ADAM DOANE - DIRECT

1  point to don't have any indication of PDF417 or anything like
2  that.
3          So asking Mr. Doane what he knew or what he did that
4  Honeywell -- that they said it was their choice to say
5  Honeywell can never see this, that's completely improper.
6          MR. MUCKENFUSS:  So first of all, Your Honor, his
7  knowledge comes from emails from OPTO's counsel.  I am
8  definitely not going to get into communications between him
9  and Honeywell.  But the knowledge he gained was from specific
10 emails from OPTO's counsel Mr. Goldstein where he specifically
11 told him laser scanner is not included.  Sounds like he may
12 have some redirect questions to ask him.  I am not going to
13 get into attorney/client communications.  But these are the
14 emails where OPTO's counsel tells them specifically that the
15 laser scanners at issue here are not being included under the
16 definition.
17         MR. STEVENS:  So I don't have any problem with the
18 emails.  I don't have any objection to that.
19         THE COURT:  That's what I'm saying.  Can we just get
20 to the emails?
21         MR. MUCKENFUSS:  I was not going to go into that.
22         THE COURT:  Let's just avoid this issue and get
23 right to the heart of the matter.
24         MR. MUCKENFUSS:  That's what I was about to do.
25         THE COURT:  Okay.  Let's do that.

JA1124

222

ADAM DOANE - DIRECT

1          (End of sidebar conference.)

2              DIRECT EXAMINATION (Cont'd.)

3    BY MR. MUCKENFUSS:

4    Q.   Mr. Doane, I'm going to show you Exhibit 95.

5         So DX95 is an email from Mr. Goldstein.  You're on this

6    email, correct, Mr. Doane?

7    A.   Yes, I am.

8    Q.   And it's dated September 16, 2020.

9    A.   Yes, it is.

10   Q.   Right?

11        Mr. Pleune is also on this email, correct?

12   A.   Yes.

13   Q.   And he's one of the lawyers you pointed out who's here

14   today.

15   A.   Yes, he is.

16   Q.   Okay.  Mr. Goldstein, do you know who he is?

17   A.   I do.  He was OPTO's outside counsel at the Quinn Emanuel

18   law firm.

19   Q.   At Quinn Emanuel.  Thank you.

20            MR. MUCKENFUSS:  Your Honor, we'd move into

21   evidence.

22            THE COURT:  It's admitted.

23            MR. MUCKENFUSS:  Thank you.

24        (Defendant's Exhibit Number 95 was received into

25   evidence.)

JA1125

ADAM DOANE - DIRECT

1  Q.   All right.  Mr. Doane, at the top I want to, for the
2  jury, highlight the top.
3       Let's just take a few minutes here to make sure we
4  understand who everybody is.  So again, Ryan Goldstein, you
5  get to see his email:  ryangoldstein@quinnemanuel.com.
6       Do you see that?
7  A.   I do.
8  Q.   He is OPTO's counsel.
9  A.   He was OPTO's counsel in this -- at this time, yes.
10 Q.   At this time.
11 A.   Yes.
12 Q.   Thank you.
13      And he is sending an email on September 16, 2020, to you
14 specifically and to Mr. Pleune, correct?
15 A.   That's correct.
16 Q.   And at this time you are with the Alston & Bird firm,
17 correct?
18 A.   That's correct.
19 Q.   And you're part of that team we talked about that's
20 representing Honeywell in the litigation.
21 A.   That's correct.
22 Q.   All right.  And there's also -- if you look at the cc
23 line, there's a reference to Honeywell ITC.
24      Do you see that?
25 A.   I do.

ADAM DOANE - DIRECT

1   Q.   What does that refer to?

2   A.   That is an email that would go to various attorneys on

3   the team.

4   Q.   Okay.  So the rest of the Alston & Bird team.

5   A.   I don't know who all it went to, but it would go to

6   multiple people on the team.

7   Q.   So it would have gone to Mr. Stevens and Mr. Pleune.

8   A.   Well, Mr. Pleune is already on the email.  Like I said, I

9   don't remember who all was on that email, so I can't say for

10  sure who all got that.

11  Q.   Okay.  Thank you.

12       Now, there are attachments to this email that were

13  sent -- Mr. Goldstein sent to the Alston & Bird team, correct?

14  A.   Yes, there are a number of attachments here.

15  Q.   All right.  There are several attachments.  I want to

16  focus first on the sales in Europe spreadsheet.

17       Do you see that?

18  A.   I do.

19  Q.   Okay.  Now, you're -- I think you've testified that

20  you're -- you have an economics degree.  I'm not as savvy, but

21  is it your -- it's your understanding that xls would reference

22  an Excel spreadsheet?

23  A.   That was not part of my economics training, you know,

24  what type of software xls is.  But I believe that is an Excel

25  spreadsheet, but I'm not confident in that.

225

ADAM DOANE - DIRECT

1   Q.   Okay.  Thank you.  Appreciate that.

2        And there are other attachments here, but I want to --

3   I'm going to focus on the spreadsheet.

4           MR. MUCKENFUSS:  So I want to go to the text of the

5   email from Mr. Goldstein.  If you could highlight that.

6           Thanks.

7   Q.   So Mr. Goldstein addressed to Ben -- is Ben, Ben Pleune?

8   A.   It is.

9   Q.   All right.  Mr. Goldstein states, "Ben, please see our

10  response.  I have sent a hard copy pursuant to the Notice as

11  well.  It may take some time for the hard copy to arrive in

12  light of delays in mail and shipping from Japan, which has

13  been affected by the coronavirus.  Accordingly, I am attaching

14  our letter and attachments here.  The attachments are the

15  letter; proof of payment for Q1; proof of payment for Q2; our

16  signed first amendment; total sales report; report for Europe;

17  report for the US; report for Japan; and verification."

18       Do you see that?

19  A.   I do.

20  Q.   And that information was sent to you specifically and

21  Mr. Pleune, correct?

22  A.   It was.

23  Q.   And it was also sent to the Honeywell ITC general email

24  which is the rest of the Alston & Bird team, correct?

25  A.   Yes, with the caveat that I don't remember who all was on

226

ADAM DOANE - DIRECT

1  that email reflected as --

2  Q.   I understand.  Thank you.

3         MR. MUCKENFUSS:  Okay.  So I'm going to go to --

4  we're going to look at the attachment.  We're going to look at

5  Exhibit 98, not to the jury.

6         MR. STEVENS:  And, Your Honor, I would reraise the

7  objection.  This is the exact data that we were just talking

8  about.

9         THE COURT:  Well, if it gets shown to the jury, I'll

10 give a limiting instruction.

11        MR. MUCKENFUSS:  Thank you, Your Honor.

12 Q.   Mr. Doane, do you recall this is the spreadsheet that is

13 referenced as sales in Europe, the Excel spreadsheet?

14 A.   The name of the document that I see here is

15 098_SalesInEurope.xls, which is very similar to the one in the

16 email attachment, so I'm going to assume this is the document.

17 Q.   Thank you.  I appreciate that.

18      And I'll represent to you this is the attachment -- one

19 of the attachments to this email.

20 A.   Okay.

21        MR. MUCKENFUSS:  What I want to do is -- if you

22 could pull up Section 4.9 from the agreement.

23 Q.   Okay.  So we'll come back to the email.  But again, I

24 want to go back to Section 4.9.

25      The statement in Section 4.9, "Honeywell understands that

JA1129

ADAM DOANE - DIRECT

1  Opticon's revenue from 2D Barcode Products in Europe in 2019
2  was €4.4 million."
3      Correct?  That was the sentence we looked at before.
4  A.  Yes, it was.
5  Q.  So the spreadsheet that's attached to the email from
6  Mr. Goldstein, the Excel spreadsheet that you're looking at,
7  is sales in Europe.  And in the first column it relates to
8  2019, correct?
9  A.  Yes.  I think you mean column C.
10 Q.  I'm sorry, column C.
11 A.  Column C does say 2019, yes.
12         MR. MUCKENFUSS:  Your Honor, we would ask to move
13 into evidence Exhibit 98.
14         THE COURT:  All right.  It's admitted.
15         (Defendant's Exhibit Number 98 was received into
16 evidence.)
17         THE COURT:  Members of the jury, in Exhibit 98,
18 Defense Exhibit 98, there are -- you will see there some
19 numbers representing sales.  Those numbers are of no moment
20 for your consideration with respect to the claim here.  This
21 has to do with Europe.  All right.  But I think counsel is
22 going to get to a different point.  But don't worry yourselves
23 at all about the numbers in there.  It has nothing to do with
24 what you're going to be asked to consider.
25 Q.  Now, Mr. Doane, looking at Exhibit 98 and the Excel

ADAM DOANE - DIRECT

 1  spreadsheet, if you -- again, I had focused, I think, before

 2  the jury saw it, we had focused on column C in 2019, correct?

 3  Do you see that?

 4  A.   I do, yes.  Column C is 2019.

 5  Q.   Okay.  The total that is listed under column C for 2019

 6  is 4,432,327, correct?

 7  A.   Yes, that is the number there.

 8  Q.   And again, the amount that is stated in the Second

 9  Amendment for sales in Europe for 2019 is €4.4 million,

10  correct?

11  A.   Yes, the agreement does -- yes, €4.4 million.

12  Q.   Okay.  Now, I want to -- I'm going to pull up the emails

13  again.

14          MR. MUCKENFUSS:  And, Your Honor, we're going to

15  have to go to a different exhibit because the way -- I don't

16  totally, from a tech standpoint, understand this.  But we're

17  going to go to the same email, but it won't have the

18  attachments listed on it because it's in a different chain and

19  I want to go through a chain of emails.

20          THE COURT:  All right.

21          MR. MUCKENFUSS:  Pull up the other exhibit, 111.

22  Don't show it to the jury yet.

23          Maybe if you could put 95 next to it with the

24  attachments.

25  Q.   So, Mr. Doane, just so there's no confusion -- I

ADAM DOANE - DIRECT

 1  apologize for shifting to a different exhibit so we can have

 2  the email chain.

 3       Exhibit 95, which is in evidence, is on the left.  I'll

 4  just represent to you it has the attachments listed.

 5       The email on the right is the same email.  It just

 6  doesn't have the attachments listed because it's part of a

 7  bigger chain.

 8       Do you dispute that?  Is that fair?

 9  A.   That's fair, yes.  On the right it looks like there's

10  more emails above it; and so when that happens, the

11  attachments don't stay with it.  Yes, I see what's going on

12  here.

13           MR. MUCKENFUSS:  Your Honor, we would move to

14  introduce Exhibit 111.

15           THE COURT:  It's admitted.

16           MR. MUCKENFUSS:  Thank you.

17            (Defendant's Exhibit Number 111 was received into

18  evidence.)

19           MR. MUCKENFUSS:  You can take Exhibit 95 off and go

20  back to the spreadsheet with the email.

21  Q.   Okay.  So we're going to go through a few emails,

22  Mr. Doane, that you received, and the rest of the Alston &

23  Bird team received, relating to this €4.4 million in Europe in

24  2019.

25           MR. MUCKENFUSS:  If you could go to page 3 of the

230

ADAM DOANE - DIRECT

1   email chain.

2   Q.   Okay.  So on October 9, 2020 -- and I want to make sure

3   we're sort of clear on the chronology.

4            MR. MUCKENFUSS:  Your Honor, may I approach?

5            THE COURT:  You may.

6            MR. MUCKENFUSS:  Thank you.

7   Q.   So we're on an email in October of 2020.  I just want to

8   make sure you understand where we are here.

9            So, Mr. Doane, the emails that you are receiving from

10  Mr. Goldstein are prior to the execution of the Second

11  Amendment, correct?

12  A.   The emails we're looking at here, yes, were prior to the

13  Second Amendment.

14  Q.   Thank you.  All right.

15            MR. MUCKENFUSS:  So let's -- I want to look at the

16  email from Mr. Goldstein October 9, 2020.

17  Q.   Again, this email is addressed to you specifically and

18  Mr. Pleune, correct?

19  A.   That's correct.

20  Q.   Cc'd is the Honeywell ITC email.  And on this particular

21  exhibit, it's the -- it shows the email address

22  honeywell.itc@alston.com.

23            Do you see that?

24  A.   I do.  And just to be clear, we've been talking about

25  this email a few times.  This is only to Alston & Bird, right?

JA1133

ADAM DOANE - DIRECT

1  This is not to anyone at Honeywell, only Alston & Bird.

2  Q.  Thank you.  I appreciate that.

3      And Alston & Bird is Honeywell's counsel, correct?

4  A.  It is.  I was just clarifying because it says Honeywell

5  ITC, so it could be easy to assume it's also going to

6  Honeywell.  It's not.  It's going to Alston & Bird.

7  Q.  Fair enough.

8      When it says @alston.com, that means it's going to Alston

9  & Bird.

10 A.  That's correct.

11 Q.  Thank you.  That's helpful.

12     So is the reason that Alston & Bird called it Honeywell

13 ITC is because that was just the name of the case?

14 A.  Yeah, that was the -- we talked about the Delaware

15 action, the ITC action.  So it was just a name that someone

16 came up with to describe, you know, the team that should get

17 the emails.

18 Q.  Got it.  Got it.  Thank you.

19     So again, this is dated October 9, 2020, right?

20 A.  Yes, that's correct.

21 Q.  All right.  Mr. Goldstein, again, for the jury, he was

22 OPTO's counsel at Quinn Emanuel at the time.

23 A.  Yes, he was.

24 Q.  All right.  And the information that he is sending to you

25 and the Alston & Bird team relates to sales of OPTO's products

ADAM DOANE - DIRECT

1  in Europe in 2019 and other years, correct?

2  A.    Yes.  He sent a variety of information and attachments,

3  one of which is the sales in Europe.

4         MR. MUCKENFUSS:  Okay.  So if you look at the -- go

5  down in the text of this.  I want to look at the first full

6  paragraph under "we should be able."

7         Thankfully I have a tech person who can do this.

8  There's no way I can do this.

9  Q.    So in the text of the email, Mr. Goldstein states, "For

10  the sales information, I have gotten some of the additional

11  information that you asked about.  I think we should perhaps

12  first focus on the European excel sheets, as those were the

13  ones that had the most information.  Once we can better

14  understand what information you are looking for, we can see if

15  it is broken down like that for the U.S. and Japan sales."

16        Do you see that?

17  A.    I do.

18  Q.    So Mr. Goldstein is providing information that Alston &

19  Bird on behalf of Honeywell is asking for, correct?

20  A.    Yes.  I believe this was the information that the

21  agreement required OPTO to provide, but, yeah.

22         MR. MUCKENFUSS:  Thank you.  We'll take that down so

23  no need to blow it up.

24         If you can put the spreadsheet back up.

25  Q.    So Mr. Goldstein goes on to state, "With respect to the

233

ADAM DOANE - DIRECT

1  European sales, I know that you wanted a better idea of what

2  products are covered in the Cat 1 tab.  I think the confusion

3  may be a result of the excel sheets providing information

4  beyond 2D products."

5       Do you see that?

6  A.   I do see that.

7  Q.   "The products are actually listed in the last tab, '2D

8  articles.'

9       "Looking back at Cat 1, which we were discussing, lines

10  31-51 have information by product categories."

11       Do you see that?

12  A.   I do.

13  Q.   I want to stop there and go over to the spreadsheet.  And

14  I apologize, this might be a little tedious, but it's

15  important.

16            MR. MUCKENFUSS:  So I want to look at the Excel

17  spreadsheet.  If you could go to Cat 1.

18  Q.   So if you see at the bottom of the spreadsheet, there's a

19  tab that's labeled "Cat 1."

20       Do you see that?

21  A.   I do.

22  Q.   And Mr. Goldstein is referring to that tab Cat 1 in his

23  email, correct?

24  A.   He refers to the Cat 1 tab which I assume is the same Cat

25  1 tab here.

ADAM DOANE - DIRECT

1   Q.   Okay.  And just so the jury understands, if you look at
2   the top total -- well, first of all, it references the year
3   2019, correct?
4   A.   Yes.
5   Q.   All right.  And at the top it has a total of 3,417,351.
6        Do you see that?
7   A.   I do.
8        MR. MUCKENFUSS:  If you could go back to the total,
9   John.
10  Q.   That's the same total in row 1 under column C.
11  A.   Yes.
12  Q.   Okay.  So Cat 1 refers to that row in column C, correct?
13  A.   They're the same number, yes.
14       MR. MUCKENFUSS:  Go back to Cat 1.
15  Q.   And just so we can get familiar with this part of the
16  excel spreadsheet.  So this is for year 2019.  Below that
17  lists a number of countries in Europe, correct?
18  A.   Yes, I do see those countries.
19  Q.   All right.  And the information provided -- provides
20  information about quantity, revenue, cost price, so on and so
21  forth, correct?
22  A.   Yes.
23  Q.   All right.  Now, below that there is information about
24  item category.
25       Do you see that?

ADAM DOANE - DIRECT

1   A.   I do.

2   Q.   All right.  And these are OPTO's product categories that

3   Mr. Goldstein is providing Alston & Bird information about,

4   correct?

5   A.   Yes.  These categories obviously were categorized by

6   Opticon, but it has been provided to Alston & Bird.

7   Q.   I want you to go back over to the email from

8   Mr. Goldstein.  And he stated, "Looking back at Cat 1, which

9   we were discussing, lines 31-51 have information by product

10  categories."

11       Do you see that?

12  A.   I do.

13  Q.   Okay.  He states, "The 2D items are only the ones that

14  have '2D' written by them in column A, so those are the items

15  aggregated as 2d barcode products."

16       Do you see that?

17  A.   I do.

18  Q.   So let's go back over to the spreadsheet.

19       Mr. Goldstein is talking about lines 31 through 51,

20  correct?

21  A.   Yes.

22  Q.   All right.  He tells you, Mr. Pleune, and the Alston &

23  Bird team that the only product categories that are 2D Barcode

24  Products are the ones that have 2D written by them in column

25  A, correct?

ADAM DOANE - DIRECT

 1  A.   That's what he said, yes.

 2       MR. MUCKENFUSS:  John, could you highlight the

 3  products that have 2D next to them.

 4  Q.   Okay.  So we've highlighted on this spreadsheet the

 5  products that OPTO told Honeywell's counsel that are 2D

 6  Barcode Products, correct?

 7  A.   That's what OPTO's counsel has told Honeywell's counsel.

 8  Whether that's true or not, I don't know.

 9  Q.   Okay.  But that's what OPTO's counsel has told you,

10  correct?

11  A.   That's what they've told us.

12  Q.   All right.  So, for example, if you look at this where

13  Mr. Goldstein is pointing this out, the ones highlighted

14  there, I think there are four product categories, correct?

15  A.   I do see four product categories that are highlighted.

16  Q.   All right.  Mr. Goldstein in his email goes on to state,

17  "The rest of the information relates to products like laser

18  that are not 2D."

19       Do you see that?

20  A.   I do.

21  Q.   Okay.  So let's go back over to the spreadsheet.  If you

22  could look at line 37.

23       Do you see that?

24  A.   I do.

25  Q.   And it states, "Fixed mount laser scanner."

ADAM DOANE - DIRECT

1    Do you see that?

2  A.  I do.

3  Q.  Okay.  That product category does not have 2D next to it,

4  correct?

5  A.  That's correct.  It says ER in column A.

6  Q.  Right.  If you look at the next line down, line 38,

7  "Handheld CCD scanner."

8    Do you see that?

9  A.  I do.

10  Q.  That does not have 2D next to it, correct?

11  A.  That's correct.  It also says ER.

12  Q.  Right.  So Mr. Goldstein has told you and the entire

13  Alston & Bird team that those products are not being included

14  as 2D Barcode Products in the calculation, correct?

15  A.  That's what he's saying and that very well could be

16  correct, right?  Remember, the test for the definition in 1.4

17  is whether a device reads a 2D barcode.  So if a laser scanner

18  does not read any 2D barcode, it's not a 2D Barcode Product.

19  Q.  Right.  And you're part -- as you testified previously,

20  you've been part of the Alston & Bird team representing

21  Honeywell since 2019 reviewing OPTO's products, correct?

22  A.  Yes, that's correct.

23  Q.  You reviewed all the specifications for those products,

24  correct?

25  A.  I'm not sure I would have reviewed all of them, but I

ADAM DOANE - DIRECT

1    reviewed at least some of them.

2    Q.   I assume -- you have an economics degree.  You're a

3    patent lawyer.  You're pretty thorough, I would assume, right?

4    A.   I am pretty thorough, yes.

5    Q.   Okay.  Let's go look at this again.  Look at line 40,

6    "Handheld laser scanner."

7         Do you see that?

8    A.   I do.

9    Q.   It does not have 2D written next to it, correct?

10   A.   It does not.  It also says ER here.

11   Q.   So Mr. Goldstein has told you and the Alston & Bird team

12   representing Honeywell that handheld laser scanner is not a 2D

13   Barcode Product, correct?

14   A.   That's what it says.  It could be correct.  I don't know

15   what barcodes -- I don't know what products are included in

16   this.  I don't know what barcodes they read.

17   Q.   Okay.  So you don't know what products were included.

18   We'll look at that in a second.  Let's continue with

19   Mr. Goldstein's email.

20        He says, "Lines 58-108 are information by products but

21   these also have information on non-2D items like batteries and

22   cables.  For those, only the products that have '2D' in column

23   K are 2D products that we are discussing."

24             MR. MUCKENFUSS:  So, John, if you could go down to

25   lines 58 through 108.  And if you could highlight the ones

ADAM DOANE - DIRECT

 1  with 2D in column K.

 2  Q.   All right.  So Mr. Goldstein for the rest of the

 3  spreadsheet has told you that only the products that have 2D

 4  in column K are being included as 2D Barcode Products,

 5  correct?

 6  A.   Yes.  He says, "For those, only the products that have

 7  '2D' in column K are 2D products that we are discussing."

 8  Q.   Right.

 9       And Mr. Goldstein at the bottom of his email states,

10  "Does that help clarify the information in Cat 1?  So only the

11  products that have 2D in column A" -- so if we can go back up

12  to lines 31 through 51.

13       Mr. Goldstein says it again.  "So only the products that

14  have 2D in column A for lines 31-51 are 2D."

15       Correct, he states it again?

16  A.   Yes.

17  Q.   "And only those with 2D in column K for lines 58-108 are

18  2D.  Then we list 2D products in the last tab."

19            MR. MUCKENFUSS:  So, John, if we could go to the

20  last tab.

21  Q.   So you see the line below, it says, "2D articles."

22  A.   I do see that.

23  Q.   All right.  So if you can look at that in the last tab.

24  It actually lists the exact model numbers for the products

25  that OPTO is telling Honeywell's counsel are being listed as

ADAM DOANE - DIRECT

1    2D, correct?

2    A.   Yes.  OPTO's counsel has said these are the products that

3    are 2D.

4    Q.   And none of those model numbers listed in the last tab

5    contain any laser scanners, correct?

6    A.   I don't know.  I can't tell from looking at the names

7    here what type of technology they use.

8    Q.   Okay.  So as part of the Alston & Bird team, patent

9    litigators, are you telling the jury you didn't review this to

10   analyze the exact products?

11        MR. STEVENS:  Your Honor, that calls for privileged

12   information.

13        THE COURT:  Overruled.

14        You can say what you did.

15        THE WITNESS:  I don't remember what I did three

16   years ago specifically with this Excel document so I can't

17   tell you.  We can go through each of them.  If you have

18   documents -- I can't tell you sitting here what technology

19   each of those SKUs -- I mean, there's a lot of them listed

20   there.

21   Q.   Okay.  You don't deny that Mr. Goldstein has told the

22   Alston & Bird team that no laser scanners are included as 2D

23   Barcode Products in this email.

24   A.   In the email he says, yeah, the products like laser that

25   are not 2D.  So I assume they're not in here, but I cannot

ADAM DOANE - DIRECT

1   confirm that.

2           MR. MUCKENFUSS:  Let's go back to Cat 1.  Go up to

3   lines 31 through 51.

4   Q.  So I want to be clear, too -- and the exact numbers here

5   are not necessarily important.  When -- OPTO provided the

6   Alston & Bird team information about laser scanners even

7   though they were not included as 2D Barcode Products, correct?

8   A.  So Mr. Goldstein said that laser products are not 2D and

9   they're not included in the 2D total here.

10  Q.  Right.  But that doesn't mean -- well, let me ask this

11  question.  If you look at line 37, for example, "Fixed mount

12  laser scanner," OPTO's counsel is telling you the quantity and

13  revenue for laser scanners for that product category of laser

14  scanners even though they're not 2D Barcode Products, correct?

15  A.  I don't know if they're 2D Barcode Products, if they meet

16  that definition based on what I'm seeing here.  I mean, what

17  they provide in Excel is "fixed mount laser scanners," and

18  there was a quantity and revenue that were provided for those.

19  Q.  But you know that OPTO -- OPTO's counsel is telling you

20  that OPTO is not counting them as 2D Barcode Products in

21  calculating the sales for the revenues, correct?

22  A.  They're saying that they're not 2D.

23          MR. MUCKENFUSS:  And if you go to the top -- if you

24  could go to the top total.  I just want to make sure the jury

25  can see how the total is calculated.

242

ADAM DOANE - DIRECT

 1  Q.   So you would agree with me the total, the 3,417,351, is a
 2  total of the highlighted 2D product categories that we just
 3  looked at, correct?
 4  A.   If you had a calculator, I could confirm that.  I'm not
 5  that good at math in my head.
 6  Q.   I'm definitely not that good either.
 7       So one thing I think that could help us out is above
 8  that -- and again, this is sort of an Excel spreadsheet thing
 9  and, you know, maybe you've looked at more than me.  But above
10  it do you see a formula that adds up the 2D products?
11  A.   I do see a formula.  I am not an Excel master.  So can I
12  tell you for certain that those are the only four that are
13  included in that?  No.  But I do see that it is doing a sum,
14  so it's adding up certain information in rows A31 through A50.
15  But I'm not an Excel wizard so I can't say for certain.
16  Q.   I understand.  I'm definitely not.
17       But as you pointed out, it says sum, and it has A31
18  through A50, quote, 2D.  That was the lines 31 through 50 that
19  Mr. Goldstein was talking about, right?
20  A.   Yes.  In his email he talks about column A, lines 31
21  through 51.  So that would be A31 to 50.  There's a slight
22  difference there.
23  Q.   Right, through 50.  Well, there's nothing on 51, right?
24  But it's through 50, right?
25  A.   Yes.

JA1145

243

ADAM DOANE - DIRECT

1  Q.   And this formula at the top adds up the -- because it has

2  2D next to it in the formula, adds up the products that have

3  2D next to them, right?

4  A.   I assume so.  I can't confirm that.

5  Q.   Fair enough.

6       And just to be clear, looking back down at the

7  spreadsheet, we've highlighted handheld CMOS or C-M-O-S 2D.

8       Do you see that?

9  A.   I do.

10 Q.   You would agree with me that CMOS or CMOS 2D, that is not

11 a laser scanner.

12 A.   That is correct.

13 Q.   Okay.  Thank you.

14      And just so the jury understands -- well, let's go back

15 to the total.

16 A.   Well, just to be clear, CMOS is an area image sensor.  I

17 don't know what OPTO is putting in there, but CMOS is not a

18 laser.

19 Q.   Right.  Thank you.  I appreciate that.

20      So CMOS, you mentioned area image sensor, that is a 2D

21 barcode scanner, correct?

22 A.   It uses an area image sensor.  It could be programmed to

23 decode 2D barcodes, but it's just a type of technology that's

24 in the barcode reader.

25 Q.   Right.  But it's not a laser.

244

ADAM DOANE - DIRECT

1   A.   It is not a laser, that is correct.

2         MR. MUCKENFUSS:  So if you could go back to the

3   total.

4         So we've been focusing on one row in 2019, spent a

5   lot of time doing that.  There are other years here.

6         And if you go back to Cat 1 -- I'm not going to go

7   through all those years, but, John, if you could scan over to

8   the right just so the jury can see.

9   Q.   This spreadsheet -- if you stop there -- that's for 2018.

10       Do you see that?

11  A.   I do.

12  Q.   And if you keep scrolling over, had information for 2017;

13  right?

14  A.   I see that.

15  Q.   And we'll scroll over one more time.  It had 2016.

16       Do you see that?

17  A.   I do.

18  Q.   Okay.  I just want to make sure there was a complete

19  picture of what we were seeing.

20       So OPTO's counsel provided you this information for all

21  of these years in Europe, correct?

22  A.   Yes, this information was provided and we saw it from at

23  least 2016 to 2019.

24  Q.   Right.  And specifically noted for Honeywell's counsel

25  which product categories were 2D Barcode Products and which

JA1147

245

ADAM DOANE - DIRECT

1  were not, correct?

2  A.   Yes.  They're telling us which ones are included and

3  which ones are not included.

4         MR. MUCKENFUSS:  So if you can go to page 1 of the

5  email.

6         Actually, go to page 2.

7  Q.   So we're looking at an email from Mr. Pleune dated

8  October 9.  He's responding to Mr. Goldstein.

9  A.   Yes, he is.

10 Q.   And you're still on this email chain, correct?

11 A.   Sure am.

12 Q.   All right.  He says, "Ryan" -- and just for the record,

13 this is page 5 of the exhibit.

14       Mr. Pleune states, "Thanks again for the call yesterday.

15 I confirmed that the person that will be submitting royalty

16 reports will need to set up credentials."

17       At the bottom he says, "As for the global sales

18 information, I understand that the aim is to get us additional

19 information by the end of the next day."

20       Do you see that?

21 A.   I do.

22       MR. MUCKENFUSS:  Okay.  Let's go to page 5 at the

23 bottom.

24       We're going to look at an email from Mr. Pleune

25 dated September 30, 2020.

JA1148

ADAM DOANE - DIRECT

1  Q.   After receiving this information Mr. Pleune states,

2  "Ryan" -- and that's Ryan Goldstein, correct?

3  A.   Yes.  This email is from Ben Pleune to Ryan Goldstein.

4  Q.   All right.  He says, "Ryan, thanks for this additional

5  information.  Honeywell has identified the two payments on its

6  end but has still not received the royalty reports required by

7  Section 4.5," and he goes on.

8       Below that he states, "We have reviewed the three Excel

9  spreadsheets with certain sales information for Europe, the

10 U.S. and Japan, and we need to collect some additional

11 information regarding the products that were included in

12 Opticon's calculation."

13      And he goes on to discuss the Excel spreadsheet that we

14 just looked at, correct?

15 A.   Yes.  He goes on to say it's still not clear what

16 products are being included and excluded in that Excel.

17 Q.   Right.  So let's go to page 1.  Let's look at what Mr. --

18 how Mr. Goldstein responds to this.

19      So at the top, for the jury, I just want to look at the

20 date since we're keeping track of the timeline here.  This is

21 an email from Ryan Goldstein dated October 23, 2020.

22      Do you see that?

23 A.   I do.

24 Q.   It has some odd hours.  It's 1:46 in the morning.  Is

25 that because of the -- maybe the difference in time with

247

ADAM DOANE - DIRECT

1  Japan?

2  A.   I would assume so unless Mr. Goldstein was just up really

3  late that night.

4  Q.   Unless he keeps some really weird hours for sure.

5  A.   Possible.

6  Q.   Right.  And this email is to Mr. Pleune and to yourself

7  again, correct?

8  A.   Yes, it is.

9  Q.   And to the rest of the Alston & Bird team, correct?

10  A.   Again, as I mentioned before, I don't know who all is on

11  that email, but it would have gone to a number of members on

12  the Alston & Bird team.

13  Q.   Was Mr. Stevens leading that team at the time?

14  A.   I believe he was lead counsel for the ITC investigation.

15  Q.   Okay.  Would he have been lead counsel at this time?

16  A.   No, probably not.  This is during the -- no, I don't

17  believe so.

18  Q.   Who would have been?

19  A.   Probably Ben Pleune.

20  Q.   Okay.  Mr. Pleune.

21       And you and Mr. Pleune are called out specifically with

22  Mr. Goldstein when he emails you.  Are you and Mr. Pleune

23  taking the lead in getting this information and reviewing it?

24  A.   I don't remember who would have reviewed this information

25  or why I was specifically called out, but we were at least

JA1150

248

ADAM DOANE - DIRECT

1  working on this and so that's why it would have come to us.

2  Q.    Right.  Now, again, just for our timeline, this

3  October 23, 2020, email is before this Second Amendment of the

4  settlement agreement is signed by Mr. Rudick, correct?

5  A.    That's correct.  And just to be clear, Mr. Rudick is from

6  Honeywell who signed the agreement.  These emails were with

7  Alston & Bird.  But yes, that's correct.

8  Q.    Yes.  Thank you for that.  But I'm just asking you about

9  the date.

10  A.    You got the dates correct, yes.

11  Q.    So I want to look at Mr. Goldstein's email responding to

12  Mr. Pleune's additional questions.  If you'd look at what I

13  call the second paragraph, but the second line.  "With respect

14  to the 2D products, I am happy to get on a call, but I am

15  still not sure exactly what you would like to know."

16      He goes on, "The 2D products include products with

17  modules, scanner products with 2D modules and handy terminal

18  products.  The products are all listed in the last tab, titled

19  '2D Article.'  This is the list of the products included, so

20  tells you which products."

21      Do you see that?

22  A.    I do.

23          MR. MUCKENFUSS:  If we could go back to the

24  spreadsheet.  I want to look at the 2D article tab again so

25  there's no confusion.

JA1151

249

ADAM DOANE - DIRECT

1  Q.   So in this 2D article tab that Mr. Goldstein is referring
2  to, it lists all the model numbers of products that are listed
3  as 2D, correct?
4  A.   Yes, these are model numbers; and column C says these are
5  2D, yes.
6        MR. MUCKENFUSS:  All right.  Let's go back to the
7  email.
8  Q.   Mr. Goldstein goes on to state, "The products not
9  included range from laser and CCD products to peripherals like
10 batteries, cradles, straps, cables."
11       Do you see that?
12 A.   I do.
13 Q.   So Mr. Goldstein tells you, I think for the third time,
14 the products not included include laser and CCD products,
15 correct?
16 A.   That's what he says here, yes.
17 Q.   Right.  So again, on October 23, 2020, he tells you again
18 that laser scanners and CCD products are not being included as
19 2D Barcode Products, correct?
20 A.   He says they're not being included in the 2D, and I
21 believe that's the 2D Barcode Products is what he's referring
22 to.
23 Q.   Right.  And so you know as of October 23 before the
24 Second Amendment is signed, you know that OPTO is not
25 including any laser scanners at all in the calculation of 2D

JA1152

250

ADAM DOANE - DIRECT

 1  Barcode Products, correct?
 2  A.    And when you say "you," do you mean me at Alston & Bird
 3  or me at Honeywell?  Because there's a distinction there.
 4  Honeywell couldn't know any of this information, so Honeywell
 5  had no idea what was being included and excluded with the
 6  sales for any of that.
 7       So if you're referring to me at Honeywell, no, I did not
 8  know that.  At the time I was at Alston & Bird, so Alston &
 9  Bird would have received this information and would have known
10  what Mr. Goldstein was saying.
11  Q.    Okay.  I'm a little confused there.  You work at
12  Honeywell now, correct?
13  A.    Correct.
14  Q.    You have that knowledge now, correct?
15  A.    You're showing it to me again.
16  Q.    Right.
17  A.    So I'm seeing it now here, yes.
18  Q.    And at the time you were at Alston & Bird, you were part
19  of the entire Alston & Bird team representing Honeywell in
20  this litigation, correct?
21  A.    Yes, I was representing Honeywell in this litigation at
22  Alston & Bird.
23  Q.    Right.  And you're one of numerous patent litigators
24  reviewing in detail OPTO's products, correct?
25  A.    Yes.

ADAM DOANE - DIRECT

1  Q.   And you knew this -- you personally knew this information
2  when the lawsuit was filed in this case, correct?
3  A.   So this lawsuit was filed in September of 2021, I
4  believe, so I would have been at Honeywell at the time.  Did I
5  remember this information?  Probably not.  Would I have seen
6  it when it came in October of 2020?  Yes.  But I can't say I
7  remember all those numbers we just looked at a month later.
8  Q.   That's a good -- thank you for that clarification.
9       So in September 2021 when Honeywell decided to sue OPTO,
10 you were working at Honeywell, correct?
11 A.   Yes.  I joined Honeywell in July of 2021.
12 Q.   And you were part of the in-house team at Honeywell
13 managing this case, correct?
14 A.   I'm not sure from the beginning if I was managing it, but
15 I was working on this case while at Honeywell, yes.
16 Q.   Right.  And is what you're telling us is you just don't
17 remember what Mr. Goldstein told you when this lawsuit was
18 filed?
19 A.   I'm saying that I don't remember all this information.  I
20 tend to forget things after a certain amount of time and so --
21 you know, this was almost a year later.  So I'm telling you I
22 don't remember everything that was in the emails and Excels we
23 just looked at, yes.
24 Q.   Okay.  So you made some comment, I think, that Honeywell
25 didn't know at this time.  Was that your testimony?

ADAM DOANE - DIRECT

1  A.   So OPTO was very clear -- OPTO's counsel was very clear

2  with Alston & Bird that no sales information was allowed to be

3  shared with Honeywell.  So Honeywell did not know any of this

4  information.

5  Q.   Okay.  But again, you're the lawyers representing

6  Honeywell, correct?

7  A.   I was a lawyer representing Honeywell while at Alston &

8  Bird.  That doesn't mean I can share every piece of

9  information with my client.

10 Q.   And you were working at Honeywell when Honeywell decided

11 to sue OPTO.

12 A.   I was working at Honeywell when this case was filed.

13 Q.   So I want to go back to Exhibit 95.  I want to look at

14 the spreadsheet -- I'm sorry, the attachments again at the

15 top.

16      So you're aware that there was a letter sent to

17 Mr. Pleune and Mr. Rudick at Honeywell, correct?

18 A.   I'm sorry, where do we see that in the email?

19          MR. MUCKENFUSS:  Let's go to the body of the email.

20 Q.   So there is a reference in this email, "The attachments

21 are the letter..."

22      Do you see that at the last...

23 A.   Yes.

24 Q.   All right.  The letter and attachments.

25          MR. MUCKENFUSS:  So I want to look at the letter.

ADAM DOANE - DIRECT

1  That's Exhibit 96.  Just show the witness.

2  Q.   So this is a letter from Ryan Goldstein at Quinn Emanuel

3  representing OPTO, correct?

4  A.   Yes.

5  Q.   And it's addressed to Ben Pleune and Mr. Rudick at

6  Honeywell, correct?

7  A.   Yes, it's addressed to Mr. Pleune and Mr. Rudick.

8         MR. MUCKENFUSS:  Your Honor, we would move into

9  evidence.

10         THE COURT:  It's admitted.

11         (Defendant's Exhibit Number 96 was received into

12  evidence.)

13  Q.   So I won't go through everything in this letter.  The

14  first paragraph relates to -- he states, "I write in response

15  to your letter dated September 8, 2020."

16       Do you see that?

17  A.   I do.

18  Q.   "In that letter, you state that payments were not

19  received for Q1 and Q2 and ask for those payments and late fee

20  assessments.  Opticon did make Q1 and Q2 payments in

21  compliance with Sections 4.3 and 4.5."

22       Do you see that?

23  A.   Yes.

24  Q.   And he attaches proof of the payment and royalty records

25  for Q1 and Q2.

ADAM DOANE - DIRECT

1      Do you see that?

2  A.   I do.

3          MR. MUCKENFUSS:  If you'd go down to the third

4  paragraph.

5  Q.   "You also asked about" -- so he goes on to state, "You

6  also asked about verification of past sales pursuant to the

7  January agreement."

8      Do you see that?

9  A.   Yes.

10 Q.   "We are attaching sales reports and a verification

11 pursuant to Section 5.1 for that as well."

12     Do you see that?

13 A.   I do.

14         MR. MUCKENFUSS:  All right.  If we can go back to

15 the letter.

16 Q.   So this letter is addressed specifically to Mr. Rudick.

17 Is that address correct for Mr. Rudick?

18 A.   At the time that address appears to be correct.

19 Honeywell has since moved since then.  But at that time that

20 appears to be the correct address.

21 Q.   Okay.  And again, at this time on September 16, 2020,

22 Mr. Rudick is the general counsel for Honeywell, right?

23 A.   No.  At this time he was the vice president and general

24 counsel of the Safety and Productivity Solutions Business

25 Group.

255

ADAM DOANE - DIRECT

1   Q.   I apologize.  I sort of get lost in all the different
2   divisions at Honeywell.
3        So he's the general counsel of that division, correct?
4   A.   Correct.  Of the Safety and Productivity Solutions.
5   Q.   Got it.  Thank you.
6        And he is the person that signed the Second Amendment,
7   correct?
8   A.   He is.
9          MR. MUCKENFUSS:  All right.  Let's go back to the
10  Second Amendment if we could.  Pull up JX3 and go to 4.9.
11  Q.   So I want to come full circle to the Second Amendment
12  which was signed February 3, 2021.
13       So prior to the Second Amendment being effective on
14  February 3, 2021, you had this information from Mr. Goldstein
15  for about four months, correct?
16  A.   Alston & Bird would have had those Excel spreadsheets
17  from, I believe it was October or September, until February.
18  So that's about four months.
19  Q.   Okay.  So Alston & Bird representing Honeywell would have
20  had this information and all the emails from Mr. Goldstein for
21  about four months before the Second Amendment was executed,
22  correct?
23  A.   Correct.
24  Q.   All right.  And again, I want to come back to the
25  sentence we started with in Section 4.9.  "Honeywell

ADAM DOANE - DIRECT

1  understands that Opticon's revenue from 2D Barcode Products in
2  Europe in 2019 was €4.4 million."
3      So you knew, Mr. Doane, and the Alston & Bird team
4  representing Honeywell knew that OPTO had not included any of
5  its laser scanners or CCD products under 2D Barcode Products
6  in calculating the sales in Europe in 2019, correct?
7  A.   Alston & Bird would have known that OPTO was not
8  including laser and CCD products in the total.  Honeywell
9  would not have known that.
10     And again, to be clear, whether those laser products were
11 actually 2D or 1D Barcode Products per the agreement is not
12 clear from the Excel spreadsheet we just looked at.
13 Q.   It is clear that no laser scanners are included, correct?
14 A.   It is clear that OPTO is not including laser scanners in
15 the total.
16 Q.   Right.  But my question is, the Alston & Bird team
17 representing Honeywell knows -- we just went through all the
18 emails -- that no laser scanners are included under 2D Barcode
19 Products, the definition in 1.4, for the sales in Europe in
20 2019.  You knew that when this agreement was signed, correct?
21 A.   Yes, Alston & Bird knew what OPTO had told them, which is
22 that they were not including those sales in the total.
23 Q.   I just want to be clear.  I know you keep making a
24 distinction between Alston & Bird and Honeywell.
25     Is the information you're contending you could not show

ADAM DOANE - DIRECT

 1  Honeywell was just the actual sales information, like the
 2  revenue?
 3  A.   We couldn't share any sales information.  OPTO was very
 4  clear.  There was a letter that was sent that was very, very
 5  explicit that Alston & Bird was not to share any sales and
 6  revenue information with its client Honeywell.  So Honeywell
 7  would not have known this information.
 8  Q.   They would not have known the actual dollars, the revenue
 9  for the products, correct?
10  A.   It would not have known that, that's correct.
11  Q.   Right.  Mr. Rudick was on the letter that Mr. Goldstein
12  sent, correct?  With the attachments, right?
13  A.   I'm not sure if he ever got those attachments.  And OPTO
14  was clear that he shouldn't have.  So I'm not sure if they
15  were actually included in that letter or how that all
16  transpired.
17  Q.   So you don't know if Mr. Rudick received it.
18  A.   I don't know, but OPTO was very clear that he shouldn't,
19  so I suspect they didn't send it to him.
20  Q.   Okay.  Is Mr. Rudick here in the courtroom today?
21  A.   I don't see him.
22  Q.   Is he going to testify?
23  A.   I don't know.
24       MR. MUCKENFUSS:  All right.  You can take that one
25  down.

ADAM DOANE - DIRECT

1    Q.   Mr. Doane, I'm going to switch to a different topic.

2              THE COURT:  Mr. Muckenfuss, would this be a

3    convenient time for a midmorning break?

4              MR. MUCKENFUSS:  Yes, Your Honor.

5              THE COURT:  Okay.  Usually I really try to keep an

6    eye on you folks to make sure you're comfortable, but I

7    especially keep an eye on our intrepid court reporter because

8    she's got to write all this down.

9              So let's take our midmorning break.  I'm sure you

10   recall the rules for your conduct while on break.  And we'll

11   be back with you in about 15 minutes.

12             (Jury exited the courtroom.)

13             THE COURT:  All right.  We're in recess 15 minutes.

14             (Brief recess at 10:32 AM.)

15             (Court back in session at 10:50 AM.)

16             THE COURT:  All right.  Bring the jury, Meg.

17             (Jury entered the courtroom.)

18             THE COURT:  All right.  You may resume.

19             MR. MUCKENFUSS:  Thank you, Your Honor.

20                          ADAM DOANE

21                 DIRECT EXAMINATION (Cont'd.)

22   BY MR MUCKENFUSS:

23   Q.   Mr. Doane, I just have a few more questions.  Then I'll

24   wrap up.

25        As a patent litigator, are you familiar with a document

ADAM DOANE - DIRECT

1  called a claim chart?

2  A.   I am familiar with a document that is typically referred

3  to as a claim chart, yes.

4  Q.   And is a claim chart a document where one party lists

5  products, or whatever it is, claiming that those products

6  infringe a particular patent?

7       That was probably a stupid way of saying it, but maybe if

8  you could help the jury.

9  A.   Yeah, just to -- to explain.  There's different types of

10  claim charts.

11      So in one type of claim chart, a party can show how it

12  believes another party infringes its patents.  So it would

13  typically look like a claim on the left side and on the right

14  side it would explain how another party's products meet that

15  claim.

16      There are other types of claim charts, like invalidity

17  claim charts.  They're similar, but in those you would have

18  maybe the claim on the left side and then on the right side a

19  party would explain why they think that claim is invalid.

20      So there's different types of claim charts.  Infringement

21  and invalidity are kind of the two main ones.  There's other

22  ones, but those are the two that...

23  Q.   I appreciate that.  Again, I'm not a patent litigator so

24  I appreciate the explanation.

25      Do you recall that there was a claim chart filed in the

ADAM DOANE - DIRECT

1  case against OPTO?  It was served.  It wasn't filed, right,
2  but there was a claim chart served in the litigation with
3  OPTO?
4  A.    So there were claim charts that were both filed and
5  served.  So if I may explain.
6      So as a part of the complaint that Honeywell filed at the
7  International Trade Commission which was asking the U.S.
8  government to exclude Opticon's products from the United
9  States, Honeywell included certain claim charts showing why
10  OPTO's products infringed its patents.  And those were based
11  on public literature, stuff you can find on the internet.  So
12  those would have been filed with the International Trade
13  Commission.  They're not confidential.
14     Later on in the investigation, Honeywell's lawyers at
15  Alston & Bird would have been able to see OPTO's source code
16  and how its products worked, the software for those.  And so
17  it would have later made claim charts that showed the claim
18  and the software, but that software is very, very
19  confidential.  You know, Honeywell can't see that.  And so
20  those claim charts would have only been served between the
21  outside counsel, so Alston & Bird and OPTO's outside counsel
22  which was Quinn Emanuel.  So those are not filed with the ITC,
23  but they're served.
24     And that distinction is small, but it's important.
25  Certain ones everyone can see in the public and others only

ADAM DOANE - DIRECT

1  the outside counsel can see.

2  Q.   I appreciate that.  That was a lot of detail.  And

3  actually, you said something which I appreciate you bringing

4  up.

5       So in preparing that claim chart, you would have

6  researched, I think you testified, all of the sort of function

7  into how a product works -- I think you mentioned source

8  code -- and all the public literature on that product,

9  correct?

10  A.   So those claim charts are designed to show -- the

11  infringement claim chart -- why Honeywell believes OPTO's

12  products infringe.  Would that have included every piece of

13  information out there?  No.  But it's supposed to show why

14  Honeywell believes a product meets that particular claim.

15  Q.   Right.  So, again, as a patent litigator working on the

16  Alston & Bird team representing Honeywell, you would have been

17  as thorough as you could researching that product and

18  preparing a claim chart like that, correct?

19  A.   We were very thorough and we would have researched

20  whatever was needed to show that that product infringed that

21  claim.

22  Q.   For example, you would have known that OPTO's laser

23  scanners could decode PDF417.  You would have known that.

24  A.   Well, it depends on the product.  Certain ones we had

25  software for, certain ones we didn't.  So not all of them, no.

262

ADAM DOANE - DIRECT

1  Q.  But you were doing that thorough research as part of the
2  Alston & Bird team, correct?
3  A.  I was doing research on OPTO's products as part of the
4  Alston & Bird team, yes.
5  Q.  So we're going to show you Exhibit 769, not to the jury.
6       So this document, DX769, is labeled Infringement Claim
7  Chart.  It references a patent number.  I'll refer to the
8  patent as '783.  And it states, "Claim Chart Showing
9  Infringement of U.S. Patent '783."
10      Do you see that?
11 A.  I do see that.
12          MR. MUCKENFUSS:  Your Honor, we'd move this into
13 evidence.
14          MR. STEVENS:  And we have our objections that we
15 noted during pretrial.
16          THE COURT:  Right.  It's admitted.
17          (Defendant's Exhibit Number 769 was received into
18 evidence.)
19          THE COURT:  Members of the jury, let me explain this
20 exhibit to you and what you're about to hear.
21          The evidence that you will hear both by way of
22 testimony and this exhibit may not be considered by you in any
23 way to alter the definition that's in 1.4.  The definition of
24 1.4 is what it is and it either covers certain products or
25 not.  But the evidence that you're about to hear may be

ADAM DOANE - DIRECT

1  considered by you with respect to other issues that will be
2  presented to you regarding the parties' understanding of
3  certain products.
4          MR. MUCKENFUSS:  Thank you, Your Honor.
5  Q.  So in this exhibit, Mr. Doane, this is a claim chart that
6  was prepared by Honeywell or Honeywell's counsel, correct?
7  A.  It's an important distinction, so I want to make sure
8  we're all clear.  I'll note this document says, "CONFIDENTIAL
9  SOURCE CODE - ATTORNEYS' EYES ONLY INFORMATION."
10      So this would be the document that I mentioned before
11 that would have been served not filed.  So no one at Honeywell
12 could have seen this information.  Alston & Bird could have
13 seen this information.
14 Q.  So Honeywell -- when you say "this information" -- I'm
15 just talking about this document.  So is their source code on
16 this document that you're looking at?
17 A.  On the page that I'm looking at --
18 Q.  Correct.
19 A.  -- I do not see source code.
20 Q.  Right.
21 A.  But my understanding is if you went to the next page, you
22 might see some source code.
23 Q.  But on this page there is no source code, correct?
24 A.  That is correct.
25 Q.  And if you look at this page -- and let's go through it.

ADAM DOANE - DIRECT

1  So it states, "Claim Chart Showing Infringement of U.S. Patent
2  Number 7,159,783 by the 1D Products."
3      Do you see that?
4  A.   I do.
5  Q.   Okay.  And is that referred to as the '783 patent?
6  A.   Yeah.  Us patent lawyers don't like to say the whole
7  patent name, so we'll refer to it as the last three numbers.
8  Q.   Right.  And again, this is a document prepared by
9  Honeywell's counsel, correct?
10 A.   Yes, this would have been prepared by Alston & Bird
11 because, as I mentioned, Honeywell couldn't see this document.
12 Q.   Right.  And again, the reason you're saying they can't
13 see the document, they can't see confidential source code,
14 correct?
15 A.   They can't see confidential source code or any other
16 information that is marked as attorneys' eyes only
17 information.
18     And to be clear, this contained confidential information
19 of Honeywell and OPTO so neither client saw this information.
20 This is just a document that the outside counsel, Alston &
21 Bird and Quinn Emanuel, would have exchanged between one
22 another.
23 Q.   Alston & Bird would not take a position inconsistent with
24 its own client, correct?
25 A.   Well, Alston & Bird were taking positions that reflect

JA1167

ADAM DOANE - DIRECT

1  Honeywell.  But Honeywell can't know the information that
2  underlies, like I mentioned, the source code.  And so can
3  Honeywell tell Alston & Bird, you know, include this piece of
4  information and read the patent this way with the source code?
5  No, it can't do that.  So Alston & Bird is Honeywell's agent.
6  It has to work on behalf of Honeywell based on what Alston &
7  Bird knows.
8  Q.   Right.  So Alston & Bird is Honeywell's agent acting on
9  Honeywell's behalf, correct?
10 A.   That's correct.
11 Q.   Right.  So Alston & Bird, as Honeywell's agent, states in
12 this document, "Opticon 1D Products directly and/or indirectly
13 infringe the asserted claims," I'll refer to it as the '783
14 patent so I don't say the whole number.  It goes on to state,
15 "The 1D products include," and it lists a number of model
16 numbers, correct?
17 A.   It does.
18 Q.   And those are model numbers of OPTO products, correct?
19 A.   They appear to be, yes.
20       MR. MUCKENFUSS:  Thank you.  You can take that down.
21 Q.   Now, just to conclude our timeline.  You may recall I
22 asked you about the nullity actions, and these were the
23 actions that Honeywell filed in Europe, for example, seeking
24 to invalidate Honeywell's patents.  Do you recall that?
25 A.    I don't.  You said Honeywell filed actions to invalidate

266

ADAM DOANE - DIRECT

1  Honeywell's patents.

2  Q.   I'm sorry.

3  A.   We would not do that, no.

4  Q.   I'm 52 so things are starting to get a little fuzzy.

5       OPTO filed claims in Europe seeking to invalidate

6  Honeywell's patents, correct?

7  A.   OPTO did file nullity actions which are actions in which

8  OPTO alleges that Honeywell's patents are invalid.

9  Q.   Thank you.

10      And you recall -- if we can put the Second Amendment back

11 up which I think is JX3.

12      Under the agreement -- we looked at the provision where

13 those nullity actions -- and I'm sorry, I'll ask you this

14 question.

15      As part of the settlement, those nullity actions were

16 dismissed, correct?

17 A.   They were.

18           MR. MUCKENFUSS:  If we can go to Section 3.5.

19 Q.   Just for the jury, "Section 3.5 Dismissal.  No later than

20 20 days from the date of the last execution of this Second

21 Amendment, Opticon shall withdraw the Nullity Actions."

22      Do you see that?

23 A.   I do see that.

24           MR. MUCKENFUSS:  May I approach, Your Honor?

25           THE COURT:  You may.

JA1169

ADAM DOANE - CROSS

1  Q.   So to conclude -- well, to add to our timeline, under the
2  agreement the nullity actions had to be dismissed no later
3  than February 23, 2021; is that fair?  Or around that time.
4  A.   Around that time, yeah.  To be clear, it says last
5  execution of this.  We have to look at the last page, but
6  around then.
7  Q.   Around that time.
8  A.   Yes.
9  Q.   And I appreciate that.  That's true.
10      Are you aware that the nullity actions were actually
11  dismissed on February 28, 2021?
12  A.   I don't remember the exact date.
13  Q.   All right.  And that was a benefit that Honeywell
14  received from the settlement agreement, correct?
15  A.   That was part of the settlement agreement, yes.
16  Q.   And Honeywell then filed this lawsuit in September of
17  2021, correct?
18  A.   That sounds correct, yes.
19          MR. MUCKENFUSS:  No further questions, Your Honor.
20          THE COURT:  You may cross examine.
21                        CROSS EXAMINATION
22  BY MR. STEVENS:
23  Q.   So, Mr. Doane, let me hand up a binder for you.
24          MR. STEVENS:  May I approach, Your Honor?
25          THE COURT:  You may.

268

ADAM DOANE - CROSS

1  Q.   So first off, Mr. Doane, does this case allege any breach
2  of anything related to Europe?
3  A.   It does not.  This case is about the main agreement that
4  we saw in the U.S.
5  Q.   Okay.  So if we look on that timeline immediately to your
6  left, which is the agreement that we say has been breached in
7  this litigation?
8  A.   It would be that first line, the January 22nd, 2020,
9  agreement.
10 Q.   And of the agreements that are there, which is the
11 agreement that deals with the United States, the country that
12 we're in right now?
13 A.   That first agreement that you see on the page there.
14        MR. STEVENS:  Your Honor, may I approach and write
15 that?
16        THE COURT:  You may.
17        MR. STEVENS:  Thank you.
18 Q.   So, sir, I've circled this January 22 agreement.  Is that
19 the agreement that we're actually here in this court to talk
20 about?
21 A.   It is.
22 Q.   Is there any allegation of breach of the Second
23 Amendment?
24 A.   There is not.
25 Q.   Okay.  So this is about the USA.

JA1171

ADAM DOANE - CROSS

1    Now, is the Second Amendment about the U.S. or is the
2    Second Amendment about Europe?
3    A.   The Second Amendment is about Europe.
4    Q.   Okay.  And again, are we asking the jury to award any
5    sort of damages or to make any allegation of breach of this
6    Second Amendment right here?
7    A.   No.  Honeywell is just seeking damages based on OPTO's
8    breach of that first agreement that's circled there.
9    Q.   Okay.  Now, you spent maybe about an hour going through
10   some emails where the other side confessed that they weren't
11   actually including the laser sales.  Where on the timeline is
12   that?  And I -- if you can't see it, Mr. Doane, I can move it
13   a little bit your way.
14   A.   I'm happy to bend over.
15        So it says -- so those emails were in October of 2020.
16   Q.   Okay.  So the "we're coming clean emails" where they say
17   that we didn't include laser products, was that before or
18   after the actual agreement?
19   A.   That was after the agreement.
20   Q.   Okay.  So from January 22 until these October emails, did
21   Opticon ever say anything about they weren't going to include
22   laser products?
23   A.   No.
24   Q.   So this is the first time that anyone had any inkling
25   that behind the scenes OPTO was not including laser products

ADAM DOANE - CROSS

1  in the money they were paying Honeywell; is that right?

2  A.    That's correct.

3            MR. MUCKENFUSS:  Your Honor, objection.

4            THE COURT:  Sustained.

5            MR. MUCKENFUSS:  May we approach?

6            THE COURT:  Sustained.

7            You can ignore that last answer, members of the

8  jury.  Recall that lawyers' questions are not evidence.

9  Q.   Well, I'll ask it again.  Mr. Doane, were those October

10  emails, was that the first time that the folks at OPTO had

11  ever said the first peep about they weren't paying you for

12  laser-based products that can decode PDF417?

13  A.   Yes, those emails were the first time that we had any

14  information about that.

15  Q.   And while he showed that they provided some information

16  for Europe relating to 2D products, what they called 2D

17  products, did they ever provide any detail for their laser or

18  CCD products so that either Alston & Bird or Honeywell or

19  anyone else could actually differentiate between those that do

20  and do not support 2D symbology?

21            MR. MUCKENFUSS:  Your Honor, objection.

22            THE COURT:  Sustained.  Rephrase that, if you would,

23  please.

24  Q.   The Excels that we looked at, did they provide any means

25  for Alston & Bird or Honeywell or anyone else to actually look

JA1173

ADAM DOANE - CROSS

1  at laser-based products or CCD-based products to be able to

2  ascertain whether they did or did not support 2D

3  functionalities?

4  A.   No.  And that was part of the back and forth in the

5  email.  We saw a lot of emails.  Alston & Bird was trying to

6  understand what products were and were not included, and so

7  you saw that in that back and forth.

8  Q.   And, Mr. Doane, while we have been talking this week

9  about 17 or 18 of OPTO's products that do actually decode

10  PDF417 and MicroPDF417 and composite codes, do they have other

11  products that actually don't have that functionality?

12  A.   Yes.  OPTO has some products that don't decode any 2D

13  barcodes.

14  Q.   And are we seeking any sort of royalty for those products

15  in this litigation?

16  A.   No.  This litigation is only about the OPTO products that

17  decode 2D barcodes.

18  Q.   So I'd actually like to go back to the beginning, if we

19  can, of the dispute and talk about the ITC litigation.

20        MR. STEVENS:  Can we publish to Mr. Doane PX188

21  starting at page 12, please.

22  Q.   Mr. Doane, what is this?

23  A.   So this is the complaint that Honeywell filed at the

24  International Trade Commission in which it asked the U.S.

25  government to investigate OPTO's products and whether they

272

ADAM DOANE - CROSS

1  infringe Honeywell's patents.

2          MR. STEVENS:  Your Honor, we'd move Plaintiff's 188

3  into evidence.

4          THE COURT:  It's admitted.

5          MR. STEVENS:  Thank you.

6          (Plaintiff's Exhibit Number 188 was received into

7  evidence.)

8          MR. STEVENS:  If we can publish that to the jury.

9  Q.   Now, is this the very first document that starts a case

10  at the ITC?

11  A.   It is, yes.

12          MR. STEVENS:  Okay.  And I want to make sure that we

13  note the date of this document, so if we could go to the very

14  first page that has a date on it.

15  Q.   What is the date of that?

16  A.   This is dated May 31, 2019.

17          MR. STEVENS:  May I approach, Your Honor?

18          THE COURT:  You may.

19          MR. STEVENS:  All right.  So May 31, of '19, ITC

20  complaint.  And my penmanship is not a whole lot better than

21  Mr. Muckenfuss's so I do apologize for that.

22          And if we can go to page 26 of the document, please,

23  sir.

24          I'm sorry, page 29.  I walked away and I forgot the

25  page number.

JA1175

ADAM DOANE - CROSS

1    Q.   All right.  So, Mr. Doane, in that first ITC complaint,

2    the first thing that started the dispute between the parties

3    back on May 31, 2019, did Honeywell indicate in that very

4    first document that PDF417 is a two-dimensional barcode?

5    A.   Yes.  Right here in the complaint you can see that

6    Honeywell is telling OPTO that PDF417 is a 2D barcode.

7    Q.   Okay.  I'm going to indicate that on this right here.

8         So in this document Honeywell says PDF417 equals

9    two-dimensional; is that right, sir?

10   A.   That's correct.

11   Q.   Okay.  Now, from this day forward in that litigation at

12   the ITC, did there ever come a point in time where OPTO said,

13   no, you're wrong.  We dispute that.  We don't think it's a

14   two-dimensional symbology.

15   A.   No, they never said that.

16          MR. STEVENS:  Okay.  Now, if we could bring up

17   Plaintiff's 206, please, and just publish it to the witness

18   and well.

19   Q.   Mr. Doane, what is Plaintiff's 206?

20   A.   So this is one of the patents that Honeywell accused OPTO

21   of infringing in that ITC complaint.  And this patent number

22   is U.S. 9,465,970.

23   Q.   Okay.  Is it all right, Mr. Doane, if I can adopt your

24   methodology and just use the last three digits to refer to it?

25   A.   That would be helpful, yes.

ADAM DOANE - CROSS

1          MR. STEVENS:  Okay.  So we'll call this, then, the

2   '970 patent.

3          Your Honor, we'd move the admission of Plaintiff's

4   206.

5          THE COURT:  It's admitted.

6          (Plaintiff's Exhibit Number 206 was received into

7   evidence.)

8   Q.   So again, Mr. Doane, is this one of the actual patents

9   that was asserted by Honeywell alleging that they infringed

10  the patents?

11  A.   Yes.  Honeywell alleged that OPTO infringed its patents

12  in the ITC and Delaware.

13  Q.   And does this patent refer to PDF417?

14  A.   It does.  I believe it's in column 3 somewhere.

15  Q.   So if we look at the paragraph column 3, line 32, could

16  you explain to the jury what the actual patent asserted

17  against OPTO said about PDF417.

18  A.   Yes.  So this patent says that two-dimensional barcodes

19  such as PDF417.

20  Q.   So it's mentioning some one-dimensional barcodes first,

21  such as -- can you tell us what it's mentioning there.

22  A.   Yes.  So it's differentiating between one-dimensional

23  barcodes like Code 39 and UPC that we talked about this week

24  and, on the other hand, two-dimensional barcodes like PDF417.

25          MR. STEVENS:  And if we can go to Claim 7 of this

ADAM DOANE - CROSS

1  document.

2  Q.   Now, sir, I'm going to ask you to just give us a little

3  bit of a tutorial.  What are these numbered claims that we see

4  here at the end of a patent?

5  A.   Yeah, so the claims are really the most important part of

6  the patent.  They really define the scope of protection.  The

7  claims are what are submitted to the government and the

8  government reviews to make sure that they are proper claims.

9  Q.   So when we see this numbered paragraph 7, is this a claim

10 that Honeywell owns; the government has said this is an

11 innovation that belongs to Honeywell?

12 A.   That's correct.  The government would have reviewed this

13 claim and ensured it was proper.

14 Q.   And in this actual claim, like a deed of a piece of

15 property that Honeywell owns, what does it say about whether

16 PDF417 is two-dimensional?

17 A.   It says the two-dimensional PDF417 barcode.  And again,

18 like the specification, it differentiates between 1D barcodes

19 and 2D barcodes like PDF417.

20      MR. STEVENS:  Thank you.  You can take that down.

21 Q.   Now, you were shown a claim chart just a moment ago by

22 Mr. Muckenfuss.  Do you recall that?

23 A.   I do.

24 Q.   And it related to just one specific of the seven patents;

25 is that right?

ADAM DOANE - CROSS

1  A.    Yes.  So that was for the '783 patent, and that was one
2  of the seven patents that was initially included in the ITC
3  complaint.
4  Q.    And does the '783 patent have anything to do with barcode
5  symbologies or whether you decode this symbology or that
6  symbology?
7  A.    No.  That patent is about a script interpreter program.
8  Essentially, what that is it's a program on a device that
9  allows you to customize it, change the data editing features,
10  for example.  Nothing to do with how a barcode is decoded or
11  symbologies or anything like that.
12  Q.    Now, Mr. Doane, you had mentioned that there was a label
13  on that document that said outside counsel's eyes only.  I'm
14  going to ask you to give us another tutorial.
15      When an ITC case is opened up, can you tell us something
16  about whether the judge issues a protective order, which some
17  people might know as a gag order.
18  A.    Sure.  So at the beginning of the case, the ALJ, the
19  judge, will require parties to sign a protective order.  And
20  so the attorneys at Alston & Bird and Quinn Emanuel would have
21  had to sign a document saying that they will keep any
22  confidential information just to themselves and not provide it
23  to anyone else, including their client.
24  Q.    Did you sign that undertaking?
25  A.    I sure did.

277

ADAM DOANE - CROSS

1  Q.   So what happens if you breach it?  What happens if you
2  sign this order from the judge and you say, ah, forget it.
3  That's not that important.
4            MR. MUCKENFUSS:  Objection, relevance, Your Honor.
5            THE COURT:  Overruled.
6  Q.   So let me start my question again.  What happens if you
7  ignore that order?  What happens if you say, ah, it's not that
8  important.  I'm going to take this confidential information
9  that's given to -- you know, by the adversary in a litigation
10 and I'm going to give it to my client Honeywell.  What happens
11 to you as a lawyer?
12 A.   I don't know exactly what happens, but I don't think it
13 would be good and I don't want to find out what would happen.
14 But I think a judge would be very upset and I might find
15 myself in jail or something like that.
16 Q.   Okay.  So the document that we saw earlier, again, was it
17 labeled outside counsel's eyes only?
18 A.   It was.
19 Q.   Now, does that mean anyone within Honeywell, the company,
20 or anyone within OPTO, the company, ever saw that document?
21 A.   No, no one within Honeywell or OPTO ever saw that
22 document.  It was only for the outside counsel Alston & Bird
23 and Quinn Emanuel.
24 Q.   Okay.  And putting aside just the label on it, do you
25 have any other reason to know that nobody within OPTO ever saw

JA1180

ADAM DOANE - CROSS

1   or relied upon that document?

2   A.   Yes.  So as part of this litigation, we asked OPTO who at

3   OPTO actually saw this document, or to confirm that no one

4   did, and they never responded to us.  And so our understanding

5   is that no one at OPTO ever saw this.

6   Q.   So they didn't even give us the courtesy of a response to

7   that question.

8   A.   No, we never got a response.

9   Q.   Okay.  So now, after that claim chart was served, does

10  the other side have to respond to it?  So you said Honeywell

11  serves an infringement chart.  Does OPTO have a duty to

12  respond to that?

13  A.   Yes.  So OPTO responds.  So as I mentioned, the claim

14  chart shows how Honeywell believes the claims infringe.  And

15  then OPTO gets an opportunity to respond to that.

16  Q.   And with respect to that characterization that we saw

17  real briefly about 1D stuff, did OPTO's counsel agree or

18  disagree with that characterization?

19  A.   So OPTO's counsel wrote back and said we disagree with

20  the definition that -- of 1D products and said those products

21  are not 1D products as you, Honeywell, has characterized them.

22  Q.   So let me get this straight.  In the complaint, PDF417 is

23  identified as two-dimensional, right?

24  A.   It is.

25  Q.   And OPTO's counsel, anyone at OPTO, they never disagreed

ADAM DOANE - CROSS

1  with that, right?

2  A.   They didn't.

3  Q.   In that one claim chart that you were just shown by the

4  other side that listed some products as 1D, OPTO said that's

5  not right; is that correct?

6  A.   That's correct.

7  Q.   Now, you mentioned another type of claim chart, an

8  invalidity chart.  Did there come a point in time where there

9  was an allegation related to invalidity of any of Honeywell's

10 patents?

11 A.   Yes.  So sometime after the chart we looked at was served

12 on OPTO, OPTO responded with their own chart, the second type,

13 the invalidity claim chart.  And essentially in those, they

14 had the claim on the left and on the right would have been

15 OPTO's argument as to why that claim is invalid.

16 Q.   Did you create some demonstratives to assist with your

17 testimony?

18 A.   I did.

19       MR. STEVENS:  So if we could pull up Slide 1 here.

20 Q.   And could you tell me the chart that we're going to see.

21       MR. STEVENS:  Your Honor, may we --

22       THE COURT:  Not to the jury yet.  Let me look at it.

23       MR. STEVENS:  Okay.  Just to Mr. Doane.

24 Q.   Can you tell us what we're seeing on the screen here.

25 A.   Yes.  So this is one of OPTO's invalidity claim charts.

ADAM DOANE - CROSS

1  And this claim chart is OPTO's argument as to why the '970
2  patent which we just looked at is allegedly invalid.
3  Q.    Okay.  If we go to the next page.  I had shown the jury a
4  few moments ago a claim that says PDF417 is two-dimensional.
5  There was another claim, though, that required the ability to
6  differentiate between 1D and 2D symbologies.  Can you tell us
7  what Claim 6 was about?
8          MR. MUCKENFUSS:  Your Honor, objection.  I mean,
9  this is not a demonstrative.  He's reading it.
10         THE COURT:  Sustained.  This is not going to come
11 before the jury.  There is no foundation for this
12 demonstrative which is not --
13         MR. STEVENS:  Okay.  I'll just ask him.  We don't
14 need the demonstrative.
15 Q.    Did one of Honeywell's claims require the differentiation
16 between a one-dimensional symbology and a two-dimensional
17 symbology?
18         MR. MUCKENFUSS:  Same objection, Your Honor.  Same
19 content.
20         THE COURT:  Overruled.
21         THE WITNESS:  So there's a claim --
22         THE COURT:  If you know.
23         THE WITNESS:  So there was a claim in Honeywell's
24 patent, the '970 patent, that talks about a classifier module.
25 And essentially, that's talking about classifying barcodes as,

ADAM DOANE - CROSS

1  like, one-dimensional or two-dimensional.  It's software in
2  the barcode that does that for you.
3  Q.   And when OPTO was trying to find an older product --
4  because they're trying to invalidate Honeywell's patent.  When
5  OPTO was looking for an older product or an older patent that
6  could differentiate between a 1D symbology and 2D symbology,
7  what example of a 2D symbology did OPTO use?
8  A.   The PDF417.
9  Q.   And what was the time frame of that?
10  A.   This would have been during the ITC investigation which
11  was 2019 to early 2020, so somewhere in that time frame.
12  Q.   Is late 2019 fair enough?
13  A.   That's fair.
14         MR. STEVENS:  Your Honor, may I approach?
15         THE COURT:  You may.  And you can take that down off
16  of everyone's screen.  Thank you.
17  Q.   So in late 2019 OPTO says that laser products are not all
18  1D; is that right?
19  A.   That's correct.
20  Q.   Okay.  And OPTO alleges that PDF417 --
21         MR. MUCKENFUSS:  Your Honor, objection.  Leading.
22         THE COURT:  Sustained.
23  Q.   And did -- what did OPTO allege in late 2019 about
24  whether PDF417 was a 1D symbology or a 2D symbology?
25  A.   We talked about that classifier module and they said the

ADAM DOANE - CROSS

1   PDF417 meets that 2D limitation, so they were calling it 2D.
2   Q.   And so, Mr. Doane, was that the sort of state of play, if
3   you will, leading up to the agreement?
4   A.   It was.  There was -- you know, neither party could agree
5   on what the definition of these products were, what products
6   were doing what.  So, yeah, there was no consensus at all.
7   Q.   Okay.  And is that one of the reasons that the parties
8   actually laid out the explicit definition in 1.4?
9   A.   It is.  So the agreement was explicit about how to
10  determine whether a product is a 1D Barcode Product or a 2D
11  Barcode Product.  It's a very easy definition to understand
12  because the parties had all this back and forth beforehand.
13          MR. STEVENS:  And if we can pull up JX1 at
14  Section 1.4.
15  Q.   Again, Mr. Doane, can you walk the jury through the
16  actual definition that the parties agreed to.
17  A.   Sure.  So what we're seeing here is Section 1.4, the
18  definition of 2D Barcode Products.  And I'll just read the
19  first sentence.  It says, "The term '2D Barcode Products'
20  shall mean any device or article of manufacture that is
21  operable to decode at least one or more two-dimensional
22  barcode symbologies into human-readable text."
23      So what that's saying is the way to determine if a
24  product is a 2D Barcode Product is you see if the product
25  decodes a 2D barcode symbology.

283

ADAM DOANE - CROSS

1  Q.   And did some of OPTO's laser products do that?

2  A.   Some of them did; some of them didn't.

3  Q.   So those that did, would those be 2D Barcode Products?

4  A.   Yes, the laser products that decode 2D barcodes meet this

5  definition.

6  Q.   And those that don't, would those be 2D Barcode Products?

7  A.   They are not.  So the laser products that only read 1D

8  barcodes meet a different definition, 1D Barcode Products.

9  They're not 2D Barcode Products.

10 Q.   And in that spreadsheet that Mr. Muckenfuss showed you

11 earlier, was there any differentiation among the laser

12 products that let you be able to sort that out?

13 A.   No.  As I was to explain, I couldn't tell what laser

14 products were ones that read 2D barcodes, which ones weren't.

15 So it wasn't clear from what we were looking at.

16       MR. STEVENS:  Also in this agreement, I'd like to go

17 forward to Section 9.2.

18 Q.   And as it's coming up, Mr. Doane, 9.2 was the discussion

19 of some testimony yesterday.  But I'd like for you to remind

20 us, what does 9.2 say and what does it mean?

21 A.   Sure.  So 9.2, I'll read it.  "This Agreement and its

22 Exhibits, constitute and contain the entire agreement among

23 the Parties respecting the subject matter hereof, and

24 supersede any and all prior negotiations, conversations,

25 correspondence, understandings, and letters."

JA1186

284

ADAM DOANE - CROSS

1    And essentially, what this is is a -- it's a very common

2  integration clause, which means that this document is what

3  controls.  When you are interpreting the agreement, you're not

4  supposed to look outside the agreement at anything before or

5  any of the parties' understandings or what they told each

6  other before this agreement.

7  Q.   And do you understand in this litigation, is there any

8  dispute now that any product, regardless of whether it's a

9  laser product, a CCD product, or an image sensor product, that

10  any of those products are 2D Barcode Products if they support

11  at least one or more two-dimensional symbologies?

12  A.   My understanding is the parties agree that if they decode

13  a 2D barcode, that they are 2D Barcode Products.

14  Q.   Thank you, sir.

15    Now, I'd like to turn our focus a little bit -- we can

16  take that down.  I'd like to turn our focus a little bit later

17  in time to some of the emails that you discussed with

18  Mr. Muckenfuss.  Is that okay?

19  A.   Sure.

20  Q.   Now, again, is there an obligation in the agreement that

21  OPTO provide quarterly royalty reports?

22  A.   Yes.  As part of the ongoing royalty, OPTO has to provide

23  royalty reports to Honeywell showing the payments.

24  Q.   And right when the agreement was signed, did that start

25  happening right away or was there a bit of a snafu about those

JA1187

ADAM DOANE - CROSS

 1  at first?

 2  A.    There was a technical issue about OPTO being able to

 3  submit those reports to Honeywell.  So at first they weren't

 4  submitted, but eventually that got figured out.

 5  Q.    Okay.  And when was the first time -- approximately what

 6  month was the first time that Honeywell received any sort of

 7  indication of royalty reports?

 8  A.    So it would have been after the agreement was signed.

 9  Would have been probably the first quarter after that

10  agreement was signed, so second or third quarter of 2020.

11  Q.    Now, the royalty reports themselves, those are -- is that

12  limited to just the U.S. products that are actually involved

13  in this case?

14  A.    It is.  Those royalty reports just include U.S. products

15  information.

16  Q.    And those royalty reports do go to Honeywell, right?  Do

17  they go straight from OPTO to Honeywell?

18  A.    Yes.  So those royalty reports, which are different than

19  what we looked at earlier, those actually go to Honeywell.

20  Q.    Okay.  Now, was there a separate obligation -- putting

21  aside the royalty reports, was there a separate obligation in

22  the contract that OPTO provide some additional sales

23  information to only outside counsel?

24  A.    Yes.  So the agreement required OPTO to provide certain

25  information about sales, more detailed information, to

ADAM DOANE - CROSS

1  Honeywell's outside counsel.  I believe that's what we were

2  looking at earlier with Mr. Muckenfuss.

3           MR. STEVENS:  Okay.  So could we turn to page 9 of

4  JX1, please.

5           And I'd like to look at that second paragraph, the

6  paragraph right down at the bottom, the second sentence of it

7  where it says "Opticon will provide."  If we could look at

8  that, sir.

9  Q.  And I'll read it for you and I want you to tell me what

10 it means.

11      "OPTICON will provide sales reports to HONEYWELL'S

12 outside counsel pursuant to the governing ITC Investigation

13 Protective Order such that the above worldwide Opticon Gross

14 Revenue can be verified."

15      Can you tell the jury what that means.

16 A.   Sure.  This required OPTO to provide the more detailed

17 sales information only to Honeywell's outside counsel, which

18 is -- and that would be governed by the protective order that

19 I mentioned where the judge issues it and the attorneys for

20 Alston & Bird had to sign that saying we won't give any of

21 this information out to our client or anyone else in the

22 public.

23 Q.   And did that Excel spreadsheet that Mr. Muckenfuss showed

24 you, was that part of this what we're seeing on the screen

25 here, this requirement?

ADAM DOANE - CROSS

1  A.   I believe so, yes.

2  Q.   So did Opticon demand when that was made available that

3  it not be shared with Honeywell?

4  A.   Yes.  So when OPTO sent those spreadsheets, they were

5  very explicit, saying do not share any of this information

6  with Honeywell.

7  Q.   Okay.  So now October comes along and finally they've

8  sort of admitted that they've not been including the laser

9  products in the royalty reports to that point in time.  Again,

10 is that the first moment that Honeywell has any inkling that

11 something is amiss here?

12 A.   That's correct.

13 Q.   And then that's roughly October.  What happened over the

14 next five or six months?

15 A.   Because it wasn't clear from OPTO what products were

16 being included and excluded from the calculation, there was a

17 months' long investigation where Honeywell was asking for

18 information from OPTO and the parties were discussing back and

19 forth trying to understand which products were included and

20 excluded.

21 Q.   And was that just October or did that go all the way

22 through the end of March of the following year?

23 A.   It was a very long period.  March sounds right.  So yeah,

24 like October through March of the next year.

25 Q.   And again, at the end of that, did there come a point in

ADAM DOANE - CROSS

1   time where OPTO's lawyers made us confirm that none of the

2   sales information itself --

3           MR. MUCKENFUSS:  Objection, leading.

4           THE COURT:  Overruled.

5   Q.   Did there come a point in time where OPTO's lawyers put

6   in writing again to make sure that none of that sales

7   information had been actually sent to Honeywell itself?

8   A.   Yes.  As I mentioned before, OPTO was very clear that

9   none of this sales information was ever to go to Honeywell.

10  Q.   Okay.  Now, after that investigation was over, let's pick

11  up the time frame there starting in May of 2021.  Tell me what

12  happened then.

13  A.   So at some point Honeywell sent a letter to OPTO

14  explaining that, hey, we've now been able to see that OPTO

15  failed to pay royalties on all the products that are 2D

16  Barcode Products, and so it asked OPTO to please make the

17  payments that it agreed to under the agreement.

18          MR. STEVENS:  And if we could look at Plaintiff's

19  259, which I believe was admitted yesterday.

20          I'm sorry, I had the wrong one for you.  PX288,

21  excuse me.  My apologies.

22          And if you could put up both pages of this.

23  Q.   And what is this document, Mr. Doane?

24  A.   So this is a letter dated June 8, 2021, from Mr. Ben

25  Pleune to Ryan Goldstein at the Quinn Emanuel law firm.

289

ADAM DOANE - CROSS

1  Q.   And in the bottom two paragraphs on the left side, what
2  is Honeywell saying about the definition of 2D Barcode
3  Products?
4  A.   So Honeywell is saying that the 2D Barcode Products are
5  as defined in the agreement, they're products that decode 2D
6  barcodes, and that's clear, and OPTO did not pay that amount.
7  Q.   Is Honeywell's position here consistent with the order we
8  received from the Court on this particular section of the
9  agreement?
10  A.   Yes.  The judge in this case has confirmed that
11  Honeywell's reading of this definition --
12           MR. MUCKENFUSS:  Your Honor, objection.
13           THE COURT:  Sustained.
14           Members of the jury, ignore that, the question and
15  the answer.
16           MR. STEVENS:  If we can go to the second page.
17  Q.   Did Honeywell say that OPTO needed to come clean and pay
18  the royalties that were missing at that point in time?
19  A.   Yes.  So on the second page right at the end of the
20  letter, Honeywell is saying that Opticon needs to pay the
21  royalties that are owed and they did not pay Honeywell.
22  Q.   And did OPTO ever do that?
23  A.   Not yet, no.
24  Q.   Did Honeywell run off to the court the first day it
25  possibly could?

JA1192

ADAM DOANE - REDIRECT

1   A.   No, it didn't.  So the agreement actually required

2   Honeywell to provide 30 days' notice to OPTO before it went to

3   court and sued OPTO.  Honeywell actually provided I believe it

4   was about 90 days' notice trying to resolve this dispute

5   outside of litigation, but OPTO refused to pay and so we find

6   ourselves here.

7             MR. STEVENS:  Thank you, Mr. Doane.

8             I pass the witness, Your Honor.

9             THE COURT:  You may redirect.

10            MR. MUCKENFUSS:  Thank you, Your Honor.

11                      REDIRECT EXAMINATION

12  BY MR. MUCKENFUSS:

13  Q.   Mr. Doane, you and your counsel have made a big effort to

14  tell the jury that certain information was not shared with

15  Honeywell.  Do you recall those questions?

16  A.   I'm not making any big effort to do anything.  I'm here

17  to tell you the facts of what happened.

18  Q.   Okay.  Well, I'm trying to understand the relevance of

19  why it matters that your client didn't receive information.

20  Are you making that point here so that your client has

21  deniability?

22            MR. STEVENS:  Objection, Your Honor.

23            THE COURT:  Overruled.

24            THE WITNESS:  I'm answering the questions that I've

25  been asked.  OPTO made clear that Alston & Bird was not to

ADAM DOANE - REDIRECT

1  provide any of the sales information to Honeywell.  I'm not
2  giving you that information for any particular purpose.  I'm
3  just telling you what actually happened.
4  Q.   Right.  I didn't ask you any questions about whether
5  Honeywell received that information.  You volunteered it when
6  I asked you the questions and your counsel emphasized it.  I'm
7  just trying to understand why it matters here.
8       Do you think it matters as to Honeywell's knowledge or
9  their actions under the agreement whether they received the
10 information or whether just their counsel received the
11 information?
12 A.   Well, there's a clear distinction between outside counsel
13 receiving information and Honeywell receiving the information.
14 Honeywell is not able to understand the detailed sales
15 information so it doesn't have the same information that its
16 counsel had.
17      I mentioned the protective order.  As outside counsel, we
18 can't just tell Honeywell everything.  So there is a
19 distinction there.  I'm not making that for a particular
20 reason.  I'm telling you what the facts are.
21 Q.   And you're not telling this jury that has any relevance
22 or importance to the issues in this case, correct?
23 A.   No.  I mean, it is relevant because Honeywell did not
24 know the numbers in the agreement.  Only outside counsel knew
25 that.

ADAM DOANE - REDIRECT

1  Q.   Right.  Alston & Bird --

2           THE COURT:  Members of the jury, at the appropriate

3  time the Court will give you an instruction as to the legal

4  effect of counsel of a particular client having certain

5  information.  So the Court will give you an instruction on

6  this.

7           MR. MUCKENFUSS:  Thank you, Your Honor.  I'll move

8  on.

9           Your Honor, if I may approach the board?

10          THE COURT:  You may.

11 Q.   Mr. Doane, I want to go back to our timeline real quick.

12      Now, your counsel came up and crossed out the Second

13 Amendment.  Do you see that?

14 A.   I do see it crossed out, yes.

15 Q.   Okay.  Now, the Second Amendment -- you would agree with

16 me, the Second Amendment is part of the same agreement,

17 correct?

18 A.   It's part of the same agreement.  The Second Amendment

19 was negotiated, signed, and reviewed, as we talked about

20 earlier, about a year later.

21 Q.   Right.  But you would agree with me the Second Amendment

22 comprises or is part of the entire settlement agreement

23 between the parties, correct?

24 A.   It is part of that entire agreement, but it obviously

25 wasn't in effect on January 22nd, 2020.  But now today it's

ADAM DOANE - REDIRECT

1  part of the whole agreement.

2  Q.    Right.  So I want to go back to Section 9.2 that your

3  counsel showed you.

4       Now, your counsel didn't read the rest of this paragraph,

5  but I want to read it, if I can, for the jury.

6       So you read the first sentence.  The second sentence

7  states, "This Agreement may be amended, modified, and/or one

8  or more provisions hereof waived only by a written instrument

9  signed by the Parties."  Correct?

10 A.    It does say that, yes.

11 Q.    Okay.  And the Second Amendment was an amendment signed

12 by the parties, correct?

13 A.    It was.

14 Q.    And it was effective February 3, 2021, correct?

15 A.    That's correct.

16 Q.    Now, your counsel also asked you questions going back to

17 Section 1.4, and I want to go back to 1.4.

18      So Section 1.4, you recall those questions by your

19 counsel, correct?

20 A.    Correct.

21 Q.    The point was made that Section 1.4 is the definition for

22 2D Barcode Products, correct?

23 A.    1.4 is the definition of 2D Barcode Products.

24 Q.    Right.  And that is the definition in which if a product

25 falls within that definition, then OPTO would have to pay a

ADAM DOANE - REDIRECT

1  royalty on that product, correct?

2  A.   That's correct.

3  Q.   And that's a definition that you as part of the Alston &

4  Bird team helped negotiate as part of the settlement, correct?

5  A.   This is part of the settlement agreement and Alston &

6  Bird was involved with that.

7          MR. MUCKENFUSS:  All right.  Let's go to Section 4.9

8  of the Second Amendment.

9  Q.   So I want to go back to Section 4.9.

10      Now, Mr. Stevens crossed out the Second Amendment which

11 we know is part of the entire settlement agreement.  Going

12 back to the sentence we looked at when I was questioning, it

13 uses the term "2D Barcode Products," correct?

14 A.   It does.

15 Q.   So the only way you know the definition of that term in

16 the Second Amendment is if you look at Section 1.4, correct?

17 A.   That's correct.

18 Q.   Right.  So the Second Amendment is tied to the settlement

19 agreement that was executed on January 22, 2020, correct?

20 A.   This amendment is part of that agreement, yes.  It came a

21 year later, but it's part of the agreement.

22 Q.   Right.  And it uses the same term, same definition in

23 Section 1.4 that was executed on January 22, 2020, correct?

24 A.   Yes.  The definition of 2D Barcode Products is as we saw

25 in the agreement dated January 22, 2020.

JA1197

ADAM DOANE - REDIRECT

1  Q.   Right.  So knowing that definition as part of the Alston
2  & Bird team, and having received all the information from
3  Mr. Goldstein about 2D products, Honeywell signs an agreement,
4  the Second Amendment, stating Honeywell understands that
5  Opticon's revenue from 2D Barcode Products in Europe in 2019
6  was €4.4 million, correct?
7  A.   That's what it says here.  I mean, Honeywell had to
8  list -- you know, believe Opticon because that's what --
9  Opticon knew the sales information.  Honeywell itself didn't.
10 Alston & Bird had some of the information, but as you saw from
11 the correspondence, it was not clear which products should be
12 included and which shouldn't be because those spreadsheets
13 didn't tell us which ones decoded 2D barcodes and which ones
14 didn't.
15 Q.   Okay.  I want to talk about that for a second.  You
16 testified a moment ago that you knew some of OPTO's laser
17 scanners decoded PDF417 and some didn't, right?  You knew
18 that.
19 A.   I know that now, yes.
20 Q.   Okay.  And as part of the Alston & Bird team, you did
21 extensive research on OPTO's products even before the first
22 settlement agreement date of January 22, 2020, correct?
23 A.   I did a lot of work on it, yes, into OPTO's products,
24 yes.
25 Q.   Yes.  Mr. Stevens showed you the documents where

ADAM DOANE - REDIRECT

1  Honeywell itself refers to PDF417, talks about symbologies,
2  well before the first settlement agreement was executed,
3  correct?
4  A.   I think you're referring to, like, the complaint we
5  looked at where Honeywell says PDF417 is a 2D barcode.
6  Q.   Right.  And as part of the Alston & Bird team -- we
7  talked about the claim chart -- you're reviewing all of the
8  information, the source code, all of the technical
9  specifications of OPTO's products, correct?
10  A.   For certain of its products.  The source code we got was
11  for the ITC investigation which is a U.S. investigation.  So I
12  would not have seen any, for example, European source code.
13  Q.   Right.  But we're talking about the same product.  We're
14  talking about laser scanners.  I know some are sold in Europe,
15  some are sold in the United States, but it's the same product,
16  right?
17  A.   I'm not sure.  I don't know OPTO's products well enough
18  to be able to tell you whether the software on the U.S. ones
19  are the same as the European ones.  I think they would be
20  different.  I think there are certain standards in Europe and
21  the U.S. that are different.  I don't know.
22  Q.   So over the course of two years working on the Alston &
23  Bird team, researching these products, you knew -- the Alston
24  & Bird team knew that OPTO was telling you truthfully from
25  Mr. Goldstein that none of its laser scanners, whether they

ADAM DOANE - REDIRECT

1  can decode PDF417 or not, none of them are being included as
2  2D Barcode Products as defined by Section 1.4.  You knew that
3  before the Second Amendment was executed, correct?
4  A.  That's what Mr. Goldstein was saying.  Whether it was
5  truthful or not, I don't know.
6  Q.  Well, it is truthful, isn't it?  It is truthful that OPTO
7  believes and has told you specifically that none of -- it
8  believes that none of its laser scanners were included under
9  Section 1.4.  That is true, correct?
10 A.  That's what OPTO said, yes.  Now, we have no way to know
11 whether those products decoded 2D or 1D barcodes.  So it may
12 have been a correct interpretation or may not have been.
13 There's no way to know.
14 Q.  I understand what you're saying.  You didn't know if some
15 of them -- and again, when you're getting Mr. Goldstein's --
16 well, let's go back to Mr. Gold -- if we have to, let's look
17 at the spreadsheet really quick.
18       MR. MUCKENFUSS:  Let's go back to 111 -- I'm sorry,
19 98.  So I want to look at -- again, go to the last half.
20 Q.  So Mr. Goldstein -- I don't want to go back through all
21 the emails again, but he tells you in the last half
22 specifically the model numbers of the products that OPTO is
23 telling you are 2D, correct?
24 A.  That is what this is referring to, yes.  It's referring
25 to the model numbers and whether they're classified as 2D in

ADAM DOANE - REDIRECT

1   this document.

2   Q.   So the whole team of Alston & Bird, patent litigators,

3   could have certainly looked at all of these model numbers and

4   looked at their technical specifications and understood

5   everything about these products, correct?

6   A.   I don't know for sure.  The problem is the ones in Europe

7   we would not have the source code for and I don't know if all

8   the technical specifications tell you what barcodes they

9   decoded.  So I can't tell you that, no.

10          MR. MUCKENFUSS:  Okay.  Well, just in case there's

11  any confusion, let's go back to Mr. Goldstein's email.  Let's

12  look at page 1.

13  Q.   So, again, I showed you this email, October 23.  By this

14  time Mr. Goldstein has told the Alston & Bird team not once,

15  not twice, but three times.  And if you look at the last

16  paragraph, the products not included range from laser and CCD

17  products.

18       Do you see that?

19  A.   I do.

20  Q.   So whether you knew what specific laser scanners decode

21  PDF417 or not, you knew that none of them, none of them, OPTO

22  is telling you, are included as 2D Barcode Products under the

23  definition of Section 1.4, correct?

24  A.   That's what Mr. Goldstein is saying, yes.

25          MR. MUCKENFUSS:  Nothing further.

ADAM DOANE - REDIRECT

 1            THE COURT:  Thank you.  You may stand down.

 2            (Witness stepped down.)

 3            MR. STEVENS:  May Mr. Doane be excused, Your Honor?

 4            THE COURT:  Any objection?

 5            MR. MUCKENFUSS:  No objection.  I do think -- well,

 6   you do list him in rebuttal, but no objection.

 7            THE COURT:  All right.  Thank you.

 8            How long is the direct with your next witness?

 9            MR. VanHOUTAN:  Your Honor, it's not long, but it

10   requires translation so it makes it longer.

11            THE COURT:  Okay.  So, members of the jury, let's

12   just take our lunch break now.  I'm going to ask you to come

13   back at 1:00.  There's some issues that I have to take up with

14   the attorneys and I'd like to get lunch too.

15            You know the rule, of course.  Leave your notes

16   here.  Don't discuss this case.  Don't start making up your

17   minds about anything.  We've got a ways to go yet.  We'll see

18   you at 1:00.

19            (Jury exited the courtroom.)

20            THE COURT:  Do you want to discuss the proposed

21   substantive instructions now?  Is that convenient for the

22   parties?

23            MR. STEVENS:  If it's all right with Your Honor, I'd

24   prefer to do lunch and maybe come back 15 minutes early.

25            THE COURT:  Yeah, we don't want you hangry for sure.

ADAM DOANE - REDIRECT

1          All right.  Let's try to get back here by quarter
2     till 1:00.
3               (Lunch recess at 11:48 AM.)
4     TUESDAY AFTERNOON, JULY 18, 2023
5               (Court back in session at 12:41 PM.)
6               (Jury not present.)
7               MR. MUCKENFUSS:  Your Honor, I know we're going to
8     go over the jury instructions.  Just to let you know, we're
9     going to play a video depo next.  That will be the next
10    witness.
11              THE COURT:  All right.  When we have the
12    interpreter, we'll need the interpreter to be sworn in the
13    presence of the jury.
14              MR. MUCKENFUSS:  Okay.
15              MR. STEVENS:  And the next one is a long one, just
16    so you know.
17              MR. MUCKENFUSS:  It's a two-hour video.
18              THE COURT:  Perfect.  So I can go do something else
19    for two hours while -- okay.
20              So what discussion does either party want to have
21    about the proposed substantive instructions?
22              MR. McCAMEY:  Whichever way Your Honor wants to do
23    it.
24              MR. STEVENS:  Doesn't matter to me.
25              THE COURT:  Well, we'll let plaintiffs go first.

ADAM DOANE - REDIRECT

```
 1          MR. STEVENS:  Do you want us to go through it sort
 2   of --
 3          THE COURT:  Just wherever you have a...
 4          MR. STEVENS:  Okay.  On page 5 in the expert
 5   testimony where you say, "I believe it is fair to say that
 6   these experts have very different opinions."  We would object
 7   to that instruction both as inconsistent with the actual facts
 8   and that it's a comment from the bench about the evidence.  We
 9   don't think that's appropriate.  So we'd ask that sentence
10   just be removed.  Doesn't add anything to informing the jury.
11          THE COURT:  All right.  I'll do that.
12          MR. STEVENS:  There's twice in here where you
13   instruct the jury that, more or less, if they find for us,
14   they'll have to come back and do damages.  We don't think --
15   you're basically telling them that if they say no, they don't
16   have to come back.  And so we don't think that that's
17   appropriate.
18          THE COURT:  Okay.  We'll revise that.
19          As long as you raise it, do the parties really want
20   damages submitted to the jury?  Is that -- I mean, of course,
21   we'll do it.  We've got them here.  But as I said, I think, in
22   our -- one of our get-togethers, that it seems fairly
23   arithmetic and that if there's some timing issue that can be
24   resolved, then maybe the Court can do it faster, better.
25          MR. MUCKENFUSS:  I think we can confer with the
```

ADAM DOANE - REDIRECT

1    other side and probably work that out.

2            THE COURT:  I mean, we'll do whatever you want, of

3    course.  We've got a jury here and if you want to submit the

4    question to them, we will, but it doesn't have to be.

5            MR. MUCKENFUSS:  Yeah, I don't think we should have

6    to do that.  I just think we just need to confer on a couple

7    of things.

8            THE COURT:  All right.

9            MR. STEVENS:  Okay.

10           THE COURT:  All right.  So I'll wait to hear from

11   you on that.  But in the meantime, I'll cede to your objection

12   about giving them an out from coming back.

13           MR. STEVENS:  Thank you, Your Honor.  And that was

14   on pages 7 and 9.

15           I'm reserving things about 50(a), right?  We don't

16   obviously agree that some of these things should even go to

17   the jury, but we'll take that up, I'm assuming, at the 50(a)

18   conference.

19           THE COURT:  7 and 9 is where you want us to remove

20   telling the jury that depending upon their verdict, they'll

21   have to come back.

22           MR. STEVENS:  Yes, sir.

23           THE COURT:  Okay.

24           MR. STEVENS:  On page 12, it says in here at the end

25   of that first sentence that, you know, OPTO claims that

ADAM DOANE - REDIRECT

1  Honeywell's position now, i.e., that certain products are 2D

2  Barcode Products, is different from Honeywell's prior position

3  on that issue, i.e., that those same products were 1D Barcode

4  Products.  I have two issues with that.

5         First, I don't believe there's an allegation that

6  we've ever used the phrase 1D Barcode Products in the past.

7  So I don't think there's any evidentiary basis and I don't

8  think that's their claim.

9         Second, I don't think that's their claim at all for

10 quasi-estoppel.  I think their claim for quasi-estoppel is

11 based upon things that happened after the agreement.  So I

12 don't believe that this paragraph at all is a fair

13 characterization of their claim.

14        THE COURT:  Who would like to address that?

15        MR. McCAMEY:  I'm happy to address it, Your Honor.

16 Zach McCamey on behalf of OPTO.

17        I just want to make sure I understand what I'm

18 addressing.  Is the objection with just that sentence or is

19 there more to it?

20        MR. STEVENS:  The objection is to the paragraph as a

21 whole.  There's a specific objection to the way that the

22 sentence is worded.  But I don't believe that this is an

23 accurate statement of what's actually in dispute in this case.

24        THE COURT:  All right.  So address that first.  Is

25 that an accurate description of the dispute or the defense

ADAM DOANE - REDIRECT

1  being raised by OPTO?

2        MR. McCAMEY:  Your Honor, I believe it is.  We're

3  certainly taking the position that laser scanners are not

4  royalty-bearing under the agreement and therefore not 2D

5  Barcode Products.  And the only other option under the

6  agreement is 1D Barcode Products.  So I think this is an

7  accurate statement.

8        MR. STEVENS:  Okay.  Then if that's the case, if

9  that's what they want to try, that's fine.  But I do think it

10  needs to be taken out that says, i.e., those same products are

11  1D Barcode Products, capitalize B, capitalize P.  There's no

12  where in this case where there's been any evidence that

13  Honeywell ever took the position that those products are,

14  quote, 1D, capital B, Barcode, capital P, Products.  Because

15  you're implying -- that's obviously a definition from the

16  agreement.  And you're implying by that instruction that we

17  said those words or wrote those words somewhere else.  That's

18  never -- there's been no evidence of that whatsoever.

19        THE COURT:  All right.  Well, I'll continue to take

20  a look at that.  I'm not sure I'll change it, but I'll

21  consider your argument.

22        MR. STEVENS:  Okay.  We don't think agency should be

23  given.

24        THE COURT:  That's going to be given.

25        MR. STEVENS:  Okay.  Then we would ask for two

ADAM DOANE - REDIRECT

 1  additional instructions.

 2          Number one, we think there needs to be an

 3  instruction about protective orders and what lawyers must do

 4  to comply with them.

 5          THE COURT:  No.

 6          MR. STEVENS:  All right.  Number two, there's been

 7  an RFA in this case.  And because that is now in evidence, I

 8  think the Court needs to instruct the jury about the binding

 9  judicial effect of a request for admission that's admitted.

10  That's something that's in evidence.  The jury doesn't have

11  context for what that is.  That's a pretty standard

12  instruction.  And so we think that needs to come in.

13          THE COURT:  All right.  What say the defendants for

14  an RFA instruction?

15          MR. McCAMEY:  Your Honor, of course, we just need to

16  see the instruction.  We very well may not have an objection

17  to it, but it's hard for me to comment without seeing the

18  language.

19          THE COURT:  We'll find some standard instruction on

20  that point.

21          Anything further for the plaintiffs?

22          MR. STEVENS:  I do have an objection to the damages

23  instruction which I'm assuming you're not going to give.

24          THE COURT:  Not if the jury is not --

25          MR. STEVENS:  I mean the first time.  Putting aside

306

ADAM DOANE - REDIRECT

1  whether we ultimately try it to the jury in phase two, I'm

2  assuming you're not going to give this in phase one under any

3  circumstance.

4          THE COURT:  No.

5          MR. STEVENS:  Okay.  So do you want me to reserve my

6  comments on --

7          THE COURT:  No, we just put them in there so

8  everybody was seeing what we might give.

9          MR. STEVENS:  Okay.

10          THE COURT:  But no, that will certainly not be given

11  to the jury before a liability determination.

12          MR. STEVENS:  Okay.  Just to tell you down the road,

13  we would object to the last sentence of the middle paragraph,

14  that the parties agree that we waived all damages.  We don't

15  think that has anything to do with the dispute that they'll be

16  given.  We're not asking them to provide past damages, so

17  that's completely extraneous to what they're going to be asked

18  to do.  There's not going to be any money that any party

19  accounts to the past.  So that sentence, we believe, should be

20  stricken.

21          If you want to take up the verdict form, we do have

22  objections to that as well.

23          THE COURT:  Sure.  Yeah, let's do that.

24          MR. STEVENS:  So the verdict form -- I've never seen

25  a civil verdict form where it doesn't have the burdens of

JA1209

ADAM DOANE - REDIRECT

1  proof.  I'm not saying there hasn't been one, but I've never

2  been a part of a case that doesn't have the burdens of proof.

3  So we prefer them to be written as, you know, something like:

4  Has Honeywell proved by a preponderance of the evidence that

5  there's a breach?  Or:  Has OPTO proved by clear and

6  convincing evidence that its defense of whatever has merit?

7  I've never seen a verdict form that doesn't have the standards

8  built into the questions that the jury is asked.

9         THE COURT:  I have.

10         MR. MUCKENFUSS:  I've seen plenty without them.  And

11  I think Your Honor is going to instruct the jury on that.

12         THE COURT:  Well, I'm certainly going to instruct

13  them on that.  I mean, I don't know that they need reminding

14  of it first.

15         I'm going to send back, just so everybody knows, the

16  part of the instructions that do wind up being given to the

17  jury.  I mean, you know, I have to decide which instructions

18  are necessary for the jury's deliberations.  But the part that

19  begins now on page 7, instructions on the law, instruction

20  number 1, those will be sent back with the jury.

21         The part that precedes that may well be supplemented

22  a little bit.  I usually -- well, not usually.  I always give

23  what I have characterized as preliminary or introductory

24  instructions before closing arguments so that what the jury

25  hears from the Court after closing arguments is just the

ADAM DOANE - REDIRECT

1  applicable law.  So that's not going to go back.  Those
2  earlier pages are not going to go back to the jury.  But
3  beginning with instruction number 1, that will go back.
4  Whatever we give will go back to the jury room with the jury.
5          MR. STEVENS:  So you're going to read that after
6  closings, just to make sure I got it right.
7          THE COURT:  Yes.
8          MR. STEVENS:  I'm assuming you don't have any
9  problem if we allude to them in closings.
10         THE COURT:  No.  Right.  Just as long as you don't
11  misstate it.
12         Anything else?
13         MR. McCAMEY:  Your Honor, just one for the
14  defendant.  Instruction number 4 on page 10.
15         THE COURT:  Yes.
16         MR. McCAMEY:  Your Honor, we had submitted a -- in
17  our proposed instructions there were instructions from the
18  Delaware statute describing how contracts are to be viewed, of
19  course, in the hierarchy of express written language, followed
20  by course of performance, followed by course of dealing,
21  followed by usage of trade.  That language comes directly from
22  the Delaware statute.  I think we've now certainly heard
23  evidence of --
24         THE COURT:  I think Delaware law is pretty clear
25  that those usages in the course of performance do not come in

ADAM DOANE - REDIRECT

 1  when it's an unambiguous provision.

 2          MR. McCAMEY:  I don't disagree with that, Your

 3  Honor, and I think that's why the hierarchy starts with the

 4  express language.  But there are ambiguous phrases within this

 5  contract.  Specifically, I think in Your Honor's summary

 6  judgment order you had held that whether something is a 2D

 7  symbology or not is a question for the jury, which it would be

 8  an ambiguous term.

 9          THE COURT:  No, no, no, no.  That's confusing two

10  different concepts.  So we're not going to give an instruction

11  on the usage and performance and course of conduct.

12          MR. McCAMEY:  Understood.  Thank you, Your Honor.

13          MR. STEVENS:  I had one more thing that I failed to

14  mention that my colleague pointed out on the verdict form.

15  The question is, as it's written here:  "Did OPTO breach the

16  parties' settlement agreement by failing to timely pay

17  Honeywell for all royalties due under the agreement?"

18          That should be for any royalties that were due under

19  the agreement that went unpaid.  It will be in damages whether

20  we have to prove that we got every dollar or not.  But all

21  we're asking the jury to do in phase one is is there any

22  breach, not did they breach for every single product.  And the

23  word "all" in here implies -- not implies, but denotes that

24  they should only check the box if somehow they find that, you

25  know, every single dollar has been unpaid.  That's not the

ADAM DOANE - REDIRECT

1    case.  If they find a breach of one dollar, that's a breach.

2            THE COURT:  Well, I'm not sure your clarification

3    would help very much, but we can look at whether we need to

4    say all or just even reference the royalties as required under

5    such and such and such.

6            MR. STEVENS:  I might suggest for any unpaid

7    royalties.

8            THE COURT:  Okay.  Thank you for the suggestion.

9            Anything else?

10           MR. MUCKENFUSS:  Nothing further.

11           MR. McCAMEY:  No, Your Honor.

12           THE COURT:  Meg, do you know if the jurors are back?

13           THE CLERK:  I do not.  Let me go look.

14           THE COURT:  So the video deposition is next?

15           MR. MUCKENFUSS:  Yes, Your Honor.

16           THE COURT:  This is an expert witness?

17           MR. MUCKENFUSS:  It is, Your Honor.

18           THE COURT:  And there has been no challenge to his

19   expertise, correct?

20           MR. STEVENS:  That's correct.  I believe it's on the

21   video -- I don't know if -- yeah, there's no objection.

22           Just so you know, Your Honor, in case you're

23   interested, the two-hour video, there is a pretty good break

24   about an hour-five or hour-ten into it if you're interested in

25   giving the jury a quick break from watching such a long video.

PAUL CHARTIER - DIRECT

1          THE COURT:  Okay.

2          (Jury entered the courtroom.)

3          THE COURT:  All right.  Members of the jury, the

4    next witness for the defense is going to be presented by video

5    deposition.  As I told you before, it's perfectly acceptable

6    in civil cases like this for witnesses to be presented to you

7    by video deposition.  You should treat the witness the same as

8    you would if the witness was sitting here in the witness

9    stand.

10          Also, I'm told it goes about two hours.  Unless

11   someone signals me they need a break, we'll watch it all and

12   then take our break.

13          Thank you.  You may proceed.

14          (The videotaped deposition of Paul Charier was

15   played.  The transcript as prepared by Patricia A. Nilsen is

16   as follows:)

17              PAUL CHARTIER, DEFENDANT'S WITNESS, SWORN,

18                       DIRECT EXAMINATION

19   BY MR. VanHOUTAN:

20   Q.  Sir, could you please introduce yourself to the jury.

21   A.  My name is Paul Chartier.

22   Q.  Mr. Chartier, where do you currently live?

23   A.  I live in a village called Sutton Benger.  It's close to

24   Chippenham in Wiltshire, England.

25   Q.  And what do you do for a living?

312

PAUL CHARTIER - DIRECT

 1  A.    I'm principal of Praxis Consultants.

 2  Q.    What type of company is Praxis Consultants?

 3  A.    It's a technology consultancy that focuses on barcode and

 4  RFID, radio-frequency identification.

 5  Q.    And Mr. Chartier, if you could just speak up a little

 6  bit?

 7  A.    Yes, certainly.

 8  Q.    Has that always been the business of Praxis Consultants?

 9  A.    Originally it was only on barcode, because RFID was an

10  emerging technology.  But more recently it covers both

11  technologies.

12  Q.    What is RFID?

13  A.    Radio-frequency identification.

14  Q.    How long have you owned Praxis Consultants?

15  A.    Forty-two years.

16  Q.    And what types of services do you offer at Praxis

17  Consultants?

18  A.    Basically three types of service.  We provide technology

19  and application advice to industry standard bodies who are

20  implementing technology; end-user organizations, either for

21  encoding or decoding, and roll out their program; and

22  technology companies, on whatever the technology companies put

23  to me as a requirement.

24  Q.    Have you owned any companies other than Praxis

25  Consultants?

JA1215

PAUL CHARTIER - DIRECT

1  A.   Yes.  I was co-owner of a company called Convergent
2  Software.
3  Q.   And what did Convergent Software do?
4  A.   Convergent Software made -- developed and marketed
5  software specifically for encoding and decoding RFID tags to
6  particular industry standards.
7  Q.   What did you do for a living before you started Praxis
8  Consultants and Convergent Software?
9  A.   Before that I worked for a major UK retailer called
10 WHSmith.
11 Q.   And what does WHSmith do?
12 A.   WHSmith sells a variety of nonfood products, and it's
13 probably best known as a retailer of books.
14 Q.   What were your positions at WHSmith?
15 A.   Initially I was employed as an industrial engineer; and
16 in the years that I was there, the five, six years that I was
17 there, I ended up with the title of business consultant.
18 Q.   When you worked as an industrial engineer for WHSmith,
19 did you work with barcodes?
20 A.   Yes.  We started to work with barcodes on a trial basis
21 with one of our small chain of stores; and then with the
22 development of UPC and its European equivalent, EAN, I ended
23 up being, as a business consultant, responsible for rolling
24 out the program of getting barcodes on all their products.
25 Q.   Have you ever served as a professor?

JA1216

PAUL CHARTIER - DIRECT

1   A.   Yes, I have.

2   Q.   Where?

3   A.   At what is now called Birmingham City University.

4   Q.   And what kind of professor were you at this university?

5   A.   I was a visiting professor, and that was an appointment

6   made by the chancellor.

7   Q.   And what did you do as a visiting professor?

8   A.   The majority of the time was undertaking research into

9   barcode and RFID, and then being involved with the team, other

10  professors there, helping their -- the university's clients.

11  Q.   Overall, how many years of experience would you say you

12  have working with barcode symbologies?

13  A.   If you add the time of Praxis Consultants to WHSmith, I

14  would say 45 years.

15  Q.   And have you been retained by OPTO to act as an expert

16  witness in this case?

17  A.   Yes, I have.

18  Q.   Have you ever worked for OPTO prior to being retained for

19  this case?

20  A.   I have not.

21  Q.   Are you being paid for your services in this case?

22  A.   Yes, I am.

23  Q.   And how much are you being paid for your services?

24  A.   The agreed fee is $175 an hour.

25  Q.   Does any of your portion -- does any portion of your

PAUL CHARTIER - DIRECT

1  compensation depend on the outcome of this case?

2  A.   None of it does at all.

3  Q.   In addition to the work you described previously, have

4  you ever worked with a company called Symbol Technologies?

5  A.   Yes, I have.

6  Q.   What did you do for Symbol Technologies?

7  A.   With Symbol Technologies, I was engaged to advise them of

8  the encoding rules for PD -- what -- the symbology is known as

9  PDF417.

10  Q.   Can you describe for the jury what PDF417 is?

11  A.   Yes.  The name stands for Portable Data File, and the

12  "417" describes the structure of the symbology.

13          THE COURT REPORTER:  I'm sorry, could you repeat?

14          THE WITNESS:  I said that the "PDF" stands for

15  Portable Data File, and that the "417" refers to the structure

16  of the symbols.

17  Q.   And if you could just speak up a little bit.

18      What kind of symbology, again, is PDF417?

19  A.   It's a multi-row symbology.

20  Q.   Is there another way to describe multi-row symbologies?

21  A.   Yes.  They're sometimes colloquially called stack

22  symbologies.

23  Q.   What exactly did you do in developing PDF417?

24  A.   The original patent described a very simple encoding

25  scheme, and Symbol Technologies was concerned of the market

PAUL CHARTIER - DIRECT

1  reach for that.  So I was involved in helping to provide
2  encoding cables for multiple languages and other kind of data.
3  Q.    You mentioned "encoding."  What does it mean to encode
4  data?
5  A.    To encode data is to take a piece of information -- for
6  example, a part number -- which might be alphanumeric, and to
7  take that data, put it into, in case of a barcode, into a
8  particular symbol structure, so that a scanner can eventually
9  scan that, decode it, and put it directly into a computer
10  system.  So it's a machine-readable technology.
11  Q.    Going back to PDF417, did you invent PDF417?
12  A.    I did not.  One of the named inventors was Dr. Ynjiun
13  Wang.
14  Q.    Are barcode symbologies like PDF417 standardized?
15  A.    Yes, they are standardized.
16  Q.    What does it mean for symbology to be standardized?
17  A.    Nowadays it means that the organization, International
18  Organization of Standardization -- that's the French way of
19  saying ISO -- is responsible for accepting a particular
20  technology and making it available to the world
21  Q.    Were you involved in the standardization of any barcode
22  symbologies?
23  A.    Yes.  I was involved with the standardization of PDF417,
24  MaxiCode, which is sponsored by United Parcel Service, and
25  Data Matrix.

PAUL CHARTIER - DIRECT

1  Q.    What was your role in the standardization of PDF417?

2  A.    In the time I started to be involved, the ISO committee

3  for barcodes did not exist.  So the decision was made to put a

4  proposal to the European standard organization so that a

5  standard could be fast-tracked, so that PDF417 was acceptable

6  to a multiple number of nations or national standardization.

7  That would have been somewhere between 30 to 40 countries in

8  Europe.

9  Q.    Did you have a specific job title while working on the

10 European standard for PDF417?

11 A.    In any development standard, an expert team is nominated

12 by national standards bodies, and I was nominated by British

13 Standards Institute.  And then within the working group of

14 the -- working group of experts, I was selected to be project

15 editor; but again, I had to be approved by the other national

16 standards bodies.

17 Q.    And what -- what did it mean to be the project editor for

18 the PDF417 European standard?

19 A.    Well, the process of drafting a standard is to be able to

20 take either no information, or in this case to take some

21 information from Symbol Technologies, and to put it in a

22 format that complied with the rules of the European standards

23 body, CEN -- which is identical, by the way, to the rules of

24 ISO -- and to agree with those experts what words should go

25 in.  And the project editor's job is to summarize all of those

PAUL CHARTIER - DIRECT

1  particular points.  Initially the project editor drives what
2  the working group is doing; but subsequently, as the standard
3  is put out to a wider community for review, the project editor
4  is responsible for dealing with all the comments on that
5  symbology.
6  Q.   How long did you serve in that role relating to the
7  European standard for PDF417?
8  A.   Well, the European standard, because the intention was to
9  fast-track it, it was a two-to-three-year period from start to
10  publication.
11  Q.   And are there other standards for PDF417 outside of the
12  European standard?
13  A.   The main standard is the international standard for
14  PDF417.  And when that was published, the European standard
15  was officially withdrawn, so that there was no potential
16  conflict.
17  Q.   What is the organization that published the international
18  standard?
19  A.   So the organization that published the international
20  standard is prominently known as ISO.  That is the
21  International Organization for Standardization.
22  Q.   Was the process for drafting the European standard the
23  same as for the ISO standard?
24  A.   Both organizations use exactly the same templates,
25  formats, rules and everything from coding.  So in the

PAUL CHARTIER - DIRECT

1  situation with the ISO standard, what the ISO standard with --

2  started with was with the published version of the European

3  standard.

4  Q.   And you may have mentioned this, but was the ISO PDF417

5  standard eventually adopted?

6  A.   It was certainly adopted, yes.

7  Q.   Are there any fundamental differences, or were there any

8  fundamental differences between the European PDF417 standard

9  and the ISO PDF417 standard?

10  A.   No, there were none.

11  Q.   You previously mentioned Dr. Wang.  Was he involved in

12  the standardization of the PDF417, either in the European

13  standard or the ISO standard?

14  A.   Within Europe, he could not have been involved, because

15  obviously he didn't come from a European nation and wasn't

16  sponsored by the European standards body.  But other people

17  from Symbol -- for example, from Belgium or Germany -- did

18  take part.

19      At the international level, he would have been possibly a

20  member of the U.S. delegation, but he wasn't.  So he was not

21  involved in any way in the standardization process.

22  Q.   Let's take a step back and talk about the fundamentals of

23  barcode symbologies.  Can you describe for the jury, what is a

24  barcode?

25  A.   A barcode is a simple means of presenting typically bars

PAUL CHARTIER - DIRECT

1  and spaces in a predefined format, so that it can encode data,
2  and then that makes it machine readable, so that a scanner and
3  decoder can input it directly into the computer system, being
4  efficient and accurate.
5  Q.   Are there different types of barcodes, or are they all
6  the same?
7  A.   Oh, there are many different types of barcode.  ISO only
8  has a few that it standardized, but historically there are
9  about 200.
10 Q.   Can you explain, at a high level, the different kinds of
11 barcodes?
12 A.   Yeah.  There are three types of barcode, as -- as I
13 consider it.  The simplest type of barcode is a linear
14 barcode, which just consists of the bars and spaces across a
15 space.  The next type are the multi-row symbologies, such as a
16 PDF417.  And the more complex ones are the matrix symbologies,
17 such as QR code and Data Matrix.
18 Q.   Do each of these kinds of barcodes use the same format to
19 encode data?
20 A.   The first two, the linear and the multi-row, means
21 exactly the same format, in that the individual symbol
22 character complies to the rules of the specific symbology
23 standard.  And what happens is symbol character after symbol
24 character are appended to make, in the case of a linear
25 barcode, a single symbol; and in the case of a multi-row

PAUL CHARTIER - DIRECT

1  symbology, the elements of a row and of the symbology, but

2  then the second row, the third row, follow exactly the same

3  rules.

4  Q.   Which of these barcodes that you just described was

5  developed first?

6  A.   The linear type were developed first, way before any

7  formal standardization.  They were engineering specifications.

8  And then they were all standardized both in -- by the trade

9  body, AIM, a number of them were standardized, and then they

10  all went to ISO as linear symbologies.

11  Q.   Which one of the barcodes that you described was

12  developed the most recently?

13  A.   The most recent type of development were the matrix

14  symbologies, the 2D matrix symbologies.

15  Q.   Sir, have you prepared some demonstrative slides to help

16  explain your testimony today?

17  A.   Yes, I have.

18         MR. VanHOUTAN:  Can we publish to the witness the

19  demonstrative slides, please.

20         Thank you.

21  Q.   Mr. Chartier, I also have these slides on the screen

22  here, so you can look at whatever is most convenient.

23  A.   Thank you.

24  Q.   Starting on Slide 1 of your demonstratives, what is shown

25  here?

PAUL CHARTIER - DIRECT

1  A.   What is shown is a Code 128 barcode symbol.  This is a
2  simple linear symbology.
3  Q.   Can you give the jury another example of a simple linear
4  symbology?
5  A.   Yeah.  One they will certainly understand that they would
6  see in the commonplace, in the supermarket and other retail
7  environment, would be the UPC symbol.
8  Q.   And how do these linear barcodes or symbologies encode
9  data?
10 A.   They encode it in a predefined bar-space pattern.  So in
11 the case of Code 128, it's three bars and three spaces; in the
12 case of UPC, it's two bars, two spaces.
13 Q.   What do you mean by "bar-space pattern"?
14 A.   For a symbology to exclude extraneous material, you have
15 to have a set of rules so that you can distinguish the pattern
16 that is presented to the scanner or the decoder in a way that
17 is meaningful.  So in the case of UPC, that simple bar-space
18 pattern of wide bars and narrow bars, wide spaces and narrow
19 spaces, simply encodes the numeric digits zero to nine.
20     In the case of 128, we're actually encoding alphanumeric
21 data and numeric-only data, depending on the -- the
22 requirement of the application.
23 Q.   And I believe you referred to Code 128, shown on Slide 1
24 of your demonstratives, as a linear barcode.  Why is it called
25 a linear barcode?

JA1225

PAUL CHARTIER - DIRECT

1   A.   Because it is scannable, in principle, from left to

2   right, with whatever appropriate scan line can be presented to

3   read it and pick up the reflectance of the bars and spaces.

4   So a typical reading device would be a laser scanner.

5   Q.   Let's go to Slide 2 of your demonstratives.

6        And what are we showing on Slide 2 here?

7   A.   What we're showing on Slide 2 is a simple demonstration

8   of the structure of a Code 128 symbol.  So to the left and

9   right, we have start and stop characters, to enable the

10  symbology to be distinguished from extraneous printing

11  material that can be on there.  The start character is

12  followed by a sequence of data characters, and immediately

13  before the stop character, in the case of Code 128, is a

14  symbol check character, which ensures that the preceding

15  information conforms to a mathematical rule.  And that's to

16  ensure that if, for example, there is a void in a bar or a

17  speck in a space, it is not misread.

18  Q.   If we could go to demonstrative Slide 3, please.

19       And could you please explain to the jury how a linear

20  barcode is decoded.

21  A.   Yes.  In this particular example, we've got the red laser

22  scan line that is crossing the symbol, and the symbol

23  character, an individual symbol character.  And in this

24  particular case it's made up of four bars and four spaces.

25       And what happens is that the scan line, as it crosses it,

PAUL CHARTIER - DIRECT

1  projects light onto the bars and spaces.  So the dark bars

2  actually absorb light, and the white spaces reflect light; and

3  that results in a signal that can be further analyzed to get

4  back, in theory and in practice, to this type of structure.

5  Q.    And if we could go to Slide 4 of your demonstratives.

6        What is this depicting?

7  A.    So this is depicting an actual scan line.  So the peaks

8  and the valleys that are in here are actually the measures of

9  the reflectance and the absorption of the light.

10       So if we look at the bottom blue arrow, it's pointing to

11 the position "Bars," and you can see there that the

12 reflectance, which is shown on the left-hand side, is -- is

13 very low; but if you look at the blue line at the top, you can

14 see that the spaces reflect a lot of light.

15 Q.    Is the vertical height of the bars of a linear barcode

16 symbology relevant to the encoding or decoding of the symbols?

17 A.    It is not relevant, and nor is the vertical height of

18 this particular profile as well.

19 Q.    If we could go to Slide 5 of your demonstratives.

20       Can you briefly describe what we're seeing on this slide,

21 please.

22 A.    Yes.  What we're seeing is two symbologies that are

23 related, one to another, that are actually encoding exactly

24 the same data.  So Figure 4 is showing a GS1 DataBar truncated

25 symbol, and because of what I know about the symbology, it's

PAUL CHARTIER - DIRECT

1  actually encoding data which is identical to the data that

2  would be encoded in a UPC symbol.

3      Figure 5 is a stacked DataBar symbol.  As you can see

4  from the circled data, it's exactly the same data as before,

5  but the difference is that the truncated symbol has been split

6  left to right from the midpoint, and the top row of stacked

7  symbol is showing the identical bar-space pattern as the

8  left-hand side of the top symbol, as can be seen by working

9  along and seeing the very wide bar that is there.

10     And the bottom part symbol is showing the right-hand side

11 of the symbol.  And if you work from the outside edge, you can

12 see there's a couple of reasonably thick bars, and they are

13 there at the bottom symbol.

14     So two symbologies representing exactly the same data,

15 and therefore, purpose.

16 Q.   And what kind of category of symbology is shown in Figure

17 4 from Slide 5 of your demonstratives?

18 A.   Figure 4 would be described as a linear symbology, and

19 Figure 5 by its name is stacked or multi-row.

20          THE COURT REPORTER:  I'm sorry, stacked what?

21          THE WITNESS:  I said from its name, the Figure 5 is

22 a stacked or a multi-row symbology.

23 Q.   Is there any difference in how the multi-row or stacked

24 symbology on the bottom is encoded or decoded as compared to

25 the linear symbology on the top of Slide 5 of your

PAUL CHARTIER - DIRECT

1  demonstratives?

2  A.    No.  As I mentioned earlier, because of the bar-space

3  pattern being identical in the top with the left- and

4  right-hand side, and having bar-space pattern top and bottom,

5  it's encoding exactly the same information, and that's

6  confirmed by the two blue circles.  The only difference is the

7  way the symbol is scanned.

8  Q.    If we could go to Slide 6 from your demonstratives.

9       And what are we seeing here on Slide 6?

10 A.    What we're seeing here on Slide 6 are the two most common

11 matrix symbologies, 2D matrix symbologies.  The top one is

12 showing QR code, and the bottom one is showing Data Matrix.

13 Q.    Is this the third type of -- or kind of symbology that

14 you referenced earlier?

15 A.    Yes.  This is what I would call a matrix symbology.

16 Q.    And can you briefly describe what a matrix symbology is?

17 A.    The matrix symbology encodes all of the data simply in

18 pixels that are black and white.  And I think it's probably

19 easier to look at the QR code to demonstrate what I mean.

20      There's also an element of overhead.  For example, the

21 square-shaped bull's eyes help orientate the symbol, so that

22 an image scanner can process and capture the entire image and

23 process it for decoding purposes.

24 Q.    Do these two-dimensional matrix symbols use the bar-space

25 patterns that we talked about with the linear and multi-row

PAUL CHARTIER - DIRECT

1  symbologies to decode data?

2  A.    No, they don't.  They literally encode data as 8-bit

3  codes in both of these cases.  Other symbologies use slightly

4  different rules, but they literally encode binary 1s and 0s in

5  an 8-bit pattern.

6  Q.    Are the decoding processes the same between linear and

7  multi-row symbologies and these matrix symbologies we see on

8  Slide 6 of your demonstratives?

9  A.    There's a fundamental distinction between linear and

10 multi-row on the one hand and these symbologies on the other.

11 These symbologies require the entire image to be captured

12 before any decoding can take place.

13 Q.    And when you say "these symbologies," what are you

14 referring to?

15 A.    I'm talking to the ones that are on the screen at the

16 moment, Slide 6, which is QR code Data Matrix.

17 Q.    Okay.  Let's switch gears from symbologies and talk about

18 scanning devices.

19      Are there different kinds of barcode scanning devices?

20 A.    Yes.  In particular, there -- as I mentioned before,

21 there's the laser scanner, there's also a simple CCD scanner,

22 and then there's an image-capture device that would be

23 required to read these symbologies, QR code and Data Matrix.

24 Q.    Let's go to demonstrative Slide 7.

25      And what are we seeing here?

PAUL CHARTIER - DIRECT

1  A.   What we're seeing here are some very old historical
2  graphics, but they explain the principles of both.
3       So on the left-hand side we have UPC scanning, and the
4  bed -- black bed that we can see there is projecting a series
5  of scan lines in a complex pattern.  So as the product is
6  moved across the scan base, there's at least one line that
7  crosses the symbol and will be able to decode the UPC symbol.
8       On the right-hand side is an early Symbol Technologies
9  handheld laser scanner, and there a laser scan beam is
10 projected onto the symbol, and that beam moves left to right,
11 right to left, over the symbol.
12      So it would read a linear symbology all in one go; and in
13 case of a multi-row symbology, you'd have to move the handheld
14 scanner up and down to capture all the rows in multi-row
15 symbology.
16 Q.   Just to be clear, what kind of scanners are these two
17 scanners shown on Slide 7 of your demonstratives?
18 A.   They're both laser scanners.  The difference -- there's a
19 fundamental difference from the one on the left-hand side,
20 that has sophistication to read UPC and EAN barcodes and
21 probably not much else, whereas the handheld one on the
22 right-hand side is capable to read and decode multiple
23 symbologies, linear and multi-row.
24 Q.   And you anticipated my next question.
25      What kind of barcode types or symbologies can laser

JA1231

PAUL CHARTIER - DIRECT

1  scanners read and decode?

2  A.    The one on the right can read linear and multi-row

3  symbologies.

4  Q.    Can laser scanners read matrix symbologies?

5  A.    No, they cannot.  Not read and decode.

6  Q.    In addition to laser scanners, you also mentioned CCD

7  scanners.

8  A.    Yes.

9  Q.    What is a CCD scanner?

10  A.    A CCD scanner is just, if you like, a simpler nonlaser

11  implementation to read linear, and in some cases multi-row

12  symbologies, because it presents -- floods the symbol with

13  light, and then the reflectance is picked up by a -- a set of

14  sensors, where individual pixels identify whether the -- it's

15  a dark bar or white space.

16  Q.    And what kind of barcode symbologies can CCD scanners

17  read?

18  A.    Because of the cost price and everything, the focus would

19  be predominantly on linear barcodes.  But they can also read

20  multi-row symbologies.

21  Q.    Can CCD scanners read matrix symbologies?

22  A.    Because they use the same scanning principle of trying to

23  pick up the reflectance of the bar-space pattern of a

24  symbology, then they cannot read a matrix symbology.  All they

25  would do is pick up the reflectance of the pixels that would

330

PAUL CHARTIER - DIRECT

1   be dark, light.

2   Q.   If we could go to demonstrative Slide 8.

3        And what do we see here?

4   A.   So this is something that most people, probably members

5   of the jury, might be familiar with, which is a QR code, and

6   being captured on a mobile phone.  And although this is a

7   popular way, it's exactly the same principle that was used

8   with a commercial image scanner.  The entire picture of the

9   symbol has to be captured before it can be decoded.

10       So here we've identified the black and white pattern, but

11  there is no certainty, until you go through the decode

12  process, that that is producing meaningful data.

13  Q.   If we could go to Slide 9 from your demonstratives.

14       What is Slide 9 depicting?

15  A.   So Slide 9 is going back to the PDF417 symbol structure.

16  So what it's depicting is in a similar way to what I was

17  describing earlier about Code 128.

18       So this has similarities.  It has the start pattern and a

19  stop pattern that basically distinguishes the symbol and its

20  content from other extraneous printing, and then it comprises

21  of left and right row indicators and data code words.

22       And the data code words are actually symbol characters

23  that comply with the rules of PDF417.  In other words, four

24  bars and four spaces to each symbol character over an element

25  with 17.

JA1233

PAUL CHARTIER - DIRECT

1  Q.   Of the categories of barcode symbologies that we've

2  discussed today, what type of symbology is PDF417?

3  A.   PDF417 is specified as a multi-row symbology.

4  Q.   Let's take a look at Slide 10 from your demonstratives,

5  please.

6       What is shown here?

7  A.   This is showing on the right-hand side a typical PDF417

8  symbol, and highlighted in the circle is the -- an individual

9  symbol character.  And we can see on the left-hand side, over

10 Figure 3, is the symbol character.  And it's very clear there

11 that it's got four bars and four spaces, and always follows

12 the rules of beginning with a bar and ending with a trailing

13 space over the 17 units.

14 Q.   Can we go to demonstrative Slide 11, please.

15      What are you demonstrating here?

16 A.   On the right-hand side there are three scan lines.  And

17 this is a simple demonstration of the way a laser scanner

18 would read a PDF417; in fact, it would produce multiple scan

19 lines, or choose one scan line that would be moved up and down

20 to pick up the information.

21      And so if we go to the left-hand side, we see there the

22 symbol character, for it to decode properly, requires the scan

23 line to clearly identify the widths of four bars and the four

24 spaces.

25 Q.   If we can go to demonstrative Slide 12, please.

PAUL CHARTIER - DIRECT

1    And what are these pictures showing?

2  A.   The right-hand picture is demonstrating a feature of

3  PDF417 which allows for cross-row scanning within a limited

4  capability.  So instead of being constrained to a precise

5  horizontal scan line between a row, it -- you can actually

6  tilt the scan line plus or minus ten degrees and pick up the

7  information.

8    So the left-hand symbol is showing a scan line that is

9  picking up, as you can see from the very bottom of the bar

10 element on the left-hand side, properly the full width of the

11 bar and the full width of the space.

12    The reality is is that image is a gross

13 oversimplification in terms of what it is, because the

14 width -- the height of such a symbol character would be the

15 height of one of those narrow bars or one of those narrow

16 spaces.  So that tilt angle is plus or minus ten degrees, or

17 thereabouts.

18 Q.   You referred to cross-row scanning.  In cross-row

19 scanning, are there any measurements being taken on a vertical

20 axis of the symbology or the symbol?

21 A.   No.  The information is encoded in the symbol characters.

22 So as it crosses, two things happen with cross-row scanning.

23 Each individual symbol character, if it meets the requirements

24 as shown on the left-hand side, with the scanner line

25 legitimately crossing all the four bar-space components, that

PAUL CHARTIER - DIRECT

1  will decode it and produce a code word.

2      If, on the other hand, that tilt angle is sharper --

3  remember, I said that that illustration is very much an

4  exaggeration -- the height would only be as wide as the narrow

5  type bars in there.  And so the situation would be that that

6  decode would be rejected, because it wouldn't comply with the

7  fundamental rules of the bar-space pattern that's required.

8  Q.    And let's take a look at demonstrative Slide 13, please.

9      What are we seeing here?

10  A.    On the right-hand side, we're showing an extreme --

11  probably unrealistic -- example of the scanner trying to scan

12  vertically.  So although it would pick up bar-space patterns,

13  it would be highly unlikely that any of those bar-space

14  patterns would actually comply with the NK structure of

15  PDF417, of having four bars and four spaces.

16      And that's very much illustrated in the left-hand symbol,

17  where the scan line is going through the bar on the left-hand

18  side, and it cannot pick up any information in that, because

19  it needs the additional spaces and bars to be meaningfully

20  decoded.

21  Q.    In the symbology shown on Slide 13 of your

22  demonstratives, which is PDF417, is any data encoded in the

23  vertical or Y-axis?

24  A.    There's no data encoded in the vertical or Y-axis that

25  can be decoded with a scan line.

PAUL CHARTIER - DIRECT

1  Q.   We've been talking about PDF417.  Are you familiar with a
2  symbology referred to as MicroPDF417?
3  A.   Yes.  MicroPDF417, by its name, is a miniature version of
4  PDF417.  So the symbol characters comply with the same rules
5  as PDF417.
6       The limiting factor is that, first of all, it encodes
7  less data; and secondly, there are different rules for
8  identifying the rows.  It actually eliminates the need for
9  proper start and stop characters.
10 Q.   And of the three types or categories of symbologies that
11 we've been discussing today -- linear symbology, multi-row
12 symbology, or matrix symbology -- what kind of symbology is
13 MicroPDF417?
14 A.   MicroPDF417 is a multi-row symbology.
15 Q.   Is there any difference in the way that PDF417 or
16 MicroPDF417 is decoded?
17 A.   The symbol characters are identical, and therefore it's
18 decoded at the symbol character level, as I showed on an
19 earlier slide.  In other words, the four bars, four spaces
20 need to be decoded to bring back the representations that can
21 be converted into a code word.
22 Q.   Are you familiar with the symbologies that are
23 collectively referred to as "composite code"?
24 A.   Yes, I am.
25 Q.   And what kind or type of the symbologies are composite

PAUL CHARTIER - DIRECT

1   codes?

2   A.   They are also multi-row symbologies.

3   Q.   Is there any difference in how composite codes are

4   decoded as compared to, for example, PDF417?

5   A.   No.  And I'll elaborate on that.

6        Two of the composite codes are based on MicroPDF417, with

7   slightly different rules for what data is encoded, and some

8   structural rules as well.  And in the case of Composite Code

9   C, it is based literally on a small version PDF417 symbol.

10            MR. VanHOUTAN:  Could we publish to the witness what

11  was previously identified or marked as Trial Exhibit 1001.

12  Q.   And, sir, could you refer to Tab 1 in the notebook in

13  front of you, which contains the same exhibit.

14  A.   Yes.

15  Q.   What is the document in front of you?

16  A.   This is the ISO standard for Data Matrix, and its full

17  title is ISO/IEC 16022.

18  Q.   And Data Matrix is what kind of symbology?

19  A.   It's a matrix symbology, as given by the title.

20  Q.   Did you consider this document, Exhibit 1001, in forming

21  your opinions in this case?

22  A.   I did.

23  Q.   Please turn to page 3 of the document.

24       Do you see Section 4.1 of page 3?

25  A.   I do.

PAUL CHARTIER - DIRECT

1    Q.    And if we could go to demonstrative Slide 14, please.

2         Can you read the sentence right below the word "4.1 Basic

3    characteristics"?

4    A.    Yes.  It says that Data Matrix is a two-dimensional

5    matrix symbology.

6    Q.    And if you could look down at subsection B of

7    Section 4.1.

8    A.    Yes.

9    Q.    Do you see that?

10   A.    I see that.  And it says "Representation of data:  A dark

11   module is a binary 1 and a light module is a zero."

12   Q.    And what does that mean?

13   A.    That means that the data that is submitted for encoding

14   into a Data Matrix symbol is presented as 8-bit binary code;

15   and the zeros and the ones are directly represented as dark

16   modules or light modules.

17   Q.    How does that compare to the linear and multi-row barcode

18   symbologies that we discussed earlier?

19   A.    Because they use bar and space patterns, the first thing

20   that they have, other than UPC, is they have a significant

21   amount of redundancy, so that a symbol that has a fault

22   instruction symbol character can be rejected; whereas in the

23   case of matrix symbologies, they use all the bits, and

24   therefore there is no redundancy at the symbol character

25   level.

PAUL CHARTIER - DIRECT

1    Q.   Is there a difference in how the linear and multi-row

2    symbologies are read and decoded as compared to matrix

3    symbologies?

4    A.   Yes.

5    Q.   What is that difference?

6    A.   The -- the fundamental difference is that the linear and

7    multi-row symbologies are read with a device such as a laser

8    scanner.  And as it crosses the entire symbol or row in a

9    multi-row symbology, it can actually identify an individual

10   symbol character and decode it.  In the case of a matrix

11   symbology, the entire image needs to be captured before any

12   processing can take place.

13   Q.   Can we go to -- can we go back to the demonstratives and

14   to demonstrative Slide 15, please.

15        And what do we see here on Slide 15?

16   A.   What we can see here on Slide 15 is a Data Matrix symbol.

17   And on the left-hand side, that's a little symbol; and on the

18   right-hand side is showing the structure, very faintly, of the

19   symbol characters that make up this particular size symbol.

20   Q.   If we could go to demonstrative Slide 16, please.

21   A.   This --

22   Q.   What do we -- sorry.

23   A.   This shows the features a lot better.

24   Q.   And what are we seeing here on Slide 16 of the

25   demonstratives?

PAUL CHARTIER - DIRECT

1  A.    Right.  So what we're seeing on the left-hand side is

2  what I was saying earlier about the 8-bit string of zeros and

3  ones.  And you can see that the second bit is a 1, and that is

4  encoded in position 2.2.  The fourth bit is a 1, and that is

5  encoded in position 2.4.  All the other bits are zero, and so

6  that's a direct representation.

7      The middle symbol is showing a Data Matrix regular symbol

8  character, which colloquially, as we were working on the ISO

9  standard, was given the nickname -- it's being accepted

10 sometimes -- as a "Utah," because it represents the boundaries

11 of that particular state in the United States.

12     The symbol on the right, the color-coding shows four

13 regular symbols from Data Matrix and a significant number of

14 irregular symbols.  So if we look at the very top row, we see

15 that symbol character 3 has only three elements, but you have

16 to go down to the bottom two rows to find the remainder.

17     So the situation with Data Matrix, and similarly with QR

18 code, is you can get an inconsistent arrangement, because of

19 the need to make it fit into a particular pattern.

20 Q.    And let's go to demonstrative Slide 17.

21     And can you tell us what we're seeing here?

22 A.    Yeah.  So this is a simple illustration, if you like.  So

23 if on the top right it had been possible to use a

24 regular-shaped Data Matrix symbol character, the two elements

25 that are shown in gray, it appears part of the same symbol

PAUL CHARTIER - DIRECT

1  character.  But because they're beyond the bounds of the size

2  of the symbol, they have to be moved over to the left-hand

3  side of the symbol.

4      And similarly, in the bottom, if we'd had -- there had

5  been a regular-shaped symbol, it would have had the 7.1, 7.2,

6  all the way through to 7.8 structure.  But because the 7.1,

7  7.3, 7.4 are outside of the bounds of the symbol, it has to be

8  moved over to the right-hand side.  And if you look in detail

9  at that image, you will see that there are a lot of irregular

10 patterns.

11     Some people might think that this is an extreme case, but

12 the reality is that as Data Matrix grows in size, it

13 introduces further constraints, such as vertical bars and

14 spaces, to ensure that it can be decoded properly.

15     So this principle carries through from the smallest Data

16 Matrix symbol up to the largest.  And as symbols get larger,

17 the complexity of the architecture, if you like, of the symbol

18 creates nearly as many irregular shapes as it does here.

19 Q.  Based on these irregular symbol characters, is Data

20 Matrix a continuous symbology?

21 A.  It is not a continuous one, basically for a few reasons.

22 One, you can see there that if it was a regular shape, even if

23 it was a regular shape, you would see -- if we look at the

24 very top right-hand one and assume that was a regular shape,

25 you would have 1.2 -- 1.3, 4 -- sorry -- yeah, 1.3, 4, 5; 1.6,

PAUL CHARTIER - DIRECT

1   1.7, 1.8.

2       So you've got those for range.  And so they -- they are

3   regular in sequence for what they're doing, but because

4   they're broken up and they're irregular, we -- we lose the --

5   any concept of continuous at all within the Data Matrix

6   symbol.  And the same would apply to a QR code as well.

7   Q.   If you were to take a laser or CCD scanner and scan one

8   row of this Data Matrix symbol, would it be able to decode any

9   data?

10  A.   All it would be able to do would be to identify whether

11  the pixels were dark or light.  And in the case, for example,

12  if a scan line went through the very top of the symbol, it

13  would pick something from a regular-shaped symbol and then get

14  bits from three irregular-shaped symbols.

15  Q.   Would it be able to decode any data?

16  A.   All it would pick up was a pattern -- if you remember the

17  scan reflectance profile, if that was applicable to this type

18  of symbol, what it would be would have a range of peaks and

19  troughs of the dark bars and spaces, but that would not be

20  able to be decoded in any meaningful manner.

21  Q.   If you took a laser or CCD scanner and ran it across the

22  whole of this matrix symbol, would that decode any data?

23  A.   The same applies, because what I've just described as an

24  incapability for the top row would apply anywhere through the

25  symbol, in terms of whatever -- what you can see, if you like,

PAUL CHARTIER - DIRECT

1  as a horizontal row, it would pick up bits of information from
2  different symbol characters.
3          MR. VanHOUTAN:  If we could publish to the witness
4  what's been previously identified as Trial Exhibit 1002.
5          And that's in Tab 2 of the binder in front of you.
6          And just to confirm, this is Trial Exhibit 1002.
7  Q.  Mr. Chartier, you've got a hard copy of Exhibit -- it's
8  Trial Exhibit 1002 in front of you.  What is this document?
9  A.  Yes, I have.  It's ISO/IEC 18004, which is the barcode
10  symbology specification for QR code.
11  Q.  Did you rely on this document in forming your opinions in
12  this case?
13  A.  Yes, I did.
14  Q.  If we could go to demonstrative Slide 18, please.
15          And if you could flip to page 4 of that exhibit.
16  A.  Yes.
17  Q.  Do you see Section 6.1 at the bottom?
18  A.  I do.
19  Q.  And it's also shown on Slide 18 of your demonstratives?
20  A.  It is.
21  Q.  And what is the first sentence following "Basic
22  characteristics"?
23  A.  The first sentence is "QR code is a matrix symbology with
24  the following characteristics."
25  Q.  So this is the third type of symbology category or kind

PAUL CHARTIER - DIRECT

1  we've talked about today?

2  A.   It is.

3  Q.   And is it the same symbology type as Data Matrix?

4  A.   Yes.

5  Q.   If you could look at subsection C on the next page of the

6  exhibit.

7  A.   I can see it.

8  Q.   And could you read the first sentence after

9  "Representation of data."

10  A.   "A dark module is nominally a binary 1, and a light

11  module is nominally a binary zero.

12  Q.   Are those the same ones and zeros that you were

13  discussing with reference to a Data Matrix?

14  A.   Yes, exactly the same principle.

15  Q.   If we could go to --

16  A.   8-bit binary represented in an 8-bit symbol.

17  Q.   If we could go to demonstrative Slide 19.

18       At a high level, what is being shown here?

19  A.   On the left-hand side is shown a real, but small, QR code

20  showing the architecture.  And if we look at that symbol, you

21  can see that there's a significant amount of overhead.  The

22  square shape bull's eye patterns are what they call finder

23  patterns, so that the symbol within the decoding procedure can

24  be reorientated into vertical or horizontal axis.

25       The black and white elements you can see there are

PAUL CHARTIER - DIRECT

1  tracking elements, again, because if the symbol is distorted,
2  it shows a problem.
3      So the finder patterns create an overhead.  The Data
4  Matrix has a simpler overhead in the small symbols we've
5  just -- the vertical line on the left and on the bottom
6  horizontal, but as the symbol gets bigger, it breaks it up
7  into more horizontal and vertical lines.
8      In the case of QR code, the bigger the QR code gets, the
9  more of the little square patterns appear in the symbol, so
10 that it can be continually readjusted in terms of alignment to
11 make sure that we can read all the pixels properly.
12     Then if we look at the gray area, we can see where data
13 is encoded, and typical with a symbology that has error
14 correction, we've got the data code words in gray and we've
15 got the error correction in white on the left-hand side.
16     It's probably better to look at the other graphics to the
17 right of the symbol.  So at the top, we have a regular QR code
18 symbology symbol that is reading upwards, and they change the
19 way they number.  They number from zero to 7 rather than 1 to
20 8, which is the same principle.
21     And then on the right-hand side, they're showing a QR
22 symbol character that is being read downwards, reading from
23 zero, 1 to 7.  And those patterns alternate.
24     There is also -- they sometimes call them "tiles."  So
25 there is also a horizontal tile, which is shown under letter 1

PAUL CHARTIER - DIRECT

1    there, and you can see that that goes zero, 1, 2, completely

2    different.

3        But then there's an irregular pattern where there is one

4    row, four pixels; another row of two pixels; followed by,

5    underneath, another row of two pixels.

6        And the point that I was making about the architecture of

7    the symbology, if you look at the smaller black and white

8    bull's eye pattern, you can see there that the symbol

9    characters in QR code have to be twisted around that -- that

10    finder pattern to be meaningful.

11        So you can see that Character 1 goes vertically, zero to

12    4, then across to 5, then 6 and 7; and a similar complex

13    structure for Character 2.

14        So in the case of QR code, it has the same type of issues

15    that Data Matrix has.  It has a combination of regular

16    patterns and irregular patterns, which means that you have to

17    identify all the pixels before you can get any meaningful

18    data.

19    Q.    Based on these irregular patterns that you mentioned, is

20    QR code a continuous symbology?

21    A.    It isn't continuous, as I said, because the sequence of

22    the bits changes; and so within a single character, it doesn't

23    follow the rules -- for example, like four bars and four

24    spaces, for PDF417 -- and then it's not continuous as well,

25    because you have a mixture of regular and irregular patterns

345

PAUL CHARTIER - DIRECT

1  making up the symbol.

2  Q.   If you used a laser or CCD scanner to scan a single row

3  of this QR symbol, would the scanner be able to decode any

4  data?

5  A.   If you scanned the top line, you would get an absolute

6  lot of noise, because it would absorb all of the darkness of

7  the finder pattern.  And as you work through, and if you sort

8  of went through somewhere in the middle, you would pick up the

9  pixels that are relevant to different QR code symbol

10  characters.  And as a result of that, you could not get any

11  meaningful information with a single scan line through a QR

12  code symbol.

13  Q.   What if you took a laser scanner or CCD scanner and ran

14  it across the whole image of this QR symbol?  Would it be able

15  to decode any data?

16  A.   You would have to capture the entire image.  So the only

17  way a laser could do that would be to capture the image and

18  effectively turn itself from being a laser scanner into being

19  an image scanner.

20  Q.   What kind of encoded data is a laser or CCD scanner

21  operable to decode?

22  A.   Because they were designed -- and if we think of PDF417

23  in its design concepts from people from Symbol, including Dr.

24  Wang, the idea was to produce a symbol structure, a symbol

25  character structure -- in the case of PDF417, the four bars

JA1248

PAUL CHARTIER - DIRECT

1  and spaces -- and to be able to decode that individual symbol

2  character.

3       I think I've mentioned this earlier in some of my

4  responses.

5       So a laser scanner and a linear CCD scanner would

6  actually be able to identify individual symbol characters and

7  confirm, yes or no, whether they complied with the rules of

8  that specific symbology.

9       If they didn't, they'd reject it.  If it was a linear

10 barcode, like Code 128, it would be a fail.  If it was a

11 multi-row symbology, like PDF417, that had error correction,

12 it would be a fail for the symbol character, but the

13 additional information or error correction would be able to

14 deal with that as a misread.

15 Q.   And the bar-space encoding that you mentioned, in your

16 opinion, is that one-dimensional or two-dimensional?

17 A.   The -- the pattern consistently for linear symbologies

18 and multi-row symbologies -- and the print quality standards

19 can form that -- take you right back to the rules for linear

20 barcode processing.

21      In other words, each symbol character needs to be coded,

22 decoded, left-right base of the structure of the bar-space

23 pattern.  Those patterns are different for different

24 symbologies, but once you know the symbology you're reading,

25 then you can pick up that information.

JA1249

PAUL CHARTIER - DIRECT

1  Q.   And let's take a look at what you're referring to as the
2  print quality standards.
3         MR. VanHOUTAN:  If we can publish to the witness
4  what was marked as Trial Exhibit 1003 and 1004.
5
6  Q.   And those are Tabs 3 and 4 in your notebook.
7       And what are these documents?
8  A.   These documents are the print quality standards.  The
9  first one on Tab 3 is ISO/IEC 15415, which is the print
10 quality standard for two-dimensional symbols; and the other
11 one is ISO/IEC 15416, which is the print quality for linear
12 symbols.
13 Q.   Did you rely on these documents in formulating your
14 opinions in this case?
15 A.   Yes, I did.
16 Q.   Who issues these standards?
17 A.   These standards are developed by a similar expert team
18 that developed symbology standards, and then going through the
19 process, they are ultimately published by ISO, the
20 International Organization for Standardization.
21 Q.   And ISO published the other two standards we were looking
22 at earlier?
23 A.    ISO published PDF417, and published QR code and Data
24 Matrix.
25 Q.   If we could go to demonstrative Slide 20, please.

PAUL CHARTIER - DIRECT

1    And how do the ISO print quality standards categorize the

2  various barcode symbologies?

3  A.   It identifies them -- this is from the 15415 standard --

4  and it basically says that they're categorized into linear

5  symbols on the one hand, and then two-dimensional symbols on

6  the other.

7    The latter may, in turn, be subdivided into multi-row

8  barcode symbols, sometimes referred to as stacked barcode

9  symbols, and two-dimensional matrix symbols.

10  Q.   And why are the two-dimensional symbols broken into two

11  subcategories?

12  A.   Because within this particular document, it treats the

13  rules for print quality fundamentally different.  And they all

14  refer back to the symbology specification.

15    So in the case of PDF417, defined here -- to be defined

16  within this document as a multi-row -- multi-row barcode

17  symbol, it would use the rules that were in the PDF standard

18  to do that.

19    In the case of Data Matrix, which it defines here as a

20  two-dimensional matrix symbol, it would use the rules for

21  decoding that I've defined in that standard.

22  Q.   If we could go to demonstrative Slide 21.

23    And do the print quality standards say whether multi-row

24  symbologies like PDF417 have the characteristics of a linear

25  or a matrix symbology?

PAUL CHARTIER - DIRECT

1  A.    They make it very clear that at symbol character level,
2  the characteristics are exactly the same as for linear.  So
3  based on this standard, a symbol character for PDF417 is no
4  different from a symbol -- a symbol character for Code 128 or
5  UPC.
6  Q.    And what are you showing here with this figure from
7  PDF417 on Slide 21 of your demonstratives?
8  A.    This is showing a PDF417 symbol, showing the scan line
9  crossing and being able to identify the bar and space widths.
10 It's the same type of graphic that was used before, but we
11 couldn't put any bar-space pattern in there that complied with
12 the rules of four bars, four spaces per the 17 units.
13 Q.    If we could go to demonstrative Slide 22.
14     And can you read the bold language from this paragraph,
15 please.
16 A.    Yes.  It says "Each row has those implied characteristics
17 of a linear barcode symbol.  Each row therefore may be read by
18 a linear symbol -- by linear symbol scanning techniques."
19 Q.    What does that mean?
20 A.    So what that means is that irrespective of the fact that
21 it's one row stacked over the other, that row by row, each
22 symbol character that is in a PDF417 symbol -- first of all,
23 symbol characters comply with rules that we just mentioned,
24 and it's continuous, because it means that you can read one
25 symbol character after another.

350

PAUL CHARTIER - DIRECT

1  Q.   And how does this compare to, say, a two-dimensional
2  matrix symbology like Data Matrix or QR code?
3  A.   They cannot use this type of line-by-line scanning, as I
4  mentioned before.  In fact, the entire image needs to be
5  captured before any processing can be done.
6       And if I could go back, this one, just a bit, that as
7  soon as sufficient symbol characters have been properly
8  decoded, PDF417 is considered to be decoded correctly; whereas
9  in the case of the matrix symbology, you have to take the
10 entire image before you can start the process.
11 Q.   If we could go to demonstrative Slide 23, please.
12      What do the ISO print quality standards say about how
13 two-dimensional matrix symbols must be read?
14 A.   Well, the first part is referring to what I've just been
15 talking about, about reading by linear scanner for multi-row.
16 But then it makes a very clear contrast with two-dimensional
17 matrix symbols.
18      So first of all, they have very defined square
19 rectangular shapes, and there are a number of these that are
20 defined.  Then within the symbol, there are just light and
21 dark modules, not conforming to a bar-space pattern.  Then you
22 have to identify the centers of those, using some grid
23 technique.  And to do that, you have to capture the entire
24 symbol to be analyzed two-dimensionally before it can be
25 decoded.

JA1253

PAUL CHARTIER - DIRECT

1          MR. VanHOUTAN:  If we could go and publish to the
2     witness what was previously marked as Trial Exhibit 1005.
3     Q.   And that's Tab 5 in your notebook.
4          What is this document?
5     A.   This is the ISO standard for PDF417.
6     Q.   And what is the number for the standard?
7     A.   This is -- standard is ISO/IEC 15438.
8     Q.   Did you consider this document in forming your opinions
9     in this case?
10    A.   Yes, I certainly did.
11    Q.   Can you remind us what the purpose of a standard
12    specification for a barcode symbology is?
13    A.   Yes.  So you could think, really, of two classes of
14    organization when we read this, and it won't necessarily be a
15    small end user, a mom-and-pop shop.
16              THE COURT REPORTER:  I'm sorry.  Could you repeat
17    that?
18              THE WITNESS:  Yes.  I said it would not be a small
19    user like a mom-and-pop store.
20              So what it would be would be a -- for example, a
21    technology company that was trying to produce the symbols,
22    say, on a label printing system; or it would be used by a
23    scanning company trying to produce the decoding, and they want
24    to make sure that both elements complied.
25              It would also be used generally by large

PAUL CHARTIER - DIRECT

 1  organizations that were making use of the standard so that
 2  they could get all of their members, their suppliers and
 3  everything, to comply.
 4          And it would be used in another way by an industry
 5  standards body to actually lay down rules of what was required
 6  for symbology.
 7  Q.  And I believe you testified about this earlier, but were
 8  you involved in the development of this standard?
 9  A.  Because this standard was fundamentally derived from the
10  European standard, I was involved with this as a member of the
11  appropriate working group.
12  Q.  If we could go to demonstrative Slide 24, please.
13          And referring to Slide 24, what does the standard say
14  about what kind of barcode symbology PDF417 is?
15  A.  So in Section 5.1.1, it lists a whole series of basic
16  characteristics.  And it -- the particular one that we've
17  highlighted here, under subheading G, is that it's code type
18  continuous, multi-row, two dimension.
19  Q.  And I think we've talked about "continuous" in the
20  context of the two matrix symbologies.  What does this mean
21  when it says it's continuous?
22  A.   In the case of the matrix symbology, I'm basically saying
23  it doesn't meet the requirements of being continuous.  It
24  fails that at two levels.  One, at the symbol character level;
25  and then the whole symbol.

PAUL CHARTIER - DIRECT

1    In the case of PDF417, "continuous" means that each
2    individual symbol character complies with the basic rule of
3    having four bars, four spaces, always beginning with a bar,
4    always ending with a trailing space.
5        Then continuous -- and then "continuous" then means that
6    one symbol character after another can be appended.  So either
7    in a row, or row by row.  The fact that it's the end of one
8    row, beginning of the -- of the next row, doesn't make any
9    difference.  It is still continuous.
10   Q.   If we could go to demonstrative Slide 25, please.
11       And what about the reference to two-dimensional in the
12   standard?
13   A.   Well, it is two-dimensional in the sense that it consists
14   of stacks of rows.  And so it's -- here the abstract is from
15   the ISO print quality standard, 15415.  And it says that all
16   two-dimensional multi-row barcode symbols are sometimes
17   referred to as stacked, where each symbol character has the
18   characteristics of a linear barcode symbol character, and that
19   was the bar-space pattern; and each row has the
20   characteristics of a linear barcode symbol.  In other words,
21   one symbol character after another.
22       As a result of that, the standard says it may be read
23   using linear scanning techniques.
24   Q.   And do the matrix symbologies, like Data Matrix and QR
25   code, comply with any of the bottom three bullet points on

PAUL CHARTIER - DIRECT

1   Slide 25 of the demonstratives?

2   A.   No, they don't.

3   Q.   If we could go to demonstrative Slide 26, please.

4        What are you showing there?

5   A.   So this is an abstract from the PDF417 standard we were

6   talking about, 15434.  And this is Annex J3, which is talking

7   about the reference decode algorithm for line decoding.

8        And what it says for line decoding is that you read each

9   symbol character, one out of five.  So you determine to get

10  the pitch, which is the edge to similar -- edge of one symbol

11  to the other one, and then the -- all the dimensions that are

12  highlighted underneath those are used to determine the

13  individual bar-space patterns.

14           THE COURT REPORTER:  I'm sorry.  Could you speak up,

15  and repeat.

16           THE WITNESS:  Yes, certainly.

17           So the graphic is showing you the pitch of an

18  individual symbol character, but the words are basically

19  saying that it is used for line decoding, which means that one

20  symbol after another has to be read for line decoding.  And

21  then the dimensions on the graphics underneath are showing how

22  the bar and space widths are determined.

23  Q.   Is that the same for the other matrix symbologies listed

24  in the two-dimensional print quality standard?  For example,

25  Data Matrix and QR code?

PAUL CHARTIER - DIRECT

1   A.   They don't work on this basis, because they don't have
2   the symbol structure rules that I mentioned before.
3            MR. VanHOUTAN:   If we could publish to the witness
4   what was previously marked as Trial Exhibit 1006.
5   Q.   And that's in Tab 6 of your binder.
6   A.   That's correct.
7   Q.   What is this document?
8   A.   This is an Opticon document identifying details of a
9   product labeled as OPR-2001 for, as stated here, a laser
10  barcode scanner.
11  Q.   Did you rely on this document in formulating your
12  opinions in this case?
13  A.   Yes, I did.
14  Q.   If we could go to demonstrative Slide 27, please.
15       Does this document describe the symbologies that this
16  OPTO product supports?
17  A.   Yes, it does.  In supported symbologies, it describes
18  them under three classes shown here.  The linear symbologies,
19  which it calls 1D; the special set of postal codes, which are
20  quite a bit different; and then it says "2D code."
21  Q.   And is PDF417 listed as a 2D code here?
22  A.   PDF417 is listed as a 2D code here.
23  Q.   If we could go to demonstrative Slide 28.
24       When documents such as this OPTO brochure refer to PDF417
25  as a 2D or two-dimensional symbology, according to the

JA1258

PAUL CHARTIER - DIRECT

1  standards, what does that mean?

2  A.   Both the print quality standard 15415 and also the PDF417

3  standard work on the fundamental basis that each symbol

4  character has the characteristics of a linear barcode symbol,

5  as I've just pointed out in Annex J from the PDF standard; and

6  each row that's abstract clearly made has the characteristics

7  of a linear barcode symbol.  And as a result, it may be read

8  using linear scanning techniques.

9  Q.   And can Data Matrix symbols like QR code or Data Matrix

10 be read using linear scanning techniques?

11 A.   No, they cannot.

12          MR. VanHOUTAN:  If we could publish to the witness

13 Exhibit 1007.

14 Q.   And that's also in Tab 7 of your binder.

15 A.   Yes.

16 Q.   What is this document?

17 A.   So this is the United States patent with the number

18 10,140,490.

19 Q.   And did you review this document during the course of

20 this litigation?

21 A.   Yes, I did.

22 Q.   Were you asked about this document during your

23 deposition?

24 A.   I was.

25 Q.   And were you asked about the document -- going back to

PAUL CHARTIER - DIRECT

1  Slide 28 of the demonstratives, this OPTO brochure -- were you
2  asked about it in your deposition?
3  A.   To my knowledge, it was linked to the two.
4  Q.   If we could go to demonstrative Slide 29, please.
5       Do you see the sentence that's also -- it's from the
6  patent, but it's also on the demonstrative, that indicates
7  what kind of symbologies are two-dimensional barcodes?
8  A.   Yes.  It mentions that two-dimensional codes, such as
9  PDF, QR, or Aztec code, are two-dimensional.
10 Q.   And you said "PDF"; did you mean PDF417?
11 A.   I meant PDF417.
12 Q.   Now, if we could go to demonstrative Slide 30, please.
13      When documents such as this OPTO patent refer to PDF417
14 as a 2D or two-dimensional symbology, according to the
15 standards, what does that mean?
16 A.   Okay.  So the reality is that the -- the key thing is the
17 symbology specification.  The symbology specification, as I've
18 just mentioned from the abstracts from Annex J, say that
19 symbol characters are read individually, and a line of symbol
20 characters is read as a line.
21      So from a symbology like PDF417, both the symbology
22 specification and the print quality standards treat it as a
23 two-dimensional multi-row barcode symbol.  And where each
24 symbol has the characteristics of a linear barcode symbol
25 character, and each row has the characteristics of a linear

PAUL CHARTIER - DIRECT

1  barcode symbol, as a result, may be read using linear scanning

2  techniques.

3  Q.   And do any of these excerpts from ISO/IEC 15415 that you

4  just read from Slide 30 of your demonstratives apply to the

5  two-dimensional matrix symbologies like Data Matrix or QR

6  code?

7  A.   They don't apply to Data Matrix, or QR code, or any other

8  matrix symbology.

9  Q.   If we could go to demonstrative Slide 31, please.

10       And we've got a reference to the QR code in the caption.

11  Do you see that?

12  A.   I see that, yes.

13  Q.   What is mentioned in the same line?  Do the standards

14  describe how QR code is read?

15  A.   Yes.  They -- both the QR code symbology specification

16  and the print quality standard 15415, from which we're taking

17  the abstract, describe the QR code as a two-dimensional matrix

18  symbol with that arrangement of dark and light modules, where

19  the centers need to be identified in the group pattern.

20       Those coordinates need to be known -- remember, I was

21  talking earlier about the regular and irregular patterns.  So

22  you have to pick them, and you also have to get rid of all the

23  extraneous architecture in the symbology.  So they must

24  therefore be analyzed two-dimensionally before it can be

25  decoded.

PAUL CHARTIER - CROSS

1  Q.   And do any of the bullet points that we're showing here

2  on Slide 31 from the demonstratives from ISO/IEC 15415 apply

3  to linear or multi-row symbologies?

4  A.   No, they do not.

5  Q.   So how does the print quality standard ISO/IEC 15415

6  treat Data Matrix symbologies on the one hand and linear and

7  multi-row symbologies on the other?

8  A.   It accepts the name of them being two-dimensional, but

9  from that point onwards it fundamentally splits them into two

10  categories, which is being the basis of my expert opinion.

11      And the matrix symbologies always have to have the entire

12  image captured before it can be processed, and in the case of

13  a multi-row symbology like PDF417, you can begin to get

14  meaningful interpretation from a single character to a code

15  word as soon as a scan line crosses from the four-bar-space

16  pattern of a legitimate symbol character.

17          MR. VanHOUTAN:  I'll pass the witness.

18                    CROSS EXAMINATION

19  BY MR. STEVENS:

20  Q.   Good afternoon, Mr. Chartier.

21  A.   Good afternoon.

22          THE COURT:  Does any member of the jury need a

23  break?

24          THE JURY:  (No response.)

25  Q.   As I introduced myself at the beginning, my name is Scott

PAUL CHARTIER - CROSS

1  Stevens.  I'm one of the attorneys representing Honeywell in

2  this case.

3       Do you understand that, sir?

4  A.   I do understand that.

5  Q.   And you and I have met at a deposition over here in the

6  UK about two months ago.  Is that correct?

7  A.   That is about correct, yeah.  That's fine.

8  Q.   So I'd like to begin our discussion with some things that

9  you did in relation to this case.  Is that fair?

10  A.   Yes, certainly.

11  Q.   Okay.  Great.

12      You have not spoken to any OPTO engineer with respect to

13  your work on this case; is that correct?

14  A.   That is correct.

15  Q.   Okay.  You didn't review any of OPTO's source code for

16  the products at issue in this litigation; is that right?

17  A.   That is correct.

18  Q.   And you didn't use or test any OPTO product with respect

19  to your work on this matter.  Is that correct, sir?

20  A.   I carried out no test of any code.

21  Q.   And you have never seen the contract between Honeywell

22  and OPTO that gave rise to this litigation; is that right?

23  A.   No.  That is correct.  As we discussed in the deposition,

24  all I had was a phrase of the contract.

25  Q.   Okay.  In fact, the lawyers for OPTO sent you one

PAUL CHARTIER - CROSS

1   solitary sentence from the contract.  Is that correct, sir?

2   A.   That is correct.

3   Q.   And the one sentence that they sent you says:  "The term

4   '2D Barcode Products' shall mean any device or article of

5   manufacture that is operable to decode at least one or more

6   two-dimensional barcode symbologies into human-readable text."

7        Is that right, sir?  Is that correct, sir?

8   A.   That is correct.  But the focus was on "operable to

9   decode."

10  Q.   Okay.

11  A.   And not the rest of the sentence.

12  Q.   That's the only sentence that they sent you --

13  A.   That's the only --

14  Q.   -- is that right?

15  A.   -- thing I've seen.

16  Q.   Okay.  For example, OPTO's lawyers didn't send you the

17  second or the third sentence in the definition of 2D Barcode

18  Products; is that correct?

19  A.   I had no additional information from lawyers or

20  engineers.

21  Q.   And you would assume that the OPTO lawyers provided you

22  with the sentence that they found most pertinent to the

23  contract.  Is that fair?

24  A.   I presume so.  But I'm not in their position.

25  Q.   Can you identify for me any innovations that OPTO or

PAUL CHARTIER - CROSS

1  Opticon has made to barcode readers over the past few decades?

2  A.   No, because as I mentioned before, I am not involved with

3  that side of the technology.  So I don't monitor who's

4  developed what and the like.

5  Q.   Now, during your direct testimony we heard a lot about

6  linear or 1D symbologies.  Do you recall talking about linear

7  symbologies with your lawyer?

8  A.   Yes.

9  Q.   Now, during your deposition you told me that the

10 definition of a linear symbology is, quote, "a symbology where

11 a scan line crosses through all the symbol characters and

12 decodes those symbol characters into, in some cases, a code

13 word, and in some cases, directly into data."  Is that

14 correct, sir?

15 A.   That is correct.

16 Q.   And you agree with me that the PDF417 symbology is not a

17 linear symbology.  Is that correct?

18 A.   That is correct.

19 Q.   And MicroPDF417 is not a linear symbology.  Is that

20 correct?

21 A.   It is not a linear symbology.  It is decoded as a linear

22 symbology.

23 Q.   Sir, yes or no:  Is MicroPDF417, as a symbology, is that

24 a linear symbology?

25 A.   It is not a linear symbology.

PAUL CHARTIER - CROSS

1   Q.   Okay.  And are composite codes -- for example, CCA, CCB,
2   and CCC -- are those linear symbologies, sir?
3   A.   They are multi-row symbologies.
4   Q.   So they are not linear symbologies; is that correct?
5   A.   They are not linear symbologies.
6   Q.   Okay.  And when I look at a PDF417 or MicroPDF417 symbol
7   on a piece of paper, it's presented as a two-dimensional
8   symbol; is that correct, sir?
9   A.   It's presented as a stacked symbol, with one row
10  underneath another.
11  Q.   Sir, it's presented as a two-dimensional symbol.  Is that
12  right?
13  A.   The same, for example, UPC would be presented as a
14  two-dimensional symbol.
15  Q.   Sir, I'd like to ask you to look at the back of your
16  binder, and you'll find the deposition, which is the words
17  that you and I exchanged two months ago.
18       Could you please find that, please.
19  A.   You say at the back?
20  Q.   Yes, sir.  It's in Volume 2 of the binder you have in
21  front of you.
22  A.   This is Volume 1.
23  Q.   Can you have Volume 2, please, sir.
24       I'd ask you to turn, when you get there, to page 53.
25       Before that, sir.

PAUL CHARTIER - CROSS

1    A.   For clarification, you mean the small numbers?

2    Q.   Correct.

3    A.   Thank you.

4         Yes.

5    Q.   Okay.  And do you see line 22?

6    A.   I do.

7    Q.   Okay.  And I asked you the question, "So as if I look at

8    a piece of paper with a PDF417 symbology on it, that is

9    two-dimensional; is that correct?"

10        And then you answer, "It's -- it's presented as a

11   two-dimensional format."

12        Is that the testimony that you gave two months ago when

13   we sat here?

14   A.   That is the testimony I gave.

15   Q.   Okay.  And additionally, MicroPDF417 and composite codes

16   are also presented in a two-dimensional -- as a

17   two-dimensional symbol; is that right, sir?

18   A.   That is correct.

19   Q.   And in each of PDF417 and MicroPDF417 and composite

20   codes, the symbol characters are arranged in a layout with

21   rows and columns.  Is that right, sir?

22   A.   They are arranged in -- in rows, but not necessarily

23   columns.  In the encoding process, the requirement is to print

24   a complete string of code words, which are then encoded in the

25   symbol, depending on the instructions -- for example, by a

PAUL CHARTIER - CROSS

1  label -- label printing software -- to fit in.

2      And in fact the PDF417 specification makes it very clear

3  that the rows-and-columns structure is an iterative process,

4  to create within the constraints of, for example, a label

5  size, what an application requires, and so forth.

6      So the situation is you create a string of code -- code

7  words, and they are then presented into the rules that make a

8  label.

9  Q.    Sir, is the following true, or is the following not true:

10 The symbol characters in a PDF417 symbol are arranged in a

11 layout which results in them being in rows and columns.  Is

12 that true or untrue, sir?

13 A.    They are presented in a format which -- depending on how

14 the user defines it, into specific cells within an arrangement

15 of rows and columns.

16 Q.    Now, the PDF417 symbol matrix is defined in two stages,

17 one of which is in fact defining a simple matrix of rows and

18 columns.  Is that true, sir?

19 A.    That is true, as part of the decoding process.

20 Q.    And you agree that the standard for PDF417 classifies it

21 as two-dimensional.  Is that correct?

22 A.    It classifies it as two-dimensional multi-row.

23 Q.    Okay.  And as you told me in your deposition a couple

24 months ago, you're not going to say that that classification

25 is incorrect, right?

PAUL CHARTIER - CROSS

1  A.    Both elements are integral to the definition of PDF417.
2  Multi-row, two-dimensional.
3  Q.    Okay.  Now, during your direct testimony, you discussed
4  your work on a European standard for PDF417.
5       Do you recall that, sir?
6  A.    I do.
7  Q.    And your role on that project was as the project editor.
8  Is that right?
9  A.    That is correct.
10 Q.    And so you were nominated, and then you were approved as
11 project editor by the 30-plus member country delegations.  Do
12 I have that right?
13 A.    It's less than 30 countries, because effectively what
14 happens is the experts are nominated by their countries; then,
15 from the experts, someone is selected as project editor, and
16 that is then confirmed by the immediate committee, not all the
17 members of the European standards.
18 Q.    Okay.  You were nominated and approved by that effort as
19 the project editor; is that fair?
20 A.    That is correct.  That is correct.
21 Q.    Okay.  In other words, you were the primary drafter of
22 that standard, correct?
23 A.    I was the person that put the words on paper that went
24 onto a computer that represented the views of the experts in
25 that working group.

PAUL CHARTIER - CROSS

1  Q.   Okay.

2  A.   So that is, for example, fundamentally different to

3  someone who would be drafting a patent.

4  Q.   And you were the primary scribe for that document; is

5  that right?

6  A.   Primary scribe simply because the project editor is

7  always the primary scribe.

8  Q.   Okay.  Now, when you circulated the draft, everyone gets

9  a chance to vote on it, right?

10 A.   It goes through phases, but the answer is progressively

11 yes, with a wider circle of participants.

12 Q.   Okay.  And when you did that with the European standard

13 for which you were the project editor, there were no "no"

14 votes; there were no dissenting votes.  Correct?

15 A.   I can't remember -- I couldn't categorically say there

16 were no dissenting votes.

17      But what I can say is before publication, it had to meet

18 the minimum requirements of a number of approvals.  And so,

19 for example, if a country abstained, then their vote wouldn't

20 count.

21 Q.   Right.  And you told me at your deposition that maybe

22 countries voted "yes," maybe they abstained, but none of them

23 voted "no."  Is that right?

24 A.   I -- no.  I cannot state that categorically.  What I can

25 say is that the countries that voted yea or nay, there were

368

PAUL CHARTIER - CROSS

1  enough positive votes to meet the criteria for publication.

2  Q.   Okay.  Can you turn in your deposition to page 40,

3  please.

4       I took your deposition two months ago.  You raised your

5  right hand and you were under oath.  Is that right?

6  A.   That is correct.

7  Q.   And at lines 23 through 25, I asked you, "And were there

8  any nays?  Were there any negative votes?"

9       And your answer was "No."

10      Did I ask you that question and did you give that

11  testimony?

12  A.   I gave you that.  That is correct.

13  Q.   And the standard -- the work that you did on the European

14  standard was the accepted groundwork for the later-in-time ISO

15  or ISO standard.  Is that right?

16  A.   That is correct.

17  Q.   Okay.  So I'd like for you to turn in your binder to

18  Plaintiff's Exhibit 13, please.

19      It's going to probably be in the other binder.

20      Sir, Plaintiff's Exhibit 13 is the ENV 12925 standard,

21  the European standard for which you were the project editor;

22  is that right?

23  A.   That is correct.

24  Q.   Again, you're the primary scribe of this document that we

25  see here as Plaintiff's 13; is that right?

JA1271

PAUL CHARTIER - CROSS

1  A.   Exactly as I've qualified.  A scribe is a person tasked
2  by the -- the working group to write the views of the working
3  group.
4  Q.   Okay.  So your words here reflect the views of the whole
5  working group.  Fair?
6  A.   That is fair.
7  Q.   Okay.  So let's turn to page 5 of the document.  You'll
8  see in the upper right it will say "page 5."
9       And here on page 5 we see a foreword.  Is that correct,
10 sir?
11 A.   That is correct.
12 Q.   Okay.  And let's read together what you wrote at the
13 time.  You said here, quote, "The technology of barcoding is
14 based on the recognition of patterns encoded in bars and
15 spaces of defined dimensions.  There are various methods of
16 encoding information in barcode form, known as symbologies.
17 And the rules defining the translation of characters into bar
18 and space patterns and other essential features are known as
19 the symbology specification."
20      Did I read that correctly, sir?
21 A.   You did.
22 Q.   And next in the foreword it says, quote, "Symbologies are
23 of two broad categories."
24      Did I read that correctly, sir?
25 A.   You did.

JA1272

PAUL CHARTIER - CROSS

1  Q.   And the first of those two categories states, quote, "A
2  traditional simple format of linear symbologies where data is
3  encoded as a single string from left to right."
4       Did I read that correctly, sir?
5  A.   You did.
6  Q.   And the second of the two categories, the foreword states
7  here, quote, "A more sophisticated format of two-dimensional
8  symbologies where data is encoded in an arrangement of rows
9  and columns."
10      Did I read that correctly, sir?
11 A.   You did.
12 Q.   So the foreword says that there are two categories of
13 symbologies, one being linear symbologies and the other being
14 two-dimensional symbologies.  That's what it says here,
15 correct?
16 A.   Yes.
17      Could I qualify that?
18 Q.   No, sir.  Your counsel will have further time to ask you
19 questions if you like.
20      And beneath that you were the primary scribe of the
21 sentence that states, quote, "PDF417 is a two-dimensional
22 symbology," end quote.
23      Did I read that correctly sir?
24 A.   You did.
25 Q.   So this document that you were the project editor for,

JA1273

PAUL CHARTIER - CROSS

1  that expressed the views of the group, says, quote, "PDF417 is
2  a two-dimensional symbology," end quote.
3       Do I have that correct, sir?
4  A.   Yes, you did.
5  Q.   Let's turn to page 14 of that document.
6       I beg your pardon, sir; page 9 of the document, please.
7  My mistake.
8       And here on page 9 we see a section entitled
9  "Requirements"; is that right?
10 A.   That's correct.
11 Q.   And underneath that, Section 4.1, "Symbology
12 Characteristics"; and 4.1.1, "Basic characteristics."  Do I
13 have that right?
14 A.   That is correct.
15 Q.   And then the next line says, "PDF417 is a multi-row
16 symbology with the following basic characteristics."
17      Do I have that right, sir?
18 A.   It does, and it emphasizes "multi-row symbology."
19 Q.   And then if we flip to the next page, one of those
20 characteristics listed here in -- as G, it says, quote, "Code
21 type, continuous, multi-row two-dimensional."
22      Did I read that correctly, sir?
23 A.   You did.
24 Q.   Okay.  On the next page, we see an example of a PDF417
25 symbol.  Do you see that there, sir?

PAUL CHARTIER - CROSS

1  A.   I do.

2  Q.   And am I correct that every PDF417 symbol includes a

3  minimum of 3 rows?

4  A.   It does.

5  Q.   It's not valid if it only has one row; is that right?

6  A.   That is correct.

7  Q.   Okay.  And every PDF417 symbol has a maximum of 90

8  columns.  Is that right?

9       I'm sorry, I misspoke.  Let me ask that again.

10      Has a maximum of 90 rows; is that correct?

11 A.   Yes.

12 Q.   Okay.  So every symbol will have between 3 and 90 rows,

13 correct?

14 A.   That is correct.

15 Q.   All right.  And each PDF417 symbol has between 3 and 32

16 columns of code words.  Is that right, sir?

17 A.   It has between 1 to 30 symbol characters, because the

18 other columns are part of the overhead symbology.

19 Q.   Okay.  Again, whether it's part of the overhead or the

20 data, there will be no fewer than 3 columns of code words and

21 no more than 32 columns of code words.  Is that right, sir?

22 A.   No, that is not correct.

23 Q.   Okay.

24 A.   That is not correct.

25 Q.   Let me ask you this:  As far as the data goes, there's

373

PAUL CHARTIER - CROSS

1  somewhere between 1 and 30 columns of encoded data.  Is that

2  right?

3  A.    That is correct.

4  Q.    Okay.  So now let me ask you to look at Plaintiff's

5  Exhibit 5.  I believe it's the first document in the binder

6  before you, sir.

7       And, sir, Plaintiff's 5 is a copy of the current standard

8  for the PDF417 symbology.  Is that right?

9  A.    That is correct.

10 Q.    And as you told me, this is the definitive reference for

11 PDF417.  Is that right?

12 A.    That is correct.

13 Q.    It's the authoritative guide to PDF417.  Fair?

14 A.    The authoritative specification.

15 Q.    And that's not just something that you know; people in

16 the industry recognize this as the authoritative guide.

17 Correct?

18 A.    Yes.

19 Q.    All right.  And this standard is dated 2015, but it was

20 reaffirmed in 2021; it's still applicable as we sit here today

21 in 2023.  Correct?

22 A.    Exactly as I reported previously.

23 Q.    So let me ask you to turn to page 4 and 5.  It's numbered

24 on the lower left and right corner.

25      And on page 4, similar to the European standard, we see a

JA1276

PAUL CHARTIER - CROSS

1  section here called "Requirements."  And underneath that,
2  "Symbology Characteristics," and underneath that, "Basic
3  Characteristics."
4       Is that correct, sir?
5  A.   That is correct.
6  Q.   And it states:  "PDF417 is a barcode symbology with the
7  following basic characteristics."
8       Did I read that correctly, sir?
9  A.   You did.
10 Q.   And one of those characteristics, found on the next page,
11 is, quote, "Code type, continuous, multi-row two-dimensional."
12      Do I have that right, sir?
13 A.   Could you point me specifically to where --
14 Q.   I'm happy to.  On page 5 --
15 A.   Yes.
16 Q.   -- at item G.
17 A.   Right.
18 Q.   One of the basic characteristics of PDF417 is, quote,
19 "Code type, continuous, multi-row two-dimensional."  Is that
20 right, sir?
21 A.   That is correct.
22 Q.   And this is a standard that you consider stable, correct?
23 A.   Not only do I consider it stable, I think the industry
24 considers it stable.
25 Q.   Okay.  During your direct testimony, you also discussed

PAUL CHARTIER - CROSS

1  print quality standards.  Do you recall that, sir?

2  A.    I do.

3  Q.    All right.  Let's look at Plaintiff's Exhibit 12 if we

4  can.

5        And this is the barcode symbol print quality test

6  specification specifically for two-dimensional symbols.  Is

7  that right?

8  A.    That is correct.

9  Q.    And this is the print quality test specification that

10  applies to PDF417 and other 2D symbologies; is that right?

11  A.    That is correct.

12  Q.    Okay.  This is also the specification that applies to

13  composite codes CCA, CCB, and CCC.  Is that correct, sir?

14  A.    Yes.

15  Q.    I'm going to ask you to turn to page little Roman "vi,"

16  little romanette 6, please.

17        Let me know when you're there.

18  A.    I'm there.

19  Q.    And you discussed some of the words on this page with

20  your counsel during your direct testimony.  Is that right,

21  sir?

22  A.    Effectively, yes, but not -- nothing specifically.

23  Q.    Okay.  So if we look at the introduction, I want to look

24  at the second sentence.  And it says, quote, "Symbology

25  specifications may be categorized into those for linear

376

PAUL CHARTIER - CROSS

1  symbols on the one hand and two-dimensional symbols on the
2  other."
3      Do you see that, sir?
4  A.   I do, and I see the rest of that sentence.
5  Q.   It goes on from there, and we'll come back to that.
6      Just want to be clear:  Again, your testimony is that
7  PDF417, MicroPDF417, and composite codes are not linear
8  symbologies, correct?
9  A.   That is correct.
10 Q.   Okay.  The sentence goes on from there to say, "The
11 latter" -- and the "the latter" is referring to
12 two-dimensional symbols -- that's right, right?
13 A.   That is correct.
14 Q.   Okay.  So these two-dimensional symbols may in turn be
15 divided into multi-row barcode symbols, sometimes referred to
16 as stacked barcode symbols, and two-dimensional matrix
17 symbols.
18      Did I read that correctly, sir?
19 A.   You did.
20 Q.   So the multi-row symbols, including things like PDF417,
21 MicroPDF417, and composite codes, are classified as
22 two-dimensional codes by the standard.  Is that right?
23 A.   They're classified as two-dimensional multi-row
24 symbologies, sir.
25 Q.   They're not classified as linear or one-dimensional,

JA1279

PAUL CHARTIER - CROSS

1    correct?

2    A.    That is correct.

3    Q.    Okay.  So from a broad classification point of view,

4    PDF417, MicroPDF417, and composite codes are classified as

5    two-dimensional.  Correct?

6    A.    As I said, with the qualifications of those two important

7    subcategories.

8    Q.    And lest there be any doubt, let's look at the end, in

9    the bibliography, which you'll find near the second-to-last

10   page.  It will have a "42" on the bottom of the document.

11       And so specifically as one of these two-dimensional

12   multi-row symbols with cross-row scanning ability, the

13   standard points to PDF417.  Is that right?

14   A.    It does.

15   Q.    And as another example of a two-dimensional multi-row

16   symbol with cross-row scanning ability, it also points to

17   MicroPDF417; is that right?

18   A.    That is correct.

19   Q.    Okay.  During your direct testimony, you made reference

20   to Mr. Wang and Symbol Technologies.  Did I hear that

21   correctly?

22   A.    I made reference to Dr. Wang, yes.

23   Q.    Dr. Wang and Symbol Technologies.

24       So I'd like for you to look at Plaintiff's Exhibit 17,

25   please.  It might be in the other binder.

378

PAUL CHARTIER - CROSS

1    A.   I think it is.

2    Q.   Do you have that in front of you, sir?

3    A.   I do, yes.

4    Q.   And Plaintiff's Exhibit 17 is a copy of United States

5    Patent Number 5,304,786.  Is that correct?

6    A.   That is correct.

7    Q.   And one of the inventors on this is the same Dr. Wang

8    that you spoke of a moment ago.  Is that right?

9    A.   Correct.

10   Q.   And you were aware of this patent -- I'm going to just

11   call it by its last three digits -- you were aware of the '786

12   patent before your work in this case began; is that right?

13   A.   That is correct.

14   Q.   Okay.  And this is one of the original patents that

15   disclosed the PDF417 symbology.  True?

16   A.   True.

17   Q.   Okay.  The title of the patent is, quote, "High-density

18   two-dimensional barcode symbol."  Correct?

19   A.   Correct.

20   Q.   And would you agree with me that throughout the '786

21   patent, it refers to PDF417 as a two-dimensional symbology.

22   Is that correct?

23   A.   That is correct.

24   Q.   And if we look at Figure 21, which will be the last of

25   the figures, can you confirm for me that that is a laser-based

JA1281

PAUL CHARTIER - CROSS

1  barcode reader?

2  A.  Yes.

3  Q.  So even as far back as this, it was known in the industry

4  that a laser-based barcode reader could be operable to decode

5  PDF417.  Is that right?

6  A.  My understanding is the objective of Symbol Technologies

7  was to make PDF417 readable with a laser.

8  Q.  Okay.  So PDF417 and MicroPDF417 symbologies can be read

9  by laser-based and CCD-based scanners.  Is that correct?

10  A.  That is correct.

11  Q.  And so if a company desires to put in the right software,

12  laser-based scanners and CCD-based scanners can be operable to

13  decode PDF417, MicroPDF417, and composite codes.  Is that

14  right?

15  A.  That is so.

16  Q.  I'd like to look back at the '786 patent.  If I could

17  direct your attention to Columns 3 and 4, please.

18      Take your time, and let me know when you're on that page.

19  A.  I'm on the page.

20  Q.  Okay.  If we look under the summary of the invention, one

21  of the things that Dr. Wang says is, quote, "The present

22  invention provides an improved high-density two-dimensional

23  symbology as well as a flexible method for using the symbology

24  to encode and decode data."

25      Did I read that correctly?

PAUL CHARTIER - CROSS

1  A.   You did.

2  Q.   And -- and you agree with Dr. -- what Dr. Wang has said

3  there.  Correct?

4  A.   I cannot disagree with what he wrote, because I wasn't

5  there when he wrote it.

6  Q.   Okay.  It further reports, quote, "The symbology may be

7  used to create a high-density two-dimensional barcode symbol,

8  which in turn may be used in a computer system."

9       Did I read that correctly?

10 A.   You did.

11 Q.   And you cannot disagree with that; in fact you agree with

12 that, don't you?

13 A.   I do agree with that.

14 Q.   Okay.  And as part of your work for OPTO, before you --

15 you can look away from the patent for a second, sir.

16      Before your work on this case, did you have the

17 opportunity before your deposition to review any OPTO patents?

18 A.   I did not review any OPTO patents until you showed me the

19 first one last time we met.

20 Q.   Wonderful.  So just to be clear, OPTO's counsel did not

21 provide you, during your work before the deposition, with any

22 of OPTO or Opticon's patents; is that right?

23 A.   That is correct.

24 Q.   Okay.  Now, I'd like to look at the patent that your

25 counsel looked at with you during the direct examination.

PAUL CHARTIER - CROSS

1   It's Plaintiff's Exhibit 207, and I believe it's in one of the

2   folders in the other binder, stuck in the very back flap of

3   that binder.

4   A.   This document?

5   Q.   Yes, sir.

6   A.   Thank you.

7   Q.   And so this is a copy of United States Patent 10,140,490.

8   And it's the same patent that you discussed with your counsel

9   during your direct testimony.  Is that right?

10  A.   That is correct.

11  Q.   And this is one of OPTO or Opticon, the defendant in this

12  case, this is one of their patents.  Do I have that right?

13  A.   That's what it says here, yeah.

14  Q.   And this patent applies to laser-based readers; is that

15  true?

16  A.   It does.

17  Q.   Okay.  I'd ask you to turn with me to Column 11, please.

18  It should be the very last page.

19  A.   I can see it.

20  Q.   If we look at the first full paragraph in Column 11, it

21  begins with the word "Optical."

22       Do you see that there, sir?

23  A.   I see that, yes.

24  Q.   And so what Opticon told the patent office, long before

25  we arrived at this courthouse for this litigation, Opticon

PAUL CHARTIER - CROSS

1  said, quote, "Optical information read by the optical

2  information reader, including the module for the optical

3  information reader, according to the invention, is not limited

4  to barcodes but may be various kinds of two-dimensional codes,

5  such as PDF417, a QR code, an Aztec code."

6      Did I read that correctly, sir?

7  A.   You did.

8  Q.   And you agree with me here that OPTO itself was referring

9  to PDF417 as a two-dimensional code in a document it filed

10  with the United States Patent Office.

11  A.   That appears to be the case.

12  Q.   And you are not going to disagree with what OPTO told the

13  U.S. Patent Office, correct?

14  A.   Correct.  I have no way of agreeing or disagreeing.

15  Q.   So I'd like to summarize some of our discussion -- you

16  can put that aside, if you'd like, sir.

17      I'd like to summarize some of our discussion regarding

18  PDF417.  In the European standard and in the print quality

19  standard, they both recognize that symbologies are of two

20  broad categories:  Linear symbologies on the one hand, and 2D

21  symbologies on the other hand.  Correct?

22  A.   Correct.

23  Q.   And both the European standard as well as the print

24  quality standard, within those two buckets, it places PDF417,

25  MicroPDF417, and composite codes in the two-dimensional

PAUL CHARTIER - CROSS

1   symbology bucket.  Is that correct?

2   A.   It's correct, but we need to understand the corollary.

3   PDF417, as a European standard, was worked on and published

4   before the existence of even a working draft for Data Matrix,

5   MaxiCode, or QR code.  So the definitions that were put in

6   those early documents simply split it into two.

7       By the time we get to the print quality standards, as you

8   yourself mentioned in the bibliography, from the 2D print

9   quality standards, there's a whole bibliography which

10  subdivides the symbologies into a finer graduation in terms of

11  their logic.

12  Q.   Sir, even in the print quality guidelines, they

13  categorize PDF417 and MicroPDF417 as within the general

14  construct of two-dimensional symbologies.  Is that true, sir?

15  A.   Only at a high level, based on the title of the standard.

16  But within the technical structure of the standard, there is a

17  fundamental difference between multi-row symbologies and

18  matrix symbologies.

19  Q.   And that document and your testimony today makes it clear

20  that PDF417 and MicroPDF417 and composite codes, they are not

21  linear symbologies, correct?

22  A.   That is correct.

23  Q.   Okay.  Again, the standard for which you were the project

24  editor says, quote, "PDF417 is a two-dimensional symbology."

25  Do I have that right?

384

PAUL CHARTIER - CROSS

1  A.   Yes.

2  Q.   And the PDF417 standard in place today calls it a

3  multi-row two-dimensional symbology.  Correct?

4  A.   Correct.

5  Q.   And you told me again in your deposition that you're not

6  going to tell the jury that the standard is wrong when it

7  calls it a multi-row two-dimensional symbology, right?

8  A.   No.  I cannot object, because that's the words that are

9  written there.

10  Q.   Okay.  Now, when a company makes a laser-based or a

11  CCD-based barcode reader, it has the option to put in the

12  software to make it operable to decode PDF417, MicroPDF417,

13  and composite codes; is that right?

14  A.   Yes, that's correct.

15  Q.   So it's known in the industry that if you make a

16  laser-based product, you can choose whether or not it's

17  operable to decode those two-dimensional symbologies, correct?

18  A.   Correct.

19  Q.   Okay.  Now, you also discussed with your counsel some of

20  OPTO's public documents, some of its literature.  Do I have

21  that right, sir?

22  A.   I discussed a limited amount of the documents.

23  Q.   Okay.  And as part of your work on this case, as you told

24  your counsel, you reviewed certain of OPTO's data sheets and

25  certain of its product literature.  Is that right?

PAUL CHARTIER - CROSS

1  A.   The focus that I had on that was just, for example,
2  significantly different to the one of Mr. Smith, where I saw
3  his detailed expert report, was to try to identify whether
4  there was a consistency or inconsistency in the way the
5  different symbologies related.  But I did not review the
6  technical content of those brochures.
7  Q.   Okay.  And I'm glad you brought up Mr. Smith.  He's one
8  of the experts for Honeywell in this litigation.  Do you
9  understand that, sir?
10 A.   I do.  I understand.
11 Q.   And you've had a chance to thoroughly review Mr. Smith's
12 expert report in this matter.  Is that right?
13 A.   I did not thoroughly review it, because what I was
14 focused on, again, is what I've just said:  Is the
15 classification that he was extracting from OPTO's documents,
16 which in my view was not always consistent one document from
17 another.
18 Q.   Understood.
19      You did have a chance to review Mr. Smith's report
20 though; is that right?
21 A.   That is correct.
22 Q.   Okay.  And you have no disagreement with the way that Mr.
23 Smith characterized PDF417; is that right?
24 A.   That's correct.
25 Q.   And you have no disagreement with the way that Mr. Smith

PAUL CHARTIER - CROSS

1   characterized MicroPDF417, correct?

2   A.    Correct.

3   Q.    Okay.  Now, in all of the OPTO documents that you

4   reviewed for your work on this case, you never came across a

5   single instance where PDF417 was referred to as a

6   one-dimensional symbology.  Correct?

7   A.    That is correct.

8   Q.    And in all of the documents -- OPTO documents that you

9   have seen, OPTO consistently referred to PDF417 and

10  MicroPDF417 as a two-dimensional symbology, correct, sir?

11  A.    Can I correct you?  When you say "all of the documents,"

12  it's about a dozen documents.

13  Q.    So in the dozen documents, the dozen OPTO documents

14  you've seen in this case, OPTO consistently referred to PDF417

15  and MicroPDF417 as two-dimensional symbologies, correct?

16  A.    That is correct.  And that complies with the high-level

17  definition of PDF417 as being two-dimensional.

18  Q.    Okay.  And so let's look at Plaintiff's Exhibit 18,

19  please.

20        Do you have that there in front of you, sir?

21  A.    I do, yes.

22  Q.    And this is the product specification for one of OPTO's

23  products; is that right?

24  A.    Yes.  It's a specification for a scan engine, which could

25  be incorporated into different types of scanners.

PAUL CHARTIER - CROSS

1    Q.   Okay.  And in fact this is one of their products that's
2    called the MDL-2001.  Is that right, sir?
3    A.   That's what the brochure states.
4    Q.   Okay.  And this is a laser-based scan engine; is that
5    right?
6    A.   That's what the brochure says, yes.
7    Q.   And I'd like to draw your attention to the second page.
8    And on the lower left there's a section entitled "Supported
9    symbologies."
10        Do you see that, sir?
11   A.   I do see that, yes.
12   Q.   And here OPTO refers to MicroPDF417 and PDF417 as 2D
13   symbologies; is that correct?
14   A.   That is correct.
15   Q.   And this literature tells the public -- excuse me.  I'll
16   withdraw that.
17        OPTO also calls composite codes 2D, or two-dimensional,
18   in this document.  Is that correct?
19   A.   It does on this document.
20   Q.   And this literature tells the public that the Opticon
21   MDL-2001 is operable to decode the 2D symbologies of PDF417
22   and MicroPDF417.  Is that correct?
23   A.   It does.  I would doubt the public would read this
24   document, because it's a scan image.
25   Q.   Okay.  Whether it's their customers or anyone else

PAUL CHARTIER - CROSS

1  interested, whoever would read this document, OPTO tells that
2  person that the MDL-2001 is operable to decode the 2D
3  symbologies of PDF417 and MicroPDF417.  Correct?
4  A.   That's what the document says.
5  Q.   And the MDL-2001 product specification also tells the
6  customer, or whoever else is going to read it, that the
7  product was operable to decode two-dimensional composite
8  codes; is that correct?
9  A.   That is correct.
10  Q.   Sir, I'd like to ask you to go to Exhibit 19.  Hopefully
11  it's the very next one in your binder.
12       And, sir, this is the product specification for the
13  OPR-2001Z laser scanner.  Is that right?
14  A.   That's what I'm reading here, yes.
15  Q.   Okay.  And let me draw your attention to the second page.
16       And do you see the section here where it says "Supported
17  symbologies," sir?
18  A.   I do, towards the bottom of the first column and the top
19  of the next one.
20  Q.   And again, in this document, Opticon is telling its
21  customers, or whoever else is interested, that PDF417 and
22  MicroPDF417 are two-dimensional codes.  Is that right?
23  A.   Yes.  Exactly as my testimony earlier.
24  Q.   And this document also states that the OPR-2001Z is
25  operable to decode each of the following two-dimensional

389

PAUL CHARTIER - REDIRECT

1  codes:  Composite codes, PDF417, and MicroPDF417.  Is that
2  right, sir?
3  A.   That's what the document states.
4  Q.   When you were talking earlier with your counsel regarding
5  the standards and the ways that barcodes are decoded, you have
6  no knowledge about how any OPTO or Opticon product actually
7  performs a decode.  Is that correct?
8  A.   That is correct.
9                    REDIRECT EXAMINATION
10 BY MR. VanHOUTAN:
11 Q.   Mr. Chartier, I have just a few follow-up questions for
12 you.
13      Both with Mr. Stevens and myself, we were discussing
14 ISO/IEC 15415.  Do you recall that?
15 A.   I do recall that.
16 Q.   And this is one of the print quality standards; is that
17 correct?
18 A.   That is correct.  It's the print quality standard for
19 two-dimensional symbols.
20 Q.   Okay.  And does that pertain to PDF417?
21 A.   It pertains to PDF417 and MicroPDF, Data Matrix, QR code,
22 among a number of symbologies.
23 Q.   And are you familiar with ISO/IEC 15416?
24 A.   Yes.  15416 is a print quality standard for linear
25 symbologies.

JA1292

PAUL CHARTIER - RECROSS

1  Q.   And how, if in any way, does ISO/IEC 15416 pertain to the
2  decoding of PDF417?
3  A.   In the two-dimensional standard 15415, it defines very
4  clearly that of itself, it provides all the rules for decoding
5  matrix symbologies.  But as far as multi-row symbologies, it
6  refers back to the rules in 15416, where each symbol character
7  shall conform to the rules of the symbol character symbology,
8  and each row symbol shall be treated as if it was a single
9  linear barcode.
10         MR. VanHOUTAN:  Thank you, Mr. Chartier.
11         Defendants at this time proffer Mr. Chartier as an
12  expert witness in the area of barcode symbologies.  I intend
13  to do this at trial as well, but I'm just putting this on the
14  record for now.
15         MR. STEVENS:  No objection.
16         MR. VanHOUTAN:  Pass the witness.
17         MR. STEVENS:  Thank you, sir.
18                   RECROSS EXAMINATION
19  BY MR. STEVENS:
20  Q.   When you talk about the print quality guideline, you
21  cannot apply that print quality guideline to PDF417 without
22  the one that refers to two-dimensional symbols.  Is that
23  right?
24  A.   The part that is relevant of two-dimensional symbols for
25  PDF417 is the one that talks about the success or the failure

PAUL CHARTIER - RECROSS

1   to decode --

2   Q.   Understood.

3   A.   -- an individual symbol character.

4   Q.   And you cannot successfully decode a PDF417 by simply

5   reading one row of it; you cannot decode the entirety of the

6   symbol by simply reading one row of it.  Is that correct, sir?

7   A.   That is correct, because as we've discussed before, there

8   are a minimum number of rows, and those rows need to be read.

9   Q.   Okay.

10         MR. STEVENS:  Can we publish to the witness, please,

11  the document on the system with the file name 757.49?

12  Q.   Let me know when that pops up on your screen, sir.

13  A.   Is that in the notebook?

14  Q.   It's not in the notebook; it's in one of the

15  demonstrative exhibits.

16  A.   Yes.  I can see something that says "49."

17  Q.   And this is one of the demonstrative exhibits that you

18  prepared with counsel for your testimony.  Is that right?

19  A.   This is not strictly -- correct, we --

20  Q.   You didn't discuss this during your direct testimony, but

21  it's one of -- it's one slide that you had prepared; is that

22  correct?

23  A.   The slide was prepared and not used.

24  Q.   Correct.  And on the bottom right it says, "Chartier

25  demonstrative exhibit."  Is that right, sir?

PAUL CHARTIER - RECROSS

1  A.   That's what it says, yes.

2  Q.   And you are the "Chartier" that --

3  A.   Yes.  Yep.

4  Q.   -- this is talking about?

5  A.   Yep.

6  Q.   And it classifies GS1 DataBar and UPC on the left as

7  linear symbologies, right?

8  A.   Correct.

9  Q.   And it classifies PDF417 and MicroPDF417 as, quote,

10 "two-dimensional multi-row symbols."  Do I have that right?

11 A.   You do.

12          MR. STEVENS:  Thank you.

13          I pass the witness.

14          MR. VanHOUTAN:  No further questions.

15          (End of videotaped deposition.)

16          THE COURT:  All right.  And for the record, the

17 Court recognizes Mr. Chartier as an expert in barcode -- how

18 would you like to phrase it?

19          MR. VanHOUTAN:  Symbology.

20          THE COURT:  Symbology.

21          All right.

22          MR. STEVENS:  We'd offer Plaintiff's 5, 13, 12, 17,

23 18, 19, and 207.

24          THE COURT:  Did you get those, Ms. Kirk?

25          THE CLERK:  Yes, sir.

PAUL CHARTIER - RECROSS

1          THE COURT:  Those are admitted.

2          (Plaintiff's Exhibits Numbers 5, 12, 13, 17, 18, 19,

3    and 207 were received into evidence.)

4          MR. VanHOUTAN:  Your Honor, defendant would offer

5    Defendant's 848, 849, 850, 851, 852, 853, and 854.

6          THE COURT:  Those are admitted.

7          (Defendant's Exhibits Nos. 848, 849, 850, 851, 852,

8    853, and 854 were received into evidence.)

9          THE COURT:  All right.  Members of the jury, I'm

10   sure you're ready for your break, so let's plan on about 15

11   minutes.  The usual rules apply.  And we'll get back to you as

12   soon as we can.  Thank you.

13         (Jury exited the courtroom.)

14         THE COURT:  We're in recess 15 minutes.

15         (Brief recess at 3:07 PM.)

16         (Court back in session at 3:23 PM.)

17         THE COURT:  Ready for the jury?

18         MR. VanHOUTAN:  Yes, Your Honor.

19         MR. STEVENS:  Yes, Your Honor.

20         THE COURT:  All right.

21         (Jury entered the courtroom.)

22         THE COURT:  Please call your next witness.

23         MR. VanHOUTAN:  Defendant calls Rie Ashihara to the

24   stand.

25         And, Your Honor, I'd also ask that the interpreter,

RIE ASHIHARA - DIRECT

1   Junko Salmon, be able to join her in the witness box.

2            THE COURT:  Yes, she can.

3            And please let's have the translator sworn prior to

4   the testimony.

5            Swear the translator first.

6            (Interpreter sworn.)

7            RIE ASHIHARA, DEFENDANT'S WITNESS, SWORN,

8            MR. VanHOUTAN:  Ms. Salmon, can you just let me know

9   whenever you're ready?

10           THE INTERPRETER:  I am ready.

11                         DIRECT EXAMINATION

12  BY MR. VanHOUTAN:

13  Q.   Ms. Ashihara, can you please introduce yourself to the

14  jury.

15  A.   My name is Rie Ashihara.

16  Q.   And, Ms. Ashihara, I know it was a long flight getting

17  here so we really appreciate your testimony today.

18           MR. VanHOUTAN:  And for the benefit of the

19  translator, I'll try to use short questions, but let me know

20  if anything is unclear for you.

21           THE INTERPRETER:  Okay.  Thank you.

22  Q.   Ms. Ashihara, are you currently employed?

23  A.   Yes.

24  Q.   And who is your current employer?

25  A.   I work for OPTO Electronics.

RIE ASHIHARA - DIRECT

1  Q.   And can you tell the jury a little bit about OPTO
2  Electronics, please.
3  A.   OPTO Electronics is headquartered in Japan inside
4  (unintelligible) which is right beside Tokyo.
5  Q.   And when was OPTO Electronics founded?
6  A.   It was established in 1976 by Masami Tawara who is the
7  current representative, director, and CEO.
8  Q.   And what kind of business is OPTO Electronics in?
9  A.   OPTO Electronics develops, manufactures, and sells
10 barcode scanners.
11 Q.   And does OPTO Electronics have any subsidiary companies?
12 A.   We do have a subsidiary in the Netherlands which is
13 called Optical Sensors Europe.  We also have a subsidiary
14 called Opticon in Seattle, Washington, in the United States.
15 Q.   And do you know roughly how many full-time employees
16 OPTO, which would include the subsidiaries, has?
17 A.   We have about 190 employees.
18 Q.   And, Ms. Ashihara, I want to make sure that I'm being
19 clear.  If I refer to OPTO, will you understand that to mean
20 OPTO Electronics, OSC, which is the European subsidiary, and
21 Opticon, which is the U.S. subsidiary?
22 A.   Understood.
23 Q.   How long have you worked at OPTO Electronics,
24 Ms. Ashihara?
25 A.   Approximately 23 years.

RIE ASHIHARA - DIRECT

1  Q.   And what department or departments do you work in at OPTO
2  Electronics?
3  A.   Product management -- product control -- product control
4  department and finance department.
5  Q.   And could you briefly describe for the jury your role in
6  OPTO's product control and finance departments.
7  A.   As regards product control, I am involved in the planning
8  of products and observation of sales trends and determining
9  when a product should be discontinued if it is to be
10 discontinued.
11      As regards finances, because it is a small department, I
12 am involved in various business activities.
13 Q.   Thank you.
14      Are you familiar with the ITC patent litigation and the
15 settlement of that litigation between OPTO and Honeywell?
16          THE INTERPRETER:  ITC litigation and what
17 litigation?  Excuse me.
18 Q.   And the settlement of that litigation between Honeywell
19 and OPTO.
20 A.   Yes, I do know about it, but I do not know the details
21 thereof.
22 Q.   And are you familiar with royalty payments that OPTO has
23 made to Honeywell as a result of the settlement of that ITC
24 litigation?
25 A.   Yes, I do know.

JA1299

RIE ASHIHARA - DIRECT

1          MR. VanHOUTAN:  If we could publish to the witness
2  and the well, but not the jury, Defendant's 855.
3  Q.  Ms. Ashihara, I'm showing you what's been marked as
4  Defendant's Exhibit 855 which is a summary of royalties that
5  OPTO has paid to Honeywell.
6          Do you recognize this document?
7          MR. STEVENS:  Your Honor, we do have an objection to
8  this document.  Is it okay if I take it up with you at
9  sidebar?
10          THE COURT:  Yes, let's do that.
11          (Sidebar conference as follows:)
12          MR. STEVENS:  Two issues.  This document was first
13  provided to us late last night.  Never been produced in
14  litigation until late last night.  Moreover, it includes --
15  it's intended to be a compilation of information but includes
16  information not produced in this case and information
17  regarding royalty reports for times different than what's
18  involved in this case.
19          Put simply, this is a document that our eyes first
20  saw late, late last night and so I don't think it should be
21  used.  I have no problem if she goes through the actual
22  royalty reports, but this compilation is not a correct
23  compilation of the actual time frame in dispute here.
24          MR. VanHOUTAN:  May I respond?
25          THE COURT:  Yes.

JA1300

398

RIE ASHIHARA - DIRECT

1        MR. VanHOUTAN:  So 1006 only requires a reasonable
2   amount of time -- a summary made of voluminous documents to be
3   made a reasonable amount of time before it's used.  We looked
4   at that and decided a reasonable amount of time was one day
5   before when we prepared a summary so we didn't have to walk
6   through royalty reports with a non-native speaker.
7        As far as the issue of not being produced, there are
8   two royalty reports produced that post-date the summary
9   cutoff.  And all of the underlying exhibits were not objected
10  to by counsel.
11       THE COURT:  And so what's the purpose of this
12  exhibit?
13       MR. VanHOUTAN:  It summarizes how much royalties
14  OPTO has paid to Honeywell since the execution of the
15  settlement agreement.  I can just ask her the number.
16       THE COURT:  Yeah, let's do that.  I mean, I'm not
17  sure how informative that is as to whether or not they've all
18  been paid.
19       MR. VanHOUTAN:  It's not going to that issue.
20       THE COURT:  I'm inclined to disallow the exhibit for
21  the reasons stated by Mr. Stevens, but will allow you to ask
22  her how much have you paid over whatever the period of time
23  is.
24       MR. VanHOUTAN:  Okay.
25       THE COURT:  Okay.

JA1301

RIE ASHIHARA - CROSS

1          (End of sidebar conference.)

2          THE COURT:  You may continue.

3                DIRECT EXAMINATION (Cont'd.)

4    BY MR. VanHOUTAN:

5    Q.   Ms. Ashihara, do you know approximately how much -- do

6    you know how much approximately that OPTO has paid to

7    Honeywell in royalties under the license agreement that

8    settled the ITC litigation?

9    A.   Ten thousand -- $10,894,502.

10   Q.   And did any of that royalties relate to OPTO's laser or

11   CCD scanners, to your knowledge?

12   A.   They do not involve laser scanners or CCD.

13   Q.   Ms. Ashihara, do you know how OPTO refers to its laser

14   and CCD scanners, whether they're 1D or 2D?

15   A.   They are considered to be one-dimensional.

16   Q.   Why?

17   A.   It is because 1D scanners are meant to read 1D barcodes

18   and two-dimensional scanners are meant to read two-dimensional

19   barcodes.

20          MR. VanHOUTAN:  Thank you, Ms. Ashihara.  No further

21   questions at this time.

22          THE COURT:  You may cross examine.

23          MR. STEVENS:  Thank you, Your Honor.

24                    CROSS EXAMINATION

25   BY MR. STEVENS:

RIE ASHIHARA - CROSS

1  Q.   Now, Ms. Ashihara, you understand that Honeywell and OPTO
2  entered into a settlement agreement on or about January 22,
3  2020, correct?
4  A.   I do know that a settlement agreement was executed, but I
5  do not know exactly when that was done.
6  Q.   And you testified on direct that, quote, you don't know
7  the details of the settlement; is that correct?
8  A.   Yes.
9  Q.   And you gave a deposition in this case in September of
10 last year.  Do you recall that, ma'am?
11 A.   Yes.
12 Q.   And as of that deposition, you had no memory of ever
13 seeing the settlement agreement prior to that day; is that
14 correct?
15 A.   I don't know whether or not having memory would be the
16 correct expression, but I did not have a grasp of the details
17 thereof.
18 Q.   Okay.  You said at the deposition you had not seen an
19 English version or a translated version of the agreement as of
20 that -- before that day, correct?
21 A.   As far as the contents of the agreement is concerned,
22 that is correct.
23 Q.   Okay.  Ms. Ashihara, are you the corporate representative
24 for OPTO at this trial here in Charlotte?
25          MR. VanHOUTAN:  Objection, Your Honor.  That's

RIE ASHIHARA - CROSS

```
 1  outside the scope.  And we would make that designation, which
 2  we have not.
 3            THE COURT:  Sustained.
 4            You don't need to answer that.
 5            THE INTERPRETER:  Okay.
 6  Q.   Now, Ms. Ashihara, you appreciate that OPTO made and sold
 7  laser and CCD-based products that were operable to decode
 8  PDF417 and MicroPDF417 --
 9            THE INTERPRETER:  I'm sorry, can you please keep the
10  sentences short.
11            MR. STEVENS:  I will.  Thank you so much.
12            THE INTERPRETER:  I'm sorry.
13            MR. STEVENS:  Let me reask the question.
14  Q.   You understand that OPTO made laser products, correct?
15  A.   Yes.
16  Q.   And some of those laser products you understand could
17  decode PDF417, correct?
18  A.   They can read them.
19  Q.   Okay.  You understand that some of OPTO's laser products
20  can read MicroPDF417, correct?
21  A.   Yes.
22  Q.   You understand that OPTO has laser products that can read
23  composite codes, correct?
24  A.   Yes.
25  Q.   Okay.  And when you prepared the royalty reports that
```

RIE ASHIHARA - CROSS

1  were sent to Honeywell, you didn't include any of those

2  later-based products that could read those codes, correct?

3  A.   That is correct.

4  Q.   Now, at your deposition -- you were one of the corporate

5  designees at your deposition; is that right?

6  A.   Yes.

7  Q.   And OPTO put you forward to discuss OPTO's creation and

8  maintenance of marketing documents.

9       You can go from there.

10             THE INTERPRETER:  Of what document?

11             MR. STEVENS:  Of marketing documents.

12             MR. VanHOUTAN:  Objection to outside the scope of

13  direct, Your Honor.

14             THE COURT:  Sustained.

15             MR. STEVENS:  So she's also on our list.  We can

16  recall her during our rebuttal case if need be.

17             MR. VanHOUTAN:  If they'd like to call her during

18  their rebuttal case, she will be here; but this is our case.

19             THE COURT:  All right.  That's the way we'll do it,

20  then.

21  BY MR. STEVENS:

22  Q.   So just to summarize, Ms. Ashihara.  You don't know the

23  details of the settlement agreement and what's required in

24  that agreement, correct?

25  A.    It's that I did not know the details of the agreement and

RIE ASHIHARA - CROSS

1    I didn't -- but I did know that we were supposed to pay
2    royalty on two-dimensional products.
3    Q.    And did anyone ever provide you the definition of
4    two-dimensional products from the agreement itself?
5    A.    I was told two-dimensional products.
6    Q.    You were told that, but nobody gave you the written
7    definition; is that correct?
8    A.    That is correct.
9    Q.    Okay.  You mentioned that Opticon has a subsidiary in the
10   state of Washington in the United States; is that correct?
11   A.    Yes.
12   Q.    Are any of the folks that work there in the courtroom
13   here today?
14   A.    No.
15   Q.    And you weren't involved in the negotiation of the
16   original settlement agreement; is that correct?
17          MR. VanHOUTAN:  Objection.  Outside the scope.
18          THE COURT:  Overruled.
19          THE INTERPRETER:  I'm sorry, can you repeat the
20   question, please.
21          MR. STEVENS:  I'm happy to.
22   Q.    You were not involved in the negotiation of the
23   agreement; is that correct?
24   A.    That is correct.
25   Q.    Are any of the folks that were involved in the

RIE ASHIHARA - CROSS

1  negotiation agreement, are any of those folks in the courtroom
2  here today?
3  A.   No, there isn't.
4           MR. STEVENS:  Thank you.
5           I pass the witness, Your Honor.
6           THE COURT:  Any redirect?
7           MR. VanHOUTAN:  No, Your Honor.
8           THE COURT:  Thank you.  You may stand down, both of
9  you.
10          (Witness stepped down.)
11          THE COURT:  Please call your next witness.
12          MR. MUCKENFUSS:  Your Honor, we have a video
13  deposition.  It will be the last piece of evidence or
14  testimony in our case.  It's only about 30 minutes.
15          THE COURT:  All right.  Let's do that.
16          So, members of the jury, we're going to see another
17  video deposition which is just like any other live witness.
18          MR. STEVENS:  Your Honor, this is the one we had
19  objected to.  Do you want to take it up at sidebar?
20          THE COURT:  Yes, let's do that.
21          (Sidebar conference as follows:)
22          MR. MUCKENFUSS:  It's pretty bad when I've got to
23  bring the rule book.
24          THE COURT:  I was going to say.
25          MR. STEVENS:  They're trying to call their own

KEES STOOP - DIRECT

1   witness.  They've not proved that that person is unavailable
2   or not here, but they're trying to call their own witness by a
3   deposition as opposed to a party opponent.
4             THE COURT:  Where does he live?
5             MR. MUCKENFUSS:  He's in the Netherlands.  It's
6   under Rule 32(a).
7             MR. STEVENS:  I'm not aware that the rules allow you
8   to call your own witness, and there's not been any proof --
9             THE COURT:  They most certainly do.  It's (a)(4).
10  They most certainly do.
11            MR. STEVENS:  I think there's a split of authority,
12  to be honest with you.
13            THE COURT:  Not in this court.
14            MR. STEVENS:  Okay.  That's fine.
15            (End of sidebar conference.)
16            MR. MUCKENFUSS:  Your Honor, we're just going to
17  hand the transcript up to the court reporter.
18            THE COURT:  All right.  Thank you.
19            MR. VanHOUTAN:  Your Honor, may I approach?
20            THE COURT:  You may.
21            (The videotaped deposition of Kees Stoop was played.
22  The transcript as reported by _____ is as follows:)
23            <u>CORNELIS STOOP, DEFENDANT'S WITNESS, SWORN,</u>
24                     DIRECT EXAMINATION
25  BY MR. STEVENS:

KEES STOOP - DIRECT

 1  Q.   Good morning, sir.  Could you state your full name,
 2  please.
 3  A.   My full official name as written in my passport is
 4  Cornelis Johannes Garadus Stoop, but I go by the name of Kees.
 5  Q.   Okay.  And by whom are you currently employed?
 6  A.   I am employed by a company called Opticon Sensors Europe,
 7  also known as OSE.
 8  Q.   And do you understand, sir, that you've been designated
 9  on behalf of OPTO Electronics to speak today on behalf of the
10  company?
11  A.   That is correct, yes, I do.
12  Q.   And do you understand that your testimony here today is
13  under oath?
14  A.   Yes, I understand.
15  Q.   And, sir, are you responsible for software or coding for
16  OPTO Electronics or Opticon Sensors?
17  A.   For Opticon Sensors I am responsible for the software
18  part, also partially for hardware part.
19  Q.   And does your software responsibilities include the
20  decoders or the decoding function of Opticon's products?
21  A.   Yes.
22  Q.   How long have you worked for Opticon Sensors?
23  A.   I started working for Opticon Sensors in 1991.  So that
24  makes this 31 years, I guess.
25  Q.   And now, during your time at Opticon, can you go through

KEES STOOP - DIRECT

1  the different positions you've held over the past 31 years for

2  me.

3  A.   Yes, I can.  I started here as a software engineer.  And

4  later, because of some study and interest, I worked as a

5  hardware engineer.  And from there I, because somebody left, I

6  got a management role of the R&D department, and finally --

7  and that's where we are now -- I am responsible for the entire

8  technical department here, so including what we call the

9  technical service where they do repair and modifications of

10 our products.

11 Q.   What is your current formal job title?

12 A.   My job title is R&D manager.

13 Q.   And roughly how many employees does Opticon Sensors

14 Europe have?

15 A.   Roughly around 30 people.

16 Q.   And how many of those folks are in R&D?

17 A.   Ten people.

18 Q.   And those ten people ultimately report to you either

19 directly or indirectly?

20 A.   Correct.

21 Q.   And who is in charge?  Who is the president or CEO, who

22 is the leader of Opticon Sensors Europe?

23 A.   The leader of Opticon Sensors Europe is Mr. Kamio,

24 Mr. Nick Kamio, at least that is the name that he goes by in

25 Europe.  He is Japanese, and his Japanese name is Mr. Naohide

KEES STOOP - DIRECT

1  Kamio.
2  Q.   Do I understand your testimony to be that Opticon, Inc.
3  in the United States is a wholly owned subsidiary of Opticon
4  Sensors Europe?
5  A.   At this moment it is, yes.
6  Q.   Okay.  So Opticon Sensors Europe effectively manages
7  Opticon, Inc.; is that right?
8  A.   Correct.
9  Q.   Is Opticon Sensors Europe a wholly owned subsidiary of
10  OPTO Electronics in Japan?
11  A.   That is correct.
12  Q.   Okay.  So for any given product, the software will either
13  be an OSE developed piece of software or it will be an OPTO
14  Japan developed piece of software; is that correct?
15  A.   That is the situation at this moment, yes.
16  Q.   Now, who develops the software for the scan engines
17  themselves?  Is that all OPTO Japan or does OSE have a role in
18  that?
19  A.   Again, at this moment the scan engines that are developed
20  by OPTO Japan will have software from OPTO Japan.
21  Q.   Does Europe develop any scan engines?
22  A.   Yes, at this moment we are working on our own scan
23  engine.
24  Q.   Are there any scan engines already in the marketplace
25  that were developed by Opticon Sensors Europe?

KEES STOOP - DIRECT

1  A.   No.

2  Q.   And is it your testimony that OPN-2006 and RS-2006 never

3  supported PDF417 or MicroPDF417?

4  A.   Correct.

5  Q.   Is there a reason that you're telling me that OPN-2006

6  never supported PDF417?

7  A.   Yes, there is a reason.  The OPN-2006 is a very small

8  product.  It doesn't have a lot of memory.  Quite some memory

9  is needed for the functionality, and so we simply didn't have

10  the space to put the decoder in it.

11  Q.   And why does it take a good amount of memory space to

12  support or decode PDF417?

13  A.   That is because the PDF417 is a -- well, I wouldn't say a

14  complex code, but there is some error correction in it, and

15  the error correction is quite complex, and needs a lot of

16  data.  I think they use a look up table in it, which is quite

17  big.

18  Q.   How much data can a PDF417 symbol contain?

19  A.   I don't know, but it's -- for a barcode, it's a lot.

20  It's like 4,000 characters, something like that.  But again, I

21  don't know for sure.

22  Q.   Sir, have you seen any of the license agreements between

23  Honeywell and OPTO?

24  A.   No, I have not seen that.

25          MR. STEVENS:  And for the record, we've marked as

KEES STOOP - DIRECT

1  Stoop Exhibit 4 a copy of the License and Settlement Agreement
2  between OPTO and Honeywell bearing production numbers
3  Honeywell 251961.  That is the starting Bates number.
4  Q.   Sir, my question to you is very simple.  Have you ever
5  seen this document before?
6  A.   No, I have not.
7  Q.   Okay.  And has OPTO ever asked you to look at the License
8  and Settlement Agreement or to discuss it or to base any
9  decisions based upon this License and Settlement Agreement; is
10 that correct?
11 A.   Well, let me put it this way:  I heard of the settlement
12 and I talked to our finance manager about it but not in
13 detail.  Only that we settled and they -- or he had, like, a
14 very short summary, like the amount that we had to pay and the
15 royalties that we had to pay, but that is about it.  I never
16 saw the document and we also have not discussed this in
17 detail.
18 Q.   So with respect to Exhibit 4, the executed settlement
19 agreement, the License and Settlement Agreement, you've never
20 seen it before and you've never discussed it in detail; is
21 that correct?
22 A.   That is correct.
23 Q.   Yet all of those products, with the exception of the
24 2006, all of those products supported the ability for a laser
25 scanner to decode PDF417 until late 2021; is that correct?

KEES STOOP - DIRECT

1  A.   Yes, that's correct.

2  Q.   So when you read a PDF417 barcode, you need to read both

3  left-right and you need to read up-down; is that correct?

4  A.   Yes, that's correct.

5  Q.   Data is presented both in rows and columns in PDF417; is

6  that right?

7  A.   I would say the data is only encoded in rows and only

8  when you read all of the rows you can combine the data in

9  those rows and send it out as one single barcode.

10 Q.   But in a PDF417 you can't read just one individual row

11 and decode it; you need to read all of the individual rows; is

12 that correct?

13 A.   No, that's not correct.  You decode one single row.  The

14 only thing is that you don't include it, but you save it in

15 memory.

16 Q.   So let me just make sure that I understand.  Unless you

17 read every single row you can't combine all the data words,

18 you can't see all of the data that the symbol is intending to

19 convey; is that right?

20 A.   Yes, that is correct.

21 Q.   When you mentioned a few moments ago that Opticon could

22 have chosen to read just one row and output just that one row

23 of data, that's not how Opticon actually implements PDF417,

24 correct?

25 A.   That's correct.  The only thing we do when one row is

KEES STOOP - DIRECT

1   decoded, we sound a short -- we issue a short sound.

2   Q.   Be that as it may, these laser products supported reading

3   PDF417 until very late in 2021, correct?

4   A.   Yes, that's correct.

5   Q.   Sir, what is barcode symbology?

6   A.   My understanding of a barcode symbology is a definition

7   of the barcode type, yes.

8   Q.   And do you understand that there are standards bodies

9   that create the definition of these symbologies?

10  A.   Yes, I'm aware of that.

11  Q.   And what that means is there's some third party that

12  publishes, either for free or sometimes you have to pay for

13  it, that publishes a specification that teaches the world how

14  to encode data in a particular barcode.

15  A.   Yes.

16          MR. STEVENS:   Let the record reflect we have marked

17  as Stoop Exhibit 6 a copy of a document whose beginning Bates

18  number is Honeywell-00000001.

19  Q.   So this is the international standard relating to PDF417;

20  is that correct?

21  A.   Yes, that's correct.

22          Sorry, give me some more time to quickly browse the

23  document.

24  Q.   I'm sorry, you take your time and tell me when you're

25  ready.

JA1315

KEES STOOP - DIRECT

1   A.   Okay.  Yeah, I have briefly gone over the document, yes.

2   Q.   Okay.  So, sir, this is a copy of the international

3   standard for PDF416 barcode symbology; is that right?

4   A.   Sorry, you said 416?

5   Q.   If I did -- let me just ask the question again.

6        Sir, what this is is a copy of the international standard

7   for the PDF417 barcode symbology; is that correct?

8   A.   Yes, that's correct.

9   Q.   Sir, I'd like to direct your attention to the top of the

10  page under item number G.  Can you please read that for me.

11  A.   "Code type: continuous, multi-row two-dimensional."

12  Q.   Sir, do you agree that PDF417 is an example of a

13  two-dimensional symbology?

14  A.   No, I don't agree on that.

15  Q.   Okay.  So despite the fact that the standard calls it a

16  continuous, multi-row two dimensional symbology, you intend to

17  tell the jury here in Charlotte that PDF417 is not a

18  two-dimensional symbology.  Do I have that right?

19  A.   Yes, you have that right.

20  Q.   Do you agree that in order to decode or read the entire

21  PDF417 symbol, you must read multiple rows?

22  A.   Yeah.  Well, we just talked about it.  It's technically

23  possible to also output just one row, but that doesn't really

24  make sense.  You want to have all of the information which is

25  decoded in the other rows as well.  So normally you output all

KEES STOOP - DIRECT

1  of the characters at once after you have read all the rows.
2  But again, if you're talking about decoding, you can decode
3  just one single row.
4  Q.   Okay.  My question, sir, if you want to be able to decode
5  and output the entire amount of data that's contained in the
6  symbol, not just a part of it, but the entire amount of data,
7  you would have to read and decode each of the different rows
8  in the PDF417 symbol; isn't that true?
9  A.   Yes.  If you want to output all the data in all the rows,
10  then you need to read all the rows, yes.
11  Q.   And in fact, that's how Opticon's products work; isn't
12  that true?  They read all of the rows and they decode and
13  output all of the rows of data.
14  A.   Yes, that is basically true.  But the user needs to move
15  the laser beam over all those rows, yes.  It's not done
16  automatically.
17  Q.   I understand.  And when -- the laser beam scans in one
18  dimension left and right, correct?
19  A.   That's correct.
20  Q.   And then the user would move it in the other dimension up
21  and down; is that correct?
22  A.   That is correct, yes.
23  Q.   And so when you're scanning a PDF417, you're scanning
24  what ends up being a rectangular space; is that correct?
25  A.   No.  I think you still scan one row at a time.  The fact

KEES STOOP - DIRECT

1  that you -- well, yes, the fact that you save previous rows in
2  memory doesn't mean you read it at the same time.
3  Q.   The data in a PDF417 symbol is presented in a
4  two-dimensional rectangular area; is that correct?
5  A.   Yes, it is presented as a number of rows on top of each
6  other.  And the height of each row is totally not relevant.
7  Q.   Right, because there could be three rows, and it might
8  have a certain height.  Or, within one symbol, there could be
9  up to 90 different rows within the same symbol; is that right?
10 A.   What I'm trying to say is the height of a row is not
11 relevant because there is no information in the height.  There
12 is only information in the horizontal direction in the rows,
13 and yes you can put a number of rows.  If it is 19 it is 19.
14 I don't know if that is the case, but if it's stated in the
15 document, I certainly believe that.  But the fact remains that
16 the data is only one-dimensional.  The data is only in rows.
17 And yes, you can read multiple rows after each other, but you
18 can only read one row at a time.
19 Q.   Again, I just want to be 100 percent clear.  When we see
20 the letter G on this page from the actual international
21 specification for PDF417 symbology, we both agree that what it
22 says here is:  "Code type: continuous, multi-row
23 two-dimensional."
24      We both agree that is what the international
25 specification says; is that right?

KEES STOOP - DIRECT

1   A.   Yes, that's right.  That's written here.

2   Q.   Okay.  But if you testify in front of this jury here in

3   Charlotte, North Carolina, you're going to tell them that

4   despite what the actual published specification says, that you

5   believe that PDF417 is only a one-dimensional symbology.

6   That's what you're going to say.  Do I have that right?

7   A.   You have that right, yes.

8   Q.   Sir, are you aware of OPTO marketing materials or

9   internal specifications that contradict what you say, and in

10  fact call PDF417 a two-dimensional symbology?

11  A.   Yes, that's true, I am aware of that.

12          MR. STEVENS:  Okay.  For example, I'd like to show

13  the witness the document with the file name MDL-1000 data

14  sheet.

15          THE WITNESS:  Yeah, got it.

16          MR. STEVENS:  Okay.  So for the record, we have

17  marked as Stoop Exhibit 7 a copy of the MDL-1000 laser barcode

18  scan engine data sheet, which is available at production

19  number 3374.

20  Q.   Sir, have you seen this document before?

21  A.   Well, I don't know if it's this document, but something

22  that looks very much like it, yes.

23  Q.   Okay.  And OPTO makes the -- its data sheets to give to

24  customers to entice them to buy its products; is that right?

25  A.   Yes, that's correct.

KEES STOOP - DIRECT

1  Q.   Okay.  And if we turn to the second page of this

2  document, what we're going to find under product

3  specifications is an area that talks about supported

4  symbologies; is that right?

5  A.   Yes, that's correct.

6  Q.   And at first what we see is the first point says:

7  "Barcode (1D.)"

8       And then it lists, I don't know, roughly 15 or 20

9  different supported symbologies.  Do I have that right?

10 A.   That's correct.

11 Q.   And then the second thing that's listed here is 2D code.

12 And 2D means two-dimensional; is that right?

13 A.   That's correct, yes.

14 Q.   And Opticon listed as the two-dimensional code

15 symbologies that this product supported, it listed composite

16 codes, MicroPDF417, and PDF417; is that correct?

17 A.   Yes, that's correct.

18 Q.   And then it also lists additional postal codes that it's

19 supporting.  Do I have that right?

20 A.   Yes, that's correct.

21 Q.   So when Opticon was creating data sheets to entice its

22 customers to purchase this product, it termed PDF417 and

23 MicroPDF417 as a 2D or two-dimensional code; is that right,

24 sir?

25 A.   Yes, that's right.

KEES STOOP - DIRECT

1  Q.   And I've given you one here on the screen, but you're
2  aware that there are dozens of these product specifications or
3  data sheets that refer to PDF417 as a 2D code.  You're aware
4  of that, right?
5           (Answer not played.)
6           MR. STEVENS:  So for the record we've marked as
7  Stoop Exhibit 8 a copy of the MDL-1000 leaflet available at
8  production number 2785.
9  Q.   Sir, have you seen the MDL-1000 laser scanner leaflet
10  before?
11  A.   Yes, I've seen it.
12  Q.   Okay.  And again, Opticon makes leaflets in order to
13  entice customers to purchase its products; is that right?
14  A.   That is correct.
15  Q.   And again, if we look at page 2 of the document under
16  "supported symbologies," Opticon is telling its customers that
17  this product supports 2D, in other words two-dimensional
18  codes, including composite codes, MicroPDF417, and PDF417.  Do
19  I have that right?
20  A.   That is correct, yes.
21           MR. STEVENS:  For the record, we have marked as
22  Exhibit 9 a copy of a document bearing production numbers
23  OPTO_00002777 through 2818.
24  Q.   Sir, this is the specifications for the NLB/RLB-100.
25  Have you seen this before?  It is a specification manual.

KEES STOOP - DIRECT

1   Have you seen this before?

2   A.   I've seen a document like this, so most likely yes.

3   Q.   Okay.  And specification manuals are documents that OPTO

4   makes for its customers to learn the detailed operation of the

5   product; is that right?

6   A.   Yes, that's correct.

7   Q.   For example, this particular one is a 42-page document;

8   is that right, sir?

9   A.   Yes.  If I may believe the page numbering, then it's 42

10  pages, yes.

11  Q.   Okay.  Let me ask you to turn to page 7 of the document.

12  It bears production number OPTO 2783.  Let me know when you're

13  there, sir.

14  A.   Yes, I am there.

15  Q.   And here one of the things we see is section number 2,

16  "overview."  Do you see that?

17  A.   Yes, I can see that.

18  Q.   And the bottom bullet point of the overview is "supported

19  symbologies."  On the left side we see a list of linear or 1D

20  symbologies.  On the right side we see a list of 2D

21  symbologies which includes MicroPDF417 and PDF417; is that

22  correct?

23  A.   That is correct.

24  Q.   And again, in this document when we see 2D, that means

25  two-dimensional; is that correct?

KEES STOOP - CROSS

1  A.    2D stands for two-dimensional, yes, correct.

2  Q.    Okay.  So we can put that aside.

3       And I'd like to direct your attention to the next

4  document that is -- the file name is source code log file

5  (DA40J04.)

6                     CROSS EXAMINATION

7  BY MR. VanHOUTAN:

8  Q.    There was some discussion about barcode symbols during

9  your testimony, such as PDF417.  Are you familiar with how

10  data is encoded in a PDF417 symbol?

11  A.    Yes, I am.

12  Q.    And how is that data encoded in a PDF417 symbol?

13  A.    The data in a PDF417 barcode is encoded as a number of

14  bars and spaces that vary in width.

15  Q.    How is the data encoded into groups of bars and spaces?

16  A.    It's encoded in -- well, as I said, the width of the bars

17  and the spaces.  And when you -- when the software determines

18  the width of those bars and spaces of that group, you get a

19  pattern and the pattern is looked up in a table.  And if the

20  pattern is indeed in the table, then the software determines

21  that that pattern corresponds to a certain value, and that is

22  then stored in memory.

23  Q.    What are the encoded groups of bars and spaces generally

24  referred to?

25  A.    Then I need to expand a little bit on how a laser scanner

KEES STOOP - CROSS

1   is working.  Laser scanner outputs a dot of laser light.  That
2   dot is moving from left to right, or from right to left, and
3   that is done by a mirror that is vibrating.  And while the dot
4   is moving over the barcode, the amount of light that is
5   reflected from the paper is collected by a photosensitive
6   element in the scanner.  And as a result, if the laser dot
7   moves over a black bar, there is very little reflection.  If
8   it is moving over a white space, there is a lot of reflection.
9        So in the end the scan engine will output a signal, a
10  square wave with -- if you have a very narrow bar, it's a very
11  narrow signal, so the distance between the upper edge and the
12  following edge is very small.  And if you have a very wide bar
13  that follows it, then the distance between the edge and the
14  next rising edge is very large.
15       The signal is going to a microprocessor that measures
16  these widths, and so the processor then processes all of this
17  information, it gets these measured widths.  And based on that
18  it first tries to find a guard pattern.  And if it has
19  detected a guard pattern, it starts to look for groups of bars
20  and spaces that we just talked about that represent the code
21  words.
22  Q.   So is the height of the bars and spaces relevant to data
23  encoding in PDF417?
24  A.   No, not at all.  It's totally irrelevant.  If the bars
25  and spaces are like a meter high, it still doesn't have any

KEES STOOP - CROSS

1  more information.

2  Q.   Conversely, are the heights of the bars and spaces

3  relevant to data decoding in PDF417?

4  A.   Not at all.

5  Q.   Would your answers be the same for MicroPDF417?

6  A.   Yes.

7  Q.   What about composite code?

8  A.   Same answer.

9  Q.   What about GS1 stacked code?

10 A.   Same answer.

11 Q.   Would you describe these laser products as 1D or 2D

12 products?

13 A.   I would describe them as 1D products.

14 Q.   Why?

15 A.   Because that's what a laser scanner actually is.  As I

16 just mentioned, a laser scanner outputs a dot of laser light

17 and it moves that dot over the paper in just one direction.

18 Q.   For the laser scanning products in topics 6 and 7 for

19 which you've been designated, are they operable to decode data

20 that is encoded into the bar space symbology?

21 A.   The data is encoded in the bars and the spaces, yes.

22 Q.   So can those laser scanning products decode that data?

23 A.   Yes.  A laser scanner can decode the data in the bars and

24 the spaces, yes.

25 Q.   Are the laser scanning products in topics 6 and 7 for

KEES STOOP - CROSS

1  which you've been designated operable to decode only bar space

2  symbology?

3  A.   Yes, correct.

4  Q.   Are there any OPTO products equipped with a CCD sensor?

5  A.   Yes, Opticon has those products.

6  Q.   Are any of the products listed under deposition topics 6

7  and 7 from Exhibit 1 equipped with a CCD sensor?

8  A.   No.  Those products are laser products.

9  Q.   Okay.  Do OPTO's CCD sensor products that you mentioned

10  have a 2D image sensor?

11  A.   No, they have a 1D image sensor, or a 1D sensor.

12  Q.   Would you describe them as 2D or 1D products?

13  A.   I would describe those as 1D.

14  Q.   Why?

15  A.   Because it is the nature of the CCD.  The CCD is

16  basically rows of photosensitive elements, and so just one

17  pixel high and therefore it cannot even see any light or

18  anything above the pixel or below it.

19  Q.   We saw some documents when you were being questioned by

20  Mr. Stevens from OPTO that referred to, for example, PDF417 as

21  a 2D symbology.  Do you recall that?

22  A.   Yes.

23  Q.   Can you tell me why those products were identified --

24  strike that.

25       Can you tell me why symbologies such as PDF417 were

KEES STOOP - CROSS

1  identified as 2D in those products -- in those product
2  documents?
3  A.    Yes.  Those documents were made -- or at least based on
4  not quite all the information.  At the time that symbol came
5  out with the PDF417 decoder and products that encode it, this
6  was very big news in the industry.  Because Symbol referred to
7  it as a 2D barcode, at the time I think everybody in the
8  industry called it a 2D barcode.
9       But later when I realized how this worked and when we
10  implemented the software in our own products, I realized it's
11  just a simple stacked 1D barcode.  There is no information in
12  the Y direction.  And therefore, I am really convinced that
13  this is just a 1D barcode.  And the same goes for all the
14  stacked codes.
15  Q.    And when did you come to this realization?
16  A.    I came to this realization when we implemented our own
17  decoder.  I cannot tell you the specific date for it, but
18  especially when the engineer that worked on it, he showed it
19  to me.  For instance, you cannot hold the scanner at a
20  90-degree angle and still read it.  That's not possible.
21  Whereas that is possible with a 2D CMOS sensor-based scaner.
22  Q.    Did you come to this realization more than five years
23  ago?
24  A.    Yes, more than five --
25            MR. STEVENS:  Objection to form.

KEES STOOP - REDIRECT

1          THE WITNESS:  Oh, definitely.

2    Q.   More than ten years ago?

3    A.   Yes, I think more than ten years ago, yes.

4                      REDIRECT EXAMINATION

5    BY MR. STEVENS:

6    Q.   I think I just want to make sure I understand.  You came

7    to this realization more than ten years ago yet you allowed

8    OPTO to continue to represent to its clients that its laser

9    products supported 2D symbologies all the way up until

10   November or December of 2021; is that correct?

11   A.   Yes, that is correct.

12   Q.   Sir, did you ever go to a meeting and hold up your hand

13   before November or December of 2021 and say "all of our

14   product literature, all of our leaflets, all of our

15   specifications are wrong"?  Did you ever tell that to

16   management?

17   A.   No, I never did.

18   Q.   I'd like to look again at Exhibit 6 which is the PDF417

19   specification.  Let me know when you have that document in

20   front of you.

21   A.   Yes, I have it in front of me.

22   Q.   In the upper right of Exhibit 6, the PDF417 barcode

23   symbology specification, we see a reference to ISO.  And

24   that's the International Organization for Standardization; is

25   that right, sir?

KEES STOOP - REDIRECT

1  A.   Yes, that's correct.

2  Q.   And then we see a reference to IEC.  And that is the

3  International Electrotechnical Commission; is that correct?

4  A.   Yes, that's correct.

5  Q.   And so Exhibit 6 here is the standards specification that

6  the ISO and the IEC published regarding PDF417; is that right,

7  sir?

8  A.   Yes, that's correct.

9  Q.   And if we look at page 14 of the document, which bears

10  production number Honeywell-14, we see at G it says:  "Code

11  type: continuous, multi-row two-dimensional."

12       Have I read that correctly, sir?

13  A.   Sorry, what page are you referring to?

14  Q.   PDF page 14.  It's page 6 on the lower left of the

15  document.  On the lower right it will say Honeywell-14.

16       Are we on the same page, sir?

17  A.   Yes, we are on the same page literally, indeed.

18  Q.   Good.  Let me ask again, sir.

19       And so in the PDF417 specification, the ISO and the IEC

20  define PDF417 as a continuous, multi-row two-dimensional code

21  type; is that correct?

22  A.   I can read that, yes.  It's written there.

23  Q.   Okay.  So if we wanted to figure out if the ISO or IEC

24  defines PDF417 as a two-dimensional barcode symbology, we'd

25  look at this document and we'd find out that those

RIE ASHIHARA - DIRECT

1  organizations do in fact define PDF417 as a two-dimensional

2  symbology; is that correct, sir?

3  A.   Well, yes, they wrote it so I assume they consider this a

4  two-dimensional barcode, yes.

5                          RECROSS EXAMINATION

6  BY MR. VanHOUTAN:

7  Q.   Mr. Stevens was asking you why you didn't raise your hand

8  and indicate to management that some of these marketing

9  materials incorrectly referred to, for example, PDF417 as 2D.

10  Why not?

11  A.   Well, because for me it does not really matter.

12  Technically speaking, it's a 1D barcode and I don't really

13  care if somebody calls it a 2D barcode.  That only became

14  relevant now in this discussion.

15              (End of videotaped deposition.)

16              THE COURT:  Further evidence for the defense?

17              MR. MUCKENFUSS:  The defense rests, Your Honor.

18              THE COURT:  Rebuttal evidence for the plaintiff?

19              MR. STEVENS:  We call Ms. Ashihara.

20              THE COURT:  Madam Translator, will you remind the

21  witness that she is still under oath.

22     RIE ASHIHARA, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN,

23              MR. STEVENS:  May I proceed?

24              THE COURT:  Yes.

25              MR. STEVENS:  Thank you.

428

RIE ASHIHARA - DIRECT

1                    DIRECT EXAMINATION
2    BY MR. STEVENS:
3    Q.   During your deposition, Ms. Ashihara, you were designated
4    to speak on behalf of the company as to certain topics; is
5    that right?
6    A.   That is correct.
7    Q.   And one of those topics was OPTO's creation and
8    maintenance of marketing documents.
9    A.   That is correct.
10   Q.   And the topic went on product specification documents for
11   any barcode scanning product.  That's what you were designated
12   for, correct?
13   A.   Specifications for barcode scanners?
14   Q.   Product specification documents for barcode scanning
15   products.
16   A.   Yes.
17          MR. STEVENS:  Can we publish to the witness PX18,
18   Plaintiff's 18, please.  Actually, it's already in evidence so
19   we can show everyone.
20   Q.   And what we see here on Plaintiff's 18 is the product
21   specifications for the MDL-2001, correct?
22   A.   That is correct.
23   Q.   And this is one of OPTO's laser products; is that
24   correct?
25   A.   Yes, that is correct.

JA1331

RIE ASHIHARA - DIRECT

1  Q.   If we look on the second page, please, on the lower left

2  there's a section called "Supported Symbologies."  Do you see

3  that?

4  A.   Yes.

5  Q.   And OPTO's product specifications say that this lesser

6  product supported 2D barcodes, correct?

7  A.   Yes, that is correct.

8          MR. STEVENS:  I'd like to look at PX19, please.

9  Q.   And, ma'am, this is the product specifications for the

10  OPR-2001Z; is that right?

11  A.   That is correct.

12  Q.   If we go to the second page and we look at the bottom of

13  the first column up to the top of the second column, we also

14  see "Supported Symbologies," correct?

15  A.   That is correct.

16  Q.   And this OPTO laser product also supports two-dimensional

17  codes, correct?

18  A.   So it supports 2D codes, specifically PDF417 and

19  MicroPDF417.

20  Q.   It also specifically supports 2D code -- composite codes,

21  correct?

22  A.   Yes.

23          MR. STEVENS:  If we could look at PX125 just to the

24  witness.

25  Q.   And, ma'am, you were in the room when we just saw the

RIE ASHIHARA - DIRECT

1   video of your colleague Mr. Stoop being played; is that right?

2   A.   I'm sorry, I cannot understand the video unless it is

3   interpreted or translated and therefore I am not -- I did not

4   understand the content of the video.

5   Q.   I'll tell you that Mr. Stoop spoke about certain

6   documents, and this is one of those documents.

7        And this is the product specifications document for the

8   MDL-1000; is that right?

9   A.   Yes.

10  Q.   And if we look at the second page under "Supported

11  Symbologies," do you see that?

12  A.   Yes.

13  Q.   The MDL-1000 also supports 2D code:  Composite codes,

14  MicroPDF417, and PDF417, correct?

15  A.   Yes, that is correct.

16            MR. STEVENS:  Your Honor, I'd admit Plaintiff's 125.

17            THE COURT:  It's admitted.

18            (Plaintiff's Exhibit Number 125 was received into

19  evidence.)

20  Q.   And so do we see on the screen now that this product

21  supports those two-dimensional codes?

22  A.   Yes.

23            MR. STEVENS:  Okay.  Could we publish to the witness

24  Plaintiff's 87, please.

25  Q.   Ma'am, this is the product -- the OPTO product

RIE ASHIHARA - DIRECT

1  specifications for the NLV-1001; is that correct?

2  A.  Yes, that is correct.

3        MR. STEVENS:  Your Honor, we would offer Plaintiff's

4  87.

5        THE COURT:  It's admitted.

6        (Plaintiff's Exhibit Number 87 was received into

7  evidence.)

8        THE COURT:  How many more do you intend to do that

9  with?

10        MR. STEVENS:  Probably just one, Your Honor.

11        THE COURT:  All right.  That sounds fine.

12        MR. STEVENS:  Okay.

13  Q.  And if we look to the second page, we again see the

14  indication of which symbologies this laser product supports,

15  correct?

16  A.  Yes, that is correct.

17  Q.  And this one also supports two-dimensional codes:

18  MicroPDF417, PDF417, and composite codes; is that right?

19  A.  That is correct.

20  Q.  So at the time the settlement agreement was signed in

21  2020, OPTO's products literature listed MicroPDF417 and PDF417

22  as two-dimensional symbologies; is that true, ma'am?

23  A.  Yes, that is correct.

24  Q.  And even today as we sit here in 2023, for OPTO's

25  products that can read PDF417 and MicroPDF417, you still list

432

RIE ASHIHARA - CROSS

1  those symbologies as two-dimensional symbologies in OPTO's
2  products literature; is that right?
3  A.   Some of the products are stated as being -- stated as
4  supporting them, yes.
5  Q.   And for those products that do support them, the
6  literature still says those symbologies are two-dimensional,
7  correct?
8  A.   That is correct.
9  Q.   And you said that -- in your deposition you said that the
10  product specifications describe the products accurately,
11  correct?
12  A.   Yes.
13        MR. STEVENS:  Thank you.
14        I pass the witness, Your Honor.
15        THE COURT:  Any cross examination?
16        MR. VanHOUTAN:  Yes.  Thank you, Your Honor.
17                CROSS EXAMINATION
18  BY MR. VanHOUTAN:
19  Q.   Ms. Ashihara, are the product brochures or data sheets
20  that Mr. Stevens was just showing you publicly available?
21  A.   Yes.
22  Q.   And have they been publicly available for many years?
23  A.   Some of them have been or -- yes, they have been
24  available for a number of years.
25  Q.   And would that include 2019 and prior to 2019?

JA1335

RIE ASHIHARA - REDIRECT

1  A.   They would have been available in 2019 as far as the

2  products that were shown to me now are concerned.

3  Q.   And why when OPTO identifies PDF417 as a 2D symbology

4  does OPTO consider those products 1D?

5  A.   So you're asking about why we consider them

6  one-dimensional products?

7  Q.   Correct.

8  A.   What we call 2D products are those that are able to read

9  all two-dimensional barcodes.  For example, QR codes and Data

10 Matrix which are generally considered 2D.

11      So the products, the laser products that were shown to me

12 now are able to read some two-dimensional barcodes, but

13 mostly -- most of the two-dimensional barcodes are not

14 readable using those products and therefore we are not able to

15 introduce them to our customers as being two-dimensional and

16 we consider them to be one-dimensional products.

17          MR. VanHOUTAN:  Thank you, Ms. Ashihara.  No further

18 questions.

19          THE COURT:  Any redirect?

20          MR. STEVENS:  Very briefly.

21                  REDIRECT EXAMINATION

22 BY MR. STEVENS:

23 Q.   Ms. Ashihara, if you would have included in the royalty

24 reports all of OPTO's products that were operable to decode

25 PDF417, MicroPDF417, and composite codes, those numbers would

434

RIE ASHIHARA - REDIRECT

 1  have been bigger; is that correct?

 2          MR. STEVENS:  I'll try it one more time.

 3          THE INTERPRETER:  The first part.  The first part.

 4  Q.   In the royalty -- if you had --

 5          THE INTERPRETER:  Royalty, okay.  I'm sorry.

 6  A.   Yes.

 7          MR. STEVENS:  Nothing further, Your Honor.

 8          THE COURT:  Thank you.  You may stand down, both of

 9  you.

10          (Witness stepped down.)

11          THE COURT:  Is this witness released?

12          MR. STEVENS:  No objection to that, Your Honor.

13          MR. VanHOUTAN:  Thank you, Your Honor.

14          THE COURT:  Further rebuttal evidence for the

15  plaintiff?

16          MR. STEVENS:  Our next witness would be called via

17  deposition.  I'm not sure if it would take us past 5:00, but

18  we can go ahead and take the next one if Your Honor would

19  like.

20          THE COURT:  Will that be your last?

21          MR. STEVENS:  It will not.

22          THE COURT:  So, members of the jury, not knowing how

23  long that will go and mostly wanting to keep my promise to let

24  you go by 5:00, we're going to quit for the night.

25          Same rules apply as last night.  Obviously, we're

JA1337

435

1  getting closer to the end of the trial, but we're not there

2  yet.  So continue to not talk to anybody about this case.

3  Don't start making up your mind.  Don't even talk to each

4  other about this case, obviously.  Don't do any other

5  independent research.

6          Leave your notepads in the jury room and we'll, of

7  course, see you again tomorrow morning at 9:00.

8          (Jury exited the courtroom.)

9          THE COURT:  Mr. Stevens, can you project how long

10  your rebuttal evidence is going to take?

11          MR. STEVENS:  I don't think it's going to last more

12  than in the range of 45 minutes to an hour and a half, I don't

13  think.

14          THE COURT:  All told trying to guess what cross will

15  be?

16          MR. STEVENS:  That's correct, Your Honor.  All in.

17          THE COURT:  So how long do the parties want for

18  closing arguments?

19          MR. STEVENS:  We would request 45 minutes.

20          MR. MUCKENFUSS:  That's fine with me.  I'll be done

21  under that.

22          THE COURT:  You sure that's enough?

23          MR. STEVENS:  Am I sure?  That's plenty.

24          THE COURT:  Okay.  Forty-five minutes it is.

25          And is there any disagreement that Honeywell has the

JA1338

1  right to open and close?

2         MR. MUCKENFUSS:  I don't think so.  If I can have

3  some time to think about that, Your Honor.

4         THE COURT:  Sure.  You have all night.

5         MR. STEVENS:  And is your rule 50/50 or if I spend

6  one minute on the opening, I can save the rest for closing?

7         THE COURT:  You can split it however you like.

8         MR. STEVENS:  Thank you, Your Honor.

9         THE COURT:  We will circulate tonight any revised

10  substantive jury instructions based upon the comments that the

11  Court got this afternoon.

12         Is there anything else we need to take up tonight?

13         MR. MUCKENFUSS:  Nothing from the defendant, Your

14  Honor.

15         THE COURT:  All right.  Then we'll be in recess

16  until 9:00 tomorrow.  Please remain in the courtroom until the

17  CSO lets you know that the jury has cleared the floor.

18         (Evening recess at 4:50 PM.)

19                  *****

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 6th day of August 2023.

17

18

19                          s/Cheryl A. Nuccio

20                          Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter

21

22

23

24

25

JA1340

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL,   )
INC.; HAND HELD PRODUCTS,   )
INC.; AND METROLOGIC   )
INSTRUMENTS, INC.,   )
   )
         Plaintiffs,   )   No. 3:21-cv-506
   )
     vs.   )   VOLUME III
   )
OPTO ELECTRONICS COMPANY,   )
LTD.,   )
   )
         Defendant.   )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 19, 2023

<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

JA1341

APPEARANCES (Cont'd.)

TYLER T. VanHOUTAN, ESQ.
McGuireWoods, LLP
Texas Tower, Suite 2400
845 Texas Avenue
Houston, Texas 77002

CHRISTINE E. LEHMAN, ESQ.
CONNOR S. HOUGHTON, ESQ.
Reichman Jorgensen Lehman & Feldberg, LLP
1909 K Street, NW
Suite 800
Washington, DC 20006

YORK M. FAULKNER, ESQ.
YorkMoodyFaulkner
Tensho Building, 7F
3-17-11 Shibaura, Suite 711
Tokyo, Japan

CHERYL A. NUCCIO, RMR, CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA1342

```
1                      I N D E X

2   PLAINTIFF'S WITNESSES                      PAGE

3   YOSHIAKI KOHMO
        Direct Examination By Mr. Stevens      442
4

5   DEFENDANT'S WITNESSES                       PAGE

6   JEREMY WHITLEY
        Direct Examination By Mr. VanHoutan    535
7       Cross Examination By Mr. Stevens       561
        Redirect Examination By Mr. VanHoutan  583
8

9   GREGORY ADAMS
        Direct Examination By Mr. Houghton     588
10      Cross Examination By Mr. Stevens       642

11                    E X H I B I T S

12  PLAINTIFF'S EXHIBITS

13  NUMBER                                  ADMITTED

14
    212 .........................................561
15  215 .........................................685

16
    DEFENDANT'S EXHIBITS
17
    NUMBER                                  ADMITTED
18
    34 ..........................................596
19  65 ..........................................629
    127 .........................................606
20  454 .........................................599
    734 .........................................622
21  735 .........................................622
    745 .........................................600
22  746 .........................................622
    747 .........................................600
23  748 .........................................600
    749 .........................................622
24  754 .........................................555
    784 .........................................628
25  809 .........................................634
```

1                           E X H I B I T S

2    DEFENDANT'S EXHIBITS

3    NUMBER                                              ADMITTED

4    810 ..........................................624
     841 ..........................................600
5    842 ..........................................610
     843 ..........................................623
6    845 ..........................................613

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA1344

441

```
 1                    P R O C E E D I N G S
 2   WEDNESDAY MORNING, JULY 19, 2023
 3              (Court called to order at 8:56 AM.)
 4              (Jury not present.)
 5              THE COURT:  Have the parties come to any agreement
 6   about the damages issue?
 7              MR. MUCKENFUSS:  We have, Your Honor.
 8              THE COURT:  What would that be?
 9              MR. MUCKENFUSS:  We will stipulate to the damages.
10              THE COURT:  All right.  Any further comments on the
11   revised substantive instructions and the verdict sheet?
12              MR. MUCKENFUSS:  Nothing from the defendant.
13              MR. STEVENS:  The last question on the verdict
14   sheet, did you intend for the jury only to resolve it in the
15   event that they rule for them or did you mean to do the
16   opposite?
17              THE COURT:  To resolve it only if they find for them
18   on the first issue, Honeywell's breach.  Otherwise, they don't
19   reach it.
20              MR. STEVENS:  Okay.  Just wanted to make sure there
21   wasn't a typo.
22              THE COURT:  Might be wrong, but it was deliberate.
23              Do we all have a common understanding that we'll
24   begin the bench trial while jury deliberations are proceeding?
25              MR. MUCKENFUSS:  Yes, Your Honor.
```

JA1345

YOSHIAKI KOHMO - DIRECT

```
 1          THE COURT:  All right.  I think we're still missing
 2   a few jurors.  We'll stand at ease.
 3          (Pause.)
 4          THE COURT:  Following the close of the evidence,
 5   we'll consider any motions made, but proceed with the jury.
 6   If folks want to be heard on that, once the jury goes out,
 7   we'll hear it then.
 8          MR. STEVENS:  Thank you, Your Honor.
 9          MR. MUCKENFUSS:  Thank you, Your Honor.
10          (Pause.)
11          (Jury entered the courtroom.)
12          THE COURT:  All right.  Welcome back all.
13          Please call your next witness.
14          MR. STEVENS:  Your Honor, we call Mr. Yoshiaki Kohmo
15   by deposition designation.
16          (The videotaped deposition of Yoshiaki Kohmo was
17   played.  The transcript as prepared by _____ is as
18   follows:)
19          YOSHIAKI KOHMO, PLAINTIFF'S WITNESS, SWORN,
20                    DIRECT EXAMINATION
21   BY MR. STEVENS:
22   Q.   Good morning, sir.  Could you please state your full
23   name.
24   A.   Yoshiaki Kohmo.
25   Q.   And, sir, you're currently employed by OPTO Electronics;
```

YOSHIAKI KOHMO - DIRECT

1  is that right?

2  A.   That's correct.

3  Q.   And how long have you been employed by OPTO Electronics?

4  A.   Just ten years.

5  Q.   You're an engineer, sir; is that correct?

6  A.   Yes.

7  Q.   And you are the patent engineer for OPTO Electronics; is

8  that correct?

9  A.   Correct.

10  Q.   So your role in all is reviewing and filing patents that

11  OPTO Electronics or its subsidiaries seek; is that correct,

12  sir?

13  A.   Well, my work primarily involves the patent application

14  and what's called the middle processing.  If a -- for example,

15  if a patent is rejected, we have to do something about it.

16  And also manage the patents that we have and also the patent

17  search of other companies.

18  Q.   So your roles at OPTO Electronics involve patents; is

19  that right?

20  A.   Yes.

21  Q.   And that's been your role for your entire ten years at

22  OPTO Electronics, correct?

23  A.   Yes.

24  Q.   And did you work with patents before you were employed by

25  OPTO Electronics?

YOSHIAKI KOHMO - DIRECT

1  A.   I did the patent work for about eight years at Sony,
2  which is where I previously worked.
3  Q.   And you understand, sir, that you have been designated to
4  speak on behalf of OPTO Electronics here today for this
5  deposition.  You understand that, sir?
6  A.   Yes.
7  Q.   So your words are the words of the company here today.
8  Do you understand that?
9  A.   Yes.
10 Q.   And you understand that this deposition might be played
11 for the members of a jury in North Carolina?
12 A.   Yes.
13 Q.   You're familiar with the symbology PDF417, aren't you?
14 A.   Yes.
15 Q.   And we talked earlier that your primary responsibility
16 with OPTO Electronics is to help the engineers write and get
17 patents; is that right?
18 A.   Ultimately we ask the patent attorney to file a patent
19 application; but the work that comes before that, yes, I help
20 out.
21 Q.   And when you help write patent applications, you do your
22 best to be as accurate as possible in the information that
23 you're conveying to the Japanese or the United States Patent
24 Office, correct?
25 A.   Yes.

JA1348

YOSHIAKI KOHMO - DIRECT

1  Q.   And it's important in patent applications to be very
2  technically precise; is that right?
3  A.   Yes.
4  Q.   Thank you.
5        MR. STEVENS:  For the record, we have marked as
6  Kohmo Exhibit 2 a copy of United States Patent Number
7  10,140,940.
8  Q.   Do you remember helping Kubo-san and Komi-san with this
9  patent application?
10 A.   My memory on that is vague, but I believe I helped out --
11 helped them out with their patent application.
12 Q.   Okay.  And the '490 patent is the patent that OPTO
13 Electronics owns; is that correct?
14 A.   Yes.
15 Q.   So the '490 patent is about positioning the laser in a
16 barcode reader; is that correct?
17 A.   Rather, this is a patent about assembly method.
18 Q.   Thank you, sir.
19       MR. STEVENS:  I'd like to go to the last page, PDF
20 page 14.  Okay.
21 Q.   And do you see Column 11 on the left side of the screen,
22 sir?
23 A.   Yes.
24 Q.   And I'd like to look at the first full paragraph that
25 begins roughly on line 6 and goes to line 10.  Do you see

YOSHIAKI KOHMO - DIRECT

1  that, sir?

2  A.   Yes.

3  Q.   I'm going to read it for the record, and it reads as

4  follows:

5       "Optical information read by the optical information

6  reader including the module for the optical information reader

7  according to the invention is not limited to bar codes but may

8  be various kinds of two-dimensional codes such as PDF417, a QR

9  code, and Aztec Code."

10      Did I read that correctly, sir?

11 A.   Yes.

12 Q.   So when OPTO Electronics was dealing with the United

13 States Patent Office as it relates to this patent, OPTO

14 Electronics represented to the United States Patent Office

15 that PDF417 is an example of a two-dimensional code; is that

16 correct, sir?

17 A.   Yes, that is correct.  I -- the engineers did tell me

18 that PDF417 is a two-dimensional code.

19           (End of videotaped deposition.)

20           MR. STEVENS:  And, Your Honor, with that, plaintiffs

21 rest.

22           THE COURT:  All right.  Thank you.

23           All right.  So, members of the jury, you've now

24 heard the evidence and soon you will hear the arguments of

25 counsel.  And following those arguments, I will instruct you

447

 1  on the law that applies in this case.  If any difference
 2  appears to you between the law as stated by the attorneys in
 3  closing arguments and that stated by me in the instructions,
 4  you are to be governed by my instructions.
 5          I remind you that it is your duty and your
 6  responsibility in this trial to judge the facts in accordance
 7  with the law as I give it to you.  You may find the facts only
 8  from the evidence which I have allowed to be admitted during
 9  the trial.  You must not consider anything which I have
10  instructed you to disregard.  And evidence which I have
11  admitted only for a limited purpose you may consider only for
12  that purpose.
13          The evidence in this case is the sworn testimony of
14  the witnesses, the exhibits received in evidence, and the
15  stipulations of the parties.
16          The questions of the lawyers are not to be
17  considered by you as evidence.
18          Testimony that the Court struck or instructed you to
19  disregard is not evidence.
20          The arguments you're about to hear from the
21  attorneys are not evidence because the lawyers are not
22  witnesses.  What they say to you -- said to you in their
23  opening statements or will say to you in their closing
24  arguments is intended to help you understand the evidence and
25  to suggest to you what you should find from that evidence.

JA1351

448

1    Again, however, if your recollection of the facts differ from
2    how the attorneys recall the evidence, you are to be guided by
3    your memories.  Same with respect to the law.  If there is any
4    difference between what they say and what I say, it's what I
5    say that controls.
6            This case should be considered and decided by you as
7    an action between persons of equal standing in the community,
8    of equal worth, and holding the same or similar stations of
9    life.  A corporation is entitled to the same fair trial at
10   your hands as a private individual.  All persons and
11   companies, wherever they may be headquartered, stand equal
12   before the law and are to be dealt with as equals in a court
13   of justice.
14           So the evidence that you may consider, and we've
15   talked about this several times, is the testimony of the
16   witnesses, and the documents that were offered into evidence
17   and received into evidence, and the stipulations of the
18   parties.
19           As I mentioned earlier at the beginning of trial,
20   the law recognizes two types of evidence:  direct and
21   circumstantial, which I explained to you before.  The law
22   makes no distinction between direct and circumstantial
23   evidence so long as it satisfies you, as a jury, that the
24   claim has been proved or has not been proved.
25           In a civil case the party with the burden of proof

JA1352

1   on any given issue has the burden of proving every disputed
2   element of its claim to you by a preponderance or a greater
3   weight of the evidence.  To establish a fact by a
4   preponderance of the evidence means to prove that the fact is
5   more likely true than not.  It refers to the quality and
6   persuasiveness of the evidence, not to the number of witnesses
7   or documents.  If you conclude that the party bearing the
8   burden of proof has failed to establish any essential part of
9   its claim by a preponderance of the evidence, you must decide
10  against it on the issue you are considering.
11        Some of you have heard of proof beyond a reasonable
12  doubt, which is the standard we use in criminal cases.  That
13  requirement does not apply to civil cases such as this and you
14  should just put it out of your mind.
15        In determining whether any fact in issue has been
16  proved by a preponderance of the evidence, unless otherwise
17  instructed, you can consider the testimony of the witnesses,
18  regardless of who may have called them, and all exhibits
19  received into evidence, regardless of who offered the exhibit.
20        A different burden of proof applies to OPTO's
21  affirmative defenses.  OPTO must prove those defenses by clear
22  and convincing evidence.  When a party has the burden of
23  proving any claim or defense by clear and convincing evidence,
24  it means that the party must present evidence that leaves you
25  with a firm belief or conviction that it is highly probable

1  that the factual contentions of the claim or defense are true.

2  This is a higher standard of proof than proof by a

3  preponderance of the evidence, but it does not require proof

4  beyond a reasonable doubt, which, again, is the criminal

5  standard and not applicable here.

6         During the trial of this case, certain testimony was

7  presented to you by way of deposition consisting of sworn

8  recorded answers to questions asked of the witness in advance

9  of the trial by one or the other attorneys.  The testimony of

10 a witness who for some reason could not be present to testify

11 from the witness stand may be presented in writing or video

12 under oath.  Such testimony is entitled to the same

13 consideration and is to be judged as to the credibility and

14 weight and otherwise considered by the jury, insofar as

15 possible, in the same way as if the witness had testified

16 before you.

17        Honeywell has offered into evidence responses to

18 what are known as requests for admission.  Before trial each

19 party has the right to ask the other party to admit in writing

20 that certain matters are true.  If the other party admits

21 those matters, you must accept them as true to the extent that

22 they are admitted.

23        The law does not require any party to call as

24 witnesses all persons who may have been present at any time or

25 place involved in the case or who may appear to have some

1  knowledge of the matters at issue in the trial.  Nor does the

2  law require any party to produce as exhibits all papers and

3  things mentioned in the evidence of the case.

4           You, as jurors, are the sole judges of the

5  credibility of the witnesses and the weight their testimony

6  deserves.  You may be guided by the appearance and conduct of

7  the witness, or by the manner in which the witness testifies,

8  or by the character of the testimony given, or by the evidence

9  to the contrary of the testimony given.

10          You should carefully scrutinize all the testimony

11 given, the circumstances under which each witness has

12 testified, and every matter in evidence which tends to show

13 whether a witness is worthy of belief.  Consider each

14 witness's intelligence, motive and state of mind, and demeanor

15 or manner while on the stand.  Consider the witness's ability

16 to observe the matters to which he or she testified, and

17 whether he or she impresses you as having an accurate

18 recollection of the matters.  Consider also any relation each

19 witness may bear to either side of the case, the manner in

20 which each witness might be affected by the verdict, and the

21 extent to which, if at all, each witness is either supported

22 or contradicted by other evidence in the case.

23          Inconsistencies or discrepancies in the testimony of

24 a witness, or between the testimony of different witnesses,

25 may or may not cause the jury to discredit such testimony.

1  Two or more persons witnessing an incident or a transaction
2  may see or hear it differently; and innocent misrecollection,
3  like failure of recollection, is not an uncommon experience.
4  In weighing the effect of a discrepancy, always consider
5  whether it pertains to a matter of importance or an
6  unimportant detail, and whether the discrepancy results from
7  innocent error or intentional falsehood.

8          After making your own judgment, you will give the
9  testimony of each witness such weight as you think it
10 deserves.  You may accept or reject the testimony of a
11 witness.  You may accept some and reject other parts of the
12 witness's testimony.  It is entirely up to you.

13         You may find that the testimony of a small number of
14 witnesses as to a fact is more credible than the testimony of
15 a large number of witnesses testifying to the fact.  A witness
16 may be discredited or impeached by contradictory evidence or
17 by evidence that at some other time the witness has said or
18 done something or has failed to say or do something that is
19 inconsistent with the witness's testimony during trial.

20         If you believe any witness has been impeached and
21 thus discredited, you may give the testimony of that witness
22 such credibility, if any, you think it deserves.

23         If a witness is shown knowingly to have testified
24 falsely concerning any material matter, you have a right to
25 distrust such witness's testimony in other particulars, and

JA1356

1  you may reject all the testimony of that witness or give it

2  such weight as you think it deserves.  False testimony is

3  knowingly made if made voluntarily and intentionally, and not

4  because of mistake or accident or other innocent reason.

5       Now, of course, you'll recall that in this case you

6  heard evidence from witnesses who have testified as experts in

7  particular fields.  An expert witness is permitted to testify

8  in the form of an opinion in a field where he purports to have

9  specialized skill or knowledge.

10      As I have instructed you, you are the sole judges of

11  the credibility of each witness and the weight to be given to

12  the testimony of each witness.  In making this determination

13  as to the testimony of an expert witness, you should consider,

14  in addition to the other tests of credibility and weight about

15  which I have instructed you, the evidence with respect to the

16  witness's training, qualifications, and experience, or the

17  lack thereof; the reasons, if any, given for the opinion;

18  whether or not the opinion is supported by facts that you find

19  from the evidence; and whether or not the opinion is

20  reasonable; and whether or not it is consistent with the other

21  believable evidence in the case.

22      In this case you heard testimony from experts for

23  both sides.  While you should carefully consider this

24  evidence, you are the sole judges of the facts.  In

25  considering the opinions of the experts, you may accept all,

454

1 none, or some of each expert's opinions. You may accept some

2 opinions from one expert and some opinions from another

3 expert. You are not bound by the opinions of the experts as

4 in the end it is your opinion that matters as long as that

5 opinion is based on a careful consideration of all the

6 evidence in the case and the law as I have and will give it to

7 you and your common sense.

8         You should consider the opinion of an expert witness

9 but you are not bound by it. In other words, you are not

10 required to accept an expert witness's opinion to the

11 exclusion of the facts and circumstances disclosed by other

12 testimony.

13         And, of course, you may not consider any matter that

14 was rejected or stricken by the Court. It is simply not

15 evidence.

16         And, of course, your verdict must be -- must not be

17 based in any way on prejudice, sympathy, bias, guess work or

18 speculation.

19         Now, you will hear, as I said, the closing arguments

20 of counsel. I'll say it for the umpteenth time. This will

21 not be evidence because they're contentions of what the

22 evidence is or will show. And again, if you discern any

23 difference from what they say the facts are and what you

24 recall, it is your memory that guides.

25         Because the case was initiated by Honeywell, they

JA1358

1  have the right to have the first closing argument and then

2  OPTO will give its closing argument and then Honeywell may

3  have a rebuttal argument to follow.

4          The jury is with Honeywell.

5          (Pause.)

6          THE COURT:  All right.  Members, of the jury, I've

7  got to take up a couple issues with the lawyers.  Let me ask

8  you to retire to the jury room for just a moment.

9          (Jury exited the courtroom.)

10         THE COURT:  All right.  Mr. Stevens, you wanted to

11  be heard before closing arguments?

12         MR. STEVENS:  Yes, sir, Your Honor.  I think we need

13  the opportunity to make our 50(a) motions.

14         THE COURT:  Well, I thought that we had agreed

15  before we brought the jury in that they would be considered as

16  having been made and would be addressed while the jury was

17  deliberating.  But now that we've got them gone, go ahead.

18         MR. STEVENS:  Okay.  First off, we would move for

19  judgment as a matter of law on our breach claim.  We don't

20  believe that the evidence has raised a triable issue to any

21  defense that they have put forward.

22         As Your Honor is going to instruct the jury, breach

23  has three elements.

24         The first is a valid contract.  That's stipulated in

25  this case, so that's already beyond proof.

456

          1          The second question is whether they breached.  And
          2   here there's really three questions:
          3          Whether the issues -- the symbologies at issue
          4   constitute 2D barcode symbologies.  And that has been answered
          5   in the affirmative both because they've not presented evidence
          6   to show otherwise and, second, because there's a request for
          7   admission.  It's been entered into this case.  And so they are
          8   not allowed to take a position contrary to the request for
          9   admission.  And so it has to be a 2D symbology.
         10          From that point forward, there's been no contrary
         11   evidence or no rejoinder or rebuttal of any sort that the 18
         12   products we're hear talking about all do support those
         13   symbologies and that there is no royalty paid for those.
         14          So based upon that, we don't believe that they have
         15   put forward any triable issue in defense of our claim for
         16   breach.
         17          THE COURT:  Motion is denied.
         18          MR. STEVENS:  Thank you, Your Honor.
         19          Next, on the implied -- I'm sorry, on the unilateral
         20   mistake of fact affirmative defense, you're going to charge
         21   the jury that, quote, "The parties came to a specific prior
         22   understanding that differed materially from the written
         23   agreement."
         24          I don't even know what that is.  There's been no
         25   evidence in this case that there was a different prior

JA1360

457

1   understanding.  It's never been pointed to.  There was not a
2   single witness from the other -- from the defense in this case
3   that ever came to the stand or was presented via deposition
4   that said he or she had a different understanding of the terms
5   prior to the case.  So that's not even been identified
6   whatsoever.

7           Moreover, they have to prove that they were mistaken
8   about something.  There's a mens rea element to that.  You
9   have to prove that you were mistaken.  Nobody in this case
10  came up and sat in that chair or was presented by deposition
11  that ever said that they had a mistake of fact prior to the
12  license.  There's not one ounce of testimony that can possibly
13  support that, and that's a burden that they bear by clear and
14  convincing evidence.

15          THE COURT:  Well, the motion in general is denied.
16  And that last part is demonstrably untrue.  There's a host of
17  evidence from which a jury could find that OPTO did not
18  understand the definition in the contract to mean what has
19  been argued to me.  So denied.

20          MR. STEVENS:  Okay.

21          Next is their affirmative defense of quasi-estoppel.
22  Again, you know, under Delaware law it only applies when
23  there's an -- where it would be unconscionable to allow a
24  person to maintain a position inconsistent with one to which
25  he acquiesced.

JA1361

458

1          There's no testimony in this case -- first off, I
2    believe that unconscionability is a question for the Court,
3    not for the jury.  I appreciate Your Honor disagrees with
4    that.  But there's been no evidence here that there has been a
5    position that Honeywell acquiesced to.  That's an affirmative
6    act that Honeywell has to make in order to bless some other
7    position.  There's been no testimony about that here that that
8    ever happened.
9          Moreover, the doctrine -- according to the *In Re*
10   *Baker Hughes* case from the federal circuit in 2000, the
11   doctrine only applies when the earlier position amounts to a
12   misstatement of fact, not of law.  So there would have to be
13   something where Honeywell pointed to a fact that is different.
14   Can't be a misunderstanding about the terms of a contract.
15         And the misstatement must be one upon which the
16   opposing party reasonably relied.  We heard no testimony from
17   any OPTO witness in this case that they reasonably relied upon
18   any misstatement of fact that Honeywell made.  Therefore,
19   there is not a triable issue on that either.
20         THE COURT:  Denied.
21         MR. STEVENS:  Okay.  And then finally, on the
22   counterclaim of the implied breach of the covenant of good
23   faith and fair dealing.  First off, there's a threshold issue
24   with this.  As I think Your Honor is aware, the rules on this
25   require the Court to first adjudicate whether there is a gap

JA1362

1   in a contract.  And then only charge the jury if the Court

2   finds that there is a gap in the contract that needs to be

3   filled and that Honeywell had some sort of implied duty based

4   upon a contractual gap.

5        That's a question for the Court.  It's very akin to

6   in North Carolina the 75-1.1 statute where it's the judge's

7   decision -- the judge's obligation first to figure out, you

8   know, the facts and whether or not the allegation rises to a

9   75-1.1, and then charge the jury to figure out whether they

10  agree with the facts.

11       It's very similar here.  There's a first step and

12  that's a step for the Court.  And there must be -- the Court

13  must find a contractual gap.  If the Court finds a contractual

14  gap, it's then the jury's question to figure out whether

15  Honeywell made some breach relating to that gap.  That's not

16  been done in this case.  So we believe both it's deficient to

17  send to the jury from that point of view and there's been no

18  fact to actually support it whatsoever.

19       THE COURT:  Mr. Muckenfuss, would you like to

20  respond to that?

21       MR. MUCKENFUSS:  Yes, Your Honor.

22       I think there is abundant evidence as to, for

23  example, Section 4.9 and the Second Amendment intrinsic to the

24  contract as to whether the parties intended here for the

25  products in question to be included under Section 1.4.  So I

460

1  think there is sufficient evidence on that point as to whether
2  there is a gap in the contract.
3      MR. STEVENS:  And the gap cannot be -- again,
4  this -- the basis of this claim cannot be a fight about the
5  actual words of the contract.  If the language in a contract
6  expressly covers a particular issue, the implied covenant does
7  not apply.  He pointed to something that's in express language
8  in the contract.  That cannot be the basis for such a claim
9  here.
10     THE COURT:  All right.  The motion is denied.
11     Please bring the jury.
12     (Jury entered the courtroom.)
13     THE COURT:  All right.  The jury is with Honeywell.
14     MR. STEVENS:  Thank you, Your Honor.
15     So I'd like to start off today where I started off
16 with you on Monday and say a heartfelt thank you for coming.
17 We appreciate that this is an imposition on your life.  And
18 this is a very important case to Honeywell and thank you so
19 much for your time.  And I mean that whichever way you guys
20 decide.  When you go back in that room, whichever way you
21 decide, I want you to know that we really do appreciate your
22 time and that you are an integral part of this process.
23     As I mentioned, the Constitution does say, and I
24 fully support it, that juries like you are the ones that get
25 to decide disputes like this here in this country.

JA1364

461

1          So I told you at the outset of this case that I
2    thought this was a pretty simple and straightforward case and
3    I thought -- I told you at the beginning that I thought the
4    evidence would show that they made products that they didn't
5    pay us for that breached the agreement.  Straightforward.  And
6    I believe that the evidence showed that, and I'd like to walk
7    through some of that with you.
8          But before I do, you heard the judge a few moments
9    ago talk about the burdens of proof.  And again, there are two
10    different burdens of proof in this case.
11          The one that we have to meet is something called
12    preponderance of the evidence.  And if you think about the
13    scales of justice, as I've put on the screen, that means if
14    you find the scales tip our way just a little bit, then you
15    find for us.  In other words, if we sort of prove our case to
16    you by 50.1 percent, that's the preponderance of the evidence.
17    That's the burden that we have to live up to.  And we
18    appreciate that that's our burden.  And frankly, I think the
19    evidence went far, far beyond that.
20          So let's walk through some of that briefly.  I'm
21    sure you guys are sick of seeing 1.4, but I'll show it to you
22    one more time here.
23          The definition of 2D Barcode Products that both
24    parties agreed to at the time they signed this agreement says,
25    quote, "The term 2D Barcode Product shall mean any device or

JA1365

1 article of manufacture that is operable to decode at least one

2 or more two-dimensional barcode symbologies in a

3 human-readable text."

4         And you heard from Ms. Ashihara and you heard from

5 their expert they have products that do that.  They have laser

6 products that do that.  They have CCD products that do that.

7 They have image sensor products that do that.  And you saw the

8 evidence, you saw the product sheets, you saw the

9 interrogatory answer, and you heard all the testimony.

10 There's no dispute in this case that those products do support

11 more than one 2D symbology.

12         So how do we figure out if something is 1D or 2D,

13 the question that I asked us together on Monday morning?

14 Well, right here we look at the standard.  Because the

15 agreement says to look to the standard.  When these parties

16 were sitting down back in 2020, they said let's just look to

17 the standard.

18         Well, we did that in this case.  We showed you that

19 the standard for PDF417 right there on the screen says it's

20 two-dimensional.

21         We showed you that the standard for the composite

22 codes, CCA, CCB, CCC, is two-dimensional.  So PDF417,

23 MicroPDF417, composite codes CCA, CCB, CCC all

24 two-dimensional.  That's five different two-dimensional codes

25 that these products support, not just one.

463

1          Lest there be any doubt, you saw the expert that

2   OPTO hired to testify to you.  Even on his own created chart,

3   he says that PDF417 and MicroPDF417 are examples of

4   two-dimensional symbologies.

5          Can't be more simple than that.

6          You saw their product literature and you heard the

7   testimony that the products do support 2D symbologies.  I

8   mean, these are OPTO's own words here on the screen.  When

9   they want people to buy their products or understand how their

10  products work, they say that it supports 2D symbologies.

11  Right there on the screen.

12         This is the MDL-2001.  This is a laser-based

13  product.  And OPTO told its customers when they were trying to

14  induce them to buy the product, told the customers that they

15  support 2D symbologies, including composite codes,

16  MicroPDF417, and PDF417.

17         Here's another example, the OPR-3201 barcode laser

18  scanner.  It says right there it supports 2D symbologies.

19         Now, the other side makes a big deal, well, these

20  are public; you should have known it.  Yeah, when we signed

21  the agreement, we thought that these were going to be paid

22  for.  We thought that these products were going to be subject

23  to the royalty because they infringe Honeywell's patents.  In

24  this case OPTO has conceded that these products might

25  infringe, quote, scores of Honeywell's patents.  Scores.

JA1367

 1  That's 20s of Honeywell's patents.

 2          So was this public when we signed the agreement?

 3  Yeah, it sure was.  Sure was.  And we expected them to pay a

 4  royalty on it.  It wasn't until we got to those come-clean

 5  emails in October that they finally said, oh, we've changed

 6  our mind; we're not going to pay you for these products after

 7  all.

 8          So I think this case is really just this

 9  straightforward.  You've got the definition there.  You add

10  the standards and what the standards tell us about the fact

11  that all these symbologies are two-dimensional.  You add the

12  proof, the overwhelming proof, that these products actually

13  support these symbologies, i.e., they're operable to decode

14  these symbologies.  You actually saw us do it on the stand.

15  You actually saw us do it with one of these products and

16  decode a PDF417 symbology.

17          I would suggest to you that right there that proves

18  breach.  And I don't think that they've come to you with any

19  sort of argument to the contrary on anything that I've just

20  said.

21          But if we want to dig into it one step deeper, the

22  gentleman that they hired as their expert, Mr. Chartier that

23  you saw on the two-hour deposition, he's the guy that was the

24  principal author of the first standard for PDF417.  I mean, he

25  knows what he's talking about when it comes to creating the

465

1  symbologies.  And that's what he wrote there on the screen.
2  And he was the primary author for this, but he wasn't speaking
3  by himself.  It was the backing of the entire standards body,
4  as he said.

5           Symbologies are two broad categories.  There's
6  linear symbologies on the one hand and there's two-dimensional
7  symbologies on the other.  And what did he write?  PDF417 is a
8  two-dimensional symbology.

9           This isn't a secret within the industry.  Everybody
10  knows this.  Everybody has access to these standards documents
11  when they're creating their product.

12           So, ladies and gentlemen, I would respectfully
13  submit that we have met our burden and that we have proved
14  that they breached the agreement in this case.

15           And these are the products that you heard our
16  expert, Mr. Smith, go through every single one this week.
17  These are the list of the 18 products for which OPTO did not
18  pay us royalties.  But each one of those products you heard
19  Mr. Smith go through, go through their interrogatory answer,
20  and say that each one of these products does in fact support
21  multiple two-dimensional symbologies.

22           Now, I also mentioned at the beginning of this case
23  that I thought that they were going to try to complicate
24  things.  I think I was right about that.  They've tried to
25  bring up things that happened before the contract, right?

JA1369

1    I've showed you that the parties agree that that was supposed
2    to be out.  The parties agree that anything that's in the
3    contract is what matters, not something that happened outside
4    the contract.
5         And then the other side has brought this Excel
6    spreadsheet from Europe that they wanted you to look at
7    yesterday.  I want to be very clear.  We're not asking for
8    damages for anything in Europe.  When the parties sat down and
9    negotiated Europe, by that point in time, you know, Honeywell
10   had lost a little bit of trust in OPTO, and so what they
11   decided to do was just have a flat fee per year.  So it
12   doesn't matter in Europe whether a product is a 1D Barcode
13   Product or a 2D Barcode Product.  OPTO just pays us a flat
14   check everywhere for Europe.  Whether they sell one dollar or
15   a billion dollars worth of product, it's a flat fee per year.
16        So the Europe dispute -- there is no Europe dispute.
17   It's very different.  We're not alleging any breach of that.
18   We're here to talk about the United States and the fact that
19   they didn't pay us the royalties that they agreed to pay us in
20   the United States.
21        Now, when Mr. Muckenfuss gets up here in a few
22   minutes, I think he's going to talk about all these things
23   other than the contract and try to talk about the Second
24   Amendment that applies to Europe, things like that.  But I do
25   want you to remember, it's his burden -- if he's going to get

1   up here and talk about some sort of mistake or anything that
2   OPTO made, it's his burden to prove that by clear and
3   convincing evidence, and that's something different.  If you
4   remember, the burden for Honeywell here is to prove this much
5   (indicating) that we've convinced you.  His burden is more
6   like this (indicating).  He has the burden by clear and
7   convincing evidence, and you heard the judge describe that
8   just a few moments ago.
9           With that, I'm going to pause and let them make
10  their closing argument and I'll have the privilege of talking
11  to you a little bit more in a few minutes.
12          Thank you very much.
13          THE COURT:  The jury is with OPTO.
14          MR. MUCKENFUSS:  Thank you, Your Honor.
15          May it please the Court:
16          Good morning, ladies and gentlemen.
17          I want to echo Mr. Stevens and thank you for serving
18  on the jury.  I know you had to probably sit through some
19  tedious video depositions and we very much appreciate your
20  attention to the case.  It is very important to both sides.
21  It's a very important process and you folks are the ones that
22  have to sit through this and make a decision, and so thank you
23  for that.
24          I do have a little bit of a PowerPoint this time so
25  I will put that up.

JA1371

468

1          I want to go through -- at the beginning of this

2   case in my opening statement, I told you what the evidence was

3   going to show, and I'm going to go through that evidence.

4          The first thing I said, the evidence would show that

5   OPTO acted consistently; that it understood that no laser

6   scanners would be included as 2D Barcode Products.

7          The second point that I told you the evidence would

8   show is that OPTO told Honeywell and Honeywell understood that

9   no one-dimensional, 1D laser scanners would be included as

10  two-dimensional or 2D Barcode Products.

11          The third point that I made that the evidence would

12  show is that Honeywell actually agreed that it understood that

13  no one-dimensional, 1D laser scanners would be included as 2D

14  Barcode Products.  I'm going to go through that evidence in a

15  second, but I want to talk about something that sort of -- I

16  sort of view it as two ships passing in the night.

17          So Honeywell spent an enormous amount of time in

18  this case, as you heard from their counsel, trying to show you

19  that the symbol, this barcode, PDF417, is called 2D.  We've

20  never disputed that PDF417 is called 2D.  I never said that

21  it's not called 2D.

22          The evidence that we presented with our experts in

23  this case was explaining PDF417.  We've admitted in the

24  case -- Mr. Stevens said it.  At the beginning of this case,

25  they asked us about the standards and whether PDF417 is called

JA1372

1  2D.  We admit that, that's true.  We're not fighting about

2  that in this case.  That's not what this case is about.

3          And just to illustrate that a little bit, so as

4  Mr. Stevens noted, OPTO had public documents going years back

5  that showed that its laser scanners could decode PDF417,

6  MicroPDF417, and composite codes.  You heard from Honeywell

7  for hours in this case tell you that these codes are called

8  2D.  We admit that.  They are called 2D.  They also have been

9  called 1D stacked barcode symbologies.

10          So on the right of the screen that you're looking

11  at, that is the patent that was filed by Honeywell in this

12  case -- excuse me, not in this case, but it is a patent that

13  was filed with the U.S. Patent Office.

14          So what did Honeywell call PDF417 in its own patent?

15  It called it a 1D stacked barcode symbology.

16          The point of the evidence from our position is to

17  explain how PDF417 is read by a laser scanner and the reason

18  that Honeywell called it a one-dimensional stacked barcode.

19  And if you guys remember the analogy that I had, right?  The

20  UPC code is like one sentence.  Like, when you read one

21  sentence from left to right, that's one-dimensional.

22          But PDF417, which is sort of a weird name for a

23  barcode, or a MicroPDF417, all it does is it makes a

24  paragraph, right?  So you have a one-dimensional code.  What

25  PDF417 does, it just creates a paragraph.  So you actually

1    have to scan with a laser scanner, go back and -- you know,
2    you go from left to right for each row.  That is unlike very
3    popular traditional 2D symbologies like QR code, right?  For
4    the QR code you take a picture.  That was the point of the
5    evidence.
6              The point of that from our side is that laser
7    scanners, even though they can read PDF417, are still
8    one-dimensional.  They're still 1D Barcode Products.  And that
9    was what I said to you in opening statement.  The question you
10   have to ask in this case is whether those one-dimensional, 1D
11   laser scanners are two-dimensional, 2D Barcode Products in
12   this case.
13             Now, I do want to talk about the contract.
14   Mr. Stevens suggested that I'm trying to distract you or talk
15   about something other than the contract.  I want to talk about
16   the contract and I'm going to talk about it a little bit here,
17   if you'll bear with me.
18             So first, before I get into the contract, I just
19   want to reorient you to the timeline of this case.
20             So first, as you recall, the License and Settlement
21   Agreement was executed on January 22, 2020.  That's the only
22   agreement -- or part of the agreement that Honeywell wants to
23   focus on.
24             And I'm going to go through these emails again.  As
25   you may recall from the testimony when Mr. Doane was on the

1    stand, the emails where OPTO told Honeywell that these
2    one-dimensional laser scanners were not included as
3    two-dimensional barcode products, that occurred in
4    September/October 2020.
5            After that, on February 3, 2021, Honeywell and OPTO
6    signed the Second Amendment.  I understand Honeywell's theme
7    here.  They want to say that's Europe; it's not the United
8    States.  That's not true.  This is part of the entire
9    settlement agreement.  There was litigation in the United
10   States and in Europe, true.  But the Second Amendment
11   constitutes the entire document.  It constitutes the entire
12   agreement.  And I'm going to get to that.  I'm going to talk
13   more as to why the Second Amendment is relevant to this case.
14           But the Second Amendment -- I think Mr. Stevens said
15   how do you figure out if something is 1D or 2D, right?  That
16   is sort of the question.  The Second Amendment did that.  The
17   parties applied the definition of 2D Barcode Products to
18   OPTO's products and they excluded one-dimensional laser
19   scanners.  It's that simple.  I'm going to go through that.
20           So what did Honeywell get out of this by executing
21   the Second Amendment?  What happened was roughly 20 days
22   later -- remember those nullity actions I talked about?  Those
23   were the claims that OPTO brought against Honeywell to
24   invalidate Honeywell's patents.  Honeywell was worried about
25   that.  Remember Mr. Stevens, they made a point to say OPTO had

472

1    really good patent counsel, right?  They were worried about
2    those nullity actions.  They got the benefit of OPTO
3    dismissing them after they signed the Second Amendment.
4         It was only after all of that that Alston & Bird
5    sent a letter to OPTO for the first time claiming that
6    one-dimensional laser scanners should be included as
7    two-dimensional barcode products for the first time.
8         So I want to -- if you can bear with me here a
9    little bit, I want to go back to the Second Amendment and look
10   at that sentence in the Second Amendment.
11        So in the Second Amendment it states that -- and
12   remember, there is litigation in Europe and the United States.
13   It's all part of the same fight, right?  So the parties amend
14   the agreement to state that "Honeywell understands that
15   Opticon's revenue from 2D Barcode Products in Europe in 2019
16   was €4.4 million."
17        So Honeywell claims, okay, this is irrelevant.  Why
18   are we talking about this?  It's in Europe.
19        Well, what's the one phrase in the sentence that
20   Honeywell wants to focus on in this case and claim that OPTO's
21   one-dimensional laser scanners are included?  It's the phrase
22   2D Barcode Products.  Again, you guys have seen that
23   definition a lot, but I want to go back to it.
24        There it is.  You've seen it over and over.
25        So the Second Amendment is not disconnected from the

JA1376

1  rest of the agreement.  The Second Amendment is where the

2  parties applied the definition of 2D Barcode Products, which

3  is in 1.4.  They applied it to OPTO's products and they made a

4  decision about what products should be included under that

5  definition of 2D Barcode Products.  That's why the Second

6  Amendment is critical because that's what the parties actually

7  agreed to.

8         They want to talk about PDF417, MicroPDF417 all day.

9  Again -- and Mr. Stevens will get up after me and show you

10 more stuff about it's 2D, it's 2D.  He doesn't want to talk

11 about this.  Honeywell doesn't want to talk about the Second

12 Amendment.  They don't -- they just want to just leave it

13 alone.  But it's critical because the parties apply the

14 definition to the products.

15        So I want to go through the evidence that was before

16 you on the Second Amendment and what OPTO told Honeywell.

17        So you remember Ryan Goldstein, these emails.

18 Again, Mr. Goldstein was OPTO's lawyer at the time.  Okay.  So

19 he's representing OPTO.  And he sends this email September 16,

20 2020, to Ben Pleune and Adam Doane.  They're here in the

21 courtroom.  They are lawyers with Alston & Bird.  They

22 represent Honeywell, right?

23        You'll remember Mr. Goldstein sends a lot of

24 information to Alston & Bird about their products, about

25 OPTO's products, and about how they were classifying the

1  products specifically for the sales in Europe, which we just
2  looked at in the Second Amendment.  Okay.
3          So remember the spreadsheet that was attached.  This
4  is a very important spreadsheet.  It's not some random
5  spreadsheet, right, that's in Europe, right?  It's not like
6  it's physically in Europe.  This is a spreadsheet sent to
7  Honeywell's counsel here in Charlotte.  So Honeywell's
8  counsel, same counsel, in Charlotte, North Carolina, they get
9  the spreadsheet because they want the information.
10 Honeywell's lawyers want a lot of detailed information to
11 figure out what OPTO is including in the calculation of the
12 sales in Europe.
13         Mr. Stevens suggested, well, it didn't matter.  It's
14 a flat fee.  Well, if it didn't matter, why are they asking
15 Mr. Goldstein for all of this detailed information?  And
16 Mr. Goldstein told them, right?  So we focused on 2019 because
17 that's the year that's in the Second Amendment, right?  If you
18 remember that sentence, OPTO tells them €4.4 million for 2D
19 Barcode Products.  It's the same number that's in the
20 spreadsheet right there, 4.4 million.
21         So what did Mr. Goldstein show them?  You remember
22 the spreadsheet.  It had a list of countries in Europe for
23 2019.  Mr. Goldstein sends this email where he is telling
24 Alston & Bird again details about the spreadsheet, right?  And
25 these are products that OPTO makes.  So these are products on

475

1  the spreadsheet.  They're the laser scanners.  They're the

2  image sensors, right?  The kind of scanners where you take a

3  picture of the QR code.  It also contains the products, the

4  laser scanners that we're fighting over in this case.

5         And what did Mr. Goldstein tell Alston & Bird?  He

6  goes through the tabs, the Cat 1 tab, and what does he tell

7  them?  "With respect to the European sales, I know that you

8  wanted a better idea of what products are covered in the Cat 1

9  tab.  I think the confusion may be a result of the excel

10  sheets providing information beyond 2D products."

11         He goes on -- and this is the critical part here.

12  So he's explaining the product categories.  He says, "The 2D

13  items are only the ones that have 2D written by them in column

14  A, so those are the items aggregated as 2D barcode products.

15  The rest of the information relates to products like laser

16  that are not 2D."

17         So Mr. Goldstein representing OPTO tells Honeywell's

18  lawyers:  We are not including the laser scanners, any of

19  them, none, in the definition of 2D Barcode Products, because

20  that's the whole point of the spreadsheet, right?  OPTO is

21  giving Honeywell information, sales information, about their

22  products in Europe and they're telling them they're not 2D

23  products.

24         So remember Mr. Stevens in his argument, he admits,

25  yeah, we knew.  We knew way back when we signed the first

JA1379

1    agreement that OPTO's laser scanners could decode PDF417.  He

2    said that.  They knew when they got this email, the lawyers

3    and Honeywell knew that there were laser scanners that could

4    decode PDF417.  And Mr. Goldstein is telling them:  We're not

5    including laser scanners in 2D Barcode Products.  They're not

6    hiding it.  OPTO is not hiding it.  They're telling them the

7    truth.  It's the consistent understanding of OPTO.  They

8    always told them this.

9           So let's look at the spreadsheet that Mr. Goldstein

10   provided Alston & Bird.  Remember, it's very specific.  It

11   notes 2D by the products.  If you look at, like, line 37,

12   that's a laser scanner product, right?  The same kind of

13   products that Honeywell is saying should be 2D Barcode

14   Products, they were told in this email that OPTO was not

15   including them as 2D Barcode Products.  And the list goes on.

16          So OPTO was very truthful.  There's not a shred of

17   evidence in this case that OPTO lied to Honeywell or said

18   something inconsistent to Honeywell about this point.

19          Let's look at the rest of the email.  Mr. Goldstein

20   goes on in detail and tells them, look, in the rest of the

21   lines, it's only the products that we note 2D.  And again, we

22   looked at that spreadsheet and OPTO was very specific about

23   which ones were 2D.

24          The one thing I want to note, too, ladies and

25   gentlemen, OPTO -- it's not like they just left laser scanners

JA1380

1   off the spreadsheet, right?  They actually told Honeywell how
2   much revenue, the quantity.  So I mean, OPTO is being very up
3   front.  They're telling Honeywell, okay, these are our laser
4   scanners.  This is how many we've sold.  This is how much
5   revenue we have.  But we're not calling them 2D.  So they're
6   being honest with Honeywell and telling them that.
7           Mr. Goldstein sends another email.  This is
8   October 23, the last email that you saw in evidence.
9   Mr. Goldstein says it again just in case there's any
10  confusion.  He says in the last paragraph, "The products not
11  included range from laser and CCD products to peripherals like
12  batteries, cradles," then he goes on.  So he tells them again
13  that OPTO is not including laser scanners as 2D Barcode
14  Products in calculating the $€4.4 million that's in the Second
15  Amendment.
16          So I just want to pause there.  So what did Alston &
17  Bird do after they got these emails?  How did they react to
18  it?  Did they email back and say whoa, whoa, whoa, we know
19  that some of your laser scanners can decode PDF417.  You can't
20  do that.  Why are you leaving them off as 2D Barcode Products?
21  They didn't do that.  They have a team of lawyers, patent
22  litigators, I think eight.  None of them emailed back and said
23  we don't agree with this.  This is a problem.  You know, we
24  have a definition of 2D Barcode Products in the contract and
25  you're telling us that laser scanners and CCD products are not

1  included?  They don't email back and say that, eight patent

2  litigators.  None of them write back and say this is a

3  problem.  They actually thank Mr. Goldstein:  Thank you for

4  the information.  This is helpful.  And they stayed quiet.

5  They don't say anything else.  Remember the Second Amendment.

6           So these emails happen in September, October 2020.

7  Alston & Bird get the emails for Honeywell.  They don't say

8  anything.  They don't say that's a problem.  They don't say,

9  hey, laser scanners should be under 2D Barcode Products.  So

10  what happens after that?

11           In February Honeywell signs the Second Amendment and

12  they say Honeywell understands that Opticon's revenue from 2D

13  Barcode Products -- we looked at the definition -- in 2019 was

14  €4.4 million.  We looked at the spreadsheet.  The spreadsheet

15  was clear.  No laser scanners.  Honeywell has admitted in this

16  case at this time they know OPTO Electronics has laser

17  scanners that can decode PDF417.  So they knew it.  They

18  agreed with it and they signed the Second Amendment, which is

19  part of the entire settlement agreement, where they agreed to

20  it.  We've proven that beyond any doubt.  I don't care what

21  standard of proof you apply to it, it's clear.

22           Now, they want to avoid it and say this is

23  irrelevant.  This has nothing to do with the agreement.

24           It has everything to do with the agreement.  This

25  whole case is about whether laser scanners are defined as 2D

1    Barcode Products.  In the contract they are applying the

2    definition to products that they think are 2D Barcode

3    Products, and they agreed that it doesn't include

4    one-dimensional laser scanners.

5          The €4.4 million.  It's not just Europe and the

6    United States; it's about one agreement.

7          Now, you might remember Mr. Doane was on the stand.

8    This was a very interesting moment in the trial for me.  You

9    may recall Mr. Doane.  I'm asking him questions about these

10   emails we just went through.  And every time I asked him a

11   question, I would ask him, "So you got this information from

12   Mr. Goldstein."  And then Mr. Doane would just offer up,

13   "Yeah, but I couldn't tell my client."  I don't know if you

14   remember that.  But every time I'd ask the question pretty

15   much, he would offer up, "Well, I was under a protective

16   order.  I couldn't tell Honeywell."

17         I sat down.  Mr. Stevens got up and he double downed

18   on it.  He was like, "Yeah, there was a protective order."  I

19   think he even asked Mr. Doane, "If you told Honeywell, you

20   could go to jail."

21         And I was thinking to myself, why is that relevant?

22   Why does it matter if Honeywell knew this?  And why are they

23   trying to make a point that the lawyers knew but the client

24   didn't know?

25         I'll tell you why.  Deniability.  They know this

480

1  information is not good for them in this case.  They were
2  actually trying to separate the lawyers from the client.  They
3  want Honeywell to be able to say, well, we didn't know that so
4  you can't stick us with it.
5        Well, the judge in this case is going to answer that
6  question about the law.  And I want to show you what the judge
7  is going to instruct you about Honeywell's lawyers and their
8  client.  This is the entire part of it.  The part I want to
9  focus on is highlighted.  What the judge is going to tell
10 you -- and I'll read it -- "Thus, in this case you must assume
11 that the conduct of Honeywell's attorneys is also the conduct
12 of Honeywell."
13       So all of this stuff about, hey, the client didn't
14 know, I couldn't tell the client, it doesn't matter, Alston &
15 Bird is Honeywell.  Every time you see an email with Alston &
16 Bird, it's Honeywell.  Every time you see an Alston & Bird
17 lawyer say something in an email, it's Honeywell.
18       The same is true for OPTO, and that's fine.
19 Mr. Goldstein was representing OPTO.  You saw those emails.
20 So he's OPTO.  And that's true.  OPTO is telling them the
21 truth.  We do not believe and we're not including
22 one-dimensional laser scanners as two-dimensional barcode
23 products.  And Honeywell agreed with that.
24       Now, I want to go back to a piece of evidence.
25 There was this claim chart.  This was actually the piece of

JA1384

1  evidence that Mr. Doane -- I showed him this claim chart.

2  Remember the claim chart is where Honeywell can say, you know,

3  under this patent we're challenging OPTO's products.

4          Mr. Doane made a big deal to tell me, "It's

5  attorneys' eyes only, look.  I couldn't tell my client.

6  Attorneys' eyes only.  I could go to jail if I showed my

7  client."  Well, the judge is going to tell you that doesn't

8  matter, right?  He is Honeywell.

9          So why are they afraid of this claim chart?  Why do

10  they want to try to convince you Honeywell didn't know about

11  it?  Well, you remember their expert, Craig Smith.  He had

12  that scanner, right?  He was up here and he showed you.  And

13  they tried to demonstrate, ah, look, OPTO's laser scanner can

14  decode PDF417.  Again, we don't dispute that.  They spent a

15  lot of time trying to show you that OPTO's laser products can

16  decode PDF417.  We don't dispute that.  That's not what the

17  case is about.

18          What the case is about, what they didn't tell you,

19  that very product is listed on this claim chart, the same

20  product, OPR-3201Z.  A laser scanner is on Honeywell's claim

21  chart and it's listed as a one-dimensional product.  That's

22  why Mr. Doane wanted to make you believe that Honeywell didn't

23  know about it.  They called it a one-dimensional product.

24          Now, Mr. Stevens will tell you, oh, you know, it's

25  complicated patent stuff.  It applies to hardware.  Or it

482

1  applies to some other type of, you know, part of the patent.
2  I don't know about that.  What I do know is Honeywell called
3  it a one-dimensional product.
4        Who signed the agreement, the Second Amendment,
5  actually signed all of the parts of the settlement agreement?
6  Brian Rudick.  Brian Rudick is the general counsel at
7  Honeywell.  He signed the agreement that said Honeywell
8  agreed, understood that laser scanners were not being included
9  as two-dimensional barcode products.  They can't hide behind
10  Alston & Bird.  They knew.
11        So Ms. Ashihara, you may recall, came here from
12  Tokyo.  She testified in this case on behalf of OPTO.  She
13  told you that OPTO has paid Honeywell over $10 million in
14  royalties already on 2D Barcode Products.  She told you
15  truthfully, she told you truthfully they did not include laser
16  scanners when they made the royalty payments.  They've never
17  hidden that.  There's no evidence that OPTO is hiding its
18  laser scanners.  Honeywell knew about its laser scanners.
19  They knew what the laser scanners can do from the beginning.
20        Ms. Ashihara told you the truth.  She told you that
21  the laser scanners can decode PDF417.  She told you that OPTO
22  calls them 2D.  She told you the truth.  We're not trying to
23  say they're not 2D.  All we're asking you is to look at the
24  whole contract and what did Honeywell agree?
25        So, ladies and gentlemen, back to the three things I

JA1386

1  started with in this case.

2      OPTO acted consistently.  They always understood and

3  they were truthful that they did not include one-dimensional

4  laser scanners as 2D Barcode Products.  Yes, they called this

5  symbol PDF417 2D.  That's not what the case is about.

6      OPTO told Honeywell -- we looked at that evidence.

7  They told Honeywell that no laser scanners would be included.

8  We just went through all that.  Mr. Rudick on behalf of

9  Honeywell signed a contract where he agreed after getting all

10  of the information from OPTO that laser scanners were not

11  included.  They applied the definition in the Second

12  Amendment.  Don't get distracted.  Mr. Stevens says it's

13  Europe.  It's a different continent.  It's the same products;

14  same settlement agreement.  Honeywell agreed.

15      I want to look at the contract.  I don't -- I'm

16  going to show you something.  I tried to -- my chicken

17  scratch.  The Post-it Notes, you guys may remember.  I wrote

18  this on a Post-it.  I tried to show you the Second Amendment.

19  Mr. Steven crossed it out.  He crossed it out.  He doesn't

20  want you to look at the Second Amendment.  He wants to say

21  it's irrelevant.  It doesn't matter.

22      But the parties applied the definition, the same

23  definition he's coming here today to convince you just because

24  a laser scanner can decode PDF417 as a 2D product, which we

25  don't dispute, don't look at the Second Amendment.  You have

1    to look at the whole agreement.

2          Honeywell knew.  Honeywell is taking inconsistent

3    positions in this case.  That's one of our defenses.  They

4    can't act one way and then act another.  They brought this

5    lawsuit and now they're trying to say something different than

6    what they agreed to in the agreement.

7          OPTO didn't breach the contract.  OPTO always was up

8    front with Honeywell.  Honeywell agreed to how OPTO classified

9    its one-dimensional laser scanners.  They signed the contract.

10   OPTO didn't breach.  They were consistent with how they

11   applied the contract to the laser scanners.

12          And finally, Honeywell can't come in here and hide

13   behind its lawyers and say there's a difference.  The judge

14   will tell you what their lawyers knew and what their lawyers

15   did equals Honeywell.  And that's critical in this case.  And

16   why would they -- why would they try to convince you there's

17   some relevance to that except to have deniability.

18          Don't let them deny the contract.  Hold them

19   accountable to the contract.  Don't let them change the deal

20   that they had with OPTO.

21          Thank you.

22          THE COURT:  The jury is with Honeywell.

23          MR. STEVENS:  So at the very end there, we heard the

24   evidence of breach.  He says they don't dispute that their

25   laser products are operable to decode 2D barcode symbologies.

485

1    So that should be the end of the breach case, right?  He said
2    that the products could do it.
3              I want to talk about the three things that he just
4    mentioned.
5              First, that OPTO was consistent about saying the
6    lasers weren't included.  That's not what the evidence showed.
7    If you heard Mr. Whitley and Mr. Doane talk about things that
8    happened before the agreement, that was not OPTO's position.
9              Mr. Muckenfuss put up the claim chart again that he
10   really, really likes, and he said I was going to make some
11   sort of patent lawyer really technical argument.  I'm not.
12   But I'm going to remind you of what Mr. Doane testified to
13   yesterday.
14             Mr. Doane testified that when that claim chart was
15   put in that case about that one specific patent, what did
16   OPTO's lawyers -- now, Mr. Muckenfuss just said whatever
17   OPTO's lawyers say, that's OPTO.  We shouldn't draw a
18   distinction.  Which, by the way, is fine with me.  What did
19   OPTO's lawyers say?  Mr. Doane sat up on that stand and
20   testified that they said no, we disagree.  While this one 1D
21   product can't decode PDF417 so that's properly a 1D product,
22   we disagree with many of the rest of them.  We don't agree
23   that those are 1D products.  Those are 2D products.  That's
24   what OPTO said in the ITC litigation.
25             And then when there is the mediation, you heard

JA1389

1  Mr. Whitley, who attended the mediation, you heard Mr. Whitley

2  say at that day the parties discussed the fact that the

3  settlement agreement was going to cover all products that were

4  operable to decode at least one 2D symbology.  Not just one

5  type of product; all products.  That was a hundred percent

6  clear before they signed the agreement.  That was the deal

7  walking in.  If there's any party that wants to change the

8  deal, it's these folks.

9         The evidence that Mr. Muckenfuss put up and spent

10  all this time on are emails that happened months later.  I

11  want to make sure everyone appreciates that the agreement was

12  signed in January of 2020 and the emails that he just put up

13  are all from September or October of 2020, about nine months

14  after the agreement.  At no point in time up to that had OPTO

15  ever mentioned that they weren't including laser products.

16  That had never been mentioned.  You heard the evidence in this

17  case that the royalty reports were not being made right after

18  the agreement was signed.  Those didn't start until later in

19  the year.  So they have not been consistent about that

20  position.

21         In the ITC case, as Mr. Doane testified, they said

22  that those products are not 1D products, they're 2D products.

23         At the mediation there was a clear agreement between

24  the parties that 2D Barcode Products would cover anything, any

25  hardware as long as it could decode at least one 2D symbology.

487

1  Then the parties went on operating under that understanding
2  for eight or nine months, and then they tried to change the
3  deal.  They sent this email saying "we're not including laser
4  products."  Okay.  Now we know.  Now we know you're hiding
5  something from us.  Now we know that you have not paid us the
6  things that you were supposed to pay us for.
7          Now, Mr. Muckenfuss wants you to think, well, that
8  was the end of the world.  Honeywell just sort of went away.
9  That's not true at all.  You heard both Mr. Doane and
10 Mr. Whitley testify that that was the beginning of a
11 conversation, not the end.
12          Over the next five to six months -- the spreadsheet
13 that he put up, what is the one thing that it did not actually
14 identify?  It didn't identify the different laser products.
15 It just had one category:  laser.  Which, of course, you can't
16 tell in that spreadsheet whether that's a 1D or a 2D product
17 because you don't know if it's able to decode 2D symbologies.
18          So once Honeywell got that, nobody just sat around
19 and said, oh, okay, that's fine.  That's not what happened.
20 You heard Mr. Doane and Mr. Whitley say that there was about a
21 five-month process where the parties went back and forth to
22 try to actually get that information, to try to get the
23 missing information.
24          Again, it's possible -- we didn't know.  It's
25 possible that OPTO had sold one dollar worth of these

JA1391

1   products, you know, and we wouldn't be here in this courtroom.
2   But it took five to six months to actually get them to cough
3   up the right information to be able to show, hey, we've been
4   sitting on a lot of these products that we didn't tell you
5   about.  We've been selling a lot of these products that we
6   told you back at the mediation, told you back in the ITC case
7   were going to be included and that we would pay the 7 percent
8   royalty on them, and then just never did it.  They didn't tell
9   us that until later and they didn't let us know the number
10  that they hid from us until March of 2021.
11          Now, Mr. Muckenfuss wants to say, oh, Honeywell
12  never once said, oh, my gosh, you guys are telling us the
13  wrong thing.  That's what he just told you:  that Honeywell
14  never stood up and said anything.
15          Can we put up PX288, please, sir.
16          That's not true at all.  After the parties completed
17  their discussion where Honeywell could actually figure out
18  what was going on here and how much sales, Honeywell put it
19  right in writing.  Sent it right back to them.  Says right
20  here, "The products identified in Honeywell's
21  correspondence" -- okay.  Let me pause there.  This is June.
22  This letter is talking about the products identified in
23  Honeywell's correspondence.  Honeywell sent them a letter that
24  they don't want you to see.  Honeywell sent a letter saying we
25  think you're missing 22 products.  This case is only about 18

489

1  of them because a few of them had been discontinued.  But
2  Honeywell sent them a letter saying there's 22 products that
3  we think you've excluded and why are you doing that?  And it
4  wasn't until March that that information was ever provided to
5  Honeywell.
6          So it says in here, "The products identified in
7  Honeywell's correspondence," i.e., where we identify the 22
8  products that we thought were missing, "are operable to decode
9  two-dimensional barcode symbologies according to Opticon's own
10 literature.  Therefore, those products fall squarely within
11 the definition of 2D Barcode Products in the Agreement, which
12 includes 'any device or article of manufacture that is
13 operable to decode at least one or more two-dimensional
14 barcode symbologies into human-readable text.' While that
15 definition explicitly includes Engines and other products that
16 include a 2D image sensor, the Agreement is clear that 2D
17 Barcode Products are not limited to Engines and other products
18 that include a 2D image sensor."
19         Let me pause there for a second.  When the judge
20 reads the jury instructions and gives them to you to take
21 back, that's what the judge's instruction is going to tell
22 you.  He's going to say that we're right about that.  He's
23 going to say that the definition is the 1.4 definition and
24 it's not limited to just image-based products like they wanted
25 to believe at this point in time.

JA1393

490

1          It goes on to say, "Contrary to your suggestion, the
2     products identified in Honeywell's correspondence cannot be 1D
3     Barcode Products because the definition of that term in the
4     Agreement specifically excludes products that are 'operable to
5     decode a 2D barcode symbology,' which these products do.  This
6     cannot be disputed" -- and it hasn't been this week -- "and
7     the points made in your letter are irrelevant to Opticon's
8     failure to meet its representations and royalty obligations
9     with respect to 2D Barcode Products."
10          Yeah, we did.  We sent them correspondence saying we
11     think there's 22 products missing.  And after they drug their
12     feet for months and months and finally let us see how much
13     sales they had of those 22 products, we did write them a
14     letter.  And we said where's the payment for these?  Why
15     haven't you included these?  This is on June 8.
16          What was the response to this letter once we
17     actually said, come on, everyone knows what the agreement
18     says.  What was the response to this letter?  Crickets.
19     Crickets.  Never heard back.  Never got a response to this.
20     At no point in time did they say, oh, gosh, that can't be
21     right.  Crickets.
22          The agreement required us to give them 30 days'
23     notice.  We gave them 90 days' notice.  If they had come to us
24     and said, all right, we'll just pay you what we owe, no
25     interest, no penalties, that would have been fine.  No harm,

JA1394

1  no foul.  But crickets for 90 days.  That's why we're here in
2  this courtroom, because they wouldn't pay.
3          Now, we heard one other key fact yesterday that
4  Mr. Muckenfuss didn't bring up in his closing.  It was really
5  interesting to me because I think we might have unraveled a
6  little bit of the mystery yesterday.  When Ms. Ashihara sat in
7  that chair, you heard her decide which products she included
8  and which products she didn't include.
9          And by the way, that spreadsheet that he showed you
10 yesterday and that he showed you right now, Ms. Ashihara was
11 the one who put that together.  That's her spreadsheet.  And
12 she told you that she was never allowed to see the agreement.
13 That she didn't go to the mediation.  She didn't negotiate the
14 agreement.  Somebody else at OPTO probably controls that
15 agreement and doesn't let it be circulated.  But she's never
16 seen the agreement.  Someone just told her to count 2D Barcode
17 Products.
18          And what did she say about how she did it?  She said
19 if it didn't -- if it wasn't able to decode every 2D Barcode
20 Product, I didn't include it.  I know that there are plenty of
21 products that can decode the five that we're talking about
22 this week.  But if it didn't include every single one, I
23 didn't include it.  And that's true in that spreadsheet that
24 he showed you too.  She didn't include that.  She didn't
25 include all the sales.

492

1          At that point in time, Honeywell didn't have access
2    to all the information.  I'm saying Honeywell, Alston & Bird,
3    we didn't have the detailed laser information so we had to
4    take their word for it.  And we did.  And perhaps that's our
5    bad decision.  But that's what happened here is that the
6    people that negotiated and signed the agreement didn't tell
7    her what she should include.  And so all those materials that
8    were provided were inaccurate because they don't actually
9    honor the agreement and live up to the agreement.
10          Now, Mr. Muckenfuss says that I want to run away
11   from the Second Amendment.  I don't.  I don't think it has
12   particular relevance to this case, but I'm happy to look at it
13   I'm happy to do that.  So again, this was signed a year later.
14          And if we could bring up JX3.  I want to bring up
15   the very top of the fourth page, please, the top paragraph of
16   the fourth page.
17          There we go right there.
18          So this is the payment obligations under the Second
19   Agreement.  And again, this doesn't apply -- nothing you see
20   here applies to the United States.  This is just about things
21   outside the United States.
22          But in the second row there, you see an annual
23   royalty payment of $425,000.  It's a flat fee.  This agreement
24   is relevant to the overall dispute, but it has nothing to do
25   with what we're here in this courtroom to talk about.  They've

JA1396

1   been paying this fee.  They've been paying us the 425,000 a
2   year for Europe.  We're not suggesting they breached that.
3   We're not going to ask the eight of you to give us anything on
4   that.  They've been paying that.  And so there is no sort of
5   accounting as it relates to Europe.  They just pay us a flat
6   fee per year whether they sell one dollar or a billion dollars
7   worth of the product.
8           Now, it was interesting to me that one of the last
9   things that Mr. Muckenfuss showed you was Mr. Rudick's
10  signature.
11          I want to talk about the folks that actually came to
12  this trial.  And one thing I haven't told you about the
13  agreement.  I can take five hours to read the whole agreement
14  to you.  I'm sure that would bore everyone to tears.  But both
15  parties agreed that if there was ever a dispute, it would come
16  to North Carolina.  It's right in the agreement.  You can see
17  it when you go back to the jury room.  It's right in -- both
18  parties agreed that we would have any dispute right here.
19  Okay.
20          Now, who came to this court this week over the past
21  two days to actually speak to you?  Who came here?  Let's put
22  everything that I say and Mr. Muckenfuss, put that all aside
23  for a second.  What witnesses put their seat -- their fanny in
24  the seat and swore an oath on that Bible?  Well, we brought
25  Mr. Jeremy Whitley, who was one of the gentlemen that was

494

1  actually at the mediation and could give you firsthand

2  information about the parties.  Mr. Doane was here.  He has

3  firsthand information about what OPTO was saying in the ITC

4  case and the negotiations and the course of dealings from that

5  point forward.

6          Who came from OPTO that was at the mediation or that

7  had anything to do with creating that agreement?  Who came and

8  talked to you about that?  Nobody.  Nobody came.  They had

9  four people at the mediation.  Not one of those people has

10 been in this courtroom this week.  They had five members of

11 the board who all had to approve unanimously this agreement

12 and they all approved it unanimously.  Who came here and sat

13 in that seat right there to talk to you about that?  Nobody.

14         Here's why.  Because they knew when they signed it

15 what they were signing up for.  It wasn't until months later

16 that they decided to change the game.  They knew that on the

17 day of the mediation and the next two and a half weeks when

18 they were using their very expensive lawyers at Quinn Emanuel,

19 who's not here, by the way.  There's five different firms that

20 have represented OPTO:  two at the ITC case and there's three

21 different firms represented here today defending OPTO; five

22 different law firms.  They knew exactly what they were

23 signing.  If they didn't, they would have brought someone over

24 here and they would have sat there and they would have said,

25 oh, no, no, no, we thought something different beforehand.

JA1398

1  That didn't happen.  You didn't see any deposition testimony
2  about any of that.

3         The two people from OPTO you've heard from:
4  Ms. Ashihara said she's never seen the agreement and
5  Mr. Stoop, the guy who wanted to tell you guys that it wasn't
6  2D despite the fact that apparently that's conceded.  The guy
7  who wanted to come to Charlotte and tell you it wasn't 2D, you
8  saw him on the video, he said he never saw the agreement
9  either.  So the two people that you've been introduced to,
10 neither of whom are even allowed to look at the agreement.

11        Moreover, when you come to federal court -- if we
12 can go to the next slide.  When you come to federal court, you
13 have the right to bring a corporate representative; someone to
14 sit here and see the case and be able to talk to you guys from
15 the company.  Mr. Taylor Smith has been here the whole time.
16 He's devoted his time just like the eight of you have devoted
17 your time to being here.

18        What corporate rep is sitting here from OPTO?  Who
19 came over here to actually show that this is an important case
20 from OPTO?  Not a single person.  Not a corporate rep has sat
21 there all week.  I think that tells you something about this
22 case and about the way that they feel about this case.

23        So I do think this case is pretty simple.  There was
24 an agreement.  There was a definition signed.  You're going to
25 see in the Court's instructions to you when he reads them and

1  hands them to you that he has told you you must apply that
2  agreement.  It's not limited to image sensors.  Anything
3  that's operable to decode 2D symbologies counts under 1.4.

4        He just admitted at the very end of his speech that
5  in fact they have those products and they haven't paid for
6  them.  That's just plain breach, pure and simple.  The fact
7  they told us ten months later we weren't paying you for it
8  doesn't somehow cure that they didn't -- that they breached in
9  the first place.  I mean, that's their argument.  We told you
10  nine months later that we're not paying you.  Yeah, that's
11  breach.  That's not not breach; that's breach.  That's
12  evidence that they breached.

13        And then apparently he's mad that we didn't sue them
14  fast enough.  You know, he's trying to suggest that Alston &
15  Bird or Honeywell should have just filed a lawsuit the next
16  day.  No, we had to work with them to understand how much
17  sales were really involved here, and then we sent them that
18  letter making a peace offering.  Crickets.  Never heard
19  anything back.

20        Now, you're going to hear about a couple different
21  affirmative defenses, and, again, these are the ones they have
22  to prove by clear and convincing evidence, right?

23        The first thing you're going to hear about is
24  something -- or hear from the judge and read in there is
25  something about unilateral mistake of fact.  They have to

1  prove to you by clear and convincing evidence that the parties
2  had a different prior agreement, a different prior agreement,
3  and that somehow that they had confusion about that.  They
4  haven't even alleged that.  What's the prior agreement prior
5  to January 22nd?  They never even brought it up.  I don't even
6  know what we're talking about there.
7           Moreover, did anyone come and sit in that chair and
8  say that they had a different understanding or that they were
9  mistaken at the time?  No.  That didn't happen at all.
10          The next affirmative defense you're going to hear
11 about is something called quasi-estoppel.  I admit, that's
12 sort of a lawyerly geeky word:  quasi-estoppel.  And what that
13 means is if Honeywell acquiesced to something, we shouldn't be
14 able to take it back.  Let me sort of tell you what that
15 means.
16          Let's say that we have some sort of a contract and,
17 you know, I say you have to pay me for a day of the week that
18 starts with a T.  Then later we say, did we mean Tuesday or
19 did we mean Thursday?  And I say to you, you know what, let's
20 just -- let's just worry about Tuesday and that's it; you
21 don't have to pay me for Thursday.  And then two years later I
22 say, hey, you haven't paid me for Thursday.  That's what this
23 is talking about.
24          Honeywell never told them that it was okay for them
25 to not pay us for the products that they had promised to pay

JA1401

1  us for.  You haven't heard a bit of evidence about that.  You
2  never heard our folks, Mr. Whitley or Mr. Doane, they never
3  said that we agreed that they didn't have to pay us.  That's
4  nuts.  We've always said that they had to pay us.  We put it
5  in the contract.  We put it in writing in the letter that they
6  didn't have the courtesy to respond to.  And that's why we're
7  here today.

8          Moreover, you never heard anyone on their side come
9  talk to you and say somehow we relied on something Honeywell
10  said to do that.

11         So I'd respectfully urge that they have not met
12  their burden to prove any of their affirmative defenses.

13         This case is straightforward.  They breached the
14  agreement and all we're asking you to do is hold them
15  accountable for that breach.  Nothing more.  Pay us what the
16  contract says that they should pay us.  That's why we're here
17  today.

18         Now, let me end again by saying thank you very much.
19  However you decide in that room -- and I truly mean that.  I
20  do think the commitment that you guys have made over the past
21  two and a half days is very honorable and that's the only way
22  that our system here works.  And so thank you very much from
23  the men and women at Honeywell.

24         Let me leave you with this.  When they leave this
25  room and when Ms. Ashihara leaves this room after they hear

JA1402

1    your verdict, they're going to make one of two different phone

2    calls.  And you guys get to decide which phone call they make.

3            They're either going to call folks back in Japan --

4    and it's halfway through the night there so they're going to

5    have to wake them up.  They're going to call folks back in

6    Japan and say, you know what, we got away with it.  Good deal.

7    The jury said, hey, we never have to pay again.  It's fine.

8    We got away with it.  Awesome.

9            Or she's going to call back home and say, you know

10   what, the jury saw through it.  The jury just said that's the

11   contract.  You actually have to honor your commitment in North

12   Carolina.  When you sign a contract here, you have to do what

13   you said you were going to do.

14           It's your choice which call they make.

15           Thank you very much.

16           THE COURT:  All right.  Members of the jury, I'll

17   remind you that obviously the arguments of counsel are not

18   evidence.  If an attorney made an argument to you and asserted

19   that something was in evidence and you don't remember it being

20   in evidence, it's your memory that controls what the evidence

21   is.

22           Now, the instructions I'm about to give you will be

23   with you in the jury room.  You can continue to take notes if

24   you want, but I didn't expect you to memorize what I'm about

25   to tell you.

1          Instruction number 1, stipulated facts.

2          Honeywell and OPTO have agreed or stipulated that

3    certain facts shall be accepted by you as true without further

4    proof.  The agreed facts in this case are as follows:

5          One, Honeywell International, Inc., is a Delaware

6    corporation with its principal place of business at 855 South

7    Mint Street, Charlotte, North Carolina 28202.

8          Two, Hand Held Products, Inc., is a Delaware

9    corporation and a wholly owned subsidiary of Honeywell

10   International, Inc., with its principal place of business at

11   855 South Mint Street, Charlotte, North Carolina 28202.

12         Three, Metrologic Instruments, Inc., is a New Jersey

13   corporation and wholly owned subsidiary of Honeywell

14   International, Inc., with its principal place of business at

15   855 South Mint Street, Charlotte, North Carolina 28202.

16         Four, OPTO Electronics Company, Limited, is a

17   Japanese company with its principal place of business at

18   12-17 -- and you'll just have to read this part, I can't

19   pronounce it -- 4-chrome, Warbi-city in Japan.

20         Five, Honeywell and OPTO entered into a License and

21   Settlement Agreement (the Agreement) with an effective date of

22   January 22, 2020.

23         Six, on September 8, 2020, Honeywell and OPTO

24   executed the First Amendment to the Agreement.

25         And seven, on February 3, 2021, Honeywell and OPTO

1   executed the Second Amendment to the Agreement.

2              Instruction number 2, breach of contract.

3              Honeywell alleges that OPTO breached the parties'

4   settlement agreement by failing to timely pay all royalties

5   due under the agreement.  To prove a claim for breach of

6   contract, the plaintiff must establish by a preponderance of

7   the evidence the following:  (1) that a contract exists; (2)

8   the defendant breached an obligation imposed by the contract;

9   and (3) resulting damages to the plaintiff.

10             Here, Honeywell and OPTO agree and stipulate to the

11  fact that the agreement is a valid contract.  This means that,

12  in making your decision, you must assume that the parties'

13  agreement is a valid and binding contract as between Honeywell

14  and OPTO.  Accordingly, what is left for you to decide at this

15  point in the trial is whether it is more likely than not that

16  OPTO breached the agreement; that is, whether OPTO did not

17  timely pay royalties on any of the products that are subject

18  to royalties as defined by the agreement.

19             Instruction 3, contract interpretation.

20             Construction of terms in the agreement itself is a

21  question of law for the Court to decide.  In this case I have

22  decided certain constructions as a matter of law, and you must

23  accept the meanings of the constructions that I give you.

24             In this case the parties dispute which of OPTO's

25  products constitute, quote, "2D Barcode Products," unquote, as

502

1   that term is defined in Section 1.4 of the agreement.  I

2   instruct you that Section 1.4 of the agreement defines, quote,

3   "2D Barcode Products," unquote as:

4          The term "2D Barcode Products" shall mean any device

5   or article of manufacture that is operable to decode at least

6   one or more two-dimensional barcode symbologies into

7   human-readable text.  Two-dimensional (2D) barcode symbologies

8   include, but are not limited to, any two-dimensional barcode

9   symbology defined by one or more standards settings

10  organizations, such as the International Organization for

11  Standardization (ISO), International Electrotechnical

12  Commission (IEC), and the Association for Automatic

13  Identification and Mobility (AIM).  For the avoidance of

14  doubt, the term "2D Barcode Product" shall include Engines and

15  other products that include a 2D image sensor and are capable

16  of outputting a 2D image that may be used to decode a 2D

17  barcode symbology into human-readable text.

18         Further, you are instructed that in applying this

19  definition to determine which of OPTO's products constitute

20  "2D Barcode Products," the third sentence of the definition is

21  to be read as inclusive of the first sentence, rather than

22  limiting the products that qualify as "2D Barcode Products."

23  That is, to be a "2D Barcode Product" under Section 1.4, a

24  product may, but need not, fulfill the terms of the third

25  sentence.

JA1406

1          In sum, you must, considering all the evidence,

2   determine whether Honeywell has proven by a preponderance of

3   the evidence that OPTO failed to pay royalties on products

4   that qualify as "2D Barcode Products" in accordance with the

5   definition of such products in Section 1.4 as I have explained

6   it to you.

7          Instruction 4, unilateral mistake.

8          OPTO has asserted two affirmative defenses to

9   Honeywell's claim of breach of contract.  OPTO must prove

10  these defenses by clear and convincing evidence.

11         First, OPTO claims that it is excused from

12  performing the contract because of a unilateral mistake of

13  fact.  In order to find in OPTO's favor on this defense, you

14  must find by clear and convincing evidence that:

15         First, there was a specific prior understanding that

16  differed materially from the written agreement;

17         Next, OPTO was mistaken as to the terms of the final

18  written agreement;

19         Third, Honeywell had knowledge of OPTO's mistake;

20  and

21         Finally, despite that knowledge, Honeywell remained

22  silent.

23         If you so find, then you will find in favor of OPTO

24  on this defense.  If not, then you will find in favor of

25  Honeywell on this issue.

1        Instruction 5, agency.

2        Agency is the relationship which results when one

3 person or entity, called the principal, authorizes another

4 person or entity, called the agent, to act for the principal.

5 A principal is liable to third persons for the acts of the

6 agent in the transaction of the principal's business.  It is

7 generally recognized that once an attorney is retained to

8 represent a client, the attorney is deemed to possess general

9 authority to act on behalf of the client in the action.  So a

10 client is bound by the acts of his lawyer-agent in both the

11 course of litigation and pre-litigation matters.

12        Thus, in this case you must assume that the conduct

13 of Honeywell's attorneys is also the conduct of Honeywell, and

14 you must likewise assume that the conduct of OPTO's attorneys

15 is also the conduct of OPTO.

16        Instruction number 6, quasi-estoppel.

17        OPTO's second affirmative defense is quasi-estoppel.

18 Honeywell contends that OPTO breached the parties' agreement

19 by failing to pay royalties on all of OPTO's products that

20 Honeywell contends are 2D Barcode Products and that OPTO

21 contends are not 2D Barcode Products.  Quasi-estoppel applies

22 when it would be unconscionable to allow a person to maintain

23 a position inconsistent with one to which he acquiesced, or

24 from which he accepted a benefit.  To constitute this sort of

25 estoppel, the act of the party against whom the estoppel is

1   sought must have gained some advantage for himself or produced

2   some disadvantage to another.

3        In this case OPTO claims that Honeywell should be

4   estopped or prevented from taking the position that OPTO

5   products at issue in this litigation are 2D Barcode Products

6   and therefore subject to royalty payments because OPTO claims

7   that Honeywell's position now is different from Honeywell's

8   prior position on this issue.  It is solely up to you as the

9   jury to determine if OPTO has proven by clear and convincing

10   evidence that Honeywell maintained a position inconsistent

11   with one to which it earlier acquiesced, or from which

12   Honeywell would have accepted a benefit, and that it would be

13   unconscionable for Honeywell to gain this advantage.

14        If you so find, then you will find in favor of OPTO

15   on its defense.  If not, then you will find in favor of

16   Honeywell on this defense.

17        Instruction number 7, breach of implied covenant of

18   good faith and fair dealing.

19        In addition to its defenses to Honeywell's claim of

20   breach of contract, OPTO has asserted its own claim for breach

21   of contract.  You will only reach this claim if you find in

22   favor of OPTO on Honeywell's breach of contract claim and

23   against OPTO on its defenses.  Like Honeywell, OPTO bears the

24   burden of proving its claim for breach of contract by a

25   preponderance of the evidence.

1    OPTO's claim for breach of contract alleges that
2  Honeywell breached the implied covenant of good faith and fair
3  dealing, which is part of every contract.  This means that,
4  even though not specifically stated in the contract, it is
5  implied or understood that each party to a contract must act
6  in good faith and deal fairly with the other party in
7  performing or enforcing the terms of the contract.  Here, OPTO
8  contends that Honeywell acted in bad faith by claiming that
9  OPTO owes royalties for products which OPTO contends that
10  Honeywell knew that OPTO had not agreed to pay.

11    The implied covenant of good faith and fair dealing
12  requires a party in a contractual relationship to refrain from
13  arbitrary or unreasonable conduct that has the effect of
14  preventing the other party to the contract from receiving the
15  fruits of the bargain.  The implied covenant cannot be invoked
16  to override express provisions of a contract and a party is
17  entitled to insist on full performance under an agreement.
18  Thus, bad faith may not be established by simply showing that
19  Honeywell's motive for its actions did not consider the best
20  interests of OPTO.  Contract law does not require parties to
21  behave thoughtfully, charitably, or unselfishly toward each
22  other.

23    To prevail on its claim, OPTO must prove each of the
24  following elements by a preponderance of the evidence:
25    First, OPTO must prove that Honeywell acted in bad

JA1410

507

1  faith with the purpose of depriving OPTO of the rights and
2  benefits under the agreement; and

3          Second, OPTO must prove that Honeywell's conduct
4  caused OPTO to suffer injury, damage, loss, or harm.

5          As to the first element, did Honeywell act in bad
6  faith with the intent to deprive OPTO of rights or benefits
7  under the agreement, you must decide whether Honeywell acted
8  with bad faith to interfere with OPTO's right to receive the
9  benefits of the contract.  In order for OPTO to prevail on its
10 claim, you must specifically find that bad faith motivated
11 Honeywell's actions.  In considering what constitutes bad
12 faith, you should consider a number of factors, including the
13 expectations of the parties and the purposes for which the
14 contract was made.  You should also consider the level of
15 sophistication between the parties, whether the parties had
16 equal or unequal bargaining power, and whether Honeywell's
17 actions involved the exercise of discretion.

18         Again, keep in mind that bad faith is not
19 established by simply showing that Honeywell's motive for its
20 actions did not consider the best interests of OPTO.  Also, if
21 Honeywell acted in good faith on an honest, but mistaken
22 belief that its actions were justified, it has not breached
23 the covenant of good faith and fair dealing.

24         As to the second element, OPTO must prove that
25 because of Honeywell's actions, OPTO was unable to realize the

JA1411

1    benefits of the agreement.

2            In summary, if you find that OPTO has proven by a

3    preponderance of the evidence that Honeywell acted in bad

4    faith with the intent to deprive OPTO of its reasonable

5    expectations under the contract and OPTO sustained injury or

6    loss as a result of such action, then you must find for OPTO.

7            If you find that OPTO has failed to prove any of

8    these elements by the preponderance of the evidence, you must

9    find for Honeywell on this issue.

10           Now, as you're about to retire to the jury room to

11   deliberate, it is your responsibility to recall all of the

12   evidence.

13           I want to remind you that the law requires me, as

14   the presiding judge, to be impartial.  You are not to draw any

15   inference from any ruling that I have made, any inflection in

16   my voice, any expression on my face, or anything that I might

17   have said or done during this trial.  If I ever intimated any

18   opinion about whether evidence should be believed or

19   disbelieved, and I hope I didn't, please ignore anything you

20   think I indicated.  I really don't have an opinion what you

21   should do.

22           Now, let me tell you how deliberations work.  When

23   you retire to the jury room, I suggest you select one of your

24   members to preside as foreperson.  That person has the same

25   vote as everybody else, just serves to lead the discussion.

1          Also, we have the exhibits available for you

2     electronically -- and Ms. Kirk will teach you how to use the

3     system -- and you'll be able to view any of the exhibits that

4     were allowed into evidence during this case during your

5     deliberations.

6          When you're deliberating, you have not reached a

7     verdict until all eight of you agree unanimously on each of

8     the questions that will be asked of you.  You may not decide

9     it by majority vote or any other method.

10          And when you're deliberating, only deliberate when

11    all eight of you are together.  If someone is in the restroom

12    or walked away for some reason, stop deliberating.  All of you

13    need to be present when you're deliberating.

14          If you need to contact me for any reason, to ask a

15    question or just for any reason, please write me a note.  And

16    I think there's a buzzer bell in there where you can alert

17    Ms. Kirk if you need to communicate with me.  Just give her

18    the note and she'll communicate with me.  I may be able to

19    answer any questions you have just by writing the answer.  If

20    necessary, we'll bring you back out.

21          Also, it's an hour or so until lunch.  You're in

22    charge.  If you want to go to lunch, you tell us when.  If you

23    don't want to go to lunch, don't go.  But just let me know

24    that.  Don't just walk out the door.  Hit the buzzer and let

25    me know, Judge, we'd like to go to lunch, and then we can talk

1   about that.

2           If you do communicate with me in any way by sending

3   a note and asking a question or, you know, lunch or anything

4   else, don't tell me how you stand in your deliberations.  If

5   you're four-four on an issue, six-two on an issue, I don't

6   want to know.  I don't need to know.

7           So, members of the jury, we'll ask you to retire to

8   the jury room now.  You'll have a verdict sheet that will

9   assist in your deliberations.  When you have reached a

10  verdict, again, please ring the buzzer to let Ms. Kirk know

11  and we'll return you to the courtroom.  The case is yours.

12  Tell us what the truth of this matter is as best you're able.

13          (Jury exited the courtroom at 10:53 AM.)

14          THE COURT:  Be ready to start up with the bench

15  trial as soon as we take our 15-minute break.

16          MR. McCAMEY:  Your Honor, we certainly want to make

17  our motion under 50(a).  I don't know if now is the time or in

18  15 minutes.  It doesn't matter to us.

19          THE COURT:  Let's do that when we come back, that

20  will be fine, because Ms. Kirk is not in here yet.

21          (Brief recess at 10:54 AM.)

22          (Court back in session at 11:11 AM.)

23          THE COURT:  All right.  Does either party care to

24  make an opening statement on the patent misuse issue?

25          MR. McCAMEY:  Your Honor, do you want to take up the

1    50(a) motion now?

2             THE COURT:  Oh, yes.  I'm sorry, yes.

3             MR. McCAMEY:  Your Honor, in the interest of brevity

4    and getting sort of right to the heart of the issue, I'm going

5    to focus the 50(a) motion discussion on the quasi-estoppel

6    issue, but it's certainly OPTO's position that these facts

7    apply to the other -- Honeywell's affirmative claim of breach

8    as well as our other affirmative defenses and we would move

9    under 50(a) for judgment as a matter of law on those, but I'm

10   going to focus the discussion specifically on quasi-estoppel.

11            Your Honor, the jury instructions require the jury

12   to find that Honeywell has maintained an inconsistent position

13   that it's now taken in this litigation.  Of course, the facts

14   show and the arguments show that the position they're taking

15   is that the laser scanners are 2D Barcode Products,

16   royalty-bearing 2D Barcode Products under the agreement.  And

17   the jury instructions further require an inconsistent position

18   in the past.

19            Your Honor, that's, I think, admitted and

20   indisputable.  The Second Amendment is an agreement by

21   Honeywell with full knowledge -- with full knowledge as to

22   what was included and what was not included.  And then the

23   Second Amendment specifically says Honeywell understands that

24   Opticon's revenue for 2D Barcode Products in Europe in 2019

25   was 4.4 million, the same number that appears in that

512

1    spreadsheet.  So that's a decision and an agreement with full

2    knowledge of all the underlying facts and circumstances that

3    Honeywell made.  That's on the one hand.  Laser scanner is

4    clearly not included as Mr. Goldstein said and as the

5    spreadsheet shows.  Now they're claiming that they are 2D

6    Barcode Products.

7            So that's the inconsistent position that we think is

8    somewhat indisputable in this case.  They at least acquiesced

9    in that agreement.

10            The other thing that the jury has to find is that

11   Honeywell accepted a benefit or gained some form of a benefit

12   based on that agreement.

13            Your Honor, the testimony, again, was undisputed.

14   Mr. Doane, when asked by Mr. Muckenfuss:  Honeywell received

15   the benefit of the nullity actions being dismissed.  Yes.  And

16   I don't have the transcript in front of me, but his answer was

17   something to the effect of, yes, that was one of the things

18   that was covered by the Second Amendment was the nullity

19   actions being dismissed.

20            Your Honor, Honeywell's taken an inconsistent

21   position and has admitted to receiving a benefit from that

22   inconsistent position.  So we think the admissions and the

23   undisputed evidence would result in judgment as a matter of

24   law for OPTO on that issue.

25            Again, I'm focusing only on quasi-estoppel, but OPTO

JA1416

513

 1   also moves under 50(a) for the other claims as well.

 2          THE COURT:  All right.  That motion is denied as

 3   well.

 4          With respect to all of these motions, we've got the

 5   jury here.  The jury has heard all of the evidence.  We'll get

 6   the jury's view on all of the issues presented.  I'm confident

 7   that there will be post-verdict motions and briefing no matter

 8   what happens.  But for now we're going to let the jury figure

 9   these issues out.

10          MR. McCAMEY:  Thank you, Your Honor.

11          THE COURT:  So again, does anyone want to make an

12   opening statement on the patent misuse issue?

13          MR. VanHOUTAN:  Yes, Your Honor, we would.

14          THE COURT:  I'd be glad to hear from you.

15          MR. VanHOUTAN:  A couple of housekeeping issues --

16          THE COURT:  Okay.

17          MR. VanHOUTAN:  -- before I start.

18          I've discussed with Honeywell's counsel, and I think

19   we're in agreement, that the parties will have access to the

20   evidence from the jury trial so we don't have to readmit

21   exhibits that have already been admitted, et cetera.

22          Is that all right with Your Honor?

23          THE COURT:  Yes, of course.

24          MR. VanHOUTAN:  And then I'd be remiss if -- we've

25   had a lot of debate on this side of the house about if the

JA1417

1  jury finds for OPTO on the breach claim or any of the
2  affirmative defenses, whether there's a case or controversy
3  that supports subject matter jurisdiction for this
4  counterclaim anymore.  I raise that now just so I don't get
5  yelled at later if things happen and we have to talk about it
6  then.

7          THE COURT:  I try real hard not to yell.

8          MR. VanHOUTAN:  All right.  Your Honor, may it
9  please the Court, I have some slides that go along with my
10 opening, if you'd like.

11         THE COURT:  Yes.

12         MR. VanHOUTAN:  So OPTO's patent misuse
13 counterclaim, we've heard a lot about this already.  The Court
14 has seen this already.  There was a motion to dismiss at the
15 outset of the case.  There were a couple of competing summary
16 judgment motions which the Court overruled.  And there's been
17 a lot of pretrial filings related to OPTO's patent misuse
18 counterclaim.  So the judge is, I think, already pretty
19 familiar with this claim so I'll make my comments brief.

20         This case here on Slide 2 is from the Court's order
21 denying both parties' summary judgment briefings stating that
22 "patent misuse 'requires that the alleged infringer show (1)
23 that the patentee has impermissibly broadened the physical or
24 temporal scope of the patent grant (2) with anticompetitive
25 effect.'"

1          So this is not a patent case.  There is no alleged

2    infringer.  But the alleged infringer in this case is OPTO and

3    the patentee in this case is Honeywell.

4          If it's not a patent case, how can we have patent

5    misuse?  Well, the patent misuse relates to Honeywell's

6    allegations in this case relating to a License and Settlement

7    Agreement, specifically a patent License and Settlement

8    Agreement.  And we've got to look at some of the definitions,

9    some of the nested definitions in that agreement to understand

10   what the agreement covers and how the patent misuse arises.

11         So the License and Settlement Agreement, Joint

12   Exhibit 1, Section 1.4, 2D Barcode Products.  We're all very

13   familiar with that term now so I won't go into it.  I've got

14   it on the screen there, but it sort of underlies the patent

15   license and the patent misuse.

16         Here on the screen we've got a 2D Barcode Product.

17   I don't know whose product this is.  It doesn't matter.  It's

18   an image-based product.  It's decoding a 2D product -- a 2D

19   symbology that looks like Data Matrix.  I don't think anybody

20   is disputing that this a 2D Barcode Product under the

21   agreement.

22         So let's get back to the agreement.  Section 1.8,

23   the licensed product "shall mean any 2D Barcode Products," and

24   only those, "that are imported into or made, sold, licensed,

25   leased, or otherwise transferred in the United States by a

1  Party during the License Period."

2          We're having a technical issue, Your Honor, but I'll

3  still be referring to the License and Settlement Agreement.

4          You can take that down.

5          So what is the license period?  So I talked about

6  the licensed product.  What's the license period?  Well, it's

7  January 22, 2020 through January 22, 2032, so about 12 years.

8          And then we've got a definition from the License and

9  Settlement Agreement, Section 1.14, of royalty-bearing

10  product.

11          THE COURT:  And I have it here.  You don't have to

12  worry about putting it up.

13          MR. VanHOUTAN:  Okay.  Royalty-bearing product

14  "shall mean any OPTICON Licensed Product or any product that

15  can only be used only with an OPTICON Licensed Product."

16          So we've got a royalty-bearing product that is a

17  licensed product and we've got a licensed product that are the

18  2D Barcode Products.  So we're beginning to establish the

19  scope of the license here.  It relates to both parties because

20  we're going to see it's a cross-license, but only Opticon is

21  obligated to pay a royalty.

22          So we're talking about a License and Settlement

23  Agreement.  What's the license?  If we go to Section 2.1 of

24  the agreement, it states "each Party (Licensor) hereby grants

25  to the other Party (Licensee) a non-exclusive,

1  non-transferable, non-sublicensable license to its U.S. Patent
2  Portfolio," and then it goes on and on.
3            So it's a cross-license as between Honeywell and
4  OPTO to each party's respective U.S. patent portfolios.  And
5  again if, we go through the nested definitions, we get back to
6  it only -- the license only covers 2D Barcode Products.
7            So the U.S. patent portfolio, which is Section 1.10
8  from the agreement -- I won't go through the whole thing --
9  "shall mean, with respect to a Party, all rights in any U.S.
10 patents."  So the license granted is just for U.S. patents for
11 both parties.
12            And then finally, we sort of come full circle to
13 existing product because the U.S. patent portfolio only
14 relates to existing products that were in existence at the
15 time of the execution of the License and Settlement Agreement.
16            I think we're back up here.
17            So an existing party, here on the screen, "shall
18 mean any 2D Barcode Product."
19            So if you go through these nested definitions from
20 the License and Settlement Agreement, you see the scope of the
21 license agreement.  If we stopped right there, this would be a
22 pretty standard patent portfolio license agreement.  It would
23 be a pretty standard cross-patent portfolio license agreement.
24 And all the cases that both parties put in their briefings
25 would relate to this agreement if that's all there was.  But

1  there's more.

2         And there's one thing that makes this License and

3  Settlement Agreement very unique and it's this provision.

4  It's the covenant not to sue from Section 2.4.  This

5  provision, how it relates to the rest of the agreement, makes

6  this very unique.  I won't go through it all because it's

7  pretty long, but if you just focus on the red language, it

8  says, "Each party shall not bring anywhere in the world" --

9  not the United States -- "anywhere in the world, any claim,

10 demand, cause of action or request for damages or other relief

11 against the other Party for any infringement, alleged

12 infringement or any other violation of any patents and/or

13 patent applications" -- not U.S. patents, any patents anywhere

14 in the world -- "for the manufacture, sale, offer to sell,

15 lease or importation of" -- what? -- "any 1D Barcode

16 Products."  So it's limited to 1D Barcode Products, but it's a

17 covenant not to sue anywhere in the world for any patents.

18 "No damages or liability of any kind whatsoever related to the

19 manufacture, sale, offer to sell, lease or importation of any

20 1D Barcode Products shall accrue during the License Period."

21        How does this relate to the present dispute?  How do

22 we get to patent misuse?  A patent right is really only one

23 thing.  It's the ability to exclude others, to exclude others

24 from doing whatever the patent claims.  It doesn't give me as

25 the patent owner the right to do anything.  It just gives me

1   the right to exclude others.

2          So what is a covenant not to sue?  What you've given

3   away is your only right in the patent when you give someone a

4   covenant not to sue.  You're saying my right to exclude is

5   exhausted.  I no longer have any rights that I can assert

6   under that patent.

7          So this covenant not to sue, which in this case

8   Honeywell gave to OPTO, related to the 1D products.  And we

9   see the definition here.  "Any article of manufacture that is

10  operable to decode at least one or more 1D barcode symbologies

11  into human-readable text," but not operable to decode a 2D

12  barcode symbology, "(and specifically excludes 2D Barcode

13  Products)."

14         That covenant not to sue with regard to 1D

15  products -- and I'll just talk about OPTO's 1D Barcode

16  Products because there is a category of products for which we

17  agree this definition applies.  Honeywell has no patent

18  rights.  It has given away all its patent rights to all its

19  patents everywhere in the world.  So it doesn't matter how

20  many products -- excuse me, how many patents cover those

21  products.  It could be one, it could be three, it could be

22  scores -- we're going to hear that -- it could be hundreds, it

23  could be thousands.  Honeywell has exhausted, given away,

24  contracted away all its rights under all its patents

25  everywhere in the world with respect to these products.

1          I'm not going to make any representation about what
2     this laser scanner does or does not have as far as
3     functionality.  I don't even know where it came from.  But
4     let's just assume it doesn't decode PDF417.  And I think we
5     can all agree that's a 1D barcode symbology.
6               THE COURT:  I doubt you're agreeing to anything.
7               MR. VanHOUTAN:  This is a 1D Barcode Product.  So
8     with regard to this product, based on all my assumptions,
9     Honeywell can't do anything.  It doesn't matter what else this
10    product does, Honeywell can't do anything.  It's given away
11    all its patent rights everywhere in the world.  It has -- so
12    whether any patents cover this product or not, it doesn't
13    matter.
14              How do we get to patent misuse?  That was a long
15    introduction.  How do we get to patent misuse?  Honeywell is
16    telling us in this litigation how the patent misuse comes to
17    be.  This is from the summary judgment briefing.  Honeywell is
18    only seeking payment for one category of product:  products
19    that decode two-dimensional barcode symbologies.  If OPTO's
20    laser scanning products or 1D image sensor products, and
21    that's the CCD products, do not decode a two-dimensional
22    barcode symbology, Honeywell does not seek payment because
23    those products are non-royalty-bearing products.
24              So if we've got the 1D products that I just showed
25    on the screen.  Those -- Honeywell can't do anything to those.

1  They've given away all their patent rights to those.  Those
2  live in a covenant-not-to-sue world.
3         If we add one functionality to that, and just one,
4  the ability to decode stacked barcode symbologies like PDF417,
5  according to Honeywell, that becomes a licensed product
6  subject to a royalty obligation.
7         And I've got a crude little demonstrative here that
8  I've put together.  We see the two worlds.  On the left we've
9  got an OPTO product.  This is actually one that's in dispute
10 in this case, OPTO L-46R.  As it stands right now, in reality,
11 this product cannot decode PDF417 or any other stacked barcode
12 symbology.  OPTO's taken that functionality out.  So according
13 to Honeywell, this is a 1D Barcode Product under the
14 agreement.  And because of that, it's subject to Honeywell's
15 covenant not to sue.  Doesn't matter how many Honeywell
16 patents that may cover this product otherwise, they've
17 forfeited all their rights.  They've given those rights away.
18 They've contracted those rights away.  They've exhausted those
19 rights.  Doesn't matter if there are patents that cover this
20 product or not, there's no royalty that's due.
21        Now, how do we get to the other side of the fence?
22 How does Honeywell get there?  I want to charge royalties if
23 I'm Honeywell.  How do I get to the right side of the fence?
24        According to Honeywell, if OPTO does just one thing,
25 adds the ability to decode stacked barcode symbologies,

JA1425

522

1    PDF417, according to Honeywell, if OPTO adds that
2    functionality tomorrow, for example, it hops over the fence.
3    It's now a 2D Barcode Product.  It's now royalty-bearing.
4    It's now a licensed product and it's subject to 7 percent
5    based on a patent license.  So that's Honeywell's argument in
6    this litigation.
7           What's the problem with that?  I mean, why is that a
8    problem?  It's the fence.  They don't have any patent rights
9    that cover decoding stacked barcode symbologies.  And the
10   Court is well versed with how we got to my statement related
11   to that.  They only identified one patent in discovery.
12   They've disclaimed that patent in this trial.  And they have
13   no other patents that they can point to that cover this
14   functionality.  So the one functionality they say transforms
15   the 1D product to a 2D Barcode Product, they don't have any
16   patent rights.  That's the patent misuse.
17          They did have a patent.  We saw this one at trial.
18   This is the '786 patent, Plaintiff's Exhibit 17.  This is one
19   of the original PDF417 patents.  You can kind of see -- it's
20   not a great quality picture, but you can kind of see the
21   symbology there.  They had a lot of patents.  This expired ten
22   years ago.  All the patents that they had that covered this
23   functionality have expired or they failed to pay maintenance
24   fees, because the PTO is a government agency so you've got to
25   keep paying them to keep your patent rights, and they didn't

JA1426

 1  pay and so they went abandoned.

 2          "Patent misuse 'requires that the alleged infringer

 3  shows (1)'" -- and this is what I've been talking about --

 4  "'that the patentee has impermissibly broadened the physical

 5  or temporal scope of the patent grant.'"

 6          Honeywell has done that here by claiming the one and

 7  only functionality that transforms the product from the left

 8  side of the screen -- jump back -- to the right side of the

 9  screen.  They don't have any patents.  They're using this

10  License and Settlement Agreement to try to extend their patent

11  rights to cover functionality for which they don't have any

12  patents.

13          And, you know, you're going to hear testimony --

14  like on the left side, when it's living in the

15  covenant-not-to-sue world, the 1D Barcode Product world, OPTO

16  can do anything to that, anything it wants.  It can take away

17  the wire and make it wireless, it can add Bluetooth, you can

18  put an AI chip in there, you can make it fully autonomous, it

19  can do your taxes, it can mow your lawn, whatever.  According

20  to Honeywell, none of that matters -- none of that

21  functionality matters if OPTO wants to add it because there is

22  only one that hops it across the fence and creates the 2D

23  Barcode Product.  Because they don't have any patents on that

24  functionality, that is patent misuse.

25          None of what I've said is in dispute.  It's all

524

1   relating to the agreement.  It's all things they've admitted
2   in this litigation.  And it's all disclosures in discovery
3   that they're now bound to.
4           The only thing that's really in dispute, and what I
5   got the sense Your Honor wanted to hear about in denying the
6   summary judgment motions, was the second part here:  whether
7   there was anticompetitive effect.
8           Honeywell has admitted anticompetitive effect.  So
9   this is, again, from the summary judgment briefing.
10          "After Honeywell filed this lawsuit, OPTO removed
11  the ability for these products to decode any two-dimensional
12  barcode symbology, including PDF417.  Because OPTO made this
13  change, OPTO no longer owes Honeywell a continuing royalty on
14  those products" -- again, this is the covenant not to sue --
15  "(assuming the products continue to be operable to decode only
16  one-dimensional symbologies)."  Again, covenant not to sue.
17  If OPTO adds that one functionality back in tomorrow,
18  according to Honeywell, they owe a royalty -- excuse me, OPTO
19  owes a royalty.
20          Here Honeywell is admitting they leaned on OPTO and
21  said you owe us 7 percent for these laser and CCD scanners
22  that can decode this symbology, pay us 7 percent.  In
23  response, OPTO took the functionality out.  That's the
24  anticompetitive effect.
25          Now, you're going to hear from OPTO's economic

JA1428

1  expert, Dr. Greg Adams, who will explain that there is direct

2  and indirect evidence demonstrating Honeywell has market

3  power, another way you can show anticompetitive effect.

4         There is a market for low-cost scanners that can

5  read stacked barcodes like PDF417, and laser scanners are an

6  important product in that market.

7         You'll hear evidence that Honeywell's conduct has

8  had a negative impact on competition and consumers in that

9  market.

10        And that Honeywell's conduct in imposing a royalty,

11 the 7 percent royalty, on OPTO's laser scanning products has

12 imposed a restraint on competition, and thus is

13 anticompetitive.  So that's the second thing that we've got to

14 show with patent misuse.

15        The remedy that we're seeking here in light of

16 Honeywell's patent misuse -- this isn't a patent case.

17 They're not asserting patents.  We're not claiming their

18 patents are invalid.  This is a breach of contract case.

19 We're not saying that any of their patents should be held

20 unenforceable.  What we're saying here is in light of their

21 patent misuse which relates to the License and Settlement

22 Agreement, we're seeking an order declaring the agreement's

23 royalty provisions unenforceable as to the disputed products:

24 laser and CCD products with the ability to decode stacked

25 barcode symbologies like PDF417.

526

1          OPTO's deal from the beginning was that it was going

2     to pay on its image sensor products.  It has paid.  It's

3     continuing to pay.  It's not seeking to undo that.  All it's

4     saying is in the light of Honeywell's patent misuse, we're

5     seeking an order rendering unenforceable the obligation as

6     suggested by Honeywell that we pay on laser and CCD scanners

7     that have stacked barcode symbology functionality.

8          And then we've got the Supreme Court holding that

9     this is an appropriate remedy in this situation under the

10    *Brulotte* case.  And this is the *Kimble* Supreme Court case.

11         And I would note that I saw a case last month where

12    a party was successful in asserting a patent misuse defense

13    and rendering a license agreement unenforceable in a case

14    where Honeywell's lawyers, Alston & Bird, actually, were

15    successful in that defense.  Now, if it was these lawyers, I

16    certainly would have made a bigger deal about it, but it

17    wasn't.  It was others in their firm.

18         THE COURT:  Do you want to give us a cite for that

19    case?

20         MR. VanHOUTAN:  Yes, I will.  Could I do it in a

21    moment, Your Honor?

22         THE COURT:  Sure.

23         MR. VanHOUTAN:  Honeywell is raising a lot of

24    defenses to OPTO's patent misuse counterclaim.  One is that

25    Section 5.3 of the agreement prevents OPTO from raising that

1  claim.

2          Now, I want to sort of cast back to the summary

3  judgment briefing.  This very argument was raised by Honeywell

4  in its summary judgment briefing as a basis to dismiss OPTO's

5  counterclaim, and the Court denied that.  And so to OPTO this

6  is law of the case.  I mean, this issue has been decided

7  already.  It was decided on summary judgment.

8          To the extent that the Court wants to hear argument

9  about it again -- I mean, it's pretty clear from the language

10 of Section 5.3, it relates to patents.  The agreement provides

11 that OPTO will not "challenge the validity, scope or

12 enforceability of any of HONEYWELL'S patents" -- we're not

13 doing that here; this is not a patent case -- and will not

14 "challenge HONEYWELL'S efforts to enforce HONEYWELL'S patents.

15         They're not seeking to enforce patents.  This isn't

16 a patent case.  And we're not challenging the enforceability

17 of anybody's patents.  We're talking about the enforceability

18 of a particular section of a License and Settlement Agreement.

19 So 5.3 doesn't apply.

20         A couple other defenses that Honeywell has raised.

21 You know, they're going to say that this agreement is

22 procompetitive and it's got procompetitive efficiencies and

23 that's why there's not patent misuse.  There's nothing

24 efficient about this agreement.  I mean, look at where we are.

25 As soon as the thing was signed, there was a dispute.  There's

528

1  been two years of litigation.  Look at all the lawyers in this

2  room.  This agreement is far from efficient.

3        I wasn't involved in how the agreement was drafted.

4  Maybe Mr. Stevens has an opinion about that.  I certainly

5  don't.  All I can say is when they put in that covenant not to

6  sue and the two definitions of 2D Barcode Product and 1D

7  Barcode Product, it created all kinds of problems.  As Your

8  Honor has said, why didn't you just put in the list of the

9  products?  I don't know.  I can't speak to that.  But

10  certainly that would have been efficient.  This agreement has

11  no procompetitive efficiencies.

12        So with that, Your Honor, those are my remarks.

13  Unless you have any questions, we look forward to putting on

14  the evidence.

15            THE COURT:  No.  Thank you.

16            MR. VanHOUTAN:  Thank you.

17            THE COURT:  Mr. Pleune.

18            MR. PLEUNE:  Your Honor, it may surprise you to hear

19  that we actually do have a dispute with respect to the first

20  prong of patent misuse.

21            May it please the Court:

22            OPTO is correct.  The defense and counterclaim of

23  patent misuse, they must prove by clear and convincing

24  evidence that Honeywell has impermissibly broadened the

25  physical or temporal scope of the patent grant and that such

JA1432

529

 1    broadening has anticompetitive effects in the relevant market.

 2           And in order to try and prove that, OPTO is

 3    presenting this novel patent misuse theory, that Honeywell is

 4    tying the license of its patent portfolio to an allegedly

 5    non-patented feature.

 6           But I want to point out to start that OPTO long ago

 7    conceded it was not pursuing a theory of tie-in.  This is from

 8    an April 11, 2022, hearing before Judge Mullen.  Judge Mullen

 9    expressed that there was no tie-in.  Counsel agreed.  There is

10    no tie-in in this case.

11           I also want to point out 35 U.S.C. Section 271.

12    Counsel for OPTO pointed out that Honeywell has the right to

13    exclude.  They do.  That's laid out very clearly in 271(d)(3)

14    which explicitly bars a misuse claim where a patentee seeks to

15    enforce its patent rights against infringement, which is

16    exactly what Honeywell is doing here.

17           Now, even if OPTO's claims were not barred by the

18    law of the case -- they are -- and Section 271(d), they're

19    also barred by the patent statute.  OPTO's theory is

20    inconsistent with the evidence and OPTO can't prove patent

21    misuse.  The evidence has already shown, and will continue to

22    show, that every one of OPTO's barcode scanning products was

23    accused of infringement.

24           The settlement agreement was jointly negotiated,

25    drafted, and executed by Honeywell and OPTO.  And they

1  identify two categories.  We heard from counsel all of a
2  sudden again this idea of the 1D scanner.  I understand that
3  they were trying to convince the jury of that.  But I think
4  that we all know what the agreement actually says.  The
5  agreement talks about two categories:  1D and 2D.  And that's
6  not determined by a 1D scanner.  That's determined by what
7  features any scanner has within it.
8          OPTO chose to remove the 2D capability from certain
9  of their products in order to avoid paying a royalty, not
10 because Honeywell had market power.  And that fact alone that
11 OPTO had the power to avoid the royalty proves that there can
12 be no misuse.
13         In addition, OPTO's expert, Dr. Adams, who we're
14 going to hear today, he failed to assess demand for laser
15 scanners that read stacked linear codes.  He didn't do that.
16         He failed to offer any evidence of Honeywell's
17 ability to exclude competition.  He didn't do that either.
18         He failed to offer any evidence regarding the lack
19 of profitability of OPTO's laser scanners.
20         And finally, and most importantly, as we just heard,
21 the settlement agreement that Honeywell and OPTO jointly
22 drafted, OPTO voluntarily agreed not to challenge Honeywell's
23 patents as unenforceable and agreed not to challenge the
24 agreement as anticompetitive.
25         So first I want to focus on the first prong,

1    impermissible broadening.  And it is undisputed, and no OPTO

2    witness will dispute, that every one of OPTO's products

3    practiced one or more of Honeywell's patents.  And that was

4    clear from the testimony of Jeremy Whitley in this case.  That

5    testimony is undisputed.  Mr. Whitley testified that every one

6    of OPTO's products was accused of infringement, and that

7    included all of OPTO's 2D Barcode Products that are subject to

8    a 7 percent royalty, as well as OPTO's 1D Barcode Products for

9    which OPTO negotiated a covenant not to sue.

10          And this testimony is supported by OPTO's own

11   Exhibit DX769 that showed that in the International Trade

12   Commission investigation, Honeywell accused scores of OPTO's

13   laser scanning products.

14          Further on, in that same exhibit, we see that

15   Honeywell accused scores of OPTO's image sensor-based

16   products.  There's no dispute about that.

17          This is also evidenced by PX234.  This is

18   Honeywell's June 1, 2019, correspondence to OPTO raising many,

19   many scores of patents, accusing all of OPTO's products of

20   infringement.

21          And therefore, as we heard from counsel, absolutely,

22   it was not a surprise that in this very case counsel for OPTO

23   conceded that if it were not for the covenant not to sue for

24   1D Barcode Products, that OPTO would infringe scores of

25   Honeywell's patents.

1          There simply cannot be patent misuse for charging a

2    royalty for products that infringe.  And that really should

3    end the patent misuse inquiry there.

4          But there's also no anticompetitive effect.  So now

5    the cornerstone of OPTO's argument is that Honeywell is using

6    its patent leverage to collect royalties on a non-patented

7    feature:  decoding stacked barcode symbologies.

8          First, that's not what Honeywell is doing.

9    Honeywell and OPTO together negotiated the framework in the

10   settlement agreement.  It is undisputed that OPTO engaged

11   qualified patent counsel and with its counsel negotiated an

12   agreement with Honeywell.  And together Honeywell and OPTO

13   agreed on the definitions of 2D Barcode Products and 1D

14   Barcode Products.  And whether any one of OPTO's products is

15   subject to a royalty is based on that definition and

16   agreement.  It is not based on any leverage or market power

17   that Honeywell holds.

18         OPTO has also failed to demonstrate that Honeywell

19   has market power and that any action taken by Honeywell

20   somehow has anticompetitive effect.  OPTO's analysis is

21   deficient, and we'll see that from Dr. Adams.

22         Now, independent of OPTO's failure to establish

23   either prong of patent misuse, OPTO's counterclaim and

24   affirmative defense must also fail because they are explicitly

25   barred by the parties' agreement.

533

1           In the parties' agreement, OPTO made two covenants.

2           First, OPTO agreed not to challenge the

3     enforceability of any Honeywell patents relating to barcode

4     technology.

5           (Jury sounded the buzzer.)

6           MR. PLEUNE:  Second, OPTO agreed not to challenge

7     Honeywell's efforts to enforce its patents as anticompetitive,

8     unfair competition, or any other violations of the law, and

9     OPTO's misuse claim is barred by both covenants.  We did hear

10    from counsel that they are not challenging the enforceability

11    of any patent.  That's not what they said in their answer,

12    Your Honor.  And that's not what patent misuse is.  The

13    doctrine of patent misuse is specifically directed at that.

14    And that's what they are pursuing here.  And they specifically

15    agreed in the contract that that is not something that they

16    would pursue.

17          For all these reasons, OPTO cannot prove patent

18    misuse and its defense and counterclaim must be denied.

19          That's all I have on patent misuse, Your Honor.  I

20    did want to briefly mention laches because I understand -- I

21    think that that's also an issue that may be put to you.

22          I'll just very briefly address that there's a

23    presumption that laches does not apply if the lawsuit is filed

24    within the statute of limitations.  This lawsuit was filed

25    within the statute for both Delaware and North Carolina law.

JA1437

534

 1  And I believe the evidence has already shown that once
 2  Honeywell learned of the breach, they did an investigation in
 3  a timely manner and brought suit, again, within the statute of
 4  limitations.
 5          THE COURT:  Thank you very much.  That was helpful
 6  from both sides.  I appreciate that.
 7          Let's see what the jury is asking us before we go
 8  any further.
 9          If you have copies of the PowerPoints you just used
10  available for us, that would be helpful.
11          MR. VanHOUTAN:  I do, Your Honor.  May I approach?
12          THE COURT:  You may.
13          (Document tendered to the Court.)
14          (The Court and the clerk conferred.)
15          THE COURT:  All the jury wanted to know is if they
16  could have multiple copies of the verdict sheet so that each
17  one could be looking at it while they're deliberating.  So
18  we're going to give them each a copy.
19          All right.  You may call your first witness.
20          MR. VanHOUTAN:  OPTO calls Mr. Jeremy Whitley,
21  please.
22          THE COURT:  Let's hold on a second.  Ms. Kirk needs
23  to be here during things like swearing in.
24          MR. VanHOUTAN:  Okay.
25          (Pause.)

JA1438

535

JEREMY WHITLEY - DIRECT

1          MR. VanHOUTAN:  Your Honor, if it's all right, I
2   think Mr. Whitley is going to be called by both parties so the
3   parties have agreed to let the cross go beyond the scope of
4   direct just to streamline the presentation of evidence.
5          THE COURT:  Very good.  Appreciate that.
6          All right.  Mr. Whitley, come forward.
7          JEREMY WHITLEY, DEFENDANT'S WITNESS, SWORN,
8                    DIRECT EXAMINATION
9   BY MR. VanHOUTAN:
10  Q.   Good morning, Mr. Whitley.
11  A.   Good morning.
12  Q.   We've got to stop meeting like this.
13  A.   This is our third date.
14  Q.   Mr. Whitley, you are an IP attorney, correct?
15  A.   Yes.
16  Q.   And you are a patent attorney?
17  A.   Yes.
18  Q.   So am I so it's okay.
19       And you managed the day-to-day of this particular
20  litigation for Honeywell; is that correct?
21  A.   Yes.
22          MR. VanHOUTAN:  And if we could put up JX1, which is
23  the License and Settlement Agreement.
24  Q.   And you're familiar with this agreement, correct?
25  A.   Yes.

JA1439

JEREMY WHITLEY - DIRECT

1            MR. VanHOUTAN:  Now, if we can go to Section 2.1 of
2    the agreement, and it's the license part.
3    Q.   Do you see that?
4    A.   Yes.
5    Q.   And it states, "Subject to the terms and conditions
6    herein, each Party (Licensor) hereby grants and shall cause
7    its Affiliates to grant to the other Party (Licensee) a
8    non-exclusive, non-transferable (except as provided herein),
9    non-sublicensable license to its U.S. Patent Portfolio to
10   make, have made, use, sell, and offer for sale in, and import
11   into the United States the Licensed Products during the
12   License Period."
13           Do you see that?
14   A.   Yes.
15   Q.   And under the agreement, this is a cross-license as
16   between Honeywell and OPTO, correct?
17   A.   Yes.
18   Q.   And it relates to the U.S. patent portfolio; not the
19   world patent portfolio, but limited to the United States,
20   correct?
21   A.   Yes.
22   Q.   And the licensed products under the agreement are defined
23   as 2D Barcode Products, correct?
24   A.   You'd have to show me that one.  I think that's right
25   based on what you said earlier.

JEREMY WHITLEY - DIRECT

1  Q.   Yeah, sure, let's take a look.

2         MR. VanHOUTAN:  If we can go to Section 1.8.

3  Q.   And it states, "The term 'Licensed Product' shall mean

4  any 2D Barcode Products that are imported into or made, sold,

5  licensed, leased, or otherwise transferred in the United

6  States by a Party during the License Period."

7       Do you see that?

8  A.   Yes.

9  Q.   Okay.  So the licensed products are 2D Barcode Products,

10 correct?

11 A.   Correct.  Imported -- all the infringing acts by either

12 party during that period.

13        MR. VanHOUTAN:  And if we could go to Section 1.9 of

14 the agreement.

15 Q.   It states the license period is between the effective

16 date and January 22, 2032; is that correct?

17 A.   Correct.

18 Q.   And the effective date is January 22, 2020, right?

19 A.   Correct.

20 Q.   So roughly -- well, not roughly.  Approximately -- sorry.

21 Exactly 12 years, correct?

22 A.   I think it's actually 12 years and a day because of the

23 inclusive, but 12 years sounds good.

24        THE COURT:  Which is it?

25        MR. VanHOUTAN:  If we can go back to Section 1.4.

538

JEREMY WHITLEY - DIRECT

1  Q.   And this is the definition of 2D Barcode Products,
2  correct?
3  A.   Yes.
4  Q.   And the Court construed Section 1.4 during the course of
5  this litigation, correct?
6  A.   Yes.
7           MR. VanHOUTAN:  All right.  If we can go to
8  Section 4.3.
9  Q.   It states -- I'm not going to read the whole thing, but
10 "in consideration of the license granted by HONEYWELL to
11 OPTICON pursuant to Section 2.1, OPTICON shall pay to
12 HONEYWELL INTERNATIONAL a royalty of seven percent of Opticon
13 Gross Revenue derived from the sales of 2D Barcode Products in
14 the United States."
15     Do you see that?
16 A.   Yes.
17 Q.   So under the agreement, OPTO is obligated to pay
18 Honeywell a 7 percent royalty on the sale of any OPTO product
19 sold in the U.S. that falls under the definition of 2D Barcode
20 Products, correct?
21 A.   Correct.
22 Q.   And in exchange for that payment, OPTO gets a license to
23 Honeywell's entire U.S. patent portfolio, right?
24 A.   With the other conditions that are in there, but yes,
25 that is one of the conditions.

JEREMY WHITLEY - DIRECT

1  Q.   But that's just for OPTO's products that fall under the
2  definition of 2D Barcode Products under Section 1.4, correct?
3  A.   Correct.  The royalties only on Opticon products.
4  Q.   And only for 2D Barcode Products, right?
5  A.   Correct.
6  Q.   Because there's another category of products set forth in
7  the agreement, right?
8  A.   Correct.
9  Q.   And that's 1D Barcode Products, right?
10 A.   Yes.
11         MR. VanHOUTAN:  If we can go to Section 1.5 of the
12 agreement.
13 Q.   And we see the definition of 1D Barcode Products,
14 correct?
15 A.   Yes.
16 Q.   It's basically anything other than a 2D Barcode Product,
17 fair?
18 A.   That can decode a barcode, yes.
19 Q.   And OPTO is not obligated to pay any patent royalties to
20 Honeywell for the sale of any 1D Barcode Products, is it?
21 A.   As defined there, yes.
22 Q.   And that's because of Section 2.4 of the agreement -- if
23 we can go there, please -- which is the covenant not to sue,
24 right?
25 A.   Correct.

JEREMY WHITLEY - DIRECT

1  Q.   And the covenant not to sue is actually broader than the
2  license because it relates to patents around the world, right?
3  A.   Correct.
4  Q.   And neither party, because it's a cross-covenant not to
5  sue, can bring any action for patent infringement anywhere in
6  the world during the license period, correct?
7  A.   Correct.
8  Q.   But that's limited to 1D Barcode Products, right?
9  A.   That is correct.
10 Q.   So regardless of whether there's tens or twenties or
11 scores or hundreds or thousands or tens of thousands of, for
12 example, Honeywell patents around the world with regard to
13 OPTO's 1D Barcode Products, Honeywell cannot assert those
14 patents, right?
15 A.   Against a product that falls in the definition of 1D
16 Barcode Product, that is correct.
17 Q.   Okay.  That's because Honeywell, and OPTO too, gave away
18 their patent rights with regard to 1D Barcode Products,
19 correct?
20 A.   That was part of the bargain of the agreement.
21 Q.   They bargained away their patent rights, correct?
22 A.   They granted a covenant not to sue on 1D Barcode
23 Products.
24 Q.   In this case Honeywell has taken the position that OPTO's
25 laser and CCD scanners that are not operable to decode stacked

JEREMY WHITLEY - DIRECT

1   barcode symbology like PDF417 qualify as 1D barcode, correct?

2   A.   I believe that is correct.  I would rephrase it to say

3   that the products that regardless of hardware fall in the

4   definition of 1D Barcode Products are not subject to a

5   royalty.

6   Q.   Regardless of hardware, correct?

7   A.   Regardless of hardware.

8   Q.   Regardless of any other functionality, right?  That's

9   Honeywell's position.

10  A.   Except for the functionality that's explicitly excluded

11  in the definition.  But any other function, yes.

12  Q.   So you could add an AI chip, you could make it wireless,

13  you could add Bluetooth, you could make it fully automated, it

14  could walk around and scan barcodes as it sees fit, all of

15  that is prohibited -- you're prohibited from suing OPTO based

16  on the covenant not to sue, right?

17  A.   I think that's right.  Can you show me the definition of

18  the 1D Barcode Products again.

19  Q.   Sure.

20          MR. VanHOUTAN:  Can we go to Section 1.5.

21          THE WITNESS:  Yes, that's correct.

22          Actually, take me back to the covenant not to sue.

23          The only reason I'm pausing is -- I think you're

24  right, that there's no language about as of the effective

25  date.

JEREMY WHITLEY - DIRECT

1        So yes, that's right.  During the license period,
2  anything that falls in the definition of 1D Barcode Products.
3  Q.   So during the license period, which is 12 years and a
4  day, OPTO can do whatever it wants, it can add anything it
5  wants, it can add any functionality it wants to its otherwise
6  1D Barcode Products, correct?
7  A.   That is correct.
8  Q.   And it owes no royalty to Honeywell for those products
9  regardless of functionality, correct?
10 A.   That is correct.
11 Q.   And Honeywell can't do anything with any of its patents,
12 anywhere in the world with regard to those products, correct?
13 A.   As long as they fall in the definition of 1D Barcode
14 Products, yes.
15 Q.   And according to Honeywell in this litigation, there's
16 only one functionality that takes those 1D Barcode Products
17 and transforms them into 2D Barcode Products, correct?
18 A.   I think that's mischaracterizing it.  There's only one --
19 you'd have to be able to decode a two-dimensional barcode to
20 fall under the definition of 2D Barcode Products.  The
21 transformation is the part -- in the definition, if you're
22 talking about the transformation from one definition to the
23 next, yes.  As long as it can decode a 2D barcode symbology,
24 then it falls into the 2D Barcode Products definition and not
25 the 1D Barcode Products definition.

JA1446

JEREMY WHITLEY - DIRECT

1  Q.   And so Honeywell's allegation in this litigation, OPTO's
2  1D Barcode Products under Section 1.5, Honeywell contends that
3  only one thing, the addition of the ability to decode stacked
4  barcode symbologies like PDF417, transform those 1D Barcode
5  Products into 2D Barcode Products under the agreement, right?
6  A.   So the only reason I'm struggling with answering that is
7  because it doesn't transfer -- transform those products.
8  That's actually different products, right?  Just because you
9  call it a rhino but then you change it, doesn't make it a
10 rhino anymore.
11 Q.   We're talking about the same products.  Let's just use my
12 example from my opening slide, all right, the OPTO L-46R.
13 Right now it doesn't have the ability to decode stacked
14 barcode symbologies like PDF417.  So Honeywell agrees that's a
15 1D Barcode Product, right?
16 A.   I'm taking you at your word that it doesn't decode any 2D
17 barcode symbologies, then, yes, it's a 1D Barcode Product.
18 Q.   Assume for my hypothetical that it does not.  I
19 understand your answer.
20      Now, according to Honeywell, if I take that L-46R and I
21 add in a functionality, the ability to decode stacked barcode
22 symbologies, according to Honeywell in this litigation, that's
23 a 2D Barcode Product under the agreement, correct?
24 A.   Correct, it's a 2D Barcode Product.  Again, you have to
25 bear with me.  My background is in computer science.  When you

JEREMY WHITLEY - DIRECT

1  add that functionality, that product is physically different.

2  So you're not transforming the product into a different

3  definition; you're actually transforming the product into a

4  different product.

5  Q.   I haven't changed the hardware, have I?

6  A.   No.  Well, you've changed the memory.  But it looks

7  different.

8  Q.   You're just adding some software, correct?

9  A.   Correct.

10  Q.   And I'm not talking about computer science what we're

11  actually doing.  I'm talking about under the agreement, that

12  transforms a 1D Barcode Product to a 2D Barcode Product,

13  correct?

14  A.   It converts it into a 2D Barcode Product.

15  Q.   You understand that OPTO's laser and CCD scanners that

16  are in dispute in this case, we saw the slide from one of your

17  experts, do not currently have the ability to decode stacked

18  barcode symbologies, correct?

19  A.   I believe that is correct.  There is a little bit of

20  confusion because some of them say that they -- the end date

21  of when they stopped doing those functions is, quote, now.

22  But my understanding is that meant now is the time that that

23  question was answered.

24       So yes, I think my understanding is those do no longer

25  decode 2D barcode symbologies.

JEREMY WHITLEY - DIRECT

1  Q.   So according to Honeywell, those products are now 1D
2  Barcode Products under Section 1.5 of the agreement, correct?
3  A.   I believe they fall into the definition of 1D Barcode
4  Products, that's correct.
5  Q.   If OPTO were to add the functionality to decode PDF417
6  into those products tomorrow, Honeywell would contend that
7  those products are 2D Barcode Products, correct?
8  A.   They would then fall under the definition of 2D Barcode
9  Products and we believe they would be 2D Barcode Products.
10 Q.   And that's regardless of any other features or functions
11 that the product had or the product would have.  It's just the
12 ability to decode stacked barcode symbologies, right?
13 A.   2D barcodes, yes.
14 Q.   According to Honeywell in this litigation, those
15 transformed 2D Barcode Products are now royalty-bearing
16 products under the agreement, correct?
17 A.   If they fall in the definition of 2D Barcode Products,
18 yes, we believe they're royalty-bearing.
19 Q.   And they're patent royalty-bearing, correct?
20 A.   I don't know what -- I don't think the term is in there,
21 but, I mean, it is in exchange for a patent license.
22 Q.   In light of Honeywell's allegations in this case, OPTO
23 removed the functionality we've been discussing, the ability
24 to decode stacked barcode symbologies like PDF417, from the
25 disputed products, correct?

546

JEREMY WHITLEY - DIRECT

1  A.   I know that they removed them.  I don't know if it's
2  because of the allegations.
3  Q.   It certainly happened after the litigation, correct?
4  A.   Correct.
5  Q.   In discovery in this case when OPTO asked Honeywell to
6  identify any patents, active or expired, that Honeywell
7  contends claim the functionality of decoding PDF417,
8  MicroPDF417, and/or composite codes with a laser scanner,
9  Honeywell identified only U.S. Patent Number 7,159,783, or the
10  '783 patent, correct?
11  A.   I will take your word for that.
12  Q.   Have you seen the '783 patent before?
13  A.   Yes.
14  Q.   It was asserted in the ITC investigation, correct?
15  A.   Correct.
16  Q.   And that patent expired on March 28, 2023, didn't it?
17  A.   I'll take your word for that.
18  Q.   Okay.  We've heard testimony in this case and statements
19  from counsel that the '783 patent didn't have anything to do
20  with PDF, did it?
21  A.   Well, it had to do with script editing of the data that's
22  output from the barcode, so that can be any barcode.  So it
23  would relate to PDF417.
24  Q.   Okay.  That's contrary to the statement that Mr. Doane
25  made, correct?

JA1450

JEREMY WHITLEY - DIRECT

1  A.   You'll have to read it back to me.  But even if it is,
2  it's what I believe.
3  Q.   It's contrary to the statement your counsel made at the
4  pretrial conference, isn't it; that this patent doesn't have
5  anything to do with PDF417?
6  A.   You'll have to read that back to me.  But my
7  understanding is it can work on any barcode that's spit out
8  into human-readable text.
9  Q.   Okay.  And the '783 patent doesn't have anything to do
10 with barcode symbologies, correct?
11 A.   Again, I believe it works on the human-readable text
12 that's spit out from a barcode, so I wouldn't say that it has
13 nothing to do with barcodes.
14 Q.   That's not what your lawyer said at the pretrial hearing,
15 is it?
16 A.   I don't know.  You'll have to read me that statement.
17 Q.   And that's not what Mr. Doane said during his testimony,
18 is it?
19 A.   Again, I don't know that he would conflict with that, so
20 I'm not sure I agree with that.  But if you read it to me or
21 show it to me, I can...
22 Q.   And I know you took my word for it, but I may need a
23 little bit more for that.  Did Honeywell identify in discovery
24 any other patents besides the '783 patent that it contends
25 claim barcode -- decoding of barcode symbologies, stacked

JEREMY WHITLEY - DIRECT

1  barcode symbologies like the '783 patent -- excuse me, like
2  PDF417, MicroPDF417, or composite codes?
3  A.    And is the question that the, like, claim covers the
4  decoding of PDF417 or is it -- are you asking were there
5  patents disclosed that cover products that decode PDF417?
6  Q.    Sure.
7          MR. VanHOUTAN:  Could we put up DX754, please.
8          Go to page 39.  If you'd highlight interrogatory
9  number 13.
10 Q.    Interrogatory number 13 says, "Identify all patents,
11 whether active or expired, owned by or assigned to Honeywell,
12 that you contend claim decoding of PDF417, MicroPDF417,
13 composite codes, or GS1 stacked codes by laser scanning."
14     Do you see that?
15 A.    Yes.
16          MR. VanHOUTAN:  Okay.  And let's go to the bottom of
17 that.
18 Q.    Honeywell answered, "Subject to and without waiving the
19 foregoing objections, Honeywell responds as follows:
20     "The License provided by the Settlement Agreement goes
21 beyond decoding.  The License provided by the Settlement
22 Agreement covers every aspect of the Product to the extent
23 that the Product practices a patent that is part of
24 Honeywell's U.S. Patent Portfolio.  As an example, OPTO's 2D
25 Barcode Products," and then there's a big list there.

JEREMY WHITLEY - DIRECT

1       MR. VanHOUTAN:  If we could go to the next page.

2  Q.  At the bottom after the list, "practice many patents

3  included in Honeywell's U.S. Patent Portfolio, including at

4  least U.S. Patent Number 7,159,783.  Further, Honeywell owns

5  thousands of patents in its portfolio related to the barcode

6  scanning industry, including scanning and decoding barcodes."

7  Correct?

8  A.  Yes.

9  Q.  Okay.  So I know you took my word for it, but I want you

10  to be able to know what you're testifying about.

11      The only patent identified by Honeywell in response to

12  rog 13, which asked about whether Honeywell has any patents

13  that claim the ability to decode PDF417, MicroPDF417,

14  composite codes, and GS1 stacked codes was the '783 patent,

15  correct?

16  A.  So I think if your question is, is it the only one that's

17  listed by number in that answer?  Yes.  But did they say

18  that's the only one that does it?  Clearly not.

19  Q.  What other patents did they identify that does it?

20  A.  So including to me means, as a patent lawyer, it's sort

21  of like comprising.  It says there's thousands of others in

22  our portfolio.

23  Q.  Those aren't listed there, are they?

24  A.  Not by number.

25  Q.  So I'm going to go back to our conversation about what

JA1453

JEREMY WHITLEY - DIRECT

1  your counsel said at the pretrial hearing regarding the '783

2  patent just so we have that on the record.

3      So Mr. Stevens states to the Court -- and this is in

4  relation to the patent claim chart that we've seen a lot

5  about.  It's in evidence, right?  And that patent claim chart

6  relates to the '738 patent, correct?

7  A.   I don't know.  I've never actually seen it other than the

8  excerpts you guys put up.

9  Q.   Mr. Stevens said, "Okay.  So that's the document, but I

10  was very interested to hear, because this is the first time

11  I've heard it, that there's going to be a dispute about PDF417

12  and whether it's one-dimensional or two-dimensional, because

13  we have an RFA in this case that says it's a two-dimensional

14  code type.  They have admitted to an RFA.  That's a judicially

15  binding admission that cannot be taken back."

16          MR. VanHOUTAN:  So I'm going to put up on the

17  screen, Your Honor, that very answer.

18          "They go on to say the reading," and then he goes

19  into the reading of -- well, I'll just read it.

20          "They go on to say that the reading of any -- like a

21  particular word might be linear.  But if you see -- can you

22  scroll up just a little bit.  They admitted that PDF417 is a

23  continuous, multi-row two-dimensional code type, and it goes

24  on from there.

25          "So they can't take it back and say that it's a

JEREMY WHITLEY - DIRECT

1   one-dimensional code type.  They've already said in an RFA
2   that it's a two-dimensional code type.  So it's strange for me
3   to hear now that that's going to be their change of position.
4          "But at any rate, there's nothing in that claim
5   chart that speaks to PDF417.  That is a figment of
6   Mr. Muckenfuss's imagination, with all due respect.  Never
7   talks about it.  That patent did not have anything to do with
8   underlying symbologies.  You can read that entire document,
9   you won't find anything to do with symbologies."
10  Q.   So I'm going to represent to you that that claim chart
11  was referencing the '783 patent and that your counsel was
12  referencing the '783 patent.
13       So I'm going to ask you -- and maybe you read it and you
14  have a different opinion -- does the '783 patent cover PDF417?
15  A.   I do think it mischaracterizes what he said a little bit.
16  And you're using as a patent attorney the word "cover."  So I
17  will say yes, it would cover devices that could read PDF417
18  and then interpret the script or apply a script that can edit
19  the human-readable text.
20          (Jury sounded the buzzer.)
21  Q.   Let's go back to the top of rog 13.  And I want to use --
22  because we're both patent attorneys, I want to use the word
23  "claim."
24       Do you dispute that the '783 patent claims PDF417?
25  A.   Do I dispute that it claims?  No, I don't dispute that it

JEREMY WHITLEY - DIRECT

1  claims.

2  Q.   You agree that it doesn't claim, correct?

3  A.   I mean, I would put it up, but I doubt that anybody would

4  have limited the claims to PDF417 in the actual claims.

5          MR. VanHOUTAN:  Could we go to PX212.

6          Your Honor, do you want us to take a break?

7          THE COURT:  No, that's fine as long as you're not

8  introducing any new exhibits.  Are you?  It's just that

9  Ms. Kirk keeps up with that, along with the rest of us, but

10  she's the one that counts.

11          MR. VanHOUTAN:  I was going to introduce a new

12  exhibit.

13          THE COURT:  Let's just wait for her, then.  I'm not

14  sure if she would trust us if we...

15          MR. VanHOUTAN:  She shouldn't.

16          THE COURT:  She might trust the court reporter,

17  though.

18          MR. VanHOUTAN:  I can move to something else

19  briefly, Your Honor.

20          THE COURT:  She'll be right back.

21          MR. VanHOUTAN:  Okay.  That's fine.

22          (Pause.)

23          (Document tendered to the Court.)

24          THE COURT:  The jury wants to go to lunch so we'll

25  just bring them back in and admonish them not to deliberate

JEREMY WHITLEY - DIRECT

1  during lunch.  You may stand down.

2          (Witness stepped down.)

3          THE COURT:  We're going to take lunch when they do.

4          MR. VanHOUTAN:  Okay.

5          MR. STEVENS:  Can we clear the screen?

6          THE COURT:  Yes.

7          MR. VanHOUTAN:  Just to be clear, Mr. Whitley is

8  still technically on the stand even though he's going to

9  lunch.

10          THE COURT:  Yes.

11          MR. VanHOUTAN:  Meaning no communications with --

12          THE COURT:  I know where you're going with that.

13          MR. VanHOUTAN:  Yeah.

14          (Jury entered the courtroom.)

15          THE COURT:  All right.  So I understand you're ready

16  for lunch.

17          Let me suggest and ask that you be back by 1:30.

18  And the reason I said you were in charge but only sort of is

19  because I want to make sure I'm here while you're

20  deliberating.  So if I say 1:30, then I know where I need to

21  be at 1:30.

22          So now, of course, it's even more important.  While

23  you're at lunch, do not discuss this case.  I don't know if

24  you will all eat together or not; but if you aren't all

25  together, you shouldn't deliberate anyway.  And the restaurant

JEREMY WHITLEY - DIRECT

1    is not the place to be doing deliberations.  So just be very

2    careful not to talk about this case during the lunch break.

3    And I'll expect you to be back in the jury room by 1:30.

4           Once you're all reassembled, feel free to renew your

5    deliberations even if it's before 1:30.  When you're all back,

6    go ahead and get started.

7           All right.  Everyone remain seated while the jury

8    leaves.

9           (Jury exited the courtroom.)

10          THE COURT:  All right.  Let's take our lunch break

11   as well until 1:30.  I have a couple of other things I need to

12   do and that will give me a little time to do it and eat lunch.

13          All right.  We'll be in recess until 1:30.

14          (Lunch recess at 12:16 PM.)

15   WEDNESDAY AFTERNOON, JULY 19, 2023

16          (Court back in session at 1:24 PM.)

17          (Jury not present.)

18          THE COURT:  You may retake the stand -- I guess we

19   should wait.  I assume you want to wait for co-counsel.

20          MR. PLEUNE:  He should be here any second.

21          MR. VanHOUTAN:  Your Honor, I have that case cite if

22   you would like it now.

23          THE COURT:  You can just read it out, please.

24          MR. VanHOUTAN:  Okay.  2023 WL 4297647.

25          THE COURT:  Thank you.

JEREMY WHITLEY - DIRECT

1          (Pause.)

2          (Witness resumed the witness stand.)

3          THE COURT:  You may continue.

4                    JEREMY WHITLEY

5               DIRECT EXAMINATION (Cont'd.)

6   BY MR. VanHOUTAN:

7   Q.   Good afternoon, Mr. Whitley.

8          MR. VanHOUTAN:  Before I continue with you, I just

9   wanted to move into evidence Honeywell's First Amended

10  Objections and Responses to Defendant's First Set of

11  Interrogatories, which is Defendant's Exhibit 754.

12         THE COURT:  All right.  It's admitted.

13         (Defendant's Exhibit Number 754 was received into

14  evidence.)

15  Q.   Mr. Whitley, before the lunch break we were talking about

16  the '783 patent.  Do you remember that?

17  A.   Yes.

18         MR. VanHOUTAN:  Okay.  Could we put up Plaintiff's

19  212, please.

20  Q.   And do you recognize this to be the '783 patent?

21  A.   Yes.

22  Q.   And we were talking about the scope of the claims.  Do

23  you recall that?

24  A.   Yes.

25         MR. VanHOUTAN:  Can we go to the last page, please.

JEREMY WHITLEY - DIRECT

1   Second to the last.  One more.

2   Q.   At the bottom there we see Claim 1.  Can you see that?

3   A.   Yes.

4   Q.   And take your time and review that and then we'll go to

5   the next page so you can see the rest of Claim 1.

6   A.   (Witness peruses document.)  Okay.

7            MR. VanHOUTAN:  Go to the next page, please.

8   Highlight the rest of Claim 1, top left.

9   A.   (Witness peruses document.)  Okay.

10  Q.   Anything in Claim 1 of the '783 patent about PDF417?

11  A.   So my understanding is this is a claim directed to

12  putting functions on a barcode reader that when executed it

13  does something to barcodes.

14       So if you're asking me does barcode appear in the claim,

15  it doesn't.  But when you say is there anything that's related

16  to a barcode?  I think so.

17  Q.   Okay.  Let me ask it this way.  In your opinion as a

18  patent attorney, would Claim 1 read on a 1D Barcode Product as

19  defined in the License and Settlement Agreement?

20  A.   If it also included software that did this, yes.

21  Q.   So it doesn't specifically relate to stacked barcode

22  symbologies like PDF417, correct?

23  A.   It doesn't -- Claim 1 doesn't specifically limit what

24  these scripts can perform on.

25           MR. VanHOUTAN:  Let's go to the next independent

JEREMY WHITLEY - DIRECT

1  claim, which I believe is 9.

2          (Jury sounded the buzzer.)

3          THE COURT:  Let's take a break.

4          MR. VanHOUTAN:  Okay.

5          (Pause.)

6          THE CLERK:  They have a verdict.

7          THE COURT:  All right.  You can stand down, please.

8          (Witness stepped down.)

9          (Jury entered the courtroom at 1:34 PM.)

10         THE COURT:  Has the jury selected a foreperson?

11         THE FOREPERSON:  Yes.

12         THE COURT:  If you would, please, hand the verdict

13  sheet to Ms. Kirk.

14         (Verdict sheet tendered to the Court.)

15         THE COURT:  All right.  As to question 1, did OPTO

16  breach the parties' settlement agreement by failing to timely

17  pay Honeywell all royalties due under the agreement?  Yes.

18         Question 2, is OPTO entitled to succeed on its

19  defense of unilateral mistake?  No.

20         Question 3, is OPTO entitled to succeed on its

21  defense of quasi-estoppel?  No.

22         And appropriately did not, then, move on to question

23  4.

24         Is this your verdict, so say you all?

25         THE JURY:  (Affirmative responses.)

JEREMY WHITLEY - DIRECT

1      THE COURT:  Does either party request polling of the
2  jury?
3          MR. MUCKENFUSS:  No, Your Honor.
4          MR. STEVENS:  No, Your Honor.
5      THE COURT:   Members of the jury, I know that we
6  all greatly appreciate your efforts on this case.  I always
7  watch the jury pretty closely during the trial and you were
8  paying close attention.  I think you understood the issues
9  well.  One of the great things about being a judge is you get
10 exposed to so many things you otherwise wouldn't.  I didn't
11 know much about barcodes before this trial and now you do too.
12 So I hope you enjoyed your time.  We do appreciate your
13 service.
14     You're now free to talk to whomever you want about
15 this or not.  It's up to you.  And hopefully you'll be
16 relieved from future federal jury service for a few years.
17     Make sure you leave your notepads behind.  Collect
18 anything you need out of the jury room.  And you have our
19 thanks and you're free to go.
20     Everyone remain in the courtroom while the jury
21 clears the floor.
22         (Jury exited the courtroom.)
23     THE COURT:  I assume you want to keep going with
24 this and address the damages issue at the end of this.
25         MR. VanHOUTAN:  Certainly want to keep going with

JEREMY WHITLEY - DIRECT

1  patent misuse.

2          THE COURT:  Yes, that's what I'm asking.

3          Come on back up.

4          (Witness resumed the witness stand.)

5          THE COURT:  All right.  You may continue.

6                  JEREMY WHITLEY

7              DIRECT EXAMINATION (Cont'd.)

8  BY MR. VanHOUTAN:

9  Q.   And I'm sorry, Mr. Whitley, we were talking about the

10  '783 patent, right?

11  A.   Yes.

12  Q.   And we looked at Claim 1, correct?

13  A.   Yes.

14  Q.   And now I've got Claim 9 on the screen here.  Could you

15  take a look at that and just let me know when you're finished

16  reviewing it.

17  A.   (Witness peruses document.)  I'm done.

18  Q.   Okay.  Anything in Claim 9 of the '783 patent about

19  PDF417, MicroPDF417, composite codes?

20  A.   Again, like with Claim 1, there's nothing that

21  specifically mentions those, but this an optical reader that

22  has scripts running on it.

23  Q.   And if there was an optical reader with those scripts,

24  could that be a 1D Barcode Product under the agreement?

25  A.   Said probably differently, if there was a 1D Barcode

JEREMY WHITLEY - DIRECT

1  Product that had this software on it -- I'm sorry.  If there
2  was a product that had this software on it that didn't decode
3  a two-dimensional code, that could be a 1D product.
4  Q.   Okay.  I think the last independent claim is Claim 20.
5       Just take a quick look at that and let me know when
6  you're ready.
7  A.   (Witness peruses document.)  Okay.
8  Q.   Anything in there about PDF417, MicroPDF417, or composite
9  codes?
10  A.   Again, nothing specifically that mentioned those; just
11  that it's an optical reader that includes software.
12  Q.   And if the product had the appropriate software, it could
13  be a 1D barcode reader under the settle agreement?  Barcode
14  product, excuse me.
15  A.   Yes.
16       MR. VanHOUTAN:  If we could go to the first page of
17  the '783 patent.
18       Highlight this.
19  Q.   And you took my word for it regarding the '783 patent
20  being expired, but I'd like you to just take a look and
21  confirm for yourself.
22  A.   So I think there is something that can be in the
23  procedural history that's not printed on the face of the
24  patent that would change the expiration date.  But if there's
25  nothing like that, then, yes, this is expired.

561

JEREMY WHITLEY - CROSS

1  Q.   And you know that because you're a patent attorney,

2  correct?

3  A.   Yes.

4         MR. VanHOUTAN:  Your Honor, I'd like to move into

5  evidence PX212.

6         THE COURT:  It's admitted.

7         MR. VanHOUTAN:  Thank you.

8         (Plaintiff's Exhibit Number 212 was received into

9  evidence.)

10        MR. VanHOUTAN:  Thank you, Mr. Whitley.  No further

11 questions at this time.

12        THE COURT:  You may cross examine.

13        MR. STEVENS:  Let's just, while we're there, if you

14 don't mind bringing up PX212.

15                    CROSS EXAMINATION

16 BY MR. STEVENS:

17 Q.   Mr. Whitley, was it a subset of OPTO's products or was it

18 every single OPTO barcode reader that was accused of

19 infringing this very patent?

20 A.   Every barcode product.

21 Q.   And was this very patent called out in the preamble to

22 the agreement as to what's being settled and resolved by the

23 scope of the agreement?

24 A.   Yes, expressly in Section A and inherently in Section B.

25 Q.   Okay.  So had they not settled and had the ITC agreed

JA1465

JEREMY WHITLEY - CROSS

1  with us, would any product, be it whether it could support
2  just 1D symbologies or whether it could also support 2D
3  symbologies, would they have been excluded from their entry
4  into the United States?
5  A.   Yes.
6  Q.   So did OPTO receive pretty significant value by getting a
7  license to this very patent?
8  A.   Yes.
9  Q.   Now, we talked about the expiration, and nobody contests
10 that it's expired as of today.  But what is your understanding
11 of when they took the functionality out of their products?
12 A.   Within the past two years.  So I think it was about eight
13 months ago.
14 Q.   All right.  And is that before this expired?
15 A.   If we could scroll down a little bit.
16      Did they take it out before it was expired?  No.
17 Q.   So when do you understand they took the functionality out
18 of their product?
19 A.   Like eight months ago.
20 Q.   Okay.  And this expired in March of this year?
21 A.   Yes.
22 Q.   So which happened first?
23 A.   This is bad.  Where are we now?  Okay.  So yes, they took
24 the functionality -- so this was still in existence when the
25 functionality was in their product.

JEREMY WHITLEY - CROSS

1  Q.   Okay.  And we'll talk to Mr. Herrington about the timing
2  of everything later.
3       But are we -- in the stipulated damages that we have, are
4  we asking a penny for any product that happened after the
5  expiration of this patent?
6  A.   No.
7  Q.   Now, is this Honeywell's only patent?
8  A.   No.
9  Q.   How many patents does Honeywell have in the barcode
10  scanning space?
11  A.   In the barcode scanning space, about 2500 global patents.
12  But I will remind you that it's not limited to just barcode
13  technology.
14  Q.   That's right.  So if perhaps they were using a, I don't
15  know, an LED patent out of a different division --
16  A.   Correct.
17  Q.   -- could they -- did they get a license to that as well?
18  A.   Correct.
19  Q.   And does Honeywell have patents in different divisions
20  that are sort of ubiquitous across consumer devices?
21  A.   Yes.  We have -- in fact, our aerospace division has a
22  number of wireless LED patents that would be applicable to
23  barcode readers.
24  Q.   Now, does Honeywell have patents on hardware?
25  A.   Yes.

JA1467

JEREMY WHITLEY - CROSS

1   Q.   Does Honeywell have patents on software?

2   A.   Yes.

3   Q.   Does Honeywell have patents on decoding?

4   A.   Yes.

5   Q.   Does Honeywell have patents on optics?

6   A.   Yes.

7   Q.   Does Honeywell have patents on connectivity, you know,

8   wireless or Bluetooth or Wi-Fi?

9   A.   Yes.

10  Q.   Does Honeywell have patents on updating the software?

11  A.   Yes.

12  Q.   Does Honeywell have patents on, you know, improved

13  scanning and decoding?

14  A.   Yes.

15  Q.   And does Honeywell have patents on a lot of those things

16  that go to any product regardless of whether it's a laser or

17  CCD or an imaging-based product?

18  A.   Correct.  We have a lot of hardware agnostic patents.

19  Q.   So I'd like to walk through a few more parts of the

20  agreement more than we did the other day.

21          MR. STEVENS:  If we could look at JX1, please.

22          Turn to -- again, let's go to Section 1.10 for a

23  moment.

24  Q.   So you saw -- you were here during the opening, right?

25  A.   Yes.

JEREMY WHITLEY - CROSS

1  Q.   And you saw the analogy that Mr. VanHoutan drew about,
2  like, jumping a fence.
3  A.   Yes.
4  Q.   I want to talk about timing.  I want to talk about what
5  happened over time.
6  A.   You've seen how bad I am with dates.
7  Q.   Before you signed this agreement, did they have a license
8  to any patents whatsoever?
9  A.   No.
10 Q.   So again, I just want to make sure that we all understand
11 the stage as the parties were sitting down to negotiate.
12      So they had no license the day before, correct?
13 A.   Correct.
14 Q.   And in both the ITC and in the Delaware action, what was
15 the scope of their products that were accused of infringement?
16 A.   All of their barcode reading products.
17 Q.   Does that include laser-based products?
18 A.   Yes.
19 Q.   Does that include both laser products that can and cannot
20 decode 2D barcodes?
21 A.   Yes.
22 Q.   Did that include all of their CCD-based products?
23 A.   Yes.
24 Q.   And did that include all of their area imager-based
25 products?

JA1469

JEREMY WHITLEY - CROSS

1  A.  Yes.

2  Q.  So as the parties were coming to negotiate, every one of

3  their products is part of that; is that right?

4  A.  Correct.

5  Q.  Okay.  Now, in the license in 1.10, I want to make sure

6  that we all understand, is this limited to the patents just in

7  the litigation?

8  A.  No.

9  Q.  So I think you testified earlier, how many U.S. patents

10 does Honeywell have as a whole?

11 A.  I think it's over 12,000.  Around 12,000.

12 Q.  Okay.

13 A.  No, it's more than that.  It's usually two-thirds.  I

14 don't have the right number, but it's around 20,000, I would

15 guess.

16 Q.  Okay.  Now, if they're using any of those patents, let's

17 say that they're using 19,000 of them, did they get the rights

18 to continue to use 19 -- all 19,000 of those patents?

19 A.  Yes.

20 Q.  And is that true whether all 19,000 of those patents are

21 directed to one little tiny bit of functionality?

22 A.  No.  It's any -- any patent that would be infringed by

23 one of their existing products, as of that day they get the --

24 they would have a license to that patent.

25         MR. STEVENS:  Okay.  So if we look at 1.4 for a

567

JEREMY WHITLEY - CROSS

1    moment.

2            Actually, I'm sorry, let's go to Section 2 --

3    Section 2.1 on page 4.

4    Q.   I think Mr. VanHoutan directed you to this.  Is this the

5    actual grant of license in the agreement?

6    A.   Yes.

7    Q.   Now, is the license limited in functionality just to

8    whether something can read two-dimensional codes?

9    A.   No.

10   Q.   Okay.  So let's assume something falls within the

11   definition of 2D Barcode Products, is it -- I just need to

12   know from a scope point of view.  Is it licensed for any of

13   its functionalities or is it licensed for only a sliver of its

14   functionalities?

15   A.   Any of its functionality that would infringe one of the

16   licensed patents.

17   Q.   And for every product that we've talked about this week

18   that fits within the ambit of 2D Barcode Products, did

19   Honeywell allege that product infringed many of its patents?

20   A.   Yes, many.

21   Q.   And have you heard from the other side in this case

22   whether they agree or disagree that there was infringement but

23   for the existence of this license?

24   A.   Yes.  I've heard a number of times that they admitted

25   that they would infringe scores of patents.

JA1471

568

JEREMY WHITLEY - CROSS

1        MR. STEVENS:  There's a little bit more to the
2   license.  If we can get it all on the screen.  I don't want
3   someone to think I'm cutting off anything.
4   Q.   While that's happening, is there any sort of field of use
5   or other sort of restriction?  In other words, are they only
6   allowed to sell to certain markets?  Are they only allowed to
7   sell west of the Mississippi?  Are they only allowed to sell
8   if their price is a certain level?  Is there any sort of
9   restriction that you have on this license?
10  A.   No, no field of use, no geographic, no restriction.
11  Q.   Is the license exclusive or non-exclusive?
12  A.   Non-exclusive.
13  Q.   So when you were negotiating this agreement and coming to
14  its final terms, if the parties had desired to have a running
15  royalty on every single product that was accused of
16  infringement in the cases, how many products would that have
17  been?
18  A.   All of them.
19  Q.   Not just these?
20  A.   Correct.
21  Q.   And so Mr. VanHoutan is talking about sort of if we take
22  functionality in, take functionality out.  I want to actually
23  talk about reality and how the parties were viewing it when
24  they came together to settle.
25       Was there a back and forth about which products there

JA1472

JEREMY WHITLEY - CROSS

1  would be a license for and which products there would be no

2  license for?  And what I mean by that is, was there a

3  negotiation here?

4  A.    Yes.

5  Q.    And could Honeywell have said, hey, I need X percentage

6  on your entire portfolio?

7  A.    Yes.

8  Q.    But instead, what did Honeywell do with respect to 1D

9  Barcode Products?

10 A.    We provided a covenant not to sue.

11 Q.    Now, again, I asked you this in the jury portion of this

12 trial.  Does that mean that you didn't believe there was

13 infringement?

14 A.    Not at all.

15 Q.    And so had you wanted to and had you demanded it, and

16 they would have to have agreed, but could you have charged a

17 royalty for all of the 1D Barcode Products as well?

18 A.    Yes.

19 Q.    And did OPTO in fact get a benefit out of the 1D Barcode

20 Product covenant not to sue?

21 A.    Yes.

22 Q.    Not just today after they made the change, but is it your

23 understanding that OPTO, ever since you've signed this

24 agreement all the way through today, has always had some 1D

25 Barcode Products?

JEREMY WHITLEY - CROSS

1  A.   Yes.

2  Q.   And have we asked them to pay us a penny on those

3  products?

4  A.   No.

5  Q.   But they still enjoy the license; is that right?  Or I'm

6  sorry, the covenant.

7  A.   Implied license, yes.

8  Q.   But for that, if they didn't have that, what could

9  Honeywell do with those products?

10  A.   So we could ask the ITC to exclude them and we could go

11  for damages in the district courts.

12  Q.   So we talked about the '783 patent.  We've talked about

13  the litigations.  Could you remind us, did Honeywell assert

14  other patents against OPTO?

15  A.   Yes.

16  Q.   And talk to me about the letter -- remind the Court, if

17  you will, about the letter that we had sent.

18  A.   So in addition to the seven that were in the ITC and the

19  district of Delaware, we actually sent a letter that

20  identified 69 U.S. patents and I think over about 150 patents

21  where we had -- we believed that all of OPTO's products

22  infringed at least one or more of those patents.

23       MR. STEVENS:  And can we pull that up, please.  It's

24  Plaintiff's 243.  It's already been admitted.

25  Q.   And, sir, is this that letter?

JEREMY WHITLEY - CROSS

1  A.   It is.

2      MR. STEVENS:  I'm going to ask that we sort of just

3  scroll through the pages.

4  Q.   Do you have a binder in front of you, sir?

5  A.   No.

6  Q.   Let me bring you one.

7      MR. STEVENS:  May I approach, Your Honor?

8      THE COURT:  You may.

9  Q.   So as we scroll through these -- I'm going to just

10  focus -- I'm sorry, take your time.

11  A.   I'm ready.

12  Q.   Okay.  So I want to just focus on the U.S. part.  We

13  don't need to go to the European and Japanese patents.  I want

14  to focus on the 69 United States patents.

15  A.   Okay.

16  Q.   Do these go to -- at least some of them, do they go to

17  laser scanners and CCD scanners?

18  A.   Yes.

19  Q.   So did there ever come a point in time where Honeywell

20  said, hey, our portfolio only includes image sensor products?

21  A.   No.

22  Q.   If someone else were to say that, would that be correct

23  or incorrect?

24  A.   Incorrect.

25  Q.   One of the patents that's on this list is United States

JA1475

JEREMY WHITLEY - CROSS

1  patent 8,296,754, 8,296,754.  Can you find that on your list,

2  Mr. Whitley.

3  A.   Yes.

4  Q.   What is that patent about?

5  A.   That is our patent that provides indicators of when a

6  barcode reader has been updated with new software.

7          MR. STEVENS:  Can I show PX213, please.

8  Q.   Is this that patent, sir?

9  A.   Yes.

10  Q.   And when was it filed?

11  A.   June 2, 2009.

12  Q.   And I see that there's a patent term extension.  Can you

13  explain to the judge what that 813 days is.

14  A.   Sure.  So for one reason or another during the

15  prosecution of the patent application, the patent office

16  calculated that based on -- usually based on delays at the

17  patent office, the patent is -- gets the benefit of an

18  extension of time beyond when it would typically expire based

19  on its filing date.

20  Q.   Does this patent run into the 2030s?

21  A.   Oh, my gosh, math again?

22      2029 plus 813 days, which is at least a couple of years,

23  so yes.

24  Q.   Okay.  Thank you, sir.

25      And is this one of the patents that you had told OPTO

JEREMY WHITLEY - CROSS

1  that they were infringing before you filed a lawsuit?

2  A.   Yes.

3       MR. STEVENS:  If we can go to Claim 7, please, near

4  the end.  Should be the last page or second to last page.

5       Yeah, there we go right there.

6  Q.   And I'll read just the first part.  "A process for

7  providing a user perceptible indication of a software change

8  affecting the capabilities of an indicia reader comprising the

9  steps of," and then it goes on from there.

10      Do you see that, sir?

11  A.   Yes.

12  Q.   Does this apply agnostically of what the hardware is?

13  A.   Yes.

14  Q.   So if a product has this functionality in it, would it

15  infringe if it's a laser scanner, a CCD scanner, or an

16  image-based scanner?

17  A.   Yes.

18  Q.   And is this one of the patents that Honeywell analyzed

19  and put them on notice that they were infringing --

20  A.   Yes.

21  Q.   -- by way of not just image sensors, but laser-based

22  scanners as well?

23  A.   Correct.  It's in the July 1, 2019, letter.

24  Q.   And did they get a license to this patent with respect to

25  2D Barcode Products?

574

JEREMY WHITLEY - CROSS

1  A.   Yes.

2  Q.   Including those that are laser-based?

3  A.   Correct.

4       MR. STEVENS:  We can take that down.

5  Q.   Sir, do you believe that Honeywell's patent portfolio is

6  valuable?

7  A.   Yes.

8  Q.   What makes you say that?

9  A.   Because a company just recently paid $360 million for a

10 license to what is essentially, while they get the entire

11 portfolio, it was focused on the 2500.  So it's pretty

12 valuable.

13 Q.   And can you identify that company for us.

14 A.   Zebra Technologies.

15 Q.   And does Zebra Technologies make laser-based products?

16 A.   Yes.

17 Q.   Do they make CCD-based products?

18 A.   Yes.

19 Q.   Do they make imager-based products?

20 A.   Yes.

21 Q.   Did they want to license just your portfolio for their

22 imager products?

23 A.   No.

24 Q.   Did they want a license to all three?

25 A.   Yes.

JA1478

JEREMY WHITLEY - CROSS

1  Q.   And is that what they took and paid for?

2  A.   Yes.

3  Q.   Have other companies recognized the value of Honeywell's

4  intellectual property?

5  A.   Yes.

6  Q.   And can you identify those for me, please.

7  A.   Yes.  So we had a license with the Code Corporation that

8  included a set number of patents.  And then recently we were

9  approached -- they're under new management.  They're now owned

10  by a company called Brady.  Brady approached us and said we

11  don't -- we see the value in your portfolio.  I think they

12  published an article to that extent.  We'd like a license to

13  the full thing.  We gave them a license to the whole

14  portfolio.

15  Q.   Thank you.

16       MR. STEVENS:  I'd like to turn back to the agreement

17  for a moment.  If we could pull JX1 back up and turn to

18  Section 1.7, please.

19  Q.   Now, during your testimony before the jury, if I recall

20  correctly -- and if I don't, tell me.  During the two and a

21  half weeks of negotiating after the mediation but before the

22  parties signed, did OPTO have the chance to add things into

23  the agreement?

24  A.   Yes.

25  Q.   And is 1.7 one of the things that they wanted to be added

JEREMY WHITLEY - CROSS

1  into the agreement?

2  A.   Yes.

3  Q.   And could you tell the judge, what is the import of 1.7?

4  A.   Yeah.  So it basically extends the definition of licensed

5  products to include improvements.  And the reason you do that

6  is because if you make a change to your licensed products that

7  doesn't rise to the level of something that's going to step on

8  a multitude of patents that you didn't even -- weren't even

9  aware about, the improvement would automatically be included

10  in the definition of existing products or licensed products so

11  you don't get sued as soon as you add an improvement to your

12  product.

13  Q.   And can you read the last sentence of the paragraph,

14  please.

15  A.   Sure.  "Improvement also includes any revision that

16  incorporates into any product offered by that Party any

17  feature already present in any of the Party's other existing

18  products, even if such incorporation produces a new

19  combination of elements."

20  Q.   And so let me try to take it out of lawyer geek and just

21  put some practical words around that.

22       So if any single one OPTO product was using a patented

23  Honeywell feature, just that one product, but after the

24  agreement, do they have the right to take that same feature

25  and put it into every single one of their other products?

JEREMY WHITLEY - CROSS

1  A.   Yes.

2  Q.   And that's okay.  That's a licensed right that they have.

3  A.   It's part of the license, yes.

4  Q.   And that applies to all of the 2D Barcode Products that

5  we've been talking about this week as well?

6  A.   Yes.

7  Q.   So they can take any feature they want, even from an

8  image sensor-based product, and put it right in there because

9  they have this right; is that correct?

10  A.   Correct.

11  Q.   In fact, isn't it true or is it true, sir, that the price

12  of image sensors are actually coming down?

13  A.   Yes.

14  Q.   So if they wanted to replace, for example, the laser in a

15  product with an image sensor, they have the right to do that?

16  A.   Yes.

17  Q.   Is that by this 1.7 section?

18  A.   Yes.

19  Q.   So one of the improvements that they could make is

20  something that I think we've called before the anti-flicker

21  area.  Can you talk to the judge a little bit about what your

22  anti-flicker technology is.

23  A.   Yes.  So we have a patent application on -- one of the

24  practical features is now that a lot of barcodes show up on

25  cell phones or displays.  If you tried to scan that with a

JEREMY WHITLEY - CROSS

1  conventional barcode scanner, you'd get this flicker effect

2  that would be bothersome.  It could cause an epileptic fit.

3  And so this changes -- once it realizes it's scanning off a

4  display, it changes so that there is an anti-flicker feature

5  to it.

6  Q.   And is that something that they were using before you

7  sued them?

8  A.   Yes.

9  Q.   Is that something that you have patented?

10 A.   Yes.

11 Q.   And is that something that they have the right to build

12 into every single one of the products that we've been here

13 talking to the jury this week about?

14 A.   Yes.

15 Q.   Would they owe Honeywell any more money for that?

16 A.   No.

17        MR. STEVENS:  All right.  If we can pull up JX3,

18 which is the Second Amendment to the agreement, please.  And

19 let's look at Section 5.3.

20        There we go right there.  Opticon's covenant not to

21 challenge.  Perfect.  Thank you.

22 Q.   I want to walk through this, but can you just remind the

23 judge what this paragraph is all about.

24 A.   Yes.  This is the paragraph that we've mentioned a couple

25 times that says that -- well, do you want me just to read it?

JEREMY WHITLEY - CROSS

1  It's going to do a better job than I am.

2  Q.   Yeah, why don't you read it into the record.

3  A.   Sure.  "OPTICON covenants that it will not challenge, and

4  shall cause its Releasing Parties and any licensees not to

5  challenge, the validity, scope or enforceability of any of

6  HONEYWELL's or its Affiliates' patents, or any other patent or

7  patent application of HONEYWELL or its Affiliates, relating to

8  Barcode Technology in whole or in part, or challenge, and

9  shall cause its Releasing Parties and any licensees not to

10  challenge, HONEYWELL's efforts to enforce HONEYWELL's or its

11  Affiliates' patents as constituting anticompetitive behavior,

12  unfair competition, or violations of the law during the

13  License Period unless HONEYWELL contends that the Release

14  HONEYWELL granted OPTICON under Section 3.1 is void due to a

15  material breach by OPTICON of this Agreement and HONEYWELL

16  seeks to enforce its patent rights."

17  Q.   All right.  Let's just take care of that last bit first.

18  Has Honeywell ever contended that the release granted to

19  Opticon under 3.1 is void?

20  A.   No.

21  Q.   Okay.  So we'll take that contingency out.

22       So let's focus on romanette i, the first part.  And just

23  in your words, what did Opticon promise not to do?

24  A.   Essentially not challenge the validity, scope, or

25  enforceability of any of our patents.

JEREMY WHITLEY - CROSS

1  Q.   Okay.  Did you prepare some demonstratives to assist in
2  your testimony?
3  A.   I did.
4  Q.   Let's look at the first here.
5       Now, we heard during the opening that this is not
6  trying -- that the purpose of their misuse defense is not
7  trying to say that a patent is unenforceable.  What do they
8  actually say in their answer?
9  A.   So under their prayer for relief, paragraph 4, they are
10 specifically asking "for a declaration that the licensed
11 patents under the agreement are unenforceable due to patent
12 misuse."
13 Q.   Thank you, sir.
14          MR. STEVENS:  So if we can go back to JX3 for a
15 moment.
16 Q.   And now let's talk about romanette ii.  And just in your
17 own words, what's the purpose of romanette ii?
18 A.   It's to prevent Opticon or its affiliates from raising a
19 claim of anticompetitive behavior, unfair competition, or
20 other violations if we try to assert our patents.
21 Q.   And do you understand that as part of their misuse
22 defense, they are asserting just that, anticompetitive
23 behavior?
24 A.   Yes.
25          MR. STEVENS:  Let's look at the second one of your

                    JEREMY WHITLEY - CROSS

1   demonstratives, please.  We're going to knock out sort of two

2   birds with one stone.

3           MR. VanHOUTAN:  Your Honor, I object to this.  If

4   they want to try to put the evidence in, that's fine; but

5   these demonstratives are improper.  He's not an expert.  I

6   understand this a bench trial.  If he wants to ask him the

7   question, he can; but he's putting up exhibits from the

8   complaint.

9           MR. STEVENS:  It's the answer.  It's their answer.

10          MR. VanHOUTAN:  From the pleadings.

11          THE COURT:  All right.  Well, the Court can consider

12   it appropriately.  I'm not being misled in any way.

13          MR. VanHOUTAN:  I believe you.

14   BY MR. STEVENS:

15   Q.   So right in the title there, right before you see dash

16   patent misuse, what is the word?

17   A.   "Unenforceability."

18   Q.   And is that precisely what they said in romanette i that

19   they wouldn't be challenging?

20   A.   Yes.

21   Q.   And then as we go -- if we read paragraphs 68 and 69, is

22   there arguments here about anticompetitive behavior?

23   A.   Yes.

24   Q.   And is that precisely what they covenanted not to do by

25   romanette ii?

582

JEREMY WHITLEY - CROSS

1   A.   That's correct.

2   Q.   Now, is this -- this 5.3, is this something that

3   Honeywell didn't really care about and just threw in or is

4   this something that was bargained for?

5   A.   No, this was something that was bargained for.

6   Q.   Is it a material term of the agreement?

7   A.   It is.

8   Q.   And did Opticon make Honeywell give it sort of similar

9   covenants as well?

10  A.   Yes.

11  Q.   So this was mutual.  Both parties agreed not to say these

12  things about the other party, correct?

13  A.   Correct.

14  Q.   Okay.  And again, was OPTO coerced into signing this

15  agreement?

16  A.   No.

17  Q.   Did you guys go to Hawaii in front of one of the most

18  world-renowned mediators to resolve your dispute?

19  A.   Yes.

20  Q.   Did they have four different people representing them in

21  the room that day?

22  A.   They did.

23  Q.   Did they take two and a half to three weeks to

24  contemplate with Quinn Emanuel, one of the most highest-priced

25  law firms in this country, every word of this agreement?

JA1486

583

JEREMY WHITLEY - REDIRECT

1   A.   Yes.
2           MR. VanHOUTAN:  Objection.  Form, speculation.
3           THE COURT:  Sustained.
4   Q.   And did they agree not to make these challenges that
5   they're making here today?
6   A.   Yes.
7           MR. STEVENS:  I pass the witness, Your Honor.
8           THE COURT:  You may redirect.
9           MR. VanHOUTAN:  Thank you, Your Honor.
10                  REDIRECT EXAMINATION
11  BY MR. VanHOUTAN:
12  Q.   The License and Settlement Agreement was executed after
13  the litigations, correct?
14  A.   Yes.
15  Q.   Not before.
16       Does the License and Settlement Agreement in any way make
17  special occasion for the patents that were asserted in the ITC
18  investigation or the Delaware litigation?
19  A.   Special occasion, meaning are they...
20  Q.   Do they have a special place in the License and
21  Settlement Agreement?
22  A.   They are called out in the background of why the -- what
23  was happening before the agreement.  They are not treated
24  specially in the license.
25  Q.   So there's not an additional royalty that Honeywell --

JA1487

JEREMY WHITLEY – REDIRECT

1   excuse me, that OPTO has to pay because one of OPTO's products

2   may have been accused of infringing one of those patents,

3   correct?

4   A.   Correct.

5   Q.   There's only two categories of products in the License

6   and Settlement Agreement, right?

7   A.   Well, there are other definitions, but there are only two

8   that distinguish between royalties and covenant not to sue.

9   Q.   That has nothing to do with the patents that were

10  asserted either in the ITC investigation or the Delaware

11  litigation, right?

12  A.   Not other than getting a license or a covenant not to

13  sue, correct.

14  Q.   And Mr. Stevens was talking about a lot of hypotheticals

15  that the parties could have done.  What the parties did is

16  embodied in the License and Settlement Agreement and its

17  amendments, right?

18  A.   Yes.

19  Q.   I want to talk about Honeywell's allegations in this

20  litigation.  And I believe you and Mr. Stevens were talking

21  about when the '783 patent expired or didn't expire, how that

22  relates to events in this case.

23       It's Honeywell's contention in this case that if PDF417,

24  for example, is added to any 1D Barcode Product sold by OPTO,

25  and let's say that happens tomorrow, OPTO owes a royalty

585

JEREMY WHITLEY - REDIRECT

1  payment on that product, correct?

2  A.    Yeah, on a product that reads a two-dimensional barcode

3  that could be PDF417.

4  Q.    Even though the '783 patent expired back in March of this

5  year, correct?

6  A.    Right.  But, you know, because of the other 30 -- no,

7  29,999.

8  Q.    Yeah, let's talk about those patents and their value.

9        For any patent, scores, hundreds, thousands, that may

10 read on a 1D Barcode Product, Honeywell doesn't get a dime

11 from OPTO for those, does it?

12 A.    If the patent covers what's defined in the agreement as a

13 1D Barcode Product, no.  It's subject to a covenant not to

14 sue, not a royalty.

15 Q.    And that's not just in the United States, that's anywhere

16 in the world, right?

17 A.    So let me back up and say we're talking about going

18 forward, right?  So the royalties, that's correct.  The

19 royalties going forward, that's everywhere, don't get a

20 royalty on a 1D Barcode Product.

21 Q.    Don't get anything.

22 A.    Well, I'm distinguishing between the lump sum payment

23 versus the going-forward covenant not to sue royalty.

24 Q.    Okay.  I understand.  With the go-forward model that you

25 just discussed, let's talk about the covenant not to sue.  And

JA1489

JEREMY WHITLEY - REDIRECT

1  that applies to OPTO's 1D Barcode Products, correct?

2  A.   Correct.

3  Q.   And the lump sum payment that you reference was

4  Honeywell -- excuse me, OPTO agreed to pay Honeywell

5  $9 million relating to all its products, right?  1D Barcode

6  Products and 2D Barcode Products, right?

7  A.   I believe that is correct, yes.

8  Q.   And then Honeywell agreed to give away all of its patents

9  that may cover any 1D Barcode Product everywhere in the world

10  for 12 years, correct?

11  A.   So we call it a covenant not to sue which is also an

12  implied license.  I don't like the idea of give it away.  But

13  yes, they are entitled to that implied license.

14  Q.   So Honeywell has no patent rights anywhere in the world

15  that can be asserted against OPTO's 1D Barcode Products,

16  correct?

17  A.   That is correct as long as it falls in the definition of

18  1D Barcode Product.

19  Q.   Doesn't seem very valuable.

20  A.   Oh, I think it's very valuable because if they didn't

21  have that, we'd be here again.

22  Q.   Again.  That's a big what-if, isn't it?

23  A.   I don't know, if you look at our track record, that it's

24  a big what-if.  I mean, other people have taken a license.

25  Q.   Yeah.  I just want to talk about what happened and not

JEREMY WHITLEY - REDIRECT

1  what could have happened, what might have happened, what the

2  parties might have done or would have done.

3      What they did was settle some litigations where OPTO

4  agreed to drop some nullity actions and some invalidity

5  counterclaims at the ITC and otherwise, and they entered into

6  this License and Settlement Agreement, right?

7  A.    The parties did enter into a settlement.

8  Q.    And as part of that, Honeywell gave a covenant not to sue

9  for its patents that may cover 1D Barcode Products everywhere

10 in the world, correct?

11 A.    Yes.  The -- well, it's not limited to -- it doesn't have

12 patents in the definition.  It's the "we won't sue 1D Barcode

13 Products."

14 Q.    How many patents cover 1D Barcode Products in the License

15 and Settlement Agreement?

16 A.    How many patents cover 1D Barcode Products?  There's no

17 way for me to calculate.  I can give you some examples.

18          MR. VanHOUTAN:  No, thank you.

19          No further questions.  Thank you, Mr. Whitley.

20          THE COURT:  Any recross?

21          MR. STEVENS:  No, Your Honor.

22          THE COURT:  All right.  Thank you.  You may stand

23 down for good.

24          THE WITNESS:  Thank you.

25          (Witness stepped down.)

GREGORY ADAMS - DIRECT

1          THE COURT:  Please call your next witness.

2          MR. HOUGHTON:  Your Honor, our next witness is

3   Dr. Greg Adams.

4          <u>GREGORY ADAMS, DEFENDANT'S WITNESS, SWORN,</u>

5                 DIRECT EXAMINATION

6   BY MR. HOUGHTON:

7   Q.   Good afternoon, Dr. Adams.  Can you please introduce

8   yourself to the Court.

9   A.   Yes.  My name is Gregory Adams.  I'm an economist.

10  Q.   And were you retained as an expert in this case by OPTO?

11  A.   I was.

12  Q.   What were you asked to do in this case?

13  A.   I was asked to evaluate certain economic and competitive

14  issues related to OPTO's patent misuse claim.

15  Q.   And did you prepare a set of slides to go along with your

16  testimony?

17  A.   I did.

18  Q.   And are these those slides?

19  A.   Yes.

20  Q.   All right.  Can you tell us about your employment

21  history, please.

22  A.   Yes.  I'm currently a vice president at Charles River

23  Associates, an economics consulting firm.  I have over 25

24  years of experience in applied macroeconomic analysis and

25  consulting.  That includes a lot of work in antitrust.  I've

589

GREGORY ADAMS - DIRECT

1  been an expert witness in state and federal courts.  I have

2  represented clients before, state and federal and antitrust

3  agencies and in other matters, and done other consulting as

4  well.

5  Q.   And have you ever taught?

6  A.   Yes.  For a long time I was an adjunct assistant

7  professor in the Department of Economics at the University of

8  Utah where I taught a number of courses, including industrial

9  organization, which is the discipline of economics under which

10  antitrust arises, also courses in law and economics and other

11  disciplines.

12  Q.   And can you briefly describe your education, please.

13  A.   Yes.  I have a bachelor's in economics from Wake Forest

14  University, a master's in agricultural and resource economics

15  from the University of Maine, and a Ph.D. in agricultural and

16  resource economics from the University of California,

17  Berkeley.

18        MR. HOUGHTON:  Your Honor, we'd offer Dr. Adams as

19  an expert in the field of macroeconomic analysis and

20  computation.  I think we already stipulated to his

21  qualifications.

22        THE COURT:  He will be so recognized without

23  objection.

24        Can I ask what year you finished Wake Forest?

25        THE WITNESS:  1982, I believe.

GREGORY ADAMS - DIRECT

1          THE COURT:  We overlap, is why I bring that up.  I
2   don't think we knew each other.
3          THE WITNESS:  I don't think so.
4          THE COURT:  Just full disclosure.
5   BY MR. HOUGHTON:
6   Q.   Dr. Adams, what information did you review as part of
7   forming your opinions in this case?
8   A.   I reviewed the common types of information that I do in
9   assignments like this and that other experts do.  So that
10  included documents produced by the parties, including
11  documents on market share, sales data on prices and
12  quantities; the pleadings in this case, including motion
13  practice, discovery responses, deposition testimony and
14  exhibits; publicly available sources on the industry and
15  barcodes and barcode symbologies and the scanners able to read
16  those; economics materials, including textbooks, but also
17  journal articles, other economic reference materials.  And I
18  also had a conversation with Mr. Sprague Ackley who is an
19  expert in barcode technology and the AIDC fields.  I
20  understand he's the inventor on a number of barcode-related
21  patents and he's been involved in barcode standards.
22  Q.   And how much total time have you spent reviewing this
23  material and preparing today?
24  A.   Well, approximately -- well, prior to this week -- I've
25  been in court all week.  But prior to this week, approximately

591

GREGORY ADAMS - DIRECT

1   150 hours; and staff working under my direction spent

2   approximately another 450 hours.

3   Q.   Okay.  And are you offering legal opinions about whether

4   Honeywell's conduct broadens its patent rights?

5   A.   I am not.

6   Q.   What were you asked to do in this case?

7   A.   I was asked to determine whether Honeywell's conduct

8   leads to -- well, it says here, "has or is likely to impose a

9   restraint on competition."  So I was focused on the impact on

10  the market.

11  Q.   And can you tell us about the factors that you considered

12  as part of your analysis.

13  A.   Yes.  I considered a lot of information about the

14  relevant business in the market, products in the market,

15  customers in the market; the condition of the business before

16  and after the restraint; the history, nature, and particularly

17  the effect of the restraint; and I also looked at direct and

18  indirect evidence of market power.

19  Q.   And can you just briefly summarize your opinions for the

20  Court before we go through the detail.

21  A.   Yes.  There is a demand for scanners that can read

22  stacked linear barcodes.  That's a specific demand.

23       Laser scanners are often a lower-cost alternative to

24  image scanners and can be the best choice for reading stacked

25  linear barcodes for price-sensitive customers.

JA1495

GREGORY ADAMS - DIRECT

1     Honeywell has market power.

2     And Honeywell royalty demands caused OPTO to stop selling

3  laser scanners that can read stacked linear barcodes and this

4  led to a reduction in competition.

5  Q.   And can you just briefly describe your understanding of

6  Honeywell's allegations in this case.

7  A.   Honeywell's allegations.  Yes, I understand that

8  Honeywell alleges that OPTO laser scanners capable of decoding

9  a stacked linear barcode should be royalty-bearing under the

10 settlement agreement.

11 Q.   And does your opinion relate to whether or not

12 Honeywell's allegations are correct?

13 A.   No.

14 Q.   What's your understanding of OPTO's patent misuse

15 allegation in this case?

16 A.   So OPTO alleges that Honeywell's imposition of a royalty

17 on laser scanner products if they can decode stacked linear

18 barcodes is an impermissible broadening of Honeywell's patent

19 rights.

20        MR. STEVENS:  Your Honor, I'm going to object to the

21 slides as leading.  If he's just going to read text from them,

22 that's leading.

23        THE COURT:  Overruled.

24 Q.   And what's your understanding of how patent misuse is

25 analyzed?

GREGORY ADAMS - DIRECT

1  A.   I understand it can be analyzed under either a per se or
2  rule of reason framework.
3  Q.   And how do your opinions in this case fit into that
4  framework?
5  A.   Well, I understand per se is a legal issue and I don't
6  offer opinions about that.  My analysis is relevant under a
7  rule of reason analysis.
8  Q.   Okay.  And can you please just briefly -- we've heard a
9  lot about barcodes this week; but for your own opinions,
10 provide us with an understanding of the terminology and
11 background that you'll be referring to today.
12 A.   Yeah.  I just want to give you the terminology I'm going
13 to try to stick to.
14      So simple linear barcodes, I'll probably just try to call
15 them simple barcodes.  And matrix codes, I'll try to use the
16 term matrix codes.  And for the codes we don't care about,
17 stacked linear barcodes, I'll try to stick to the term stacked
18 codes or stacked barcodes.
19 Q.   And do you have an understanding of whether all of these
20 symbologies are still used in the market today?
21 A.   Yes.  I think that's acknowledged.
22 Q.   Okay.  And what about barcode scanners, how do those
23 relate to your opinions?
24 A.   Well, those are the products at issue.  That's the
25 products that OPTO and Honeywell sell.  So those are really

GREGORY ADAMS - DIRECT

1  the focus of my opinions.

2  Q.   Are there different categories of barcode scanners that

3  are important to your opinions?

4  A.   Yes, and they're the ones we've heard about.  So laser --

5  on the one hand laser scanners and on the other hand image

6  scanners.

7  Q.   And is there another type of barcode scanner?

8  A.   There is.  We've heard about the 1D CCD scanner.  And for

9  the purposes of my analysis, that's similar to a laser scanner

10  in that both laser scanners and 1D CCD scanners can both read

11  simple barcodes and some of them can read stacked codes, but

12  none of them can read matrix codes.  So I generally just talk

13  about laser scanners, but it's somewhat of a shorthand.

14  Q.   And do you have a general understanding of whether both

15  types of scanners that you talked about are used in the

16  market?

17  A.   Yes.  Both are still offered, sold, used by consumers.

18  Image scanners are an increasing part of the market, the newer

19  technology, and they comprise an increasing percentage of

20  total sales.  But laser scanners are still used in the market.

21  Q.   Are you aware of any relative advantages and

22  disadvantages of laser scanners and image scanners?

23  A.   Yes, several.

24  Q.   Okay.  Can you briefly describe that.

25  A.   Sure.  Well, one would be, as I just said, image scanners

GREGORY ADAMS - DIRECT

1  can read matrix codes while laser scanners cannot.  So if

2  you're a consumer that needs to read a matrix code, image

3  scanner has a clear advantage.  A laser scanner is not going

4  to work for you.

5  Q.   Okay.  Anything else?

6  A.   Sure.  Image scanners tend to be less expensive.  So --

7  I'm sorry, laser scanners tend to be less expensive than image

8  scanners.  So a sense on price, often for price-sensitive

9  customers, if you do not need to read a matrix code, the

10 cheaper alternative will be a laser scanner instead of an

11 image scanner.

12 Q.   And do you have any evidence to support your conclusion

13 about the laser scanners being less expensive?

14 A.   Yes.

15 Q.   Okay.  We're going to look at DX34 -- well, actually,

16 before we do, did you do an analysis of pricing in this case?

17 A.   Right.  So one of the things I did to determine relative

18 prices and whether laser scanners tend to be less expensive is

19 compare pricing of the Honeywell image scanner versus the OPTO

20 laser scanners.  So it's a comparison of those two products

21 and I'll describe its products.  It can read stacked codes but

22 not matrix codes.

23 Q.   And which Honeywell scanner did you look at?

24 A.   I looked at the Honeywell Voyager 1400 product.

25 Q.   Okay.  And now turning to DX34.

GREGORY ADAMS - DIRECT

1      Can you explain what DX34 is.

2  A.   DX34 is the Honeywell scanner comparison guide.

3          MR. HOUGHTON:  And, Your Honor, we move to admit

4  DX34.

5          THE COURT:  It's admitted.

6          (Defendant's Exhibit Number 34 was received into

7  evidence.)

8  Q.   And if we look at page 4 of DX34, can you explain a

9  little bit more about the Voyager 1400 product and why it was

10  important to your analysis.

11  A.   Right.  So -- yes.  This is a screen shot.  It's not the

12  entire page 4, but it zooms in on the Honeywell Voyager 1400.

13      So a couple of important things here.

14      First, note that it is designated in the economy 1D/2D

15  models.  So I was trying to determine, especially for

16  price-sensitive customers, whether an image -- whether a laser

17  scanner would be a less expensive option than an image

18  scanner.  Honeywell offers a lot of different image scanners

19  that have a lot of different features and functionalities and

20  it wouldn't be fair to compare one of their really expensive

21  products to a laser scanner.  So I focused on the Voyager 1400

22  which is their economy 1D/2D model.

23  Q.   Were there any other interesting features about the

24  1400g?

25  A.   Yes, and that's shown in the box on the bottom.  This

597

GREGORY ADAMS - DIRECT

1  product is offered in three versions or there's three separate
2  products, but there's three stock keeping units.  And these
3  three stock keeping units have three different
4  functionalities.
5      So first, the 1400g1D can just read simple barcodes.  The
6  second, the 1400gPDF can read simple barcodes and can read
7  stacked codes.  And the 1400g2D can read all three types of
8  codes, including matrix codes.
9      And this is an image scanner, so understand it's
10 technically able -- any of the versions is technically able to
11 read all the codes, but this is what they've been programmed
12 to be able to recognize.
13 Q.  Does the Voyager 1400 compete with laser scanners?
14 A.  Yes.
15 Q.  And how do you know that?
16 A.  I know that because Honeywell said that.
17 Q.  And can you explain what's shown on the slide here.
18 A.  Yes.  This is an excerpt from Mr. Smith, I think it's
19 Taylor Smith.  The Mr. Smith that's the employee, not the
20 expert at OPTO -- Honeywell.
21 Q.  And what did he say about the Voyager PDF?
22 A.  Yes.  He was asked looking at the 1400PDF:  Why is there
23 a model that has -- would be different for decoding 1D and
24 PDF417 and having a separate model that adds 2D?  So he says,
25 "PDF417 is a common barcode and that laser scanners and linear

JA1501

GREGORY ADAMS - DIRECT

1  imagers have the ability to read PDF417 symbology.  And so we
2  created a market-competitive product that has the ability of
3  upgrading and providing full 2D symbology but can also read
4  PDF417 to compete with laser scanners and linear imagers."
5      So he's saying this product, particularly the version of
6  Voyager 1400 that can read a -- just a 1D or a linear code and
7  a PDF417, that product was created to compete with laser
8  scanners and linear imagers.
9  Q.   Okay.  And did he say anything else?
10 A.   Well, he did.  In the next page there he goes on to,
11 well, what's the relative pricing?  So on page 68 he says,
12 There's a different price point for the 1400gPDF versus the 2D
13 model, yes, with the 1400PDF being cheaper."
14     So you have a product here that's created to compete with
15 laser scanners and that product is priced at less than the
16 product that can read the full 2D codes because laser scanners
17 can't read those 2D codes.  So they don't compete for people
18 that need to read 2D code, but laser scanners are an option
19 for consumers that don't need to read a 2D code.  And so an
20 image scanner that completes with those needs to sell for a
21 lower price.
22 Q.   And do you know whether the Voyager 1400 specifically
23 competes with OPTO's products?
24 A.   Yes.
25 Q.   OPTO's laser scanners.

599

GREGORY ADAMS - DIRECT

1  A.   Yes.  We've heard here this week that Honeywell in
2  general competes with OPTO on the sale of scanners.  And
3  Mr. Smith said specifically with respect to this product, this
4  product being the Voyager 1400PDF, that it competes with the
5  OPTO laser scanning products.
6  Q.   Okay.  Now look at DX454.
7       Can you explain what this document is.
8  A.   Well, let me -- what number is that in my binder?
9  Q.   Should be on the front cover.  It has a key.
10 A.   This looks like the Voyager transaction data, a screen
11 shot of it.
12 Q.   Can you just look quickly in your binder to make sure.
13 A.   Well, this looks like it.  It's a big Excel file.  It's
14 this wide (indicating), maybe a little wider.  It's very long.
15 There's a lot of rows.
16 Q.   And what did you rely on DX454 for in your opinion?
17 A.   For the pricing of the Voyager 1400 products.
18         MR. HOUGHTON:  Your Honor, move to admit DX454.
19         THE COURT:  It's admitted.
20         (Defendant's Exhibit Number 454 was received into
21 evidence.)
22         MR. HOUGHTON:  And if we could go to the next slide
23 here.
24 Q.   We're looking at screen shots of DX748, DX745, and DX747.
25 Can you identify these documents?

JA1503

GREGORY ADAMS - DIRECT

1  A.   Yes.  These are three -- I'm not sure if it was three
2  different Excel files or three tabs within the same Excel
3  file, but this is the OPTO sales data that I used for the
4  price comparison I'm about to discuss.
5          MR. HOUGHTON:  Your Honor, I'd move to admit DX748,
6  DX745, and DX747.
7          THE COURT:  Admitted.
8          (Defendant's Exhibits Nos. 745, 747, and 748 were
9  received into evidence.)
10 Q.   Okay.  And you mentioned a price comparison.  Can you
11 just describe at a high level what you did there.
12 A.   Yes.  I compared the average sales price of the Voyager
13 1400PDF product to the prices of the OPTO laser scanners
14 capable of decoding a PDF417 file.
15 Q.   Okay.  We're looking at DX841.  And can you just describe
16 what this document is.
17 A.   Yes.  This is Table 1 from my expert report and this
18 reports the results of that price comparison.
19         MR. HOUGHTON:  Your Honor, we move to admit DX841.
20         THE COURT:  It's admitted.
21         (Defendant's Exhibit Number 841 was received into
22 evidence.)
23 Q.   And can you explain what specifically you're showing here
24 on the slide.
25 A.   Yes.  So as I mentioned earlier, there's three versions

GREGORY ADAMS - DIRECT

1  or three different Voyager 1400 products.  I'm going to talk

2  about the prices of the other two versions in a moment, but

3  here I want to focus on the one with the box around it which

4  is the Voyager 1400PDF.  So this is the version we were

5  talking about that can decode a linear barcode or a stacked

6  barcode but not a matrix code.

7  Q.   Okay.  And what does your analysis here show?

8  A.   Right.  So this -- in the red box it calculates the

9  average annual sales price of the Voyager product in each

10 year.  2022 is a partial year.  I think it's six months.

11      And then below this are listed all of the OPTO handheld

12 scanners in this case that were laser scanners and are capable

13 of reading a stacked linear barcode as well.  So these are the

14 competitive OPTO laser scanning products.

15 Q.   And did you draw any conclusions from this analysis?

16 A.   Yes.  If you -- I know there's a lot of numbers here.

17 But if you look at this, and for almost every OPTO product in

18 almost every year, the average sales price of the OPTO laser

19 scanners is less than the average sales price of the Voyager

20 1400PDF, which you recall the Voyager 1400 is the economy

21 version of the Honeywell image scanner product.  And moreover,

22 the PDF version of that is the product that was created to be

23 even less expensive for targeted competition with laser

24 scanners that can read a PDF14 file.

25 Q.   Did you have any other evidence that laser scanners are

GREGORY ADAMS - DIRECT

1  less expensive than image scanners?

2  A.  Yes.

3  Q.  And generally, where did you go to find that?

4  A.  I went to the internet looking at information about the

5  industry and about the relative advantages of laser scanners

6  versus image scanners.

7  Q.  Okay.  And this is DX846.  Can you identify this?

8  A.  This is one of the documents on which I relied for my

9  comparison of laser scanners and image scanners.

10          MR. HOUGHTON:  Your Honor, we move to admit DX846.

11          MR. STEVENS:  Your Honor, I object.  That's hearsay.

12  He can rely upon it and talk about it, but that shouldn't come

13  into evidence.  This is a third party's website.  So I do

14  object to this coming into evidence.  I don't have any problem

15  with him mentioning the things that he relied on, but that's

16  hearsay.

17          THE COURT:  All right.  Sustained.

18  Q.  Dr. Adams, can you explain what you took from this

19  document.  What did it show you?

20  A.  Yes.

21          MR. STEVENS:  I'm going to object.  If he's just

22  going to sit here and read the document that we just excluded

23  as hearsay, I would object to that as well.

24          THE COURT:  Overruled.  You may proceed.

25          THE WITNESS:  Yes.  So this is a comparison of laser

GREGORY ADAMS - DIRECT

1   scanners to image scanners.  And it lists a number of pros and

2   cons of each, all of which are not on here.  It's, you know, a

3   longer document.  But one of the advantages of laser scanners

4   that it mentioned is laser scanners tend to be less expensive

5   than image sensors for customers that need to read a stacked

6   barcode but don't need to read a matrix code.

7   Q.    And are you aware of any other advantages of laser

8   scanners?

9   A.    Right.  Yes, I am.  And I think this document and other

10  documents mention other advantages in certain -- for certain

11  customers in certain use applications.  For instance, laser

12  scanners are less sensitive -- they have a greater depth of

13  field, so they're less sensitive to how far away the barcode

14  is from the scanner.  So that can be advantageous in certain

15  use cases.

16  Q.    Are there any other factors that create demand for laser

17  scanners that can read stacked barcodes?

18  A.    Yes.

19  Q.    And can you explain that.

20  A.    Yes.  One factor is what we call installed base effects.

21  Q.    What are those?

22  A.    First, what's an installed base?  So with computer

23  hardware, scanners, a lot of industrial equipment, these are

24  durable goods so they last a long time.  And scanners and a

25  lot of other computer and technology systems, in addition,

GREGORY ADAMS - DIRECT

1   individual products, they work with a lot of complimentary
2   other hardware and software, so you've got to get everything
3   to work together.  And once you get it working together, you
4   know, you want to use that system for a long time because it's
5   expensive and troublesome to switch -- to replace everything
6   and switch to a new system.  So you have these -- a lot of
7   these systems that are out there in the world, in the market,
8   being used with different technology.
9        Now, in a lot of technology markets there is
10  technological progress.  New types of products come along.
11  And the new types of products may be better in a lot of
12  instances, in a lot of ways.  And it may be the case that for
13  a lot of customers who are newly adopting technology, they're
14  going with a new technology, not the legacy technology.  So in
15  this case the legacy technology may be laser scanners while
16  the new technology may be image sensors.
17       So you may have a situation where a lot of the new
18  purchases of products are with the newer technology.  But that
19  doesn't mean that the laser technology -- the legacy
20  technology is not still in use out in the market.  A lot of
21  people sill are out there, they have these products and they
22  want to keep using them.  And that can create a continued
23  demand for those older technology products like laser scanners
24  because, for instance, you might break something or they just
25  stop working, like computer monitors or something, they stop

605

GREGORY ADAMS - DIRECT

1  working and you need to replace that.  It's easier to replace

2  it with the technology that you had rather than something new.

3  Or you need to expand your network.  If you're a retailer, you

4  may open a new store.  You want to use the same system that

5  you've used before.

6       So even if the product might be thought of in some sense

7  as a legacy product, with an installed base there's still a

8  lot of that out in the market and that installed base creates

9  a continued demand for those products.

10 Q.   When this litigation started, did OPTO still sell

11 scanners capable of decoding stacked linear barcodes?

12 A.   Yes.

13 Q.   And we talked earlier about that sales data, right?

14 A.   Yes.

15 Q.   And did that sales data inform your opinion about whether

16 there's demand for laser scanners that can read stacked linear

17 barcodes?

18 A.   Among a lot of other things, yes.

19 Q.   And what did that relate to in your opinion?

20 A.   Well, it relates to there's a lot of sales of these

21 products so these laser scanners are still being sold in the

22 market.  They're worth tens of millions of dollars in sales of

23 those products.

24 Q.   Have you seen any evidence about the value of the ability

25 of a scanner to decode stacked linear barcodes?

JA1509

GREGORY ADAMS - DIRECT

1  A.    Yes.

2  Q.    And we're going to look at DX127.

3        What is this document?

4  A.    This is the Honeywell price book.

5  Q.    And did you rely on this document?

6  A.    I did.

7        MR. HOUGHTON:  Your Honor, move DX127 in.

8        THE COURT:  It's admitted.

9        (Defendant's Exhibit Number 127 was received into

10  evidence.)

11  Q.    What specifically in this document did you rely on?

12  A.    Well, I relied on the price -- the list prices for the

13  Voyager 1400 products that we discussed previously.

14  Q.    Okay.  In looking at page 3 specifically, what does this

15  show?

16  A.    This, again, is a screen shot of the price book.  This is

17  just for the Voyager 1400 products.  And as I mentioned

18  previously, it's three different versions.  You'll notice

19  there's six lines here because each version comes in two

20  different colors, so there's six different stock keeping

21  units.

22      But I've extracted some of the list prices below so

23  they're easier to read.  And what this shows me is the list

24  price for the Voyager 1400 product that can just read simple

25  barcodes and nothing else is $217.57.

GREGORY ADAMS - DIRECT

1  Q.   Okay.  And what about the PDF417 version?

2  A.   For the PDF417 version, the list price is significantly

3  higher.  It's $300.97, so it's about a 38 percent increase in

4  price.

5  Q.   And what about the 2D version?

6  A.   The 2D version is $376.52, so about another 25 percent

7  increase in price.

8  Q.   And what does this price differential tell you about this

9  product and the market more generally?

10  A.   It tells me a few things.

11      One, it tells me there's real value for a scanner to be

12  able to decode PDF417 over and above just a simple barcode.

13  There must be customers out there who really value that and

14  have a willingness to pay.  Honeywell believes that by their

15  pricing decision because they price the PDF417 version at a

16  significant premium to the 1D version.  So that's a valuable

17  product characteristic for at least some customers.  There's a

18  willingness to pay for that.

19      It also tells me -- getting back to Mr. Smith's

20  testimony, that you do need -- you know, for customers that

21  need to read a PDF417 but don't need to read a matrix code,

22  those customers are more price sensitive.  Those customers can

23  use a laser scanner; and therefore, you need to offer them a

24  better price than you have to offer customers who need to read

25  a 2D code because the PDF417 version sells at a significant

GREGORY ADAMS - DIRECT

1  discount to the fully featured 2D version, as Mr. Smith

2  testified.  He said we had to create a product to be price

3  competitive and it was a lower-priced product.  And it is

4  lower priced.

5  Q.   Is there an economic term for this kind of pricing?

6  A.   Yes.  This kind of pricing is what we call price

7  discrimination, which is segmenting customers by their demand

8  and then offering them different prices.

9  Q.   Okay.  And turning back to DX841, what were you doing

10  here with the pricing of the Voyager 1400?

11  A.   Okay.  This, again, is back to Table 1 from my expert

12  report.  This is just the top part.  The table has the OPTO

13  products, but they're not relevant for what I'm going to

14  discuss right now so I'm focused on just the Voyager products.

15      And what we looked at before was list prices.  So a

16  common question is, well, what about the prices customers

17  actually pay instead of the list prices, do they follow the

18  same pattern?  And they do.

19      So this is the average annual sales price of the

20  different versions of the Voyager product in different years.

21  And you see the same pattern and pricing:  That the version

22  that can read a matrix code sells for more than the version

23  that can read a PDF code, and the version that can only read a

24  simple code sells for even less.

25  Q.   Did you have any observations about the Voyager sales

609

GREGORY ADAMS - DIRECT

1  data more generally?

2  A.   Yes.  In the U.S. the sales of the Voyager product are

3  relatively low.  This is not a major product category for

4  Honeywell.

5  Q.   Do you know if Honeywell still sells the Voyager?

6  A.   I understand they still sell it.  Mr. Smith said that

7  there was no plan to discontinue it.

8  Q.   Did the sales levels of the Voyager product prevent you

9  from reaching an opinion on the market here?

10  A.   No, they don't.  I mean, there's no minimum size for a

11  market.  There's no minimum size for an antitrust market.

12  There's no minimum size for a market over which competitive

13  effects could occur.

14  Q.   Did you look at anything else as part of your analysis of

15  the market value of the ability to decode stacked linear

16  barcodes?

17  A.   Yes.  I also looked at pricing of some OPTO products.

18  Q.   Okay.  This is DX842.  Can you describe what this is?

19  A.   Yes.  This is Table 2 from my expert report.

20  Q.   Okay.  And what were you doing here in Table 2?

21  A.   What I was doing here was I was comparing the transaction

22  prices of two different paired sets of OPTO products.  And the

23  interesting thing about these products -- and I'll describe

24  the top row.  It's similar for the bottom two rows.

25       But the L-46R -- there's an L-46R and an L-46X.  These

JA1513

GREGORY ADAMS - DIRECT

1  are two OPTO scanning products.  And they look the same.  And

2  I understand they are the same except for the scan engine

3  that's inside.  So all the other connectivity and shock

4  resistance and memory and everything else is the same.

5      But the L-46R uses a laser scan engine so it's a laser

6  scanner.  And the L-46X uses an image sensor so it's an image

7  scanner.  And the L-46R, it's one of the accused products in

8  this case.  It's a laser scanner that could, you know,

9  previously read a stacked linear barcode.  And the L-46X can

10  read all codes including the matrix code because it's an image

11  scanner.  So the only difference is that scan engine and the

12  codes that they can read.

13      Compare the prices and you see that the laser version is

14  less expensive, sells at a discount to the image sensor

15  version.

16      And the same is true of the next product, the L-50C and

17  the L-50; two products that are the same except for the scan

18  engines.  And the product with the laser scan engine sales at

19  a discount.

20          MR. HOUGHTON:  Your Honor, we move DX842 into

21  evidence.

22          THE COURT:  It's admitted.

23          (Defendant's Exhibit Number 842 was received into

24  evidence.)

25  Q.  And wrapping up this segment of your analysis, can you

GREGORY ADAMS - DIRECT

1  summarize your opinions about the relevant business.

2  A.   Yes.  I mean, there's substantial demand for scanners

3  that can read a stacked barcode, and that's reflected in

4  market prices.  So the value of being able to read a PDF417

5  code or another stacked code is reflected in the price premium

6  of those products over scanners that can just read a simple

7  barcode.

8       At the same time, scanners, laser scanners that can only

9  read -- that can read a stacked code but not a matrix code

10 sell at a discount to scanners that can read all types of

11 codes.

12      And even though there's increasing adoption of image

13 scanners in the market and they comprise an increasing

14 percentage of total sales of scanning products, there's still

15 a demand for laser scanners.

16 Q.   Okay.  Turning next to your opinions on market power.

17 Can you just briefly describe your definition of market power.

18 A.   Market power is the ability to control price or exclude

19 competition.  Also, sometimes said in economics, a definition

20 that's used, is market power is the power to price above

21 marginal cost.

22 Q.   Are those any different?

23 A.   They're describing the same thing because to be able to

24 price above marginal cost, the reason firms are able to price

25 above marginal cost is because they face reduced competition.

GREGORY ADAMS - DIRECT

1    If you have really vigorous competition, a lot of other
2    suppliers selling similar products to your product, if you try
3    to price above marginal cost, they'd be able to undercut you
4    on price.  And that's what competition does:  It drives price
5    down toward marginal cost.  They're two ways of describing the
6    same thing.
7    Q.   As an economist, how do you determine whether a firm has
8    market power?
9    A.   Well, there's two general classes of approach.  You can
10   either use what's called direct evidence or indirect evidence.
11   Q.   Which approach did you employ in this case?
12   A.   Both.
13   Q.   Okay.  Let's talk about direct evidence first.  Can you
14   just generally describe what is direct evidence of market
15   power?
16   A.   Direct evidence of market power is what it sounds like.
17   And so if market power is the ability to control prices or
18   exclude competition, direct evidence is direct evidence of a
19   firm's ability to control price or exclude competition.
20   Q.   Is the direct evidence approach to determining market
21   power an accepted methodology in economics and antitrust?
22   A.   Yes.
23   Q.   Let's look at DX845.
24        Can you identify this document?
25   A.   Yes.  This is the Horizontal Merger Guidelines.  They're

613

GREGORY ADAMS - DIRECT

1  issued by the Antitrust Divisions of the Department of Justice

2  and the Federal Trade Commission.

3  Q.   And how did this document relate to your opinions, if at

4  all?

5  A.   Right.  So this document, it's the Horizontal Merger

6  Guidelines and on its face is about mergers.  The methods and

7  approaches and the economics that are contained in these

8  guidelines are widely used in non-merger context as well.  So

9  a lot of, you know, the methods and approaches I use are

10  discussed here in the merger guidelines, including there's

11  discussion about the use of direct evidence.

12          MR. HOUGHTON:  Your Honor, we move DX845 into

13  evidence.

14          THE COURT:  It's admitted.

15          (Defendant's Exhibit Number 845 was received into

16  evidence.)

17  Q.   And what do the merger guidelines say about direct

18  evidence?

19  A.   Well, they discuss direct evidence throughout, but they

20  mention that evidence of competitive effects, so direct

21  evidence of competitive effects, can inform market definition

22  just as market definition can be informative regarding

23  competitive effects.  And we'll discuss in a moment the

24  indirect approach that I mentioned to determine the market

25  power involves market definition and looking at market shares.

JA1517

614

GREGORY ADAMS - DIRECT

 1      And it says -- you know, goes on, such evidence, the
 2   direct evidence, may also more directly predict the
 3   competitive effects of a merger, reducing the role of
 4   inferences from market definition and market shares.
 5      So it's saying if you have direct evidence of competitive
 6   effects, it may reduce the role of using the indirect method
 7   which involves market definition and market shares.
 8   Q.   And do the merger guidelines say anything else about
 9   direct evidence?
10   A.   Yes, they do.  As I said, they discuss it throughout, but
11   I have another portion of it here on a slide which notes the
12   agencies' analysis need not start with market definition.
13   Some of the analytical tools by the agencies to assess
14   competitive effects do not rely on market definition at all,
15   although evaluation of competitive alternatives available to
16   customers is always necessary at some point.
17   Q.   Did you rely on anything else to support the idea that
18   direct evidence can be used to show market power?
19   A.   Yes.
20   Q.   And what sorts of things did you look at?
21   A.   Right.  So economics and antitrust tax and treatises
22   including the American Bar Association.  The antitrust section
23   has a handbook on market definition in antitrusts.  And while
24   the American Bar Association is obviously an association of
25   lawyers, the antitrust section has a lot of economics members.

JA1518

GREGORY ADAMS - DIRECT

1  And this particular book, the editor of the book, is an
2  economist.
3  Q.    And what specifically are you trying to show here on this
4  slide?
5  A.    Well, I'm trying to show that the use of direct evidence
6  of market power is accepted and recognized that, as it says in
7  the last sentence here, "One may be able to use direct
8  evidence of competitive effects and market power to infer the
9  relevant market in which the market power is being exercised."
10       And also it says above, "If market power anticompetitive
11  effects can be directly observed or proven, there may be no
12  need to define relevant markets, calculate market shares, and
13  draw inferences."
14  Q.    Okay.  And what direct evidence did you see in this case
15  that indicated whether or not Honeywell had market power?
16  A.    I saw the direct evidence that Honeywell was able to --
17  in response to Honeywell's royalty demands, OPTO withdrew the
18  laser scanning products capable of reading stacked codes from
19  the market.  I think it's clear that Honeywell competed with
20  OPTO, among other places, in the sale of scanners to
21  price-sensitive customers who need to read stacked linear
22  barcodes.  So they were a competitor there so OPTO -- sorry,
23  Honeywell was able to exclude a competitor.
24  Q.    And when you say that Honeywell was able to exclude OPTO
25  from the market, can you explain that a little bit more.

GREGORY ADAMS - DIRECT

1  A.   Well, Honeywell -- Honeywell's conduct lead to OPTO
2  leaving the market.  You know, I don't think it's coincidence
3  that these occurred at the same time.  In response to the
4  Honeywell royalty demands on its laser scanners, OPTO removed
5  that functionality.  So they removed from the market
6  products -- laser scanning products that could read a PDF417
7  or other stacked barcode and they replaced them with similar
8  products that didn't have that functionality.
9  Q.   From an economic perspective, did OPTO have any other
10 choices?
11 A.   I don't know about from an economic perspective, but from
12 a broader perspective could they have done something else?
13 Yes, they could have.  They could have continued to sell the
14 products and incurred the royalty costs on those products.
15 Q.   And what would that have looked like?
16 A.   Well, if they had done that, that would have been an
17 increase in OPTO's costs.  It would have been a direct
18 7 percent increase in their marginal cost.  So it's
19 overwhelmingly likely that that would have resulted in higher
20 prices for the OPTO products.  In almost any market structure,
21 when marginal costs increase, the profit maximizing price of
22 the firm increases.
23      So overwhelmingly likely that it would have led to an
24 increase in price.  And that in itself would have been a
25 competitive effect and it would have been evidence of market

GREGORY ADAMS - DIRECT

1  power.  Because recall, market power is the ability to control
2  price or exclude competition.  And so it's one or the other.
3  But that would have been a direct competitive effect had OPTO
4  stayed in the market and raised its price of its products.
5  Q.   Okay.  And any other options?
6  A.   Well, I know Mr. Herrington had mentioned that OPTO, at
7  least, you know, in his mind, theoretically had the option of
8  paying the royalty and not changing its price at all.  Just
9  accepting a lower profit margin, I think is how he would put
10 it.
11 Q.   And from an economic perspective, do you have any
12 opinions about that option?
13 A.   Yes, a couple.
14      One, as I said, it's overwhelmingly likely that if you
15 raise a firm's marginal costs, that they will pass on at least
16 some of that cost to their customers in almost any market
17 structure.
18      But second, I can observe what OPTO did and I can
19 reliably conclude that this increase in OPTO's costs made
20 continuing to offer the products unprofitable to OPTO because
21 they withdrew them from the market.
22 Q.   And is that method of determining profitability something
23 that's recognized in economics?
24 A.   Yes.  It's the foundation of economics.  We make
25 inferences about what consumers value by what choices they

618

GREGORY ADAMS - DIRECT

1  make in the market.  We make inferences on firms by what their
2  profit function looks like and what's profit maximizing to
3  them by the choices they make.  So if we see a firm offering a
4  product in the market and then we see that firm's marginal
5  cost increase and the firm chooses to no longer offer the
6  product in the market, we can draw a pretty obvious conclusion
7  from that that that increase in cost made that product no
8  longer profitable for the firm.
9  Q.   Is there a term for that in economics?
10 A.   Yeah.  The general term we use is reveal preference, and
11 it's just a fancy way of saying you can observe what people
12 value and believe and think by what they do.
13 Q.   Okay.  We talked a little bit earlier about price
14 discrimination.  And how does that relate to your opinions on
15 market power?
16 A.   Well, price discrimination is another direct evidence way
17 of assessing the presence of market power.  You might say it's
18 an indicia, a direct indicia of market power.  And the reason
19 is because price discrimination is when a firm is segmenting
20 the market.  So they face two or more groups of customers who
21 have different demands, so a different willingnesses to pay.
22      You have some customers who have a low willingness to pay
23 and some who have a high willingness to pay and you'd really
24 like to segment them and charge the people with high
25 willingness to pay a higher price.  But that would price you

JA1522

GREGORY ADAMS - DIRECT

1    out of the market for those that only have a low willingness

2    to pay.  So you want to offer a low price to the customers who

3    have a low willingness to pay.  The problem then, all your

4    high value customers will look over here and say, well, I'll

5    just take the low-priced product.

6        So you need to segment the market and the way you segment

7    the market are things like what Honeywell did.  It's common.

8    You create different product specifications so that you appeal

9    to those different consumer groups and they can't swap between

10   your products.  The high value customers who need to read a

11   matrix code can't come over here and buy the discount Voyager

12   product because it can only read a stacked code.

13       Now, for that to be successful, if you face a lot of

14   competition, you're obviously getting good profits on the

15   high-priced product.  But you're selling the low-priced

16   product at the low price and you still think that's profitable

17   because you're doing it, so you must be making even more money

18   on the high-priced product.  And so there's a margin there and

19   there's a competitive opportunity for, you know, potential

20   competitors to come in and undercut that.  And the fact that

21   you can be successful at that, that says you must have some

22   degree of market power.

23       And that's not just me.  This is an excerpt from -- this

24   is the -- it says "Price Discrimination" here.  That's the

25   name of the chapter.  This is the *Handbook of Industrial*

620

GREGORY ADAMS - DIRECT

 1  *Organization* which is an economics text.  It's a review of the

 2  industrial organization literature and it's a chapter on price

 3  discrimination.  And as it says, "Three conditions are

 4  necessary in order for price discrimination to be a viable

 5  solution to a firm's pricing problem."  And first, the firm

 6  must have some market power.

 7  Q.    Okay.  You mentioned there was also another approach to

 8  determining market power that you used, and can you describe

 9  what that is.

10  A.    Yes.  That's the indirect approach that we've talked

11  around a bit.  And the indirect approach to market power, you

12  know, the typical approach is to define a relevant market and

13  measure market shares within that market.

14  Q.    And what was the general market you were looking at in

15  this case?

16  A.    I was looking at the market for scanners capable of

17  decoding a stacked linear barcode in particular for

18  price-sensitive customers.

19  Q.    And did you define a market in the same way as you would

20  in an antitrust case market?

21  A.    I used the same general approaches and methods, but I

22  didn't do the same depth of analysis to formally define a

23  relevant antitrust market in the way that I would in a full

24  blown antitrust case.

25  Q.    Why not?

JA1524

621

GREGORY ADAMS - DIRECT

1  A.   For a couple of reasons.

2       One, it wasn't necessary.  We have a lot of direct

3  evidence of Honeywell's market power.

4       But also, there's not the same types of information that

5  are available in this case in the discovery that you might

6  need in a full antitrust case.  A lot of those approaches are

7  very data and information intensive.

8  Q.   And did that prevent you from defining a market

9  sufficient to reach any opinions here?

10 A.   No, it did not prevent me from defining the general area

11 of commerce in which OPTO and Honeywell compete and assessing

12 competitive conditions in that market.

13 Q.   How did you go about analyzing the market in this case?

14 A.   Well, I looked at a number of things that I mentioned

15 before.  I looked at the different types of products that are

16 available.  The fact that Honeywell offers a product targeted

17 for price-sensitive customers who only need to read stacked

18 codes and not matrix codes is informative.  It focuses on an

19 area of competition.  I looked at the other products that were

20 available to those customers.  I looked at, as we've

21 discussed, the relative advantages of laser scanners and image

22 scanners.

23      So back -- we talked about the merger guidelines.  I

24 think it says you always have to evaluate the competitive

25 alternatives available to customers, so that's looking at the

JA1525

GREGORY ADAMS - DIRECT

1    competitive alternatives.  I looked at all of that.

2        I looked at suppliers and some pricing that we've just

3    discussed.  And then also some market share information for

4    suppliers of scanners.

5    Q.   And what market share information did you look at?

6    A.   I had two sources available.  The first is from a firm

7    called Meticulous Research and the second from a firm called

8    VDC Research.

9    Q.   Okay.  And showing excerpts of a couple of those exhibits

10   here, DX746, DX749, DX734, and DX735.

11       Can you identify these.

12   A.   Yes.  These are the Meticulous Research reports, and it's

13   for two years.  There's two exhibits for each one because

14   there's both a PDF version and then there's an Excel file

15   associated with it.  But for two years, I think it's 2021 --

16   the first one is not dated on the cover -- and the second one

17   is 2022.

18   Q.   And did you rely on these documents?

19   A.   I did.

20           MR. HOUGHTON:  Your Honor, we move DX746, 749, 734,

21   and 735 into evidence.

22           THE COURT:  They're admitted.

23           (Defendant's Exhibits Nos. 734, 735, 746, and 749

24   were received into evidence.)

25   Q.   What market categories do these data present market

GREGORY ADAMS - DIRECT

1   shares for?

2   A.   They presented market shares for -- by the way, I said

3   they were two years.  I'm presenting data here on 2022.  The

4   data for 2021 is not identical, but it's very similar.  There

5   weren't big changes.

6        So this is Table 3 from my expert report which just takes

7   the market share percentages from the Meticulous report and

8   puts it all in a table and it's a little easier to look at.

9   Meticulous presents data for total market all scanners and

10  also for some different categories of the market:  Handheld,

11  fixed mount, engines, and terminals.  And in each of those

12  categories, it presents data both for the total and for 1D and

13  2D.

14  Q.   And this was DX843; is that right?

15  A.   Yes.

16            MR. HOUGHTON:  Your Honor, we move DX843 into

17  evidence.

18            THE COURT:  It's admitted.

19            (Defendant's Exhibit Number 843 was received into

20  evidence.)

21  Q.   What does the Meticulous data that you're representing

22  here show generally about the markets that you were looking

23  at?

24  A.   It shows generally about the markets I was looking at,

25  this looks like a concentrated market.

624

GREGORY ADAMS - DIRECT

1  Q.   And are there any typical ways that economists calculate

2  the level of concentration in a market?

3  A.   There is a typical way, yes.

4  Q.   Okay.  And what's that called?

5  A.   It's called the Herfindahl-Hirschman Index.

6  Q.   Okay.  And this is DX810.  Can you identify this for us?

7  A.   Yes.  This is from the Department of Justice Antitrust

8  Division's website that just describes the

9  Herfindahl-Hirschman Index.

10         MR. HOUGHTON:  Your Honor, we move DX810 into

11  evidence.

12         MR. STEVENS:  Objection, hearsay.

13         THE COURT:  It's admitted.

14         (Defendant's Exhibit Number 810 was received into

15  evidence.)

16  Q.   And can you explain what exactly the HHI is.

17  A.   Well, I mean, HHI, as it says here, it's a commonly

18  accepted measure of market concentration, which it is.  I

19  mean, I didn't need to go see this to know that.  I've worked

20  with HHIs throughout my career.  It's a very commonly accepted

21  measure of market concentration.

22      It shows how it's calculated.  The calculation is fairly

23  straightforward.  To calculate an HHI, you take the market

24  share of each individual firm in the market, you square that

25  market share, and then you sum them up and you get a total.

JA1528

GREGORY ADAMS - DIRECT

1  And then what do you do with the total?  Well, that total will
2  tell you whether the market -- the degree to which the market
3  is concentrated.
4       So in the last paragraph it discusses briefly market
5  concentration thresholds based on HHI that the DOJ enforcement
6  agency uses.  And so it says the agencies -- and because this
7  is a joint statement of the FTC and the DOJ, which is why
8  agencies is pluralized.
9       The agencies generally consider markets in which the HHI
10 is between 1500 and 2500 points to be moderately concentrated,
11 and consider markets in which the HHI is in excess of 2500
12 points to be highly concentrated.
13 Q.   And are those different levels of HHI still current
14 today?
15 A.   Interesting question.  And the reason I laugh is these --
16 this is a statement -- these statements also appear in the
17 merger guidelines that we looked at previously.  And there was
18 a date on that and the date was 2010.  That's the current
19 version -- you know, the current final version of the merger
20 guidelines.  But from time to time they're revised.  Have not
21 been revised since 2010.  But the enforcement agencies have
22 said that they are working on revising the merger guidelines.
23 They've said that for a while.  It's a big project.  And
24 people were anxiously awaiting this.  And last night in the
25 middle of the night the DOJ and the FTC released their

GREGORY ADAMS - DIRECT

1 proposed new merger guidelines.  I got up this morning at 5:45
2 and it was sitting in my inbox.
3     So is it current?  I mean, what's out there right now,
4 the new one, is a proposal.  It's a draft.  And there will be
5 lots of discussion on it.  And there will be conferences and
6 symposia.  And there will probably be -- you know, take public
7 comment.
8     But there is a new version of the -- or new proposal of
9 the merger guidelines.  And one of the things that that
10 includes -- and I haven't read the entire merger new proposal,
11 but what came across on my email, and people were already
12 talking about this morning because it's near the front, is the
13 proposed new merger guidelines say that the agencies will
14 consider markets in which the HHI is 1800 to be highly
15 concentrated.  So it's a lowering of the threshold for a
16 highly concentrated market.
17 Q.   How did you go about calculating HHI in this case?
18 A.   So what I did in this case, I used the Meticulous data.
19 But, of course, if you look at the Meticulous data, one of the
20 limitations of that data is it only gives the market shares
21 for the top two firms, which are Zebra and Honeywell.
22 Everybody else is in other.  And to calculate the HHI, you
23 need the market share of each firm in the market.  So you have
24 to make some assumptions about how many firms are out there
25 and what is the distribution of their market share.

GREGORY ADAMS - DIRECT

1      So what I -- I made the most conservative assumption I
2   could, which I assumed there's a lot of firms in other and
3   they all have equal market share.  And the equal market share,
4   we'll talk about, is important because that's an assumption
5   that leads to the lowest calculated market concentration.
6      As the document we just looked at from the DOJ noted in
7   the middle paragraph, that as the disparity in firm sizes
8   increases, as they're not all the same, the calculated market
9   concentration goes up.
10      So I just conservatively assumed that they're all the
11  same and I assumed 25 suppliers in other, and I calculated the
12  HHI using that.
13      Now, I did pressure test.  Does 25 matter?  What if I
14  just assumed ten firms or what if I assumed a hundred firms?
15  And it doesn't really matter.  The numbers change just a small
16  amount but not significant.  So the calculation isn't
17  particularly sensitive to the number of firms.  As I'll
18  discuss in a minute, it is sort of sensitive to the equal
19  share assumption.
20  Q.   Okay.  Let's look at DX784.
21      Can you identify this document?
22  A.   Yes.  This is Table 4 from my expert report where I, you
23  know, give the results of the HHI calculations.
24          MR. HOUGHTON:  Your Honor, we move DX784 into
25  evidence.

GREGORY ADAMS - DIRECT

1        THE COURT:  It's admitted.

2        (Defendant's Exhibit Number 784 was received into

3  evidence.)

4        MR. STEVENS:  Just for the record, we'd object to

5  that.

6  Q.   And focusing on the top line, can you describe what's

7  shown here in your calculations.

8  A.   Yes.  This is HHI calculated under the assumptions that I

9  just gave about 25 firms all having equal market share.  And

10  focusing on the handheld category because that's where most of

11  the accused OPTO products are and that's where OPTO and

12  Honeywell compete, the HHI numbers are 2,000 to 2,250.  So

13  under current merger guideline guidance, that's a -- you know,

14  squarely in the middle of the moderately concentrated market.

15  Under the new guidelines it would be squarely in the highly

16  concentrated category.  But either way it's a concentrated

17  market.

18  Q.   And do you see any information that gave you any way to

19  look at the other category here?

20  A.   Right.  So the -- as I mentioned, yes, the other

21  category -- it matters what you assume about those firms in

22  the other category.  Are they all the same?  Is it a bunch of

23  them with a really small market share?  Or is it one or two of

24  them with a lot, you know, bigger and then a bunch of small

25  ones?  Because the latter would lead to a higher HHI and to

629

GREGORY ADAMS - DIRECT

1  greater market concentration.

2      So I looked at the VDC report, the VDC data.  And the

3  reason I didn't rely on the VDC data as a primary source is

4  it's only worldwide.  The Meticulous research data, that's for

5  the U.S.  So it's only worldwide.  But the nice thing about

6  the VDC data is it does give a bigger breakdown, a deeper

7  breakdown of the market shares worldwide of other firms other

8  than the top two.

9  Q.   And this is DX65.  Can you just identify that?

10 A.   Yes.  This is a page from the VDC report that I was just

11 discussing.

12          MR. HOUGHTON:  Your Honor, we move DX65 into

13 evidence.

14          THE COURT:  It's admitted.

15          (Defendant's Exhibit Number 65 was received into

16 evidence.)

17 Q.   And how did you use this information in your alternative

18 calculations?

19 A.   Well, I used this to test my assumption that all the

20 firms in the other category are all the same size and they're

21 all small because there's 25 of them, and it shows that's

22 probably not right.  Datalogic is a big firm.  And that

23 comports with what I learned qualitatively.  I think we heard

24 on Monday Datalogic is a big firm in this industry, and I've

25 seen that in other places and heard that, that Datalogic is

JA1533

GREGORY ADAMS - DIRECT

1  big in the U.S.

2      And so it confirmed my suspicion that my assumption about

3  equal market shares for all the firms in the other category

4  was inaccurate and probably my HHI numbers are too low.

5  Q.   Okay.  And did you do any alternative calculations?

6  A.   Yes.  So I made an alternative assumption and that

7  assumption was that for the third firm -- you know, the first

8  firm in the other category, which would be the third largest

9  firm in the market, I assumed their share was half as large as

10 the second firm; and for the fourth firm, I assumed their

11 share was half as large as the third firm, et cetera.  So

12 there's a distribution of sizes of the firms in the other

13 category.  They're not all the same, but it's a smoothly

14 declining share.  And then I calculated the HHIs under that

15 assumption and that's what's shown here in the red box on

16 Table 4 in the second row.  And the numbers go up.  So you see

17 in this case the market is even more concentrated.

18 Q.   Okay.  We talked earlier about the merger guidelines and

19 what they say about HHI.  And did you rely on that in your

20 opinions at all?

21 A.   I did.

22 Q.   Can you explain that.

23 A.   Yes.  So the merger guidelines discuss the HHI in a

24 number of places and they give HHI thresholds and give

25 guidance on how to interpret different HHI numbers.

GREGORY ADAMS - DIRECT

1      So this is a screen shot from the merger guidelines on
2   page 19; and this is the 2010 merger guidelines, so this is
3   not the things that came out last night.  And they say the
4   agencies employ the following general standards for the
5   relevant markets they've defined.
6      And it goes on to small change in concentration,
7   discusses unconcentrated markets, which this is not, and
8   discusses moderately concentrated markets, which this would be
9   under the old guidelines given the results we've seen.  And
10  then it's not shown here, but they also discuss highly
11  concentrated markets.
12      But evaluating this as a moderately concentrated market,
13  which is what the HHI results we just looked at showed under
14  the old guidelines, it says that mergers resulting in
15  moderately concentrated markets that involve an increase in
16  the HHI of more than a hundred points potentially raise
17  significant competitive concerns and often warrant scrutiny.
18      So what I did here is -- what I thought is, all right,
19  what does that look like?  So we're in a moderately
20  concentrated market.  What does a change in HHI of 100 look
21  like?  So I was doing this thought experiment a couple of
22  nights ago in my hotel -- I don't have any paper up here, but
23  I think I can do this without paper.  It's easier for me to do
24  math when I'm writing.
25      Assume we're in a moderately concentrated market and

GREGORY ADAMS - DIRECT

1   we've got two firms.  We have firm A and firm B.  And firm A

2   has a market share of 25 percent.  That's about the size of

3   OPTO in this market, maybe a little lower, but -- I'm sorry,

4   not OPTO.  Honeywell.  And then we have another firm that's

5   just really small, say 2 percent.  Okay.  So what would be

6   their contribution to the HHI in the market when they're two

7   separate firms?

8        So you square 25 percent, and that equals 625.  And you

9   square 2 percent, and that equals 4.  And you add 625 and 4,

10  and that's 629.  So those two firms would be contributing 629

11  points to the measure of concentration in that relevant market

12  when they were independent firms.

13       What if they merged?  Now we don't have two firms, one at

14  25 percent share and one at 2 percent share; we have a single

15  firm at 27 percent share.  And so what would the HHI look like

16  then?

17       You square 27 percent -- and this is why I did it in the

18  hotel room before because this I can't do in my head, but I

19  remember that it's 729.  And then the delta -- I mean, I chose

20  the 2 percent deliberately.  The delta is a hundred, right?

21       So that's in a moderately concentrated market, a firm

22  that has a market share of about 25 percent merging with a

23  firm that has 2 percent would give you a change in the HHI of

24  100, and the merger guideline says that is -- you know, that

25  would potentially raise significant competitive concerns and

JA1536

633

GREGORY ADAMS - DIRECT

1  often warrant scrutiny.

2      And I would suggest this isn't a big thing, right?  This

3  is not a big move so -- and 25 percent is not a big market

4  share.  I mean, we're not talking about a firm that's 70 or

5  80 percent.  But this is in a moderately concentrated market,

6  a firm of 25 percent or so, things that they do can

7  potentially raise significant competitive concerns and often

8  warrant scrutiny.  So they have market power.

9  Q.   Okay.  And why does market concentration matter to your

10  opinions?

11  A.   Well, it matters, you know, for this example I gave,

12  which is market concentration is a measure of market power

13  firms.  And so we think in economics we have models of what we

14  call oligopoly market.  So what's an oligopoly market?  Well,

15  the classic intro to economic markets are perfect competition

16  and monopoly.  But the reality is most markets aren't

17  perfectly competitive and most of them aren't monopolies.

18  They fall somewhere in the middle.  And an oligopoly is where

19  you have a few large firms, and that's what we see here.

20      We have a lot of models that study these markets and

21  they're complicated.  They're more complicated than the other

22  markets.  But one of the things that those models are clear

23  about is that as concentration increases, the ability of firms

24  within those markets to price above marginal cost increases.

25  The concentration is associated with increased price relative

JA1537

634

GREGORY ADAMS - DIRECT

1  to marginal cost.  And as I discussed before, price above
2  marginal cost is an indicia of market power.  So increased
3  concentration is an indicia of increased market power.
4  Q.   Okay.  And let's look at DX809.
5       Can you identify this document?
6  A.   Yes.  These are other guidelines.  These are antitrust
7  guidelines for the licensing of intellectual property.  These
8  are also issued jointly by the Federal Trade Commission and
9  the Department of Justice.
10  Q.   And did you rely on these documents for your opinions on
11  market concentration?
12  A.   I did.
13         MR. HOUGHTON:  Your Honor, we move in DX809.
14         THE COURT:  It's admitted.
15         (Defendant's Exhibit Number 809 was received into
16  evidence.)
17  Q.   What did you rely on in the licensing guidelines?
18  A.   A couple of things.  One is, you know, I've discussed
19  market concentration and how market concentration is important
20  in merger analysis and it's important in general antitrust.
21  It's important in economics.
22       The question might be is this -- this case is kind of
23  about licensing so does concentration matter there?  And it
24  does.  So here in the guidelines when they're discussing the
25  section Analysis of Anticompetitive Effects, which is what

GREGORY ADAMS - DIRECT

 1  we're up to here, it says the potential for competitive harm

 2  depends, in part, on the degree of concentration in, the

 3  difficulty of entry into, and the responsiveness of supply and

 4  demand to changes in price in the relevant markets.

 5       So concentration matters in mergers, it matters in

 6  general antitrust, it matters in licensing antitrust matters.

 7  Q.   Okay.  Was there anything else in the licensing

 8  guidelines that you relied on?

 9  A.   Yes.

10  Q.   And what was that?

11  A.   So the licensing guidelines provide a safety zone.  Often

12  the agencies' guidance provide these safety zones.  They're

13  typically market share based.  And so they will say, look, you

14  know, if you're a firm and you're below some threshold of

15  size, then your actions are unlikely to have anticompetitive

16  effects and therefore the agencies are unlikely to bring an

17  enforcement action against your conduct.  So it just gives

18  some guidance to firms.

19       But it tells us kind of what is too small to matter or

20  too small not necessarily to matter because they always keep

21  other options open; but, you know, it's too small to likely

22  matter.

23       And in this instance, the antitrust safety zone is

24  20 percent of market share.  And by the way, that's 20 percent

25  for the licensee and licensor, so in this instance it would be

GREGORY ADAMS - DIRECT

1  Honeywell and OPTO combined, but even just Honeywell is above
2  20 percent.  So they're not within the safety zone.  And what
3  that tells me is within economics and antitrust, they're not
4  too small to matter.
5  Q.   Okay.  And did you draw any conclusions from the HHI
6  analysis and the other documents you looked at here?
7  A.   Yes.  I drew the conclusion that Honeywell has market
8  power.
9  Q.   And what were the two types of evidence you looked at
10  again about market power?
11  A.   Yeah.  So going back, the direct evidence of market
12  power, both the price discrimination and the ability to
13  exclude.  So that's direct evidence that Honeywell has market
14  power.
15       And there's indirect evidence that Honeywell has market
16  power.  They successfully practice price discrimination.  I
17  shouldn't have put that in the indirect.  I think it's more
18  direct evidence, but either way it's evidence.
19       But Honeywell is a large player in a concentrated market.
20  As my example from the merger guidelines show in the change in
21  HHIs, what that says is, you know, a firm that's in a market
22  of this level of concentration that's about the size of
23  Honeywell, that's a firm that has market power.  It's -- you
24  know, it's a firm whose actions can lead to adverse impacts on
25  competition.

GREGORY ADAMS - DIRECT

1  Q.   Okay.  And you mentioned earlier that part of your
2  analysis was to look at the effect of the restraint.  So what
3  did you do here as part of that analysis?
4  A.   So I -- you know, we -- I observed that, one, there's a
5  distinct demand for scanners that can read stacked linear
6  barcodes.  And that laser scanners in particular, as a product
7  category within that, you know, provide a unique nexus of
8  competition because laser scanners lead to lower prices.
9  Image scanners have to have special versions that are
10 discounted to compete with them.  So that's -- there's -- it's
11 an important source of competition in the market:  Is image
12 scanners able to read stacked codes?
13      And in this instance the effect in the first order is
14 OPTO removed from the market its image scanners able to read
15 stacked codes.  And so the question then is, well, does
16 that -- I mean, it matters to OPTO, but does it matter to
17 consumers overall?  Is it an effect on competition?
18      So I looked to see what else was available of laser
19 scanners able to read stacked codes in the market.  You know,
20 are there a lot of those or not?
21 Q.   I think you might have said OPTO removed its image
22 scanners.  Was that right?
23 A.   Oh, I did not -- I'm sorry.  I may have well said that.
24 But OPTO removed its laser scanners, the accused products in
25 this case.

638

GREGORY ADAMS - DIRECT

1  Q.   And then you mentioned you looked at the rest of the
2  market.  How did you do that?
3  A.   Well, I looked.  I kind of acted like a customer.  I went
4  and reviewed product offerings at various suppliers.  We saw
5  the Honeywell, I think, scanner comparison guide, you know,
6  kind of their product book.  Honeywell, it's my understanding,
7  does not offer -- I think it was said here.  They don't offer
8  a laser scanner that can read a PDF417 so they don't have that
9  product in their product catalog.
10      I looked at Zebra, looked at their product catalog.  I
11  went to Datalogic, looked at their product catalog.  I think
12  Symbol and Code.  The suppliers I could find their product
13  catalogs, I went and looked directly at the product catalog.
14  Often you have to click through and look at some of the
15  technical specs to see what codes they can read.  I think
16  we've seen here in court a lot of these brochures or product
17  marketing materials that will say often on the second page the
18  codes that the scanner can read.  So you have to go look at
19  those and see.
20      I also went -- there's a number of resellers, Barcodes,
21  Incorporated, et cetera, that resell products.  They resell
22  Honeywell products.  I don't mean resell as used.  I mean
23  they're a distributor.  They sell Honeywell products and Zebra
24  products and Code and Symbol and a lot of the vendors.  Again,
25  you can go through their products and look and see are there

JA1542

GREGORY ADAMS - DIRECT

1  laser scanners available that can read stacked barcodes?

2  Q.   And what did you find?

3  A.   I found there are very few.  I found in particular only

4  two vendors offering four unique products.

5  Q.   And what are you showing here on this slide?

6  A.   So the first I found, this is from Zebra.  It's obviously

7  a handheld scanner.  As you see over on the right, it's

8  available in two models:  One that will just read simple

9  codes, 1D only, and one that will also read PDF/composite

10  codes.  So that's one product that's available.

11  Q.   Did you find any others?

12  A.   I found three other products all from the same supplier,

13  Microscan.  Microscan is a very small vendor.  They're on the

14  VDC research.  They're down pretty far, very near the bottom.

15  All three of these are obviously not handheld scanners.

16  They're fixed scanners.  These were the only products I was

17  able to locate that were laser scanners capable of reading a

18  stacked barcode.

19  Q.   Did you do anything to confirm your analysis?

20  A.   Yes.

21  Q.   What did you do?

22  A.   As I mentioned at the start of my testimony, I spoke with

23  Mr. Ackley who's very knowledgeable in the industry.  And one

24  of the things I spoke with him about was this.  I had done

25  this work at the time.  And I asked him, I said, this is what

GREGORY ADAMS - DIRECT

1  I'm looking for.  This is what I'm finding.  And he confirmed

2  my search.  He said no, there's not a lot of those products

3  available.

4  Q.   So what does all this tell you about the effect of the

5  restraint here?

6  A.   It tells me the effect of the restraint is real.  It's a

7  significant reduction in competition that, again, laser

8  scanners capable of reading stacked codes, they're a unique

9  source of competition.  They lead to lower prices.  And when

10  OPTO removed their products from the market, that was a

11  significant reduction in the availability of those products

12  overall.

13  Q.   Just to wrap up, can you run through your summary of

14  opinions one more time.

15  A.   Yes.  There's a demand, distinct demand, for scanners

16  that can read stacked barcodes.

17       And laser scanners are often a lower cost alternative for

18  those, so they're a good option for price-sensitive customers.

19       Honeywell has market power in a concentrated market.

20       And Honeywell's royalty demands caused OPTO to stop

21  selling laser scanners that can read stacked codes and that

22  led to a reduction in competition.

23            MR. HOUGHTON:  Thank you, Dr. Adams.

24            We pass the witness.

25            THE COURT:  Let me ask one question.

GREGORY ADAMS - CROSS

1          Did I understand you correctly that Honeywell does
2   not offer any laser scanners that can decode stacked barcode?
3          THE WITNESS:  I believe that's correct.  Of course,
4   there's other people here who could also -- they offer laser
5   scanners.  And they may have in the past offered laser
6   scanners capable of reading stacked barcode, but I do not
7   believe they currently do.
8          THE COURT:  So for that particular product,
9   Honeywell and OPTO are not direct competitors.
10          THE WITNESS:  Well, I would say they are direct
11   competitors for the customers of those products because a
12   substitute product is, for instance, the Voyager product that
13   can also only read a linear -- a simple barcode and a stacked
14   barcode.  I mean, that -- Honeywell deliberately created that
15   product to compete for those same customers so they compete
16   there.  I mean, that product was created to compete with laser
17   scanners.  So it's a cheap product -- cheap -- inexpensive
18   product for more price-sensitive customers, so they compete
19   for that group of customers.
20          THE COURT:  All right.  Thank you.
21          Let's take a 15-minutes recess.
22          (Brief recess at 3:28 PM.)
23          (Court back in session at 3:45 PM.)
24          THE COURT:  You may cross examine.
25          MR. STEVENS:  Thank you, Your Honor.

GREGORY ADAMS - CROSS

1                          GREGORY ADAMS

2                        CROSS EXAMINATION

3  BY MR. STEVENS:

4  Q.   Dr. Adams, at the time you issued your opinions, you had

5  never had any discussion or conversation with any OPTO

6  employee; is that right?

7  A.   That's correct.

8  Q.   So you've never spoken with an OPTO engineer, right?

9  A.   Correct.

10 Q.   And you had never spoken with an OPTO business person

11 when you came out with your opinions, true?

12 A.   Correct.

13 Q.   Just to rattle some names out, you've never had a

14 conversation Mr. Tanaka, true?

15 A.   True.

16 Q.   Never talked to Mr. Kamio; is that right?

17 A.   Correct.

18 Q.   Never talked to Mr. Stoop?

19 A.   Correct.

20 Q.   Never talked to Mr. De Winter, correct?

21 A.   Correct.

22 Q.   All right.  At least as of May, never had a single

23 conversation with anyone at OPTO, fair?

24 A.   Correct.

25 Q.   And you've offered yourself as an economist.  You're not

GREGORY ADAMS - CROSS

1  an accountant; is that right?

2  A.   That's correct.

3  Q.   You don't dispute that there were certain of OPTO's

4  laser-based products that were operable to decode PDF417 and

5  MicroPDF417 in the past, correct?

6  A.   I understand that's -- I don't have an opinion, you know,

7  one way or the other, but I understand that they did.  That's

8  why we're here.

9  Q.   And you understand that OPTO had CCD-based products in

10 the past that could decode those symbologies, fair?

11 A.   I do understand that, yes.

12 Q.   So at the time the parties signed the license, OPTO had

13 both laser and CCD-based products that were operable to decode

14 those symbologies.  You understand that?

15 A.   I understand that, yes.

16 Q.   Okay.  You also understand that at the time they signed

17 the agreement, OPTO had laser-based and CCD-based products

18 that did not support those symbologies.

19 A.   Yes.  I think that's right, yes.

20 Q.   So just to make sure we're on the same page, at the time

21 of the agreement, OPTO both had products -- laser and CCD

22 products that did support those symbologies and those that

23 didn't, fair?

24 A.   I think so.  The second part -- I mean, I know they -- I

25 know -- I mean, I haven't investigated it as fact, but I

644

GREGORY ADAMS - CROSS

1  understand they had the products that could decode stacked

2  barcodes.  That's what the dispute is about.  I'm pretty sure

3  they had laser scanners that would just read simple barcodes,

4  yeah.

5  Q.   All right.  And after this lawsuit was filed, OPTO took

6  the stacked code functionality out of its laser products,

7  right?

8  A.   Yes.

9  Q.   You haven't actually had a conversation with anyone at

10  OPTO about the reason they did that, have you?

11  A.   No.

12  Q.   I think you said on direct you have a baseline assumption

13  that that was removed because that was a, quote,

14  profit-maximizing decision; is that right?

15  A.   I assume that all the decisions that OPTO and Honeywell

16  make are profit-maximizing decisions, yes.

17          MR. STEVENS:  Okay.  Can I have the ELMO, please.

18  I'm going to do this the old-fashioned way.  How about that.

19  Q.   Now, did you look at any documentation about why OPTO

20  took that functionality out of its products?

21  A.   Not that I recall.

22  Q.   Okay.  Let's do that together.

23       You see that this is an OPTO document to Rex Industries.

24  Do you see that there?

25  A.   I do.

JA1548

645

GREGORY ADAMS - CROSS

1  Q.   Do you see it's called "1D Code Compatible Products,
2  Notice of Changes to Read-Compatible Code"?  Did I read that
3  right, sir?
4  A.   Yes.
5  Q.   And this is dated in December of 2021.  Do I have that
6  right, sir?
7  A.   Yeah, I think that's how to read that date.
8  Q.   And in that document some of the changes they're making
9  are removing the functionality for PDF417 and MicroPDF417 and
10  2D codes, right?
11  A.   Well, I haven't seen this document before, so...
12  Q.   Well, it says right there, "Details:  Removal of 'read
13  permission' in the following stack codes."  Fair?
14  A.   Okay.  Yep, I see that.
15  Q.   Okay.  And we look at the reason for change.  Do you see
16  that there, sir?  Number 3.  "Reason for change, conclusion."
17      Do you see that?
18  A.   I do.
19  Q.   All right.  And here under the second -- well, I'll read
20  the first part.  "In light of the difficulty obtaining
21  semiconductors, which is expected to continue in the future,
22  we are changing the software in order to secure candidate
23  substitute components."
24      Did I read that correctly, sir?
25  A.   You did.

JA1549

GREGORY ADAMS - CROSS

1  Q.   Okay.  And then right here it says, "By deleting the read

2  function for these stacked codes, we can reduce required

3  resources and enable the use of lower order components."

4       Is that right?

5  A.   That's what that says.

6  Q.   Is there anywhere on this page where it says it has

7  anything to do with this lawsuit or the royalty?

8  A.   Not that I see.

9            MR. STEVENS:  Your Honor, we'd offer Plaintiff's

10 185.

11           MR. HOUGHTON:  Your Honor, we'd object to that.

12 He's never seen the document before.

13           THE COURT:  Sustained.

14 Q.   Well, if you didn't see that one, did you look at this

15 document:  "1D Code Compatible Products, Notice of Changes to

16 Read-Compatible Code"?

17 A.   No.

18 Q.   Okay.  So this is another document you didn't look at

19 when you told the Court that the reason they took it out was

20 to make a profit-maximizing decision in light of the royalty.

21 A.   I have not reviewed this document.

22 Q.   Let's see what this one says.

23      Number 4, do you see again it says, "Reason for change,

24 conclusion"?

25 A.   I do see that section.

GREGORY ADAMS - CROSS

1  Q.   It says there, "With the spread of CMOS products" -- now,
2  let me pause there.
3       Do you know what CMOS is, sir?
4  A.   I believe it's a type of image scanner, so they're
5  talking about image scanners there.
6  Q.   That's right, yes, sir.
7       "With the spread of CMOS products with image scanner
8  products, we have ended CCD products stacked barcode reading."
9       Is that what it says?
10 A.   Yes.
11 Q.   Then it says, "Please contact sales for any
12 clarifications or to discuss requests."  Is that right?
13 A.   Yes.
14 Q.   So anywhere on this does it say that the reason they made
15 this change was because they didn't want to pay Honeywell
16 7 percent?
17 A.   Not under their reason for change here.
18 Q.   Now, one of the things that you said several times when
19 you were speaking earlier was, you know, you mentioned
20 Honeywell's conduct or royalty demand.  And I just want to
21 make sure that we're all clear on what that is.  That stems
22 from the agreement, correct?
23 A.   Oh, yeah, that -- yes.
24 Q.   Okay.  And that's an agreement that OPTO voluntarily
25 signed, right?

GREGORY ADAMS - CROSS

1  A.   I presume so.  It's the settlement agreement that's been
2  at issue in this litigation.
3  Q.   Okay.  So when you say there was a Honeywell royalty
4  demand, what you're talking about is the royalty that's in the
5  parties' joint agreement, right?
6  A.   I mean, I don't want to get into taking positions about
7  what is -- you know, what the settlement agreement says and
8  what, you know -- what royalties are required under the
9  settlement agreement.  As we talked about in my deposition,
10  I'm not offering opinions on contract interpretation and what
11  that License and Settlement Agreement says.
12  Q.   Okay.  I just want to make sure that we understand that
13  the genesis of this royalty demand -- we're not talking about
14  something different than the agreement that they agreed to; is
15  that right?
16  A.   We're talking about this lawsuit.  I mean, you know,
17  that's why we're here is because there was a disagreement
18  about that settlement and license agreement and what products
19  were royalty-bearing under that agreement.  So, yeah, I mean,
20  if that's -- that's what we're talking about.
21  Q.   Okay.  And you're not offering any opinions regarding the
22  meaning of any aspect of the agreement, fair?
23  A.   I am not offering legal opinions about contract
24  interpretation.
25  Q.   When a company puts the work into coming up with an

GREGORY ADAMS - CROSS

1  invention, that work usually costs time, effort, money, right?
2  A.    Normally work costs time, effort, and money.
3  Q.    So when Honeywell went to the effort to create all of its
4  patents, they had to invest money, R&D money, right?
5  A.    I would presume that some R&D expenses went into getting
6  those patents.
7  Q.    Okay.  And when someone else doesn't have to pay for
8  that, they can just take that -- what's disclosed in the
9  patent and they don't necessarily have to have the same R&D
10 spend; is that right, sir?
11 A.    It's a very general hypothetical.  But if you're asking
12 me if another company doesn't do that R&D spend, then they
13 don't do the R&D spend, yeah, that's true.
14 Q.    Okay.  Do you know how much OPTO has spent in R&D to
15 develop the products that use the Honeywell technology?
16 A.    I don't.
17 Q.    So you don't know how much money OPTO has actually saved
18 by using Honeywell's technology instead of developing their
19 own; is that right?
20 A.    I don't.  I don't know if they saved any.
21 Q.    And if they did, though, you can't quantify that for us,
22 can you?
23 A.    I'm not offering an opinion on that.
24 Q.    Now, I want to talk a little bit about your past.  You
25 have never offered testimony as to patent misuse in court

GREGORY ADAMS - CROSS

1  before, fair?

2  A.   That's correct.

3  Q.   In fact, before this case you've not authored an expert

4  report on the topic of patent misuse, true?

5  A.   No, not on patent misuse.  On other antitrust

6  counterclaims related to patent conduct, yes.  But

7  specifically as to patent misuse, no.

8  Q.   Okay.  You've never published in the area of patent

9  misuse, true?

10  A.   True.

11  Q.   You've never given a speech or been a panelist at a

12  presentation on the topic of patent misuse; is that right?

13  A.   True.  Again, related to other antitrust issues or

14  counterclaims related to licensing conduct, yes, but

15  specifically to patent misuse, no.

16  Q.   Okay.  You've never had any training and you've never

17  performed any course work on the topic of patent misuse,

18  correct?

19  A.   Specifically on the topic of patent misuse, no.  I have a

20  lot of training in economics and antitrust, including with

21  intellectual property and licensing.  But specific to patent

22  misuse, no.

23  Q.   Is there a counterclaim in this case for antitrust?

24  A.   No, but the issue's impact on the market, impact on

25  competition are -- those are antitrust topics.  It may not be

GREGORY ADAMS - CROSS

1  an antitrust legal claim.  That's definitely an antitrust
2  economic topic.
3  Q.   I want to talk a little bit broader than misuse for a
4  moment.  You can't give me a single example of a time that
5  you've testified before a judge or a jury in a patent case; is
6  that right?
7  A.   A judge or a jury in a patent case?
8  Q.   Yes, sir.
9  A.   I don't know.  You asked me at my deposition and I
10 couldn't recall one.  It hasn't happened since my deposition.
11 So possibly.
12 Q.   Now, you're employed by a company called CRA, right?
13 A.   Yes.  Charles River Associates, abbreviated CRA.
14 Q.   Your report and your words today, you're not speaking on
15 behalf of CRA, right?
16 A.   No.  All of the consultants at CRA, we speak on behalf of
17 ourselves.
18 Q.   Okay.  None of your co-vice presidents at CRA performed
19 any quality control or peer review of your report; is that
20 right?
21 A.   No.  They've never done for any of my reports.
22 Q.   Okay.  Now, I'd like to discuss some of the assumptions
23 that counsel in this case instructed you to assume.  Is that
24 all right?
25 A.   Yes.

652

GREGORY ADAMS - CROSS

1  Q.   Okay.  Now, counsel asked you to assume that Honeywell's,
2  quote, challenged conduct has the effect of impermissibly
3  broadening the scope of Honeywell's patent rights; is that
4  right?
5  A.   Right.  As I say in my report, I take that as an
6  assumption.  To make clear, I'm not offering opinions on that
7  topic.  I'm not saying the conduct here, was it an
8  impermissible broadening or, I think as Honeywell contends, it
9  was a -- I don't know what the right word is, but permissible
10 exercise of its patent rights.  I'm not offering opinions on
11 that.
12 Q.   Okay.  So let me just break that apart just to make sure
13 we're all clear.
14 A.   Yeah.
15 Q.   You're not offering any opinion that any conduct has the
16 effect of impermissibly broadening the scope of Honeywell's
17 patent rights, true?
18 A.   True.
19 Q.   Okay.  Now, I mentioned when I did the air quotes a
20 second ago, in your report, again, you said you were asked to
21 assume that Honeywell's challenged conduct has that effect.
22 But when I took your deposition, you didn't even know what the
23 challenged conduct was, right?
24 A.   I don't recall that, but you can read me my deposition or
25 show it to me.

JA1556

GREGORY ADAMS - CROSS

1  Q.   You said that you didn't have an understanding of
2  Honeywell's challenged conduct.  Do you remember saying that,
3  sir?
4  A.   I don't, but I may have.
5  Q.   Okay.  Well, let's look together.  I want to be fair to
6  you.
7       And I asked you, "Okay.  So the question that I had for
8  you is when you say that you were asked to assume for purposes
9  of your opinion something about Honeywell's challenged
10 conduct, what is your understanding of, quote, 'Honeywell's
11 challenged conduct?'"
12      And you said, "I don't have an understanding of
13 Honeywell's challenged conduct."
14      Did I ask you that question and did you give that answer,
15 sir?
16 A.   It appears so.
17 Q.   And when I asked you your understanding -- even if it was
18 just an assumption -- when I asked you your understanding of
19 how the Honeywell challenged conduct has the alleged effect of
20 impermissibly broadening the scope of Honeywell's patent
21 rights, you've told me that you have not sought to understand
22 that; is that true?
23 A.   Right, because I've not sought to offer any opinion about
24 whether Honeywell has or has not impermissibly broadened its
25 patent rights.  So I can see why I would say that because I

GREGORY ADAMS - CROSS

1  don't care about that issue.  I don't mean to say that I don't
2  care because I'm cavalier.  It's just that's not part of my
3  assignment.  It's not relevant to my opinions here.
4  Q.   Okay.  So again, going back to the contract.  You
5  understand the 2020 settlement agreement contract was
6  voluntarily entered into by the parties in this room, right?
7  A.   That's my understanding.
8  Q.   You agree that OPTO voluntarily agreed to pay an ongoing
9  7 percent royalty on any 2D Barcode Products, fair?
10  Q.   Again, without taking positions on, you know,
11  specifically contract interpretation, yes, there's a royalty
12  clause in there of 7 percent.
13  Q.   Okay.  And that is the 7 percent -- when you're talking
14  about Honeywell demanding some royalty, it's that 7 percent
15  from the agreement that you were talking about, fair?
16  A.   Right.  It's this dispute that brings us here, the
17  royalty dispute that brings us here, which I understand is
18  about that settlement agreement.  That's the conduct that I
19  understand led OPTO to withdraw the products from the market.
20  Q.   Okay.  So you had some questions earlier during your
21  direct where you talked about profitability.  Do you remember
22  using the term "profitability"?
23  A.   I do.
24  Q.   And I want to be clear.  When you use that term, you're
25  using it in an economic sense, not in an accounting sense,

GREGORY ADAMS - CROSS

 1  true?

 2  A.    Absolutely.  I'm an economist and I use that term in an

 3  economic sense.

 4  Q.    Okay.  So you don't know what the profit margins were on

 5  any of OPTO's laser or CCD-based products when they were

 6  operable to decode the symbologies; is that right?

 7  A.    Okay.  So we've just introduced the concept of different

 8  economic and accounting conceptions of profit.  So if you're

 9  going to ask me questions now, we should be clear which profit

10  margin.  Are you talking about an accounting profit margin or

11  an economic profit margin?

12  Q.    I mean, could you quantify either one?

13  A.    I could not quantify an accounting profit margin.  I

14  could -- I can know something about the economic profit

15  margins by the decisions that OPTO made.  So for instance,

16  they were offering certain products in the market for sale

17  given the cost structure and the cost that they were

18  incurring.  What can I conclude from that?  I can conclude

19  that they perceived it to be profit maximizing to offer those

20  products for sale.  So that tells me as an economic matter the

21  economic profit margin was positive.  Now, can I tell you was

22  it, you know, 5 percent or 6.3 or 2.7?  No.  I can tell you

23  it's greater than zero.

24  Q.    Okay.  So let's talk about accounting, then.  Can you

25  tell me what the accounting profit margin was on any of OPTO's

GREGORY ADAMS - CROSS

1  laser or CCD-based products before they made the change?
2  A.   No.  I did no analysis of accounting profit margins.
3  Q.   Okay.  It's entirely possible, then, that all those
4  products had an accounting margin greater than 7 percent,
5  true?
6  A.   It's possible.  An accounting margin could be anything
7  given the rules of accounting and how depreciation and
8  amortization is treated and fixed costs are allocated.  The
9  accounting margins could be not literally anything, but the
10 accounting margins could be a lot of things.
11 Q.   Okay.  They could be above 7 percent, true?
12 A.   It could be above 7 percent, correct.
13 Q.   All right.  It could also very well be true that there
14 would still be an accounting profit if they paid Honeywell the
15 7 percent, right?
16 A.   There could be.  Again, accounting margins can be
17 influenced by depreciation, amortization, tax treatments, how
18 fixed costs are allocated.  So -- but -- so yes, you know,
19 accounting margin, depending on how you accounted for all
20 those costs, could be greater than 7 -- I'm sorry -- it could
21 be -- it could be anything.  And again, not literally
22 anything, but it could be a lot of numbers.
23 Q.   Okay.  So you haven't done anything to figure out whether
24 they were still going to make an accounting profit if they had
25 made the decision to leave the functionality in and pay us,

GREGORY ADAMS - CROSS

1  right?

2  A.   I have not done any analysis of accounting data in this

3  case.

4  Q.   Okay.  So again, just clarify for me.  On your direct, if

5  anyone were to look it up down the road and see that you used

6  the word "unprofitable," you were talking in the economic

7  sense not in the accounting sense, true?

8  A.   Yes.

9  Q.   Thank you, sir.

10      Now, OPTO, when they made this change and took that

11  functionality out, they didn't lose even a single customer as

12  a result of the decision to remove the functionality from

13  laser and CCD-based products, correct?

14  A.   I can't say that's correct.

15  Q.   Because you just don't know one way or the other.

16  A.   I don't know.  I can't name a customer that they lost.

17  But I can't say they didn't either.  The data are ambiguous so

18  you can't say they did, but you can't say they didn't either.

19  It works both ways.

20  Q.   Fair enough.  But as we sit here today, you can't

21  identify for me one customer that they lost, true?

22  A.   Correct.

23  Q.   Let's put aside customers.  You can't identify a single

24  sale that OPTO lost as a result of its decision to remove the

25  functionality from those products, true?

JA1561

GREGORY ADAMS - CROSS

1  A.   Right.  It works both ways.  The data are messy and you
2  can't say that they did or did not.
3  Q.   Okay.  And again, this is the trial.  This is the day
4  that we sort of have to get all the facts out there.  You
5  can't identify for me a single sale that they lost as a result
6  of this decision, true?
7  A.   Correct.
8  Q.   So as you sit here right now, you can't tell me that OPTO
9  has lost even a penny in revenue or in economic -- I'm sorry,
10  in accounting profitability as a result of its decision to
11  take the functionality out of the product, right?
12  A.   No, I can't.  I mean, that's not an element of injury
13  because I'm not looking at injury to OPTO.  I'm looking at
14  injury to competition.  Looking for damages those would be
15  important factors.  But no, I can't tell you.
16  Q.   And you can't tell me that Honeywell has gained a penny
17  in revenue or profitability as a result of OPTO removing that
18  functionality, true?
19  A.   True.  I'm not looking at Honeywell's unjust enrichment
20  or some measure of Honeywell's scheme.
21  Q.   Okay.  You can't tell me that Zebra has gained even a
22  penny in revenue or profitability as a result of OPTO's taking
23  that functionality out, right?
24  A.   No.
25  Q.   You can't tell me that any other competitor in the

JA1562

GREGORY ADAMS - CROSS

1  barcode industry gained even a penny in revenue as a result of

2  OPTO's decision to take the functionality out as a result of

3  this lawsuit; is that right?

4  A.    Correct.

5  Q.    Now, you said this on your direct, but I want to go

6  through it with you.

7        You agree with me that OPTO could have made other

8  decisions as opposed to removing the functionality from its

9  product; is that right?

10  A.    Right.  Physically -- you know, there are other things

11  they physically and legally could have done.

12  Q.    Okay.  One of the things that they could have done is

13  kept the product -- kept the functionality in and paid the

14  royalty that they agreed to pay when they first signed the

15  agreement, true?

16  A.    As I discussed, that's something they could have done.

17  Q.    Okay.  And if that was a problem from a margin point of

18  view, they could have increased their prices, true?

19  A.    They could have increased their prices.  It would have

20  been an impact on the market, but they could have done it.

21  Q.    And you didn't attempt to quantify the price elasticity

22  for these products; is that true?

23  A.    That's true.  As I said, it's overwhelmingly likely that

24  some but not all of the cost increase would be passed through

25  because that's overwhelmingly likely in virtually any market

GREGORY ADAMS - CROSS

1  structure.  So it would have been passed through to a partial

2  degree.

3  Q.   So again, sir, I just want to ask you a straightforward

4  question.  You have not attempted to quantify the price

5  elasticity for these products; is that true?

6  A.   That's correct.

7  Q.   Now, another choice that OPTO could have made was to

8  continue to keep the functionality in, pay the royalty it

9  agreed to pay and decrease their accounting profit; is that

10 right?

11 A.   Yes.  If they had kept the products on the market, paid

12 the royalty, not increased the price, then by simple

13 arithmetic their accounting margin would have declined.  Their

14 economic margin would have declined as well.

15 Q.   And companies can decrease their profit margin while

16 still being profitable from an accounting point of view; is

17 that fair?

18 A.   Yes, as a general statement they could.

19 Q.   Now, you understand that the law allows a patent owner to

20 charge a royalty for a product that actually infringes one of

21 the patent holders' products; is that right?

22 A.   Caveat that I'm not an attorney and not offering legal

23 opinions, but, yes, in general.  I mean, it's the -- a

24 patentee is entitled to no less than a reasonable royalty.  So

25 yes, I mean, royalties -- charging a royalty in a licensing

GREGORY ADAMS - CROSS

1   agreement is something that happens a lot.

2   Q.   In fact, it's something that's a patent holder's right;

3   is that right?

4   A.   Yes.  Again, not offering legal opinions and -- you know,

5   like all rights, there's boundaries on those rights.  There's

6   limitations.  But, yes, patentees can license and charge

7   royalties.

8   Q.   And you mentioned this a moment ago, but you're aware

9   that the patent statute actually requires that you -- that if

10  it's in litigation and infringement is found, there must be an

11  award of damages no less than a reasonable royalty, true?

12           MR. HOUGHTON:  Objection, Your Honor.  This is

13  just --

14           THE COURT:  Sustained.

15  Q.   Now, are you aware in this case that OPTO has said and

16  represented that its products infringe perhaps scores of

17  Honeywell's products?

18           MR. HOUGHTON:  Objection, Your Honor, to the

19  relevance.

20           THE COURT:  Overruled this far.

21           THE WITNESS:  I've heard -- I've been in the

22  courtroom this week so I've heard that.  I've also seen it, I

23  believe, in maybe some of the pretrial motions.  So yes, I'm

24  aware.

25  Q.   Okay.

662

GREGORY ADAMS - CROSS

1  A.   Well, let me put it this way.  I'm aware it's been said
2  they said it.  I mean -- and I'm not disputing that they said
3  it.  But I wasn't there when they said it so I'm not an
4  eyewitness to that fact.
5  Q.   Fair enough.
6       Now, again, you haven't attempted to do any analysis as
7  to whether OPTO's products actually infringe Honeywell's
8  patents, right?
9  A.   Yeah, I have not performed any sort of infringement
10 analysis on any OPTO product on any Honeywell patent.
11 Q.   Okay.  And again, you're not suggesting that a patent
12 holder is somehow not allowed to charge a royalty against a
13 product that actually infringes, true?
14 A.   I'm not offering legal opinions about what patent holders
15 are allowed to do.
16 Q.   Okay.  And I think you may have said this earlier.  While
17 you've offered opinions regarding the impact of OPTO having to
18 pay a royalty, you've not offered any opinions as to whether
19 that royalty is a perfectly permissible exercise of
20 Honeywell's patent rights, true?
21 A.   I think so.  I mean, is that different --
22            THE COURT:  Mr. Stevens, the Court's aware of what
23 his opinions are and we can exclude everything else, so you
24 need not ask him everything that he is not opining about.
25            MR. STEVENS:  Okay.  Fair enough.

GREGORY ADAMS - CROSS

 1  Q.   So you mentioned -- I do want -- you brought this up
 2  during your direct and so this one I would like to have an
 3  understanding on.
 4       You had brought up the rule of reason.  I saw you put it
 5  on one of your slides, right?
 6  A.   Correct, yes.
 7  Q.   Okay.  But you're not offering an opinion regarding the
 8  results of the rule of reason test, true?
 9  A.   I think I am.  I'm offering an opinion that the conduct
10  has had an impact on the market.
11  Q.   Okay.  Sir, you remember you took a deposition, swore an
12  oath, right?
13  A.   Yes.
14  Q.   And I asked you, "So you're not offering an opinion, a
15  final opinion, regarding the results of a rule of reason test;
16  is that fair?"
17       And then you said, "That's correct."  And you went on to
18  say that you're offering some other things, but you're not
19  offering a final opinion on the rule of reason; is that right?
20            MR. HOUGHTON:  Your Honor, can we see the rest of
21  the --
22            THE WITNESS:  Apparently I said it, but, yeah, can I
23  see the rest --
24  Q.   Yeah, I'm sorry.  I didn't appreciate it wasn't on the
25  screen.  I apologize.

JA1567

664

GREGORY ADAMS - CROSS

1  A.   I'm trying to get the pagination here.

2       Can you slide it up?

3  Q.   I sure can.

4  A.   Okay.  That's correct.  I'm offering some components that

5  are useful for someone, a finder of factor -- I think that

6  should be a finder of fact.

7  Q.   I think that's probably right.

8  A.   I may have misspoke or it may have been mistranscribed.

9       A finder of fact or a legal entity making that

10 determination.

11      Yeah, so what I said is I'm not offering -- you know,

12 this is patent misuse.  That, I understand, is a question for

13 the Court.  I'm offering some economic analysis that I

14 understand goes into that determination.  But I'm not the

15 finder of fact -- or maybe it's the finder of law.  But I'm

16 not the decider.

17 Q.   You have not purported to walk through all of the tests

18 of a rule of reason.  You might have done certain subparts of

19 it, but you're not suggesting that you walked through that

20 entire test; is that fair?

21 A.   I'm saying that I evaluated competitive impact, so impact

22 on the market.

23 Q.   Okay.  And one of the other things you have not done is

24 weigh any procompetitive effects of the agreement between

25 Honeywell and OPTO; is that right?

JA1568

665

GREGORY ADAMS - CROSS

1  A.    Right.  As I said in my deposition, I don't know what
2  those would be.  I don't know what procompetitive effects
3  would be.  But I haven't attempted to analyze and quantify any
4  of those because I don't know what they would be.
5  Q.    Okay.  Now, you understand that the agreement is a
6  portfolio license, true?
7  A.    Yes.  I think today there was discussion about that.
8  Q.    Okay.  And during your direct testimony, you showed the
9  antitrust guidelines, not the merger guidelines, but the
10 intellectual property licensing guidelines.  Do you remember
11 talking about that?
12 A.    I do.
13 Q.    Okay.  And did you actually walk through it to see if
14 there's any practices in there like, you know, geographical
15 restrictions, field of use restrictions?  Did you walk through
16 any of that to see if there's anything in the Honeywell/OPTO
17 agreement that runs afoul of any of that?
18 A.    Do you mean did I read the agreement with those factors
19 in mind?
20 Q.    Yes, sir.
21 A.    Yes, I read the settlement agreement here quite a few
22 times.
23 Q.    Okay.
24 A.    I guess we discussed in my deposition, I don't think
25 there's a field of use restriction in there or a geographic

JA1569

GREGORY ADAMS - CROSS

1  restriction.

2  Q.   Okay.  Is there a -- I'm looking at the guidelines here.

3  There's a checklist.  Is there a horizontal restraint in the

4  Honeywell/OPTO settlement agreement?

5  A.   Arguably, yes.  I mean, the restraint here is on OPTO who

6  is a horizontal competitor of Honeywell.  That is the aspect.

7  This is not a vertical case.  This is a horizontal case.  So

8  to the degree there is a restraint here, it is a horizontal

9  restraint.

10 Q.   Okay.  Thank you for telling me that.  Let's come back to

11 that, then.

12      Is there any price maintenance or price requirements in

13 the agreement between OPTO and Honeywell?

14 A.   There's not resale price maintenance.

15 Q.   Okay.  Is there a tie-in arrangement in the agreement

16 between OPTO and Honeywell?

17 A.   I've been in the court here and there was a dispute.  I

18 know there was some discussion about tie-in and all of this.

19 I haven't -- I haven't analyzed this as an antitrust tie-in

20 case.  I haven't evaluated tie-in.

21 Q.   There's nothing that requires OPTO to buy some staple

22 good from Honeywell or for Honeywell to buy some staple good

23 from OPTO; is that true?

24 A.   I'm not aware of a tie-in good.

25 Q.   Is there anything in the agreement that has any sort of

GREGORY ADAMS - CROSS

1  exclusive dealings requirement between OPTO and Honeywell?

2  A.   I'm not aware of anything that would be characterized as

3  exclusive dealing.

4  Q.   Is the agreement -- is there any acquisition of

5  intellectual property rights in that agreement?

6  A.   Acquisition as opposed to licensing, no.  There is a

7  cross-license, but they're going both ways.  But it is a

8  non-exclusive cross-license.

9  Q.   And you got to my last point.  It's non-exclusive, not

10  exclusive, correct?

11  A.   The rights -- again, as I understand it, not being an

12  attorney, the rights granted are non-exclusive.

13  Q.   So there's nothing in the agreement between Honeywell and

14  OPTO that runs afoul of anything in the antitrust guidelines;

15  is that right?

16  A.   Well, no, I won't agree with that for a couple reasons.

17       One, it's a legal question, right, I mean, ultimately, so

18  I'm not offering legal opinions.

19       But also, I think what we've discussed is not the

20  complete guidelines.  I mean, if you look at the guidelines,

21  they do discuss the attempted enforcement of invalid or

22  unenforceable patent rights or maybe it's intellectual

23  property rights.  So that's discussed.  I mean, this conduct

24  here, as I understand the OPTO allegations, fall within that.

25  It's the attempted enforcement of invalid or unenforceable

GREGORY ADAMS - CROSS

1   property rights.

2        So, you know, the factors you mentioned, yes, I agree,

3   you know, those are aspects of licensing agreements between

4   horizontal parties that could raise antitrust scrutiny, but

5   that's not a comprehensive list.

6   Q.   So let's go back to the one that you point out, the

7   horizontal restraint.  I just want to make sure I understand

8   this.

9        There is nothing in the agreement that stops either party

10  from making whatever products they want.  There's no, like,

11  restriction that OPTO can't make more than a thousand barcode

12  readers a year.  There's nothing like that in this agreement,

13  fair?

14  A.   There's nothing like that.  The agreement has an effect

15  on OPTO's costs and that effect on OPTO's costs has an effect

16  on OPTO's quantity decisions, including whether they offer any

17  quantity of certain types of products at all.  But there's

18  nothing in there that says you can't make or you can only make

19  this number of a specific product.

20  Q.   Okay.  So the restraint that you're talking about is

21  simply that they have to choose to pay the 7 percent royalty

22  if they want to make the product, right?

23  A.   Yeah.  I hope I've been clear, yeah, that the conduct

24  we're talking about is the royalty demand on laser scanners

25  capable of decoding a stacked code.

GREGORY ADAMS - CROSS

1  Q.   You also understand that if an intellectual property
2  right, for example, a patent, does confer power, that power
3  does not by itself offend the antitrust laws, true?
4  A.   Right.  I've heard that and that's true.  I mean,
5  generally -- we keep saying, you know, patents create -- do
6  patents create market power?  Well, yes, they do.  Is that
7  actionable?  Well, no, that's the point.  Not always because
8  that's the point of a patent.  You know, the way patents
9  derive value is from their -- you know, their ability to
10  exclude.  That's what makes them valuable.  They're not art.
11  You know, we don't value them for their esthetic properties.
12  We value them for their ability to exclude.  So, yeah.
13      Now, you know, what's permissible?  Again, a legal
14  question.  And certainly patents, you know, do grant some
15  rights to exclude.  Again, that's what gives them value.  That
16  right is not unlimited.
17  Q.   Okay.  So I'd like to change gears and discuss the market
18  definition that you applied when you did your market analysis.
19  Is that okay?
20  A.   Uh-huh.
21  Q.   All right.  Now, the market you define is any scanner
22  that supports what you've identified as a stacked symbology;
23  is that right?
24  A.   Well, that's one area of commerce.  As I say, you know, I
25  identify scanners capable of reading stacked linear barcodes.

GREGORY ADAMS - CROSS

1  And then I focus on a segment of that market, price-sensitive
2  customers, so people who are price sensitive and customers who
3  need to read a stacked code.  And often because they're the
4  price-sensitive ones, these are customers who don't need to
5  read a matrix code.
6  Q.   Sir, if I have it right, I've got it right; if I've got
7  it wrong, I've got it wrong.
8  A.   Okay.
9  Q.   Did you define the market that you analyzed as any
10 scanner that supports what you've identified as a stacked
11 symbology?
12 A.   Right.  So as I said in my deposition and today, I think,
13 I haven't precisely defined all the boundaries of the relevant
14 market so -- of every product and supplier that might be in
15 that market.  The area of competition here, the products at
16 issue, are scanners that can read stacked barcodes.
17      Now, would that -- would competitive products in that
18 market include every scanner that could read a stacked barcode
19 and would they all be acceptable substitutes for the same
20 customers?  Maybe not.  I don't know.  I mean, there may be
21 some really expensive scanners that can read stacked barcodes
22 and not matrix codes.  They wouldn't necessarily compete for
23 the same customers that OPTO was selling the products in this
24 case to.
25 Q.   For example, one of the things -- you've not performed a

GREGORY ADAMS - CROSS

 1  SSNIP test; is that right?

 2  A.    That's correct.

 3  Q.    So you have not performed a rule of reason analysis to

 4  define the relevant marketplace as you would using a SSNIP

 5  test in an antitrust case; is that true?

 6  A.    Well, you've confounded a few things there.  I mean, the

 7  rule of reason analysis and the SSNIP test, I don't know that

 8  they have the relation that your question seems to imply.

 9      I performed a rule of reason analysis.  As I've said, I

10  haven't formally defined, you know, the precise boundaries of

11  the market.

12  Q.    Okay.  One of the alternative markets you looked into is

13  products that are just laser and CCD-based products that can

14  support what you call stacked symbologies.  You looked into

15  that market, right?

16  A.    Well, I looked a lot into those products because, as I

17  said, those products are important.  They provide a unique

18  competitive pressure.  Now, might that be a relevant market --

19  might that be an antitrust market?  It might be.  But, you

20  know, what you care about is the relevant antitrust market and

21  the word "relevant" does some work here.  And what's relevant

22  is, you know, in a merger case it's the -- you know, the area

23  where the two merging parties compete.  And in a, you know,

24  litigation, it's the area where the plaintiff and defendant

25  compete.  So you have to look there, where they compete.  So

672

GREGORY ADAMS - CROSS

1   there Honeywell competes in that market.  I think they say
2   they do.  They compete in that market with a low cost or
3   low-priced image sensor scanner.
4        So you can't draw -- you can draw the boundary too narrow
5   and you miss the nexus of competition that you're trying to
6   analyze.
7   Q.   My question was much simpler, sir.
8   A.   Okay.
9   Q.   Did you look into an alternative market involving just
10  laser and CCD-based products?  Did you look into that market?
11  A.   I certainly looked at products in there.
12  Q.   Okay.  And you found that Honeywell doesn't make any
13  products in that market, true?
14  A.   Right.  As we discussed, they do not make a laser scanner
15  capable of decoding a stacked barcode.
16  Q.   So if we were to analyze that market, Honeywell would
17  have a zero percent market share, true?
18  A.   Right.  That would not be a relevant antitrust market to
19  this case, but they would have a zero share in that market.
20  Q.   Okay.  Now, other companies do make products in that
21  market, like Zebra, true?
22  A.   Zebra does make a laser scanner capable of reading a
23  stacked code.
24  Q.   And Zebra has a license to Honeywell's technology; is
25  that true?

JA1576

GREGORY ADAMS - CROSS

1  A.   They do have a license with Honeywell.

2  Q.   Okay.  So I want to talk about some of the other

3  competitors.  You can't identify for me any competitor in the

4  market that you have identified that has increased prices in

5  light of OPTO's decision; is that right?

6  A.   That's correct.

7  Q.   And the market that you have actually used -- I know you

8  said you haven't precisely defined the market, but in the

9  market that you're talking about, Honeywell does not have the

10  greatest market share, true?

11  A.   Yeah, that's true.

12  Q.   Zebra has a bigger market share than Honeywell in the

13  market that you're looking at, right?

14  A.   Yeah.  They're close, but Zebra typically is a larger

15  firm.

16  Q.   Okay.  Now, in the actual market that you're talking

17  about, which is -- well, I withdraw the question.

18       In the actual market that you're talking about, you don't

19  know within that market what share of demand or market share

20  Honeywell has, right?

21  A.   Right.  Specifically for lower-priced scanners capable of

22  decoding a stacked barcode, you know, at that level, no, I

23  don't have sufficient data to calculate market shares within

24  that specific market.

25  Q.   Okay.  Within that market you can't tell me what OPTO's

GREGORY ADAMS - CROSS

1  market share is, right?

2  A.    Correct.

3  Q.    You can't tell me what Datalogic or CipherLab's market

4  share is, right?

5  A.    Correct.

6  Q.    You can't tell me what Code Corporation's or Brady's or

7  Cognex' or Denso's or Logic Controls' or Newland's or Omron's

8  or Socket Mobile's or Unitech's, you can't tell me what any of

9  those competitors' market share is in the market that you're

10  talking about, right?

11  A.    Correct.

12  Q.    And the market share data that you presented on direct,

13  what we saw from either -- there was VDC and the other one

14  just popped out of my brain.

15  A.    Meticulous.

16  Q.    Meticulous, thank you.  The market share data that you

17  presented from either Meticulous or VDC, that market share

18  data does not match up with the actual market that you're

19  analyzing vis-a-vis your opinions, true?

20  A.    Right, it doesn't precisely conform to it.  It's handheld

21  scanners, which is an important market segment and -- but it

22  does not zoom down to just laser scanners that can read

23  stacked barcodes and lower-priced image scanners that can read

24  stacked barcodes.

25  Q.    Okay.  Now, in the market that you analyzed, you can't

GREGORY ADAMS - CROSS

1  identify for me that there's been any lowering of output by
2  any of OPTO's competitors; is that right?  There's been no
3  restriction on output in that market by any of OPTO's
4  competitors; is that correct?
5  A.    By anyone other than OPTO.
6  Q.    Correct, yes, sir.
7  A.    Your statement is correct.
8  Q.    Thank you.
9        And you're not suggesting that Honeywell has the ability
10 to call -- excuse me.  I said it poorly.  Let me try again.
11       You're not saying that Honeywell has the ability to
12 charge supracompetitive prices in a durable manner in the
13 market as you have defined it, true?
14 A.    Well, I think -- I'm saying Honeywell has market power.
15 We know that from the concentration evidence.  And market
16 power is the ability to charge prices, you know, above the
17 competitive -- the perfectly competitive level.  So I think I
18 would be saying that.
19 Q.    Okay.  Has Honeywell raised its prices on any product,
20 even a penny, as a result of the decision OPTO made?
21 A.    Not that I know of.
22 Q.    Has any competitor in the whole market been able to raise
23 their prices a penny because of the decision they made?
24 A.    The decision who made?
25 Q.    OPTO.

GREGORY ADAMS - CROSS

 1  A.   Not that I know of.

 2  Q.   Okay.  You've not analyzed the barriers to entry of the

 3  market that you've defined; is that true?

 4  A.   That's true.

 5  Q.   I want to talk about customers, for a few minutes, of

 6  barcode readers.  Is that fair?

 7  A.   Sure.

 8  Q.   Okay.  Can you identify a single customer that's had to

 9  pay one penny more, either to OPTO or Honeywell or anyone else

10  in the industry, that's had to pay one penny more as a result

11  of OPTO's decision to take the functionality out of its

12  products?

13  A.   No.

14  Q.   Can you identify a single customer that has not been able

15  to purchase the SKU of its choosing as a result of OPTO's

16  taking the functionality out of its product?

17  A.   I can't name one for you now, but yeah, I can identify a

18  lot of those.

19  Q.   Can you identify just one by name?

20  A.   As I sit here?

21  Q.   Yes, sir.

22  A.   No.

23  Q.   Have you attempted to perform any analysis as to whether

24  any competitor, not just OPTO or Honeywell, but any competitor

25  in the market is capacity constrained with respect to any of

GREGORY ADAMS - CROSS

1  their barcode products?

2  A.   No.

3  Q.   So I'd like to turn and discuss your testimony about

4  alleged market concentration.  Is that okay?

5  A.   Uh-huh.

6  Q.   Several times in your direct you mentioned mergers, and I

7  just want to be clear here that nobody in this case is

8  attempting to merge.  Is that a fair statement?

9  A.   That's my understanding.  As I said, the merger

10  guidelines and the approaches there are widely used.  But,

11  yeah, this is not a merger case here.

12  Q.   Okay.  And so when you said the thing about whether a

13  merger increased the HHI by over a hundred, nobody here is

14  merging, fair?

15  A.   Nobody here is merging, but those -- those calculations

16  are informative as to market power for firms about the size of

17  Honeywell in markets that are as concentrated as the market

18  we're looking at.

19  Q.   Okay.  Now, the HHI -- can I just use that as the

20  shorthand?

21  A.   Please.

22  Q.   I'm going to get that wrong.  I'm going to eat my words

23  on that.  Tell me if I do.

24  A.   I always get the names wrong.  I reverse them.  So saying

25  HHI is better.

GREGORY ADAMS - CROSS

1  Q.   Okay.  The HHI data that you used and the analysis that
2  you draw from that data does not precisely match the relevant
3  market that you've analyzed, true?
4  A.   Right.  This is the same questions you asked about the
5  Meticulous data because that's what I used.  The Meticulous
6  data is for a broader market category.
7  Q.   Can you identify for me in any case law or precedent or
8  any sort of legal publications or journals where the use of
9  HHI has ever been applied in a patent misuse case?
10 A.   In a patent misuse case?
11 Q.   Yes, sir.
12 A.   No, but in antitrust cases it is very widely and
13 routinely applied.  So when you're analyzing competitive
14 effects on a market, HHI is very commonly applied.
15 Q.   I'm asking about a patent misuse case.  Can you cite to
16 me anything that's ever suggested that that's relevant to
17 patent misuse?
18 A.   In a patent misuse case, I can't tell you.
19 Q.   Okay.  So as far as you know, nobody has ever offered an
20 HHI analysis in respect to trying to prove a patent misuse
21 case.
22 A.   In a patent misuse case, I don't know.  But if you're
23 trying to analyze competitive effects, you're going to look at
24 an HHI very commonly.
25 Q.   And the brochure that you looked at, the DOJ brochure

JA1582

GREGORY ADAMS - CROSS

1  that says to analyze it, again, that's in the analysis -- the
2  title of the document tells us it's the analysis of a
3  horizontal merger, true?
4  A.   So you mean the merger guidelines?
5  Q.   That's what I mean, yes, sir.
6  A.   Right, yes.  So the merger guidelines, as I said, you
7  know, they're about mergers because that's what they're
8  called.
9  Q.   Okay.
10  A.   They're very widely used outside the merger context by
11  economists, by attorneys.  It's a very common approach.
12  Q.   Now, I want to talk about math for a second.
13  A.   Oh, okay.
14  Q.   Here we go.  You told --
15  A.   I've got my pen.
16  Q.   It's not going to require you to do any math.
17  A.   Okay.
18  Q.   The underlying math that goes into HHI, correct me if I
19  have it wrong, is you take everyone's market share, you square
20  it and you sum it; is that right?
21  A.   Right.
22  Q.   So for any particular market that you're looking at,
23  that's a defined number, fair?  What I mean by that is,
24  whether we're talking about something Honeywell did or OPTO
25  did or Zebra did or Denso Wave did, the HHI number is the

JA1583

GREGORY ADAMS - CROSS

1  same, fair?

2  A.    Right.  It's the market shares that matter.  It doesn't

3  matter the name attached to the firm; it's the market shares.

4  Q.    So if we were to analyze something that Denso did in this

5  market, the HHI number analysis that you did wouldn't change.

6  A.    Well, the HHI is the same.  Now, the competitive effects

7  may well be different because Denso -- I'd have to look.  They

8  could be a lot smaller and so the competitive effects could

9  differ.

10       The example I went through about the merger case and the

11  change of 100, that gets to that.  Because let's say you have

12  Denso, it's small, and they do the same thing.  They're going

13  to acquire a firm with 2 percent.  But if Denso has, I don't

14  know, say, 4 percent market share; so then 4 times 4 is 16,

15  and then 2 times 2 is 4.  So combined when they're

16  unconsolidated, they contribute 20 points to the change in

17  HHI.  And when they merge they become 6, so that's 36.  So the

18  change is 16.

19       So when you look at the DOJ HHI thresholds on mergers,

20  they talk about a change of 100.  And that's what's embodied

21  there is big firms doing a thing, you know, can lead to the

22  potential for anticompetitive effects.  I'm not saying it's

23  necessarily anticompetitive.  But big firms doing a thing in a

24  concentrated market can lead to potential for anticompetitive

25  effects where a small firm doing the same thing doesn't lead

681

GREGORY ADAMS - CROSS

 1  to the same potential.  So the size of the firm matters as
 2  well as the concentration in the market.
 3  Q.   Okay.  So my question is -- I'm not talking about a
 4  merger so let's just take that right out, okay?
 5  A.   All right.
 6  Q.   If we were to analyze anyone's actions in the barcode
 7  reading space, whether Denso raised its prices or Zebra
 8  lowered its output, or anything like that, no matter who the
 9  person that we're looking at is, that HHI number is static,
10  fair?
11  A.   The HHI number is static, but the potential for
12  anticompetitive effects is not.
13  Q.   Okay.  And for every action Honeywell ever takes in the
14  barcode reading market, if you were to analyze it, the HHI
15  number for that is static too, right?
16  A.   Right.  Given the market concentration, if market
17  concentration doesn't change, market concentration doesn't
18  change.
19  Q.   Right.  And you're not suggesting that there is any law
20  or any sort of legal effect that says you can't -- that
21  doesn't allow for patent licensing in a somewhat concentrated
22  market; is that right?
23  A.   No, I'm not saying it's prohibited.  I'm saying it could
24  be subject to antitrust scrutiny.
25  Q.   Okay.  And that's for a naked license.

JA1585

GREGORY ADAMS - CROSS

1    A.    Well, I've heard the term "naked license" and it brings
2    up odd pictures in my mind.  But what do you mean by naked
3    license?
4    Q.    Non-exclusive license.
5    A.    All right.
6    Q.    However much you want to make, you've just got to pay for
7    it.
8    A.    Right.  So, yeah.  I mean, that's why we have licensing
9    guidelines -- the antitrust guidelines for the evaluation of
10   license of intellectual property; because while licensing is
11   allowed, it can be a good thing in certain contexts, it can
12   also not be.  I mean, if it was always good, we wouldn't need
13   antitrust guidelines to evaluate it.
14   Q.    Right.  And the guidelines do have bullet points of
15   things to look for, right?
16   A.    They do have bullet point things to look for.
17   Q.    And you've not been able to find something on that bullet
18   point that this agreement runs afoul of; is that right?
19   A.    No, I disagree with that.  We just talked about this.
20   First of all, the list is not exclusive.  I don't know if it's
21   in the bullet points, but in the guidelines it does talk about
22   the attempted enforcement of invalid or unenforceable property
23   rights.  And I'm doing this from memory so I may not have that
24   exactly right.  But that's in there.
25   Q.    Right.  And you appreciate that Honeywell has a broad

GREGORY ADAMS - CROSS

1  portfolio of patents that no one has challenged the validity

2  of that go for a long, long time into the future, fair?

3  A.   I've heard a lot about Honeywell's patent portfolio here

4  so -- I don't have opinions on it, but I understand they do

5  have a lot of patents.

6  Q.   Okay.  You're not here to suggest that they're all

7  unenforceable or invalid, right?

8  A.   I am not here to suggest that Honeywell has or has not

9  impermissibly broadened the scope of their patent rights.

10  Q.   Okay.  One other topic I wanted to touch on.  You

11  mentioned during your direct testimony a gentleman by the name

12  of Mr. Ackley.  Do I have that right?

13  A.   Correct.

14  Q.   And it was counsel for OPTO that put you in touch with

15  him, fair?

16  A.   Yes.

17  Q.   And I think that you mentioned that Mr. Ackley -- and if

18  I heard you wrong, tell me.  On direct you said Mr. Ackley is

19  somebody who sort of knows some things about barcodes and he's

20  got some patents in the space; is that right?

21  A.   That's correct.

22  Q.   Okay.  In fact, in your report you reported that

23  Mr. Ackley is an inventor on a significant number of

24  barcode-related patents; is that right?

25  A.   That's what I understand.

GREGORY ADAMS - CROSS

1  Q.  And you and I walked through two of those at your
2  deposition; is that right?
3  A.  I recall going through patents.  I don't recall the
4  number.
5  Q.  Okay.  Well, let's peek at them.
6      First off PX215.  This is one of the patents that we
7  walked through at your deposition; is that right?
8  A.  Honestly, I don't remember; but if you tell me, I believe
9  you.
10 Q.  Okay.
11 A.  I mean, I remember walking through patents.  I don't
12 remember which particular ones.
13 Q.  Okay.  So I will represent to you that this is one of the
14 ones that we discussed at your deposition.
15 A.  I trust you on that.
16 Q.  And this is one -- you know, you mentioned in your report
17 and your testimony that Mr. Ackley has a lot of patents in the
18 barcode space, right?
19 A.  Right.
20 Q.  This is one of those; is that fair?
21 A.  It says Ackley on the patent, Inventor H. Sprague Ackley,
22 so I presume that's one of them.
23 Q.  And this is assigned to Handheld Products; is that right?
24 A.  Correct.
25          MR. STEVENS:  Your Honor, we'd offer Plaintiff's

GREGORY ADAMS - CROSS

```
 1  215.
 2          MR. HOUGHTON:  Objection.  It's irrelevant.
 3          THE COURT:  Yes, it is, but we'll admit it.
 4          (Plaintiff's Exhibit Number 215 was received into
 5  evidence.)
 6  Q.   And one of the other ones that we discussed was another
 7  one by Mr. Ackley; is that right?
 8  A.   We did discuss more than one patent by Mr. Ackley at my
 9  deposition.
10  Q.   And do you recall -- another quick math question.
11          In your deposition I put up a patent that had a 2016
12  filing date and a 2036 expiration date.  Do you recall that,
13  sir?
14  A.   No, not specifically.
15  Q.   But you do recall that we looked at a patent that went on
16  beyond the term of the agreement that we're talking about
17  here; is that fair?
18  A.   You know, I actually don't.  Again, I'll take your word
19  for it, but I don't recall that as I sit here.
20  Q.   And the patent that we looked at together at your
21  deposition had the name of "Implementation of algorithm to
22  decode two-dimensional barcode PDF417."  Do you recall that,
23  sir?
24  A.   No, I don't recall the title.
25          MR. HOUGHTON:  Your Honor, we'd object to this whole
```

686

GREGORY ADAMS - CROSS

 1  line as trying to bring in the patents that were excluded.
 2          THE COURT:  Sustained.  Move on.  None of this is
 3  helpful to the Court.  Move on.
 4          MR. STEVENS:  All right.
 5          In that case, Your Honor, I'm finished.
 6          THE COURT:  Any redirect?
 7          MR. HOUGHTON:  No, Your Honor.
 8          THE COURT:  You may stand down.  Thank you.
 9          THE WITNESS:  Thank you.
10          (Witness stepped down.)
11          THE COURT:  May this witness be released?
12          MR. STEVENS:  He may.
13          THE COURT:  Call your next witness.
14          MR. VanHOUTAN:  Defendant rests, Your Honor.
15          THE COURT:  Evidence for Honeywell?
16          MR. STEVENS:  So under 52(c), that was not changed
17  and they've now made their case.  Is it the time for us to
18  make that motion?
19          THE COURT:  Yes.
20          MR. STEVENS:  We believe that there's many, many
21  holes in their case.  They've not been able to suggest -- in
22  fact, they're not arguing that the products in question are
23  not covered by a patent.  In other words, they've conceded
24  that the products in question infringe as many as scores of
25  Honeywell's patents.

JA1590

687

1          Without that predicate fact, without them
2    establishing by clear and convincing evidence that there's a
3    product -- I'm sorry -- yes, a product that is not covered by
4    one of Honeywell's patents, I don't see how it could ever fall
5    within the ambit of patent misuse.
6          Moreover, on the economic side, the analysis that
7    you just heard was not done in the proper way.  He said that
8    he did not do a formal market analysis and define a relevant
9    market and go through the quantitative aspects of that.
10         Moreover, the alleged restraint on competition is
11    simply the fact that they chose to take functionality out
12    instead of paying the royalty and they could have made other
13    decisions.  That is simply suggesting that the exercise of a
14    patent right somehow created a market effect, and that's just
15    not what the law says.
16         So for that reason we think that you should grant a
17    43(a) motion here.
18         THE COURT:  And you say?
19         MR. VanHOUTAN:  It seems like we're talking past
20    each other a lot on this patent misuse issue.
21         There is no dispute 1D Barcode Products, no
22    Honeywell patents cover those.  He keeps referring to covering
23    and they admit scores.  They admit there are no patents that
24    cover those products.  There's only one functionality that
25    they say in this litigation transforms those products from the

JA1591

 1  covenant not to sue world, no patent rights, to a licensed
 2  product world and that's the ability to decode stacked barcode
 3  symbologies for which there is a multitude of evidence that
 4  they're trying to overcome that there is no patent that they
 5  have that's active for that.
 6          So that is the patent misuse.  That's the first
 7  element.  And that's clear.
 8          And then there's the anticompetitive effect.  That's
 9  the second thing.  We saw direct evidence that as a result of
10  this litigation and the demand for a 7 percent royalty on
11  additional products, OPTO removed that functionality from
12  those products effectively removing those products from the
13  market for low-cost customers.
14          And then Dr. Adams went through the market that he
15  defined --
16          THE COURT:  What's the evidence that that's the
17  reason they removed it from the market as opposed to on some
18  of the exhibits that were shown during cross?
19          MR. VanHOUTAN:  I would say that they've admitted in
20  their briefing that that's the reason that it was removed.
21          But there's a lot of circumstantial evidence showing
22  that they didn't remove it before this litigation.  There's no
23  evidence showing that it was removed for any other purpose.
24  It is only when -- and this makes a lot of sense -- when
25  7 percent was tacked on to these products, to the demand for

689

1  it, that's when they removed that functionality.

2          So that's only one aspect of the evidence.  The

3  second is they have market power in this competitive market

4  where the two companies come together and compete.  The HHI

5  analysis is clear.  It's a concentrated market.  They have

6  market power.  They have the power to move price and that

7  shows market power in this -- in this market.  So we've shown

8  it both directly and indirectly on that portion of the patent

9  misuse analysis.

10          THE COURT:  Well, the Court's going to reserve

11  ruling on this motion.

12          MR. STEVENS:  And just in case some appellate court

13  would ever get mad at me, we also move on the fact that

14  they're precluded from making this argument in the contract.

15  I appreciate you're going to reserve on it, but I don't want

16  to be said that I didn't say it.

17          THE COURT:  No, I understand that.

18          All right.  So can you forecast for me Honeywell's

19  evidence on this issue.

20          MR. STEVENS:  We have one deposition to play first

21  and then we have two witnesses that we're going to call.

22          MR. VanHOUTAN:  Your Honor, I would suggest that we

23  just move the deposition transcript into evidence versus

24  playing it.  I mean, that's really -- we're making an

25  evidentiary record here.

JA1593

690

1          THE COURT:  And that's fine with me.  I'm sure you

2     want to argue from it, but my guess is the arguments will most

3     substantively be in the proposed -- revised proposed findings

4     and conclusions.

5          You're looking like you don't want to just move it

6     into evidence.

7          MR. STEVENS:  I don't.  I think it's important

8     testimony.  I think Your Honor should see it and assess the

9     credibility of it and hear it in light of what you just heard.

10    It's not terribly long.

11         THE COURT:  No, I'll listen to it.

12         MR. STEVENS:  Okay.

13         THE COURT:  I'm not cutting anybody off.

14         MR. STEVENS:  I think we can get -- can anyone tell

15    me how long it is?

16         MS. GRIFFIN:  34 minutes.

17         MR. STEVENS:  It's 34 minutes.  And then we have two

18    witnesses, each of whom I'm going to assume, direct and cross,

19    is of the order of one hour.

20         THE COURT:  And I was willing to stay as late as

21    necessary because I was very much hoping to get through by

22    noon tomorrow, but it sounds like that is not going to be a

23    heavy lift no matter what we do.

24         MR. STEVENS:  It's not going to be a heavy lift to

25    get through by noon.  I think we will no matter what.

JA1594

```
 1          THE COURT:  And rebuttal, if there is any, will be
 2   not long?
 3          MR. VanHOUTAN:  Limited, Your Honor.
 4          THE COURT:  All right.  Well, let's just start back
 5   up, then, at 9:00 since I'm confident we'll get through by
 6   noon.  And the reason I was pushing for that -- we could have
 7   made other arrangements.  There's a memorial service here in
 8   the courthouse tomorrow at 1:00 for a former fellow assistant
 9   U.S. attorney and I was very much hoping to be able to attend.
10          If we're going to be done by noon -- of course, we
11   could have reconvened.  But if that schedule is going to work,
12   then I'm content to stop for the day.
13          MR. STEVENS:  We'll get you there, Your Honor.
14          THE COURT:  All right.  Court will be in recess
15   until 9:00 tomorrow morning.  Thank you all.
16          (Evening recess at 4:43 PM.)
17                          *****
18
19
20
21
22
23
24
25
```

```
 1  UNITED STATES DISTRICT COURT
 2  WESTERN DISTRICT OF NORTH CAROLINA
 3  CERTIFICATE OF REPORTER
 4
 5
 6          I, Cheryl A. Nuccio, Federal Official Realtime Court
 7  Reporter, in and for the United States District Court for the
 8  Western District of North Carolina, do hereby certify that
 9  pursuant to Section 753, Title 28, United States Code, that
10  the foregoing is a true and correct transcript of the
11  stenographically reported proceedings held in the
12  above-entitled matter and that the transcript page format is
13  in conformance with the regulations of the Judicial Conference
14  of the United States.
15
16          Dated this 6th day of August 2023.
17
18
19                          s/Cheryl A. Nuccio
20                          Cheryl A. Nuccio, RMR-CRR
                            Official Court Reporter
21
22
23
24
25
```

JA1596