Nos. 2023-1850, -2038

# United States Court of Appeals
*for the*
# Fourth Circuit

HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC.;
METROLOGIC INSTRUMENTS, INC.,

*Plaintiffs-Appellants/Cross-Appellees,*

*v.*

OPTO ELECTRONICS CO., LTD.,

*Defendant-Appellee/Cross-Appellant.*

**On Appeal from the United States District Court
for the Western District of North Carolina
Case No. 3:21-cv-506-KDB-DCK**

**JOINT APPENDIX
VOLUME 4 OF 16 (PAGES 1597-2135)**

Kirk T. Bradley
M. Scott Stevens
S. Benjamin Pleune
Stephen R. Lareau
Nicholas C. Marais
Lauren N. Griffin
Brandon C.E. Springer
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Ste. 300
Charlotte, NC 28203
(704) 444-1000

*Attorneys for Plaintiffs-Appellants
Honeywell International Inc.;
Hand-Held Products, Inc.; and
Metrologic Instruments, Inc.*

York M. Faulkner
YORKMOODYFAULKNER
711
Tensho Building, 7F
3-17-11 Shibaura
Tokyo, Minato-Ku, 108-0023
Japan
(202) 251-0837

Brian D. Schmalzbach
MCGUIREWOODS, LLP
800 East Canal Street
Richmond, Virginia 23219
(804) 775-4746

*Attorneys for Defendant-Appellee
Opto Electronics Co., Ltd.*

April 1, 2024

| **VOLUME 1 OF 16** | | |
|---|---|---|
| **Date** | **Description** | **Page** |
| | Docket Sheet | JA1 |
| 2021.09.24 | Complaint for Breach of Contract | JA51 |
| 2022.04.14 | Order on Motion to Dismiss | JA102 |
| 2022.08.29 | Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Admission | JA108 |
| 2023.02.16 | Order on Discovery Disputes | JA121 |
| 2023.02.22 | Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA125 |
| 2023.02.22 | EXHIBIT C – MDL-2001 Product Specification | JA128 |
| 2023.03.08 | Defendant OPTO Electronics Co., Ltd.'s Motion for Summary Judgment | JA131 |
| 2023.03.08 | EXHIBIT 1 – ITC Complaint | JA134 |
| 2023.03.08 | EXHIBIT 2 – ITC Order | JA189 |
| 2023.03.08 | EXHIBIT 3 – ITC Order and Honeywell's Response | JA194 |
| 2023.03.08 | EXHIBIT 4 – Claim Chart Excerpts | JA206 |
| 2023.03.08 | EXHIBIT 5 – ISO-IEC 15415 | JA209 |
| 2023.03.08 | EXHIBIT 6 – Honeywell Website | JA262 |
| 2023.03.08 | EXHIBIT 7 – U.S. Patent No. 5,243,655 | JA271 |
| 2023.03.08 | EXHIBIT 8 – ISO-IEC 15438 | JA300 |
| 2023.03.08 | EXHIBIT 9 – Accurate Data | JA417 |
| 2023.03.08 | EXHIBIT 10 – Honeywell Tech Support Page | JA421 |
| 2023.03.15 | EXHIBIT D – Wang Expert Report | JA424 |
| 2023.03.15 | EXHIBIT E – MDI-4050 Product Datasheet | JA437 |
| 2023.03.21 | Order denying OPTO's Objections to Magistrate Judge's Decision (Dkt. 125) | JA440 |
| 2023.03.22 | EXHIBIT A – L-22X Marketing Materials | JA452 |
| 2023.03.22 | EXHIBIT B – U.S. Patent No. 10,140,490 | JA455 |
| 2023.03.29 | Defendant's Reply in Support of Motion for Summary Judgment | JA470 |
| 2023.03.28 | OPTO Cover Motion for Summary Judgment on Patent Misuse | JA487 |
| 2023.03.29 | EXHIBIT 2 – U.S. Patent No. 7,159,783 | JA490 |
| 2023.04.20 | Summary Judgment Order | JA512 |

**VOLUME 2 OF 16**

| Date | Description | Page |
|------|-------------|------|
| 2023.05.01 | Honeywell's Motion for Reconsideration and Offer of Proof of Dkt. 195 | JA546 |
| 2023.05.01 | EXHIBIT S - OPTO Electronics Audit Report | JA549 |
| 2023.06.02 | Order Denying Honeywell's Motion for Reconsideration | JA565 |
| 2023.06.20 | Joint Stipulation of Facts | JA575 |
| 2023.07.05 | OPTO's Motion to Strike Honeywell's Second Amended Objections and Responses to OPTO's First Set of Interrogatories | JA579 |
| 2023.07.10 | EXHIBIT D – June 5, 2023 E-Mail from J. O'Brien | JA583 |
| 2023.07.10 | EXHIBIT E – OPTO's Amended Exhibit List | JA585 |
| 2023.07.10 | EXHIBIT H – Honeywell's First Amended Exhibit List | JA629 |
| 2023.07.13 | Transcript from July 11, 2023 Pre-Trial Conference | JA643 |
| 2023.07.13 | Order on Motions in Limine and Pretrial Matters | JA762 |
| 2023.07.18 | Order Granting OPTO's Motion to Strike Honeywell's Second Amended Objections and Responses to OPTO's First Set of Interrogatories | JA776 |
| 2023.07.19 | Verdict Form | JA781 |
| 2023.07.20 | Judgment in Case | JA783 |
| 2023.07.25 | Stipulation Regarding Jury Verdict Damages | JA784 |
| 2023.07.26 | Amended Judgment | JA787 |
| 2023.08.03 | Honeywell's Motion for Fees and Costs | JA788 |
| 2023.08.03 | Memorandum in support of Honeywell's Motion for Fees and Costs | JA791 |
| 2023.08.03 | EXHIBIT C – June 26, 2023 E-Mail from R. Muckenfuss | JA807 |
| 2023.08.03 | EXHIBIT D – OPTO Summary of Financial Results for Fiscal Year End 2022 | JA810 |
| 2023.08.03 | EXHIBIT E – OPTO Financial Statement | JA849 |
| 2023.08.03 | EXHIBIT F – Honeywell International Inc. et al v. Opticon, Inc. et al, C.A. 1:19-cv-1019-CFC (D. Del.) Complaint | JA870 |

| 2023.07.17 | Trial Transcript - Volume I | JA903 |
|---|---|---|
| | Testimony of Taylor Smith: | |
| | Direct Examination by Mr. Pleune | JA966 |
| | Cross Examination by Mr. Muckenfuss | JA973 |
| | | |
| | Testimony of Jeremy Christopher Whitley: | |
| | Direct Examination by Mr. Stevens | JA976 |
| | Cross Examination by Mr. VanHoutan | JA1001 |
| | Redirect Examination by Mr. Stevens | JA1009 |
| | | |
| | Testimony of Craig Smith: | |
| | Direct Examination by Mr. Marais | JA1017 |
| | Voir Dire Examination by Ms. Lehman | JA1026 |
| | Direct Examination by Mr. Marais | JA1030 |
| | Cross Examination by Ms. Lehman | JA1055 |
| | Redirect Examination by Mr. Marais | JA1078 |

**VOLUME 3 OF 16**

| Date | Description | Page |
|---|---|---|
| 2023.07.18 | Trial Transcript - Volume II | JA1089 |
| | Testimony of Adam Doane: | |
| | Direct Examination by Mr. Muckenfuss | JA1102 |
| | Cross Examination by Mr. Stevens | JA1170 |
| | Redirect Examination by Mr. Muckenfuss | JA1193 |
| | | |
| | Testimony of Paul Chartier: | |
| | Direct Examination by Mr. VanHoutan | JA1214 |
| | Cross Examination by Mr. Stevens | JA1262 |
| | Redirect Examination by Mr. VanHoutan | JA1292 |
| | Recross Examination by Mr. Stevens | JA1293 |
| | | |
| | Testimony of Rie Ashihara: | |
| | Direct Examination by Mr. VanHoutan | JA1297 |
| | Cross Examination by Mr. Stevens | JA1302 |
| | | |
| | Testimony of Cornelis Stoop: | |
| | Direct Examination by Mr. Stevens | JA1309 |
| | Cross Examination by Mr. VanHoutan | JA1323 |
| | Redirect Examination by Mr. Stevens | JA1328 |
| | Recross Examination by Mr. VanHoutan | JA1330 |

| | | |
|---|---|---|
| | Testimony of Rie Ashihara: | |
| | Direct Examination by Mr. Stevens | JA1331 |
| | Cross Examination by Mr. VanHoutan | JA1335 |
| | Redirect Examination by Mr. Stevens | JA1336 |
| 2023.07.19 | Trial Transcript - Volume III | JA1341 |
| | Testimony of Yoshiaki Kohmo: | |
| | Direct Examination by Mr. Stevens | JA1346 |
| | Testimony of Jeremy Whitley: | |
| | Direct Examination by Mr. VanHoutan | JA1439 |
| | Cross Examination by Mr. Stevens | JA1465 |
| | Redirect Examination by Mr. VanHoutan | JA1487 |
| | Testimony of Gregory Adams: | |
| | Direct Examination by Mr. Houghton | JA1492 |
| | Cross Examination by Mr. Stevens | JA1546 |
| **VOLUME 4 OF 16** | | |
| **Date** | **Description** | **Page** |
| 2023.07.20 | Trial Transcript - Volume IV | JA1597 |
| | Testimony of Shigeaki Tanaka: | |
| | Direct Examination by Mr. Stevens | JA1601 |
| | Testimony of David Taylor: | |
| | Direct Examination by Mr. Springer | JA1611 |
| | Voir Dire Examination by Mr. McCamey | JA1618 |
| | Direct Examination by Mr. Springer | JA1619 |
| | Cross Examination by Mr. McCamey | JA1636 |
| | Redirect Examination by Mr. Springer | JA1645 |
| | Testimony of Ryan N. Herrington: | |
| | Direct Examination by Mr. Lareau | JA1646 |
| | Cross Examination by Mr. VanHoutan | JA1660 |
| 2023.08.14 | Honeywell's Notice of Appeal to the Fourth Circuit | JA1688 |
| 2023.08.17 | EXHIBIT 3 – Zebra License and Settlement Agreement | JA1691 |
| 2023.08.17 | OPTO Motion for Judgment as a Matter of Law | JA1712 |
| 2023.08.17 | Trial Transcript Excerpt | JA1716 |
| | Testimony of Jeremy Christopher Whitley: | |
| | Direct Examination by Mr. Stevens | JA1720 |
| | Cross Examination by Mr. VanHoutan | JA1723 |

iv

| | | |
|---|---|---|
| 2023.08.17 | Trial Transcript Excerpt | JA1725 |
| | Testimony of Adam Doane: | |
| | Direct Examination by Mr. Muckenfuss | JA1732 |
| | Cross Examination by Mr. Stevens | JA1735 |
| | Testimony of Rie Ashihara: | |
| | Direct Examination by Mr. VanHoutan | JA1738 |
| | Redirect Examination by Mr. Stevens | JA1740 |
| 2023.08.17 | Trial Transcript Excerpt<br>Closing Argument by Mr. Stevens. | JA1742 |
| 2023.08.24 | Reply in Support of Motion for Fees and Costs | JA1746 |
| 2023.08.24 | EXHIBIT A – E-mail from Z. McCamey | JA1764 |
| 2023.08.31 | Honeywell's Response to OPTO's Motion for Judgment as a Matter of Law | JA1767 |
| 2023.09.27 | Order on Post-Trial Motions | JA1797 |
| 2023.10.02 | Honeywell's Amended Notice of Appeal to the United States Court of Appeals for the Fourth Circuit | JA1814 |
| 2023.10.04 | Notice of Appeal of Defendant OPTO Electronics Co., Ltd. to the United States Court of Appeals for the Fourth Circuit | JA1817 |
| 2023.10.27 | Honeywell's Notice of Appeal to the United States Court of Appeals for the Federal Circuit | JA1820 |
| 2023.11.07 | OPTO's Notice of Appeal to the United States Court of Appeals for the Federal Circuit | JA1823 |

| Exhibit | Description | Page No. |
|---|---|---|
| PX-5 | ISO/IEC 15438 | JA1827 |
| PX-12 | ISO/IEC 15415 | JA1943 |
| PX-17 | U.S. Patent No. 5,304,786 | JA1995 |
| PX-18 | MDL-2001 Datasheet | JA2046 |
| PX-19 | OPR-2001Z Leaflet | JA2048 |
| PX-62 | Auditor's Report and Internal Control Audit Report | JA2050 |
| PX-63 | Notice Regarding Filing of Lawsuit, Recording of Extraordinary Loss, and Revision of Consolidated Earnings Forecast for the Fiscal Year Ending November 2021, OPTO Press Release, November 30, 2021 | JA2072 |
| PX-87 | NLV-1001 Product Specification | JA2078 |
| PX-125 | MDL-1000 Specification | JA2080 |

| PX-188 | *In the Matter of Certain Barcode Scanners, Scan Engines, Products Containing the Same, and Components Thereof*, Complaint, Investigation No. 337-TA-1165 | JA2082 |

**VOLUME 5 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| PX-206 | U.S. Patent No. 9,465,970 | JA2136 |
| PX-207 | U.S. Patent No. 10,140,490 | JA2201 |
| PX-212 | U.S. Patent No. 7,159,783 | JA2215 |
| PX-214 | U.S. Patent No. 8,752,766 | JA2236 |
| PX-215 | U.S. Patent No. 9,230,140 | JA2266 |
| PX-216 | U.S. Patent No. 10,846,498 | JA2280 |
| PX-218 | U.S. Patent No. 10,235,547 | JA2308 |
| PX-225 | U.S. Patent No. 8,587,595 | JA2336 |
| PX-226 | U.S. Patent No. 9,092,686 | JA2348 |
| PX-227 | U.S. Patent No. 9,659,203 | JA2361 |
| PX-228 | U.S. Patent No. 9,384,378 | JA2374 |
| PX-319 | 3Q JASDAQ Regulatory Filing (Sept. 22, 2022) | JA2387 |
| PX-325 | OPTO's Objections and Responses to Honeywell's First Requests for Admission | JA2410 |
| DX-816 | US Patent No 7,387,253 | JA2423 |
| DX-818 | US Patent No 7,104,456 | JA2486 |

**VOLUME 6 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| DX-838 | US Patent No 7,472,831 | JA2546 |
| DX-848 | P. Chartier Trial Exhibit 1001 | JA2713 |
| DX-849 | P. Chartier Trial Exhibit 1002 | JA2857 |
| DX-850 | P. Chartier Trial Exhibit 1003 | JA2987 |

**VOLUME 7 OF 16**

| Exhibit | Description | Page No. |
|---|---|---|
| DX-851 | P. Chartier Trial Exhibit 1004 | JA3031 |
| DX-852 | P. Chartier Trial Exhibit 1005 | JA3083 |
| DX-853 | P. Chartier Trial Exhibit 1006 | JA3199 |
| DX-854 | P. Chartier Trial Exhibit 1007 | JA3201 |

| \multicolumn{3}{c}{**VOLUME 8 OF 16 – SEALED**} |
|---|---|---|
| **Date** | **Description** | **Page No.** |
| 2022.01.05 | Answer, Affirmative Defenses, and Counterclaims | JA3215 |
| 2022.04.11 | Hearing Transcript on Motion to Dismiss | JA3249 |
| 2022.08.11 | Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories | JA3293 |
| 2022.09.06 | Honeywell's Objections and Responses to Defendant's First Set of Interrogatories | JA3336 |
| 2022.09.06 | Honeywell's Objections and Responses to Defendant's First Set of Requests for Admission | JA3375 |
| 2022.09.21 | Deposition Transcript of J. Whitley | JA3393 |
| 2022.09.26 | Deposition Transcript of R. Ashihara | JA3574 |
| **VOLUME 9 OF 16 – SEALED** |
| **Date** | **Description** | **Page No.** |
| 2022.09.27 | Deposition Transcript of Y. Kohmo | JA3683 |
| 2022.09.29 | Defendant's Objections and Responses to Plaintiffs' Second Set of Interrogatories | JA3757 |
| 2022.09.29 | Defendant's Supplemental and Amended Objections and Responses to Plaintiffs' First Set of Interrogatories | JA3769 |
| 2022.09.30 | Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA3815 |
| 2022.10.21 | Expert Report of Mr. Ryan N. Herrington | JA3857 |
| 2022.11.18 | Expert Report of Dr. Greg Adams | JA3923 |
| 2023.02.22 | Memorandum in Support of Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA3950 |
| 2023.02.02 | EXHIBIT A – License and Settlement Agreement | JA3973 |
| 2023.02.22 | EXHIBIT B – July 1, 2019 Correspondence | JA4005 |
| 2023.02.22 | EXHIBIT D – September 21, 2022 J. Whitley Deposition Excerpts | JA4015 |
| 2023.02.22 | EXHIBIT E – September 29, 2022 OPTO's Supplemental Responses to First Interrogatories | JA4022 |
| 2023.02.22 | EXHIBIT F – September 29, 2022 OPTO's Objections and Responses to Second Interrogatories | JA4029 |
| 2023.02.22 | EXHIBIT G - G. Adams Expert Report Excerpts | JA4034 |

| 2022.02.25 | Transcript of February 15, 2022 Status Hearing and Discovery Conference | JA4043 |
|---|---|---|

### VOLUME 10 OF 16 – SEALED

| Date | Description | Page No. |
|---|---|---|
| 2023.03.02 | OPTO's Objections to Discovery Rulings | JA4223 |
| 2023.03.08 | Defendant's Memorandum in Support of Its Motion for Summary Judgment | JA4250 |
| 2023.03.08 | EXHIBIT 1 – First Amendment to License and Settlement Agreement | JA4282 |
| 2023.03.08 | EXHIBIT 2 – Second Amendment to License and Settlement Agreement | JA4285 |
| 2023.03.08 | EXHIBIT 3 – Application and Declaration for Remittance | JA4291 |
| 2023.03.08 | EXHIBIT 4 – Application and Declaration for Remittance | JA4293 |
| 2023.03.08 | EXHIBIT 5 – Quarterly Royalty Reports and Wire Transfer Receipts | JA4295 |
| 2023.03.08 | Defendant's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA4333 |
| 2023.03.15 | Reply in Support of Honeywell's Motion for Partial Summary Judgment and Legal Determinations Regarding Contractual Interpretation | JA4364 |
| 2023.03.15 | EXHIBIT A – OPTO's Supplemental and Amended Objections and Responses to First Set of Interrogatories | JA4381 |
| 2023.03.15 | EXHIBIT B – ISO/IEC 15438 | JA4398 |
| 2023.03.15 | EXHIBIT C – September 27, 2022 Excerpts from Deposition of Yoshiaki Kohmo | JA4515 |
| 2023.03.16 | Honeywell's Response to OPTO's Objections to Magistrate Judge's Decision | JA4523 |
| 2023.03.22 | Honeywell's Response in Opposition to OPTO's Motion for Summary Judgment | JA4551 |
| 2023.03.28 | Honeywell's Memo in Support of Motion for Partial Summary Judgment Regarding Patent Misuse | JA4576 |
| 2023.03.28 | EXHIBIT C – July 1, 2019 Correspondence from B. Pleune to K. Chu | JA4595 |

| Date | Description | Page No. |
|------|-------------|----------|
| 2023.03.28 | EXHIBIT D – Defendant's Supplemental and Amended Objections and Responses to Plaintiff's First Set of Interrogatories | JA4605 |
| 2023.03.29 | OPTO's Memorandum in Support of Motion for Summary Judgment Regarding Patent Misuse | JA4616 |
| 2023.04.10 | Honeywell's Opposition to OPTO's Motion for Summary Judgment Regarding Patent Misuse | JA4632 |
| 2023.04.10 | EXHIBIT A – September 30, 2022 Honeywell's First Amended Objections & Responses to OPTO's First Set of Interrogatories | JA4655 |
| 2023.04.10 | OPTO's Response to Honeywell's Patent Misuse Motion for Summary Judgment | JA4674 |

**VOLUME 11 OF 16 – SEALED**

| Date | Description | Page No. |
|------|-------------|----------|
| 2023.04.10 | EXHIBIT A – OPTO's Supplemental Responses to Plaintiffs' First Set of Interrogatories | JA4695 |
| 2023.05.01 | Memorandum in Support of Honeywell's Motion for Reconsideration of Dkt. 195 | JA4742 |
| 2023.05.01 | EXHIBIT A – License and Settlement Agreement | JA4769 |
| 2023.05.01 | EXHIBIT B – Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA4801 |
| 2023.05.01 | EXHIBIT C – Expert Report of Ryan N. Herrington | JA4844 |
| 2023.05.01 | EXHIBIT D – September 8, 2020 Letter to OPTO Electronics | JA4911 |
| 2023.05.01 | EXHIBIT E – September 16, 2020 E-mail from Counsel for OPTO | JA4914 |
| 2023.05.01 | EXHIBIT F – October 23, 2020 E-mail from Counsel for OPTO | JA4917 |
| 2023.05.01 | EXHIBIT G – December 16, 2020 Letter to Counsel for OPTO | JA4927 |
| 2023.05.01 | EXHIBIT H – January 1, 2021 E-mail from Counsel for OPTO | JA4929 |
| 2023.05.01 | EXHIBIT I – Non-Disclosure & Confidentiality Agreement | JA4936 |
| 2023.05.12 | EXHIBIT J – January 4, 2021 E-mail from Matsuzawa | JA4940 |

| 2023.05.12 | EXHIBIT K – January 6, 2021 E-mail from Matsuzawa | JA4952 |
|---|---|---|
| 2023.05.12 | EXHIBIT L – January 11, 2021 E-mail to Matsuzawa | JA4964 |
| 2023.05.12 | EXHIBIT M – January 15, 2021 E-mail to Matsuzawa | JA4980 |
| 2023.05.12 | EXHIBIT N – January 26, 2021 E-mail to Matsuzawa | JA4989 |
| 2023.05.12 | EXHIBIT O – February 1, 2021 and February 10, 2021 E-mails to Matsuzawa | JA5001 |
| 2023.05.12 | EXHIBIT P – February 3, 2021 E-mail to Matsuzawa | JA5012 |
| 2023.05.12 | EXHIBIT Q – March 31, 2021 E-mail to Matsuzawa | JA5018 |

| **VOLUME 12 OF 16 – SEALED** | | |
|---|---|---|
| **Date** | **Description** | **Page No.** |
| 2023.05.01 | EXHIBIT R – Deposition transcript of Rie Ashihara | JA5146 |
| 2023.05.01 | EXHIBIT S – April 13, 2023 Excerpts of Motions | JA5255 |
| 2023.05.10 | Hearing Transcript from Motions Heard on April 13. 2023 | JA5398 |
| 2023.05.15 | Defendant's Response in Opposition to Plaintiffs' Motion for Reconsideration of Dkt. 195 and Offer of Proof | JA5540 |
| 2023.05.22 | Honeywell's Reply in Support of Its Motion for Reconsideration and Offer of Proof | JA5568 |
| 2023.06.20 | OPTO's Proposed Findings of Fact and Conclusions of Law re Patent Misuse | JA5586 |
| 2023.06.20 | OPTO's Trial Brief | JA5605 |

| **VOLUME 13 OF 16 – SEALED** | | |
|---|---|---|
| **Date** | **Description** | **Page No.** |
| 2023.06.20 | Honeywell's Trial Brief Regarding Jury Trial | JA5626 |
| 2023.06.20 | Honeywell's Trial Brief Regarding Patent Misuse | JA5647 |
| 2023.06.20 | Honeywell's Proposed Findings of Fact and Conclusions of Law | JA5671 |
| 2023.07.05 | OPTO's Memorandum in Support of Motion to Strike | JA5690 |
| 2023.07.05 | EXHIBIT 1 – Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5706 |

| 2023.07.10 | Honeywell's Response to Motion to Strike | JA5753 |
|---|---|---|
| 2023.07.10 | EXHIBIT A – Honeywell's First Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5770 |
| 2023.07.10 | EXHIBIT B - Honeywell's Second Amended Objections and Responses to Defendant's First Set of Interrogatories | JA5813 |
| 2023.07.10 | EXHIBIT C - Redlined Version of Honeywell's Interrogatory Responses | JA5860 |
| 2023.07.10 | EXHIBIT F – December 27, 2022 OPTO's Second Supplemental Responses to Honeywell's First Set of Interrogatories | JA5908 |
| 2023.07.10 | EXHIBIT G – April 12, 2023 Rebuttal Expert Report of Ryan H. Herrington | JA5956 |
| 2023.07.10 | EXHIBIT I – October 21, 2022 Expert Report of David O. Taylor | JA6014 |
| 2023.08.03 | EXHIBIT A – License and Settlement Agreement | JA6072 |
| **VOLUME 14 OF 16 – SEALED** | | |
| **Date** | **Description** | **Page No.** |
| 2023.08.03 | EXHIBIT B – Declaration of M. Scott Stevens | JA6104 |
| 2023.08.17 | OPTO's Opposition to Honeywell's Motion for Attorney Fees and Costs | JA6263 |
| 2023.08.17 | EXHIBIT 1 – Fees and Costs Analysis | JA6295 |
| 2023.08.17 | EXHIBIT 2 – Metrologic Settlement and License Agreement | JA6317 |
| 2023.08.17 | EXHIBIT 4 – Doc Production Invoice | JA6333 |
| 2023.08.17 | EXHIBIT 5 – Invoice | JA6336 |
| 2023.08.17 | OPTO Memo in Support of Motion for Judgment as a Matter of Law | JA6338 |
| 2023.08.31 | EXHIBIT A – Defendant's Second Supplemental Objections and Responses to Plaintiff's Frist Set of Interrogatories | JA6369 |
| 2023.09.12 | OPTO Reply in Support of Motion for Judgment as a Matter of Law | JA6417 |

| **VOLUME 15 OF 16 – SEALED** | | |
|---|---|---|
| **Exhibit** | **Description** | **Page No.** |
| JX-1 | License and Settlement Agreement | JA6432 |
| JX-2 | First Amendment to License and Settlement Agreement | JA6436 |
| JX-3 | Second Amendment to License and Settlement Agreement | JA6465 |
| PX-4 | ISO/IEC 15438 | JA6470 |
| PX-8 | ISO/IEC 24728 | JA6586 |
| PX-10 | ISO/IEC 24723 | JA6710 |
| PX-13 | European Pre-Standard, ENV12925 | JA6762 |
| **VOLUME 16 OF 16 – SEALED** | | |
| **Exhibit** | **Description** | **Page No.** |
| PX-61 | Table of OPTO Interrogatory Response No. 3 | JA6878 |
| PX-243 | Letter from B. Pleune to Quinn Emanuel (dated July 1, 2019) | JA6925 |
| PX-244 | Pleune Correspondence to Goldstein (May 21, 2021) | JA6934 |
| PX-245 | Report Draft OP EU 4 April2021.xlsx (Enclosure to Audit Letter) | JA6936 |
| PX-246 | Report Draft OP-1 0220.xlsx (Enclosure to Audit Letter) | JA6969 |
| PX-247 | Report Draft OP US_20210414.xlsx (Enclosure to Audit Letter) | JA7068 |
| PX-259 | E-Mail Chain with R. Goldstein (October 23, 2020) | JA7096 |
| PX-261 | E-Mail Chain with R. Goldstein (January 12, 2021) | JA7105 |
| PX-288 | Pleune June 2021 correspondence to Goldstein | JA7111 |
| PX-289 | Matsuzawa & Co. Invoice in Japanese | JA7113 |
| DX-095 | September 16, 2020 Email from Goldstein to Pleune | JA7118 |
| DX-096 | September 16, 2020 Letter from Goldstein to Pleune | JA7120 |
| DX-098 | Sales Spreadsheets Sent by Goldstein to Pleune | JA7121 |
| DX-111 | September 30 – December 16 Email Thread Goldstein and Pleune | JA7175 |
| DX-769 | Honeywell's ITC Claims Charts | JA7184 |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL, INC.; HAND HELD PRODUCTS, INC.; AND METROLOGIC INSTRUMENTS, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 3:21-cv-506 |
| vs. | ) ) ) | VOLUME IV |
| OPTO ELECTRONICS COMPANY, LTD., | ) ) ) | |
| Defendant. | ) ) ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 20, 2023

APPEARANCES:

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

JA1597

APPEARANCES (Cont'd.)

        TYLER T. VanHOUTAN, ESQ.
        McGuireWoods, LLP
        Texas Tower, Suite 2400
        845 Texas Avenue
        Houston, Texas 77002

        CHRISTINE E. LEHMAN, ESQ.
        CONNOR S. HOUGHTON, ESQ.
        Reichman Jorgensen Lehman & Feldberg, LLP
        1909 K Street, NW
        Suite 800
        Washington, DC 20006

        YORK M. FAULKNER, ESQ.
        YorkMoodyFaulkner
        Tensho Building, 7F
        3-17-11 Shibaura, Suite 711
        Tokyo, Japan

                    CHERYL A. NUCCIO, RMR, CRR
                      Official Court Reporter
                    United States District Court
                     Charlotte, North Carolina

JA1598

694

1                          I N D E X

2    PLAINTIFF'S WITNESSES                           PAGE

3    SHIGEAKI TANAKA
         Direct Examination By Mr. Stevens          696
4

5    DAVID TAYLOR
         Direct Examination By Mr. Springer         706
6        Voir Dire Examination By Mr. McCamey       713
         Direct Examination By Mr. Springer         714
7        Cross Examination By Mr. McCamey           731
         Redirect Examination By Mr. Springer       740
8

9    RYAN N. HERRINGTON
         Direct Examination By Mr. Lareau           741
10       Cross Examination By Mr. VanHoutan         755

11                        E X H I B I T S

12   JOINT EXHIBITS

13   NUMBER                                       ADMITTED

14
15   2 .........................................716

16

17

18

19

20

21

22

23

24

25

JA1599

```
 1                    P R O C E E D I N G S
 2   THURSDAY MORNING, JULY 20, 2023
 3              (Court called to order at 8:58 AM.)
 4              THE COURT:  Good morning.
 5              ALL COUNSEL:  Good morning, Your Honor.
 6              THE COURT:  You may call your next witness.
 7              MR. PLEUNE:  Your Honor, we have just one brief
 8   housekeeping issue that we want to raise, although you may
 9   want to hear it at the end of the evidence, but the agreement
10   between the parties about damages.
11              THE COURT:  Yes.
12              MR. PLEUNE:  How would you like to receive that?
13              THE COURT:  Well, what are you going to give me?
14              MR. PLEUNE:  Fair.  We could certainly read the
15   emails into the record or we could submit something to you
16   that explains the parties' agreement on that.
17              THE COURT:  Yeah, why don't you submit something in
18   writing, some sort of joint proposed resolution, and that will
19   make the record clearer and simpler.
20              MR. PLEUNE:  Okay.  We'll do that.
21              THE COURT:  You may call your next witness.
22              MR. PLEUNE:  Call Professor David Taylor -- we'll
23   call Tanaka.  We have a video deposition that we're going to
24   start with.
25              THE COURT:  All right.
```

SHIGEAKI TANAKA - DIRECT

1              (The videotaped deposition of Shigeaki Tanaka was

2     played.  The transcript as reported by _____ is as

3     follows:)

4              SHIGEAKI TANAKA, PLAINTIFF'S WITNESS, SWORN,

5                        DIRECT EXAMINATION

6     BY MR. STEVENS:

7     Q.   Good morning.

8     A.   Good morning.

9     Q.   Could you please state your full name?

10    A.   Shigeaki Tanaka.

11    Q.   And, Mr. Tanaka, am I correct that you are on the board

12    of OPTO Electronics?

13    A.   Yes.

14    Q.   So you are a director of OPTO Electronics?

15    A.   Yes.

16    Q.   You're also an accountant or auditor for the company; is

17    that correct?

18    A.   Yes.

19    Q.   And so your consulting or auditing company provides the

20    auditing services for OPTO Electronics; is that correct, sir?

21    A.   My company provides tax support services, and I am on the

22    board as an external director, but I also serve as an auditor.

23    Q.   You attended the mediation in January of 2020 in Hawaii;

24    is that correct?

25    A.   Yes.

JA1601

SHIGEAKI TANAKA - DIRECT

1  Q.   And you appreciate that the final agreement between the
2  companies wasn't finalized for several weeks thereafter; is
3  that correct?
4  A.   Yes.
5  Q.   And were you involved in reviewing or offering edits to
6  the License and Settlement Agreement between the date of the
7  mediation and when it was actually executed?
8  A.   Well, what I mean by "review" is I was not working --
9  interacting with attorneys to go through every single wording
10 of it.  And that as -- because I'm a board member, I was in a
11 position to check the progress of this settlement, so that is
12 what I did in the last phase.
13 Q.   Okay.  So on the day of the mediation after all day of
14 negotiation, you, your colleague who was the leader of
15 finance, your two lawyers, and the board members all decided
16 to make the agreement with Honeywell.  Is that correct?
17 A.   Yes.
18 Q.   And then again, in order to sign the contract, when it
19 was ultimately signed, the whole board, including the lawyer
20 on the board, unanimously agreed to sign that agreement with
21 Honeywell; correct?
22 A.   Yes.
23 Q.   OPTO acquired a license to many more patents than just
24 those involved in the ITC investigation.  Isn't that true,
25 sir?

SHIGEAKI TANAKA - DIRECT

1  A.   It's not that OPTO acquired rights.  My understanding is
2  that through this settlement OPTO recognized that for the
3  things that were involved in ITC, OPTO needed to pay royalties
4  to Honeywell, and OPTO recognized that, and that's what led to
5  the settlement.
6  Q.   Are you aware that there is also a litigation between
7  Honeywell and OPTO Electronics in Delaware?
8  A.   Yes.
9  Q.   And the settlement agreement resolved that litigation as
10  well, didn't it?
11  A.   I'm aware of that.
12  Q.   And OPTO Electronics' laser scanners and its CCD scanners
13  were a subject of that litigation between Honeywell and OPTO
14  Electronics in Japan -- I'm sorry, in Delaware, correct?
15  A.   I don't know what was involved in the -- that particular
16  litigation.  However, my understanding is that ITC -- the
17  conclusion of the ITC investigation brought an end to the
18  Delaware litigation.
19  Q.   Okay.  So the ITC litigation and the Delaware litigation
20  were going forward, and then the parties settled, and that
21  January 2020 settlement agreement ended both of those
22  litigations.  Is that a fair summary?
23  A.   That is the -- my understanding.  I believe that was the
24  schedule.  Yes.
25  Q.   Sir, yes or no:  In the Delaware litigation, Honeywell

asserted that OPTO Electronics' CCD and laser-based products infringe one or more of Honeywell's patents?
A. I do not remember much about the ITC matter. Sorry.
Q. Again, I asked you about the Delaware case. So do you have the Delaware action in your mind, sir?
A. I do not remember the Delaware case at all -- as well.
MR. STEVENS: For the record, we've marked as Deposition Exhibit 1 a copy of the License and Settlement Agreement effective January 22, 2020, between OPTO and Honeywell. It starts with Production Number HONEYWELL-00251961.
Q. Sir, my question for you is this is the License and Settlement Agreement between OPTO and Honeywell for early 2020; is that correct?
A. Yes.
Q. In paragraph D, each of the parties reported that they wanted to avoid further risks and litigation expenses for the legal actions, in the plural, and that they were reaching a business resolution and settlement of the two, plural, legal actions; is that correct?
A. I can answer questions through the interpreter. However, I cannot tell you straight from this document what it says.
Q. Sir, you approved this very document before it was signed; is that correct, sir?
A. I was given a brief on the content of this -- the

SHIGEAKI TANAKA - DIRECT

1  document, and then I approved it.

2  Q.   And, sir, it's true that OPTO Electronics knew it was

3  resolving all of Honeywell's claims from the ITC and all of

4  Honeywell's claims from the Delaware action when OPTO entered

5  into this settlement and license agreement.  Isn't that

6  correct?

7  A.   OPTO's understanding is that by settling the ITC, the

8  case, it would be able to resolve the Delaware case as well.

9  Q.   Let me ask you to turn your attention to page 13 of the

10  agreement, sir.  And there's a section that says "9.4.

11  Construction."  Let me just know when you see that on the

12  screen.

13  A.   Yes.

14  Q.   I'm going to read it in English so that it's translated

15  for you.  I'm going to read the first sentence in English so

16  it's translated for you.  It says, quote:

17       "This Agreement shall be construed as if equally drafted

18  by the Parties hereto."

19       Do you see that sentence, sir?

20  A.   I see where -- I think I know where you're pointing to.

21  However, this is in English, and I don't know if what I'm

22  hearing through the interpreter and my understanding are an

23  exact match.

24  Q.   What is your understanding of the sentence that says,

25  quote:  "This Agreement shall be construed as if equally

SHIGEAKI TANAKA - DIRECT

1  drafted by the Parties hereto"?

2  A.   The attorney we had at the time checked this document,

3  and the word "equally" was used from the checking.  And we

4  were in a position to approve that document.  And in this

5  document, I believe the word was used because the parties

6  involved were on the same page.

7  Q.   About a year after the parties entered into the 2020

8  agreement, they entered into the second amendment to the

9  agreement in 2021.  Is that right?

10 A.   Yes.

11 Q.   And, again, you and your board members approved that and

12 you were represented by counsel with respect to the signing of

13 the second amendment to the settlement agreement; is that

14 right?

15 A.   Yes.

16 Q.   You understand that you have been designated to speak on

17 behalf of the company with respect to:

18      "Any alleged limitation on OPTO's ability to compete in

19 an alternative market... and unlawfully supporting prices in

20 the 2D barcode reader market that Honeywell dominates by

21 raising the prices of substitute 1D barcode readers."

22      Do you understand that, sir?

23 A.   Is this question about -- related to the countersuit from

24 our side?

25           MR. STEVENS:  Counsel, can you stipulate that he's

SHIGEAKI TANAKA - DIRECT

1  been put up on Topic 31?

2          MR. McCAMEY:  Yes.

3  Q.   Sir, you appreciate that outside the United States the

4  agreement between OPTO and Honeywell results in an annual

5  payment to be made regardless of how many products OPTO or

6  OPTO Sensors Europe sells?

7  A.   Yes.

8  Q.   And in the United States, Opticon has to pay a royalty

9  for certain products that it sells.  Is that correct?

10 A.   Yes.

11 Q.   Has Opticon Inc. lost any customers in the United States

12 based on this lawsuit?

13 A.   I don't know.

14 Q.   Has Opticon Inc. lost any sales in the United States

15 based upon any changes that might have been made as a result

16 of this litigation?

17 A.   I don't know what factor contributed to the sales.  And,

18 however, I can say for sure that there was a change in sales,

19 and also the raw cost ratio went up.

20 Q.   What was the change in sales that you're referring to?

21 A.   Up and down in sales.

22 Q.   Okay.  And are any of those ups or downs as a result of

23 the removal of any barcode symbology from any of Opticon's

24 products?

25 A.   I do not know clearly that is the reason because this was

SHIGEAKI TANAKA - DIRECT

1  a time when COVID hit, so I don't know the direct reason.

2  Q.   Have any of Opticon Inc.'s customers raised any concern

3  regarding the removal of PDF417, as an example, from certain

4  of Opticon Inc.'s products?

5  A.   Overseas subsidiaries, the sales details, that is, the

6  details of the substance of the sales were not reported to the

7  board of directors, so I don't know.

8  Q.   I'm asking whether you have any knowledge as to whether

9  Honeywell has been -- has even attempted to or has been

10  successful in raising prices as a result of this litigation?

11  A.   I have no idea on that.

12  Q.   Who is the biggest provider of barcode readers in the

13  United States?

14  A.   Zebra.

15  Q.   Do you know whether Zebra is licensed to Honeywell's

16  barcode reader portfolio?

17  A.   I heard about it.

18  Q.   And what market share do you believe Honeywell has in the

19  United States for barcode reader products?

20  A.   I do know that Honeywell has a substantial share.  But I

21  don't know the exact number.

22  Q.   But as you said a moment ago, Honeywell's not even the

23  Number 1 player as far as share of demand or market share goes

24  in the United States; is that correct?

25  A.   At this point in time, that is correct.

SHIGEAKI TANAKA - DIRECT

1  Q.   And that's been true ever since you guys signed the
2  agreement in January of 2020 and that's true all the way up to
3  today, correct?
4  A.   It probably has not changed.
5  Q.   How, if at all, has this litigation adversely affected
6  Opticon's business?
7  A.   Are you talking about this particular litigation or the
8  result of the settlement?
9  A.   I'm talking about -- well, I'll ask both.  The result of
10  the settlement, how has that hurt, if at all, Opticon's
11  ability to compete in the United States market?
12  A.   So let's get to the first part about the result of the
13  settlement.  Did that impact our -- adversely impact our
14  competitiveness?  Well, we don't have numerical data to
15  support that, so I don't know.  And, however, our company, we
16  fully agreed to the terms of the 2020 settlement.  That is why
17  we signed it.  And as a result it pushed out -- pushed up our
18  raw cost ratio.  That happened as a result.
19      As for this litigation, well, we agreed to the terms of
20  the settlement.  And the cost, the laser scanner was out of
21  scope.  That was OPTO's understanding, and that is why we
22  settled, and that is why we agreed to designate the
23  specified -- the royalty rate.
24      But if that is not the case and the laser scanners are
25  actually in the scope, then if that is the case, we would not

SHIGEAKI TANAKA - DIRECT

1  have settled in the first place.  We would not have agreed to
2  the royalty rate that was agreed upon.
3      And -- because if the laser products are included, then
4  that is going to adversely affect our profitability and also
5  push -- further push up our raw cost, so that would impact our
6  business significantly more.
7  Q.  Describe for me the market for stacked linear barcode
8  decoding.
9  A.  I don't know much about it.
10 Q.  So OPTO has contended in this case that there's a
11 lucrative market for stacked linear barcode decoding.
12     As the director of OPTO Electronics, can you speak to
13 that alleged lucrative market?
14 A.  I'm not a director in charge of that part, so I don't
15 know.
16 Q.  Have you ever heard of the market for stacked linear
17 barcode decoding?
18 A.  I've seen stacked code, but never heard of market.
19 Q.  And Opticon Inc. still has plenty of products that will
20 decode stacked barcodes; correct?
21 A.  No.  I don't know the technical detail on this matter.
22 And -- because when it comes to the stacked code, the extent
23 of my knowledge is very limited.  I didn't know that the laser
24 product could read the stacked code.  And Opticon has the
25 laser products, but my understanding was that these products

DAVID TAYLOR - DIRECT

1  were able to read regular barcodes, not the stacked code.  I
2  didn't know that.
3  Q.   Do you know whether Honeywell sells any laser-based
4  products in the United States that can read a stacked code?
5  A.   I don't know.
6  Q.   With respect to the laser-based or CCD-based products,
7  does Honeywell have any market power in the, quote, lucrative
8  market for stacked linear barcode decoding?
9  A.   I don't know.
10              (End of videotaped deposition.)
11              MR. PLEUNE:  That's it.
12              THE COURT:  Thank you.  You may call your next
13  witness.
14              MR. PLEUNE:  Plaintiffs now calls Professor David
15  Taylor.
16              MR. McCAMEY:  Your Honor, OPTO would reraise the
17  objection made in our MILs to Professor Taylor's testimony.  I
18  think Your Honor has partially ruled on that in the MIL order
19  and suggested that you would ask for a proffer as to what his
20  testimony would be to provide a proper scope.
21              THE COURT:  Well, I think we can just do that live;
22  and, if necessary, the Court will strike any testimony.
23              DAVID TAYLOR, PLAINTIFF'S WITNESS, SWORN,
24                     DIRECT EXAMINATION
25  BY MR. SPRINGER:

DAVID TAYLOR - DIRECT

1  Q.   Good morning, Professor Taylor.
2  A.   Good morning.
3  Q.   Could you please introduce yourself to the Court.
4  A.   Yes.  I'm David Taylor.  I'm a professor at the SMU
5  Dedman School of Law in Dallas, Texas.
6  Q.   Can you tell us a little bit about yourself.
7  A.   Sure.  I'm a native Texan.  Was born in Irving, Texas.  I
8  attended Texas A&M University for my bachelor's degree and
9  then attended Harvard Law School.  I worked at Baker Botts, a
10 law firm in Dallas, Texas.  And ultimately ended up at SMU
11 where I work today.
12 Q.   What did you study in college?
13 A.   In college my degree is in mechanical engineering.
14 Q.   And did you graduate?
15 A.   I did.
16 Q.   What did you do after graduating from Texas A&M?
17 A.   After graduating I went to work for National Instruments
18 Corporation in Austin, Texas.  They provide computer hardware
19 and software products, and I did technical support for those
20 products.
21 Q.   Did you also go to law school?
22 A.   Yes.  After leaving National Instruments, I went to
23 Cambridge to Harvard Law School and graduated with my JD
24 there.
25 Q.   What did you do after graduating from Harvard?

JA1612

DAVID TAYLOR - DIRECT

1  A.   After graduating I went to Dallas and started working at
2  the law firm of Baker Botts in the intellectual property
3  department doing primarily patent prosecution, but that
4  involves obtaining assignments from vendors, drafting patent
5  applications, filing patent applications, corresponding with
6  the patent office.  During that time I became a registered
7  patent attorney.  And also during that time I edited
8  intellectual property agreements.
9  Q.   And how long were you at Baker Botts at that point in
10 time?
11 A.   At that point it was a year.  Then I left Baker Botts to
12 go clerk for the U.S. Court of Appeals for the Federal Circuit
13 in Washington, DC.
14 Q.   And could you tell me about your experience there.
15 A.   Yes.  At the federal circuit they have exclusive
16 jurisdiction over appeals in patent cases, so I worked on --
17 helped my judge with appeals on patent cases both from
18 district courts and from the International Trade Commission.
19 The court also has the exclusive jurisdiction over appeals in
20 government contract cases filed at the Court of Federal
21 Claims, and so I helped my judge with those types of cases as
22 well.  Many other types of cases beyond those.
23 Q.   And how long was that clerkship?
24 A.   I clerked for about a year.
25 Q.   And what did you do after that?

DAVID TAYLOR - DIRECT

1  A.    After my clerkship I went back to Baker Botts and went
2  back to the intellectual property department in Dallas, and
3  from that time I was primarily doing patent litigation which
4  involved all aspects of litigation and district court.
5  appeals.  That work also involved negotiating, drafting,
6  editing settlement agreements and license agreements.
7  Q.    And how long were you in that role?
8  A.    After my clerkship, I think it it was about five and a
9  half years before I then left the firm to join the law school
10  at SMU.
11  Q.    And could you tell me about that.
12  A.    Sure.  I've been at SMU since 2011, and I teach patent
13  law, selected topics in intellectual property, intellectual
14  property, patent law institutional choice, contracts one,
15  contracts two.  I think that covers the classes I teach.  Then
16  I do research in the area of intellectual property.
17  Q.    Could you tell us a little bit about your research.
18  A.    So I've written parts of two books.  One book is on
19  patent remedies for complex products, complex products meaning
20  products that use multiple technologies covered by multiple
21  patents.  And I have another portion of a case book I drafted
22  a chapter on patent utility.
23        I drafted -- I've done research, surveys, drafted many
24  articles on various aspects of intellectual property.  An
25  example would be an article I wrote on using reasonable

DAVID TAYLOR - DIRECT

1  royalties to value patented technology.  But there are many
2  articles.
3  Q.    And I neglected to ask you, what is your current position
4  at SMU?
5  A.    So I'm a professor of law, but I'm also the co-director
6  of the Tsai Center for Law, Science and Innovation.
7  Q.    And what is that?
8  A.    The Tsai Center is an academic center I helped found.  It
9  now has about a $5 million endowment.  It funds the research
10 that I do in the area of intellectual property.
11 Q.    And going back to your time at Baker Botts, did you work
12 on patent licensing agreements?
13 A.    Yes.  Patent licensing agreements in my first stint as
14 well as in my second stint, including in the context of
15 settling litigation.
16 Q.    And in your current role at SMU, do you interact with
17 patent licensing agreements?
18 A.    Yes.  I mentioned an article that's about royalties and
19 that involves analyzing license agreements.
20 Q.    Have you ever served as an expert witness before?
21 A.    I have.  In about the last seven years I think I've
22 worked on about 15 cases.
23 Q.    Could you tell me a little bit more about those cases.
24 A.    So they really fall into two camps.  One is domestic
25 cases whether it's in state court or federal court in the

DAVID TAYLOR - DIRECT

1 United States and then another set of cases is the
2 international cases.  The state and federal cases, about 12
3 cases.  The international cases, about three.  And they're
4 very different.
5       In the international cases I'm typically recognized as an
6 expert with respect to law, U.S. law, whether it's U.S. patent
7 law, intellectual property law, state contract law.
8       In the domestic cases I'm typically offering opinions on
9 factual questions typically related to licensing and
10 assignments in the patent context.  Basically assisting the
11 trier of fact with respect to complex corporate transactions.
12 Q.   And you understand that today we're not asking you to
13 opine on any legal questions.
14 A.   I understand that.
15 Q.   Have you ever testified at trial?
16 A.   I have testified at trial twice.
17       Once was in the Eastern District of Texas in a patent
18 infringement case.  The testimony related to a license
19 defense.  And I was recognized by the Court as an expert in
20 that case.
21       And then the other case was before an administrative law
22 judge at the International Trade Commission and that case
23 involved ownership and assignment of patents.  And again, I
24 was recognized as an expert in that proceeding as well.
25 Q.   And what was the scope of your expertise in that

DAVID TAYLOR - DIRECT

1   proceeding?

2   A.   In the ITC proceeding?

3   Q.   In both of them, sorry.

4   A.   In the Eastern District of Texas, it was on licensing.

5   And in the International Trade Commission, it was on

6   assignments and ownership of patents.

7   Q.   And have you ever served as a special master in any

8   patent cases?

9   A.   Yes.  I'm currently serving as a special master in a

10  patent infringement case in the Northern District of Texas.

11  And I'm actually in the process of being appointed in another

12  patent infringement case as a special master with another

13  judge in the Northern District of Texas.

14          MR. SPRINGER:  Your Honor, at this time we would

15  tender Professor Taylor as an expert in the fields of patent

16  licensing agreements and patent procedure.  We do not intend

17  to offer him as an expert as it relates to the ITC.  And so we

18  understand with respect to patent licensing agreements and

19  patent procedures OPTO has stipulated to his qualifications.

20          THE COURT:  All right.  With that stipulation the

21  Court will recognize him in those areas.

22          MR. McCAMEY:  I certainly agree with that.  I would

23  just note we don't read that tender as incorporating

24  competition and analysis of competition.  So with that note, I

25  would -- we certainly stipulate to that tender.

JA1617

DAVID TAYLOR - VOIR DIRE

1          THE COURT:  Will you be soliciting testimony on
2   those subjects?
3          MR. SPRINGER:  So we intend to solicit testimony
4   related to the procompetitive benefits of the License and
5   Settlement Agreement in this case which Professor Taylor has
6   expertise based on his years of experience with license and
7   patent agreements.
8          THE COURT:  And do you challenge his qualifications
9   to render that opinion?
10         MR. McCAMEY:  Yes, Your Honor.  If I can have three
11  or four questions, I can do this very quickly.
12         THE COURT:  Yes, you may.
13                    VOIR DIRE EXAMINATION
14  BY MR. McCAMEY:
15  Q.   Professor Taylor, your bachelor's degree is in mechanical
16  engineering, true?
17  A.   True.
18  Q.   And then you went to Harvard Law School and got your JD,
19  correct?
20  A.   Correct.
21  Q.   And that's the only university level education that
22  you've pursued or received, true?
23  A.   I attended the University of Texas at Arlington summer
24  school for physics.  But other than those schools, those are
25  the only schools I've attended, yes.

DAVID TAYLOR - DIRECT

1  Q.  Never sought or achieved an economics degree, true?
2  A.  True.
3  Q.  Same answer for an accounting degree?
4  A.  True.
5  Q.  Didn't perform any economic analysis of the agreement
6  that's actually at issue in this case to determine the
7  competition -- or the competitive effects that it actually had
8  on the market, right?
9  A.  Well, I think my report discloses the procompetitive
10 benefits of the agreement at issue in this case and I
11 identified four procompetitive benefits, so...
12 Q.  But you didn't conduct any economic tests, no HHI test,
13 for example, right?
14 A.  No HHI test.
15 Q.  No accounting tests either?
16 A.  No accounting tests.
17         MR. McCAMEY:  Your Honor, with that, the objection
18 would be he's not an economist.  He's not an accountant.  He
19 would be opining on just the legal impact of a licensing
20 agreement, which we don't think is the proper subject for
21 expert testimony.
22         MR. SPRINGER:  If I may briefly redirect.
23         THE COURT:  Yes, please, because I'm not there yet.
24              DIRECT EXAMINATION (Cont'd.)
25 BY MR. SPRINGER:

DAVID TAYLOR - DIRECT

1  Q.  Professor Taylor, based on your experience, do you need
2  to conduct an HHI test in order to evaluate the procompetitive
3  benefits of a license and settlement agreement?
4  A.   In all my study of procompetitive benefits related to
5  license agreements, I've never seen HHI being used in that
6  context.
7  Q.  Could you tell us a little bit more about your study of
8  procompetitive benefits of license and settlement agreements.
9  A.   Right.  So I just read the literature on the impact of
10 license agreements on markets and companies that agree to
11 those agreements.  Various law review articles, for example.
12        THE COURT:  All right.  The Court will hear the
13 evidence and determine whether his education, training, and
14 background is sufficient to support whatever opinions he
15 provides.
16        MR. SPRINGER:  Thank you, Your Honor.
17        Let's start by looking at what is JX1, if we could
18 pull that up.
19 Q.  Professor Taylor, what is this document?
20 A.   This is the License and Settlement Agreement that's in
21 dispute in this case.
22 Q.  And have you reviewed this document and relied upon it as
23 part of forming your opinions in this case?
24 A.   Yes.
25 Q.  We're going to come back to this, but just briefly.  Do

DAVID TAYLOR - DIRECT

1  you know if this amendment -- if this agreement was amended?

2  A.   Yes, I understand this amendment -- or this agreement was

3  amended twice.

4        MR. SPRINGER:  Can we pull up JX2.

5  Q.   What is this document?

6  A.   I understand this was the First Amendment to the

7  agreement we just looked at.

8  Q.   Okay.  And have you reviewed this document as part of

9  preparing for your testimony today?

10 A.   I have.

11       MR. SPRINGER:  We move to admit JX2.

12       THE COURT:  I thought it was already in, but if it's

13 not, it is now.

14       (Joint Exhibit Number 2 was received into evidence.)

15       MR. SPRINGER:  And can we pull up JX3.

16 Q.   What is this document?

17 A.   This is the Second Amendment to the same agreement we've

18 been looking at.

19 Q.   And did you review this document as part of preparing for

20 your testimony today?

21 A.   Yes, I did.

22       MR. SPRINGER:  Let's turn back to JX1.

23 Q.   If we could direct your attention to Section 2.1 -- and

24 pull that out on the screen -- what is this provision?

25 A.   So this is the license agreement between the parties.

DAVID TAYLOR - DIRECT

1  This is the license provision within the license agreement.
2  And it's actually a cross-license agreement, so each party was
3  granting to the other a license to certain patents.
4  Q.   And can you explain generally the function that patent
5  licenses serve.
6  A.   My understanding is that a license is a promise not to
7  sue, and I believe in this case it's in exchange for payment.
8  And it kind of works like an insurance, you know, in the sense
9  that if you're sued for patent infringement but you have a
10 license, you can assert the defense.  And sometimes the
11 agreements have attorney fee provisions.  If somebody granted
12 a license and yet sues for infringement or even if they don't
13 include that, there might be damages in terms of attorney's
14 fees.  So in some sense it works like an insurance agreement.
15 Q.   And what types of patent licenses exist?
16 A.   I mean, there's all types of licenses.  It depends on
17 exactly what the contract says, of course, but there could be
18 exclusive, non-exclusive.  There could be a license of one
19 patent or multiple patents or what we call a portfolio
20 license.  There could be license to one product, multiple
21 products.  It just depends on the agreement.
22 Q.   And can parties to an agreement structure payment for
23 patent licenses in various ways?
24 A.   Right, yes.  So there could be a lump sum payment.  There
25 could be running royalties that depend on use of the patented

JA1622

DAVID TAYLOR - DIRECT

1  technology during the term of the agreement.  There could be
2  some combination.
3  Q.   You also just mentioned portfolio licenses.  Is
4  Section 2.1 a portfolio license?
5  A.   Yes, I would say it's a portfolio license.  U.S. Patent
6  Portfolio is capitalized there.  It's defined.  But it's a
7  collection of patents.  In fact, I think it's all of the U.S.
8  patents owned by these parties at the time of the agreement.
9  So I would call that -- well, it's called a portfolio
10  patent -- portfolio license, sorry.
11  Q.   And in general, what is a portfolio license?
12  A.   A portfolio license is a license to a large set of
13  patents.  Sometimes it's all of the patents owned by an
14  entity.  And that's a collection -- usually a large collection
15  of patents.
16  Q.   And why might someone want a portfolio license instead of
17  a license targeted at just one specific product or patent?
18  A.   Right.  So in my experience, you know, the companies that
19  enter into these agreements are looking for peace with respect
20  to the other party and not typically just with respect to one
21  patent.  Any of the patents that were being asserted against
22  them they would want to have covered in the license.  And
23  often when there's a portfolio license, any other patents,
24  they just want peace with respect to that patent portfolio,
25  the larger group of patents, and that provides more benefits

DAVID TAYLOR - DIRECT

1  than just a license to one patent.

2  Q.    And does the portfolio cross-license in Section 2.1 here

3  on the screen benefit the parties?

4  A.    Yes.  It's a portfolio cross-license so both parties are

5  licensing.  And I think there's four benefits that we see.

6        One is that it clears blocking positions.

7        One is -- another is it allows integration of

8  complimentary technologies.

9        It certainly eliminates litigation costs with respect to

10 patent litigation.

11       And then it also eliminates risk and the cost associated

12 with potential infringement liability whether through an

13 injunction or through damages if there was litigation and you

14 lost that litigation in the future.

15       So in all four of those ways it provides benefit to the

16 recipient of a license.

17 Q.    Thank you for that.  And I'd like to just kind of break

18 those down a little bit more.

19       The first one that you mentioned was I think you said

20 clearing blocking patents.  Could you explain what you mean by

21 that.

22 A.    Right.  So a blocking situation is where there are two

23 technologies and they're both covered by patents but they're

24 covered by different entities.  One of the technologies we

25 would call a basic technology.  The other technology we would

DAVID TAYLOR - DIRECT

1  call an improvement technology.  And if different entities own

2  patents on the basic technology and the improvement

3  technology, then neither party has the right to use or sell

4  the improvement technology.  And so that technology -- without

5  infringing patents, it will not get to the market and cannot

6  be used to gain a profit.

7  Q.   Can you give me an example of how that might work.

8  A.   Sure.  The typical example I use is a chair.  So if I own

9  a patent on a chair but you own a patent on a reclining

10  chair -- and let's just assume these are novel and meet all

11  the patentability requirements.  These are valid patents.  So

12  I own the patent on the chair.  You own the patent on the

13  reclining chair.

14      If neither of us have licensed the other, neither of us

15  under the law at least, are able to sell the reclining chair.

16  If I try to sell the reclining chair but you own the patent on

17  the reclining chair, I have infringed your patent.  If you try

18  to sell the reclining chair, I own the patent on the chair --

19  it's still a chair even if it's reclining -- and so you would

20  infringe my patent if you sold the reclining chair.  So in

21  that situation, without a cross-license, neither of us under

22  the law can sell the reclining chair.

23      So a cross-license allows you to clear the blocking

24  position.  And when it's a cross-license, actually, we compete

25  in that market with respect to the reclining chair.  We both

JA1625

DAVID TAYLOR - DIRECT

1  can sell in the market a reclining chair, absent any other
2  patents that other entities own.
3  Q.   And how does Section 2.1 of this agreement clear blocking
4  positions?
5  A.   This is a cross-license agreement, so a cross-license
6  agreement is what clears blocking positions.  And it clears
7  the blocking positions with respect to the U.S. patent
8  portfolios of both of the parties.
9  Q.   The second benefit you mentioned earlier relates to the
10 integration of technologies.  What do you mean by that?
11 A.   The integration of complimentary technology.  I think an
12 example is helpful here too.
13      What I'm talking about is if there was, for example, a
14 computer that would run an algorithm that analyzed data to try
15 to cure diseases.  Sounds very useful and beneficial for
16 society.  But imagine that the algorithm is novel and it's
17 patented.  And imagine that the -- but it takes a lot of
18 processing power to run that algorithm.  And with a slow
19 processor, it might -- let's just say it takes a year to
20 identify and cure a disease.  With a very fast processor, it
21 perhaps could identify and cure the disease in a day, right?
22      So it's the combination of the technology and the
23 processor and combined with the technology and the algorithm
24 used to identify and cure the disease that really provides the
25 benefit that benefits society, right?  So it's the combination

DAVID TAYLOR - DIRECT

1  of the technologies in end use.

2  Q.   And how does Section 2.1 allow for the integration of

3  complimentary technologies?

4  A.   When it's a patent portfolio license, there's multiple

5  technologies.  And when it's a cross-license, both parties

6  have access to either party's inventions and so they get to

7  combine those technologies into their devices and allow for

8  the -- you know, the compliments between those technologies to

9  exist and to provide those benefits.

10 Q.   And are you aware of a specific example of that occurring

11 in this case?

12 A.   Well, I understand in this case the '783 patent was

13 asserted in the prior litigations prior to the settlement and

14 there was a data edit function that -- in the OPTO products

15 that was accused of infringement.  And so that would be an

16 example of technology, you might call it improvement

17 technology, but it could be combined with other technologies

18 in the 2D Barcode Products or the 1D Barcode Products that the

19 parties sell and that would provide some benefit beyond just

20 the ability to scan barcodes.  I understand that it allowed

21 for the editing of the data that came out of the barcodes.

22 That's what I heard testimony on.

23 Q.   And the third benefit you mentioned is elimination of

24 litigation costs.  A lot of lawyers in the room.  I think we

25 are familiar with that.  But anything to expand on there?

JA1627

DAVID TAYLOR - DIRECT

1  A.    Well, certainly any settlement agreement eliminates

2  litigation costs, but there's some unique aspects of a license

3  agreement.  A license provides these rights going forward.

4  And so it's the -- litigation in the future should not exist,

5  the patent infringement litigation should not exist.  So a

6  license going forward should eliminate the cost.  Patent

7  litigation is notoriously expensive.

8       Beyond that, it eliminates the need to monitor the other

9  party's products and services to try to analyze whether

10 they're infringing because, well, they have a license.  We

11 don't need to do that anymore.

12          On the other side, you don't have to be worried

13 about the other party's patents because if you received a

14 license to those, you don't have to get opinion of counsel,

15 which can be very expensive.  You don't have to get a

16 freedom-to-operate analysis.  And so it can eliminate costs

17 going forward as well.

18 Q.    And does the license in Section 2.1 provide that benefit?

19 A.    Yes.  It's a cross-license agreement.

20 Q.    And the fourth benefit you identified earlier was risk

21 reduction in investment.  Can you expand on that.

22 A.    Yes.  I mean, working with, you know, inventors I know

23 that taking products to market is risky.  But one of the risks

24 in particular is the risk of patent infringement injunctions

25 and whatever remedies, damages, even attorney's fees.  And so

JA1628

DAVID TAYLOR - DIRECT

1  by agreeing to a license, you also eliminate that risk:  risks
2  that you are liable for infringement, but also risks that you
3  assert a patent and the patent is invalidated in litigation,
4  really.  That can be damaging to the value of your patent
5  portfolio.
6      So a license agreement -- a cross-license agreement
7  provides significant value in that respect as well.
8  Q.   And does Section 2.1 of this agreement provide that
9  benefit?
10 A.   Yes.  It's a cross-license agreement with multiple -- you
11 know, a patent portfolio, large number of patents, so it
12 provides significant benefit.
13 Q.   And I think a few times you've mentioned the phrase
14 "improvements."  Can you explain what an improvement is in the
15 context of a patent license.
16 A.   Well, I think in this agreement there's -- I know there's
17 a definition of improvements.  But generally in patent license
18 context, when we talk about improvements, we really talk about
19 changes to patented technology.  We don't necessarily mean,
20 like, it's better.  It's just a change.  But it depends on
21 what the agreement says.  We can look at this definition of
22 improvement.
23     But, you know, when you're negotiating a license
24 agreement, you're often concerned with improvements because
25 you wonder, if you're the recipient of a license, if I change

JA1629

DAVID TAYLOR - DIRECT

1  this product, am I outside the scope of my license?  Can I be
2  sued for patent infringement?  You'd be worried about that.
3       Often, as well, one of the things that comes up is you're
4  wondering if I make an improvement or they make an
5  improvement, who owns any patented improvement to the extent
6  it's patentable?  I don't think that's in dispute, but that's
7  another concern that often arises.
8  Q.   And you mentioned that improvements is defined in this
9  agreement.
10           MR. SPRINGER:  Could we flip to Section 1.7.
11  Q.   What is this provision?
12  A.   Yes.  This is the improvements provision I was talking
13  about.  I'm not going to read it, but I notice the -- I think
14  it's "(i) revision, change, modification, alteration" -- I'm
15  not going to read the whole thing, but there's that part of
16  the definition.
17       Then the last sentence was important, it seemed to me.
18  "Improvement" -- I'll -- well, that language is something I
19  also considered in analyzing this license agreement.
20  Q.   And so why is that last sentence important?
21  A.   Well, this provides significant benefits to the parties.
22  As I discussed, when you're thinking about taking a license,
23  if it doesn't cover improvements, you'd be worried that you're
24  stuck with the technology that exists at the time of the
25  agreement.  And what would be better and provide you more

DAVID TAYLOR - DIRECT

1  competitive benefit in the market is to be able to improve
2  your product and not worry about infringing a patent.  And
3  this does that for both parties.  It allows them to change
4  their products, modify their products.
5      But also, in this last sentence -- and I'm not trying to
6  interpret the agreement.  Just trying to understand its
7  application.  But it allows the parties to combine
8  technologies that may exist in one product at the time of the
9  effective date and move them into other products within
10  their -- all of their products that they're selling.  And so
11  that's just another benefit that the parties agreed to give
12  each other in this agreement.
13          MR. SPRINGER:  Could we also turn next to
14  Section 2.4
15  Q.  What is this provision?
16  A.  I understand this is the covenant not to sue provision in
17  this License and Settlement Agreement.
18  Q.  And I'm not going to ask you to read the whole thing or
19  read the whole thing into the record, but how does this
20  provision differ from the license in Section 2.1?
21  A.  Well, a license -- I think I described earlier a license
22  is a promise not to sue.  A covenant not to sue is a covenant
23  not to sue.  It's a promise not to sue one-sided.  Typically,
24  in my experience, covenants are not accompanied with
25  royalties.  If you accompany a promise not to sue with a

JA1631

DAVID TAYLOR - DIRECT

1  running royalty, we would call it a royalty -- we'd call it a
2  license, sorry.
3      But one difference also between a license and a covenant
4  not to sue is that typically -- depends on the wording of the
5  agreement.  Typically a license runs with a product.  You
6  license a product.  But a covenant not to sue is personal to
7  the entity or entities that receive the covenants not to sue.
8  So in that way -- and again, it depends on how it's defined,
9  obviously, but that's one difference.
10 Q.   And were you present in the courtroom yesterday when
11 Mr. VanHoutan was asking questions of Mr. Whitley?
12 A.   Yes.
13 Q.   Do you remember Mr. Whitley testifying that, you know,
14 under this provision OPTO could add all sorts of things to its
15 1D Barcode Products that might infringe a Honeywell patent?
16 A.   I remember that.
17 Q.   And wouldn't have to pay any additional fee if they did
18 so?
19 A.   Right.
20 Q.   Does that ability to do that under this provision benefit
21 OPTO?
22 A.   Yeah.  I mean, this is a significant benefit to OPTO.
23 Before this agreement they did not -- they were accused of
24 infringement -- it's my understanding they were accused of
25 infringement with respect to all of their 1D and 2D products.

JA1632

728

DAVID TAYLOR - DIRECT

 1  And then after this agreement I understand they received a
 2  covenant not to sue that covered their 1D products.
 3      So as between before the agreement and after the
 4  agreement, that is a significant benefit for the reasons I
 5  discussed earlier in the four areas of benefits I described.
 6  Q.  And so, I guess, why are you comparing before the
 7  agreement with after the agreement?
 8  A.  I'm trying to understand whether this agreement has
 9  procompetitive benefits.  I understand, at least, that's what
10  I've been asked to do.
11  Q.  And so did all of the provisions of the agreement take
12  effect at the same time?
13  A.  Right, yeah.  They took effect when the agreement was
14  signed.  And then there's an effective date within the
15  agreement.
16  Q.  And so to summarize, in your opinion did the license in
17  this agreement provide benefits to OPTO?
18  A.  It provided, yes, benefits.  I mentioned the four
19  benefits that were provided to OPTO.  I think they were
20  also -- they were also provided to Honeywell.  But yes.  As
21  compared to OPTO's position before the agreement and after, I
22  think I've described the four benefits I see that OPTO
23  received.
24  Q.  And do those benefits impact the public?
25  A.  Yes.  They're procompetitive efficiencies.  And I would

JA1633

DAVID TAYLOR - DIRECT

1  couple the first two, right?  Allowing OPTO to use technology
2  it arguably was not otherwise able to use before the agreement
3  in light of the allegations of infringement before the
4  agreement.  So those -- it allowed OPTO to bring to market
5  technologies that the public would not have been -- otherwise
6  been able to, at least arguably had they been found liable of
7  infringement, bring to market.  So that's the first two,
8  right, in terms of clearing blocking positions and allowing
9  integration of complimentary technologies.
10      But then the other benefit that the public receives is
11  the reduction of costs to OPTO, you know, in terms of reduced
12  litigation expense, reduced risk of injunctions and damages.
13  The reduced costs theoretically flow through to consumers as
14  well.
15  Q.  And does the License and Settlement Agreement require
16  OPTO to buy anything?
17  A.  I'm not aware of the agreement requiring OPTO to buy
18  anything.
19  Q.  And does it prevent OPTO from selling any barcode
20  scanning products?
21  A.  I guess when you say anything, I should say I'm not aware
22  of it requiring OPTO to buy any products.  I mean, they have
23  an obligation to pay royalties, but I'm not aware of them
24  requiring them to buy any product, I'm sorry.
25  Q.  No, no.  Thank you for that clarification.

DAVID TAYLOR - DIRECT

1    Does the license agreement require OPTO to buy any
2 Honeywell products?
3 A.   I'm not aware of that, no.
4 Q.   And does it prevent OPTO from selling any barcode
5 scanning products?
6 A.   No.  My understanding is the opposite.  It allows OPTO,
7 through a license and a covenant not to sue, to sell all kinds
8 of products and technology.
9 Q.   Were you here for the testimony of Dr. Adams yesterday?
10 A.   I was, although I did leave for about 30 seconds to get
11 water.
12 Q.   And did Dr. Adams offer any opinion about whether the
13 agreement has procompetitive benefits?
14 A.   For the time I was here, I did not hear that.  In fact, I
15 heard him say -- I won't repeat what he said, but I heard
16 him -- I did not hear any discussion -- or hear him offer any
17 testimony offering opinions on procompetitive benefits of the
18 agreement.
19 Q.   Okay.  And other than those 30 seconds you stepped out,
20 were you here throughout OPTO's case in chief yesterday?
21 A.   Yes.
22 Q.   Did you hear any evidence from OPTO weighing the
23 procompetitive benefits of the agreement against the -- any
24 alleged anticompetitive harm?
25 A.   No.

731

DAVID TAYLOR - CROSS

1  Q.   Have you seen any evidence in this case that suggests
2  that Honeywell has broadened the scope of its patents?
3  A.   No.
4  Q.   Why do you say that?
5  A.   Well, before -- I'm comparing before the agreement and
6  after the agreement was signed.  And before the agreement OPTO
7  was alleged to be infringing.  They were involved in
8  litigation.  And patents are presumed valid, I guess, and so
9  they did not have the ability under the law to -- at least
10  arguably, to have these products go to market, or if they did
11  they were infringing.  And then after -- importantly, my
12  understanding is that every product covered by the covenant
13  not to sue in the license was alleged to infringe before the
14  agreement was signed.  And the agreement does not go beyond
15  that scope.  That's my understanding.
16              MR. SPRINGER:  With that, we'd pass the witness.
17              THE COURT:  You may cross examine.
18              MR. McCAMEY:  Thank you, Your Honor.
19                      CROSS EXAMINATION
20  BY MR. McCAMEY:
21  Q.   Professor Taylor, I want to pick up right where you left
22  off.  I think you opined that it's your opinion that
23  Honeywell -- the agreement does not broaden the scope of
24  Honeywell's patent portfolio; is that right?
25  A.   That's correct.

JA1636

DAVID TAYLOR - CROSS

1  Q.   And you didn't look at all of the patents that are in

2  Honeywell's patent portfolio, did you?

3  A.   No.  I understand -- I did ask about how many patents we

4  were dealing with and I was told it was about ten thousand

5  patents.

6  Q.   And you didn't do any infringement analysis to determine

7  whether OPTO's products actually did or did not infringe any

8  of those ten thousand patents, right?

9  A.   Correct.

10  Q.   You can't tell the Court sitting here this morning even

11  one patent that you have individually analyzed to say this

12  product infringes that patent, true?

13  A.   True.  I did not do that.

14  Q.   Now, sir, you spent a lot of time on direct talking

15  about -- you were calling it benefits, I think, in your

16  report.  You called it procompetitive efficiencies, right?

17  A.   Right.

18  Q.   I think you said you had four benefits for them, and I

19  wrote them down here.  I just want to make sure I've got them

20  right.

21       Clearing blocking patents is the first one.

22  A.   Correct.

23  Q.   And then allowing the integration of complimentary tech;

24  is that right?

25  A.   Yes.

DAVID TAYLOR - CROSS

1  Q.    And then risk related ones.  Litigation costs and risk of
2  investment, right?
3  A.    Yes.
4  Q.    Okay.  I want to start with the complimentary tech, and I
5  think you provided an example both in your report and this
6  morning about the data edit function, right?
7  A.    Right.
8  Q.    And relying on 1.7 of the agreement, I think you said --
9  it's your understanding that the data edit function may or may
10 not have infringed one or more of Honeywell's patents at the
11 effective date, right?
12 A.    I understand it was asserted to be infringing in, I
13 think, both litigations prior to the settlement agreement.
14 Q.    Sure.  So because that functionality existed at the date
15 of the effective date, it's your opinion that OPTO is now able
16 to incorporate that into any of its products, true?
17 A.    True, pursuant to the agreement.
18 Q.    Pursuant to the agreement.  And actually, it would result
19 in zero -- in no additional royalty payment, right?
20 A.    No add -- just by incorporating that existing technology,
21 it would not increase the royalty payments.  The royalty
22 payments were based on, I guess we all know at this point, the
23 definition of 2D Barcode Products, not that particular patent.
24 Q.    Sure.  So because that functionality existed at the
25 effective date, it can now be incorporated.  No additional

DAVID TAYLOR - CROSS

1  royalty payment, right?

2  A.  As a result of the agreement, correct.

3  Q.  And that's one of the procompetitive benefits that --

4  your efficiencies, depending on what word you want to use,

5  right?

6  A.  Correct.

7  Q.  You don't have an understanding -- you certainly don't

8  have all of OPTO's products memorized, right?

9  A.  Correct.

10  Q.  And you certainly don't have all their functionalities

11  memorized.

12  A.  Correct.

13  Q.  So I'm not going to turn this into a memory test or even

14  try to.  So I want to just use a hypothetical product so that

15  we can all be talking apples to apples.  Is that fair?

16  A.  Okay.

17  Q.  So I want you to imagine OPTO product A.  It's a laser

18  scanner.  It cannot read stacked code.  It cannot read any

19  other 2D code.  Everyone agrees that it falls within the 1D

20  Barcode Product under the agreement.  And it always has.  It

21  never has been able to do any of this stuff.

22      Do you understand the hypothetical so far?

23  A.  I understand.

24  Q.  OPTO would have to pay zero dollars on any of its revenue

25  for the sales of that product.  You agree with me on that,

DAVID TAYLOR - CROSS

1  right?

2  A.    Depends on the time frame.  Before the agreement, I

3  disagree.  After the agreement, I agree.

4  Q.    Under the agreement OPTO would never -- well, hold on.

5  Let's back up.

6       You haven't -- of course, you haven't conducted any

7  infringement analysis on a hypothetical product, right?

8  A.    Of course.  No.

9  Q.    Okay.  And you haven't conducted any infringement

10  analysis on any product, right?  So you have no idea sitting

11  there today whether any product, hypothetical or not, of

12  OPTO's actually infringes any of Honeywell's patents, right?

13  A.    Depends on the time.  So before the agreement, these

14  questions matter.  And I did not do any analysis so I don't

15  have an opinion one way or the other whether they infringed

16  before the agreement.  I mean, I'm looking at the agreement

17  trying to understand its effect.  I'm not trying to interpret

18  it.  I'm just trying to understand its effect.

19       And after the agreement, I agree if it's a 1D product, no

20  royalty is owed.

21  Q.    Okay.  So zero dollars on this product as it exists in

22  this hypothetical world.

23       Now, the only thing that I'm going to change about that

24  product is now everything is the exact same, but it can read

25  stacked code.  Okay.

DAVID TAYLOR - CROSS

1  A.    Okay.

2  Q.    Do you understand the hypothetical as presented?

3  A.    Yes.

4  Q.    You understand that Honeywell's position in this case is

5  that that is now a 2D Barcode Product, right?

6  A.    Yes, I understand that.

7  Q.    Okay.  And you understand that it's Honeywell's position

8  that because it's a 2D Barcode Product, it's now subject to a

9  7 percent royalty, right?

10  A.    Under the agreement now, yes.

11  Q.    Okay.  So just by changing that one functionality, this

12  product went from zero percent royalty owed to 7 percent

13  royalty owed, right?

14  A.    No, I disagree.  Just by changing the functionality,

15  that's incorrect.  You have to look at the right time period.

16  Before the agreement it didn't matter whether it was 1D or

17  2 --

18  Q.    Sir, let me make sure --

19  A.    It didn't matter whether it was 1D or 2D.  I don't know

20  whether it infringed or not.  I'm not offering opinions on

21  that.  I understand from the testimony all 1D and 2D products

22  were accused of infringement before the agreement was signed.

23  I'm not saying that they infringed or not.

24  Q.    And I'm not asking you about before the agreement.  Let

25  me make sure my question is clear.

DAVID TAYLOR - CROSS

 1    After the agreement.  Zero percent royalty owed before
 2  the change; 7 percent royalty owed after the change, yes?
 3  A.    After the agreement, yes, that's my understanding.
 4  Q.    Okay.  And you're aware that OPTO's products -- on the
 5  effective date of the contract, certain of OPTO's products,
 6  both some of its laser scanners, some of its CCD scanners, and
 7  then its area image sensors, had the ability to read stacked
 8  code, true?
 9  A.    That's my understanding from the testimony I've heard.
10  Q.    Okay.  So that's one of the technologies that can be
11  incorporated under your definition of this improvement into
12  any other technology -- or excuse me, into any other product,
13  right?
14  A.    No, that's not my understanding of the effect.  I mean,
15  that would make it a 2D product, I think.
16  Q.    Well, sir, you agree with me that it's a technology that
17  existed at the time of the effective date, yes?
18  A.    That's my understanding from the testimony, yes.
19  Q.    Sorry, I missed your answer.  You agree with me that that
20  is a technology that existed at the time of the effective
21  date, yes?
22  A.    That's my understanding.  You're talking about the 1D
23  stacked barcode technology, whether that was existing at the
24  time of the agreement?
25  Q.    Yes.

DAVID TAYLOR - CROSS

1  A.   Yes, I understand that that technology existed at that
2  time.
3  Q.   Okay.  And just to make sure we're clear, incorporating
4  just that technology post-agreement, that's the only thing
5  we're changing -- laser scanner can't do it, laser scanner can
6  do it -- percent to 7 percent, yes?
7  A.   No.  That would make it a 2D Barcode Product, is my
8  understanding.  I think that's what the jury found.  I was
9  here for the jury verdict.  I think that would make it a 2D
10 Barcode Product and so it would be subject to the 2 percent
11 royalty -- 7 percent royalty in light of that.
12 Q.   I think --
13 A.   I'm not sure if I'm misunderstanding the question.
14 Q.   No, I think we said the same thing in two different ways.
15 A.   Okay.
16 Q.   Zero percent to 7 percent just by changing that one
17 functionality, yes?
18 A.   Oh, yes.
19 Q.   Now, sir, you also discussed on direct the concept of
20 blocking patents, right?
21 A.   Yes.
22 Q.   I think you used a chair example to describe what a
23 blocking patent was to the Court.
24 A.   Yes.
25 Q.   Sir, you've been retained in this case for quite some

DAVID TAYLOR - CROSS

1  time, right?

2  A.   I don't know when I was retained.  I think it was in

3  2022.

4  Q.   2022 you produced two expert reports?

5  A.   That's correct.

6  Q.   Had access to Honeywell's patent portfolio to review it

7  if you wanted to.

8  A.   Correct.

9  Q.   And at the time I took your deposition a couple months

10 ago, whenever that was, you hadn't identified even one

11 blocking patent that was cleared by this agreement, true?

12 A.   By patent number, no, I did not identify one number.

13 Although I identify in my report, I think, the '783 patent

14 which could be a blocking patent.

15 Q.   I want to make sure I ask the question correctly.  Sir,

16 did you identify any specific patents that may be considered

17 blocking patents in this case?

18 A.   I mean, I looked at the '783 patent.  It could be a

19 blocking patent.  But what I did not find, I didn't analyze is

20 looking for the other patent owned by OPTO that would create

21 the blocking scenario because you have to have patents owned

22 by different companies.  So it could be a blocking patent, but

23 I did not identify that kind of a corresponding patent by

24 OPTO.

25 Q.   And, sir, you do remember giving a deposition in this

DAVID TAYLOR - REDIRECT

1  case, right?

2  A.   Yes.

3        MR. McCAMEY:  John, can we pull up page 150 of Mr.

4  Taylor's deposition.

5        And if we can blow up lines 14 through 17, please.

6  Q.   Sir, I'm going to read this and if you'll read along with

7  me and make sure that I read it correctly.

8     "Question:  Did you identify any specific patents that

9  may be considered blocking patents in this case?

10    "Answer.  I did not.  That's why I said it 'clears

11  possible blocking patents.'"

12     Did I read that correctly?

13  A.   Yes.

14  Q.   Did I ask you that question and did you give me that

15  answer at your deposition?

16  A.    I trust the transcript, yes.

17        MR. McCAMEY:  Thank you, Professor Taylor.

18        Nothing further, Your Honor.

19        THE COURT:  Any redirect?

20        MR. SPRINGER:  Briefly, Your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. SPRINGER:

23  Q.   Professor Taylor, Mr. McCamey was asking you several

24  questions about a hypothetical scenario where, you know, OPTO

25  product A, you know, was not a 2D Barcode Product and then it

RYAN HERRINGTON - DIRECT

1  changed its functionality and became a 2D Barcode Product.
2  But for the agreement, would those products have infringed
3  Honeywell's patents?
4  A.   Again, I didn't do an infringement analysis.
5           MR. McCAMEY:  Objection, Your Honor.  Speculation.
6           THE COURT:  Well, he's about to answer correctly.
7           THE WITNESS:  I didn't do an infringement analysis
8  so -- but I understand they were alleged -- I understand from
9  the testimony, whether it was the jury trial or the bench
10  trial, that all of the 1D and 2D Barcode Products were accused
11  of infringement by Honeywell.  But I did not do an
12  infringement analysis.
13           MR. SPRINGER:  Thank you.  No further questions.
14           THE COURT:  Thank you.  You may step down.
15           (Witness stepped down.)
16           THE COURT:  Any additional witnesses?
17           MR. PLEUNE:  Yes, Your Honor.  Plaintiff calls Ryan
18  Herrington.
19      RYAN N. HERRINGTON, PLAINTIFF'S WITNESS, SWORN,
20                   DIRECT EXAMINATION
21  BY MR. LAREAU:
22  Q.   Good morning, Mr. Herrington.  Would you please state
23  your name.
24  A.   Yes.  Ryan N. Herrington.
25  Q.   And where do you live, Mr. Herrington?

RYAN HERRINGTON - DIRECT

1  A.   I live in Dallas, Texas.

2  Q.   And what is your current position?

3  A.   I'm the senior managing director at FTI Consulting,

4  specifically in the Forensic and Litigation Services Practice.

5  Q.   And how long have you worked at FTI?

6  A.   I've worked there for over 17 years now.

7  Q.   And how long have you been in the forensic and litigation

8  services field generally?

9  A.   Over 20 years at this point.  Ever since I came out of

10 undergrad in 2001 I've continuously worked in the damage

11 quantification field and providing those types of services to

12 clients.

13 Q.   And what are your responsibilities at FTI?

14 A.   What I normally do is provide financial, economic, damage

15 quantification consulting services to clients primarily in the

16 fields of intellectual property disputes as well as breach of

17 contract cases like this.

18 Q.   And have you prepared any demonstratives today to aid in

19 your testimony?

20 A.   I have.

21       MR. LAREAU:  If we can go ahead and display those,

22 please.

23 Q.   Mr. Herrington, could you please briefly describe your

24 educational background.

25 A.   Sure.  So I received my BBA magna cum laude from Texas

RYAN HERRINGTON - DIRECT

1  A&M University in finance and then I subsequently went on and

2  received a Master's of Business Administration from the

3  University of Texas at Dallas.

4  Q.   And do you have any professional certifications?

5  A.   I do.  I hold three.  I'm a Certified Licensing

6  Professional, I'm a Certified Valuation Analyst, and I'm a

7  Certified Fraud Examiner.  And in holding those three

8  certifications, I'm also part of three professional

9  associations.  I'm part of the Licensing Executives Society,

10  I'm part of the National Association of Certified Valuators

11  and Analysts, and I'm part of the Association of Certified

12  Fraud Examiners.

13  Q.   And have you ever published or presented in your field?

14  A.   I have over 20 times at this point on economic topics,

15  damages topics.  And then I have published over five times,

16  including a chapter in the *Litigation Services Handbook* which

17  is actually a leading treatise for damages experts such as

18  myself.

19          MR. LAREAU:  Your Honor, we'd offer Mr. Herrington

20  as an expert in accounting, economics, and competitive

21  analysis.

22          THE COURT:  Any objection?

23          MR. VanHOUTAN:  No objection, Your Honor.

24          THE COURT:  The Court so recognizes him.

25  Q.   Mr. Herrington, have you been retained to provide expert

RYAN HERRINGTON - DIRECT

1  opinions in this matter?

2  A.   Yes.  I was retained by Alston & Bird on behalf of

3  Honeywell to assess the analyses and opinions of Dr. Adams

4  specifically related to OPTO's claim of patent misuse.

5  Q.   And what is your understanding of the alleged patent

6  misuse claims against Honeywell by OPTO?

7  A.   Essentially, it's my understanding that OPTO is claiming

8  that by Honeywell seeking a royalty of 7 percent on OPTO's 2D

9  Barcode Products, that is essentially patent misuse.

10 Q.   Now, have you formed any opinions with respect to

11 Dr. Adams' conclusions regarding this alleged patent misuse?

12 A.   I have.  Based on what I've reviewed of Dr. Adams'

13 analysis, his analysis is flawed and essentially

14 inappropriate.  These are three high level critiques that I

15 have of his opinion.

16     Number one, that he fails to assess demand for laser

17 scanners that read what he refers to as stacked linear

18 barcodes.

19     Number two, that he fails to offer evidence to conclude

20 that Honeywell has the ability to exclude competition.

21     And number three, that he fails to proffer any evidence

22 or analysis regarding his -- or OPTO's alleged lack of

23 profitability.

24 Q.   Let's talk about this first one.  What conclusion does

25 Dr. Adams reach regarding demand?

RYAN HERRINGTON - DIRECT

1  A.   So in his expert report -- and we heard it yesterday as
2  well from Dr. Adams -- he states that there's demand for
3  scanners that can read what he terms stacked linear barcodes.
4  Q.   Now, is that conclusion regarding scanners relevant?
5  A.   No.
6  Q.   Can you explain to the Court why not.
7  A.   Absolutely.  So what's at issue here is really laser
8  scanners that can read what he terms stacked linear barcodes,
9  not scanners.  I haven't -- I sat there this entire week and I
10 haven't heard any testimony where Honeywell has disputed the
11 fact that there may be demand for a scanner such as an image
12 scanner to read what Dr. Adams refers to as stacked linear
13 barcodes.  But again, I think what's at issue here is whether
14 there's demand for laser scanners.
15 Q.   And did Dr. Adams provide any evidence of the alleged
16 demand for the laser scanners that can read at least one
17 two-dimensional barcode?
18 A.   No.
19 Q.   What does the evidence that you reviewed in this matter
20 suggest regarding the demand for laser scanners that can read
21 at least one two-dimensional barcode?
22 A.   So the evidence that I saw in this case would suggest
23 there's actually a lack of demand for laser scanners that can
24 read this stacked linear barcode, as Dr. Adams calls it.  We
25 heard from Mr. Tanaka actually earlier today.  And when he was

JA1650

RYAN HERRINGTON - DIRECT

1  asked if Opticon or OPTO could identify any customers in the
2  United States that they actually lost based on this lawsuit,
3  he was not able to identify any.
4  Q.   And what about Dr. Adams; did Dr. Adams identify any
5  customers that were lost?
6  A.   No.  We heard this yesterday.  Dr. Adams testified that
7  he couldn't identify a single customer, a single dollar that
8  OPTO had lost.  But he also admitted as much in his
9  deposition.
10 Q.   Now, has OPTO continued to sell its laser scanner
11 products after it decided to turn off the ability in these
12 products to read at least one two-dimensional symbology?
13 A.   Yes.  Based on the information I received, which I
14 believe was the first seven months of 2022, OPTO sold over $1
15 million of laser scanners.
16 Q.   Now, is there any other evidence in this matter to
17 suggest a lack of demand for laser scanners that can read at
18 least one two-dimensional symbology?
19 A.   I think, again, from OPTO -- we heard from Mr. Stoop
20 earlier this week.  And when he was asked what OPTO would tell
21 a customer if a customer came to them and asked why did they
22 turn off this functionality, he said, quote, "It's extremely
23 unlikely that a customer will ask for this."  So this
24 functionality is not used for many years already.
25      And again, when he was asked how many people this would

RYAN HERRINGTON - DIRECT

 1  affect, he says, "The amount of people that are actually using
 2  that functionality, I cannot say zero, but it is not very
 3  big."
 4      So again, this goes towards the basis of me concluding
 5  there seems to be a lack of demand for laser scanners that can
 6  read these, what Dr. Adams referred to as stacked linear
 7  barcodes.
 8  Q.   And do you recall that Dr. Adams testified about a
 9  product that he alleged competed with the relevant OPTO
10  products?  It was the -- I believe it was the Voyager 1400 1D
11  plus PDF417.
12  A.   Yes, I recall that testimony.  I believe Dr. Adams stated
13  that sales were low, but I don't think he ever actually gave
14  the number.
15      And so here I'm giving the number of the Honeywell
16  product that Dr. Adams identified actually competes with
17  OPTO's laser scanners that can decode what he calls stacked
18  linear barcodes.  You'll see that over a three-year period
19  from 2020 to 2022, that product made a grand total of $11,148
20  in sales.
21  Q.   Now, Mr. Herrington, I want to be very clear what we're
22  looking at in your demonstrative and let's unpack this a
23  little bit.
24      First, did I hear you correctly that there's only been
25  $11,148 in sales for the product that Dr. Adams alleges

RYAN HERRINGTON - DIRECT

1  competes with the disputed products in this case?

2  A.   Correct.  And that's over a three-year period it's

3  $11,148.

4  Q.   Okay.  Let's unpack the graph that we see here on the

5  screen.

6       Now, I see there's a scale at the bottom.  It's a little

7  small and there's a lot of characters.  So the product that

8  Dr. Adams relied on to evaluate demand is the one that's the

9  blue bar.  And the product that's the red bar that you can see

10 much more of is the 1D plus PDF417 plus 2D product; is that

11 correct?

12 A.   Correct.  So the blue bar, which I'm honestly having a

13 really hard time seeing here because I know it's so small.

14 There we go.  It's been circled.  Thank you.  That represents

15 the sales of the Voyager 1400 product that Dr. Adams

16 identified competes with OPTO's laser scanners that can decode

17 what he calls a stacked linear barcode.  And these other sales

18 are the Voyager 1400 product when it has its full

19 functionality and can read other 2D barcode symbologies.

20 Q.   All right.  So just to be clear, is Dr. Adams relying on

21 the red bar as the product that competes with OPTO's disputed

22 products in this case?

23 A.   No, no, no.  He's relying on the bars we can't even

24 really see because it's, again, $11,148 over a three-year

25 period.

749

RYAN HERRINGTON - DIRECT

 1   Q.   Let's take a step forward.  What does Dr. Adams conclude
 2   regarding Honeywell and its market power?
 3   A.   He concludes that Honeywell has market power based on its
 4   ability to exclude competition.
 5   Q.   And what is Dr. Adams' support for this conclusion?
 6   A.   That, again, because Honeywell has asked for the
 7   7 percent royalty as spelled out in the agreement on these 2D
 8   Barcode Products, that that has somehow forced OPTO to exit
 9   the market and therefore has excluded competition.
10   Q.   Now, in your work on this case, have you seen any
11   evidence to suggest that Honeywell forced OPTO to disable the
12   ability of its laser scanners to read any code at all?
13   A.   No.
14   Q.   Does Dr. Adams discuss other business decisions that OPTO
15   could have made?
16   A.   He does.  So Dr. Adams, he talked about it yesterday, but
17   he also mentioned it in his report, that there were other
18   decisions that OPTO could have made.  OPTO could have
19   increased its price for its products.  Or it could have
20   accepted a lower profit margin on those products.  Or it could
21   have done what OPTO ultimately chose to do which is withdraw
22   the products or remove the functionality.
23   Q.   Now, what do Honeywell's past actions actually suggest to
24   you regarding its stance on competition?
25   A.   Its past actions would suggest to me that it encourages

JA1654

RYAN HERRINGTON - DIRECT

1  competition.  It doesn't really seek to exclude it.

2  Q.   And what's your basis for that conclusion,

3  Mr. Herrington?

4  A.   So we've heard lots of testimony about this this week,

5  but Honeywell's actually licensed its patent portfolio to

6  other competitors, including Zebra who I think Dr. Adams

7  recognizes as the market leader.  And they've also licensed to

8  Code and I believe Datalogic, which I think Dr. Adams also

9  talked about as a major player in the industry.  So to me that

10 would suggest that they are willing to encourage competition,

11 not necessarily seek to exclude it.

12 Q.   And circling back, Mr. Herrington, how much in sales in a

13 three-year period did Honeywell have of the product that

14 Dr. Adams alleged competed with OPTO's products at issue in

15 this litigation?

16 A.   So again, $11,148 over a three-year period.

17 Q.   And I want to be clear.  Did Dr. Adams use these sales

18 figures as the basis for his HHI analysis regarding market

19 concentration?

20 A.   No, he did not.  He looked at the handheld scanner market

21 overall in those market share numbers.

22 Q.   So when Dr. Adams testified about the 20 percent safety

23 zone and the guidelines and was doing his analysis and math in

24 his testimony, he wasn't basing it on these sales, was he?

25 A.   No.

RYAN HERRINGTON - DIRECT

1  Q.   And these sales, as I believe Dr. Adams called them low,

2  suggest what to you regarding Honeywell's market power in this

3  market?

4  A.   It would suggest in this market they have a lack of

5  market power.

6  Q.   And have you seen any evidence presented by Dr. Adams to

7  suggest that Honeywell has power over price, namely the power

8  to raise price and restrict output?

9  A.   No.

10  Q.   And have you ever heard of a test to see if a potential

11  seller of a product might exert a small but significant and

12  non-transitory increase in price?

13  A.   I have heard.

14  Q.   What is that commonly referred to?

15  A.   The SSNIP test.

16  Q.   Just generally, why would someone do that?

17  A.   I think it's to define a relevant market of products.

18  Q.   And did Dr. Adams perform a SSNIP test in his report?

19  A.   No, not in his report, and he admitted that yesterday in

20  his testimony.

21  Q.   Now, do you agree with Dr. Adams' assertion that, quote,

22  Honeywell royalty demands are a restraint of OPTO's ability to

23  compete and that exercising patent rights is a restraint on

24  competition?

25  A.   No.  I think what we've heard from both sides this week

RYAN HERRINGTON - DIRECT

1  is that a patent by its very definition is giving someone a
2  right to exclude someone else from making or using an
3  invention.
4  Q.   So is there anything wrong with licensing -- excuse me,
5  licensing intellectual property rights?
6  A.   Not that I'm aware of.  And in fact, in some of the
7  guidelines that Dr. Adams was pointing to yesterday, I don't
8  believe you're going to find anything in there that talks
9  about a restraint on competition is when someone is exercising
10 their patent rights.
11 Q.   Let's take another step forward.  Does Dr. Adams offer
12 any evidence or analysis on the unprofitability of OPTO's
13 products?
14 A.   No, he doesn't.
15 Q.   And does Dr. Adams discuss various business decisions
16 that OPTO could have made in response to its royalty
17 obligations?
18 A.   Again, I went over these a little bit earlier, but I'll
19 repeat them.  So OPTO could have chosen to increase the price
20 of its products.  They could have chosen to decrease the
21 profit margin on those products.  Or they could have chosen to
22 disable the ability of those products to read the symbologies
23 and therefore remove those products from the market.  They
24 could have made any of those choices.
25 Q.   Now, what business decision did OPTO choose not to make?

RYAN HERRINGTON - DIRECT

1  A.   They didn't, as far as I see, increase the price of the

2  products or decrease the profit margins of those products.

3  That's not what they did.  That's not what they chose to do.

4  Q.   And what business decision did OPTO choose to make?

5  A.   OPTO chose to disable the ability of those products to

6  read.  And you can see by the earlier testimony I gave, there

7  was no evidence that any customers came to them and asked, you

8  know, why.

9  Q.   And what does Dr. Adams conclude based on this business

10  decision?

11  A.   He concludes that because OPTO made that business

12  decision, that somehow that was Honeywell's forcing them to

13  exit the market.

14  Q.   And does Dr. Adams cite to any documentary evidence that

15  OPTO disabled its products from reading at least one 2D

16  barcode symbology due to a lack of profitability?

17  A.   No.

18  Q.   Did Dr. Adams proffer any profitability calculations or

19  analysis on OPTO's products at issue to establish whether a

20  7 percent royalty rate would have made these products

21  unprofitable?

22  A.   No.

23  Q.   Did Dr. Adams testify about OPTO's profit margins at his

24  deposition and yesterday?

25  A.   He did.  In both places he admitted that he didn't know

RYAN HERRINGTON - DIRECT

1  what OPTO's profit margins were.  His idea of a profit margin
2  was more theoretical in nature and he wasn't looking at any
3  actual accounting data to see if that -- what he was supposing
4  was true.
5  Q.   To summarize, Mr. Herrington, has Dr. Adams demonstrated
6  that Honeywell has market power?
7  A.   No, not in my opinion.  These are three of my overarching
8  opinions that render his analysis flawed.
9  Q.   And I have one final housekeeping issue for
10 Mr. Herrington.  Did you offer an opinion in this case
11 regarding the proper calculation of damages for OPTO's breach
12 of 4.3 and 4.6 of the settlement agreement?
13 A.   Yes, I had an expert report with that opinion.
14 Q.   And do you understand whether OPTO has stipulated to
15 those damages?
16 A.   I understand -- I understand that OPTO has stipulated to
17 the damages number that was in my report.
18        MR. VanHOUTAN:  Your Honor, this is outside the
19 scope of this witness's knowledge.  We're happy to discuss the
20 stipulation, but we don't need to do it through this witness.
21        THE COURT:  Yes, it's unnecessary for these
22 purposes.
23        MR. LAREAU:  One final question, Your Honor, that
24 doesn't relate to the stipulation.
25 Q.   In the damages that you calculated, Mr. Herrington, did

RYAN HERRINGTON - CROSS

1  you rely on any sales for products sold by OPTO in 2023?

2  A.   No.

3        MR. LAREAU:  No further questions, Your Honor.  Pass

4  the witness.

5        THE COURT:  You may cross examine.

6        MR. VanHOUTAN:  May I approach the witness?

7        THE COURT:  You may.

8                    CROSS EXAMINATION

9  BY MR. VanHOUTAN:

10  Q.   Good morning, Mr. Herrington.

11  A.   Good morning.

12  Q.   It seems like all of Honeywell's experts today are from

13  Dallas.  I'm from Houston so I guess we can't be friends.

14  A.   And from Texas A&M it seems like.

15  Q.   Now, you don't have an economics degree, correct?

16  A.   I don't have a degree; although, I've been recognized as

17  an economic expert numerous times.

18  Q.   And you are not an antitrust expert, correct?

19  A.   I wouldn't classify myself as an antitrust expert;

20  although, I obviously have given opinions in the past on

21  competition, which is the opinions I'm giving here.

22  Q.   Your company FTI has a website, correct?

23  A.   Oh, yes, we have a website.

24  Q.   And on that website it lists some individuals who are

25  antitrust experts and it doesn't identify you, correct?

RYAN HERRINGTON - CROSS

1  A.   Oh, as I said in my deposition, I think the website lists
2  individuals that may have that particular expertise, but there
3  are countless individuals at FTI that aren't on the website
4  that also have antitrust experience.
5  Q.   You talked a lot about demand.  I want to ask some
6  questions about markets.  You agree that a market exists for
7  laser and CCD scanners with the ability to read stacked
8  barcode symbologies like PDF417, correct?
9  A.   A market exists in the sense that sales have clearly been
10 made in that market.  Now, the level of sales, I think, is
11 what is in question and whether that constitutes demand.
12 Q.   And based on sales alone, you're not able to tell me what
13 is demand versus lack of demand, right?  You're just making
14 that up.
15 A.   Oh, I'm not making it up.  I think there's no bright line
16 test.  I think Dr. Adams would agree there's no bright-line
17 test.  You have to look at everything in totality.  So I think
18 looking at all the evidence here would suggest there's a lack
19 of demand.
20      And what Dr. Adams did is he didn't actually look at even
21 demand for laser scanners.  His opinion was there was a demand
22 for scanners that can read that symbology.  So he wasn't even
23 looking at the right thing.
24 Q.   It's your opinion there's a lack of demand, correct?
25 A.   My opinion is the evidence would suggest there's a lack

RYAN HERRINGTON - CROSS

1  of demand.  I certainly didn't see evidence put forward that

2  there is demand.  And really, that's the failure of proof on

3  Dr. Adams.  That's ultimately his burden, is my understanding.

4  Q.   And you couldn't tell me in your deposition at what sales

5  level in your opinion would be demand versus lack of demand,

6  correct?

7  A.   I agree, there's no bright-line test.

8  Q.   But you agree there is a market for these products with

9  the functionality we've discussed, stacked barcode

10  symbologies, right?

11  A.   I believe that there have been sales made in that

12  marketplace.  But if there was a true demand for laser

13  scanners that could decode 2D Barcode Products or 2D barcode

14  scanners, I would have expected the testimony from OPTO's own

15  30(b)(6) witnesses to be very different than the testimony I

16  relied on for my opinion.

17  Q.   You agree that OPTO was selling laser and CCD scanners

18  with the ability to read stacked barcode symbologies like

19  PDF417 to customers before this lawsuit, right?

20  A.   Yes.

21  Q.   It was selling in the neighborhood of $5 million a year

22  worth of those products, correct?

23  A.   I don't remember the exact number; but if that's what

24  you're stipulating to, then that wouldn't surprise me that

25  they may have made sales like that.

RYAN HERRINGTON - CROSS

1   Q.   And over the past five years, it's roughly $90 million
2   worth of sales that OPTO's made in this market to these
3   customers, correct?
4   A.   Again, I don't have that number memorized; but if that's
5   what you're saying they did, it wouldn't necessarily surprise
6   me.  But again, I think if the demand, then, was for a laser
7   scanner to be able to read that symbology, when that
8   functionality was removed, I would have again expected
9   different testimony from OPTO's 30(b)(6) witnesses and I would
10  expect to see Dr. Adams identify customers or sales that were
11  lost because there was so much pent-up demand for these
12  products.  And that's not what I saw.
13  Q.   And you didn't analyze the sale of OPTO's laser or CCD
14  scanners with the capability to -- strike that.
15       You didn't analyze OPTO's laser or CCD scanners after the
16  ability to decode stacked barcode symbologies was removed,
17  correct?
18  A.   Well, I think I said in my direct that in 2022 I think
19  they still sold 1 million laser scanners in the first seven
20  months of 2022, I believe.
21  Q.   As compared to 5 million the year before when that
22  capability was there?
23  A.   That's potentially true.  Although, what I would say is I
24  think -- and I said this in my deposition -- there are a lot
25  of reasons that could affect sales numbers.

RYAN HERRINGTON - CROSS

1  Q.   After this lawsuit was filed, OPTO removed the capability

2  to decode stacked barcode symbologies from its laser and CCD

3  products, correct?

4  A.   I think that's what OPTO contends and I believe I relied

5  on OPTO's contentions for that understanding.  But I think as

6  we all saw yesterday, there may be a question on why OPTO

7  removed that functionality, at least based on a couple of

8  exhibits that were put up yesterday.

9  Q.   If you can go to your rebuttal expert report in your

10 binder there.

11 A.   Sure.

12 Q.   And turn to page 4.

13 A.   Okay.

14 Q.   At the bottom of paragraph 6 of page 4, you state,

15 "Specifically, OPTO alleges that," quote -- sorry, "that

16 'after Honeywell filed the complaint, OPTO was forced to turn

17 off the stacked linear barcode decoding function in its laser

18 scanner products in light of Honeywell's allegations.'"

19       Did I read that correctly?

20 A.   Yes.  And I cite defendant's supplemental and amended

21 objections and responses.  So I'm quoting OPTO's allegations,

22 correct.

23          MR. VanHOUTAN:  Just for the record, that's been

24 admitted into evidence.  It's Plaintiff's Exhibit 61, response

25 to rog 11.

RYAN HERRINGTON - CROSS

1  Q.   You didn't do any comparison to determine how OPTO's

2  sales of the products that we've been discussing, laser and

3  CCD scanners, with the capability we've been discussing, the

4  ability to decode barcode -- stacked barcode symbologies,

5  compared to when the functionality was there and when it was

6  removed, correct?

7  A.   I think we just went over that a little bit when you

8  asked me sales before and after.  And what I would say is -- I

9  think I answered this in my deposition.  There are many

10  reasons sales can be different, but I didn't do a formal

11  analysis of that.

12  Q.   And you don't know whether any of those reasons apply,

13  correct?

14  A.   I don't know why any of the reasons apply.  I guess what

15  I would be asking is I would have expected to see, like I

16  said, different testimony from OPTO on if it was truly because

17  of the removal of functionality and that was -- that was the

18  demand was for this functionality, I would have expected

19  different responses from OPTO.

20  Q.   So you don't have a firm opinion either way, correct?

21  A.   No, I was rebutting Dr. Adams' analysis and this is a

22  basic tenet of his analysis; that when it falls, it causes the

23  rest of his opinion to fail.

24  Q.   You agree that there is a demand in the market for area

25  image scanners with the ability to read stacked barcode

RYAN HERRINGTON - CROSS

1   symbologies like PDF417, correct?

2   A.   I would not disagree that -- and I don't think anybody

3   has said in this case that there's not a demand for scanners

4   to read it, and that was the point.  Because I understand that

5   PDF417 is used on driver's licenses, as we've heard.  It's

6   used for boarding passes.  So there may be a demand for

7   scanners and specifically image scanners like you point out.

8   But again, I was being specific to laser scanners which is the

9   products that were at issue here.

10  Q.   Honeywell's Voyager 1400 is an area image scanner with

11  the capability to decode stacked barcode symbologies, correct?

12  A.   Careful.  So there's three different Voyager 1400s in the

13  sense of what they turn on and turn off.  And so my

14  understanding would be, if you saw my demonstrative exhibits,

15  the large amount of sales that were in red that dwarfed what

16  Dr. Adams said actually competes with the laser-based

17  scanners, those would be what would be called an image scanner

18  that has its full functionality turned on.  Whereas, the one

19  that Dr. Adams said competes of the Voyager 1400s is the one

20  that's just labeled 1D plus PDF417, and that's where sales

21  were only $11,148 over a three-year period.

22  Q.   But you agree that there's demand in the market for an

23  area image scanner like the Voyager 1400 with the capability

24  to decode stacked barcode symbologies like PDF417, correct?

25  A.   There's clearly demand for the 1400 that has the ability

RYAN HERRINGTON - CROSS

1  to do the 2D, the full 2D because you can see that in some of
2  the sales.  As compared to the 1D PDF417, I would say that
3  shows a lack of demand.  $11,000 over a three-year period
4  seems low to me.  And honestly, Dr. Adams agreed.  He said
5  they were low sales.
6  Q.   So I want to just be clear on this and your opinion.  If
7  you could turn to your deposition transcript.
8  A.   Sure.
9  Q.   And let's go to page 208.
10 A.   Okay.
11 Q.   Starting at line 13.
12 A.   Okay.
13 Q.   Give me one moment.
14 A.   Okay.
15 Q.   I want to switch gears a little bit.
16      You never asked anyone at Honeywell in this case whether
17 there was a demand or a lack of demand for laser and CCD
18 scanners that could read PDF417, did you?
19 A.   No.  I looked at OPTO's own testimony.
20 Q.   And you don't have an opinion on whether a large base of
21 installed laser CCD scanners would create a continuing demand
22 for that product, correct?
23 A.   I would have expected if there was a large installed base
24 to have very different answers when that functionality was
25 turned off.

RYAN HERRINGTON - CROSS

1  Q.   Let me ask my question again.

2  A.   Sure.

3  Q.   You don't have an opinion on whether a large base of

4  installed laser scanners would create a continuing demand for

5  that product, correct?

6  A.   I don't think I have an exact opinion on that in my

7  report; although, I obviously point out what OPTO said when

8  asked if any customers had come to them with any -- did they

9  lose any customers when they turned it off and the answer was

10 no.  The number that would even use this functionality is

11 not -- is not zero, but not very big, I think is the quote.

12 Q.   Are you done?

13 A.   Yes.

14 Q.   And you don't have an opinion on what would be required

15 for a customer with laser or CCD scanners to switch to using

16 image scanners, correct?

17 A.   I don't think I have an opinion on that, no.

18 Q.   Mr. Herrington, now that I have my house in order a

19 little bit, if we can go back to your deposition transcript.

20 A.   Okay.

21 Q.   Let's go to page 207, please.

22 A.   Okay.

23 Q.   And we were talking about demand in the market for area

24 image scanners that can read PDF417.  Do you recall that?

25 A.   Yes.

RYAN HERRINGTON - CROSS

1  Q.   And I asked you at line 13, "So, I want to -- I want to
2  ask -- before we talk about laser scanners -- in your opinion,
3  is there a demand for area image scanners that can decode at
4  least one of PDF417 or MicroPDF417?"
5       And you said, "Yeah, I wouldn't disagree with that.  I
6  think there's probably a demand for that."
7       And then you went on, and please feel free to read the
8  rest of it.
9  A.   Yeah, I think we should keep going all the way through
10 208, which is where you went to first, and I think you'll see
11 a full answer there that's very consistent with what I gave.
12 Q.   Okay.  There was no qualification regarding it having to
13 have the full complement of stacked symbologies and 2D, like
14 QR symbologies, anything like that, right?
15 A.   I guess I'd have to read this in its entirety to
16 understand.  In your question there wasn't a qualification of
17 that.
18 Q.   Okay.
19 A.   But I think that's the way I would understand it.  I
20 mean, I don't think anywhere in this report I said that I
21 thought $11,000 of sales is demand.
22 Q.   And you can't tell me if it was $30,000, whether that
23 would be demand, or if it was $45,000, if that would be
24 demand.  You're just saying that the number you've seen shows
25 a lack of demand, correct?

RYAN HERRINGTON - CROSS

1  A.   There's no bright-line test.  I mean, obviously you can

2  see just between the two products that I put up in my

3  demonstratives, the one that is the area image scanner that

4  had the ability to read all 2D barcode symbologies obviously

5  had -- I don't know.  It was definitely over a million dollars

6  in sales in just one year, I think.  Meanwhile, the one that

7  could only read 1D plus PDF417 sold by Honeywell had $11,148

8  over a three-year period.

9  Q.   You have no basis to disagree with Dr. Adams that there

10  are price-sensitive customers for whom the best option is

11  often a laser or CCD scanner product rather than a typically

12  more expensive area image scanner, correct?

13  A.   I don't think I have an opinion on that.  Again, but

14  that's not consistent with OPTO's testimony about what they

15  did or what customers did when they removed the functionality.

16  Q.   I just want to be clear.  You don't have an opinion on

17  that, correct?

18  A.   I think that's what I said.  It's not consistent with

19  what I saw.  That's my opinion.  But I don't have a specific

20  opinion on the price sensitivity.

21  Q.   Okay.  Let me just try to -- so we're speaking the same

22  language.

23  A.   Sure.

24  Q.   If you have an opinion, you have an opinion --

25  A.   Okay.

RYAN HERRINGTON - CROSS

1  Q.   -- and I'm happy to hear what that opinion is.
2       If you don't have an opinion, then you don't have an
3  opinion.
4  A.   Okay.
5  Q.   So let me ask my question again.
6  A.   Sure.
7  Q.   Do you have a basis to disagree with Dr. Adams that there
8  are price-sensitive customers for whom the best option is
9  often a laser or CCD scanner product rather than a typically
10 more expensive area image scanner?
11 A.   Directly, no, besides what I just previously stated.
12 Q.   You understand Honeywell is seeking a royalty in this
13 case on OPTO's laser and CCD scanning products that can decode
14 stacked barcode symbologies like PDF417, correct?
15 A.   Can you repeat your question, I'm sorry.
16 Q.   Sure.  I'll try to speak slower.
17 A.   Okay.
18 Q.   You understand Honeywell is seeking a royalty in this
19 case on OPTO's laser and CCD scanning products that can decode
20 stacked barcode symbologies like PDF417, correct?
21 A.   Yes.  I think they've already sought to.  It's already
22 been ruled.  But yes.
23 Q.   And once the feature allowing those products to read
24 PDF417, for example, is turned off, Honeywell is no longer
25 seeking a royalty on those products, correct?

RYAN HERRINGTON - CROSS

 1  A.   There may not be an ongoing royalty because it wouldn't
 2  fall into the definition of 2D Barcode Products; but I think
 3  based on the settlement agreement, License and Settlement
 4  Agreement that I reviewed, there were lump sum payments that
 5  were made pre the agreement that would, I assume, encompass
 6  part of the benefit of being able to sell 1D products as
 7  defined in the agreement.
 8  Q.   I think you said this in your answer, but just to be
 9  clear.  On a go-forward basis, if OPTO removes its
10  functionality from its products, Honeywell is no longer
11  seeking a royalty payment, correct?
12  A.   I think they're not seeking a royalty payment
13  specifically related to those products if they're not defined
14  as 2D Barcode Products as the jury defined it.
15  Q.   In your opinion, there is a lack of demand in the market
16  for the ability for a laser or CCD scanner to read stacked
17  barcode symbologies like PDF417, correct?
18  A.   It would suggest there's a lack of demand.  The main
19  opinion is that Dr. Adams didn't even look at that to see if
20  there was demand for laser scanners.  His opinion was there
21  was a demand for scanners.  That's the main thrust of the
22  opinion.
23  Q.   And you prepared -- I think your counsel started to
24  allude to it -- a damages report for effectively the jury
25  trial in this case, correct?

RYAN HERRINGTON - CROSS

1  A.   Yes, I did prepare a damages report for the jury trial.

2  Q.   How many -- let me say that again.  How much Honeywell

3  was demanding in this case, correct?

4  A.   Yes.

5  Q.   And you agree that Honeywell was seeking millions of

6  dollars in damages in this case from OPTO for the very

7  products that you say have no demand in the marketplace,

8  correct?

9          MR. LAREAU:  Objection, Your Honor.  Counsel is

10  referring to the portions of the report that were stricken or

11  ruled on through summary judgment.  He's referring to

12  Section 5 which was excluded by Your Honor in the summary

13  judgment order.

14          MR. VanHOUTAN:  Your Honor, this is just allegations

15  in their complaint.

16          THE COURT:  To the extent -- well, I mean, I

17  understand the distinction so I will not be misled, I assure

18  you.  But I would appreciate, if you're going to talk about

19  actual dollars, that you do make the differentiation between

20  the two areas of damages.

21          MR. VanHOUTAN:  I'm not going to ask any further

22  questions about that.

23  Q.   Let's talk about market power a little bit.

24  A.   Okay.

25  Q.   You agree that market power can be determined from direct

RYAN HERRINGTON - CROSS

1  evidence, including supracompetitive prices, restricted
2  output, and excluding competition.
3  A.  I don't think I disagree with that.
4  Q.  You don't know how to determine whether a company has
5  real market power, which you classify as real, or just regular
6  market power, correct?
7  A.  I think real market power was just citing what was in a
8  supreme court decision in talking about power over price, so
9  the ability to exclude competition.
10 Q.  So real market power is just regular market power,
11 correct?
12 A.  I mean, power over price, excluding competition, I think
13 you -- the point is you have to prove either, and I don't
14 think that's what Dr. Adams did.
15 Q.  So power over price and the ability to exclude, that's
16 real market power, right?
17 A.  I don't know if I would use just real.  My understanding
18 is that's a definition of how you try to determine if there's
19 market power.
20 Q.  I'm just under -- trying to understand your definition of
21 real versus not real.
22     So would you agree that market power, real, regular,
23 otherwise, is the power over price and the ability to exclude
24 competition?
25 A.  I don't think I define real market power.  I think I'm

RYAN HERRINGTON - CROSS

1  just citing it.  If we go to my report, I think I'm just

2  making a cite there.  I don't think I'm trying to define real

3  market power.

4  Q.    Okay.  Fair enough.

5        So market power is the power over price or the ability to

6  exclude competition, correct?

7  A.    I think that's what's in the literature.  But again, I'm

8  not putting forth a formal definition.  That's not part of my

9  opinion per se.

10  Q.    You agree that power over price is the power to force a

11  purchaser to do something that it would not do in a

12  competitive market and/or the ability of a single seller to

13  raise price and restrict output, correct?

14  A.    That sounds reasonable, but I would probably want to see

15  the formal definition before I just agree.

16  Q.    And you understand that OPTO removed the functionality to

17  decode stacked barcode symbologies like PDF417 from its laser

18  and CCD products as a result of this litigation, correct?

19  A.    I don't know if it's as a result of this litigation.  I

20  would say that's what OPTO alleges.  But as we all saw

21  yesterday, that may not be the case why they removed it.

22  Q.    And you haven't seen any evidence that OPTO turned off

23  this functionality or removed this functionality for any

24  reason outside of this litigation, correct?

25  A.    Well, I think we saw two exhibits so --

RYAN HERRINGTON - CROSS

1   Q.   Other than -- sorry.

2   A.   -- I disagree.

3   Q.   Other than that, have you seen anything else?

4   A.   Other than that, no.  But I haven't seen anything that

5   says that they did remove it because of -- this functionality

6   except for their own contentions.

7   Q.   I think you testified to this, but correct me if I'm

8   wrong.  One of the options OPTO had from Honeywell's royalty

9   demands in this litigation was to remove the functionality

10  from the products; and that's what they did, right?

11  A.   That was one option among at least three that Dr. Adams

12  and I both agree they had those choices; and they chose to do

13  the third, correct.

14  Q.   And you don't have an opinion about whether continuing to

15  pay a 7 percent royalty on the products accused in this case,

16  laser and CCD scanners, would have made them unprofitable for

17  OPTO, right?

18  A.   I don't have an opinion because I didn't see any evidence

19  or analysis put forward by Dr. Adams to show that -- what the

20  profit margins were.  So I would have expected -- if that's

21  the reason, I would have expected to see an analysis of that,

22  of what he calls the accounting profitability, but what I call

23  the real dollars and cents.

24  Q.   So let me just be clear in my question again.  You don't

25  have an opinion yourself, do you?

JA1676

RYAN HERRINGTON - CROSS

1  A.   No.  I didn't -- I don't have an opinion.  I have a -- I
2  didn't see any profitability numbers to do that calculation.
3  Q.   You have no criticism of Dr. Adams' HHI calculations or
4  other market concentration analyses, do you?
5  A.   Just outside of the fact what I pointed out in my direct
6  was that he clearly was using the wrong market.
7  Q.   And you didn't ask anyone at Honeywell for any market
8  share data, correct?
9  A.   No, I don't believe so.  I think, as Dr. Adams said,
10 there was some market share data that had been produced.
11 Q.   And you acknowledge that the Voyager product that
12 Honeywell sells in one of the versions competes with OPTO's
13 laser and CCD scanners, correct?
14 A.   In one of the versions.  Yeah, I think Dr. Adams says
15 that the Voyager 1400 1D plus PDF417 is the product that
16 specifically competes with the laser scanners.
17 Q.   And that Voyager product is an image scanner, correct?
18 A.   It's an image scanner, as I understand it, with the
19 functionality turned off to just allow for 1D and PDF417.
20 Q.   Okay.
21 A.   So it's what Honeywell deems as competitive with the
22 laser scanners.
23 Q.   And it competes with -- I think you just said it there.
24 It competes with OPTO's laser and CCD scanners with that same
25 functionality, correct?

JA1677

RYAN HERRINGTON - CROSS

1  A.   I think that's what Honeywell meant to do with that
2  device, correct.
3  Q.   So the two products that are competing are just scanners:
4  One's a laser scanner; one's an image scanner, correct?
5  A.   One's a laser scanner -- that would be OPTO's -- but with
6  the ability to read a 2D Barcode Product, which we now
7  understand means it's a 2D Barcode Product under the License
8  and Settlement Agreement.  That competes with a scanner that
9  has all functionality removed except for the ability to read
10  1D and PDF417.  That's the way I understand it.
11  Q.   Okay.  Let's focus on the hardware.  One is a laser
12  scanner; one is an image sensor scanner, right?
13  A.   I think it is an image sensor scanner that has the
14  functionality removed.
15  Q.   They're both scanners, correct?
16  A.   Yes, I think they are both scanners.
17  Q.   You talked about the low sales of a particular version of
18  the Voyager Honeywell product, correct?
19  A.   Yes.
20  Q.   Honeywell has no plans to discontinue that product, do
21  they?
22  A.   Not that I know of.
23  Q.   And just to be clear, you're not offering an opinion on
24  whether Honeywell did or did not impermissibly broaden the
25  scope of its patent rights, correct?

JA1678

RYAN HERRINGTON - CROSS

1  A.   No, I'm not offering that opinion, to answer your
2  question.
3  Q.   Thank you.
4       You were talking about Honeywell's licensing and license
5  agreements.
6  A.   Yes.
7  Q.   And some of those licenses relate to a mandate by the FTC
8  that Honeywell go out and license some of its patents, right?
9  A.   Possibly.
10 Q.   You talked about, again, the low sales of the Voyager
11 product.  Are you sure you added up everything correctly?
12 A.   I thought I did.
13 Q.   Okay.  You got both the ivory model and the black model,
14 correct?
15 A.   I would have to look at my exact exhibit to see.
16 Q.   Okay.
17 A.   I think what Dr. Adams said in his report was it's 15,000
18 annually.  And I think what I said was it's $11,148 over that
19 three-year period.  But either way, clearly it's a very low
20 amount of sales because Dr. Adams thought it was low even at
21 15,000 annually, so I wouldn't disagree.
22 Q.   Okay.  Let's go to your rebuttal report at Footnote 31.
23 A.   Okay.
24 Q.   And at the top -- I'm not going to read it out loud, but
25 can you read it for yourself, please, and just let me know

RYAN HERRINGTON - CROSS

1   when you're ready.

2   A.   Footnote 31?  I've read Footnote 31.

3   Q.   So it states -- and I just want to read the material

4   names.  "Scanner 1400G 1D PDF417, IVORY or USB Kit 1400G:

5   1D/PDF417/IVORY," correct?

6   A.   Yes.

7            MR. VanHOUTAN:  If we could bring up DX127, please.

8            And if we could go to page 3 to the hardware

9   scanner.

10  Q.   And we see here under SKU types "1D, PDF417, ivory" --

11  I'm looking at the bottom -- and "1D, PDF417, black."

12       Do you see that?

13  A.   Yes.

14  Q.   You didn't include the black, did you?

15  A.   It doesn't appear that I did.  I don't know if those

16  sales are made in the United States or not.

17  Q.   Assuming they are, you don't know what that brings the

18  sales of this particular Voyager product to, do you?

19  A.   If they're made in the United States, no, but -- I would

20  assume, if that's what Dr. Adams did and how he got 15,000, as

21  we both agree, they're still low.  They don't compare at all

22  to the demand that we see for Honeywell's full 2D product, the

23  Voyager 1400.

24           MR. VanHOUTAN:  No further questions.  Thank you,

25  Mr. Herrington.

```
 1              THE COURT:  Any redirect?
 2              MR. LAREAU:  No, Your Honor.
 3              THE COURT:  Thank you.  You may stand down.
 4              (Witness stepped down.)
 5              THE COURT:  Additional evidence for Honeywell?
 6              MR. PLEUNE:  No further witnesses from plaintiff,
 7   Your Honor.
 8              THE COURT:  Evidence for OPTO?
 9              MR. VanHOUTAN:  Your Honor, would it be appropriate
10   to take a short break so we can confer and see if we've got
11   any rebuttal?
12              THE COURT:  All right.  We'll take a 15-minute
13   break.
14              MR. VanHOUTAN:  Thank you.
15              (Brief recess at 10:45 AM.)
16              (Court back in session at 11:01 AM.)
17              THE COURT:  Will there be rebuttal evidence from
18   OPTO?
19              MR. VanHOUTAN:  No, Your Honor.
20              THE COURT:  Care to make or renew your motion?
21              MR. PLEUNE:  Yeah, we'd like to renew our motion
22   under 52(c).
23              THE COURT:  Would you like to be heard on it any
24   further?
25              MR. PLEUNE:  No, Your Honor.
```

JA1681

1          THE COURT:  Would you like to respond any further?

2          MR. VanHOUTAN:  We'd like to make our own motion

3    which arguably would be a response.

4          THE COURT:  Yes.

5          MR. VanHOUTAN:  Very briefly, Your Honor.

6          Impermissibly broaden the scope of the patent grant,

7    we think we've shown that.  The evidence has shown that.

8    There are two categories of products in the agreement.  One is

9    subject to a covenant not to sue.  One is subject to a

10   license.  According to Honeywell, only one product

11   functionality transforms one product to the next, but they

12   don't have patents on that.

13         And then as far as the anticompetitive effect, we've

14   now heard the evidence.  OPTO was selling a lot of these

15   beforehand.  And after this litigation, in response to the

16   litigation, OPTO is not selling very many and they're not

17   available to the consumers.  That's direct evidence of

18   anticompetitive effect.  We've talked about market

19   concentration and how Honeywell is a big player; has more of

20   an impact on the market than somebody who has 1 or 2 percent.

21         And then finally, the anticompetitive effect

22   evidence we've heard, it's not competitive efficiencies when

23   subject to an impermissible extension of a patent grant it

24   requires a consumer or someone to take something out of the

25   market, which OPTO was forced to do here, or otherwise pass on

1  a 7 percent profit increase -- price increase to the consumer

2  and it's really the consumer that's harmed.  And that's sort

3  of the anticompetitive effect analysis.

4           So we would move under Rule 52(c.)

5           THE COURT:  All right.

6           MR. PLEUNE:  And I'll just briefly respond to that,

7  Your Honor.

8           OPTO's statutorily precluded from patent misuse

9  under 35 U.C.S. Section 271.  They're contractually precluded

10 under Section 5.3 of the agreement.  And I think, as we saw

11 from the testimony today, they have failed to show any market

12 power by Honeywell.  I think what we have seen is that there

13 is a significant lack of evidence of anything that would

14 actually prove market power, particularly for the market as

15 Dr. Adams defined it.  If anything, we saw that that was an

16 extremely small market for which there was no demand and

17 certainly no evidence of demand.

18           THE COURT:  The Court finds that there is

19 insufficient evidence from which the Court could find by clear

20 and convincing evidence that OPTO has established that the

21 license agreement had anticompetitive effects even if it had

22 the effect of impermissibly broadening the scope of

23 Honeywell's patents, which the Court is not deciding.

24           The Court finds as fact that there is not clear and

25 convincing evidence why OPTO removed the ability to decode 2D

 1    symbologies from the laser scanner products in dispute, which

 2    is quite curious to the Court because if there was such

 3    evidence, it would be easily presented.

 4          Nor is there clear and convincing evidence of

 5    anticompetitive effects in the market.  Dr. Adams testified

 6    based on the HHI analysis that there is a risk of

 7    anticompetitive harm in the context of what he described as

 8    the closest market for which he has data.  But OPTO did not

 9    present any evidence of increased prices, limitations in the

10    availability of the products, or other anticompetitive effects

11    in any relevant market.

12          Mr. Herrington further described some of the

13    deficiencies in the evidence with respect to anticompetitive

14    effects in the market.

15          In the absence of proof of anticompetitive effects,

16    which the parties agree is required to prove patent misuse,

17    the Court concludes as a matter of law that OPTO has not

18    established patent misuse.  So Honeywell's motion is granted

19    and OPTO's motion is denied.

20          Now, one last thing, at least on my list.  Honeywell

21    has requested fees and costs pursuant to 4.7.  Have the

22    parties discussed that?  Is that part of your resolution?

23          MR. PLEUNE:  No, Your Honor, that's not part of the

24    resolution.  My understanding is that we would address that in

25    the post-trial briefing.

JA1684

```
 1            THE COURT:  All right.  And I would appreciate both
 2   sides addressing the very issue whether that -- what fees that
 3   covers because the provision -- or the phraseology in 4.7 is
 4   fees and costs.  The Court notices, I think, at least two
 5   other places the agreement references attorney's fees.  So I
 6   don't know whether the parties dispute whether 4.7 covers
 7   attorney's fees.  Based on the history of this case, I assume
 8   you do.  But I would ask both sides to address what fees and
 9   costs it actually covers under 4.7 in your post-trial
10   briefings.
11            Anything further for us to discuss today?
12            MR. STEVENS:  Your Honor, as I try to do in all
13   these cases, thank you and all of your staff's time this week
14   and leading up to this case.  We certainly appreciate it.
15   It's been an honor to try a case in your courtroom.
16            THE COURT:  Appreciate that.
17            MR. MUCKENFUSS:  I echo that, Your Honor.
18            Nothing further.
19            THE COURT:  Yeah, I was going to say, look, I know
20   and remember the effort it takes to get ready for a trial like
21   this and to try a case like this.  The long nights, the long
22   weekends -- absence of weekends, actually.  And so I always
23   appreciate not only the effort involved, but the art of trying
24   a case, which, you know, is dying, unfortunately.  Just --
25   there are not enough opportunities to try cases.  Not that I'm
```

JA1685

1  encouraging things go to trial.

2          And I do appreciate both sides giving some of your

3  younger attorneys the opportunity to participate actively in

4  the litigation.  I think that's very important.  You know,

5  we're all going to age out at some point and we need the next

6  generation to take up where we leave off.  So thank you all

7  very much for your collective efforts.

8          You know, the Fourth Circuit used to have a practice

9  of the judges would come down off the high and greet counsel,

10  as they called it.  Now, when COVID hit, they stopped doing

11  that.  I don't know if they've taken that back up.  Not to

12  pretend to be the Fourth Circuit, I would like to come down

13  and do the same.

14          (End of proceedings at 11:08 AM.)

15                          *****

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 6th day of August 2023.

17

18

19                              s/Cheryl A. Nuccio

20                              Cheryl A. Nuccio, RMR-CRR
                                Official Court Reporter

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | |
| *Plaintiffs*, | |
| v. | |
| OPTO ELECTRONICS CO., LTD., | Case No. 3:21-cv-00506 |
| *Defendant and Counterclaim Plaintiff*, | |
| v. | |
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | |
| *Counterclaim Defendants*. | |

**PLAINTIFFS' NOTICE OF APPEAL**
**TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

Notice is hereby given under Federal Rule of Appellate Procedure 3 that Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. (collectively "Honeywell") appeal to the United States Court of Appeals for the Fourth Circuit the final Judgment entered on July 20, 2023 (Dkt. 353) as amended by the Amended Judgment entered on July 26, 2023 (Dkt. 358), and all orders, decisions, verdicts, rulings, findings, and conclusions that underlie or relate thereto, including but not limited to the Court's April 20, 2023, Order (Dkt. 195) granting-in-part summary judgment against Honeywell regarding Honeywell's claim under Section 5.1 of the License and Settlement Agreement between Honeywell and OPTO Electronics

JA1688

Co., Ltd., and the Court's June 2, 2023, Order (Dkt. 223) denying Honeywell's motion for

reconsideration.

Submitted August 14, 2023

<div style="margin-left: 45%;">

/s/ *S. Benjamin Pleune*

S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**ALSTON & BIRD LLP**
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

</div>

JA1689

**CERTIFICATE OF SERVICE**

I certify that on August 14, 2023 I filed a copy of this NOTICE OF APPEAL using the

Court's CM/ECF system, which automatically provides service to all counsel of record.

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

3

JA1690

Exhibit 3

JA1691

# LICENSE AND SETTLEMENT AGREEMENT

This License and Settlement Agreement ("Agreement") is made and entered into, effective as of the date when both Parties have executed the Agreement (the "Effective Date"), by and between:

1. Honeywell International Inc. ("Honeywell International"), Hand Held Products, Inc., Metrologic Instruments, Inc., Metrologic (Suzhou) Technology Co., Ltd., Vocollect Inc., Intermec IP Corp., Intermec Technologies Corp., Datamax-O'Neil Corp., Honeywell Productivity Solutions GmbH, Honeywell (China) Co., Ltd. (all of the foregoing collectively referred to herein as "Honeywell"); and

2. Zebra Technologies Corporation ("ZTC"), Symbol Technologies LLC, Zebra Technologies Europe Limited, Zebra Technologies GmbH, Zebra Technologies Germany GmbH, Genuine Zebra Technologies Trading (Shanghai) Co., Ltd., Zebra Technologies B.V., Zebra Technologies Netherlands B.V. (all of the foregoing collectively referred to herein as "Zebra").

Honeywell and Zebra shall be referred to herein collectively as the "Parties" and individually as a "Party."

WHEREAS, certain disputes have arisen between Honeywell and Zebra regarding the intellectual property rights of each Party allegedly infringed by the other Party that have resulted in the filing of numerous actions, as defined below; and

WHEREAS, each Party denies liability to the other in all of the disputes and in the interest in avoiding protracted litigation, agree to resolve the Actions with the undertakings set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, conditions, and agreements set forth herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, ZTC agrees to pay Honeywell International an amount of $360,000,000, as described below, and the Parties further agree as follows:

## 1. DEFINITIONS

1. <u>Actions</u>. The term "Actions" shall mean:
    a. Certain Barcode Scanners, Mobile Computers with Barcode Scanning Capabilities, Scan Engines, And Components Thereof, Inv. No. 337-TA-1285 (ITC, filed Sept. 28, 2021)
    b. Honeywell International, Inc. v. Zebra Technologies Corp., Case No. 21-cv-01008 (W.D. Tex. filed Sept. 29, 2021)
    c. Honeywell International Inc. v. Zebra Technologies Corp., Case No. 22-cv-03428 (GRB) (SLT) (E.D. N.Y.) (W.D. Tex. filed Sept. 29, 2021)
    d. Certain Barcode Scanners, Scan Engines, Mobile Computers with Barcode Scanning Functionalities, Products Containing the Same, and Components Thereof, Inv. No. 337-TA-1317 (ITC, filed May 2, 2022)
    e. Honeywell International Inc. v. Zebra Technologies Corp., Case No. 22-cv-00442 (W.D. Tex., filed May 2, 2022)
    f. Certain Barcode Scanners, Scan Engines, Mobile Computers with Barcode Scanning Functionalities, Products Containing the Same, and Components Thereof II, Inv. No. 337-TA-1321 (ITC, filed May 20, 2022)
    g. Honeywell International, Inc. v. Zebra Technologies Corp., Case No. 22-cv-00517 (W.D. Tex., filed May 20, 2022)
    h. Honeywell International Inc. v. Zebra Technologies Corp., Case No. 22-cv-00519 (W.D. Tex., filed May 20, 2022)
    i. Hand Held Products, Inc. v. Zebra Technologies Corp., Case No. 22-cv-00701 (D. Del., filed May 27, 2022)

HONEYWELL-00260852

JA1692

j.   (2021) Hu 73 Zhi Min Chu No. 1414 ((2021)沪73知民初1414号)

k.   (2021) Hu 73 Zhi Min Chu No. 1415 ((2021)沪73知民初1415号)

l.   (2021) Hu 73 Zhi Min Chu No. 1416 ((2021)沪73知民初1416号)

m.   (2021) Yue 03 Min Chu No. 7474  ((2021)粤03民初7474号)

n.   (2021) Yue 03 Min Chu No. 7475  ((2021)粤03民初7475号)

o.   (2021) Yue 03 Min Chu No. 7378  ((2021)粤03民初7378号)

p.   Hand Held Products, Inc. ./. Zebra Technologies Corp. et al., RC Mannheim, docket no. 7 O 128/21 [EP 653]

q.   Hand Held Products, Inc. ./. Zebra Technologies Corp. et al., RC Mannheim, docket no. 7 O 52/22 [EP 350]

r.   Hand Held Products, Inc. ./. Zebra Technologies Corp. et al., RC Mannheim, docket no. 7 O 53/22 [EP 581]

s.   Metrologic Instruments, Inc. ./. Zebra Technologies Europe Limited, docket no. 21 O 13072/21 [EP 162]

t.   Metrologic Instruments, Inc. ./. Zebra Technologies Corporation and Zebra Technologies Germany GmbH, docket no. 21 O 2570/22

u.   Hand Held Products, Inc. ./. Zebra Technologies Corporation, Zebra Technologies Germany GmbH, and Zebra Technologies Europe Limited, docket no. 44 O 5945/22

v.   (1) Hand Held Products, Inc. (2) Metrologic Instruments, Inc. (Claimants) -v- (1) Zebra Technologies Europe Limited (2) Zebra Technologies Corp.(Defendants) and (3) Honeywell Control Systems Limited (Third Party) with claim number HP-2021-000036 before the Patents Court, in the Intellectual Property List (Chancery Division), Business and Property Courts of England and Wales, High Court of Justice

w.   Hand Held Products Inc. v. Zebra Technologies B.V., Zebra Technologies Netherlands B.V., and Zebra Technologies Europe Ltd., Application No. request for admission to accelerated regime for patent cases, C/09/629948-KG/RK 22-656

x.   Hand Held Products Inc. v. Zebra Technologies B.V., Zebra Technologies Netherlands B.V., and Zebra Technologies Europe Ltd., proceedings on the merits, EP 3 633 537

y.   Honeywell (China) Co., Ltd. v. Genuine Zebra Technologies Trading (Shanghai) Co., Ltd., Nanjing Bidi Internet of Things Technology Co., Ltd.; Case No.: (2022) Su 01 Minchu2016 (Nanjing Intermediate People's Court)

z.   Honeywell (China) Co., Ltd. v. Genuine Zebra Technologies Trading (Shanghai) Co., Ltd., Guangzhou Jiafan Computer Co., Ltd. (Guangzhou IP Court)

aa.   Certain Barcode Scanners, Mobile Computers with Barcode Scanning Capabilities, Scan Engines, RFID Printers, Components Thereof, and Products Containing the Same, Inv. No. 337-TA-1306 (ITC filed Feb. 4, 2022)

bb.   Certain Barcode Scanners, Mobile Computers with Barcode Scanning Capabilities, Scan Engines, Components Thereof, and Products Containing the Same, Inv. No. 337-TA-1307 (ITC filed Feb. 4, 2022)

cc.   Zebra Technologies Corp. et. al. v. Honeywell International Inc., Case No. 22-cv-00658 (E.D. N.Y. filed Feb. 4, 2022)

dd.   Zebra Technologies Corp. et. al. v. Honeywell International Inc., Case No. 22-cv-00662 (E.D. N.Y. filed Feb. 4, 2022)

ee.   Zebra Technologies Corp. et. al. v. Honeywell International Inc., Case No. 22-cv-00663 (E.D. N.Y. filed Feb. 4, 2022)

ff.   Zebra Technologies Germany GmbH ./. Hand Held Products Inc., Federal Patent Court, docket no. 6 Ni 40/22 (EP) [EP 653]

gg.   Zebra Technologies Germany GmbH ./. Hand Held Products Inc., Federal Patent Court, docket no. 6 Ni 41/22 (EP) [EP 581]

HONEYWELL-00260853

JA1693

hh. Zebra Technologies Germany GmbH ./. Hand Held Products Inc., Federal Patent Court, docket no. 2 Ni 7/22 (EP) [EP 350]

ii. Zebra Technologies Germany GmbH ./. Metrologic Instruments Inc., Federal Patent Court, docket no. 6 Ni 37/22 (EP) [EP 162]

jj. Symbol Technologies LLC ./. Honeywell International Inc., RC Munich, docket no. 7 O 1455/22 [EP 648]

kk. Symbol Technologies LLC ./. Honeywell International Inc., RC Munich, docket no. 7 O 1457/22 [EP 526]

ll. Symbol Technologies LLC ./. Honeywell Productivity Solutions GmbH, RC Munich, docket no. 7 O 1458/22 [EP 526]

mm.    Honeywell Productivity Solutions GmbH ./. Symbol Technologies LLC, Federal Patent Court, docket no. 7 Ni 7/22 (EP)

nn. (1) Symbol Technologies LLC (formerly Symbol Technologies Inc., a limited liability corporation organised and existing under the law of the State of Delaware, USA) (2) Zebra Technologies Europe Limited (Claimants) -v- (1) Honeywell Control Systems Limited (Defendant) with claim number HP-2022-000001 within the Shorter Trials Scheme before the Patents Court, in the Intellectual Property List (Chancery Division), Business and Property Courts of England and Wales, High Court of Justice

oo. Case Docket No. 4W114312: Patent invalidation request against ZL201110220834.X(CN102324014B)-CNIPA

pp. Case Docket No. 4W114314: Patent invalidation request against ZL201110220832.0(CN102324013B)-CNIPA

qq. Case Docket No. 4W114315: Patent invalidation request against ZL200680016023.5(CN101171597B)-CNIPA

rr. (2022）沪73知民初278号 (2022 Hu 73 Zhiminchu No. 278) Genuine Zebra Technologies Trading (Shanghai) Co., Ltd. v. Honeywell International Inc. and Honeywell (China) Co., Ltd

ss. (2022）沪73知民初279号 (2022 Hu 73 Zhiminchu No. 279) Genuine Zebra Technologies Trading (Shanghai) Co., Ltd. v. Honeywell International Inc. and Honeywell (China) Co., Ltd.

tt. And any other Actions or lawsuits filed by either Party or its Affiliates against the other Party or its Affiliates prior to the Effective Date, or any other government investigations targeting a Party or its Affiliates instituted at the request of the other Party or its Affiliates prior to the Effective Date, that are not specifically listed above and are pending as of the Effective Date.

2. <u>Affiliate</u>. The term "Affiliate" shall mean any Person that directly or indirectly controls, is controlled by, or is under common control with a Party during the Term of this Agreement for as long as that control exists, where "control" means: (i) the ownership of, or the power to vote, at least fifty percent (50%) of the voting stock, shares or interests of an entity, or (ii) the right to exercise management control, whether through ownership interest, contract, or otherwise. For avoidance of doubt, (a) Affiliate shall include all current and future subsidiaries of a Party during the Term of this Agreement other than, in the case of Honeywell, Quantinuum, and (b) for purposes of this Agreement, Quantinuum will not be considered an Affiliate of Honeywell (even though it satisfies the definition of Affiliate), and Quantinuum is excluded from this Agreement altogether.

3. <u>Assist</u>. The term "Assist" shall mean providing a third party with (a) any analysis of the Licensed Patents, or any portion thereof; or (b) prior art or an analysis of any prior art to any of the Licensed Patents; to the extent, in each case, with the intent to support such Third Party in connection with a Challenge of any of the Licensed Patents or any portion thereof.

4. <u>Challenge</u>. The term "Challenge" shall mean to contest, oppose, attempt to invalidate, or otherwise Assist in the contest of, the validity, patentability, scope, construction, enforceability, or Licensor's ownership

Page 3 of 20

HONEYWELL-00260854

JA1694

of any subject matter in the Licensed Patents or any claims thereof, including but not limited to opposition or assistance in the opposition of the grant of any letters patent comprising the Licensed Patents, in any legal or, administrative proceedings, including in a court of law, before the United States Patent and Trademark Office, European Patent Office, or any other forum (including any patent office, agency or tribunal) in any jurisdiction, or in arbitration (except as required under court order or subpoena). Cancellation, amendment, or withdrawal of claims in a pending application in the course of patent prosecution shall not constitute a Challenge.

5.  <u>Change of Control</u>.  The term "Change of Control" shall mean an event whereby a Party is subject to or engages in: (i) a merger, consolidation or other transaction or connected series of transactions that would result in the voting securities of such Party immediately prior to such transaction or connected series of transactions being held or beneficially owned by a Third Party after such transaction or connected series of transactions representing (either by remaining outstanding, or by being converted into, voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of such Party or the surviving entity; (ii) any transaction or connected series of transactions (including, without limitation merger, consolidation, share exchange, sale, issuance, or transfer of voting securities; reclassification or recapitalization of capital stock; or dissolution, liquidation, or winding-up) in which a Third Party acquires more than 50% of the combined voting power of such Party's then outstanding voting securities; or (iii) any transaction or connected series of transactions with a Third Party by which the holders of the voting securities of such Party approve an agreement for the sale or disposition (or any transaction or connected series of transactions having a similar effect) of all or substantially all of the assets of such Party. An internal reorganization within business units of a Party shall not be deemed a Change of Control. A spin-out or divestiture transaction shall not be deemed a Change of Control.

6.  <u>Excluded Area Products</u>.  The term "Excluded Area Products" shall mean those specific products and associated software that are primarily designed for use in, or manufactured by companies in, the following fields:



Page **4** of **20**

HONEYWELL-00260855

JA1695



Case 3:21-cv-00506-KDB-DCK   Document 373-3   Filed 08/17/23   Page 6 of 21

HONEYWELL-00260856

JA1696



For avoidance of doubt, the Excluded Area Products are not intended (and the Parties have not so agreed) to limit competition between the Parties or their Affiliates

Page 6 of 20

HONEYWELL-00260857

JA1697

in these areas. Rather the Excluded Area Products are intended to define areas in which the parties are not agreeing to covenant not to sue each other in the event that one of the Parties continues to infringe the other Party's patents after being put on notice and given a 90-day opportunity to cure.

7. <u>Existing Products</u>. The term "Existing Products" shall mean (i) the products that are offered for sale or in development as of the Effective Date by a Party or its Affiliates and (ii) evolutions or extensions of products that are offered for sale as of the Effective Date by a Party or its Affiliates. For the avoidance of doubt, products that are offered for sale or in development as of the Effective Date by a Party or its Affiliates and evolutions or extensions of products that are offered for sale as of the Effective Date by a Party or its Affiliates are "Existing Products" even if such products also fall within the scope of "Excluded Area Product." For the further avoidance of doubt, "Existing Products" shall also include products acquired through acquisition (except for Excluded Area Products) that are of the same type as those offered for sale or in development or evolutions or extensions of the same type as those offered or in development by the acquiring Party as of the Effective Date.

8. <u>Future Products</u>. The term "Future Products" shall mean the products (other than the Existing Products) that are offered after the Effective Date by a Party or its Affiliates (including later acquired Affiliates) and are not Excluded Area Products.

9. <u>Licensed Patents</u>. The term "Licensed Patents" shall mean all U.S. and foreign patents and applications owned, licenseable or enforceable by either Party or its Affiliates as of the Effective Date, and all current and future continuations, continuations in part, divisionals, reissues, reexaminations, renewals, or extensions thereof, and any other applications claiming priority to one or more of the same.

10. <u>Licensed Products</u>. The term "Licensed Products" means, with respect to a Party, that Party's or its Affiliates' Existing Products.

11. <u>License Period</u>. The term "License Period" shall mean the period between the Effective Date and, subject to earlier termination or expiration as provided herein, the end of the enforceability period after the expiration of the last to expire of the Licensed Patents.

12. <u>Patent</u>. The term "Patent" shall mean any exclusionary right granted by any U.S. or foreign government entity, including patents, published applications, certificates of addition, design patents, and utility models.

13. <u>Person</u>. The term "Person" shall mean an individual, corporation, partnership, limited liability company, joint venture, trust, trustee, unincorporated organization or other entity, including a governmental entity.

14. <u>Released Party</u>. The term "Released Party" shall mean: (i) a Party; and, as of the Effective Date: (ii) its Affiliates; and (iii) each of their respective parents, subsidiaries, joint ventures, divisions, partners, distributors, customers, equity holders, directors, officers, employees, in-house attorneys, partners, principals, successors, and assigns, and each of their respective developers, wholesalers, distributors, resellers, retailers, OEMs, and direct and indirect customers. Released Party includes but is not limited to all named defendants or respondents in each of the Actions (including Shenzhen Lianda Yushang Technology Limited and Shanghai Jinxun Electronics Co., Ltd.), whether or not they are a party to this Agreement.

15. <u>Third Party</u>. The term "Third Party" shall mean any Person other than a Party and its Affiliates.

## 2. LICENSE AND COVENANT NOT TO SUE

Page 7 of 20

HONEYWELL-00260858

JA1698

1. <u>License</u>. Subject to the terms and conditions herein, each Party ("Licensor") hereby grants and shall cause its Affiliates to grant to the other Party and its Affiliates ("Licensee") during the License Period only, a non-exclusive, non-transferable (except as provided in Section 8 below), non-sublicensable, royalty-free license under the Licensed Patents to (a) make, sell, offer for sale, import, have made, use and otherwise dispose of the Licensed Products during the License Period and (b) practice all methods and processes under the Licensed Patents in connection with the Licensed Products. The "have made" rights granted under this paragraph include products (i) that are made by a Third Party for the use, sale, offer for sale and/or importation exclusively by or on behalf of a Party or its Affiliates, or (ii) are designed and/or manufactured by a Third Party for use, sale, offer for sale and/or importation by a Party or its Affiliates under the brand name of that Party or Affiliate. For the avoidance of doubt, the "have made" rights in this paragraph do not cover any manufacturing activities of a Third Party for purpose of obtaining rights under the Licensor's Licensed Patents (*i.e.*, patent laundering), including making or having made products based on designs from, by, or owned by any Person other than a Party and/or its Affiliates and not sold by a Party or its Affiliates under a brand name associated with that Party or Affiliate.

2. <u>Covenants Not to Sue</u>. Subject to the terms and conditions herein:

   a. For a period of twelve (12) years from the Effective Date (the "CNTS Period"), each Party and its Affiliates shall not bring, or assist any Third Party in bringing, any action for infringement of any Patent (including Patents owned or controlled by a Party after the Effective Date) or predicated on infringement of any Patent, or to otherwise assert, or assist any Third Party in asserting, anywhere in the world, any claim, demand, cause of action, or request for damages or other relief against the other Party regarding infringement of any Patent, or any governmental investigation or action predicated on infringement of any Patent; for making, having made, using, leasing, offering for sale, selling, importing, transferring or otherwise disposing of Existing Products or Future Products; no damages or liability of any kind whatsoever relating to the infringement of any Patent, by reason of any manufacture, sale, offer to sell, importation, or use of any product by any Party or its Affiliates, shall accrue during the CNTS Period to the extent such activities fall within the scope of the CNTS.

   b. For products which are neither Existing Products nor Future Products, but are Excluded Area Products (collectively, the "Excluded CNTS Products"), a Party shall provide written notice (per Section 9.4) to the other Party prior to bringing, or assisting any Third Party in bringing any action for patent infringement against the other Party or its Affiliates directed to Excluded CNTS Products for 12 years from the Effective Date. Damages relating to the infringement of any Excluded CNTS Products will not accrue until 90 days after the date a Party provides written notice of alleged infringement to the other Party. Such notice shall specify the patent(s) and relevant patent claims and the accused Excluded CNTS Products. If after 90 days, the Parties cannot agree on whether a product is covered within the scope of Excluded CNTS Products, the Parties agree to submit the issue to binding arbitration pursuant to the AAA rules, and will refrain from filing any legal action (including but not limited to any government investigation) against the other Party, until a final decision is rendered in the arbitration.

   c. Neither Party waives its right to sue a Third Party that is subsequently acquired by the other Party for acts that occurred before the Third Party was acquired. Notwithstanding the foregoing, with respect to products that are not Excluded Area Products, the Party must have previously provided written notice that includes a specific claim of infringement to the Third Party and the Party has engaged in an ongoing written communications campaign related to the claim of infringement with the Third Party within the three (3) years preceding the announcement of the proposed acquisition or commenced litigation against the Third Party prior to the announcement of the proposed acquisition in order to preserve its right to sue the Third Party for acts that occurred prior to when

Page **8** of 20

HONEYWELL-00260859

JA1699

the Third Party was acquired. In the event of such litigation, neither Party may use this agreement as evidence of infringement by the Third Party or to establish damages or a royalty rate.

3.  <u>No Other Rights</u>. Licensee acknowledges and agrees that: (i) no rights, permissions, licenses, immunities, or covenants are granted (or any obligations undertaken) expressly or by implication or estoppel or otherwise, with respect to any Licensed Patent beyond the licenses expressly granted by Licensor in Section 2.1, and (ii) the express license granted to Licensee in Section 2.1 applies only to the Licensed Patent and not to any other patents. No licenses, permissions or rights are granted to any Licensor trade secret, know-how, copyrights, Patents (other than the Licensed Patent) or trademark rights, all of which are unlicensed under this Agreement. Licensor is not obligated to provide or deliver to Licensee any documentation, software, technology, or know-how under this Agreement nor any technical support or services. All rights not expressly granted to Licensee by Licensor are reserved by Licensor. There are no implied rights.

## 3. MUTUAL RELEASES AND DISMISSALS

1.  <u>Release</u>. Subject to the terms and conditions herein, each Party, on behalf of itself and its Affiliates, hereby releases, acquits, and forever discharges (a) the other Party and its Released Parties (but excluding Third Parties) from any and all claims or liability of any kind whatsoever, known or unknown, suspected or unsuspected, of any nature whatsoever, whether in law or in equity, in the United States or any foreign country, from the beginning of time to the Effective Date, and (b) Third Parties who are a Party's Released Parties from any claims or liability, known or unknown, suspected or unsuspected, of any kind or nature whatsoever, whether in law or in equity, in the United States or any foreign country, solely with respect to activity occurring prior to the Effective Date that, if it occurred after the Effective Date, would have been licensed by the other Party under Section 2.1 of this Agreement (but only to the extent that the Released Party's activities were with respect to the Licensed Products and discontinued products of the other Party or its Affiliates). Nothing in this Section shall be interpreted as releasing either Party from its obligations set forth in this Agreement, from claims or causes of action arising out of any breach of those obligations, or from claims arising after the Effective Date.

2.  <u>Dismissal</u>. No later than 10 days from the Effective Date, the Parties shall dismiss or terminate the Actions by (1) filing the dismissal and termination papers mutually agreed to by the Parties or by (2) otherwise causing the Actions to be dismissed pursuant to the relevant court/agency's practice and rules. Counsel for Honeywell will refrain from appearing at the July 13, 2022 hearing in the Dutch cases (listed in Section 1. (w) and (x)) to effectuate the dismissal of the two cases. Each Party shall bear its own costs, expenses, and attorneys' fees in connection with the Actions except to the extent a party was previously ordered by a court to pay the other party (not to exceed £172,000) in connection with any of the Actions, which payment must be made in accordance with the timing of this Agreement. The Parties acknowledge and agree that this Agreement is enforceable according to its terms with respect to the dismissal of all claims and counterclaims in the Actions.

3.  <u>Waiver of Section 1542 of the California Civil Code</u>. The Parties to this Agreement hereby expressly waive the provisions of Section 1542 of the California Civil Code and any similar provision of the statutory or non-statutory law of any other jurisdiction. Section 1542 of the California Civil Code states as follows:

>   A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Page **9** of **20**

HONEYWELL-00260860

JA1700

## 4. PAYMENTS

1. <u>Payment For Past Damages</u>. The payments satisfy all past damages on all claims asserted in Actions.

2. <u>Payment Terms</u>:

   a. Zebra Technologies Corporation ("ZTC") agrees to pay to Honeywell International a total of up to $360 million under this Agreement. Subject to the following provisions of section 4.2, Payments shall be made by ZTC on or before each of the Relevant Due Dates and in the amounts as set forth in the following table:

   | Payment Milestone | Relevant Financial Quarter | Relevant Due Date | Payment |
   |---|---|---|---|
   | 1 | | June 30, 2022 | $45,000,000.00 |
   | 2 | Q3 2022 | September 16, 2022 | $45,000,000.00 |
   | 3 | Q4 2022 | December 16, 2022 | $45,000,000.00 |
   | 4 | Q1 2023 | March 17, 2023 | $45,000,000.00 |
   | 5 | Q2 2023 | June 16, 2023 | $45,000,000.00 |
   | 6 | Q3 2023 | September 15, 2023 | $45,000,000.00 |
   | 7 | Q4 2023 | December 15, 2023 | $45,000,000.00 |
   | 8 | Q1 2024 | March 15, 2024 | $45,000,000.00 |
   | 9 (if needed) | Any later financial quarter to which a Payment has been deferred | The 15th of the last month of the financial quarter | |

   b. Starting with Payment Milestone #2, for each Payment Milestone, ZTC agrees to make each Payment to Honeywell International on or before the Relevant Due Date for a Relevant Financial Quarter but only if ZTC reasonably expects to recognize revenue in that Relevant Financial Quarter of at least $200M attributed to Zebra's scanning and mobility products.

   c. Subject to the next paragraph, if prior to the Relevant Due Date for a Relevant Financial Quarter that a Payment is due, ZTC does not reasonably expect to recognize revenue in that Relevant Financial Quarter of at least $200M attributable to Zebra's scanning and mobility products, ZTC shall notify Honeywell International of its expectation no later than the Relevant Due Date and shall defer making that Payment (Deferred Payment) until the Relevant Due Date for the next financial quarter in which ZTC reasonably expects to recognize revenue of at least $200M attributed to Zebra's scanning and mobility products. For the avoidance of doubt, should ZTC defer making a Payment for a Relevant Financial Quarter until a later financial quarter pursuant to this paragraph, the Payment shall be in addition to (rather than in lieu of) any Payment that would also be due for the later financial quarter. Further, if ZTC fails to timely make a Payment and fails to notify Honeywell International of the expectation set forth above for that Payment, the Payment shall be considered a late payment pursuant to the Late Payments section below. In the event the Deferred Payments extend 10 years beyond the due date of the last milestone payment, the Deferred Payment amounts will no longer be owed.

   d. If ZTC actually recognizes at least $200M in revenue attributed to Zebra's scanning and mobility products in a financial quarter ("Quarterly Revenue Threshold") where it notified Honeywell International that it did not expect to recognize at least $200M in revenue attributable to Zebra's scanning and mobility products in that financial quarter, ZTC shall make the Payment for that financial quarter within fifteen (15) days after Zebra files its 10-Q for that financial quarter.

HONEYWELL-00260861

JA1701

   e.   In the event that ZTC has made a Payment during a Relevant Financial Quarter where it reasonably expected to exceed the Quarterly Revenue Threshold but notifies Honeywell International that the threshold was not met, then Honeywell International will apply the Payment (pre-paid amount) in the next financial quarter where Zebra expects to exceed the Quarterly Revenue Threshold. In the event that payments are deferred for four consecutive quarters, the pre-paid amount received will be returned to ZTC, and ZTC will in turn owe that returned to payment to Honeywell to be paid fifteen (15) days after the closing of the next financial quarter after Zebra recognizes at least $200M revenue attributable to scanning and mobility products in that financial quarter.

   f.   The ongoing calculation of the revenue for scanning and mobility products shall consist of at least all of the product categories contained in Zebra's confidential pre-mediation exchange of US and Worldwide Revenue which was shared with Honeywell as part of the confidential mediation between the Parties that occurred in June 2022, a redacted copy (which removes Zebra's confidential information) of which is attached as Exhibit 2. To the extent that Zebra reorganizes, divests certain businesses and no longer reports revenue on the basis of scanning and mobility products, then Honeywell International, in its sole discretion, will review Zebra's organizational structure and identify a new revenue target which will trigger Zebra's Payment deferral mechanism set forth above.

If a payment due date falls on a US federal holiday, the payment shall be made on the next business day. All payments are non-refundable and shall be made in full without deduction, withholding, or offset.

3.   <u>Waiver Of Other Past Damages</u>.  Subject to Section 4.1-4.2 above, each Party, on its own behalf and on behalf of its Affiliates, hereby waives all damages of any kind or nature arising out of or related to any patent infringement by a Released Party occurring prior to the Effective Date as provided in Section 3.1 above.

4.   <u>Method of Payment</u>.  ZTC shall pay the amounts set forth in Section 4.1 in United States currency by wire transfer as follows:



   Honeywell reserves the right to change the bank account into which ZTC is to wire the payment.  Any such change must be provided in writing to ZTC per Section 9.4.

5.   <u>Late Payments</u>.  In the event Honeywell International Inc. has not received any required payment on or before the date due therefor under Section 4.2 above, Honeywell will promptly provide notice of such missing payment to ZTC, following the mechanisms for notice set out in this agreement.  Upon receipt of such notice, ZTC will cure any payment issues within five (5) business days.  Following that cure period, if the amounts owed still have not been received by Honeywell International Inc, (i) Honeywell may sue for payment, and (ii) ZTC will pay late fees calculated as an annual rate of seven percent (7%) per annum for each month or portion thereof that the payment, but in any case a minimum of one month will be used to compute such late fee if the required payment is received by Honeywell International Inc. more than five days after the last day to cure any missing payment.

HONEYWELL-00260862

JA1702

6. <u>No Withholding</u>. Attached hereto as Exhibit 1 is Honeywell International Inc.'s completed IRS Form W-9.

## 5. REPRESENTATIONS, WARRANTIES, AND COVENANTS

1. <u>Authority</u>. Each Party represents and warrants to the other Party that (a) it has the corporate power and right to enter into this Agreement and to grant the licenses, releases and covenants granted herein, including to license the Licensed Patents and make the releases made in this Agreement, and to bind its Affiliates under this Agreement, (b) it is the sole and lawful owners of all right, title and interest in and to all matters which it purports to release herein (the "Released Matters") and that it has not heretofore assigned or transferred to any person or Entity any right, title or interest in the Released Matters, (c) it is executing this Agreement after consultation with its own independent legal counsel, (d) the person executing this Agreement on behalf of such Party has the full right and authority to enter into this Agreement on such Party's behalf, (e) this Agreement is valid, binding, and enforceable in accordance with its terms, except as may be limited by bankruptcy or insolvency laws and subject to principles of equity, and (f) neither it nor any Affiliate has filed any action, suit or proceeding against the other Party or its Affiliates except as expressly referenced and released herein, but in the event that they have, such Party or its Affiliate shall promptly move to dismiss such action, suit or proceeding against the other Party or its Affiliates.

2. <u>Maintenance and Prosecution</u>. Each Party shall have no obligation to maintain or prosecute any Licensed Patents.

3. <u>Covenant Not To Challenge</u>. Each Party covenants that, after the Effective Date, it will not knowingly and voluntarily Challenge, and shall cause its Affiliates not to Challenge, in any forum, including Federal Courts, whether under 28 U.S.C. §§ 2201-2202 or not, the United States Patent and Trademark Office, the European Patent Office, and/or the International Trade Commission, the validity, scope or enforceability of any of the other Party's Licensed Patents until (i) the end of the License Period or (ii) termination of this Agreement. Each Party further covenants that, after the Effective Date, it will not knowingly and voluntarily Challenge, and shall cause its Affiliates not to Challenge, in any forum, including Federal Courts, whether under 28 U.S.C. §§ 2201-2202 or not, the United States Patent and Trademark Office, the European Patent Office, and/or the International Trade Commission, the validity, scope or enforceability of any of the other Party's Patents (including unlicensed patents) until (i) the end of the CNTS in Section 2.2 (to the extent a CNTS period applies) or (ii) termination of this Agreement; provided, however, nothing in this Agreement shall prevent a Party or its Affiliates from complying with or responding to any court or governmental order or subpoena relating to the other party's Patents. Notwithstanding the foregoing, nothing in this Agreement will preclude a Licensee and its Affiliates from making any disclosure, providing information or producing documents as required by law, court order or legal process (including, without limitation, litigation related to discovery and/or subpoena), even if made in connection with a proceeding challenging the validity or enforceability of one or more of the Patents, and any such disclosure will not be considered a breach of this Agreement. It is understood that a Licensee and its Affiliates providing factual statements regarding Licensed Products or other products covered by the CNTS in response to a validly propounded subpoena will not be considered as challenging as used above. In the event that a Party learns that the other Party is in breach of this Section 5.3, said Party shall notify the other Party, who must cure said breach within thirty (30) days of receipt of notice from the other Party.

4. <u>No Other Warranty</u>. Each Party makes no other representation or warranty, express or implied, regarding any other matter, including representations or warranties with regard to (i) the validity, scope or essentiality of the Licensed Patents, or (ii) the ability of Licensee to use, manufacture, have manufactured

HONEYWELL-00260863

JA1703

or sell Licensee Products free of infringement of Third Party intellectual property rights, the implied warranties of merchantability or fitness for any particular purpose.

5. <u>Marking.</u>  Each Party agrees to take reasonable efforts to mark all of its Licensed Products and other products covered by the CNTS, physically or virtually, with the number of each patent of the other Party's Licensed Patents claiming an invention embodied in such product in a manner which is adequate to provide notice under the terms of 35 United States Code section 287 (and all equivalent foreign laws). Such reasonable efforts shall include a commercially reasonable time to implement the required marking. Following written notice from the Party owning a Patent that the Party contends must be marked by the other Party's products or services (such notice identifying the specific patents at issue and the specific products or services that the notifying Party believes should be marked with those patents), the other Party shall mark the products or services with the patent numbers in the manner set forth above following a commercially reasonable time to implement the requested marking.  When a Party marks its products in this manner in response to notice from the other Party, such marking shall not be deemed as an admission of infringement of the patent(s) to be marked by the marking Party.

## 6. CONFIDENTIALITY

1. All information provided pursuant to this Agreement, including the terms of this Agreement, shall be regarded as confidential information ("Confidential Information"). The Parties shall use Confidential Information only for the purposes set forth herein. Each Party shall safeguard the Confidential Information of the other Party with the same degree of care that it utilizes to safeguard its own proprietary information of a similar character, but in no event shall it use less than reasonable care to safeguard such Confidential Information. A Party shall not disclose any Confidential Information, except: (i) to its Affiliates, provided that the recipients are informed of, and obligated to maintain, the confidentiality of the Confidential Information; (ii) with the prior written consent of the other Party; (iii) to Third Parties as may be required under applicable law, regulation or order of a governmental authority of competent jurisdiction (including by the rules or regulations of the United States Securities and Exchange Commission or similar regulatory agency in a country other than the United States or of any stock exchange or NASDAQ), which includes, but is not limited to, the disclosure of the amount of the settlement in public filings with the United States Securities and Exchange Commission); (iv) to Third Parties during the course of litigation if required in discovery so long as the disclosure of such Confidential Information is made on a confidential basis under an appropriate protective order entered in the litigation, or non-disclosure agreement with similar provisions, and provided that the producing Party gives prior written notice to the other Party; (v) in any pleadings in connection with the enforcement of this Agreement, with the understanding that any such pleading shall be filed confidentially or under seal to the extent allowable by the applicable court or tribunal; (vi) on a confidential basis under an appropriate non-disclosure agreement to a third party potential purchaser of either Party's patent(s) provided that all financial information and Exhibits 1 and 2 from this Agreement is completely redacted or (vii) in confidence to a Party's lenders and potential lenders; acquirers and potential acquirers; bankers; investment bankers; investors and potential investors; consultants; accountants; tax advisors; auditors; and attorneys for the purposes of seeking professional services, investment monies, acquisition or divestiture, provided that the recipients are informed of, and obligated to maintain, the confidentiality of the Confidential Information. Each Party shall be responsible for its Affiliates' compliance with this Article.  Confidential Information shall not include information that: (i) was already known by the receiving Party or its Affiliates, other than under an agreement of secrecy or non-use, at the time of its disclosure; (ii) has passed into the public domain prior to or after its disclosure, other than through any act or omission attributable to the receiving Party or its Affiliates; (iii) was subsequently disclosed to the receiving Party or its Affiliates, other than pursuant to an agreement of secrecy or non-use, by a Third Party that had not acquired the information under an obligation of confidentiality (excluding required cooperation or disclosures where a Party or its Affiliates must disclose the other Party's Confidential Information on a non-confidential basis to a governmental entity or agency

Page 13 of 20

HONEYWELL-00260864

JA1704

in response to a governmental demand or requirement to disclose); or (iv) was independently developed by the receiving Party or its Affiliates. This paragraph contemplates that the Parties will submit a mutually-agreeable redacted public version of the Agreement to the United States International Trade Commission in connection with motions to terminate the Actions in that forum. Subject to the foregoing, in the event that a Party or Affiliate intends to publicly disclose any Confidential Information in which, as part of that disclosure, the disclosing Party or Affiliate mentions the other Party (or any their Affiliates) by name, then the Party or Affiliate intending to disclose the Confidential Information shall provide the other Party with a copy of the proposed disclosure 48 hours prior to disclosing the Confidential Information.

## 7. TERM AND TERMINATION

1. <u>Term</u>. This Agreement shall commence as of the Effective Date and shall expire at the end of the License Period, unless earlier terminated in accordance with Section 7.2.

2. <u>Termination</u>. This Agreement may not be terminated except (i) by mutual written agreement of the Parties; or (ii) by Honeywell International in the event ZTC fails to pay the amounts owed under this Agreement, and such failure to pay is not cured within thirty (30) days of ZTC's receipt of written notice of such failure to pay. Subject to the foregoing, the definitions and the confidentiality and other provisions that by their express terms or nature continue and survive will survive should this Agreement terminate by mutual written agreement of the Parties.

## 8. ASSIGNMENT AND TRANSFER

1. <u>Assignment</u>. The rights granted to each Party pursuant to this Agreement are personal to the receiving Party and may only be assigned as described in this section. Upon a Change of Control, the acquired Party may elect to assign this Agreement to an Acquirer. An "Acquirer" shall mean the Third Party involved in the Change of Control of a Party or that acquires a Party's product line(s) through the sale or disposition of all or substantially all of the assets of any product line(s) (including a spin-out of an Affiliate). Except as specified in this Section 8.1, no Party may assign or otherwise transfer any rights under this Agreement without the other Party's prior written consent. However, a Party may assume or assume and assign this Agreement in a bankruptcy proceeding without the other Party's prior written consent so long as the assignee agrees that all rights and obligations of this Agreement shall continue in full force and effect. Subject to this Section 8.1, a Party may also assign to an Acquirer without the other Party's prior written consent:

   a. this Agreement in connection with a Change of Control of such Party, or
   b. this Agreement solely with respect to a Party's product line in connection with a transfer of all or substantially all of the assets of the product line.

In the event of any assignment of this Agreement, the Acquirer must agree in writing that it shall abide by all the assigning Party's obligations under this Agreement in favor of the non-assigning Party and its Affiliates, and agree in writing to be bound by this Agreement, subject to the following terms:

   i. the license under Section 2.1 that is so assigned is limited solely to the Licensed Products that are transferred from the transferring Party to the Acquirer; the license that gets assigned with any transfer of those specific Licensed Products, whether from the Party to the Acquirer or a subsequent transfer, is limited to the Licensed Products that were transferred from the Party to the Acquirer at the time of transaction (*i.e.*, such Licensed Products shall no longer include any evolutions or extensions after the date of the transfer),

Page 14 of 20

HONEYWELL-00260865

JA1705

    ii.    the CNTS given by the non-assigning Party will not extend to the Acquirer or its Affiliates beyond the Existing Products and Future Products transferred to the Acquirer as they exist as of the transaction date and only then for the remainder of the CNTS Period, and

    iii.    no Patents of the Acquirer or its Affiliates will be licensed under this Agreement or subject to the CNTS (except those acquired in the transaction, all of which are subject to Section 8.2).

An assigning Party shall provide notice to the other Party at least thirty (30) days before any assignment.

In the event of a Change of Control of a Party that does not result in an assignment of this Agreement, the following will apply:

    i.    the license under Section 2.1 is limited to the acquired Party and its Affiliates that are acquired and shall not include the products of the Acquirer and its Affiliates. Any products moved from the Acquirer to the acquired Party or its Affiliates shall not circumvent the limitations of this section,

    ii.    the CNTS given by the Party not involved in the Change of Control transaction will not extend to the Acquirer or its Affiliates beyond the Existing Products and Future Products of the Party and its Affiliates who undergoes the Change of Control and then only for the remainder of the CNTS Period, and

    iii.    no Patents of the Acquirer or its Affiliates will be licensed under this Agreement or subject to the CNTS (except those acquired in the transaction, all of which are subject to Section 8.2).

Nothing described in this Section 8.1 limits the licenses, covenants, and rights afforded by this Agreement to the Party and its Affiliates who are not involved in the Change of Control or assignment transaction. Any assignment in contravention of this paragraph shall be null and void. For the avoidance of any doubt, this Section 8.1 is not intended to expand the rights and obligations under this Agreement to an Acquirer of a Party or all or substantially all the assets of a product line of a Party. The rights conferred under this Agreement (including the right to payment) constitute a grant of a property interest in an intellectual property right which runs with any assignment or transfer of the intellectual property. ZTC will be released from its payment obligations (in whole or in part, depending on the nature of the assignment) so long as ZTC's assignee expressly assumes in writing the applicable payment obligations and the other obligations hereunder and assignee's creditworthiness is acceptable to Honeywell in its sole discretion.

2.    <u>Effect on Transfer of Patents</u>. Any assignment, exclusive license, exclusive sublicense, or transfer of any or all of a Party's Licensed Patents to a Third Party ("Patents Immediate Transferee") is and shall be subject to the releases, covenants, and licenses granted in this Agreement to the other Party and shall be fully binding upon such Patents Immediate Transferee. The granting Party will impose on each Patents Immediate Transferee a legally binding requirement imposing on such transferee the obligations under this Section with respect to the Patents (including a further obligation on such transferee to impose the obligations of this Section on any subsequent transferee of the Patents).

## 9. MISCELLANEOUS

1.    <u>No Waiver</u>. No provision of this Agreement shall be waived by any act, omission or knowledge of a Party or its Affiliates except by an instrument in writing expressly waiving such provision and signed by a duly authorized representative of the waiving Party. No express or implied waiver of any breach of any term, condition or obligation of this Agreement shall be construed as a waiver of any subsequent breach of that term, condition or obligation or of any other term, condition or obligation of this Agreement of the same or of a different nature.

HONEYWELL-00260866

JA1706

2. <u>Governing Law</u>. The laws of the State of Delaware govern this Agreement without regard to its conflict of laws provisions.

3. <u>Severability</u>. If any term, clause, or provision of this Agreement shall be held to be invalid, the validity of any other term, clause or provision shall not be affected; and such invalid term, clause or provision shall be replaced by a valid term that reflects the economic effect of the invalid term, clause or provision, or if such is not possible, shall be deemed deleted from this Agreement.

4. <u>Notices</u>. All notices required or permitted to be given hereunder shall be in writing and shall be delivered by hand, or, if dispatched by prepaid air courier, with package tracing capabilities or by registered or certified airmail, postage prepaid, addressed as follows:

If to Honeywell:

    Honeywell International Inc.
    855 S. Mint Street
    Charlotte, NC 28202

    Attention: Senior Vice-President and General Counsel

    With a copy to:

    Honeywell Safety & Productivity Solutions
    855 S. Mint Street
    Charlotte, NC 28202

    Attention: Brian Rudick, Vice President and General Counsel

If to Zebra:

    Zebra Technologies Corporation
    3 Overlook Point
    Lincolnshire, IL 60069
    (847) 634-6700

    Attention: Chief Legal Officer

Such notices shall be deemed to have been served when received by addressee. A Party may give written notice of a change of address and, after notice of such change has been received, any notice or request shall thereafter be given to such Party as above provided at such changed address.

5. <u>Construction</u>. This Agreement will be construed in all respects as jointly drafted and will not be construed, in any way, against any Party on the ground that the Party or its counsel drafted this Agreement. As used in this Agreement, the term "including" and terms of like import will be interpreted as terms of explication as if followed by the words "but not limited to". The term "such as" means "such as without limiting the generality of the foregoing." The terms "hereof", "hereunder", "herein", and similar expressions refer to this Agreement and not to any particular Section or other portion hereof. Unless something in the subject matter or context is inconsistent therewith, references in this Agreement to Sections and Exhibits are to Sections of, and Exhibits to, this Agreement. The headings in this Agreement are for reference only and are not to be used in the interpretation or construction of this Agreement.

Page 16 of 20

HONEYWELL-00260867

JA1707

6. <u>Entire Agreement</u>. This Agreement (including all Exhibits hereto, which are all incorporated by this reference) sets forth the entire agreement and understanding between the Parties as to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, discussions and other communications between the Parties with respect to the subject matter hereof, including the handwritten settlement agreement dated June 4, 2022.

7. <u>Amendment</u>. No modification or amendment to this Agreement will be effective unless it is in a writing that identifies itself as an amendment to this Agreement and is signed by authorized representatives of each of the Parties, nor will any waiver of any rights be effective unless assented to in writing by the Party to be charged.

8. <u>PDF Signatures and Counterparts</u>. This Agreement and any counterpart thereof may be executed either on paper or electronically and may be transmitted by email in the form of a portable document format (".pdf") document or other electronic record. Each counterpart of such Agreement, when so executed and transmitted, shall be deemed valid and acceptable for all purposes as an original and all such counterparts shall constitute one and the same document. For avoidance of doubt, any counterpart may converted from paper to electronic form, or from electronic form to paper, at the discretion of the party receiving such counterpart, and such converted counterpart shall be deemed an original for transmission, execution, delivery and/or retention.

9. <u>Beneficiaries</u>. This Agreement and the licenses, releases and covenants granted herein shall inure to the benefit of the Parties, their permitted successors and assigns, and, insofar as expressly provided herein, and to any of their respective Affiliates and Released Parties, only to the extent expressly provided in this Agreement.

10. <u>Dispute Resolution</u>. In the event that a dispute arises under this Agreement, (other than disputes arising out of or related to Excluded CNTS Products as described in Section 2.2(b) herein, which shall be arbitrated under AAA rules), the Parties agree that such dispute shall be brought solely and exclusively in, and resolved by the United States District Court for the District of Delaware, or if the U.S. District Court for the District of Delaware lacks subject matter jurisdiction, then the Parties agree that such disputes shall be subject to the exclusive jurisdiction of the state courts of the State of Delaware. Each Party hereby irrevocably consents to the jurisdiction of such court for the sole purpose of resolving disputes under this Agreement and waives any objections thereto, whether on the ground of *forum non conveniens*, or other reasons. The judgment of such court may be entered and enforced by any court of competent jurisdiction over the applicable Party or its assets, wherever located.

11. <u>Relationship of the Parties</u>. Nothing contained in this Agreement shall be deemed or construed as creating a joint venture, partnership, or fiduciary relationship between the Parties. Neither Party by virtue of this Agreement is authorized to bind the other Party or to act as an agent, employee or legal representative of the other Party, and the relationship of the Parties is, and at all times will continue to be, that of independent contractors.

12. <u>Attorneys' Fees</u>. Subject to the terms herein, each Party shall bear its own attorneys' fees (except as provided in Section 3.2) and related expenses incurred by or on behalf of said Party in connection with the Actions and the preparation and negotiation of this Agreement. In addition to damages awarded, in the event of litigation to enforce a provision of this Agreement, the party seeking to enforce the provision, if successful, is entitled to seek its reasonable attorneys' fees, costs, and expenses.

13. <u>U.S. Bankruptcy Code Section 365(n)</u>. The Parties acknowledge and agree that all rights and licenses granted by a Licensor under or pursuant to this Agreement are, and will otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, as amended (the "Bankruptcy Code"),

Page 17 of 20

HONEYWELL-00260868

JA1708

licenses of rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The Parties agree that, notwithstanding anything else in this Agreement, a Party and its Affiliates, as the licensees of such Licensor's Licensed Patents under this Agreement, will retain and may fully exercise all of its rights and elections under the Bankruptcy Code (including, without limitation, a Party's and its Affiliates' right to the continued enjoyment of the rights and licenses granted by the Licensor under this Agreement).

IN WITNESS WHEREOF, each of the Parties hereto, by its duly authorized representative, has executed this Agreement effective as of the Effective Date first set forth above.

Brian S. Rudick
Vice President & General Counsel
Honeywell Safety & Productivity Solutions
Honeywell International Inc.

Date: June 28, 2022

Cristen Kogl
Chief Legal Officer & General Counsel
Zebra Technologies Corporation

Date: June 28, 2022

HONEYWELL-00260869

JA1709

**EXHIBIT 1**



| Form **W-9** (Rev. October 2018) Department of the Treasury Internal | **Request for Taxpayer Identification Number and Certification** | **Give Form to the requester. Do not send to the IRS.** |

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| **Sign Here** | Signature of U.S. person ▶ | *Mark L. Hill* | Date ▶ | *1/2/2021* |

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X                                    Form **W-9** (Rev. 10-2018)

*BLH*    *(signature)*

Page **19** of 20

HONEYWELL-00260870

JA1710

**EXHIBIT 2**

**Units**

| Business Unit | Product Category |  |
|---|---|---|
| DCS | Bioptic |  |
| DCS | Fixed Ind Scanner |  |
| DCS | Handheld Reader |  |
| DCS | Handheld Scanner - 2D Imager |  |
| DCS | Handheld Scanner - Laser |  |
| DCS | Handheld Scanner - Linear Image |  |
| DCS | Kiosk |  |
| DCS | Machine Vision |  |
| DCS | Mini Slot |  |
| DCS | Presentation Scanner |  |
| DCS | Scan Engine - 2D |  |
| DCS | Scan Engine - Laser |  |
| DCS | Scan Engine - Linear Imager |  |
| **DCS Total** |  |  |
| EMC | EDA |  |
| EMC | Handheld |  |
| EMC | Rugged Tablet |  |
| EMC | Vehicle - Mounted |  |
| EMC | Wearable |  |
| **EMC Total** |  |  |
| **Grand Total** |  |  |

**Revenues**

| Business Unit | Product Category |  |
|---|---|---|
| DCS | Bioptic |  |
| DCS | Fixed Ind Scanner |  |
| DCS | Handheld Reader |  |
| DCS | Handheld Scanner - 2D Imager |  |
| DCS | Handheld Scanner - Laser |  |
| DCS | Handheld Scanner - Linear Image |  |
| DCS | Kiosk |  |
| DCS | Machine Vision |  |
| DCS | Mini Slot |  |
| DCS | Presentation Scanner |  |
| DCS | Scan Engine - 2D |  |
| DCS | Scan Engine - Laser |  |
| DCS | Scan Engine - Linear Imager |  |
| **DCS Total** |  |  |
| EMC | EDA |  |
| EMC | Handheld |  |
| EMC | Rugged Tablet |  |
| EMC | Vehicle - Mounted |  |
| EMC | Wearable |  |
| **EMC Total** |  |  |
| **Grand Total** |  |  |

HONEYWELL-00260871

JA1711

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> OPTO ELECTRONICS CO., LTD., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) )<br><br>Case No. 3:21-cv-00506 |

**DEFENDANT'S RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW,
ALTERNATIVE RULE 59 MOTION FOR A NEW TRIAL,
AND RENEWED MOTION FOR SUMMARY JUDGMENT**

Defendant OPTO Electronics Co., Ltd. ("OPTO"), by and through its undersigned counsel and pursuant to Federal Rules of Civil Procedure 50, 56, 59, and Local Rule 7.1, hereby respectfully moves this Court to enter judgment as a matter of law in favor of OPTO and against Plaintiffs Honeywell International Inc.; Hand Held Products, Inc.; and Metrologic Instruments, Inc. (collectively, "Honeywell") on Honeywell's breach of contract claim against OPTO, as well as OPTO's affirmative defenses of quasi-estoppel and unilateral mistake of fact. In the alternative, OPTO respectfully moves this Court to order a new trial on Honeywell's breach of contract claim and OPTO's affirmative defenses of quasi-estoppel and unilateral mistake of fact. Finally, OPTO respectfully renews its Motion for Summary Judgment Regarding Plaintiffs' *Per Se* Patent Misuse (Dkts. 168, 169) and Motion for Summary Judgment concerning contract interpretation. *See* Dkts. 132, 133. The grounds and authorities in support of this Motion are set forth in OPTO's Brief in Support of its Rule 50 Motion for Judgment as a Matter of Law, Alternative Rule 59 Motion for a

JA1712

New Trial, and Renewed Motion for Summary Judgment and the exhibits thereto, filed contemporaneously herewith.

WHEREFORE, OPTO respectfully requests that this Court enter an order granting OPTO's Rule 50 Motion for Judgment as a Matter of Law, Alternative Rule 59 Motion for a New Trial, and Renewed Motion for Summary Judgment in its entirety.

Dated:  August 17, 2023

Respectfully submitted,

**McGuireWoods LLP**

*/s/ Robert A. Muckenfuss*
Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com

Tyler T. VanHoutan
McGuireWoods LLP
Texas Tower, Ste 2400
845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com

Christine E. Lehman
Connor S. Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

JA1713

York M. Faulkner
YORKMOODYFAULKNER
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

JA1714

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2023, a copy of the foregoing was filed electronically with the Clerk of the Court for the Western District of North Carolina by using the CM/ECF system. Counsel for all parties in this case are registered CM/ECF users and will be served by the CM/ECF system.


_/s/ Robert A. Muckenfuss_
Robert A. Muckenfuss

JA1715

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL,  )
INC.; HAND HELD PRODUCTS, )
INC.; AND METROLOGIC      )
INSTRUMENTS, INC.,        )
                          )
              Plaintiffs, )    No. 3:21-cv-506
                          )
       vs.                )    VOLUME I
                          )
OPTO ELECTRONICS COMPANY, )
LTD.,                     )
                          )
              Defendant.  )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 17, 2023


<u>APPEARANCES:</u>

On Behalf of the Plaintiffs:

     MATTHEW SCOTT STEVENS, ESQ.
     S. BENJAMIN PLEUNE, ESQ.
     LAUREN NICHOLE GRIFFIN, ESQ.
     NICHOLAS CHRISTOPHER MARAIS, ESQ.
     BRANDON C.E. SPRINGER, ESQ.
     STEPHEN RICHARD LAREAU, ESQ.
     Alston & Bird, LLP
     101 South Tryon Street, Suite 4000
     Charlotte, North Carolina 28202

On Behalf of the Defendant:

     ROBERT MUCKENFUSS, ESQ.
     ZACHARY L. McCAMEY, ESQ.
     JESSICA LYNN O'BRIEN, ESQ.
     McGuireWoods, LLP
     201 North Tryon Street, Suite 3000
     Charlotte, North Carolina 28202

JA1716

APPEARANCES (Cont'd.)

TYLER T. VanHOUTAN, ESQ.
McGuireWoods, LLP
Texas Tower, Suite 2400
845 Texas Avenue
Houston, Texas 77002

CHRISTINE E. LEHMAN, ESQ.
CONNOR S. HOUGHTON, ESQ.
Reichman Jorgensen Lehman & Feldberg, LLP
1909 K Street, NW
Suite 800
Washington, DC 20006

YORK M. FAULKNER, ESQ.
YorkMoodyFaulkner
Tensho Building, 7F
3-17-11 Shibaura, Suite 711
Tokyo, Japan

CHERYL A. NUCCIO, RMR, CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA1717

1   during this trial.

2          I instruct you that during the trial you are not to

3   discuss this case with anyone or permit anyone to discuss it

4   with you, even with each other.  Until you all retire to the

5   jury room to deliberate your verdict, you must not discuss

6   this case with anyone.

7          Do not tell your family, close friends, or anybody

8   else anything about this case.  If you need to let an employer

9   or somebody at home, or something, know why you are not where

10  you usually are, you can tell them you were selected to serve

11  on a federal jury and that's it.  Don't tell them anything

12  about it.  Don't tell them civil or criminal.  Don't tell them

13  the nature of the case.  Just tell them that you're doing jury

14  service and you're not permitted to talk about it.

15         Don't do any independent research, get on the

16  internet, or any other kind of research trying to figure out

17  anything about these companies or any of the individuals in

18  this case or any of the issues that you've heard discussed.

19  Okay.  Everything you'll need to know to make your decision

20  will come from the witness stand and from the exhibits.

21         Do not form any opinion about this case until all of

22  the evidence is in, you've heard the closing arguments of the

23  attorneys, and you've received your instructions from the

24  Court about the law you are to apply.  Keep an open mind.

25  Form no opinions.

1   qualifications and experience, or the lack thereof; and the

2   reasons, if any, given for the opinion; whether or not the

3   opinion is supported by facts that you find from the evidence;

4   and whether or not the opinion is reasonable; and whether or

5   not it is consistent with the other believable evidence in

6   this case.  Thus, you should consider the testimony of an

7   expert witness as you would any other witness and you are not

8   bound to accept it just because they're experts.

9          So the trial will begin with opening statements, and

10  counsel for Honeywell will go first.  They're the plaintiff in

11  this case.  And then counsel for OPTO will have their opening

12  statement.  And then my guess is by that time we'll be ready

13  for lunch.  We'll take a break and then we'll start the

14  evidence after that.

15         The jury is with Honeywell.

16         MR. STEVENS:  Thank you, Your Honor.  May I approach

17  the podium?

18         THE COURT:  You may.

19         MR. STEVENS:  And may I have permission to publish

20  my slide deck to the jury?

21         THE COURT:  Yes.

22         MR. STEVENS:  Thank you.

23         So, ladies and gentlemen, I'm sure there's no doubt

24  that when you walked through that door this morning, you

25  probably said to yourself:  What am I doing here?  What's this

JEREMY WHITLEY - DIRECT

1  A.    2D Barcode Product because it is operable to decode a 2D
2  barcode symbology, which puts it in the definition of 2D
3  Barcode Products.  And we put in the definition with OPTO 1D
4  Barcode Products clearly exclude anything that is a 2D barcode
5  -- that can decode a 2D barcode symbology.
6  Q.    Now, you had mentioned that there was a covenant not to
7  sue for no additional money.  Does that mean that Honeywell
8  didn't think that these products infringed?
9  A.    Not at all.  We thought all of their products infringed.
10 Q.    And can you explain to me why the parties agreed for
11 there to be a royalty on 2D Barcode Products, but there's not
12 to be a further royalty on 1D Barcode Products.
13 A.    So the focus for Honeywell is on 2D Barcode Products,
14 products that decode 2D symbologies.  Providing a covenant not
15 to sue on a 1D Barcode Product was a bargaining chip that we
16 gave if we could get the right value on the 2D Barcode
17 Products.
18 Q.    And did Honeywell and OPTO agree that the 7 percent
19 royalty was the right value for Honeywell's portfolio on those
20 2D products?
21 A.    Yes.
22       MR. STEVENS:  I'd like to turn down to Section 1.10
23 for a moment.
24 Q.    Did OPTO receive a license just to those patents in the
25 litigation or just those patents in the letter, or was it

93

JEREMY WHITLEY - DIRECT

1  Q.   I'd like to now talk about the time frame after you and
2  OPTO signed the agreement, if that's okay.
3  A.   Sure.
4  Q.   Did OPTO immediately provide the royalty reports that it
5  was supposed to provide for products after the agreement?
6  A.   No.  I think there was some technical issues with
7  providing those to us.
8  Q.   But did there come a point in time where OPTO did start
9  to provide those?
10 A.   Yes, eventually we started to receive the royalty
11 reports.
12 Q.   And was there something missing when you got those?
13 A.   Yes.  We noticed that there were a number of products
14 that we believed fell into the definition of 2D Barcode
15 Products because they were operable to decode at least one 2D
16 barcode symbology that were missing from the royalty reports.
17 Q.   Now, did you run off and file a lawsuit the next day or
18 did you do something different?
19 A.   No.  We actually asked OPTO to provide information about
20 the products that were being withheld from the royalty
21 reports.
22 Q.   And why would you do that?  If you had a suspicion that
23 not all the products were there, why did you want more
24 information?
25 A.   Well, we didn't have all the facts.  Like, we didn't know

JA1721

JEREMY WHITLEY - DIRECT

1  if those products were actually still being offered, were they
2  being offered in the United States, to what extent, how much
3  revenue, et cetera.  There's a bunch of material we needed to
4  figure out was this a material issue or not.
5  Q.    So once they said, hey, we're not including these
6  products in the royalty reports, did Honeywell do any sort of
7  investigation to figure out, hey, what are we really talking
8  about here?
9  A.    Yes.  We actually asked for that financial information so
10 that we could determine is this a big deal or not.
11 Q.    And how long did that process take?
12 A.    I think maybe six months.
13 Q.    And --
14 A.    Eight months.
15 Q.    And at the end of that, once Honeywell had that
16 information, what did it do?
17 A.    It sent a couple of letters to OPTO saying, hey, we have
18 identified products that fall clearly within the definition of
19 2D Barcode Products.  We'd like you to compensate us for
20 those, and asked them to do so.
21         MR. STEVENS:  If we could publish to the well and
22 the witness PX288.
23 Q.    Once that comes up on your screen, can you identify this
24 document for me, please.
25 A.    Yes.  This is one of those letters that I talked about

JEREMY WHITLEY - CROSS

1  Q.   And in fact, there are two amendments to the License and
2  Settlement Agreement, correct?
3  A.   Yes.
4  Q.   Amendment One and Amendment Two, correct?
5  A.   Yes.
6  Q.   And same answers with regard to those amendments, right?
7  A.   I can't say for sure which attorney reviewed them, but,
8  yes, we reviewed them and A&B reviewed them.
9  Q.   Multiple in-house attorneys at Honeywell reviewed them,
10 correct?
11 A.   Correct.
12 Q.   Multiple business people reviewed them at Honeywell,
13 correct?
14 A.   No, I don't think any business people reviewed the
15 amendments.
16 Q.   Okay.  Outside counsel for Honeywell, including some of
17 the individuals sitting at counsel table, reviewed the
18 amendments before they were signed, correct?
19 A.   Again, I don't know which specifically or both of them,
20 but, yes, Alston & Bird did review the amendments.
21 Q.   And those amendments incorporate the same terms from the
22 License and Settlement Agreement, correct?
23 A.   My memory -- I haven't reviewed the amendments in detail
24 recently.  I believe there's a statement that says all the
25 terms are the same.  But they are amendments to the agreement

JEREMY WHITLEY - CROSS

1  so it would mean that they used the same language as the

2  agreement.

3  Q.   You would agree that the License and Settlement Agreement

4  and the First and Second Amendments are all part of the same

5  agreement, correct?

6  A.   Yes.

7  Q.   You were talking with your counsel about payments that

8  OPTO either made or didn't make under this agreement.  Do you

9  recall that?

10  A.   Yes.

11  Q.   And you would agree that OPTO made all of the payments

12  required for its image-based sensor products, correct?

13  A.   I believe that is correct.  I don't know if I've ever,

14  like, confirmed that, but I believe that's correct.

15  Q.   You have no reason to believe it's not correct, correct?

16  A.   I just don't have any recollection.

17  Q.   Understood.

18      The only products that you're saying that OPTO did not

19  pay under the License and Settlement Agreement are laser and

20  CCD scanners with particular functionality, correct?

21  A.   Any device that's operable to decode.  I don't know the

22  hardware in those devices.

23  Q.   So is it your position that OPTO's products with image

24  sensors without that functionality, no royalty would be owed,

25  correct?

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC.; HAND HELD PRODUCTS, INC.; AND METROLOGIC INSTRUMENTS, INC., | ) ) ) ) ) |
| Plaintiffs, | ) No. 3:21-cv-506 ) |
| vs. | ) VOLUME II ) |
| OPTO ELECTRONICS COMPANY, LTD., | ) ) ) |
| Defendant. | ) ) |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 18, 2023

<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

JA1725

APPEARANCES (Cont'd.)

TYLER T. VanHOUTAN, ESQ.
McGuireWoods, LLP
Texas Tower, Suite 2400
845 Texas Avenue
Houston, Texas 77002

CHRISTINE E. LEHMAN, ESQ.
CONNOR S. HOUGHTON, ESQ.
Reichman Jorgensen Lehman & Feldberg, LLP
1909 K Street, NW
Suite 800
Washington, DC 20006

YORK M. FAULKNER, ESQ.
YorkMoodyFaulkner
Tensho Building, 7F
3-17-11 Shibaura, Suite 711
Tokyo, Japan

CHERYL A. NUCCIO, RMR, CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA1726

```
 1    need to set aside some time for such a discussion.
 2              MR. STEVENS:  We did have some objections, Your
 3    Honor.  I don't think it's something that's going to take a
 4    long period of time, but we did have some objections.
 5              MR. McCAMEY:  Very minimal, but we do have one or
 6    two as well, Your Honor.
 7              THE COURT:  So since we're surely going to get past
 8    the lunch hour, maybe we'll just give the jury an extra 15
 9    minutes for lunch and we can take it up then.
10              MR. McCAMEY:  Thank you, Your Honor.
11              MR. MUCKENFUSS:  Thank you, Your Honor.
12              THE COURT:  Are we ready for the jury?
13              (No response.)
14              THE COURT:  All right.  Bring the jury in, Ms. Kirk.
15              MR. MUCKENFUSS:  Your Honor...
16              THE COURT:  Yes.  Hold on.
17              MR. MUCKENFUSS:  I apologize.  I feel like this is
18    one of those -- I've seen a movie like this, but our
19    audio/visual guy has had a problem in traffic.  I think he's
20    literally going through security right now.  I just don't want
21    disruption with the jury.  I apologize to the Court.
22              THE COURT:  No, that's all right.  We can wait for
23    that.
24              MR. MUCKENFUSS:  Thank you, Your Honor.
25              MR. STEVENS:  Since we have the time, I just want to
```

1   forecast one thing for you so you don't hear it for the first

2   time in the middle of the testimony.  I do believe that the

3   theory that you're going to hear with this first witness is a

4   brand new theory for this case, unpleaded by them, never

5   mentioned in an interrogatory, never disclosed in any way,

6   shape, or form.  This is a witness that's never been deposed

7   in this case.  And so I just -- there's likely going to be

8   objections once we get into this testimony as something that's

9   never been disclosed in this case before.

10          THE COURT:  All right.  So what's the new theory

11   you're anticipating?

12          MR. STEVENS:  I think -- during the pretrial

13   conference you told us that we weren't allowed to talk about

14   the details of the audit or the sales reports that they owed

15   us after the fact of the contract.  And I think that's what

16   he's going to get into.  I suspect he's going to get into

17   those sales reports and talk about them and go into detail in

18   those sales reports.

19          THE COURT:  Post-agreement sales reports?

20          MR. STEVENS:  Yes, Your Honor.

21          THE COURT:  Weren't those raised yesterday during

22   your case in chief that there were sales reports that were

23   received and that that raised the whole issue and brought to

24   the attention of Honeywell that certain royalties were not

25   being paid?

JA1728

1          MR. STEVENS:  Those are royalty reports, not the

2     sales reports.  Honeywell never could see those.  What our

3     witnesses talked about are the royalty reports that OPTO must

4     actually give to Honeywell proper.  They actually submit them

5     not even through the lawyers.  Someone at OPTO submits royalty

6     reports to Honeywell directly.  That's what the testimony was

7     about yesterday.  That has nothing to do with Section 5 of the

8     agreement.  There is a separate requirement in Section 5.1 of

9     the agreement that there were -- that sales reports went to

10    outside counsel's eyes only.  They were very insistent that

11    none of that information could ever be shared with Honeywell.

12    And that's what he's going to get into.  That's not something

13    that we talked about at any point in time in our case in

14    chief.

15          THE COURT:  These are sales reports related to

16    pre-agreement royalties?

17          MR. STEVENS:  That's right, Your Honor.  Sales

18    reports pre-agreement that go to the second sentence of 5.1

19    which you told me in the pretrial we can't bring up.

20          MR. MUCKENFUSS:  We're not getting into 5.1,

21    obviously, with regard to the damages.  Obviously, they know

22    about this theory as he just articulated it.

23          But we've gone through these emails ad nauseam.  It

24    was in summary judgment.  We've talked about this a lot.  The

25    sales reports go to the understanding of the parties as what's

1  included under the definition of 1.4.  We're not going to be

2  talking about the specifics of the damages or things that

3  relate to that 5.1.

4          But, yes, as Honeywell's counsel -- and it's not

5  just their counsel.  It's their general counsel too.  They

6  received information from OPTO where it was clear that these

7  scanners were not included under the definition of 1.4.

8          Yes, it's in the context of providing that

9  information to Honeywell's counsel.  But that is our -- that's

10  our entire case on that point.  It goes to the defense.  It

11  definitely goes to the defense as to the understanding of

12  what's included under 1.4, that they knew it, they understood

13  it as Honeywell's counsel because OPTO told them.  And that's

14  what I said in opening -- my opening statement.  He knows

15  about it.  That's sort of the point.

16          So yes, that is the evidence that's going to come

17  in.

18          THE COURT:  Well, the numbers from the sales report

19  are irrelevant, right?

20          MR. MUCKENFUSS:  They are relevant just to the point

21  that they understood that OPTO was giving them very specific

22  information about laser scanners that were not included under

23  the definition of 1.4.  They knew that.

24          So it's not relevant for damages.  It's not relevant

25  for the jury in terms of -- from that standpoint.  But it is

1    relevant that they had knowledge that OPTO was telling them

2    that these specific products that they're now claiming are 2D

3    Barcode Products, OPTO was not including them in that

4    definition.

5            THE COURT:  Well, that far I can see that OPTO's

6    position was we were identifying for Honeywell products upon

7    which we were not paying royalties.  But the sales reports,

8    I'm not seeing how those are relevant for the jury's

9    consideration.

10           MR. MUCKENFUSS:  See, this is where it's difficult

11   without, obviously, being in the context of, you know, showing

12   it to Your Honor, but they know this.  The spreadsheets

13   actually note which exact products are 2D and which are not.

14   That's what they received.  So the spreadsheets actually have

15   the notation that OPTO gave them that specifically note what's

16   2D under 1.4 and what are not.  That's in the spreadsheet.

17           THE COURT:  I'm just going to have to deal with it

18   as it comes up.

19           But your point is well taken, Mr. Stevens, that you

20   weren't allowed to address this and we'll keep a close eye on

21   it being appropriate for the affirmative defense only.

22           MR. STEVENS:  Thank you, Your Honor.  And just to

23   clarify, it's not in their counterclaims, not in their

24   affirmative defenses, not even in their trial brief.

25           MR. MUCKENFUSS:  Well...

ADAM DOANE - DIRECT

1            THE COURT:  That's all right.
2            (Pause.)
3            THE COURT:  Let me know when you're ready.
4            MR. MUCKENFUSS:  I think we're okay.  I think he'll
5    be up and going by the time they come in.
6            THE COURT:  Okay.
7            (Jury entered the courtroom.)
8            THE COURT:  Good morning, members of the jury.
9            THE JURY:  Good morning.
10            THE COURT:  I trust you withstood the onslaught of
11    the curious last night and abided by the Court's instructions
12    to not discuss this case.
13            The defense may call its first witness.
14            MR. MUCKENFUSS:  Thank you, Your Honor.
15            Defense calls Adam Doane.
16             ADAM DOANE, DEFENDANT'S WITNESS, SWORN,
17            MR. MUCKENFUSS:  Your Honor, with the Court's
18    indulgence, would it be okay if I place the flip chart next to
19    the witness?  I may be writing some dates on it.
20            THE COURT:  Sure, that's fine.
21            MR. MUCKENFUSS:  Thank you, Your Honor.
22                        DIRECT EXAMINATION
23    BY MR. MUCKENFUSS:
24    Q.  Mr. Doane, can you state your full name.
25    A.   Adam Doane.

ADAM DOANE - DIRECT

1  Opticon's revenue from 2D Barcode Products in Europe in 2019

2  was  4.4 million."

3      Correct?  That was the sentence we looked at before.

4  A.  Yes, it was.

5  Q.  So the spreadsheet that's attached to the email from

6  Mr. Goldstein, the Excel spreadsheet that you're looking at,

7  is sales in Europe.  And in the first column it relates to

8  2019, correct?

9  A.  Yes.  I think you mean column C.

10  Q.  I'm sorry, column C.

11  A.  Column C does say 2019, yes.

12      MR. MUCKENFUSS:  Your Honor, we would ask to move

13  into evidence Exhibit 98.

14      THE COURT:  All right.  It's admitted.

15      (Defendant's Exhibit Number 98 was received into

16  evidence.)

17      THE COURT:  Members of the jury, in Exhibit 98,

18  Defense Exhibit 98, there are -- you will see there some

19  numbers representing sales.  Those numbers are of no moment

20  for your consideration with respect to the claim here.  This

21  has to do with Europe.  All right.  But I think counsel is

22  going to get to a different point.  But don't worry yourselves

23  at all about the numbers in there.  It has nothing to do with

24  what you're going to be asked to consider.

25  Q.  Now, Mr. Doane, looking at Exhibit 98 and the Excel

ADAM DOANE - DIRECT

1   Honeywell's patents.

2   Q.   I'm sorry.

3   A.   We would not do that, no.

4   Q.   I'm 52 so things are starting to get a little fuzzy.

5        OPTO filed claims in Europe seeking to invalidate

6   Honeywell's patents, correct?

7   A.   OPTO did file nullity actions which are actions in which

8   OPTO alleges that Honeywell's patents are invalid.

9   Q.   Thank you.

10       And you recall -- if we can put the Second Amendment back

11  up which I think is JX3.

12       Under the agreement -- we looked at the provision where

13  those nullity actions -- and I'm sorry, I'll ask you this

14  question.

15       As part of the settlement, those nullity actions were

16  dismissed, correct?

17  A.   They were.

18            MR. MUCKENFUSS:  If we can go to Section 3.5.

19  Q.   Just for the jury, "Section 3.5 Dismissal.  No later than

20  20 days from the date of the last execution of this Second

21  Amendment, Opticon shall withdraw the Nullity Actions."

22       Do you see that?

23  A.   I do see that.

24            MR. MUCKENFUSS:  May I approach, Your Honor?

25            THE COURT:  You may.

268

ADAM DOANE - CROSS

1  Q.   So first off, Mr. Doane, does this case allege any breach
2  of anything related to Europe?
3  A.   It does not.  This case is about the main agreement that
4  we saw in the U.S.
5  Q.   Okay.  So if we look on that timeline immediately to your
6  left, which is the agreement that we say has been breached in
7  this litigation?
8  A.   It would be that first line, the January 22nd, 2020,
9  agreement.
10 Q.   And of the agreements that are there, which is the
11 agreement that deals with the United States, the country that
12 we're in right now?
13 A.   That first agreement that you see on the page there.
14       MR. STEVENS:  Your Honor, may I approach and write
15 that?
16       THE COURT:  You may.
17       MR. STEVENS:  Thank you.
18 Q.   So, sir, I've circled this January 22 agreement.  Is that
19 the agreement that we're actually here in this court to talk
20 about?
21 A.   It is.
22 Q.   Is there any allegation of breach of the Second
23 Amendment?
24 A.   There is not.
25 Q.   Okay.  So this is about the USA.

JA1735

ADAM DOANE - CROSS

1    Now, is the Second Amendment about the U.S. or is the
2  Second Amendment about Europe?
3  A.   The Second Amendment is about Europe.
4  Q.   Okay.  And again, are we asking the jury to award any
5  sort of damages or to make any allegation of breach of this
6  Second Amendment right here?
7  A.   No.  Honeywell is just seeking damages based on OPTO's
8  breach of that first agreement that's circled there.
9  Q.   Okay.  Now, you spent maybe about an hour going through
10  some emails where the other side confessed that they weren't
11  actually including the laser sales.  Where on the timeline is
12  that?  And I -- if you can't see it, Mr. Doane, I can move it
13  a little bit your way.
14  A.   I'm happy to bend over.
15    So it says -- so those emails were in October of 2020.
16  Q.   Okay.  So the "we're coming clean emails" where they say
17  that we didn't include laser products, was that before or
18  after the actual agreement?
19  A.   That was after the agreement.
20  Q.   Okay.  So from January 22 until these October emails, did
21  Opticon ever say anything about they weren't going to include
22  laser products?
23  A.   No.
24  Q.   So this is the first time that anyone had any inkling
25  that behind the scenes OPTO was not including laser products

ADAM DOANE - CROSS

1   A.   I believe so, yes.

2   Q.   So did Opticon demand when that was made available that

3   it not be shared with Honeywell?

4   A.   Yes.  So when OPTO sent those spreadsheets, they were

5   very explicit, saying do not share any of this information

6   with Honeywell.

7   Q.   Okay.  So now October comes along and finally they've

8   sort of admitted that they've not been including the laser

9   products in the royalty reports to that point in time.  Again,

10  is that the first moment that Honeywell has any inkling that

11  something is amiss here?

12  A.   That's correct.

13  Q.   And then that's roughly October.  What happened over the

14  next five or six months?

15  A.   Because it wasn't clear from OPTO what products were

16  being included and excluded from the calculation, there was a

17  months' long investigation where Honeywell was asking for

18  information from OPTO and the parties were discussing back and

19  forth trying to understand which products were included and

20  excluded.

21  Q.   And was that just October or did that go all the way

22  through the end of March of the following year?

23  A.   It was a very long period.  March sounds right.  So yeah,

24  like October through March of the next year.

25  Q.   And again, at the end of that, did there come a point in

RIE ASHIHARA - DIRECT

1  Q.   And what department or departments do you work in at OPTO
2  Electronics?
3  A.   Product management -- product control -- product control
4  department and finance department.
5  Q.   And could you briefly describe for the jury your role in
6  OPTO's product control and finance departments.
7  A.   As regards product control, I am involved in the planning
8  of products and observation of sales trends and determining
9  when a product should be discontinued if it is to be
10  discontinued.
11      As regards finances, because it is a small department, I
12  am involved in various business activities.
13  Q.   Thank you.
14      Are you familiar with the ITC patent litigation and the
15  settlement of that litigation between OPTO and Honeywell?
16          THE INTERPRETER:  ITC litigation and what
17  litigation?  Excuse me.
18  Q.   And the settlement of that litigation between Honeywell
19  and OPTO.
20  A.   Yes, I do know about it, but I do not know the details
21  thereof.
22  Q.   And are you familiar with royalty payments that OPTO has
23  made to Honeywell as a result of the settlement of that ITC
24  litigation?
25  A.   Yes, I do know.

RIE ASHIHARA - CROSS

1      (End of sidebar conference.)

2      THE COURT:  You may continue.

3              DIRECT EXAMINATION (Cont'd.)

4  BY MR. VanHOUTAN:

5  Q.   Ms. Ashihara, do you know approximately how much -- do

6  you know how much approximately that OPTO has paid to

7  Honeywell in royalties under the license agreement that

8  settled the ITC litigation?

9  A.   Ten thousand -- $10,894,502.

10  Q.   And did any of that royalties relate to OPTO's laser or

11  CCD scanners, to your knowledge?

12  A.   They do not involve laser scanners or CCD.

13  Q.   Ms. Ashihara, do you know how OPTO refers to its laser

14  and CCD scanners, whether they're 1D or 2D?

15  A.   They are considered to be one-dimensional.

16  Q.   Why?

17  A.   It is because 1D scanners are meant to read 1D barcodes

18  and two-dimensional scanners are meant to read two-dimensional

19  barcodes.

20          MR. VanHOUTAN:  Thank you, Ms. Ashihara.  No further

21  questions at this time.

22          THE COURT:  You may cross examine.

23          MR. STEVENS:  Thank you, Your Honor.

24                  CROSS EXAMINATION

25  BY MR. STEVENS:

JA1739

RIE ASHIHARA - REDIRECT

1  A.   They would have been available in 2019 as far as the
2  products that were shown to me now are concerned.
3  Q.   And why when OPTO identifies PDF417 as a 2D symbology
4  does OPTO consider those products 1D?
5  A.   So you're asking about why we consider them
6  one-dimensional products?
7  Q.   Correct.
8  A.   What we call 2D products are those that are able to read
9  all two-dimensional barcodes.  For example, QR codes and Data
10 Matrix which are generally considered 2D.
11      So the products, the laser products that were shown to me
12 now are able to read some two-dimensional barcodes, but
13 mostly -- most of the two-dimensional barcodes are not
14 readable using those products and therefore we are not able to
15 introduce them to our customers as being two-dimensional and
16 we consider them to be one-dimensional products.
17          MR. VanHOUTAN:  Thank you, Ms. Ashihara.  No further
18 questions.
19          THE COURT:  Any redirect?
20          MR. STEVENS:  Very briefly.
21                  REDIRECT EXAMINATION
22 BY MR. STEVENS:
23 Q.   Ms. Ashihara, if you would have included in the royalty
24 reports all of OPTO's products that were operable to decode
25 PDF417, MicroPDF417, and composite codes, those numbers would

RIE ASHIHARA - REDIRECT

1  have been bigger; is that correct?

2          MR. STEVENS:  I'll try it one more time.

3          THE INTERPRETER:  The first part.  The first part.

4  Q.   In the royalty -- if you had --

5          THE INTERPRETER:  Royalty, okay.  I'm sorry.

6  A.   Yes.

7          MR. STEVENS:  Nothing further, Your Honor.

8          THE COURT:  Thank you.  You may stand down, both of

9  you.

10          (Witness stepped down.)

11          THE COURT:  Is this witness released?

12          MR. STEVENS:  No objection to that, Your Honor.

13          MR. VanHOUTAN:  Thank you, Your Honor.

14          THE COURT:  Further rebuttal evidence for the

15  plaintiff?

16          MR. STEVENS:  Our next witness would be called via

17  deposition.  I'm not sure if it would take us past 5:00, but

18  we can go ahead and take the next one if Your Honor would

19  like.

20          THE COURT:  Will that be your last?

21          MR. STEVENS:  It will not.

22          THE COURT:  So, members of the jury, not knowing how

23  long that will go and mostly wanting to keep my promise to let

24  you go by 5:00, we're going to quit for the night.

25          Same rules apply as last night.  Obviously, we're

JA1741

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL, )
INC.; HAND HELD PRODUCTS, )
INC.; AND METROLOGIC )
INSTRUMENTS, INC., )
)
        Plaintiffs, )    No. 3:21-cv-506
)
    vs. )    VOLUME III
)
OPTO ELECTRONICS COMPANY, )
LTD., )
)
        Defendant. )
_____)

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE KENNETH D. BELL
UNITED STATES DISTRICT COURT JUDGE
JULY 19, 2023

<u>APPEARANCES</u>:

On Behalf of the Plaintiffs:

    MATTHEW SCOTT STEVENS, ESQ.
    S. BENJAMIN PLEUNE, ESQ.
    LAUREN NICHOLE GRIFFIN, ESQ.
    NICHOLAS CHRISTOPHER MARAIS, ESQ.
    BRANDON C.E. SPRINGER, ESQ.
    STEPHEN RICHARD LAREAU, ESQ.
    Alston & Bird, LLP
    101 South Tryon Street, Suite 4000
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ROBERT MUCKENFUSS, ESQ.
    ZACHARY L. McCAMEY, ESQ.
    JESSICA LYNN O'BRIEN, ESQ.
    McGuireWoods, LLP
    201 North Tryon Street, Suite 3000
    Charlotte, North Carolina 28202

JA1742

APPEARANCES (Cont'd.)

    TYLER T. VanHOUTAN, ESQ.
    McGuireWoods, LLP
    Texas Tower, Suite 2400
    845 Texas Avenue
    Houston, Texas 77002

    CHRISTINE E. LEHMAN, ESQ.
    CONNOR S. HOUGHTON, ESQ.
    Reichman Jorgensen Lehman & Feldberg, LLP
    1909 K Street, NW
    Suite 800
    Washington, DC 20006

    YORK M. FAULKNER, ESQ.
    YorkMoodyFaulkner
    Tensho Building, 7F
    3-17-11 Shibaura, Suite 711
    Tokyo, Japan

                    CHERYL A. NUCCIO, RMR, CRR
                      Official Court Reporter
                    United States District Court
                      Charlotte, North Carolina

JA1743

1   I've showed you that the parties agree that that was supposed
2   to be out.  The parties agree that anything that's in the
3   contract is what matters, not something that happened outside
4   the contract.
5          And then the other side has brought this Excel
6   spreadsheet from Europe that they wanted you to look at
7   yesterday.  I want to be very clear.  We're not asking for
8   damages for anything in Europe.  When the parties sat down and
9   negotiated Europe, by that point in time, you know, Honeywell
10  had lost a little bit of trust in OPTO, and so what they
11  decided to do was just have a flat fee per year.  So it
12  doesn't matter in Europe whether a product is a 1D Barcode
13  Product or a 2D Barcode Product.  OPTO just pays us a flat
14  check everywhere for Europe.  Whether they sell one dollar or
15  a billion dollars worth of product, it's a flat fee per year.
16         So the Europe dispute -- there is no Europe dispute.
17  It's very different.  We're not alleging any breach of that.
18  We're here to talk about the United States and the fact that
19  they didn't pay us the royalties that they agreed to pay us in
20  the United States.
21         Now, when Mr. Muckenfuss gets up here in a few
22  minutes, I think he's going to talk about all these things
23  other than the contract and try to talk about the Second
24  Amendment that applies to Europe, things like that.  But I do
25  want you to remember, it's his burden -- if he's going to get

1  no foul.  But crickets for 90 days.  That's why we're here in

2  this courtroom, because they wouldn't pay.

3      Now, we heard one other key fact yesterday that

4  Mr. Muckenfuss didn't bring up in his closing.  It was really

5  interesting to me because I think we might have unraveled a

6  little bit of the mystery yesterday.  When Ms. Ashihara sat in

7  that chair, you heard her decide which products she included

8  and which products she didn't include.

9      And by the way, that spreadsheet that he showed you

10  yesterday and that he showed you right now, Ms. Ashihara was

11  the one who put that together.  That's her spreadsheet.  And

12  she told you that she was never allowed to see the agreement.

13  That she didn't go to the mediation.  She didn't negotiate the

14  agreement.  Somebody else at OPTO probably controls that

15  agreement and doesn't let it be circulated.  But she's never

16  seen the agreement.  Someone just told her to count 2D Barcode

17  Products.

18      And what did she say about how she did it?  She said

19  if it didn't -- if it wasn't able to decode every 2D Barcode

20  Product, I didn't include it.  I know that there are plenty of

21  products that can decode the five that we're talking about

22  this week.  But if it didn't include every single one, I

23  didn't include it.  And that's true in that spreadsheet that

24  he showed you too.  She didn't include that.  She didn't

25  include all the sales.

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> OPTO ELECTRONICS CO., LTD., <br><br> *Defendant and* <br> *Counterclaim Plaintiff*, <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Counterclaim Defendants*. | CIVIL ACTION NO. 3:21-cv-00506 |

**REPLY IN SUPPORT OF HONEYWELL'S**
**MOTION FOR FEES AND COSTS**
**(Dkt. 360)**

JA1746

**TABLE OF CONTENTS**

I.　INTRODUCTION ..................................................................................... 1

II.　SECTION 4.7 EXPLICITLY SHIFTS HONEYWELL'S FEES AND COSTS INCURRED IN THIS ACTION TO OPTO ........................................ 1

　　A.　The Only Objective and Reasonable Understanding of Section 4.7 Includes All Fees and Costs, Not Some Undefined Subset of Each ......................... 2

　　B.　The Context of the Agreement as a Whole Supports Awarding Honeywell Its Fees and Costs ................................................................. 3

　　C.　The Court Should Decline OPTO's Invitation to Review Extrinsic Evidence ........................................................................................ 4

III.　SECTION 4.7 APPLIES TO THE PRESENT BREACH-OF-CONTRACT ACTION ........................................................................ 5

IV.　HONEYWELL MET ITS CONTRACTUAL BURDEN OF PROVING ITS FEES AND COSTS ........................................................................ 8

V.　HONEYWELL'S FEES AND COSTS DO NOT MERIT REDUCTION ............................ 10

VI.　HONEYWELL WILL SEPARATELY SEEK ITS TAXABLE COSTS .............................. 12

VII.　CONCLUSION ..................................................................................... 12

i

JA1747

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                                                                    **Page(s)**

*Anderson v. Snyder's Fishing Club,*
   No. 2137-S, 2007 Del. Ch. LEXIS 364 (Del. Ch. Feb. 5, 2007) ................................................5

*Balt. Pile Driving & Marine Constr., Inc. v. Wu & Assocs.,*
   No. N19L-07-090, 2022 WL 3466066 (Del. Super. Ct. Aug. 18, 2022) ...................................1

*Barker Cap. LLC v. Rebus LLC,*
   No. 04C-10-269, 2006 WL 246572 (Del. Super. Ct. Jan. 12, 2006) ......................................12

*Beneficial Delaware, Inc. v. Waples,*
   No. 05L-05-006, 2006 WL 1880960 (Del. Super. Ct. July 3, 2006) ......................................11

*BNSF Ry. Co. v. United States,*
   775 F.3d 743 (5th Cir. 2015) ..............................................................................................3

*Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund,*
   No. 2017-0393, 2020 WL 5416516 (Del. Ch. Sept. 8, 2020)...................................................4

*Commercial Credit Grp., Inc. v. Falcon Equip., LLC,*
   No. 3:09cv376-DSC, 2010 WL 144101 (W.D.N.C. Jan. 8, 2010) ..........................................11

*Comrie v. Enterasys Networks, Inc.,*
   No. 19254, 2004 WL 936505 (Del. Ch. Apr. 27, 2004) .........................................................5

*Concord Steel, Inc. v. Wilmington Steel Processing Co.,*
   No. 3369-VCP, 2010 WL 571934 (Del. Ch. Feb. 5, 2010) ...................................................10

*GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.,*
   270 F. Supp. 2d 476 (D. Del. 2003).....................................................................................2, 3

*HCR-ManorCare v. Fugee,*
   No. 07C-10-024 MMJ, 2010 WL 780020 (Del. Super. Ct. Jan. 26, 2010)...............................7

*Ivize of Milwaukee, LLC. v. Compex Litig. Support, LLC,*
   Nos. 3158-VCL, 3406-VCL, 2009 WL 1111179 (Del. Ch. Apr. 27, 2009)...........................11

*Mahani v. EDIX Media Group, Inc.,*
   935 A.2d 242, 243, 245–48 (Del. 2007) ...............................................................................8

*Millcreek Shopping Ctr., LLC v. Jenner Enters.,*
   No. N13C-11-145, 2017 Del. Super. Lexis 170 (Super. Ct. Mar. 31, 2017).....................6, 10

*Oakley v. Toll Bros., Inc.,*
   No. S10C-05-021, 2012 WL 1405724 (Del. Super. Ct. Jan. 19, 2012) .................................11

ii

JA1748

*Estate of Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) ........................................................................2

*Paul Elton, LLC v. Rommel Del., LLC*,
  No. 2019-0750, 2022 WL 793126 (Del. Ch. Mar. 16, 2022) ....................4

*Relax Ltd. v. ANIP Acquisition Co.*,
  No. N10C-06-032, 2011 WL 4954174 (Del. Super. Ct. Oct. 17, 2011)................12

*W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*,
  No. 2742-VCN, 2009 WL 458779 (Del. Ch. Feb. 23, 2009).................11

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................................3, 5, 8

iii

JA1749

## I.     INTRODUCTION

The language of Section 4.7 is clear: "In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action." Dkt. 359-1 at § 4.7. That is, if a party institutes an action to collect *any* overdue payments, Section 4.7 is invoked, and a party is entitled to its fees and costs. Here, Honeywell instituted an action to collect overdue payments—and the jury specifically found that "OPTO breach[ed] the Parties' Settlement Agreement ***by failing to timely pay Honeywell all royalties due under the Agreement***" (Dkt. 350 (emphasis added))—therefore Section 4.7 is invoked, and Honeywell is entitled to its fees and costs. It's as simple as that.

OPTO's Response (a 25-page opposition in response to a 10-page opening brief) attempts to obfuscate this simplicity through a scattershot of arguments. But much of OPTO's Response is premised on an incorrect reading of the Agreement and Delaware contract law. As Honeywell sets forth below, each of OPTO's arguments fails either in the face of Section 4.7's simple and clear terms or the proper lens of Delaware law.

## II.     SECTION 4.7 EXPLICITLY SHIFTS HONEYWELL'S FEES AND COSTS INCURRED IN THIS ACTION TO OPTO

Section 4.7 is a fee-shifting provision that requires OPTO to pay all fees and costs that Honeywell incurred in collecting OPTO's overdue payments. Indeed, OPTO does not dispute that Section 4.7 is a valid and enforceable fee-shifting provision. Nor could it as Delaware law does not require a single "magic" word to establish a valid and enforceable fee-shifting provision. *Balt. Pile Driving & Marine Constr., Inc. v. Wu & Assocs.*, No. N19L-07-090, 2022 WL 3466066, at *2 (Del. Super. Ct. Aug. 18, 2022) ("Under Delaware law, there is no 'bright-line language' to establish a fee-shifting provision."). OPTO's Response does no more than run from the otherwise clear

language of Section 4.7. While OPTO may now wish that Section 4.7 was drafted narrower, OPTO cannot hide from its clear and bargained-for language.

### A. The Only Objective and Reasonable Understanding of Section 4.7 Includes All Fees and Costs, Not Some Undefined Subset of Each

While OPTO would like to limit an otherwise broad term, such as "fees," to something less than any fee, an objective, reasonable person would understand the word "fees" to include *any* fee. And Delaware law mandates that the understanding of the objective, reasonable person prevail. *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("a contract's construction should be that which would be understood by an objective, reasonable third party.").

Section 4.7 is devoid of any qualifying or limiting language. Specifically, Section 4.7 states: "In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action." Dkt. 359-1 at § 4.7. Thus, based on the plain language of Section 4.7 there would be no need or motivation for an objective, reasonable third party to understand this provision to mean anything less than any and all fees and costs. In fact, when faced with a similar broadly worded indemnification provision, the District of Delaware enforced that wording and found that an objective and reasonable third party would enforce the language as written. Specifically, in *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F. Supp. 2d 476 (D. Del. 2003), the District of Delaware was tasked with determining whether the word "expenses" in a contract that stated a "party shall promptly reimburse the indemnified party for expense as they are incurred" included attorneys' fees. The court found that:

> Because the language of Section 9.4(a) is unambiguous, the Court must construe it in accordance with how it would be understood by "an objective reasonable third party." [] An expense is defined as a "financial burden or outlay: cost." Websters Ninth New Collegiate Dictionary (1986). Accordingly, the Court concludes that a reasonable third party would not understand expenses as used in Section 9.4(a) to refer to only one type of cost incurred by Plaintiffs and not another. Attorney's fees

2

JA1751

are a cost; thus, the Court concludes that they fall within the ambit of reimbursable expenses.

*Id.* at 483.

Like the parties in *GB Biosciences,* both parties here seemingly agree that Section 4.7 is unambiguous.[1] *See* Dkt. 372 at 5. And BLACK'S LAW DICTIONARY confirms that there is no limiting language in the common understanding of the words "fees" and "costs." *See* COST, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "costs" as "[t]he expenses of litigation, prosecution, or other legal transaction"); *id*. at FEE (defining "fees" as "a charge or payment for labor or services, esp. professional services."). Accordingly, like the court found in *GB Biosciences*, an objective, reasonable third party would read Section 4.7 to include all fees and all costs.

### B.  The Context of the Agreement as a Whole Supports Awarding Honeywell Its Fees and Costs

Honeywell does not dispute that the parties used the narrower phrase "attorneys' fees" in certain parts of the Agreement but used the *broader* term "fees" in Section 4.7. OPTO avers that this is objective evidence that attorneys' fees are excluded. Dkt. 372 at 6. But that argument fails for at least the following reasons.

First, basic grammar denotes that "fees" is broader than "attorneys' fees." "Attorneys'" is an adjective/modifier that limits (and thus narrows) the word "fees" to a particular type of "fee." *See, e.g., BNSF Ry. Co. v. United States*, 775 F.3d 743, 752 (5th Cir. 2015) (interpreting the word "money remuneration" in a statute and opining that "while the word 'remuneration' is broad, the modifier 'money' must narrow it to some degree. . .").

---

[1] OPTO's Response refers to Section 4.7 as both unambiguous (in the argument) and ambiguous (in the introduction). *See* Dkt. 372 at 5 ("Section 4.7 of the Agreement requires the traditional approach to contract interpretation, which is to 'interpret clear and unambiguous contract terms according to their plain meaning.'"). In response to interrogatories in discovery, OPTO never identified Section 4.7 as allegedly ambiguous.

3

JA1752

Second, when read as a whole, the Agreement supports awarding Honeywell all of its fees and costs. In the context of the Agreement, the parties' use of "fees" in certain instances and "attorneys' fees" in other instances makes sense. For example, in the underlying Delaware and ITC actions, the parties knew the precise fees at issue. Namely, in the Delaware action, Honeywell sought attorneys' fees from OPTO. Dkt. 359-1 at Background ¶ B. Against that backdrop, it makes sense that when the parties were resolving those disputes, they agreed that "[e]ach Party shall bear its own . . . attorneys' fees." Dkt. 359-1 at § 3.2. But with respect to Section 4.7, there was no such hindsight or need otherwise to limit "fees" or "costs" to any one type of fee or cost.

Lastly, OPTO's authority is both inapplicable and unavailing. OPTO relies on *Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund*, No. 2017-0393, 2020 WL 5416516 (Del. Ch. Sept. 8, 2020). But *Braga* did not involve a fee-shifting provision. Rather the defendant in *Braga* invited the court to read a provision that articulated the terms of an investment to be a valid fee-shifting provision, and the court declined to do so. *Id*. at *3. In the *Paul Elton* case also cited by OPTO, the court was tasked with determining whether to award fees based on a contract that included two different fee-shifting provisions (both providing for attorneys' fees). *Paul Elton, LLC v. Rommel Del., LLC*, No. 2019-0750, 2022 WL 793126, at * 2 (Del. Ch. Mar. 16, 2022). The court declined to award fees under either provision because the action at issue was not the type contemplated by either provision. *Id*. Here, unlike *Braga* and *Paul Elton*, there is a valid and enforceable fee shifting provision that covers the precise type of suit Honeywell brought (and won).

**C. The Court Should Decline OPTO's Invitation to Review Extrinsic Evidence**

Delaware law is clear that a court should look solely to the contract at issue in determining whether to award fees and costs. *Comrie v. Enterasys Networks, Inc.*, No. 19254, 2004 WL 936505, at *2 (Del. Ch. Apr. 27, 2004). OPTO asks this Court to do the exact opposite. Specifically, OPTO

asks this Court to consider Honeywell's (not-in-evidence) agreements with Datalogic and Zebra in determining whether to award fees and costs, but neither of these agreements are relevant to the present action. While OPTO claims that Honeywell opened the door to extrinsic evidence by citing BLACK'S LAW DICTIONARY, Delaware courts have turned to dictionary definitions in understanding the common understanding of a term without opening the door to extrinsic evidence. *See, e.g., Anderson v. Snyder's Fishing Club*, No. 2137-S, 2007 Del. Ch. LEXIS 364, at *8–10 (Del. Ch. Feb. 5, 2007) (considering BLACK'S LAW DICTIONARY not extrinsic evidence). Honeywell cited to BLACK'S LAW DICTIONARY, to show no more than a common understanding of the terms "fees" and "costs." Accordingly, the Court should decline OPTO's invitation to review extrinsic evidence in the form of *different contracts* that do not involve an agreement between these two parties.

## III.     SECTION 4.7 APPLIES TO THE PRESENT BREACH-OF-CONTRACT ACTION

Section 4.7 contemplates the precise action that Honeywell brought—an action to collect overdue payments from OPTO. OPTO insists that Section 4.7 is designed for a different type of action, a collections action, in which a party institutes an action "to recover unpaid obligations based on a debtor/creditor relationship." Dkt. 372 at 7. This argument fails in view of a plain reading of the Agreement and is inconsistent with the actual jury verdict in this litigation.

First, there is a close congruency between the language of Agreement and the finding of the jury. The fee-shifting provision applies to any "an action to **collect any overdue payments**" and the jury explicitly found that "OPTO breach[ed] the [] Agreement **by failing to timely pay Honeywell all royalties due under the Agreement**." Dkt. 350 (emphases added).  It cannot be more apparent that the jury's finding of breach falls squarely within the ambit of the fee-shifting provision.

Second, Honeywell and OPTO are not in a debtor/creditor relationship, so there would be no point in including a provision that is premised on such a relationship. For there to be a debtor/creditor relationship, Honeywell would have had to loan money to OPTO. *See Millcreek*

*Shopping Ctr., LLC v. Jenner Enters.*, No. N13C-11-145, 2017 Del. Super. Lexis 170, at *11 (Super. Ct. Mar. 31, 2017) (finding that there must be an underlying loan obligation for the formation of a debtor-creditor relationship under Delaware debtor-creditor law). Honeywell did not loan any money to OPTO. Indeed, much of OPTO's Response continually references a "debt" owed to Honeywell and a "debt" that could be turned over to collections. But Honeywell never loaned money to OPTO that would make Honeywell a creditor.

Third, Section 4 of the Agreement is not limited to "collections actions." Section 4 of the Agreement is titled "Payments and Other Consideration." Dkt. 359-1 at § 4. Section 4 articulates OPTO's various payment obligations: Section 4.2 articulates OPTO's lump sum payment to Honeywell; Section 4.3 articulates OPTO's ongoing royalty payments; Section 4.4 articulates how OPTO should make payments under Section 4; Section 4.5 requires OPTO to submit reports in connection with its royalty obligations; and Section 4.6 articulates a late fee in the event OPTO is late in making its payments. *Id.* at §§ 4.2, 4.3, 4.4, 4.5, and 4.6. And then Section 4.7 articulates what happens in the event OPTO fails to make any of these payments. *Id.* at § 4.7.

It is indisputable that the jury returned a verdict that implicated damages pursuant to both Sections 4.3 and 4.6. Namely, both Honeywell ***and OPTO*** stipulated "that the computation of the royalties under Section 4.3 and the late fees under Section 4.6 of the License and Settlement Agreement directed to the accused products in this matter is $859,741." Dkt. 355. [2] It is inconsistent to stipulate to damages under Section 4 but at the same time ask the court to ignore Section 4.7. It

---

[2] The similarities in the language of Sections 4.6 and 4.7 is noteworthy: Section 4.6 recites "[i]n the event a Party fails to make any payment due hereunder. . .," and Section 4.7 recites "[i]n the event a Party must institute an action to collect any overdue payments…" Dkt. 359-1 at §§ 4.6, 4.7.

JA1755

is clear from a plain reading of the Agreement that Section 4.7 is implicated when a party institutes *any action* to collect any overdue payments due under Section 4.

Fourth, OPTO incorrectly argues that Honeywell is not entitled to its fees and costs under Section 4.7 because Honeywell brought an action under Section 9.8. Dkt. 372 at 8. Section 4.7 gives OPTO a 10-day grace period to satisfy any outstanding payment obligations before owing Honeywell its fees and costs. Specifically, Section 4.7 states:

> In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action. Prior to the institution of any such action, the Party shall provide the other with Notice of the overdue payments and ten (10) days to satisfy any outstanding obligation.

Dkt. 359-1 at § 4.7. Thus, once notified of overdue payments, OPTO has 10 days to cure. If it does not cure within 10 days and Honeywell institutes any action to collect the overdue payments, Honeywell is entitled to its fees and costs from such action. Relatedly, Section 9.8 is broadly directed to instituting an action for *any* breach of the Agreement at large, *including a breach under Section 4*. That is, in addition to a breach of Section 4, Section 9.8 includes any breach of Section 5 (Representations) or Section 6 (Confidentiality). A failure to make the requisite payments under Section 4, is, by definition, a breach of the Agreement. Because of this breach, and because Honeywell brought an action based on this breach, Section 9.8 is likewise necessarily implicated.

Fifth, OPTO's reliance on *HCR-ManorCare v. Fugee*, No. 07C-10-024, 2010 WL 780020 (Del. Super. Ct. Jan. 26, 2010) is unavailing, as the provision there is easily distinguishable from Section 4.7. The Agreement in *HCR-Manor* is indisputably directed to a situation where an account is turned over to a collections agency. Specifically, the agreement in that case states, "[s]hould the Resident's *account for any reason be turned over for collection*, the Resident will pay the Center's collections costs, including attorneys' fees." *Id.* at *6 (emphasis added). This is in stark contrast to

Section 4.7's "**institute an action** to collect any overdue payments," that contemplates more than simply turning an account over to collections. Dkt. 359-1 at § 4.7 (emphasis added).

Up to this point, OPTO's arguments for the inapplicability of Section 4.7 begs the question of what does "fees and costs" under Section 4.7 mean? Well, according to OPTO, it can never mean attorneys' or expert fees. According to OPTO, the "fees and costs" of Section 4.7 include only "collection costs" such as "paying a fee to a collection agency for recovering an unpaid debt amount." Dkt. 372 at 7. Ironically, the common understanding of "collection costs" include attorneys' fees. *See* COSTS OF COLLECTION, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "costs of collection" as "expenses incurred in receiving payment of a note; esp., attorney's fees incurred in the effort to collect a note.").

## IV.    HONEYWELL MET ITS CONTRACTUAL BURDEN OF PROVING ITS FEES AND COSTS

Honeywell's fees and costs are both reasonable and consistent with the language of Section 4.7 (and Del. Rules of Prof'l Conduct 1.5(a)), as Honeywell demonstrated in its Opening Memorandum and the attached declaration. OPTO's Response cites the *Mahani* case, but that case further underscores the reasonableness of Honeywell's position. *Mahani v. EDIX Media Group, Inc.* 935 A.2d 242, 243, 245–48 (Del. 2007). There, the defendant challenged the Court of Chancery's decision to award plaintiff all of its attorneys' fees, alleging that the plaintiff's success was limited and that the court "abdicated any role in determining whether the fee was a reasonable fee." *Id*. at 246. The Delaware Supreme Court affirmed the full-fee award, noting that "the reasonableness of attorneys' fees and other expenses in a contractual fee shifting case should be assessed by reference to the legal services purchased by those fees, not be reference to the degree of success achieved in the litigation." *Id*. at 248. Moreover, the court credited the fact that the

8

Chancellor found that the defendant's conduct in resisting discovery "heavily contributed to the total number of hours [plaintiff] spent litigating the case." *Id*.

Here, Honeywell put forward evidence of Honeywell's actual fees and costs, as well as evidence of (1) the reasonableness of the hourly rates charged (and the fact they were significantly discounted), (2) the reasonableness of the overall number of hours, (3) the fact that OPTO's conduct contributed heavily to the required effort (via three affirmative defenses and three counterclaims), (4) the need for specialized attorneys knowledgeable in patent law, and (5) the fact that Honeywell prevailed on all of its counts and OPTO did not prevail on any affirmative defense or counterclaim. Moreover, Honeywell made the most apt comparison possible, demonstrating that OPTO likely outspent Honeywell by 50%—a fact never rebutted by OPTO. With this evidence, Honeywell addressed the relevant Del. Rules of Prof'l Conduct 1.5 factors (which are noted in the Comments to be a non-exclusive guide and not all applicable in every proceeding). Indeed, only Rule 1.5 factors 1, 3, 4, 6, and 7 apply here, each of which Honeywell provided evidence in support thereof:

- Factor 1: The attorney time was necessary and reasonable, especially in light of the number and nature of affirmative defenses and counterclaims (including one sounding in patent law) OPTO chose to bring. *See, e.g.*, Dkt. 361 at 1, 8–9.
- Factors 3 & 6: The attorneys' fees were discounted and attested to be reasonable in the subject matter and geography. *See, e.g.*, Dkt. 361 at 8–9; Dkt. 359-2 at ¶¶ 6–9.
- Factor 4: Honeywell prevailed on its single count of breach; OPTO did not prevail on any of its six total affirmative defenses and counterclaims. *See, e.g.*, Dkt. 361 at 1, 7–9; Dkt. 37; Dkt. 350.
- Factor 7: Honeywell's team included trained patent litigators to address the patent license and to defend the patent misuse allegation. *See, e.g.*, Dkt. 361 at 1, 8; Dkt. 359-2 at ¶ 6.

Here, OPTO rebutted none of Honeywell's evidence—OPTO didn't challenge, for example, the reasonableness of the rates Honeywell paid (or the fact that OPTO's lawyers likely charged a higher rate) or the hours expended. Moreover, while Honeywell had no obligation under the Agreement to remove any of its fees and costs related to this action, Honeywell did so in a good-faith attempt to

9

JA1758

be conservative. To be clear, most of the core issues in this case, which involved the most attorney and expert time, such as whether PDF417 is a one-dimensional or two-dimensional barcode and whether OPTO's products were 2D Barcode Products, infected each and every claim at issue in this case including Honeywell's claims under Section 4.

Moreover, it is nonsensical for OPTO to claim that Honeywell isn't entitled to fees and costs for defending against OPTO's counterclaim of patent misuse. Dkt. 372 at 15. OPTO contends that its patent misuse counterclaim "was [] not related to any action to collect overdue payments." *Id*. But based on OPTO's own words, its counterclaim of patent misuse was directly connected to Honeywell seeking Section 4's overdue royalty payments. *See* Dkt. 187 at 1 (alleging Honeywell's "campaign to extract royalty payments on OPTO's laser products...constitutes *per se* patent misuse."); *see also* Dkt. 195 at 17 (Order) ("[OPTO] claims that Honeywell is unlawfully attempting to extract royalties for functionality . . . that is not covered by an active Honeywell patent."). In short, Honeywell more than showed that its fees and costs are reasonable.

## V. HONEYWELL'S FEES AND COSTS DO NOT MERIT REDUCTION

OPTO's arguments that Honeywell's fees and costs are "capped" or should be diminished are inconsistent with the law.

First, OPTO's position that 10 Del. C. § 3912 applies to the present action is blatantly incorrect. Delaware law is clear that 10 Del. C. § 3912 applies **exclusively** to writings evidencing a debt. *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. 3369-VCP, 2010 WL 571934, at *2 (Del. Ch. Feb. 5, 2010). Delaware courts have consistently rejected the application of § 3912 to anything less than a written instrument evidencing a debtor-creditor relationship. *See, e.g.*, *Concord Steel*, 2010 WL 571934, at *2 (declining to apply § 3912 to an APA because an "APA is not a writing that evidences a debt. Rather, it is a contract governing the sales of a company's assets."); *Millcreek Shopping*, 2017 Del. Super. LEXIS 170, at *11 (declining to apply § 3912 to a lease

10

JA1759

because a "lease provision obligating lessee to indemnify lessor for reasonable attorneys' fees is not subject to § 3912 because a debtor-creditor relationship does not exist."); *Oakley v. Toll Bros., Inc.*, No. S10C-05-021, 2012 WL 1405724, at *2 (Del. Super. Ct. Jan. 19, 2012) (declining to apply § 3912 because the litigation between the parties was not about a mortgage, but about a contract of sale, their relationship did "not fit the sort of traditional loan-based debtor/creditor relationship as envisioned" by § 3912).

The other two cases OPTO cites both involved an actual creditor-debtor relationship. *See Beneficial Delaware, Inc. v. Waples*, No. 05L-05-006, 2006 WL 1880960, at *1–2 (Del. Super. Ct. July 3, 2006) (contemplating applying § 3912 to a mortgage foreclosure action); *Commercial Credit Grp., Inc. v. Falcon Equip., LLC*, No. 3:09cv376-DSC, 2010 WL 144101, at *10 (W.D.N.C. Jan. 8, 2010) (applying § 3912 to an action for defaulted loans).

Second, Delaware does not limit attorneys' fees absent a contractual requirement to do so. "Unless otherwise stated in the contract, a contractual provision entitling the prevailing party to fees will usually be applied in an all-or-nothing manner." *Ivize of Milwaukee, LLC. v. Compex Litig. Support, LLC*, Nos. 3158-VCL, 3406-VCL, 2009 WL 1111179, at *14 (Del. Ch. Apr. 27, 2009). And "Delaware law is clear that in the usual case, and absent contractual language to the contrary, whether a party has prevailed is determined ***by looking at the outcome of the substantive issues, not damages***." *Id*. (emphasis added); *see also W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, No. 2742-VCN, 2009 WL 458779, at *9 (Del. Ch. Feb. 23, 2009) ("whether a party prevailed is determined by reference to substantive issues, not damages"). As Honeywell explained in its Opening Memorandum, it prevailed on every single issue presented to the jury and bench.

Moreover, the cases that OPTO cites in support of diminishing Honeywell's fees and costs do not support such a proposition. First, OPTO's reliance on *Relax Ltd. v. ANIP Acquisition Co.*,

11

No. N10C-06-032, 2011 WL 4954174 (Del. Super. Ct. Oct. 17, 2011) is misplaced as that case is applying the "English Rule" to attorneys' fees; not Delaware law. *Id*. at 3–4. Second, *Barker Cap. LLC v. Rebus LLC*, No. 04C-10-269, 2006 WL 246572, at *10 (Del. Super. Ct. Jan. 12, 2006) provides no guidance on what it means for "such fees and other expenses shall be in proportion to the success achieved by Plaintiff." Indeed, OPTO provides no sound bases for reducing Honeywell's fees and costs award.

## VI.     HONEYWELL WILL SEPARATELY SEEK ITS TAXABLE COSTS

Honeywell is not using this motion to double dip on its fees and costs. As OPTO is uniquely aware, Honeywell intends to, in the future, separately seek any taxable costs (that are not captured within the relief provided in response to this motion) pursuant to Rule 54(d)(1) and Local Civil Rule 54.1(a). OPTO is aware of this because Honeywell sent OPTO its bill of taxable costs. *See* Ex. A. On July 30, Honeywell sent OPTO its proposed bill of taxable costs, and OPTO responded that LCvR 54.1 delays the bill of costs until 30 days after the termination of an appeal or expiration of appellate rights. *Id*. Honeywell intends on resolving all disputes regarding those taxable costs (including which party is the prevailing party under Fed. R. Civ. P. 54 and LCvR 54.1) at that time.

## VII.     CONCLUSION

For the foregoing reasons, and those identified in Honeywell's Opening Memorandum, Honeywell respectfully requests that the Court enforce Section 4.7 of the parties' Agreement.

12

JA1761

Dated: August 24, 2023

Respectfully submitted,

*/s/ S. Benjamin Pleune*
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim*
*Defendants Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

13

JA1762

**CERTIFICATE OF SERVICE**

I certify that on August 24, 2023, a copy of the foregoing Reply was served on counsel of record by filing the same with the Court's ECF system.

/s/ S. Benjamin Pleune
S. Benjamin Pleune

JA1763

# EXHIBIT A

| | |
|---|---|
| **From:** | McCamey, Zach |
| **Sent:** | Tuesday, August 1, 2023 6:07 PM |
| **To:** | Stevens, Scott; Muckenfuss, Robert; VanHoutan, Tyler; O'Brien, Jessica L.; Lehman, Christine; Faulkner, York; Houghton, Connor |
| **Cc:** | HON-WDNC |
| **Subject:** | RE: Hon v. Opto: Proposed Bill of Costs |

**EXTERNAL SENDER – Proceed with caution**

Scott,

Thanks for your email. We are reviewing the bill of costs and invoices you sent over. Based on our initial review of the documents, OPTO will object to Honeywell's bill of costs.

However, our understanding of Federal Rule of Civil Procedure 54 and Local Rule 54.1 is that the bill of costs is not due until 30 days after the expiration of time allowed for appeal of a final judgment or receipt of the mandate terminating the appeal. As such, it may be more productive to meet and confer closer to the deadline for submission of the bill of costs, and we are happy to meet and confer at that time.

Thank you,

Zach

**Zachary L. McCamey**
Associate
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
T:  +1 704 343 2070
M: +1 423 329 1054
F:  +1 704 444 8870
zmccamey@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com



**From:** Stevens, Scott <Scott.Stevens@alston.com>
**Sent:** Sunday, July 30, 2023 12:14 PM
**To:** McCamey, Zachary L. <ZMcCamey@mcguirewoods.com>; Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>; VanHoutan, Tyler T. <TVanHoutan@mcguirewoods.com>; O'Brien, Jessica L. <JOBrien@mcguirewoods.com>; Lehman, Christine <clehman@reichmanjorgensen.com>; Faulkner, York <york.faulkner@ymf-law.com>; Houghton, Connor <choughton@reichmanjorgensen.com>

JA1765

**Cc:** HON-WDNC <HON-WDNC@alston.com>
**Subject:** Hon v. Opto: Proposed Bill of Costs

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Counsel:

Please find attached our proposed bill of costs.  We would like to receive any comments you have on this over the next few days in hopes that when we file it, the parties will have resolved any objections or disputes.  To that goal, we have omitted certain additional charges that we believe fall within the ambit of taxable costs. Please let us know your availability for a meet and confer on this on either Monday or Tuesday.

We will provide an FTP site with all the backup invoices tomorrow.

Best, Scott

M Scott Stevens
Partner
**ALSTON & BIRD**
Vantage South End
1120 S. Tryon St., Suite 300
Charlotte, NC 28203
+1 704 444 1025 (O)
Scott.Stevens@alston.com

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

JA1766

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

      *Plaintiffs,*

v.

OPTO ELECTRONICS CO., LTD.,

      *Defendant and
Counterclaim Plaintiff,*

v.

HONEYWELL INTERNATIONAL INC.,
HAND HELD PRODUCTS, INC., and
METROLOGIC INSTRUMENTS, INC.,

      *Counterclaim Defendants.*

CIVIL ACTION NO. 3:21-cv-00506

**HONEYWELL'S MEMORANDUM IN OPPOSITION TO
OPTO'S RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW,
ALTERNATIVE RULE 59 MOTION FOR A NEW TRIAL,
AND RENEWED MOTIONS FOR SUMMARY JUDGMENT**

JA1767

## **TABLE OF CONTENTS**

OPTO's MOTION FAILS A THRESHOLD REQUIREMENT ........................................ 1

    A.    OPTO's attempted Rule 50(a) motion was untimely, which precludes its Rule 50(b) motion. ......................................... 1

    B.    As to breach and unilateral mistake, OPTO's attempted Rule 50(a) motion was further deficient for its lack of specificity or substance. ....................... 3

INTRODUCTION ......................................................................................... 4

BACKGROUND .......................................................................................... 5

LEGAL STANDARDS .................................................................................. 6

ARGUMENT .............................................................................................. 7

I.    OPTO's Rule 50(b) motion should be denied For multiple reasons ....................... 7

    A.    There was more than a legally sufficient evidentiary basis for a reasonable jury to find that OPTO breached the License and Settlement Agreement ......................... 7

    B.    OPTO did not present overwhelming evidence in support of its quasi-estoppel defense. ........................................ 15

    C.    OPTO did not present any evidence (let alone overwhelming evidence) in support of its unilateral-mistake defense. ................... 18

II.    OPTO's Rule 59 motion should be denied. .................................. 19

    A.    The jury's verdict is not against the weight of the evidence and would not result in a miscarriage of justice. ................... 19

    B.    The Court's limiting instruction does not warrant a new trial. ............. 19

        1.    OPTO waived its objection to the Court's limiting instruction. ............. 19

        2.    OPTO's argument also fails on the merits. ................. 20

III.    OPTO's request to "renew" a rule 56 motion fails. ...................... 22

CONCLUSION ........................................................................................... 22

**HONEYWELL'S MEMORANUM IN OPPOSITION**        i

JA1768

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alonso v. Westcoast Corp.*,
 920 F.3d 878 (5th Cir. 2019) .................................................2

*Brown v. Ford Motor Co.*,
 67 F. Supp. 2d 581 (E.D. Va. 1999) ................................20

*Calhoun v. Walmart Stores E., LP*,
 818 F. App'x 899 (11th Cir. 2020) ............................2, 3

*Campbell v. Dist. of Columbia*,
 894 F.3d 281 (D.C. Cir. 2018) ...........................................2

*Dennis v. Columbia Colleton*,
 290 F.3d 639 (4th Cir. 2002) ...........................................7

*Dennis v. Gen. Elec. Corp.*,
 762 F.2d 365 (4th Cir. 1985) .........................................20

*Donohue v. Lambert*,
 No. 7:13-cv-00397, 2016 U.S. Dist. LEXIS 49812 (W.D. Va. Apr. 12, 2016).........................1

*EEOC v. A.C. Widenhouse, Inc.*,
 576 F. App'x 227 (4th Cir. 2014) ..................................20

*Exxon Shipping Co. v. Baker*,
 554 U.S. 471 (2008) .............................................................1

*Falto De Roman v. Mun. Gov't of Mayaguez*,
 46 F.4th 51 (1st Cir. 2022) ...............................................2

*FDIC v. Schuchmann*,
 235 F.3d 1217 (10th Cir. 2000) .......................................2

*Fineman v. Armstrong World Indus., Inc.*,
 980 F.2d 171 (3d Cir. 1992)...............................................3

*Hanover Am. Ins. Co. v. Tattooed Millionaire Entm't, LLC*,
 974 F.3d 767 (6th Cir. 2020) ...........................................2

*Hyundai Motor Fin. Co. v. McKay Motors I, LLC*,
 574 F.3d 637 (8th Cir. 2009) ...........................................2

*Kars 4 Kids Inc. v. Am. Can!*,
    8 F.4th 209 (3d Cir. 2021) ................................................................4

*Lightning Lube v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993)................................................................2

*Mealey v. Apartment Rentals*,
    125 F.3d 844 (Table), 1997 WL 592831 (2d Cir. Sept. 24, 1997) ............2

*Nichols v. Ashland Hosp. Corp.*,
    251 F.3d 496 (4th Cir. 2001) ............................................................4

*P.R. Chunk, Inc. v. Martin Marietta Materials, Inc.*,
    170 F. App'x 288 (4th Cir. 2006)......................................................1

*Precision Fabrics Grp., Inc. v. Tietex, Int'l, Ltd.*,
    367 F. Supp. 3d 487 (D.S.C. 2019)............................................7, 15

*Queenie, Ltd. v. Nygard Int'l*,
    321 F.3d 282 (2d Cir. 2003) (Sotomayor, J., concurring) ....................3

*Reserves Mgmt., LLC v. Am. Acquisition Prop. I, LLC*,
    86 A.3d 1119 (Table), 2014 WL 823407 (Del. Feb. 28, 2014) .............17

*Tortu v. Las Vegas Metro. Pol. Dep't*,
    556 F.3d 1075 (9th Cir. 2009) ..........................................................2

*WL All. LLC v. Precision Testing Grp. Inc.*,
    No. 22-10780, 2022 WL 17830257 (11th Cir. Dec. 21, 2022)................4

*Zahran v. Cleary Bldg. Corp.*,
    182 F.3d 923 (Table), 1999 WL 439402 (7th Cir. June 21, 1999) ...........2

**RULES**

Fed. R. Civ. P. 50(a) .............................................................. passim

Fed. R. Civ. P. 50(b) .............................................................. passim

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                   iii

JA1770

Fed. R. Civ. P. 51(d) ...............................................................................................20

Fed. R. Civ. P. 56(b) ..............................................................................................22

Fed. R. Civ. P. 59 ...........................................................................................6, 7, 18

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                    iv

JA1771

### OPTO'S MOTION FAILS A THRESHOLD REQUIREMENT

Prior to addressing the substance of OPTO's motion, as a threshold issue, any Rule 50(b) motion is limited to renewing a properly raised Rule 50(a) motion. Here, OPTO's Rule 50(b) motion is barred in at least two ways: (1) OPTO failed to make a timely Rule 50(a) motion on any issue it now raises,[1] and (2) OPTO failed to make a Rule 50(a) motion on each of the issues presented in its Rule 50(b) motion.

### A.      OPTO's attempted Rule 50(a) motion was untimely, which precludes its Rule 50(b) motion.

The law is clear: Under Rule 50(a), a motion for judgment as a matter of law must be made "***before*** the case is submitted to the jury." Fed. R. Civ. P. 50(a).[2] The Fourth Circuit is clear that this is a firm bar. "Rule 50(a) requires that, to be timely, the motion for judgment as a matter of law must be made '***before submission of the case to the jury***.'" *P.R. Chunk, Inc. v. Martin Marietta Materials, Inc.*, 170 F. App'x 288, 290 (4th Cir. 2006) (per curiam) (internal citation omitted). And—as is plain from the use of the word "renew" in Rule 50(b)—"a party cannot bring a Rule 50(b) motion unless [it] filed a Rule 50(a) motion for judgment as a matter of law ***before the jury began deliberations***." *Donohue v. Lambert*, No. 7:13-cv-00397, 2016 U.S. Dist. LEXIS 49812, at *3 (W.D. Va. Apr. 12, 2016); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) ***before the case was submitted to the jury***.").

---

[1] In comparison, OPTO did timely raise a Rule 50(a) motion limited to challenging whether Honeywell sufficiently identified the "specific products that they complain should have been included in the definition of 2D Barcode Products," which the Court denied. Tr. 190:10–191:14. OPTO did not renew that challenge in its Rule 50(b) motion (Dkt. 374 & 375). And the parties stipulated to damages for the products that the jury found to be 2D Barcode Products (Dkt. 355).

[2] All emphasis is added unless noted otherwise.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                    1

The Circuits are unanimous on this hard rule.[3]

OPTO could have made an oral Rule 50(a) motion **when Honeywell did** (Dkt. 367, Tr. 455:12–460:10) or could have filed a motion on the docket after the close of the evidence and before the case was submitted, **as Honeywell did** (Dkt. 348). OPTO chose not to. Instead, OPTO waited until **after** the case submitted to the jury to make any motion. Dkt. 367, Tr. 510:7–513:3. OPTO has accordingly waived any ability to seek Rule 50(b) relief from the jury's verdict.

This is not a mere technicality. Rule 50(a)'s requirements are grounded in "the Seventh Amendment jury right (as well as basic fairness)." *Hanover Am. Ins. Co.*, 974 F.3d at 783. The notes to the Rule support that proposition:

> The earlier motion [*i.e.,* the 50(a) motion] informs the opposing party of the challenge to the sufficiency of the evidence and affords a clear opportunity to provide additional evidence that may be available. The earlier motion also alerts the court to the opportunity to simplify the trial by resolving some issues, or even all issues, without submission to the jury. This fulfillment of the functional needs that underlie present Rule 50(b) also satisfies the Seventh Amendment.

*Id.* (quoting Advisory Committee Notes to the 2006 Am. to Fed. R. Civ. P. 50(b)). Allowing the

---

[3] *See, e.g., Falto De Roman v. Mun. Gov't of Mayaguez*, 46 F.4th 51, 55–56 (1st Cir. 2022) (affirming denial of Rule 50(b) motion because party waived relief by "fail[ing] to move for judgment before her case was submitted to the jury"); *Mealey v. Apartment Rentals*, 125 F.3d 844 (Table), 1997 WL 592831, at *2 (2d Cir. Sept. 24, 1997) ("Rule 50 requires that a motion for a judgment as a matter of law first be made prior to the submission of the case to the jury."); *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1173 (3d Cir. 1993) ("Absent a motion in accordance with [Rule] 50(a), judicial reexamination of the evidence abridges [a party's] right to a trial by jury."); *Alonso v. Westcoast Corp.*, 920 F.3d 878, 883–84 (5th Cir. 2019); *Hanover Am. Ins. Co. v. Tattooed Millionaire Entm't, LLC*, 974 F.3d 767, 783 (6th Cir. 2020); *Zahran v. Cleary Bldg. Corp.*, 182 F.3d 923 (Table), 1999 WL 439402, at *1 (7th Cir. June 21, 1999) (affirming denial of Rule 50(b) motion because party "had failed to file a Rule 50(a) motion for judgment as a matter of law **before** the case was submitted to the jury") (emphasis original); *Hyundai Motor Fin. Co. v. McKay Motors I, LLC*, 574 F.3d 637, 641 (8th Cir. 2009); *Tortu v. Las Vegas Metro. Pol. Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009) ("Failing to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of considering a Rule 50(b) motion."); *FDIC v. Schuchmann*, 235 F.3d 1217, 1231 (10th Cir. 2000); *Calhoun v. Walmart Stores E., LP*, 818 F. App'x 899, 905–06 (11th Cir. 2020); *Campbell v. Dist. of Columbia*, 894 F.3d 281, 286 (D.C. Cir. 2018).

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                    2

nonmoving party notice and an opportunity to cure an alleged deficiency avoids "inequity" and is "precisely the purpose of Rule 50's requirement that a motion be made before the issue is submitted to the factfinder." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 291 (2d Cir. 2003) (Sotomayor, J., concurring); *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992).

OPTO may argue that the Court's comments at Tr. 455 excuse its deficiency. But waiting would have been improper (as discussed above), so Honeywell sought the opportunity to make its motion before the jury was charged. Dkt. 367, Tr. 455:12–13 (Mr. Stevens: "Yes, sir, Your Honor. I think we need the opportunity to make our 50(a) motions."). The Court correctly afforded the parties the opportunity to do so. *Id*. at Tr. 455:17 (The Court: "But now that we've got them gone, go ahead."). Honeywell also filed a Rule 50(a) motion and supporting brief on the docket at 9:15am on July 19, 2023 (Dkt. 348)—after the parties rested and well before the Court submitted the case to the jury at 10:53 AM. *See id*. at Tr. 510–11. OPTO, on the other hand, chose not to file a motion or to raise an oral motion—despite the opportunity to do so immediately after Honeywell's counsel made its oral motions—until *after* the case was submitted to the jury. *Id*. at Tr. 510:22. That bars its Rule 50(b) motion. *See Calhoun*, 818 F. App'x at 905–06 (a party's request that "the judge return to the courtroom after the jury retired for deliberations so she could make such a motion" was not "timely because the case was already submitted to the jury"). "[A] party's misapprehension of law is an unlikely basis for excusing the absence of a timely Rule 50(a) motion." *Queenie, Ltd.*, 321 F.3d at 289.

**B.      As to breach and unilateral mistake, OPTO's attempted Rule 50(a) motion was further deficient for its lack of specificity or substance.**

Aside from OPTO's quasi-estoppel argument, OPTO's belated Rule 50(a) motion failed to specify any basis for the relief it now seeks in its Rule 50(b) motion. The predicate Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the

**HONEYWELL'S MEMORANDUM IN OPPOSITION**                                                3

judgment." Fed. R. Civ. P. 50. While OPTO's Rule 50(b) motion covers three claims (Dkt. 375 at 8–21), OPTO's (untimely) Rule 50(a) motion referenced the contract claim only in passing and did not raise OPTO's unilateral mistake defense at all. Instead, OPTO's counsel made it clear that the "focus [of] the 50(a) motion" was on the "quasi-estoppel issue." Dkt. 367, Tr. 511:5–6; *see also* Tr. 512:25–513:1 ("Again, I'm focusing only on quasi-estoppel, but OPTO also moved under 50(a) for the other claims as well."). OPTO's passing reference to "mov[ing] under . . . other claims" is not enough. *See WL All. LLC v. Precision Testing Grp. Inc.*, No. 22-10780, 2022 WL 17830257, at *3 (11th Cir. Dec. 21, 2022) (per curiam) ("This Court repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the **same grounds** as the original request for judgment as a matter of law . . . ."); *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 220 (3d Cir. 2021) (Rule 50(b) motion as to the validity element was waived because party "presented no arguments" as to that element).

Because OPTO raises arguments about Honeywell's breach of contract claim and OPTO's unilateral mistake defense for the first time in its Rule 50(b) motion, its motion should be denied as a "nullity." *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 501 n.1 (4th Cir. 2001). Therefore, OPTO's Rule 50(b) motion should be denied as procedurally improper in addition to failing to meet the threshold requirement of a timely, sufficient predicate Rule 50(a) motion.

## INTRODUCTION

Despite having the opportunity to say so in a multitude of ways—such as in its answer and counterclaims, responses to Honeywell's Interrogatories, summary-judgment briefing, or even its trial brief—OPTO never mentioned its theory that the reference to "Opticon's revenue from 2D Barcode Products in Europe" in the Second Amendment to the Agreement undercuts Honeywell's claims, until OPTO's presentation of evidence at trial. Regardless of whether OPTO pivoted to this

**HONEYWELL'S MEMORANUM IN OPPOSITION**        4

new theory on the fly or simply sought to ambush Honeywell at trial, the jury rightly saw through it. Now, OPTO rests its entire post-trial briefing on that rejected (and baseless) theory.

The Court found that the Agreement contains an unambiguous definition of 2D Barcode Products. That category of products includes—as a matter of law—"any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text." Honeywell presented overwhelming evidence on that score. And OPTO failed to meet its burden of proof for any of its affirmative defenses, each of which had several legal and factual flaws. The jury applied the evidence presented at trial to that definition and rightly found in Honeywell's favor.

OPTO now asks the Court to overturn the jury's findings of fact or to order a new trial. Both requests fail—procedurally and on the merits.

## BACKGROUND[4]

**OPTO never raised its "Second Amendment" theory before trial.** From day one of this case (and in fact, since the execution of the Agreement), Honeywell has consistently maintained that the definition of "2D Barcode Products" includes OPTO's laser and CCD scanners that were operable to decode two-dimensional symbologies, including PDF417, MicroPDF417, and composite codes. OPTO, on the other hand, has shifted its position several times—its latest theory appearing for the first time in the middle of trial.

OPTO had ample opportunity to raise its (incorrect) theory that the Second Amendment to the Agreement defined the universe of relevant products under § 1.4 (or that Honeywell "acquiesced" to a new definition in the Second Amendment) well before trial. OPTO never

---

[4] Despite OPTO labeling its factual background section as a "Statement of Undisputed Facts," Honeywell disputes many of those so-called facts—and rebutted OPTO's assertions regarding the same with evidence at trial.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                    5

JA1776

mentioned the Second Amendment in its Answer, Affirmative Defenses, and Counterclaims. Dkt. 14. Nor did OPTO mention the Second Amendment in its opposition to Honeywell's motion to dismiss. Dkt. 24. When Honeywell served interrogatories asking OPTO for its contentions related to Honeywell's breach claim and each of OPTO's affirmative defenses, OPTO responded with theories and defenses wholly unrelated to § 4.9 of the Second Amendment. Ex. A (OPTO's Second Supplemental Responses and Objections). Honeywell and OPTO cross-moved for summary judgment on the interpretation of § 1.4 of the Settlement Agreement. Across OPTO's three summary-judgment briefs on the issue, OPTO never mentioned § 4.9, the calculation of European sales, or an alleged redefining of 2D Barcode Products. *See* Dkt. 133; Dkt. 135; Dkt. 166. And even in its trial brief, OPTO never mentioned § 4.9 or the calculation of European sales. Dkt. 254.

**The jury found in Honeywell's favor at trial.** During the jury trial phase of the case, Honeywell put on testimony and evidence from Messrs. Taylor Smith, Jeremy Whitley, and Craig Smith in its case-in-chief. OPTO presented testimony from Mr. Adam Doane, Mr. Paul Chartier, Ms. Rie Ashihara, and Mr. Kees Stoop in its case-in-chief. On rebuttal, Honeywell recalled Ms. Ashihara and presented testimony from Mr. Yoshiaki Kohmo.

After deliberation, the jury found for Honeywell on all issues. Dkt. 350.

<div align="center">

**LEGAL STANDARDS**

</div>

If a party makes a motion for judgment as a matter of law under Rule 50(a) "**before** the case is submitted to the jury," a party may "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b) (emphasis added). The moving party bears the burden of showing that "a reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-moving party. Fed. R. Civ. P. 50(a)(1). The court must view the evidence in the light "most favorable to the prevailing party."

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                         6

*Precision Fabrics Grp., Inc. v. Tietex, Int'l, Ltd.*, 367 F. Supp. 3d 487, 498 (D.S.C. 2019) (quoting *King v. McMillan*, 594 F.3d 301, 312 (4th Cir. 2010)). "A party seeking judgment as a matter of law who also bears the burden of proof faces a **formidable** burden." *Id.* (emphasis added) (citing *Gilliam v. Montgomery Ward & Co., Inc.*, No. 96-1210, 1997 WL 429454, at *8 (4th Cir. 1997) (noting judgment as a matter of law should be granted in favor of the party bearing the burden of proof only in "extreme cases")); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 722 (4th Cir. 2019) ("[O]nce a jury has evaluated witness credibility, weighed evidence, and reached a verdict, a litigant seeking to overturn that verdict faces a steep hurdle."). "The court must determine whether 'the effect of the evidence is not only sufficient to meet his burden of proof, but is overwhelming, leaving no room for the jury to draw significant inferences in favor of the other party.'" *Id.* (quoting *Radtke v. Lifecare Mgmt.*, 795 F.3d 159, 165–66 (D.C. Cir. 2015)).

Under Federal Rule of Civil Procedure 59, a court "should grant a new trial only if (1) the verdict is against the clear weight of the evidence, (2) is based on evidence which is false, or (3) will result in a miscarriage of justice." *Dennis v. Columbia Colleton*, 290 F.3d 639, 650 (4th Cir. 2002).

## ARGUMENT

### I.      OPTO'S RULE 50(B) MOTION SHOULD BE DENIED FOR MULTIPLE REASONS.

#### A.      There was more than a legally sufficient evidentiary basis for a reasonable jury to find that OPTO breached the License and Settlement Agreement.

In its summary judgment Order, the Court held that the definition of "2D Barcode Products" in § 1.4 of the Agreement is "unambiguous" and that, accordingly, "any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text" constitutes a 2D Barcode Product. The questions for the jury, as OPTO's counsel told the Court, are that "there's a real factual dispute as to whether [PDF417 is] in fact a 2D symbology or not and whether the laser scanners at issue here actually are operable to decode

**HONEYWELL'S MEMORANDUM IN OPPOSITION**                                    7

that symbology as a 2D symbology." Dkt. 365, Tr. 14:14–18; *see also id.* at 59:23–24 (Mr. Muckenfuss: "So the issue in the case is whether PDF417 is 2D."); *see also* Dkt. 195 at 11 n.5 (finding that "what barcodes are two-dimensional symbologies under Section 1.4" is a jury question). In order to find in Honeywell's favor on Honeywell's breach claim, the jury simply needed to find that it was more likely than not that the symbologies at issue (including PDF417) were two-dimensional barcode symbologies, that OPTO's products in dispute were operable to decode those products, and that OPTO failed to timely pay royalties on those products. That's it.

The evidence supporting Honeywell's position was more than legally sufficient to support the jury's verdict—it was overwhelming. As a brief summary of that evidence:

The disputed symbologies are two-dimensional symbologies:

- Section 1.4 of the Agreement specifies that two-dimensional barcode symbologies include, but are not limited to, "any two-dimensional barcode symbology defined by one or more standards settings organizations such as the International Organization for Standardization (ISO), International Electrotechnical Commission (IEC), and the Association for Automatic Identification and Mobility (AIM)." JX-1.

- In response to Honeywell's Request for Admission No. 4, OPTO "[a]dmitted that PDF417 is a continuous, multi-row **two-dimensional** code type symbol . . . ." PX-325 (emphasis added).

- The ISO/IEC standard for PDF417 identifies PDF417 as "a bar code symbology with the following basic characteristics . . . (g) Code type: continuous, multi-row **two-dimensional**." PX-4 (emphasis added).

- The ISO standard for MicroPDF417 describes MicroPDF417 as a "multirow symbology which may be utilized by applications needing to encode a moderate amount of data in a **two-dimensional symbol**." PX-8 (emphasis added).

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                        8

- The ISO standard for composite codes explains that composite codes include a linear component and a "**two-dimensional symbol**" component. PX-10 (emphasis added).

- Craig Smith—Honeywell's expert on source code, imaging algorithms, decoding algorithms, and barcode symbologies—testified that PDF417, MicroPDF417, and composite codes are two-dimensional barcode symbologies, citing the standards. Dkt. 365, Tr. 132:13–24.

- Paul Chartier—**OPTO's expert** on barcode symbologies—created a demonstrative exhibit based on the relevant standards in which he classified PDF417 and MicroPDF417 as "**two-dimensional multirow symbols**." Dkt. 366, Tr. 391:10–392:11 (emphasis added). Mr. Chartier likewise relied on a separate ISO standard, related to print quality standards, which also explained that there were multiple symbology types, and that those that are continuous, multi-row two-dimensional symbols fall into the category of two-dimensional symbologies. PX-12; *see also* Dkt. 366, Tr. 375:3–377:21; Tr. 390:20–391:8. In the European PDF417 standard, Mr. Chartier admitted that he was the "primary scribe" for the document that expressly stated that "PDF417 is a two-dimensional symbology." *Id*. at Tr. 365:20–367:7. Even further, Mr. Chartier himself admitted that the testimony given by Mr. Smith as to his characterization of PDF417 and MicroPDF417 was accurate. *Id*. at Tr. 385:19–386:2.

OPTO's products were operable to decode at least one two-dimensional symbology:

- OPTO's response to Honeywell's Interrogatory No. 3 confirms that each of the products that Honeywell claims are 2D Barcode Products under § 1.4 were operable to decode at least one of PDF417, MicroPDF417, GS1 Composite, and/or GS1 Stacked during the relevant time period. PX-61.

- Mr. Smith walked through each of the products at issue and testified that every single disputed product was admitted to as being operable to decode at least one of those symbologies. Dkt.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                        9

365, Tr. 143:21–147:21. He also used a demonstrative to show the jury how one of the products at issue was operable to decode PDF417. *Id*. at Tr. 150:18–152:25.

- Ms. Ashihara—OPTO's lone employee who appeared in person at trial—testified that OPTO's own product literature identified that its products were operable to decode "2D" barcodes, which included PDF417, MicroPDF417, and composite codes. Dkt. 366, Tr. 428:17–431:19; PX-18; PX-19; PX-87; PX-125. Ms. Ashihara also admitted that OPTO's laser products, including those at issue in this case, "are able to read some 2D barcodes." *Id*. at Tr. 433:11–12.

OPTO failed to timely pay royalties for each of the disputed products:

- Mr. Taylor Smith and Mr. Jeremy Whitley each testified that OPTO failed to pay Honeywell all of the royalties owed under the Agreement. Dkt. 365, Tr. 70:25–71:5; 91:15–22.

- Ms. Ashihara testified that none of the royalties paid by OPTO to Honeywell included those OPTO laser or CCD products that could decode at least one 2D symbology, and that the royalties would have been greater had OPTO paid royalties on those products. Dkt. 366, Tr. 399:10–12; 401:6–402; Tr. 433:23–434:6.

The evidence was so clear that, in his closing argument, OPTO's counsel about-faced and told the jury: "We've never disputed that PDF417 is called 2D. I never said that it's not called 2D. . . . We admit that, that's true. We're not fighting about that in this case. That's not what this case is about." Dkt. 376, Tr. 468:19–469:2. He went on to also concede that OPTO's at-issue scanners "can read PDF417." *Id.* at Tr. 470:6–8. The jury applied those facts to the Court's interpretation of the Agreement and (rightly and easily) found in Honeywell's favor.

OPTO now advances a new theory: that the Second Amendment to the License and Settlement Agreement provides an updated or amended definition of "2D Barcode Products." Dkt.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                                    10

375 at 8. OPTO never made that argument until trial—including omitting it in its own trial brief. OPTO's approach is not only a textbook trial by ambush, but it also seeks to directly undermine and evade the Court's order that "2D Barcode Products" include "any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text." *See* Dkt. 195. If OPTO wanted to argue that § 4.9 of the Second Amendment (rather than §1.4) set the metes and bounds of the definition of 2D Barcode Products, it needed to do so at summary judgment. But even had OPTO made the argument sooner, the Agreement specifies that it may be amended or modified "only by a written instrument signed by the parties." JX-1 at § 9.2. The Second Amendment never purports to amend or modify the definition in § 1.4 (although it expressly added two new definitions in § 1.18 and 1.19) (*see* JX-3), and OPTO even admitted that § 4.9 "did not amend Section 1.4 of the Agreement." Dkt. 375 at 14.

Faced with that reality, OPTO instead invented a new theory to ambush Honeywell at trial and muddy the waters: that § 4.9 applied § 1.4 and that everyone allegedly knew OPTO's calculation of €4.4 million in sales for Europe was a proper accounting of all 2D Barcode Products. The jury rightly saw through OPTO's pivot. There are several different reasons why the jury had more than sufficient evidence to find in Honeywell's favor on OPTO's surprise trial theory.

*First*, OPTO's argument is predicated on the theory that Honeywell's "objective conduct" bound it to "the negotiated terms of the Agreement (including the Second Amendment)" (Dkt. 375 at 11), but no evidence was presented at trial that any person who signed or ratified the Second Amendment (at Honeywell *or OPTO*) understood § 4.9 of that document to redefine "2D Barcode Products" or to delineate the universe of 2D Barcode Products. On the contrary, Mr. Whitley testified that the parties jointly expressed that § 1.4 of the Agreement defined which products are royalty-bearing under the Agreement. Dkt. 365, Tr. 88:4–8 ("So the definition for 2D Barcode

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                    11

Products, which are the products that were royalty-bearing, are specifically meaning 'any device or article of manufacture that is operable to decode at least one or more two-dimensional symbologies into human-readable text.'"). Mr. Doane agreed that the term "2D Barcode Products" is defined in § 1.4. Dkt. 366, Tr. 218:9–11. And the Court previously recognized that § 1.4's definition of "2D Barcode Products" is the contract term "on which the obligation to pay royalties depends." Dkt. 195 at 2. OPTO did not put forward testimony of any OPTO witness who was even *allowed* to see the Agreement and its amendments, so there is no evidence supporting OPTO's argument to the contrary.

*Second*, OPTO's theory hinges on the idea that Honeywell knew that the €4.4 million identified in the Second Amendment excluded OPTO's European laser scanning and CCD products that were operable to decode two-dimensional barcodes. But neither Mr. Whitley nor Mr. Doane said anything of the sort. Instead, OPTO conveniently omits from its narrative the unrebutted testimony of Mr. Doane that OPTO's correspondence led Honeywell to conduct an investigation of OPTO's products that extended well beyond the date of the Second Amendment:

> Q. And then that's roughly October. What happened over the next five or six months?
>
> A. Because it wasn't clear from OPTO what products were being included and excluded from the calculation, there was a months' long investigation where Honeywell was asking for information from OPTO and the parties were discussing back and forth trying to understand which products were included and excluded.
>
> Q. And what just October or did that go all the way through the end of March of the following year?
>
> A. It was a very long period. March sounds right. So yeah, like October through March of the next year.

Dkt. 366, Tr. 287:13–24. Mr. Whitley's testimony corroborates that account:

> Q. So once they said, hey, we're not including these products in the royalty reports, did Honeywell do any sort of investigation to figure out, hey, what are we really talking about here?

**HONEYWELL'S MEMORANUM IN OPPOSITION**                    12

A. Yes. We actually asked for that financial information so that we could determine is this a big deal or not.

Q. And how long did that process take?

A. I think maybe six months. . . . Eight months.

Dkt. 365, Tr. 94:5–14. After that investigation was complete, Honeywell "sent a couple letters to OPTO saying, hey, we have identified products that fall clearly within the definition of 2D Barcode Products. We'd like you to compensate us for those, and asked them to do so." *Id*. at Tr. 94:17–19. That letter was dated June 8, 2021. Dkt. 366, Tr. 288:18–289:23. But the Second Amendment was executed on February 3, 2021 (JX-3)—months before Honeywell had complete information about which products were or weren't included in OPTO's royalty calculations, including its calculations of European sales.

*Third*, although OPTO points to October 2020 sales information in support of it claim, OPTO ignores Mr. Doane's testimony that there was no way for him (or anyone else at Honeywell) to know whether any of the products OPTO included in that sales data were operable to decode a two-dimensional barcode. As Mr. Doane explained, "Remember, the test for the definition in 1.4 is whether a device reads a 2D barcode. So if a laser scanner does not read any 2D barcode, it's not a 2D Barcode Product." Dkt. 366, Tr. 237:16–18.

Mr. Doane reiterated this point several times:

Q. So Mr. Goldstein has told you and the Alston & Bird team representing Honeywell that handheld laser scanner is not a 2D Barcode Product, correct?

A. That's what it says. It could be correct. I don't know what barcodes—I don't know what products are included in this. I don't know what barcodes they read.

*Id*. at Tr. 238:11–16.

Q. The Excels that we looked at, did they provide any means for Alston & Bird or Honeywell or anyone else to actually look at laser-based products or CCD-based products to be able to ascertain whether they did or did not support 2D functionalities?

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                        13

JA1784

> A. No. And that was part of the back and forth in the email. We saw a lot of emails. Alston & Bird was trying to understand what products were and were not included, and so you saw that in that back and forth.

*Id*. at Tr. 270:24–271:7.

> Q. And did some of OPTO's laser products [read two-dimensional barcodes]?
>
> A. Some of them did; some of them didn't.
>
> Q. So those that did, would those be 2D Barcode Products?
>
> A. Yes, the laser products that decode 2D barcodes meet this definition.
>
> Q. And those that don't, would those be 2D Barcode Products?
>
> A. They are not . . . .
>
> Q. And in that spreadsheet that Mr. Muckenfuss showed you earlier, was there any differentiation among the laser products that let you be able to sort that out?
>
> A. No. As I was [trying] to explain, I couldn't tell what laser products were ones that read 2D barcodes, which ones weren't. So it wasn't clear from what we were looking at.

*Id*. at Tr. 283:1–15; Tr. 236:7–8 (Mr. Doane: "That's what OPTO's counsel has told Honeywell's counsel. Whether that's true or not, I don't know."); *Id*. at Tr. 240:6–7 (Mr. Doane: "I can't tell from looking at the names here what type of technology they use."); *Id*. at Tr. 241:15–18 (Mr. Doane: "I don't know if they're 2D Barcode Products, if they meet that definition based on what I'm seeing here. . . ."); *Id*. at Tr. 256:10–12 (Mr. Doane: "And again, to be clear, whether those laser products were actually 2D or 1D Barcode Products per the agreement is not clear from the Excel spreadsheet we just looked at.").

In short, the evidence is undisputed that OPTO's European laser scanners might be programmed without the capability of reading any 2D barcode. *See Id*. at Tr. 283:1–15. And Mr. Doane's testimony is more than sufficient evidence for the jury to conclude that neither Honeywell nor its counsel knew whether the European products in OPTO's October 2020 sales data and

**HONEYWELL'S MEMORANUM IN OPPOSITION**                    14

JA1785

corresponding emails were operable to decode a two-dimensional barcode symbology at the time of the execution of the Second Amendment. *Id.*

*Fourth*, as the Court's instruction to the jury made clear, Honeywell did not seek any relief related to OPTO's sales in Europe, which were governed by the Second Amendment. *Id*. at Tr. 227:17–24. Mr. Doane confirmed as much. *Id*. at Tr. 268:1–4 (Q: "So first off, Mr. Doane, does this case allege any breach of anything related to Europe?" A: "It does not. This case is about the main agreement that we saw in the U.S."); *Id*. at Tr. 268:22–24 (Q: "Is there any allegation of breach of the Second Amendment?" A: "There is not."). And as it relates to sales in the U.S. (covered by the initial Agreement), Honeywell had no knowledge that OPTO would in the future exclude any laser or CCD products that could decode a two-dimensional barcode from the royalty payments. *Id*. at Tr. 269:16–270:14. And as it relates to Europe, Mr. Doane testified that Alston & Bird did not have access to any European source code and that he wouldn't know "whether the software on the U.S. [products] are the same as the European ones." *Id*. at Tr. 296:18–19. OPTO's attempt to amend § 1.4's definition for U.S. products by looking to European sales in § 4.9 is comparing apples and oranges.

The Court should deny OPTO's Rule 50(b) motion as it relates to Honeywell's breach claim because there is overwhelming evidence that the OPTO products in question, for which no royalties were paid, were operable to decode at least PDF417, microPDF417, and composite codes, and that those symbologies are two-dimensional symbologies. Thus, the jury correctly found that OPTO breached the Agreement.

**B.      OPTO did not present overwhelming evidence in support of its quasi-estoppel defense.**

OPTO faces an even higher burden for its Rule 50(b) motion on its defenses—for which it bears the clear-and-convincing burden of proof. *See Precision Fabrics*, 367 F. Supp. 3d at 498

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                                    15

(noting that such a motion should be granted only in "extreme cases"). As the Court instructed the jury, OPTO could succeed on its quasi-estoppel defense only if OPTO proved by clear and convincing evidence that "Honeywell maintained a position inconsistent with one to which it earlier acquiesced, or from which Honeywell would have accepted a benefit, and that it would be unconscionable for Honeywell to gain this advantage." Dkt. 367, Tr. 505:10–13. There are several reasons why the jury could have found OPTO failed to meet its burden. OPTO's Rule 50(b) motion with respect to its quasi-estoppel defense should be rejected for any one of these reasons.

*First*, there is legally sufficient evidence for the jury to have found that OPTO did not meet its burden of proving that Honeywell took inconsistent positions. Despite bearing a hefty burden of proof in its motion, OPTO doesn't cite a single shred of evidence in support of its claim that Honeywell took inconsistent positions. *See* Dkt. 375 at 16. On the contrary, the evidence shows that Honeywell's positions (unlike OPTO's) have been consistent from day one. As detailed above, Honeywell always understood that § 1.4 includes any OPTO barcode scanning product that is operable to decode one or more two-dimensional symbologies. *See* Dkt. 365, Tr. 88:4–8; Dkt. 366, Tr. 218:9–11. OPTO cannot point to any evidence that Honeywell changed its position on the meaning of § 1.4 in October 2020, February 2021, June 2021, or at any point during the pendency of this case.

*Second*, there is legally sufficient evidence for the jury to have found that OPTO did not meet its burden of proving that Honeywell gained an advantage and that OPTO was harmed by Honeywell's supposed inconsistent positions. OPTO doesn't cite any specific evidence in support of this element either. Dkt. 375 at 16–17. Instead, OPTO attempts to put the burden of proof on Honeywell to *disprove* OPTO's defense, which is not the law. Regardless, Mr. Whitley and Mr. Doane both testified that Honeywell did not know the value of OPTO's European sales before

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                      16

JA1787

the execution of the Second Amendment. Dkt. 366, Tr. 287:13–24; Dkt. 365, Tr. 94:5–14. There is no evidence in the record of any advantage gained, let alone evidence of OPTO's baseless allegations of "feigned agreement" or "false pretenses." *See* Dkt. 375 at 17.

Regarding OPTO's noting that it agreed in the Second Amendment to withdraw its nullity actions (Dkt. 375 at 16, 21), the jury could easily have found (and should have found) that action not to be a benefit having anything to do the statement regarding European sales. Honeywell dismissed its infringement actions; and OPTO dismissed its nullity actions—neither of those actions was influenced at all by the comment about sales. If anything, the reference to €4.4 million in European sales may have worked to Honeywell's *detriment*.

*Third*, there is legally sufficient evidence for the jury to have found that OPTO did not meet its burden of proving unconscionability. "Traditionally, a contract will be found unconscionable where 'no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other.'" *Reserves Mgmt., LLC v. Am. Acquisition Prop. I, LLC*, 86 A.3d 1119 (Table), 2014 WL 823407, at *9 (Del. Feb. 28, 2014) (quoting *Tulowitz v. Atl. Richfield Co.*, 396 A.2d 956 (Del. 1978)). "For a contract clause to be unconscionable, its terms must be 'so one-sided as to be oppressive,'" and "courts are particularly reluctant to find unconscionability in contracts between sophisticated corporations." *Id.* (internal citations omitted). OPTO argues that Honeywell's position is unconscionable because if OPTO underreported its European sales, that would result in an overstatement of Honeywell's royalty allocations and patent portfolio value from the Second Amendment. Dkt. 375 at 18–19. OPTO's argument is too clever by half. For starters, no evidence supporting OPTO's unconscionability argument was presented to the jury (or raised at any point prior to OPTO's Rule 50(b) motion). There was no evidence of the value of Honeywell's European patent portfolio, no evidence of what the true "denominator" for European sales is, and

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                    17

no testimony (or even an allegation) that there is a material falsity in the Second Amendment. As Mr. Doane explained (and as stated several times above), neither Alston & Bird nor Honeywell knew what European products were operable to decode two-dimensional barcode symbologies before the execution of the Second Amendment. Dkt. 366, Tr. 238, 271, 283. Beyond that, OPTO assumes that Honeywell would have agreed to the same terms in the Second Amendment if its European sales were greater than €4.4 million. That is baseless conjecture and speculation—and an after-the-fact attorney argument never presented to the jury. More likely, if OPTO's European sales of 2D Barcode Products were higher and properly disclosed, Honeywell may have been able to derive a *greater* amount of royalties from OPTO in Europe. As a result, Honeywell would have been *harmed* by receiving too few royalties for OPTO's European sales and OPTO would have benefited from underpaying royalties for its European sales.

OPTO's Rule 50(b) motion on its quasi-estoppel defense should be denied for at least the foregoing reasons.

### C.    OPTO did not present any evidence (let alone overwhelming evidence) in support of its unilateral-mistake defense.

As for OPTO's unilateral mistake defense, OPTO presented no testimony from any OPTO witness who was even authorized to review the Agreement. As a result, there is no evidence in the record—far from the requisite "overwhelming" evidence—supporting OPTO's assertion that there was a specific prior understanding of the Agreement, that OPTO was mistaken as to the Agreement's terms, that Honeywell had knowledge of OPTO's mistake, or that Honeywell remained silent. The only evidence that OPTO points to is an email from Mr. Goldstein to Mr. Pleune (*see* Dkt. 375 at 20–21)—which came nearly nine months *after* the execution of the Agreement. That cannot serve as proof of a prior agreement, a prior understanding, or Honeywell's knowledge of that understanding.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                      18

JA1789

The Court should deny OPTO's Rule 50(b) motion as to OPTO's affirmative defenses.

## II.    OPTO'S RULE 59 MOTION SHOULD BE DENIED.

OPTO's Rule 59 motion raises two arguments in support of its alternative motion for a new trial. Neither has any merit.

### A.    The jury's verdict is not against the weight of the evidence and would not result in a miscarriage of justice.

OPTO first argues that the "undisputed evidence" demonstrates that Honeywell agreed that the at-issue products are not included in the Agreement's definition of 2D Barcode Products. For all of the reasons stated above, there is nothing "undisputed" about that assertion—the testimony of Honeywell's employees was directly to the contrary. The Court should deny OPTO's motion on this score for the same reasons it should deny OPTO's Rule 50(b) motion.

### B.    The Court's limiting instruction does not warrant a new trial.

OPTO also argues that the Court's limiting instruction with respect to European sales was in error and warrants a new trial. That claim should also be rejected.

#### 1.    OPTO waived its objection to the Court's limiting instruction.

As a threshold matter, OPTO waived its argument that Court's limiting instruction was improper by not objecting to it at trial.[5] The Fourth Circuit has made it clear that "a motion for a

---

[5] The morning before OPTO began its case-in-chief, Honeywell informed the Court that it believed that OPTO was going to present "a brand new theory for this case, unpleaded by [OPTO], never mentioned in an interrogatory, never disclosed in any way, shape, or form." Dkt. 366, Tr. 195:2-5. Namely, Honeywell suspected (correctly) that OPTO was going to raise a new theory based on "the sales reports that [OPTO] owed [Honeywell] after the [] contract" that were related to the ***pre-Agreement*** sales subject to Section 5.1. *Id*. at Tr. 195:12–18; Tr. 196:1–19. Honeywell objected to this theory and any supporting evidence on the grounds that the sales reports "go to the second sentence of 5.1 which [the Court] told [Honeywell] in the pretrial [conference] [they] can't bring up." *Id*. In response, OPTO did not deny that it intended on raising a new and never-before-seen theory based on evidence the parties were previously told that they can't address at trial. When asked if the "numbers from the sales report are irrelevant," OPTO admitted that they were "not relevant for damages." *Id*. at Tr. 197:18–24. The Court specifically asked OPTO whether it wanted to be heard regarding limiting instructions at that moment, or whether the Court should take the

new trial should not be granted [] where the moving party has failed to timely object to the alleged impropriety giving rise to the motion." *Dennis v. Gen. Elec. Corp.*, 762 F.2d 365, 366-67 (4th Cir. 1985); *see also Brown v. Ford Motor Co.*, 67 F. Supp. 2d 581, 587 (E.D. Va. 1999) (denying a motion for a new trial based on an allegedly improper limiting instruction that was not objected to during trial because "a motion for a new trial should not be granted . . . where the moving party has failed to timely object to the alleged impropriety giving rise to the motion").

Here, OPTO plainly failed to object to the Court's limiting instruction. OPTO's motion for a new trial, filed 29 days after the jury returned a verdict, is the first time that OPTO ever expressed any concerns regarding the Court's instruction. That should end the inquiry.

<div align="center">

**2.    OPTO's argument also fails on the merits.**

</div>

Where a party fails to timely object to a limiting instruction, such as here, a court will review the "otherwise waived claim for plain error if that error affects substantial rights." *EEOC v. A.C. Widenhouse, Inc.*, 576 F. App'x 227, 230 (4th Cir. 2014); *see also* Fed. R. Civ. P. 51(d)(2). "For an error to affect substantial rights, it generally 'must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *EEOC*, 576 at 231 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). But OPTO fails in the requirement that it "must make a specific showing of prejudice." *Id*.

OPTO simply states, with no explanation, that "this plain error affects substantial rights and raises serious issues regarding the fairness of the proceedings because the instruction effectively

---

evidence up during the testimony: "So you can – you said you wanted to be heard on it. We can do that now. Or I can just take my best shot during the trial." *Id*. at Tr. 193:6–8. Counsel for OPTO answered: "I think it would probably be better to do it when the evidence comes in in the context of the testimony." *Id*. at Tr. 193:9–11, 17–18. When OPTO offered the evidence supporting this theory into evidence, the Court gave a limiting instruction consistent with the Court's and the parties' discussion. *Id*. at Tr. 227:17–24. Neither OPTO nor Honeywell objected to the limiting instruction.

**HONEYWELL'S MEMORANUM IN OPPOSITION**        20

<div align="center">

**JA1791**

</div>

nullified all evidence 'having to do with Europe,' which evidence was critical to all of OPTO's substantive and affirmative defenses." Dkt. 375 at 24. But OPTO goes no further. OPTO does not even attempt to make a specific showing of prejudice. The fact is that OPTO received a full and fair opportunity to attempt to make its point. OPTO examined Mr. Doane for over an hour on this specific document in its (rejected) attempt to show its purported relevance to all issues in the case. Moreover, OPTO's counsel spent the majority of his summation walking through the document, in another attempt to persuade the jury. The jury just didn't agree with OPTO and Mr. Muckenfuss's position—the instruction didn't stop the presentation of evidence or the jury's consideration of it.[6]

OPTO also mischaracterizes the Court's limiting instruction. OPTO claims that Exhibit 98 is relevant to "the scope of products included in the definition of 2D Barcode Products" and that because of the instruction, the jury did not consider whether "Honeywell assented to the including of all OPTO and laser and CCD products," "materially changed is positions regarding royalty calculations," and "remained silent while knowing OPTO's mistake." Dkt. 375 at 22, 24. But the Court didn't prevent any of that consideration. OPTO's contention falls flat when compared to the actual language of the Court's instruction. Namely, the Court stated:

> Members of the jury, in Exhibit 98, Defense Exhibit 98, there are -- **_you will see there some numbers representing sales. Those numbers are of no moment for your consideration with respect to the claim here. This has to do with Europe_**. All right. But I think counsel is going to get to a different point. But don't worry yourselves at all about the numbers in there. It has nothing to do with what you're going to be asked to consider.

---

[6] Moreover, OPTO's claims of "serious issues regarding fairness" and the evidence being "critical to all of OPTO's substantive and affirmative defenses" ring especially hollow when neither Honeywell nor the Court had any advance notice that OPTO's "entire case" was going to rest on this brand-new theory about the Second Amendment until after trial started. If the evidence was truly this critical, OPTO could (and should) have easily raised the issue earlier.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                    21

Dkt. 366, Tr. 227:17–24 (emphasis added). Nowhere did the Court tell the jury to ignore product names, product descriptions, the Second Amendment, Section 4.9 of the Second Amendment, or any evidence of Honeywell's knowledge or mindset regarding the Second Amendment and Exhibit 98. The Court told the jury to ignore only the actual sales figures.

Tellingly, OPTO articulates no connection between the actual sales figures of the individual products in Exhibit 98 and any of its defenses or counterclaims. That's because the sales amounts of the individual products that OPTO sold in Europe from 2015 to 2019 are immaterial. All OPTO attempted to do was to tie the €4.4 million summation in the spreadsheet to the Second Amendment, which OPTO had a full and fair opportunity to do. OPTO did not need the individual sales amounts for its purpose. Nor does one need the sales figures to understand what products were or were not included in Exhibit 98. OPTO simply fails to articulate any relevance and any connection between the actual sale amounts and its claims and defenses.

Moreover, the Court's instruction makes sense given the timing of the instruction. When the Court gave this instruction, the parties had not yet stipulated to damages. As a result, the Court rightly instructed the jury that those sales figures were irrelevant for purposes of damages.

## III.    OPTO'S REQUEST TO "RENEW" A RULE 56 MOTION FAILS.

There is no rule that permits "renewing" a Rule 56 motion. *See* Fed. R. Civ. P. 56(b) (the time limit for Rule 56 motions ends 30 days after discovery or as differently set by the Court). Now that a trial has been conducted, OPTO's relief is limited to that provided under Rule 50 or 59. OPTO's request to renew a Rule 56 summary judgment motion should be denied.

### CONCLUSION

The overwhelming evidence in this case shows that OPTO breached the Agreement—the evidence showed that OPTO failed to pay royalties for products that were operable to decode 2D barcode symbologies. OPTO's counsel basically admitted to breach in his summation. *See* Dkt.

**HONEYWELL'S MEMORANUM IN OPPOSITION**                                    22

367, Tr. 468:19–469:2 ("We've never disputed that PDF417 is called 2D. I never said that it's not called 2D. . . . We admit that, that's true."); *id*. at Tr. 470:6–8 ("[OPTO's] laser scanners. . .can read PDF417. . ."). OPTO's attempt to re-litigate the definition in § 1.4 is too little, too late, in violation of the Court's decision on that point, and was properly rejected by the jury.

Moreover, OPTO simply failed to present clear and convincing evidence regarding its affirmative defenses. The jury could have found any or all of the following: (1) Honeywell never took an inconsistent position as to the definition of § 1.4, (2) the fact that Honeywell expressed an "understanding" in the Second Amendment as to European sales is not inconsistent with anything else Honeywell has said, (3) even if relevant, the European spreadsheet didn't identify which products would or would not meet the definition of 2D Barcode Products, (4) Honeywell was not benefitted by the "understanding" expressed in the Second Amendment (in fact, it may have been harmed by it), and/or (5) enforcing § 1.4 as written was not unconscionable in any event. OPTO bore the burden by clear-and-convincing evidence as to each of these affirmative defenses. Plenty of evidence supports the jury's decision to reject them.

Finally, OPTO's attempt to have a new trial based on a single limiting instruction to which it never objected should be denied. OPTO specifically asked the Court to consider the evidence and any limiting instruction along with the testimony, but then never objected when the Court did exactly that. That should end the inquiry. But additionally, OPTO has not showed that the instruction was improper in any way. Nor did the instruction prevent OPTO from fully presenting its (rejected) theory to the jury. No basis exists to grant OPTO a new trial.

The Court should deny OPTO's motion for post-judgment relief.

**HONEYWELL'S MEMORANUM IN OPPOSITION** 23

Dated: August 31, 2023

Respectfully submitted,

_/s/ S. Benjamin Pleune_
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
1120 S. Tryon Street, Suite 300
Charlotte, NC 28203
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

_Counsel for Plaintiffs and Counterclaim_
_Defendants Honeywell International Inc.,_
_Hand Held Products, Inc., and_
_Metrologic Instruments, Inc._

**HONEYWELL'S MEMORANUM IN OPPOSITION**                    24

JA1795

## CERTIFICATE OF SERVICE

I certify that on August 31, 2023, I filed and served a copy of this Response using the CM/ECF system on all counsel of record.

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

**HONEYWELL'S MEMORANUM IN OPPOSITION**                    25

JA1796

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO. 3:21-CV-00506-KDB-DCK

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC. AND METROLOGIC INSTRUMENTS, INC., | |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| OPTO ELECTRONICS CO., LTD.,  | |
| **Defendant.** | |

Now before the Court in this long running and contentious litigation[1] are the Parties' post-trial motions; specifically, Plaintiffs' Motion for Fees and Costs  (Doc. No. 360) and Defendant's Motion for Judgment as a Matter of Law, Alternative Rule 59 Motion for a New Trial and Renewed Motion for Summary Judgment (Doc. No. 374). After careful consideration of the motions, the Parties' briefs and exhibits and all relevant parts of the record in this matter, the Court will deny both motions.

Plaintiffs ("Honeywell") prevailed in both the jury and bench trials in this action. Defendant ("OPTO") asks the Court to overrule the jury verdict as a matter of law, award summary judgment or grant a new trial based on its arguments that the "Second Amendment" to the Parties' License and Settlement Agreement ("Agreement") requires judgment in its favor. OPTO had a full

---

[1] The animosity among counsel has continued to the bitter end, with Honeywell's counsel objecting to a routine request for a three day extension of time to file a brief that was due at the end of the Labor Day weekend. *See* Doc. No.  387.

JA1797

and fair opportunity to present its evidence and arguments to the jury and the Court. While OPTO's arguments were potentially persuasive and the Court would have upheld a jury verdict in OPTO's favor, the Court finds that there was sufficient evidence to support the jury's and the Court's verdicts. Further, the Court rejects OPTO's argument that a limiting instruction related to evidence underlying OPTO's "Second Amendment" arguments (to which OPTO did not object) was plain error requiring a new trial. Therefore, OPTO's post-trial motions will be denied.

As is well known, the "American Rule" requires each party to a legal dispute to pay its own attorney fees in the absence of an express statutory or contractual right to recover those fees. In its motion, Honeywell seeks "fees and costs" – primarily attorney fees – under Section 4.7 of the Agreement. However, that provision, drafted by sophisticated counsel, does not mention "*attorney* fees" (like every other case under governing Delaware law that has awarded attorney fees under a contract). In addition to failing to refer to "attorney" fees, which are specifically referenced in several other parts of the Agreement, Section 4.7 lacks the "prevailing party" language that is the "hallmark" of fee shifting provisions under Delaware law and may not even apply to "court" actions, which are the subject of a separate section of the Agreement that says nothing about the award of attorneys' fees. Finally, the evidence shows that when Honeywell wanted to negotiate a contractual provision that clearly shifted attorney fees to the prevailing party, it knew how to do so, both in the Agreement and in similar licensing agreements with other companies. Therefore, Honeywell has failed to prove a "clear and unequivocal agreement" to shift attorney fees, and its motion for "fees and costs" will accordingly be denied.

## I.    LEGAL STANDARD

OPTO seeks judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and alternatively a new trial under Rule 59.[2] If a party timely makes a motion for judgment as a matter of law under Rule 50(a), a party may "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).When the loser of a jury trial challenges the verdict under Rule 50(b), "the question is whether a jury, viewing the evidence in the light most favorable to [the winning party], could have properly reached the conclusion reached by this jury." *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 784 (4th Cir. 2023). All disputed facts must be construed in favor of the party who won at trial and it must be given the benefit of all reasonable inferences. *Id.*; *See Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999).   A jury verdict will thus withstand a Rule 50(b) motion unless "there is no legally sufficient evidentiary basis" to support the jury verdict. *See Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001); *Pracht v. Saga Freight Logistics, LLC*, No. 3:13-cv-00529, 2016 WL 3032691, at *2 (W.D.N.C. May 26, 2016) (citing *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004)). In sum, "once a jury has evaluated witness credibility, weighed evidence, and reached a verdict, a litigant seeking to overturn that verdict faces a steep hurdle." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 722 (4th Cir. 2019)

---

[2] OPTO also briefly (and without citing authority) seeks to "renew" its Motions for Summary Judgment Regarding Breach of Contract and Plaintiff's Per Se Patent Misuse "for purposes of appellate preservation." The Court fails to understand this portion of OPTO's motion. To the extent an issue was resolved at summary judgment and not tried, no "renewal" of the Rule 56 motion is necessary to preserve the issue for appeal (nor would it be timely under the Rules or the governing Case Management Order). As to issues tried to the jury or the Court, a party may pursue motions under Rules 50 and 59. In any event, the Court need not separately describe the standard for review of a motion for summary judgment, which mirrors the standard for Rule 50 motions for judgment as a matter of law. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644 (4th Cir. 2002).

Under Federal Rule of Civil Procedure 59, "a district court may grant a new trial only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017). Improper evidentiary rulings or instructions likewise compel a new trial when the error "rendered the entire trial unfair." *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) (citation omitted). "The crucial inquiry on review is whether an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair." *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 241 (4th Cir. 2016) (internal quotation marks omitted). A district court's denial of a request for a new trial "rests with the sound discretion of the trial judge and will not be reversed absent an abuse of discretion." *Hicks v. Ferreyra*, 64 F.4th 156, 174–75 (4th Cir. 2023) (quoting *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 436 (4th Cir. 2004)).

## II.    FACTS AND PROCEDURAL HISTORY

Honeywell and OPTO are competitors in the market for bar-code scanning equipment and technology. In 2020, the Parties purported to settle extensive patent litigation at the U.S. International Trade Commission and in the United States District Court for the District of Delaware through a patent licensing agreement. The parties agree that the Agreement is governed by and to be construed under the laws of the State of Delaware (as well as applicable federal law).

In this action Honeywell claims that OPTO breached the Agreement by misstating the amount of OPTO's pre-Agreement sales of certain alleged "2D" barcode scanning products and failing to pay ongoing royalties on those products. OPTO defends that claim on the merits, contending that OPTO has in fact paid all applicable royalties (thereby reflecting the Parties' disagreement over which of OPTO's products require royalty payments). Also, OPTO asserts

affirmative defenses of quasi-estoppel and unilateral mistake based on its allegation that even if the Agreement required OPTO to pay royalties on the disputed products, Honeywell knew that OPTO believed that those products were not subject to royalty obligations and took inconsistent positions that bar Honeywell's claims of breach of contract. For its counterclaims, OPTO asserts that Honeywell has committed patent misuse and unfair trade practices because Honeywell is allegedly using the Agreement to unlawfully seek royalties on features of products for which it does not have patent protection.

The Court narrowed the dispute on summary judgment, Doc. No. 195, and the remaining contract claims, including the related affirmative defenses, were tried to a jury from July 17 to July 19, 2023. The jury returned a verdict for Honeywell on all claims. On July 19 and 20, 2023, the Court held a bench trial on OPTO's counterclaim for patent misuse. At the close of OPTO's evidence, the Court granted Honeywell's motion for judgment as a matter of law on OPTO's counterclaim.

The Parties have timely filed[3] their post-trial motions, which have been fully briefed and are ripe for the Court's decision.

---

[3] Honeywell argues that OPTO's post-trial Rule 50(b) motion is untimely because OPTO did not timely move under Rule 50(a) for judgment as a matter of law "before the case was submitted to the jury." This is a meritless argument. As Honeywell is well aware, *prior* to submission of the case to the jury, the Court informed the Parties that, "Following the close of the evidence, we'll consider any motions made, but proceed with the jury." Tr. 442:4-9. The Court handled the Rule 50 motions in this manner to avoid wasting the jury's time and to allow them to more quickly begin their deliberations, while giving the Parties a full opportunity to make a record on their motions later. Although Honeywell still made a motion (ignoring the Court's ruling), OPTO cannot properly be faulted for following the Court's order that Rule 50 motions would be "considered made" and then arguing its Rule 50 motion while the jury was deliberating. *See* Tr. 455:10-17; 510:16-511:2.

## III.    DISCUSSION

### A.    OPTO's Post-Trial Motions

OPTO's Rule 50 and 59 motions rest primarily on its contention that a February 3, 2021 "Second Amendment" to the Agreement shows the parties' mutual understanding that the products for which Honeywell is claiming unpaid royalties (what it generally refers to as "laser" and CCD products) are not subject to royalties because they are not "2D Barcode Products" under Section 1.4 of the Agreement (which defines the products on which royalties are owed). In the Second Amendment, the Parties agreed to settle their remaining dispute related to OPTO's European sales to the extent those issues had not already been resolved. *See* JX 3 (Doc. No. 375-7). Specifically, Honeywell agreed to dismiss its European infringement actions, and OPTO in turn agreed to dismiss its actions seeking to nullify some of Honeywell's European patents. *See* JX 3 at 3.5. Also, in the Second Amendment OPTO agreed to pay an annual $425,000 royalty on its European sales of 2D Barcode Products for a license to Honeywell's EX-US Patent Portfolio. *See* JX 3 at 4.9. In connection with that annual royalty payment, the parties agreed:

> The above annual royalty payments cumulatively comprise the full monetary consideration for the license granted pursuant to Section 2.7 regardless of future sales or revenue. Honeywell understands that [OPTO's] revenue from 2D Barcode Products in Europe in 2019 was €4.4 million.

JX 3 at 4.9; JX 1 (Doc. No. 375-6) at 1.4 (defining "2D Barcode Products").

According to OPTO, the evidence definitively shows that the €4.4 million amount referenced in the Second Amendment excluded all revenue from sales of OPTO's laser and CCD products. Therefore, OPTO argues that in acknowledging that it "understands that OPTO's revenue from 2D Barcode Products in Europe in 2019 was €4.4 million," Honeywell agreed that "2D Barcode Products" as defined in the Agreement does not include laser and CCD products, which encompass all the products for which royalties were not paid. In summary, OPTO contends

6

JA1802

that if Honeywell "understood" that the disputed laser and CCD products were not included in the definition of products for which royalties were due, then there can be "no legally sufficient evidentiary basis" to sustain the jury verdict on the breach of contract claim. For the same reasons, OPTO's affirmative defenses of quasi-estoppel and unilateral mistake would also bar Honeywell's contractual claims. OPTO thus concludes that based on this allegedly "undisputed" evidence no reasonable juror could have found in Honeywell's favor, and the Court can and should enter judgment as a matter of law in favor of OPTO.

With their "Second Amendment" arguments, OPTO offers a potentially persuasive defense against Honeywell's claims; however, there are at least two fundamental problems for OPTO.[4] First, its evidence was very much "disputed" by Honeywell at trial. And, second, the jury agreed with Honeywell. At trial, Honeywell focused its testimonial and documentary evidence on the definitional language of "2D Barcode Products" in Section 1.4, specifically whether the disputed products were operable to decode a "two-dimensional barcode symbology," which it argued included "stacked" symbologies such as PDF417. It asked the jury to find that OPTO's disputed products could decode such "2D" symbologies and that royalties had admittedly not been paid on those products. With respect to OPTO's "Second Amendment" defense, Honeywell's witnesses denied that they "understood" that OPTO's European sales did not include products which could decode "two dimensional symbologies." Also, they disputed that by entering the Second Amendment (which related to settlement of a relatively small amount of European sales) that

_____

[4] Honeywell also attacks OPTO's "Second Amendment" defense because OPTO did not make this argument at summary judgment or in its trial brief. While the Court agrees that there is some inconsistency (and curiosity) in OPTO now arguing the centrality and overwhelming strength of this argument as a matter of law when it failed to raise the defense until trial, parties are not required to assert all their arguments at summary judgment. Therefore, the Court has evaluated OPTO's arguments on their merits without regard to the timing of when they were first presented.

7

Honeywell intended to make any change to the definition of 2D Barcode Products in Section 1.4 with respect to sales in the United States or agree that all "laser" or "CCD" products were outside the scope of that definition. *See* Doc. No. 381 at 11-15.

To be sure, at trial (and in its briefing here) OPTO offered numerous cogent rejoinders to Honeywell's witnesses and arguments. And, again, had the jury agreed with OPTO, the Court would readily find that verdict to be based on sufficient evidence. But, OPTO must prove more than its Second Amendment defense could or even should have been successful; it must prove that there was no proper way for the jury to disagree with OPTO's arguments. The Court cannot make that further leap; rather, it finds that Honeywell proffered sufficient evidence that if believed by the jury (which it apparently was) supports the jury's verdict in Honeywell's favor. Therefore, OPTO's Rule 50(b) motion will be denied. Similarly, OPTO is not entitled to a new trial under Rule 59. In support of its Rule 59 motion, OPTO reprises its arguments made in support of its Rule 50 motion, which the Court declines to find are sufficient to conclude the verdict was (1) against the clear weight of the evidence; (2) based upon false evidence; or (3) will result in a miscarriage of justice. *See EEOC v. Consol Energy, Inc.*, 860 F.3d at 145.

In addition, OPTO argues that the Court's limiting instruction with respect to European sales was erroneous and warrants a new trial. The Court disagrees, both that the instruction was erroneous and that, in the absence of any objection, it requires a new trial. In connection with the introduction of Defense Exhibit 98, a document which summarized and then described in detail OPTO's European sales that were the basis for the €4.4 million referenced in the Second Amendment, the Court gave the following limiting instruction:

> Members of the jury, in Exhibit 98, Defense Exhibit 98, there are -- you will see there some numbers representing sales. Those numbers are of no moment for your consideration with respect to the claim here. This has to do with Europe. All right. But I think counsel is going to get to a different

> point. But don't worry yourselves at all about the numbers in there. It has
> nothing to do with what you're going to be asked to consider.

Doc. No. 366, Tr. 227:17–24. Neither party objected to the instruction nor asked that it be clarified in any way. And, following the instruction, OPTO was given and took full advantage of an opportunity to cross-examine Honeywell witnesses about the document and to make arguments to explain and promote its "Second Amendment" defense to the jury.

First, as would be expected, OPTO's failure to object to the instruction at trial, when any necessary clarifying language could have been added to the instruction, significantly affects the Court's review of OPTO's post-trial challenge. The Fourth Circuit has made it clear that "a motion for a new trial should not be granted [] where the moving party has failed to timely object to the alleged impropriety giving rise to the motion." *Dennis v. Gen. Elec. Corp.*, 762 F.2d 365, 366-67 (4th Cir. 1985); *see also Brown v. Ford Motor Co.*, 67 F. Supp. 2d 581, 587 (E.D. Va. 1999) (denying a motion for a new trial based on an allegedly improper limiting instruction that was not objected to during trial because "a motion for a new trial should not be granted . . . where the moving party has failed to timely object to the alleged impropriety giving rise to the motion"). However, even where a party fails to timely object to a limiting instruction, the court should review the "otherwise waived claim for plain error if that error affects substantial rights." *EEOC v. A.C. Widenhouse, Inc.*, 576 F. App'x 227, 230 (4th Cir. 2014); *see also* Fed. R. Civ. P. 51(d)(2). "For an error to affect substantial rights, it generally 'must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *EEOC*, 576 at 231 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

The Court's limiting instruction on Defense Exhibit 98 was not plain error nor did it affect the outcome of the trial. The instruction correctly informed the jury that it need not concern itself with the European sales figures reflected in the Exhibit. Rather, the jury was told that the exhibit was being

9

JA1805

offered to make "a different point," which would be (and then was) explained by OPTO's counsel. There is no dispute that the European sales figures were themselves irrelevant to Honeywell's claims, which only included OPTO's sales in the United States. Accordingly, there was no error, much less "plain error" in the Court's instruction. Also, as clearly forecasted in the instruction, OPTO was allowed to fully pursue its Second Amendment defense both through an extensive cross-examination of Honeywell's witness and in closing arguments. Thus, the Court's "limiting" instruction in no way limited OPTO's ability to present all the evidence and arguments it wanted to the jury. That the jury was not persuaded cannot be fairly connected to the instruction.

Therefore, the Court will also deny OPTO's motion for a new trial under Rule 59.

**B.    Honeywell's Motion for Attorney Fees**

When considering the award of attorney's fees under Delaware law, the "'basic point of reference' is the bedrock principle known as the 'American Rule': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Donnelly v. ProPharma Grp. Topco, LLC*, No. CV 21-894-MAK, 2023 WL 5528613, at *6 (D. Del. Aug. 28, 2023) (quoting *Peter v. Nantkwest, Inc.*, 140 S.Ct. 365, 370, 205 L.Ed.2d 304 (2019)). There is no "bright-line language" to support an enforceable fee-shifting provision under Delaware law, but a contractual fee-shifting provision must be "a clear and unequivocal agreement triggered by a dispute over a party's failure to fulfill obligations under the contract." *Id*.; *Baltimore Pile Driving and Marine Constr., Inc. v. Wu Assocs., Inc.*, 2022 WL 3466066, at *2 (Del. Super. Ct. Aug. 18, 2022); *Facchina Const. Litigs.*, 2021 WL 1118115, at *2 (Del. Super. Ct. Mar. 24, 2021). Also, there must be "specific language" such as reference to a "prevailing party," which is considered by Delaware courts as "a hallmark term of fee-shifting provisions." *Braga Invest. & Advisory, LLC v. Yenni*, 2023 WL 3736879, at *18 (Del. Ch. May 31, 2023) (quoting *Murfey v. WHC*

10

JA1806

*Ventures*, LLC, 2022 WL 214741, at \*2 (Del. Ch. Jan. 25, 2022)). Finally, because courts require a clear and unequivocal agreement evidencing a fee-shifting provision, "[p]arties should not expect the Court to deviate from the American [R]ule if care has not been taken in drafting a contract's language." *Donnelly*, 2023 WL 5528613, at \*4 (quoting *Baltimore Pile Driving and Marine Constr., Inc.*, 2022 WL 3466066 at \*1).

In sum, unlike other contract provisions which the Court must interpret without any assumptions or "default" position, (for example, there is no governing Delaware rule on which products are subject to a license royalty), unless Honeywell establishes a clear and unequivocal contractual or statutory right to attorney fees, the Court must deny the request. Subject to this "bedrock" principle, Delaware law adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party," and the goal of contract interpretation is to "effectuate the parties' intent." *Donnelly*, 2023 WL 5528613, at \*6-7. Courts interpret contracts to "give each provision and term effect" and not render any terms "meaningless or illusory." *Id*. All contracts must be read as a whole, giving meaning to each term and avoiding an interpretation rendering any term "mere surplusage." *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp*., 206 A.3d 836, 846 (Del. 2019).

In addition to Section 4.7, the single provision of the Agreement on which Honeywell bases its request for attorney fees, there are a number of relevant sections of the Agreement that the Court must consider (copied below in the order they appear in the Agreement):

**Background**

**B**. In civil action 1:19-cv-01010-CFC filed in the United States District Court for the District of Delaware ("DELAWARE ACTION"), HONEYWELL asserted claims against OPTICON for infringing claims of the same patents that were at issue in the ITC investigation and sought a declaration of infringement, damages, interest, ***attorney fees***, and accounting of damages, costs of suit, and equitable relief.

11

JA1807

(Doc. No. 118-2, at 2) (emphasis added).

**3.2 <u>Dismissal</u>**. Each Party shall bear its ***own costs, expenses, and attorneys' fees*** in connection with this Agreement, the ITC INVESTIGATION and the DELAWARE ACTION."
(Doc. No. 118-2, at 7) (emphasis added).

**4.7 <u>Collection</u>**. In the event a Party must ***institute an action*** to collect any overdue payments, that Party shall be entitled to its ***fees and costs incurred*** with respect to such an action. Prior to the institution of any such action, the Party shall ***provide the other with Notice of the overdue payments and ten (10) days*** to satisfy any outstanding obligation.

(Doc. No. 118-2, at 8) (emphasis added).

**9.8 <u>Dispute Resolution</u>**. Before any Party can ***commence any action in court*** against the other Party arising out of or relating to this Agreement, such Party shall first give notice to the other Party of the basis for the dispute and must ***seek to resolve such dispute through conferring with the other Party for a period of thirty (30) days***. If agreement is not reached within thirty (30) days after such notice or such further period as the Parties may agree, only then may a Party bring such dispute before a court. In any such action, the Parties shall have all remedies available to them under applicable law.

(Doc. No. 118-2, at 16) (emphasis added).

<u>Exhibit C</u>
Alternate Dispute Resolution Process
…
**<u>Loser Pays</u>**. The Party prevailing at a Step of the Third Party Review shall recover up to all its reasonable ***attorneys' fees*** and costs for work performed in relation to that Step, to be determined at the discretion of the Arbitrator.

(Doc. No. 118-2, at 28) (emphasis added).

As summarized briefly at the beginning of this Order, the Court finds that Honeywell has failed for several independent reasons (also considered collectively) to carry its burden to show a clear and unequivocal agreement to shift attorney fees to OPTO. First, and perhaps most obvious, the contract section on which Honeywell relies does not say Honeywell is entitled to "attorney" or "legal" fees. Indeed, Honeywell has not cited a single case in which attorney fees were awarded based on a contractual provision that referred only to "fees" without any reference to "attorney"

JA1808

fees. *See Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *1 (Del. Ch. Apr. 27, 2004) ("*… the prevailing party shall be entitled to recover its costs, including reasonable attorneys' fees.*") (emphasis in original); *Knight v. Grinnage*, 1997 WL 633299, at *3 (Del. Ch. Oct. 7, 1997) (denying request for attorneys' fees, holding: "I assume the parties recognize they had an opportunity to bargain for that provision and for their own 'market' related reasons declined to do so. Therefore, I will not restructure their bargain and *sua sponte* reform the contract to include such a provision."); *L&W Ins., Inc. v. Harrington*, 2007 WL 1756540, at *1 (Del. Ch. June 6, 2007) ("*… if there be a prevailing party, shall be entitled to recover, in addition to costs of suit, such **reasonable attorney's fees** as the tribunal determining the action may award.*") (emphasis added); *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352, n.107 (Del. 2013) ("The Issuer will defend … from and against any and all claims, … or expenses of whatever kind or nature … (**including, without limitation, counsel and consultant fees and expenses** ...) arising out of this Agreement . . . .") (emphasis added); *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *1 (Del. Ch. Aug. 13, 2010) (requiring defendant "to bear all of the expenses, **including attorneys' fees**, that Aveta has incurred because of [his] contempt.") (emphasis added); *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F. Supp. 2d 476, 478 (D. Del. 2003) (awarding attorney fees in the context of a Stock Purchase Agreement that indemnified the buyer "from … costs, fees and expenses (including without limitation, **reasonable attorneys … fees**…incurred in connection with any matter indemnifiable…)";[5] *see also Braga*, 2020 WL 5416516, at *3 (rejecting request

---

[5] In *GB Biosciences*, the primary issue before the court was whether the buyer was entitled to reimbursement of "expenses" prior to a judicial determination that those expenses were reasonable. After deciding that question, in the final paragraph of the opinion, the court rejected an argument that "expenses" in the section describing the process for obtaining reimbursement did not include attorneys' fees. Curiously (and unnecessarily), the court decided the attorneys' fees question by reference to a dictionary definition of "expenses" instead of simply referring to the express

13

for attorneys' fees in part because "the operative term of the contract" on which the motion was based "does not even mention attorneys' fees"); *Paul Elton, LLC v. Rommel Delaware, LLC*, 2022 WL 793126, at *3 (Del. Ch. Mar. 16, 2022) (finding that one provision of the contract did not provide for attorneys' fees where a different provision specifically awarded attorneys' fees, which "demonstrat[ed] that the parties were capable of drafting the sort of clear and unequivocal language required to shift fees when they so intended").

Further, there is no dispute that in drafting the Agreement, Honeywell and OPTO were represented by sophisticated and experienced counsel, who know how to say "attorney fees" when they want to do so. As recited above, in at least three other sections of the Agreement – the Background, Section 3.2 and Exhibit C – the Agreement specifically refers to "attorney(s) fees." Most striking is Exhibit C in which the parties agreed to a "Loser Pays" provision[6] in which the "Party prevailing … shall recover up to all its reasonable ***attorneys' fees*** and costs." (Doc. No. 118-2, at 28) (emphasis added). Unlike Section 4.7, Exhibit C is a clear and unequivocal agreement to shift attorneys' fees and costs.

Beyond the demonstrated ability of Honeywell's counsel to agree to clear language that shifts an entitlement to recover attorneys' fees to a prevailing party in Exhibit C of the Agreement, Honeywell has also negotiated clear attorneys' fees provisions in similar license agreements[7]

---

language of the contract defining recoverable indemnification expenses to include "attorneys' fees." Thus, the Court finds *GB Biosciences* unpersuasive in support of Honeywell's argument for a "broad" reading of "fees" without reference to "attorneys" fees.

[6] The Court notes that despite OPTO highlighting this section of the Agreement in its responsive arguments, Honeywell did not provide any reply to those arguments or even mention this critical section of the Agreement in its Reply brief.

[7] Honeywell asks the Court not to consider "extrinsic" evidence related to other license agreements (the authenticity of which it does not challenge) because Section 4.7 is "unambiguous." The Court cannot conclude Section 4.7 is "unambiguous" as it relates to "attorneys" fees based on the other references to "attorneys" fees in the Agreement and the lack of clarity in the language used.

related to the same bar-code scanning patents and types of products. For example, in its settlement and license agreement with Datalogic, Honeywell included the following provision allowing recovery of reasonable attorneys' fees:

> 11.13.  Attorneys' Fees and Costs.  In the event any action or proceeding is brought by either Party in connection with this Agreement, ***the prevailing Party in such action or proceeding will be entitled to recover its costs, expert witness fees, and reasonable attorneys' fees***, including costs and fees on appeal from the non- prevailing party.

Doc. No. 372-2 at 13-14 (emphasis added).  Similarly, in its settlement agreement with Zebra, Honeywell included the following attorneys' fees provision:

> 12. Attorneys' Fees.  Subject to the terms herein, each party shall bear its own attorneys' fees (except as provided in Section 3.2) and related expenses incurred by or on behalf of said Party in connection with the Actions and the preparation and negotiation of this Agreement. In addition to damages awarded, ***in the event of litigation to enforce a provision of this Agreement, the party seeking to enforce the provision, if successful, is entitled to seek its reasonable attorneys' fees, costs, and expenses***.

Doc. No. 372-2 (PX-202) at 17, § 9.12 (emphasis added). These examples are further proof that when Honeywell wanted to negotiate a clear provision shifting attorneys' fees to a prevailing party it knew how to do so. Again, because courts require a clear and unequivocal agreement evidencing an attorney fee-shifting provision, "[p]arties should not expect the Court to deviate from the American [R]ule if care has not been taken in drafting a contract's language." *Donnelly*, 2023 WL 5528613, at \*4.

Section 4.7 also fails as an attorney "fee-shifting" provision because it lacks a reference to a "prevailing party." *See Donnelly*, 2023 WL 5528613, at \*6. Instead, an award under Section 4.7 on its face simply flows from the institution of an action and does not require the party filing

---

Therefore, it is appropriate for the Court to consider the extrinsic evidence offered. However, the Court notes that its consideration of Honeywell's other license agreements only corroborates what is already apparent from the Agreement itself and the Court would have reached the same result even if it had not considered any extrinsic evidence.

15

JA1811

the action to prevail.   In *Baltimore Pile Driving and Marine Construction, Inc.*, the Delaware Superior Court found no basis to shift attorneys' fees from contract language stating, "[a]ll legal fees resulting from [Plaintiff's] need to secure legal services for any infraction of the terms and conditions of this Executed Proposal or any Contract/Purchase Order, and any disputes arising from the contract [sic] to be adjudicated in Harford County, Maryland" in part because there is no reference to a "prevailing party." *Baltimore Pile Driving*, 2022 WL 3466066, at * 1, *3.  The court reasoned the sophisticated counsel representing the parties would know how to draft a fee-shifting provision under Delaware law and concluded the provision "is poorly drafted and lacks sufficient clarity" to be a clear and unequivocal enforceable agreement for fee-shifting. *Id*. Similarly, in *Murfey v. WHC Ventures, LLC* the Delaware Chancery Court found the parties did not agree to fee-shifting when reviewing the agreement as a whole because, as here, another section of the agreement contained a fee-shifting provision, shifting attorneys' fees to the "prevailing party" in an arbitration. The court concluded the later provision supported an interpretation the earlier provision did not encompass fee-shifting in litigation. *See Murfey,* 2022 WL 214741, at * 2. As in *Donnelly*, the Court must "observ[e] with particular obedience" language of fee-shifting agreements so as not to "swallow the American Rule." *Donnelly*, 2023 WL 5528613, at *7.

Finally, it is unclear from the Agreement if Section 4.7 even applies to this "court" dispute. By its terms, Section 4.7 applies to "an action" and requires a party to give only 10 days' notice prior to institution of the action. In contrast, Section 9.8 specifically applies to "any action in court against the other party" and requires a 30 day period for the party to give notice and confer with the other party to resolve their dispute.  Therefore, if  Section 4.7 also applies to court actions then its 10 day notice period requirement would be unnecessary because Section 9.8 already mandates

JA1812

30 days' notice. Further, Section 9.8 has no language even arguably shifting attorneys' fees. So, it also seems inconsistent for the Parties to not agree to shift attorneys' fees in the provision governing court actions (which are otherwise subject to significantly *more* efforts to reach a settlement) than actions subject to Section 4.7. As noted above, the Court is obligated to interpret contracts to "give each provision and term effect" and not render any terms "meaningless, illusory or mere surplusage." See *Sunline*, 206 A.3d at 846. Giving full meaning to both Section 4.7 and 9.8 thus further undercuts Honeywell's efforts to portray Section 4.7 as a "clear and unequivocal" agreement to shift attorneys' fees in this litigation.

In summary, as discussed at the outset, the Court must decide Honeywell's request for attorneys' fees under Section 4.7 under the strict constraints of the American Rule, where each party must bear its own attorneys' fees unless there is a "clear and unequivocal" agreement to shift attorneys' fees. Honeywell has failed to meet that burden; accordingly, its motion for attorneys' fees will be denied.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Plaintiffs' Motion for Fees and Costs  (Doc. No. 360) is **DENIED**; and

2.  Defendant's Motion for Judgment as a Matter of Law, Alternative Rule 59 Motion for a New Trial and Renewed Motion for Summary Judgment (Doc. No. 374) is **DENIED**.

**SO ORDERED ADJUDGED AND DECREED**.

Signed:  September 27, 2023

Kenneth D. Bell
United States District Judge

17

JA1813

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> OPTO ELECTRONICS CO., LTD., <br><br> *Defendant and Counterclaim Plaintiff*, <br><br> v. <br><br> HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., <br><br> *Counterclaim Defendants*. | Case No. 3:21-cv-00506 |

**PLAINTIFFS' AMENDED NOTICE OF APPEAL**
**TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

Notice is hereby given under Federal Rules of Appellate Procedure 3 and 4 that Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. (collectively "Honeywell") appeal to the United States Court of Appeals for the Fourth Circuit the final Judgment entered on July 20, 2023 (Dkt. 353) as amended by the Amended Judgment entered on July 26, 2023 (Dkt. 358), and all orders, decisions, verdicts, rulings, findings, and conclusions that underlie or relate thereto, including but not limited to (1) the Court's April 20, 2023, Order (Dkt. 195) granting-in-part summary judgment against Honeywell regarding Honeywell's claim under Section 5.1 of the License and Settlement Agreement between Honeywell and OPTO

JA1814

Electronics Co., Ltd.; (2) the Court's June 2, 2023, Order (Dkt. 223) denying Honeywell's motion for reconsideration; and (3) the Court's September 27, 2023 Order (Dkt. 394) denying Honeywell's motion for fees and costs.

Submitted October 2, 2023

/s/ S. Benjamin Pleune
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**ALSTON & BIRD LLP**
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

JA1815

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 2, 2023 I filed a copy of this AMENDED NOTICE OF APPEAL

using the Court's CM/ECF system, which automatically provides service to all counsel of record.

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

3

JA1816

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL INC., | ) | |
| HAND HELD PRODUCTS, INC., and | ) | |
| METROLOGIC INSTRUMENTS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-00506 |
| | ) | |
| OPTO ELECTRONICS CO., LTD., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

---

**NOTICE OF APPEAL OF**
**DEFENDANT OPTO ELECTRONICS CO., LTD.**

Notice is hereby given that Defendant OPTO Electronics Co., Ltd. ("OPTO") appeals

to the United States Court of Appeals for the Fourth Circuit from the Judgment entered in this

action on July 20, 2023 (Dkt. 353), as amended July 26, 2023 (Dkt. 358); the Order entered

in this action on September 27, 2023 (Dkt. 394) denying OPTO's Motion for Judgment as a

Matter of Law; and all orders, opinions, and rulings that merge into the Judgment, including

but not limited to the Order entered in this action on April 20, 2023 (Dkt. 195) granting partial

summary judgment to Plaintiffs and denying summary judgment to OPTO.

Dated: October 4, 2023

Respectfully submitted,

**McGuireWoods LLP**

*/s/ Robert A. Muckenfuss*
Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
McGuireWoods LLP
201 N. Tryon Street, Suite 3000

1

JA1817

Charlotte, North Carolina 28202
Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com

Tyler T. VanHoutan
McGuireWoods LLP
Texas Tower, Ste 2400 | 845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com

Christine E. Lehman
Connor S. Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

York M. Faulkner
YorkMoodyFaulkner
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

2

JA1818

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of October, 2023, the foregoing was served upon all counsel of record via the Court's CM/ECF System.

*/s/ Robert A. Muckenfuss*
Robert A. Muckenfuss

JA1819

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | |
| *Plaintiffs*, | |
| v. | |
| OPTO ELECTRONICS CO., LTD., | Case No. 3:21-cv-00506 |
| *Defendant and Counterclaim Plaintiff*, | |
| v. | |
| HONEYWELL INTERNATIONAL INC., HAND HELD PRODUCTS, INC., and METROLOGIC INSTRUMENTS, INC., | |
| *Counterclaim Defendants*. | |

**PLAINTIFFS' NOTICE OF APPEAL
TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Notice is hereby given under Federal Rules of Appellate Procedure 3 and 4 that Plaintiffs Honeywell International Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. (collectively "Honeywell") appeal to the United States Court of Appeals for the Federal Circuit the final Judgment entered on July 20, 2023 (Dkt. 353) as amended by the Amended Judgment entered on July 26, 2023 (Dkt. 358), and all orders, decisions, verdicts, rulings, findings, and conclusions that underlie or relate thereto, including but not limited to (1) the Court's April 20, 2023, Order (Dkt. 195) granting-in-part summary judgment against Honeywell regarding Honeywell's claim under Section 5.1 of the License and Settlement Agreement between

JA1820

Honeywell and OPTO Electronics Co., Ltd.; (2) the Court's June 2, 2023, Order (Dkt. 223) denying Honeywell's motion for reconsideration; and (3) the Court's September 27, 2023 Order (Dkt. 394) denying Honeywell's motion for fees and costs.

Submitted October 27, 2023

/s/ *S. Benjamin Pleune*
S. Benjamin Pleune (NC Bar No. 28748)
M. Scott Stevens (NC Bar No. 37828)
Michael R. Hoernlein (NC Bar No. 40419)
Stephen R. Lareau (NC Bar No. 42992)
Brandon Springer (NC Bar No. 54523)
Nicholas C. Marais (NC Bar No. 53533)
Lauren N. Griffin (NC Bar No. 54766)
**ALSTON & BIRD LLP**
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1935

*Counsel for Plaintiffs and Counterclaim Defendants*
*Honeywell International Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

JA1821

## CERTIFICATE OF SERVICE

I certify that on October 27, 2023 I filed a copy of this NOTICE OF APPEAL using the

Court's CM/ECF system, which automatically provides service to all counsel of record.


/s/ *S. Benjamin Pleune*
S. Benjamin Pleune
N.C. Bar No. 28748

3

JA1822

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

HONEYWELL INTERNATIONAL INC.,   )
HAND HELD PRODUCTS, INC., and   )
METROLOGIC INSTRUMENTS, INC.,   )
                                )
        Plaintiffs,             )
                                )
v.                              )        Case No. 3:21-cv-00506
                                )
OPTO ELECTRONICS CO., LTD.,     )        JURY TRIAL DEMANDED
                                )
        Defendant.              )

---

**PROTECTIVE NOTICE OF CROSS-APPEAL OF
DEFENDANT OPTO ELECTRONICS CO., LTD.**

Notice is hereby given that Defendant Opto Electronics Co., Ltd. ("OPTO") appeals to the United States Court of Appeals for the Federal Circuit from the Judgment entered in this action on July 20, 2023 (Dkt. 353), as amended July 26, 2023 (Dkt. 358); the Order entered in this action on September 27, 2023 (Dkt. 394) denying OPTO's Motion for Judgment as a Matter of Law; and all orders, opinions, and rulings that merge into the Judgment, including but not limited to the Order entered in this action on April 20, 2023 (Dkt. 195) granting partial summary judgment to Plaintiffs and denying summary judgment to OPTO.

Like Plaintiffs, OPTO has filed a Notice of Appeal to the Fourth Circuit (Dkt. 398). But Plaintiffs filed a Notice of Appeal to the Federal Circuit on October 27, 2023 (Dkt. 402). Plaintiffs then notified OPTO that they intend to move to transfer the Fourth Circuit appeals (Nos. 23-1850 & 23-2038) to the Federal Circuit.  OPTO intends to oppose that motion to

1

JA1823

transfer because those appeals are not within the Federal Circuit's jurisdiction under 28 U.S.C. § 1295(a)(1). And OPTO intends to move to transfer the Federal Circuit appeals (including No. 24-1109) to the Fourth Circuit for the same reason. OPTO nevertheless files this Protective Notice of Cross-Appeal in the event that appellate jurisdiction is determined to lie with the Federal Circuit. This Protective Notice of Cross-Appeal to the Federal Circuit is timely filed within fourteen days after Plaintiffs' October 27 Notice of Appeal. Fed. R. App. P. 4(a)(3).

Dated: November 7, 2023

Respectfully submitted,

**McGuireWoods LLP**

*/s/ Robert A. Muckenfuss*
Robert Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
Jessica O'Brien, NC State Bar #56679
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: 704 343 2351 Facsimile: 704 444 8869
rmuckenfuss@mcguirewoods.com
zmccamey@mcguirewoods.com
jobrien@mcguirewoods.com

Tyler T. VanHoutan
McGuireWoods LLP
Texas Tower, Ste 2400 | 845 Texas Avenue
Houston, TX 77002
Telephone: 832-214-9911
tvanhoutan@mcguirewoods.com

Christine E. Lehman
Connor S. Houghton
Reichman Jorgensen Lehman & Feldberg LLP
1909 K St, NW, Suite 800
Washington, DC 20006
Telephone: 650-623-1401
clehman@reichmanjorgensen.com
choughton@reichmanjorgensen.com

JA1824

York M. Faulkner
YORKMOODYFAULKNER
Tensho Bldg., 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
Telephone: +1-202-251-0837
york.faulkner@ymf-law.com

*Attorneys for Defendant Opto Electronics Co., LTD.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of November, 2023, the foregoing was served upon all counsel of record via the Court's CM/ECF System.

*/s/ Robert A. Muckenfuss*
Robert A. Muckenfuss

JA1826

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

# INTERNATIONAL STANDARD

# ISO/IEC 15438

Third edition
2015-09-15

---

## Information technology — Automatic identification and data capture techniques — PDF417 bar code symbology specification

*Technologies de l'information — Techniques automatiques d'identification et de capture des données — Spécifications pour la symbologie de code à barres PDF417*

---

Reference number
ISO/IEC 15438:2015(E)



© ISO/IEC 2015

OPTO_00012083

JA1827

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

 **COPYRIGHT PROTECTED DOCUMENT**

© ISO/IEC 2015, Published in Switzerland

All rights reserved. Unless otherwise specified, no part of this publication may be reproduced or utilized otherwise in any form or by any means, electronic or mechanical, including photocopying, or posting on the internet or an intranet, without prior written permission. Permission can be requested from either ISO at the address below or ISO's member body in the country of the requester.

ISO copyright office
Ch. de Blandonnet 8 • CP 401
CH-1214 Vernier, Geneva, Switzerland
Tel. +41 22 749 01 11
Fax +41 22 749 09 47
copyright@iso.org
www.iso.org

OPTO_00012084

JA1828

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

# Contents

Page

Foreword .............................................................................................................................................................v

Introduction ......................................................................................................................................................vi

1    Scope ...................................................................................................................................................1

2    Normative references .......................................................................................................................1

3    Terms and definitions ......................................................................................................................1

4    Symbols, operations and abbreviated terms ................................................................................3
    4.1    Symbols ...............................................................................................................................3
    4.2    Mathematical operations ...................................................................................................4
    4.3    Abbreviated terms .............................................................................................................4

5    Requirements .....................................................................................................................................4
    5.1    Symbology characteristics .................................................................................................4
        5.1.1    Basic characteristics ..........................................................................................4
        5.1.2    Summary of additional features ........................................................................5
    5.2    Symbol structure ................................................................................................................6
        5.2.1    PDF417 symbol parameters ..............................................................................6
        5.2.2    Row parameters .................................................................................................6
        5.2.3    Codeword sequence ...........................................................................................7
    5.3    Basic encodation ................................................................................................................8
        5.3.1    Symbol character structure ...............................................................................8
        5.3.2    Start and stop characters ..................................................................................9
    5.4    High level (data) encodation .............................................................................................9
        5.4.1    Function codewords ..........................................................................................10
        5.4.2    Text Compaction mode .....................................................................................12
        5.4.3    Byte Compaction mode .....................................................................................17
        5.4.4    Numeric Compaction mode ..............................................................................19
        5.4.5    Advice to select the appropriate compaction mode ........................................20
        5.4.6    Treatment of PDF417 reserved codewords ......................................................20
    5.5    Extended Channel Interpretation ...................................................................................21
        5.5.1    Encoding the ECI assignment number .............................................................22
        5.5.2    Pre-assigned and default Extended Channel Interpretations ........................22
        5.5.3    Encoding ECI sequences within compaction modes ........................................23
        5.5.4    Post-decode protocol .........................................................................................25
    5.6    Determining the codeword sequence ..............................................................................25
    5.7    Error detection and correction ........................................................................................25
        5.7.1    Error correction level .......................................................................................25
        5.7.2    Error correction capacity .................................................................................26
        5.7.3    Defining the error correction codewords .........................................................26
    5.8    Dimensions .......................................................................................................................27
        5.8.1    Minimum width of a module (X) ......................................................................27
        5.8.2    Row height (Y) ..................................................................................................27
        5.8.3    Quiet zones .......................................................................................................27
    5.9    Defining the symbol format .............................................................................................27
        5.9.1    Defining the aspect ratio of the module ..........................................................27
        5.9.2    Defining the symbol matrix of rows and columns ...........................................28
    5.10    Generating the error correction codewords ....................................................................29
    5.11    Low level encodation .......................................................................................................30
        5.11.1    Clusters ............................................................................................................31
        5.11.2    Determining the symbol matrix ......................................................................31
        5.11.3    Determining the values of the left and right row indicators ...........................32
        5.11.4    Row encoding ....................................................................................................32
    5.12    Compact PDF417 ............................................................................................................32
    5.13    Macro PDF417 .................................................................................................................32

© ISO/IEC 2015 – All rights reserved

iii

OPTO_00012085

JA1829

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

|   |   | |
|---|---|---|
| | 5.13.1 | Compaction modes and Macro PDF417 ........................................................... 33 |
| | 5.13.2 | ECIs and Macro PDF417 ............................................................................... 33 |
| 5.14 | User guidelines ........................................................................................................ 33 |
| | 5.14.1 | Human readable interpretation ..................................................................... 33 |
| | 5.14.2 | Autodiscrimination capability ...................................................................... 33 |
| | 5.14.3 | User-defined application parameters ............................................................ 33 |
| | 5.14.4 | PDF417 symbol quality ................................................................................ 34 |
| 5.15 | Reference decode algorithm ..................................................................................... 34 |
| 5.16 | Error detection and error correction procedure ........................................................ 34 |
| 5.17 | Transmitted data ...................................................................................................... 34 |
| | 5.17.1 | Transmitted data in the basic (default) interpretation .................................. 34 |
| | 5.17.2 | Transmission protocol for Extended Channel Interpretation (ECI) ............... 35 |
| | 5.17.3 | Transmitted data for Macro PDF417 ............................................................ 36 |
| | 5.17.4 | Transmission of reserved codewords using the ECI protocol ......................... 36 |
| | 5.17.5 | Symbology identifier .................................................................................... 36 |
| | 5.17.6 | Transmission using older protocols .............................................................. 36 |

**Annex A** (normative) **Encoding/decoding table of PDF417 symbol character bar-space sequences** ......................................................................................................... 37

**Annex B** (normative) **The default character set for Byte Compaction mode** .................. 60

**Annex C** (normative) **Byte Compaction mode encoding algorithm** .............................. 61

**Annex D** (normative) **Numeric Compaction mode encoding algorithm** ....................... 63

**Annex E** (normative) **User selection of error correction level** ..................................... 65

**Annex F** (normative) **Tables of coefficients for calculating PDF417 error correction codewords** ... 66

**Annex G** (normative) **Compact PDF417** .................................................................... 70

**Annex H** (normative) **Macro PDF417** ........................................................................ 71

**Annex I** (normative) **Testing PDF417 symbol quality** ................................................ 79

**Annex J** (normative) **Reference decode algorithm for PDF417** .................................. 80

**Annex K** (normative) **Error correction procedures** .................................................... 84

**Annex L** (normative) **Symbology identifier** ............................................................... 86

**Annex M** (normative) **Transmission protocol for decoders conforming with original PDF417 standards** ................................................................................................... 87

**Annex N** (informative) **Algorithm to minimise the number of codewords** .................... 93

**Annex O** (informative) **Guidelines to determine the symbol matrix** ............................ 95

**Annex P** (informative) **Calculating the coefficients for generating the error correction codewords – worked example** .................................................................................. 99

**Annex Q** (informative) **Generating the error correction codewords - worked example** ... 100

**Annex R** (informative) **Division circuit procedure for generating error correction codewords** ... 104

**Annex S** (informative) **Additional guidelines for the use of PDF417** ......................... 106

**Bibliography** ........................................................................................................... 108

© ISO/IEC 2015 – All rights reserved

OPTO_00012086

JA1830

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

# Foreword

ISO (the International Organization for Standardization) and IEC (the International Electrotechnical Commission) form the specialized system for worldwide standardization. National bodies that are members of ISO or IEC participate in the development of International Standards through technical committees established by the respective organization to deal with particular fields of technical activity. ISO and IEC technical committees collaborate in fields of mutual interest. Other international organizations, governmental and non-governmental, in liaison with ISO and IEC, also take part in the work. In the field of information technology, ISO and IEC have established a joint technical committee, ISO/IEC JTC 1.

The procedures used to develop this document and those intended for its further maintenance are described in the ISO/IEC Directives, Part 1. In particular the different approval criteria needed for the different types of document should be noted. This document was drafted in accordance with the editorial rules of the ISO/IEC Directives, Part 2 (see www.iso.org/directives).

Attention is drawn to the possibility that some of the elements of this document may be the subject of patent rights. ISO and IEC shall not be held responsible for identifying any or all such patent rights. Details of any patent rights identified during the development of the document will be in the Introduction and/or on the ISO list of patent declarations received (see www.iso.org/patents).

Any trade name used in this document is information given for the convenience of users and does not constitute an endorsement.

For an explanation on the meaning of ISO specific terms and expressions related to conformity assessment, as well as information about ISO's adherence to the WTO principles in the Technical Barriers to Trade (TBT) see the following URL: Foreword - Supplementary information

The committee responsible for this document is ISO/IEC JTC 1, *Information technology*, Subcommittee SC 31, *Automatic identification and data capture techniques*.

This third edition cancels and replaces the second edition (ISO/IEC 15438:2006), of which it constitutes a minor revision.

OPTO_00012087

JA1831

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

## Introduction

The technology of bar coding is based on the recognition of patterns of bars and spaces of defined dimensions. There are various methods of encoding information in bar code form, known as symbologies, and the rules defining the translation of characters into bars and space patterns and other essential features are known as the symbology specification.

Manufacturers of bar code equipment and users of bar code technology require publicly available standard symbology specifications to which they can refer when developing equipment and application standards. It is the intent and understanding of ISO/IEC that the symbology presented in this International Standard is entirely in the public domain and free of all user restrictions, licences and fees.

© ISO/IEC 2015 – All rights reserved

OPTO_00012088

JA1832

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**INTERNATIONAL STANDARD**        ISO/IEC 15438:2015(E)

# Information technology — Automatic identification and data capture techniques — PDF417 bar code symbology specification

## 1  Scope

This International Standard specifies the requirements for the bar code symbology known as PDF417. It specifies PDF417 symbology characteristics, data character encodation, symbol formats, dimensions, error correction rules, reference decoding algorithm, and a number of application parameters.

## 2  Normative references

The following documents, in whole or in part, are normatively referenced in this document and are indispensable for its application. For dated references, only the edition cited applies. For undated references, the latest edition of the referenced document (including any amendments) applies.

ISO/IEC 646, *Information technology — ISO 7-bit coded character set for information interchange*

ISO/IEC 15415, *Information technology — Automatic identification and data capture techniques — Bar code symbol print quality test specification — Two-dimensional symbols*

ISO/IEC 15424, *Information technology — Automatic identification and data capture techniques — Data Carrier Identifiers (including Symbology Identifiers)*

ISO/IEC 19762-1, *Information technology — Automatic identification and data capture (AIDC) techniques — Harmonized vocabulary — Part 1: General terms relating to AIDC*

ISO/IEC 19762-2, *Information technology — Automatic identification and data capture (AIDC) techniques — Harmonized vocabulary — Part 2: Optically readable media (ORM)*

ISO/IEC 24723, *Information technology — Automatic identification and data capture techniques — GS1 Composite bar code symbology specification*

## 3  Terms and definitions

For the purposes of this document, the terms and definitions given in ISO/IEC 19762-1, ISO/IEC 19762-2 and the following apply.

**3.1**
**basic channel model**
standard system for encoding and transmitting bar code data where data message bytes are output from the decoder but no control information about the message is transmitted

Note 1 to entry: A decoder complying with this model operates in Basic Channel Mode.

**3.2**
**bar-space sequence**
sequence which represents the module widths of the elements of a symbol character

© ISO/IEC 2015 – All rights reserved

1

JA1833

Licensed to Opticon, Inc / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

**3.3**
**cluster**
any of the three mutually exclusive subsets of PDF417 symbol characters

Note 1 to entry: The symbol characters in a given cluster conform with particular structural rules which are used in decoding the symbology.

**3.4**
**compaction mode**
any of the three data compaction algorithms in PDF417 (Text, Numeric and Byte Compaction modes) which are used to map 8-bit data bytes efficiently to PDF417 codewords

**3.5**
**e-distance**
distance from the leading edge of an element to the leading edge of the next similar element, or from trailing edge to trailing edge

**3.6**
**error correction codeword**
encodes a value derived from the error correction codeword algorithm to enable decode errors to be detected and, depending on the error correction level, to be corrected

**3.7**
**Extended Channel Interpretation**
**ECI**
procedure within some symbologies, including PDF417, to replace the default interpretation with another interpretation in a reliable manner

Note 1 to entry: The interpretation intended prior to producing the symbol can be retrieved after decoding the scanned symbol to recreate the data message in its original format.

**3.8**
**Extended Channel Model**
system for encoding and transmitting both data message bytes and control information about the message, the control information being communicated using Extended Channel Interpretation (ECI) escape sequences

Note 1 to entry: A decoder complying with this model operates in Extended Channel Mode.

**3.9**
**function codeword**
initiates a particular operation within a symbology

EXAMPLE    To switch between data encoding sets, to invoke a compaction scheme, to program the reader, or to invoke Extended Channel Interpretations.

**3.10**
**Global Label Identifier**
**GLI**
procedure in the PDF417 symbology which behaves in a similar manner to Extended Channel Interpretation

Note 1 to entry: The GLI system was the PDF417-specific precursor to the symbology-independent ECI system.

**3.11**
**Macro PDF417**
procedure in the PDF417 symbology logically to distribute data from a computer file across a number of related PDF417 symbols

Note 1 to entry: The procedure considerably extends the data capacity beyond that of a single symbol.

Note 2 to entry: This procedure is similar to the Structured Append feature in other symbologies.

2    © ISO/IEC 2015 – All rights reserved

OPTO_00012090

JA1834

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

**3.12**
**Mode Latch codeword**
used to switch from one mode to another mode, which stays in effect until another latch or shift codeword is implicitly or explicitly brought into use, or until the end of the symbol is reached

**3.13**
**Mode Shift codeword**
used to switch from one mode to another for one codeword, after which encoding returns to the original mode

**3.14**
**Row Indicator codeword**
PDF417 codeword adjacent to the start or stop character in a row, which encodes information about the structure of the PDF417 symbol in terms of the row identification, total number of rows and columns, and the error correction level

**3.15**
**Symbol Length Descriptor**
first codeword in a PDF417 symbol, which encodes the total number of data codewords in the symbol


# 4   Symbols, operations and abbreviated terms

## 4.1   Symbols

For the purposes of this International Standard, the following mathematical symbols apply. There are some cases where the symbols below have been used in a different manner in an equation. This has been done for consistency with a more general use of the notation and is always clearly defined in the text.

$A$      symbol aspect ratio (height to width) of a PDF417 symbol

$b$      element width in a symbol character

$c$      number of columns in the symbol in the data region (excluding start, stop and row indicator codewords)

$d$      data codeword including all function codewords

$E$      error correction codeword

$e$      edge to similar edge dimension in a symbol character

$F$      row number

$f$      number of substitution errors

$H$      height of symbol including quiet zone

$K$      cluster number

$k$      number of error correction codewords

$L$      left row indicator

$l$      number of erasures

$m$      number of source data codewords prior to the addition of the Symbol Length Descriptor and any pad codewords

$n$      total number of data codewords including Symbol Length Descriptor and any pad codewords

© ISO/IEC 2015 – All rights reserved                                                                                                    **3**

OPTO_00012091

JA1835

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

$p$      pitch or width of a symbol character

$Q_H$     horizontal quiet zone

$Q_V$     vertical quiet zone

$R$      right row indicator

$r$      number of rows in the symbol

$s$      error correction level

$W$      width of symbol including quiet zone

$X$      X-dimension or module width

$Y$      module height (also called row height)

## 4.2   Mathematical operations

For the purposes of this International Standard, the following mathematical operations apply.

div     is the integer division operator, rounding down

INT     is the integer value, i.e. where a number is rounded down to its whole number component, ignoring its decimal fractions

mod     is the positive integer remainder after division. If the remainder is negative, add the value of the divisor to make it positive. For example, the remainder of –29 160 divided by 929 is –361 which when added to 929 yields 568.

## 4.3   Abbreviated terms

For the purposes of this International Standard, the following abbreviated terms apply.

ECI     Extended Channel Interpretation

GLI     Global Label Identifier

## 5   Requirements

## 5.1   Symbology characteristics

### 5.1.1   Basic characteristics

PDF417 is a bar code symbology with the following basic characteristics.

a)   Encodable character set:

    1)   Text Compaction mode (see 5.4.1.5) permits all printable ASCII characters to be encoded, i.e. values 32 to 126 inclusive in accordance with ISO/IEC 646 (IRV), as well as selected control characters;

    2)   Byte Compaction mode (see 5.4.3) permits all 256 possible 8-bit byte values to be encoded. This includes all ASCII characters value 0 to 127 inclusive and provides for international character set support;

    3)   Numeric Compaction mode (see 5.4.4) permits efficient encoding of numeric data strings;

**4**

© ISO/IEC 2015 – All rights reserved

OPTO_00012092

JA1836

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

4)   Up to 811 800 different character sets or data interpretations;

5)   Various function codewords for control purposes.

b)   Symbol character structure: ($n$, $k$, $m$) characters of 17 modules ($n$), 4 bar and 4 space elements ($k$), with the largest element 6 modules wide ($m$).

c)   Maximum possible number of data characters per symbol (at error correction level 0): 925 data codewords which can encode:

1)   Text Compaction mode: 1 850 characters (at 2 data characters per codeword);

2)   Byte Compaction mode: 1 108 characters (at 1,2 data characters per codeword);

3)   Numeric Compaction mode: 2 710 characters (at 2,93 data characters per codeword).

At the minimum recommended error correction level, there is a maximum of 863 data codewords which can encode:

4)   Text Compaction mode: 1 726 characters (at 2 data characters per codeword);

5)   Byte Compaction mode: 1 033 characters (at 1,2 data characters per codeword);

6)   Numeric Compaction mode: 2 528 characters (at 2,93 data characters per codeword).

d)   Symbol size:

1)   Number of rows: 3 to 90;

2)   Number of columns: 1 to 30;

3)   Width in modules: 90X to 583X including quiet zones;

4)   Maximum codeword capacity: 928 codewords;

5)   Maximum data codeword capacity: 925 codewords.

Since the number of rows and the number of columns are selectable, the aspect ratio of a PDF417 symbol may be varied when printing to suit the spatial requirements of the application.

e)   Selectable error correction: 2 to 512 codewords per symbol (see 5.7).

f)   Non-data overhead:

1)   Per row: 73 modules, including quiet zones;

2)   Per symbol: a minimum of 3 codewords, represented as symbol characters.

g)   Code type: continuous, multi-row two-dimensional.

h)   Character self-checking: Yes.

i)   Bi-directionally decodable: Yes.

### 5.1.2   Summary of additional features

Additional features which are inherent or optional in PDF417 are summarised below.

a)   **Data compaction**: (inherent) Three schemes are defined to compact a number of data characters into codewords. Generally data is not directly represented on a one character for one codeword basis (see 5.4.1.5 to 5.4.4).

b)   **Extended Channel Interpretations**: (optional) These mechanisms allow up to 811 800 different data character sets or interpretations to be encoded (see 5.5).

© ISO/IEC 2015 – All rights reserved                                                            **5**

OPTO_00012093

JA1837

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

c)  **Macro PDF417**: (optional) This mechanism allows files of data to be represented logically and consecutively in a number of PDF417 symbols. Up to 99 999 different PDF417 symbols can be so linked or concatenated and be scanned in any sequence to enable the original data file to be correctly reconstructed (see 5.13).

d)  **Edge to edge decodable**: (inherent) PDF417 can be decoded by measuring elements from edge to similar edge (see 5.3.1).

e)  **Cross row scanning**: (inherent) The combination of the following three characteristics in PDF417 facilitates cross row scanning:

    1)  being synchronised horizontally, or self clocking;

    2)  row identification;

    3)  being synchronised vertically, by using the cluster values to achieve local row discrimination.

    This combination allows a single linear scan to cross a number of rows and achieve a partial decode of the data so long as at least one complete symbol character per row is decoded into its codeword. The decoding algorithm can then place the individual codewords into a meaningful matrix.

f)  **Error correction**: (inherent) A user may define one of 9 error correction levels. All but Level 0 not only detect errors but also can correct erroneously decoded or missing codewords (see 5.7).

g)  **Compact PDF417**: (optional) In relatively 'clean' environments, it is possible to reduce some of the row overhead to improve the symbol density (see 5.12).

NOTE    In earlier specifications of PDF417, Compact PDF417 was called Truncated PDF417. Compact PDF417 is the preferred term to avoid confusion with the more general use of the term 'truncated'.

## 5.2  Symbol structure

### 5.2.1  PDF417 symbol parameters

Each PDF417 symbol consists of a stack of vertically aligned rows with a minimum of 3 rows (maximum 90 rows). Each row shall include a minimum of 1 symbol character (maximum 30 symbol characters), excluding start, stop and row indicator columns. The symbol shall include a quiet zone on all four sides. Figure 1 illustrates a PDF417 symbol encoding the text: PDF417 Symbology Standard.



**Figure 1 — PDF417 symbol structure**

### 5.2.2  Row parameters

Each PDF417 row shall comprise of the following:

a)  leading quiet zone;

© ISO/IEC 2015 – All rights reserved

OPTO_00012094

JA1838

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

b)   start character;

c)   left row indicator symbol character;

d)   1 to 30 symbol characters;

e)   right row indicator symbol character;

f)   stop character;

g)   trailing quiet zone.

NOTE    The number of symbol characters (or codewords) defined in item 'd' above is equal to the number of data columns in the PDF417 symbol.

### 5.2.3   Codeword sequence

A PDF417 symbol may contain up to 928 symbol characters or codewords. Symbol character is the more appropriate term to refer to the printed bar/space pattern; codeword is more appropriate for the numeric value of the symbol character. The codewords shall follow this sequence:

a)   The first codeword, the Symbol Length Descriptor, shall always encode the total number of data codewords in the symbol, including the Symbol Length Descriptor itself, data codewords and pad codewords, but excluding the number of error correction codewords.

b)   The data codewords shall follow, from the most significant encodable character. Function codewords may be inserted to achieve data compaction.

c)   Pad codewords to enable the codeword sequence to be represented in a rectangular matrix. Pad codewords may also be used to fill additional complete rows to achieve an aspect ratio desired or as specified by the application.

d)   An optional Macro PDF417 Control Block.

e)   Error correction codewords for error detection and correction.

The codewords are arranged with the most significant codeword adjacent to the Symbol Length Descriptor, and are encoded from left to right and from top row to bottom. Figure 2 illustrates in layout format the sequence for a symbol like what is being shown in Figure 1. In Figure 2, an error correction level of 1 has been used and one pad character was needed to completely fill the symbol matrix.

| | | | | | |
|---|---|---|---|---|---|
| | $L_1$ | $d_{15}$ | $d_{14}$ | $R_1$ | |
| | $L_2$ | $d_{13}$ | $d_{12}$ | $R_2$ | |
| | $L_3$ | $d_{11}$ | $d_{10}$ | $R_3$ | |
| S | $L_4$ | $d_9$ | $d_8$ | $R_4$ | S |
| T | $L_5$ | $d_7$ | $d_6$ | $R_5$ | T |
| A | $L_6$ | $d_5$ | $d_4$ | $R_6$ | O |
| R | $L_7$ | $d_3$ | $d_2$ | $R_7$ | P |
| T | $L_8$ | $d_1$ | $d_0$ | $R_8$ | |
| | $L_9$ | $E_3$ | $E_2$ | $R_9$ | |
| | $L_{10}$ | $E_1$ | $E_0$ | $R_{10}$ | |

**Figure 2 — PDF417 Example of Symbol Layout Schematic**

© ISO/IEC 2015 – All rights reserved

OPTO_00012095

JA1839

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

where

| | |
|---|---|
| $L$, $R$, $d$ and $E$ | are as defined in <u>Clause 4</u>; |
| $d_{15}$ | Symbol Length Descriptor (in this example, with a value of 16); |
| $d_{14}$ to $d_1$ | encoded representation of data; |
| $d_0$ | pad codeword. |

The rules and advice for structuring the matrix are included in <u>5.9</u>.

### 5.3 Basic encodation

#### 5.3.1 Symbol character structure

Each PDF417 symbol character shall consist of four bar elements and four space elements, each of which can be one to six modules wide. The four bar and four space elements shall measure 17 modules in total. PDF417 symbol characters can be decoded by measuring the e-distances within the character.

Each symbol character is defined by an 8-digit bar-space sequence which represents the module widths of the eight elements of that symbol character. <u>Figure 3</u> illustrates a symbol character with the bar-space sequence 51111125.



**Figure 3 — A PDF417 symbol character**

There are 929 defined symbol character values (codewords) numbered from 0 to 928.

The codewords are represented by three mutually exclusive symbol character sets, or clusters. Each cluster encodes the 929 available PDF417 codewords into different bar-space patterns so that one cluster is distinct from another. The cluster numbers are 0, 3, and 6. The cluster definition applies to all PDF417 symbol characters, except for start and stop characters.

The cluster number K is defined by the following formula:

$$K = (b_1 - b_2 + b_3 - b_4 +) \bmod 99$$

where $b_1$, $b_2$, $b_3$ and $b_4$ represent the width in modules of the four bar elements respectively.

© ISO/IEC 2015 – All rights reserved

OPTO_00012096

JA1840

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 258 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

The cluster number $K$ for the symbol character in Figure 3 is:

$$K = (5 - 1 + 1 - 2 + 9) \bmod 9 = 3$$

The codewords and the bar-space sequences for each cluster of symbol characters are given in Annex A.

### 5.3.2 Start and stop characters

The start and stop characters shall be composed as defined in Table 1 and illustrated in Figure 4:

**Table 1 — Bar-space sequence for Start and Stop Characters**

| Character | Bar-space sequence | | | | | | | | |
|-----------|---|---|---|---|---|---|---|---|---|
| | B | S | B | S | B | S | B | S | B |
| Start | 8 | 1 | 1 | 1 | 1 | 1 | 1 | 3 | |
| Stop | 7 | 1 | 1 | 3 | 1 | 1 | 1 | 2 | 1 |

NOTE 1    The PDF417 stop and start characters are unique in having elements more than 6 modules wide.

NOTE 2    The stop character has one extra single module bar element.

The start and stop characters shall have the same bar-space sequence for all rows.



**Start Character**                    **Stop Character**

**Figure 4 — PDF417 Start and Stop Characters**

## 5.4   High level (data) encodation

High level encoding converts the data characters into their corresponding codewords.

Data compaction schemes shall be used to achieve efficient high level encoding. Three modes are defined below, each of which defines a particular efficient mapping between user defined data and codeword sequences. PDF417 has three data compaction modes:

— Text Compaction mode (see 5.4.1.5);

— Byte Compaction mode (see 5.4.3);

— Numeric Compaction mode (see 5.4.4).

A given string of data bytes may be represented by different codeword sequences, depending on how the encoder switches between compaction modes and sub-modes. There is no single specified way to encode data in a PDF417 symbol.

900 codewords (0 to 899) are available in each mode for data encodation and other functions within the mode. The remaining 29 codewords are assigned to specific functions (see 5.4.1) independent of the current compaction mode.

© ISO/IEC 2015 – All rights reserved

OPTO_00012097

JA1841

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

PDF417 also supports the Extended Channel Interpretation system, which allows different interpretations of data to be accurately encoded in the symbol (see 5.5).

### 5.4.1  Function codewords

Codewords 900 to 928 are assigned as function codewords as follows:

— for switching between modes (see 5.4.1.1);

— for enhanced applications using Extended Channel Interpretations (ECIs) (see 5.4.1.2);

— for other enhanced applications (see 5.4.1.3 and 5.4.1.4).

At present codewords 903 to 912, 914 to 917, and 919 are reserved. Table 2 defines the complete list of assigned and reserved function codewords. Their functions are defined in 5.4.1.1 to 5.4.1.5. See 5.4.6 for the treatment of reserved codewords.

**Table 2 — Assignments of PDF417 function codewords**

| Codeword | Function | Refer to subclause |
|---|---|---|
| 900 | mode latch to Text Compaction mode | 5.4.1.1 |
| 901 | mode latch to Byte Compaction mode | 5.4.1.1, 5.4.3.1 |
| 902 | mode latch to Numeric Compaction mode | 5.4.1.1 |
| 903 to 912 | Reserved | |
| 913 | mode shift to Byte Compaction mode | 5.4.1.1 |
| 914 to 917, 919 | Reserved | |
| 918 | linkage flag to associated linear component, in a composite symbol (other than an EAN.UCC Composite symbol) | 5.4.1.5 |
| 920 | linkage flag to associated linear component, in an EAN.UCC Composite symbol | 5.4.1.5 |
| 921 | reader initialisation | 5.4.1.4 |
| 922 | terminator codeword for Macro PDF control block | 5.13 |
| 923 | sequence tag to identify the beginning of optional fields in the Macro PDF control block | 5.13 |
| 924 | mode latch to Byte Compaction mode (used differently from 901) | 5.4.1.1, 5.4.3.1 |
| 925 to 927 | identifier for an Extended Channel Interpretation (ECI) | 5.5 |
| 928 | Macro marker codeword to indicate the beginning of a Macro PDF Control Block | 5.13 |

#### 5.4.1.1  Function codewords for mode switching

In one PDF417 symbol it is possible to switch back and forth between modes as often as required. Advice about selecting the appropriate modes is given in 5.4.5.

A Mode Latch codeword may be used to switch from the current mode to the indicated destination mode which stays in effect until another mode switch is explicitly brought into use. Codewords 900 to 902 and 924 are assigned for this purpose. Table 3 defines their function.

The Mode Shift codeword 913 shall cause a temporary switch from Text Compaction mode to Byte Compaction mode. This switch shall be in effect for only the next codeword, after which the mode shall revert to the prevailing sub-mode of the Text Compaction mode. Codeword 913 is only available in Text Compaction mode; its use is described in 5.4.2.4.

© ISO/IEC 2015 – All rights reserved

OPTO_00012098

JA1842

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

**Table 3 — Mode Definition and Mode Switching Codewords**

| Destination Mode | Mode Latch | Mode Shift |
|---|---|---|
| Text Compaction | 900 | |
| Byte Compaction | 901/924 | 913 |
| Numeric Compaction | 902 | |

NOTE      The table identifies the codeword to be used to switch to the defined mode.

The switching rules between the three modes are defined in Table 4 and shown schematically in Figure 5.

**Table 4 — Mode Transition Table, Showing Codewords and Their Function**

| Original Mode | Destination Mode | | |
|---|---|---|---|
| | **Text** | **Byte** | **Numeric** |
| **Text** | 900 mode latch | 913 mode shift<br>901 mode latch<br>924 mode latch | 902 mode latch |
| **Byte** | 900 mode latch | 901 mode latch<br>924 mode latch | 902 mode latch |
| **Numeric** | 900 mode latch | 901 mode latch<br>924 mode latch | 902 mode latch |



**Key**

  mode shift

───────  mode latch

**Figure 5 — Available Mode Switching**

The switching rules into Byte Compaction mode are more fully defined in 5.4.3.1.

© ISO/IEC 2015 – All rights reserved                                                                    **11**

OPTO_00012099

JA1843

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

#### 5.4.1.2    Function codewords for switching to Extended Channel Interpretations

An ECI codeword can be used to switch to a particular interpretation, which stays in effect until another ECI codeword is explicitly brought into use or until the end of the data. Codewords 925 to 927 are assigned to this function (see 5.5).

#### 5.4.1.3    Function codewords for Macro PDF417

Macro PDF417 symbols (see 5.13) shall use codeword 928 at the start of the Macro PDF417 Control Block. Codewords 922 and 923 are used for special functions in Macro PDF417.

#### 5.4.1.4    Function codeword for reader initialisation

Codeword 921 shall be used to instruct the reader to interpret the data contained within the symbol as programming for reader initialisation. Codeword 921 shall appear as the first codeword after the Symbol Length Descriptor. In the case of a Macro PDF417 initialisation sequence, codeword 921 shall appear in every symbol.

The data contained in an initialisation symbol or sequence of symbols shall not be transmitted by the reader.

#### 5.4.1.5    Function codewords for linkage flags in composite symbols

Codeword 920 shall be used as a linkage flag to signal the presence of an associated EAN.UCC linear component in accordance with ISO/IEC 24723.

Codeword 918 shall be used as a linkage flag to signal the presence of an associated linear component in any other composite symbology.

When used, the 918 or 920 codeword may appear in any position in the symbol. The applicable composite symbology specification may define a specific position of the linkage flag.

Readers supporting the indicated composite application should decode and transmit the data from all components as specified in the relevant composite symbology specification. Readers not supporting the indicated composite application may treat the 918 or 920 codeword as a reserved codeword (see 5.4.6). In addition, readers not supporting the indicated 918 composite application may have an option to ignore the two-dimensional composite component and transmit only the data from the associated linear component.

### 5.4.2    Text Compaction mode

The Text Compaction mode includes all the printable ASCII characters (i.e. values from 32 to 126) and three ASCII control characters: HT or tab (ASCII value 9), LF or line feed (ASCII value 10), and CR or carriage return (ASCII value 13). The Text Compaction mode also includes various latch and shift characters which are used exclusively within the mode.

The Text Compaction mode encodes up to 2 characters per codeword. The compaction rules for converting data into PDF417 codewords are defined in 5.4.2.2. The sub-mode switches are defined in 5.4.2.3.

#### 5.4.2.1    Text Compaction sub-modes

The Text Compaction mode has four sub-modes:

—   Alpha (uppercase alphabetic);

—   Lower (lowercase alphabetic);

—   Mixed (numeric and some punctuation);

—   Punctuation.

**12**                                                   © ISO/IEC 2015 – All rights reserved

JA1844

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

Each sub-mode contains 30 characters, including sub-mode latch and shift characters.

The default compaction mode for PDF417 in effect at the start of each symbol shall always be Text Compaction mode Alpha sub-mode (uppercase alphabetic). A latch codeword from another mode to the Text Compaction mode shall always switch to the Text Compaction Alpha sub-mode.

All the characters and their values are defined in Table 5.

**Table 5 — Text Compaction Sub-Mode Definition**

| Base 30 | Text Compaction Sub-Modes | | | | | | | |
|---------|-------|-------|-------|-------|-------|-------|-------|-------|
| | Alpha | | Lower | | Mixed | | Punctuation | |
| Value | Char | ASCII | Char | ASCII | Char | ASCII | Char | ASCII |
| 0 | A | 65 | a | 97 | 0 | 48 | ; | 59 |
| 1 | B | 66 | b | 98 | 1 | 49 | < | 60 |
| 2 | C | 67 | c | 99 | 2 | 50 | > | 62 |
| 3 | D | 68 | d | 100 | 3 | 51 | @ | 64 |
| 4 | E | 69 | e | 101 | 4 | 52 | [ | 91 |
| 5 | F | 70 | f | 102 | 5 | 53 | \ | 92 |
| 6 | G | 71 | g | 103 | 6 | 54 | ] | 93 |
| 7 | H | 72 | h | 104 | 7 | 55 | _ | 95 |
| 8 | I | 73 | i | 105 | 8 | 56 | ' | 96 |
| 9 | J | 74 | j | 106 | 9 | 57 | ~ | 126 |
| 10 | K | 75 | k | 107 | & | 38 | ! | 33 |
| 11 | L | 76 | l | 108 | CR | 13 | CR | 13 |
| 12 | M | 77 | m | 109 | HT | 9 | HT | 9 |
| 13 | N | 78 | n | 110 | , | 44 | , | 44 |
| 14 | O | 79 | o | 111 | : | 58 | : | 58 |
| 15 | P | 80 | p | 112 | # | 35 | LF | 10 |
| 16 | Q | 81 | q | 113 | - | 45 | - | 45 |
| 17 | R | 82 | r | 114 | . | 46 | . | 46 |
| 18 | S | 83 | s | 115 | $ | 36 | $ | 36 |
| 19 | T | 84 | t | 116 | / | 47 | / | 47 |
| 20 | U | 85 | u | 117 | + | 43 | " | 34 |
| 21 | V | 86 | v | 118 | % | 37 | \| | 124 |
| 22 | W | 87 | w | 119 | * | 42 | * | 42 |
| 23 | X | 88 | x | 120 | = | 61 | ( | 40 |
| 24 | Y | 89 | y | 121 | ^ | 94 | ) | 41 |
| 25 | Z | 90 | z | 122 | pl | | ? | 63 |
| 26 | space | 32 | space | 32 | space | 32 | { | 123 |

al = latch to alpha

as = shift to alpha

ll = latch to lower

ml = latch to mixed

pl = latch to punctuation

ps = shift to punctuation

© ISO/IEC 2015 – All rights reserved

13

OPTO_00012101

JA1845

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

**Table 5** *(continued)*

| Base 30 | Text Compaction Sub-Modes | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Alpha | | Lower | | Mixed | | Punctuation | |
| Value | Char | ASCII | Char | ASCII | Char | ASCII | Char | ASCII |
| 27 | ll | | as | | ll | | } | 125 |
| 28 | ml | | ml | | al | | ' | 39 |
| 29 | ps | | ps | | ps | | al | |

al = latch to alpha

as = shift to alpha

ll = latch to lower

ml = latch to mixed

pl = latch to punctuation

ps = shift to punctuation

NOTE    The Char columns above show the default interpretation of ECI 000003 of the byte values shown in the adjacent ASCII columns. Each table entry represents half a codeword, i.e. the value range from 0 to 29 (see 5.4.2.2)

### 5.4.2.2    Compaction rules for encoding in Text Compaction mode

In Text Compaction mode, pairs of data characters are represented in a single codeword. The values assigned to the data characters are in the range 0 to 29 (i.e. base 30) and are defined in Table 5. For each pair of base 30 values, the first or left value shall be designated the more significant value $h$, the other shall be designated the less significant value $l$.

The encoded PDF417 codeword is defined using the following formula:

$$d = h \times 30 + l$$

where $d$ is as defined in Clause 4.

The formula shall also apply to the base 30 values for shifts and latches within the Text Compaction mode. Appropriate latch and shift values shall be used between sub-modes. If the encoding of the character sequence does not result in an even number of base 30 values, see 5.4.2.4 for the specific mechanism to use.

The following example illustrates how compaction is achieved in Text Compaction mode.

EXAMPLE    Data to be encoded: PDF417

**Table 6 — Example of Text Compaction Encoding**

| Character Pairs | $h$ | $l$ | $h \times 30 + l$ | Codeword |
|---|---|---|---|---|
| P D | 15 | 3 | $15 \times 30 + 3$ | 453 |
| F ml | 5 | 28 | $5 \times 30 + 28$ | 178 |
| 4 1 | 4 | 1 | $4 \times 30 + 1$ | 121 |
| 7 ps | 7 | 29 | $7 \times 30 + 29$ | 239 |

NOTE 1    ml (latch to mixed sub-mode) is used to switch to encode the numeric characters.

NOTE 2    ps is used as a pad value in this example, other shift and latch values can be used (see 5.4.2.4)

The data PDF417 is represented by codewords 453, 178, 121, 239

© ISO/IEC 2015 – All rights reserved

OPTO_00012102

JA1846

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

### 5.4.2.3    Text Compaction sub-mode switching: latch and shift function

Switching from one sub-mode to another within Text Compaction mode shall be through the latch and shift values defined for the sub-mode in effect prior to the switch.

A sub-mode shift shall be used to switch from one Text Compaction sub-mode to another for only one data character. Subsequent codewords revert to the sub-mode being used immediately prior to the shift (except when ps is used as a pad, see 5.4.2.4). The shift functions are as follows:

—  ps  =  shift to punctuation sub-mode;

—  as  =  shift to uppercase alphabetic sub-mode.

A sub-mode latch shall be used to switch from one Text Compaction sub-mode to another, which stays in effect until another latch or shift is explicitly brought into use. The latch functions are as follows:

—  al  =  latch to uppercase alphabetic sub-mode;

—  ll  =  latch to lowercase alphabetic sub-mode;

—  ml  =  latch to mixed (numeric and other punctuation) sub-mode;

—  pl  =  latch to punctuation sub-mode.

A limited set of latch and shift functions is available within each Text Compaction sub-mode. Those which are available are listed in Table 5. Table 7 shows the transition table between Text Compaction sub-modes; Figure 6 shows this schematically.

NOTE        A sub-mode latch may be followed by another sub-mode latch or sub-mode shift; but a sub-mode shift may not be followed by either a sub-mode shift or sub-mode latch.

### Table 7 — Text Compaction sub-mode transition table

| Original Sub-Mode | Destination Sub-Mode | | | |
|---|---|---|---|---|
| | **Alpha** | **Lower** | **Mixed** | **Punctuation** |
| **Alpha** | | ll | ml | ps |
| **Lower** | as | | ml | ps |
| **Mixed** | al | ll | | ps<br>pl |
| **Punctuation** | al | | | |

© ISO/IEC 2015 – All rights reserved

OPTO_00012103

JA1847

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)



**Key**

| | |
|---|---|
| ——————— | sub-mode latch |
| - - - - - - - - - | sub-mode shift |
| ll | latch to lower case sub-mode |
| ps | shift to punctuation sub-mode |
| ml | latch to mixed sub-mode |
| as | shift to alpha sub-mode |
| al | latch to alpha sub-mode |
| pl | latch to punctuation sub-mode |

**Figure 6 — Text Compaction Sub-Mode Switching**

### 5.4.2.4    Mechanisms for using a pad in Text Compaction mode

If the Text Compaction character sequence does not result in an even number of base 30 values, a pad shall be added to the end of the character sequence. An example is illustrated in Table 6. As there are no specific null functions in Text Compaction mode, the sub-mode shift and latch shall be used in accordance with the mechanisms defined for the following cases.

The cases are as follows:

a)   If the character sequence continues to the end of the data, or the Text Compaction mode character sequence is followed by latching to another compaction mode, then the pad can be any of the sub-mode shifts or sub-mode latches.

b)   If the Text Compaction mode character sequence is followed by a byte shift (codeword 913) to encode a single Byte Compaction mode character, two mechanisms can be used depending on the Text Compaction sub-mode being used prior to the Byte Compaction shift:

1)   If the Text Compaction sub-mode is other than punctuation, then base 30 value 29 (ps) should be used if encodation is intended to revert to the same Text Compaction sub-mode. The decoder shall ignore a ps immediately preceding codeword 913.

2)   If the Text Compaction sub-mode is punctuation, then base 30 value 29 (al) shall be used. The decoder shall not ignore the (al), and therefore will return to the Alpha sub-mode.

16

© ISO/IEC 2015 – All rights reserved

JA1848

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

#### 5.4.2.5    Switching from Text Compaction mode

Text Compaction mode may be terminated by the end of the symbol, or by any of the following codewords:

— 900 (Text Compaction mode latch);

— 901 (Byte Compaction mode latch);

— 902 (Numeric Compaction mode latch);

— 924 (Byte Compaction mode latch);

— 928 (Beginning of Macro PDF417 Control Block);

— 923 (Beginning of Macro PDF417 Optional Field);

— 922 (Macro PDF417 Terminator).

The last three codewords only occur within the Macro PDF417 Control Block of a Macro PDF417 symbol (see 5.13.1). Text Compaction mode is also affected by the presence of a reserved codeword (see 5.4.6).

If the decoder is in the Text Compaction mode and encounters codeword 913 (Byte Compaction mode shift), it decodes the codeword following codeword 913 as a single binary byte and then returns to the Text Compaction mode. The sub-mode to which the decoder returns is the most-recently-latched sub-mode that was in effect prior to codeword 913; a ps sub-mode shift immediately prior to codeword 913 is ignored.

If the decoder is in the Text Compaction mode and encounters codeword 900 (Text Compaction mode latch), the decoder reinitialises to the Alpha sub-mode.

#### 5.4.3    Byte Compaction mode

The Byte Compaction mode enables a sequence of 8-bit bytes to be encoded into a sequence of codewords. It is accomplished by a Base 256 to Base 900 conversion, which achieves a compaction ratio of six bytes to five codewords (1,2 : 1).

All the characters and their values (0 to 255) are defined in Annex B. This shall be treated as the default graphical and control character interpretation. When ECIs are invoked (see 5.5), this interpretation is defined as ECI 000003 (see 5.5.2).

NOTE    In previous PDF417 specifications, the default character set corresponded to ECI 000002 (a code page of the MS-DOS operating system). The interpretation of byte character values below 128 is unchanged and the operation of PDF417 printing and scanning equipment is unaffected. New applications that use byte character values above 127 should assume the ECI 000003 default interpretation for broadest compatibility with current systems. Existing applications utilizing values above 127 may continue to encode and process data as before. Applications that rely upon the prior default interpretation of values above 127 may encode ECI 000002 explicitly if they wish to signal this interpretation.

#### 5.4.3.1    Switching to Byte Compaction mode

When in either Text or Numeric Compaction mode, to switch to Byte Compaction mode, it is necessary to use one of the following codewords:

— **mode latch 924** shall be used when the total number of Byte Compaction characters to be encoded is an integer multiple of 6;

— **mode latch 901** shall be used when the total number of Byte Compaction characters to be encoded is not a multiple of 6;

— **mode shift 913** can be used instead of codeword 901 when a single Byte Compaction character has to be encoded.

OPTO_00012105

JA1849

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

### 5.4.3.2 Compaction rules for encoding a single Byte Compaction character (using mode shift 913)

To encode a single Byte Compaction character, the codeword shall be the decimal value (0 to 255) of the character as defined in Annex B.

### 5.4.3.3 Compaction rules for encoding longer Byte Compaction character strings (using mode latch 924 or 901)

The following procedure shall be used to encode Byte Compaction character data.

a) Establish the total number of Byte Compaction characters.

b) If a perfect multiple of 6, mode latch 924 shall be used; else mode latch 901 shall be used.

c) Sub-divide the number of Byte Compaction characters into a sequence of 6 characters, from left to right (the most to least significant characters). If less than 6 characters, go to Step 7.

d) Assign the decimal values of the 6 data bytes to be encoded in Byte Compaction mode as $b_5$ to $b_0$ (where $b_5$ is the first data byte).

e) Carry out a base 256 to base 900 conversion to produce a sequence of 5 codewords. Annex C defines an algorithm and illustrates a worked example.

f) Repeat from Step 3 as necessary.

g) For the remaining Byte Compaction characters when mode latch 901 is used, (i.e. when the last group is less than 6 Byte Compaction characters) the codeword(s) shall be the decimal value(s) (0 to 255) of the character(s) as defined in Annex B, the most to the least significant.

NOTE    Byte Compaction mode following mode latch 901 assumes that the total number of bytes to be encoded is not a multiple of six. If the number of bytes to be encoded in Byte Compaction mode happens to be an integer multiple of six, then either a 901 or a 924 Byte Compaction Latch shall be encoded, placed at any point in the symbol that would create a correct encodation according to these encodation rules. For example, a 924 codeword as either the first or second codeword would identify the following stream of Byte Compaction mode codewords as encoding a multiple-of-six number of bytes. Alternatively, a 901 could be placed at any position within the Byte Compaction mode codeword stream that would split that stream into two segments, neither of which encodes a multiple-of-six number of bytes.

If additional encodation is required in Text Compaction or Numeric Compaction modes, the appropriate latch characters shall be used (see 5.4.1.1).

### 5.4.3.4 Switching from Byte Compaction

Byte Compaction mode may be terminated by the end of the symbol, or by any of the following codewords:

— 900 (Text Compaction mode latch);

— 901 (Byte Compaction mode latch);

— 902 (Numeric Compaction mode latch);

— 924 (Byte Compaction mode latch);

— 928 (Beginning of Macro PDF417 Control Block);

— 923 (Beginning of Macro PDF417 Optional Field);

— 922 (Macro PDF417 Terminator).

The last three codewords only occur within the Macro PDF417 Control Block of a Macro PDF417 symbol (see 5.13.1). Byte Compaction mode is also affected by the presence of a reserved codeword (see 5.4.6).

18

© ISO/IEC 2015 – All rights reserved

OPTO_00012106

JA1850

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

Re-invoking Byte Compaction mode (by using codeword 901 or 924 while in Byte Compaction mode) serves to terminate the previous Byte Compaction mode grouping of 6 Byte Compaction characters as described in 5.4.3.3, and then to start a new grouping. This procedure may be necessary when an ECI assignment number needs to be encoded (see 5.5.3.2).

During the decode process for Byte Compaction mode, the treatment of the final group of codewords differs depending on whether Byte Compaction mode is invoked with codeword 901 or 924.

If Byte Compaction mode is invoked with codeword 924, the total number of codewords within the compaction mode shall be a multiple of five. If this is not the case, the symbol is invalid. All the 5-codeword groups are decoded into 6-byte groups.

If Byte Compaction mode is invoked with codeword 901, the final group of codewords is interpreted directly as one byte per codeword, without compaction. Therefore, if the last group consists of five codewords, the group is interpreted as 5 bytes, rather than 6.

### 5.4.4    Numeric Compaction mode

The Numeric Compaction mode is a method for base 10 to base 900 data compaction and should be used to encode long strings of consecutive numeric digits. The Numeric Compaction mode encodes up to 2,93 numeric digits per codeword.

### 5.4.4.1    Latch to Numeric Compaction mode

Numeric Compaction mode may be invoked when in Text Compaction or Byte Compaction modes using mode latch 902.

### 5.4.4.2    Compaction rules for encoding long strings of consecutive numeric digits

The following procedure shall be used to compact numeric data.

a)    Divide the string of digits into groups of 44 digits, except for the last group, which may contain fewer.

b)    For each group, add the digit 1 to the most significant position to prevent the loss of leading zeros.

EXAMPLE

| original data | 00246812345678 |
|---|---|
| after step 2 | 1 00246812345678 |

NOTE      The leading digit 1 is removed in the decode algorithm.

c)    Perform a base 10 to base 900 conversion. Annex D defines an algorithm for this and illustrates a worked example.

d)    Repeat from Step 2 as necessary.

The following rules can be used to determine the precise number of codewords in Numeric Compaction mode:

—    groups of 44 numeric digits compact to 15 codewords;

—    for groups of shorter sequences of digits, the number of codewords can be calculated as follows:

Codewords = INT (number of digits/3) +1

EXAMPLE      For a 28 digit sequence

INT (28/3) + 1 = 9 + 1 = 10 codewords

© ISO/IEC 2015 – All rights reserved                                                                                          **19**

OPTO_00012107

JA1851

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 269 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

### 5.4.4.3    Switching from Numeric Compaction mode

Numeric Compaction mode may be terminated by the end of the symbol, or by any of the following codewords:

— 900 (Text Compaction mode latch);

— 901 (Byte Compaction mode latch);

— 902 (Numeric Compaction mode latch);

— 924 (Byte Compaction mode latch);

— 928 (Beginning of Macro PDF417 Control Block);

— 923 (Beginning of Macro PDF417 Optional Field);

— 922 (Macro PDF417 Terminator).

The last three codewords only occur within the Macro PDF417 Control Block of a Macro PDF417 symbol (see 5.13.1). Numeric Compaction mode is also affected by the presence of a reserved codeword (see 5.4.6).

Re-invoking Numeric Compaction mode (by using codeword 902 while in Numeric Compaction mode) serves to terminate the current Numeric Compaction mode grouping as described in 5.4.4.2, and then to start a new grouping. This procedure may be necessary when an ECI assignment number needs to be encoded (see 5.5.3.4).

During the decode process for Numeric Compaction mode, the result of the base 900 to base 10 conversion shall result in a number whose most significant digit is a '1'. If the base 900 to base 10 conversion does not result in a number beginning with '1', the symbol shall be treated as invalid. The leading '1' is removed to produce the original number.

### 5.4.5    Advice to select the appropriate compaction mode

All basic implementations for printing and scanning PDF417 symbols shall support the three modes: Text Compaction, Byte Compaction and Numeric Compaction. The default character set for Text Compaction shall be as defined in Table 5; and that for Byte Compaction shall be as defined in Annex B. Text Compaction mode is usually more efficient than Byte Compaction mode for encoding standard ASCII text files because of its better compaction of ASCII character values 9, 10, 13 and 32 to 126.

The Numeric Compaction mode should be used for long numeric strings.

Advice about switching between modes to minimise the number of codewords is provided as an algorithm in Annex N.

### 5.4.6    Treatment of PDF417 reserved codewords

#### 5.4.6.1    Overview

PDF417 symbols intended for use in open systems should not employ any of the codewords that are listed as reserved (see 5.4.1) in the current edition of this International Standard. However, decoding equipment should support the transmission of reserved codewords using escape sequences as defined in 5.17.4. Decoding equipment may also support an option of treating such symbols as invalid, as would be the case when operating in Basic Channel Mode.

Receiving systems should discard data containing any escape sequences using reserved codewords, unless the system is aware of a new definition for a previously reserved codeword.

    © ISO/IEC 2015 – All rights reserved

OPTO_00012108

JA1852

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

### 5.4.6.2   Making future use of reserved codewords

Any new function codewords, to be defined in future revisions of this International Standard, shall have their encoding rules specified to provide backwards compatibility with pre-existing equipment. Specifically

a) when a new signalling codeword (as opposed to a new compaction mode codeword) is encoded, it shall immediately be followed by an appropriate compaction mode latch so that the subsequent data codewords are interpreted and transmitted as a byte stream, rather than as a series of escaped uninterpreted codewords. This approach will achieve the desired results with decoding equipment conforming with both the original and this PDF417 standard, regardless of whether that equipment employs the original or the new transmission protocol, and

b) at the receiving system, the ECI decoder will process the signal ECIs (i.e. Macro Control Blocks and escaped uninterpreted codewords) before the encodable ECIs (such as character sets). Thus, the encoder should take into account the order of operations as follows:

1) the Macro Control Block ECIs, if present, will be used to assemble the complete byte stream in the proper order;

2) the escaped data codewords will be translated by the ECI decoder according to the rules of the new compaction mode or signalling ECI, and the resulting data bytes will be inserted into their proper place within the byte stream;

3) finally, the character set and other encodable ECIs will be applied to the resulting byte stream.

## 5.5   Extended Channel Interpretation

The Extended Channel Interpretation (ECI) protocol allows the output data stream to have interpretations different from that of the default character set. The ECI protocol is defined consistently across a number of symbologies, including PDF417. ECIs are assigned by AIM Global, Inc.

NOTE    Originally, a symbology specific scheme called Global Label Identifiers (GLIs) was defined for PDF417. Encoding and decoding ECIs is identical to earlier specifications for PDF417 GLIs. However, the transmission protocol for decoded messages according to earlier PDF417 specifications for GLIs is different from the transmission protocol for ECIs. There are also differences with respect to the use of interpretive ECIs with Macro PDF417. This International Standard permits the use of the earlier and current protocols in such a way that old and new equipment can continue to co-exist.

Five broad types of interpretations are supported in PDF417:

a) character sets (or code pages);

b) general purpose interpretations such as data encryption and data compression (as distinct from the compaction modes of the symbology);

c) user defined interpretations for closed systems;

d) transmission of control information for Macro PDF417;

e) transmission of uninterpreted PDF417 codewords.

Transmission of the Extended Channel Interpretation protocol is fully specified in the AIM International standard ITS/04-001, Part 1. The protocol provides a consistent method to specify particular interpretations of byte values before printing and after decoding.

The Extended Channel Interpretation (ECI) is identified by a 6-digit number which is encoded in the PDF417 symbol by one of three specific codewords followed by one or two codewords (see 5.5.1). A specific ECI may be invoked anywhere in the encoded message subject to the rules of the compaction modes (see 5.5.3).

© ISO/IEC 2015 – All rights reserved                                                    **21**

JA1853

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

The ECI protocol can only be used with decoders enabled to transmit the symbology identifier (see 5.17.5). Decoders that are not enabled to transmit the symbology identifier cannot reliably convey the escape sequences from any symbol containing an ECI.

### 5.5.1    Encoding the ECI assignment number

An ECI can be invoked anywhere in the data stream, subject to the conditions defined in 5.5.3. Once an ECI has been invoked, switching may take place between any of the compaction modes. The compaction mode used is determined strictly by the 8-bit data values being encoded and does not depend on the ECI in force. For example, a sequence of values in the range 48 to 57 (decimal) would be most efficiently encoded in Numeric Compaction mode even if the sequence were not to be interpreted as numbers.

The ECI assignment number is encoded in one of the three ECI codeword sequences, which begin with the codewords 927, 926 or 925. One or two additional codewords are used to encode the ECI assignment number. The encodation rules are defined in Table 8.

**Table 8 — Encoding ECI assignment numbers**

| ECI assignment number | Codeword sequence | Codewords | Ranges |
|---|---|---|---|
| 000000 to 000899 | $C_0$ | 927 | |
| | $C_1$ | ECI_no | $C_1$ = (0 to 899) |
| 000900 to 810899 | $C_0$ | 926 | |
| | $C_1$ | ECI_no div 900 - 1 | $C_1$ = (0 to 899) |
| | $C_2$ | ECI_no mod 900 | $C_2$ = (0 to 899) |
| 810900 to 811799 | $C_0$ | 925 | |
| | $C_1$ | ECI_no - 810 900 | $C_1$ = (0 to 899) |

There are 811 800 possible ECI assignment numbers available in PDF417.

NOTE     The encodation method is identical to the GLI scheme incorporated in the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications.

The following example illustrates the encodation:

EXAMPLE     ECI = 013579

Codewords: [926] [(13 579 div 900) - 1] [13 579 mod 900]

= [926][15 - 1] [79]

= [926] [14] [79]

### 5.5.2    Pre-assigned and default Extended Channel Interpretations

The following ECIs, ECI 000000 to ECI 000003, have been pre-assigned to be backwards compatible with existing symbology specifications, including PDF417.

— ECI 000000 (equates to original GLI 0) represents the default encodation scheme of encoders compliant with the original PDF417 standards.

— ECI 000001 (equates to original GLI 1) represents the GLI encodation scheme of a number of symbologies with characters 0 to 127 being identical to those of ISO/IEC 646:1991, International Reference Version (equivalent to ANSI X3.4) and characters 128 to 255 being identical to those values of ISO/IEC 8859-1.

NOTE     ECI 000000 (equivalent to GLI 0) and ECI 000001 (equivalent to GLI 1) require a return-to-GLI 0 logic at the beginning of each encoded symbol of a Macro PDF417 set of symbols. This protocol is not adopted for other Extended Channel Interpretations.

© ISO/IEC 2015 – All rights reserved

OPTO_00012110

JA1854

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 272 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

— ECI 000002 has an equivalent code table to ECI 000000, without the return-to-GLI 0 logic.

— ECI 000003 has an equivalent code table to ECI 000001, without the return-to-GLI 0 logic. ECI 000003 is the default encodation scheme for encoders fully compliant with this edition of this standard.

ECI 000000 and ECI 000001 shall not be encoded in the same PDF417 symbol or Macro PDF417 symbol set as other ECIs, except for user defined ECIs. ECI 000002 and ECI 000003 provide the compatible alternatives to ECI 000000 and ECI 000001 respectively. ECI 000000 and ECI 000001 should not be used in new applications.

### 5.5.3    Encoding ECI sequences within compaction modes

The general encodation principle is that ECIs are applied to the source data byte stream (to signal various interpretations) producing a modified byte stream that is encoded into PDF417 symbols using the symbology's compaction modes for efficiency. The ECI encoding, and symbology specific compaction, form two independent logical layers of the process.

Although ECI assignments and compaction modes may generally be intermixed, some combinations can produce illogical or ambiguous behaviour. The following clauses define how ECIs may be incorporated without ambiguity by specifying the valid placements of ECI escape sequences.

#### 5.5.3.1    ECIs and Text Compaction mode

An ECI escape sequence may be placed anywhere within Text Compaction mode. The sub-mode invoked immediately prior to the ECI escape sequence is preserved for the encodation immediately after it. Thus, sub-mode latches and shifts are preserved across an ECI escape sequence and thus a sub-mode shift immediately before an ECI escape sequence is not ignored.

#### 5.5.3.2    ECIs and Byte Compaction mode using mode latch 924 and 901

If encoding in Byte Compaction mode using mode latch 924, an ECI escape sequence may be positioned by an encoder immediately following codeword 924, or at any 5-codeword boundary thereafter. This is necessary to provide an unambiguous position in the decoded byte stream for the decoder to place the escape sequence.

If the decoder is in the 924 version of Byte Compaction mode and finds an ECI escape sequence following a 5-codeword group, it shall output the six data bytes associated with the codewords before the escape sequence, output the escape sequence, and then continue collecting codewords for decoding in Byte Compaction mode. If the decoder encounters an ECI escape sequence at other than these prescribed locations, it shall treat the symbol as invalid.

If encoding in Byte Compaction mode using mode latch 901, an ECI escape sequence may be positioned

— immediately following codeword 901,

— immediately after any set of five codewords encoding six bytes, and

— immediately after any of the trailing single-byte codewords at the end of the sequence.

NOTE    The decoder cannot assume that, just because the ECI escape sequence follows a set of five codewords, the five codewords encode six bytes, since an input stream of length 6N+5 (where N is an integer) will have a final set of five codewords that encode only five bytes, one byte per codeword. The decoder must, therefore, scan forward in the symbol past the ECI escape sequence to determine where the 901 mode terminates, as defined in 5.4.3.4. Based on this information, it can then determine how the group of five codewords have been encoded.

Figure 7 illustrates valid locations for ECI escape sequences when encoding in Byte Compaction mode. If the decoder encounters an ECI escape sequence within the 5-codeword group, it shall treat the symbol as invalid.

OPTO_00012111

**JA1855**

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)



5 codeword group      5 codeword group

**Key**

☐      byte compaction mode codeword

◆      valid location for ECI escape sequence

**Figure 7 — Valid Locations for ECI Escape Sequences in Byte Compaction Mode**

**5.5.3.3    ECIs and Byte Compaction using mode shift 913**

If encoding in Byte Compaction mode using mode shift 913, an ECI escape sequence may be placed

— immediately preceding codeword 913,

— immediately following codeword 913, and

— immediately following the codeword after codeword 913.

In the first two cases, the ECI escape sequence is output before the encoded byte, while in the last case, the escape sequence is output following the encoded byte.

**5.5.3.4    ECIs and Numeric Compaction mode**

An ECI escape sequence shall not be placed within a group of codewords being processed through the base 10 to base 900 conversion as defined in 5.4.4.2. It may only be placed within a Numeric Compaction mode region at a boundary between (the typically) 15-codeword groups. This is necessary to provide an unambiguous position in the decoded digit stream for the decoder to place the escape sequence.

Thus, an ECI escape sequence may only be placed

— immediately after codeword 902,

— after the 15th codeword,

— after the 30th codeword, and

— etc.

If the encoder needs to place an ECI escape sequence at a location that does not result in a multiple of 15 codewords, it shall treat the numeric block before the ECI as a complete entity, as defined in 5.4.4.2 step 2. It shall re-invoke the Numeric Compaction mode by placing another codeword 902 in the stream followed by the ECI escape sequence.

If the decoder finds an ECI escape sequence on one of the boundary points defined above, it shall emit the data bytes associated with the codewords before the escape sequence (if any), then emit the escape sequence, and then continue collecting codewords for decoding in Numeric Compaction mode. If the decoder encounters an ECI escape sequence at other than the prescribed locations, it shall treat the symbol as invalid.

**5.5.3.5    Combining ECIs**

Two or more ECI escape sequences (e.g. assignment numbers) may be placed at any point where one ECI can be validly located; providing that no codewords, other than those used to encode the ECI escape sequence, are placed between them.

24                                                                      © ISO/IEC 2015 – All rights reserved

OPTO_00012112

JA1856

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

### 5.5.4 Post-decode protocol

The protocol for transmitting ECI data shall be as defined in 5.17.2. When transmitting ECIs, symbology identifiers (see 5.17.5) shall be fully implemented and the appropriate symbology identifier shall be transmitted as a preamble.

## 5.6 Determining the codeword sequence

The encoding process generates a sequence of codewords defined as:

$$d_{n-1} \ldots d_0$$

where

$d$     is the data codeword including the Symbol Length Descriptor and all function codewords;

$n$     is the total number of data (and pad) codewords including the Symbol Length Descriptor but excluding the error correction codewords.

The Symbol Length Descriptor shall be the first data codeword and designated $d_{n-1}$. Its value shall be equal to the total number of data codewords $n$; this count shall include the Symbol Length Descriptor itself and thus shall be in the range of 1 to 926.

During the encoding process, sequences of codewords will be established. Like the original data itself, the most significant data shall appear first, for example, textual and numeric data reads from the left to the right. The sequence of codewords shall be that the most significant data codeword containing encoded data is the one designated $d_{n-2}$. The final data (or pad) codeword is the one designated $d_0$.

The process used to determine the symbol matrix of rows and columns (see 5.9.2) can require the addition of trailing pad codewords to the end of the data codeword sequence.

## 5.7 Error detection and correction

Each PDF417 symbol contains at least two error correction codewords. The Error Correction codewords provide capability for both error detection and correction.

### 5.7.1 Error correction level

The error correction level for a PDF417 symbol is selectable at the time of symbol creation. Table 9 shows the number of error correction codewords for each error correction level.

**Table 9 — Error Correction Levels and Error Correction Codewords**

| Error Correction Level | Total Number of Error Correction Codewords |
|:---:|:---:|
| 0 | 2 |
| 1 | 4 |
| 2 | 8 |
| 3 | 16 |
| 4 | 32 |
| 5 | 64 |
| 6 | 128 |
| 7 | 256 |
| 8 | 512 |

© ISO/IEC 2015 – All rights reserved

**25**

OPTO_00012113

JA1857

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

### 5.7.2   Error correction capacity

Error correction can be used to compensate for defects in the label and misreads during the decode procedure. For any given error correction level, a particular number of error correction codewords is incorporated into the PDF417 symbol. The error correction codeword algorithm used allows two types of error to be recovered:

— an **erasure**, which is a missing or undecodable codeword at a known position;

— a **substitution error**, which is an erroneously decoded codeword at an unknown position.

The error correction scheme requires one error correction codeword to rectify an erasure and two to recover a substitution error. Thus a given error correction level can rectify any combination of substitution errors and erasures which satisfy the following equations:

$$l + 2f \leq 2^{s+1} - 2$$

where $l$, $f$ and $s$ are as defined in 4.1.

However, if most of the error correction capacity is used to correct erasures, the possibility of undetected errors is increased. For this reason, whenever there are fewer than 4 errors corrected (except when $s = 0$), the error correction capacity should be reduced as follows:

$$l + 2f \leq 2^{s+1} - 3$$

where $l$, $f$ and $s$ are as defined in 4.1.

EXAMPLE     A PDF417 symbol with error correction level 3 has 16 error correction codewords of which up to 14 can be used to correct errors and erasures. They can correct up to 13 erasures or 7 substitution errors, or any combination of $l$ erasures and $f$ substitution errors subject to the practical equations above. Table 10 specifies the possible combinations.

**Table 10 — Possible Error Correction Combinations for Error Correction Level 3**

| Recovered Substitution Errors | Recovered Erasures | Determining Equation |
|:---:|:---|:---|
| 0 | 13 or less | |
| 1 | 11 or less | $l + 2f \leq 2^{s+1} - 3$ |
| 2 | 9 or less | (number of errors <4) |
| 3 | 7 or less | |
| 4 | 6 or less | |
| 5 | 4 or less | $l + 2f \leq 2^{s+1} - 2$ |
| 6 | 2 or less | (number of errors ≥4) |
| 7 | 0 | |

### 5.7.3   Defining the error correction codewords

A two-stage process must be performed to define the error correction codewords.

a)   Selecting the error correction level. This is a user or application defined option and is described in Annex E.

b)   Generating the error correction codewords. This is to a prescribed set of rules defined in 5.10. The procedures cannot be used until all the data codewords, including pad codewords (see 5.9.2) have been defined.

26                                                         © ISO/IEC 2015 – All rights reserved

JA1858

OPTO_00012114

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

NOTE      The procedures defined in 5.3 to 5.9, 5.13 and 5.14 are of prime interest to users. The more technical procedures defined in 5.10, 5.11 and 5.15 are likely to be achieved electronically and require no user decisions.

## 5.8   Dimensions

PDF417 symbols should conform with the following dimensions.

### 5.8.1   Minimum width of a module (X)

This should be defined by the application specification, having due regard to the availability of equipment for the production and reading of symbols and complying with the general requirements of the application.

The X dimension shall be constant throughout a given symbol.

NOTE      Current bar code symbol quality measurement standards (e.g. ISO/IEC 15415) do not require absolute dimensional measurements to be taken into account for assessing symbol quality. Non-compliance with any minimum dimension should not therefore, by itself, be a reason for rejection of a symbol under these standards.

### 5.8.2   Row height (Y)

For symbols with at least the recommended minimum level of error correction:

$$Y \geq 3X$$

For symbols with less than the recommended minimum level of error correction, the row height may be increased, particularly when the X dimension is small. (See Annex E for details of the recommended error correction level).

### 5.8.3   Quiet zones

— Minimum width of horizontal quiet zone (to the left and right of the PDF417 symbol): $2X$

— Minimum size of vertical quiet zone (above and below the PDF417 symbol): $2X$

## 5.9   Defining the symbol format

The PDF417 symbol matrix, and the overall size and shape of the symbol, are determined by

a)   the module width and aspect ratio, and

b)   the number of rows and columns in the symbol matrix.

To create a PDF417 symbol, these parameters are selected through a combination of user inputs, application constraints, and default settings. The selection process can be iterative until the user is satisfied with the resultant format.

### 5.9.1   Defining the aspect ratio of the module

The aspect ratio of the printed module shall be defined by two dimensions:

— $X$ is the desired dimension of the narrowest bar and narrowest space;

— $Y$ is the desired dimension of the height of each row.

These parameters are defined by the user or application. The major factors that determine the values of these parameters are the resolutions of the printing and scanning systems used in the application. These points are discussed in 5.14.

© ISO/IEC 2015 – All rights reserved                                                                    **27**

OPTO_00012115

JA1859

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

### 5.9.2 Defining the symbol matrix of rows and columns

There are several factors which need to be considered in order to determine the symbol matrix, i.e. the number of rows $r$ and the number of columns $c$:

— the amount and type of data to be encoded;

— the basic rules of the symbology which, for example, determine the limits on the number of rows and columns (see 5.2.1 and 5.2.2);

— the physical space available to print the symbol;

— the fact that longer rows result in the use of less symbol overhead (start and stop characters, row indicators and space for quiet zones);

— the fact that the length of the row (including the quiet zones) must be less than the length of the scan line prescribed or implied by the application;

— the type of scanner, which may determine the overall aspect ratio of the symbol;

— the selected level of error correction.

For many applications, the allowable width of the symbol is the primary constraint, and the symbol matrix can be directly determined by fixing the number of columns. Annex O provides more precise guidelines which should be used to define the symbol matrix.

After the source data has been encoded using the selected compaction modes, the number of source data codewords $m$ (prior to the addition of the Symbol Length Descriptor and any pad codewords) is known. Once the number of rows and columns, and the error correction level, have been selected, the total number of data codewords $n$ is calculated as:

$$n = c \times r - k$$

where $c$, $k$, $n$ and $r$ are as defined in 4.1.

The matrix can result in a situation where the number of rows and columns requires the use of pad codewords (by convention using value **900**). This occurs when:

$$n > m + 1$$

where $m$ and $n$ are as defined in 4.1.

The Symbol Length Descriptor shall be set to the value $n$ determined above, thus:

$$d_{n-1} = n = c \times r - k$$

The number of pad codewords required is $\left(n - m\right) - 1$.

The pad codewords should have the value 900 and shall be placed in the least significant positions of the data codeword sequence, i.e. to the right of the least-significant source data codeword (but before the Macro PDF417 Control Block, if present). An example of this process is given below. Apart from the insertion of the Symbol Length Descriptor and any pad codewords, the codeword sequence shall remain identical to the one originally generated when encoding the source data.

EXAMPLE

let $m$ = 246, $c$ = 12, $r$ = 24, and $k$ = 32, then $n$ = ($c$ x $r$) - $k$ = (12 x 24) - 32 = 256.

NOTE     The notation is as defined above.

The value of the Symbol Length Descriptor is $n$ = 256.

28                                            © ISO/IEC 2015 – All rights reserved

OPTO_00012116

JA1860

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

The number of pad codewords = $(n - m) - 1 = 256 - 246 - 1 = 9$. In this example, the data codewords (before padding) begin with a latch to Numeric Compaction mode (Codeword 902), and end with codeword 423, and the pads all use codeword 900. The addition of the Symbol Length Descriptor and pads is shown below:

| Original data codeword sequence: | | | $d_{m-1}$ | ... | $d_0$ | | | |
|---|---|---|---|---|---|---|---|---|
| Codewords: | | | 902 | ... | 423 | | | |

| Padded data codeword sequence: | $d_{n-1}$ | $d_{n-2}$ | ... | $d_9$ | $d_8$ | ... | $d_0$ |
|---|---|---|---|---|---|---|---|
| Codewords: | 256 | 902 | ... | 423 | 900 | ... | 900 |

## 5.10 Generating the error correction codewords

The error correction codewords shall be generated using the procedure defined below. They are calculated on the basis of the values of all the data codewords including the Symbol Length Descriptor and any pad codewords. The codeword sequence is defined as:

$$d_{n-1}, d_{n-2}, \ldots d_0$$

where $d_{n-1}$ is the Symbol Length Descriptor.

The symbol data polynomial is:

$$d(x) = d_{n-1}x^{n-1} + d_{n-2}x^{n-2} + \ldots + d_1x + d_0$$

The following describes mathematically how the error correction codewords shall be computed for a given stream of data and a selected error correction level. All the arithmetic shall be done in modulo 929.

The error correction codewords are the complement of coefficients of the remainder resulting from dividing the symbol data polynomial $d(x)$ multiplied by $x^k$ by the generator polynomial $g(x)$. Negative values are mapped into the Galois Field GF (929) by adding 929 until the value is ≥0.

The following generator polynomial shall be used to calculate coefficients for $k$ error correction codewords required for the error correction level:

$$g_k(x) = (x - 3)\left(x - 3^2\right)\left(x - 3^3\right)\ldots\left(x - 3^k\right)$$

$$= \alpha_0 + \alpha_1x + \alpha_2x^2 + \ldots + \alpha_{k-1}x^{k-1} + x^k$$

where

$g_k(x)$    is the generator polynomial and x is the unknown variable;

$k$        is the total number of error correction codewords;

$\alpha_j$     is the coefficient of powers of $x$ produced by the generator polynomial $g_k(x)$

An example for calculating the coefficients is given in Annex Q.

Annex F contains all the coefficient values necessary to encode a PDF417 symbol of any error correction level.

© ISO/IEC 2015 – All rights reserved

OPTO_00012117

JA1861

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

The error correction codewords shall be calculated according to the algorithm defined below using the following notation:

$d_i$       is the data codeword $d_{n-1} \ldots d_0$;

$E_j$       is the error correction codeword $E_{k-1} \ldots E_0$;

$\alpha_j$       is the coefficient of powers of $x$ taken from the generator polynomial (see above for an explanation and <u>Annex F</u> for the values);

$t_1, t_2, t_3$    are the temporary variables.

The algorithm is as follows.

a)    Identify the data codeword sequence $d_{n-1}, d_{n-2} \ldots d_0$.

b)    Initialise error correction codewords $E_0, \ldots, E_{k-1}$ to value = 0.

c)    For each data codeword $d_i = d_{n-1} \ldots d_0$:

     BEGIN

        $t_1 = (d_i + E_{k-1}) \bmod 929$

        For each error correction codeword $E_j = E_{k-1} \ldots E_1$:

        BEGIN

            $t_2 = (t_1 \times \alpha_j) \bmod 929$

            $t_3 = 929 - t_2$

            $E_j = (E_{j-1} + t_3) \bmod 929$

        END

        $t_2 = (t_1 \times \alpha_0) \bmod 929$

        $t_3 = 929 - t_2$

        $E_0 = t_3 \bmod 929$

     END

d)    For each error correction codeword, $E_j = E_0 \ldots E_{k-1}$, calculate the complement:

     BEGIN

        If $E_j$ not equal to 0

            $E_j = 929 - E_j$

     END

An example of calculating the error correction codewords is given in <u>Annex Q</u>.

An alternative procedure for generating the error correction codewords, using a division circuit, is given in <u>Annex R</u>.

### 5.11 Low level encodation

Low level encoding converts the codewords into their corresponding symbol characters (bar-space sequence) given that the symbol matrix has been fixed.

30

© ISO/IEC 2015 – All rights reserved

OPTO_00012118

JA1862

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

Figure 8 illustrates schematically for a PDF417 symbol the corresponding position of each data codeword, error correction codeword and row indicators.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $L_1$ | $d_{n-1}$ | $d_{n-2}$ | | | | $R_1$ | |
| | $L_2$ | | | | | | $R_2$ | |
| S T A R T | | | | | | | | S T O P |
| | $L_{r-1}$ | | | | $d_0$ | $E_{k-1}$ $E_{k-2}$ | $R_{r-1}$ | |
| | $L_r$ | | | | | $E_1$ $E_0$ | $R_r$ | |

**Key**

| | |
|---|---|
| $L_r$ | left row indicator |
| $R_r$ | right row indicator |
| shaded area | data codeword area |
| Unshaded area under the codeword area | for error correction codewords |

**Figure 8 — Typical PDF417 Symbol Schematic Showing the Positioning of Codewords**

### 5.11.1  Clusters

PDF417 uses a system of local row discrimination to detect row-to-row transitions.

The set of codewords is represented in each of three clusters. Cluster numbers 0, 3 and 6 are used. The associated bar-space sequences of each symbol character representing each codeword and cluster are given in Annex A.

To encode the row indicators and codewords, each row shall contain the symbol characters (bar-space patterns) of only one cluster. Row 1 shall use symbol characters from cluster 0, row 2 shall use symbol characters from cluster 3, row 3 shall use symbol characters from cluster 6, row 4 shall use symbol characters from cluster 0 and so forth. The cluster sequence 0, 3, 6 shall repeat continually. The cluster number $K$ for any row can be calculated:

$$K = \left[ \left( rownumber - 1 \right) \bmod 3 \right] \times 3$$

where the rows are numbered 1 to $r$ (as defined in 4.1).

Because any two adjacent rows have different clusters, the decoder can utilise scans that cross rows while decoding a PDF417 symbol.

### 5.11.2  Determining the symbol matrix

The symbol matrix of rows and columns shall be finally determined by the procedures set out in 5.9.2. This provides the values of $r$ and $c$.

JA1863

OPTO_00012119

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

### 5.11.3 Determining the values of the left and right row indicators

The row indicators in a PDF417 symbol are codewords which encode several key parameters: the row number ($F$), the number of rows ($r$), the number of columns ($c$) and the error correction level ($s$). The information shall be spread over three rows and the cycle shall repeat continually. The row number ($F$) shall be encoded in each row.

#### 5.11.3.1 Left row indicators

Left row indicators shall be calculated as follows:

If $K_F = 0$;  $L_F = 30 \times [(F - 1) \text{ div } 3] + (r - 1) \text{ div } 3$

If $K_F = 3$;  $L_F = 30 \times [(F - 1) \text{ div } 3] + (s \times 3) + (r - 1) \text{ mod } 3$

If $K_F = 6$;  $L_F = 30 \times [(F - 1) \text{ div } 3] + (c - 1)$

where $c$, $F$, $r$, $s$ and $K$ are as defined in 4.1

#### 5.11.3.2 Right row indicators

Right row indicators shall be calculated as follows:

If $K_F = 0$;  $R_F = 30 \times [(F - 1) \text{ div } 3] + (c - 1)$

If $K_F = 3$;  $R_F = 30 \times [(F - 1) \text{ div } 3] + (r - 1) \text{ div } 3$

If $K_F = 6$;  $R_F = 30 \times [(F - 1) \text{ div } 3) + (s \times 3] + (r - 1) \text{ mod } 3$

where $c$, $F$, $r$, $s$, and $K$ are as defined in 4.1.

### 5.11.4 Row encoding

In each row, the following symbol characters shall conform with the cluster number:

— left row indicator;

— symbol characters representing data and/or error correction codewords to a number equal to the number of columns;

— right row indicator.

The start and stop characters are constant for all rows.

The symbol shall be encoded row by row, taking $c$ (the number of columns) codewords into each row. The first row shall include the Symbol Length Descriptor in the first column. The last row shall include some or all of the error correction codewords.

### 5.12 Compact PDF417

Compact PDF417 symbols are an available option. If used, Compact PDF417 shall conform with Annex G.

### 5.13 Macro PDF417

Macro PDF417 provides a mechanism for the data in a file to be split into blocks and be represented in more than one PDF417 symbol. This mechanism is similar to the Structured Append feature in other symbologies.

Each Macro PDF417 symbol shall contain additional control information to enable the original data file to be properly reconstructed, irrespective of the sequence in which the individual PDF417 symbols are scanned and decoded.

32                                              © ISO/IEC 2015 – All rights reserved

OPTO_00012120

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 282 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

Up to 99 999 individual PDF417 symbols may be used to encode data in Macro PDF417.

Full details of the procedures of Macro PDF417 are given in Annex H.

### 5.13.1  Compaction modes and Macro PDF417

The Macro PDF417 Control Block has a predefined encoding method, so codeword 928 causes the termination of any compaction mode sequence in the body of the symbol. The Segment Index field shall be encoded in Numeric Compaction mode. Each defined Macro PDF417 optional field has a specific, implied initial compaction mode and sub-mode, and the beginning of a new optional field serves to terminate the compaction mode from the previous field (see H.2.3) and initiates its default mode. Specifically, even if two consecutive optional fields both use the Text Compaction mode, the Alpha sub-mode is reset when codeword 923 is encountered.

### 5.13.2  ECIs and Macro PDF417

Subject to the constraints defined in 5.5.2, ECIs may occur in the message encoded in a single or Macro PDF417 set of symbols. Any ECI invoked shall apply until the end of the encoded data, or until another ECI is encountered. Thus, the interpretation of the ECI may straddle two or more symbols.

The ECI interpretation(s) in the body of the data codeword stream do not extend into the Macro PDF417 Control Block but resume automatically at the beginning of the next symbol. The Control Block's data is interpreted using the default ECI (000003), unless ECI escape sequences are explicitly encoded in an optional field in the Control Block; the effect of any such ECI is automatically terminated at the end of the field in which it appears.

NOTE    When implemented as GLIs according to earlier specifications (e.g. the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications), encodation implies a return to GLI 0 (equivalent to ECI 000000) at the start of each symbol. If it is intended for a GLI 1 to persist into the next symbol, then GLI 1 shall be explicitly encoded at the start of this next symbol. As encoders compliant with these earlier standards will be in use for some time, advice is given in 5.17.6 on how to achieve compatibility with this specification.

## 5.14  User guidelines

### 5.14.1  Human readable interpretation

PDF417 symbols are capable of encoding large amounts of data, which means that a human readable interpretation of the data characters may not be practical. As an alternative, descriptive text, rather than literal text, may accompany the symbol. The message may be printed anywhere in the area surrounding the symbol, but should not interfere with the symbol itself nor the quiet zones. Font and character size are not specified by this International Standard, but may be by application standards.

### 5.14.2  Autodiscrimination capability

PDF417 can be used in an autodiscrimination environment with a number of other symbologies (see 5.1).

### 5.14.3  User-defined application parameters

Application standards shall define parameters of PDF417 symbols specified in this International Standard as variable, as follows:

#### 5.14.3.1  Symbology and dimensional characteristics

Application standards shall specify the following data, symbology and dimensional parameters:

a)  the selection and use of Extended Channel Interpretations, if required, to extend data encodation beyond the default interpretations of the basic modes;

b)  the volume of data in the symbol, which may be fixed, variable or variable up to a defined maximum;

© ISO/IEC 2015 – All rights reserved

OPTO_00012121

JA1865

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

c)   the selection of the error correction level;

d)   range of *X*-dimension;

e)   range of *Y*-dimension;

f)   symbol parameters: the range of permissible aspect ratios and/or whether symbol width or height has a maximum size.

NOTE     Additional factors which should be taken into consideration when specifying PDF417 applications are given in Annexes Q and S.

### 5.14.3.2   Test specification

The parameters for the evaluation of symbols shall be defined by specifying a quality grade in accordance with ISO/IEC 15415 in the application standard.

This grade is expressed in the form:

> grade/aperture/peak response wavelength

The following example illustrates the types of value which need to be expressed:

> 1,5/10/660

where

> 1,5    is the overall symbol quality grade;
>
> 10     is the measuring aperture reference number (in this example 0,25 mm diameter);
>
> 660    is the peak response wavelength in nanometres.

NOTE        ISO/IEC 15415 gives guidance on selection of grading parameters in application specifications. The values appropriate for the application shall be defined in the application standard.

### 5.14.4   PDF417 symbol quality

PDF417 symbols shall be assessed for quality using the 2D bar code symbol print quality guidelines defined in ISO/IEC 15415 for multi-row symbols with cross-row scanning capability.

## 5.15   Reference decode algorithm

The reference decode algorithm for PDF417 is defined in Annex J. This reference decode algorithm is the basis for print quality assessment according to ISO/IEC 15415.

## 5.16   Error detection and error correction procedure

As part of the decode procedure, it is possible to reconstruct the symbol for erasures and substitution errors within the error correction capacity of the symbol. This can be done by using the procedure set out in Annex K.

## 5.17   Transmitted data

### 5.17.1   Transmitted data in the basic (default) interpretation

All data codewords shall be translated into user data and transmitted as 8-bit bytes, whether this data is encoded in Text Compaction, Byte Compaction or Numeric Compaction mode. Start and stop characters, row indicators, the Symbol Length Descriptor, mode switching codewords, pad codewords and error correction codewords are not transmitted.

34

© ISO/IEC 2015 – All rights reserved

OPTO_00012122

JA1866

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
**ISO/IEC 15438:2015(E)**

**5.17.2 Transmission protocol for Extended Channel Interpretation (ECI)**

In systems where ECIs are supported, a symbology identifier prefix shall be used with every transmission (see 5.17.5 and Annex L). Macro PDF417 Control Blocks (if transmitted) shall be treated as part of a control set of escape sequences which operate in conjunction with the ECI transmission protocol (see 5.17.3 and Annex H).

Three codewords (925, 926 and 927) signal the encoding of an ECI value and are decoded as byte values as follows.

a)   If the ECI sequence begins with codeword 927:

   1)   codeword 927 is transmitted as the escape character 92, which represents reverse solidus (\), or backslash, in the default encoding;

   2)   the next codeword is converted into a 6-digit value, by placing leading zeros before the codeword. The 6-digit value is transmitted as the six corresponding byte values in the range, 48 to 57.

   EXAMPLE

   Symbol encodes: [927] [123]

   Data transmission (byte): 92, 48, 48, 48, 49, 50, 51

   ASCII interpretation: \000123

b)   If the ECI sequence begins with codeword 926:

   1)   codeword 926 is transmitted as escape character 92;

   2)   the next two codewords are converted into a 6-digit value, with leading zeros if required, using the following formula:

   [(1st codeword) +1] × 900 + (2nd codeword)

   The 6-digit value is transmitted as the six corresponding byte values in the range, 48 to 57.

   EXAMPLE

   Symbol encodes: [926] [136] [156]

   Data transmission (bytes): 92, 49, 50, 51, 52, 53, 54

   ASCII interpretation: \123456

c)   If the ECI sequence begins with codeword 925:

   1)   codeword 925 is transmitted as escape character 92;

   2)   the next codeword is converted into a 6-digit value by adding the value 810 900 to it. The 6-digit value is transmitted as the six corresponding byte values in the range, 48 to 57.

   EXAMPLE

   Symbol encodes: [925] [456]

   Data transmission (byte): 92, 56, 49, 49, 51, 53, 54

   ASCII interpretation: \811356

The procedure is repeated for each occurrence of Extended Channel Interpretation (ECI).

Application software recognising the 7-byte escape sequence of 92 followed by six bytes (each in the range 48 to 57) should interpret all subsequent characters until the end of the encoded data, or until another single byte 92 is encountered, as being from the ECI defined by the 6-digit sequence.

© ISO/IEC 2015 – All rights reserved    **35**

OPTO_00012123

JA1867

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 285 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

If the reverse solidus, or other character represented by byte 92 needs to be used as encoded data, transmission shall be as follows. Whenever byte 92 occurs as data, two bytes of that value shall be transmitted; thus a single occurrence is always an escape character and a double occurrence indicates true data.

EXAMPLE

| | |
|---|---|
| Encoded data: | A\\B\C |
| Transmission: | A\\\\B\\C |

### 5.17.3  Transmitted data for Macro PDF417

The protocol for transmitted data for Macro PDF417 is included in H.6.

### 5.17.4  Transmission of reserved codewords using the ECI protocol

When operating under the ECI transmission protocol, PDF417 decoders should transmit a reserved codeword escape sequence of six bytes (interpreted as '\CnnnC'), representing escape character (92) followed by 'C' (67), three digits which represent the decimal value of the reserved codeword, followed by another 'C', which terminates the escape sequence in a symbology-independent manner. The data codewords which follow the reserved codeword are not interpreted by the decoder according to any compaction mode, but instead are transmitted as a series of escape sequences representing the codewords using the same 6-byte escape sequence defined earlier in this paragraph. All remaining data codewords are transmitted in this manner, until one of the following is reached:

— the end of the encoded data in the symbol;

— a latch to a recognised compaction mode;

— a Macro PDF417 Control Block function codeword (928, 923, or 922).

Codeword 913 (Byte shift) is only permitted from Text Compaction mode, and thus shall not be part of the codeword stream while in this process of sending escaped uninterpreted codewords.

NOTE    This protocol can properly transmit the message syntax of any reserved codeword whose future definition is to provide either a signalling function or to represent a new compaction mode.

### 5.17.5  Symbology identifier

Once the structure of the data (in terms of Macro PDF417, ECI, etc) has been identified, the appropriate symbology identifier should be added as a preamble to the transmitted data by the decoder. See Annex L for the symbology identifiers which apply to PDF417.

### 5.17.6  Transmission using older protocols

The introduction of the Extended Channel Interpretation system, common to a number of symbologies, has had an impact on pre-existing symbologies including PDF417. The basic encoding and decoding rules remain identical in this International Standard to those in the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications. Transmission for both ECIs and Macro PDF417 is different in format, but conveys equivalent information.

All new PDF417 decoding equipment and software should conform with this International Standard. However, equipment conforming with the earlier standard will still be in existence for a number of years. Annex M defines the rules which shall be followed when using decoding equipment and software not capable of being compliant with the current ECI and Macro PDF417 symbols. In this way, old and new decoding equipment can continue to co-exist.

© ISO/IEC 2015 – All rights reserved

OPTO_00012124

JA1868

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

# Annex A
## (normative)

# Encoding/decoding table of PDF417 symbol character bar-space sequences

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0<br>BSBSBSBS | Cluster 3<br>BSBSBSBS | Cluster 6<br>BSBSBSBS |
| 0 | 31111136 | 51111125 | 21111155 |
| 1 | 41111144 | 61111133 | 31111163 |
| 2 | 51111152 | 41111216 | 11111246 |
| 3 | 31111235 | 51111224 | 21111254 |
| 4 | 41111243 | 61111232 | 31111262 |
| 5 | 51111251 | 41111315 | 11111345 |
| 6 | 21111326 | 51111323 | 21111353 |
| 7 | 31111334 | 61111331 | 31111361 |
| 8 | 21111425 | 41111414 | 11111444 |
| 9 | 11111516 | 51111422 | 21111452 |
| 10 | 21111524 | 41111513 | 11111543 |
| 11 | 11111615 | 51111521 | 61112114 |
| 12 | 21112136 | 41111612 | 11112155 |
| 13 | 31112144 | 41112125 | 21112163 |
| 14 | 41112152 | 51112132 | 61112213 |
| 15 | 21112235 | 61112141 | 11112254 |
| 16 | 31112243 | 31112216 | 21112262 |
| 17 | 41112251 | 41112224 | 61112312 |
| 18 | 11112326 | 51112232 | 11112353 |
| 19 | 21112334 | 31112315 | 21112361 |
| 20 | 11112425 | 41112323 | 61112411 |
| 21 | 11113136 | 51112331 | 11112452 |
| 22 | 21113144 | 31112414 | 51113114 |
| 23 | 31113152 | 41112422 | 61113122 |
| 24 | 11113235 | 31112513 | 11113163 |
| 25 | 21113243 | 41112521 | 51113213 |
| 26 | 31113251 | 31112612 | 61113221 |
| 27 | 11113334 | 31113125 | 11113262 |
| 28 | 21113342 | 41113133 | 51113312 |
| 29 | 11114144 | 51113141 | 11113361 |
| 30 | 21114152 | 21113216 | 51113411 |
| 31 | 11114243 | 31113224 | 41114114 |
| 32 | 21114251 | 41113232 | 51114122 |
| 33 | 11115152 | 21113315 | 41114213 |

© ISO/IEC 2015 – All rights reserved    37

OPTO_00012125

JA1869

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 34 | 51116111 | 31113323 | 51114221 |
| 35 | 31121135 | 41113331 | 41114312 |
| 36 | 41121143 | 21113414 | 41114411 |
| 37 | 51121151 | 31113422 | 31115114 |
| 38 | 21121226 | 21113513 | 41115122 |
| 39 | 31121234 | 31113521 | 31115213 |
| 40 | 41121242 | 21113612 | 41115221 |
| 41 | 21121325 | 21114125 | 31115312 |
| 42 | 31121333 | 31114133 | 31115411 |
| 43 | 11121416 | 41114141 | 21116114 |
| 44 | 21121424 | 11114216 | 31116122 |
| 45 | 31121432 | 21114224 | 21116213 |
| 46 | 11121515 | 31114232 | 31116221 |
| 47 | 21121523 | 11114315 | 21116312 |
| 48 | 11121614 | 21114323 | 11121146 |
| 49 | 21122135 | 31114331 | 21121154 |
| 50 | 31122143 | 11114414 | 31121162 |
| 51 | 41122151 | 21114422 | 11121245 |
| 52 | 11122226 | 11114513 | 21121253 |
| 53 | 21122234 | 21114521 | 31121261 |
| 54 | 31122242 | 11115125 | 11121344 |
| 55 | 11122325 | 21115133 | 21121352 |
| 56 | 21122333 | 31115141 | 11121443 |
| 57 | 31122341 | 11115224 | 21121451 |
| 58 | 11122424 | 21115232 | 11121542 |
| 59 | 21122432 | 11115323 | 61122113 |
| 60 | 11123135 | 21115331 | 11122154 |
| 61 | 21123143 | 11115422 | 21122162 |
| 62 | 31123151 | 11116133 | 61122212 |
| 63 | 11123234 | 21116141 | 11122253 |
| 64 | 21123242 | 11116232 | 21122261 |
| 65 | 11123333 | 11116331 | 61122311 |
| 66 | 21123341 | 41121116 | 11122352 |
| 67 | 11124143 | 51121124 | 11122451 |
| 68 | 21124151 | 61121132 | 51123113 |
| 69 | 11124242 | 41121215 | 61123121 |
| 70 | 11124341 | 51121223 | 11123162 |
| 71 | 21131126 | 61121231 | 51123212 |
| 72 | 31131134 | 41121314 | 11123261 |
| 73 | 41131142 | 51121322 | 51123311 |
| 74 | 21131225 | 41121413 | 41124113 |
| 75 | 31131233 | 51121421 | 51124121 |

38

© ISO/IEC 2015 – All rights reserved

OPTO_00012126

JA1870

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 76 | 41131241 | 41121512 | 41124212 |
| 77 | 11131316 | 41121611 | 41124311 |
| 78 | 21131324 | 31122116 | 31125113 |
| 79 | 31131332 | 41122124 | 41125121 |
| 80 | 11131415 | 51122132 | 31125212 |
| 81 | 21131423 | 31122215 | 31125311 |
| 82 | 11131514 | 41122223 | 21126113 |
| 83 | 11131613 | 51122231 | 31126121 |
| 84 | 11132126 | 31122314 | 21126212 |
| 85 | 21132134 | 41122322 | 21126311 |
| 86 | 31132142 | 31122413 | 11131145 |
| 87 | 11132225 | 41122421 | 21131153 |
| 88 | 21132233 | 31122512 | 31131161 |
| 89 | 31132241 | 31122611 | 11131244 |
| 90 | 11132324 | 21123116 | 21131252 |
| 91 | 21132332 | 31123124 | 11131343 |
| 92 | 11132423 | 41123132 | 21131351 |
| 93 | 11132522 | 21123215 | 11131442 |
| 94 | 11133134 | 31123223 | 11131541 |
| 95 | 21133142 | 41123231 | 61132112 |
| 96 | 11133233 | 21123314 | 11132153 |
| 97 | 21133241 | 31123322 | 21132161 |
| 98 | 11133332 | 21123413 | 61132211 |
| 99 | 11134142 | 31123421 | 11132252 |
| 100 | 21141125 | 21123512 | 11132351 |
| 101 | 31141133 | 21123611 | 51133112 |
| 102 | 41141141 | 11124116 | 11133161 |
| 103 | 11141216 | 21124124 | 51133211 |
| 104 | 21141224 | 31124132 | 41134112 |
| 105 | 31141232 | 11124212 | 41134211 |
| 106 | 11141315 | 21124223 | 31135112 |
| 107 | 21141323 | 31124231 | 31135211 |
| 108 | 31141331 | 11124314 | 21136112 |
| 109 | 11141414 | 21124322 | 21136211 |
| 110 | 21141422 | 11124413 | 11141144 |
| 111 | 11141513 | 21124421 | 21141152 |
| 112 | 21141521 | 11124512 | 11141243 |
| 113 | 11142125 | 11125124 | 21141251 |
| 114 | 21142133 | 21125132 | 11141342 |
| 115 | 31142141 | 11125223 | 11141441 |
| 116 | 11142224 | 21125231 | 61142111 |
| 117 | 21142232 | 11125322 | 11142152 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012127

JA1871

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 118 | 11142323 | 11125421 | 11142251 |
| 119 | 21142331 | 11126132 | 51143111 |
| 120 | 11142422 | 11126231 | 41144111 |
| 121 | 11142521 | 41131115 | 31145111 |
| 122 | 21143141 | 51131123 | 11151143 |
| 123 | 11143331 | 61131131 | 21151151 |
| 124 | 11151116 | 41131214 | 11151242 |
| 125 | 21151124 | 51131222 | 11151341 |
| 126 | 31151132 | 41131313 | 11152151 |
| 127 | 11151215 | 51131321 | 11161142 |
| 128 | 21151223 | 41131412 | 11161241 |
| 129 | 31151231 | 41131511 | 12111146 |
| 130 | 11151314 | 31132115 | 22111154 |
| 131 | 21151322 | 41132123 | 32111162 |
| 132 | 11151413 | 51132131 | 12111245 |
| 133 | 21151421 | 31132214 | 22111253 |
| 134 | 11151512 | 41132222 | 32111261 |
| 135 | 11152124 | 31132313 | 12111344 |
| 136 | 11152223 | 41132321 | 22111352 |
| 137 | 11152322 | 31132412 | 12111443 |
| 138 | 11161115 | 31132511 | 22111451 |
| 139 | 31161131 | 21133115 | 12111542 |
| 140 | 21161222 | 31133123 | 62112113 |
| 141 | 21161321 | 41133131 | 12112154 |
| 142 | 11161511 | 21133214 | 22112162 |
| 143 | 32111135 | 31133222 | 62112212 |
| 144 | 42111143 | 21133313 | 12112253 |
| 145 | 52111151 | 31133321 | 22112261 |
| 146 | 22111226 | 21133412 | 62112311 |
| 147 | 32111234 | 21133511 | 12112352 |
| 148 | 42111242 | 11134115 | 12112451 |
| 149 | 22111325 | 21134123 | 52113113 |
| 150 | 32111333 | 31134131 | 62113121 |
| 151 | 42111341 | 11134214 | 12113162 |
| 152 | 12111416 | 21134222 | 52113212 |
| 153 | 22111424 | 11134313 | 12113261 |
| 154 | 12111515 | 21134321 | 52113311 |
| 155 | 22112135 | 11134412 | 42114113 |
| 156 | 32112143 | 11134511 | 52114121 |
| 157 | 42112151 | 11135123 | 42114212 |
| 158 | 12112226 | 21135131 | 42114311 |
| 159 | 22112234 | 11135222 | 32115113 |

**40**

© ISO/IEC 2015 – All rights reserved

OPTO_00012128

JA1872

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 160 | 32112242 | 11135321 | 42115121 |
| 161 | 12112325 | 11136131 | 32115212 |
| 162 | 22112333 | 41141114 | 32115311 |
| 163 | 12112424 | 51141122 | 22116113 |
| 164 | 12112523 | 41141213 | 32116121 |
| 165 | 12113135 | 51141221 | 22116212 |
| 166 | 22113143 | 41141312 | 22116311 |
| 167 | 32113151 | 41141411 | 21211145 |
| 168 | 12113234 | 31142114 | 31211153 |
| 169 | 22113242 | 41142122 | 41211161 |
| 170 | 12113333 | 31142213 | 11211236 |
| 171 | 12113432 | 41142221 | 21211244 |
| 172 | 12114143 | 31142312 | 31211252 |
| 173 | 22114151 | 31142411 | 11211335 |
| 174 | 12114242 | 21143114 | 21211343 |
| 175 | 12115151 | 31143122 | 31211351 |
| 176 | 31211126 | 21143213 | 11211434 |
| 177 | 41211134 | 31143221 | 21211442 |
| 178 | 51211142 | 21143312 | 11211533 |
| 179 | 31211225 | 21143411 | 21211541 |
| 180 | 41211233 | 11144114 | 11211632 |
| 181 | 51211241 | 21144122 | 12121145 |
| 182 | 21211316 | 11144213 | 22121153 |
| 183 | 31211324 | 21144221 | 32121161 |
| 184 | 41211332 | 11144312 | 11212145 |
| 185 | 21211415 | 11144411 | 12121244 |
| 186 | 31211423 | 11145122 | 22121252 |
| 187 | 41211431 | 11145221 | 11212244 |
| 188 | 21211514 | 41151113 | 21212252 |
| 189 | 31211522 | 51151121 | 22121351 |
| 190 | 22121126 | 41151212 | 11212343 |
| 191 | 32121134 | 41151311 | 12121442 |
| 192 | 42121142 | 31152113 | 11212442 |
| 193 | 21212126 | 41152121 | 12121541 |
| 194 | 22121225 | 31152212 | 11212541 |
| 195 | 32121233 | 31152311 | 62122112 |
| 196 | 42121241 | 21153113 | 12122153 |
| 197 | 21212225 | 31153121 | 22122161 |
| 198 | 31212233 | 21153212 | 61213112 |
| 199 | 41212241 | 21153311 | 62122211 |
| 200 | 11212316 | 11154113 | 11213153 |
| 201 | 12121415 | 21154121 | 12122252 |

© ISO/IEC 2015 – All rights reserved    **41**

JA1873

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 202 | 22121423 | 11154212 | 61213211 |
| 203 | 32121431 | 11154311 | 11213252 |
| 204 | 11212415 | 41161112 | 12122351 |
| 205 | 21212423 | 41161211 | 11213351 |
| 206 | 11212514 | 31162112 | 52123112 |
| 207 | 12122126 | 31162211 | 12123161 |
| 208 | 22122134 | 21163112 | 51214112 |
| 209 | 32122142 | 21163211 | 52123211 |
| 210 | 11213126 | 42111116 | 11214161 |
| 211 | 12122225 | 52111124 | 51214211 |
| 212 | 22122233 | 62111132 | 42124112 |
| 213 | 32122241 | 42111215 | 41215112 |
| 214 | 11213225 | 52111223 | 42124211 |
| 215 | 21213233 | 62111231 | 41215211 |
| 216 | 31213241 | 42111314 | 32125112 |
| 217 | 11213324 | 52111322 | 31216112 |
| 218 | 12122423 | 42111413 | 32125211 |
| 219 | 11213423 | 52111421 | 31216211 |
| 220 | 12123134 | 42111512 | 22126112 |
| 221 | 22123142 | 42111611 | 22126211 |
| 222 | 11214134 | 32112116 | 11221136 |
| 223 | 12123233 | 42112124 | 21221144 |
| 224 | 22123241 | 52112132 | 31221152 |
| 225 | 11214233 | 32112215 | 11221235 |
| 226 | 21214241 | 42112223 | 21221243 |
| 227 | 11214332 | 52112231 | 31221251 |
| 228 | 12124142 | 32112314 | 11221334 |
| 229 | 11215142 | 42112322 | 21221342 |
| 230 | 12124241 | 32112413 | 11221433 |
| 231 | 11215241 | 42112421 | 21221441 |
| 232 | 31221125 | 32112512 | 11221532 |
| 233 | 41221133 | 32112611 | 11221631 |
| 234 | 51221141 | 22113116 | 12131144 |
| 235 | 21221216 | 32113124 | 22131152 |
| 236 | 31221224 | 42113132 | 11222144 |
| 237 | 41221232 | 22113215 | 12131243 |
| 238 | 21221315 | 32113223 | 22131251 |
| 239 | 31221323 | 42113231 | 11222243 |
| 240 | 41221331 | 22113314 | 21222251 |
| 241 | 21221414 | 32113322 | 11222342 |
| 242 | 31221422 | 22113413 | 12131441 |
| 243 | 21221513 | 32113421 | 11222441 |

42

© ISO/IEC 2015 – All rights reserved

JA1874

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 244 | 21221612 | 22113512 | 62132111 |
| 245 | 22131125 | 22113611 | 12132152 |
| 246 | 32131133 | 12114116 | 61223111 |
| 247 | 42131141 | 22114124 | 11223152 |
| 248 | 21222125 | 32114132 | 12132251 |
| 249 | 22131224 | 12114215 | 11223251 |
| 250 | 32131232 | 22114223 | 52133111 |
| 251 | 11222216 | 32114231 | 51224111 |
| 252 | 12131315 | 12114314 | 42134111 |
| 253 | 31222232 | 22114322 | 41225111 |
| 254 | 32131331 | 12114413 | 32135111 |
| 255 | 11222315 | 22114421 | 31226111 |
| 256 | 12131414 | 12114512 | 22136111 |
| 257 | 22131422 | 12115124 | 11231135 |
| 258 | 11222414 | 22115132 | 21231143 |
| 259 | 21222422 | 12115223 | 31231151 |
| 260 | 22131521 | 22115231 | 11231234 |
| 261 | 12131612 | 12115322 | 21231242 |
| 262 | 12132125 | 12115421 | 11231333 |
| 263 | 22132133 | 12116132 | 21231341 |
| 264 | 32132141 | 12116231 | 11231432 |
| 265 | 11223125 | 51211115 | 11231531 |
| 266 | 12132224 | 61211123 | 12141143 |
| 267 | 22132232 | 11211164 | 22141151 |
| 268 | 11223224 | 51211214 | 11232143 |
| 269 | 21223232 | 61211222 | 12141242 |
| 270 | 22132331 | 11211263 | 11232242 |
| 271 | 11223323 | 51211313 | 12141341 |
| 272 | 12132422 | 61211321 | 11232341 |
| 273 | 12132521 | 11211362 | 12142151 |
| 274 | 12133133 | 51211412 | 11233151 |
| 275 | 22133141 | 51211511 | 11241134 |
| 276 | 11224133 | 42121115 | 21241142 |
| 277 | 12133232 | 52121123 | 11241233 |
| 278 | 11224232 | 62121131 | 21241241 |
| 279 | 12133331 | 41212115 | 11241332 |
| 280 | 11224331 | 42121214 | 11241431 |
| 281 | 11225141 | 61212131 | 12151142 |
| 282 | 21231116 | 41212214 | 11242142 |
| 283 | 31231124 | 51212222 | 12151241 |
| 284 | 41231132 | 52121321 | 11242241 |
| 285 | 21231215 | 41212313 | 11251133 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012131

JA1875

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 286 | 31231223 | 42121412 | 21251141 |
| 287 | 41231231 | 41212412 | 11251232 |
| 288 | 21231314 | 42121511 | 11251331 |
| 289 | 31231322 | 41212511 | 12161141 |
| 290 | 21231413 | 32122115 | 11252141 |
| 291 | 31231421 | 42122123 | 11261132 |
| 292 | 21231512 | 52122131 | 11261231 |
| 293 | 21231611 | 31213115 | 13111145 |
| 294 | 12141116 | 32122214 | 23111153 |
| 295 | 22141124 | 42122222 | 33111161 |
| 296 | 32141132 | 31213214 | 13111244 |
| 297 | 11232116 | 41213222 | 23111252 |
| 298 | 12141215 | 42122321 | 13111343 |
| 299 | 22141223 | 31213313 | 23111351 |
| 300 | 32141231 | 32122412 | 13111442 |
| 301 | 11232215 | 31213412 | 13111541 |
| 302 | 21232223 | 32122511 | 63112112 |
| 303 | 31232231 | 31213511 | 13112153 |
| 304 | 11232314 | 22123115 | 23112161 |
| 305 | 12141413 | 32123123 | 63112211 |
| 306 | 22141421 | 42123131 | 13112252 |
| 307 | 11232413 | 21214115 | 13112351 |
| 308 | 21232421 | 22123214 | 53113112 |
| 309 | 11232512 | 32123222 | 13113161 |
| 310 | 12142124 | 21214214 | 53113211 |
| 311 | 22142132 | 31214222 | 43114112 |
| 312 | 11233124 | 32123321 | 43114211 |
| 313 | 12142223 | 21214313 | 33115112 |
| 314 | 22142231 | 22123412 | 33115211 |
| 315 | 11233223 | 21214412 | 23116112 |
| 316 | 21233231 | 22123511 | 23116211 |
| 317 | 11233322 | 21214511 | 12211136 |
| 318 | 12142421 | 12124115 | 22211144 |
| 319 | 11233421 | 22124123 | 32211152 |
| 320 | 11234132 | 32124131 | 12211235 |
| 321 | 11234231 | 11215115 | 22211243 |
| 322 | 21241115 | 12124214 | 32211251 |
| 323 | 31241123 | 22124222 | 12211334 |
| 324 | 41241131 | 11215214 | 22211342 |
| 325 | 21241214 | 21215222 | 12211433 |
| 326 | 31241222 | 22124321 | 22211441 |
| 327 | 21241313 | 11215313 | 12211532 |

44

© ISO/IEC 2015 – All rights reserved

OPTO_00012132

JA1876

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 328 | 31241321 | 12124412 | 12221631 |
| 329 | 21241412 | 11215412 | 13121144 |
| 330 | 21241511 | 12124511 | 23121152 |
| 331 | 12151115 | 12125123 | 12212144 |
| 332 | 22151123 | 22125131 | 13121243 |
| 333 | 32151131 | 11216123 | 23121251 |
| 334 | 11242115 | 12125222 | 12212243 |
| 335 | 12151214 | 11216222 | 22212251 |
| 336 | 22151222 | 12125321 | 12212342 |
| 337 | 11242214 | 11216321 | 13121441 |
| 338 | 21242222 | 12126131 | 12212441 |
| 339 | 22151321 | 51221114 | 63122111 |
| 340 | 11242313 | 61221122 | 13122152 |
| 341 | 12151412 | 11221163 | 62213111 |
| 342 | 11242412 | 51221213 | 12213152 |
| 343 | 12151511 | 61221221 | 13122251 |
| 344 | 12152123 | 11221262 | 12213251 |
| 345 | 11243123 | 51221312 | 53123111 |
| 346 | 11243222 | 11221361 | 52214111 |
| 347 | 11243321 | 51221411 | 43124111 |
| 348 | 31251122 | 42131114 | 42215111 |
| 349 | 31251221 | 52131122 | 33125111 |
| 350 | 21251411 | 41222114 | 32216111 |
| 351 | 22161122 | 42131213 | 23126111 |
| 352 | 12161213 | 52131221 | 21311135 |
| 353 | 11252213 | 41222213 | 31311143 |
| 354 | 11252312 | 51222221 | 41311151 |
| 355 | 11252411 | 41222312 | 11311226 |
| 356 | 23111126 | 42131411 | 21311234 |
| 357 | 33111134 | 41222411 | 31311242 |
| 358 | 43111142 | 32132114 | 11311325 |
| 359 | 23111225 | 42132122 | 21311333 |
| 360 | 33111233 | 31223114 | 31311341 |
| 361 | 13111316 | 32132213 | 11311424 |
| 362 | 23111324 | 42132221 | 21311432 |
| 363 | 33111332 | 31223213 | 11311523 |
| 364 | 13111415 | 41223221 | 21311531 |
| 365 | 23111423 | 31223312 | 11311622 |
| 366 | 13111514 | 32132411 | 12221135 |
| 367 | 13111613 | 31223411 | 22221143 |
| 368 | 13112126 | 22133114 | 32221151 |
| 369 | 23112134 | 32133122 | 11312135 |

© ISO/IEC 2015 – All rights reserved   **45**

OPTO_00012133

JA1877

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 370 | 33112142 | 21224114 | 12221234 |
| 371 | 13112225 | 22133213 | 22221242 |
| 372 | 23112233 | 32133221 | 11312234 |
| 373 | 33112241 | 21224213 | 21312242 |
| 374 | 13112324 | 31224221 | 22221341 |
| 375 | 23112332 | 21224312 | 11312333 |
| 376 | 13112423 | 22133411 | 12221432 |
| 377 | 13112522 | 21224411 | 11312432 |
| 378 | 13113134 | 12134114 | 12221531 |
| 379 | 23113142 | 22134122 | 11312531 |
| 380 | 13113233 | 11225114 | 13131143 |
| 381 | 23113241 | 12134213 | 23131151 |
| 382 | 13113332 | 22134221 | 12222143 |
| 383 | 13114142 | 11225213 | 13131242 |
| 384 | 13114241 | 21225221 | 11313143 |
| 385 | 32211125 | 11225312 | 12222242 |
| 386 | 42211133 | 12134411 | 13131341 |
| 387 | 52211141 | 11225411 | 11313242 |
| 388 | 22211216 | 12135122 | 12222341 |
| 389 | 32211224 | 11226122 | 11313341 |
| 390 | 42211232 | 12135221 | 13132151 |
| 391 | 22211315 | 11226221 | 12223151 |
| 392 | 32211323 | 51231113 | 11314151 |
| 393 | 42211331 | 61231121 | 11321126 |
| 394 | 22211414 | 11231162 | 21321134 |
| 395 | 32211422 | 51231212 | 31321142 |
| 396 | 22211513 | 11231261 | 11321225 |
| 397 | 32211521 | 51231311 | 21321233 |
| 398 | 23121125 | 42141113 | 31321241 |
| 399 | 33121133 | 52141121 | 11321324 |
| 400 | 43121141 | 41232113 | 21321332 |
| 401 | 22212125 | 51232121 | 11321423 |
| 402 | 23121224 | 41232212 | 21321431 |
| 403 | 33121232 | 42141311 | 11321522 |
| 404 | 12212216 | 41232311 | 11321621 |
| 405 | 13121315 | 32142113 | 12231134 |
| 406 | 32212232 | 42142121 | 22231142 |
| 407 | 33121331 | 31233113 | 11322134 |
| 408 | 12212315 | 32142212 | 12231233 |
| 409 | 22212323 | 31233212 | 22231241 |
| 410 | 23121422 | 32142311 | 11322233 |
| 411 | 12212414 | 31233311 | 21322241 |

46

© ISO/IEC 2015 – All rights reserved

OPTO_00012134

JA1878

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 412 | 13121513 | 22143113 | 11322332 |
| 413 | 12212513 | 32143121 | 12231431 |
| 414 | 13122125 | 21234113 | 11322431 |
| 415 | 23122133 | 31234121 | 13141142 |
| 416 | 33122141 | 21234212 | 12232142 |
| 417 | 12213125 | 22143311 | 13141241 |
| 418 | 13122224 | 21234311 | 11323142 |
| 419 | 32213141 | 12144113 | 12232241 |
| 420 | 12213224 | 22144121 | 11323241 |
| 421 | 22213232 | 11235113 | 11331125 |
| 422 | 23122331 | 12144212 | 21331133 |
| 423 | 12213323 | 11235212 | 31331141 |
| 424 | 13122422 | 12144311 | 11331224 |
| 425 | 12213422 | 11235311 | 21331232 |
| 426 | 13123133 | 12145121 | 11331323 |
| 427 | 23123141 | 11236121 | 21331331 |
| 428 | 12214133 | 51241112 | 11331422 |
| 429 | 13123232 | 11241161 | 11331521 |
| 430 | 12214232 | 51241211 | 12241133 |
| 431 | 13123331 | 42151112 | 22241141 |
| 432 | 13124141 | 41242112 | 11332133 |
| 433 | 12215141 | 42151211 | 12241232 |
| 434 | 31311116 | 41242211 | 11332232 |
| 435 | 41311124 | 32152112 | 12241331 |
| 436 | 51311132 | 31243112 | 11332331 |
| 437 | 31311215 | 32152211 | 13151141 |
| 438 | 41311223 | 31243211 | 12242141 |
| 439 | 51311231 | 22153112 | 11333141 |
| 440 | 31311314 | 21244112 | 11341124 |
| 441 | 41311322 | 22153211 | 21341132 |
| 442 | 31311413 | 21244211 | 11341223 |
| 443 | 41311421 | 12154112 | 21341231 |
| 444 | 31311512 | 11245112 | 11341322 |
| 445 | 22221116 | 12154211 | 11341421 |
| 446 | 32221124 | 11245211 | 12251132 |
| 447 | 42221132 | 51251111 | 11342132 |
| 448 | 21312116 | 42161111 | 12251231 |
| 449 | 22221215 | 41252111 | 11342231 |
| 450 | 41312132 | 32162111 | 11351123 |
| 451 | 42221231 | 31253111 | 21351131 |
| 452 | 21312215 | 22163111 | 11351222 |
| 453 | 31312223 | 21254111 | 11351321 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012135

JA1879

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 454 | 41312231 | 43111115 | 12261131 |
| 455 | 21312314 | 53111123 | 11352131 |
| 456 | 22221413 | 63111131 | 11361122 |
| 457 | 32221421 | 43111214 | 11361221 |
| 458 | 21312413 | 53111222 | 14111144 |
| 459 | 31312421 | 43111313 | 24111152 |
| 460 | 22221611 | 53111321 | 14111243 |
| 461 | 13131116 | 43111412 | 24111251 |
| 462 | 23131124 | 43111511 | 14111342 |
| 463 | 33131132 | 33112115 | 14111441 |
| 464 | 12222116 | 43112123 | 14112152 |
| 465 | 13131215 | 53112131 | 14112251 |
| 466 | 23131223 | 33112214 | 54113111 |
| 467 | 33131231 | 43112222 | 44114111 |
| 468 | 11313116 | 33112313 | 34115111 |
| 469 | 12222215 | 43112321 | 24116111 |
| 470 | 22222223 | 33112412 | 13211135 |
| 471 | 32222231 | 33112511 | 23211143 |
| 472 | 11313215 | 23113115 | 33211151 |
| 473 | 21313223 | 33113123 | 13211234 |
| 474 | 31313231 | 43113131 | 23211242 |
| 475 | 23131421 | 23113214 | 13211333 |
| 476 | 11313314 | 33113222 | 23211341 |
| 477 | 12222413 | 23113313 | 13211432 |
| 478 | 22222421 | 33113321 | 13211531 |
| 479 | 11313413 | 23113412 | 14121143 |
| 480 | 13131611 | 23113511 | 24121151 |
| 481 | 13132124 | 13114115 | 13212143 |
| 482 | 23132132 | 23114123 | 14121242 |
| 483 | 12223124 | 33114131 | 13212242 |
| 484 | 13132223 | 13114214 | 14121341 |
| 485 | 23132231 | 23114222 | 13212341 |
| 486 | 11314124 | 13114313 | 14122151 |
| 487 | 12223223 | 23114321 | 13213151 |
| 488 | 22223231 | 13114412 | 12311126 |
| 489 | 11314223 | 13114511 | 22311134 |
| 490 | 21314231 | 13115123 | 32311142 |
| 491 | 13132421 | 23115131 | 12311225 |
| 492 | 12223421 | 13115222 | 22311233 |
| 493 | 13133132 | 13115321 | 32311241 |
| 494 | 12224132 | 13116131 | 12311324 |
| 495 | 13133231 | 52211114 | 22311332 |

48

© ISO/IEC 2015 – All rights reserved

OPTO_00012136

JA1880

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 496 | 11315132 | 62211122 | 12311423 |
| 497 | 12224231 | 12211163 | 22311431 |
| 498 | 31321115 | 52211213 | 12311522 |
| 499 | 41321123 | 62211221 | 12311621 |
| 500 | 51321131 | 12211262 | 13221134 |
| 501 | 31321214 | 52211312 | 23221142 |
| 502 | 41321222 | 12211361 | 12312134 |
| 503 | 31321313 | 52211411 | 13221233 |
| 504 | 41321321 | 43121114 | 23221241 |
| 505 | 31321412 | 53121122 | 12312233 |
| 506 | 31321511 | 42212114 | 13221332 |
| 507 | 22231115 | 43121213 | 12312332 |
| 508 | 32231123 | 53121221 | 13221431 |
| 509 | 42231131 | 42212213 | 12312431 |
| 510 | 21322115 | 52212221 | 14131142 |
| 511 | 22231214 | 42212312 | 13222142 |
| 512 | 41322131 | 43121411 | 14131241 |
| 513 | 21322214 | 42212411 | 12313142 |
| 514 | 31322222 | 33122114 | 13222241 |
| 515 | 32231321 | 43122122 | 12313241 |
| 516 | 21322313 | 32213114 | 21411125 |
| 517 | 22231412 | 33122213 | 31411133 |
| 518 | 21322412 | 43122221 | 41411141 |
| 519 | 22231511 | 32213213 | 11411216 |
| 520 | 21322511 | 42213221 | 21411224 |
| 521 | 13141115 | 32213312 | 31411232 |
| 522 | 23141123 | 33122411 | 11411315 |
| 523 | 33141131 | 32213411 | 21411323 |
| 524 | 12232115 | 23123114 | 31411331 |
| 525 | 13141214 | 33123122 | 11411414 |
| 526 | 23141222 | 22214114 | 21411422 |
| 527 | 11323115 | 23123213 | 11411513 |
| 528 | 12232214 | 33123221 | 21411521 |
| 529 | 22232222 | 22214213 | 11411612 |
| 530 | 23141321 | 32214221 | 12321125 |
| 531 | 11323214 | 22214312 | 22321133 |
| 532 | 21323222 | 23123411 | 32321141 |
| 533 | 13141412 | 22214411 | 11412125 |
| 534 | 11323313 | 13124114 | 12321224 |
| 535 | 12232412 | 23124122 | 22321232 |
| 536 | 13141511 | 12215114 | 11412224 |
| 537 | 12232511 | 13124213 | 21412232 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012137

JA1881

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 538 | 13142123 | 23124221 | 22321331 |
| 539 | 23142131 | 12215213 | 11412323 |
| 540 | 12233123 | 22215221 | 12321422 |
| 541 | 13142222 | 12215312 | 11412422 |
| 542 | 11324123 | 13124411 | 12321521 |
| 543 | 12233222 | 12215411 | 11412521 |
| 544 | 13142321 | 13125122 | 13231133 |
| 545 | 11324222 | 12216122 | 23231141 |
| 546 | 12233321 | 13125221 | 12322133 |
| 547 | 13143131 | 12216221 | 13231232 |
| 548 | 11325131 | 61311113 | 11413133 |
| 549 | 31331114 | 11311154 | 12322232 |
| 550 | 41331122 | 21311162 | 13231331 |
| 551 | 31331213 | 61311212 | 11413232 |
| 552 | 41331221 | 11311253 | 12322331 |
| 553 | 31331312 | 21311261 | 11413331 |
| 554 | 31331411 | 61311311 | 14141141 |
| 555 | 22241114 | 11311352 | 13232141 |
| 556 | 32241122 | 11311451 | 12323141 |
| 557 | 21332114 | 52221113 | 11414141 |
| 558 | 22241213 | 62221121 | 11421116 |
| 559 | 32241221 | 12221162 | 21421124 |
| 560 | 21332213 | 51312113 | 31421132 |
| 561 | 31332221 | 61312121 | 11421215 |
| 562 | 21332312 | 11312162 | 21421223 |
| 563 | 22241411 | 12221261 | 31421231 |
| 564 | 21332411 | 51312212 | 11421314 |
| 565 | 13151114 | 52221311 | 21421322 |
| 566 | 23151122 | 11312261 | 11421413 |
| 567 | 12242114 | 51312311 | 21421421 |
| 568 | 13151213 | 43131113 | 11421512 |
| 569 | 23151221 | 53131121 | 11421611 |
| 570 | 11333114 | 42222113 | 12331124 |
| 571 | 12242213 | 43131212 | 22331132 |
| 572 | 22242221 | 41313113 | 11422124 |
| 573 | 11333213 | 51313121 | 12331223 |
| 574 | 21333221 | 43131311 | 22331231 |
| 575 | 13151411 | 41313212 | 11422223 |
| 576 | 11333312 | 42222311 | 21422231 |
| 577 | 12242411 | 41313311 | 11422322 |
| 578 | 11333411 | 33132113 | 12331421 |
| 579 | 12243122 | 43132121 | 11422421 |

**50**

© ISO/IEC 2015 – All rights reserved

OPTO_00012138

JA1882

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 580 | 11334122 | 32223113 | 13241132 |
| 581 | 11334221 | 33132212 | 12332132 |
| 582 | 41341121 | 31314113 | 13241231 |
| 583 | 31341311 | 32223212 | 11423132 |
| 584 | 32251121 | 33132311 | 12332231 |
| 585 | 22251212 | 31314212 | 11423231 |
| 586 | 22251311 | 32223311 | 11431115 |
| 587 | 13161113 | 31314311 | 21431123 |
| 588 | 12252113 | 23133113 | 31431131 |
| 589 | 11343113 | 33133121 | 11431214 |
| 590 | 13161311 | 22224113 | 21431222 |
| 591 | 12252311 | 23133212 | 11431313 |
| 592 | 24111125 | 21315113 | 21431321 |
| 593 | 14111216 | 22224212 | 11431412 |
| 594 | 24111224 | 23133311 | 11431511 |
| 595 | 14111315 | 21315212 | 12341123 |
| 596 | 24111323 | 22224311 | 22341131 |
| 597 | 34111331 | 21315311 | 11432123 |
| 598 | 14111414 | 13134113 | 12341222 |
| 599 | 24111422 | 23134121 | 11432222 |
| 600 | 14111513 | 12225113 | 12341321 |
| 601 | 24111521 | 13134212 | 11432321 |
| 602 | 14112125 | 11316113 | 13251131 |
| 603 | 24112133 | 12225212 | 12342131 |
| 604 | 34112141 | 13134311 | 11433131 |
| 605 | 14112224 | 11316212 | 11441114 |
| 606 | 24112232 | 12225311 | 21441122 |
| 607 | 14112323 | 11316311 | 11441213 |
| 608 | 24112331 | 13135121 | 21441221 |
| 609 | 14112422 | 12226121 | 11441312 |
| 610 | 14112521 | 61321112 | 11441411 |
| 611 | 14113133 | 11321153 | 12351122 |
| 612 | 24113141 | 21321161 | 11442122 |
| 613 | 14113232 | 61321211 | 12351221 |
| 614 | 14113331 | 11321252 | 11442221 |
| 615 | 14114141 | 11321351 | 11451113 |
| 616 | 23211116 | 52231112 | 21451121 |
| 617 | 33211124 | 12231161 | 11451212 |
| 618 | 43211132 | 51322112 | 11451311 |
| 619 | 23211215 | 52231211 | 12361121 |
| 620 | 33211223 | 11322161 | 11452121 |
| 621 | 23211314 | 51322211 | 15111143 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012139

JA1883

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 622 | 33211322 | 43141112 | 25111151 |
| 623 | 23211413 | 42232112 | 15111242 |
| 624 | 33211421 | 43141211 | 15111341 |
| 625 | 23211512 | 41323112 | 15112151 |
| 626 | 14121116 | 42232211 | 14211134 |
| 627 | 24121124 | 41323211 | 24211142 |
| 628 | 34121132 | 33142112 | 14211233 |
| 629 | 13212116 | 32233112 | 24211241 |
| 630 | 14121215 | 33142211 | 14211332 |
| 631 | 33212132 | 31324112 | 14211431 |
| 632 | 34121231 | 32233211 | 15121142 |
| 633 | 13212215 | 31324211 | 14212142 |
| 634 | 23212223 | 23143112 | 15121241 |
| 635 | 33212231 | 22234112 | 14212241 |
| 636 | 13212314 | 23143211 | 13311125 |
| 637 | 14121413 | 21325112 | 23311133 |
| 638 | 24121421 | 22234211 | 33311141 |
| 639 | 13212413 | 21325211 | 13311224 |
| 640 | 23212421 | 13144112 | 23311232 |
| 641 | 14121611 | 12235112 | 13311323 |
| 642 | 14122124 | 13144211 | 23311331 |
| 643 | 24122132 | 11326112 | 13311422 |
| 644 | 13213124 | 12235211 | 13311521 |
| 645 | 14122223 | 11326211 | 14221133 |
| 646 | 24122231 | 61331111 | 24221141 |
| 647 | 13213223 | 11331152 | 13312133 |
| 648 | 23213231 | 11331251 | 14221232 |
| 649 | 13213322 | 52241111 | 13312232 |
| 650 | 14122421 | 51332111 | 14221331 |
| 651 | 14123132 | 43151111 | 13312331 |
| 652 | 13214132 | 42242111 | 15131141 |
| 653 | 14123231 | 41333111 | 14222141 |
| 654 | 13214231 | 33152111 | 13313141 |
| 655 | 32311115 | 32243111 | 12411116 |
| 656 | 42311123 | 31334111 | 22411124 |
| 657 | 52311131 | 23153111 | 32411132 |
| 658 | 32311214 | 22244111 | 12411215 |
| 659 | 42311222 | 21335111 | 22411223 |
| 660 | 32311313 | 13154111 | 32411231 |
| 661 | 42311321 | 12245111 | 12411314 |
| 662 | 32311412 | 11336111 | 22411322 |
| 663 | 32311511 | 11341151 | 12411413 |

**52**

© ISO/IEC 2015 – All rights reserved

OPTO_00012140

JA1884

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 664 | 23221115 | 44111114 | 22411421 |
| 665 | 33221123 | 54111122 | 12411512 |
| 666 | 22312115 | 44111213 | 12411611 |
| 667 | 23221214 | 54111221 | 13321124 |
| 668 | 33221222 | 44111312 | 23321132 |
| 669 | 22312214 | 44111411 | 12412124 |
| 670 | 32312222 | 34112114 | 13321223 |
| 671 | 33221321 | 44112122 | 23321231 |
| 672 | 22312313 | 34112124 | 12412223 |
| 673 | 23221412 | 44112221 | 22412231 |
| 674 | 22312412 | 34112312 | 12412322 |
| 675 | 23221511 | 34112411 | 13321421 |
| 676 | 22312511 | 24113114 | 12412421 |
| 677 | 14131115 | 34113122 | 14231132 |
| 678 | 24131123 | 24113213 | 13322132 |
| 679 | 13222115 | 34113221 | 14231231 |
| 680 | 14131214 | 24113312 | 12413132 |
| 681 | 33222131 | 24113411 | 13322231 |
| 682 | 12313115 | 14114114 | 12413231 |
| 683 | 13222214 | 24114122 | 21511115 |
| 684 | 23222222 | 14114213 | 31511123 |
| 685 | 24131321 | 24114221 | 41511131 |
| 686 | 12313214 | 14114312 | 21511214 |
| 687 | 22313222 | 14114411 | 31511222 |
| 688 | 14131412 | 14115122 | 21511313 |
| 689 | 12313313 | 14115221 | 31511321 |
| 690 | 13222412 | 53211113 | 21511412 |
| 691 | 14131511 | 63211121 | 21511511 |
| 692 | 13222511 | 13211162 | 12421115 |
| 693 | 14132123 | 53211212 | 22421123 |
| 694 | 24132131 | 13211261 | 32421131 |
| 695 | 13223123 | 53211311 | 11512115 |
| 696 | 14132222 | 44121113 | 12421214 |
| 697 | 12314123 | 54121121 | 22421222 |
| 698 | 13223222 | 43212113 | 11512214 |
| 699 | 14132321 | 44121212 | 21512222 |
| 700 | 12314222 | 43212212 | 22421321 |
| 701 | 13223321 | 44121311 | 11512313 |
| 702 | 14133131 | 43212311 | 12421412 |
| 703 | 13224131 | 34122113 | 11512412 |
| 704 | 12315131 | 44122121 | 12421511 |
| 705 | 41411114 | 33213113 | 11512511 |

© ISO/IEC 2015 – All rights reserved

53

OPTO_00012141

JA1885

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 706 | 51411122 | 34122212 | 13331123 |
| 707 | 41411213 | 33213212 | 23331131 |
| 708 | 51411221 | 34122311 | 12422123 |
| 709 | 41411312 | 33213311 | 13331222 |
| 710 | 41411411 | 24123113 | 11513123 |
| 711 | 32321114 | 34123121 | 12422222 |
| 712 | 42321122 | 23214113 | 13331321 |
| 713 | 31412114 | 24123212 | 11513222 |
| 714 | 41412122 | 23214212 | 12422321 |
| 715 | 42321221 | 24123311 | 11513321 |
| 716 | 31412213 | 23214311 | 14241131 |
| 717 | 41412221 | 14124113 | 13332131 |
| 718 | 31412312 | 24124121 | 12423131 |
| 719 | 32321411 | 13215113 | 11514131 |
| 720 | 31412411 | 14124212 | 21521114 |
| 721 | 23231114 | 13215212 | 31521122 |
| 722 | 33231122 | 14124311 | 21521213 |
| 723 | 22322114 | 13215311 | 31521221 |
| 724 | 23231213 | 14125121 | 21521312 |
| 725 | 33231221 | 13216121 | 21521411 |
| 726 | 21413114 | 62311112 | 12431114 |
| 727 | 22322213 | 12311153 | 22431122 |
| 728 | 32322221 | 22311161 | 11522114 |
| 729 | 21413213 | 62311211 | 12431213 |
| 730 | 31413221 | 12311252 | 22431221 |
| 731 | 23231411 | 12311351 | 11522213 |
| 732 | 21413312 | 53221112 | 21522221 |
| 733 | 22322411 | 13221161 | 11522312 |
| 734 | 21413411 | 52312112 | 12431411 |
| 735 | 14141114 | 53221211 | 11522411 |
| 736 | 24141122 | 12312161 | 13341122 |
| 737 | 13232114 | 52312211 | 12432122 |
| 738 | 14141213 | 44131112 | 13341221 |
| 739 | 24141221 | 43222112 | 11523122 |
| 740 | 12323114 | 44131211 | 12432221 |
| 741 | 13232213 | 42313112 | 11523221 |
| 742 | 23232221 | 43222211 | 21531113 |
| 743 | 11414114 | 42313211 | 31531121 |
| 744 | 12323213 | 34132112 | 21531212 |
| 745 | 22323221 | 33223112 | 21531311 |
| 746 | 14141411 | 34132211 | 12441113 |
| 747 | 11414213 | 32314112 | 22441121 |

54

© ISO/IEC 2015 – All rights reserved

OPTO_00012142

JA1886

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 748 | 21414221 | 33223211 | 11532113 |
| 749 | 13232411 | 32314211 | 12441212 |
| 750 | 11414312 | 24133112 | 11532212 |
| 751 | 14142122 | 23224112 | 12441311 |
| 752 | 13233122 | 24133211 | 11532311 |
| 753 | 14142221 | 22315112 | 13351121 |
| 754 | 12324122 | 23224211 | 12442121 |
| 755 | 13233221 | 22315211 | 11533121 |
| 756 | 11415122 | 14134112 | 21541112 |
| 757 | 12324221 | 13225112 | 21541211 |
| 758 | 11415221 | 14134211 | 12451112 |
| 759 | 41421113 | 12316112 | 11542112 |
| 760 | 51421121 | 13225211 | 12451211 |
| 761 | 41421212 | 12316211 | 11542211 |
| 762 | 41421311 | 11411144 | 16111142 |
| 763 | 32331113 | 21411152 | 16111241 |
| 764 | 42331121 | 11411243 | 15211133 |
| 765 | 31422113 | 21411251 | 25211141 |
| 766 | 41422121 | 11411342 | 15211232 |
| 767 | 31422212 | 11411441 | 15211331 |
| 768 | 32331311 | 62321111 | 16121141 |
| 769 | 31422311 | 12321152 | 15212141 |
| 770 | 23241113 | 61412111 | 14311124 |
| 771 | 33241121 | 11412152 | 24311132 |
| 772 | 22332113 | 12321251 | 14311223 |
| 773 | 23241212 | 11412251 | 24311231 |
| 774 | 21423113 | 53231111 | 14311322 |
| 775 | 22332212 | 52322111 | 14311421 |
| 776 | 23241311 | 51413111 | 15221132 |
| 777 | 21423212 | 44141111 | 14312132 |
| 778 | 22332311 | 43232111 | 15221231 |
| 779 | 21423311 | 42323111 | 14312231 |
| 780 | 14151113 | 41414111 | 13411115 |
| 781 | 24151121 | 34142111 | 23411123 |
| 782 | 13242113 | 33233111 | 33411131 |
| 783 | 23242121 | 32324111 | 13411214 |
| 784 | 12333113 | 31415111 | 23411222 |
| 785 | 13242212 | 24143111 | 13411313 |
| 786 | 14151311 | 23234111 | 23411321 |
| 787 | 11424113 | 22325111 | 13411412 |
| 788 | 12333212 | 21416111 | 13411511 |
| 789 | 13242311 | 14144111 | 14321123 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012143

JA1887

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 790 | 11424212 | 13235111 | 24321131 |
| 791 | 12333311 | 12326111 | 13412123 |
| 792 | 11424311 | 11421143 | 23412131 |
| 793 | 13243121 | 21421151 | 13412222 |
| 794 | 11425121 | 11421242 | 14321321 |
| 795 | 41431211 | 11421341 | 13412321 |
| 796 | 31432112 | 12331151 | 15231131 |
| 797 | 31432211 | 11422151 | 14322131 |
| 798 | 22342112 | 11431142 | 13413131 |
| 799 | 21433112 | 11431241 | 22511114 |
| 800 | 21433211 | 11441141 | 32511122 |
| 801 | 13252112 | 45111113 | 22511213 |
| 802 | 12343112 | 45111212 | 32511221 |
| 803 | 11434112 | 45111311 | 22511312 |
| 804 | 11434211 | 35112113 | 22511411 |
| 805 | 15111116 | 45112121 | 13421114 |
| 806 | 15111215 | 35112212 | 23421122 |
| 807 | 25111223 | 35112311 | 12512114 |
| 808 | 15111314 | 25113113 | 22512122 |
| 809 | 15111413 | 35113121 | 23421221 |
| 810 | 15111512 | 25113212 | 12512213 |
| 811 | 15112124 | 25113311 | 13421312 |
| 812 | 15112223 | 15114113 | 12512312 |
| 813 | 15112322 | 25114121 | 13421411 |
| 814 | 15112421 | 15114212 | 12512411 |
| 815 | 15113132 | 15114311 | 14331122 |
| 816 | 15113231 | 15115121 | 13422122 |
| 817 | 24211115 | 54211112 | 14331221 |
| 818 | 24211214 | 14211161 | 12513122 |
| 819 | 34211222 | 54211211 | 13422221 |
| 820 | 24211313 | 45121112 | 12513221 |
| 821 | 34211321 | 44212112 | 31611113 |
| 822 | 24211412 | 45121121 | 41611121 |
| 823 | 24211511 | 44212211 | 31611212 |
| 824 | 15121115 | 35122112 | 31611311 |
| 825 | 25121123 | 34213112 | 22521113 |
| 826 | 14212115 | 35122211 | 32521121 |
| 827 | 24212123 | 34213211 | 21612113 |
| 828 | 25121222 | 25123112 | 22521212 |
| 829 | 14212214 | 24214112 | 21612212 |
| 830 | 24212222 | 25123211 | 22521311 |
| 831 | 14212313 | 24214211 | 21612311 |

56

© ISO/IEC 2015 – All rights reserved

OPTO_00012144

JA1888

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 832 | 24212321 | 15124112 | 13431113 |
| 833 | 14212412 | 14215112 | 23431121 |
| 834 | 15121511 | 15124211 | 12522113 |
| 835 | 14212511 | 14215211 | 13431212 |
| 836 | 15122123 | 63311111 | 11613113 |
| 837 | 25122131 | 13311152 | 12522212 |
| 838 | 14213123 | 13311251 | 13431311 |
| 839 | 24213131 | 54221111 | 11613212 |
| 840 | 14213222 | 53312111 | 12522311 |
| 841 | 15122321 | 45131111 | 11613311 |
| 842 | 14213321 | 44222111 | 14341121 |
| 843 | 15123131 | 43313111 | 13432121 |
| 844 | 14214131 | 35132111 | 12523121 |
| 845 | 33311114 | 34223111 | 11614121 |
| 846 | 33311213 | 33314111 | 31621112 |
| 847 | 33311312 | 25133111 | 31621211 |
| 848 | 33311411 | 24224111 | 22531112 |
| 849 | 24221114 | 23315111 | 21622112 |
| 850 | 23312114 | 15134111 | 22531211 |
| 851 | 33312122 | 14225111 | 21622211 |
| 852 | 34221221 | 13316111 | 13441112 |
| 853 | 23312213 | 12411143 | 12532112 |
| 854 | 33312221 | 22411151 | 13441211 |
| 855 | 23312312 | 12411242 | 11623112 |
| 856 | 24221411 | 12411341 | 12532211 |
| 857 | 23312411 | 13321151 | 11623211 |
| 858 | 15131114 | 12412151 | 31631111 |
| 859 | 14222114 | 11511134 | 22541111 |
| 860 | 15131213 | 21511142 | 21632111 |
| 861 | 25131221 | 11511233 | 13451111 |
| 862 | 13313114 | 21511241 | 12542111 |
| 863 | 14222213 | 11511332 | 11633111 |
| 864 | 15131312 | 11511431 | 16211132 |
| 865 | 13313213 | 12421142 | 16211231 |
| 866 | 14222312 | 11512142 | 15311123 |
| 867 | 15131411 | 12421241 | 25311131 |
| 868 | 13313312 | 11512241 | 15311222 |
| 869 | 14222411 | 11521133 | 15311321 |
| 870 | 15132122 | 21521141 | 16221131 |
| 871 | 14223122 | 11521232 | 15312131 |
| 872 | 15132221 | 11521331 | 14411114 |
| 873 | 13314122 | 12431141 | 24411122 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012145

JA1889

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 | Cluster 3 | Cluster 6 |
| | BSBSBSBS | BSBSBSBS | BSBSBSBS |
| 874 | 14223221 | 11522141 | 14411213 |
| 875 | 13314221 | 11531132 | 24411221 |
| 876 | 42411113 | 11531231 | 14411312 |
| 877 | 42411212 | 11541131 | 14411411 |
| 878 | 42411311 | 36112112 | 15321122 |
| 879 | 33321113 | 36112211 | 14412122 |
| 880 | 32412113 | 26113112 | 15321221 |
| 881 | 42412121 | 26113211 | 14412221 |
| 882 | 32412212 | 16114112 | 23511113 |
| 883 | 33321311 | 16114211 | 33511121 |
| 884 | 32412311 | 45212111 | 23511212 |
| 885 | 24231113 | 36122111 | 23511311 |
| 886 | 34231121 | 35213111 | 14421113 |
| 887 | 23322113 | 26123111 | 24421121 |
| 888 | 33322121 | 25214111 | 13512113 |
| 889 | 22413113 | 16124111 | 23512121 |
| 890 | 23322212 | 15215111 | 13512212 |
| 891 | 24231311 | 14311151 | 14421311 |
| 892 | 22413212 | 13411142 | 13512311 |
| 893 | 23322311 | 13411241 | 15331121 |
| 894 | 22413311 | 12511133 | 14422121 |
| 895 | 15141113 | 22511141 | 13513121 |
| 896 | 25141121 | 12511232 | 32611112 |
| 897 | 14232113 | 12511331 | 32611211 |
| 898 | 24232121 | 13421141 | 23521112 |
| 899 | 13323113 | 12512141 | 22612112 |
| 900 | 14232212 | 11611124 | 23521211 |
| 901 | 15141311 | 21611132 | 22612211 |
| 902 | 12414113 | 11611223 | 14431112 |
| 903 | 13323212 | 21611231 | 13522112 |
| 904 | 14232311 | 11611322 | 14431211 |
| 905 | 12414212 | 11611421 | 12613112 |
| 906 | 13323311 | 12521132 | 13522211 |
| 907 | 15142121 | 11612132 | 12613211 |
| 908 | 14233121 | 12521231 | 32621111 |
| 909 | 13324121 | 11612231 | 23531111 |
| 910 | 12415121 | 11621123 | 22622111 |
| 911 | 51511112 | 21621131 | 14441111 |
| 912 | 51511211 | 11621222 | 13532111 |
| 913 | 42421112 | 11621321 | 12623111 |
| 914 | 41512112 | 12531131 | 16311122 |
| 915 | 42421211 | 11622131 | 16311221 |

58

© ISO/IEC 2015 – All rights reserved

OPTO_00012146

JA1890

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 308 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

| Codeword | Bar-space sequence | | |
|---|---|---|---|
| | Cluster 0 BSBSBSBS | Cluster 3 BSBSBSBS | Cluster 6 BSBSBSBS |
| 916 | 41512211 | 11631122 | 15411113 |
| 917 | 33331112 | 11631221 | 25411121 |
| 918 | 32422112 | 14411141 | 15411212 |
| 919 | 33331211 | 13511132 | 15411311 |
| 920 | 31513112 | 13511231 | 16321121 |
| 921 | 32422211 | 12611123 | 15412121 |
| 922 | 31513211 | 22611131 | 24511112 |
| 923 | 24241112 | 12611222 | 24511211 |
| 924 | 23332112 | 12611321 | 15421112 |
| 925 | 24241211 | 13521131 | 14512112 |
| 926 | 22423112 | 12612131 | 15421211 |
| 927 | 23332211 | 12621122 | 14512211 |
| 928 | 21514112 | 12621221 | 33611111 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012147

JA1891

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

# Annex B
(normative)

# The default character set for Byte Compaction mode

| B | C | B | C | B | C | B | C | B | C | B | C | B | C | B | C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | NUL | 32 | space | 64 | @ | 96 | ` | 128 | | 160 | NBSP | 192 | À | 224 | à |
| 1 | SOH | 33 | ! | 65 | A | 97 | a | 129 | | 161 | ¡ | 193 | Á | 225 | á |
| 2 | STX | 34 | " | 66 | B | 98 | b | 130 | | 162 | ¢ | 194 | Â | 226 | â |
| 3 | ETX | 35 | # | 67 | C | 99 | c | 131 | | 163 | £ | 195 | Ã | 227 | ã |
| 4 | EOT | 36 | $ | 68 | D | 100 | d | 132 | | 164 | ¤ | 196 | Ä | 228 | ä |
| 5 | ENQ | 37 | % | 69 | E | 101 | e | 133 | | 165 | ¥ | 197 | Å | 229 | å |
| 6 | ACK | 38 | & | 70 | F | 102 | f | 134 | | 166 | ¦ | 198 | Æ | 230 | æ |
| 7 | BEL | 39 | ' | 71 | G | 103 | g | 135 | | 167 | § | 199 | Ç | 231 | ç |
| 8 | BS | 40 | ( | 72 | H | 104 | h | 136 | | 168 | ¨ | 200 | È | 232 | è |
| 9 | HT | 41 | ) | 73 | I | 105 | i | 137 | | 169 | © | 201 | É | 233 | é |
| 10 | LF | 42 | * | 74 | J | 106 | j | 138 | | 170 | ª | 202 | Ê | 234 | ê |
| 11 | VT | 43 | + | 75 | K | 107 | k | 139 | | 171 | « | 203 | Ë | 235 | ë |
| 12 | FF | 44 | , | 76 | L | 108 | l | 140 | | 172 | ¬ | 204 | Ì | 236 | ì |
| 13 | CR | 45 | - | 77 | M | 109 | m | 141 | | 173 | SHY | 205 | Í | 237 | í |
| 14 | SO | 46 | . | 78 | N | 110 | n | 142 | | 174 | ® | 206 | Î | 238 | î |
| 15 | SI | 47 | / | 79 | O | 111 | o | 143 | | 175 | ¯ | 207 | Ï | 239 | ï |
| 16 | DLE | 48 | 0 | 80 | P | 112 | p | 144 | | 176 | ° | 208 | Ð | 240 | ð |
| 17 | DC1 | 49 | 1 | 81 | Q | 113 | q | 145 | | 177 | ± | 209 | Ñ | 241 | ñ |
| 18 | DC2 | 50 | 2 | 82 | R | 114 | r | 146 | | 178 | ² | 210 | Ò | 242 | ò |
| 19 | DC3 | 51 | 3 | 83 | S | 115 | s | 147 | | 179 | ³ | 211 | Ó | 243 | ó |
| 20 | DC4 | 52 | 4 | 84 | T | 116 | t | 148 | | 180 | ´ | 212 | Ô | 244 | ô |
| 21 | NAK | 53 | 5 | 85 | U | 117 | u | 149 | | 181 | µ | 213 | Õ | 245 | õ |
| 22 | SYN | 54 | 6 | 86 | V | 118 | v | 150 | | 182 | ¶ | 214 | Ö | 246 | ö |
| 23 | ETB | 55 | 7 | 87 | W | 119 | w | 151 | | 183 | · | 215 | × | 247 | ÷ |
| 24 | CAN | 56 | 8 | 88 | X | 120 | x | 152 | | 184 | ¸ | 216 | Ø | 248 | ø |
| 25 | EM | 57 | 9 | 89 | Y | 121 | y | 153 | | 185 | ¹ | 217 | Ù | 249 | ù |
| 26 | SUB | 58 | : | 90 | Z | 122 | z | 154 | | 186 | º | 218 | Ú | 250 | ú |
| 27 | ESC | 59 | ; | 91 | [ | 123 | { | 155 | | 187 | » | 219 | Û | 251 | û |
| 28 | IS4/FS | 60 | < | 92 | \ | 124 | | | 156 | | 188 | ¼ | 220 | Ü | 252 | ü |
| 29 | IS3/GS | 61 | = | 93 | ] | 125 | } | 157 | | 189 | ½ | 221 | Ý | 253 | ý |
| 30 | IS2/RS | 62 | > | 94 | ^ | 126 | ~ | 158 | | 190 | ¾ | 222 | Þ | 254 | þ |
| 31 | IS1/US | 63 | ? | 95 | _ | 127 | DEL | 159 | | 191 | ¿ | 223 | ß | 255 | ÿ |

NOTE    This table corresponds to the character set defined in ISO/IEC 8859-1, with the addition of the control characters (byte values 00 – 31) defined in ISO/IEC 646, International Reference Version.

60

© ISO/IEC 2015 – All rights reserved

OPTO_00012148

JA1892

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

## Annex C
### (normative)

## Byte Compaction mode encoding algorithm

This conversion is used in Byte Compaction mode. It converts six data bytes to five PDF417 data codewords. The conversion equation is:

$$b_5 \times 256^5 + b_4 \times 256^4 + b_3 \times 256^3 + b_2 \times 256^2 + b_1 \times 256^1 + b_0 \times 256^0$$

$$= d_4 \times 900^4 + d_3 \times 900^3 + d_2 \times 900^2 + d_1 \times 900^1 + d_0 \times 900^0$$

where

$b$ is the data byte value as a decimal (0 to 255);

$d$ is the data codeword.

The following algorithm may be used for a base 256 to base 900 conversion.

a) Designate $t$ = temporary variable

b) Calculate $t = b_5 \times 256^5 + b_4 \times 256^4 + b_3 \times 256^3 + b_2 \times 256^2 + b_1 \times 256^1 + b_0 \times 256^0$

c) Calculate each codeword as follows:

For each data codeword $d_i = d_0 .... d_4$

BEGIN

| | | |
|---|---|---|
| $d_i$ | = | $t$ mod 900 |
| $t$ | = | $t$ div 900 |

END

EXAMPLE

Encode the Byte Compaction characters $b_5 .... b_0$ {231, 101, 11, 97, 205, 2}

Calculate the sum $t$ using the decimal values of the six Byte Compaction characters:

$t$ = $231 \times 256^5 + 101 \times 256^4 + 11 \times 256^3 + 97 \times 256^2 + 205 \times 256^1$

$+ 2 \times 256^0$

= 254 421 168 672 002

Calculate codeword 0

$d_0$ = 254 421 168 672 002 mod 900 = 302

$t$ = 254 421 168 672 002 div 900 = 282 690 187 413

Calculate codeword 1

$d_1$ = 282 690 187 413 mod 900 = 213

© ISO/IEC 2015 – All rights reserved

OPTO_00012149

JA1893

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

$t$ = 282 690 187 413 div 900 = 314 100 208

Calculate codeword 2

$d_2$ = 314 100 208 mod 900 = 208

$t$ = 314 100 208 div 900 = 349 000

Calculate codeword 3

$d_3$ = 349 000 mod 900 = 700

$t$ = 349 000 div 900 = 387

Calculate codeword 4

$d_4$ = 387 mod 900 = 387

$t$ = 387 div 900 = 0

The codeword sequence $d_4 \dots d_0$ is 387, 700, 208, 213, 302

© ISO/IEC 2015 – All rights reserved

OPTO_00012150

JA1894

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

## Annex D
(normative)

## Numeric Compaction mode encoding algorithm

This conversion is used in Numeric Compaction mode. It converts groups of up to 44 consecutive numeric digits to 15 or fewer PDF417 data codewords.

The following algorithm may be used for a base 10 to base 900 conversion.

a)  Designate $t$ = temporary value.

b)  Set the initial value of $t$ to be the group of up to 44 consecutive numeric digits, preceded by the digit 1.

c)  Calculate each codeword as follows:

      For each data codeword $d_i = d_0 .... d_{n-1}$

      BEGIN

          $d_i$    =    $t$ mod 900

          $t$    =    $t$ div 900

          If $t$    =    0, then stop encoding

      END

EXAMPLE

Encode the fifteen digit numeric string 000213298174000

Prefix the numeric string with a 1 and set the initial value of

$t$    = 1 000 213 298 174 000

Calculate codeword 0

$d_0$ = 1 000 213 298 174 000 mod 900   = 200

$t$    = 1 000 213 298 174 000 div 900   = 1 111 348 109 082

Calculate codeword 1

$d_1$ = 1 111 348 109 082 mod 900    = 282

$t$    = 1 111 348 109 082 div 900    = 1 234 831 232

Calculate codeword 2

$d_2$ = 1 234 831 232 mod 900      = 632

$t$    = 1 234 831 232 div 900      1 372 034

Calculate codeword 3

$d_3$ = 1 372 034 mod 900          = 434

$t$    = 1 372 034 div 900          = 1 524

© ISO/IEC 2015 – All rights reserved

OPTO_00012151

JA1895

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

Calculate codeword 4

| | | |
|---|---|---|
| $d_4$ | = 1 524 mod 900 | = 624 |
| $t$ | = 1 524 div 900 | = 1 |

Calculate codeword 5

| | | |
|---|---|---|
| $d_5$ | = 1 mod 900 | = 1 |
| $t$ | = 1 div 900 | = 0 |

The codeword sequence $d_5 \ldots d_0$ is 1, 624, 434, 632, 282, 200

64

© ISO/IEC 2015 – All rights reserved

OPTO_00012152

JA1896

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

## Annex E
(normative)

## User selection of error correction level

### E.1   Recommended minimum error correction level

The minimum level of error correction level should be as defined in Table E.1.

**Table E.1 — Recommended Error Correction Level**

| Number of Data Codewords | Minimum Error Correction Level |
|---|---|
| 1 to 40 | 2 |
| 41 to 160 | 3 |
| 161 to 320 | 4 |
| 321 to 863 | 5 |

As a guide for estimating the number of data codewords from data content in order to use Table E.1, use 1,8 text characters per data codeword in Text Compaction mode, 2,9 digits per data codeword in Numeric Compaction mode and 1,2 bytes per data codeword in Byte Compaction mode.

Higher levels of error correction should be used where significant symbol damage or degradation is anticipated. Lower than recommended error correction levels may be used in closed system applications.

### E.2   Other user consideration of the error correction level

The objective in an application standard should be to make use of the features of error correction without sacrificing the data content capacity.

The following factors should be taken into account by the user in selecting an error correction level.

a) The recommended error correction level (see Table E.1) should be followed.

b) Since the maximum number of data codewords per symbol is fixed at 925, large numbers of data codewords limit the maximum level of error correction that can be implemented. More than 415 data codewords precludes Error Correction Level 8. More than 671 data codewords precludes Levels 7 and 8. More than 799 data codewords precludes Levels 6, 7 and 8. More than 863 data codewords precludes Level 5 and therefore is not recommended.

c) Where PDF417 symbols are likely to have missing or totally obliterated codewords, the Error Correction Level may be increased up to Error Correction level 8, or up to a level where the number of error correction codewords fills the maximum sized matrix appropriate for the application.

d) It is preferable to maintain symbol quality rather than to compensate for poor print quality by increasing the error correction level. Instead of adopting a higher error correction level, it may be better to specify a larger X-dimension or particular substrates and materials which can maintain the print quality of the PDF417 symbol.

© ISO/IEC 2015 – All rights reserved

OPTO_00012153

JA1897

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

# Annex F
## (normative)

## Tables of coefficients for calculating PDF417 error correction codewords

Table F.1 — Coefficient table for error correction level 0

| $j$ | 0 | 1 |
|---|---|---|
| $\alpha_j$ | 27 | 917 |

Table F.2 — Coefficient table for error correction level 1

| $j$ | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| $\alpha_j$ | 522 | 568 | 723 | 809 |

Table F.3 — Coefficient table for error correction level 2

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 237 | 308 | 436 | 284 | 646 | 653 | 428 | 379 |

Table F.4 — Coefficient table for error correction level 3

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 274 | 562 | 232 | 755 | 599 | 524 | 801 | 132 | 295 | 116 | 442 | 428 | 295 | 42 | 176 | 65 |

Table F.5 — Coefficient table for error correction level 4

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 361 | 575 | 922 | 525 | 176 | 586 | 640 | 321 | 536 | 742 | 677 | 742 | 687 | 284 | 193 | 517 |
| $j$ | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| $\alpha_j$ | 273 | 494 | 263 | 147 | 593 | 800 | 571 | 320 | 803 | 133 | 231 | 390 | 685 | 330 | 63 | 410 |

Table F.6 — Coefficient table for error correction level 5

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 539 | 422 | 6 | 93 | 862 | 771 | 453 | 106 | 610 | 287 | 107 | 505 | 733 | 877 | 381 | 612 |
| $j$ | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| $\alpha_j$ | 723 | 476 | 462 | 172 | 430 | 609 | 858 | 822 | 543 | 376 | 511 | 400 | 672 | 762 | 283 | 184 |
| $j$ | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| $\alpha_j$ | 440 | 35 | 519 | 31 | 460 | 594 | 225 | 535 | 517 | 352 | 605 | 158 | 651 | 201 | 488 | 502 |
| $j$ | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 |
| $\alpha_j$ | 648 | 733 | 717 | 83 | 404 | 97 | 280 | 771 | 840 | 629 | 4 | 381 | 843 | 623 | 264 | 543 |

66

© ISO/IEC 2015 – All rights reserved

OPTO_00012154

JA1898

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
**ISO/IEC 15438:2015(E)**

**Table F.7 — Coefficient table for error correction level 6**

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 521 | 310 | 864 | 547 | 858 | 580 | 296 | 379 | 53 | 779 | 897 | 444 | 400 | 925 | 749 | 415 |
| $j$ | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| $\alpha_j$ | 822 | 93 | 217 | 208 | 928 | 244 | 583 | 620 | 246 | 148 | 447 | 631 | 292 | 908 | 490 | 704 |
| $j$ | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| $\alpha_j$ | 516 | 258 | 457 | 907 | 594 | 723 | 674 | 292 | 272 | 96 | 684 | 432 | 686 | 606 | 860 | 569 |
| $j$ | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 |
| $\alpha_j$ | 193 | 219 | 129 | 186 | 236 | 287 | 192 | 775 | 278 | 173 | 40 | 379 | 712 | 463 | 646 | 776 |
| $j$ | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 |
| $\alpha_j$ | 171 | 491 | 297 | 763 | 156 | 732 | 95 | 270 | 447 | 90 | 507 | 48 | 228 | 821 | 808 | 898 |
| $j$ | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 |
| $\alpha_j$ | 784 | 663 | 627 | 378 | 382 | 262 | 380 | 602 | 754 | 336 | 89 | 614 | 87 | 432 | 670 | 616 |
| $j$ | 96 | 97 | 98 | 99 | 100 | 101 | 102 | 103 | 104 | 105 | 106 | 107 | 108 | 109 | 110 | 111 |
| $\alpha_j$ | 157 | 374 | 242 | 726 | 600 | 269 | 375 | 898 | 845 | 454 | 354 | 130 | 814 | 587 | 804 | 34 |
| $j$ | 112 | 113 | 114 | 115 | 116 | 117 | 118 | 119 | 120 | 121 | 122 | 123 | 124 | 125 | 126 | 127 |
| $\alpha_j$ | 211 | 330 | 539 | 297 | 827 | 865 | 37 | 517 | 834 | 315 | 550 | 86 | 801 | 4 | 108 | 539 |

**Table F.8 — Coefficient table for error correction level 7**

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 524 | 894 | 75 | 766 | 882 | 857 | 74 | 204 | 82 | 586 | 708 | 250 | 905 | 786 | 138 | 720 |
| $j$ | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| $\alpha_j$ | 858 | 194 | 311 | 913 | 275 | 190 | 375 | 850 | 438 | 733 | 194 | 280 | 201 | 280 | 828 | 757 |
| $j$ | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| $\alpha_j$ | 710 | 814 | 919 | 89 | 68 | 569 | 11 | 204 | 796 | 605 | 540 | 913 | 801 | 700 | 799 | 137 |
| $j$ | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 |
| $\alpha_j$ | 439 | 418 | 592 | 668 | 353 | 859 | 370 | 694 | 325 | 240 | 216 | 257 | 284 | 549 | 209 | 884 |
| $j$ | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 |
| $\alpha_j$ | 315 | 70 | 329 | 793 | 490 | 274 | 877 | 162 | 749 | 812 | 684 | 461 | 334 | 376 | 849 | 521 |
| $j$ | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 |
| $\alpha_j$ | 307 | 291 | 803 | 712 | 19 | 358 | 399 | 908 | 103 | 511 | 51 | 8 | 517 | 225 | 289 | 470 |
| $j$ | 96 | 97 | 98 | 99 | 100 | 101 | 102 | 103 | 104 | 105 | 106 | 107 | 108 | 109 | 110 | 111 |
| $\alpha_j$ | 637 | 731 | 66 | 255 | 917 | 269 | 463 | 830 | 730 | 433 | 848 | 585 | 136 | 538 | 906 | 90 |
| $j$ | 112 | 113 | 114 | 115 | 116 | 117 | 118 | 119 | 120 | 121 | 122 | 123 | 124 | 125 | 126 | 127 |
| $\alpha_j$ | 2 | 290 | 743 | 199 | 655 | 903 | 329 | 49 | 802 | 580 | 355 | 588 | 188 | 462 | 10 | 134 |
| $j$ | 128 | 129 | 130 | 131 | 132 | 133 | 134 | 135 | 136 | 137 | 138 | 139 | 140 | 141 | 142 | 143 |
| $\alpha_j$ | 628 | 320 | 479 | 130 | 739 | 71 | 263 | 318 | 374 | 601 | 192 | 605 | 142 | 673 | 687 | 234 |
| $j$ | 144 | 145 | 146 | 147 | 148 | 149 | 150 | 151 | 152 | 153 | 154 | 155 | 156 | 157 | 158 | 159 |
| $\alpha_j$ | 722 | 384 | 177 | 752 | 607 | 640 | 455 | 193 | 689 | 707 | 805 | 641 | 48 | 60 | 732 | 621 |
| $j$ | 160 | 161 | 162 | 163 | 164 | 165 | 166 | 167 | 168 | 169 | 170 | 171 | 172 | 173 | 174 | 175 |
| $\alpha_j$ | 895 | 544 | 261 | 852 | 655 | 309 | 697 | 755 | 756 | 60 | 231 | 773 | 434 | 421 | 726 | 528 |
| $j$ | 176 | 177 | 178 | 179 | 180 | 181 | 182 | 183 | 184 | 185 | 186 | 187 | 188 | 189 | 190 | 191 |
| $\alpha_j$ | 503 | 118 | 49 | 795 | 32 | 144 | 500 | 238 | 836 | 394 | 280 | 566 | 319 | 9 | 647 | 550 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012155

JA1899

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

**Table F.8** *(continued)*

| $j$ | 192 | 193 | 194 | 195 | 196 | 197 | 198 | 199 | 200 | 201 | 202 | 203 | 204 | 205 | 206 | 207 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 73 | 914 | 342 | 126 | 32 | 681 | 331 | 792 | 620 | 60 | 609 | 441 | 180 | 791 | 893 | 754 |
| $j$ | 208 | 209 | 210 | 211 | 212 | 213 | 214 | 215 | 216 | 217 | 218 | 219 | 220 | 221 | 222 | 223 |
| $\alpha_j$ | 605 | 383 | 228 | 749 | 760 | 213 | 54 | 297 | 134 | 54 | 834 | 299 | 922 | 191 | 910 | 532 |
| $j$ | 224 | 225 | 226 | 227 | 228 | 229 | 230 | 231 | 232 | 233 | 234 | 235 | 236 | 237 | 238 | 239 |
| $\alpha_j$ | 609 | 829 | 189 | 20 | 167 | 29 | 872 | 449 | 83 | 402 | 41 | 656 | 505 | 579 | 481 | 173 |
| $j$ | 240 | 241 | 242 | 243 | 244 | 245 | 246 | 247 | 248 | 249 | 250 | 251 | 252 | 253 | 254 | 255 |
| $\alpha_j$ | 404 | 251 | 688 | 95 | 497 | 555 | 642 | 543 | 307 | 159 | 924 | 558 | 648 | 55 | 497 | 10 |

**Table F.9 — Coefficient table for error correction level 8**

| $j$ | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 352 | 77 | 373 | 504 | 35 | 599 | 428 | 207 | 409 | 574 | 118 | 498 | 285 | 380 | 350 | 492 |
| $j$ | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| $\alpha_j$ | 197 | 265 | 920 | 155 | 914 | 299 | 229 | 643 | 294 | 871 | 306 | 88 | 87 | 193 | 352 | 781 |
| $j$ | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| $\alpha_j$ | 846 | 75 | 327 | 520 | 435 | 543 | 203 | 666 | 249 | 346 | 781 | 621 | 640 | 268 | 794 | 534 |
| $j$ | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 |
| $\alpha_j$ | 539 | 781 | 408 | 390 | 644 | 102 | 476 | 499 | 290 | 632 | 545 | 37 | 858 | 916 | 552 | 41 |
| $j$ | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 |
| $\alpha_j$ | 542 | 289 | 122 | 272 | 383 | 800 | 485 | 98 | 752 | 472 | 761 | 107 | 784 | 860 | 658 | 741 |
| $j$ | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 |
| $\alpha_j$ | 290 | 204 | 681 | 407 | 855 | 85 | 99 | 62 | 482 | 180 | 20 | 297 | 451 | 593 | 913 | 142 |
| $j$ | 96 | 97 | 98 | 99 | 100 | 101 | 102 | 103 | 104 | 105 | 106 | 107 | 108 | 109 | 110 | 111 |
| $\alpha_j$ | 808 | 684 | 287 | 536 | 561 | 76 | 653 | 899 | 729 | 567 | 744 | 390 | 513 | 192 | 516 | 258 |
| $j$ | 112 | 113 | 114 | 115 | 116 | 117 | 118 | 119 | 120 | 121 | 122 | 123 | 124 | 125 | 126 | 127 |
| $\alpha_j$ | 240 | 518 | 794 | 395 | 768 | 848 | 51 | 610 | 384 | 168 | 190 | 826 | 328 | 596 | 786 | 303 |
| $j$ | 128 | 129 | 130 | 131 | 132 | 133 | 134 | 135 | 136 | 137 | 138 | 139 | 140 | 141 | 142 | 143 |
| $\alpha_j$ | 570 | 381 | 415 | 641 | 156 | 237 | 151 | 429 | 531 | 207 | 676 | 710 | 89 | 168 | 304 | 402 |
| $j$ | 144 | 145 | 146 | 147 | 148 | 149 | 150 | 151 | 152 | 153 | 154 | 155 | 156 | 157 | 158 | 159 |
| $\alpha_j$ | 40 | 708 | 575 | 162 | 864 | 229 | 65 | 861 | 841 | 512 | 164 | 477 | 221 | 92 | 358 | 785 |
| $j$ | 160 | 161 | 162 | 163 | 164 | 165 | 166 | 167 | 168 | 169 | 170 | 171 | 172 | 173 | 174 | 175 |
| $\alpha_j$ | 288 | 357 | 850 | 836 | 827 | 736 | 707 | 94 | 8 | 494 | 114 | 521 | 2 | 499 | 851 | 543 |
| $j$ | 176 | 177 | 178 | 179 | 180 | 181 | 182 | 183 | 184 | 185 | 186 | 187 | 188 | 189 | 190 | 191 |
| $\alpha_j$ | 152 | 729 | 771 | 95 | 248 | 361 | 578 | 323 | 856 | 797 | 289 | 51 | 684 | 466 | 533 | 820 |
| $j$ | 192 | 193 | 194 | 195 | 196 | 197 | 198 | 199 | 200 | 201 | 202 | 203 | 204 | 205 | 206 | 207 |
| $\alpha_j$ | 669 | 45 | 902 | 452 | 167 | 342 | 244 | 173 | 35 | 463 | 651 | 51 | 699 | 591 | 452 | 578 |
| $j$ | 208 | 209 | 210 | 211 | 212 | 213 | 214 | 215 | 216 | 217 | 218 | 219 | 220 | 221 | 222 | 223 |
| $\alpha_j$ | 37 | 124 | 298 | 332 | 552 | 43 | 427 | 119 | 662 | 777 | 475 | 850 | 764 | 364 | 578 | 911 |
| $j$ | 224 | 225 | 226 | 227 | 228 | 229 | 230 | 231 | 232 | 233 | 234 | 235 | 236 | 237 | 238 | 239 |
| $\alpha_j$ | 283 | 711 | 472 | 420 | 245 | 288 | 594 | 394 | 511 | 327 | 589 | 777 | 699 | 688 | 43 | 408 |
| $j$ | 240 | 241 | 242 | 243 | 244 | 245 | 246 | 247 | 248 | 249 | 250 | 251 | 252 | 253 | 254 | 255 |
| $\alpha_j$ | 842 | 383 | 721 | 521 | 560 | 644 | 714 | 559 | 62 | 145 | 873 | 663 | 713 | 159 | 672 | 729 |

68

© ISO/IEC 2015 – All rights reserved

OPTO_00012156

JA1900

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

**Table F.9** (continued)

| $j$ | 256 | 257 | 258 | 259 | 260 | 261 | 262 | 263 | 264 | 265 | 266 | 267 | 268 | 269 | 270 | 271 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $\alpha_j$ | 624 | 59 | 193 | 417 | 158 | 209 | 563 | 564 | 343 | 693 | 109 | 608 | 563 | 365 | 181 | 772 |
| $j$ | 272 | 273 | 274 | 275 | 276 | 277 | 278 | 279 | 280 | 281 | 282 | 283 | 284 | 285 | 286 | 287 |
| $\alpha_j$ | 677 | 310 | 248 | 353 | 708 | 410 | 579 | 870 | 617 | 841 | 632 | 860 | 289 | 536 | 35 | 777 |
| $j$ | 288 | 289 | 290 | 291 | 292 | 293 | 294 | 295 | 296 | 297 | 298 | 299 | 300 | 301 | 302 | 303 |
| $\alpha_j$ | 618 | 586 | 424 | 833 | 77 | 597 | 346 | 269 | 757 | 632 | 695 | 751 | 331 | 247 | 184 | 45 |
| $j$ | 304 | 305 | 306 | 307 | 308 | 309 | 310 | 311 | 312 | 313 | 314 | 315 | 316 | 317 | 318 | 319 |
| $\alpha_j$ | 787 | 680 | 18 | 66 | 407 | 369 | 54 | 492 | 228 | 613 | 830 | 922 | 437 | 519 | 644 | 905 |
| $j$ | 320 | 321 | 322 | 323 | 324 | 325 | 326 | 327 | 328 | 329 | 330 | 331 | 332 | 333 | 334 | 335 |
| $\alpha_j$ | 789 | 420 | 305 | 441 | 207 | 300 | 892 | 827 | 141 | 537 | 381 | 662 | 513 | 56 | 252 | 341 |
| $j$ | 336 | 337 | 338 | 339 | 340 | 341 | 342 | 343 | 344 | 345 | 346 | 347 | 348 | 349 | 350 | 351 |
| $\alpha_j$ | 242 | 797 | 838 | 837 | 720 | 224 | 307 | 631 | 61 | 87 | 560 | 310 | 756 | 665 | 597 | 808 |
| $j$ | 352 | 353 | 354 | 355 | 356 | 357 | 358 | 359 | 360 | 361 | 362 | 363 | 364 | 365 | 366 | 367 |
| $\alpha_j$ | 851 | 309 | 473 | 795 | 378 | 31 | 647 | 915 | 459 | 806 | 590 | 731 | 425 | 216 | 548 | 249 |
| $j$ | 368 | 369 | 370 | 371 | 372 | 373 | 374 | 375 | 376 | 377 | 378 | 379 | 380 | 381 | 382 | 383 |
| $\alpha_j$ | 321 | 881 | 699 | 535 | 673 | 782 | 210 | 815 | 905 | 303 | 843 | 922 | 281 | 73 | 469 | 791 |
| $j$ | 384 | 385 | 386 | 387 | 388 | 389 | 390 | 391 | 392 | 393 | 394 | 395 | 396 | 397 | 398 | 399 |
| $\alpha_j$ | 660 | 162 | 498 | 308 | 155 | 422 | 907 | 817 | 187 | 62 | 16 | 425 | 535 | 336 | 286 | 437 |
| $j$ | 400 | 401 | 402 | 403 | 404 | 405 | 406 | 407 | 408 | 409 | 410 | 411 | 412 | 413 | 414 | 415 |
| $\alpha_j$ | 375 | 273 | 610 | 296 | 183 | 923 | 116 | 667 | 751 | 353 | 62 | 366 | 691 | 379 | 687 | 842 |
| $j$ | 416 | 417 | 418 | 419 | 420 | 421 | 422 | 423 | 424 | 425 | 426 | 427 | 428 | 429 | 430 | 431 |
| $\alpha_j$ | 37 | 357 | 720 | 742 | 330 | 5 | 39 | 923 | 311 | 424 | 242 | 749 | 321 | 54 | 669 | 316 |
| $j$ | 432 | 433 | 434 | 435 | 436 | 437 | 438 | 439 | 440 | 441 | 442 | 443 | 444 | 445 | 446 | 447 |
| $\alpha_j$ | 342 | 299 | 534 | 105 | 667 | 488 | 640 | 672 | 576 | 540 | 316 | 486 | 721 | 610 | 46 | 656 |
| $j$ | 448 | 449 | 450 | 451 | 452 | 453 | 454 | 455 | 456 | 457 | 458 | 459 | 460 | 461 | 462 | 463 |
| $\alpha_j$ | 447 | 171 | 616 | 464 | 190 | 531 | 297 | 321 | 762 | 752 | 533 | 175 | 134 | 14 | 381 | 433 |
| $j$ | 464 | 465 | 466 | 467 | 468 | 469 | 470 | 471 | 472 | 473 | 474 | 475 | 476 | 477 | 478 | 479 |
| $\alpha_j$ | 717 | 45 | 111 | 20 | 596 | 284 | 736 | 138 | 646 | 411 | 877 | 669 | 141 | 919 | 45 | 780 |
| $j$ | 480 | 481 | 482 | 483 | 484 | 485 | 486 | 487 | 488 | 489 | 490 | 491 | 492 | 493 | 494 | 495 |
| $\alpha_j$ | 407 | 164 | 332 | 899 | 165 | 726 | 600 | 325 | 498 | 655 | 357 | 752 | 768 | 223 | 849 | 647 |
| $j$ | 496 | 497 | 498 | 499 | 500 | 501 | 502 | 503 | 504 | 505 | 506 | 507 | 508 | 509 | 510 | 511 |
| $\alpha_j$ | 63 | 310 | 863 | 251 | 366 | 304 | 282 | 738 | 675 | 410 | 389 | 244 | 31 | 121 | 303 | 263 |

© ISO/IEC 2015 – All rights reserved

OPTO_00012157

JA1901

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

ISO/IEC 15438:2015(E)

# Annex G
## (normative)

## Compact PDF417

### G.1 Description

Compact PDF417 may be used where space considerations are a primary concern and symbol damage is unlikely. In an environment where label damage is unlikely (e.g. an office), the right row indicators may be omitted and the stop pattern may be reduced to one module width bar, as indicated in Figure G.1. This procedure reduces the non-data overhead from 4 codewords per row to 2 codewords per row, with some trade-off in decode performance and robustness, or the ability to withstand noise, damage, degradation, dust etc.

This overhead reduction version is called Compact PDF417, which is fully decoder compatible with standard PDF417.

A Compact PDF417 symbol with fewer than 6 rows encodes the number of columns in only one place, which is not error corrected, and is therefore extremely vulnerable to poor print quality or damage.

NOTE    In the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications, the term Truncated PDF417 has been used in a technically synonymous manner. The name Compact PDF417 is preferred to avoid confusion with the more general use of the term 'truncated'.



**Figure G.1 — Compact PDF417**

### G.2 Print quality

Although the standard print quality method specified in 5.14.4 is applied to Compact PDF417, the absence of a Stop Pattern (other than the single module bar) requires two exceptions to be made.

The analysis of scan reflectance profiles for the Start and Stop Patterns applies only to the Start Pattern.

For the assessment of Codeword Yield, the requirement that a qualifying scan of the top or bottom row of the symbol (which ISO/IEC 15415 includes the decoding of both Start and Stop Patterns) cannot be applied; instead, as for other rows, the Start Pattern and at least one additional codeword must have been decoded.

© ISO/IEC 2015 – All rights reserved

OPTO_00012158

JA1902

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

## Annex H
### (normative)

## Macro PDF417

### H.1   Macro PDF417 overview

Macro PDF417 provides a standard mechanism for creating a distributed representation of files too large to be represented by a single PDF417 symbol. Macro PDF417 symbols differ from ordinary PDF417 symbols in that they contain additional control information in a Macro PDF417 Control Block.

Using Macro PDF417, large files are split into several file segments and encoded into individual symbols. The Control Block defines the file ID, the concatenation sequence and optionally other information about the file. The Macro PDF417 decoder uses the Control Block's information to reconstruct the file correctly, independent of symbol scanning order.

### H.2   Macro PDF417 syntax

Each Macro PDF417 symbol shall encode a Macro PDF417 Control Block containing control information. The Control Block begins with the Macro marker codeword (928). The Control Block follows the data block with which it is associated, and the number of codewords in the control block is counted as data and incorporated in the value of the Symbol Length Descriptor. The beginning of the error correction codewords identifies the end of the Control Block.

NOTE        A symbol containing no user data, other than a Macro PDF417 Control Block, is a valid symbol.

The Control Block shall contain at least the two mandatory fields: a segment index and file ID. It also may contain a number of optional fields, as described in H.2.3.

Figure H.1 illustrates the position of the Control Block in a Macro PDF417 symbol.



**Figure H.1 — PDF417 Symbol Layouts**

© ISO/IEC 2015 – All rights reserved                                                                71

OPTO_00012159

JA1903

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

ISO/IEC 15438:2015(E)

### H.2.1   The segment index

In Macro PDF417, each symbol represents a segment of the whole file. To reconstruct the whole file, the segments need to be placed in the correct order. Control information in the Control Block facilitates this reassembly process. For a file divided into a set of j Macro PDF417 symbols, the segment index field in each symbol's Control Block contains a value between 0 and j - 1, corresponding to the relative position of that symbol's content within the distributed representation.

The segment index field is two codewords in length and is encoded using Numeric Compaction mode as defined in 5.4.4. The segment index value shall be padded with leading zeros to five digits before Numeric Compaction shall be applied, and the switch to Numeric Compaction shall not require an explicit mode latch (codeword 902). The largest allowed value in the segment index field is 99 998. Thus, up to 99 999 Macro PDF417 symbols may comprise the distributed representation of a data file.

NOTE       This translates to a capacity of nearly 110 million bytes of data in Byte Compaction mode, or 184 million characters in Text Compaction mode, or nearly 300 million characters in Numeric Compaction mode.

### H.2.2   File ID field

For each related Macro PDF417 symbol, the file ID field contains the same value. This ensures that all re-assembled symbol data belongs to the same distributed file representation. The file ID is a variable length field which begins with the first codeword following the segment index and extends to the start of the optional fields (if present) or to the end of the Control Block (if not).

Each codeword in the file ID can have a value between 0 and 899, effectively making the file ID a series of base 900 numbers. Each codeword of the series is transmitted as the 3-digit ASCII representation of its decimal value.

NOTE       The effectiveness of the file identification scheme is influenced by both the length of the file ID field and the suitability of the algorithm used to generate its value.

### H.2.3   Optional fields

Optional fields may follow the file ID. Each optional field begins with a specific tag sequence and extends until the start of the next optional field (if present) or the end of the Control Block (if not). The tag sequence consists of codeword 923 followed by a single codeword field designator. In each optional field, data following the tag sequence has a field-specific interpretation. Empty optional fields shall not be used. Table H.1 shows the correspondence between currently defined field designators and optional field contents. Each optional field begins with an implied reset to the compaction mode shown in the table and with an implied reset to ECI 000002 (or GLI 0 for encoders complying with earlier PDF417 standards). ECI escape sequences and mode latches and shifts may be used, but only in the optional fields initially in Text Compaction mode.

These fields shall always represent global file attributes and so need not be present in the Control Block of more than one Macro PDF417 symbol within the distributed file representation, with the exception of the segment count field, as described below. The segment which contains these fields is defined by the specific encoder implementation. If a particular field is to appear in more than one segment, it shall appear identically in every segment. There is no required order for the optional fields.

© ISO/IEC 2015 – All rights reserved

OPTO_00012160

JA1904

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

**Table H.1 — Macro PDF417 Optional Field Designators**

| Field Designator | Byte Value Transmitted | Contents | Initial Compaction Mode | Fixed Compaction Mode[a] | Total Number of Codewords[b] |
|---|---|---|---|---|---|
| 0 | 48 | File Name | Text Compaction | N | Variable |
| 1 | 49 | Segment Count | Numeric Compaction | Y | 4 |
| 2 | 50 | Time Stamp | Numeric Compaction | Y | 6 |
| 3 | 51 | Sender | Text Compaction | N | Variable |
| 4 | 52 | Addressee | Text Compaction | N | Variable |
| 5 | 53 | File Size | Numeric Compaction | Y | Variable |
| 6 | 54 | Checksum | Numeric Compaction | Y | 4 |

[a] A 'Y' in the 'Fixed Compaction Mode' column means that no ECIs and no compaction mode latches and shifts are allowed in that field.

[b] The totals shown in the last column include the two-codeword tag sequence.

As shown in Table H.1, all optional fields use standard PDF417 high-level encoding. At the beginning of each field, the default mode in effect shall be defined by Table H.1, regardless of mode shifts and latches earlier in the symbol.

Specific construction of optional fields shall be as follows.

— The segment count field (identifying the total number of Macro PDF417 symbols in the distributed file) can contain values from 1 to 99 999 and shall be encoded as two codewords. If the optional segment count field is used, that field shall appear in every segment.

— The time stamp field shall be interpreted in Numeric Compaction mode. It indicates the time stamp on the source file expressed as the elapsed time in seconds since 1970:01:01:00:00:00 GMT (i.e. 00:00:00 GMT on 1 January 1970). Using this format, four codewords can encode any date over the next 200 centuries.

— The file size field contains the size in bytes of the entire source file.

— The checksum field contains the value of the 16-bit (2 bytes) CRC checksum using the CCITT-16 polynomial $x^{16} + x^{12} + x^5 + 1$ computed over the entire source file.

The file size and checksum shall be calculated from the original source file, prior to the addition of any ECI escape sequences for Extended Channel Interpretation encoding. This implies that, if the receiver is to verify the checksum after reception, the original source file must be reconstructed verbatim. This requires, for the purposes of this optional checksum verification only, that no user-selectable or optional transformations of the byte stream be performed, even if these would normally be done in ECI decode processing.

If the CRC is used, the calculation may be performed either before the data is sent to the printer or in the printer, based on the capabilities of the printer.

Field designator values greater than 6 are not currently defined. However, PDF417 decoding equipment shall decode and transmit any optional fields encountered with a field designator of 7 to 9 (byte 55 to 57) or A to Z (byte 65 to 90) by treating the field's data as being initially in Text Compaction mode and being variable length.

## H.2.4   Macro PDF417 terminator

The Control Block in the symbol representing the last segment of a Macro PDF417 file contains a special marker, consisting of the codeword 922 at the end of the Control Block. The Control Block for every other symbol shall end after any optional fields with no special terminator.

OPTO_00012161

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

## H.3   High level encoding considerations

While Macro PDF417 provides a mechanism for logically associating a set of symbols, it is important to realise that, with respect to PDF417 high-level encoding, each symbol shall remain a distinct entity. Thus, the scope of a mode switch shall be confined to the symbol in which it occurs. Each symbol shall implicitly begin in the Alpha sub-mode of the Text Compaction mode.

The two mandatory fields are encoded as follows: a) the segment index is encoded in Numeric Compaction mode; b) the file ID is encoded as a sequence of base 900 numbers.

In the context of a Control Block optional field, the compaction modes indicated in Table H.1 shall supersede the mode currently set by the mode identifier codewords within the data codeword region of the symbol. The scope of the current ECI, however, skips over the Macro Control Block to the start of the next Macro PDF417 symbol. Each Macro Control Block field begins with an implied reset to ECI 000002 (or GLI 0 for encoders complying with the earlier PDF417 standards). It shall also be possible to set a different ECI within an optional Text Compaction mode Macro Control Block field, for example, to represent properly a Greek addressee's name. The ECI escape sequence may be placed in any permitted position (see 5.5.3) after the tag codeword (923).

## H.4   Encodation example

To illustrate the encodation of a Macro Control Block, the following example is used.

A Macro PDF417 series encodes a total of 4 567 bytes of user defined data in four PDF417 symbols (or file segments). Other 'header' data to be encoded are

— File ID = $17_{base\ 900}$ $53_{base\ 900}$,

— Segment count to be used,

— Sender: CEN BE, and

— Addressee: ISO CH.

NOTE    The segment count, sender and addressee are three optional fields selected by the user.

On the assumption that the encoder places optional fields in the first symbol, the encodation of the Macro Control Block would be as follows for that symbol.

   ...   [last data codeword] $[928]_A$ [111] $[100]_B$ [017] $[053]_C$ [923] $[001]_D$

   [111] $[104]_E$ [923] $[003]_F$ [064] [416] $[034]_G$ [923] $[004]_H$ [258] [446] $[067]_I$

   [first error correcting codeword]...

The last symbol of four would have the following Macro Control Block:

   [last data codeword] $[928]_A$ [111] $[103]_B$ [017] $[053]_C$

   923] $[001]_D$ [111] $[104]_E$ $[922]_J$ [first error correcting codeword]

   where

   A   is the Macro Marker Codeword;

   B   is the File Segment ID.

File segments are numbered from 0 to $j$ - 1, and are encoded using Numeric Compaction

   1st Segment = 00000 = codewords 111, 100

   4th Segment = 00003 = codewords 111, 103

**74**                                                   © ISO/IEC 2015 – All rights reserved

OPTO_00012162

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

C = File ID to base 900

D = Tag for segment count field

E = Segment count

F = Tag for sender field

G = Sender field encoding CEN BE

H = Tag for addressee field

I = Addressee field encoding ISO CH

J = Macro PDF417 Terminator

## H.5   Macro PDF417 and the Extended Channel Interpretation protocol

The symbology-independent Extended Channel Interpretation (ECI) protocol was developed after PDF417 was specified as a symbology. PDF417 supported its own Global Label Identifier (GLI) system, the precursor and basis of the ECI protocol, from the first publication of the symbology specification in 1994. Therefore, previous 'GLI' implementations have to be taken into account. There are two different conditions which need to be taken into account:

— GLI 0 and 1 which were the only interpretations specified in the original PDF417 specifications. These are equivalent to ECI 000000 and ECI 000001. The precise rules for Macro PDF417 are defined in H.5.1;

— all other ECI assignments, whose usage with Macro PDF417 is defined in H.5.2.

### H.5.1   Macro PDF417 with ECI 000000 and 000001 (GLI 0 and 1)

As GLIs were intrinsically part of the original PDF417 specification, it is logical to have a GLI encoder and Macro PDF417 encoder combined in one unit. The original PDF417 symbology specification called for an implied 'return-to-GLI 0' logic at the beginning of the second and subsequent Macro PDF417 symbols, thus every symbol is expected to start at the default interpretation. For GLI 0 and 1 (equivalent to ECI 000000 and ECI 000001), this has no inherent effect on the encodation. However, for some complex ECIs, the return-to-GLI 0 logic is difficult to implement in a symbology-independent manner.

Encoding software compliant with the original specification for Macro PDF417 and GLI 0 and 1 is completely suitable for pre-existing applications. So too are pre-existing applications of user defined GLIs (now called ECIs) because by definition, the domain of the system is constrained.

All ECIs numbered 000002 or higher shall not be defined with the return-to-GLI 0 logic. Therefore, PDF417 symbols shall not mix ECI 000000 and ECI 000001 with any higher numbered ECI (except in closed systems).

### H.5.2   Macro PDF417 and other ECIs

An ECI encoder could be symbology independent and create a byte stream as input to a PDF417 symbology encoder. The ECI encoder should behave as if there is a single data stream, irrespective of the size of the file. Thus, an ECI once invoked would persist across segments until another ECI or the end of the encoded data. This is essential if, for example, the ECI assignment represents an encryption scheme, where returning to GLI 0 would not be appropriate.

© ISO/IEC 2015 – All rights reserved

**75**

JA1907

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

Macro PDF417 encoders compliant with this International Standard need not encode the prevailing ECI at the beginning of subsequent Macro PDF417 symbols.

NOTE     There may need to be some iteration to produce a logical end-of-symbol encodation, for example, Numeric Compaction mode shall not straddle two segments, but two separate Numeric Compaction blocks can be encoded at the end of one symbol and at the beginning of the next. These conditions are related to Macro PDF417 and High Level Encoding (see H.3) and not Macro PDF417 and ECIs.

## H.6   Macro PDF417 data transmission

The transmission of Macro PDF417 Control Block information shall be treated in a similar manner to that of interpretative ECIs. The symbology-independent ECI protocol is defined below; the original PDF417 protocol is defined in Annex M. Although the Macro Control Block is encoded at the end of the symbol's data, it is transmitted before the symbol's data when using the ECI protocol.

Three codewords (922, 923 and 928) signal the encodation of a Macro PDF417 Control Block or one of its constituent parts. Decoding is as follows:

a)   If the Macro marker codeword (928) begins the sequence:

1)   Codeword 928 is transmitted as the escape sequence 92, 77, 73, which represents '\MI' in the default interpretation.

2)   The next two codewords identify the segment index. These are encoded in Numeric Compaction mode and decode as a 5-digit number in the range 00 000 to 99 998.

3)   The next codewords encode the file ID field, which shall be the same for all related Macro PDF417 symbols. The end point of the file ID field is codeword 922, codeword 923, or the end of the encoded data in the symbol. Each codeword is converted to a 3-digit number in the range 000 to 899 (i.e. the codeword number) and transmitted as three byte values (in the range decimal 48 to 57) following the escape header 92, 77, 70, which represents '\MF' in the default interpretation.

b)   If the Macro sequence tag codeword (923) begins the sequence:

1)   Codeword 923 is transmitted as the escape sequence 92, 77, 79, which represents '\MO' in the default interpretation.

2)   The next codeword represents one of the optional field designators in Table H.1 transmitted as a single byte representing the ASCII value of the designator.

3)   The next codewords carry the data content of the optional field designator. The end point of the optional field is codeword 922, codeword 923, or the end of the encoded data in the symbol. The intervening codewords should be converted according to the decode rules of the relevant compaction mode defined in Table H.1. The resultant data may be variable length.

c)   If the Macro PDF417 Terminator (codeword 922) is identified, the escape sequence 92, 77, 90, which represents '\MZ' in the default interpretation, shall be transmitted.

d)   At the end of the Macro Control Block, as defined by the end of encoded data in the symbol, the escape sequence 92, 77, 89, which represents '\MY' in the default interpretation, shall be transmitted.

NOTE     This escape sequence is not explicitly encoded in the symbol.

All the Macro Control Block fields for a symbol (segment) shall be transmitted as a single block starting with \MI... and ending with \MY. The transmission of the Macro Control Block shall precede the transmission of the remainder of the encoded file segment, even though it is encoded at the end of the symbol.

76

© ISO/IEC 2015 – All rights reserved

OPTO_00012164

JA1908

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

EXAMPLE

The Macro PDF417 Control Block of the first symbol, Segment Index = 0, with a File ID (100, 200, 300) would be encoded in the symbol as the codeword sequence:

[928] [111] [100] [100] [200] [300]

It would be transmitted as:

Data transmission (byte):

92, 77, 73, 48, 48, 48, 48, 48, 92, 77, 70, 49, 48, 48, 50, 48, 48, 51, 48, 48, 92, 77, 89

ASCII interpretation:

\MI00000\MF100200300\MY

As the Macro PDF417 symbols are scanned, the de-packetizing function reconstructs the original message, bearing in mind that the symbols may be scanned out of sequence. If the system is operating in buffered mode, the de-packetizing function is in the decoder; if operating in unbuffered mode, it is in the receiving system.

Decoders should provide a decoder-specific means whereby the processing of a given Macro PDF417 file ID may be aborted, thus allowing the decoder to begin processing a new File ID. This is necessary to prevent a deadlock condition should one or more symbols of a given File ID be missing or undecodable.

## H.6.1   Operating in buffered mode

In buffered mode, de-packetizing shall be performed in the decoder/reader. Depending on the equipment configuration, it will either

— send the reconstructed data with no Macro Control Block, or

— send one Macro Control Block (which itself may have been reconstructed to include all optional fields included in any symbols) to precede the entire encoded message. The resulting Macro Control Block shall have its Macro Index field set to 0 and shall include the Macro end-of-file field (in effect, to mark the entire reconstructed message as the first - and only - Macro segment of the pseudo-series).

## H.6.2   Operating in unbuffered mode

In unbuffered mode, de-packetizing shall be performed in the receiving system. Each transmitted Macro Control Block shall represent all of the required and optional fields actually encoded in the symbol.

When configured in unbuffered mode, a decoder may optionally be configured not to require successive symbols to be of the same File ID. This procedure would only be appropriate if the decoder is configured to transmit the Macro PDF417 Control Block to the receiving system, and this receiving system is designed to monitor the File ID portion of the Control Block to determine when the entire file has been processed. Symbols with a different File ID or no File ID (e.g. a single symbol not part of a Macro PDF417 set) shall be dealt with as determined by the receiving system.

To facilitate checking that all symbols in a Macro PDF417 set are received in an unbuffered operation, the optional Segment Count field should be used whenever possible as part of the encoded Macro Control Block.

## H.6.3   Reset-to-Zero transmissions

Because the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications defined GLI 0 and GLI 1 to have rules slightly different from the rules for ECIs, a reader compliant with this International

OPTO_00012165

JA1909

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

Standard must, in two situations, emit extra escape sequences when transmitting symbols containing explicit GLI 1 invocations.

a)  The decoder shall transmit either a GLI 0 escape sequence or an ECI 000000 escape sequence (depending upon which transmission protocol it is programmed to use) after transmitting the data of any Macro PDF417 symbol whose data ends in a GLI 1 (ECI 000001) interpretation.

b)  The decoder shall transmit a GLI 1 (ECI 000001) at the start of each variable length optional field encoded in Text Compaction mode in the Macro Control Block, if the data preceding that field ends in a GLI 1 (ECI 000001) interpretation.

This requirement applies whether operating in buffered or unbuffered mode, and whether the decoder is programmed to transmit using either the ECI protocol, or the original PDF417 transmission protocol.

**78**

© ISO/IEC 2015 – All rights reserved

OPTO_00012166

JA1910

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

## Annex I
### (normative)

## Testing PDF417 symbol quality

As specified in 5.14.4, the quality of PDF417 symbols is evaluated according to the methodology defined in ISO/IEC 15415 for the assessment of multi-row symbologies with cross-row scanning ability.

In summary, PDF417 symbols are graded in respect of the following:

— analysis of the scan reflectance profile, applied to the start and stop patterns only;

— Codeword Yield, applied to the data and error correction codewords only, which measures the efficiency with which linear scans can recover data from the symbol. The Codeword Yield is the number of validly decoded codewords expressed as a percentage of the maximum number of codewords that could have been decoded, i.e. the number of data columns in the symbol multiplied by the number of "qualified" scans (after adjusting for tilt);

— Unused Error Correction, applied to the data and error correction codewords only, which expresses the number of errors and erasures as a function of the error correction capacity of the symbol;

— codeword print quality, applied to the data and error correction codewords only, which enables the Decodability, Defects and Modulation parameters of scan reflectance profiles covering the entire data region of the symbol to be graded; these grades are then modified to allow for the effect of error correction in masking less than perfect attributes of the symbol that influence symbol quality.

The overall symbol grade shall be the lowest of the grade based on analysis of the scan reflectance profile, and the grades based on Codeword Yield, Unused Error Correction and codeword print quality.

© ISO/IEC 2015 – All rights reserved

OPTO_00012167

JA1911

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

# Annex J
## (normative)

# Reference decode algorithm for PDF417

## J.1   General

This Annex describes the reference decode algorithm used in the computation of decodability when assessing the symbol quality using the method described in ISO/IEC 15415.

When assessing symbol quality through the use of this reference decode algorithm, a PDF417 symbol shall be decoded, in a series of scan lines running across the symbol that cross at least one start or stop character, but not necessarily row by row. It is possible to decode the symbol if the scan line crosses two or more rows by using the cluster number. The decoding of symbol character bar-space sequences shall be achieved by using 'edge to similar edge' (e) measurements.

The PDF417 symbol shall be decoded in four phases:

a)   initialisation - to establish the symbol matrix;

b)   line decoding using the reference decode algorithm;

c)   filling the matrix;

d)   interpretation.

## J.2   Initialisation

A sufficient number of line decodes (see J.3) shall be performed at the start of the decode process to establish the symbol structure parameters [number of rows ($r$), number of columns ($c$)], and error correction levels. This information is encoded in the left and right row indicators, adjacent respectively to the start and stop characters.

After the symbol structure parameters have been initialised, a matrix shall be established which reflects the size (rows by columns) of the symbol being decoded. The matrix shall exclude start and stop characters and row indicators.

## J.3   Reference decode algorithm for line decoding

A decodable scan line shall contain at least one quiet zone, a start or stop character, one row indicator and one or more symbol characters in the data region. A scan line may cross more than one row. The algorithm contains the following steps to decode the line.

a)   Confirm the presence of a quiet zone.

b)   For each symbol character bar-space sequence (including start and stop character), calculate the following width measurements as per Figure J.1.

$$p$$

$$e_1, e_2, e_3, e_4, e_5 \text{ and } e_6$$

80                                            © ISO/IEC 2015 – All rights reserved

OPTO_00012168

JA1912

Licensed to Opticon, Inc / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**



**Figure J.1 — Decode measurements**

c) Convert measurements $e_1$, $e_2$, $e_3$, $e_4$, $e_5$, and $e_6$ to normalised values $E_1$, $E_2$, $E_3$, $E_4$, $E_5$ and $E_6$ which will represent the integral module width of these measurements. The following method is used for the $i$ th value.

If $1,5p/17 \le e_i < 2,5p/17$, then $E_i = 2$

If $2,5p/17 \le e_i < 3,5p/17$, then $E_i = 3$

If $3,5p/17 \le e_i < 4,5p/17$, then $E_i = 4$

If $4,5p/17 \le e_i < 5,5p/17$, then $E_i = 5$

If $5,5p/17 \le e_i < 6,5p/17$, then $E_i = 6$

If $6,5p/17 \le e_i < 7,5p/17$, then $E_i = 7$

If $7,5p/17 \le e_i < 8,5p/17$, then $E_i = 8$

If $8,5p/17 \le e_i < 9,5p/17$, then $E_i = 9$

Otherwise, the symbol character bar-space sequence is in error.

d) After finding a start or stop character, attempt to decode a row indicator, and as many symbol characters as the number of columns in the matrix, in the direction derived from the start or stop character decoded. Decode the symbol character bar-space sequences as per step 5.

e) Compute the symbol character cluster number $K$ by:

$K = (E_1 - E_2 + E_5 - E_6 + 9) \bmod 9$

NOTE 1     This formula yields identical results to the equation given in 5.3.1.

The cluster number $K$ shall equal 0, 3 or 6; otherwise the symbol character and its associated codeword are in error.

f) Retrieve the codeword from the decode table (Annex A) using the seven values (cluster value $K$ and the values $E_1$, $E_2$, $E_3$, $E_4$, $E_5$ and $E_6$) as the key. These values can be calculated directly from the bar-space sequence values given in Annex A.

© ISO/IEC 2015 – All rights reserved     **81**

OPTO_00012169

JA1913

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

NOTE 2    The calculation implicitly uses the cluster number to detect all decode errors caused by single non-systematic one-module edge errors.

g)  Once valid start and/or stop characters have been established, the codewords for the left row indicator and/or right row indicator shall be used to establish the symbol structure parameters. The inverse of the equations defined in 5.11.3.1 and 5.11.3.2 shall be used to establish the row number ($F$), the number of rows ($r$), the number of columns ($c$) and the error correction level ($s$).

h)  Perform such other secondary checks (scan acceleration, absolute timing dimensions, quiet zones etc) as deemed prudent and appropriate for the particular characteristics of the reading device.

## J.4    Filling the matrix

The following procedure shall be used to fill the matrix of rows ($r$) by columns ($c$) established by the initialisation procedure.

a)  Set the initial value of the erasure count $v$ to be equal to $r \times c$.

b)  For each scan, attempt to decode as many codewords as the number of columns of the matrix.

c)  Valid decode results are placed in the matrix at their appropriate positions determined by the row number (from the row indicators) and the cluster value.

If row crossing occurs, the scan line will have different row numbers indicated by the left and right row indicators. The cluster number shall be used to interpolate the correct row number for each individual valid codeword.

EXAMPLE    A decoded scan has valid start and stop characters and has a left row indicator with row number 7 and a right row indicator with row number 10. There are 10 columns in the matrix. The scan line has not decoded three codewords because it did not remain entirely in the one row for the full transition, however the position of these 'missing' codewords is known from element timings.



**Figure J.2 — Schematic Showing a Scan Line Crossing Rows**

The clusters are as follows: unknown, 6, 6, 6, unknown, 0, 0, unknown, 3, 3.

Using matrix notation of $r$ (row), $c$ (column), the codewords are filled in the positions:

unknown, (8, 2), (8, 3), (8, 4), unknown, (9, 6), (9, 7), unknown, (10, 9), and (10, 10)

NOTE    This example is extreme in that it crosses four rows, but it still results in the successful decode of 70 percent of the codewords.

d)  As the matrix is being filled, the erasure count $v$ shall be reduced by one for each valid codeword.

e)  If the error correction level is not equal to zero, error recovery may be attempted when the number of unknown codewords (the erasure count $v$) satisfies the equations in 5.7.2 (with $v = l$ and $f = 0$). If error recovery fails, then more codewords shall be collected.

f)  If the error correction level is equal to zero, validate the two error correction codewords.

    © ISO/IEC 2015 – All rights reserved

OPTO_00012170

JA1914

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

For more details on error detection and correction see <u>Annex K</u>.

## J.5    Interpretation

Beginning from an initial state of the Alpha sub-mode of Text Compaction mode, the data codewords shall be interpreted according to the compaction modes.

© ISO/IEC 2015 – All rights reserved

OPTO_00012171

JA1915

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

# Annex K
## (normative)

# Error correction procedures

When the total number of unknown codewords **v** is less than or equal to the value of $l$ in the appropriate equation in 5.7.2, where $f = 0$, then the recovery scheme may be invoked. The unknown codewords shall be substituted by zeros and the position of the $l$ th unknown codeword is $j_l$ for $l = 1, 2, ..., v$. Construct the symbol character polynomial:

$$C\left(x\right) = C_{n-1}x_{n-1} + C_{n-2}x^{n-2} + ... + C_1x^1 + C_0$$

where

    $n$ coefficients     are the codewords read, with $C_{n-1}$ being the first codeword;

    $n$                     is the total number of codewords.

Calculate $k$ syndrome values ($S_1$ to $S_k$) by evaluating:

    $C(x)$ at $x = 3^i$

for $i = 1$ to $i = k$

where $k$ is the number of error correction characters in the symbol = $2^{s + 1}$.

A circuit to generate the syndromes is shown in Figure K.1.



**Figure K.1 — Symbol Syndrome Divider**

Since the locations of unknown codewords in the symbol matrix are known from $j_l$ for $l = 1, 2, ... v$, the error location polynomial for these known positions can be computed:

$$\sigma\left(x\right) = \left(1 - \beta_1 x\right)\left(1 - \beta_2 x\right)...\left(1 - \beta_v x\right)$$

$$= 1 + \sigma_1 x + ... + \sigma_v x^v$$

where $\beta_l = 3^{j_l}$.

84

© ISO/IEC 2015 – All rights reserved

OPTO_00012172

JA1916

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

The error location polynomial, $\sigma(x)$, can be updated to include the position of errors. This can be done by using the Berlekamp-Massey algorithm, see Reference [2].

At this point, verify that the number of erasures and errors satisfy the appropriate error correction capacity equation in 5.7.2.

Solving $\sigma(x) = 0$ yields the position of the $t$ errors, where $t \geq 0$; if $t = 0$ there is no error. It is now necessary to compute the error value, $e_{jl}$ for location $j_l$, $l = 1, ..., v + t$. To compute the error values one auxiliary polynomial, the $Z$-polynomial, is needed which is defined by:

$$Z(x) = 1 + \left(s_1 + \sigma_1\right)x + \left(s_2 + \sigma_1 s_1 + \sigma_2\right)x^2 + ... + \left(s_\eta + \sigma_1 s_{\eta-1} + \sigma_2 s_{\eta-2} + \sigma_\eta\right)x^\eta$$

where $\eta = v + t$.

The error value at location $j_l$ is thus given by:

$$e_{j_l} = \frac{Z(\beta_l^{-1})}{\beta_l \prod_{i=1, i \neq l}^{\eta} (1 - \beta_i \beta_l^{-1})}$$

After solving successfully for the error values, the complements of the error values are added to the codewords in the corresponding locations.

© ISO/IEC 2015 – All rights reserved

**85**

OPTO_00012173

**JA1917**

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

ISO/IEC 15438:2015(E)

# Annex L
## (normative)

# Symbology identifier

The uniform methodology defined in ISO/IEC 15424 shall be used for reporting the symbology read, options set in the reader and any special features of the symbology encountered.

The symbology identifier for PDF417 is:

> ]Lm

where

]    is the symbology identifier flag character (ASCII 93);

L    is the symbology identifier for PDF417;

m    is a modifier character with one of the values defined in Table L.1.

### Table L.1 — Symbology Identifier Modifier Values for PDF417

| m | Option |
|---|--------|
| 0 | Reader set to conform with protocol defined in the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications (see Annex M)[a] |
| 1 | Reader set to follow the protocol of this standard for Extended Channel Interpretation (see 5.17.2). All data characters 92 are doubled |
| 2 | Reader set to follow the protocol of this standard for Basic Channel operation (see 5.17.1). Data characters 92 are not doubled[b] |

[a]    When this option is transmitted, the receiver cannot determine reliably whether ECIs have been invoked, nor whether data byte 92 has been doubled in transmission.

[b]    When decoders are set to this mode, unbuffered Macro PDF417 symbols, and symbols requiring the decoder to convey ECI escape sequences, cannot be transmitted.

This information shall not be encoded in the bar code symbol, but should be generated by the decoder after decoding and be transmitted as a preamble to the data message.

© ISO/IEC 2015 – All rights reserved

OPTO_00012174

JA1918

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 336 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

## Annex M
(normative)

## Transmission protocol for decoders conforming with original PDF417 standards

### M.1  General

Earlier PDF417 symbology specifications supported: Basic Channel Mode, Global Label Identifiers (the precursor to the symbology-independent Extended Channel Interpretation) and Macro PDF417 (but without full integration with the ECI protocol). This Annex

— defines the transmission protocol compliant with the original specification, and which may still be used, and

— addresses issues of compatibility.

### M.2  Basic Channel mode

In the Basic Channel, all data symbol characters are translated according to the compaction modes in effect, and are included in the data transmission as a sequence of 8-bit bytes. Start and stop characters, row indicators, the Symbol Length Descriptor, mode switching codewords and error correction codewords are not transmitted.

NOTE       This is identical to the procedure of 5.17.1.

Original decoders should output symbology identifier ]L0, or may not transmit a symbology identifier preamble.

### M.3  GLI encoded symbols

Only GLI 0 and GLI 1 have been previously specified, but the transmission of all GLI/ECI escape sequences is supported by the original protocol. Three codewords (925, 926 and 927) signal the encodation of a GLI value and are decoded as byte values as follows:

a)  If the GLI sequence begins with codeword 927:

    1)  Codeword 927 is transmitted as a 4-byte escape sequence 92, 57, 50, 55, which represents '\927' in the ASCII interpretation.

    2)  The next codeword represents the GLI number in the range 000 to 899. The codeword is converted to a 3-digit value. The 3-digit value is transmitted as the appropriate byte values (48 to 57), preceded by byte 92.

    EXAMPLE

    Symbol encodes:          [927] [001]

    Data transmission (byte): 92, 57, 50, 55, 92, 48, 48, 49

    ASCII interpretation:     \927\001

© ISO/IEC 2015 – All rights reserved

OPTO_00012175

JA1919

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

b)  If the GLI sequence begins with codeword 926:

    1)  Codeword 926 is transmitted as a 4-byte escape sequence 92, 57, 50, 54, which represents '\926' in the ASCII interpretation.

    2)  The next two codewords (codewords 000 to 899 are permissible) represent the number of the ECI as follows:

Codeword 1 = ECI_no div 900 - 1

Codeword 2 = ECI_no mod 900

Each codeword is converted to a 3-digit value. The 3-digit value is transmitted as the appropriate byte values (48 to 57), preceded by byte 92.

EXAMPLE

Symbol encodes:      [926] [136] [156]

Data transmission (byte): 92, 57, 50, 54, 92, 49, 51, 54, 92, 49, 53, 54

ASCII interpretation:    \926\136\156

c)  If the GLI sequence begins with codeword 925:

    1)  Codeword 925 is transmitted as a 4-byte escape sequence 92, 57, 50, 53, which represents '\925' in the ASCII interpretation.

    2)  The next codeword represents the number of the user defined GLI minus 810 900 (any codeword 000 to 899 is permissible). This codeword is converted to a 3-digit value. The 3-digit value is transmitted as the appropriate byte values (48 to 57), preceded by byte 92.

EXAMPLE

Symbol encodes:      [925] [456]

Data transmission (byte): 92, 57, 50, 53, 92, 52, 53, 54

ASCII interpretation:    \925\456

The procedure is repeated for each occurrence of a GLI.

NOTE 1    Illustrations of similar ECI examples, but utilizing the ECI protocol, are given in 5.17.2.

If the reverse solidus, or other character represented by byte 92 needs to be used as encoded data, transmission shall be as follows. Whenever byte 92 occurs as data, two bytes of that value shall be transmitted; thus a single occurrence is always an escape character and a double occurrence indicates true data.

EXAMPLE

        Encoded data:  A\\B\C

        Transmission:  A\\\\B\\C

The default escape character may be changed in the decoder (in which case the receiving system shall be configured to match), but the byte values 47 to 58 (generally interpreted as numeric digits) shall not be used.

NOTE 2    In the ECI compliant protocol (see 5.17.2), the escape character is fixed at 92.

As an option, decoders may have an operating mode where no escape character is defined; such readers cannot transmit escape sequences nor double any data characters. Thus, this mode cannot support the transmission of ECI escape sequences, nor Macro PDF417 Control Blocks.

© ISO/IEC 2015 – All rights reserved

OPTO_00012176

JA1920

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

## M.4  Macro PDF417 symbols

When operating under the original PDF417 transmission protocol, once a PDF417 decoder has processed a Macro PDF417 symbol with a given file ID, it shall decode and transmit all of the symbols for that file ID before it may transmit any other symbols. This requirement applies under either of the following transmission modes.

### M.4.1  Transmission in buffered mode

A buffered transmission system requires the decoder to collect the entire symbol set prior to its transmission. Processing of the mandatory fields of the Macro Control Block is dealt with internally. The transmission of optional fields can be individually enabled or disabled in the decoder. Optional fields, if present, should be transmitted once at the end of the entire data set. Each field shall begin with the transmission of the corresponding Macro PDF417 optional field tag sequence. The tag sequence consists of the codeword 923 followed by a tag value as defined in Table H.1; this sequence shall be transmitted using the escape character as defined in M.3. The high level decoded content of the field shall be transmitted after this tag sequence.

### M.4.2  Transmission in unbuffered mode

An unbuffered transmission system allows the decoder to transmit the individual symbols as they are decoded.

When using the unbuffered scheme, transmission of the Macro PDF417 Control Header should be enabled, because symbols in the unbuffered scheme are not ordered internally by the reader. This allows the host system to impose the proper ordering on the received data.

Transmission of the Macro PDF417 Control Header may be enabled or disabled. The Macro PDF417 Control Header is a portion of the Macro PDF417 Control Block, (see Figure H.1) which consists of the marker codeword 928, the Segment Index (in Numeric Compaction mode), and the File ID codeword sequence. When transmission of the Control Header is enabled, the marker codeword and the File ID codewords should be transmitted using the escape character as defined in M.3. For example, the Macro PDF417 Control Header of the first symbol, Segment Index = 0, with a File ID (100, 200, 300) would be encoded in the symbol as the codeword sequence:

[928] [111] [100] [100] [200] [300]

and (assuming the default escape character 92) would be transmitted as:

Data transmission (byte):

92, 57, 50, 56, 48, 48, 48, 48, 48, 92, 49, 48, 48, 92, 50, 48, 48, 92, 51, 48, 48

ASCII interpretation: \92800000\100\200\300

If enabled, the Macro PDF417 Control Header shall be transmitted following the data encoded in the symbol.

When the last GLI sequence transmitted by the reader is other than GLI 0, then the transmitted data from that segment shall be terminated with the byte sequence 92, 55, 92, 48, 48, 48 (ASCII equivalent: \927\000), as if the symbol's data ended with the sequence of codewords [927] [000]. This reverts the interpretation of the next block back to GLI 0.

The transmission of optional fields can be individually enabled or disabled in the decoder. The enabled optional fields shall be transmitted with each Macro PDF417 symbol in which they have been encoded. Each field shall begin with the transmission of the corresponding Macro PDF417 optional field tag sequence. The tag sequence consists of the codeword 923 followed by a tag value as defined in Table H.1; this sequence shall be transmitted using the escape character as defined in M.3. The high level decoded content of the field shall be transmitted after this tag sequence.

© ISO/IEC 2015 – All rights reserved

OPTO_00012177

JA1921

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

Based only on the transmission of the encoded data stream, it can be difficult or impossible to determine where the boundary exists between the end of the Macro Control Block (especially if containing optional fields) and the beginning of the next symbol's data content. The system's transmission protocol (e.g. using the conventional transmission escape characters STX and ETX, or other 'hand shaking' procedures) may be used to determine the boundaries between transmitted Macro PDF417 symbols.

To facilitate checking that all symbols in a Macro PDF417 set are received in an unbuffered operation, the optional Segment Count field should be used whenever possible as part of the encoded Macro Control Block.

## M.5  Transmission of reserved codewords using the original PDF417 protocol

When operating under the original PDF417 transmission protocol, decoders should transmit a reserved codeword as an escape character (default of 92) followed by three digits which represent the decimal value of the reserved codeword. The data codewords which follow the reserved codeword are interpreted and transmitted according to the compaction mode in effect prior to the reserved codeword. Specifically, the interpretation will be as if the reserved codeword inserted a latch codeword to the compaction mode already in effect.

Such a latch, when in Byte or Numeric Compaction mode, re-initialises a new 'grouping' of codewords. If the prevailing mode is Text Compaction, the effect is to re-initialise to the Alpha sub-mode of Text Compaction.

While this protocol can properly transmit the message syntax of any reserved codeword whose future definition is to provide a signalling function, it will not provide unambiguous output for a new compaction mode. Therefore, when using the original PDF417 transmission protocol, the receiver should discard any data following the escape sequence representing a newly defined compaction mode codeword.

## M.6  Achieving compatibility between old and new PDF417 equipment

### M.6.1  Encoders

The introduction of Extended Channel Interpretations, which are symbology-independent, means that it is logical to separate the functions of ECI encoding from symbology encoding. GLI encoding is de facto intrinsically linked to the PDF417 symbology. The encoded codeword stream is intended to be equivalent, whether the symbol has been encoded on existing or new encoders. It should be possible to encode, for example, data conforming with the interpretation of ECI 000123 (which itself has not been defined at the date of publication of this standard) under a PDF417 specific GLI capable encoder or on a first stage symbology-independent ECI encoder followed by a second stage PDF417 symbology encoder.

There are two constraints:

— the return-to-GLI 0 logic shall only be applied to GLI 0 (ECI 000000) and GLI 1 (ECI 000001);

— GLI 0 and 1 shall not be intermixed with other ECIs in the same symbol, or Macro PDF417 set.

### M.6.2  Decoders

The key to interoperability between original and new protocol PDF417 decoders is the required transmission of the symbology identifier prefix whenever a decoder is configured for the new Extended Channel Mode operation, and the required use of the prefix whenever old and new PDF417 equipment is mixed at the same installation. That is, a decoder enabled for Extended Channel Mode operation (even if reading a mix of Basic Channel Mode and Extended Channel Mode symbols) will send a symbology identifier with every transmission.

NOTE      The original AIM USA (1994) and AIM Europe (1994) PDF417 specifications did not require the use of a symbology identifier, even when doubling the escape character (default of 92). Compliance with the ECI protocol as specified in this standard requires the use of the symbology identifier.

90

© ISO/IEC 2015 – All rights reserved

OPTO_00012178

JA1922

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

Decoders shall be considered to be in conformance under one of the following conditions.

a) **Fully conforming with the ECI protocol and with this International Standard**:

    1) Transmitting the appropriate symbology identifiers.

    2) Capable of being set or switched to Basic Channel Mode or Extended Channel Mode operation.

    3) Transmitting the ECI protocol as specified in this standard (see 5.17.2).

    4) Processing Macro PDF417 as specified in this standard.

b) **Conforming with 1994 standards**:

    1) And interoperable with new equipment, and ECI encoded symbols.

        i) Transmitting the symbology identifier ']L0'.

        ii) Capable of being set or switched to Basic Channel Mode or Extended Channel Mode operation.

        iii) Transmitting the GLI protocol as specified in M.3.

        iv) Processing Macro PDF417 as specified in M.4.

    2) But not interoperable with new equipment, and ECI encoded symbols.

        i) Not transmitting a symbology identifier.

        ii) Capable of being set or switched to Basic Channel Mode or Extended Channel Mode operation.

        iii) Transmitting the GLI protocol as specified in M.3.

        iv) Processing Macro PDF417 as specified in M.4.

c) **Conforming with Basic Channel Mode only**:

    1) Transmitting the symbology identifier ']L0' (old equipment) or ']L2 (new equipment), or transmitting no symbology identifier.

    2) Treating symbols containing ECI codewords as invalid.

    3) Treating Macro PDF417 symbols as invalid, unless the reader is operating in buffered mode, and transmission of the Macro Control Header is disabled.

Assuming that equipment is properly set up as above, this gives the receiver the ability to detect, and react properly to, the following conditions.

a) **If a symbology identifier of ']L1' is present at the start of the transmission**:

In this case, the receiver can be sure that the decoder is operating in Extended Channel Mode for the symbol scanned. Therefore all byte 92, when occurring as data, have been doubled whether or not the symbol contains ECIs or is part of a Macro PDF417 set. Single occurrences of byte 92 indicate the start of an escape sequence. All other features conform with this standard.

b) **If a symbology identifier of ']L2' is present at the start of the transmission**:

In this case, the receiver can be sure that the decoder is operating in Basic Channel Mode for the symbol scanned. Therefore, byte 92 will always represent a single byte of data.

Symbols with ECI escapes shall be considered invalid. Macro PDF417 symbols shall be considered invalid, unless the reader is configured for buffered mode, and is configured to not transmit Macro PDF417 Control Headers.

© ISO/IEC 2015 – All rights reserved

OPTO_00012179

JA1923

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 341 of 552

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

c)  **If a symbology identifier of ']L0' is present at the start of the transmission, denoting the 1994 version of PDF417:**

This case is an exception because the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications, although it does provide explicit Extended Channel Mode support, define '0' (i.e. 'no options set') as the only option value for the PDF417 symbology identifier. Thus, existing PDF417 equipment, if fully compliant with the original AIM USA (1994) and AIM Europe (1994) PDF417 specifications, will not use the new option values to indicate whether Extended Channel Mode or Basic Channel Mode is in effect. Therefore, if the receiver sees ']L0', then it should expect 1994 standard-compliant PDF417 behaviour. In particular:

1)  The receiver cannot tell from the transmission whether the decoder is in Extended Channel Mode (always doubles the byte assigned as the escape character as per M.3) or Basic Channel Mode (never doubles any bytes); the decoder must be configured to match the expectations of the receiver.

2)  If the decoder is set to Extended Channel Mode and if ECIs are encoded in the symbol, the decoder will transmit 1994 PDF417-style GLI escape sequences (as per M.3) rather than ECI escape sequence as defined in 5.17.2.

3)  Using original protocol, if a Macro Control Block is present, the contents of the Macro Control Block follows, rather than precedes, the data bytes in the symbol.

d)  **If no symbology identifier is present at the start of the transmission:**

In this case, either

1)  the decoder is properly configured to support Basic Channel Mode symbols only. The receiving system is assured that no byte value is being doubled by the decoder and that any apparent ECIs in the data stream are accidental character combinations, or

2)  the decoder is improperly configured for interoperability in an open system where ECI encoded symbols may be encountered.

                    © ISO/IEC 2015 – All rights reserved

OPTO_00012180

JA1924

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

# Annex N
(informative)

# Algorithm to minimise the number of codewords

The same data may be represented by different PDF417 codeword sequences through the use of different compaction modes and switching procedures. There shall be no prescribed procedure, but the following algorithm will tend to minimise the number of codewords required.

a)   Let $P$ point to the start of the data stream.

b)   Set current encoding mode to Text Compaction.

c)   Let $N$ be the number of consecutive digits starting at $P$.

d)   If $N$ is ≥13 then

    1)   latch to Numeric Compaction mode,

    2)   encode the $N$ characters using numeric compaction,

    3)   advance $P$ by $N$, and

    4)   go to Step 3.

e)   Else if $N$ <13 then

    1)   let $T$ be the length of a Text Compaction mode character sequence starting at $P$. The sequence is terminated when either a character from a mode other than Text Compaction is detected or a numeric sequence of ≥13 digits is detected,

    2)   if $T$ is ≥5 then

        i)   latch into Text Compaction mode,

        ii)   encode the $T$ characters using the Text Compaction mode,

        iii)   advance $P$ by $T$, and

        iv)   go to Step 3,

    3)   else if $T$ <5 then

        i).   let $B$ be the length of the binary encodable sequence starting at $P$. The sequence is terminated when either a Text Compaction sequence of length ≥5 is found or a numeric sequence of length ≥13 is found,

        ii)   if $B$ is equal to 1 AND the current mode is Text Compaction, then

            I)   shift into Byte Compaction mode,

            II)   encode the single byte value using Byte Compaction mode,

            III)   advance $P$ by $B$, and

            IV)   go to Step 3,

        iii)   else

            I)   latch into Byte Compaction mode,

© ISO/IEC 2015 – All rights reserved

OPTO_00012181

JA1925

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

II)  encode the *B* bytes using Byte Compaction mode,

III)  advance *P* by *B*, and

IV)  go to Step 3.

94                                            © ISO/IEC 2015 – All rights reserved

JA1926

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

# Annex O
(informative)

# Guidelines to determine the symbol matrix

## O.1   Parameters affecting the determination of the matrix

A number of parameters should be used before printing to determine the symbol matrix in terms of the number of rows ($r$) and columns ($c$).

Each parameter addresses one single feature which may constrain the symbol matrix. In the equations which follow, $A$, $c$, $k$, $n$, $Q_H$, $Q_V$, $r$, $X$ and $Y$ conform with the definitions provided in 4.1.

The equations may be used in their own right or to construct a more complex algorithm.

— Parameter 1: Number of Rows: $r$

  $3 \leq r \leq 90$ (see 5.2.1)

— Parameter 2: Number of Columns: $c$

  $1 \leq c \leq 30$ (see 5.2.2)

— Parameter 3: $X$ dimension

  Defined by the application specification (see 5.8.1)

— Parameter 4: $Y$ dimension

  $Y \geq 3X$    (see 5.8.2)

— Parameter 5: Horizontal Quiet Zone: $Q_H$

  $Q_H \geq 2X$ (see 5.8.3)

— Parameter 6: Vertical Quiet Zone: $Q_V$

  $Q_V \geq 2X$ (see 5.8.3)

— Parameter 7: Width available for the symbol, $W$

  $W \geq \left(17c + 69\right) + 2Q_H$

NOTE 1    This parameter could be limited by the scanner field of view or the label width.

— Parameter 8: Height available for the symbol, $H$

  $H \geq Yr + 2Q_V$

NOTE 2    This parameter could be limited by the scanner field of view or the label width.

— Parameter 9: Matrix Parameters

  $\left(n + k\right) = \left(c * r\right) < 929$

© ISO/IEC 2015 – All rights reserved                                                                      95

OPTO_00012183

JA1927

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

**ISO/IEC 15438:2015(E)**

— Parameter 10: Symbol Aspect Ratio: $A$

Before the symbol size can be determined, the number of data codewords and error correction codewords must be calculated. The next step depends upon which parameters are constrained by the application. When the requirements of the application specify an overall symbol aspect ratio, then O.2 gives guidance on calculating the number of data region columns needed to create a symbol of that aspect ratio. If instead the application constrains either the allowed height or width of the symbol (or both), then simpler calculations can be used. O.1 shows this simpler algorithm that can be used when the symbol width is constrained.

— When an overall width $W$ (including quiet zones) is specified, then the number of data columns can be calculated from the equation of Parameter 7 (rounding up to the nearest integer number of columns). The number of rows is then derived from the total number of codewords: $(n + k) = (c * r)$.

— The symbol aspect ratio $A$ is the height to width of the symbol including quiet zones. To achieve a given value of $A$, the following equation can be solved, with respect to the number of columns ($c$). The equation assumes that the quiet zones are expressed in precise terms of $X$ but the equation can be used in all cases to produce the best approximation of the number of columns ($c$).

$$A = \frac{H}{W} = \frac{rY + 2Q_V}{17X(c + 73)}$$

where

$A, c, H, Q_V, r, W, X$ and $Y$     are as defined in Clause 4;

$Q_V$                          is $2X$.

Since the number of rows can be expressed as

$$r = \left(\frac{n + k}{c}\right)$$

where

$n$ and $k$   are as defined in Clause 4.

96                               © ISO/IEC 2015 – All rights reserved

OPTO_00012184

JA1928

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

the equation can be reformulated as:

$$A = \frac{\left(\dfrac{n+k}{c}\right)Y + 4X}{\left(17c + 73\right)x} = \frac{\left(n+k\right)Y + 4cX}{\left(17c^2 + 73c\right)X} = \frac{\left(n+k\right)\dfrac{Y}{X} + 4c}{17c^2 + 73c}$$

Thus:

$$A\left(17c^2 + 73c\right) - \left[\left(n+k\right)\frac{Y}{X}\right] - 4c = 0$$

This equation can be expressed as:

$$17Ac^2 + \left(73A - 4\right)c - \left[\left(n+k\right)Y \, / \, X\right] = 0$$

which (substituting $x$ for $c$) is a quadratic equation in the form of:

$$ax^2 + bx + c = 0$$

Since the solution equation for a quadratic equation is

$$x = \frac{-b \pm \sqrt{b^2 - 4ac}}{2a}$$

substituting the parameter values of PDF417, the solution equation for the quadratic equation, ignoring the negative value, becomes:

$$c = \frac{-\left(73A - 4\right) + \left\{\left(73A - 4\right)^2 + 4\left(17A\right)\left[\left(n+k\right)Y \, / \, X\right]\right\}^{0,5}}{2\left(17A\right)}$$

The value of $n$ is dependent on the number of pad codewords and this is not known until the matrix parameters are determined. However, the number of source codewords is known. As $m + 1 \leq n$ this can be substituted in the above equation as follows:

$$c = \frac{-\left(73A - 4\right) + \left\{\left(73A - 4\right)^2 + 4\left(17A\right)\left[\left(m+1+k\right)Y \, / \, X\right]\right\}^{0,5}}{2\left(17A\right)}$$

Solving the positive value of $c$ produces a result which is not an integer. The nearest integer value of $c$ gives the best value of the number of columns to achieve the aspect ratio.

The number of rows is given by:

$$r = INT\left[\left(m+1+k\right) \, / \, c\right] + 1$$

If $\left(c * r\right) \geq m + 1 + k + c$

then $r = r - 1$

© ISO/IEC 2015 – All rights reserved    **97**

OPTO_00012185

JA1929

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

As $(c * r) = (n + k)$, the number of pad codewords is $(n + k) - (m + 1 + k)$

EXAMPLE    To achieve an aspect ratio $A = 0.5$ for a PDF417 symbol where $m + 1 + k = 277$, $X = 0.33$ mm and $Y = 1.00$ mm

$$c = \frac{-\left[(73 * 0.5) - 4\right] = \left\{\left[(73 * 0.5) - 4\right]^2 + 4\left(17 * 0.5\right)\left(\dfrac{277 * 1.00}{0.33}\right)\right\}^{0.5}}{2\left(17 * 0.5\right)}$$

$$c = \frac{-32.5 + \left(1056 + 28539\right)^{0.5}}{17}$$

$$c = \frac{-32.5 + 172.0}{17}$$

$$c = \frac{139.5}{17} = 8.21 = 8$$

$$r = INT\left(\frac{277}{c}\right) + 1 = INT\left(34.6\right) + 1 = 35$$

$$(m + 1 + k) \leq (c * r) < 929$$

$277 \leq 280 < 929$

The number of pad codewords required is:

$$(c * r) - (m + 1 + k)$$

$280 - 277 = 3$

This symbol has 35 rows and 8 columns and measures 68,97 mm wide by 36,32 mm high, an actual aspect ratio of 0,527.

## O.2   Guidelines should any parameters not be achieved

If the symbol fails to conform with the intended label size

a)   reduce the data content, if possible,

b)   increase the label size in one or both dimensions,

c)   reduce the error correction level, and

d)   reduce the $X$-dimension or the module height ($Y$).

98

© ISO/IEC 2015 – All rights reserved

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

## Annex P
### (informative)

## Calculating the coefficients for generating the error correction codewords – worked example

The following generator polynomial shall be used to calculate coefficients for each error correction level:

$$g_k(x) = (x - 3)\ (x - 3^2)\ (x - 3^3)\ ....\ (x - 3^k)$$

$$= \alpha_0 + \alpha_1 x + \alpha_2 x^2 + .... \alpha_{k-1} x^{k-1} + x^k$$

where

$g_k(x)$    is the generator polynomial;

$k$    is the total number of error correction codewords;

$\alpha_j$    is the coefficient of powers of x produced by the generator polynomial $g_k(x)$.

First expand the above equation. Next, calculate the complement of the coefficient from the above.

For $\alpha_j = \alpha_0 .... \alpha_{k-1}$

BEGIN

$\alpha_j = \alpha_j \bmod 929$

END

EXAMPLE

Calculate generator polynomial coefficients for error correction level 1

| $s$ | = 1 | error correction level 1 |
|---|---|---|
| $k$ | $= 2^{s+1} = 4$ | (number of error correction codewords) |
| $g_4(x)$ | $= (x - 3)\ (x - 3^2)\ (x - 3^3)\ (x - 3^4)$ | |
| | $= 59\,049 - 29\,160x + 3\,510x^2 - 120x^3 + x^4$ | |
| $\alpha_0$ | $= 59\,049 \bmod 929$ | $= 522$ |
| $\alpha_1$ | $= -29\,160 \bmod 929$ | $= 568$ |
| $\alpha_2$ | $= 3\,510 \bmod 929$ | $= 723$ |
| $\alpha_3$ | $= -120 \bmod 929$ | $= 809$ |

NOTE    Annex F contains all of the coefficient values necessary to encode a PDF417 symbol of any error correction level.

© ISO/IEC 2015 – All rights reserved

OPTO_00012187

JA1931

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

# Annex Q
## (informative)

# Generating the error correction codewords - worked example

To generate the error correction codewords, the algorithm in 5.10 shall be used. (The notation used in the example below is identical to that in 5.10.)

EXAMPLE

The data PDF417 is represented by the codewords 5, 453, 178, 121, 239, when preceded by the Symbol Length Descriptor. There are no pad codewords. Then:

$n$   = 5 (number of codewords including symbol length descriptor)

$d_4$   = 5

$d_3$   = 453

$d_2$   = 178

$d_1$   = 121

$d_0$   = 239

Selecting an error correction level of 1 gives:

$s$   = 1

$k$   = $2^{1+1}$     = 4

$\alpha_0,...,\alpha_3$ = 522, 568, 723, 809

NOTE        The example is artificially simple, having only 5 data codewords and 4 error correction codewords. However, it fully illustrates the entire process which expands with increases in the number of data codewords and the number of error correction codewords.

The calculations are:

Initialise $E_0, ..., E_3$ to 0

$t_1 = (d_4 + E_3) \bmod 929 = (5 + 0) \bmod 929 = 5$

$t_2 = (t_1 \times \alpha_3) \bmod 929 = (5 \times 809) \bmod 929 = 329$

$t_3 = 929 - t_2 = 929 - 329 = 600$

$E_3 = (E_2 + t_3) \bmod 929 = (0 + 600) \bmod 929 = 600$

$t_2 = (t_1 \times \alpha_2) \bmod 929 = (5 \times 723) \bmod 929 = 828$

$t_3 = 929 - t_2 = 929 - 828 = 101$

$E_2 = (E_1 + t_3) \bmod 929 = (0 + 101) \bmod 929 = 101$

**100**                    © ISO/IEC 2015 – All rights reserved

OPTO_00012188

JA1932

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5
ISO/IEC 15438:2015(E)

$$t_2 = (t_1 \times \alpha_1) \bmod 929 = (5 \times 568) \bmod 929 = 53$$

$$t_3 = 929 - t_2 = 929 - 53 = 876$$

$$E_1 = (E_0 + t_3) \bmod 929 = (0 + 876) \bmod 929 = 876$$

$$t_2 = (t_1 \times \alpha_0) \bmod 929 = (5 \times 522) \bmod 929 = 752$$

$$t_3 = 929 - t_2 = 929 - 752 = 177$$

$$E_0 = t_3 \bmod 929 = 177 \bmod 929 = 177$$

$$t_1 = (d_3 + E_3) \bmod 929 = (453 + 600) \bmod 929 = 124$$

$$t_2 = (t_1 \times \alpha_3) \bmod 929 = (124 \times 809) \bmod 929 = 913$$

$$t_3 = 929 - t2 = 929 - 913 = 16$$

$$E_3 = (E_2 + t_3) \bmod 929 = (101 + 16) \bmod 929 = 117$$

$$t_2 = (t_1 \times \alpha_2) \bmod 929 = (124 \times 723) \bmod 929 = 468$$

$$t_3 = 929 - t_2 = 929 - 468 = 461$$

$$E_2 = (E_1 + t_3) \bmod 929 = (876 + 461) \bmod 929 = 408$$

$$t_2 = (t_1 \times \alpha_1) \bmod 929 = (124 \times 568) \bmod 929 = 757$$

$$t_3 = 929 - t_2 = 929 - 757 = 172$$

$$E_1 = (E_0 + t_3) \bmod 929 = (177 + 172) \bmod 929 = 349$$

$$t_2 = (t_1 \times \alpha_0) \bmod 929 = (124 \times 522) \bmod 929 = 627$$

$$t_3 = 929 - t_2 = 929 - 627 = 302$$

$$E_0 = t_3 \bmod 929 = 302 \bmod 929 = 302$$

$$t_1 = (d_2 + E_3) \bmod 929 = (178 + 117) \bmod 929 = 295$$

$$t_2 = (t_1 \times \alpha_3) \bmod 929 = (295 \times 809) \bmod 929 = 831$$

$$t_3 = 929 - t_2 = 929 - 831 = 98$$

$$E_3 = (E_2 + t_3) \bmod 929 = (408 + 98) \bmod 929 = 506$$

© ISO/IEC 2015 – All rights reserved

OPTO_00012189

JA1933

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

$$t_2 = (t_1 \times \alpha_2) \bmod 929 = (295 \times 723) \bmod 929 = 544$$
$$t_3 = 929 - t_2 = 929 - 544 = 385$$
$$E_2 = (E_1 + t_3) \bmod 929 = (349 + 385) \bmod 929 = 734$$

$$t_2 = (t_1 \times \alpha_1) \bmod 929 = (295 \times 568) \bmod 929 = 340$$
$$t_3 = 929 - t_2 = 929 - 340 = 589$$
$$E_1 = (E_0 + t_3) \bmod 929 = (302 + 589) \bmod 929 = 891$$

$$t_2 = (t_1 \times \alpha_0) \bmod 929 = (295 \times 522) \bmod 929 = 705$$
$$t_3 = 929 - t_2 = 929 - 705 = 224$$
$$E_0 = t_3 \bmod 929 = 224 \bmod 929 = 224$$

$$t_1 = (d_1 + E_3) \bmod 929 = (121 + 506) \bmod 929 = 627$$

$$t_2 = (t_1 \times \alpha_3) \bmod 929 = (627 \times 809) \bmod 929 = 9$$
$$t_3 = 929 - t_2 = 929 - 9 = 920$$
$$E_3 = (E_2 + t_3) \bmod 929 = (734 + 920) \bmod 929 = 725$$

$$t_2 = (t_1 \times \alpha_2) \bmod 929 = (627 \times 723) \bmod 929 = 898$$
$$t_3 = 929 - t_2 = 929 - 898 = 31$$
$$E_2 = (E_1 + t_3) \bmod 929 = (891 + 31) \bmod 929 = 922$$

$$t_2 = (t_1 \times \alpha_1) \bmod 929 = (627 \times 568) \bmod 929 = 329$$
$$t_3 = 929 - t_2 = 929 - 329 = 600$$
$$E_1 = (E_0 + t_3) \bmod 929 = (224 + 600) \bmod 929 = 824$$

$$t_2 = (t_1 \times \alpha_0) \bmod 929 = (627 \times 522) \bmod 929 = 286$$
$$t_3 = 929 - t_2 = 929 - 286 = 643$$
$$E_0 = t_3 \bmod 929 = 643 \bmod 929 = 643$$

$$t_1 = (d_0 + E_3) \bmod 929 = (239 + 725) \bmod 929 = 35$$

**102**

© ISO/IEC 2015 – All rights reserved

OPTO_00012190

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

$$t_2 = (t_1 \times \alpha_3) \bmod 929 = (35 \times 809) \bmod 929 = 445$$

$$t_3 = 929 - t_2 = 929 - 445 = 484$$

$$E_3 = (E_2 + t_3) \bmod 929 = (922 + 484) \bmod 929 = 477$$

$$t_2 = (t_1 \times \alpha_2) \bmod 929 = (35 \times 723) \bmod 929 = 222$$

$$t_3 = 929 - t_2 = 929 - 222 = 707$$

$$E_2 = (E_1 + t_3) \bmod 929 = (824 + 707) \bmod 929 = 602$$

$$t_2 = (t_1 \times \alpha_1) \bmod 929 = (35 \times 568) \bmod 929 = 371$$

$$t_3 = 929 - t_2 = 929 - 371 = 558$$

$$E_1 = (E_0 + t_3) \bmod 929 = (643 + 558) \bmod 929 = 272$$

$$t_2 = (t_1 \times \alpha_0) \bmod 929 = (35 \times 522) \bmod 929 = 619$$

$$t_3 = 929 - t_2 = 929 - 619 = 310$$

$$E_0 = t_3 \bmod 929 = 310 \bmod 929 = 310$$

Finally calculate the complement of the results from above, to get the 4 error correction codewords for the encoded data **PDF417** as follows:

$$E_3 = 929 - E_3 = 929 - 477 = 452$$

$$E_2 = 929 - E_2 = 929 - 602 = 327$$

$$E_1 = 929 - E_1 = 929 - 272 = 657$$

$$E_0 = 929 - E_0 = 929 - 310 = 619$$

© ISO/IEC 2015 – All rights reserved

OPTO_00012191

JA1935

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

ISO/IEC 15438:2015(E)

# Annex R
(informative)

# Division circuit procedure for generating error correction codewords

This procedure is an alternative procedure to that specified in 5.10 and uses a division circuit as the basis of determining the error correction codewords.

The division circuit shall be as illustrated in Figure R.1.



**Key**

©    modulo complement

⊕    modulo addition

⊗    modulo multiplication

**Figure R.1 — Error correction codeword encoding circuit**

The registers $b_0$ through to $b_{k-1}$ shall be initialised as zeros. The modulo mathematics shall be defined by the following equations:

$$x \oplus y \equiv (x + y) \bmod 929$$

$$x \otimes y \equiv (x \times y) \bmod 929$$

$$© \, x = (929 - x) \bmod 929$$

where

$x$ and $y$    are numbers from 0 to 928;

⊕    is modulo addition;

⊗    is modulo multiplication;

©    is the modulo complement.

There shall be two phases to generate the encoding. In the first phase, with the switch in the down position, the symbol data is passed both to the output and the circuit. The first phase is complete after $n$ clock pulses. In the second phase ($n + 1 \ldots n + k$ clock pulses), with the switch in the up position, the error

© ISO/IEC 2015 – All rights reserved

OPTO_00012192

JA1936

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

correction codewords $E_{k-1}$, ..., $E_0$ are generated by flushing the registers in order and complementing the output while keeping the data input at 0.

© ISO/IEC 2015 – All rights reserved

**105**

OPTO_00012193

JA1937

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

ISO/IEC 15438:2015(E)

# Annex S
(informative)

# Additional guidelines for the use of PDF417

## S.1  Autodiscrimination compatibility

PDF417 may be read by suitably programmed bar code decoders which have been designed to autodiscriminate it from other symbologies. The decoder's valid set of symbologies should be limited to those needed by a given application to maximise reading security.

## S.2  Pixel-based printing

### S.2.1  General principles

Graphics software used to create bar codes on pixel-based printers must scale each bar and space exactly to the pixel pitch of the printer being used. For edge to similar edge decodable symbologies like PDF417, the number of pixels comprising each symbol character must be a fixed and constant integer multiple of the number of modules in the symbol character. For PDF417, the number of modules is 17 for the Start Pattern, other symbol characters, and 18 for the Stop Pattern. Therefore, a given printer can only print a certain set of $X$ dimensions.

Compensation for uniform bar width growth (or loss) must be in equal offsetting amounts on all bars and spaces in the symbol. This may be accomplished by changing an integer number of pixels from dark to light or light to dark in the same manner for each bar-space pair in the symbol and for the last bar in the symbol. For example, all pixels along the same edge of every bar in the symbol could be changed from dark to light, or pixels along both edges of every bar in the symbol could be changed from dark to light, provided that the printer resolution is sufficient to allow this to be performed satisfactorily. Any set of dark to light or light to dark pixel changes is acceptable provided the adjustment is performed consistently across the whole symbol and does not change the edge to similar edge measurements or the total symbol character width. Failure to follow these principles results in degraded symbol quality and often results in unreadable symbols.

General purpose printing software designed to support a wide range of printers should provide the user with the capability of adjusting the $X$ dimension and bar width growth or loss.

### S.2.2  Programmer's Example

These principles can be reduced to the following rules for digital bar code design files.

a)  Convert the desired $X$ dimension to a module size in pixels rounded down to the nearest integer.

b)  Determine the number of pixels corresponding to the desired compensation for uniform bar width growth and round up to the next larger integer.

c)  Apply the above results to determine the pixel count of every bar and space in the symbol.

EXAMPLE       Using digital bar code design files with a printing device with 24 dots per mm, create a 0,27 mm $X$ dimension symbol with 0,06 mm of bar width reduction.

The module size is 24 dots/mm × 0,27 mm/module = 6,5 pixels, which rounds down to 6 pixels per module.

The bar growth compensation is 0,06 mm x 24 dots/mm = 1,4 pixels, which rounds up to 2 pixels.

This process results in the following pixel count for bars and spaces as illustrated in Table S.1.

© ISO/IEC 2015 – All rights reserved

OPTO_00012194

JA1938

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**
**ISO/IEC 15438:2015(E)**

Table S.1 — Example of correcting pixels for imaging resolution and bar width reduction

| Element width (modules) | Nominal width (pixels) | Corrected pixel count | |
|---|---|---|---|
| | | Bars | Spaces |
| 1 | 6 | 4 | 8 |
| 2 | 12 | 10 | 14 |
| 3 | 18 | 16 | 20 |
| 4 | 24 | 22 | 26 |
| 5 | 30 | 28 | 32 |
| 6 | 36 | 34 | 38 |
| 8 | 48 | 46 | n/a |

© ISO/IEC 2015 – All rights reserved

OPTO_00012195

JA1939

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

PX-5

**ISO/IEC 15438:2015(E)**

# Bibliography

[1]    ISO/IEC 8859-1, *Information technology — 8-bit single-byte coded graphic character sets — Part 1: Latin alphabet No. 1*

[2]    Blahut, R.E. Theory and Practice of Error Control Codes, published by Addison Wesley, 1984, p. 260, etc.

[3]    AIM USA Uniform Symbology Specification PDF417, published by AIM USA, 1994

[4]    Europe Uniform Symbology Specification AIM PDF417, published by AIM Europe, 1994

[5]    ANSI X3.4, *Coded Character Sets — 7-bit American National Standard Code for Information Interchange (7-bit ASCII) (equivalent to the US national version of ISO/IEC 646)*

[6]    AIM Inc. International Technical Standard: ITS/04-001, *Extended Channel Interpretations — Part 1: Identification Schemes and Protocols*[1]

[7]    AIM Inc. ITS/04-001: International Technical Standard: *Extended Channel Interpretations — Part 2: Registration Procedure for Coded Character Sets and Other Data Formats — Character Set Register*

---

1)    Published by AIM Global, 125 Warrendale-Bayne Road, Suite 100, Warrendale, PA 15086, USA.

**108**

© ISO/IEC 2015 – All rights reserved

OPTO_00012196

JA1940

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: CIP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**PX-5**

OPTO_00012197

PX-5

Licensed to Opticon, Inc. / John Goss (jgoss@opticonusa.com)
ISO Store Order: OP-552645 / Downloaded: 2021-10-01
Single user licence only, copying and networking prohibited.

**ISO/IEC 15438:2015(E)**

**ICS  35.040**

Price based on 108 pages

© ISO/IEC 2015 – All rights reserved

OPTO_00012198

JA1942

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

# INTERNATIONAL STANDARD

# ISO/IEC 15415

Second edition
2011-12-15

*Reviewed and confirmed in 2018*

# Information technology — Automatic identification and data capture techniques — Bar code symbol print quality test specification — Two-dimensional symbols

*Technologies de l'information — Techniques automatiques d'identification et de capture des données — Spécification de test de qualité d'impression des symboles de code à barres — Symboles bidimensionnels*

Reference number
ISO/IEC 15415:2011(E)

© ISO/IEC 2011

OPTO_00012697



JA1943

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**



**COPYRIGHT PROTECTED DOCUMENT**

© ISO/IEC 2011

All rights reserved. Unless otherwise specified, no part of this publication may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying and microfilm, without permission in writing from either ISO at the address below or ISO's member body in the country of the requester.

ISO copyright office
Case postale 56 • CH-1211 Geneva 20
Tel.  + 41 22 749 01 11
Fax  + 41 22 749 09 47
E-mail  copyright@iso.org
Web  www.iso.org

Published in Switzerland

© ISO/IEC 2011 – All rights reserved

OPTO_00012698

JA1944

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 362 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

# Contents

Foreword ........................................................................................................................................................ v

Introduction .................................................................................................................................................. vi

1     Scope .................................................................................................................................................. 1

2     Normative references ........................................................................................................................ 1

3     Terms and definitions ....................................................................................................................... 2

4     Symbols and abbreviated terms ...................................................................................................... 3

5     Quality grading ................................................................................................................................. 3
5.1   General ............................................................................................................................................... 3
5.2   Expression of quality grades ........................................................................................................... 4
5.3   Overall Symbol Grade ...................................................................................................................... 4
5.4   Reporting of symbol grade .............................................................................................................. 5

6     Measurement methodology for two-dimensional multi-row bar code symbols ........................... 5
6.1   General ............................................................................................................................................... 5
6.2   Symbologies with cross-row scanning ability ............................................................................... 6
6.2.1 Basis of grading ............................................................................................................................... 6
6.2.2 Grade based on analysis of scan reflectance profile ..................................................................... 6
6.2.3 Grade based on Codeword Yield ..................................................................................................... 7
6.2.4 Grade based on unused error correction ........................................................................................ 8
6.2.5 Grade based on codeword print quality .......................................................................................... 9
6.2.6 Overall symbol grade ...................................................................................................................... 10
6.3   Symbologies requiring row-by-row scanning ............................................................................... 11

7     Measurement methodology for two-dimensional matrix symbols ............................................... 11
7.1   Overview of methodology ................................................................................................................ 11
7.2   Obtaining the test images ............................................................................................................... 12
7.2.1 Measurement conditions ................................................................................................................ 12
7.2.2 Raw image ....................................................................................................................................... 12
7.2.3 Reference grey-scale image ........................................................................................................... 12
7.2.4 Binarised image .............................................................................................................................. 13
7.3   Reference reflectivity measurements ............................................................................................ 13
7.3.1 General requirements ..................................................................................................................... 13
7.3.2 Light source ..................................................................................................................................... 13
7.3.3 Effective resolution and measuring aperture ............................................................................... 13
7.3.4 Optical geometry ............................................................................................................................. 14
7.3.5 Inspection area ................................................................................................................................ 16
7.4   Number of scans .............................................................................................................................. 16
7.5   Basis of scan grading ...................................................................................................................... 16
7.6   Grading procedure ........................................................................................................................... 16
7.7   Additional reflectance check over extended area ......................................................................... 17
7.8   Image assessment parameters and grading .................................................................................. 17
7.8.1 Use of reference decode algorithm ................................................................................................ 17
7.8.2 Decode .............................................................................................................................................. 17
7.8.3 Symbol Contrast .............................................................................................................................. 18
7.8.4 Modulation and related measurements .......................................................................................... 18
7.8.5 Fixed Pattern Damage ..................................................................................................................... 21
7.8.6 Axial Nonuniformity ........................................................................................................................ 21
7.8.7 Grid Nonuniformity .......................................................................................................................... 22
7.8.8 Unused error correction .................................................................................................................. 23
7.8.9 Additional grading parameters ....................................................................................................... 23

© ISO/IEC 2011 – All rights reserved

OPTO_00012699

JA1945

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**ISO/IEC 15415:2011(E)**

7.9     Scan grading ...................................................................................................................23
7.10    Overall Symbol Grade .....................................................................................................24
7.11    Print growth......................................................................................................................24

**8       Measurement methodologies for composite symbologies**..........................................**24**

**9       Substrate characteristics**.............................................................................................**25**

**Annex A** (normative)  **Symbology-specific parameters and values for symbol grading**...........................**26**

**Annex B** (informative)  **Symbol grading flowchart for two-dimensional matrix symbols**........................**30**

**Annex C** (informative)  **Interpreting the scan and symbol grades** .............................................................**31**

**Annex D** (informative)  **Guidance on selection of grading parameters in application specifications**.......**33**

**Annex E** (informative)  **Substrate characteristics** ...............................................................................**39**

**Annex F** (informative)  **Parameter grade overlay applied to two-dimensional symbologies**....................**41**

**Bibliography**.......................................................................................................................................**42**

© ISO/IEC 2011 – All rights reserved

OPTO_00012700

JA1946

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 364 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

# Foreword

ISO (the International Organization for Standardization) and IEC (the International Electrotechnical Commission) form the specialized system for worldwide standardization. National bodies that are members of ISO or IEC participate in the development of International Standards through technical committees established by the respective organization to deal with particular fields of technical activity. ISO and IEC technical committees collaborate in fields of mutual interest. Other international organizations, governmental and non-governmental, in liaison with ISO and IEC, also take part in the work. In the field of information technology, ISO and IEC have established a joint technical committee, ISO/IEC JTC 1.

International Standards are drafted in accordance with the rules given in the ISO/IEC Directives, Part 2.

The main task of the joint technical committee is to prepare International Standards. Draft International Standards adopted by the joint technical committee are circulated to national bodies for voting. Publication as an International Standard requires approval by at least 75 % of the national bodies casting a vote.

Attention is drawn to the possibility that some of the elements of this document may be the subject of patent rights. ISO and IEC shall not be held responsible for identifying any or all such patent rights.

ISO/IEC 15415 was prepared by Joint Technical Committee ISO/IEC JTC 1, *Information technology*, Subcommittee SC 31, *Automatic identification and data capture techniques*.

This second edition cancels and replaces the first edition (ISO/IEC 15415:2004), which has been technically revised. It also incorporates the Technical Corrigendum ISO/IEC 15415:2004/Cor.1:2008.

© ISO/IEC 2011 – All rights reserved

v

OPTO_00012701

JA1947

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

# Introduction

The technology of bar coding is based on the recognition of patterns encoded, in bars and spaces or in a matrix of modules of defined dimensions, according to rules defining the translation of characters into such patterns, known as the symbology specification. Symbology specifications may be categorised into those for linear symbols, on the one hand, and two-dimensional symbols on the other; the latter may in turn be sub-divided into "multi-row bar code symbols", sometimes referred to as "stacked bar code symbols", and "two-dimensional matrix symbols". In addition, there is a hybrid group of symbologies known as "composite symbologies"; these symbols consist of two components carrying a single message or related data, one of which is usually a linear symbol and the other a two-dimensional symbol positioned in a defined relationship with the linear symbol.

Multi-row bar code symbols are constructed graphically as a series of rows of symbol characters, representing data and overhead components, placed in a defined vertical arrangement to form a (normally) rectangular symbol, which contains a single data message. Each symbol character has the characteristics of a linear bar code symbol character and each row has those of a linear bar code symbol; each row, therefore, may be read by linear symbol scanning techniques, but the data from all the rows in the symbol must be read before the message can be transferred to the application software.

Two-dimensional matrix symbols are normally square or rectangular arrangements of dark and light modules, the centres of which are placed at the intersections of a grid of two (sometimes more) axes; the coordinates of each module need to be known in order to determine its significance, and the symbol must therefore be analysed two-dimensionally before it can be decoded. Dot codes are a subset of matrix codes in which the individual modules do not directly touch their neighbours but are separated from them by a clear space.

Unless the context requires otherwise, the term "symbol" in this International Standard may refer to either type of symbology.

The bar code symbol must be produced in such a way as to be reliably decoded at the point of use, if it is to fulfil its basic objective as a machine-readable data carrier.

Manufacturers of bar code equipment and the producers and users of bar code symbols therefore require publicly available standard test specifications for the objective assessment of the quality of bar code symbols (a process known as verification), to which they can refer when developing equipment and application standards or determining the quality of the symbols. Such test specifications form the basis for the development of measuring equipment for process control and quality assurance purposes during symbol production as well as afterwards.

The performance of measuring equipment for the verification of symbols (verifiers) is the subject of a separate International Standard (ISO/IEC 15426, Parts 1 and 2).

This International Standard is intended to achieve comparable results to the linear bar code symbol quality standard ISO/IEC 15416, the general principles of which it has followed. It should be read in conjunction with the symbology specification applicable to the bar code symbol being tested, which provides symbology-specific detail necessary for its application. Two-dimensional multi-row bar code symbols are verified according to the ISO/IEC 15416 methodology, with the modifications described in Clause 6; different parameters and methodologies are applicable to two-dimensional matrix symbols.

There are currently many methods of assessing bar code quality at different stages of symbol production. The methodologies described in this International Standard are not intended as a replacement for any current process control methods. They provide symbol producers and their trading partners with universally standardized means for communicating about the quality of multi-row bar code and two-dimensional matrix symbols after they have been printed. The procedures described in this International Standard must necessarily be augmented by the reference decode algorithm and other measurement details within the

© ISO/IEC 2011 – All rights reserved

OPTO_00012702

JA1948

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12
**ISO/IEC 15415:2011(E)**

applicable symbology specification, and they may also be altered or overridden as appropriate by governing symbology or application specifications.

Alternative methods of quality assessment may be agreed between parties or as part of an application specification.

For direct part mark applications, a modified version of the methodology defined in this International Standard has been defined in ISO/IEC TR 29158.

© ISO/IEC 2011 – All rights reserved

OPTO_00012703

JA1949

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**PX-12**

OPTO_00012704

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**INTERNATIONAL STANDARD**                                ISO/IEC 15415:2011(E)

# Information technology — Automatic identification and data capture techniques — Bar code symbol print quality test specification — Two-dimensional symbols

## 1 Scope

This International Standard

— specifies two methodologies for the measurement of specific attributes of two-dimensional bar code symbols, one of these being applicable to multi-row bar code symbologies and the other to two-dimensional matrix symbologies;

— defines methods for evaluating and grading these measurements and deriving an overall assessment of symbol quality;

— gives information on possible causes of deviation from optimum grades to assist users in taking appropriate corrective action.

This International Standard applies to those two-dimensional symbologies for which a reference decode algorithm has been defined, but its methodologies can be applied partially or wholly to other similar symbologies.

While this International Standard can be applied to direct part marks, it is possible that better correlation between measurement results and scanning performance will be obtained with ISO/IEC TR 29158 in combination with this International Standard.

## 2 Normative references

The following referenced documents are indispensable for the application of this document. For dated references, only the edition cited applies. For undated references, the latest edition of the referenced document (including any amendments) applies.

ISO/IEC 19762-1, *Information technology — Automatic identification and data capture (AIDC) techniques — Harmonized vocabulary — Part 1: General terms relating to AIDC*

ISO/IEC 19762-2, *Information technology — Automatic identification and data capture (AIDC) techniques — Harmonized vocabulary — Part 2: Optically readable media (ORM)*

ISO 7724-2:1984, *Paints and varnishes — Colorimetry — Part 2: Colour measurement*

ISO/IEC 15416, *Information technology — Automatic identification and data capture techniques — Bar code print quality test specification — Linear symbols*

NOTE     The Bibliography lists official and industry standards containing specifications of symbologies to which (inter alia) this International Standard is applicable.

© ISO/IEC 2011 – All rights reserved
1

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

## 3   Terms and definitions

For the purposes of this document, the terms and definitions given in ISO/IEC 19762-1, ISO/IEC 19762-2, ISO/IEC 15416 and the following apply.

**3.1**
**binarised image**
binary (black/white) image created by applying the Global Threshold to the pixel values in the reference grey-scale image

**3.2**
**effective resolution**
resolution obtained on the surface of the symbol under test, normally expressed in pixels per millimetre or pixels per inch, and calculated as the resolution of the image capture element multiplied by the magnification of the optical elements of the measuring device

**3.3**
**error correction capacity**
number of codewords in a symbol (or error control block) assigned for erasure and error correction, minus the number of codewords reserved for error detection

**3.4**
**inspection area**
rectangular area which contains the entire symbol to be tested inclusive of its quiet zones

**3.5**
**grade threshold**
boundary value separating two grade levels, the value itself being taken as the lower limit of the upper grade

**3.6**
**module error**
module of which the apparent dark or light state in the binarised image is inverted from its intended state

**3.7**
**pixel**
individual light-sensitive element in an array [e.g. CCD (charge coupled device) or CMOS (complementary metal oxide semiconductor) device]

**3.8**
**raw image**
plot of the reflectance values in x and y coordinates across a two-dimensional image, representing the discrete reflectance values from each pixel of the light-sensitive array

**3.9**
**reference grey-scale image**
plot of the reflectance values in x and y coordinates across a two-dimensional image, derived from the discrete reflectance values of each pixel of the light-sensitive array by convolving the raw image with a synthesised circular aperture

**3.10**
**reflectance margin**
measurement of modulation using error correction and known module colours

**3.11**
**sample area**
area of an image contained within a circle 0,8X in diameter, X being the average module width determined by the application of the reference decode algorithm for the symbology in question or, where the application permits a range of X dimensions, the minimum module width permitted by the application specification

**2**

© ISO/IEC 2011 – All rights reserved

OPTO_00012706

JA1952

Licensed to York Faulkner (york.faulkner@vmf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**PX-12**
**ISO/IEC 15415:2011(E)**

**3.12**
**scan grade**
result of the assessment of a single scan of a matrix symbol, derived by taking the lowest grade achieved for any measured parameter of the reference grey-scale and binarised images

# 4    Symbols and abbreviated terms

*AN* = Axial Nonuniformity

$E_{cap}$ = error correction capacity of the symbol

*e* = number of erasures

*FPD* = Fixed Pattern Damage

*GN* = Grid Nonuniformity

*GT* = Global Threshold

*MARGIN* = a measure of the difference in reflectance between a module and the global threshold, the value of which goes to zero for modules of the incorrect reflectance state

*MOD* = an absolute measure of the difference in reflectance between a module and the global threshold

$R_{max}$ = highest reflectance in any element or quiet zone in a scan reflectance profile, or the highest reflectance of any sample area in a two-dimensional matrix symbol

$R_{min}$ = lowest reflectance in any element in a scan reflectance profile, or the lowest reflectance of any sample area in a two-dimensional matrix symbol

*SC* = Symbol Contrast (equal to $R_{max}$ - $R_{min}$)

*t* = number of errors

*UEC* = Unused Error Correction

# 5    Quality grading

## 5.1    General

The measurement of two-dimensional bar code symbols is designed to yield a quality grade indicating the overall quality of the symbol which can be used by producers and users of the symbol for diagnostic and process control purposes, and which is broadly predictive of the read performance to be expected of the symbol in various environments. The process requires the measurement and grading of defined parameters, from which a grade for an individual scan (scan reflectance profile grade or scan grade) is derived; the grades of multiple scans of the symbol are averaged to provide the overall symbol grade.

As a consequence of the use of different types of reading equipment under differing conditions in actual applications, the levels of quality required of two-dimensional bar code symbols to ensure an acceptable level of performance will differ. Application specifications should therefore define the required performance in terms of overall symbol grade in accordance with this standard. The guidelines in Annex D.4 are provided as an aid in writing application standards which employ this standard.

This standard defines the method of obtaining a quality grade for individual symbols. The use of this method in high volume quality control regimes may require sampling in order to achieve desired results. Such sampling plans, including required sampling rates are outside of the scope of this international standard.

© ISO/IEC 2011 – All rights reserved    **3**

OPTO_00012707

JA1953

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 371 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

NOTE    Information on sampling plans may be found in the following: ISO 3951-1, ISO 3951-2, ISO 3951-3, ISO 3951-5 or ISO 2859-10.

## 5.2    Expression of quality grades

Although this International Standard specifies a numeric basis for expressing quality grades on a descending scale from 4 to 0, with 4 representing the highest quality, individual parameter grades and individual scan grades may also be expressed on an equivalent alphabetic scale from A to D, with a failing grade of F, in application standards with a historical link to ANSI X3.182.

Table 1 maps the alphabetic and numeric grades to each other.

**Table 1 — Equivalence of numeric and alphabetic quality grades**

| Numeric grade | Alphabetic Grade |
|:---:|:---:|
| 4 | A |
| 3 | B |
| 2 | C |
| 1 | D |
| 0 | F |

## 5.3    Overall Symbol Grade

The overall symbol grade shall be calculated as defined in 6.2.6 or 7.10. Overall symbol grades shall be expressed to one decimal place on a numeric scale ranging in descending order of quality from 4,0 to 0,0.

Where a specification defines overall symbol grades in alphabetic terms the relative mapping of the alphabetic and numeric grades is as illustrated in Figure 1 below. For example, the range of 1,5 to immediately below 2,5 corresponds to grade C.



**Figure 1 — Mapping of alphabetic and numeric overall symbol grades**

© ISO/IEC 2011 – All rights reserved

OPTO_00012708

JA1954

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order OP-575474 / Downloaded 2022-01-21
Single user licence only, copying and networking prohibited

### 5.4 Reporting of symbol grade

A symbol grade is only meaningful if it is reported in conjunction with the illumination and aperture used. It should be shown in the format *grade/aperture/light/angle*, where:

- *"grade"* is the overall symbol grade as defined in 6.2.6 or 7.10, i.e. the arithmetic mean to one decimal place of the scan reflectance profile or scan grades,

- *"aperture"* is the aperture reference number (from ISO/IEC 15416 for linear scanning techniques, or the diameter in thousandths of an inch (to the nearest thousandth) of the synthetic aperture defined in 7.3.3),

- *"light"* defines the illumination: a numeric value indicates the peak light wavelength in nanometres (for narrow band illumination); the alphabetic character W indicates that the symbol has been measured with broadband illumination ("white light") the spectral response characteristics of which must imperatively be defined or have their source specification clearly referenced,

- *"angle"* is an additional parameter defining the angle of incidence (relative to the plane of the symbol) of the illumination. It shall be included in the reporting of the overall symbol grade when the angle of incidence is other than 45°. Its absence indicates that the angle of incidence is 45°.

NOTE    While illumination from four sides with an angle of incidence of 45° is the default, other angles of incidence may be specified as requirements for grading by specifying the angle instead of leaving it blank. Other lighting options are defined in ISO/IEC TR 29158 which may be more appropriate for direct part marking applications, especially in applications which rely on symbols marked on reflectance substrates.

An asterisk following the value for "grade", in the case of a two-dimensional matrix symbol, indicates that the surroundings of the symbol contain extremes of reflectance that may interfere with reading - see 7.6.

Examples

2,8/05/660 would indicate that the average of the grades of the scan reflectance profiles, or of the scan grades, was 2,8 when these were obtained with the use of a 0,125 mm aperture (ref. no. 05) and a 660 nm light source, incident at 45°.

2,8/10/W/30 would indicate the grade of a symbol intended to be read in broadband light, measured with light incident at 30° and using a 0,250 mm aperture (ref. no. 10), but would need to be accompanied either by a reference to the application specification defining the reference spectral characteristics used for measurement or a definition of the spectral characteristics themselves.

2,8*/10/670 would indicate the grade of a symbol measured using a 0,250 mm aperture (ref. no. 10), and a 670 nm light source, and indicates the presence of a potentially interfering extreme reflectance value in the surroundings of the symbol.

NOTE    The same notation is used to specify a minimum grade that is required in an application as is a grade that is obtained by measuring a symbol in accordance with this standard. For example, an application standard may specify a symbol quality requirement as 1.5/05/660 and this would be met by a measured grade of X.X/05/660 as long as X.X is a number that is greater or equal to 1.5. However, this requirement would not be met by 2.0/10/660 nor 3.0/05/W nor 3.5/05/660/30.

## 6    Measurement methodology for two-dimensional multi-row bar code symbols

### 6.1    General

The evaluation of two-dimensional multi-row bar code symbols shall be based on the application of the methodology of ISO/IEC 15416, modified as described in 6.2.2 or 6.3, and if appropriate for the symbology, on the application of the additional provisions described in 6.2.3, 6.2.4 and 6.2.5, to derive an overall symbol grade. Ambient light levels shall be controlled in order not to have any influence on the measurement results. The symbol shall be scanned using the light wavelength(s) and effective aperture size specified in the appropriate application standard. When performing a measurement, the scan lines should be made perpendicular to the height of the bars in the start and stop characters and should as far as possible pass through the centres of rows in order to minimise the effect of cross-talk from adjacent rows. In the case of area

© ISO/IEC 2011 – All rights reserved

OPTO_00012709

JA1955

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 373 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**ISO/IEC 15415:2011(E)**

imaging techniques, a number of scan lines, perpendicular to the height of the bars and sufficient to cover all rows of the symbol, shall be synthesised by convolving the raw image with the appropriate synthetic aperture.

## 6.2 Symbologies with cross-row scanning ability

### 6.2.1 Basis of grading

The distinguishing feature of these symbologies is their ability to be read with scan lines that cross row boundaries. Symbologies of this type, at the date of publication of this International Standard, also share the feature that the start and stop patterns (or equivalent features of the symbol, e.g. the Row Address Patterns of MicroPDF417) are constant from row to row, or the position of only one edge in these patterns varies by no more than 1X in adjacent rows of the symbol. These symbologies shall be graded in respect of:

— Analysis of the scan reflectance profile (based on ISO/IEC 15416) (see 6.2.2)

— Codeword Yield (see 6.2.3)

— Unused Error Correction (see 6.2.4)

— Codeword print quality (see 6.2.5)

### 6.2.2 Grade based on analysis of scan reflectance profile

The start and stop or equivalent (e.g. Row Address) patterns of the symbol shall be evaluated according to ISO/IEC 15416. Regions with data content will be evaluated separately as described in 6.1.2, 6.1.3 and 6.1.4. Test scans of the Start and Stop patterns shall be graded using all parameters specified in ISO/IEC 15416.The effective aperture size is specified in the appropriate application standard or is the default aperture size appropriate for the symbol X dimension given in ISO/IEC 15416.

For the analysis of the scan reflectance profiles, the number of scans should be ten, or the height of the symbol divided by the measuring aperture if this quotient is less than ten. Scans should be approximately evenly spaced over the height of the symbol. For example, in a twenty-row symbol the ten scans might be performed in alternate rows. In a two-row symbol, up to five scans might be performed in each row, at different positions in the height of the bars. The symbology specification may give more specific guidance on the selection of the scans to be used.

To identify bars and spaces, a Global Threshold for each scan has to be determined. Global Threshold shall be equal in reflectance to $(R_{max} + R_{min}) / 2$, where the values $R_{max}$ and $R_{min}$ are respectively the highest and the lowest reflectances in the scan. All regions above the Global Threshold shall be considered spaces (or quiet zones) and all regions below shall be considered bars.

Edge locations shall be determined as the points where the reflectance value is midway between the highest reflectance in the adjoining space and the lowest reflectance in the adjoining bar, in accordance with ISO/IEC 15416.

For the evaluation of the parameters 'decode' and 'decodability' the reference decode algorithm for the symbology shall be applied.

Each scan shall be graded as the lowest grade for any individual parameter in that scan. The grade based on scan reflectance profiles shall be the arithmetic mean of the grades for the individual scans.

The measurement of bar width gain or loss may be used for process control purposes. Note that this method will not be sensitive to printing variations parallel to the height of the start and stop characters. If a full analysis of the printing process is desired, symbols should be printed and tested in both orientations.

    © ISO/IEC 2011 – All rights reserved

OPTO_00012710

JA1956

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 374 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

### 6.2.3    Grade based on Codeword Yield

This parameter measures the efficiency with which linear scans can recover data from a two-dimensional multi-row symbol. The Codeword Yield is the number of validly decoded codewords expressed as a percentage of the maximum number of codewords that could have been decoded (after adjusting for tilt). A poor Codeword Yield, for a symbol whose other measurements are good, may indicate a Y-axis print quality problem (such as those shown in Table C.1).

Obtain a matrix of the correct symbol character values, such as would result from successful completion of the *UEC* calculations (see 6.2.4). This matrix is used as the "final decode of the symbol" used in subsequent steps to determine validly decoded codewords.

An individual scan qualifies for inclusion in the Codeword Yield calculation if it meets either of two conditions:

1) The scan did not include recognised portions of either the top or the bottom row of the symbol. At least one of the Start or Stop (or Row Address) patterns shall have been successfully decoded from that scan, together with at least one additional codeword or the corresponding second Start or Stop pattern, or Row Address Pattern.

2) The scan included recognised portions of either the top or the bottom row of the symbol. Both the Start and Stop patterns of the symbol shall have been successfully decoded from that scan.

It is important to note that an extension to the symbology's Reference Decode Algorithm is required, in order to detect and decode a pair of Start and Stop patterns when neither of the adjacent codewords is decodable. As examples, a linear search for a matching pair of PDF417 Start and Stop patterns, or a linear search for a matching pair of MicroPDF417 Row Indicator Patterns, would fulfil this requirement for scans where the Reference Decode Algorithm alone did not decode both patterns; thus this extension can qualify a scan where no codewords (other than the matched end patterns) were decoded. Note however, that a scan that contains only a *single* decoded Start or Stop pattern found by this linear search does not count as a qualified scan, if no other codewords or corresponding second Start or Stop pattern, or Row Address Pattern, were also decoded.

Decode the symbol completely and populate the symbol matrix.

For each qualified scan, compare the codewords actually decoded with the codewords in the symbol matrix and count the number of codewords that match. Accumulate the total number of validly decoded codewords, and update a count of the number of times each codeword of the symbol has been decoded and a count of the number of times each row has been detected. Also record a count of the number of detected row crossings in each scan (a crossing is "detected" when a scan line yields correctly-decoded codewords from adjacent rows).

After processing each scan, calculate the maximum number of codewords that could have been decoded thus far, as the number of qualified scans multiplied by the number of columns in the symbol (excluding the fixed patterns, such as the Start and Stop patterns of PDF417 or the Row Address Indicators of MicroPDF417).

The entire symbol shall be scanned multiple times until three conditions are met:

1) the maximum number of codewords that could have been decoded is at least ten times the number of codewords in the symbol,

2) the highest and lowest decodable rows (which may not necessarily be the first and last rows) of the symbol have each been scanned at least three times, and

3) at least $(0.9n)$ of the codewords (data or error correction) have been successfully decoded two or more times, where $n$ is the number of non-error-correction data codewords in the symbol.

EXAMPLE     Taking a PDF417 symbol with 6 rows and 16 columns and error correction level 4, the total number of codewords is 96, of which 64 are data and 32 error correction. To fulfil condition 1, the maximum number of codewords that could have been decoded must be at least 960. To fulfil condition 3, since n is 64, at least 58 of the codewords must have been decoded twice or more $(0.9 \times 64 = 57.6)$.

© ISO/IEC 2011 – All rights reserved

OPTO_00012711

JA1957

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

If the ratio of the total number of validly decoded codewords to the total number of detected row crossings is less than 10 : 1, then discard the measurements just obtained, and repeat the measurement process, adjusting the tilt angle of the scan line to reduce the number of row crossings.

Otherwise, to compensate for any residual tilt, subtract the number of detected row crossings from the calculated maximum number of codewords that could have been decoded.

Codeword Yield shall be graded as shown in Table 2:

**Table 2 — Grading of Codeword Yield**

| Codeword Yield | Grade |
|:---:|:---:|
| ≥ 71% | 4 |
| ≥ 64% | 3 |
| ≥ 57% | 2 |
| ≥ 50% | 1 |
| < 50% | 0 |

### 6.2.4   Grade based on unused error correction

Decode the symbol completely and process scans until the number of decoded codewords stabilises. Calculate the unused error correction ($UEC$) as $UEC = 1,0 - ((e + 2t) / E_{cap})$, where $e$ = the number of erasures, $t$ = the number of errors and $E_{cap}$ = the error correction capacity of the symbol (the number of error correction codewords minus the number of error correction codewords reserved for error detection). If no error correction has been applied to the symbol, and if the symbol decodes, $UEC = 1$. If $(e + 2t)$ is greater than $E_{cap}$, $UEC = 0$. In symbols with more than one (e.g. interleaved) error correction block, $UEC$ shall be calculated for each block independently and the lowest value shall be used for grading purposes.

Unused Error Correction shall be graded as shown in Table 3:

**Table 3 —Grading of Unused Error Correction**

| Unused Error Correction | Grade |
|:---:|:---:|
| ≥ 0,62 | 4 |
| ≥ 0,50 | 3 |
| ≥ 0,37 | 2 |
| ≥ 0,25 | 1 |
| < 0,25 | 0 |

8

© ISO/IEC 2011 – All rights reserved

OPTO_00012712

JA1958

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 376 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

### 6.2.5  Grade based on codeword print quality

The approach detailed in this subclause provides additional diagnostic information and enables allowance to be made for the effect of error correction in masking less than perfect attributes of the symbol that influence symbol quality, by applying an overlay technique as described in Annex F. It enables the Decodability, Defects and Modulation parameters of scan reflectance profiles covering the entire data region of the symbol to be graded in accordance with ISO/IEC 15416.

This approach uses the following procedure for the assessment of each of the three parameters. In symbols with more than one (e.g. interleaved) error correction block, it shall be applied to each block independently and the lowest value shall be used for grading purposes.

The entire symbol shall be scanned until $0.9n$ codewords (where $n$ has the same meaning as in 6.2.3) have been decoded ten times or until it is certain that each codeword has been scanned at least once without inter-row interference. In each scan, the Decodability, Defects and Modulation parameters shall be measured in each symbol character in accordance with ISO/IEC 15416. The calculation of all three parameters shall be based on the value of Symbol Contrast obtained from $R_{max}$ and $R_{min}$ in that scan line. The interim codeword grade of each parameter (Modulation, Defects and Decodability) for each codeword is the highest codeword grade for that parameter obtained on any scan for that codeword.

Where the rows include overhead characters (other than the Start and Stop, or equivalent patterns), for example Row Indicators in PDF417 symbols, that are not included in the error correction calculation, these overhead characters shall be assessed first for each row together with the corresponding characters from the rows immediately above and below the row being considered. The highest interim codeword grade for any of these six (or four, in the case of the top or bottom row) characters shall be the overhead grade used to moderate the interim codeword grades for the codewords in the row. If a data codeword's interim codeword grade is higher than the grade obtained by the overhead characters, the data codeword's interim codeword grade shall be reduced to the overhead grade. The interim parameter grades so obtained shall then be modified to allow for the influence of error correction, as described below.

For each parameter, the cumulative number of symbol characters achieving each grade from 4 to 0 or a higher grade, and those not decoded, shall be counted, and the counts shall be compared with the error correction capacity of the symbol as follows:

For each grade level, assuming that all symbol characters not achieving that grade or a higher grade are erasures, derive a notional grade for Unused Error Correction as described in 6.2.4, based on the percentage thresholds shown in Table 3. The codeword parameter grade shall be the lower of the grade level and the notional UEC grade.

NOTE 1    This notional grade is not related to, and does not affect, the UEC grade for the symbol as calculated according to 6.2.4, but is a means of compensating for the extent to which error correction can mask imperfections in a symbol. If one symbol has higher error correction capacity than another symbol, then the former symbol can tolerate a greater number of codewords with poor values for the parameter in question than the latter. See Annex F for a fuller description of the approach. The final codeword parameter grade for the symbol shall be the highest codeword interim grade for all grade levels.

Table 4 shows an example of grading one parameter in a symbol containing 100 symbol characters (codewords) with an error correction capacity of 32 codewords. The 100 codewords consist of 68 data codewords, 3 error correction codewords reserved for error detection, and 29 error correction codewords to be used for correcting erasures or errors, giving an erasure correction capacity of 29. The symbol would be graded 1 for the parameter concerned (the highest value in the right-hand column).

NOTE 2    A similar calculation is performed for each of the parameters Modulation, Defects and Decodability

© ISO/IEC 2011 – All rights reserved

OPTO_00012713

JA1959

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**PX-12**

**ISO/IEC 15415:2011(E)**

Table 4 — Example of codeword print quality parameter grading in symbols with cross-row scanning ability, applying overlay procedure in Annex F

| *MOD*/Defects/Decodability grade level (a) | No. of codewords at level a | Cumulative no. of codewords at level a or higher (b) | Remaining codewords (treated as erasures) (100 - b) (c) | Notional unused error correction capacity (29 − c) | Notional UEC (%) | Notional UEC grade (d) | Codeword interim grade level (Lower of a or d) (e) |
|---|---|---|---|---|---|---|---|
| 4 | 40 | 40 | 60 | (exceeded) | <0 | 0 | 0 |
| 3 | 20 | 60 | 40 | (exceeded) | <0 | 0 | 0 |
| 2 | 10 | 70 | 30 | (exceeded) | <0 | 0 | 0 |
| 1 | 10 | 80 | 20 | 9 | 31% | 1 | 1 |
| 0 | 7 | 87 | 13 | 16 | 55% | 3 | 0 |
| Not decoded | 13 | 100 | | | | | |
| | | | | | Parameter grade (Highest value of **e**) | | 1 |

### 6.2.6  Overall symbol grade

The overall symbol grade shall be the lowest of the grade based on analysis of the scan reflectance profile in accordance with 6.2.2, and the grades based on Codeword Yield, Unused Error Correction and codeword print quality in accordance with 6.2.3, 6.2.4 and 6.2.5.

The flowchart in Figure 2 summarises the process.

**10**

© ISO/IEC 2011 – All rights reserved

OPTO_00012714

JA1960

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-S76474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12
**ISO/IEC 15415:2011(E)**



**Figure 2 — Grading process for multi-row symbols with cross-row scanning ability**

### 6.3    Symbologies requiring row-by-row scanning

The distinguishing feature of these symbologies is that they require a scan line to traverse a complete row from start to stop pattern (or in the reverse direction) without crossing into an adjacent row and that they require all rows to be scanned.

Each row shall be evaluated in accordance with ISO/IEC 15416 as though it were a separate symbol. Scan lines shall pass through the inspection band of the central 80% of the height of each row, as specified in ISO/IEC 15416, in order to minimise the effects of cross-talk from adjacent rows. The number of scans per row should be the lower of ten, or the inspection band height divided by the aperture diameter. The overall symbol grade shall be the lowest overall grade obtained for any row.

## 7    Measurement methodology for two-dimensional matrix symbols

### 7.1    Overview of methodology

The measurement methodology defined in this clause is designed to maximize the consistency of both reflectivity and dimensional measurements of symbols on various substrates. The basis of this methodology is the measurement of reflectance from the symbol. This methodology is also intended to correlate with conditions encountered in two-dimensional matrix scanning systems.

The method starts by obtaining the raw image, which is a high-resolution grey-scale image of the symbol captured under controlled illumination and viewing conditions. The stored raw image is then converted into a

OPTO_00012715

JA1961

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**ISO/IEC 15415:2011(E)**

reference grey-scale image, by convolving the raw image with a synthetic circular aperture. From the reference grey-scale image, the Symbol Contrast, Modulation and Fixed Pattern Damage parameters are measured and graded. A secondary binarised image is produced from the reference grey-scale image by applying a Global Threshold, and this binarised image is then analysed and graded for the parameters of Decode, Axial Nonuniformity, Grid Nonuniformity, and Unused Error Correction, together with any additional parameters defined in the symbology or application specification. The methodology recognises possible extreme reflectance values in the neighbourhood of the symbol, which might interfere with reading; however, only their presence is indicated in the report of the overall symbol grade.

In addition, print growth or loss is measured along each axis of the symbol and reported as an ungraded process control measurement.

The scan grade is the lowest grade achieved for these seven parameters and any others specified for a given symbology or application.

## 7.2   Obtaining the test images

### 7.2.1   Measurement conditions

A test image of the symbol shall be obtained in a configuration that mimics the typical scanning situation for that symbol, but with substantially higher resolution (see 7.3.3), uniform illumination, and at best focus. The reference optical arrangement is defined in 7.3.4 and should be used where application requirements do not call for a specialised optical arrangement; alternative optical arrangements (two of which are defined in 7.3.4) may be used provided that the measurements obtained with them can be correlated with the use of the reference optical arrangement.

Measurements shall be made with light of a single peak wavelength or set of spectral characteristics and a known diameter of measuring aperture, both of which shall be defined by the application specification or determined in accordance with 7.3.2 and 7.3.3. Ambient light levels shall be controlled in order not to have any influence on the measurement results.

Whenever possible, measurements shall be made on the symbol in its final configuration, i.e. the configuration in which it is intended to be scanned. The measurement method is described in 7.6 and 7.7, and Annex B, and is intended to prevent extreme reflectance values outside the symbol area (e.g. when surrounded by free air or a highly specularly reflective surface) from distorting the symbol contrast measurements.

Specialized applications (e.g. the measurement of quality of symbols produced by engraving or etching the substrate surface) clearly must dictate the colour and angle of symbol illumination as well as the required imaging resolution, but the general test set-up defined in 7.3.4 should work suitably for many open applications. For Direct Part Mark applications, a modified version of the methodology described in this standard may be more appropriate. The modified methodology is formally defined in ISO/IEC TR 29158 and may be followed if such is in accordance with the relevant application standard.

Two principles govern the design of the optical set-up. First, the test image's grey-scale shall be nominally linear and not be enhanced in any way. Second, the image resolution shall be adequate to produce consistent readings. See 7.3.3.

### 7.2.2   Raw image

The raw image is a plot of the actual reflectance values for each pixel of the light-sensitive array, from which are derived the reference grey-scale image and the binarised image which are evaluated for the assessment of symbol quality.

### 7.2.3   Reference grey-scale image

The reference grey-scale image is obtained from the raw image by processing the individual pixel reflectance values through a synthetic circular aperture as defined in 7.3.3. It is used for the assessment of the parameters Symbol Contrast, Modulation, Reflectance Margin and Fixed Pattern Damage.

**12**                                                © ISO/IEC 2011 – All rights reserved

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 380 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

#### 7.2.4    Binarised image

The binarised image is obtained from the reference grey-scale image by applying a Global Threshold midway between $R_{max}$ and $R_{min}$, determined as defined in 7.6. It is used for the assessment of the parameters Decode, Axial Non-uniformity, Grid Non-uniformity, and Unused Error Correction.

### 7.3    Reference reflectivity measurements

#### 7.3.1    General requirements

Equipment for assessing the quality of symbols in accordance with this clause shall comprise a means of measuring and analysing the variations in the reflectivity of a symbol on its substrate over an inspection area which shall cover the full height and width of the symbol including all quiet zones.

All measurements on a two-dimensional matrix symbol shall be made within the inspection area defined in accordance with 7.3.5.

The measured reflectance values shall be expressed in percentage terms either with reference to the reflectance of a barium sulphate or magnesium oxide reference sample complying with the requirements of ISO 7724-2, which shall be taken as 100 per cent, or by means of calibration and reference to recognised national standards laboratories.

#### 7.3.2    Light source

The peak light wavelength or, in the case of applications designed for the use of broadband illumination, the reference spectral response characteristics, should be specified in the application specification to suit the intended scanning environment. When the peak wavelength or spectral characteristics are not specified in the application specification, measurements should be made using light of characteristics that approximate most closely to those expected to be used in the scanning process. Light sources may either have inherently narrow band or near-monochromatic characteristics or have broad bandwidths; in the latter case the spectral response of the measuring system may be restricted to the desired peak wavelength(s) by the interposition of an appropriate narrow band filter in the optical path.

NOTE    Special care is necessary when making measurements with broadband illumination. The overall spectral response of the measurement and reading systems must be defined and matched in order to make accurate and repeatable measurements of the grey-scale reflectance of a sample area that correlate with the intended system. Overall spectral response includes the spectral distribution of the light source, the response of the detector and any associated filter characteristics.

Refer to Annex D for guidance on the selection of the light source.

#### 7.3.3    Effective resolution and measuring aperture

The measuring aperture is specified by the user application specification to suit the $X$ dimension of the symbol and the intended scanning environment. Matrix symbol grading shall be carried out using a synthesised aperture. An aperture size in the range of 50% to 80% of the smallest $X$ dimension to be encountered in an application is recommended. In an application where symbols of differing $X$ dimensions will be encountered, the application standard should ensure that all measurements are made with the aperture appropriate to the smallest $X$ dimension to be encountered. See Annex D.2 for guidance in writing application standards and considering the tradeoffs associated with the choice of aperture size.

The effective resolution of an instrument that implements this international standard shall be sufficient to ensure that the parameter grading results are consistent irrespective of the rotation of the symbol. The effective resolution is the product of the resolution of the light-sensitive array and of the magnification of the associated optical system and effected by distortions introduced by the optical system. The reference optical arrangement requires high resolution, such as an effective resolution of not less than ten pixels per module in width and height.

NOTE    Implementations (e.g. commercial verifiers) may use fewer pixels per module, providing that the consistency irrespective of rotation mentioned above is achieved on the test symbols specified in ISO/IEC 15426-2.

© ISO/IEC 2011 – All rights reserved

OPTO_00012717

JA1963

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

### 7.3.4   Optical geometry

A reference optical geometry is defined for reflectivity measurements and consists of:

— flood incident illumination, uniform across the inspection area, from a set of four light sources arranged at 90 degree intervals around a circle concentric with the inspection area and in a plane parallel to that of the inspection area, at a height which will allow incident light to fall on the centre of the inspection area at an angle of 45° to its plane, and

— a light collection device, the optical axis of which is perpendicular to the inspection area and passes through its centre, and which focuses an image of the test symbol on a light-sensitive array.

The light reflected from the inspection area (see 7.3.5) plus the 20$Z$ extension defined in 7.7 shall be collected and focussed on the light-sensitive array.

Implementations may use alternative optical geometries and components, provided that their performance can be correlated with that of the reference optical arrangement defined in this section. Figures 3 and 4 illustrate the principle of the optical arrangement, but are not intended to represent actual devices; in particular the magnification of the device is likely to differ from 1:1. In addition, many devices include filters to modify the spectral characteristics or restrict the effect of unwanted spectral components. Implementations should have sufficient resolution irrespective of the rotation as stated in 7.3.3, unless the manufacturer defines handling instructions which restricts the angle of the symbol in relation to the camera chip orientation.

This reference geometry is intended to provide a basis to assist the consistency of measurement and may not correspond with the optical geometry of individual scanning systems. As stated in 7.2, specialised applications, and especially those involving direct part marking which employs physical changes to the surface of the substrate for the creation of the graphic image, may require the angle of illumination, in particular, to be set to a different particular angle such as 30° to the plane of the symbol. If an angle other than the default is specified in the application specification, then the angle of incidence of the light shall be stated as a fourth parameter when reporting the overall symbol grade, as described in 5.4.

The modified methodology defined in ISO/IEC TR 29158 intended for direct part marking applications defines more illumination options including diffuse illumination at a near-90° incident angle.

**14**

© ISO/IEC 2011 – All rights reserved

OPTO_00012718

JA1964

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**PX-12**
**ISO/IEC 15415:2011(E)**



1 – Light sensing element

2 – Lens providing 1:1 magnification (measurement *A* = measurement *B*)

3 – Inspection area

4 – Light sources

$\vartheta$ - Angle of incidence of light relative to plane of symbol (default = 45°, optionally 30° or 90° diffuse)

**Figure 3 — Reference optical arrangement – side view**



**Figure 4 — Reference optical arrangement – plan view**

© ISO/IEC 2011 – All rights reserved

**15**

OPTO_00012719

JA1965

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

### 7.3.5   Inspection area

The area within which all measurements shall be made shall be a rectangular area framing the complete symbol, including quiet zones. The centre of the inspection area shall be as close as practicable to the centre of the field of view.

NOTE      The inspection area is not the same as the field of view of the verifier, which should be sufficiently large to include the whole symbol plus the $20Z$ extension described in 7.7.

### 7.4   Number of scans

The overall symbol grade is obtained through one measurement, with the symbol oriented in any rotation with respect to the measuring device, in a plane perpendicular to the optical axis to the imager sensor. See D.5 for information regarding the fact that this international standard previously required five scans at different rotations to be made and averaged to obtain an overall grade.

Note:      This may not be appropriate for symbols on certain substrates or marking methods that do not exhibit uniform diffuse reflection and therefore exhibit variations in symbol reflectance characteristics when viewed in different orientations relative to the axis of the measuring device. Such symbols may be more appropriately measured by following the modified methodology in ISO/IEC TR 29158.

### 7.5   Basis of scan grading

Two-dimensional symbol quality assessment shall be based on the measurement and grading of parameters of the reference grey-scale image, the binarised image derived from it, and the application of the reference decode algorithm to these, as defined in 7.8. Quality grading of these parameters shall be used to provide a relative measure of symbol quality under the measurement conditions used. Each parameter shall be measured and a grade on a descending scale of integers from 4 to 0 shall be allocated to it. The grade 4 represents the highest quality, while the grade 0 represents failure.

### 7.6   Grading procedure

A flowchart illustrating the procedure is shown in Annex B.

Centre the symbol in the field of view

Capture the raw image (see 7.2.2).

Find and replace the brightest .005% pixels in the overall image with the median of the nine pixels consisting of itself and its eight immediate neighbours.

Apply the aperture defined in 7.3.3 to the raw image to create a reference grey-scale image (see 7.2.3).

A circular area with a diameter 20 times the aperture diameter, centred in the reference grey-scale image, should be used to find the initial values for $R_{min}$ and $R_{max}$. Using these values, determine an initial Global Threshold, create a binarised image (see 7.2.4), find the symbol and perform an initial decode.

Once the symbol has been decoded, measure revised $R_{min}$ and $R_{max}$ and recalculate the Global Threshold based on the whole inspection area of the reference grey-scale image (including the quiet zone). These values are used to recalculate module centres. Create a new binarised image. Perform a definitive decode and calculate all of the graded parameters of the symbol. Based on these, determine the scan grade for that image.

**16**

© ISO/IEC 2011 – All rights reserved

OPTO_00012720

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 384 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

## 7.7    Additional reflectance check over extended area

If the scan grade for each of modulation, decode, and finder pattern damage is 1 or higher, then perform an additional reflectance check as follows:

Measure $R_{min}$ and $R_{max}$ over an area extending to 20Z beyond the quiet zone on all sides. The field of view must be large enough to contain all points in the extended area.

If either the extended-area $R_{min}$ is lower than the revised $R_{min}$, or the extended-area $R_{max}$ is higher than the revised $R_{max}$, then repeat the measurement of modulation and finder pattern damage. If that measurement results in a modulation or finder pattern damage grade of 0, then an asterisk is appended to the overall symbol grade. This asterisk indicates that the substrate surrounding the symbol contains extremes of reflectance that may interfere with reading.

NOTE    This additional reflectance check does not alter the reported overall symbol grade nor the reported grades for the symbol contrast, modulation or finder pattern damage parameters.

The additional reflectance check may be omitted, if specifically permitted by the application specification, where the conditions under which the symbol is produced and applied are such that the risk of excessively high or low reflectance values in the extended area is insignificant, and the verifier field of view may then include only the symbol and its associated quiet zones.

## 7.8    Image assessment parameters and grading

### 7.8.1    Use of reference decode algorithm

The symbology reference decode algorithm found in the symbology specification is to be used in the verification process. In order to simplify processing the reference decode algorithm may be modified in the verifier by assuming that the symbol to be verified is approximately centred in the field of view of the device. No modifications to the reference decode algorithm that alter the functions listed below (since the adaptive grid mapping are essential to the grading process defined herein) are to be made. The reference decode performs five tasks needed for subsequent measurement of the symbol quality parameters.

- It locates and defines the area covered by the test symbol in the image.

- It determines reference points from the fixed patterns of the symbol to be used in constructing an ideal grid for measuring GNU.

- It adaptively creates a grid mapping of the data module nominal centres so as to sample them.

- It determines the nominal grid centre spacings in each axis of the symbol (the symbol X dimension)

- It performs error correction, detecting if symbol damage has consumed any of the error budget.

- It attempts to decode the symbol.

These functions each facilitate one or more of the measurements described in the following subclauses.

The image parameters described in 7.8.2 to 7.8.9 shall be assessed for compliance with this standard.

### 7.8.2    Decode

The Decode parameter tests, on a Pass/Fail basis, whether the symbol has all its features sufficiently correct to be readable by the reference decode algorithm.

The symbology reference decode algorithm shall be used to decode the symbol using the module centre positions on the grid determined by processing the binarised image.

OPTO_00012721

JA1967

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 385 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

If the image cannot be decoded using the symbology reference decode algorithm, then it shall receive the failing grade 0. Otherwise, it shall receive the grade 4.

### 7.8.3 Symbol Contrast

Symbol Contrast tests that the two reflective states in the symbol, namely light and dark, are sufficiently distinct within the symbol.

Using the reference grey-scale image of the symbol, measure the highest and lowest reflectance values in the inspection area. Symbol contrast is the difference between the highest and lowest reflectance values in the inspection area. The reflectance values to be used are the revised $R_{max}$ and $R_{min}$ as defined in 7.6.

$$SC = R_{max} - R_{min}$$

Symbol contrast shall be graded as shown in Table 5.

**Table 5 — Symbol Contrast grading**

| Symbol Contrast | Grade |
|---|---|
| ≥ 70% | 4 |
| ≥ 55% | 3 |
| ≥ 40% | 2 |
| ≥ 20% | 1 |
| < 20% | 0 |

### 7.8.4 Modulation and related measurements

#### 7.8.4.1 Modulation

Modulation is a measure of the uniformity of reflectance of the dark and light modules respectively. Factors such as print growth (or loss), misplacement of a module relative to the grid intersection, the optical characteristics of the substrate and uneven printing may reduce the absolute value of the difference between the reflectance of a module and the Global Threshold. A low Modulation may increase the probability of a module being incorrectly identified as dark or light.

The reflectance value of each module in the symbol shall be measured by superimposing on the reference grey-scale image the grid determined by applying the symbology reference decode algorithm to the binarised image. Calculate MOD, the Modulation value of each module as follows:

$$MOD = 2 * (abs\ (R - GT))\ /\ SC$$

Where     $MOD$ = modulation
              $R$ is the reflectance of the module
              $GT$ is the Global Threshold
              $SC$ is the Symbol Contrast

Assign the grade level for each module according to Table 6. For each codeword, select the minimum modulation grade of all modules in the codeword. As suggested by the absolute value in the function for MOD, whether a codeword is decoded correctly has no bearing on the grade level that is assigned. In this way, Modulation differs from Reflectance Margin, see 7.8.4.3.

© ISO/IEC 2011 – All rights reserved

OPTO_00012722

JA1968

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**PX-12**
**ISO/IEC 15415:2011(E)**

**Table 6 — Module grading for Modulation and Reflectance Margin**

| MOD or MARGIN | Module Grade |
|---|---|
| ≥ 0,50 | 4 |
| ≥ 0,40 | 3 |
| ≥ 0,30 | 2 |
| ≥ 0,20 | 1 |
| < 0,20 | 0 |

The cumulative number of codewords achieving each grade shall be counted and compared with the error correction capacity of the symbol as follows:

For each grade level, assuming that all codewords not achieving that grade or a higher grade are errors, derive a notional Unused Error Correction grade as described 7.8.8. Take the lower of the grade level and the notional UEC grade.

NOTE    This notional grade is not related to, and does not affect, the *UEC* grade for the symbol as calculated according to 7.8.8, but is a means of compensating for the extent to which error correction can mask imperfections in a symbol. If one symbol has higher error correction capacity than another symbol, then the former symbol can tolerate a greater number of codewords with low modulation than the latter. See Annex F for a fuller description of the approach.

Then the Modulation grade for the symbol shall be the highest of the resulting values for all grade levels. When the symbol consists of more than one (e.g. interleaved) error correction block, each block shall be assessed independently and the lowest grade for any block shall be taken as the Modulation grade of the symbol.

Table 7(A) shows an example of grading Modulation in a symbol containing 120 codewords, 60 of which are error correction codewords with a capacity to correct up to 30 errors in a single error correction block. Modulation grade of the symbol in the example would be 2 (the highest value in the right-hand column).

**Table 7(A) — Example of Modulation grading in a two-dimensional matrix symbol**

| MOD codeword grade level (a) | No. of codewords at level a | Cumulative no. of codewords at level a or higher (b) | Remaining codewords (treated as errors) (120 - b) (c) | Notional unused error correction capacity (30 − c) | Notional UEC (%) | Notional UEC grade (d) | Lower of a or d (e) |
|---|---|---|---|---|---|---|---|
| 4 | 25 | 25 | 95 | (exceeded) | <0 | 0 | 0 |
| 3 | 75 | 100 | 20 | 10 | 33,3% | 1 | 1 |
| 2 | 15 | 115 | 5 | 25 | 83,3% | 4 | **2** |
| 1 | 3 | 118 | 2 | 28 | 93.3% | 4 | 1 |
| 0 | 2 | 120 | 0 | 30 | 100% | 4 | 0 |
| | | | | | Modulation grade (Highest value of e): | | 2 |

In this example, some codewords may contain errors but that does not affect the calculation.

© ISO/IEC 2011 – All rights reserved                                                    **19**

OPTO_00012723

JA1969

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 387 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

ISO/IEC 15415:2011(E)

### 7.8.4.2    Contrast Uniformity

Contrast Uniformity is an optional parameter that can be a useful process control tool for measuring localized contrast variations. Contrast Uniformity does not affect the overall grade.

Contrast Uniformity is defined as the minimum MOD value found in any module contained in the data region of the symbol in clause 7.8.4.1.

### 7.8.4.3    Reflectance Margin

Reflectance Margin is a measure of how well each module is correctly distinguishable as light or dark in comparison to the global threshold. Factors such as print growth (or loss), misplacement of a module relative to the grid intersection, the optical characteristics of the substrate, uneven printing, or encodation errors, may reduce or even eliminate the margin for error between the reflectance of a module and the Global Threshold. A low Reflectance Margin may increase the probability of a module being incorrectly identified as dark or light.

The reflectance value of each module in each codeword in the symbol shall be measured by superimposing on the reference grey-scale image the grid determined by applying the symbology reference decode algorithm to the binarised image.

Since the correct state of each module is known after decoding, any modules which are decoded incorrectly are assigned a *MARGIN* value of 0.

For modules whose correct state is light:

*MARGIN = 2 \* (R − GT) / SC for R ≥ GT*

MARGIN = 0 for R < GT

and for modules whose correct state is dark:

*MARGIN = 2 \* (GT − R) / SC for R < GT*

MARGIN = 0 for R ≥ GT

Where        *MARGIN* = the reflectance margin of the module
             *R* is the reflectance of the module
             *GT* is the Global Threshold
             *SC* is the Symbol Contrast

Assign the grade level for each module according to Table 6. For each codeword, select the minimum grade for *MARGIN* of all modules in the codeword. Since codewords which are misdecoded are given grade level of 0, Reflectance Margin differs from Modulation, see 7.8.4.1.

The cumulative number of codewords achieving each grade shall be counted and compared with the error correction capacity of the symbol as follows:

For each grade level, assuming that all codewords not achieving that grade or a higher grade are errors, derive a notional Unused Error Correction grade as described in 7.8.8. Take the lower of the grade level and the notional UEC grade.

NOTE    This notional grade is not related to, and does not affect, the *UEC* grade for the symbol as calculated according to 7.8.8, but is a means of compensating for the extent to which error correction can mask imperfections in a symbol. If one symbol has higher error correction capacity than another symbol, then the former symbol can tolerate a greater number of codewords with low modulation than the latter. See Annex F for a fuller description of the approach.

Then the Reflectance Margin grade for the symbol shall be the highest of the resulting values for all grade levels.

     © ISO/IEC 2011 – All rights reserved

OPTO_00012724

JA1970

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

Table 7(B) shows an example of grading Reflectance Margin in a symbol containing 120 codewords, 60 of which are error correction codewords with a capacity to correct up to 30 errors in a single error correction block. The Modulation grade of the symbol in the example would be 1 (the highest value in the right-hand column).

**Table 7(B)— Example of Reflectance Margin grading in a two-dimensional matrix symbol, applying overlay procedure in Annex F**

| *MARGIN* codeword grade level (a) | No. of codewords at level a | Cumulative no. of codewords at level a or higher (b) | Remaining codewords (treated as errors) (120 - b) (c) | Notional unused error correction capacity (30 - c) | Notional *UEC* (%) | Notional *UEC* grade (d) | Lower of a or d (e) |
|---|---|---|---|---|---|---|---|
| 4 | 15 | 15 | 105 | (exceeded) | <0 | 0 | 0 |
| 3 | 70 | 85 | 35 | (exceeded) | <0 | 0 | 0 |
| 2 | 15 | 100 | 20 | 10 | 33,3% | 1 | 1 |
| 1 | 5 | 105 | 15 | 15 | 50% | 3 | 1 |
| 0 | 15 | 120 | 0 | 30 | 100% | 4 | 0 |
| | | | | | Reflectance Margin grade (Highest value of e): | | 1 |

This example represents values from the same symbol used in Table 7(A). However, in this example ten codewords from level 4, and five codewords from level 3 are detected to contain at least one module which is on the wrong side of the global threshold and are therefore errors. These codewords are therefore counted at level 0 in this example. The resulting grade too is changed significantly.

### 7.8.5 Fixed Pattern Damage

This parameter tests that damage to the finder pattern, quiet zone, timing, navigation and other fixed patterns in a symbol does not reduce unacceptably the ability of the reference decode algorithm to locate and identify the symbol within the field of view, by inverting the apparent state of one or more modules from light to dark or vice versa. The particular patterns to be considered, and the amounts of damage corresponding to the various grade thresholds, require to be specified independently for the symbology concerned.

Fixed Pattern Damage is evaluated in the reference grey-scale image in terms of the number of module errors (i.e. modules that appear as the inverse of the intended colour) in the feature (or part of the feature) concerned. Where the symbol comprises a number of distinct features (e.g. finder pattern, timing pattern) each feature may require to be evaluated separately and the worst value used for grading purposes.

Fixed Pattern Damage shall be graded using the threshold values appropriate to each symbology, specified in Annex A, or in the symbology specification, the latter taking precedence.

### 7.8.6 Axial Nonuniformity

Two-dimensional matrix symbols include data fields of modules nominally lying in a regular polygonal grid, and any reference decode algorithm must adaptively map the centre positions of those modules to extract the data. Axial Nonuniformity measures and grades the spacing of the mapping centres, i.e. the sampling points, or intersections of the grid obtained by applying the reference decode algorithm to the binarised image, in the direction of each of the grid's major axes. Axial Nonuniformity tests for uneven scaling of the symbol which would hinder readability at some non-normal viewing angles more than at others.

© ISO/IEC 2011 – All rights reserved

OPTO_00012725

JA1971

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

The spacings between adjacent sampling points are independently sorted for each polygonal axis, then the average spacings $X_{AVG}$, $Y_{AVG}$, … along each axis are computed. Axial Nonuniformity is a measure of how much the sampling point spacing differs from one axis to another, namely:

$AN = \text{abs}(X_{AVG} - Y_{AVG}) / ((X_{AVG} + Y_{AVG}) / 2)$

where abs() yields the absolute value. If a symbology has more than two major axes, then Axial Nonuniformity is computed for those two average spacings which differ the most.

Axial Nonuniformity shall be graded as shown in Table 8.

Table 8 — Axial Nonuniformity grading

| Axial Nonuniformity | Grade |
|---|---|
| ≤ 0,06 | 4 |
| ≤ 0,08 | 3 |
| ≤ 0,10 | 2 |
| ≤ 0,12 | 1 |
| > 0,12 | 0 |

### 7.8.7 Grid Nonuniformity

Grid Nonuniformity measures and grades the largest vector deviation of the grid intersections, determined by the reference decode algorithm from the binarised image of a given symbol, from their ideal theoretical position.

Using the reference decode algorithm for the symbology, plot the positions of all grid intersections in the data area of the symbol and compare these positions with the ideal grid in a theoretical perfect symbol of the same nominal dimensions. The greatest distance between the actual and the theoretical position of any intersection, expressed as a fraction of the $X$ dimension of the symbol, shall be taken for grading purposes.

The theoretical grid shall be constructed by equal spacing from the minimum number of reference points defined by the reference decode algorithm from the fixed patterns in the symbol.

Grid Nonuniformity shall be graded as shown in Table 9.

Table 9 — Grid Nonuniformity grading

| Grid Nonuniformity | Grade |
|---|---|
| ≤ 0,38 | 4 |
| ≤ 0,50 | 3 |
| ≤ 0,63 | 2 |
| ≤ 0,75 | 1 |
| > 0,75 | 0 |

© ISO/IEC 2011 – All rights reserved

OPTO_00012726

JA1972

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

### 7.8.8    Unused error correction

The Unused Error Correction parameter tests the extent to which regional or spot damage in the symbol has eroded the reading safety margin that error correction provides.

Decode the binarised image using the reference decode algorithm.

The amount of Unused Error Correction is calculated as $UEC = 1,0 - ((e + 2t) / E_{cap})$, where $e$ = the number of erasures, $t$ = the number of errors and $E_{cap}$ = the error correction capacity of the symbol (the number of error correction codewords minus the number of error correction codewords reserved for error detection). If no error correction has been applied to the symbol, and if the symbol decodes, the value of $UEC$ is taken as 1. If $(e + 2t)$ is greater than $E_{cap}$, $UEC = 0$. In symbols with more than one (e.g. interleaved) error correction block, $UEC$ shall be calculated for each block independently and the lowest value shall be used for grading purposes.

Unused Error Correction shall be graded as shown in Table 10.

**Table 10 — Unused Error Correction grading**

| $UEC$ | Grade |
|---|---|
| ≥ 0,62 | 4 |
| ≥ 0,50 | 3 |
| ≥ 0,37 | 2 |
| ≥ 0,25 | 1 |
| < 0,25 | 0 |

### 7.8.9    Additional grading parameters

Symbology or application specifications may define additional parameters which may be graded and taken into account in the calculation of the overall symbol grade.

NOTE        For example, an application specification may require that the $X$ dimension is within a certain range.

## 7.9    Scan grading

The scan grade for each scan shall be the lowest grade of any parameter in that scan as measured in accordance with 7.8.2 to 7.8.9.

In order to determine the causes of poor quality grades, it is necessary to examine the grades for each parameter in the scan in question as described in Annex C.

Table 11 summarises the test parameters and grade levels.

© ISO/IEC 2011 – All rights reserved

OPTO_00012727

JA1973

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 391 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**Table 11 — Test parameters and values**

| Para-meter Grade | Decode | Symbol Contrast | Fixed Pattern Damage | Axial Non-uniformity | Grid Non-uniformity | Modulation and Reflectance Margin (interim values) | Unused Error Correction |
|---|---|---|---|---|---|---|---|
| 4 (A) | Passes | $SC \geq 0{,}70$ | | $AN \leq 0{,}06$ | $GN \leq 0{,}38$ | | $UEC \geq 0{,}62$ |
| 3 (B) | | $SC \geq 0{,}55$ | See symbology specification or Annex A for grade thresholds | $AN \leq 0{,}08$ | $GN \leq 0{,}50$ | See 7.8.4 | $UEC \geq 0{,}50$ |
| 2 (C) | | $SC \geq 0{,}40$ | | $AN \leq 0{,}10$ | $GN \leq 0{,}63$ | | $UEC \geq 0{,}37$ |
| 1 (D) | | $SC \geq 0{,}20$ | | $AN \leq 0{,}12$ | $GN \leq 0{,}75$ | | $UEC \geq 0{,}25$ |
| 0 (F) | Fails | $SC < 0{,}20$ | | $AN > 0{,}12$ | $GN > 0{,}75$ | | $UEC < 0{,}25$ |

## 7.10 Overall Symbol Grade

If incorrect data is obtained, then the overall symbol grade, irrespective of the other parameter grades, shall be 0. Otherwise, the overall symbol grade shall be the lowest of the individual parameter grades. Overall symbol grades shall be expressed on a numeric scale ranging in descending order of quality from 4,0 to 0,0.

NOTE    The overall grade may be expressed as a real number to one decimal place in keeping with historical precedent.

## 7.11 Print growth

Print Growth tests that the graphical features comprising the symbol have not grown or shrunk from nominal so much as to hinder readability with less favourable imaging conditions than the test condition. The print growth parameter, the extent to which dark or light markings appropriately fill their module boundaries, is an important indication of process quality which affects reading performance. Print growth may be measured and evaluated independently in more than one axis, to determine, for example, both horizontal and vertical growth. Print growth shall not be a graded parameter but should be reported as an informative measure for the purposes of process control.

Starting with the binarised image, identify the graphical structures particular to the symbology that are most indicative of element growth or shrinkage in each axis of the symbol, which will generally be fixed structures or isolated elements. Based on the symbology specification and its reference decode algorithm, determine for each of these structures, in each axis, its nominal dimension $D_{NOM}$ in modules.

Determine the actual dimension $D$ in terms of $X$ between the two edges of the structure by counting pixels along the grid lines derived by the use of the reference decode algorithm and passing through each structure to be measured in the symbol axis in question.

In each scan of the symbol, print growth shall then be calculated for each axis as the arithmetic mean of all values of $(D - D_{NOM})$. It shall be reported as the arithmetic mean of the values of print growth for each scan. Where the result is negative, it represents print loss.

## 8    Measurement methodologies for composite symbologies

Each component shall be measured and graded separately. The linear component shall be measured and graded in accordance with ISO/IEC 15416. When the two-dimensional composite component uses a multi-row bar code symbology, then the methodology specified in Clause 6 shall be applied to the two-dimensional composite component; when it uses a two-dimensional matrix symbology, then the methodology specified in Clause 7 shall be applied to it. Both the overall grade for the linear component so measured and the overall

© ISO/IEC 2011 – All rights reserved

OPTO_00012728

JA1974

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 392 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

grade for the two-dimensional composite component shall be reported, to assist users who may only require to read the linear component as well as those requiring to read the complete symbol.

# 9   Substrate characteristics

Certain characteristics of the substrate, notably gloss, low opacity and the presence of an over-laminate in the case of symbols printed on paper or similar media, and the surface texture and its response to the marking methods used, in the case of symbols directly marked on to the surface of an item, may affect reflectance measurements, and the recommendations in Annex E should be taken into account if any of these factors is present.

© ISO/IEC 2011 – All rights reserved

OPTO_00012729

JA1975

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 393 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

# Annex A
(normative)

# Symbology-specific parameters and values for symbol grading

## A.1 Application

Because of differences in symbology structures and reference decode algorithms, the specific grading rules to apply to each symbology (especially with respect to fixed pattern damage) must be defined and specified for each particular symbology, either in this International Standard or within the Symbology Specification for that particular symbology.

This annex defines values corresponding to grade thresholds for Fixed Pattern Damage for Maxicode (ISO/IEC 16023). The first edition publication of this international standard also defined the fixed pattern damage grading parameters for Data Matrix and QR Code but these definitions are now included in the symbology specifications.

Where a symbology specification specifies the basis for grading these parameters, and makes express reference to this International Standard, the basis or values in the symbology specification shall override those indicated in this Annex.

Some symbologies may require additional parameters. These shall be added to the quality assessment of this standard in accordance with 7.8.9.

## A.2 Data Matrix Fixed Pattern Damage

Data Matrix Fixed Pattern Damage (FPD) shall be assessed in accordance with ISO/IEC 16022.

NOTE    The original version of this International Standard contained details of fixed pattern grading for Data Matrix. Such details are now found in ISO/IEC 16022.

## A.3 Maxicode Fixed Pattern Damage

### A.3.1 Features to be assessed

The Fixed Patterns of a Maxicode symbol are (a) a 3-ring circular bullseye near the centre of the symbol and (b) six 3-module orientation patterns surrounding it. These are shown in Figure A.1.

© ISO/IEC 2011 – All rights reserved

OPTO_00012730

JA1976

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12
**ISO/IEC 15415:2011(E)**



**Figure A.1 — Fixed Patterns within a Maxicode symbol**

### A.3.2 Grading of bullseye

The bullseye is not a natural extension of the hexagonal array of data modules, and thus cannot be graded by sampling module centres. Instead, two other quality measures are performed.

1. Ring Continuity. Each of the three dark rings in the bullseye, and the two intervening light rings, shall be sampled at every image pixel location along a circular path nominally centred within the region, as shown by dotted lines in Figure A.2 below. The central light circular region shall also be sampled along a small circular path whose radius is one third the nominal radius of that region, as also shown.



**Figure A.2 — Sampling Paths within a Maxicode bullseye**

These six groups of sampled points are each graded according to how many samples from along each path are the wrong colour, as a percentage of the total number of samples along that circular path, with the grade assigned as follows:

© ISO/IEC 2011 – All rights reserved

**27**

OPTO_00012731

JA1977

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 395 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**ISO/IEC 15415:2011(E)**

### Table A.1 — Grading of Ring Continuity

| Number of samples in error | Grade |
|---|---|
| 0 | 4 |
| ≤ 3% | 3 |
| ≤ 6% | 2 |
| ≤ 9% | 1 |
| > 9% | 0 |

2. <u>Ring Growth</u>. Scan profiles shall be measured from the grey-scale image along both horizontal and vertical scan paths (relative to the symbol's orientation) through the bullseye's exact centre as shown below, and the edge positions established by the methods in ISO 15416.



**Figure A.3 —  Ring Growth Sampling Paths within a Maxicode bullseye**

For each profile independently, the ring growth shall be calculated as:

$$RG = (S_{bar} - S_{space}) / (S_{bar} + S_{space})$$

where      $S_{bar}$ is the sum of the bar widths

$S_{space}$ is the sum of the space widths

excluding both of the outermost bars (the outer dark ring) and the central space (circle). These horizontal & vertical Ring Growth measurements are then each graded as:

28

© ISO/IEC 2011 – All rights reserved

OPTO_00012732

JA1978

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**Table A.2 — Grading of Ring Growth**

| RG | Grade |
|---|---|
| -0,10 < RG < +0,10 | 4 |
| -0,14 < RG < +0,14 | 3 |
| -0,17 < RG < +0,17 | 2 |
| -0,20 < RG < +0,20 | 1 |
| RG < -0,20 or RG > +0,20 | 0 |

### A.3.3 Grading of Orientation Patterns

The six orientation patterns are taken collectively as a group of 18 modules sampled as part of the data field. Grading is performed based on a count of the number of erroneous (wrong colour) modules as follows:

**Table A.3 — Grading of Orientation Patterns**

| Number of module errors | Grade |
|---|---|
| 0 | 4 |
| 1 | 3 |
| 2 | 2 |
| 3 | 1 |
| ≥ 4 | 0 |

### A.3.4 Overall Fixed Pattern Damage grade

The overall Fixed Pattern Damage grade is the lowest of the six Ring Continuity grades, the two Ring Growth grades, and the single Orientation Pattern grade achieved.

### A.4 QR Code Fixed Pattern Damage and additional parameters

QR Code Fixed Pattern Damage (FPD) and additional parameters shall be assessed in accordance with ISO/IEC 18004.

NOTE    The original version of this International Standard contained details of fixed pattern grading for QR Code. Such details are now found in ISO/IEC 18004.

### A.5 Aztec Code Fixed Pattern Damage and additional parameters

Aztec Code Fixed Pattern Damage (FPD) and additional parameters shall be assessed in accordance with ISO/IEC 24778.

OPTO_00012733

JA1979

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

# Annex B
(informative)

# Symbol grading flowchart for two-dimensional matrix symbols

This Annex shows the sequence of steps required in order to grade the quality of a two-dimensional matrix symbol.



© ISO/IEC 2011 – All rights reserved

OPTO_00012734

JA1980

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12
ISO/IEC 15415:2011(E)

# Annex C
## (informative)

## Interpreting the scan and symbol grades

This Annex describes possible causes of reduced grades, either in a multi-row symbol or a matrix symbol.

The table below identifies a number of factors that may lead to low or failing grades for the parameters indicated, which may be similar or differ for the two classes of two-dimensional symbol.

**Table C.1 — Possible causes of low grades**

| Parameter | Multi-row symbols | Matrix symbols |
|---|---|---|
| Symbol Contrast | • low background or light module reflectance, due to:<br>  • incorrect substrate e.g. blue paper for red light<br>  • glossy laminate/overwrap<br>  • inappropriate angle of illumination (direct marked symbols)<br>• high dark module reflectance, due to<br>  • low absorption of incident light by ink (unsuitable formulation/colour)<br>  • insufficient ink coverage (e.g. non-overlapping ink-jet dots)<br>  • inappropriate angle of illumination (direct marked symbols) | • low background or light module reflectance, due to:<br>  • incorrect substrate e.g. blue paper for red light<br>  • glossy laminate/overwrap<br>  • inappropriate angle of illumination (direct marked symbols)<br>• high dark module reflectance, due to<br>  • low absorption of incident light by ink (unsuitable formulation/colour)<br>  • insufficient ink coverage (e.g. non-overlapping ink-jet dots)<br>• inappropriate angle of illumination (direct marked symbols) |
| Decode | • many factors - see other parameters in table<br>• software errors in printing system | • many factors - see other parameters in table<br>• software errors in printing system |
| Unused Error Correction | • physical damage (scuffing, tearing, obliteration)<br>• bit errors due to defects<br>• excessive print growth in one or two axes<br>• local deformation<br>• misplaced modules | • physical damage (scuffing, tearing, obliteration)<br>• bit errors due to defects<br>• excessive print growth in one or two axes<br>• local deformation<br>• misplaced modules |
| Minimum Reflectance ($R_{min}$) | Reflectance of all bars > $0,5R_{max}$ - see symbol contrast for possible causes | |
| Minimum Edge Contrast | • excessive print growth/loss<br>• too large measuring aperture<br>• irregular substrate reflectance<br>• low ink coverage<br>• showthrough | |
| Modulation | • print growth/loss<br>• too large measuring aperture<br>• irregular substrate reflectance<br>• variation in ink coverage<br>• showthrough | • print growth or loss<br>• too large measuring aperture<br>• misplaced modules<br>• defects (spots or voids)<br>• irregular substrate reflectance<br>• variation in ink coverage<br>• showthrough |
| Defects | • spots of ink or other dark marks on background<br>• voids in printed areas<br>• faulty print head elements<br>• too small measuring aperture | |

© ISO/IEC 2011 – All rights reserved

31

JA1981

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

| Parameter | Multi-row symbols | Matrix symbols |
|---|---|---|
| Decodability | • local distortion<br>• pixel errors in printing<br>• slippage during printing<br>• blocked inkjet nozzle<br>• faulty thermal element | |
| Codeword Yield | • excessive tilt of scan line<br>• Y axis print growth<br>• thermal "drag" | |
| Fixed Pattern Damage | | • blocked printer nozzle<br>• faulty thermal element<br>• physical damage (tearing, scuffing, obliteration) |
| Axial Nonuniformity | | • mismatch of transport speed in printing with symbol dimensions<br>• printing software errors<br>• verifier axis not perpendicular to symbol plane |
| Grid Nonuniformity | | • transport errors in printing (acceleration/deceleration, vibration, slippage)<br>• variation in printhead to substrate distance<br>• verifier axis not perpendicular to symbol plane |
| Print Growth/Loss (ungraded) | • print process-dependent factors<br>• absorbency of substrate<br>• dot size (ink-jet, dot peening etc.)<br>• incorrect thermal print head temperature | • print process-dependent factors<br>• absorbency of substrate<br>• dot size (ink-jet, dot peening etc.)<br>• incorrect thermal print head temperature |

32

© ISO/IEC 2011 – All rights reserved

OPTO_00012736

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

# Annex D
## (informative)

## Guidance on selection of grading parameters in application specifications

### D.1  Selection of measurement wavelength

#### D.1.1  General considerations

Clauses 6 and 7 of this standard require measurements to be made using light of the same characteristics as those which the intended scanning environment will use. If, as may happen, an application specification does not specify the light source, a judgment must be made in order to determine the most probable light source for reading, to enable valid measurements to be made and to be sure that the results will be properly indicative of likely scanning performance in the application.

It should be noted that for maximum correlation, it is not only the light source (including any filters that modify its spectral distribution) that must be taken into account, but also the spectral sensitivity of the sensor, since reflectance at a given wavelength is a function of the product of the intensity of the light emitted and the sensitivity of the sensor. However for the purposes of this Annex, the sensor sensitivity is ignored.

#### D.1.2  Light sources

Light sources for bar code scanning applications normally fall into two areas:

— narrow band illumination in either the visible or the infra-red spectrum or

— broadband illumination covering a large part of the visible spectrum, sometimes referred to as "white light" although it may have a bias to a colour; a very few specialised applications may call for light sources of unusual characteristics such as ultra-violet for fluorescent symbols.

Multi-row bar code scanning almost always uses narrow band visible light, with light sources with a peak wavelength in the red part of the spectrum, between 620 and 700 nm. Infra-red scanning uses sources with peak wavelengths between 720 nm and 940 nm.

Two-dimensional matrix symbols are scanned under a variety of illumination conditions, with the most common being white light and, in a number of hand-held reading devices, the same visible red area of the spectrum as for linear and multi-row bar code symbols.

The most common light sources used for these purposes are:

a)  Narrow band

   1)  Helium-neon laser (633 nm) (multi-row bar code symbols only)

   2)  Light-emitting diode (near-monochromatic, at numerous visible and infra-red peak wavelengths)

   3)  Solid-state laser diode (most usually 660 nm and 670 nm) (multi-row bar code symbols only)

b)  Broadband

   1)  Incandescent lamp (nominally white light with a colour temperature in the range 2800°K to 3200°K)

   2)  Fluorescent lighting (nominally white light with a colour temperature in the range of 3200°K to 5500°K)

© ISO/IEC 2011 – All rights reserved

OPTO_00012737

JA1983

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

3)   Light-emitting diode (nominally white light with a colour temperature in the region of 7000°K)

4)   Halogen lamps (nominally white light with a colour temperature in the region of 2800°K to 3200°K)

5)   Gas discharge lamps (light of various characteristics)

The key characteristics of these are as follows.

A **helium-neon laser** is a gas-filled laser tube which emits highly monochromatic coherent light at a peak wavelength of 632,8 nm (usually rounded to 633 nm), in the visible red area of the spectrum.

A **light-emitting diode** is a low-power solid-state component most frequently found as the light source in a light pen (wand) or CCD scanner. Operating wavelengths in the visible spectrum may be from 620 to 680 nm; most commonly either 633/640 or about 660 nm. In the infra-red, 880 to 940 nm is the most common range of wavelengths.

A **laser diode** is also a low power solid-state component emitting highly monochromatic coherent light. Typical wavelengths in the visible spectrum used by these, at the date of publication of this standard, are 660 and 670 nm. In the infra-red spectrum 780 nm is common. They are frequently found in hand-held (laser) scanning equipment and a number of fixed scanners.

**Broadband light sources** are mainly found in systems using two-dimensional imaging and image processing technology rather than scanning techniques.

**Incandescent lamps** have a power distribution covering much of the visible spectrum and well into the near infra-red spectrum; their optical characteristics are more easily defined in colour temperature terms rather than in those of peak wavelength, because of the wide bandwidth and relative absence of clearly-defined peaks in the power distribution. These broadband power distribution characteristics mean that the symbol contrast values obtained from symbols may vary with different colour temperatures to a significantly lesser extent than values obtained with light sources whose power distributions peak sharply with narrow bandwidth.

**Halogen lamps** (also known, more correctly, as tungsten halogen lamps) are a development of incandescent lamps with a higher colour temperature and a smooth power distribution curve across the spectrum, extending well into the near infra-red.

**Fluorescent light sources** also produce nominally white light and have broadband power distribution characteristics, which, in comparison with those of an incandescent source, tend more towards the bluer region of the visible spectrum, often with a significant ultra-violet component, and a number of peaks in their spectral power distribution. Typical colour temperatures for such lighting are in the region of 3200° to 5500°K. The physical structure of a fluorescent lamp is that of a tube which can be formed into various shapes, and an annular shape concentric with the optical axis of a reading device provides very satisfactory uniform diffuse illumination.

**Light emitting diodes** with nominally "white light" characteristics emit "cool" white light and may have a nominal colour temperature in the region of 7000°K. Their actual spectral distribution may show a number of peaks e.g. in the blue and yellow or orange regions.

**Gas discharge lamps** tend to have spectral distributions with multiple sharp peaks at wavelengths depending on the precise mixture of gases used. For example, sodium vapour emits light with a well-defined peak at around 580 nm (yellow-orange) and mercury vapour emits a green-blue light at around 520 nm.

The use of filters to modify the spectral distribution of the illumination system is common. For example, when used in conjunction with a Wratten 26 filter, the light characteristics of a 2856°K lamp approximate to those of a 620-633 nm source. The use of infra-red and/or ultra-violet absorbing filters is also common in scanning systems. It is possible to alter the apparent colour temperature of a source by the use of filters.

NOTE:      Wavelengths and colour temperatures stated above are indicative and may change as the technology evolves.

34

© ISO/IEC 2011 – All rights reserved

OPTO_00012738

JA1984

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 402 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

### D.1.3  Effect of variations in wavelength

The reflectance of a substrate or bar code symbol element varies with the wavelength of the incident light. A black, blue, or green printed area will tend to absorb visible red light strongly (and appear therefore of low reflectance), whereas a white, red or orange area will reflect most of such incident light. In the infra-red spectrum, the apparent colour of the element does not correlate at all with reflectance; it is the nature of the pigmentation used (for example the proportion of carbon content) which governs reflectance. Taking reflectance measured at 633 nm as a reference, when measured at 660 or 680 nm the results may differ significantly, and sufficiently to cause the symbol grade to change by one or two units, or even more in the case of bars printed on some thermal papers.

In the case of broadband illumination, however, the presence of light at multiple wavelengths in the spectral power distribution of the light means that reflectance values of black inks measured under white light from various sources will not differ significantly; there may however be some variation (an increase in reflectance) in the case of dye-based black inks where the illumination has a significant infra-red component. With coloured pigments there will be greater variations. Interposing a filter in the light path will introduce a more peaked spectral distribution and the spectral response curve of the reader will require to be more closely matched to that of the light source. It is not uncommon for the optical train to include both infra-red and ultra-violet absorbing filters.

### D.1.4  Considerations affecting selection of broadband light sources

Broadband light sources, by definition, emit light over a band of wavelengths without a clearly defined sharp peak. Nonetheless, the intensity of light emitted at different wavelengths will vary. In particular, light of a colour temperature in the region of 3000°K is described as "warm" light and the spectral distribution of this light shows higher intensity of emission towards the red (and infra-red) region of the spectrum, whereas light with a higher colour temperature in the region of 6500°K is described as "cool" light and its spectral distribution is biased to the blue-violet region of the spectrum, extending into the ultra-violet. Light with a higher colour temperature will yield higher reflectance values on blue pigments than light with a lower colour temperature. The converse is true for red pigments.

It is possible to modify the apparent colour temperature of a light source by the interposition of an appropriate filter.

It may also be possible to approximate the characteristics of different broadband light sources with sufficient precision for bar code symbol quality assessment purposes by combining reflectance measurements at three narrow band wavelengths across the visible spectrum, e.g. in the red, green and blue regions (assuming that the ultra-violet and infra-red regions have been cut off by the use of appropriate absorbing filters); the results can then be modified to match the spectral response characteristics in the application by applying an appropriate correction factor at each wavelength.

## D.2  Selection of aperture

For matrix symbol grading, the choice of aperture size is very important, and it must be specified in accordance with 7.3.3 in order for symbol grades to be measured consistently. It is the responsibility of an application specification to define a fixed measuring aperture to be used. As required by 5.4 of this standard, the aperture size must be reported together with the grade and illumination in order to identify the conditions under which the measurement was made.

The size of the measuring aperture affects whether voids in the symbol will be "filled in" during the verification process. Therefore, the measuring aperture must be selected with reference to the range of nominal module size and expected scanning environment. An aperture that is too small will not fill in unintentional voids, or gaps between elements of a direct marked symbol, that would lead to low grades or undecodable symbols. On the other hand, a measuring aperture that is too large will blur individual modules, resulting in low modulation, and may prevent the symbol from being decoded.

An aperture size in the range of 50% to 80% of the minimum allowed module size is a typical choice for an application specification. Importantly however, an application specification that allows a range of nominal

OPTO_00012739

JA1985

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

module sizes (for example a range of 0,25 mm through 0,40 mm) should specify a single aperture size to be used in all cases. That is to say that the verification of each symbol is made with an aperture that is not necessarily related to that symbol's module size. For example if 80% of 0,25 mm were specified, i.e. a 0,20 mm aperture, then all symbols used in that application including 0,40 mm symbols must be measured using a 0,20 mm aperture. Another aperture size may be chosen, even one equal to or larger than the minimum module size. The important factor is that a single measuring aperture be specified and used consistently within an application area.

If a range of module sizes is used within an application specification, then the relatively small measuring aperture required to read the symbols with the smallest module size will limit the size of the largest acceptable spots and voids. If too large an aperture were used, the modulation for the smallest module size would be inadequate. In general the larger the aperture, the larger the acceptable size of spots and voids. Conversely, the smaller the aperture, the smaller the acceptable module size that can be read. Therefore, a successful application specification must select a measuring aperture that will predict the readability of both the largest and smallest module size symbols.

A single fixed measuring aperture ensures that all symbols will be measured in a way that will reflect performance in the expected scanning environment. The choice of measuring aperture that is specified will be influenced in some cases by the scanning equipment that is expected to be prevalent in the application-scanning environment. Conversely, the scanning equipment may also be influenced by the specification of the measuring aperture. In both cases however, a "match" between verification technique and scanning environment is made in order to produce a high correlation between grade level and scanning performance.

The nominal diameter of the measuring aperture should be specified by the user application specification, to suit the intended scanning environment or with reference to the guidelines of Table D.1 . When the measuring aperture diameter is not specified in the application specification, Table D.1 should be used as a guide. In an application where a range of X dimensions will be encountered, all measurements shall be made with the aperture appropriate to the smallest X dimension to be encountered.

NOTE    An application specification may specify a range of X dimensions that differs from those listed in Table D.2 and can specify an aperture size that differs from the recommendation of Table D.2.

**Table D.1 — Guideline for diameter of measuring aperture**

| X Dimension(mm) | Aperture diameter (mm) | Reference number |
|---|---|---|
| $0,100 \leq X < 0,150$ (4mil-6mil) | 0,050 | 02 |
| $0,150 \leq X < 0,190$ (6mil-7.5mil) | 0,075 | 03 |
| $0,190 \leq X < 0,250$ (7.5mil-10mil) | 0,125 | 05 |
| $0,250 \leq X < 0,500$ (10mil-20.0mil) | 0,200 | 08 |
| $0,500 \leq X < 0,750$ (20mil-30mil) | 0,400 | 16 |
| $0,750 \leq X$ (30mil-) | 0,500 | 20 |
| NOTE    The aperture reference number approximates to the measuring aperture diameter in thousandths of an inch; this reference number is used for consistency with the ANSI standard X3.182 and ISO/IEC 15416. | | |

© ISO/IEC 2011 – All rights reserved

OPTO_00012740

JA1986

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

## D.3  Selection of lighting angle

Whereas the default 45° illumination angle is well suited to printed symbols and those marked on even surfaces without localised points of specular reflection, i.e. those from which diffuse reflection does not vary sharply with the angle of incidence or collection of the light, many "direct marked" symbols require to have the angle of incidence adjusted to optimise reading performance. The spectral characteristics of the illumination for use with engraved or similar symbols may therefore be less important than the respective angles of incidence and collection of the light on the symbol. The light source needs to be positioned in such a way that the apparent contrast as seen by the image capture device is related to the process used in the application to read the symbols.

Depending on the nature of the surface and the marking technique used, the spectral characteristics of the light source may also have an influence on its contrast. Prediction of scanner performance will be enhanced when the application specification requires verification using the same source as that used for reading the symbols. The modified version of the methodology defined in ISO/IEC TR 29158 may provide a better approach to select appropriate lighting angles for direct part marks.

## D.4  Selection of minimum acceptable grade

The specification of the minimum acceptable grade in an application specification should be based on consideration of the trade-off between the possibly increased cost of producing higher-grade symbols and the improved scanning performance to be obtained by the use of such symbols, together with the data integrity requirements of the application.

A requirement for higher grade symbols may restrict the choice of the following available to the producer of the symbols:

— Inks (or other marking media) and substrates on which to mark the symbol (e.g. to ensure a high level of symbol contrast, a substrate with high reflectance and/or an ink with low reflectance under the specified illumination are needed, imposing limits on the choice of colour available)

— Marking technology (e.g. those in which the placement of printer dots is less well-controlled may be excluded)

It may also require slower production rates or higher levels of quality control, or lead to higher rejection rates, all of which contribute to higher unit costs.

On the other hand, the receiver of the symbols will benefit from improved read rates, or may have a greater choice of reading technology open to him.

If a low symbol grade is specified, the receiver of the symbols may incur additional costs in:

— Installing higher quality reading equipment

— Accepting a lower read rate

— Reprocessing of symbols that failed to scan

Many applications require a minimum grade of 1,5 (C), which offers them a fair balance between the cost of production and reading performance under the conditions of their application.

The more critical it is that a high read rate be achieved, on grounds not only of cost but also data integrity, the higher the grade that needs to be specified.

© ISO/IEC 2011 – All rights reserved

OPTO_00012741

JA1987

Licensed to York Faulkner (york faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

## D.5  Affect of Symbol Rotation during verification

The first edition publication of this international standard called for an overall grade to be computed by averaging five individual scan results, taken with the symbol rotated in five different orientations. However, this requirement has been removed and this standard now calls for only one scan to be used for grading.

The five scan rotation requirement was originally required for two reasons: to account for symbols that do not exhibit uniform diffuse reflection and to "average out" any effective changes in measurement resolution by verification devices. The first reason is better addressed through a modified version of the methodology defined in this international standard in ISO/IEC TR 29158. The second reason is addressed by the publication of ISO/IEC 15426-2 which requires the minimum effective resolution defined in 7.3.3.

The removal of the five rotation requirement greatly simplifies the verification procedure for most symbols (whose characteristics do not vary with orientation) and facilitates practical quality control regimes.

© ISO/IEC 2011 – All rights reserved

OPTO_00012742

JA1988

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

ISO/IEC 15415:2011(E)

# Annex E
(informative)

## Substrate characteristics

### E.1 Rationale

In certain circumstances for example, the design and production of printed packaging materials incorporating bar code symbols or the production of symbols directly marked on to a surface, it may be necessary or desirable to assess the acceptability of substrates and/or ink colours for a given bar code application, before a bar code symbol is available which could be tested in accordance with this standard. Reference should be made to ISO/IEC TR 19782 for additional guidance on the effects of gloss and low substrate opacity on the reading and verification of these symbols.

### E.2 Substrate opacity

The methodology of the International Standard requires that the symbol shall be graded according to the parameters in Clause 6 (multi-row symbols) or 7 (matrix symbols) when measured in its final configuration, e.g. final filled package.

If it is not possible to measure the symbol in this configuration then the effects of show-through of high-contrast interfering patterns may be ignored if when measured as follows the substrate opacity is 0,85 or greater. If the opacity is less than 0,85 the symbol should be measured when backed by a uniform dark surface the reflectance of which is not more than 5 per cent.

The opacity of the substrate shall be calculated as follows:

Opacity = $R2 / R1$

where: $R1$ = Reflectance of a sample sheet of the substrate backed with a white surface the reflectance of which is 89 percent or greater.

$R2$ = Reflectance of the same sample sheet backed with a black surface the reflectance of which is not more than 5 percent.

### E.3 Gloss

The reference illumination conditions specified for the measurement of reflectance should enable the maximum rejection of specular reflection while giving a representative assessment of the diffuse reflectance of the symbol and substrate. Highly glossy materials and those whose diffuse reflectance characteristics vary with the angle of incident and/or collected light - as may be the case with many materials on which symbols are directly marked - may yield grades differing from those obtained by the use of the reference optical arrangement with illumination at 45°, and for this reason sub-clause 7.3.4 provides alternative angles of illumination to enable apparent symbol contrast to be maximised.

### E.4 Over-laminate

A symbol intended to be covered with a protective lamination should be graded according to the parameters in clause 6 (multi-row symbols) or Clause 7 (matrix symbols) when measured with the laminate in place. The thickness of the laminate including its adhesive should be as small as possible in order to minimise its effects on the reading performance of the symbol.

© ISO/IEC 2011 – All rights reserved

OPTO_00012743

JA1989

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

ISO/IEC 15415:2011(E)

## E.5  Static reflectance measurements

### E.5.1  General

In some cases it may be desirable to carry out static reflectance measurements of samples of the substrate on which a bar code is to be printed and on colour patches or ink samples which replicate the colour in which the bar code will be printed. The following guidelines provide a means which, if it is followed, will predict as closely as is generally possible the results which will be obtained when the symbol is scanned dynamically.

Static reflectance measurements should be made with the wavelength of light, aperture size and optical arrangement which relate to the application and which are specified in accordance with ISO/IEC 15416 (multi-row symbols) of this standard.

Where reflectance measurement equipment meeting the requirements of this Annex is not available, optical density measurements may be made using a standard densitometer with an appropriate light source and converted to reflectance values; density ($D$) and reflectance ($R$) are related as follows:

$R = 100 / 10^D$

NOTE    It is impossible to predict to a high degree of accuracy the symbol contrast and, in particular, the edge contrast which will be achieved in the printed symbol. It is therefore appropriate to allow some safety margin above the minimum values for specified grades.

### E.5.2  Prediction of Symbol Contrast ($SC$)

The prediction of $SC$ requires that measurements of reflectance be made on samples which simulate the highest ($R_{max}$) and lowest reflectance ($R_{min}$) areas which will be present in the finished symbol.

It is probable that in most bar code symbols $R_{max}$ will be found in the quiet zone of the symbol; therefore to simulate the conditions found in the quiet zone, $R_{max}$ should be measured in the centre of a sample area, at least $10X$ in diameter, of the material on which the symbol is to be printed.

It is probable that in most bar code symbols $R_{min}$ will be found in the widest bars of the symbol, or areas with a number of contiguous dark modules; therefore to simulate the conditions most likely to yield a value of $R_{min}$ consistent with that which would be found in practice, reflectance should be measured in the centre of a strip of material $2X$ to $3X$ wide and which matches the colour in which the dark elements are to be printed.

A predicted value of $SC$ can then be calculated:

$SC' = R_{max} - R_{min}$

For materials which do not satisfy the tests for opacity, which are detailed in Annex E.1, the measurements which are made for the purpose of predicting $SC$ should be made with the test samples backed by a uniform dark surface, the reflectance of which is not more than 5%. The same measurements should then be made with the test samples backed by a uniform surface the reflectance of which is not less than 89%. The calculated value of static SC shall be equal to or greater than the minimum value for the grade selected for the application, for tests on both the dark and light backgrounds.

© ISO/IEC 2011 – All rights reserved

OPTO_00012744

JA1990

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

# Annex F
(informative)

## Parameter grade overlay applied to two-dimensional symbologies

This Annex describes the technique used in this International Standard to derive a final grade for a parameter from a set of notional grades determined for a set of grade levels, each determined at five fixed grade levels for the parameter.

The technique computes a notional grade for a parameter for each grade level by assuming that only modules or codewords that meet or exceed that grade level for that parameter are actually readable. The modules or codewords which are readable then result in a grade for that parameter according to the rules for that parameter (whether based on unused error correction or fixed pattern damage).

If one considers what the performance would be for a scanner that could only read codewords or modules above a particular parameter grade level, it is clear what will happen – only codewords or modules at or above that grade level may be counted towards the readability calculation for the symbol at that grade level.

For example, if codewords or modules with a grade of 2 must be counted before a grade of 3 on unused error correction or fixed pattern damage may be obtained, then the symbol must be a grade 2.

Furthermore, if codewords graded 3 or better can only result in an unused error correction or fixed pattern damage level of 2, the symbol must also be a grade 2.

However, the readability of a symbol must take into account the readability of codewords or modules at each grade level and the ability of the symbol to be read using error correction or allowing for some fixed pattern damage and the resulting grade should be the highest of these two possible outcomes.

The following procedure can therefore be established:

a) Count the number of codewords in each grade level, including higher grade levels, assume that all remaining codewords are erasures (multi-row symbols) or errors (matrix symbols) and determine an unused error correction or fixed pattern damage grade.

b) For each grade level, take the lower of the grade level and the associated unused error correction or fixed pattern damage parameter grade.

c) Select the highest of the values from step b as the symbol grade for that parameter.

This ensures that a scanner will have performance associated with the assigned grade because the scanner's ability to read codewords or modules of the assigned grade or higher will bring it within the error correction or fixed pattern damage capacity of the assigned grade level or better.

This method provides a way of accounting for imperfections in symbols which are designed to tolerate imperfections. In fact, it favours symbols with more error correction capacity, which certainly does make a symbol easier to read. It also reconciles the print quality measurement method of linear symbols with that of 2D symbols. In a sense the linear approach, which takes the worst case, is the trivial extension of the above rule in the case of no error correction. In this case, the codeword with lowest grade is always needed to get anything other than a 0 for "unused error correction". If this value happens to be a 1, then the symbol must be a 1, even if all other codewords had quality of 4.

NOTE     The notional Unused Error Correction or Fixed Pattern Damage grade used in this calculation is not related to, and does not affect, the UEC or Fixed Pattern Damage grade for the symbol as calculated according to 6.2.4, 7.8.8 or 7.8.5 respectively.

© ISO/IEC 2011 – All rights reserved

OPTO_00012745

JA1991

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 409 of 552

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

# Bibliography

**Symbology specifications**

**Multi-Row Symbols with cross-row scanning ability**

[1]    ISO/IEC 15438, *Information technology — Automatic identification and data capture techniques — PDF417 bar code symbology specification*

[2]    ISO/IEC 24728, *Information technology — Automatic identification and data capture techniques — MicroPDF417 bar code symbology specification*

[3]    AIM ITS - SuperCode

**Multi-Row Symbols without cross-row scanning ability**

[4]    EN 12323, AID technologies - Symbology Specifications - Code 16K

[5]    ANSI/AIM BC6-1995, USS - Code 49

[6]    AIM USS Codablock F

[7]    ISO/IEC 24724, *Information technology — Automatic identification and data capture techniques — GS1 DataBar bar code symbology specification*

**Matrix Symbols**

[8]    ISO/IEC 16022, *Information technology — Automatic identification and data capture techniques — Data Matrix bar code symbology specification*

[9]    ISO/IEC 16023, *Information technology — International symbology specification — MaxiCode*

[10]   ISO/IEC 18004, *Information technology — Automatic identification and data capture techniques — QR Code 2005 bar code symbology specification*

[11]   AIM USS - Code One

[12]   ISO/IEC 24778, *Information technology — Automatic identification and data capture techniques — Aztec Code bar code symbology specification*

[13]   AIM USS - Dot Code A

**Composite Symbologies**

[14]   ISO/IEC 24723, *Information technology — Automatic identification and data capture techniques — GS1 Composite bar code symbology specification*

[15]   AIM ITS - Aztec Mesas

NOTE 1    Specifications published by AIM Global - viz. AIM International Technical Specifications (ITS) and Uniform Symbology Specifications (USS) - are obtainable from AIM Inc., 634 Alpha Drive, Pittsburgh, PA 15238, USA

NOTE 2    This is not an exhaustive list of symbology specifications.

© ISO/IEC 2011 – All rights reserved

OPTO_00012746

JA1992

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-576474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

PX-12

**ISO/IEC 15415:2011(E)**

**Other specifications**

[16]  ISO 2859-10, *Sampling procedures for inspection by attributes — Part 10: Introduction to the ISO 2859 series of standards for sampling for inspection by attributes*

[17]  ISO 3951-1, *Sampling procedures for inspection by variables — Part 1: Specification for single sampling plans indexed by acceptance quality limit (AQL) for lot-by-lot inspection for a single quality characteristic and a single AQL*

[18]  ISO 3951-2, *Sampling procedures for inspection by variables — Part 2: General specification for single sampling plans indexed by acceptance quality limit (AQL) for lot-by-lot inspection of independent quality characteristics*

[19]  ISO 3951-3, *Sampling procedures for inspection by variables — Part 3: Double sampling schemes indexed by acceptance quality limit (AQL) for lot-by-lot inspection*

[20]  ISO 3951-5, *Sampling procedures for inspection by variables — Part 5: Sequential sampling plans indexed by acceptance quality limit (AQL) for inspection by variables (known standard deviation)*

[21]  ISO/IEC 15426-1, *Information technology — Automatic identification and data capture techniques — Bar code verifier conformance specification — Part 1: Linear symbols*

[22]  ISO/IEC 15426-2, *Information technology — Automatic identification and data capture techniques — Bar code verifier conformance specification — Part 2: Two-dimensional symbols*

[23]  ISO/IEC TR 19782, *Information technology — Automatic identification and data capture techniques — Effects of gloss and low substrate opacity on reading of bar code symbols*

[24]  ISO/IEC TR 29158, *Information technology — Automatic identification and data capture techniques — Direct Part Mark (DPM) Quality Guideline*

© ISO/IEC 2011 – All rights reserved

OPTO_00012747

JA1993

Licensed to York Faulkner (york.faulkner@ymf-law.com)
ISO Store Order: OP-575474 / Downloaded: 2022-01-21
Single user licence only, copying and networking prohibited

**ISO/IEC 15415:2011(E)**

**ICS  35.040**
Price based on 43 pages

© ISO/IEC 2011 – All rights reserved

OPTO_00012748

PX-17

US005304786A

# United States Patent [19]

### Pavlidis et al.

[11]  **Patent Number:** **5,304,786**

[45]  **Date of Patent:** **Apr. 19, 1994**

[54]  **HIGH DENSITY TWO-DIMENSIONAL BAR CODE SYMBOL**

[75]  Inventors: **Theodosios Pavlidis**, Setauket; **Yajium P. Wang**, Port Jefferson Station; **Jerome Swartz**, Old Field, all of N.Y.

[73]  Assignee: **Symbol Technologies, Inc.,** Bohemia, N.Y.

[21]  Appl. No.: **461,881**

[22]  Filed:  **Jan. 5, 1990**

[51]  Int. Cl.$^5$ ............................................... **G06K 7/10**
[52]  U.S. Cl. .................................... **235/462; 235/456**
[58]  Field of Search ............... 235/462, 454, 456, 235/487, 494

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,832,686 | 8/1974 | Bilgutay . | |
| 4,283,622 | 8/1981 | Passer et al. | 235/494 |
| 4,707,612 | 1/1987 | Martin | 235/454 |
| 4,782,221 | 11/1988 | Brass et al. | 235/487 |
| 4,786,792 | 11/1988 | Pierce et al. | 235/494 |
| 4,794,239 | 12/1988 | Allais . | |
| 4,889,982 | 12/1989 | Young et al. | 235/494 |
| 4,926,035 | 5/1990 | Fujisaki | 235/494 |
| 4,939,354 | 7/1990 | Priddy et al. | 235/494 |
| 4,947,383 | 8/1990 | Hudson | 235/494 |

#### OTHER PUBLICATIONS

*The Characteristics and Decodability of the Universal Product Code Symbol* by D. Savir and G. J. Laurer, IBM Systems Journal vol. 14, No. 1, pp. 16–34, 1975.

The title page, the table of contents, and Chapters 3 & 4 of *Error Control Coding: Fundamentals and Applications* by Shu Lin and Daniel J. Costello, Jr., Prentice–Hall, 1983.

The title page, the table of contents, Chapter 1, 2, Sections 2 & 3 and Chapter 3, Sections 5–9 of *Time Warps, String Edits and Macromolecules: The Theory and Prac-*

*tice of Sequence Comparison*, edited by D. Sankoff and J. B. Kruskal, Addison–Wesley, 1983.

Allais, David, "Code 49 (Revision C) Symbology Description and Explanation," cover date Dec. 9, 1987.

Bobker, Steven, "The Software Strip," MacUser Magazine, Apr. 1986.

ICS Identcode–Systeme, "Code A Block Identcode MLS–2D Description Jul. 1989".

ICS Identcode–Systeme, "Identcode MLS–2D Specification Copyright IBO–1280689".

Laserlight Systems, Inc., "Code 16K," running header date Oct. 6, 1989.

Pavlidis, Theo, "Getting the Most from Your Bar Code Real Estate, or, Information Theoretical Aspects of Bar Coding," Nov. 3, 1988.

SCAN Newsletter, Ltd., Nov., 1989.

Vericode Identification System–The Electronic Fingerprint (undated).

*Primary Examiner*—Robert A. Weinhardt

[57]  **ABSTRACT**

A nonvolatile electro-optical read-only memory includes a substrate on which is printed (or otherwise inscribed) a complex symbol or "label" with a high density two-dimensional symbology, a variable number of component symbols or "codewords" per row, and a variable number of rows. Codewords in alternating rows are selected from mutually exclusive subsets of a mark pattern such as a (17,4) mark pattern. The subsets are defined in terms of particular values of a discriminator function, which is illustrated as being a function of the widths of bars and spaces in a given codeword. In the illustrated embodiment, each subset includes 929 available codewords; that, plus a two-step method of decoding scanned data, permitting significant flexibility in defining mappings of human-readable symbol sets into codewords. The memory may be used in conjunction with a scanner and a suitable control system in a number of applications, e.g., robotic operations or automated microfilm searching.

**70 Claims, 27 Drawing Sheets**





Exhibit #

Chartier 6

4/20/23

exhibitsticker.com

USCA4 Appeal: 23-1850      Doc: 45-4      Filed: 04/01/2024      Pg: 413 of 552

FIG. 1A
PRIOR ART

10

15



FIG. 1B
PRIOR ART

11

16

FIG. 1C

12

17

FIG. 2

$x_1$ $x_2$ $x_3$ $x_4$ $x_5$ $x_6$ $x_7$ $x_8$

$t_1$ $t_3$ $t_5$ $t_7$

$t_2$ $t_4$ $t_6$

JA1996

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 414 of 552



# FIG. 3

| | |
|---|---|
| row0 | Cluster0 |
| row1 | Cluster3 |
| row2 | Cluster6 |
| row4 | Cluster0 |
| | |
| row n | Cluster (n mod 3)*3 |

# FIG.4

JA1997

| Value/Mode | Alpha | Mixed | Numeric | User(s) |
|---|---|---|---|---|
| 0 | A | 0 | 0 | |
| 1 | B | 1 | | |
| 2 | C | 2 | | |
| 3 | D | 3 | | |
| 4 | E | 4 | | |
| 5 | F | 5 | | user |
| 6 | G | 6 | | defined |
| 7 | H | 7 | | value |
| 8 | I | 8 | | |
| 9 | J | 9 | | |
| 10 | K | A | | |
| 11 | L | B | | mode 3      mode 20 |
| 12 | M | C | | to              to |
| 13 | N | D | | mode 19   mode 29 |
| 14 | O | E | to | |
| 15 | P | F | | |
| 16 | Q | ! | | |
| 17 | R | $ | | |
| 18 | S | % | | |
| 19 | T | & | | |
| 20 | U | * | | |
| 21 | V | ( | | |
| 22 | W | ) | | |
| 23 | X | - | | |
| 24 | Y | + | | |
| 25 | Z | = | | |
| 26 | - | / | | |
| 27 | space | : | | |
| 28 | ms | as | | |
| 29 | us | us | | us |
| 30 | | | | |
| to | | | | |
| 925 | | | 925 | |
| 926 | | | space | |
| 927 | | | as | as |
| 928 | | | ms | ms |

FIG. 5

USCA4 Appeal: 23-1850      Doc: 45-4      Filed: 04/01/2024      Pg: 416 of 552

PX-17



FIG. 6

PX-17



FIG. 7

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 418 of 552

FIG. 8



FIG. 9



Encoder

JA2001

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 419 of 552

PX-17

| $a_{1,n-1}$ | $a_{1,n-2}$ | | $a_{1,1}$ | $a_{1,0}$ | $b_{1,r0}$ |
|---|---|---|---|---|---|
| $a_{2,n-1}$ | $a_{2,n-2}$ | | $a_{2,1}$ | $a_{2,0}$ | $b_{2,r0}$ |
| | | | | | |
| $a_{m-1,n-1}$ | $a_{m-1,n-2}$ | | $a_{m-1,1}$ | $a_{m-1,0}$ | $b_{m-1,r0}$ |
| $a_{m,n-1}$ | $a_{m,n-2}$ | | $b_{s1}$ | $b_{s0}$ | $b_{m,r0}$ |

## FIG. 10



## FIG. 11

Syndrome divider

JA2002

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 420 of 552

FIG. 12



FIG. 13



JA2003

PX-17

| Table I : The t-sequence table. Cluster0 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 222266 | 0 | 226655 | 50 | 244664 | 100 | 324545 | 150 | 334333 | 200 |
| 222277 | 1 | 226666 | 51 | 245542 | 101 | 324556 | 151 | 334344 | 201 |
| 222355 | 2 | 226733 | 52 | 245553 | 102 | 324645 | 152 | 334355 | 202 |
| 222366 | 3 | 226755 | 53 | 245564 | 103 | 324656 | 153 | 334366 | 203 |
| 222444 | 4 | 227722 | 54 | 245653 | 104 | 325523 | 154 | 334377 | 204 |
| 222455 | 5 | 227744 | 55 | 245664 | 105 | 325534 | 155 | 334433 | 205 |
| 222466 | 6 | 227766 | 56 | 245764 | 106 | 325545 | 156 | 334444 | 206 |
| 222477 | 7 | 233354 | 57 | 246642 | 107 | 325556 | 157 | 334455 | 207 |
| 222555 | 8 | 233365 | 58 | 246653 | 108 | 325567 | 158 | 334466 | 208 |
| 222566 | 9 | 233443 | 59 | 246664 | 109 | 325634 | 159 | 334533 | 209 |
| 222666 | 10 | 233454 | 60 | 246675 | 110 | 325645 | 160 | 334544 | 210 |
| 222677 | 11 | 233465 | 61 | 246764 | 111 | 325656 | 161 | 334555 | 211 |
| 223355 | 12 | 233476 | 62 | 247753 | 112 | 325745 | 162 | 334566 | 212 |
| 223366 | 13 | 233554 | 63 | 255552 | 113 | 326623 | 163 | 334577 | 213 |
| 223444 | 14 | 233565 | 64 | 255563 | 114 | 326634 | 164 | 334644 | 214 |
| 223455 | 15 | 233665 | 65 | 255574 | 115 | 326645 | 165 | 334655 | 215 |
| 223466 | 16 | 233676 | 66 | 255663 | 116 | 326656 | 166 | 334666 | 216 |
| 223544 | 17 | 234443 | 67 | 256652 | 117 | 326745 | 167 | 334755 | 217 |
| 223555 | 18 | 234454 | 68 | 256663 | 118 | 327734 | 168 | 335422 | 218 |
| 223566 | 19 | 234465 | 69 | 256674 | 119 | 332255 | 169 | 335433 | 219 |
| 223577 | 20 | 234476 | 70 | 257752 | 120 | 332266 | 170 | 335444 | 220 |
| 223655 | 21 | 234543 | 71 | 266662 | 121 | 332344 | 171 | 335455 | 221 |
| 223666 | 22 | 234554 | 72 | 267762 | 122 | 332355 | 172 | 335466 | 222 |
| 223677 | 23 | 234565 | 73 | 322245 | 123 | 332366 | 173 | 335477 | 223 |
| 224444 | 24 | 234654 | 74 | 322256 | 124 | 332444 | 174 | 335522 | 224 |
| 224455 | 25 | 234665 | 75 | 322267 | 125 | 332455 | 175 | 335533 | 225 |
| 224466 | 26 | 234765 | 76 | 322334 | 126 | 332466 | 176 | 335566 | 226 |
| 224533 | 27 | 235532 | 77 | 322345 | 127 | 332477 | 177 | 335555 | 227 |
| 224544 | 28 | 235543 | 78 | 322356 | 128 | 332555 | 178 | 335566 | 228 |
| 224555 | 29 | 235554 | 79 | 322445 | 129 | 332566 | 179 | 335577 | 229 |
| 224566 | 30 | 235565 | 80 | 322456 | 130 | 332577 | 180 | 335633 | 230 |
| 224577 | 31 | 235643 | 81 | 322467 | 131 | 332666 | 181 | 335655 | 231 |
| 224644 | 32 | 235654 | 82 | 322556 | 132 | 333244 | 182 | 335655 | 232 |
| 224655 | 33 | 235665 | 83 | 323334 | 133 | 333255 | 183 | 335666 | 233 |
| 224666 | 34 | 235676 | 84 | 323345 | 134 | 333266 | 184 | 335755 | 234 |
| 224755 | 35 | 235765 | 85 | 323356 | 135 | 333333 | 185 | 336522 | 235 |
| 225533 | 36 | 236632 | 86 | 323434 | 136 | 333344 | 186 | 336533 | 236 |
| 225544 | 37 | 236643 | 87 | 323445 | 137 | 333355 | 187 | 336544 | 237 |
| 225555 | 38 | 236654 | 88 | 323456 | 138 | 333366 | 188 | 336555 | 238 |
| 225566 | 39 | 236665 | 89 | 323467 | 139 | 333377 | 189 | 336566 | 239 |
| 225577 | 40 | 236743 | 90 | 323545 | 140 | 333433 | 190 | 336622 | 240 |
| 225633 | 41 | 236765 | 91 | 323556 | 141 | 333444 | 191 | 336633 | 241 |
| 225644 | 42 | 237732 | 92 | 323567 | 142 | 333455 | 192 | 336644 | 242 |
| 225655 | 43 | 237754 | 93 | 323656 | 143 | 333466 | 193 | 336655 | 243 |
| 225666 | 44 | 244442 | 94 | 324423 | 144 | 333477 | 194 | 336666 | 244 |
| 225744 | 45 | 244453 | 95 | 324434 | 145 | 333544 | 195 | 336744 | 245 |
| 225766 | 46 | 244464 | 96 | 324445 | 146 | 333555 | 196 | 337633 | 246 |
| 226622 | 47 | 244553 | 97 | 324456 | 147 | 333566 | 197 | 337655 | 247 |
| 226633 | 48 | 244564 | 98 | 324467 | 148 | 333655 | 198 | 337733 | 248 |
| 226644 | 49 | 244575 | 99 | 324534 | 149 | 333666 | 199 | 337755 | 249 |

FIG. 14A

JA2004

| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
|---|---|---|---|---|---|---|---|---|---|
| 343343 | 250 | 354453 | 300 | 424546 | 350 | 435523 | 400 | 444266 | 450 |
| 343354 | 251 | 354464 | 301 | 425524 | 351 | 435534 | 401 | 444277 | 451 |
| 343365 | 252 | 354475 | 302 | 425539 | 352 | 435545 | 402 | 444322 | 452 |
| 343376 | 253 | 354553 | 303 | 425546 | 353 | 435556 | 403 | 444333 | 453 |
| 343443 | 254 | 354564 | 304 | 425635 | 354 | 435634 | 404 | 444344 | 454 |
| 343454 | 255 | 354575 | 305 | 426624 | 355 | 435645 | 405 | 444355 | 455 |
| 343465 | 256 | 354664 | 306 | 426635 | 356 | 436523 | 406 | 444366 | 456 |
| 343554 | 257 | 355442 | 307 | 432234 | 357 | 436534 | 407 | 444377 | 457 |
| 343565 | 258 | 355453 | 308 | 432245 | 358 | 436545 | 408 | 444422 | 458 |
| 343665 | 259 | 355464 | 309 | 432256 | 359 | 436623 | 409 | 444433 | 459 |
| 344332 | 260 | 355542 | 310 | 432334 | 360 | 436634 | 410 | 444444 | 460 |
| 344343 | 261 | 355553 | 311 | 432345 | 361 | 436645 | 411 | 444455 | 461 |
| 344354 | 262 | 355564 | 312 | 432356 | 362 | 436734 | 412 | 444466 | 462 |
| 344365 | 263 | 355653 | 313 | 432367 | 363 | 437634 | 413 | 444477 | 463 |
| 344432 | 264 | 355664 | 314 | 432445 | 364 | 437734 | 414 | 444533 | 464 |
| 344443 | 265 | 356542 | 315 | 432456 | 365 | 442244 | 415 | 444544 | 465 |
| 344454 | 266 | 356553 | 316 | 432467 | 366 | 442255 | 416 | 444555 | 466 |
| 344465 | 267 | 356564 | 317 | 432556 | 367 | 442266 | 417 | 444566 | 467 |
| 344543 | 268 | 356642 | 318 | 433223 | 368 | 442333 | 418 | 444644 | 468 |
| 344554 | 269 | 356653 | 319 | 433234 | 369 | 442344 | 419 | 444655 | 469 |
| 344565 | 270 | 356664 | 320 | 433245 | 370 | 442355 | 420 | 445522 | 470 |
| 344576 | 271 | 356753 | 321 | 433256 | 371 | 442366 | 421 | 445333 | 471 |
| 344654 | 272 | 357653 | 322 | 433267 | 372 | 442377 | 422 | 445344 | 472 |
| 344665 | 273 | 357753 | 323 | 433323 | 373 | 442444 | 423 | 445355 | 473 |
| 345432 | 274 | 365552 | 324 | 433334 | 374 | 442455 | 424 | 445366 | 474 |
| 345443 | 275 | 365563 | 325 | 433345 | 375 | 442466 | 425 | 445422 | 475 |
| 345454 | 276 | 365663 | 326 | 433356 | 376 | 442555 | 426 | 445433 | 476 |
| 345465 | 277 | 366552 | 327 | 433367 | 377 | 442566 | 427 | 445444 | 477 |
| 345532 | 278 | 366563 | 328 | 433434 | 378 | 443233 | 428 | 445455 | 478 |
| 345543 | 279 | 366652 | 329 | 433444 | 379 | 443244 | 429 | 445466 | 479 |
| 345554 | 280 | 366663 | 330 | 433456 | 380 | 443255 | 430 | 445522 | 480 |
| 345565 | 281 | 367752 | 331 | 433455 | 381 | 443266 | 431 | 445533 | 481 |
| 345576 | 282 | 422224 | 332 | 433556 | 382 | 443277 | 432 | 445544 | 482 |
| 345643 | 283 | 422235 | 333 | 434323 | 383 | 443333 | 433 | 445555 | 483 |
| 345654 | 284 | 422246 | 334 | 434334 | 384 | 443344 | 434 | 445566 | 484 |
| 345665 | 285 | 422335 | 335 | 434355 | 385 | 443355 | 435 | 445633 | 485 |
| 345754 | 286 | 422346 | 336 | 434356 | 386 | 443366 | 436 | 445644 | 486 |
| 346532 | 287 | 422357 | 337 | 434367 | 387 | 443433 | 437 | 445655 | 487 |
| 346543 | 288 | 422446 | 338 | 434423 | 388 | 443444 | 438 | 446422 | 488 |
| 346554 | 289 | 423324 | 339 | 434434 | 389 | 443455 | 439 | 446433 | 489 |
| 346565 | 290 | 423335 | 340 | 434445 | 390 | 443466 | 440 | 446444 | 490 |
| 346632 | 291 | 423346 | 341 | 434456 | 391 | 443477 | 441 | 446455 | 491 |
| 346643 | 292 | 423435 | 342 | 434534 | 392 | 443544 | 442 | 446522 | 492 |
| 346654 | 293 | 423446 | 343 | 434545 | 393 | 443555 | 443 | 446533 | 493 |
| 346665 | 294 | 423546 | 344 | 434556 | 394 | 443566 | 444 | 446544 | 494 |
| 346754 | 295 | 424424 | 345 | 434645 | 395 | 443655 | 445 | 446555 | 495 |
| 347643 | 296 | 424435 | 346 | 435423 | 396 | 444222 | 446 | 446622 | 496 |
| 347732 | 297 | 424446 | 347 | 435434 | 397 | 444233 | 447 | 446633 | 497 |
| 347754 | 298 | 424457 | 348 | 435445 | 398 | 444244 | 448 | 446644 | 498 |
| 354442 | 299 | 424535 | 349 | 435456 | 399 | 444255 | 449 | 446655 | 499 |

**FIG. 14B**

JA2005

**U.S. Patent**    Apr. 19, 1994    Sheet 11 of 27    5,304,786

| Table I : The t-sequence table. Cluster0 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 446733 | 500 | 456643 | 550 | 533335 | 600 | 544445 | 650 | 554222 | 700 |
| 447522 | 501 | 456654 | 551 | 533346 | 601 | 544456 | 651 | 554233 | 701 |
| 447544 | 502 | 456743 | 552 | 533435 | 602 | 544534 | 652 | 554244 | 702 |
| 447633 | 503 | 457543 | 553 | 533446 | 603 | 544545 | 653 | 554255 | 703 |
| 447722 | 504 | 457643 | 554 | 534324 | 604 | 545323 | 654 | 554266 | 704 |
| 447744 | 505 | 457743 | 555 | 534335 | 605 | 545334 | 655 | 554322 | 705 |
| 453332 | 506 | 464442 | 556 | 534346 | 606 | 545345 | 656 | 554333 | 706 |
| 453343 | 507 | 464453 | 557 | 534424 | 607 | 545423 | 657 | 554344 | 707 |
| 453354 | 508 | 464464 | 558 | 534435 | 608 | 545434 | 658 | 554355 | 708 |
| 453365 | 509 | 464553 | 559 | 534446 | 609 | 545445 | 659 | 554366 | 709 |
| 453443 | 510 | 464564 | 560 | 534535 | 610 | 545523 | 660 | 554422 | 710 |
| 453454 | 511 | 465442 | 561 | 535424 | 611 | 545534 | 661 | 554433 | 711 |
| 453465 | 512 | 465453 | 562 | 535435 | 612 | 545545 | 662 | 554444 | 712 |
| 453476 | 513 | 465464 | 563 | 535524 | 613 | 545634 | 663 | 554455 | 713 |
| 453554 | 514 | 465542 | 564 | 535535 | 614 | 546423 | 664 | 554466 | 714 |
| 453565 | 515 | 465553 | 565 | 535624 | 615 | 546434 | 665 | 554533 | 715 |
| 454332 | 516 | 465564 | 566 | 536624 | 616 | 546523 | 666 | 554544 | 716 |
| 454343 | 517 | 465653 | 567 | 542223 | 617 | 546534 | 667 | 554555 | 717 |
| 454354 | 518 | 466442 | 568 | 542234 | 618 | 546623 | 668 | 554644 | 718 |
| 454365 | 519 | 466453 | 569 | 542245 | 619 | 546634 | 669 | 555222 | 719 |
| 454432 | 520 | 466542 | 570 | 542256 | 620 | 547623 | 670 | 555233 | 720 |
| 454443 | 521 | 466553 | 571 | 542334 | 621 | 552233 | 671 | 555244 | 721 |
| 454454 | 522 | 466642 | 572 | 542345 | 622 | 552244 | 672 | 555255 | 722 |
| 454465 | 523 | 466653 | 573 | 542356 | 623 | 552255 | 673 | 555322 | 723 |
| 454476 | 524 | 467642 | 574 | 542367 | 624 | 552266 | 674 | 555333 | 724 |
| 454543 | 525 | 475552 | 575 | 542445 | 625 | 552277 | 675 | 555344 | 725 |
| 454554 | 526 | 476552 | 576 | 542456 | 626 | 552333 | 676 | 555355 | 726 |
| 454565 | 527 | 522225 | 577 | 543223 | 627 | 552344 | 677 | 555422 | 727 |
| 454654 | 528 | 522236 | 578 | 543234 | 628 | 552355 | 678 | 555433 | 728 |
| 455332 | 529 | 522247 | 579 | 543245 | 629 | 552366 | 679 | 555444 | 729 |
| 455343 | 530 | 522336 | 580 | 543256 | 630 | 552444 | 680 | 555455 | 730 |
| 455354 | 531 | 523325 | 581 | 543323 | 631 | 552455 | 681 | 555522 | 731 |
| 455365 | 532 | 523336 | 582 | 543334 | 632 | 552466 | 682 | 555533 | 732 |
| 455432 | 533 | 523347 | 583 | 543345 | 633 | 552555 | 683 | 555544 | 733 |
| 455443 | 534 | 523436 | 584 | 543356 | 634 | 553222 | 684 | 555555 | 734 |
| 455454 | 535 | 524425 | 585 | 543367 | 635 | 553233 | 685 | 555633 | 735 |
| 455465 | 536 | 524436 | 586 | 543434 | 636 | 553244 | 686 | 555644 | 736 |
| 455532 | 537 | 525525 | 587 | 543445 | 637 | 553255 | 687 | 556322 | 737 |
| 455543 | 538 | 532224 | 588 | 543456 | 638 | 553266 | 688 | 556333 | 738 |
| 455554 | 539 | 532235 | 589 | 543545 | 639 | 553322 | 689 | 556344 | 739 |
| 455565 | 540 | 532246 | 590 | 544223 | 640 | 553333 | 690 | 556422 | 740 |
| 455643 | 541 | 532257 | 591 | 544234 | 641 | 553344 | 691 | 556433 | 741 |
| 455654 | 542 | 532335 | 592 | 544245 | 642 | 553355 | 692 | 556444 | 742 |
| 456432 | 543 | 532346 | 593 | 544256 | 643 | 553366 | 693 | 556522 | 743 |
| 456443 | 544 | 532357 | 594 | 544323 | 644 | 553433 | 694 | 556533 | 744 |
| 456454 | 545 | 532446 | 595 | 544334 | 645 | 553444 | 695 | 556544 | 745 |
| 456532 | 546 | 533224 | 596 | 544345 | 646 | 553455 | 696 | 556622 | 746 |
| 456543 | 547 | 533235 | 597 | 544356 | 647 | 553466 | 697 | 556633 | 747 |
| 456554 | 548 | 533246 | 598 | 544423 | 648 | 553544 | 698 | 556644 | 748 |
| 456632 | 549 | 533324 | 599 | 544434 | 649 | 553555 | 699 | 557422 | 749 |

## FIG. 14C

PX-17

U.S. Patent                Apr. 19, 1994        Sheet 12 of 27        5,304,786

| Table I : The t-sequence table. Cluster0 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 557522 | 750 | 632225 | 800 | 654223 | 850 | 664244 | 900 | | |
| 557622 | 751 | 632236 | 801 | 654234 | 851 | 664255 | 901 | | |
| 555722 | 752 | 632247 | 802 | 654245 | 852 | 664322 | 902 | | |
| 563332 | 753 | 632336 | 803 | 654323 | 853 | 664333 | 903 | | |
| 563343 | 754 | 633225 | 804 | 654334 | 854 | 664344 | 904 | | |
| 563354 | 755 | 633236 | 805 | 654345 | 855 | 664355 | 905 | | |
| 563365 | 756 | 633325 | 806 | 654423 | 856 | 664422 | 906 | | |
| 563443 | 757 | 633336 | 807 | 654434 | 857 | 664433 | 907 | | |
| 563454 | 758 | 634325 | 808 | 654445 | 858 | 664444 | 908 | | |
| 563465 | 759 | 634425 | 809 | 654534 | 859 | 664455 | 909 | | |
| 563554 | 760 | 642224 | 810 | 655223 | 860 | 664533 | 910 | | |
| 564332 | 761 | 642235 | 811 | 655234 | 861 | 664544 | 911 | | |
| 564343 | 762 | 642246 | 812 | 655323 | 862 | 665222 | 912 | | |
| 564354 | 763 | 642335 | 813 | 655334 | 863 | 665233 | 913 | | |
| 564365 | 764 | 642346 | 814 | 655423 | 864 | 665244 | 914 | | |
| 564432 | 765 | 643224 | 815 | 655434 | 865 | 665322 | 915 | | |
| 564443 | 766 | 643235 | 816 | 655523 | 866 | 665333 | 916 | | |
| 564454 | 767 | 643246 | 817 | 655534 | 867 | 665344 | 917 | | |
| 564465 | 768 | 643324 | 818 | 656323 | 868 | 665422 | 918 | | |
| 564543 | 769 | 643335 | 819 | 656423 | 869 | 665433 | 919 | | |
| 564554 | 770 | 643346 | 820 | 656523 | 870 | 665444 | 920 | | |
| 565332 | 771 | 643435 | 821 | 656623 | 871 | 665522 | 921 | | |
| 565343 | 772 | 644224 | 822 | 662222 | 872 | 665533 | 922 | | |
| 565354 | 773 | 644235 | 823 | 662233 | 873 | 665544 | 923 | | |
| 565432 | 774 | 644324 | 824 | 662244 | 874 | 665633 | 924 | | |
| 565443 | 775 | 644335 | 825 | 662255 | 875 | 666222 | 925 | | |
| 565454 | 776 | 644424 | 826 | 662266 | 876 | 666233 | 926 | | |
| 565532 | 777 | 644435 | 827 | 662277 | 877 | 666322 | 927 | | |
| 565543 | 778 | 645324 | 828 | 662333 | 878 | 666333 | 928 | | |
| 565554 | 779 | 645424 | 829 | 662344 | 879 | | | | |
| 565643 | 780 | 645524 | 830 | 662355 | 880 | | | | |
| 566332 | 781 | 652223 | 831 | 662366 | 881 | | | | |
| 566343 | 782 | 652234 | 832 | 662444 | 882 | | | | |
| 566432 | 783 | 652245 | 833 | 662455 | 883 | | | | |
| 566443 | 784 | 652256 | 834 | 663222 | 884 | | | | |
| 566532 | 785 | 652267 | 835 | 663233 | 885 | | | | |
| 566543 | 786 | 652334 | 836 | 663244 | 886 | | | | |
| 566632 | 787 | 652345 | 837 | 663255 | 887 | | | | |
| 566643 | 788 | 652356 | 838 | 663266 | 888 | | | | |
| 567432 | 789 | 652445 | 839 | 663322 | 889 | | | | |
| 567632 | 790 | 653223 | 840 | 663333 | 890 | | | | |
| 574442 | 791 | 653234 | 841 | 663344 | 891 | | | | |
| 574464 | 792 | 653245 | 842 | 663355 | 892 | | | | |
| 575442 | 793 | 653256 | 843 | 663366 | 893 | | | | |
| 575542 | 794 | 653323 | 844 | 663433 | 894 | | | | |
| 576442 | 795 | 653334 | 845 | 663444 | 895 | | | | |
| 576642 | 796 | 653345 | 846 | 663455 | 896 | | | | |
| 622226 | 797 | 653356 | 847 | 663544 | 897 | | | | |
| 622772 | 798 | 653434 | 848 | 664222 | 898 | | | | |
| 623326 | 799 | 653445 | 849 | 664233 | 899 | | | | |

FIG. 14D

JA2007

| Table I : The t-sequence table. Cluster3 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 222563 | 0 | 234327 | 50 | 266224 | 100 | 323775 | 150 | 334685 | 200 |
| 222574 | 1 | 234338 | 51 | 266235 | 101 | 324642 | 151 | 334752 | 201 |
| 222585 | 2 | 234349 | 52 | 266246 | 102 | 324653 | 152 | 334763 | 202 |
| 222596 | 3 | 234762 | 53 | 266257 | 103 | 324664 | 153 | 334774 | 203 |
| 222663 | 4 | 234773 | 54 | 266335 | 104 | 324675 | 154 | 334785 | 204 |
| 222674 | 5 | 234784 | 55 | 266346 | 105 | 324686 | 155 | 334863 | 205 |
| 222685 | 6 | 234795 | 56 | 267324 | 106 | 324753 | 156 | 334874 | 206 |
| 222696 | 7 | 234873 | 57 | 267335 | 107 | 324764 | 157 | 335752 | 207 |
| 222774 | 8 | 234884 | 58 | 267346 | 108 | 324775 | 158 | 335763 | 208 |
| 222785 | 9 | 235427 | 59 | 267435 | 109 | 324864 | 159 | 335774 | 209 |
| 222796 | 10 | 235438 | 60 | 268424 | 110 | 325742 | 160 | 335852 | 210 |
| 223563 | 11 | 235862 | 61 | 268435 | 111 | 325753 | 161 | 335863 | 211 |
| 223663 | 12 | 235873 | 62 | 269524 | 112 | 325764 | 162 | 335874 | 212 |
| 223674 | 13 | 235884 | 63 | 277223 | 113 | 325775 | 163 | 335963 | 213 |
| 223685 | 14 | 235973 | 64 | 277234 | 114 | 325853 | 164 | 336852 | 214 |
| 223696 | 15 | 236527 | 65 | 277245 | 115 | 325864 | 165 | 336863 | 215 |
| 223763 | 16 | 236962 | 66 | 277256 | 116 | 326842 | 166 | 336952 | 216 |
| 223774 | 17 | 236973 | 67 | 277334 | 117 | 326853 | 167 | 336963 | 217 |
| 223785 | 18 | 244226 | 68 | 277345 | 118 | 326864 | 168 | 337952 | 218 |
| 223796 | 19 | 244237 | 69 | 278323 | 119 | 326953 | 169 | 343227 | 219 |
| 223874 | 20 | 244248 | 70 | 278334 | 120 | 327942 | 170 | 343238 | 220 |
| 223885 | 21 | 244259 | 71 | 278345 | 121 | 327953 | 171 | 343249 | 221 |
| 224752 | 22 | 244337 | 72 | 278434 | 122 | 332552 | 172 | 343662 | 222 |
| 224763 | 23 | 244348 | 73 | 279423 | 123 | 332563 | 173 | 343673 | 223 |
| 224774 | 24 | 244772 | 74 | 279434 | 124 | 332574 | 174 | 343684 | 224 |
| 224785 | 25 | 244783 | 75 | 322453 | 125 | 332585 | 175 | 343695 | 225 |
| 224796 | 26 | 244794 | 76 | 322464 | 126 | 332596 | 176 | 343773 | 226 |
| 224863 | 27 | 245326 | 77 | 322475 | 127 | 332663 | 177 | 343784 | 227 |
| 224874 | 28 | 245337 | 78 | 322486 | 128 | 332674 | 178 | 344227 | 228 |
| 224885 | 29 | 245348 | 79 | 322497 | 129 | 332685 | 179 | 344238 | 229 |
| 224974 | 30 | 245437 | 80 | 322553 | 130 | 332696 | 180 | 344327 | 230 |
| 225852 | 31 | 245872 | 81 | 322564 | 131 | 332774 | 181 | 344338 | 231 |
| 225863 | 32 | 245883 | 82 | 322575 | 132 | 332785 | 182 | 344662 | 232 |
| 225874 | 33 | 246426 | 83 | 322586 | 133 | 333552 | 183 | 344673 | 233 |
| 225885 | 34 | 246437 | 84 | 322597 | 134 | 333563 | 184 | 344684 | 234 |
| 225963 | 35 | 246972 | 85 | 322664 | 135 | 333574 | 185 | 344762 | 235 |
| 225974 | 36 | 247526 | 86 | 322675 | 136 | 333585 | 186 | 344773 | 236 |
| 226952 | 37 | 255225 | 87 | 322686 | 137 | 333596 | 187 | 344784 | 237 |
| 226963 | 38 | 255236 | 88 | 322775 | 138 | 333652 | 188 | 344873 | 238 |
| 226974 | 39 | 255247 | 89 | 323542 | 139 | 333663 | 189 | 345327 | 239 |
| 233227 | 40 | 255258 | 90 | 323553 | 140 | 333674 | 190 | 345427 | 240 |
| 233238 | 41 | 255336 | 91 | 323564 | 141 | 333685 | 191 | 345762 | 241 |
| 233249 | 42 | 255347 | 92 | 323575 | 142 | 333696 | 192 | 345773 | 242 |
| 233662 | 43 | 256325 | 93 | 323586 | 143 | 333763 | 193 | 345862 | 243 |
| 233673 | 44 | 256336 | 94 | 323597 | 144 | 333774 | 194 | 345873 | 244 |
| 233684 | 45 | 256347 | 95 | 323653 | 145 | 333785 | 195 | 346862 | 245 |
| 233695 | 46 | 256436 | 96 | 323664 | 146 | 333874 | 196 | 346962 | 246 |
| 233773 | 47 | 257425 | 97 | 323675 | 147 | 334652 | 197 | 354226 | 247 |
| 233784 | 48 | 257436 | 98 | 323686 | 148 | 334663 | 198 | 354237 | 248 |
| 233795 | 49 | 258525 | 99 | 323764 | 149 | 334674 | 199 | 354248 | 249 |

FIG. 15A

JA2008

**U.S. Patent**    Apr. 19, 1994    Sheet 14 of 27    **5,304,786**

| Table I : The t-sequence table. Cluster3 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 354337 | 250 | 422576 | 300 | 433475 | 350 | 443685 | 400 | 497223 | 450 |
| 354772 | 251 | 422665 | 301 | 433486 | 351 | 443763 | 401 | 497224 | 451 |
| 354783 | 252 | 423432 | 302 | 433542 | 352 | 443774 | 402 | 498323 | 452 |
| 355226 | 253 | 423443 | 303 | 433553 | 353 | 444552 | 403 | 522233 | 453 |
| 355237 | 254 | 423454 | 304 | 433564 | 354 | 444563 | 404 | 522244 | 454 |
| 355326 | 255 | 423465 | 305 | 433575 | 355 | 444574 | 405 | 522255 | 455 |
| 355337 | 256 | 423476 | 306 | 433586 | 356 | 444652 | 406 | 522266 | 456 |
| 355772 | 257 | 423487 | 307 | 433653 | 357 | 444663 | 407 | 522277 | 457 |
| 355872 | 258 | 423543 | 308 | 433664 | 358 | 444674 | 408 | 522333 | 458 |
| 356326 | 259 | 423554 | 309 | 433675 | 359 | 444752 | 409 | 522344 | 459 |
| 356426 | 260 | 423565 | 310 | 433764 | 360 | 444763 | 410 | 522355 | 460 |
| 365225 | 261 | 423576 | 311 | 434542 | 361 | 444774 | 411 | 522366 | 461 |
| 365236 | 262 | 423654 | 312 | 434553 | 362 | 444863 | 412 | 522377 | 462 |
| 365247 | 263 | 423665 | 313 | 434564 | 363 | 445652 | 413 | 522444 | 463 |
| 365336 | 264 | 424532 | 314 | 434575 | 364 | 445663 | 414 | 522455 | 464 |
| 366225 | 265 | 424543 | 315 | 434642 | 365 | 445752 | 415 | 522466 | 465 |
| 366236 | 266 | 424554 | 316 | 434653 | 366 | 445763 | 416 | 522555 | 466 |
| 366325 | 267 | 424565 | 317 | 434664 | 367 | 445852 | 417 | 523322 | 467 |
| 366336 | 268 | 424576 | 318 | 434675 | 368 | 445863 | 418 | 523333 | 468 |
| 367325 | 269 | 424643 | 319 | 434753 | 369 | 446752 | 419 | 523344 | 469 |
| 367425 | 270 | 424654 | 320 | 434764 | 370 | 446852 | 420 | 523355 | 470 |
| 376224 | 271 | 424665 | 321 | 435642 | 371 | 446952 | 421 | 523366 | 471 |
| 376235 | 272 | 424754 | 322 | 435653 | 372 | 453227 | 422 | 523377 | 472 |
| 376246 | 273 | 425632 | 323 | 435664 | 373 | 453238 | 423 | 523444 | 473 |
| 376335 | 274 | 425643 | 324 | 435742 | 374 | 453662 | 424 | 523455 | 474 |
| 377224 | 275 | 425654 | 325 | 435753 | 375 | 453673 | 425 | 523466 | 475 |
| 377235 | 276 | 425665 | 326 | 435764 | 376 | 453684 | 426 | 523477 | 476 |
| 377324 | 277 | 425743 | 327 | 435853 | 377 | 453773 | 427 | 523555 | 477 |
| 377335 | 278 | 425754 | 328 | 436742 | 378 | 454227 | 428 | 524422 | 478 |
| 378324 | 279 | 426732 | 329 | 436753 | 379 | 454327 | 429 | 524433 | 479 |
| 378424 | 280 | 426743 | 330 | 436842 | 380 | 454662 | 430 | 524444 | 480 |
| 387223 | 281 | 426754 | 331 | 436853 | 381 | 454673 | 431 | 524455 | 481 |
| 387234 | 282 | 426843 | 332 | 437842 | 382 | 454762 | 432 | 524466 | 482 |
| 387245 | 283 | 427832 | 333 | 437942 | 383 | 454773 | 433 | 524544 | 483 |
| 387334 | 284 | 427843 | 334 | 442552 | 384 | 455662 | 434 | 524644 | 484 |
| 388323 | 285 | 432442 | 335 | 442563 | 385 | 455762 | 435 | 524544 | 485 |
| 388334 | 286 | 432453 | 336 | 442574 | 386 | 455862 | 436 | 524644 | 486 |
| 389423 | 287 | 432464 | 337 | 442585 | 387 | 464226 | 437 | 525522 | 487 |
| 422343 | 288 | 432475 | 338 | 442596 | 388 | 464237 | 438 | 525522 | 488 |
| 422354 | 289 | 432486 | 339 | 442663 | 389 | 464772 | 439 | 525533 | 489 |
| 422365 | 290 | 432497 | 340 | 442674 | 390 | 465226 | 440 | 525544 | 490 |
| 422376 | 291 | 432553 | 341 | 442685 | 391 | 465326 | 441 | 525555 | 491 |
| 422387 | 292 | 432564 | 342 | 442774 | 392 | 475225 | 442 | 525633 | 492 |
| 422443 | 293 | 432575 | 343 | 443552 | 393 | 475236 | 443 | 526622 | 493 |
| 422454 | 294 | 432586 | 344 | 443563 | 394 | 476225 | 444 | 526633 | 494 |
| 422465 | 295 | 432664 | 345 | 443574 | 395 | 476325 | 445 | 526644 | 495 |
| 422476 | 296 | 432675 | 346 | 443585 | 396 | 486224 | 446 | 526644 | 496 |
| 422487 | 297 | 433442 | 347 | 443652 | 397 | 486235 | 447 | 526644 | 497 |
| 422554 | 298 | 433453 | 348 | 443663 | 398 | 487224 | 448 | 527722 | 498 |
| 422565 | 299 | 433464 | 349 | 443674 | 399 | 487324 | 449 | 527733 | 499 |

**FIG. 15B**

| Table I : The t-sequence table. Cluster3 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 532332 | 500 | 542453 | 550 | 554552 | 600 | 632444 | 650 | 643354 | 700 |
| 532343 | 501 | 542464 | 551 | 554563 | 601 | 632455 | 651 | 643365 | 701 |
| 532354 | 502 | 542475 | 552 | 554652 | 602 | 633222 | 652 | 643432 | 702 |
| 532365 | 503 | 542486 | 553 | 554663 | 603 | 633233 | 653 | 643443 | 703 |
| 532376 | 504 | 542553 | 554 | 554752 | 604 | 633244 | 654 | 643454 | 704 |
| 532387 | 505 | 542564 | 555 | 554763 | 605 | 633255 | 655 | 643465 | 705 |
| 532443 | 506 | 542575 | 556 | 555552 | 606 | 633266 | 656 | 643543 | 706 |
| 532454 | 507 | 542664 | 557 | 555652 | 607 | 633322 | 657 | 643554 | 707 |
| 532465 | 508 | 543442 | 558 | 555752 | 608 | 633333 | 658 | 644332 | 708 |
| 532476 | 509 | 543453 | 559 | 555852 | 609 | 633344 | 659 | 644343 | 709 |
| 532554 | 510 | 543464 | 560 | 563227 | 610 | 633355 | 660 | 644354 | 710 |
| 532565 | 511 | 543475 | 561 | 563662 | 611 | 633366 | 661 | 644432 | 711 |
| 533332 | 512 | 543542 | 562 | 563673 | 612 | 633433 | 662 | 644443 | 712 |
| 533343 | 513 | 543553 | 563 | 564662 | 613 | 633444 | 663 | 644454 | 713 |
| 533354 | 514 | 543564 | 564 | 564762 | 614 | 633455 | 664 | 644532 | 714 |
| 533365 | 515 | 543575 | 565 | 574226 | 615 | 633544 | 665 | 644543 | 715 |
| 533376 | 516 | 543653 | 566 | 585225 | 616 | 634322 | 666 | 644554 | 716 |
| 533432 | 517 | 543664 | 567 | 596224 | 617 | 634333 | 667 | 644643 | 717 |
| 533443 | 518 | 544442 | 568 | 622223 | 618 | 634344 | 668 | 645432 | 718 |
| 533454 | 519 | 544453 | 569 | 622234 | 619 | 634355 | 669 | 645443 | 719 |
| 533465 | 520 | 544464 | 570 | 622245 | 620 | 634422 | 670 | 645532 | 720 |
| 533476 | 521 | 544542 | 571 | 622256 | 621 | 634433 | 671 | 645543 | 721 |
| 533543 | 522 | 544553 | 572 | 622267 | 622 | 634444 | 672 | 645632 | 722 |
| 533554 | 523 | 544564 | 573 | 622334 | 623 | 634455 | 673 | 645643 | 723 |
| 533565 | 524 | 544642 | 574 | 622345 | 624 | 634533 | 674 | 646532 | 724 |
| 533654 | 525 | 544653 | 575 | 622356 | 625 | 634544 | 675 | 646632 | 725 |
| 534432 | 526 | 544664 | 576 | 622445 | 626 | 635422 | 676 | 646732 | 726 |
| 534443 | 527 | 544753 | 577 | 623323 | 627 | 635433 | 677 | 652442 | 727 |
| 534454 | 528 | 545542 | 578 | 623334 | 628 | 635444 | 678 | 652453 | 728 |
| 534465 | 529 | 545553 | 579 | 623345 | 629 | 635522 | 679 | 652464 | 729 |
| 534532 | 530 | 545642 | 580 | 623356 | 630 | 635533 | 680 | 652475 | 730 |
| 534543 | 531 | 545653 | 581 | 623434 | 631 | 635544 | 681 | 652553 | 731 |
| 534554 | 532 | 545742 | 582 | 623445 | 632 | 635633 | 682 | 652564 | 732 |
| 534565 | 533 | 545753 | 583 | 624423 | 633 | 636522 | 683 | 653442 | 733 |
| 534643 | 534 | 546642 | 584 | 624434 | 634 | 636533 | 684 | 653453 | 734 |
| 534654 | 535 | 546742 | 585 | 624445 | 635 | 636622 | 685 | 653464 | 735 |
| 535532 | 536 | 546842 | 586 | 624534 | 636 | 636633 | 686 | 653542 | 736 |
| 535543 | 537 | 552552 | 587 | 625523 | 637 | 637622 | 687 | 653553 | 737 |
| 535554 | 538 | 552563 | 588 | 625534 | 638 | 637722 | 688 | 653564 | 738 |
| 535632 | 539 | 552574 | 589 | 626623 | 639 | 642332 | 689 | 653653 | 739 |
| 535643 | 540 | 552585 | 590 | 632222 | 640 | 642343 | 690 | 654442 | 740 |
| 535654 | 541 | 552663 | 591 | 632233 | 641 | 642354 | 691 | 654453 | 741 |
| 535743 | 542 | 552674 | 592 | 632244 | 642 | 642365 | 692 | 654542 | 742 |
| 536632 | 543 | 553552 | 593 | 632255 | 643 | 642376 | 693 | 654553 | 743 |
| 536643 | 544 | 553563 | 594 | 632266 | 644 | 642443 | 694 | 654642 | 744 |
| 536732 | 545 | 553574 | 595 | 632277 | 645 | 642454 | 695 | 654653 | 745 |
| 536743 | 546 | 553652 | 596 | 632333 | 646 | 642465 | 696 | 655442 | 746 |
| 537732 | 547 | 553663 | 597 | 632344 | 647 | 642554 | 697 | 655542 | 747 |
| 537832 | 548 | 553674 | 598 | 632355 | 648 | 643332 | 698 | 655642 | 748 |
| 542442 | 549 | 553763 | 599 | 632366 | 649 | 643343 | 699 | 655742 | 749 |

FIG. 15C

JA2010

| colspan | Table I : The t-sequence table. Cluster3 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
|---|---|---|---|---|---|---|---|---|---|
| 662552 | 750 | 743255 | 800 | 762453 | 850 | 862343 | 900 | | |
| 662563 | 751 | 743322 | 801 | 762464 | 851 | 862354 | 901 | | |
| 662574 | 752 | 743333 | 802 | 762553 | 852 | 862443 | 902 | | |
| 662663 | 753 | 743344 | 803 | 763442 | 853 | 863332 | 903 | | |
| 663552 | 754 | 743355 | 804 | 763453 | 854 | 863343 | 904 | | |
| 663563 | 755 | 743433 | 805 | 763542 | 855 | 863432 | 905 | | |
| 663652 | 756 | 743444 | 806 | 763553 | 856 | 863443 | 906 | | |
| 663663 | 757 | 744222 | 807 | 764442 | 857 | 864332 | 907 | | |
| 664552 | 758 | 744233 | 808 | 764542 | 858 | 864432 | 908 | | |
| 664652 | 759 | 744244 | 809 | 764642 | 859 | 864532 | 909 | | |
| 664752 | 760 | 744322 | 810 | 772552 | 860 | 872442 | 910 | | |
| 673662 | 761 | 744333 | 811 | 772563 | 861 | 872453 | 911 | | |
| 722224 | 762 | 744344 | 812 | 773552 | 862 | 873442 | 912 | | |
| 722235 | 763 | 744422 | 813 | 773652 | 863 | 873542 | 913 | | |
| 722246 | 764 | 744433 | 814 | 832224 | 864 | 942224 | 914 | | |
| 722335 | 765 | 744444 | 815 | 832235 | 865 | 952223 | 915 | | |
| 723324 | 766 | 744533 | 816 | 833324 | 866 | 952234 | 916 | | |
| 723335 | 767 | 745322 | 817 | 842223 | 867 | 953223 | 917 | | |
| 724424 | 768 | 745333 | 818 | 842234 | 868 | 953323 | 918 | | |
| 732223 | 769 | 745422 | 819 | 842245 | 869 | 962222 | 919 | | |
| 732234 | 770 | 745433 | 820 | 842334 | 870 | 962233 | 920 | | |
| 732245 | 771 | 745522 | 821 | 843223 | 871 | 962244 | 921 | | |
| 732256 | 772 | 745533 | 822 | 843234 | 872 | 962333 | 922 | | |
| 732334 | 773 | 746422 | 823 | 843323 | 873 | 963222 | 923 | | |
| 732345 | 774 | 746522 | 824 | 843334 | 874 | 963233 | 924 | | |
| 733223 | 775 | 746622 | 825 | 844323 | 875 | 963322 | 925 | | |
| 733234 | 776 | 752332 | 826 | 844423 | 876 | 963333 | 926 | | |
| 733245 | 777 | 752343 | 827 | 852222 | 877 | 964222 | 927 | | |
| 733323 | 778 | 752354 | 828 | 852233 | 878 | 964322 | 928 | | |
| 733334 | 779 | 752365 | 829 | 852244 | 879 | | | | |
| 733345 | 780 | 752443 | 830 | 852255 | 880 | | | | |
| 733434 | 781 | 752454 | 831 | 852333 | 881 | | | | |
| 734323 | 782 | 753332 | 832 | 852344 | 882 | | | | |
| 734334 | 783 | 753343 | 833 | 853222 | 883 | | | | |
| 734423 | 784 | 753354 | 834 | 853233 | 884 | | | | |
| 734434 | 785 | 753432 | 835 | 853244 | 885 | | | | |
| 735423 | 786 | 753443 | 836 | 853322 | 886 | | | | |
| 735523 | 787 | 753454 | 837 | 853333 | 887 | | | | |
| 742222 | 788 | 753543 | 838 | 853344 | 888 | | | | |
| 742233 | 789 | 754332 | 839 | 853433 | 889 | | | | |
| 742244 | 790 | 754343 | 840 | 854222 | 890 | | | | |
| 742255 | 791 | 754432 | 841 | 854233 | 891 | | | | |
| 742266 | 792 | 754443 | 842 | 854322 | 892 | | | | |
| 742333 | 793 | 754532 | 843 | 854333 | 893 | | | | |
| 742344 | 794 | 754543 | 844 | 854422 | 894 | | | | |
| 742355 | 795 | 755332 | 845 | 854433 | 895 | | | | |
| 742444 | 796 | 755432 | 846 | 855322 | 896 | | | | |
| 743222 | 797 | 755532 | 847 | 855422 | 897 | | | | |
| 743233 | 798 | 755632 | 848 | 855522 | 898 | | | | |
| 743244 | 799 | 762442 | 849 | 862332 | 899 | | | | |

**FIG. 15D**

JA2011

| Table I : The t-sequence table. Cluster6 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 222236 | 0 | 233357 | 50 | 244445 | 100 | 255555 | 150 | 268643 | 200 |
| 222247 | 1 | 233368 | 51 | 244456 | 101 | 256322 | 151 | 269632 | 201 |
| 222258 | 2 | 233379 | 52 | 244467 | 102 | 256333 | 152 | 269643 | 202 |
| 222269 | 3 | 233446 | 53 | 244556 | 103 | 256344 | 153 | 277442 | 203 |
| 222336 | 4 | 233457 | 54 | 245323 | 104 | 256355 | 154 | 277453 | 204 |
| 222347 | 5 | 233468 | 55 | 245334 | 105 | 256366 | 155 | 277464 | 205 |
| 222358 | 6 | 233557 | 56 | 245345 | 106 | 256377 | 156 | 277553 | 206 |
| 222369 | 7 | 234324 | 57 | 245356 | 107 | 256433 | 157 | 278542 | 207 |
| 222447 | 8 | 234335 | 58 | 245367 | 108 | 256444 | 158 | 278553 | 208 |
| 222458 | 9 | 234346 | 59 | 245378 | 109 | 256455 | 159 | 279642 | 209 |
| 222469 | 10 | 234357 | 60 | 245434 | 110 | 256466 | 160 | 322226 | 210 |
| 223325 | 11 | 234368 | 61 | 245445 | 111 | 256544 | 161 | 322237 | 211 |
| 223336 | 12 | 234379 | 62 | 245456 | 112 | 256555 | 162 | 322248 | 212 |
| 223347 | 13 | 234435 | 63 | 245467 | 113 | 257422 | 163 | 322259 | 213 |
| 223358 | 14 | 234446 | 64 | 245545 | 114 | 257433 | 164 | 322337 | 214 |
| 223369 | 15 | 234457 | 65 | 245556 | 115 | 257444 | 165 | 322348 | 215 |
| 223436 | 16 | 234468 | 66 | 246423 | 116 | 257455 | 166 | 322359 | 216 |
| 223447 | 17 | 234546 | 67 | 246434 | 117 | 257466 | 167 | 322772 | 217 |
| 223458 | 18 | 234557 | 68 | 246445 | 118 | 257533 | 168 | 322783 | 218 |
| 223469 | 19 | 235424 | 69 | 246456 | 119 | 257544 | 169 | 322794 | 219 |
| 223547 | 20 | 235435 | 70 | 246467 | 120 | 257555 | 170 | 323326 | 220 |
| 223558 | 21 | 235446 | 71 | 246534 | 121 | 257644 | 171 | 323337 | 221 |
| 224425 | 22 | 235457 | 72 | 246545 | 122 | 258522 | 172 | 323348 | 222 |
| 224436 | 23 | 235468 | 73 | 246556 | 123 | 258533 | 173 | 323359 | 223 |
| 224447 | 24 | 235535 | 74 | 246645 | 124 | 258544 | 174 | 323437 | 224 |
| 224458 | 25 | 235546 | 75 | 247523 | 125 | 258555 | 175 | 323448 | 225 |
| 224469 | 26 | 235557 | 76 | 247534 | 126 | 258633 | 176 | 323872 | 226 |
| 224536 | 27 | 235646 | 77 | 247545 | 127 | 258644 | 177 | 323883 | 227 |
| 224547 | 28 | 236524 | 78 | 247556 | 128 | 259622 | 178 | 323894 | 228 |
| 224558 | 29 | 236535 | 79 | 247634 | 129 | 259633 | 179 | 324426 | 229 |
| 224647 | 30 | 236546 | 80 | 247645 | 130 | 259644 | 180 | 324437 | 230 |
| 225525 | 31 | 236557 | 81 | 248623 | 131 | 259733 | 181 | 324448 | 231 |
| 225536 | 32 | 236635 | 82 | 248634 | 132 | 266332 | 182 | 324537 | 232 |
| 225547 | 33 | 236646 | 83 | 248645 | 133 | 266343 | 183 | 324972 | 233 |
| 225558 | 34 | 237624 | 84 | 248734 | 134 | 266354 | 184 | 324983 | 234 |
| 225636 | 35 | 237635 | 85 | 249723 | 135 | 266365 | 185 | 325526 | 235 |
| 225647 | 36 | 237646 | 86 | 249734 | 136 | 266376 | 186 | 325537 | 236 |
| 226625 | 37 | 237735 | 87 | 255233 | 137 | 266443 | 187 | 326626 | 237 |
| 226636 | 38 | 238724 | 88 | 255244 | 138 | 266454 | 188 | 332225 | 238 |
| 226647 | 39 | 238735 | 89 | 255255 | 139 | 266465 | 189 | 332236 | 239 |
| 226736 | 40 | 244234 | 90 | 255266 | 140 | 266554 | 190 | 332247 | 240 |
| 227725 | 41 | 244245 | 91 | 255277 | 141 | 267432 | 191 | 332258 | 241 |
| 227736 | 42 | 244256 | 92 | 255333 | 142 | 267443 | 192 | 332269 | 242 |
| 233235 | 43 | 244267 | 93 | 255344 | 143 | 267454 | 193 | 332336 | 243 |
| 233246 | 44 | 244278 | 94 | 255355 | 144 | 267465 | 194 | 332347 | 244 |
| 233257 | 45 | 244334 | 95 | 255366 | 145 | 267543 | 195 | 332358 | 245 |
| 233268 | 46 | 244345 | 96 | 255377 | 146 | 267554 | 196 | 332369 | 246 |
| 233279 | 47 | 244356 | 97 | 255444 | 147 | 268532 | 197 | 332447 | 247 |
| 233335 | 48 | 244367 | 98 | 255455 | 148 | 268543 | 198 | 332458 | 248 |
| 233346 | 49 | 244378 | 99 | 255466 | 149 | 268554 | 199 | 333225 | 249 |

FIG. 16A

JA2012

| Table I : The t-sequence table. Cluster6 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
| 333236 | 250 | 344246 | 300 | 355256 | 350 | 366266 | 400 | 387442 | 450 |
| 333247 | 251 | 344257 | 301 | 355267 | 351 | 366322 | 401 | 387453 | 451 |
| 333258 | 252 | 344268 | 302 | 355323 | 352 | 366333 | 402 | 388542 | 452 |
| 333269 | 253 | 344324 | 303 | 355334 | 353 | 366344 | 403 | 422227 | 453 |
| 333325 | 254 | 344335 | 304 | 355345 | 354 | 366355 | 404 | 422238 | 454 |
| 333336 | 255 | 344346 | 305 | 355356 | 355 | 366366 | 405 | 422249 | 455 |
| 333347 | 256 | 344357 | 306 | 355367 | 356 | 366433 | 406 | 422662 | 456 |
| 333358 | 257 | 344368 | 307 | 355434 | 357 | 366444 | 407 | 422673 | 457 |
| 333369 | 258 | 344435 | 308 | 355445 | 358 | 366455 | 408 | 422695 | 458 |
| 333436 | 259 | 344446 | 309 | 355456 | 359 | 366544 | 409 | 422773 | 459 |
| 333447 | 260 | 344457 | 310 | 355545 | 360 | 367322 | 410 | 422773 | 460 |
| 333458 | 261 | 344546 | 311 | 356323 | 361 | 367333 | 411 | 422784 | 461 |
| 333547 | 262 | 345324 | 312 | 356334 | 362 | 367344 | 412 | 423327 | 462 |
| 334325 | 263 | 345335 | 313 | 356345 | 363 | 367355 | 413 | 423338 | 463 |
| 334336 | 264 | 345346 | 314 | 356356 | 364 | 367422 | 414 | 423762 | 464 |
| 334347 | 265 | 345357 | 315 | 356423 | 365 | 367433 | 415 | 423773 | 465 |
| 334358 | 266 | 345424 | 316 | 356434 | 366 | 367444 | 416 | 423784 | 466 |
| 334425 | 267 | 345435 | 317 | 356445 | 367 | 367455 | 417 | 423873 | 467 |
| 334436 | 268 | 345446 | 318 | 356456 | 368 | 367533 | 418 | 424427 | 468 |
| 334447 | 269 | 345457 | 319 | 356534 | 369 | 367544 | 419 | 424862 | 469 |
| 334458 | 270 | 345535 | 320 | 356545 | 370 | 368422 | 420 | 424873 | 470 |
| 334536 | 271 | 345546 | 321 | 357423 | 371 | 368433 | 421 | 425962 | 471 |
| 334547 | 272 | 346624 | 322 | 357434 | 372 | 368444 | 422 | 432226 | 472 |
| 335425 | 273 | 346435 | 323 | 357445 | 373 | 368522 | 423 | 432237 | 473 |
| 335436 | 274 | 346446 | 324 | 357523 | 374 | 368533 | 424 | 432248 | 474 |
| 335447 | 275 | 346524 | 325 | 357534 | 375 | 368544 | 425 | 432259 | 475 |
| 335525 | 276 | 346535 | 326 | 357545 | 376 | 368633 | 426 | 432337 | 476 |
| 335536 | 277 | 346546 | 327 | 357634 | 377 | 369522 | 427 | 432348 | 477 |
| 335547 | 278 | 346635 | 328 | 358523 | 378 | 369533 | 428 | 432772 | 478 |
| 335636 | 279 | 347524 | 329 | 358534 | 379 | 369622 | 429 | 432783 | 479 |
| 336525 | 280 | 347535 | 330 | 358623 | 380 | 369633 | 430 | 432794 | 480 |
| 336536 | 281 | 347624 | 331 | 358634 | 381 | 376332 | 431 | 433226 | 481 |
| 336625 | 282 | 347635 | 332 | 359623 | 382 | 376343 | 432 | 433237 | 482 |
| 336636 | 283 | 348624 | 333 | 359723 | 383 | 376354 | 433 | 433248 | 483 |
| 337625 | 284 | 348724 | 334 | 365222 | 384 | 376365 | 434 | 433326 | 484 |
| 337725 | 285 | 354223 | 335 | 365233 | 385 | 376443 | 435 | 433337 | 485 |
| 343224 | 286 | 354234 | 336 | 365244 | 386 | 376454 | 436 | 433348 | 486 |
| 343235 | 287 | 354245 | 337 | 365255 | 387 | 377332 | 437 | 433437 | 487 |
| 343246 | 288 | 354256 | 338 | 365266 | 388 | 377343 | 438 | 433772 | 488 |
| 343257 | 289 | 354267 | 339 | 365277 | 389 | 377354 | 439 | 433783 | 489 |
| 343268 | 290 | 354278 | 340 | 365333 | 390 | 377432 | 440 | 433872 | 490 |
| 343279 | 291 | 354334 | 341 | 365344 | 391 | 377443 | 441 | 433883 | 491 |
| 343335 | 292 | 354345 | 342 | 365355 | 392 | 377454 | 442 | 434326 | 492 |
| 343346 | 293 | 354356 | 343 | 365366 | 393 | 377543 | 443 | 434337 | 493 |
| 343357 | 294 | 354367 | 344 | 365444 | 394 | 378432 | 444 | 434426 | 494 |
| 343368 | 295 | 354445 | 345 | 365455 | 395 | 378443 | 445 | 434437 | 495 |
| 343446 | 296 | 354456 | 346 | 366222 | 396 | 378532 | 446 | 434872 | 496 |
| 343457 | 297 | 355223 | 347 | 366233 | 397 | 378543 | 447 | 434972 | 497 |
| 344224 | 298 | 355234 | 348 | 366244 | 398 | 379532 | 448 | 435426 | 498 |
| 344235 | 299 | 355245 | 349 | 366255 | 399 | 379632 | 449 | 435526 | 499 |

FIG. 16B

JA2013

Table I : The t-sequence table. Cluster6

| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
|---|---|---|---|---|---|---|---|---|---|
| 442225 | 500 | 454257 | 550 | 466345 | 600 | 479522 | 650 | 543772 | 700 |
| 442236 | 501 | 454324 | 551 | 466423 | 601 | 479622 | 651 | 543872 | 701 |
| 442247 | 502 | 454335 | 552 | 466434 | 602 | 486332 | 652 | 544226 | 702 |
| 442268 | 503 | 454346 | 553 | 466445 | 603 | 486343 | 653 | 544326 | 703 |
| 442269 | 504 | 454357 | 554 | 466534 | 604 | 486354 | 654 | 544426 | 704 |
| 442336 | 505 | 454435 | 555 | 467323 | 605 | 486443 | 655 | 552225 | 705 |
| 442347 | 506 | 454446 | 556 | 467334 | 606 | 487332 | 656 | 552236 | 706 |
| 442358 | 507 | 455224 | 557 | 467423 | 607 | 487343 | 657 | 552247 | 707 |
| 442447 | 508 | 455235 | 558 | 467434 | 608 | 487432 | 658 | 552258 | 708 |
| 443225 | 509 | 455246 | 559 | 467523 | 609 | 487443 | 659 | 552336 | 709 |
| 443236 | 510 | 455324 | 560 | 467534 | 610 | 488432 | 660 | 552347 | 710 |
| 443247 | 511 | 455335 | 561 | 468423 | 611 | 488532 | 661 | 553225 | 711 |
| 443258 | 512 | 455346 | 562 | 468523 | 612 | 497442 | 662 | 553236 | 712 |
| 443325 | 513 | 455424 | 563 | 468623 | 613 | 522552 | 663 | 553247 | 713 |
| 443336 | 514 | 455435 | 564 | 475222 | 614 | 522563 | 664 | 553325 | 714 |
| 443347 | 515 | 455446 | 565 | 475233 | 615 | 522574 | 665 | 553336 | 715 |
| 443358 | 516 | 455535 | 566 | 475244 | 616 | 522585 | 666 | 553347 | 716 |
| 443436 | 517 | 456324 | 567 | 475255 | 617 | 522663 | 667 | 553436 | 717 |
| 443447 | 518 | 456335 | 568 | 475266 | 618 | 522674 | 668 | 554225 | 718 |
| 444225 | 519 | 456424 | 569 | 475333 | 619 | 523652 | 669 | 554236 | 719 |
| 444236 | 520 | 456435 | 570 | 475344 | 620 | 523663 | 670 | 554325 | 720 |
| 444247 | 521 | 456524 | 571 | 475355 | 621 | 523674 | 671 | 554336 | 721 |
| 444325 | 522 | 456535 | 572 | 475444 | 622 | 523763 | 672 | 554425 | 722 |
| 444336 | 523 | 457424 | 573 | 476222 | 623 | 524752 | 673 | 554436 | 723 |
| 444347 | 524 | 457524 | 574 | 476233 | 624 | 524763 | 674 | 555225 | 724 |
| 444425 | 525 | 457624 | 575 | 476244 | 625 | 525852 | 675 | 555325 | 725 |
| 444436 | 526 | 464223 | 576 | 476255 | 626 | 532227 | 676 | 555525 | 726 |
| 444447 | 527 | 464234 | 577 | 476322 | 627 | 532238 | 677 | 563224 | 727 |
| 444536 | 528 | 464245 | 578 | 476333 | 628 | 532662 | 678 | 563235 | 728 |
| 445325 | 529 | 464256 | 579 | 476344 | 629 | 532673 | 679 | 563246 | 729 |
| 445336 | 530 | 464267 | 580 | 476355 | 630 | 532684 | 680 | 563257 | 730 |
| 445425 | 531 | 464334 | 581 | 476433 | 631 | 532773 | 681 | 563335 | 731 |
| 445436 | 532 | 464345 | 582 | 476444 | 632 | 533227 | 682 | 563346 | 732 |
| 445525 | 533 | 464356 | 583 | 477222 | 633 | 533327 | 683 | 564224 | 733 |
| 445536 | 534 | 464445 | 584 | 477233 | 634 | 533662 | 684 | 564235 | 734 |
| 446525 | 535 | 465223 | 585 | 477244 | 635 | 533673 | 685 | 564246 | 735 |
| 446625 | 536 | 465234 | 586 | 477322 | 636 | 533762 | 686 | 564324 | 736 |
| 446625 | 537 | 465245 | 587 | 477333 | 637 | 533773 | 687 | 564335 | 737 |
| 453224 | 538 | 465256 | 588 | 477344 | 638 | 534762 | 688 | 564435 | 738 |
| 453235 | 539 | 465323 | 589 | 477422 | 639 | 534862 | 689 | 565224 | 739 |
| 453246 | 540 | 465334 | 590 | 477433 | 640 | 542226 | 690 | 565235 | 740 |
| 453257 | 541 | 465345 | 591 | 477444 | 641 | 542237 | 691 | 565324 | 741 |
| 453268 | 542 | 465356 | 592 | 477533 | 642 | 542248 | 692 | 565424 | 742 |
| 453335 | 543 | 465434 | 593 | 478322 | 643 | 542337 | 693 | 566224 | 743 |
| 453346 | 544 | 465445 | 594 | 478333 | 644 | 542772 | 694 | 566324 | 744 |
| 453357 | 545 | 466223 | 595 | 478422 | 645 | 542783 | 695 | 566424 | 745 |
| 453446 | 546 | 466234 | 596 | 478433 | 646 | 543226 | 696 | 566524 | 746 |
| 454224 | 547 | 466245 | 597 | 478522 | 647 | 543237 | 697 | 566624 | 747 |
| 454235 | 548 | 466323 | 598 | 478533 | 648 | 543326 | 698 | 567224 | 748 |
| 454246 | 549 | 466334 | 599 | 479422 | 649 | 543337 | 699 | 567324 | 749 |

FIG. 16C

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 432 of 552

| \multicolumn{10}{c}{Table I : The t-sequence table. Cluster6} |
|---|

| t-seq | val | t-seq | val | t-seq | val | t-seq | val | t-seq | val |
|---|---|---|---|---|---|---|---|---|---|
| 566524 | 750 | 622442 | 800 | 674324 | 850 | 742552 | 900 | | |
| 574223 | 751 | 622453 | 801 | 674335 | 851 | 742563 | 901 | | |
| 574234 | 752 | 622464 | 802 | 675224 | 852 | 743552 | 902 | | |
| 574245 | 753 | 622475 | 803 | 675324 | 853 | 743652 | 903 | | |
| 574256 | 754 | 622553 | 804 | 675424 | 854 | 752662 | 904 | | |
| 574334 | 755 | 622564 | 805 | 684223 | 855 | 762226 | 905 | | |
| 574345 | 756 | 623542 | 806 | 684234 | 856 | 772225 | 906 | | |
| 575223 | 757 | 623553 | 807 | 684245 | 857 | 772236 | 907 | | |
| 575234 | 758 | 623564 | 808 | 684334 | 858 | 773225 | 908 | | |
| 575245 | 759 | 623653 | 809 | 685223 | 859 | 773325 | 909 | | |
| 575323 | 760 | 624642 | 810 | 685234 | 860 | 783224 | 910 | | |
| 575334 | 761 | 624653 | 811 | 685323 | 861 | 783235 | 911 | | |
| 575345 | 762 | 625742 | 812 | 685334 | 862 | 784224 | 912 | | |
| 575434 | 763 | 632552 | 813 | 686223 | 863 | 784324 | 913 | | |
| 576223 | 764 | 632563 | 814 | 686323 | 864 | 794223 | 914 | | |
| 576234 | 765 | 632574 | 815 | 686423 | 865 | 794234 | 915 | | |
| 576323 | 766 | 632663 | 816 | 695222 | 866 | 795223 | 916 | | |
| 576334 | 767 | 633552 | 817 | 695233 | 867 | 795323 | 917 | | |
| 576423 | 768 | 633563 | 818 | 695244 | 868 | 832332 | 918 | | |
| 576434 | 769 | 633652 | 819 | 695333 | 869 | 832343 | 919 | | |
| 577223 | 770 | 633663 | 820 | 696222 | 870 | 832354 | 920 | | |
| 577323 | 771 | 634652 | 821 | 696233 | 871 | 832443 | 921 | | |
| 577423 | 772 | 634752 | 822 | 696322 | 872 | 833432 | 922 | | |
| 577523 | 773 | 642227 | 823 | 696333 | 873 | 833443 | 923 | | |
| 585222 | 774 | 642662 | 824 | 697222 | 874 | 834532 | 924 | | |
| 585233 | 775 | 642673 | 825 | 697322 | 875 | 842442 | 925 | | |
| 585244 | 776 | 643662 | 826 | 697422 | 876 | 842453 | 926 | | |
| 585255 | 777 | 643762 | 827 | 722332 | 877 | 843442 | 927 | | |
| 585333 | 778 | 652226 | 828 | 722343 | 878 | 843542 | 928 | | |
| 585344 | 779 | 652237 | 829 | 722354 | 879 | | | | |
| 586222 | 780 | 652772 | 830 | 722365 | 880 | | | | |
| 586233 | 781 | 653226 | 831 | 722443 | 881 | | | | |
| 586244 | 782 | 653326 | 832 | 722454 | 882 | | | | |
| 586322 | 783 | 662225 | 833 | 723432 | 883 | | | | |
| 586333 | 784 | 662236 | 834 | 723443 | 884 | | | | |
| 586344 | 785 | 662247 | 835 | 723454 | 885 | | | | |
| 586433 | 786 | 662336 | 836 | 723543 | 886 | | | | |
| 587222 | 787 | 663225 | 837 | 724532 | 887 | | | | |
| 587233 | 788 | 663236 | 838 | 724543 | 888 | | | | |
| 587322 | 789 | 663325 | 839 | 725632 | 889 | | | | |
| 587333 | 790 | 663336 | 840 | 732442 | 890 | | | | |
| 587422 | 791 | 664225 | 841 | 732453 | 891 | | | | |
| 587433 | 792 | 664325 | 842 | 732464 | 892 | | | | |
| 588322 | 793 | 664425 | 843 | 732553 | 893 | | | | |
| 588422 | 794 | 673224 | 844 | 733442 | 894 | | | | |
| 588522 | 795 | 673235 | 845 | 733453 | 895 | | | | |
| 596332 | 796 | 673246 | 846 | 733542 | 896 | | | | |
| 596343 | 797 | 673335 | 847 | 733553 | 897 | | | | |
| 597332 | 798 | 674224 | 848 | 734542 | 898 | | | | |
| 597432 | 799 | 674235 | 849 | 734642 | 899 | | | | |

## FIG. 16D

JA2015

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 433 of 552

# FIG. 17A

../src/pdf174.c

```
#include <stdio.h>
#define MODULE 9

FILE *fopen(),*fout[9];

int t[8];
int x[8] = {0,0,0,0,0,0,0,0};
int b[13] = {0,0,0,0,0,0,0,0,0,0,0,0,0};
int m = 7;
int n = 9; /*17 - 8*/
int other = 0;
int total = 0;


int grteq(i)
int i;
{
int k,flag;

    flag=0;
    for(k=0;k<=m;k++) if(x[k] >= i) flag=1;
    return(flag);
}
```

JA2016

**U.S. Patent**   Apr. 19, 1994   Sheet 22 of 27   **5,304,786**

# FIG. 17B

```
void s(i)
int i;
{
int k,sum,j,tmp;

    sum=0;
    for(k=0;k<i;k++) sum += x[k];
    if(i == m){
      x[m] = n - sum;
      for(k=0;k<m;k++) t[k] = x[k]+x[k+1];
      tmp = x[0] - x[2] + x[4] - x[6];
      tmp = tmp%MODULE;
      if(tmp < 0) tmp += MODULE;
      total++;
      if(grteq(6)) other++;
        else{ b[tmp]++;
            for(k=0;k<m;k++)
              fprintf(fout[tmp],"%d ",t[k]+2);
            fprintf(fout[tmp],"\n");
          }
    }else{
      for(j=0;j<=(n-sum);j++){x[i]=j; s(i+1);}
    }
  }
```

# FIG. 17C

```
main()
{
int k;

    fout[0]=fopen("out0","w");
    fout[1]=fopen("out1","w");
    fout[2]=fopen("out2","w");
    fout[3]=fopen("out3","w");
    fout[4]=fopen("out4","w");
    fout[5]=fopen("out5","w");
    fout[6]=fopen("out6","w");
    fout[7]=fopen("out7","w");
    fout[8]=fopen("out8","w");
    s(0);
    for(k=0;k<MODULE;k++)  fclose(fout[k]);
}
```

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 436 of 552

PX-17



FIG. 18

JA2019

USCA4 Appeal: 23-1850    Doc: 45-4    Filed: 04/01/2024    Pg: 437 of 552

PX-17



FIG. 19a

FIG. 19b

FIG. 19c

FIG. 19d

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 438 of 552



# FIG. 20

JA2021

USCA4 Appeal: 23-1850     Doc: 45-4     Filed: 04/01/2024     Pg: 439 of 552

PX-17



FIG. 21

PX-17

5,304,786

| 1 | 2 |

# HIGH DENSITY TWO-DIMENSIONAL BAR CODE SYMBOL

## BACKGROUND OF THE INVENTION

The present invention relates to a high density, two-dimensional bar code symbol, comprising a substrate on which is printed (or otherwise inscribed) a complex symbol or "label" with a high density two-dimensional symbology, a variable number of component symbols or "codewords" per line, and a variable number of lines.

### Bar Code Symbology

A bar code is typically a linear array of elements that are either printed directly on an object or on labels that are affixed to the object. As shown in FIGS. 1 and 2, bar code elements typically comprise bars and spaces, with bars of varying widths representing strings of binary ones and spaces of varying widths representing strings of binary zeros. Many bar codes are optically detectable and are read by devices such as scanning laser beams or handheld wands. Other bar codes are implemented in magnetic media. The readers and scanning systems electro-optically decode the symbol to multiple alpha-numerical characters that are intended to be descriptive of the article or some characteristic thereof. Such characters are typically represented in digital form as an input to a data processing system for applications in point-of-sale processing, inventory control, and the like. Scanning systems of this general type have been disclosed, for example, in U.S. Pat. Nos. 4,251,798; 4,360,798; 4,369,361; 4,387,297; 4,409,470 and 4,460,120, all of which have been assigned to the same assignee as the instant application.

Most bar codes presently used contain only five or six letters or digits, no more than a typical vehicle license plate. In view of the relatively small amount of data contained in a typical linear bar code, the most typical applications of a bar code are to use the encoded data merely as an index to a file or data base associated with the computer system where comprehensive information is available.

As noted above, the contrasting parallel bars and spaces (referred to herein as "marks") of typical optically-detectable bar codes have varying widths. Generally, the bars and spaces can be no smaller than a specified minimum width, termed the code's "unit" (or "x dimension" or "module"). While the theoretical minimum unit size is the wavelength of the light being used to read the bar code, other practical limitations exist. Among these limitations are the desired depth of field of the reading equipment, the limitations of a given printing process, and the robustness of the printed image to be correctly read despite dust, dirt, and minor physical damage.

The bar code symbols are formed from bars or elements typically rectangular in shape with a variety of possible widths. The specific arrangement of elements defines the character represented according to a set of rules and definitions specified by the code or "symbology" used. The relative size of the bars and spaces is determined by the type of coding used, as is the actual size of the bars and spaces. The number of characters per inch represented by the bar symbol is referred to as the density of the symbol. To encode a desired sequence of characters, a collection of element arrangements are concatenated together to form the complete bar code symbol, with each character of the message being represented by its own corresponding group of elements. In some symbologies a unique "start" and "stop" character is used to indicate where the bar code begins and ends. A number of different bar code symbologies exist. These symbologies include UPS/EAN, Code 39, Code 93, Code 128, Codabar, and Interleaved 2 of 5.

### Symbologies of (n,k) Type

Some bar codes are referred to as belonging to the (n,k) family defined by Savir and Laurer in "The Characteristics and Decodeability of the Universal Product Code," IBM Systems Journal, Vol. 14, No. 1, 1975. A code of the (n,k) type represents characters uniquely by a string of n bits each containing k runs of one bit (i.e., k bars) and k runs of zero bits (i.e., k spaces). An (n,k) code is decodable in both directions, i.e., by scanning it either forwards or backwards. Such bar codes are often referred to by the numbers n and k; for example, the well-known Code 93 derives its name from this (n,k) notation, i.e., n=9 and k=3. The UPC code is an example of a (7,2) code, i.e., n=7 and k=2, to Allais.

### Prior Two-Dimensional Bar Codes

Known two-dimensional bar codes exist that are extensions of one-dimensional bar codes, in that one-dimensional bar codes are stacked with horizontal guard bars between them to increase the density. An example of such bar codes is seen in U.S. Pat. No. 4,794,239, to Allais.

An obstacle to increasing the density of two-dimensional bar codes is the need for a certain minimum height in the vertical direction. A minimum height is needed to ensure that a human operator can keep a "scan line" (i.e., the path of a given scanning motion, such as that achieved by passing a hand-held wand across a bar code) within the area of a single bar-code row. FIG. 1 illustrates this difficulty: scan lines 10, 11, and 12 represent identical exemplar paths of, e.g., handheld wands over the bar codes 15, 16, and 17. It will be seen that with a tall bar code 15, the scan lines 10 all stay within the confines of one bar code row, whereas with shorter bar codes 16 or 17, the scan lines 11 and 12 cross from one row to another.

Another limitation seen in some known two-dimensional bar codes is the use of fixed maps to translate from codewords to characters. The fixed maps restrict the flexibility of applications. For example, the well-known Code 49 has fixed maps (i.e., six modes) to translate a codeword numerically or alphanumerically.

Although such two-dimensional bar codes provide some increase in the storage capacity, such codes are still used as indices for file look-up, rather than as a complete data file in itself.

Still another drawback of some known two-dimensional codes is the need for a fixed number of codewords per line (referred to here as a "row") and the limitation of a maximum number of rows. For instance, Code 49 (a bar code generally in accordance with the aforementioned Allais '239 patent) has 4 codewords per row and 8 rows maximum.

Yet another problem is the lack of flexibility in choosing a suitable security system. (The term "security" is commonly used to refer to confidence in accuracy or correctness; it is usually specified by a misdecode rate, e.g., in errors per million). Code 49, for example, provides a very high level of security while sacrificing about 30% of its codewords on average for checking errors. In some applications, however, a lesser degree of

JA2023

5,304,786

3

security may be an acceptable trade-off in return for a greater codeword density; the ability to vary the security would be advantageous.

## SUMMARY OF THE INVENTION

The present invention provides an improved high-density two-dimensional symbology, as well as a flexible method for using the symbology to encode and decode data. The symbology may be used to create a high density, two-dimensional bar code symbol, which in turn may be used in a computer system.

Prior codes have been restricted in terms of information capacity or density. The present invention achieves storage capacity of up to 1 kilobytes of memory within an area of one to four square inches. The significance of such a memory should not be underestimated—it represents about 250 English words, about the size of a page or screen display. As an information unit, such unit is most suitable for many applications.

### Summary of Label Row-Wise Organization

A two-dimensional label in accordance with the invention comprises multiple rows of codewords; that is, the term "label" is used here to mean a complex marking of specified dimensions that includes a number of codewords organized in rows. Each codeword is a mark pattern comprising a plurality of elements or marks; the marks can be of various heights, as in a bar code, or can be of a relatively small height to form a "dot code." Not just any mark pattern can constitute a codeword, however; each codeword belongs to a specific family or "set" of mark patterns that conforms to a particular descriptive rule about some characteristic of each mark pattern, e.g., a rule about the width of each mark and the total width of each mark pattern.

The codewords in any two adjacent rows are written in mutually exclusive subsets of the mark-pattern set (although in some embodiments the union of the subsets is not exhaustive of the set itself). In particular, each subset of the mark-pattern set is defined so that it includes, as valid codewords for that subset, only those mark patterns that satisfy certain discriminator-function criteria.

Such rowwise usage of alternating subsets of codewords, grouped according to discriminator-function criteria, permits quick determination whether a row has been crossed, without the need for a horizontal guard bar. That is, for a given scanned codeword in a label, determination of the discriminator function indicates whether the codeword comes from the same row as the previously-scanned codeword or from a different row (that is, whether the scan line has crossed between rows as illustrated in FIG. 1).

Detection of line-crossing permits "stitching" of partial scans of particular rows into a map (e.g., in memory) of the label. The stitching process is roughly analogous to stitching a number of pieces of colored fabric into a pre-designed quilt that displays, e.g., a picture: as each "piece" is acquired by the scanning process, it is incorporated piecewise into the appropriate point in the label.

For example, suppose that computation of the appropriate discriminator functions reveals that a scanning pass has scanned the first half of row 1 and the second half of row 2 of a label such as is shown in FIG. 3. Assume that the respective longitudes of the scanned data with respect to the ends of the label are known, e.g., through detection of start- and/or stop-codes. The

4

knowledge that a row boundary has been crossed permits all the scanned data from the scanning pass to be incorporated into the respective proper rows of the label map at the respective proper longitudes (assuming no scanning or decoding errors); the data from the scanning pass need not be discarded merely because the data did not all come from a single desired row.

As another (greatly simplified) hypothetical example, assume that a part of one row has been scanned and that the data "123456789" are incorporated into the label map as a result. Further assume that a second scanning pass of that row is made, and that the data "6789ABCD" are decoded as a result. If the overlapping portion if any between the two scanned data "pieces"—in this case, the "6789" portion—can be determined (e.g., with string-matching techniques such as described below), then the remainder of the later-scanned data can be appropriately incorporated into the label map (in this case, the "ABCD" portion).

Consequently, the operator need not be scrupulously careful to sweep the wand over the label one row at a time; virtually any scanning pass that includes either a row's start code or a stop code, or that can somehow be determined to overlap with data already incorporated in the label map, will yield useable data (assuming no coding or decoding errors). A label in accordance with the invention thus advantageously increases the density of information by permitting height reductions in the codewords.

### Summary of Organization of Codeword Subsets

As noted above, a key feature of the invention is the use of different codeword subsets in different rows, each subset satisfying certain discriminator-function criteria. In one embodiment described here for illustrative purposes, a (17,4) symbology is used. A discriminator function is used to divide the 11,400 available mark patterns in that symbology into three mark-pattern subsets of 929 codewords each.

The discriminator function may take as its inputs the various widths of the on- and off-marks of a mark pattern (e.g., optically detectable bars and spaces) and may provide as an output a number from 0 to 8. Three subsets may then be selected whose discriminator function values are 0, 3, and 6, respectively, and whose mark widths meet certain other criteria. Each subset thus comprises a collection of codewords, all of whose discriminator functions are both equal to each other and readily distinguishable from those of the codewords in the other two subsets.

The availability of 929 codewords in each subset, each with a unique discriminatory-function number, permits each codeword to be used to represent a two-digit number in base 30. This capability leads to several advantages.

As shown in FIG. 5, each digit of the two-digit base-30 number can be used in an "alpha mode" or in a "mixed mode"; that is, each digit can be mapped into a 30-place alphabetic translation table or into a 30-place mixed alphanumeric translation table. In each of these 30-place tables, one or more digits are reserved for use as signals to change translation tables.

Alternatively, each two-digit number can be used in a "numeric mode" or in a "user mode"; that is, each number can be mapped into a 929-place numeric translation table or into any of up to twenty-seven 929-place user-defined translation tables. In each of these tables as well,

5,304,786

5

one or more digits are reserved for use as signals to begin using a different translation table.

### Summary of Two-Step Decoding Method

The decoding method of the invention advantageously makes use of the symbology organization of the invention. In the first step, when a codeword is scanned, the discriminator function of the scanned codeword is computed to determine the codeword subset of which the scanned codeword is a member. A t-sequence number based on the width of the marks comprising the codeword is also computed; that number is used as an entry point into a lookup table for the codeword subset in question. The lookup table yields a number from 0 to 928, which is parsed into a two-digit number in base 30.

In the second step, the high- and low-order digits of the base-30 number are used to determine the symbolic meaning assigned to the codeword (which may include an instruction to change translation tables).

The method of the invention thus advantageously permits the user to define multiple translation tables. In addition, the invention is not constrained by logical limits on the number of codewords per row nor on the number of rows. This gives the user freedom to lay out the symbology in areas of varying shapes.

### Summary of Error Detection and Correction

A row-oriented incremental error detection capability is provided through the use of a checksum codeword for each row. After completion of low-level decoding but before performance of high-level decoding, various checksum computations are performed to test the accuracy of the scan.

In addition, a "final" checksum codeword for the label as a whole is used for additional security. The use of these checksums permits a limited degree of error recovery, since the check-sums reflect the information contents of each of the codewords in the label. That is, errors in decoding particular codewords can be corrected in some circumstances by "subtracting" the known correct codewords from the checksum, so to speak, thereby yielding the correct value for the erroneously decoded codeword.

If the test results are satisfactory, the high-level decoding step is performed.

### Summary of System Implementation

Another feature of the present invention is to provide a system for reading bar code symbols or the like, including a hand-held scanning unit in a lightweight, portable housing including a symbol-detection device for generating a laser beam directed toward a symbol to be read, and for receiving reflected light from such symbol to produce electrical signals corresponding to data represented by the symbol; a data processing device for processing the data represented by the symbol having a state according to at least first and second different coding procedures; and a read-control device to actuate the symbol-detection device to initiate reading of a symbol; wherein the symbol includes at least two groups of codewords; each codeword representing at least one information-bearing character and being selected from among a set of valid mark patterns. Each mark pattern comprises a pattern of marks, each mark pattern being representative of encoded data according to one of a plurality of different coding procedures; the codewords in each group being selected from a subset for said group being defined by a specified rule for that

6

group that differs from the rule specified for said different group; each coding procedure being a function of the state of the data processing device.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A–1B are illustrations of prior-art bar code symbology.

FIG. 1C is an illustration of a label in accordance with the present invention.

FIG. 2 is an illustration of the relationship between an x-sequence and a t-sequence in a codeword comprising part of a label embodying the present invention.

FIG. 3 is an exemplar layout of an illustrative high density two-dimensional symbology design in accordance with the invention.

FIG. 4 is a block-diagram illustration of the use of alternate sub-symbologies in different rows of a multi-row label in accordance with the invention.

FIG. 5 is a table showing alternate translation modes for encoding or decoding codewords.

FIG. 6 is a state-machine diagram of aspects of a method for using the table shown in FIG. 5.

FIG. 7 is a pictorial representation of a sequence of encoding a string of readable characters into scannable codewords.

FIG. 8 is a logic diagram of an illustrative circuit for computing a checksum for a row in a label embodying the invention;

FIG. 9 shows a similar circuit for computing an additional checksum for the entire label.

FIG. 10 is a schematic illustration of the layout of codewords within a label.

FIGS. 11 through 13 are logic diagrams of illustrative circuits for performing error recovery in accordance with the invention.

FIGS. 14A through 14D, FIGS. 15A through 15D, and FIGS. 16A through 16D depict tables used for decoding codewords in three different sub-symbologies. FIGS. 17A–C show a C-language program that may be used to generate these tables.

FIG. 18 is a block diagram of a computer system using a high density, two-dimensional bar code symbol in accordance with the invention.

FIGS. 19a, 19b, 19c, and 19d depict alternative type of laser scanning pattern that may be used in connection with the present invention;

FIG. 20 shows an alternative arrangement of a bar code symbol;

FIG. 21 shows a cross-sectional view of an implementation of a hand-held laser scanner which may be used to implement the present invention.

### DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

#### Stitching of Partial Scans

The label of the invention proves especially useful for stitching together of partial scans. As noted above (and referring to FIG. 1), when scan lines 12 cross codeword rows in a label 17, the partial scans must be "stitched" or pieced together. Consider a retail store checkout counter where a sales clerk manually passes a hand-held wand over a multirow label. If the wand's travel does not run substantially parallel to the label, the scan line may pass from one row to another; parts of different rows are thus scanned, but neither row is scanned completely.

5,304,786

**7**

Stitching entails building a map of each row of the label (e.g. in memory); successive passes of the wand result in a greater degree of filling in the map. It can be accomplished by using known string matching algorithms, such as disclosed in D. Sankoff and J. B. Kruskal, editors, Time Warps, String Edits, and Macromolecules: The Theory and Practice of Sequence Comparison, Addison-Wesley, Reading, Mass., 1983. One such algorithm is described below.

### Partitioned Symbology

Stitching is facilitated by using different sub-symbologies in alternate rows, selected so that the scanner can make a local decision on whether a row has been crossed. Using different sub-symbologies in alternate rows allows the elimination of horizontal guard bars seen in prior-art code symbologies, thus permitting higher density of information.

The illustrative embodiment of the present invention utilizes an advantageous scheme for organizing codewords into readily distinguishable groups. The scheme makes use of the principle of coding theorem to pick only a fraction of available mark patterns as legal code words to increase decoding reliability; it can be applied to any of a number of labels.

One such label, referred to here as a "PDF417" label (for "Portable Data File 417"), is described as an illustration of this invention. PDF417 is a (17,4) label of the (n,k) type described above. Each codeword has 4 bars and 4 spaces with a total width of 17 modules.

It can be shown that this code yields a set of 11,440 different combinations of mark patterns. To increase decoding reliability, only a fraction of these available mark patterns are used as valid codewords.

### Discriminator Function for Defining Subset Partition

As a first step in selecting a group of mark patterns for such use for this particular code, the 11,440 mark patterns are partitioned into nine subsets or "clusters," by calculating a discriminator function f(X) for each mark pattern X:

$$f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$$

where $x_1$, $x_3$, $x_5$ and $x_7$ stand for the bars' widths, and $x_2$, $x_4$, $x_6$ and $x_8$ stand for the spaces' widths. The discriminator function f(X) above is one of possible alternative equations used to subdivide the different possible combinations into nine different subsets.

Further narrowing is performed on three of the nine subsets of mark patterns, namely the subsets in which f(X)=0, f(X)=3, and f(X)=6 (sometimes called cluster(0) cluster (3) and cluster(6), respectively). The narrowing is performed in part by defining a "t-sequence" for each mark pattern. Each element $t_k$ of the t-sequence is computed according to the formula:

$$t_k = x_k + x_{k+1}, \text{ where } k = 1, \ldots, 7$$

The three subsets cluster(i) (where i=0, 3, 6) are narrowed by selecting mark patterns where no mark width $x_j$ is more than six (where j=1, ..., 7), and where no $t_k$ is more than nine (where k=1, ..., 8).

Thus, the three final subsets cluster(i) of the mark patterns X that are selected for use as code words can be summarized as follows:

$$\text{cluster}(i) = \{X : f(X) = i, \ x_j \leq 6, \ t_k \leq 9\}$$

**8**

where i=0, 3, 6, j=1, ..., 8, and k=1, ..., 7. After sorting each cluster by the t-sequence while suppressing duplicate entries, it can be shown that each cluster(i) includes at least 934 mark patterns. The closest prime number to 934 is 929; accordingly, 929 mark patterns are selected from each cluster(i) for use as codewords. (For convenience, the term "x-sequence," with respect to any given mark pattern, is defined as the number having as its digits $x_1 x_2 \ldots x_8$.)

The t-sequence of each codeword can be used to identify that codeword, since it can be shown that each such t-sequence is unique within the three subsets cluster(i). It will be apparent that only the first six digits of the seven-digit t-sequence need be used to uniquely specify a codeword of the (17, 4) type, since as illustrated in FIG. 2, the value of the final t-sequence element $t_7$ is completely determined by the first six elements $t_i$ and the fixed total width $\Sigma x_j$ of the mark pattern. As an example, suppose that $t_1=2$, $t_2=4$, $t_3=6$, $t_4=7$, $t_5=6$, and $t_6=4$; the t-sequence for that codeword would be 246764.

The partition just described has the advantage that, by computing f(X) for any scanned mark pattern, the mark pattern's membership (or nonmembership) in a codeword subset can quickly be ascertained. Furthermore, since the t-sequence for each codeword is unique, computation of the t-sequence permits that value to be used in a lookup table to determine the symbolic meaning assigned to a scanned mark pattern that belongs to a codeword subset.

Other equivalent discriminator functions f(X) may be constructed and used. Preferably, such a discriminator function should partition the available mark patterns into clusters (not necessarily nine clusters) approximately uniform in size. In addition, the clusters selected for use as codewords preferably are equidistant in "error distance"; that is, the probability that a codeword from any of selected clusters A, B, C, etc., will be mistaken for a codeword from another one of those clusters should be of the same order of magnitude regardless of which of the other clusters is considered.

### Generating Subsets of Codewords

An example of a computer program for generating lists of codewords for the various clusters(i) is set forth in FIG. 17. The example program is written for convenience in the well-known C programming language, although any suitable language may be used; the example program is used generally as follows:

1. The program of FIG. 17 is used to generate 9 output files, referred to here as out(i), where i=0, ..., 8. Only the output files out(0), out(3), and out(6) are used; they may be renamed as "cluster" files cluster(0), cluster(3), and cluster(6), respectively.

2. All three cluster files are conventionally sorted to remove ambiguous entries, i.e., to eliminate any mark pattern whose t-sequence is identical to the t-sequence of any other mark pattern.

3. The cluster files cluster(3) and cluster(6) are conventionally filtered to remove those entries in which any $t_k$ is wider than 9.

4. In the cluster file cluster(0), those odd entries (i.e., the first entry, third entry, etc.) in which any $t_k$ is wider than 6 are filtered out, as are those even entries in which any $t_k$ is wider than 7. This is an arbitrary restriction designed to help make cluster(0) approximately the same size as cluster(3) and cluster(6), inasmuch as with-

5,304,786

**9**

out such a restriction cluster(0) would be larger than the other two.

5. The first 929 t-sequences of each of the filtered cluster files are selected as the desired entries for the respective lookup tables.

Multirow Label Using Alternating Codeword Subsets

In the multirow label of the invention, each row uses codewords from a different subset than the rows immediately adjacent to it. This enables the scanner to recognize with a high degree of precision whether a scan line has crossed a row in the middle of a codeword, because if a row has been crossed, the codewords scanned will not yield the same f(X) as the previous row.

A row of codewords in accordance with the invention may conveniently contain unique start and stop codes in the conventional manner whose x-sequences are, e.g., 81111113 and 71121113 respectively. These start and stop codes are unique in that no other codeword in any cluster has the same t-sequence as either of them; furthermore, they are members of none of the final subsets of codewords because the required condition $x_j \leqq 6$ for all $j = 1, \ldots, 8$ is not true for those codes. The start code may be selected to have its widest bar away from the ensuing data codewords to reduce the possibility of intercodeword interference, as is the above start code; if desired, the stop code may be so selected as well.

The height to unit module ratio H (the ratio of the height of a codeword (or a row) to one module width) may be changed from label to label or even from row to row depending on the printing/scanner (system or channel) resolution, R, or on the need of various applications. FIG. 3 shows the first and the last rows having H approximately equal to 10, the rows in between having H approximately equal to 3, and the resolution R being approximately equal to 10 mil.

The first row of the multirow label uses cluster(0) codes, the second row cluster(3) codes, the third cluster(6) codes, the fourth cluster(0) codes, the fifth cluster(3) codes, and so on. There is no logical limit on the number of codewords per row or the total number of rows.

In the embodiment illustrated here, the first codeword in each row is dedicated for use as a row identifier and the last codeword in each row is a checksum. (The maximum number of rows is thus 929, i.e., the number of codewords in the dedicated cluster). It is of course possible to distinguish between forward scanning and backward scanning of the row by matching the start/-stop codeword forwardly or backwardly.

Other Row-Wise Partitioning of Codewords

It will be apparent to those of ordinary skill having the benefit of this disclosure that the invention is not limited to the specific mark patterns, discriminator function f(X), and t-sequence described above. The foregoing method of deriving a symbology can be applied in a substantially similar manner to yield equivalent symbologies having other kinds of mark patterns.

For example, labels can be constructed from bars of varying shades of gray or even from bars of a wide range of colors, instead of from black and white marks only. In such a label, a discriminator function for dividing all possible mark patterns into mutually exclusive codeword subsets, and a t-sequence function for uniquely identifying each codeword within a subset, may be based on a readily detectable attribute of a mark

**10**

such as its hue or its gray scale value as well as on the width of each mark (or in lieu of the width, or in combination with the width).

It will likewise be apparent that, broadly construed, the same principle encompasses the equivalent use of codewords of different colors (or shades of gray) in alternate rows. That is, all rows of a multi-row label could use the same subset of mark patterns as codewords, but in different colors or shades or orientations; the determination whether a row has been crossed would be made based on whether a color or shade or orientation change had occurred.

Subset Organization for Two-Step Decoding

In the illustrative, width-based embodiment described above, since each cluster(i) includes 929 codewords, each t-sequence in a cluster thus will correspond to a number from 0 to 928. The codewords in each subset can be organized according to a base 30 system in which one codeword, representing a number in base 30, is used to signify two alphanumeric characters.

Codewords can be scanned and decoded as follows. When a codeword is scanned, its t-sequence is noted. The t-sequence is then used as input to an initial, low-level decoding step; the output from the low-level decoding step is a number from 0 to 928 which in turn is used as an input to a high-level decoding step.

Initial Low-Level Decoding Step

The low-level decoding step entails looking up the t-sequence in a table for the appropriate cluster to find a corresponding value. The table may be created as described above. Referring to FIG. 14A (a lookup table for cluster(0)), for example, the t-sequence 246764 corresponds to the value 111.

The actual circuitry for the lookup tables may be conventional; it will be appreciated by those of ordinary skill that the use of a prime number of codewords in a subset, e.g., 929, advantageously facilitates the design of the circuitry.

Mode-Dependent High-Level Decoding Step

The look-up value 111 from the foregoing example can be broken down into a two-number sequence in base 30, each number being in the range 0–29 and having a high-level value $V_H$ and a low-level value $V_L$. The base-30 sequence is computed as follows:

$$V_H = x \text{ div } 30;$$

and

$$V_L = x \text{ mod } 30.$$

For the t-sequence used above, 246764, yielding a look-up value of 111, the high level value is 3, and the low level value is 21, since $111 = 3 \times 30 + 21$. Each of the high and low values (i.e., 3 and 21) is then evaluated by looking it up in a suitable (arbitrary) table, such as shown in FIG. 5.

The exemplar table in FIG. 5 shows 30 decoding modes, including Alpha, Numeric, Mixed, and User modes. The various User modes are designated as the modes in FIG. 5 corresponding to columns 3 through 29 (with column 0 being Alpha mode).

In the illustrative embodiment, the Alpha mode is the default mode; therefore, the sample t-sequence 246764

JA2027

5,304,786

11

ultimately translates into the two-letter sequence DV, via the lookup value 111 and the base-30 sequence 3, 21.

It will be seen that the coding arrangement depicted in FIG. 5 provides for mode switching that can be advantageously effected either within a single codeword or within a string of codewords. The technique for invoking mode switching varies depending on the current decoder mode.

### Examples of High-Level Decoding

The state machine diagram in FIG. 6 illustrates a high-level decoding process in accordance with the invention for the exemplar embodiment. For convenience, a two-number sequence in base 30 is represented as "xxH xxL" or "(xxH, xxL)," where "xx" represents an arbitrary one-or two-digit number. For example, a high-level value of 18 and a low-level value of 10 is depicted herein as 18H, 10L or as (18H, 10L).

As an example, assume the decoder is currently in Alpha mode. As shown in FIG. 5, changing from Alpha mode to Mixed mode requires that either the high value or the low value of the two-digit base-30 sequence be equal to 28. If the high value is 28, then the low value is unimportant for mode switching purposes; likewise, if the low value is 28, then the high value is unimportant for mode switching purposes.

For Alpha mode, a high value of 28 signals to the decoder that a mode switch to Mixed mode (depicted in FIG. 5 as "ms" or Mixed-mode switch) must be effected; therefore, the low value of the high value/low value pair will be interpreted in the Mixed mode. A low value of 28 allows the decoder to interpret the high value of the high value/low value pair in the current mode, namely Alpha mode, and then to switch into Mixed mode. This mode switching technique allows a final value to be decoded in the current mode before switching to the next mode, therefore eliminating waste resulting from using an extra high value/low value pair to insure that a final high value is interpreted in the current mode.

With decoding being done in Alpha mode, a hypothetical value of 856 yields 28H 16L, i.e., a high value of 28 and a low value of 16 (since $856=28\times30+16$). The high value of 28 toggles the decoder into Mixed mode, and the low value 16, when translated according to FIG. 5's Mixed mode protocol, yields "!" (an exclamation point).

To change from Alpha mode to User mode, a high value of 29 (depicted as "us" or User-mode switch) and any low value n within the range of 3 to 29 is required. Low values of 0, 1, or 2 result in no mode switch, a switch to Mixed mode, or a switch to Numeric mode, respectively. In contrast to switching from Alpha to Numeric or Mixed modes, a switch to a User mode cannot be done by a low value of 29; any such values are ignored.

Switching between other modes is done in a generally similar manner, as shown in FIGS. 5 and 6. Referring to those Figures, a decoder in Numeric mode can only directly switch to Alpha mode or Mixed mode. To toggle from Numeric mode to Alpha mode a non-position dependent value of 927 is required, i.e., either a high-level value or a low-level value equal to 927 will effect the mode switch. Likewise, to toggle from Numeric mode to Mixed mode a non-position dependent value of 928 is required. It will be apparent that the numbers 927 and 928 are the last two positions in the Numeric mode, and are reserved for mode-switching characters for convenience.

12

To change from User mode to one of the predefined modes (Alpha, Numeric or Mixed) a high value of 29 and a low value within the range 0 to 2 are required. The low value in this combination corresponds to the predefined mode into which the decoder is switching (i.e. a low value of 0 corresponds to Alpha mode, a low value of 1 corresponds to Mixed mode and a low value of 2 corresponds to Numeric mode.

For example, assume that the current mode is Alpha and that three consecutive codewords are to be decoded: 872, 345 and 99. Translating into base 30, 872 yields a high level value of 29 and a low level value of 2 ($872=29\times30+2$). The first codeword 872 thus defines a User mode into which the decoder is switching. Referring to FIG. 5, if the decoder is in Alpha mode and a high level value of 29 and a low level value of 2 are encountered (as in the example above), the decoder changes to Numeric mode.

As another example, assume that the decoder is in Alpha mode and that the scanned codeword's lookup value is 723. In this case $V_H=723$ div $30=24$, and $V_L=723$ mod $30=3$. Therefore, the decoded codeword is (24H, 3L). Since the current mode is Alpha, FIG. 5 yields (Y,D) as the respective values for the decoded codeword (24H, 3L).

Decoding of values in the Numeric mode differs from decoding of values in Alpha mode and Mixed mode. Decoding in Numeric mode treats a two-number sequences as a number in base 926. For example, suppose that the current mode is Alpha and that the following three codewords are encountered 872, 345 and 99. A base 30 conversion of the first codeword 872 yields H=29 and L=2. This sequence signals the decoder to switch from Alpha mode to Numeric mode. Switching to the radix-926 decoding system, the second and third codewords are decoded as $(345\times926)+99=319569$.

The User modes may be used with considerable flexibility. All or part of one or more modes may be used to represent a special user-defined code; for example, frequently-occurring words, phrases, sentences, paragraphs, etc. can be assigned to respective positions within a User mode. A given phrase, etc., can then be represented in the label as a single codeword (combined with a "us" mode-switch command if necessary). It will be apparent that a great many different words, phrases, etc., can be represented, e.g., in the coding scheme depicted in FIG. 5 as an illustration.

### Encoding Method

An encoding procedure is the reverse process of the decoding procedure. For example, referring to FIG. 6, a license plate number "HUD-329" when encoded yields the following string of codewords: 230, 926, 843, 69. Each element of the original string "HUD-329" is located in FIG. 5 and translated according to proper mode protocol. The first four elements of the string are translated using Alpha mode. This results in H=7, U=20, D=3, and -(hyphen)=26.

The last three elements may be translated using Mixed mode. To switch to Mixed mode from Alpha mode a Mixed Shift (28) character is needed. The Mixed-mode translation then results in 3=3, 2=2 and 9=9. The complete string is thus 7 20 3 26 28 3 2 9.

This string is partitioned into high value/low value pairs, with resulting pairs (7,20) (3,26) (28,3) and (2,9). Each of these pairs is encoded as a codeword. To encode a high value/low value pair, the high value is

5,304,786

**13**

multiplied by 30, and the low value is added to the result of this multiplication.

For example, the pair (7,20) is encoded by multiplying 7 times 30 and adding 20, yielding a result of 230. All four pairs are encoded in this manner; the resulting string is 230 116 843 69. The string is translated into codewords in accordance with the appropriate lookup table for the codeword subset in use. Assuming hypothetically that cluster(0) is in use, the string is expressed using the codewords corresponding respectively to t-sequences 335633 (for 230), 255663 (for 116), etc.

### Checksum Computation

A checksum and error recovery scheme provides a row-oriented incremental error detection capability and high primitive decoding reliability. Within each row, a long polynomial division checksum scheme is used.

For convenience, each i-th codeword may be referred to by a corresponding index number $a_i$, i.e., by the result of the low-level decoding step discussed above for that codeword. Each codeword's index number $a_i$ will thus have a value from 0 to 928; each codeword is referred to sometimes for convenience by its index number.

Each row with codewords $a_{n-1}, a_{n-2}, \ldots, a_0$ can be represented as a polynomial:

$$a(x) = a_0 + a_1x + a_2x^2 \ldots + a_{n-1}x^{n-1}$$

This polynomial is referred to herein as the message polynomial, as discussed in, e.g., Shu Lin and D. J. Costello, Jr., Error Control Coding, 1983.

A row checksum $b_{r0}$ is defined as the remainder resulting from dividing the message polynomial a(x) by a generator polynomial (see ibid.):

$$g_r(x) = x + 926$$

Those of ordinary skill will recognize that 926 is the complement of 3 in a Galois Field based on 929, or GF(929).

The checksum of each row can conveniently be computed using the checksum encoding circuit shown in FIG. 8. In FIGS. 8 through 13, the circle-plus (modulo addition), circle-X (modulo multiplication), and circle-C (modulo complementation) symbols are defined over GF(929) as:

$$x(\text{circle-plus})y = (x+y)\bmod 929$$

$$x(\text{circle-X})y = (x*y)\bmod 929$$

$$(\text{circle-C})x = 929 - x$$

where x and y are any numbers from 0 to 928. It will of course be recognized that the design and construction of actual circuitry is a matter of routine implementation by those of ordinary skill. Such circuitry consequently is not further discussed here.

To perform the checksum computation, the register $b_{r0}$ is initialized to 0. The input is a sequence of the codewords' index numbers $a_i$ in a row, fed one number at a time into the input. The input fans into the output line (e.g., to a label printer) and the checksum encoding circuit simultaneously.

As the first codeword is input, the circle-plus computation is performed with the codeword's number $a_i$ sequence and $b_{r0}$ (i.e., 0) as operands. The output of that computation and the number 926 is fed to the circle-X computation; the output of that computation is comple-

**14**

mented and stored in the $b_{r0}$ register. After all of the codewords in a row have been processed through the checksum encoding circuit, the complement of the final value of $b_{r0}$ is the checksum and is appended at the end of the row. The sequence of codewords for the row (e.g., as printed) is now $a_{n-1}, a_{n-2}, \ldots, a_0, 929 - b_{r0}$.

A similar scheme is used to compute a structure checksum, one representing the entire label. For this second type of checksum, all codewords in the label as printed (including the codewords representing the checksums for each row except the last row) form the message polynomial, which may be expressed as:

$$a(x) = a_{m,2} + a_{m,3}x + \ldots \\ + a_{m,n-1}x^{n-2} + b_{m-1,1}x^{n-2} + \ldots \\ + a_{1,n-1}x^{nm-3}$$

where the coefficients are defined as in FIG. 10, tracing backwardly from right to left and bottom to top. A different generator polynomial is used to calculate a remainder in a similar fashion as before, namely:

$$g_s(x) = (x+926)(x+920)$$

Dividing the new message polynomial by this new generator polynomial results in a remainder $b(x) = b_{s0} + b_{s1}x$. Complementing the coefficients of this remainder yields two parity-check codewords, which serve as a structure checksum as discussed below.

In implementation, this division is accomplished by using a division circuit such as shown in FIG. 9. The registers $b_{s0}$ and $b_{s1}$ are initialized as zeros. As soon as the message polynomial has entered the output and the circuit, the complements of the parity-check codewords are in the registers and are appended in the order $b_{s1}, b_{s0}$ just before the checksum of the last row. Then the checksum $b_{r0}$ of the last row is computed and appended to the end of the last row, as shown in FIG. 10.

It will be noted that there are no user-definable codewords corresponding to the positions $a_{m,1}$ and $a_{m,0}$. These positions are reserved for the codewords $b_{s,1}$ and $b_{s,0}$ as shown in FIG. 10. Thus, in a label with m rows and n codewords per row, the total number of user definable codewords is nm-4m-2, i.e., the number of codewords per row times the number of rows, minus four codewords for each row (a start code, a stop code, a row number, and a row checksum), and also minus the two parity-check codewords (i.e., the structure checksum).

### Gross Error Detection

Gross error detection may be accomplished as follows. At the beginning of the scanning process, all entries (e.g., "slots" or "grid locations") of the map of the label are initialized to indicate unknown characters.

The low-level decoding step, as applied to a signal generated by any given scanning pass, will generate a sequence of one or more index numbers, one for each codewords that was scanned. Each index number may be any number from 0 to 928, depending on the t-sequence of the corresponding scanned codeword.

For each scanning pass, three arrays DA, CA, and FA are constructed (e.g., in memory in accordance with conventional techniques) to represent the codewords scanned in that pass:

A "decoding array" DA represents the index numbers that are obtained from the tables in FIGS. **14A**

5,304,786

**15**

through 16D and that correspond to the scanned codewords.

A "cluster array" CA represents the clusters or subsets to which the respective scanned codewords belong.

A "confidence array" FA represents the confidence existing in the accuracy of the decoding of the respective scanned codewords.

For example, a scanning pass and low-level decoding step may generate a decoding array DA comprising a sequence of index numbers such as (293, 321, 209, 99, 679). The corresponding sequence of clusters might be (3, 3, 0, 0, 0) indicating that the first two codewords were members of cluster(3) and the final three were members of cluster(0). This implies that the subsequence comprising the second and third codewords (represented by 321 and 209 in the array DA) bracket the point at which a row was crossed, i.e., that the two codewords are in two adjacent rows. Because such row-crossing subsequences frequently have higher error probability, they are assigned a relatively low weight in a confidence array FA. In the example above, the confidence array FA for the scanned codewords might be (3, 1, 1, 3, 3).

Now suppose that a previous scanning pass had resulted in a decoding array DA of (293, 329, 222, 999, 999) for the same sequence of codewords, where 999 represents an unknown codeword whose confidence level is zero. Further assume that the confidence array FA for that previous scanning pass is (3, 3, 1, 0, 0), because the row was crossed between the third and fourth characters on that pass instead of between the second and third characters as hypothesized in the previous paragraph.

A "voting" process may be used to compare the confidence arrays for the two scanning passes to determine which results are more likely to be correct. For example, the voting rules may be as follows:

1. If two successive scans of a given codeword result in the same index number after low-level decoding, then the corresponding confidence figures in the two confidence arrays FA are added;

2. In contrast, if two successive scans result in different numbers for the same codeword, then (a) if one of the two index numbers has a higher confidence level than the other, the higher-confidence index number "survives" and is filled into the decoding array DA, but the confidence level for the corresponding position in the confidence array FA is reduced by the confidence level for the nonsurviving index number, (b) if both index numbers have equal confidence levels, then neither index number survives; instead the unknown-codeword index number 999 is used as the "surviving" index number and the confidence is reset to zero; and

3. If the index number $a_i$ for one scan of a given codeword is 999 (representing an unknown codeword) and an acceptable index number for the other scan (i.e., an index number from 0 to 928), then the acceptable index number is kept, and the confidence level of that index number remains the same.

It will of course be appreciated by those of ordinary skill that a wide variety of conventional array- and memory-management techniques may be used for creating and manipulating the arrays DA, CA, and FA. For example, the decoding array DA might be the label map itself, with a temporary array being used to hold the index numbers $a_i$ for a new scan and with surviving index numbers from that scan being written into the

**16**

appropriate position in the array DA (or perhaps not written if the same index number is already represented at that position). In such an example, the cluster array CA and the confidence array FA might each be "shadows" of the decoding array DA, with as many positions in each as there are in the decoding array DA.

When the decoding array DA has been filled with an acceptable index number $a_i$ for all codeword positions corresponding to a particular row in the label, the representation of that row in the decoding array DA is set aside. That is, regardless of the confidence that exists about the accuracy of the contents of the decoding array DA, once the row has been decoded to indicate acceptable index numbers for each codeword, no further decoding is done for codewords in that row; additional error detection proceeds as described below.

*Further Error Detection and Recovery by Checksumming*

Errors may still exist in the decoding array DA for a particular row even after that row is set aside. Before performing high-level decoding, the redundant information stored in the row checksums and the label checksum can advantageously be used to detect and/or recover from errors in scanning any particular codeword by a process of elimination.

Generally speaking, if all but one or two of the codewords in the entire label are known to be correct, the correct values of the unknown codewords can be computed by "subtracting" (so to speak) the values of the known codewords from the values of the checksums, which of course reflect the values of all codewords, known and unknown.

Errors in any particular row may be detected by using a syndrome divider such as shown in FIG. 11. The register $d_{r0}$ is initialized to zero. After the index numbers $a_i$ of the scanned row are fed to the syndrome divider, the register $d_{r0}$ indicates the detection result. If $d_{r0}$ is equal to zero, the corresponding row was correctly scanned and its image or map in memory can be locked; otherwise, an error occurred in the scanning and decoding of the row, and the row must be re-scanned. If all codewords in the label are decoded and check summed without error, then the following error recovery step can be skipped.

When the total number of still-unknown codewords is less or equal to two, an error recovery scheme as follows can be invoked. The unknown codewords first are replaced in the label map with zeros. A syndrome $S_i$ is then computed for each $i = 1, 2$. Since by hypothesis the position $p_v$ of the unknown (i.e., erroneous) codewords is known, where $v = 1, 2$, only the values of those unknown codewords need be computed. As a first step, an error value $e_{pv}$ is computed for each error position $p_v$ by solving the following system of matrix equations:

$$\begin{bmatrix} S_1 \\ S_2 \end{bmatrix} = \begin{bmatrix} 3^{p1} & 3^{p2} \\ 3^{2(p1)} & 3^{2(p2)} \end{bmatrix} \begin{bmatrix} e_{p1} \\ e_{p2} \end{bmatrix}$$

If only one error exists, the system becomes overdetermined, that is, more information is present than is needed to solve the above matrix, which reduces to:

PX-17

5,304,786

17

$$\begin{bmatrix} S_1 \\ S_2 \end{bmatrix} = \begin{bmatrix} 3^{\rho 1} \\ 3^{2(\rho 1)} \end{bmatrix} e_{\rho 1}$$

For an assumed one-error case, if the above matrix equation system is consistent (that is, if the foregoing two matrix equations yield the same solutions), then one error does indeed exist and the solution of $3^{\rho 1}$ is the error value, i.e., the correct value of the unknown code-word. Otherwise, an undiscovered second error exists in the label, and the decoding result is rejected.

After successfully solving for the error values, the complement of error values are filled into the corresponding unknown codewords' locations. Then the error detection computation is performed again for those rows containing unknown codewords. If no errors are detected, the decoding result then is taken as correct; otherwise, the decoding result is likewise rejected.

### Nonvolatile Memory and Computer System

Referring to FIG. 18, a high density, two-dimensional bar code symbol 100 may be created by marking a suitable substrate (e.g., paper) with one or more labels in accordance with the foregoing description. The memory 100 may be combined with a fixed or a movable scanner 110 for use as a storage device for a suitably programmed computer such as a processor 120.

For example, a robot might have an on-board computer programmed to control the robot to perform simple tasks, such as selectively moving an object 130 by means of a manipulator 140. An on-board scanner 110 might operate as the robot's "eyes" for reading labels of the kind described above. In similar fashion, a conveyor system might include a fixed scanner 130 and a moving belt that served as the manipulator 140. The label preferably contains a list of instructions for operating the robot, with the computer on-board. The robot responding to data and instructions contained on the label.

### Additional Illustrative Embodiments

It will of course be recognized by those of ordinary skill (having the benefit of this disclosure) that the invention is capable of being adapted to other uses and in other embodiments than the illustrative ones disclosed above. Furthermore, the invention may be implemented in numerous specific architectures. A few examples are briefly mentioned below for illustrative purposes:

The decoder of a conventional one-dimensional scanner could be reprogrammed to perform one or more of the functions described above, e.g., by replacing a read-only memory (ROM) chip containing the programming if the scanner is so constructed;

A scanning system could be built using a suitably programmed microprocessor or other computational unit to perform one or more of the above functions. The programming could be loaded into dynamic read-write memory (RAM), or could be "burned" into read-only memory (ROM) either onboard or outboard of the microprocessor;

A scanning system could be built using a computation unit specially designed to perform the functions described above;

18

Parallel processing technology could be used to partition the work of decoding the various parts of a label;

and so forth. The actual design and construction of any particular implementation is a matter of routine for those of ordinary skill having the benefit of this disclosure, the details of which are not further discussed here.

Referring to FIG. 18, a computer system including a high density, two-dimensional bar code symbol 100 of the type described could be used in a number of applications. As an illustration, an overnight package delivery service (e.g., Federal Express, UPS, Purolator, and the like) might have certain of its package-sorting functions automated through the use of memories 100 in the form of printed labels in accordance with the foregoing, applied to packages such as the object 130 shown in the figure. In one such possibility, package shippers would fill out a waybill 100 by responding to queries posed by a suitable computer program. The program's printed output (e.g., on a laser printer or dot matrix printer) might include both a human-readable destination address and a label 100 as described above in which that information was encoded in scannable form. The shipper would affix the printed waybill 100 to the object 130 being shipped. (Other information such as the shipper's telephone number and the like could likewise be so encoded.) One of the key advantages of the high data capacity memory 100 of the present invention is that it may be created at the warehouse or loading dock by an inexpensive printer so that updated or corrected information may be applied at the point of shipment. The fact that the memory is merely a paper label means that it is inexpensive and disposable. Thus, the present invention may be implemented in conjunction with a portable terminal and thermal printer to create and print a label, even in a remote location. Such a portable terminal, connected to scanner, allows the user to scan, print, and apply the label to the article quickly and inexpensively. At various points during shipment, suitable robots could read the label 100 and, using manipulators 140, direct the object 130 appropriately; e.g., a scanner 110 could read the memory 100 to generate a signal; based on the content of that signal, a manipulator 140 controlled by a processor 120 could move the object 140 as appropriate.

A similar arrangement could be used in a warehouse inventory control system. A label of the type described could be printed or otherwise applied to or inscribed on one or more sides of a shipping carton or directly to merchandise. The label might have encoded therein as much information as desired about the specific item, e.g., its type, color, dimensions, weight, point of manufacture, lot number, and so forth. A suitable robot could be used as an order-filling machine by moving within the warehouse and, using its scanner, searching for merchandise whose label indicates that it matches a specified order. (Searching could of course be in accordance with techniques now known or hereafter developed.) It will be apparent that this arrangement would permit information about specific merchandise items to be stored locally at the merchandise itself.

Such local storage could advantageously take the place of a separate file of information about the item, e.g., stored in a computer data base and keyed to a bar-code serial number on the item. Local storage would reduce the problem of dealing with "orphan" merchandise whose serial numbers were not known to the computer data base. In addition, it would permit rapid in-processing of newly-received merchandise

5,304,786

**19**

shipments, in that complete information about the new merchandise could be scanned into the warehouse's information system, obviating the need for the shipper to generate and transmit a separate information file (e.g., on a computer tape or by hard copy) about the specific items being shipped. This would similarly be advantageous in, e.g., libraries or other organizations that regularly received shipments of books or similar objects that required cataloging.

Another feature of the present invention is to utilize the bar code according to the present invention so that it may be affixed to an article as a means of identifying that article and associating information with the article much like a "read-only memory" or identification tag implemented in so called RF ID systems. One such implementation is to print a variety of different bar code symbols which are available in easily disposable and affixable format so that information may be easily and quickly affixed to the article. One example of an application is in connection with the repair and service of equipment. The use of a service record is useful for quality control and documentation purposes, but it is often impractical to store detailed written records with the equipment. The use of a high density, encoded services report affixed to the equipment in the form of a two-dimensional bar code is especially advantageous. The service technician may select the appropriate PDF label from a set of labels corresponding to repairs performed, and attach the label to the repaired equipment. If the equipment is returned for subsequent repairs, the service technician has the complete service history attached to the equipment in only a few square inches.

As another example, a high density, two demensional bar code symbol and scanner system could be used for enhanced searching of microfilm rolls or microfiche sheets. Assume that a large body of text and/or graphical information is stored photographically on a roll of microfilm. An example of such information might be the thousands of documents—printed, typed, handwritten, drawn, or a combination thereof—that can be involved in a large litigation. Known computerized litigation support systems permit paralegals to summarize each document page in a data base; for each document page, selected information from the data base could be inscribed as a label in accordance with the foregoing on the corresponding frame of microfilm, in a corner or other appropriate location.

A microfilm reader could be equipped with (a) input means such as a keyboard by which a user could specify search criteria (e.g., in Boolean logic); (b) a fixed scanner to read microfilm labels as the microfilm was scrolled; and (c) control means to determine whether a given microfilm frame satisfied the specified search criteria. The user would then be able to view documents conveniently. In the case of multiple-reel document collections, a master index or indexes could be encoded on a separate reel; output means such as a CRT or an LCD or LED display could be used to instruct the user as to which reel to mount to locate the specific document desired.

For example, a microfilm reader with a scanner might be designed to be coupled to and controlled by a conventional desktop, laptop, or notebook computer in a conventional manner as a peripheral device (or the essentials of such a computer could be built into the reader). The computer would not need to have the entire document-summary data base available on disk storage, since the microfilm itself would contain the

**20**

necessary information; it would suffice if the computer was programmed (e.g., in ROM) to perform the desired search functions using the label-encoded data from the microfilm.

Still another feature of the present invention is to provide a method for processing information by optically scanning indicia on the surface of a substrate, the indicia including a plurality of codewords scanned sequentially and organized into at least two independent scanning paths, each codeword being either an information codeword or a control codeword, and each information codeword corresponding to at least one information-containing character. A plurality of different mapping functions are provided each associating the code word with one character out of a set of different characters, with only one mapping function being active at any given time. Each codeword in any one scanning path is distinct from any codeword in an adjacent scanning path. Using such a codeword data structure, the method includes the steps of: determining whether a scanned codeword is an information codeword or a control codeword; decoding the codeword according to the mapping function if said codeword is an information codeword; and processing the codeword if the codeword is a control codeword. If the codeword is a control codeword, it identifies a new mapping function, and processing of subsequently scanned codewords take place using the new mapping function.

As an example of the different scanning paths that may be used, and a different organization of the codewords, reference is made to FIGS. 19 and 20.

FIG. 19a, 19b, 19c, and 19d is an alternative type of laser scanning pattern that may be used in connection with the present invention.

The present invention may be implemented in a handheld, laser-scanning, bar code reader until such as illustrated in FIG. 21. This hand-held device of FIG. 21 is generally of the style disclosed in U.S. Pat. No. 4,760,248, issued to Swartz et al., assigned to Symbol Technologies, Inc., and also similar to the configuration of a bar code reader commercially available as part number LS 8100II from Symbol Technolgies, Inc. Alternatively, or in addition, features of U.S. Pat. No. 4,387,297 issued to Swartz et al., or U.S. Pat. No. 4,409,470 issued to Shepard et al., both such patents assigned to Symbol Technologies, Inc., may be employed in constructing the bar code reader unit of FIG. 21. These U.S. Pat. Nos. 4,760,248, 4,387,297 and 4,409,470 are incorporated herein by reference. An outgoing light beam 151 is generated in the reader 100, usually by a laser diode or the like, and directed to impinge upon a bar code symbol a few inches from the front of the reader unit. The outgoing beam 151 is scanned in a fixed linear pattern, or more complex pattern such as shown in FIG. 19 may be employed and the user positions the hand-held unit so this scan pattern traverses the symbol to be read. The use of a central dark portion, such as in FIG. 19d, may be used for aiming, or other visual techniques associated with alignment. Reflected light 152 from the symbol is detected by a light-responsive device 146 in the reader unit, producing serial electrical signals to be processed for identifying the bar code. The reader unit 100 is a gun shaped device, having a piston-grip type of handle 153 and movable trigger 154 is employed to allow the user to activate the light beam 151 and detector circuitry when pointed at the symbol to be read, thereby saving battery life if the unit is self-powered. A light-weight plastic

5,304,786

21

housing **155** contains the laser light source, the detector **146**, the optics and signal processing circuitry, and the CPU **140** as well as a battery **162**. A light-transmissive window **156** in the front end of the housing **155** allows the outgoing light beam **151** to exit and the incoming reflected light **152** to enter. The reader **100** is designed to be aimed at a bar code symbol by the user from a position where the reader **100** is spaced from the symbol, i.e., not touching the symbol or moving cross the symbol. Typically, this type of hand-held bar code reader is specified to operate in the range of perhaps several inches.

As seen in FIG. 21, a suitable lens **157** (or multiple lens system) is used to collimate and focus the scanned beam into the bar code symbol at an appropriate reference plane, and this same lens **157** may be used to focus the reflected light **152**. A light source **158** such as a semiconductor laser diode is positioned to introduce a light beam into the axis of the lens **157** by a partially-silvered mirror and other lenses or beam-shaping structure as needed, along with an oscillating mirror **159** which is attached to a scanning motor **160** activated when the trigger **154** is pulled. If the light produced by the source **158** is not visible, an aiming light may be included in the optical system, again employing a partially-silvered mirror to introduce the beam into the light path coaxially with the lens **157**. The aiming light, if needed, produces a visible-light spot which is scanned just like the laser beam; the user employs this visible light to aim the reader unit at the symbol before pulling the trigger **154**.

In real applications, either the length of bar code should be fixed, or an additional character should be placed in the bar code to indicate its length. If not, misdecodings may occur.

If the length of the bar code is fixed, the performance of decoding using stitching might be better than that of decoding using a complete scan, because the reject rate and the misdecode rate is less in most good quality bar codes (in cases where the quality of the bar code is very poor, the misdecode rate may be greater, but never greater than 2K times, where K is the number of the scans used for stitching).

Although the present invention has been described with respect to multiple line bar codes, it is not limited to such embodiments. It is conceivable that the method of the present invention may also find application for use with various machine vision or optical character recognition applications in which information is derived from other types of indicia such as characters or from the surface characteristics of the article being scanned.

In all of the various embodiments, the elements of the scanner may be assembled into a very compact package that allows the scanner to be fabricated as a single printed circuit board or integral module. Such a module can interchangeably be used as the laser scanning element for a variety of different types of data acquisition systems. For example, the module may be alternately used in a hand-held scanner, a table top scanner attached to a flexible arm or mounting extending over the surface of the table or attached to the underside of the table top, or mounted as a subcomponent or subassembly of a more sophisticated data acquisition system.

The module would advantageously comprise a laser-/optics subassembly mounted on a support, a scanning element such as a rotating or reciprocating mirror, and a photodetector component. Control or data lines associated with such components may be connected to an

22

electrical connector mounted on the edge or external surface of the module to enable the module to be electrically connected to a mating connector associated with other elements of the data acquisition system.

An individual module may have specific scanning or decoding characteristics associated with it, e.g. operability at a certain working distance, or operability with a specific symbology or printing density. The characteristics may also be defined through the manual setting of control switches associated with the module. The user may also adapt the data acquisition system to scan different types of articles or the system may be adapted for different applications by interchanging modules on the data acquisition system through the use of the simple electrical connector.

The following claims are intended to encompass all such uses, implementations, and embodiments.

What is claimed is:

1. A method of generating a signal representative of information encoded in a machine-readable label,

(A) said machine-readable label including at least two rows of codewords, one row adjacent to and beneath another

(B) each said codeword representing at least one information-bearing character and being selected from among a set of detectable mark/space patterns,

(C) each said mark/space pattern having a determinable discriminator function value and comprising a pattern of marks and spaces, each said mark and space being representative of one of a plurality of different states,

(D) each said row having codewords selected from one of a plurality of subsets of said mark/space patterns, each said subset comprising mark/space patterns having discriminator function values that are mutually exclusive of discriminator values corresponding to the mark/space patterns comprising any other subset, said method including the steps of:

(a) scanning the codewords;

(b) computing the discriminator function value for each of the scanned codewords;

(c) determining, from the value of the computed discriminator function, the row containing each of the scanned codewords;

(d) decoding each of the scanned codewords to obtain a plurality of corresponding symbolic values; and

(e) generating a signal representative of the presence of each of said corresponding symbolic values in the determined row.

2. A method of generating a signal representative of information encoded in a machine-readable label,

(A) said machine-readable label including first, second, and third rows of codewords and at least one control word, each said codeword representing at least one information-bearing character and being selected from among first, second, and third subsets of detectable mark/space patterns,

(B) each said mark/space pattern comprising a fixed width pattern of at least eight marks and spaces of varying widths representing on states and off states,

(C) each said mark and space having a width $x_i$ of an integral multiple of a basic width unit,

(D) each of said first, second, and third subsets including only codewords X matching all of the

PX-17

5,304,786

**23**

following criteria: (i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7)$ mod 9 of each codeword X in the respective first, second, and third subsets is equal to 0, 3, or 6, respectively, (ii) all t-sequences $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and (iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units, said method including the steps of:

(a) scanning said mark/space patterns within said machine-readable label and generating an electronic image of each of said scanned mark/space patterns;

(b) determining whether each of said scanned mark/space patterns is a codeword;

(c) if any of said scanned mark/space patterns is a codeword, then classifying each of the codewords as a member of one of the first, second, or third subsets;

(d) decoding each of the codewords in the corresponding classified subset; and

(e) generating a signal uniquely representing the codewords.

3. The method as set forth in claim 2 in which said step of determining whether each of said scanned mark/space patterns is a codeword includes the steps of:

(a) computing for each of the scanned mark/space patterns a t-sequence of N−1 digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in a scanned mark/space pattern;

(b) computing the discriminator function of each of the scanned mark/space patterns; and

(c) if the computed t-sequence and the computed discriminator function for any of said scanned mark/space patterns fail to satisfy the criteria for said first, second, and third subsets, then indicating that each said failed mark/space pattern is not a codeword.

4. A method of generating a signal representative of information encoded in a machine-readable label,

(A) said machine-readable label including first, second, and third rows of codewords and at least one control word, each said codeword representing at least one information-bearing character and being selected from among first, second, and third subsets of detectable mark/space patterns,

(B) each said mark/space pattern comprising a fixed width pattern of at least eight marks and spaces of varying widths representing on states and off states,

(C) each said mark and space having a width $x_i$ of an integral multiple of a basic width unit,

(D) each of said first, second, and third subsets including only codewords X matching all of the following criteria: (i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7)$ mod 9 of each codeword X in the respective first, second, and third subsets is equal to 0, 3, or 6, respectively, (ii) all t-sequences $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and (iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units, said method including the steps of:

(a) scanning said mark/space patterns within said machine-readable label and generating an electronic image of each of said scanned mark/space patterns;

**24**

(b) computing for each of the scanned mark/space patterns a t-sequence of N−1 digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in a scanned mark/space pattern;

(c) computing the discriminator functions of each of the scanned mark/space patterns;

(d) if the computed t-sequence and the computed discriminator function for any of the scanned mark/space patterns fail to satisfy the criteria for said first, second, and third subsets, then indicating that each said failed mark/space pattern is not a codeword;

(e) if any of said scanned mark/space patterns is a codeword, then classifying each of the codewords as a member of one of the first, second, or third subsets;

(f) according to the classified subset, performing a first level of decoding each of the codewords including obtaining from one of three lookup tables in a first memory, the three tables respectively representing the first, second, and third subsets, a plurality of index numbers uniquely corresponding to the computed t-sequences;

(g) performing a second level of decoding the codewords including:

(1) converting each said index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value;

(2) for each of the high values and the low values in succession, (i) determining, from the state of a decoding-mode variable stored in a second memory, which of a plurality of decoding modes is a currently active decoding mode, (ii) determining a symbol character associated with the high value or low value from a lookup table in said second memory associated with the active mode, and (iii) if the symbol character is a shift character, changing to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode; and

(h) generating a signal uniquely representing the codewords.

5. A method of generating a signal representative of information encoded in a machine-readable label,

(A) said machine-readable label including first, second, and third rows each comprising a plurality of codewords and at least one control word,

(B) each said codeword representing at least one information-bearing character and being selected from among first, second, and third subsets of detectable mark/space patterns,

(C) each said mark/space pattern comprising a fixed width pattern of at least eight marks and spaces of varying widths representing on states and off states,

(D) each said mark and space having a width $x_i$ of an integral multiple of a basic width unit,

(E) each of said first, second, and third subsets including only codewords X matching all of the following criteria: (i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7)$ mod 9 of each codeword X in the respective first, second, and third subsets is equal to 0, 3, or 6, respectively, (ii) all t-sequences $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and (iii) each codeword X

5,304,786

**25**

includes only marks and spaces whose widths are not greater than 6 basic width units,

(F) each said row including a checksum codeword representing a checksum function of the other codewords in the row, the checksum function being a function of each unique respective values of each codeword in the row, said method including the steps of:

(a) scanning said mark/space patterns within a row and generating an electronic image of each of said scanned mark/space patterns;

(b) computing for each of the scanned mark/space patterns a t-sequence of N−1 digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in a scanned mark/space pattern;

(c) computing the discriminator function of each of the scanned mark/space patterns;

(d) if the computed t-sequence and the computed discriminator function for any of the scanned mark/space patterns fail to satisfy the criteria for said first, second, and third subsets, then indicating that each said failed mark/space pattern is not a codeword;

(e) if any of the scanned mark/space patterns is a codeword, then classifying each of the codewords as a member of one of the first, second, or third subsets;

(f) according to the classified subset, performing a first level of decoding each of the codewords including obtaining from one of three lookup tables in a first memory, the three tables respectively representing the first, second, and third subsets, a plurality of initial index numbers uniquely corresponding to the computed t-sequences;

(g) storing said initial index numbers for each of the codewords in corresponding storage locations in an initial decoding array DA in a second memory;

(h) if an initial index number has been stored in the initial decoding array DA for all codewords in each of said rows, then computing checksum functions of the codewords represented in the initial decoding array DA;

(i) if any of the computed checksum functions does not match the checksum codeword for the respective row, then indicating an error;

(j) if a computed checksum function does match the checksum codeword for the row, then performing a second level of decoding the codewords including (i) converting each said initial index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value, (2) for each of the high values and the low values in succession, (i) determining, from the state of a decoding-mode variable stored in a third memory, which of a plurality of decoding modes is a currently active decoding mode, (ii) determining a symbol character associated with the high value or low value from a lookup table in said third memory associated with the active mode, and (iii) if the symbol character is a shift character, changing to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode; and

**26**

(k) generating a signal uniquely representing the codewords.

6. The method as claimed in claim 5, further including the following steps:

(l) determining a plurality of initial confidence level values corresponding to each of said initial index numbers stored in the initial decoding array (DA) and storing the determined initial confidence level values in a corresponding initial confidence array (FA) in a second memory;

(m) rescanning, redecoding, and redetermining a plurality of updated index numbers and corresponding updated confidence level values;

(n) storing in an updated decoding array in said first memory and in an updated confidence array in said second memory the respective updated index numbers and updated confidence level values;

(o) if, for each said codeword, the updated index number equals the initial index number and the updated and initial index numbers each equal one of a plurality of known codewords, then (i) adding the corresponding initial and updated confidence level values to obtain a final confidence value, (ii) storing the final confidence level value in a final confidence array, and (iii) storing the initial index number in a final decoding array;

(p) if, for each said codeword, the updated index number does not equal the initial index number and the updated and initial index numbers each equal one of said plurality of known codewords, then

(1) if the corresponding initial confidence value is greater than the updated confidence value, then storing the initial index number in a final decoding array, calculating a corresponding final confidence value by subtracting the updated confidence value from the initial confidence value, and storing the final confidence value in a final confidence array,

(2) if the corresponding updated confidence value is greater than the initial confidence value, then storing the updated index number in said final decoding array, calculating the corresponding final confidence value by subtracting the initial confidence value from the updated confidence value, and storing the final confidence value in said final confidence array, and

(3) if the corresponding initial and updated confidence values are equal, then storing a predetermined unknown index number in said final decoding array, setting the corresponding final confidence value to zero, and storing the final confidence value in said final confidence array; and

(q) if, for each said codeword, either the initial index number or the updated index number equals the predetermined unknown index number and the other index number equals one of said plurality of known index numbers, then storing the known index number and the corresponding confidence value in said final decoding array and said final confidence array, respectively.

7. A method of scanning and decoding a series of patterns representative of information encoded in a machine-readable label,

(A) said machine-readable label including first, second, and third rows each comprising a plurality of codewords and at least one control word,

5,304,786

27

(B) each said codeword representing at least one information-bearing character and being selected from among first, second, and third subsets of detectable mark/space patterns,

(C) each said mark/space pattern comprising a fixed width pattern of at least eight marks and spaces of varying widths representing on states and off states,

(D) each said mark and space having a width $x_i$ of an integral multiple of a basic width unit,

(E) each of said first, second, and third subsets including only codewords X matching all of the following criteria: (i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$ of each codeword X in the respective first, second, and third subsets is equal to 0, 3, or 6, respectively, (ii) all t-sequences $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and (iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units,

(F) each said row including a row checksum codeword representing a checksum function of the other codewords in the row, the checksum function being a function of unique respective values of each codeword in the row,

(G) the machine-readable label including a sequence of one or more codewords representing a structure checksum for the machine-readable label, said method including the steps of:

(a) scanning a mark/space pattern within a row and generating an electronic image of said scanned mark/space pattern;

(b) computing a t-sequence of $N-1$ digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in the scanned mark/space pattern;

(c) computing the discriminator function of the scanned mark/space pattern; and

(d) if the computed t-sequence and the computed discriminator function fail to satisfy the criteria for said first, second, and third subsets, then indicating that the scanned mark/space pattern is not a codeword;

(e) if the scanned mark/space pattern is a codeword, then classifying the codeword as a member of one of the first, second, or third subset;

(f) according to the classified subset, performing a first level of decoding the codeword including obtaining from one of three lookup tables in a first memory, the three tables corresponding to the first, second, and third subsets, an initial index number uniquely corresponding to the computed t-sequence;

(g) storing said initial index number for the codeword in a corresponding storage location in an initial decoding array DA in a second memory;

(h) repeatedly performing steps (a) through (g) until an initial index number has been stored in the initial decoding array DA for (i) each of the row checksum codewords for each said row and the structure checksum codeword sequence, and (ii) all but at most two of all codewords in all rows of the machine-readable label;

(i) if an initial index number has not been stored for an unknown codeword in any of said rows, then computing an initial index number for each said unknown codeword as a function of one or both of the initial index numbers corresponding to the

28

respective row checksum codeword and the structure checksum codeword sequence;

(j) if an initial index number has been stored in the initial decoding array DA for all codewords in any of said rows, then computing the respective checksum function of the codewords represented in the initial decoding array DA for each said row;

(k) if the computed checksum function does not match the row checksum codeword for any of said rows, then indicating an error for each unmatched checksum function.

8. The method as set forth in claim 7 including the additional steps, if the computed checksum does match the checksum codeword for the row, of:

(l) performing a second level of decoding the codewords including:

(1) converting each said initial index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value;

(2) for each of the high values and the low values in succession, (i) determining, from the state of a decoding-mode variable stored in a third memory, which of a plurality of decoding modes is a currently active decoding mode, (ii) determining a symbol character associated with the high value or low value from a lookup table in said third memory associated with the active mode, and (iii) if the symbol character is a shift character, changing to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode; and

(m) generating a signal uniquely representing the codewords.

9. The method as claimed in claim 7 further including the following steps:

(m) determining a plurality of initial confidence level values corresponding to each of said initial index numbers stored in the initial decoding array (DA) and storing the determined initial confidence level values in a corresponding initial confidence array (FA) in a second memory;

(n) rescanning, redecoding, and redetermining a plurality of updated index numbers and corresponding updated confidence level values;

(o) storing in an updated decoding array in said first memory and in an updated confidence array in said second memory the respective updated index numbers and updated confidence level values;

(p) if, for each said codeword, the updated index number equals the initial index number and the updated and initial index numbers each equal one of a plurality of known codewords, then (1) adding the corresponding initial and updated confidence level values to obtain a final confidence value, (2) storing the final confidence level value in a final confidence array, and (3) storing the initial index number in a final decoding array;

(q) if, for each said codeword, the updated index number does not equal the initial index number and the updated and initial index numbers each equal one of said plurality of known codewords, then (1) if the corresponding initial confidence value is greater than the updated confidence value, then storing the initial index number in a final decoding array, calculating a corresponding final con-

PX-17

5,304,786

29

fidence value by subtracting the updated confidence value from the initial confidence value, and storing the final confidence value in a final confidence array,

(2) if the corresponding updated confidence value is greater than the initial confidence value, then storing the updated index number in said final decoding array, calculating the corresponding final confidence value by subtracting the initial confidence value from the updated confidence value, and storing the final confidence value in said final confidence array, and

(3) if the corresponding initial and updated confidence values are equal, then storing a predetermined unknown index number in said final decoding array, setting the corresponding final confidence value to zero, and storing the final confidence value in said final confidence array; and

(r) if, for each said codeword, either the initial index number or the updated index number equals the predetermined unknown index number and the other index number equals one of said plurality of known index numbers, then storing the known index number and the corresponding confidence value in said final decoding array and said final confidence array, respectively.

10. The method as set forth in claim 9, including the additional steps of:

(s) performing, if the computed checksum matches the checksum codeword for the row, a second level of decoding the scanned codewords including:

(1) converting each index number stored in said final decoding array into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value;

(2) for each of the high values and the low values in succession, (i) determining, from the state of a decoding-mode variable stored in a third memory, which of a plurality of decoding modes is a currently active decoding mode, (ii) determining a symbol character associated with the high value or low value from a lookup table in said third memory associated with the active mode, and (iii) if the symbol character is a shift character, changing to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode; and

(t) generating a signal uniquely representing the scanned codewords.

11. A method for generating a signal produced by scanning a machine-readable label that includes a plurality of codewords organized into at least two adjacent rows, each said codeword representing at least one human-recognizable symbol and no codeword in any one row being identical to any codeword in an adjacent row, said method including the steps of:

(a) scanning said label to detect said codewords;

(b) determining a detectable characteristic for each said scanned codeword;

(c) computing a unique index number for each said scanned codeword as a function of said detectable characteristic; and

30

(d) processing each of the index numbers to generate a signal representative of the at least one human-recognizable symbol.

12. The method as set forth in claim 11 in which the step of determining a detectable characteristic for each said scanned codeword includes the step of computing a discriminator function, no codeword in any one row having a discriminator function identical to that of a codeword in an adjacent row.

13. The method as set forth in claim 11 in which each said codeword comprises a fixed width pattern of at least eight marks and spaces of varying widths and each said mark and space has a width $x_i$ of an integral multiple of a basic width unit;

wherein the step of determining a detectable characteristic for each said scanned codeword includes the step of computing a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$ of each codeword; and

wherein no codeword in any one row has a function $f(X)$ identical to the function $f(X)$ of any codeword in an adjacent row.

14. The method as set forth in claim 11, wherein no codeword in any one row has a function $f(X)$ identical to the function $f(X)$ of any codeword in an adjacent row, each said codeword comprising a fixed width pattern of at least eight marks and spaces of varying widths and each said mark and space has a width $x_i$ of an integral multiple of a basic width unit, the step of determining a detectable characteristic for each said scanned codeword including the steps of:

(a) computing a function $f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$ of each codeword; and

(b) computing for each codeword a function $t_k = x_k + x_{k+1}$ for $k = 1, \ldots, 7$.

15. The method as set forth in claim 11 in which the determining step represents a first decoding step and the computing step represents a second decoding step; and

in which the step of processing each of the index numbers includes the substeps of

determining whether each said codeword includes a representation of a mode-switching symbol, and

if so, switching from a first decoding mode to a second decoding mode.

16. A method for storing and retrieving information by scanning indicia on the surface of a substrate,

(A) said indicia including a plurality of codewords scanned sequentially and organized into at least two adjacent rows,

(B) each codeword being either an information codeword or a control codeword,

(C) each information codeword being a representation of at least one information-containing data structure,

(D) no codeword in any one row being identical to any codeword in an adjacent row, said method comprising the steps of:

(a) storing information including applying said indicia to said substrate; and

(b) retrieving said information, including:

(1) scanning said indicia to detect a codeword;

(2) determining whether said scanned codeword is an information codeword or a control codeword,

(3) providing a plurality of different protocols, each said protocol associating said scanned codeword with a corresponding one of said

JA2037

5,304,786

31

data structures, only one protocol being active at any given time;

(4) if said scanned codeword is an information codeword, decoding and outputting said scanned codeword according to the active protocol,

(5) if said scanned codeword is a control codeword, processing said scanned codeword to decode a symbol representative of a new protocol, and changing the active protocol to the new protocol, and

(6) repeating steps (1) through (5) until all codewords are decoded.

**17.** An apparatus for generating a signal representative of information encoded in a machine-readable label, said machine-readable label including at least two adjacent rows of codewords, each said codeword representing at least one information bearing character and being selected from a set of detectable mark/space patterns, each said mark/space pattern having a determinable discriminator function, the apparatus comprising:

scanning means for scanning said codewords within the machine-readable label;

means for computing a discriminator function value for each of the each of the scanned codewords;

means for determining, from the value of the discriminator function computed by the computing means, the row of the machine-readable label corresponding to each of the scanned codewords;

means for decoding each of the scanned codewords to obtain a plurality of corresponding symbolic values; and

means for generating a signal representing the presence of each of said plurality of corresponding symbolic values in the determined row.

**18.** An apparatus for generating a signal representative of information encoded in a machine-readable label, said machine-readable label including first, second, and third rows of codewords and at least one control word, each said codeword representing at least one information-bearing character and being selected from first, second, and third subsets of detectable mark/space patterns, each said mark/space pattern comprising a fixed width pattern of at least eight marks and spaces of varying widths representing on states and off states, each said mark and space having a width $x_i$ of an integral multiple of a basic width unit, each of said first, second, and third subsets including only codewords X matching all of the following criteria:

(i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7)$ mod 9 of each codeword in the respective first, second and third subsets is equal to 0, 3, or 6, respectively,

(ii) all t-sequences $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and

(iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units, the apparatus comprising:

(a) means for scanning said mark/space patterns within said machine-readable label and for generating an electronic image of each of said scanned mark/space patterns;

(b) means for determining whether each of said scanned mark/space patterns is a codeword;

(c) means, coupled to said determining means, for classifying each of the codewords as a member of one of the first, second, or third subsets;

32

(d) means for decoding in the classified subset each of the codewords; and

(e) means for generating a signal uniquely representing the codewords.

**19.** The apparatus as set forth in claim **18** in which said means for determining whether each of said scanned mark/space patterns is a codeword includes:

(i) first means for computing, from each of the scanned mark/space patterns, a t-sequence of $N-1$ digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in a scanned mark/space pattern;

(ii) second means for computing the discriminator function of each of the scanned mark/space patterns; and

(iii) means, coupled to the first and second computing means, for indicating that any of the scanned mark/space patterns is not a codeword, if the computed t-sequence and the computed discriminator function fail to satisfy the criteria for said first, second, and third subsets.

**20.** An apparatus for generating a signal representative of information encoded in a machine-readable label, said machine-readable label including first, second, and third rows of codewords and at least one control word, each said codeword representing at least one information-bearing character and being selected from first, second, and third subsets of detectable mark/space patterns, each said mark/space pattern comprising a fixed width pattern of at least eight marks and spaces of varying widths representing on states and off states, each said mark and space having a width $x_i$ of an integral multiple of a basic width unit, each of said first, second, and third subsets including only codewords X matching all of the following criteria:

(i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7)$ mod 9 of each codeword in the respective first, second and third subsets is equal to 0, 3, or 6, respectively,

(ii) all t-sequences $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and

(iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units, the apparatus comprising:

(a) means for scanning said mark/space patterns within said machine-readable label and for generating an electronic image of each of said scanned mark/space patterns;

(b) first means for computing, from each of the scanned mark/space patterns, a t-sequence of $N-1$ digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in each of the scanned mark/space patterns;

(c) second means for computing the discriminator function of each of the scanned mark/space patterns;

(d) means, coupled to the first and second computing means, for indicating that any of the scanned mark/space patterns is not a codeword, if the computed t-sequence and the computed discriminator function fail to satisfy the criteria for said first, second, and third subsets;

(e) means, coupled to said indicating means, for classifying each of the codewords as a member of one of the first, second, or third subsets;

(f) means, coupled to said classifying means, for performing a first level of decoding each of the codewords including obtaining from one of three lookup tables in a first memory, the three tables

JA2038

PX-17

5,304,786

**33**

corresponding to the first, second, and third subsets, a plurality of index numbers uniquely corresponding to the computed t-sequences from the first computing means;

(g) means for performing a second level of decoding the codewords including:

(1) means for converting each said index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value;

(2) for each of the high values and the low values, (i) first means for determining, from the state of a decoding-mode variable stored in a second memory, which of a plurality of decoding modes is a currently active decoding mode, (ii) second means for determining, a symbol character associated with the high value or low value from a lookup table in said second memory associated with the active mode, and (iii) means, coupled to said second determining means, for changing to a specified new current decoding mode, and for changing the state of the decoding-mode variable to correspond to the new decoding mode, if said symbol character is a shift character; and

(h) means for generating a signal uniquely representing the codewords.

21. An apparatus for generating a signal representative of information encoded in a machine-readable label, said machine-readable label including first, second, and third rows each comprising a plurality of codewords and at least one control word, each said codeword representing at least one information-bearing character and being selected from among first, second, and third subsets of detectable mark/space patterns, each said mark/space pattern comprising a fixed-width pattern of at least eight marks and spaces of varying widths representing on states and off states, each said mark and space having a width $x_i$ of an integral multiple of a basic width unit, each of said first, second, and third subsets including only codewords X matching all of the following criteria:

(i) a discriminator function $f(X)=(x_1-x_3+x_5-x_7)$ mod 9 of each codeword in the respective first, second and third subsets is equal to 0, 3, or 6, respectively,

(ii) all t-sequences $t_i=x_i+x_{i+1}$ of each codeword X are not greater than 9 basic width units, and

(iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units, each said row including a checksum codeword representing a checksum function of the other codewords in the row, the checksum function being a function of unique respective values of each codeword in the row, the apparatus comprising:

(a) means for scanning each of said mark/space patterns within said machine-readable label and for generating an electronic image of each said scanned mark/space patterns;

(b) first means for computing, for each of the scanned mark/space patterns, a t-sequence of $N-1$ digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in each of the scanned mark/space patterns;

(c) second means for computing the discriminator function of each of the scanned mark/space patterns;

**34**

(d) means, coupled to the first and second computing means, for indicating that any of the scanned mark/space patterns is not a codeword, if the computed t-sequence and the computed x-sequence fail to satisfy the criteria for said first, second, and third subsets;

(e) means, coupled to said indicating means, for classifying each of the codewords as a member of one of the first, second, or third subsets;

(f) means, coupled to said classifying means, for performing a first level of decoding the codewords including obtaining from one of three lookup tables in a first memory, the three tables corresponding to the first, second, and third subsets, a plurality of initial index numbers uniquely corresponding to the computed t-sequences from the first computing means;

(g) means for storing said initial index numbers for the codewords in a corresponding storage location in an initial decoding array DA in a second memory;

(h) third means for computing checksum functions of the codewords represented in the initial decoding array DA if an initial index number has been stored in the initial decoding array DA for all codewords in each of said rows;

(i) second means for indicating an error if any of the computed checksum functions does not match the checksum codeword for the respective row;

(j) means for performing a second level of decoding the codewords, if a computed checksum function does match the checksum codeword for the row, including:

(1) means for converting each said initial index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value,

(2) first means for determining, for each of the high values and the low values, from the state of a decoding-mode variable stored in a third memory, which of a plurality of decoding modes is a currently active decoding mode,

(3) second means for determining, for each of the high values and the low values, a symbol character associated with the high value or low value from a lookup table in said third memory associated with the active mode, and

(4) means, coupled to said second determining means, for changing, for each of the high values and low values, to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode if said symbol character is a shift character; and

(k) means for generating a signal uniquely representing the codewords.

22. The apparatus as claimed in claim 21, further comprising:

(m) means for determining a plurality of initial confidence level values corresponding to each of said initial index numbers stored in the initial decoding array (DA) and for storing the determined initial confidence level values in a corresponding initial confidence array (FA) in a second memory;

5,304,786

**35**

(n) means for rescanning, redecoding, and redetermining a plurality of updated index numbers and corresponding updated confidence level values;

(o) means for storing in an updated decoding array in said first memory and in an updated confidence array in said second memory the respective updated index numbers and updated confidence level values;

(p) means for adding, for each said codeword, the initial and updated confidence level values to obtain a final confidence level value, for storing the final confidence level value in a final confidence array, and for storing the initial index number in a final decoding array, if the updated index number equals the initial index number and the updated initial index numbers each equal one of a plurality of known codewords;

(q) means for storing the initial index number in a final decoding array, for computing a final confidence value by subtracting the updated confidence value from the initial confidence value, and for storing the final confidence value in a final confidence array, if the initial confidence value is greater than the updated confidence value, and if, for each said codeword, the updated index number does not equal the initial number value and the updated and initial index numbers each equal one of said plurality of known codewords;

(r) means for storing the updated index number in said final decoding array, for calculating the final confidence value by subtracting the initial confidence value from the updated confidence value, and for storing the final confidence value in said final confidence array, if the updated confidence value is greater than the initial confidence value, and if, for each said codeword, the updated index number does not equal the initial number value and the updated and initial index numbers each equal one of said plurality of known codewords;

(s) means for storing a predetermined unknown index number in said final decoding array, for setting the corresponding final confidence value to zero, and for storing the final confidence value in said final confidence array, if the initial and updated confidence numbers are equal, and if, for each said codeword, the updated index number does not equal the initial number value and the updated and initial index numbers each equal one of said plurality of known codewords; and

(t) means for storing, for each said codeword, the known index number and the corresponding confidence value in said final decoding array and said final confidence array, respectively, if either the initial index number or the updated index number equals the predetermined unknown index number and the other index number equals one of said plurality of known index numbers.

**23.** An apparatus for scanning and decoding a series of patterns representative of information encoded in a machine-readable label, said machine-readable label including first, second, and third rows each comprising a plurality of codewords and at least one control word, each said codeword representing at least one information-bearing character and being selected from among first, second, and third subsets of detectable mark/space patterns, each said mark/space pattern comprising a fixed-width pattern of marks and spaces of varying widths representing on states and off states, each said

**36**

mark and space having a width $x_i$ of an integral multiple of a basic width unit, each of said first, second, and third subsets including only codewords X matching all of the following criteria:

(i) a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7)$ mod 9 of each codeword in the respective first, second and third subsets is equal to 0, 3, or 6, respectively,

(ii) all t-functions $t_i = x_i + x_{i+1}$ of each codeword X are not greater than 9 basic width units, and

(iii) each codeword X includes only marks and spaces whose widths are not greater than 6 basic width units, each said row including row checksum a codeword representing a checksum function of the other codewords in the row, the checksum function being a function of unique respective values of each codeword in the row, the machine-readable label including a sequence of one or more codewords representing a structure checksum for the machine-readable label, the apparatus comprising:

(a) means for scanning each of said mark/space patterns within said machine-readable label and for generating an electronic image of each of said scanned mark/space patterns;

(b) first means for computing, for each of the scanned mark/space patterns, a t-sequence of $N-1$ digits whose $i^{th}$ digit is $t_i$, where N is the number of marks and spaces in each of the scanned mark/space patterns;

(c) second means for computing the discriminator function of each of the scanned mark/space patterns; and

(d) means, coupled to the first and second computing means, for indicating that each of the scanned mark/space patterns is not a codeword, if the computed t-sequence and the computed discriminator function fail to satisfy the criteria for said first, second, and third subsets;

(e) means, coupled to the indicating means, for classifying each of the codewords as a member of one of the first, second, or third subsets, if the scanned mark/space pattern is a codeword;

(f) means, coupled to said classifying means, for performing a first level of decoding the codewords including obtaining from one of three lookup tables in a first memory, the three tables corresponding to the first, second, and third subsets, a plurality of initial index numbers uniquely corresponding to the computed t-sequences from the first computing means;

(g) means for storing each of said initial index numbers for each of the codewords in a corresponding storage location in an initial decoding array DA in a second memory;

(h) third means for computing an initial index number for each codeword for which an initial index number has not been stored in the initial decoding array DA;

(i) fourth means for computing the checksum function of the codewords represented in the decoding array DA for any of said rows in which an initial index number has been stored in the initial decoding array DA for all codewords in a row; and

(j) second means for indicating an error for any of said rows in which the computed checksum function does not match the row checksum codeword.

5,304,786

37

24. The apparatus as set forth in claim 23 further comprising:

(k) means for performing a second level of decoding the codewords including:

(1) means for converting each said initial index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value,

(2) first means for determining, for each of the high values and the low values, from the state of a decoding-mode variable stored in a third memory, which of a plurality of decoding modes is a currently active decoding mode,

(3) second means for determining, for each of the high values and the low values, a symbol character associated with each high value and low value from a lookup table in said third memory associated with the active mode, and

(4) means, coupled to the second determining means, for changing, for each of the high values and the low values, to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode if said symbol character is a shift character; and

(1) means for generating a signal uniquely representing the codewords.

25. The apparatus as claimed in claim 23 further comprising:

(1) means for determining a plurality of initial confidence level values corresponding to each of said initial index numbers stored in the initial decoding array (DA) and for storing the determined initial confidence level values in a corresponding initial confidence array (FA) in a second memory;

(m) means for rescanning, redecoding, and redetermining a plurality of updated index numbers and corresponding updated confidence level values;

(n) means for storing in an updated decoding array in said first memory and an updated confidence array in said second memory the respective updated index numbers and updated confidence level values;

(o) means for adding, for each said codeword, the initial and updated confidence level values to obtain a final confidence level value, for storing the final confidence level value in a final confidence array, and for storing the initial index number in a final decoding array, if the updated index number equals the initial index number and the updated and initial index numbers each equal one of a plurality of known codewords;

(p) means for storing the initial index number in a final decoding array, for computing a final confidence value by subtracting the updated confidence value from the initial confidence value, and for storing the final confidence value in a final confidence array, if the initial confidence value is greater than the updated confidence value, and if, for each said codeword, the updated index number does not equal the initial number value and the updated and initial index numbers each equal one of said plurality of known codewords;

(q) means for storing the updated index number in said final decoding array, for calculating the final confidence value by subtracting the initial confidence value from the updated confidence value, and for storing the final confidence value in said

38

final confidence array, if the updated confidence value is greater than the initial confidence value, and if, for each said codeword, the updated index number does not equal the initial number value and the updated and initial index numbers each equal one of said plurality of known codewords;

(r) means for storing a predetermined unknown index number in said final decoding array, for setting the corresponding final confidence value to zero, and for storing the final confidence value in said final confidence array, if the initial and updated confidence numbers are equal, and if, for each said codeword, the updated index number does not equal the initial number value and the updated and initial index numbers each equal one of said plurality of known codewords; and

(s) means for storing, for each said codeword, the known index number and the corresponding confidence value in said final decoding array and said final confidence array, respectively, if either the initial index number or the updated index number equals the predetermined unknown index number and the other index number equals one of said plurality of known index numbers.

26. The apparatus as claimed in claim 25 further comprising:

(r) means for performing a second level of decoding the scanned codewords including

(1) means for converting each said index number into a two-digit number in base 30, the first digit of said two-digit number being a high value and the second digit being a low value,

(2) first means for determining, for each of the high values and the low values, from the state of a decoding-mode variable stored in a third memory, which of a plurality of decoding modes is a currently active decoding mode,

(3) second means for determining, for each of the high values and the low values, a symbol character associated with each high value and low value from a lookup table in said third memory associated with the active mode, and

(4) means, coupled to the second determining means, for changing, for each of the high values and the low values, to a specified new current decoding mode and changing the state of the decoding-mode variable to correspond to the new decoding mode if said symbol character is a shift character; and

(s) means for generating a signal uniquely representing the scanned codewords.

27. An apparatus for generating a signal produced by scanning a machine-readable label, said machine readable label including a plurality of codewords organized into at least two adjacent rows, each said codeword representing at least one human-recognizable symbol and no codeword in any one row being identical to any codeword in an adjacent row, the apparatus comprising:

(a) means for scanning said label to detect said codewords;

(b) first decoding means for determining a detectable characteristic for each said scanned codeword;

(c) second decoding means for computing a unique index number for each said scanned codeword as a function of said detectable characteristic; and

5,304,786

39

(d) means for processing each of the index numbers to generate a signal representative of said at least one human-recognizable symbol.

**28.** The apparatus of claim **27**, wherein the first decoding means for determining a detectable characteristic for each said scanned codeword includes:

means for computing a discriminator function, no codeword in any one row having a discriminator function identical to that of a codeword in an adjacent row.

**29.** The apparatus of claim **27**, wherein each said codeword comprises a fixed width pattern of at least eight marks and spaces of varying widths and each said mark and space has a width $x_i$ of an integral multiple of a basic width unit, the first decoding means for determining a detectable characteristic for each said codeword including:

means for computing a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$ of each codeword.

**30.** The apparatus of claim **27**, wherein each said codeword comprises a fixed width pattern of at least eight marks and spaces of varying widths and each said mark and space has a width $x_i$ of an integral multiple of a basic width unit, the first decoding means for determining a detectable characteristic for each said scanned codeword including:

(i) means for computing a discriminator function $f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$ of the codewords; and

(ii) means for computing a t-sequence $t_k = x_k + x_{k+1}$ for k having values from 1 to 7.

**31.** The apparatus of claim **27**, wherein the determining means represents a first decoding means and the computing means represents a second decoding means, and wherein the means for processing each of the index numbers includes:

second means for determining whether each said scanned codeword includes a representation of a mode-switching symbol, and

means, coupled to the second determining means, for switching from a first decoding mode to a second decoding mode, if a scanned codeword includes a representation of a mode-switching symbol.

**32.** An apparatus for storing and retrieving information by scanning indicia on the surface of a substrate, said indicia including a plurality of codewords scanned sequentially and organized into at least two adjacent rows, each codeword being either an information codeword or a control codeword, each information codeword being a representation of at least one information-containing data structure, no codeword in any one row being identical to any codeword in an adjacent row, the apparatus comprising:

(a) means for storing information including applying said indicia to said substrate; and

(b) means for retrieving said information including:
(1) means for scanning said indicia to detect said information and control codewords;

(2) means for determining whether each of said scanned codewords is an information codeword or a control codeword;

(3) means for providing a plurality of different protocols, each said protocol associating each said scanned codeword with a corresponding said data structure, only one protocol being active at any given time;

(4) means, coupled to the determining means, for decoding and outputting each of said scanned

40

information codewords according to the active protocol, and

(5) means, coupled to the determining means, for processing each of said scanned control codewords to decode a symbol representative of a new protocol, and for changing the active protocol to the new protocol.

**33.** A method of reading a machine-readable symbol, the symbol, including a plurality of individual codewords and at least one control word, each codeword and control word having a detectable mark/space pattern, the codewords, when taken in sequence, together defining an encoded version of data to be decoded, the mark/space pattern of each codeword having a detectable characteristic representative of information relating to a position of each said codeword within said sequence, the method comprising the steps, executed using a machine, of:

(a) scanning and reading the codewords;

(b) calculating, for each codeword X, a value of a discriminator function $f(X)$ dependent upon the detectable characteristic;

(c) determining the position in said sequence of each codeword X as a function of the order in which each codeword X has been read and as a function of the corresponding value of said discriminator function $f(X)$; and

(d) decoding, as a function of said determined position, the codewords and outputting a decoded version of said data.

**34.** The method as claimed in claim **33** wherein the decoding step includes the substep of storing the decoded data.

**35.** The method as claimed in claim **33** wherein the codewords are arranged in a plurality of subset regions within the symbol, the subset region into which each codeword X lies depending upon the corresponding value of said discriminator function $f(X)$.

**36.** The method as claimed in claim **33** wherein the codewords are arranged in a plurality of subset regions within the symbol and said discriminator function $f(X)$ may take a plurality of discrete values, the subset region into which each codeword X falls being uniquely determined by the corresponding value of said discriminator function $f(X)$.

**37.** The method as claimed in claim **36** wherein the mark/space patterns within any given subset region are approximately equidistant in terms of error distance from the mark/space patterns within any other subset region.

**38.** The method as claimed in claim **33** wherein the codewords are arranged in a plurality of rows within the symbol, the row in which each codeword X lies being at least partially determined by the corresponding value of said discriminator function $f(X)$.

**39.** The method as claimed in claim **38** wherein the step of scanning and reading the codewords includes the substeps of scanning said codewords substantially row-wise, and assigning the codewords $X_i$ (i = 1, 2 . . . ) to a common row so long as the value of $f(X_i)$ remains constant.

**40.** The method as claimed in claim **39** wherein a first row comprises codewords having values of $f(X_i)$ that are mutually exclusive of values of $f(X_i)$ for codewords lying in a second adjacent row.

**41.** The method as claimed in claim **40** wherein a third row comprises codewords having values of $f(X_i)$ that are mutually exclusive of values of $f(X_i)$ for code-

5,304,786

**41**

words lying in said first row and said second row, said third row being adjacent to said second row.

42. The method as claimed in claim 38 wherein said machine-readable symbol includes a symbol checksum codeword and each said row of said machine-readable symbol includes a row checksum codeword, the method further comprising the steps of:

(e) computing a checksum for each said row; and

(f) for each said row, determining that an error has occurred if said calculated checksum does not match a checksum provided by the corresponding row checksum codeword.

43. The method as claimed in claim 42 wherein the step of scanning and reading includes the substep of scanning each said row to determine whether a scanned mark/space pattern is a codeword, and wherein the step of decoding the codewords includes, for each said row, the following substeps:

(1) determining, where possible, an index number corresponding to each said codeword;

(2) storing the respective index numbers in a decoding array (DA) in a memory; and

(3) repeating substeps (1) and (2) until an index number has been stored in said decoding array (DA) for (i) the row checksum codeword for the row, and (ii) all but one of the codewords in the row, the method further comprising the step of:

(g) reconstructing the missing one codeword using the row checksum codeword.

44. The method as claimed in claim 42 wherein the step of scanning and reading includes scanning each said row to determine whether a scanned mark/space pattern is a codeword, and wherein the step of decoding the determined codewords further includes the following substeps:

determining, where possible, an initial index number corresponding to each said codeword;

storing the respective initial index numbers in an initial decoding array (DA) in a first memory; and repeating the determining and storing substeps for each row and for all rows until an initial index number has been stored in the initial decoding array (DA) for: (i) said symbol checksum codeword, (ii) all but two of the codewords in the symbol, and (iii) the row checksum codewords for each row having the missing codewords, the method further comprising the step of:

(g) reconstructing the missing codewords using said row checksum codewords and said symbol checksum codeword.

45. The method as claimed in claim 44 further comprising the steps of:

(h) determining a plurality of initial confidence level values corresponding to each of said initial index numbers stored in the initial decoding array (DA) and storing the determined initial confidence level values in a corresponding initial confidence array (FA) in a second memory;

(i) rescanning, redecoding, and redetermining a plurality of updated index numbers and corresponding updated confidence level values;

(j) storing in an updated decoding array in said first memory said updated index numbers and storing in an updated confidence array in said second memory the updated confidence level values;

(k) if, for each said codeword, the updated index number equals the initial index number and the updated and initial index numbers each represent

**42**

one of a plurality of known codewords, then (i) adding the corresponding initial confidence level value to the corresponding updated confidence level value to obtain a final confidence level value, (ii) storing the final confidence level value in a final confidence array, and (iii) storing the initial index number in a final decoding array;

(1) if, for each said codeword, the updated index number does not equal the initial index number and the updated and initial index numbers each represent one of said plurality of known codewords, then

(1) if the corresponding initial confidence value is greater than the updated confidence value, then storing the initial index number in said final decoding array, calculating a corresponding final confidence value by subtracting the updated confidence value from the initial confidence value, and storing the final confidence value in said final confidence array,

(2) if the corresponding updated confidence value is greater than the initial confidence value, then storing the updated index number in said final decoding array, calculating the corresponding final confidence value by subtracting the initial confidence value from the updated confidence value, and storing the final confidence value in said final confidence array, and

(3) if the corresponding initial and updated confidence values are equal, then storing a predetermined unknown index number in said final decoding array, setting the corresponding final confidence value to zero, and storing the final confidence value in said final confidence array; and

(m) if, for each said codeword, either the initial index number or the updated index number represents the predetermined unknown index number and the other index number represents one of said plurality of known index numbers, then storing the known index number and the corresponding confidence value in said final decoding array and said final confidence array, respectively.

46. The method as claimed in claim 33 wherein each said mark/space pattern comprises a fixed width pattern of marks and spaces.

47. The method as claimed in claim 46 wherein said discriminator function f(X) is a function of the widths of the individual marks making up each codeword X.

48. The method as claimed in claim 47 wherein said mark/space pattern has four marks, and wherein:

$$f(X) = (x_1 - x_3 + x_5 - x_7) \bmod 9$$

where:

$x_1$ = width of 1st mark

$x_3$ = width of 2nd mark

$x_5$ = width of 3rd mark

$x_7$ = width of 4th mark.

49. The method as claimed in claim 48 wherein the decoding step includes the substep of determining a scanned mark/space pattern is not a codeword if f(X) does not equal 0, 3 or 6.

50. The method as claimed in claim 46 wherein said discriminator function f(X) is a function of the widths of the individual spaces making up each codeword X.

51. The method as claimed in claim 46 wherein said discriminator function f(X) is a function of the widths of

5,304,786

43

the individual marks and spaces making up each codeword X.

**52.** The method as claimed in claim 33 wherein each said mark/space pattern comprises a fixed width pattern of marks and spaces, and

   wherein the decoding step includes the substep of determining a scanned mark/space pattern is not a codeword if at least one of the marks and spaces making up the pattern is wider than a specified width limit.

**53.** The method as claimed in claim 52 wherein the total width of a valid codeword is 17 basic width units, and the specified width limit is 6 basic width units.

**54.** The method as claimed in claim 33 wherein each said mark/space pattern comprises a fixed width pattern of marks and spaces, each said mark and space being a measured distance from one another and having a leading edge and a trailing edge, and

   wherein the decoding step includes the substep of determining a scanned mark/space pattern is not a codeword if the measured distance between the leading edge of any one of the marks and the leading edge of a following mark in said pattern, or the leading edge of any one of the spaces and the leading edge of a following space in said pattern, is greater than a specified width limit.

**55.** The method as claimed in claim 54 wherein the total width of a valid codeword is 17 basic width units, and the specified width limit is 9 basic width units.

**56.** The method as claimed in claim 33 wherein a scanned mark/space pattern comprises a plurality of marks and spaces, and

   wherein the decoding step includes the substep of determining each said scanned pattern is not a codeword if the scanned pattern does not comprise exactly a given number of marks and spaces.

**57.** The method as claimed in claim 56 wherein the total width of a valid codeword is 17 basic width units, said given number of marks and spaces being 4 marks and 4 spaces.

**58.** A method of reading a machine-readable symbol, the symbol including a plurality of individual codewords and at least one control word, each codeword and control word having a detectable mark/space pattern, the codewords, when taken in sequence, together defining an encoded version of data to be decoded, the mark/space pattern of each codeword having a detectable characteristic representative of information relating to a position of each said codeword within said sequence, the method comprising the steps, executed using a machine, of:

   (a) scanning and reading the codewords;

   (b) calculating, for each codeword X, a value of a discriminator function f(X) dependent upon the detectable characteristic;

   (c) calculating a t-sequence for each said codeword X, the t-sequence being defined as a sequence of N−1 digits whose $i^{th}$ digit is $t_i$, where N is the total number of marks and spaces in a mark/space pattern, each mark and space being a measured distance from one another and having a leading edge and a trailing edge, and $t_i$ equals a measured distance between the leading edge of the $i^{th}$ mark and the leading edge of the following mark in a mark/space pattern, or the leading edge of the $i^{th}$ space and the leading edge of the following space in a mark/space pattern; and

44

   (d) decoding each said codeword X as a function of the respective t-sequence and discriminator function f(X) and outputting a decoded version of said data.

**59.** The method as claimed in claim 58 wherein the decoding step includes the substep of performing a first level of decoding for each said codeword X, wherein an index number for each said codeword X is located in a first lookup table in a first memory, each said index number, for a given value of said discriminator function f(X), uniquely corresponding to the calculated t-sequence of the respective codeword X.

**60.** The method as claimed in claim 59 wherein the decoding step includes the substeps of:

   converting each said index number into a respective high level value $V_H$ and a respective low level value $V_L$, each said high level value and low level value being defined as follows:

$$V_H = \text{(index number) div } m,$$

$$V_L = \text{(index number) mod } m; \text{ and}$$

   performing, for each said codeword X, a second level of decoding, wherein for each said codeword X two predetermined consecutive values are located in a second lookup table in a second memory at addresses corresponding to $V_H$ and $V_L$.

**61.** The method as claimed in claim 60 wherein m=30.

**62.** The method as claimed in claim 59 further comprising the steps of:

   (e) maintaining in a second memory a plurality of lookup tables corresponding to a plurality of decoding modes;

   (f) maintaining a decoding-mode variable in a third memory representative of the decoding mode currently active; and

   (g) when the index value for any said codeword X, or the value of $V_H$ or $V_L$ of any said codeword X, corresponds to a control character specifying a new decoding mode, changing to said new decoding mode and storing in said third memory the decoding-mode variable corresponding to said new decoding mode.

**63.** A method of reading a machine-readable symbol, the symbol including a plurality of codewords organized into at least two adjacent rows, each codeword being a representation of an item of data, and no codeword in any one row being identical to any codeword in an adjacent row, the method including the steps, executed using a machine, of:

   (a) scanning and reading said plurality of codewords within the symbol;

   (b) determining whether an individual scanned codeword lies in one said row or in another adjacent row;

   (c) computing an index number for said individual scanned codeword as a function of a detectable characteristic of said codeword and as a function of the result of the determining step; and

   (d) processing the index number to generate a signal representative of said data item.

**64.** An apparatus for reading and decoding a machine readable symbol, the symbol including a plurality of individual codewords having a position within the symbol, each codeword having a detectable mark/space pattern, said codewords, when taken in sequence, defin-

5,304,786

45

ing an encoded version of data to be decoded, the apparatus comprising:
  (a) means for scanning and reading the codewords;
  (b) means for calculating, for each codeword X, a discriminator function $f(X)$;
  (c) means for determining the position of each codeword X in said sequence as a function of the order in which each codeword X has been read and as a function of the value of $f(X)$;
  (d) means for decoding the codewords to obtain a decoded version of said data; and
  (e) means for outputting the decoded version of the data.

65. The apparatus as claimed in claim 64, including means for storing said decoded version of said data.

66. A robotic system for use in selectively moving an object having a machine-readable symbol, said robotic system including a plurality of individual codewords and at least one control word, each codeword and control word having a detectable mark/space pattern, the codewords, when taken in sequence, defining an encoded version of data to be decoded, the mark/space pattern of each codeword having a detectable characteristic representative of information relating to a position of each said codeword within said sequence, said robotic system comprising:
  (a) first scanning means for scanning and reading the codewords;
  (b) means for calculating, for each codeword X, a value of a discriminator function $f(X)$ dependent upon the detectable characteristic;
  (c) means for determining the position in said sequence of each codeword X as a function of the order in which each codeword X has been read and as a function of the corresponding value of said discriminator function $f(X)$;
  (d) means for decoding the codewords as a function of said determined position and for outputting a decoded version of said data;
  (e) second scanning means for generating a signal as a function of the decoded version of said data; and
  (f) means for manipulating said object in response to said signal.

67. An apparatus for generating a signal representative of information encoded in a machine-readable symbol, the symbol including at least two adjacent rows of codewords, each codeword representing an item of data and being selected from a set of detectable mark/space patterns, each said mark/space pattern having a determinable discriminator function, the apparatus comprising:
  (a) scanning means for scanning the codewords within the symbol;
  (b) means for computing the discriminator function for each of said scanned codewords;
  (c) means for determining, from the values of the computed discriminator functions corresponding to each of said scanned codewords, the row of the symbol in which each of said scanned codewords lies;
  (d) means for decoding said scanned codewords as a function of the determined row for each of said scanned codewords to obtain a plurality of corresponding symbolic values; and
  (e) means for generating a plurality of signals representative of said symbolic values.

46

68. The apparatus as claimed in claim 67 having means for storing a plurality of stored values representative of said symbolic values.

69. Apparatus for retrieving information by scanning indicia on the surface of a substrate, the indicia including a plurality of codewords organized into at least two adjacent rows, each codeword being either an information codeword or a control codeword, each information codeword being representative of at least one information-containing data structure, and no codeword in any one row being identical to any codeword in an adjacent row, the apparatus comprising:
  (a) scanning means for scanning said plurality of codewords within the indicia;
  (b) means for determining whether an individual scanned codeword is an information codeword or a control codeword;
  (c) means for storing a plurality of different protocols each associating a scanned information codeword with a corresponding data structure, only one protocol being active at any given time;
  (d) means, coupled to the determining means, for decoding said individual scanned codeword according to the currently active protocol, if the scanned codeword is an information codeword; and
  (e) means, coupled to the determining means, for processing said individual scanned codeword and, if said individual scanned codeword is a control codeword, for decoding a symbol representative of a new protocol and for changing the currently active protocol to said new protocol.

70. A method for storing and retrieving information by scanning indicia on the surface of a substrate, said indicia including a plurality of codewords scanned sequentially and organized into at least two adjacent rows, each codeword being either an information codeword or a control codeword, each information codeword being a representation of at least one information-containing data structure, no codeword in any one row being identical to any codeword in an adjacent row, the method including the steps of:
  (a) storing information by applying said indicia to said substrate; and
  (b) retrieving said information, the retrieving step including the substeps of:
    (1) scanning said indicia to detect said information and control codewords,
    (2) determining whether each of said scanned codewords is an information codeword or a control codeword,
    (3) providing a plurality of different protocols each associating each codeword with a corresponding data structure, only one protocol being active at any given time,
    (4) if any of said scanned codewords is an information codeword as determined in said determining step, then decoding and outputting each of said scanned information codewords according to the active protocol, and
    (5) if any of said scanned codewords is a control codeword as determined in said determining step, then processing each of said scanned control codewords to decode a symbol representative of a new protocol, and changing the active protocol to the new protocol.

* * * * *

**OEM**                                                      **PX-18**

# MDL-2001
## Laser Barcode Scan Engine



### Highlights

- Features a 650 nm visible laser diode that scans bi-directionally
- Extremely fast scan rate of 100 scans/second
- Small size makes it easy to mount and integrate into space constrained areas
- Connects via 12 pin FFC connector
- Programmable software with a wide variety of options
- Low profile, square scan engine—dimensions of 0.80" x 0.44" x 0.71" and weight of 0.17 ounces
- Engineering kit available – enables faster time to market
- Two year warranty

# ≡ OPTICON

HONEYWELL-00003377

JA2046

PX-18

# MDL-2001

## Product Specifications

### COMMUNICATION

**SERIAL CMOS:** 12 pin FFC connector

### POWER

**VOLTAGE REQUIREMENT:** 3.3V ± 10%
**CURRENT CONSUMPTION:** Maximum 125mA

### BARCODE SCANNER OPTICS

**LIGHT SOURCE:** 650 nm visible laser diode
**SCAN METHOD:** Bi-directional
**SCANNING SCAN RATE:** 100 scans/sec
**READING PITCH ANGLE:** -35 to 0°, 0 to +35°
**READING SKEW ANGLE:** -50 to -8°, +8 to +50°
**READING TILT ANGLE:** -20 to 0°, 0 to +20°
**CURVATURE:** R>15 mm (EAN 8), R>20 mm (EAN 13)
**MINIMUM RESOLUTION AT PCS 0.9:** 5 mil (0.127 mm)
**MINIMUM PCS VALUE:** 0.45
**DEPTH OF FIELD AT PCS 0.9 CODE 39:**
39 mil (1.0 mm) 2.76 - 25.59 in (70 - 650 mm)
20 mil (0.5 mm) 1.97 - 16.54 in (50 - 420 mm)
10 mil (0.25 mm) 1.97 - 10.24 in (50 - 260 mm)
6 mil (0.15 mm) 1.97 - 5.91 in (50 - 150 mm)
5 mil (0.127 mm) 2.36 - 4.72 in (60- 120 mm)

### SUPPORTED SYMBOLOGIES

**BARCODE (1D):** JAN/UPC/EAN incl. add on, Codabar/
NW-7, Code 11, Code 39, Code 93, Code 128, GS1-128
(EAN -128), GS1 DataBar (RSS), IATA , Industrial 2of5,
Interleaved 2of5, ISBN-ISMN-ISSN, Matrix 2of5,
MSI/Plessey, S-Code, Telepen, Tri-Optic, UK/Plessey
**BARCODE (2D):** Composite codes, MicroPDF417,
PDF417
**BARCODE (POSTAL CODES):** Chinese Post, Korean
Postal Authority code

### DURABILITY

**TEMPERATURE:**
Operation: -4 to 149 °F (-20 to 65 °C)
Storage: -22 to 158 °F (-30 to 70 °C)
**HUMIDITY:**
Operation: 5 - 90% (non-condensing)
Storage: 5 - 90% (non-condensing
**AMBIENT LIGHT IMMUNITY:**
Fluorescent: 4,000 lx max
Direct sun: 80,000 lx max
Incandescent: 4,000 lx max
**DROP TEST:** packed in dummy case 6 ft (1.8 m) drop
onto concrete surface
**MBTF:** 30,000 hours except laser diode (10.000 hours)
and except mirror scan unit (10,000 hours)

### PHYSICAL

**DIMENSIONS (WXHXD):** 0.80 x 0.44 x 0.71 in
(20.4 x 11.2 x 18.0 mm)
**WEIGHT BODY:** Ca. 0.17 oz (4.7 g)

### REGULATORY AND SAFETY

**PRODUCT COMPLIANCE:** RoHS, JIS-C-6802 Class 2,
FDA CDRH Class II

### SOLD SEPARATELY

**MEK1000 SDK:** Development board. Getting started
disc, RS232 cable
**CONNECTION CABLE, POWER SUPPLY:**
100-240V/0.5A, 50/60 Hz, 5V/2A

© Copyright Opticon. All rights reserved. This information
is subject to change without prior notice. For availability,
contact your local representative. MDL-2001_051816



**WWW.OPTICONUSA.COM**

HONEYWELL-00003378

JA2047

PX-19

≡ **OPTICON**

**Cabled Scanners**



# OPR-2001Z

## Laser scanner

The OPR-2001Z is a slim and ultra-lightweight silver and black design. It delivers the perfect combination of performance, durability and style. It feels good in the hand; it looks great on the counter and improves productivity.

## Highlights

- Slim and ultra-lightweight delivering the perfect combination of performance, durability and style

- Feels good in the hand and looks great on the counter

- Ideal scanning solution for retail, healthcare, education and logistics applications

- 100 scans/second high speed laser scanner

- Durable – survives 1.5 meter drop to concrete

- IP42 rating against dust and moisture

- Trigger modes: manual, auto-trigger and stand detection

- Compact size and weight: 56 x 151 x 31 mm (W x H x D) and only 60 grams

- Communication interface: RS232 or USB

- Stand included

- Backed by a two year warranty





HONEYWELL-00004619

JA2048

PX-19

# OPR-2001Z
## Product Specifications

**Operating indicators**
Visual: 1 large LED (red/green/orange)
Non-visual: buzzer

**Operating keys**
Entry options: 1 scan key

**Communication**
RS232C: DB9 connector with external power supply
USB: ver. 1.1, HID/VCP, USB-A connector

**Power**
Voltage requirement: 5V ± 10% (USB), 6V (min 5.5, max 6.5) (RS232)
Current consumption: Max. 210 mA

**Barcode scanner optics**
Light source: 650 nm visible laser diode
Scan method: Bi-directional scanning
Scan rate: Up to 100 scans / second
Trigger mode: Manual, auto-trigger, stand detection
Reading pitch angle: ± 35º
Reading skew angle: -50º to -8º, 8º to +50º
Reading tilt angle: ± 20º
Curvature: R≥15 mm (EAN8), R≥20 mm (EAN13)
Min. resolution at PCS 0.9: 0.127 mm / 5 mil
Min. PCS value: 0.45
Depth of field at code 39:
40 - 400 mm (1.0 mm) / 1.57 - 15.75 in (39 mil)
20 - 300 mm (0.5 mm) / 0.79 - 11.81 in (20 mil)
20 - 200 mm (0.25 mm) / 0.79 - 7.87 in (10 mil)
20 - 100 mm (0.15 mm) / 0.79 - 3.94 in (6 mil)
30 - 70 mm (0.127 mm) / 1.18 - 2.76 in (5 mil)

**Supported symbologies**
Barcode (1D):: JAN/UPC/EAN incl. add on, Codabar/NW-7, Code 11, Code 39, Code 93, Code 128, GS1-128 (EAN-128), GS1 DataBar (RSS), IATA, Industrial 2 of 5, Interleaved 2 of 5, ISBN-ISSN-ISMN, Matrix 2 of 5, MSI/Plessey, UK/Plessey, S-Code, Telepen, Tri-Optic
Postal code: Chinese Post, Korean Postal Authority code
2D code: Composite codes, PDF417, MicroPDF417

**Durability**
Temperature in operation: -5 to 50 ºC / 23 to 122 ºF
Temperature in storage: -20 to 60 ºC / -4 to 140 ºF
Humidity in operation: 5% to 95% (non-condensing)
Humidity in storage: 5% to 95% (non-condensing)
Ambient light immunity: Fluorescent 3,000 lx, direct sun 50,000 lx, incandescent 3,000 lx max
Drop test: 1.5 m / 5 ft drop onto concrete surface
Vibration test: 10 - 100Hz with 2G for 1 hour
Protection rate: IP42

**Physical**
Dimensions Scanner (W x H x D): 56 x 151 x 31 mm / 2.20 x 5.94 x 1.22 in
Weight body: Ca. 60 g / 2.1 oz (excl. cable)
Dimensions Stand (W x H x D): 99 x 174 x 127 mm / 3.90 x 6.85 x 5.00 in (excl. scanner)
Weight Stand: Ca. 90 g / 3.2 oz
Case: ABS, chrome stand

**Regulatory & safety**
Product compliance: CE, FCC, VCCI, RoHS, JIS-C-6802 Class 2, IEC60825-1 Class 2, FDA CDRH Class II, EN55022, EN55024

**Items**
Enclosed: Stand (optionally sold separately)
Sold separately: power supply 100-240V/0.5A, 50/60 Hz, 6V/2A (for RS232)

**Models**
Interface versions: RS232, USB



**≡ OPTICON**

www.opticon.com

® Copyright Opticon. All rights reserved. This information is subject to change without prior notice. For availability, contact your local representative.
_OPR-2001Z_04.2019

HONEYWELL-00004620

JA2049

PX-62

Independent Auditor's Report and Internal Control Audit Report

February 24, 2022

To: The Board of Directors.
Optoelectronics, K.K.

Sanyu Audit Corporation
Tokyo Office

Designated Partner
            Certified Public Accountant        Suzue MASUDA
Engagement Partner


Designated Partner
            Certified Public Accountant        Hirofumi KAWAMURA
Engagement Partner


Financial Statement Audit

Audit Opinion

        For the purpose of audit certification under the provisions of Article 193-2, Paragraph 1 of the Financial Instruments and Exchange Law, our audit corporation has conducted an audit of the consolidated financial statement of Optoelectronics, Inc. listed in the "Status of Accounting" section of the Securities Registration Report for the consolidated fiscal year from December 1, 2020 to November 30, 2021, including the consolidated balance sheet, the consolidated profit and loss statement, the consolidated statement of comprehensive income, the consolidated statement of changes in net assets, the consolidated statement of cash flows, important items forming the basis for creating the consolidated financial statement, and other notes and consolidated supplementary statements.

        Our audit corporation finds that the aforementioned consolidated financial statements, in conformity with accounting principles generally accepted in Japan, fairly present in all material respects the financial position of Optoelectronics, K.K. and its consolidated subsidiaries as of November 30, 2021, and the results of their operations and their cash flows for the year then ended.


Basis for Audit Opinion

        We conducted our audit in accordance with auditing standards generally

1

JA2050

PX-62

accepted in Japan. The responsibilities of our audit corporation are set forth in "Responsibilities of Auditors in a Consolidated Financial Statement Audit." We are independent of the Company and its consolidated subsidiaries, and have performed our other ethical duties as auditors in accordance with the provisions of the Code of Professional Ethics in Japan. We judge that we have obtained sufficient and appropriate audit evidence to provide a basis for our opinion.

Key Audit Considerations

Major audit considerations are those matters that the auditors, as professional experts, considered to be of particular importance in the audit of the consolidated financial statements for the current consolidated fiscal year. Major audit considerations are matters addressed in the course of performing an audit of the consolidated financial statements as a whole and in forming our audit opinion, and the auditors do not separately express opinions on those matters.

2

JA2051

PX-62

| Appropriateness of dead stock asset valuation outside the operating cycle process | |
|---|---|
| Details of major audit considerations and reasons for decisions | Audit Responses |
| In the consolidated balance sheet for the subject consolidated fiscal year, merchandise and finished goods of 1,135 million yen, work in process of 144 million yen, and raw materials and supplies of 718 million yen were recorded, accounting in total for 15.7% of total assets.<br><br>As stated in the Consolidated Financial Statement [Notes] (Significant Accounting Estimates), the company calculates the balance sheet value of inventories by writing down book values based on reduced profitability, and dead stock outside the operating cycle process is calculated by writing down book value by a certain percentage.<br><br>The percentage of devaluation of the carrying amount requires a long-term sales forecast by management, and the determination of expected disposal involves the judgment of the management regarding holding policies based on actual sales and actual disposals, so the uncertainty of the estimate is relatively high.<br><br>Based on the above, the present auditors judged that the valuation of dead stock inventories outside the business cycle constitutes an "important matter for audit consideration." | In order to consider the appropriateness of dead stock asset valuations, the present auditors conducted primarily the following audit procedures.<br>- We evaluated the status and operation of internal controls pertaining to the evaluation of inventory dead stock evaluations.<br>- We asked management whether they have changed inventory holding policies in light of changes in inventory sales and related market conditions or the like.<br>- To confirm the holding status of inventories, we analyzed actual sales and dead stock status of inventories.<br>- We evaluated the reasonableness of the key assumptions used by management in determining certain percentage devaluations of book value, based on actual sales and dispositions in prior and the subject consolidated fiscal year.<br>- In calculating valuation losses for dead stock, we reviewed the accuracy and completeness of the balance data and receipts/payments data used for prior periods and recalculated the valuation losses.<br>- We confirmed that inventories whose book values were individually written down were accounted for in accordance with the accounting policies.<br>- For consolidated subsidiaries Opticon Sensors Europe B. V. and Opticon, Inc., we made use of the auditors of the component units, and reviewed the involvement of said unit auditors in risk assessment, as well as the audit procedures and conclusions reached, to evaluate whether sufficient and appropriate audit evidence was acquired in order to obtain a basis for opinions expressed. |
| Estimated Provision for Litigation Losses | |
| Major audit considerations and reasons for decisions | Audit Responses |

3

JA2052

PX-62

| | |
|---|---|
| A provision for litigation losses of 640 million yen was recorded on the consolidated balance sheet for the current consolidated fiscal year.<br><br>As described in Consolidated Financial Statements [Notes] (significant accounting estimates), the Company has been sued for damages for default on royalty obligations by Honeywell International, Inc. and two other companies (hereinafter "Honeywell"), and at the meeting of the Board of Directors on 11.30.2021 a decision was taken to respond to the Honeywell lawsuit, and a written answer was submitted; a provision for litigation losses was recorded in preparation for possible payment obligations resulting from a judgment or settlement.<br><br>A provision for litigation losses is recorded when it is probable that such losses will be incurred and it becomes possible to reasonably estimate the amount of such losses. However [these] have a high uncertainty because the likelihood of incurring such losses and a reasonable estimation of the amount of such losses involves judgement by management.<br><br>For the above reason, the auditors have judged that the recorded estimated provision for litigation losses is a "major audit consideration." | The auditors primarily performed the following audit procedures to assess the reasonableness of the estimated provision for litigation losses.<br>- In order to understand the details of the lawsuit claiming damages for default of royalty obligation, we examined the complaint, the documents that form the basis of the lawsuit, and records of consultations with attorneys.<br>- In addition to questioning management about the circumstances leading to the lawsuit, the points of dispute in the lawsuit, and the planned response and outlook, we reviewed minutes of Board of Directors meetings and other documents to examine the appropriateness of estimated amounts.<br>- [We] checked in writing the views of legal counsel handling the lawsuit, conducted interviews, considered the content of the responses, and considered the reasonableness of management's judgments concerning potential losses.<br>- The amount of the provision for litigation losses was reviewed by comparison with and the like against evidentiary documents. |

**Management and Audit and Supervisory Committee Responsibility for Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of consolidated financial statements in accordance with accounting principles generally accepted in Japan. This includes establishing and operating such internal controls as management determines necessary to enable the preparation and fair presentation of consolidated financial statements free from material misstatement, whether due to fraud or error.

In preparing consolidated financial statements, management considers whether it is appropriate to prepare the consolidated financial statements on a going concern basis, and discloses said items when required to disclose items pertaining to a going concern in accordance with accounting principles generally accepted in Japan.

4

PX-62

The responsibility of the Audit and Supervisory Committee is to monitor the performance of the directors' duties to maintain and operate the financial reporting process.

Auditors' Responsibility in Auditing a Consolidated Financial Statement

The auditor's responsibility is to obtain reasonable assurance based on the audit performed by the auditor as to whether the consolidated financial statement as a whole is free of material misstatement, whether due to fraud or error, and to express an opinion in the auditor's report from an independent stance relative to the consolidated financial statement. A misstatement is considered to be material if it could have been caused by fraud or error and, individually or in the aggregate, could reasonably be expected to influence the decisions of users of the consolidated financial statement.

The auditor shall exercise professional judgment throughout the audit process in accordance with auditing standards generally accepted as fair and appropriate in Japan, and shall conduct the following with professional skepticism.

- Identify and assess the risk of material misstatement due to fraud or error. Propose and implement audit procedures that address the risk of material misstatements. Selection and application of audit procedures are at the auditor's discretion. In addition, sufficient and appropriate audit evidence is obtained to provide a basis for expressing an opinion.

- The purpose of an audit of consolidated financial statements is not to express an opinion on the effectiveness of internal control, however in order to propose audit procedures appropriate to the circumstances, the auditor considers internal controls relevant to the audit when assessing risk.

- Evaluate the appropriateness of accounting policies and methods of application thereof adopted by management and the reasonableness of accounting estimates made by management and the appropriateness of related notes.

- Conclude whether it is appropriate for management to prepare a consolidated financial statement on a going concern basis and, based on audit evidence obtained, [conclude] whether there is material uncertainty regarding events or circumstances that might cast significant doubt on the entity's ability to continue as a going concern. If a material uncertainty regarding the entity's ability to continue as a going concern is found, [the auditor] should draw attention [thereto] in the notes to the consolidated financial statement in the auditor's report or, if a note regarding in the consolidated financial statement regarding material uncertainty is not appropriate, should express

5

JA2054

an opinion with the excluded item regarding the consolidated financial statement. The auditor's conclusion is based on audit evidence obtained up to the date of the auditor's report, however future events or circumstances may cause the entity to become unable to continue as a going concern.

- Evaluate whether the presentation and notes to consolidated financial statements conform with accounting principles generally accepted in Japan, and whether the presentation, organization, and content of the consolidated financial statements, including related notes, as well as the transactions and accounting events based on those consolidated financial statements, are appropriately presented.

- To express opinions about the consolidated financial statement, [the auditor] obtains sufficient and reliable audit evidence concerning the financial information of the Company and its affiliates. The auditor is responsible for directing, supervising, and performing the audit of consolidated financial statements. The auditor is solely responsible for the audit opinion.

The auditor shall report to the Audit and Supervisory Committee on the scope and timing of the planned audit, significant audit findings including material deficiencies in internal control identified during the course of the audit, and other matters required by the audit standards.

The auditor shall report to the Audit and Supervisory Committee on the auditor's compliance with the rules of professional ethics in Japan regarding independence, as well as any matters reasonably believed to influence the auditor's independence, and safeguards, if any, taken to remove or mitigate any impeding factors.

Of the matters discussed with the Audit and Supervisory Committee, the auditor shall determine those matters considered particularly important to the audit of the consolidated financial statements for the current fiscal year to be major audit considerations and shall include them in the auditor's report. However, the auditor shall not include such matters in the auditor's report if the disclosure of such matters is prohibited by law or if, in extremely limited [circumstances], the auditor determines that such matters should not be reported because the disadvantages of reporting such matters in the auditor's report are reasonably expected to outweigh the public interest.

Internal   Control   Audits
Audit Opinions

PX-62

We have conducted an audit of the Company's internal control report as of November 30, 2021 for the purpose of certifying the audit in accordance with Article 193-2, Paragraph 2 of the Financial Instruments and Exchange Law.

The auditors find that the internal control report referred to above, in which Optoelectronics, Inc. indicated that internal controls over financial reporting as of November 30, 2021 were effective, conforms to the criteria for assessment of internal control over financial reporting generally accepted in Japan, and fairly presents the results of an assessment of internal controls relative to financial reporting in all material respects.

Basis for Audit Opinion

The auditors conducted our internal control audit in accordance with standards for the auditing of internal controls over financial reporting generally accepted in Japan. The responsibilities of the auditors in the criteria for auditing internal controls relative to financial reporting are set forth in "Auditor's Responsibilities in Internal Control Audits." The present auditors, in accordance with the rules on professional ethics in Japan, are independent of the Company and its consolidated subsidiaries, and fulfill our other ethical responsibilities as auditors. We judge that we have obtained sufficient and appropriate audit evidence to provide a basis for our opinion.

7

Management and the Audit and Supervisory Committee Responsibilities for the Internal Control Report

Management is responsible for maintaining and operating internal controls over financial reporting, and for preparing and properly presenting internal control reports in accordance with the evaluation standards generally accepted in Japan for internal controls over financial reporting.

The Audit and Supervisory Committee is responsible for monitoring and verifying the maintenance and operation of internal controls over financial reporting.

Note that internal control over financial reporting may not completely prevent or detect misstatements in financial reporting.

Auditor's Responsibility for Internal Control Audits

The auditor is responsible for obtaining reasonable assurance about whether the internal control report is free of material misstatement based on the internal control audit performed by the auditor, and for expressing an opinion on the internal control report from an independent standpoint in the internal control audit report.

In accordance with auditing standards for internal control over financial reporting generally accepted in Japan, the auditor, throughout the audit process, exercises professional judgment and maintains professional skepticism while performing the following.

- Perform audit procedures to obtain audit evidence regarding results of assessments of internal controls over financial reporting in the internal control report. Internal control auditing procedures are selected and applied based on the auditor's judgment of their importance to the reliability of financial reporting.

- Consider the presentation of the internal control report as a whole, including written statements made by management regarding the scope of evaluation of internal control over financial reporting, evaluation procedures, and evaluation results.

- Obtain sufficient and appropriate audit evidence regarding the results of the assessment of internal controls over financial reporting in the internal control report. The auditor has responsibility for the direction, supervision, and implementation of the audit of the internal control report. Auditors are solely responsible for their audit opinions.

The auditor shall report to the Audit and Supervisory Committee on the scope and

8

JA2057

PX-62

timing of the planned internal control audit, the results of the internal control audit, any identified material deficiencies in internal control that should be disclosed, results of corrective measures thereto, and any other matters required by the audit standards for internal control.

The auditor shall report to the Audit and Supervisory Committee on the auditor's compliance with the rules of professional ethics in Japan regarding independence, as well as any matters reasonably believed to influence the auditor's independence, and safeguards, if any, taken to remove or mitigate any impeding factors.

Conflict of Interest

There is no interest between the Company or its consolidated subsidiaries and this audit corporation or its engagement partners that requires disclosure pursuant to the provisions of the Certified Public Accountants Act.

---

*1. The above is a digitized version of the information contained in the original Audit Report, the original of which is kept separately by the Company (the company submitting the Annual Securities Report).
2. XBRL data is not included in the scope of the audit.

**PX-62**

Independent Auditor's Report

February 24, 2022

To: The Board of Directors.
Optoelectronics, K.K.

Sanyu Audit Corporation
Tokyo Office

Designated Partner
      Certified Public Accountant      Suzue MASUDA
Engagement Partner

Designated Partner
      Certified Public Accountant      Hirofumi KAWAMURA
Engagement Partner

Financial Statement Audit

Audit Opinion

For the purpose of audit certification under the provisions of Article 193-2, Section 1 of the Financial Instruments and Exchange Law, our audit corporation has conducted an audit of the financial statement of Optoelectronics, Inc. listed in the "Status of Accounting" section of the Securities Registration Report for the 46th business fiscal year from December 1, 2020 to November 30, 2021, including the balance sheet, the profit and loss statement, the statement of comprehensive income, the consolidated statement of changes in net assets, the consolidated statement of cash flows, important items forming the basis for creating the consolidated financial statement, and other notes and supplementary statements.

Our audit corporation finds that the aforementioned financial statements, in conformity with accounting principles generally accepted in Japan, fairly present in all material respects the financial position of Optoelectronics, K.K. as of November 30, 2021, and the results of its operations for the business year then ended.

Basis for Audit Opinion

We conducted our audit in accordance with auditing standards generally accepted in Japan. The responsibilities of our audit corporation are set forth in

10

JA2059

PX-62

"Responsibilities of Auditors in a Consolidated Financial Statement Audit." We are independent of the Company, and have performed our other ethical duties as auditors in accordance with the provisions of the Code of Professional Ethics in Japan. We judge that we have obtained sufficient and appropriate audit evidence to provide a basis for our opinion.

Key Audit Considerations

Major audit considerations are those matters that the auditors, as professional experts, considered to be of particular importance in the audit of financial statements for the current business year. Major audit considerations are matters addressed in the course of performing an audit of the financial statements as a whole and in forming our audit opinion, and the auditors do not separately express opinions on those matters.

11

JA2060

PX-62

| Appropriateness of dead stock asset valuation outside the operating cycle process | |
|---|---|
| Details of major audit considerations and reasons for decisions | Audit Responses |
| In the balance sheet for the subject business year, merchandise and finished goods of 369 million yen and raw materials and supplies of 144 million yen were recorded, accounting in total for 15.7% of total assets.<br><br>As stated in the Consolidated Financial Statement [Notes] (Significant Accounting Estimates), the company calculates the balance sheet value of inventories by writing down book values based on reduced profitability, and dead stock outside the operating cycle process is calculated by writing down book value by a certain percentage.<br><br>The percentage of devaluation of the carrying amount requires a long-term sales forecast by management, and the determination of expected disposal involves the judgment of the management regarding holding policies based on actual sales and actual disposals, so the uncertainty of the estimate is relatively high.<br><br>Based on the above, the present auditors judged that the valuation of dead stock inventories outside the business cycle constitutes an "important matter for audit consideration." | In order to consider the appropriateness of dead stock asset valuations, the present auditors conducted primarily the following audit procedures.<br>- We evaluated the status and operation of internal controls pertaining to the evaluation of inventory dead stock evaluations.<br>- We asked management whether they have changed inventory holding policies in light of changes in inventory sales and related market conditions or the like.<br>- To confirm the holding status of inventories, we analyzed actual sales and dead stock status of inventories.<br>- We evaluated the reasonableness of the key assumptions used by management in determining certain percentage devaluations of book value, based on actual sales and dispositions in prior and the subject business years.<br>- In calculating valuation losses for dead stock, we reviewed the accuracy and completeness of the balance data and receipts/payments data used for prior periods and recalculated the valuation losses.<br>- We confirmed that inventories whose book values were individually written down were accounted for in accordance with the accounting policies. |
| Estimated Provision for Litigation Losses | |
| [Note]   As noted in (significant accounting estimates), a provision for litigation losses of 213 million yen was recorded in the balance sheet for the current business year.<br>        As the details of major audit considerations, the reasons for their determination, and the audit responses are the same as the major audit considerations (estimate of provision for litigation losses) stated in the auditor's report of the consolidated financial statement, those have been omitted from this report. | |

Management and Audit and Supervisory Committee Responsibility for Financial Statements

Management is responsible for the preparation and fair presentation of financial statements in accordance with accounting principles generally accepted in Japan. This includes establishing and operating such internal controls as management determines necessary to enable the preparation and fair presentation of financial statements free from material misstatement, whether due to fraud or error.

In preparing financial statements, management considers whether it is appropriate to prepare the financial statements on a going concern basis, and discloses said items when required to disclose items pertaining to a going concern in accordance with accounting principles generally accepted in Japan.

12

JA2061

PX-62

The responsibility of the **Audit and Supervisory Committee** is to **monitor** the performance of the directors' duties to maintain and operate the financial reporting process.

Auditors' Responsibility in Financial Statement Audits

The auditor's responsibility is to obtain reasonable assurance based on the audit performed by the auditor as to whether the financial statement as a whole is free of material misstatement, whether due to fraud or error, and to express an opinion in the auditor's report from an independent stance relative to the financial statement. A **misstatement is considered to be** material if it could have been caused by fraud or error and, individually or in the aggregate, could reasonably be expected to influence the decisions of users of the financial statement.

The auditor shall exercise professional judgment throughout the audit process in accordance with auditing standards generally accepted as fair and appropriate in Japan, and shall conduct the following with professional skepticism.

- Identify and assess the risk of material misstatement due to fraud or error. Propose and implement audit procedures that address the risk of material misstatements. **Selection** and application of audit procedures are at the auditor's discretion. In addition, sufficient and appropriate audit evidence is obtained to provide a basis for expressing an opinion.

- The purpose of an audit of consolidated financial statements is not to express an opinion on the effectiveness of internal control, however in order to propose audit procedures appropriate to the circumstances, the auditor considers internal controls relevant to the audit when assessing risk.

- Evaluate the appropriateness of accounting policies and methods of application thereof adopted by management and the reasonableness of accounting estimates made by management and the appropriateness of related notes.

- Conclude whether it is appropriate for management to prepare a financial statement on a going concern basis and, based on audit evidence obtained, [conclude] whether there is material uncertainty regarding events or circumstances that might cast significant doubt on the entity's ability to continue as a going concern. If a material uncertainty regarding the entity's ability to continue as a going concern is found, [the auditor] should draw attention [thereto] in the notes to the financial statement in the auditor's report or, if a note regarding in the financial statement regarding material uncertainty is not appropriate, should express an opinion with the excluded item

13

JA2062

PX-62

regarding the financial statement. The auditor's conclusion is based on audit evidence obtained up to the date of the auditor's report, however future events or circumstances may cause the entity to become unable to continue as a going concern.

- Evaluate whether the presentation and notes to financial statements conform with accounting principles generally accepted in Japan, and whether the presentation, organization, and content of the financial statements, including related notes, as well as the transactions and accounting events based on those financial statements, are appropriately presented.

The auditor shall report to the Audit and Supervisory Committee on the scope and timing of the planned audit, significant audit findings including material deficiencies in internal control identified during the course of the audit, and other matters required by the audit standards.

The auditor shall report to the Audit and Supervisory Committee on the auditor's compliance with the rules of professional ethics in Japan regarding independence, as well as any matters reasonably believed to influence the auditor's independence, and safeguards, if any, taken to remove or mitigate any impeding factors.

Of the matters discussed with the Audit and Supervisory Committee, the auditor shall determine those matters considered particularly important to the audit of the consolidated financial statements for the current fiscal year to be major audit considerations and shall include them in the auditor's report. However, the auditor shall not include such matters in the auditor's report if the disclosure of such matters is prohibited by law or if, in extremely limited [circumstances], the auditor determines that such matters should not be reported because the disadvantages of reporting such matters in the auditor's report are reasonably expected to outweigh the public interest.

Conflict of Interest

There is no interest between the Company and this audit corporation or its engagement partners that requires disclosure pursuant to the provisions of the Certified Public Accountants Act.

---

*1. The above is a digitized version of the information contained in the original Audit Report, the original of which is kept separately by the Company (the company submitting the Annual Securities Report).
2. XBRL data is not included in the scope of the audit.

JA2063

PX-62

**Christopher Field**
**Japanese Technical Interpreting and Translation**
**52 Sherman's Bridge Rd., Wayland MA 01778 Tel. 617-905-6060**
*www.christopherfield.com*



Verify at www.atanet.org/verify

## CERTIFICATION OF TRANSLATION

I, Christopher L. Field, residing at 52 Sherman's Bridge Rd., Wayland MA, 01778, United States of America, declare and state as follows:

I am well acquainted with the English and Japanese languages. I have translated numerous Japanese documents of legal and/or technical content into English. I am fully accredited by the American Translators Association (ATA) for Japanese to English translation, and my ATA certification number is 423514.

I have personally translated the attached document, entitled **"Optoelectronic Audit Report"** from Japanese into English. I hereby certify that the English translation of the attached documents is an accurate translation to the best of my knowledge and ability.

I further declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed at Wayland, Massachusetts, 14 February, 2023.

Signed, _____

Christopher Field

ATA Certified Translator, Japanese to English, Certificate No. 423514

JA2064

**PX-62**

<div align="center">

独立監査人の監査報告書及び内部統制監査報告書

</div>

2022年2月24日

株式会社オプトエレクトロニクス

　　　取　締　役　会　御中

<div align="center">

三　優　監　査　法　人
東　京　事　務　所

指　定　社　員　　公認会計士　　増　田　涼　恵
業　務　執　行　社　員

指　定　社　員　　公認会計士　　川　村　啓　文
業　務　執　行　社　員

</div>

＜財務諸表監査＞
監査意見

　当監査法人は、金融商品取引法第193条の２第１項の規定に基づく監査証明を行うため、「経理の状況」に掲げられている株式会社オプトエレクトロニクスの2020年12月１日から2021年11月30日までの連結会計年度の連結財務諸表、すなわち、連結貸借対照表、連結損益計算書、連結包括利益計算書、連結株主資本等変動計算書、連結キャッシュ・フロー計算書、連結財務諸表作成のための基本となる重要な事項、その他の注記及び連結附属明細表について監査を行った。

　当監査法人は、上記の連結財務諸表が、我が国において一般に公正妥当と認められる企業会計の基準に準拠して、株式会社オプトエレクトロニクス及び連結子会社の2021年11月30日現在の財政状態並びに同日をもって終了する連結会計年度の経営成績及びキャッシュ・フローの状況を、全ての重要な点において適正に表示しているものと認める。

監査意見の根拠

　当監査法人は、我が国において一般に公正妥当と認められる監査の基準に準拠して監査を行った。監査の基準における当監査法人の責任は、「連結財務諸表監査における監査人の責任」に記載されている。当監査法人は、我が国における職業倫理に関する規定に従って、会社及び連結子会社から独立しており、また、監査人としてのその他の倫理上の責任を果たしている。当監査法人は、意見表明の基礎となる十分かつ適切な監査証拠を入手したと判断している。

監査上の主要な検討事項

　監査上の主要な検討事項とは、当連結会計年度の連結財務諸表の監査において、監査人が職業的専門家として特に重要であると判断した事項である。監査上の主要な検討事項は、連結財務諸表全体に対する監査の実施過程及び監査意見の形成において対応した事項であり、当監査法人は、当該事項に対して個別に意見を表明するものではない。

<div align="center">

JA2065

</div>

**PX-62**

| 営業循環過程から外れたたな卸資産の滞留品評価の妥当性 | |
|---|---|
| 監査上の主要な検討事項の内容及び決定理由 | 監査上の対応 |
| 　当連結会計年度の連結貸借対照表において、商品及び製品1,135百万円、仕掛品144百万円、原材料及び貯蔵品718百万円が計上されており、合計金額は総資産の15.7%を占めている。<br>　連結財務諸表【注記事項】（重要な会計上の見積り）に記載のとおり、会社は、たな卸資産の貸借対照表価額について収益性の低下に基づく簿価切下げの方法により算定しており、営業循環過程から外れた滞留品については、帳簿価額を一定の割合で切り下げる方法により算定している。<br>　帳簿価額を切り下げる割合については、経営者による長期間の販売予測が必要となり、また、処分見込品の判定は、販売実績や処分実績を踏まえた保有方針について経営者の判断を伴うため見積りの不確実性が相対的に高い。<br>　以上から、当監査法人は、営業循環過程から外れたたな卸資産の滞留品評価について、「監査上の主要な検討事項」に該当すると判断した。 | 　当監査法人は、たな卸資産の滞留品評価の妥当性を検討するため、主に以下の監査手続を実施した。<br>・ たな卸資産の滞留品評価に関連する内部統制の整備及び運用状況を評価した。<br>・ たな卸資産の販売状況や関連する市場の状況等の変化を踏まえたたな卸資産の保有方針の変更の有無について、経営者に質問をした。<br>・ たな卸資産の保有状況を確認するため、たな卸資産の販売実績及び滞留状況を分析した。<br>・ 帳簿価額を切り下げる一定の割合を決定する際に経営者が使用した主要な仮定について、過年度及び当連結会計年度の販売実績と処分実績を踏まえ、当該合理性を評価した。<br>・ 滞留品の評価損の算定に当たり、使用された過年度の残高データと受払データの正確性及び網羅性を検討するとともに、評価損の再計算を実施した。<br>・ 個別に帳簿価額を切り下げたたな卸資産について、会計方針に従った会計処理が行われていることを確認した。<br>・ 連結子会社である Opticon Sensors Europe B.V. 及び Opticon, Inc.については、構成単位の監査人を利用し、当該構成単位の監査人のリスク評価に関与するとともに、実施した監査手続及び結論を査閲し、意見表明の基礎を得るために十分かつ適切な監査証拠が入手されたかどうかを評価した。 |

| 訴訟損失引当金の見積計上 | |
|---|---|
| 監査上の主要な検討事項の内容及び決定理由 | 監査上の対応 |
| 　当連結会計年度の連結貸借対照表において、訴訟損失引当金が640百万円計上されている。<br>　連結財務諸表【注記事項】（重要な会計上の見積り）に記載のとおり、ロイヤリティ債務不履行による損害賠償請求訴訟がHONEYWELL INTERNATIONAL, INC. 他2社（以下、「HONEYWELL社」という。）より提起され、2021年11月30日開催の取締役会においてHONEYWELL社の提訴に対して応訴することを決議し、答弁書を提出しているが、判決また和解により支払義務が生じた場合に備え、訴訟損失引当金を計上している。<br>　訴訟損失引当金については、当該損失の発生可能性が高く、合理的に金額を見積もることが出来となった時点で計上されるが、当該損失の発生可能性及び合理的な金額の見積りには経営者の判断を伴うため不確実性が高い。<br>　以上から、当監査法人は、訴訟損失引当金の見積計上について、「監査上の主要な検討事項」に該当すると判断した。 | 　当監査法人は、訴訟損失引当金の見積計上の合理性を評価するため、主に以下の監査手続を実施した。<br>・ ロイヤリティ債務不履行による損害賠償請求訴訟の内容を把握するため、訴状、その訴訟の根拠となる文書、弁護士相談記録を閲覧した。<br>・ 訴訟に至る経緯、訴訟の争点、及び今後の対応方針と見通しについて、経営者に質問するとともに、取締役会議事録等を閲覧し、発生金額の見積りの妥当性を検討した。<br>・ 当該訴訟担当弁護士の見解を書面により確認し、面談を行うとともに、回答内容を検討し、経営者の損失の発生可能性の判断の妥当性を検討した。<br>・ 訴訟損失引当金の金額について、根拠資料との照合等を行い、損失額の妥当性を検討した。 |

**連結財務諸表に対する経営者及び監査等委員会の責任**

　経営者の責任は、我が国において一般に公正妥当と認められる企業会計の基準に準拠して連結財務諸表を作成し適正に表示することにある。これには、不正又は誤謬による重要な虚偽表示のない連結財務諸表を作成し適正に表示するために経営者が必要と判断した内部統制を整備及び運用することが含まれる。

　連結財務諸表を作成するに当たり、経営者は、継続企業の前提に基づき連結財務諸表を作成することが適切であるかど

**PX-62**

うかを評価し、我が国において一般に公正妥当と認められる企業会計の基準に基づいて継続企業に関する事項を開示する
必要がある場合には当該事項を開示する責任がある。
　監査等委員会の責任は、財務報告プロセスの整備及び運用における取締役の職務の執行を監視することにある。

連結財務諸表監査における監査人の責任
　監査人の責任は、監査人が実施した監査に基づいて、全体としての連結財務諸表に不正又は誤謬による重要な虚偽表示
がないかどうかについて合理的な保証を得て、監査報告書において独立の立場から連結財務諸表に対する意見を表明する
ことにある。虚偽表示は、不正又は誤謬により発生する可能性があり、個別に又は集計すると、連結財務諸表の利用者の
意思決定に影響を与えると合理的に見込まれる場合は、重要性があると判断される。
　監査人は、我が国において一般に公正妥当と認められる監査の基準に従って、監査の過程を通じて、職業的専門家とし
ての判断を行い、職業的懐疑心を保持して以下を実施する。
　・　不正又は誤謬による重要な虚偽表示リスクを識別し、評価する。また、重要な虚偽表示リスクに対応した監査手続
　　を立案し、実施する。監査手続の選択及び適用は監査人の判断による。さらに、意見表明の基礎となる十分かつ適切
　　な監査証拠を入手する。
　・　連結財務諸表監査の目的は、内部統制の有効性について意見表明するためのものではないが、監査人は、リスク評
　　価の実施に際して、状況に応じた適切な監査手続を立案するために、監査に関連する内部統制を検討する。
　・　経営者が採用した会計方針及びその適用方法の適切性、並びに経営者によって行われた会計上の見積りの合理性及
　　び関連する注記事項の妥当性を評価する。
　・　経営者が継続企業を前提として連結財務諸表を作成することが適切であるかどうか、また、入手した監査証拠に基
　　づき、継続企業の前提に重要な疑義を生じさせるような事象又は状況に関して重要な不確実性が認められるかどうか
　　結論付ける。継続企業の前提に関する重要な不確実性が認められる場合は、監査報告書において連結財務諸表の注記
　　事項に注意を喚起すること、又は重要な不確実性に関する連結財務諸表の注記事項が適切でない場合は、連結財務諸
　　表に対して除外事項付意見を表明することが求められている。監査人の結論は、監査報告書日までに入手した監査証
　　拠に基づいているが、将来の事象や状況により、企業は継続企業として存続できなくなる可能性がある。
　・　連結財務諸表の表示及び注記事項が、我が国において一般に公正妥当と認められる企業会計の基準に準拠している
　　かどうかとともに、関連する注記事項を含めた連結財務諸表の表示、構成及び内容、並びに連結財務諸表が基礎とな
　　る取引や会計事象を適正に表示しているかどうかを評価する。
　・　連結財務諸表に対する意見を表明するために、会社及び連結子会社の財務情報に関する十分かつ適切な監査証拠を
　　入手する。監査人は、連結財務諸表の監査に関する指示、監督及び実施に関して責任がある。監査人は、単独で監査
　　意見に対して責任を負う。
　監査人は、監査等委員会に対して、計画した監査の範囲とその実施時期、監査の実施過程で識別した内部統制の重要な
不備を含む監査上の重要な発見事項、及び監査の基準で求められているその他の事項について報告を行う。
　監査人は、監査等委員会に対して、独立性についての我が国における職業倫理に関する規定を遵守したこと、並びに監
査人の独立性に影響を与えると合理的に考えられる事項、及び阻害要因を除去又は軽減するためにセーフガードを講じて
いる場合はその内容について報告を行う。
　監査人は、監査等委員会と協議した事項のうち、当連結会計年度の連結財務諸表の監査で特に重要であると判断した事
項を監査上の主要な検討事項と決定し、監査報告書において記載する。ただし、法令等により当該事項の公表が禁止され
ている場合や、極めて限定的ではあるが、監査報告書において報告することにより生じる不利益が公共の利益を上回ると
合理的に見込まれるため、監査人が報告すべきでないと判断した場合は、当該事項を記載しない。

<内部統制監査>
監査意見
　当監査法人は、金融商品取引法第193条の２第２項の規定に基づく監査証明を行うため、株式会社の2021年11月30日現
在の内部統制報告書について監査を行った。
　当監査法人は、株式会社オプトエレクトロニクスが2021年11月30日現在の財務報告に係る内部統制は有効であると表示
した上記の内部統制報告書が、我が国において一般に公正妥当と認められる財務報告に係る内部統制の評価の基準に準拠
して、財務報告に係る内部統制の評価結果について、全ての重要な点において適正に表示しているものと認める。

監査意見の根拠
　当監査法人は、我が国において一般に公正妥当と認められる財務報告に係る内部統制の監査の基準に準拠して内部統制
監査を行った。財務報告に係る内部統制の監査の基準における当監査法人の責任は、「内部統制監査における監査人の責
任」に記載されている。当監査法人は、我が国における職業倫理に関する規定に従って、会社及び連結子会社から独立し
ており、また、監査人としてのその他の倫理上の責任を果たしている。当監査法人は、意見表明の基礎となる十分かつ適
切な監査証拠を入手したと判断している。

内部統制報告書に対する経営者及び監査等委員会の責任

　経営者の責任は、財務報告に係る内部統制を整備及び運用し、我が国において一般に公正妥当と認められる財務報告に係る内部統制の評価の基準に準拠して内部統制報告書を作成し適正に表示することにある。

　監査等委員会の責任は、財務報告に係る内部統制の整備及び運用状況を監視、検証することにある。

　なお、財務報告に係る内部統制により財務報告の虚偽の記載を完全には防止又は発見することができない可能性がある。

内部統制監査における監査人の責任

　監査人の責任は、監査人が実施した内部統制監査に基づいて、内部統制報告書に重要な虚偽表示がないかどうかについて合理的な保証を得て、内部統制監査報告書において独立の立場から内部統制報告書に対する意見を表明することにある。

　監査人は、我が国において一般に公正妥当と認められる財務報告に係る内部統制の監査の基準に従って、監査の過程を通じて、職業的専門家としての判断を行い、職業的懐疑心を保持して以下を実施する。
- ・　内部統制報告書における財務報告に係る内部統制の評価結果について監査証拠を入手するための監査手続を実施する。内部統制監査の監査手続は、監査人の判断により、財務報告の信頼性に及ぼす影響の重要性に基づいて選択及び適用される。
- ・　財務報告に係る内部統制の評価範囲、評価手続及び評価結果について経営者が行った記載を含め、全体としての内部統制報告書の表示を検討する。
- ・　内部統制報告書における財務報告に係る内部統制の評価結果に関する十分かつ適切な監査証拠を入手する。監査人は、内部統制監査報告書の監査に関する指示、監督及び実施に関して責任がある。監査人は、単独で監査意見に対して責任を負う。

　監査人は、監査等委員会に対して、計画した内部統制監査の範囲とその実施時期、内部統制監査の実施結果、識別した内部統制の開示すべき重要な不備、その是正結果、及び内部統制の監査の基準で求められているその他の事項について報告を行う。

　監査人は、監査等委員会に対して、独立性についての我が国における職業倫理に関する規定を遵守したこと、並びに監査人の独立性に影響を与えると合理的に考えられる事項、及び阻害要因を除去又は軽減するためにセーフガードを講じている場合はその内容について報告を行う。

利害関係

　会社及び連結子会社と当監査法人又は業務執行社員との間には、公認会計士法の規定により記載すべき利害関係はない。

<div align="right">以　　上</div>

---

※１．上記は監査報告書の原本に記載された事項を電子化したものであり、その原本は当社（有価証券報告書提出会社）が別途保管しております。
　２．ＸＢＲＬデータは監査の対象には含まれていません。

PX-62

独立監査人の監査報告書

2022年2月24日

株式会社オプトエレクトロニクス

　　取　締　役　会　御中

三　優　監　査　法　人
東　京　事　務　所

指　定　社　員　　公認会計士　　増　田　涼　恵
業　務　執　行　社　員

指　定　社　員　　公認会計士　　川　村　啓　文
業　務　執　行　社　員

監査意見
　当監査法人は、金融商品取引法第193条の2第1項の規定に基づく監査証明を行うため、「経理の状況」に掲げられている株式会社オプトエレクトロニクスの2020年12月1日から2021年11月30日までの第46期事業年度の財務諸表、すなわち、貸借対照表、損益計算書、株主資本等変動計算書、重要な会計方針、その他の注記及び附属明細表について監査を行った。
　当監査法人は、上記の財務諸表が、我が国において一般に公正妥当と認められる企業会計の基準に準拠して、株式会社オプトエレクトロニクスの2021年11月30日現在の財政状態及び同日をもって終了する事業年度の経営成績を、全ての重要な点において適正に表示しているものと認める。

監査意見の根拠
　当監査法人は、我が国において一般に公正妥当と認められる監査の基準に準拠して監査を行った。監査の基準における当監査法人の責任は、「財務諸表監査における監査人の責任」に記載されている。当監査法人は、我が国における職業倫理に関する規定に従って、会社から独立しており、また、監査人としてのその他の倫理上の責任を果たしている。当監査法人は、意見表明の基礎となる十分かつ適切な監査証拠を入手したと判断している。

監査上の主要な検討事項
　監査上の主要な検討事項とは、当事業年度の財務諸表の監査において、監査人が職業的専門家として特に重要であると判断した事項である。監査上の主要な検討事項は、財務諸表全体に対する監査の実施過程及び監査意見の形成において対応した事項であり、当監査法人は、当該事項に対して個別に意見を表明するものではない。

JA2069

PX-62

| 営業循環過程から外れたたな卸資産の滞留品評価の妥当性 | |
|---|---|
| 監査上の主要な検討事項の内容及び決定理由 | 監査上の対応 |
| 当事業年度の貸借対照表において、商品及び製品369百万円、原材料及び貯蔵品329百万円が計上されており、合計金額は総資産の13.0%を占めている。<br>財務諸表【注記事項】（重要な会計上の見積り）に記載のとおり、会社は、たな卸資産の貸借対照表価額について収益性の低下に基づく簿価切下げの方法により算定しており、営業循環過程から外れた滞留品については、帳簿価額を一定の割合で切下げる方法により算定している。<br>帳簿価額を切下げる割合については、経営者による長期間の販売予測が必要となり、また、処分見込品の判定は、販売実績や処分実績を踏まえた保有方針について経営者の判断を伴うため見積りの不確実性が相対的に高い。<br>以上から、当監査法人は、営業循環過程から外れたたな卸資産の滞留品評価について、「監査上の主要な検討事項」に該当すると判断した。 | 当監査法人は、たな卸資産の滞留品評価の妥当性を検討するため、主に以下の監査手続を実施した。<br>・ たな卸資産の滞留品評価に関連する内部統制の整備及び運用状況を評価した。<br>・ たな卸資産の販売状況や関連する市場の状況等の変化を踏まえたたな卸資産の保有方針の変更の有無について、経営者に質問をした。<br>・ たな卸資産の保有状況を確認するため、たな卸資産の販売実績及び滞留状況を分析した。<br>・ 帳簿価額を切下げる一定の割合を決定する際に経営者が使用した主要な仮定について、過年度及び当事業年度の販売実績と処分実績を踏まえ、当該合理性を評価した。<br>・ 滞留品の評価損の算定に当たり、使用された過年度の残高データと受払データの正確性と網羅性を検討するとともに、評価損の再計算を実施した。<br>・ 個別に帳簿価額を切下げたたな卸資産について、会計方針に従った会計処理が行われていることを確認した。 |
| 訴訟損失引当金の見積計上 | |
| 【注記事項】（重要な会計上の見積り）に記載のとおり、当事業年度の貸借対照表において、訴訟損失引当金が213百万円計上されている。<br>　監査上の主要な検討事項の内容、決定理由及び監査上の対応については、連結財務諸表の監査報告書に記載されている監査上の主要な検討事項（訴訟損失引当金の見積計上）と同一内容であるため、記載を省略している。 | |

**財務諸表に対する経営者及び監査等委員会の責任**

　経営者の責任は、我が国において一般に公正妥当と認められる企業会計の基準に準拠して財務諸表を作成し適正に表示することにある。これには、不正又は誤謬による重要な虚偽表示のない財務諸表を作成し適正に表示するために経営者が必要と判断した内部統制を整備及び運用することが含まれる。

　財務諸表を作成するに当たり、経営者は、継続企業の前提に基づき財務諸表を作成することが適切であるかどうかを評価し、我が国において一般に公正妥当と認められる企業会計の基準に基づいて継続企業に関する事項を開示する必要がある場合には当該事項を開示する責任がある。

　監査等委員会の責任は、財務報告プロセスの整備及び運用における取締役の職務の執行を監視することにある。

**財務諸表監査における監査人の責任**

　監査人の責任は、監査人が実施した監査に基づいて、全体としての財務諸表に不正又は誤謬による重要な虚偽表示がないかどうかについて合理的な保証を得て、監査報告書において独立の立場から財務諸表に対する意見を表明することにある。虚偽表示は、不正又は誤謬により発生する可能性があり、個別に又は集計すると、財務諸表の利用者の意思決定に影響を与えると合理的に見込まれる場合に、重要性があると判断される。

　監査人は、我が国において一般に公正妥当と認められる監査の基準に従って、監査の過程を通じて、職業的専門家としての判断を行い、職業的懐疑心を保持して以下を実施する。

・　不正又は誤謬による重要な虚偽表示リスクを識別し、評価する。また、重要な虚偽表示リスクに対応した監査手続を立案し、実施する。監査手続の選択及び適用は監査人の判断による。さらに、意見表明の基礎となる十分かつ適切な監査証拠を入手する。

・　財務諸表監査の目的は、内部統制の有効性について意見表明するためのものではないが、監査人は、リスク評価の実施に際して、状況に応じた適切な監査手続を立案するために、監査に関連する内部統制を検討する。

・　経営者が採用した会計方針及びその適用方法の適切性、並びに経営者によって行われた会計上の見積りの合理性及び関連する注記事項の妥当性を評価する。

・　経営者が継続企業を前提として財務諸表を作成することが適切であるかどうか、また、入手した監査証拠に基づき、継続企業の前提に重要な疑義を生じさせるような事象又は状況に関して重要な不確実性が認められるかどうか結

**PX-62**

論付ける。継続企業の前提に関する重要な不確実性が認められる場合は、監査報告書において財務諸表の注記事項に注意を喚起すること、又は重要な不確実性に関する財務諸表の注記事項が適切でない場合は、財務諸表に対して除外事項付意見を表明することが求められている。監査人の結論は、監査報告書日までに入手した監査証拠に基づいているが、将来の事象や状況により、企業は継続企業として存続できなくなる可能性がある。

・　財務諸表の表示及び注記事項が、我が国において一般に公正妥当と認められる企業会計の基準に準拠しているかどうかとともに、関連する注記事項を含めた財務諸表の表示、構成及び内容、並びに財務諸表が基礎となる取引や会計事象を適正に表示しているかどうかを評価する。

監査人は、監査等委員会に対して、計画した監査の範囲とその実施時期、監査の実施過程で識別した内部統制の重要な不備を含む監査上の重要な発見事項、及び監査の基準で求められているその他の事項について報告を行う。

監査人は、監査等委員会に対して、独立性についての我が国における職業倫理に関する規定を遵守したこと、並びに監査人の独立性に影響を与えると合理的に考えられる事項、及び阻害要因を除去又は軽減するためにセーフガードを講じている場合はその内容について報告を行う。

監査人は、監査等委員会と協議した事項のうち、当事業年度の財務諸表の監査で特に重要であると判断した事項を監査上の主要な検討事項と決定し、監査報告書において記載する。ただし、法令等により当該事項の公表が禁止されている場合や、極めて限定的ではあるが、監査報告書において報告することにより生じる不利益が公共の利益を上回ると合理的に見込まれるため、監査人が報告すべきでないと判断した場合は、当該事項を記載しない。

利害関係

会社と当監査法人又は業務執行社員との間には、公認会計士法の規定により記載すべき利害関係はない。

以　　　上

---

※１．上記は監査報告書の原本に記載された事項を電子化したものであり、その原本は当社（有価証券報告書提出会社）が別途保管しております。

２．ＸＢＲＬデータは監査の対象には含まれていません。

**PX-63**





11.30.2021

To Whom It May Concern

Optoelectronics, KK
Representative: President Masami Tawara
(ASDAQ Code 6664)
Inquiries: Katsutoshi Ishikawa
Tel. 048-446-1181

**Notice Regarding Filing of Lawsuit, Declaration of Special Losses,
and Revision of November 2011 Annual Consolidated Results Forecast**

At our Nov. 30 2021 board of directors meeting, the Company Group took the decision to accept a litigation proceeding and declare associated losses (allowance for litigation).

We also revised the November 2021 annual results forecast published on June 24, 2021, of which we inform you below.

Note

1. Filing of suit against the company.
(1) Venue and date on which suit was filed.
① Filing venue:
North Carolina Western District Court
② Date of filing:
9.24.2021

(2) Filing Party
- Name:       HONEYWELL INTERNATIONAL, INC.
  Address:       115 Tabor Rd, Morris Plains, NJ 07950
- Name:       HAND HELD PRODUCTS, INC.
  Address:       9680 Old Bailes Road, Fort Mill, South Carolina 29707
- Name:       METROLOGIC INSTRUMENTS, INC.
Address:       9680 Old Bailes Road, Fort Mill, South Carolina 29707

(3) Reason for lawsuit and circumstances leading to the lawsuit.
The Company had been sued for patent infringement by US company HONEYWELL on 5.31.2019 ("the previous suit" below), but had agreed to a settlement on 1.22.2020. We were subsequently served with similar suits in Holland and Germany, but agreed to a settlement thereto on 2.3. 2021, resulting in a withdrawal of all lawsuits and ending of said lawsuits.

JA2072

PX-63

However HONEYWELL [then] claimed that we were obliged to pay a royalty on product[s] not subject to the previous lawsuit, and pursued the Company for additional royalties.

The company objected that HONEYWELL's claims were unwarranted in the extreme and baseless in light of the settlement agreement history, and differed from the Company's understanding of the literal construction of the  settlement agreement, however a suit for damages based on default of debt was filed on 9.24.2021.

The company considered means of resolution such as settlement or the like in parallel with the suit, but decided to file a response to the HONEYWELL suit on 11.30.2021, and to submit a reply.

(4) Value Sought by the Lawsuit

An additional royalty of US$5,663,684.18, losses due to delay for the number of days elapsed until resolution [of the suit], and plaintiff attorney fees.

2. Declaration of special losses (allowance for litigation)

Regarding the lawsuit in 1. above, a decision was made to declare an allowance for litigation losses of 640 million yen for the consolidated 11.2021 accounting period  as a special loss of in anticipation of circumstances in which a monetary amount is determined by a judgment, or an obligation to pay arises against our company due to settlement.

3. Revision of annual results forecast

(1) Revision of the 11.2021 annual results forecast (12.1.2020-11.30.2021)

(unit: million yen)

| | 売上高 | Gross Profit | Net Profit | Net profit returned to parent company shareholders | 1株当たり 当期純利益 |
|---|---|---|---|---|---|
| Previously announced forecast (A) | 8,000 | 1,030 | 944 | 715 | Yen 115.73 |
| Revised forecast (B) | 8,295 | 1,165 | 1,123 | 338 | 54.71 |
| Change (B-A) | 295 | 135 | 179 | △ 377 | |
| Increase/decrease % | 3.7% | 13.1% | 19.0% | △52.7% | |
| (Reference) Prior period results (11.202) | 6,549 | △ 308 | △ 356 | △ 1,254 | △203.03 |

(2) Reason for revision

Regarding net profit returned to the parent company shareholders for the current period, as noted in 2. above, the allowance for litigation is declared as a special loss, resulting in a difference relative to the previously announced results and a revision of the results forecast.

JA2073

PX-63

(Note) The results forecast above was prepared based on information obtainable by the Company as of the publication of this document; actual results may differ from the forecast due to a variety of factors in the future.

4. Other

The delay in timely disclosure following the date of filing of the lawsuit is due to the fact that a judgment that the target amount of the lawsuit does not fulfill the requirements for timely disclosure set forth by the Tokyo Stock Exchange, that there was a possibility that the complaint would be withdrawn through an out of court resolution such as a settlement, and that a response was established by submission to the court of a written response, [for which] a grace period was provided.

END

PX-63

**Christopher Field**
**Japanese Technical Interpreting and Translation**
**52 Sherman's Bridge Rd., Wayland MA 01778 Tel. 617-905-6060**
*www.christopherfield.com*



## CERTIFICATION OF TRANSLATION

I, Christopher L. Field, residing at 52 Sherman's Bridge Rd., Wayland MA, 01778, United States of America, declare and state as follows:

I am well acquainted with the English and Japanese languages. I have translated numerous Japanese documents of legal and/or technical content into English. I am fully accredited by the American Translators Association (ATA) for Japanese to English translation, and my ATA certification number is 423514.

I have personally translated the attached document, entitled "11.30.2021 Press Release" from Japanese into English. I hereby certify that the English translation of the attached documents is an accurate translation to the best of my knowledge and ability.

I further declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed at Frisco, Texas, 19 June, 2023.

Signed,_____

Christopher Field

ATA Certified Translator, Japanese to English, Certificate No. 423514

JA2075

**PX-63**

 

2021 年 11 月 30 日

各　　位

会 社 名　株式会社オプトエレクトロニクス

代表者名　代表取締役社長　俵　政美

（ＪＡＳＤＡＱ・コード６６６４）

問合せ先　管理部部長　　石川　勝利

電　話　０４８－４４６－１１８１

<div align="center">

**訴訟の提起並びに特別損失の計上及び**
**2021 年 11 月期通期連結業績予想の修正に関するお知らせ**

</div>

　当社グループは、2021 年 11 月 30 日付締役会において、訴訟手続きの受け入れ及びこれに伴う特別損失（訴訟損失引当金繰入額）を計上することを決定いたしました。

　また、あわせて 2021 年 6 月 24 日に公表しました 2021 年 11 月期通期連結業績予想を修正しましたので、下記のとおりお知らせいたします。

<div align="center">

記

</div>

１．当社に対する訴訟の提起

（1）訴訟が提起された裁判所等及び年月日

　①訴訟が提起された裁判所等

　米国ノースカロライナ州西部地区地方裁判所

　②訴訟が提起された年月日

　2021 年 9 月 24 日

（2）訴訟を提起した者の概要

　・名称：　　HONEYWELL INTERNATIONAL, INC.,

　　所在地：　115 Tabor Road, Morris Plains, NJ 07950

　・名称：　　HAND HELD PRODUCTS, INC.,

　　所在地：　9680 Old Bailes Road, Fort Mill, South Carolina 29707

　・名称：　　METROLOGIC INSTRUMENTS, INC.,

　　所在地：　9680 Old Bailes Road, Fort Mill, South Carolina 29707

（3）訴訟の原因及び訴訟提起に至った経緯

　当社は、2019 年 5 月 31 日付で米国 HONEYWELL 社から特許権侵害訴訟（以下「前回訴訟」といいます。）を提起されておりましたが、2020 年 1 月 22 日をもって和解の合意をいたしました。その後、オランダ・ドイツにおいても同様の訴訟を提起されましたが、2021 年 2 月 3 日をもって和解の合意をしたことにより、すべての訴えが取り下げられ、当該訴訟は終息いたしました。

　しかし、HONEYWELL 社は当社に対し、前回訴訟の対象ではなかった製品についてもロイヤリティの支払義務があると主張し、当社に追加のロイヤリティを要求しました。

<div align="center">

JA2076

</div>

**PX-63**

　　当社は、HONEYWELL 社の主張は和解契約が成立した経緯に基づかない、極めて不当なものであり、同社の和解契約の文言解釈は当社の認識と相違しているものとして、異議を申し立てましたが、2021 年 9 月 24 日をもって債務不履行による損害賠償請求訴訟が提起されました。

　　当社は、訴訟と並行して和解等の解決手段を検討してまいりましたが、2021 年 11 月 30 日に HONEYWELL 社の提訴に対して応訴することを決議し、答弁書を提出することといたしました。

(4) 訴訟の目的の価額
　　追加のロイヤリティ金額 US$5,663,684.18、判決までの日数分の遅延損害金及び相手方の弁護士費用。

２．特別損失（訴訟損失引当金繰入額）の計上
　　前記１．の訴訟について、判決により金額が確定した場合、または和解により当社にて支払義務が発生した場合に備え、訴訟損失引当金繰入額 640 百万円を 2021 年 11 月期連結会計期間において特別損失として計上することとなりました。

３．通期業績予想の修正について
(1) 2021 年 11 月期通期連結業績予想の修正（2020 年 12 月 1 日〜2021 年 11 月 30 日）

（単位：百万円）

| | 売上高 | 営業利益 | 経常利益 | 親会社株主に帰属する当期純利益 | 1 株当たり当期純利益 |
|---|---|---|---|---|---|
| | | | | | 円　銭 |
| 前回発表予想（Ａ） | 8,000 | 1,030 | 944 | 715 | 115.73 |
| 今回修正予想（Ｂ） | 8,295 | 1,165 | 1,123 | 338 | 54.71 |
| 増減額（Ｂ−Ａ） | 295 | 135 | 179 | △ 377 | |
| 増 減 率 | 3.7% | 13.1% | 19.0% | △52.7% | |
| （ご参考）前期実績（2020 年 11 月期） | 6,549 | △ 308 | △ 356 | △ 1,254 | △203.03 |

(2) 修正の理由
　　親会社株主に帰属する当期純利益について、上記２．に記載のとおり、訴訟損失引当金繰入額を特別損失として計上したことにより、前回発表の業績から差異が生じることから、業績予想値の修正をいたしました。

(注) 上記の業績予想は、本資料の発表日現在において当社が入手可能な情報に基づいて作成したものであり、実際の業績は今後の様々な要因によって予想と異なる可能性があります。

４．その他
　　本件訴訟の提起日から遅れての適時開示となった理由は、訴訟の目的の価額は東京証券取引所が定める適時開示要件を満たすものではないと判断したこと、和解等の裁判外の解決により訴状が取下げとなる可能性があったこと、当社からの裁判所への答弁書提出を以て応訴が確定するものであり、提出までの猶予期間が設けられていたことによるものです。

以　上

PX-87



**Fixed Mount**

# NLV-1001

## Laser scanner

The NLV-1001, a low-cost fixed mount scanner, quickly and efficiently scans 1D barcodes for light industrial or retail applications. This fixed mount scanner uses a bi-directional scanning approach to achieve a scan rate of 100 sps.









## Highlights

- Rapidly scans and decodes a wide variety of 1D barcodes
- Bi-directional scanning at 100 scans/second
- Complete unit with integrated decoder
- Durable – survives 0.75 m drop to concrete
- IP43 rating against dust and moisture
- Compact size and weight: 30 x 20 x 43.3 mm (WxHxD) and 30 grams
- Trigger modes: manual test button, multiple read, auto-trigger, hardware and software trigger
- Communication interface: USB or RS232
- Backed by a two year warranty

HONEYWELL-00004577

JA2078

PX-87

# NLV-1001
## Product Specifications

### Operating indicators
Visual: 1 LED (red/green/orange)
Non-visual: Buzzer

### Communication
RS232: DB9 connector with external power supply, without connector
USB: Ver. 1.1, HID/VCP, USB-A connector

### Power
Voltage requirement: 5V ±10%
Current consumption: 85 mA (typical use), max. 150 mA

### Barcode scanner optics
Light source: 650 nm visible laser diode
Scan method: Bi-directional scanning
Scan rate: 100 scans / second
Trigger mode: Manual, multiple read, auto-trigger, serial software trigger
Reading pitch angle: ± 35°
Reading skew angle: -50 to 8°, 8 to +50°
Reading tilt angle: ± 20°
Curvature: R≥15 mm (EAN8), R≥20 mm (EAN13)
Min. resolution at pcs 0.9: 0.127 mm / 5 mil
Min. pcs value: 0.45
Depth of field at code 39:
60 - 100 mm (0.127 mm) / 2.36 - 3.94 in (5 mil)
50 - 130 mm (0.15 mm) / 1.97 - 5.12 in (6 mil)
50 - 240 mm (0.25 mm) / 1.97 - 9.45 in (10 mil)
50 - 400 mm (0.5 mm) / 1.97 - 15.75 in (20 mil)
70 - 630 mm (1.0 mm) / 2.76 - 24.80 in (39 mil)

### Supported symbologies
Barcode (1D): JAN/UPC/EAN incl. add on, Codabar/NW-7, Code 11, Code 39, Code 93, Code 128, GS1-128 (EAN-128), GS1 Databar (RSS), IATA, Industrial 2of5, Interleaved 2of5, ISBN-ISSN-ISMN, Matrix 2of5, MSI/Plessey, S-Code, Telepen, Tri-Optic, UK/Plessey
Postal code: Chinese Post, Korean Postal Authority code
2D code: Composite codes, MicroPDF417, PDF417

### Durability
Temperature in operation: -10 to 45 °C / 14 to 113 °F
Temperature in storage: -20 to 60 °C / -4 to 140 °F
Humidity in operation: 20 - 85% (non-condensing)
Humidity in storage: 20 - 90% (non-condensing)
Ambient light immunity: Fluorescent 3,000 lx max, Sunlight 50,000 lx max, Incandescent 3,000 lx max
Antistatic electricity: 10 kV (non-destructive)
Drop test: 0.75 m / 2.5 ft drop onto concrete surface
Protection rate: IP67

### Physical
Dimensions (WxHxD): 30 x 20 x 43.3 mm / 1.18 x 0.79 x 1.70 in
Weight: Ca. 30 g / 1.1 oz (excl. cable)
Case: ABS, Black

### Regulatory & Safety
CE, FCC, VCCI, RoHS, JIS-C-6802 Class 2, IEC 60825-1 Class 2, FDA CDRH Class II, IEC/EN60950-1, EN55022, EN55024

### Items
Sold separately: Power supply 100-240V/0.5A, 50/60 Hz, 5V/2A (for RS232)

### Models
Interface: RS232, USB


≡ OPTICON

www.opticon.com

© Copyright Opticon. All rights reserved. This information is subject to change without prior notice. For availability, contact your local representative.
_NLV-1001_04.2020

HONEYWELL-00004578

JA2079

PX-125

 **OPTICON**

**Engines**

# MDL-1000
## Laser scanner

The MDL-1000 is a laser barcode scan engine with an extremely small rectangular form factor. This laser scan engine is ideal for space-constrained portable devices and has a low power consumption.



## Highlights

- Features a 650 nm visible laser diode that scans bi-directionally
- Extremely fast scan rate of 100 scans/second
- Complete barcode scan engine module with integrated decoder
- Small size makes it easy to mount and integrate into space constrained areas
- Serial CMOS communication via 12 pin FFC connector
- Low power consumption to fit your design needs
- Programmable software with a wide variety of options
- Engineering kit available – enables faster time to market
- Two year warranty protects your investment



scale 100%





HONEYWELL-00002784

JA2080

PX-125

# MDL-1000
## Product Specifications

**Communication**
Serial CMOS: 12 pin FFC connector

**Power**
Voltage requirement: 3.3V ± 10%
Current consumption: Max. 125 mA

**Barcode scanner optics**
Light source: 650 mn visible laser diode
Scan method: Bi-directional scanning
Scan rate: 100 scans / seconds
Reading pitch angle: ± 35°
Reading skew angle: -50 to 8°, 8 to +50°
Reading tilt angle: ± 20°
Curvature: R>15 mm (EAN8), R>20 mm (EAN13)
Min. resolution at pcs 0.9: 0.127 mm / 5 mil
Min. pcs value: 0.45
Depth of field at code 39:
70 - 650 mm (1.0 mm) / 2.76 - 25.59 in (39 mil)
50 - 420 mm (0.5 mm) / 1.97 - 16.54 in (20 mil)
50 - 260 mm (0.25 mm) / 1.97 - 10.24 in (10 mil)
50 - 150 mm (0.15 mm) / 1.97 - 5.91 in (6 mil)
60- 120 mm (0.127 mm) / 2.36 - 4.72 in (5 mil)

**Supported symbologies**
Barcode (1D): JAN/UPC/EAN incl. add on, Codabar/
NW-7, Code 11, Code 39, Code 93, Code 128, GS1-128
(EAN-128), GS1 Databar (RSS), IATA, Industrial 2of5,
Interleaved 2of5, ISBN-ISSN-ISMN, Matrix 2of5, MSI/
Plessey, S-Code, Telepen, Tri-Optic, UK/Plessey
Postal code: Chinese Post, Korean Postal Authority
code
2D code: Composite codes, MicroPDF417, PDF417

**Durability**
Temperature in operation: -20 to 65 °C / -4 to 149 °F
Temperature in storage: -30 to 70 °C / -22 to 158 °F
Humidity in operation: 5 - 90% (non-condensing)
Humidity in storage: 5 - 90% (non-condensing)
Ambient light immunity: Fluorescent 4,000 lx max,
Sunlight 80,000 lx max, Incandescent 4,000 lx max
Drop test: Packed in dummy case 1.8 m / 6 ft drop
onto concrete surface
MBTF: 30,000 hours except laser diode (10.000
hours) and except mirror scan unit (10,000 hours)

**Physical**
Dimensions (WxHxD): 28 x 7.8 x 18 mm / 1.1 x 0.31 x
0.71 in
Weight: Ca. 10 g / 0.35 oz

**Regulatory & Safety**
RoHS, JIS C6802 Class 2, IEC60825-1 Class 2, FDA
CDRH Class II

**Items**
Sold seperately: MEK-3100 development board (With
power supply, RS232 cable, USB cable, PCBs)

≡ **OPTICON**

www.opticon.com

® Copyright Opticon. All rights reseved. This information is subject to change without prior notice. For availability, contact your local representative.
_MDL-1000_04.2019

HONEYWELL-00002785



JA2081

PX-188

# ALSTON & BIRD LLP

The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404

202-239-3300
Fax: 202-654-4842
www.alston.com

M. Scott Stevens        Direct Dial: 202-239-3025        Email: scott.stevens@alston.com



May 31, 2019

VIA HAND DELIVERY

The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, DC 20436

> Re:    *Certain Barcode Scanners, Scan Engines, Products Containing the
> Same, and Components Thereof, Docket No. 337-TA-\_\_\_\_*

Dear Secretary Barton:

      Enclosed for filing please find documents in support of a request by Complainants
Honeywell International, Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc.
(collectively "Honeywell") that the U.S. International Trade Commission institute an
investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, concerning
certain barcode scanners, scan engines, products containing the same, and components
thereof. A separate letter requesting confidential treatment of Confidential Exhibits 37
and 38 is included with this filing. There is no confidential business information
contained in the Complaint itself. Honeywell's submission includes the following
documents:

- One (1) original and eight (8) true paper copies of the Complaint, pursuant to
  Commission Rule 210.8(a)(1)(i).

- One (1) electronic copy of the non-confidential exhibits to the Complaint,
  pursuant to Commission Rules 210.8(a)(1)(i) and 210.12(a)(9), including:

  - One (1) electronic certified copy each of U.S. Pat. Nos. 9,465,970;
    8,978,985; 7,148,923; 7,527,206; 9,659,199; 7,159,783; and 8,794,520 as
    Exhibits 1-7 to the Verified Complaint, respectively, pursuant to
    Commission Rule 210.12(a)(9)(i); and

  - One (1) electronic certified copy of the assignment records for each of the
    970, 985, 923, 206, 783, and 520 patents as Exhibits 8-11 and 13-14 to the
    Verified Complaint, respectively, pursuant to Commission Rule

Atlanta • Beijing • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Washington

**Exhibit #**

**Adams 05**

05/11/23

JA2082

May 31, 2019
Page 2

> 210.12(a)(9)(ii). Also enclosed is a non-certified copy of the assignment record for the 199 patent. We have placed an order with the U.S. Patent & Trademark Office for the certified copy of this assignment record, and will submit it when it arrives.

- One (1) electronic copy of the confidential exhibits to the Verified Complaint, pursuant to Commission Rule and 210.8(a)(1)(ii).

- One (1) additional copy each — four (4) additional copies total — of the Complaint and accompanying electronic copies of the non-confidential exhibits, for service upon each Proposed Respondent, pursuant to Commission Rule 210.8(a)(1)(iii); and four (4) additional copies of the confidential exhibits for service upon Proposed Respondents' counsel after they have subscribed to the Protective Order.

- One (1) additional copy each – two (2) additional copies total – of the Complaint for the governments of Japan and the Netherlands, pursuant to Commission Rule 210.8(a)(1)(iv).

- One (1) physical sample of a domestic article protected by the asserted patents, as Exhibit P1 to the Complaint, pursuant to Commission Rule 210.12(b).

- One (1) physical sample of an imported article that is the subject of the Complaint, as Exhibit P2 to the Complaint, pursuant to Commission Rule 210.12(b).

- Certified copies of the prosecution histories of the 923 and 206 Patents as Appendices C-D to the Complaint. Also enclosed are non-certified copies of the prosecution histories of the 970, 985, 199, 783, and 520 patents as Appendices A-B and E-G to the Complaint. We have placed an order with the U.S. Patent & Trademark Office for the certified copies of these prosecution histories, and will submit them when they arrive.

- Three (3) additional electronic copies each of the prosecution histories of the 970, 985, 923, 206, 199, 783, and 520 Patents as Appendices A-G to the Complaint, pursuant to Commission Rule 210.12(c)(1).

- Four (4) electronic copies each of each patent and applicable pages of each technical reference mentioned in the prosecution histories of the 970, 985, 923, 206, 199, 783, and 520 Patents as Appendices H-N to the Complaint, pursuant to Commission Rule 210.12(c)(2).

- A letter and certification requesting confidential treatment for the information contained in Confidential Exhibits 37 and 38 to the Complaint, pursuant to Commission Rules 201.6(b) and 210.5(d).

PX-188

May 31, 2019
Page 3

- A Statement on the Public Interest regarding the remedial orders sought by Honeywell in the Complaint, pursuant to Commission Rule 210.8(b).

Thank you for your attention to this matter. Please contact me with any questions pertaining to this submission.

Sincerely,

M. Scott Stevens

*Counsel for Complainants*

Enclosures

PX-188

# ALSTON&BIRD LLP

The Atlantic Building
950 F Street, NW
Washington, DC 20004-1404

202-239-3300
Fax: 202-654-4842
www.alston.com

M. Scott Stevens                    Direct Dial: 202-239-3025                    Email: scott.stevens@alston.com

May 31, 2019

## VIA HAND DELIVERY

Office of the Secretary
Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E. Street, S.W., Room 317
Washington, DC 20436

Re:   *Certain Barcode Scanners, Scan Engines, Products Containing the Same, and*
      *Components Thereof, Docket No. 337-TA-_____*

### REQUEST FOR CONFIDENTIAL TREATMENT

Dear Secretary Barton:

Pursuant to Commission Rule 201.6, Complainants Honeywell International, Inc.,
Hand Held Products, Inc., Metrologic Instruments, Inc. (collectively "Honeywell") hereby
respectfully request confidential treatment of certain confidential business information
contained in Confidential Exhibits 37 and 38 to Honeywell's Complaint, filed herewith.

The information for which confidential treatment is sought consists of proprietary
commercial secrets, specifically:

- Proprietary information regarding Honeywell's licensees and others who may
  have rights to the one or more of the Asserted Patents (Confidential Exhibit 37).

- Proprietary financial data in Honeywell's investments in the facilities, engineering, and
  research and development of those products protected by one or more claims of the
  Asserted Patents (Confidential Exhibits 38).

The business information described herein qualifies as confidential business information
because substantially-identical information is not available to the public and its disclosure would
likely impair the Commission's ability to obtain information necessary to perform its statutory
functions as well as cause substantial harm to the competitive position of the organizations from
which the information is not available to the public is attached hereto.

---

Atlanta • Beijing • Brussels • Charlotte • Dallas • Los Angeles • New York • Research Triangle • Silicon Valley • Washington, D.C.

JA2085

PX-188

May 31, 2019
Page 2


Thank you for your attention to this matter. Please contact me with any questions pertaining to this submission.

Sincerely,

M. Scott Stevens

Enclosures (certification)

PX-188

## CERTIFICATION

I, M Scott Stevens, attorney for Honeywell International, Inc., Hand Held Products, Inc. d/b/a Honeywell Scanning & Mobility, Metrologic Instruments, Inc. (collectively "Honeywell"), declare:

1.  I am duly authorized by Honeywell to execute this certification.

2.  I have reviewed Confidential Exhibits 23, 25-28, 31 and 32 to Honeywell's Complaint, for which confidential treatment has been requested.

3.  To the best of my knowledge, information and belief, founded after reasonable inquiry, substantially-identical information is not available to the public

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of May, 2017, in Charlotte, NC.


M. Scott Stevens

## U.S. INTERNATIONAL TRADE COMMISSION
## WASHINGTON, DC

In the Matter of

**CERTAIN BARCODE SCANNERS, SCAN ENGINES, PRODUCTS CONTAINING THE SAME, AND COMPONENTS THEREOF**

Investigation No. 337-TA-___

### COMPLAINANTS' PUBLIC INTEREST STATEMENT

Complainants Honeywell International, Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. (collectively "Honeywell") submit this public-interest statement, as required by 19 C.F.R. § 210.8(b). As discussed below, the remedy sought against Opticon, Inc., Opticon Sensors Europe B.V., OPTO Electronics Co., Ltd., and Hokkaido Electronic Industry Co., Ltd. (collectively "Respondents" or "Opticon") will not have an adverse effect on public health or welfare, competitive conditions in the U.S. economy, production of like or directly competitive articles in the United States, or U.S. consumers.

### I.   THE REQUESTED REMEDY WILL NOT HARM THE PUBLIC INTEREST

The Accused Products in this matter, as defined in the accompanying complaint, are Respondents' barcode scanners, scan engines, and related products that infringe the Asserted Patents. As a result, the requested remedy is directed only at those specific products manufactured by or on behalf of Respondents and sold for importation, imported, and/or sold after importation into the United States. Thus, the only potentially relevant public-interest inquiry is whether the exclusion of this discrete subset of articles, not barcode readers generally, necessitates the denial of Section 337 relief based on the statutory public-interest factors. As shown below, there are no public interest concerns implicated by this small subset of devices that would implicate public interest for at least three reasons.

1

First, the exclusion order would not exclude devices that specifically implicate the significant national security or public health issues upon which the ITC has precluded or reduced relief in the past.[1]  Second, Respondents' Accused Products generally make up a small minority of the U.S. market for barcode scanners.  Third, any demand gap felt by the exclusion order could be made up by Honeywell and/or Honeywell's competitors.  Honeywell expands on these reasons below.

## II.    SPECIFIC PUBLIC-INTEREST INQUIRIES

### A.    The Commission has a Strong Public Interest in Protecting IP

The ITC has made clear that the public interest rests in the protection of intellectual-property rights ("IPR").[2]  That protection is to be denied in only limited situations.[3]  The question with respect to the public interest, then, is not whether a "balancing" of factors merely favors a remedy, but rather whether competing interests exist of so great a significance with regard to only the Accused Products that the strong public policy of protecting IPR must give way.  As shown below, any public interest concerns invoked by this investigation pales in comparison to this countervailing interest.

---

[1] *See Certain Fluidized Supporting Apparatus*, Inv. Nos. 337-TA-182/188, Comm'n Op. (Oct. 5, 1984); *Certain Inclined-Field Acceleration Tubes*, Inv. No. 337-TA-67, Comm'n. Op. (Dec. 29, 1980); *Certain Automatic Crankpin Grinders*, Inv. No. 337-TA-60, Comm'n Op. (Dec. 17, 1979); *see also Personal Data & Mobile Communication Devices*, Inv. No. 337-TA-710, Comm'n Op., at 81 n.56 (Dec. 29, 2011) (stating that the ITC "does not believe that the mere fact that a technological field has been determined to provide benefits to the economy is sufficient to excuse infringement of a patent in that field").

[2] *See, e.g., Certain Digital Television Prods. & Certain Prods. Containing Same & Methods of Using Same*, Inv. No. 337-TA-617, Comm'n Op., at 9 (Aug. 23, 2009) ("*Digital TV Products*").

[3] *See Certain Baseband Processor Chips & Chipsets, Transmitter & Receiver (Radio) Chips, Power Control Chips, & Prods. Containing Same, Including Cellular Tel. Handsets*, Inv. No. 337-TA-543, Comm'n Op., at 153 (June 19, 2007) ("[T]he statute requires relief for an aggrieved patent holder, except in those limited circumstances in which the statutory public interest concerns are so great as to trump the public interest in enforcement of [IPR].")

JA2089

**B.    Exclusion of the Accused Products Would Not Implicate Public Health, Safety, or Welfare Concerns**

The Accused Products do not invoke any specific public health, safety, or welfare concerns. Moreover, the general availability of currently sold and installed barcode scanners or scan engines will not be affected, such that current customers can continue to use their in-field devices.

**C.    Like Articles are Available to Satisfy Demand for Excluded Accused Products**

The technologies embodied in the relevant infringed patents at issue are, and will continue to be, available in Honeywell's full line of Honeywell Barcode Scanners as defined in the accompanying complaint.  Thus, any U.S. consumer with a desire for those specific features will have access to ample substitutes containing those features.

As mentioned above, Respondents have a relatively small portion of the U.S. market for barcode scanners or engines.  Accordingly, Honeywell and its competitors, including licensees, would easily be able to fill any demand gap felt by the requested remedies, if any.  And as is readily apparent from Confidential Exhibit 37 to the Complaint, Honeywell has many licensees to the Asserted Patents thus ensuring both supply and competition in the U.S. market for barcode scanners.

The availability of the Honeywell Barcode Scanners will ensure that, even after the requested remedy is issued, U.S. consumers will still have choices with respect to barcode reading and scanning technology.  Moreover, nothing about the desired remedy will impact the availability of existing barcode scanners currently in place in the United States.  Accordingly, issuance of the requested remedy will not result in any shortage of barcode scanners or scan engines in the United States.[4]

---

[4] *See Certain Agric. Tractors Under 50 Power Take-off Horsepower,* USITC Pub. 3026, Inv. No. 337-TA-380, Comm'n Op., at 34 (Mar. 1997) (concluding that orders at issue had limited economic impact due to considerable competition from other non-infringing goods).

D.    **There Is Sufficient Capacity to Replace Excluded Accused Products**

There is no question that Honeywell or other large market players have the capacity to replace the volume of Accused Products subject to the requested remedial orders within a commercially reasonable time. As stated above, Respondents have a relatively low market share. Thus, there is no indication that excluding the Accused Products will harm the public interest via unmet demand.[5]

E.    **The Remedy Has No Relevant Public-Interest Impact on U.S. Consumers**

As discussed above, even after the requested remedy is issued, customers may purchase and consumers will have access barcode scanners from numerous sources, including Honeywell. Accordingly, the issuance of such relief will have no relevant public interest impact on U.S. consumers.[6]

III.    **CONCLUSION**

For the foregoing reasons, no public-interest concerns preclude the issuance of the proposed remedy against Respondents in this matter.

Dated: May 31, 2019                          Respectfully submitted,

M. Scott Stevens
**ALSTON & BIRD LLP**
950 F Street NW

---

[5] *See Certain Optical Disk Controller Chips,* Inv. No. 337-TA-506, Comm'n Op., at 61 (Sept. 28, 2005) (issuing remedy where "there is no evidence that the U.S. demand for the covered products cannot be met by other entities, including the Complainants").

[6] *See Digital TV Prods.,* Comm'n Op., at 15-16 (finding that any adverse effect on U.S. consumers resulting from remedy would be minimal, given the range of available products, and would not outweigh the benefit of protecting complainant's IPR).

4

Washington, DC 20004
Telephone: (202) 239-3025
Facsimile: (704) 654-4825

S. Benjamin Pleune
Stephen R. Lareau
Adam J. Doane
Nicolas C. Marais
**ALSTON & BIRD LLP**
101 South Tryon Street
Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1098
Facsimile: (704) 444-1698

Patrick J. Flinn
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7920
Facsimile: (404) 253-8370

*Counsel for Complainants*
*Honeywell International, Inc.,*
*Hand Held Products, Inc.,*
*and Metrologic Instruments, Inc.*

JA2092

PX-188

## U.S. INTERNATIONAL TRADE COMMISSION
## WASHINGTON, DC

**In the Matter of**

**CERTAIN BARCODE SCANNERS,**
**SCAN ENGINES, PRODUCTS**
**CONTAINING THE SAME, AND**
**COMPONENTS THEREOF**

Investigation No. 337-TA-___

## COMPLAINT UNDER SECTION 337 OF
## THE TARIFF ACT OF 1930, AS AMENDED

**Complainants:**

Honeywell International, Inc.
115 Tabor Road
Morris Plains, NJ 07950
Telephone: (877) 841-2840

Hand Held Products, Inc.
9680 Old Bailes Road
Fort Mill, SC 29707
Telephone: (803) 835-8000

Metrologic Instruments, Inc.
9680 Old Bailes Road
Fort Mill, SC 29707
Telephone: (803) 835-8000

**Counsel for Complainants:**
M. Scott Stevens
**ALSTON & BIRD LLP**
950 F Street NW
Washington, DC 20004
Telephone: (202) 239-3025

S. Benjamin Pleune
Stephen R. Lareau
Adam J. Doane
Nicholas C. Marais
**ALSTON & BIRD LLP**
101 South Tryon Street
Charlotte, NC 28280
Telephone: (704) 444-1098

**Proposed Respondents:**

Opticon, Inc.
2200 Lind Ave. SW
Suite 100
Renton, WA 98057
Telephone: (425) 651-2120

Opticon Sensors Europe B.V.
Opaallaan 35
2132 XV Hoofddorp
The Netherlands
Telephone: +21 23-569 2700

OPTO Electronics Co., Ltd.
12-17, Tsukagoshi 4-chome
Warabi-city Saitama Pref.,
335-0002
Japan
Telephone: +81 48-4461183

Hokkaido Electronic Industry Co., Ltd.
118-122 Kamiashibetsu-cho
Ashibetsu-shi, Hokkaido
Japan
Telephone: +81 48-4461183

JA2093

PX-188

Patrick J. Flinn
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7920
Facsimile: (404) 253-8370

## TABLE OF CONTENTS

LIST OF EXHIBITS ................................................................................................. iii

LIST OF PHYSICAL EXHIBITS ........................................................................... v

LIST OF APPENDICES ......................................................................................... vi

I.      INTRODUCTION ........................................................................................ 1

II.     COMPLAINANTS ....................................................................................... 3

        A.      Honeywell International, Inc. ...................................................... 3

        B.      Hand Held Products, Inc. ........................................................... 5

        C.      Metrologic Instruments, Inc. ...................................................... 6

III.    PROPOSED RESPONDENTS ..................................................................... 7

        A.      Opticon, Inc. ................................................................................ 7

        B.      Opticon Sensors Europe B.V. ..................................................... 7

        C.      OPTO Electronics Co., Ltd. ....................................................... 8

        D.      Hokkaido Electronic Industry Co., Ltd. .................................... 8

        E.      Statement Regarding Additional Potential Respondents ........... 9

IV.     THE TECHNOLOGY AND ACCUSED PRODUCTS AT ISSUE .............. 9

V.      THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTION
        OF THE INVENTIONS .............................................................................. 12

        A.      Ownership of the Asserted Patents ............................................ 12

        B.      U.S. Patent No. 9,465,970 .......................................................... 13

        C.      U.S. Patent No. 8,978,985 .......................................................... 14

        D.      U.S. Patent No. 7,148,923 .......................................................... 15

        E.      U.S. Patent No. 7,527,206 .......................................................... 16

        F.      U.S. Patent No. 9,659,199 .......................................................... 17

        G.      U.S. Patent No. 7,159,783 .......................................................... 18

        H.      U.S. Patent No. 8,794,520 .......................................................... 19

JA2095

I.      Foreign Counterparts of the Asserted Patents...........................................20

J.      Licensees Under the Asserted Patents ...............................................20

VI.   RESPONDENTS' UNLAWFUL AND UNFAIR ACTS.................................20

A.    Direct Infringement...........................................................22

B.    Contributory Infringement .............................................23

C.    Induced Infringement.....................................................24

VII.  SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE ...........................24

VIII. HARMONIZED TARIFF SCHEDULE NUMBERS ...............................25

IX.   RELATED LITIGATION ....................................................25

X.    DOMESTIC INDUSTRY ....................................................26

A.    Honeywell's Practice of the Asserted Patents .........................................27

B.    Honeywell's Investments in the United States Relating to Products That Practice the Asserted Patents ....................................................29

1.    Significant Investment in Plant and Equipment.......................................30

2.    Significant Employment of Labor and Capital ...........................................31

3.    Substantial Investments in Engineering and Research and Development 31

4.    Other Expenditures ....................................................31

XI.   REQUEST FOR RELIEF ....................................................32

JA2096

## LIST OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Certified copy of U.S. Patent No. 9,465,970 |
| 2 | Certified copy of U.S. Patent No. 8,978,985 |
| 3 | Certified copy of U.S. Patent No. 7,148,923 |
| 4 | Certified copy of U.S. Patent No. 7,527,206 |
| 5 | Certified copy of U.S. Patent No. 9,659,199 |
| 6 | Certified copy of U.S. Patent No. 7,159,783 |
| 7 | Certified copy of U.S. Patent No. 8,794,520 |
| 8 | Certified copy of Assignment Record for U.S. Patent No. 9,465,970 |
| 9 | Certified copy of Assignment Record for U.S. Patent No. 8,978,985 |
| 10 | Certified copy of Assignment Record for U.S. Patent No. 7,148,923 |
| 11 | Certified copy of Assignment Record for U.S. Patent No. 7,527,206 |
| 12 | Certified copy of Assignment Record for U.S. Patent No. 9,659,199[1] |
| 13 | Certified copy of Assignment Record for U.S. Patent No. 7,159,783 |
| 14 | Certified copy of Assignment Record for U.S. Patent No. 8,794,520 |
| 15 | List of Foreign Counterparts of the Asserted Patents |
| 16 | Claim Chart Showing Infringement of U.S. Patent No. 9,465,970 |
| 17 | Claim Chart Showing Infringement of U.S. Patent No. 8,978,985 |
| 18 | Claim Chart Showing Infringement of U.S. Patent No. 7,148,923 |
| 19 | Claim Chart Showing Infringement of U.S. Patent No. 7,527,206 |
| 20 | Claim Chart Showing Infringement of U.S. Patent No. 9,659,199 |
| 21 | Claim Chart Showing Infringement of U.S. Patent No. 7,159,783 |
| 22 | Claim Chart Showing Infringement of U.S. Patent No. 8,794,520 |
| 23 | Information regarding Proposed Respondents |
| 24 | Information regarding Opticon L-50X Scanner (Datasheet and User Guides) |
| 25 | Information regarding Opticon MDI-3100 Scan Engine (Datasheets and User Guides) |
| 26 | Declaration of Stephen Lareau |
| 27 | Photographs of Opticon's L-50X Scanner |
| 28 | Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 9,465,970 |
| 29 | Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 8,978,985 |
| 30 | Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 7,148,923 |
| 31 | Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 7,527,206 |
| 32 | Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 9,659,199 |

---

[1] With the original complaint, Honeywell is submitting a non-certified version of the assignment record relevant to U.S. Patent No. 9,659,199. Honeywell has placed an order for the certified version and will submit it as soon as it is received from the U.S. Patent and Trademark Office.

JA2097

**PX-188**

33    Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 7,159,783

34    Claim Chart Showing Honeywell Xenon 1902g Practices U.S. Patent No. 8,794,520

35    Information regarding the Honeywell Xenon 1902g (Datasheet and User Guide)

36    Photographs of Honeywell Xenon 1902g

37    Confidential List of Licensees to Asserted Patents

38    Confidential Declaration of Heath Martin

JA2098

## LIST OF PHYSICAL EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| P1 | Physical sample of a domestic article protected by at least one of the Asserted Patents: Honeywell Xenon 1902g |
| P2 | Physical sample of the following imported article that is a subject of the Complaint: Opticon L-50X Scanner |

v

JA2099

## LIST OF APPENDICES

| Appendix | Description |
|---|---|
| App. A | Certified copy of Prosecution History of U.S. Patent No. 9,465,970[2] |
| App. B | Certified copy of Prosecution History of U.S. Patent No. 8,978,985 |
| App. C | Certified copy of Prosecution History of U.S. Patent No. 7,148,923 |
| App. D | Certified copy of Prosecution History of U.S. Patent No. 7,527,206 |
| App. E | Certified copy of Prosecution History of U.S. Patent No. 9,659,199 |
| App. F | Certified copy of Prosecution History of U.S. Patent No. 7,159,783 |
| App. G | Certified copy of Prosecution History of U.S. Patent No. 8,794,520 |
| App. H | Copy of References Cited in Prosecution History of U.S. Patent No. 9,465,970 |
| App. I | Copy of References Cited in Prosecution History of U.S. Patent No. 8,978,985 |
| App. J | Copy of References Cited in Prosecution History of U.S. Patent No. 7,148,923 |
| App. K | Copy of References Cited in Prosecution History of U.S. Patent No. 7,527,206 |
| App. L | Copy of References Cited in Prosecution History of U.S. Patent No. 9,659,199 |
| App. M | Copy of References Cited in Prosecution History of U.S. Patent No. 7,159,783 |
| App. N | Copy of References Cited in Prosecution History of U.S. Patent No. 8,794,520 |

---

[2] With the original complaint, Honeywell is submitting non-certified versions of the file histories for Appendices A, B, E, F, and G. Honeywell has placed orders for the certified versions of these file histories and will submit them as soon as they are received from the U.S. Patent and Trademark Office.

JA2100

PX-188

## I.    INTRODUCTION

1.    Honeywell International, Inc., Hand Held Products, Inc., and Metrologic Instruments, Inc. (collectively, "Honeywell" or "Complainants") file this complaint pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), based on the unlawful importation into the United States, the sale for importation into the United States, and/or the sale within the United States after importation of certain barcode scanners, scan engines, products containing the same, and components thereof.

2.    The proposed Respondents are Opticon Inc., Opticon Sensors Europe B.V., OPTO Electronics Co., Ltd., and Hokkaido Electronic Industry Co., Ltd. (collectively, "Opticon" or "Respondents").

3.    The complaint is directed to Respondents' imported barcode scanners, scan engines, products containing the same, and components thereof, including but not limited to, at least Opticon's L-50X, PX-20, L-46X, M-10, OPN-2006, and OPN-3002i scanners and Opticon's MDI-3100, MDI-4100, MDI-4050, and MDI-4150 scan engines, that infringe the following claims:

| U.S. Patent No. | Asserted Claims | Accused Products[3] |
|---|---|---|
| 9,465,970 | **1**, 2, 4-10, 13-21, **22**, 23, 25-31, 34-42, **43**, 44, 46-52, 55-63, **85** | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 |
| 8,978,985 | **1**, 2, 4-9, **12**, 13, 15-21, **22**, and 23-27 | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 |

---

[3] The identification of a specific model or type of barcode reader or scan engine is not intended to limit the scope of the investigation. Discovery may reveal that additional Opticon products infringe the Asserted Patents' claims and/or that additional claims are infringed, and any remedy should extend to all barcode readers, barcode scanners, scan engines, products containing the same, and components thereof.

1

| U.S. Patent No. | Asserted Claims | Accused Products[3] |
|---|---|---|
| 7,148,923 | **1**, 2-6, 8, **10**, **19**, 20-28, **29**, and 30-33 | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 |
| 7,527,206 | **1**, 2-3, **11**, 12-14, 17, 19, **20**, 21-23, 26, and 28 | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-/4050, and MDI-4150 |
| 9,659,199 | **1**, 2-7, **8**, 9-13, **14**, and 15-20 | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 |
| 7,159,783 | **9**, 10-19, and **20** | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 |
| 8,794,520 | **1**, 2-17, **18**, 19-24, **25**, 26, and **27** | At least L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 |

As shown above, the same set of Accused Products are alleged to infringe all of the Asserted Patents. Of the Asserted Patents, five provide technology helping to properly expose an image of a barcode, including two from the same family covering global shutter technology. The other two Asserted Patents relate to the scanner's operating system and certain features thereof.

4.    The Accused Products are manufactured and/or sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by or on behalf of Respondents.

5.    An industry as required by 19 U.S.C. §§ 1337(a)(2) and (3) exists in the United States relating to articles protected by the Asserted Patents.

6.    Honeywell seeks as relief a permanent limited exclusion order prohibiting entry into the United States of Respondents' infringing barcode scanners, scan engines, products containing the same, and components thereof. Honeywell requests that such an exclusion order prohibit Respondents from importing into the United States key components of the accused

2

barcode scanners, such as scan engines, imaging modules, circuit boards, and flash memory modules, so as to prevent Respondents from evading any exclusion order directed to its barcode scanners and scan engines.

7.    Honeywell also requests permanent cease and desist orders prohibiting Respondents from importing, admitting or withdrawing from a foreign trade zone, marketing, advertising, demonstrating, warehousing inventory, distributing, offering for sale, selling, licensing, repairing, programming, packaging, repackaging, bundling, or updating its certain barcode scanners, scan engines, products containing the same, and components thereof.

8.    Honeywell also requests that the Commission require an appropriate bond be posted for any activities otherwise covered by the permanent limited exclusion order and/or permanent cease and desist orders during the Presidential review period.

## II.    COMPLAINANTS

### A.    Honeywell International, Inc.

9.    Honeywell International, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 115 Tabor Road, Morris Plains, NJ 07950.  Honeywell has announced that it is relocating its corporate headquarters to Charlotte, NC.

10.    The corporation known today as Honeywell traces its roots to 1904 and an engineer named Mark Honeywell from Wabash, Indiana who developed and installed the first hot-water-heating system in the United States.  Honeywell would later play a key role in U.S. war efforts, inventing and manufacturing the first electronic autopilot system, which proved to be a turning point in World War II.  After entering the computer business through a merger with Raytheon

3

Corporation in 1957, Honeywell developed and engineered the instruments that safely landed Neil Armstrong and Buzz Aldrin on the moon.

11. In 1999, Honeywell and AlliedSignal merged. AlliedSignal was formed in 1920 in response to a shortage of drugs and chemicals during World War I. Germany controlled a majority of the world's chemical industry, which led to dramatic shortages during the war. AlliedSignal quickly became a leading producer of various chemicals and would eventually enter the aerospace, automotive, and engineered-materials businesses through mergers with prominent American corporations such as Signal Companies and Union Texas Natural Gas. At present, Honeywell is headquartered in Morris Plains, New Jersey and employs, in conjunction with its subsidiaries, approximately 43,000 employees in the United States.

12. Research is one of the keys to Honeywell's success and provides the necessary cornerstone for its cutting-edge products. Operating 150 research and engineering facilities globally, Honeywell employs over 12,000 engineers and over 14000 software developers domestically. As of early 2019, Honeywell had over 25,000 granted patents and over 11,000 patent applications stemming from its R&D work.

13. Since the 1960s, Honeywell and its subsidiaries have spent tens of millions of dollars in U.S. expenditures related to the development, testing, product support, repair, and service of its barcode scanning product lines, which, *inter alia*, embody the innovations of the Asserted Patents and many other patents in Honeywell's patent portfolio. These expenditures and efforts demonstrate Honeywell's commitment to bringing state-of-the-art barcode scanning equipment to U.S. consumers and businesses.

4

**B.     Hand Held Products, Inc.**

14.     Hand Held Products, Inc. ("Hand Held") is a corporation organized under the laws of Delaware, with its principal place of business at 9680 Old Bailes Road, Fort Mill, SC 29707. Hand Held is a wholly owned subsidiary of Honeywell International, Inc.  Hand Held is relocating its corporate headquarters to Charlotte, NC later in 2019.

15.     Hand Held was founded in Charlotte, North Carolina and provided barcode reading and image collection solutions for a variety of applications including mobile, wireless, and transaction processing.  One of Hand Held's feature products was the Dolphin handheld computer, which included both laser barcode scanning and image capture technology.  Hand Held would eventually merge with Honeywell in late 2007 and operated as the Honeywell Scanning & Mobility division.

16.     Hand Held has developed and sells a diverse range of products, which cover a spectrum of industries and solutions.  These products include barcode scanners, computer devices, printers, wearable technology, software, and RFID devices.  These devices provide innovative solutions for factories, healthcare and manufacturing facilities, and retail.  As a result of Hand Held's innovative design and product features, its products have become commonplace in hospitals and other healthcare facilities because of their reliability, accuracy, and versatility.

17.     Hand Held owns approximately 1,400 granted patents and approximately 500 pending patent applications.  These patents/patent applications cover a wide range of technologies relating to cellular phones, barcode scanners, wearable technology, human interface devices, and various components thereof.

C.     **Metrologic Instruments, Inc.**

18.     Metrologic Instruments, Inc. ("Metrologic") is a corporation organized under the laws of New Jersey, with its principal place of business at 9680 Old Bailes Road, Fort Mill, SC 29707.  Metrologic is a wholly owned subsidiary of Honeywell International, Inc.  Metrologic is relocating its corporate headquarters to Charlotte, NC later in 2019.

19.     Metrologic was founded in 1968.  In the 1970s with the rise in popularity of barcode scanners, Metrologic entered the industry, developing the first hand-held laser barcode scanner, known as the X-scanner.  After decades of research and development, Metrologic debuted the Voyager barcode scanner in 2000, which featured push-button data transmission.  The Voyager had the ability to act both as a handheld scanner and as a presentation scanner while cradled and quickly became one of the best-selling barcode scanners and remains an industry leader to this day.  In the spring of 2008, Metrologic joined forces with Honeywell, officially becoming a part of, along with Hand Held, Honeywell Scanning & Mobility in 2009.

20.     Metrologic is an industry leader in data capture and collection hardware and software.   During the birth of the Universal Product Code, Metrologic introduced triggerless, omnidirectional, and mini-slot scanners into the retail market to help read and decode these new barcodes.   Since these breakthroughs, Metrologic's technologies have included barcode computing, software for barcode scanners optimization, and wireless communication network infrastructure.  Today, Metrologic owns approximately 350 granted patents and approximately 25 pending patent applications.  These patents cover a wide variety of technologies in the areas of laser and imaging technologies.

6

### III.    PROPOSED RESPONDENTS

#### A.    Opticon, Inc.

21.    Proposed Respondent Opticon, Inc. ("Opticon USA") is a company organized and existing under the laws of the State of Delaware, having a principal place of business at 2220 Lind Ave. SW, Suite 100, Renton, WA 98057-3327.  Opticon USA, among other things, is engaged in the importation into the United States and sale after importation into the United States of barcode scanners and scan engines, including the Accused Products.

22.    Upon information and belief, Opticon USA imports and sells after importation all or a substantial portion of the Accused Products.

23.    Upon information and belief, Opticon USA is a direct or indirect subsidiary of OPTO Electronics Co., Ltd.

24.    Additional information concerning Opticon USA may be found on its website, available at http://www.opticonusa.com.

#### B.    Opticon Sensors Europe B.V.

25.    Proposed Respondent Opticon Sensors Europe B.V. ("Opticon Sensors") is, upon information and belief, a company organized and existing under the laws of The Netherlands, having a principal place of business at Opaallaan 35, 2132 XV Hoofddorp, Netherlands.

26.    Upon information and belief, Opticon Sensors, among other things, is engaged in overseeing and/or arranging the manufacture of the Accused Products, overseeing and/or arranging the importation of the Accused Products, as well as the sale for importation and the importation into the United States of barcode scanners and scan engines, including the Accused Products.

27.    For example, Opticon Sensors's website states that it "has several central activities besides [ex-US] sales, such as logistics and technical engineering. . . . The technical departments

7

consist of production, research and development for hardware and software, technical support, and a service department." Ex. 23.

28.     Upon information and belief, Opticon Sensors is a direct or indirect subsidiary of OPTO Electronics Co., Ltd.

29.     Additional information concerning OPTO may be found on its website, available at https://opticon.com/countries/netherlands/ .

## C.     OPTO Electronics Co., Ltd.

30.     Proposed Respondent OPTO Electronics Co., Ltd. ("OPTO") is, upon information and belief, a company organized and existing under the laws of Japan, having a principal place of business at 12-17, Tsukagoshi 4-chrome, Warabi-city Saitama Pref., 335-0002, Japan.

31.     Upon information and belief, OPTO, among other things, is engaged in overseeing and/or arranging the manufacture of the Accused Products, as well as the sale for importation and the importation into the United States of barcode scanners, including the Accused Products.

32.     For example, OPTO's website states that, "Product manufacturing is managed through our Japanese office, OPTO Electronics Co. Ltd., which uses a major ISO-certified production facility." Ex. 23.

33.     Additional information concerning OPTO may be found on its website, available at https://opticon.com/countries/japan/.

## D.     Hokkaido Electronic Industry Co., Ltd.

34.     Proposed Respondent Hokkaido Electronic Industry Co., Ltd. ("Hokkaido") a/k/a Hokkaido Electronic Co., Ltd. and Hokkaido Electronics Industrial Co., Ltd. is, upon information and belief, a company organized and existing under the laws of Japan, having a principal place of business at 118-122 Kamiashibetsu-cho, Ashibetsu-shi, Hokkaido, Japan.

8

35.     Upon information and belief, Hokkaido, among other things, is engaged in the manufacture of the Accused Products as well as the sale for importation into the United States of barcode scanners and scan engines, including the Accused Products.

36.     For example, Hokkaido's ISO 9001 certificate states that its scope is: "THE MANUFACTURE OF BARCODE SCANNER, WIRELESS BARCODE SCANNER AND MODULE FOR BARCODE SCANNER." Ex. 23.

37.     For example, OPTO's public filings indicate that Hokkaido performs at least a portion of the "Manufacture of our group products." Ex. 23.

38.     Upon information and belief, Hokkaido is a direct or indirect subsidiary of OPTO Electronics Co., Ltd.

**E.     Statement Regarding Additional Potential Respondents**

39.     According to OPTO, certain of its "products are outsourced to several overseas companies outside the [OPTO] group." Ex. 23. The identity or identities of these additional manufacturers of Accused Products, who upon information and belief then sell the Accused Products for importation into the United States, are unknown to Complainants at this time. Complainants reserve the right to move to add additional respondents should discovery identify additional manufacturers.

**IV.     THE TECHNOLOGY AND ACCUSED PRODUCTS AT ISSUE**

40.     The Asserted Patents, described in more detail below, are a reflection of the breadth of Honeywell's extensive dedication and investment in barcode scanning technology. Ever since the 1960s, Honeywell has strived to provide its customers with cutting-edge bar code scanning devices.

JA2109

41.    Early barcode scanners were designed only to read linear, one-dimensional (1D) barcodes. 1D barcodes use a series of lines and spaces and variable lengths to encode data. These linear barcodes can contain only a handful of characters. Accordingly, to encode longer strings of data, a 1D barcode would need to be physically enlarged or extended, which is not suitable for all circumstances.



42.    As a result, various two-dimensional (2D) barcodes, which use shapes, as opposed to lines, to encode data were designed. Because data can be encoded based both on a vertical and horizontal arrangement of shapes, 2D barcodes can encode exponentially more data in the same amount of space compared to their 1D counterparts.

43.    The advent of 2D barcodes ushered in a new era and a new need for advanced barcode scanners that could decode these complex arrangements of shapes and sizes. As a pioneer in advanced 2D barcode scanners, Honeywell developed an array of products with technologies that allowed barcode scanners to seamlessly read 2D and 1D barcodes. Because of the complexity of 2D barcodes and the complexity in reading such barcodes, even the slightest change in lighting, user hand-jitter, or angle of scanning can dramatically affect the ability to effectively and efficiently decode these barcodes. This complexity, coupled with the need for speed of decoding

10

especially in healthcare, retail, and manufacturing settings, underscores the importance of Honeywell's technological advances.

44.    One of Honeywell's key innovations was the development of global-shutter technology in CMOS-based barcode scanners. Traditionally, CMOS image sensors used a rolling shutter technique in which individual rows of pixels in the image sensor were activated and read out in sequence. This meant that, for example, the top row of pixels in the image sensor was exposed before the bottom row of pixels. Because rolling shutter involved the exposing rows of pixels sequentially at different times, rolling shutter suffers from two disadvantages: image distortion and image blur. To overcome these drawbacks, Honeywell engineers developed the use of global shutter technology in the CMOS image sensor, in which all or substantially all of the pixels are simultaneously exposed. Exposing all pixels in the sensor simultaneously addresses each drawback because pixels are not exposed at different points in times during image capture. Products incorporating global shutter were and still are far superior to scan engines utilizing rolling shutter, and this innovation resulted in significant commercial success for Honeywell's global-shutter products.

45.    Honeywell has developed technology and software programming that allows these barcode scanners to adjust automatically, in real-time, to various environmental conditions. For example, Honeywell developed barcode scanners that can adjust exposure (light) settings on a frame-by-frame basis, which allows a barcode reader to capture higher-quality images. An addition innovation was the development of barcode readers capable of adjusting exposure settings in a real-time fashion in a multitasking operation system environment. Honeywell also developed barcode reader technology that improves the user experience by reducing apparent flicker from the illumination LEDs that are utilized during scanning operations while also improving the ability of the reader to read images on LCD screens. Moreover, Honeywell developed barcode reader

11

technology that allows the reader to determine the location of a barcode within the frame and use information regarding the quality of the image at that location in order to obtain an improved subsequent image. One Honeywell innovation even allows barcode scanners to be customized using a script-interpreter program. Combined, these technologies lead to faster decode time and more accurate, concise character output. Barcode scanners, because of Honeywell's advancements, can now quickly decode any type of barcode, regardless of environment, and can automatically adjust to different users to provide quick and accurate scanning and decoding.

46.     The Accused Products are certain Opticon barcode scanners, scan engines, products containing the same, and components thereof that incorporate, without authorization, certain of Honeywell's technologies as set forth and claimed in the Asserted Patents.

47.     In accordance with Rule 210.12(a)(12), the Accused Products fall into the categories of products that are generally known in plain English as: "barcode scanners, barcode readers, barcode decoders, stationary scanners, handheld scanners, companion scanners, cabled scanners, wireless scanners, mobile scanning devices, handheld computers, and/or scan engines."

## V.     THE ASSERTED PATENTS AND NON-TECHNICAL DESCRIPTION OF THE INVENTIONS[4]

### A.     Ownership of the Asserted Patents

48.     Hand Held Products, Inc. owns the entire right, title, and interest to the 970 Patent. A certified copy of the assignment records for the 970 Patent, as maintained by the USPTO, is attached as Exhibit 8.

---

[4] All non-technical descriptions of the inventions herein are presented to give a general background of those inventions. Such statements are not intended to be used, nor should be used, for purposes of patent claim interpretation. Complainants present these statements subject to, and without waiver of, their right to argue that claim terms should be construed in a particular way, as contemplated by claim interpretation jurisprudence and the relevant evidence.

JA2112

49.    Hand Held Products, Inc. owns the entire right, title, and interest to the 985 Patent. A certified copy of the assignment records for the 985 Patent, as maintained by the USPTO, is attached as Exhibit 9.

50.    Hand Held Products, Inc. owns the entire right, title, and interest to the 923 Patent. A certified copy of the assignment records for the 923 Patent, as maintained by the USPTO, is attached as Exhibit 10.

51.    Metrologic Instruments, Inc. owns the entire right, title, and interest to the 206 Patent. A certified copy of the assignment records for the 206 Patent, as maintained by the USPTO, is attached as Exhibit 11.

52.    Hand Held Products, Inc. owns the entire right, title, and interest to the 199 Patent. A certified copy of the assignment records for the 199 Patent, as maintained by the USPTO, is attached as Exhibit 12.

53.    Hand Held Products, Inc. owns the entire right, title, and interest to the 783 Patent. A certified copy of the assignment records for the 783 Patent, as maintained by the USPTO, is attached as Exhibit 13.

54.    Hand Held Products, Inc. owns the entire right, title, and interest to the 520 Patent. A certified copy of the assignment records for the 520 Patent, as maintained by the USPTO, is attached as Exhibit 14.

**B.    U.S. Patent No. 9,465,970**

55.    The 970 Patent, entitled "Image Reader Comprising CMOS Based Image Sensor Array," issued on October 11, 2016, naming inventors Ynjiun P. Wang and William H. Havens. The 970 Patent issued from U.S. Patent Application Serial No. 14/221,903, filed on March 21,

13

2014, and expires on March 11, 2025. The first maintenance fee window for the 970 Patent opens on October 11, 2019.

56.    A certified copy of the 970 Patent is attached as Exhibit 1.

57.    A certified copy[5] of the prosecution history of the 970 Patent, as maintained by the United States Patent and Trademark Office ("USPTO"), and copies of each reference cited in the 970 Patent and its prosecution history are included in Appendices A and H, respectively.

58.    The 970 Patent has 107 claims, 5 of which are independent claims. Complainants assert claims **1**, 2, 4-10, 13-21, **22**, 23, 25-31, 34-42, **43**, 44, 46-52, 55-63, and **85**.

59.    The 970 Patent discloses, for example, an apparatus using a CMOS image sensor in a global-shutter mode to decode a bar code. Barcode reading benefits from the exposure of substantially all of the pixels in the image sensor. But traditionally, CMOS-based image readers have employed rolling shutters whereby one row of pixels is exposed at a time, resulting in image distortion and image blur. The technology of the 970 Patent allows for the use of global-shutter technology to expose substantially all of the pixels at once in a CMOS-based image sensor, limiting image distortion and blur. This allows for barcodes to be read more accurately and quickly.

**C.    U.S. Patent No. 8,978,985**

60.    The 985 Patent, entitled "Image Reader Comprising CMOS Based Image Sensor Array," issued on March 17, 2015, naming inventors Ynjiun P. Wang and William H. Havens. The 985 Patent issued from U.S. Patent Application Serial No. 14/273,631, filed on May 19, 2014, and expires on March 11, 2025. All maintenance fees due have been timely paid for the 985 Patent.

---

[5] With the original complaint, Honeywell is submitting non-certified versions of the file histories for Appendices A, B, E, F, and G. Honeywell has placed orders for the certified versions of these file histories and will submit them as soon as they are received from the U.S. Patent and Trademark Office.

14

61.    A certified copy of the 985 Patent is attached as Exhibit 2.

62.    A certified copy of the prosecution history of the 985 Patent, as maintained by the USPTO, and copies of each reference cited in the 985 Patent and its prosecution history are included in Appendices B and I, respectively.

63.    The 985 Patent has 27 claims, 3 of which are independent claims.  Complainants assert claims **1**, 2, 4-9, **12**, 13, 15-21, **22**, and 23-27.

64.    The 985 Patent discloses, for example, a barcode reading device using a CMOS image sensor in a global-shutter mode to decode a 1D or 2D barcode.  Barcode reading benefits from the exposure of substantially all of the pixels in the image sensor.  But traditionally, CMOS-based image readers have employed rolling shutters whereby one row of pixels is exposed at a time, resulting in image distortion and image blur.  Also, prior-art barcode reading devices have had difficulty reading all 1D and 2D barcodes.  The technology of the 985 Patent allows for the use of global-shutter technology to expose substantially all of the pixels at once in a CMOS-based image sensor, limiting image distortion and blur.  This allows for both 1D and 2D barcodes to be read more accurately and quickly.

**D.    U.S. Patent No. 7,148,923**

65.    The 923 Patent, entitled "Methods and Apparatus for Automatic Exposure Control," issued on December 12, 2006, naming inventors Jeffrey D. Harper, Robert M. Hussey, Matthew W. Pankow, and Timothy P. Meier.  The 923 Patent issued from U.S. Patent Application Serial No. 09/903,300, filed on July 11, 2001, and expires on October 19, 2021.  All maintenance fees due have been paid for the 923 Patent.

66.    A certified copy of the 923 Patent is attached as Exhibit 3.

15

JA2115

67.    A certified copy of the prosecution history of the 923 Patent, as maintained by the USPTO, and copies of each reference cited in the 923 Patent and its prosecution history are included in Appendices C and J, respectively.

68.    The 923 Patent has 33 claims, 6 of which are independent claims. Complainants assert claims 1, 2-6, 8, 10, 19, 20-28, 29, and 30-33.

69.    The 923 Patent discloses, for example, a device and method for automated exposure control in a multi-tasking environment. Exposure, in imaging, is a measure of the amount of light per unit area in a particular space, and to accurately read barcodes, a scanner needs to be able to alter the exposure based on environmental conditions. The technology of the 923 Patent allows for the adjustment of exposure settings in an imaging device in a real-time fashion, using distinct modules, so that the exposure setting is accurate for the particular image being captured. This technology allows for the reading of data from a wider range of products that may be of different size, shape, and material construction.

**E.    U.S. Patent No. 7,527,206**

70.    The 206 Patent, entitled "Method of Setting the Time Duration of Illumination From an LED-Based Illumination Array Employed in a Digital Imaging-Based Code Symbol Reader, Using an Image-Processing Based Illumination Metering Program Executed Therewithin," issued on May 5, 2009, naming inventors Xiaoxun Zhu, Yong Liu, Ka Man Au, Rui Hou, Hongpeng Yu, Xi Tao, Liang Liu, Wenhua Zhang, and Anatoly Kotlarsky. The 206 Patent issued from U.S. Patent Application Serial No. 11/607,114, filed on November 30, 2006, and expires on November 13, 2023. All maintenance fees due have been timely paid for the 206 Patent.

71.    A certified copy of the 206 Patent is attached as Exhibit 4.

72.     A certified copy of the prosecution history of the 206 Patent, as maintained by the USTPO, and copies of each reference cited in the 206 Patent and its prosecution history are included in Appendices D and K, respectively.

73.     The 206 Patent has 28 claims, 3 of which are independent claims. Complainants assert claims **1**, 2-3, **11**, 12-14, 17, 19, **20**, 21-23, 26, and 28.

74.     The 206 Patent discloses, for example, a barcode reader with a modified imaging sensor to adjust to varied light conditions based on the environment around the barcode and reader. Historically, barcode scanners would use integrated illumination subsystems, which limited the capability to read large and highly dense barcodes. The technology of the 206 Patent allows real-time measuring and correction of added illumination duration for subsequent image capture. This allows for barcodes to be read more clearly and accurately.

**F.    U.S. Patent No. 9,659,199**

75.     The 199 Patent, entitled "Terminal with Flicker-Corrected Aimer and Alternating Illumination," issued on May 23, 2017, naming inventors Daniel Van Volkinburg, Stephen Patrick Deloge, Kevin Bower, Matthew Pankow, and Ryan Kather. The 199 Patent issued from U.S. Patent Application Serial No. 15/176,366, filed on June 8, 2016, and expires on January 31, 2031. The first maintenance fee window for the 199 Patent opens on March 23, 2020.

76.     A certified copy of the 199 Patent is attached as Exhibit 5.

77.     A certified copy of the prosecution history of the 199 Patent, as maintained by the USPTO, and copies of each reference cited in the 199 Patent and its prosecution history are included in Appendices E and L, respectively.

78.     The 199 Patent has 20 claims, 3 of which are independent claims. Complainants assert claims **1**, 2-7, **8**, 9-13, **14**, and 15-20.

JA2117

79. The 199 Patent discloses, for example, a device and method for activating a screen reading mode with reduced flickering to read an indicia. Traditionally, barcode scanners used illumination to read any barcode for greater image clarity and exposure overall decoding speed. Using illumination on a screen, however, can cause specular reflection resulting in an unreadable barcode. The 199 Patent allows for a screen reading mode with an alternating illumination where there is an exposure period without illumination. It also allows for illumination at specific intervals to reduce flickering effects which can result in a noticeable change in illumination brightness. This allows for barcode scanners to read screens such as, for example, phone mobile-device screens.

### G.    U.S. Patent No. 7,159,783

80. The 783 Patent, entitled "Customizable Optical Reader," issued on January 9, 2007, naming inventors Joseph Walczyk, Dieter Fauth, David Holzhauer, Robert M. Hussey, Barry Keys, Joseph Livingston, and Michael D. Robinson. The 783 Patent issued from U.S. Patent Application Serial No. 11/203,667, filed on August 12, 2005, and expires on March 28, 2023. All maintenance fees due have been timely paid for the 783 Patent.

81. A certified copy of the 783 Patent is attached as Exhibit 6.

82. A certified copy of the prosecution history of the 783 Patent, as maintained by the USPTO, and copies of each reference cited in the 783 Patent and its prosecution history are included in Appendices F and M, respectively.

83. The 783 Patent has 20 claims, 3 of which are independent claims. Complainants assert claims **9**, 10-19, and **20**.

84. The 783 Patent discloses, for example, a device and method of customizing an optical reader. Historically, optical readers output a specific string as programmed into the barcode. The 783 patent allows a user to configure the optical reader using a script interpreter

18

program to output an edited string that may differ from the original string programmed into the barcode. This allows customization of an optical reader in a manner consistent with the user's particular application.

### H.    U.S. Patent No. 8,794,520

85.    The 520 Patent, entitled "Method and Apparatus for Operating Indicia Reading Terminal Including Parameter Determination," issued on August 5, 2014, naming inventors Ynjiun P. Wang and Shulan Deng. The 520 Patent issued from U.S. Patent Application Serial No. 12/242,244, filed on September 30, 2008, and expires on June 21, 2029. All maintenance fees due have been timely paid for the 520 Patent.

86.    A certified copy of the 520 Patent is attached as Exhibit 7.

87.    A certified copy of the prosecution history of the 520 Patent, as maintained by the USPTO, and copies of each reference cited in the 520 Patent and its prosecution history are included in Appendices G and N, respectively.

88.    The 520 Patent has 27 claims, 4 of which are independent claims. Complainants assert claims **1**, 2-17, **18**, 19-24, **25**, 26, and **27**.

89.    The 520 Patent discloses, for example, a device and method of determining a parameter in a hand-held barcode reader. Historically, to determine, for example, an exposure parameter, a sample of pixel values could be derived from the frame and averaged to determine the frame white level. When a significant portion of the background is white, or black, however, the determined parameter may be inaccurate, which may result in misreads. The 520 Patent allows the barcode reader to determine a location of a barcode, and derive a parameter from a sample of pixels from that location. This allows for a significant reduction in misreads.

19

**I.**    **Foreign Counterparts of the Asserted Patents**

90.    A list of each foreign patent, each foreign patent application, and each foreign application that has been denied, abandoned, or withdrawn corresponding to the Asserted Patents, with an indication of the prosecution status of each such foreign patent application, is attached as Exhibit 15. Honeywell is aware of no other foreign patent, foreign patent application, or foreign application that has been denied, abandoned, or withdrawn corresponding to the Asserted Patents.

**J.**    **Licensees Under the Asserted Patents**

91.    Any party that may be licensed to one or more of the Asserted Patents is identified in Confidential Exhibit 37.

**VI.**    **RESPONDENTS' UNLAWFUL AND UNFAIR ACTS**

92.    As discussed in detail below, the Accused Products are barcode scanners, scan engines, products containing the same, and components thereof, that infringe the Asserted Patents and are manufactured abroad by or for Opticon and sold for importation into the United States, imported into the United States, and/or sold within the United States after importation, at least in part by Opticon. Information regarding representative Accused Products discussed below can be found in Exhibits 24-25.

93.    Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **1**, 2, 4-10, 13-21, **22**, 23, 25-31, 34-42, **43**, 44, 46-52, 55-63, and **85** of the 790 Patent with respect to at least its L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

94.    An exemplary claim chart showing infringement of independent claims 1, 22, 43, and 85 of the 790 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 16.

95.     Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **1**, 2, 4-9, **12**, 13, 15-21, **22**, and 23-27 of the 985 Patent with respect to at least its L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

96.     An exemplary claim chart showing infringement of independent claims 1, 12, and 22 of the 985 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 17.

97.     Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **1**, 2-6, 8, **10**, **19**, 20-28, **29**, and 30-33 of the 923 Patent with respect to at least its L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

98.     An exemplary claim chart showing infringement of independent claims 1, 10, 19, and 29 of the 923 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 18.

99.     Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **1**, 2-3, **11**, 12-14, 17, 19, **20**, 21-23, 26, and 28 of the 206 Patent with respect to at least its L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

100.     An exemplary claim chart showing infringement of independent claims 1, 11, and 20 of the 206 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 19.

101.     Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **1**, 2-7, **8**, 9-13, **14**, and 15-20 of the 199 Patent with respect to at least its

L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

102. An exemplary claim chart showing infringement of independent claims 1, 8, and 14 of the 199 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 20.

103. Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **9**, 10-19, and **20** of the 783 Patent with respect to at least its L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

104. An exemplary claim chart showing infringement of independent claims 9 and 20 of the 783 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 21.

105. Opticon directly infringes, contributes to the infringement of, and/or induces the infringement of claims **1**, 2-17, **18**, 19-24, **25**, 26, and **27** of the 520 Patent with respect to at least its L-50X, PX-20, L-46X, M-10, OPN-2006, OPN-3002i, MDI-3100, MDI-4100, MDI-4050, and MDI-4150 products.

106. An exemplary claim chart showing infringement of independent claims 1, 18, 25, and 27 of the 520 Patent by Opticon's L-50X, which is representative of the Accused Products, is attached as Exhibit 22.

**A.    Direct Infringement**

107. Respondents directly infringe the Asserted Patents through their manufacture, sale for importation, importation, and/or sale after importation of the Accused Products.

22

108. On information and belief, Respondents manufacture the Accused Products abroad, including in Japan and China, and then sell those Accused Products for importation into the United States.

109. On information and belief, Opticon imports into the United States all of the Accused Products.

110. Opticon directly and through authorized agents, sells and offers for sale the Accused Products within the United States to end users.

111. On information and belief, Opticon tests or operates the Accused Products in the United States, thereby performing the claimed methods and directly infringing any asserted claims of the Asserted Patents requiring such operation. Similarly, Opticon's customers and the end users of the Accused Products test and/or operate the Accused Products in the United States, in accordance with Opticon's instruction contained in, for example, its user manuals, thereby also performing the claimed methods and directly infringing the asserted claims of the Asserted Patents requiring such operation.

**B.     Contributory Infringement**

112. Respondents also contribute to infringement of the Asserted Patents by selling for importation into the United States, importing into the United States, and/or or selling within the United States after importation the Accused Products, the non-staple constituent parts of those devices, which are not suitable for substantial non-infringing use and which embody a material part of the inventions described in the Asserted Patents. On information and belief, these devices are known by Respondents to be especially made or especially adapted for use in the infringement of the Asserted Patents.

113.    Specifically, upon information and belief, Opticon sells the Accused Products to resellers and end users with knowledge that the devices infringe. End users of the barcode scanners directly infringe the Asserted Patents.

114.    Respondents have had notice of the Asserted Patents and Honeywell's claims of infringement of each since no later than the service of this Complaint. Despite having notice of the Asserted Patents and its infringement of the Asserted Patents, Respondents have continued their unlawful activities and expanded those activities by launching new infringing products.

### C.    Induced Infringement

115.    Respondents also induced, and continue to induce, infringement of the Asserted Patents by encouraging and facilitating others to perform acts known by Respondents to infringe the Asserted Patents with the specific intent that those performing the acts infringe the Asserted Patents. Upon information and belief, Opticon did so with knowledge of the Asserted Patents. Opticon, upon information and belief, among other things, advertises the Accused Products, publishes datasheets and promotional literature describing the operation of those devices, creates and/or distributes user manuals for the Accused Products, and offers support and technical assistance to its customers designed to induce those customers to perform the specific acts of direct infringement. On information and belief, these materials instruct and encourage users to use Opticon's Accused Products in a manner that infringes the asserted claims.

### VII.    SPECIFIC INSTANCES OF UNFAIR IMPORTATION AND SALE

116.    Respondents sell for importation into the United States, import into the United States, and/or sell after importation into the United States the Accused Products. An example of an Accused Product was purchased from a retailer in the United States. *See* Exhibits 26-27.

24

**JA2124**

117.    Opticon's Accused Products are manufactured abroad, sold for importation into the United States, imported into the United States, and/or sold after importation into the United States by Opticon and/or its authorized agents. *See* Exhibits 23, 27.

118.    Upon information and belief, most or all of the Accused Products are manufactured either by OPTO Electronics Co., Ltd.'s subsidiary Hokkaido at manufacturing facilities in Japan or on behalf of Opticon at one or more contract manufacturing facilities in China. *See* Exhibit 23.

119.    Exhibit 27 contains photographs of an Opticon L-50X, which includes a MDI-3100 scan engine, including various components and parts thereof, purchased from a retailer in the United States. These photographs show, *inter alia*, that the L-50X indicates that it was "Made in China." The packaging and the L-50X itself also indicate as follows: "Made in China." Specifically, Honeywell's counsel caused an Opticon L-50X to be purchased on May 13, 2019 from Barcodes, Inc., based in Chicago, Illinois. *See* Exhibit 26.

## VIII.    HARMONIZED TARIFF SCHEDULE NUMBERS

120.    On information and belief, the Accused Products have been imported into the United States under at least the following Harmonized Tariff Schedule numbers: 8471605000 and 8471900000.

## IX.    RELATED LITIGATION

121.    Concurrent with the instant complaint, Honeywell will file a complaint in the U.S. District Court for the District of Delaware alleging infringement of the Asserted Patents against Opticon.

122.    U.S. Patent No. 7,568,628, which issued from the parent application of the applications that resulted in the 970 and 985 patents, was the subject of an *Inter Partes* Review Petition filed on September 20, 2013 in *Fujian Newland Computer Co., Ltd. v. Hand Held*

25

*Products, Inc.*, IPR2013-00595 (PTAB). The PTAB instituted review of claims 1, 18, 35, 36, 39, 44, and 46 on February 28, 2014. And the PTAB issued its Final Written Decision on February 18, 2015 affirming the validity of all challenged claims.

123. On May 23, 2017, Honeywell International, Inc., Hand Held, and Metrologic filed a complaint with the ITC asserting infringement of the 923 patent, the 206 patent, and four other patents against The Code Corporation ("Code") and its subsidiary Cortex Ltd. The ITC instituted Investigation No. 337-TA-1061 on June 21, 2017 based on that complaint.

124. On January 17, 2018, the Commission entered a Consent Order against Code, barring importation or the sale after importation, *inter alia*, of Code's products that infringe claims 10, 19-21, 24-28, and 31 of the 923 patent. That Consent Order remains effective today.

125. The Commission terminated the 1061 Investigation as to the remaining asserted claims of the 923 patent and the asserted claims of the 206 patent on March 22, 2018 based on a confidential settlement agreement between Honeywell and Code.

126. Other than as described above, the alleged unfair methods of competition and unfair acts, or the subject matter thereof, are not and have not been the subject of any court or agency litigation.

## X.    DOMESTIC INDUSTRY

127. An industry as required by Section 337(a)(2) and as defined by Section 337(a)(3) exists in the United States. Honeywell offers several styles and lines of its scanner products, including the products sold under the Granit and Xenon trade names, that practice one or more of the Asserted Patents, including the Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110

26

products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50,

Dolphin ct60, and the Captuvo sleds (collectively, "Honeywell Barcode Scanners"), and has spent

millions of dollars in the United States to create, test, and support these models for use by U.S.

consumers. Thus, Honeywell's activities as they relate to the Honeywell Barcode Scanners

support a domestic industry relating to barcode scanning products that practice the Asserted

Patents.

**A.    Honeywell's Practice of the Asserted Patents**

128.    As stated above, for purposes of this complaint, Honeywell submits its Xenon

1902g as representative of Honeywell's barcode scanners that practice the Asserted Patents. The

following table provides an exemplary summary of the Asserted Patents being practiced by

Honeywell's products:

| U.S. Patent No. | Honeywell Products |
|---|---|
| 9,465,970 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |
| 8,978,985 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |
| 7,148,923 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 |

27

| U.S. Patent No. | Honeywell Products |
| --- | --- |
|  | products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |
| 7,527,206 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |
| 9,659,199 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |
| 7,159,783 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |
| 8,794,520 | At least Xenon 1900g, Xenon 1902g, Xenon 1900h, Xenon 1902h, Granit 1910i, Granit 1911i, Granit 1920i, Vuquest 3320g, the N5600-series scan engines, the N6600-series engines the CK75, Dolphin 60s, Dolphin 75e, Dolphin 99, certain Dolphin 6110 products, Dolphin 7800, Dolphin ck65, Dolphin cn80, Dolphin ct40 products, Dolphin ct50, Dolphin ct60, and the Captuvo sleds |

129.    In addition, Honeywell is actively designing barcode scanning devices in the United States that will use technology claimed in the Asserted Patents and thus, these new products also may practice the Asserted Patents.

28

JA2128

130.    Information regarding Honeywell's Xenon 1902g, including an operation manual, screenshots, and photographs, are included in Exhibits 35-36.

131.    Exhibit 28 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 1 of the 970 Patent.

132.    Exhibit 29 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 1 of 985 Patent.

133.    Exhibit 30 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 29 of the 923 Patent.

134.    Exhibit 31 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 20 of the 206 Patent.

135.    Exhibit 32 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 1 of the 199 Patent.

136.    Exhibit 33 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 20 of the 783 Patent.

137.    Exhibit 34 contains a claim chart showing that Honeywell's Xenon 1902g practices claim 18 of the 520 Patent.

**B.    Honeywell's Investments in the United States Relating to Products That Practice the Asserted Patents**

138.    Honeywell has made, and continues to make, substantial investments in the United States to create and support the products that practice the Asserted Patents.

139.    In addition to the above, in 2011 Honeywell designed and released its Xenon line of barcode scanners, some of which compete with the infringing Opticon L-50X.

140.    Honeywell's Xenon line of barcode scanners revolutionized the market, ushering a new area of barcode scanning technology. Certain Xenon scanners are specifically designed for

29

healthcare facilities, industrial settings, and retail use, respectively. These scanners are able to withstand up to 50 drops to concrete from distances as high as 6 feet and have IP41 environmental sealing, allowing them to be cleaned and disinfected for healthcare facilities. Because of their industry leading technologies, the Xenon scanners have extended field depths and can read barcodes that have been damaged, are high-density, are translucent, or are in color.

141.   The Xenon products were designed in the United States, primarily in New York and New Jersey. And the Xenon products are supported, maintained, and repaired in the United States, primarily in North Carolina and South Carolina.

142.   Honeywell continues to update and improve its Xenon products, and continues to develop and launch newer versions.

143.   Honeywell has expended considerable resources on plant and equipment, labor and capital, and engineering and research and development to support the Honeywell Scanners in the United States. These expenditures continue as Honeywell further improves the Honeywell Barcode Scanners and also seeks to develop new barcode scanners and related technologies. A discussion of both current and future representative expenditures is set forth below.

### 1.   Significant Investment in Plant and Equipment

144.   Honeywell has spent, and continues to spend, significant sums on its domestic facilities supporting the products that practice the Asserted Patents. For example, the research and development efforts for each of the Honeywell Barcode Scanners took place at least in Honeywell's New York, New Jersey, and South Carolina facilities, in which Honeywell has made, and continues to make, extensive investments. *See* Confidential Exhibit 38.

30

JA2130

### 2.    Significant Employment of Labor and Capital

145.    Honeywell has engaged in, and continues to engage in, significant employment of labor and capital in the United States. As of May 2019 Honeywell had approximately 43,000 U.S.-based employees. Honeywell employs about 1100 people in the United States in its Productivity Products business group, which includes the scan engines, scanners, and mobility products identified above. Honeywell employs many U.S.-based employees working in research and development or in ongoing product maintenance that supports the Honeywell Barcode Scanners. *See* Confidential Exhibit 38.

### 3.    Substantial Investments in Engineering and Research and Development

146.    Honeywell has made, and continues to make, substantial investment in engineering and research and development activities that support the products that practice the Asserted Patents.

147.    For example, just since 2015, Honeywell has spent millions of dollars in the United States on the research and development of the Honeywell barcode scanners. These expenditures include, but are not limited to, direct technical program costs and costs for building prototypes and testing of these barcode scanning devices. *See* Confidential Exhibit 38.

### 4.    Other Expenditures

148.    Honeywell supports its products, including the Honeywell Barcode Scanners, with substantial customer and consumer service, warranty, and repair teams. These teams include personnel located in North Carolina and South Carolina that handle repairs and a team of field support specialists that train distributors, retailers, and customers how to use the products. At its Fort Mill, SC facility, Honeywell built and maintains a testing laboratory with various equipment used to manufacture, test, and analyze various prototypes and products. Honeywell also invests

substantial sums in its logistics, warehousing, and distribution of its products within the United States. Honeywell relies heavily on the domestic services of domestic third-party logistics providers. Honeywell also has a significant OEM business, selling software and scanner engines to third parties that manufacture products in the United States. *See* Confidential Exhibit 38.

## XI.    REQUEST FOR RELIEF

149.    Complainants request that the U.S. International Trade Commission:

a.    Institute an immediate investigation, pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, with respect to violations of Section 337 based upon the sale for importation into the United States, the importation into the United States, and/or the sale within the United States after importation of Respondents' barcode scanners, scan engines, products containing the same, and components thereof that infringe one or more claims of the Asserted Patents;

b.    Determine that there has been a violation of Section 337 by each Respondent;

c.    Issue a permanent limited exclusion order, pursuant to 19 U.S.C. § 1337(d), prohibiting entry into the United States all of Respondents' barcode scanners, scan engines, products containing the same, and components thereof that infringe one or more claims of the Asserted Patents;

d.    Issue permanent cease and desist orders, pursuant to 19 U.S.C. § 1337(f), prohibiting Respondents, or their parents, subsidiaries, or other affiliates, from importing, admitting or withdrawing from a foreign trade zone, marketing, advertising, demonstrating, warehousing inventory, distributing, offering for sale, selling, licensing, repairing, programming, or updating

32

barcode scanners, scan engines, products containing the same, and components thereof that infringe one or more claims of the Asserted Patents;

e.    Require appropriate bond be posted, pursuant to 19 U.S.C. § 1337(j), with Customs and Border Protection (CBP) for entry of any Accused Product or component thereof during the Presidential review period;

f.    Require an appropriate bond be posted, pursuant to 19 U.S.C. § 1337(j), with the Commission for each and every proscribed activity pursuant to the Cease and Desist Order during the Presidential review period; and

g.    Grant such other and further relief as the Commission deems just and proper based on the facts determined by the investigation and the authority of the Commission.

33

PX-188

Dated: May 31, 2019

Respectfully submitted,

M. Scott Stevens
**ALSTON & BIRD LLP**
950 F Street NW
Washington, DC 20004
Telephone:  (202) 239-3025
Facsimile:   (704) 654-4825

S. Benjamin Pleune
Stephen R. Lareau
Adam J. Doane
Nicholas C. Marais
**ALSTON & BIRD LLP**
101 South Tryon Street
Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1098
Facsimile: (704) 444-1698

Patrick J. Flinn
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-9720
Facsimile: (404) 253-8370

*Counsel for Complainants*
*Honeywell International, Inc.,*
*Hand Held Products, Inc., and*
*Metrologic Instruments, Inc.*

34

JA2134

## VERIFICATION OF COMPLAINT

I, Jeremy Whitley, declare under penalty of perjury under the laws of the United States of America, and in accordance with 19 C.F.R. §§ 210.4 and 210.12(a) the following is true and correct:

1. I am the Chief Intellectual Property Counsel at Honeywell Safety & Productivity Solutions, and I am duly authorized to verify this complaint on behalf of complainants;

2. I have read the complaint and am aware of its contents;

3. The complaint is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of the investigation or related proceeding;

4. To the best of my knowledge, information and belief founded upon reasonable inquiry, the claims and legal contentions of this complaint are warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; and

5. To the best of my knowledge, information and belief founded upon reasonable inquiry, the allegations and other factual contentions in the complaint have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

Executed on May 30, 2019.

Jeremy Whitley

JA2135