**Nos. 23-1850, 23-2038**

## In the

# United States Court of Appeals

## For the Fourth Circuit

───────────────

HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC.; METROLOGIC INSTRUMENTS, INC.,

*Plaintiffs-Appellants,*

v.

OPTO ELECTRONICS CO., LTD.,

*Defendant-Cross-Appellant.*

───────────────

On Appeal from the United States District Court
for the Western District of North Carolina
Case No. 3:21-cv-506-KDB-DCK

───────────────

**REDACTED OPENING/RESPONSE BRIEF OF
DEFENDANT-CROSS-APPELLANT OPTO ELECTRONICS CO., LTD.**

───────────────

York M. Faulkner
YORKMOODYFAULKNER
Tensho Building, 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
T: (202) 351-0837
york.faulkner@ymf-law.com

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4746
bschmalzbach@mcguirewoods.com

*Counsel for OPTO Electronics Co., Ltd.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1850; 23-2038    Caption: Honeywell International Inc., et al. v. OPTO Electronics Co., Ltd.

Pursuant to FRAP 26.1 and Local Rule 26.1,

OPTO Electronics Co., Ltd.
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☑ YES ☐ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

i

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?               ☐YES ☑NO
If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?               ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.    Is this a criminal case in which there was an organizational victim?           ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ Brian D. Schmalzbach                    Date:      4/30/2024

Counsel for: OPTO Electronics Co., Ltd.

ii

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ............................................3

STATEMENT OF ISSUES .........................................................4

STATEMENT OF THE CASE......................................................5

I.    Factual background ...........................................................5

    A.    OPTO's barcode-scanning products and the symbologies they decode................................................................5

        1.    OPTO's laser products and 1D symbologies ......................6

        2.    OPTO's CMOS 2D barcode products and 2D symbologies ................................................................8

        3.    The disputed products and symbologies ...........................10

    B.    Prior litigation between the parties .................................12

    C.    The January 22, 2020 Settlement Agreement................................14

    D.    OPTO's verification of worldwide sales under §5.1 ...................14

    E.    The February 3, 2021 Second Amendment....................................15

    F.    Honeywell conducted the §5.1 audit more than a year after the Agreement's effective date. ......................................16

    G.    Honeywell's covenant not to sue and OPTO's laser products ............................................................17

    H.    Honeywell has no active patents directed to decoding multi-row "stacked" barcode symbologies with a laser scanner. ................................................................18

II.    Procedural history .........................................................18

    A.    At summary judgment, the district court misconstrued "2D Barcode Products" but properly rejected Honeywell's claim to pre-Agreement royalties under §5.1.............................20

iii

B.    The district court held as a matter of law that Honeywell did not commit *per se* patent misuse ............................................... 22

C.    After the jury verdict, the district court denied OPTO's post-trial motion. ................................................................. 23

D.    The district court properly denied Honeywell's motion for attorneys' fees. .............................................................. 24

SUMMARY OF ARGUMENT ....................................................... 24

ARGUMENT ............................................................................. 27

I.    The district court properly granted summary judgment on Honeywell's demand for §5.1 damages. .................................. 27

A.    Section 5.1 creates a condition. ........................................ 28

1.    "Should" creates a condition. ................................. 28

2.    To satisfy the condition, Honeywell must complete the audit within one year of the Effective Date of the Agreement. ............................................................. 30

B.    Honeywell failed to satisfy that condition. .................................. 31

C.    The district court properly resolved this question. ..................... 32

D.    Honeywell's belated attempts to evade the audit condition are unavailing. ...................................................................... 35

1.    Honeywell cannot evade the audit requirement by invoking another contractual provision. ........................... 35

2.    Honeywell preserved no other arguments for excusing its failure to conduct a timely audit. ................... 37

3.    Honeywell's arguments for excusing its failure to conduct a timely audit are meritless. ................................. 39

a.    Honeywell did not substantially comply with §5.1. ............................................................... 39

b.    OPTO did not waive its right to a timely audit. ..... 40

c.    OPTO did not prevent Honeywell from satisfying the requirements of §5.1. .......................... 42

d.    OPTO did not frustrate §5.1's purpose. ................... 43

iv

II.     The district court correctly denied Honeywell's fee request. ..............44

    A.     The parties did not contract around the American Rule...........45

    B.     The purported fee-shifting provision omits necessary "prevailing party" language.........................................................48

III.    OPTO was entitled to judgment as a matter of law because Honeywell agreed that the relevant sales excluded these products....................................................................................................48

    A.     OPTO did not breach the Settlement Agreement.......................49

        1.     The Court should read §1.4's definition of "2D Barcode Products" in light of §4.9's calculation. ...............50

        2.     The ███████ calculation did not include laser or CCD products. ........................................................................51

        3.     No reasonable jury could find that Honeywell was unaware that §4.9's calculation omitted laser and CCD products. ........................................................................52

            a.     The language of the Agreement establishes that Honeywell understood that the ███████ calculation omitted OPTO's laser products.............53

            b.     Honeywell presented no evidence from which a reasonable jury could conclude it did not know that the calculation omitted OPTO's laser products........................................................................55

            c.     Honeywell is bound by its counsel's knowledge.................................................................56

    B.     Quasi-estoppel bars Honeywell's claims.....................................57

    C.     OPTO is excused from breach because of unilateral mistake. ...............................................................................................58

IV.     A new trial is needed because the verdict contradicts the clear weight of the evidence. ...................................................................................59

V.      The district court erred in construing "2D Barcode Product" not to require "a 2D image sensor."...................................................................61

    A.     The district court's reading produces an absurd result.............66

       1.    The district court wrongly relies on an undefined term. ...........................................................66

       2.    The district court leaves third parties in control. ..............67

   B.    The district court's definition ignores the duties of the third sentence. ......................................................................69

       1.    The district court over-privileged the first sentence at the expense of the third. .......................................69

       2.    The district court improperly read "For avoidance of doubt" as expansive. ...............................................70

       3.    "Shall include" signals an exhaustive list. .........................71

   C.    That misconstruction prejudiced OPTO. .....................................73

VI.   The district court erred in holding that Honeywell did not commit *per se* patent misuse. ......................................................73

   A.    Honeywell's demand for royalties on the non-patented multi-row decoding function is *per se* patent misuse. ................75

       1.    Honeywell's attempt to extend the temporal scope of expired patents is *per se* misuse. ...........................75

       2.    Honeywell's attempt to derive a benefit not attributable to the use of its general-purpose patents is *per se* patent misuse. .........................................78

   B.    The district court wrongly required proof of Honeywell's economic power. ...............................................................81

CONCLUSION ...............................................................................83

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Activision Blizzard, Inc. Litig.*,
    124 A.3d 1025 (Del. Ch. 2015) ..........................................................70

*Albino v. Baca*,
    747 F.3d 1162 (9th Cir. 2014) .........................................................34

*Amirsaleh v. Bd. of Trade of N.Y.*,
    27 A.3d 522 (Del. 2011) ............................................................40, 41

*Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr.*,
    2020 WL 6582958 (Del. Super. Nov. 10, 2020) ...............................47

*Babcock v. Newton*,
    2012 WL 5364579, 977 N.E.2d 105 (Mass. App. 2012) .................71

*Bako Pathology LP v. Bakotic*,
    288 A.3d 252 (Del. 2022) ...............................................................45

*Baltimore Pile Driving & Marine Constr., Inc. v. Wu & Assocs., Inc.*,
    2022 WL 3466066 (Del. Super. Aug. 18, 2022) .........................45, 48

*Bevard v. Farmers Ins. Exch.*,
    127 F.3d 1147 (9th Cir. 1997) .........................................................46

*BLGH Holdings LLC v. enXco LFG Holding, LLC*,
    41 A.3d 410 (Del. 2012) ............................................................27, 36

*Braga Inv. & Advisory, LLC v. Yenni*,
    2023 WL 3736879 (Del. Ch. May 31, 2023) ...................................48

*Brown v. Sylvester*,
    56 N.W. 709 (Neb. 1893) ................................................................71

*Brulotte v. Thys Co.*,
    379 U.S. 29 (1964)..........................................................74, 75, 76, 77

*C.A.N. Ent. v. Health & Hum. Servs.*,
  373 S.E.2d 584 (S.C. 1988) ............................................................31

*CM Com. Realty, Inc. v. Alpha Tr. Real Est., LLC*,
  2022 WL 509693 (Del. Super. Feb. 18, 2022) ................................50

*Compton v. Metal Prod., Inc.*,
  453 F.2d 38 (4th Cir. 1971) ...........................................................82

*Continental Casualty Co. v. Winder Labs., LLC*,
  73 F.4th 934 (11th Cir. 2023) ........................................................37

*Covington Square Assocs., LLC v. Ingles Markets, Inc.*,
  641 S.E.2d 266 (Ga. App. 2007) ....................................................71

*DCV Holdings, Inc. v. ConAgra, Inc.*,
  889 A.2d 954 (Del. 2005) ...............................................................71

*Dupree v. Younger*,
  143 S. Ct. 1382 (2023)....................................................................74

*Matter of Est. of Landon*,
  2023 WL 5533132 (Del. Ch. Aug. 28, 2023) .................................29

*Ethyl Gasoline Corp. v. United States*,
  309 U.S. 436 (1940)..................................................................74, 80

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
  817 A.2d 160 (Del. 2002) ...............................................................38

*Hall v. Ross*,
  616 S.E.2d 145 (Ga. App. 2005).....................................................29

*Hicks v. Ferreyra*,
  64 F.4th 156 (4th Cir. 2023).....................................................59, 60

*State ex rel. Hirst v. Black*,
  83 A.2d 678 (Del. Super. 1951).......................................................67

*Jones v. Schneiderman*,
  974 F. Supp. 2d 322 (S.D.N.Y. Sept. 30, 2013)..............................71

*Karp v. First Conn. Bancorp., Inc.*,
  69 F.4th 223 (4th Cir. 2023) ................................................... 35

*Kimble v. Marvel Entm't, LLC*,
  576 U.S. 446 (2015) ............................................ 75, 76, 78, 82, 83

*Lasercomb America, Inc. v. Reynolds*,
  911 F.2d 970 (4th Cir. 1990) ................................................. 83

*LPPAS Rep., LLC v. ATH Holding Co.*,
  2023 WL 3197819 (Del. Ch. May 2, 2023) ..................................... 39

*Moore v. Equitrans, L.P.*,
  27 F.4th 211 (4th Cir. 2022) ............................................. 33, 36

*Morris Friedman & Co. v. United States*,
  351 F. Supp. 611 (Cust. Ct. 1972) ........................................... 71

*In re NextMedia Grp., Inc.*,
  440 B.R. 76 (Bankr. D. Del. 2010), *aff'd*, 2011 WL 4711997
  (D. Del. Oct. 6, 2011) ...................................................... 40

*Norfolk S. Ry. Co. v. Zayo Grp., LLC*,
  87 F.4th 585 (4th Cir. 2023) ................................................ 66

*Obsidian Fin. Grp., LLC v. Identity Theft Guard Sols., Inc.*,
  2021 WL 1578201 (Del. Ch. Apr. 22, 2021) ................................... 40

*Osborn ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) ............................................... 28, 37

*Parkway 1046, LLC v. U.S. Home Corp.*,
  961 F.3d 301 (4th Cir. 2020) ................................................ 44

*Penley v. McDowell Cnty. Bd. of Educ.*,
  876 F.3d 646 (4th Cir. 2017) ................................................ 33

*Poynter by Poynter v. Ratcliff*,
  874 F.2d 219 (4th Cir. 1989) ................................................ 60

*Princo Corp. v. Int'l Trade Comm'n,*
    616 F.3d 1318 (Fed. Cir. 2010) ....................................................81

*RBC Cap. Markets, LLC v. Jervis,*
    129 A.3d 816 (Del. 2015) ...........................................................57

*Rehoboth Mall Ltd. v. NPC Int'l, Inc.,*
    953 A.2d 702 (Del. 2008) ...........................................................41

*Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins.,*
    616 A.2d 1192 (Del. 1992) .........................................................28

*Rimini St., Inc. v. Oracle USA, Inc.,*
    139 S. Ct. 873 (2019)..................................................................46

*Rohm & Haas Elec. Materials, LLC v. Honeywell Int'l, Inc.,*
    2009 WL 1033651 (D. Del. Apr. 16, 2009) ...................................56

*Rsrvs. Mgmt., LLC v. Am. Acquisition Prop. I, LLC,*
    2014 WL 823407 (Del. 2014) .....................................................54

*Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real
    Est. Fund,*
    68 A.3d 665 (Del. 2013) ...................................................45, 46, 58

*Scott Paper Co. v. Marcalus Mfg. Co.,*
    326 U.S. 249 (1945)....................................................................76

*SEC v. Clark,*
    60 F.4th 807 (4th Cir. 2023).......................................................49

*Shintom Co., Ltd. v. Audiovox Corp.,*
    888 A.2d 225 (Del. 2005) ...........................................................64

*SPV-LS, LLC v. Transamerica Life Ins. Co.,*
    912 F.3d 1106 (8th Cir. 2019).....................................................37

*Petition of State,*
    708 A.2d 983 (Del. 1998) ...........................................................45

*Tabe v. Texas Inpatient Consultants, LLLP*,
  555 S.W.3d 382 (Tex. App. 2018) ................................................... 29

*Town of Cheswold v. C. Del. Bus. Park*,
  188 A.3d 810 (Del. 2018) ............................................................... 67

*United States v. Aiyer*,
  33 F.4th 97 (2d Cir. 2022) ............................................................. 73

*United States v. Bank of America Corp.*,
  753 F.3d 1335 (D.C. Cir. 2014) ...................................................... 70

*Velasquez v. Salsas and Beer Rest., Inc.*,
  735 F. App'x 807 (4th Cir. 2018) ............................................. 33, 34

*In re Viking Pump, Inc.*,
  148 A.3d 633 (Del. 2016) ............................................................... 50

*Virginia Panel Corp. v. MAC Panel Co.*,
  133 F.3d 860 (Fed. Cir. 1997) ....................................................... 73

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
  901 A.2d 106 (Del. 2006) ............................................................... 44

*Waters v. Delaware Moving & Storage, Inc.*,
  300 A.3d 1 (Del. Super. 2023) ....................................................... 54

*Weinberg v. Waystar, Inc.*,
  294 A.3d 1039 (Del. 2023) ........................................................ 68, 69

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ............................................................ 74, 78, 79

*Zoroastrian Ctr. & Darb-E-Mehr of Metro. Washington, D.C. v.
  Rustam Guiv Found. of New York*,
  822 F.3d 739 (4th Cir. 2016) ......................................................... 45

**Statutes**

28 U.S.C. §1294(1) ............................................................................ 4

28 U.S.C. §1332 ............................................................3

35 U.S.C. §271(d)(5) ....................................................82

Act of Nov. 19, 1988, §201, 102 Stat. 4676 ..........................82

**Rules**

Fed. R. Civ. P. 50(a)(1) ...............................................49

Fed. R. Civ. P. 56(f) ....................................................33

**Other Authorities**

1 H. Hovenkamp, et al., IP and Antitrust §3.2d (2d ed., Supp. 2014) ...........82

*If*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/if ..................................29

*Include*, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/
    include ..........................................................................72

*Including*, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/
    including.........................................................................72

*Provide*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/provide .....................29

Restatement (Second) of Contracts (1981) .................. 28, 29, 39, 40, 44, 51, 69

*Should*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/should.......................29

Williston on Contracts (4th ed.) .................................................28, 29, 40, 41, 44

*Within*, Merriam-Webster Online Dictionary,
    https://www.merriam-webster.com/dictionary/within .......................31

## INTRODUCTION

This alleged breach-of-contract case arises out of a Settlement and License Agreement ("Agreement") resolving global patent litigation between two barcode-scanner manufacturers: Plaintiff Honeywell International Inc. and its subsidiaries, and Defendant OPTO Electronics Co. Under the Agreement, OPTO pays royalties on its "2D Barcode Products," and Honeywell granted a covenant not to sue over OPTO's "1D Barcode Products."

OPTO's scanners use two fundamentally different technologies tracking that distinction: some use two-dimensional imaging technology (cameras) to decode two-dimensional symbols like QR codes; others use simpler laser-based technology to decode various linear barcodes. OPTO's 2D imaging products are undisputedly 2D Barcode Products, and OPTO paid royalties accordingly. The question here, however, turns on whether OPTO's laser products are royalty-bearing 2D Barcode Products, or 1D Barcode Products immune under Honeywell's covenant.

The answer lies in Honeywell's admission on the face of the Agreement. The Second Amendment to the Agreement includes a calculation of 2019 revenue from sales of OPTO's 2D Barcode Products that

1

*excludes* all revenue from OPTO's laser products.  Honeywell acknowledged that calculation in the contractual text: ████████████████

████████████████████████████████████████████████

JA6468 (emphasis added).  The undisputed evidence shows that (1) OPTO disclosed that calculation to Honeywell and repeatedly confirmed that the calculation excluded all revenue from laser products; (2) Honeywell never objected to that calculation; and (3) Honeywell signed the Amendment, confirming its understanding.

Yet scarcely after the ink dried, Honeywell reversed course and demanded royalties on OPTO's laser products, suddenly insisting—contrary to its contractual admission—that they are 2D Barcode Products. But Honeywell's contractual admission bars that Johnny-come-lately demand.  And contract defenses of quasi-estoppel and unilateral mistake prohibit Honeywell from taking advantage of OPTO's contrary understanding, which was well-known to Honeywell.  In any event, Honeywell's misconstruction of "2D Barcode Products"—which the district court erroneously adopted at summary judgment—violated core principles of contractual interpretation.  And under Honeywell's misconstruction, it has committed patent misuse *per se* by seeking royalties on expired patents

2

and otherwise inflating its patent rights.  For these reasons and those below, the breach-of-contract verdict awarding post-Agreement royalty damages cannot stand.

By contrast, the district court correctly granted summary judgment against Honeywell's opportunistic demand for pre-Agreement royalties. The court correctly held that such royalties required Honeywell to exercise its contractual right to complete an audit of OPTO's pre-Agreement sales within one year.  There is no genuine dispute that Honeywell failed to conduct that timely audit.  Honeywell insists on appeal that it was blindsided by the district court's summary judgment resolution, but *Honeywell* moved for summary judgment on this issue, and was well aware that it was required to put its best foot forward.  So, at a minimum, this Court should affirm summary judgment against pre-Agreement royalties, as well as the denial of Honeywell s meritless attorneys' fees demand under a contract that does not shift them.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity, and the amount-in-controversy exceeds $75,000.  JA52; JA3216.  The district court denied OPTO's timely post-trial

3

motion on September 27, 2023.  JA783; JA1797-1813.  Honeywell noticed its

appeal on August 14, 2023, and filed an amended notice on October 2, 2023.

OPTO timely noticed its appeal on October 4, 2023.  JA1817-1819.  This Court

has appellate jurisdiction under 28 U.S.C. §1294(1).  *See* Opposition to

Honeywell MTD, 4th Cir. ECF 36 (Nov. 27, 2023).

## STATEMENT OF ISSUES

I.      Did the district court correctly grant summary judgment on

Honeywell's claim for pre-Agreement royalty damages because Honeywell

failed to conduct a timely audit?

II.     Did the district court correctly deny Honeywell's motion for

attorney's fees and costs?

III.    Did Honeywell's confessed contractual "understanding" that

the relevant products were not royalty-bearing 2D Barcode Products require

judgment as a matter of law that OPTO breached no obligation, or at least

that Honeywell is barred by doctrines of quasi-estoppel or unilateral mistake

from recovering royalties on those products?

IV.     Did that confessed contractual "understanding" render the

verdict contrary to the clear weight of the evidence, requiring a new trial?

4

V.     Did the district court misconstrue the key term "2D Barcode Products" by eliminating the Agreement's requirement that such products contain 2D image sensors?

VI.     Did the district court err in holding that Honeywell committed no *per se* patent misuse when Honeywell demanded royalties for functions covered by only expired patents and non-patented functions?

## STATEMENT OF THE CASE

## I.     Factual background

### A.     OPTO's barcode-scanning products and the symbologies they decode

The Agreement concerns barcode-scanning products.  OPTO sells three structurally and functionally distinct types of barcode scanners: (1) laser scanners; (2) CCD scanners; and (3) CMOS 2D image scanners.  JA7121; JA2046-2048; JA2078-2082; JA5424-5425.

Laser and CCD scanners (together, "laser products") decode linear barcodes, often found on consumer products like milk cartons.  The third group of products (OPTO's CMOS 2D image scanners) decodes all symbologies, including two-dimensional matrix images like QR codes on restaurant menus.  All types of OPTO's barcode products are programmable

to decode multi-row "stacked" symbologies, often found on shipping labels. This dispute centers on OPTO's laser products' ability to decode these "stacked" symbologies.

### 1.    OPTO's laser products and 1D symbologies

OPTO's laser products scan barcode symbologies with linear alternating vertical black bars and white spaces. JA1223; JA1302; JA1325. Laser scanners use laser beams to read and decode these symbologies. JA1226-1227. CCD scanners decode them with an image sensor that captures a thin horizontal line of image data across the face of the alternating bars and spaces. JA1326.

1D symbols encode data based on the widths of those bars and spaces. JA1223-1224. Like letters, combinations of width-values form "words" with predetermined meaning. OPTO's laser products *only* decode symbols using continuous one-dimensional bar-space symbol characters. JA1231-1233.

Figure 1 depicts a 1D symbology:



*Figure 1*

In Figure 1, symbol characters 1 and 3 have an overall width of 16 equal units, with four bars and four spaces.  Symbol characters 2 and 4 also have four bars and four spaces but an overall width of 15 equal units.

Figure 2 depicts a single four bar-space symbol character.



*Figure 2*

*Figure 3*

To measure the widths in Figure 2, a laser or CCD scanner generates a "scan reflectance profile" (Figure 3) based on reflected light intensities.  JA1225-1226; JA1226-1227.  The symbol character's black bars correspond to valleys,

7

and the white spaces correspond to peaks in the scan reflectance profile. JA1225-1226; JA1226-1227.

Before this lawsuit, all but two of OPTO's 35+ laser products could decode both single-row symbols and multi-row "stacked" symbols with alternating bars and spaces. JA1313-1314; JA4705-4714. Following Honeywell's Complaint, OPTO disabled all laser products' multi-row decoding functions. JA4622. Now that they only decode single-row symbols, Honeywell demands no royalties on those laser products. Under Honeywell's theory, the products' transition from royalty-bearing 2D Barcode Products to non-royalty-bearing 1D Barcode Products turned exclusively on disablement of that multi-row symbol decoding function.

### 2.    OPTO's CMOS 2D barcode products and 2D symbologies

Unlike OPTO's laser products that decode symbologies consisting of one-dimensionally arranged lines of alternating bars and spaces, OPTO's CMOS 2D products decode symbologies containing two-dimensional arrangements of data "bits" within a defined matrix. JA4676. These products use 2D image sensors that capture two-dimensional digital images

of a 2D matrix symbol, like QR Code or DataMatrix. JA4676. Figure 4 is a DataMatrix and Figure 5 depicts one of its "8-bit" symbol characters.





01001111

*Figure 4*                                    *Figure 5*

A two-dimensional, matrix barcode symbol encodes data through a "binary" system. A "0" (light) or "1" (dark) reflect each "bit" of data. Computers group bits into units called "bytes," whose values are determined by their compositions of "1" and "0" bits.

Unlike 1D symbologies' continuous linear arrangements, complex 2D matrix symbologies arrange data two-dimensionally and "must therefore be analyzed two-dimensionally before [they] can be decoded." JA1948. This decoding requires two steps. First, the scanner captures a two-dimensional image of the symbol. JA1961-1974. Then, it maps the location of each data bit within the matrix and determines if it is a 0 or a 1. JA1961-1974. Only OPTO's CMOS 2D products with 2D image sensors can decode these 2D symbologies.

9

### 3.    The disputed products and symbologies

This dispute concerns OPTO's laser products' former ability to decode multi-row symbologies.    These newer 1D symbologies store and communicate more data, but still use linear scanning techniques.

For example, Figure 6 shows a single-row GS1 DataBar symbol representing the value "(01)00012345678905":



*Figure 6*

Figure 7 shows that same GS1 DataBar symbol data divided and "stacked" in two rows:



*Figure 7*

Both symbols encode the same data using the same bar-width sequence. When scanned, scanners "see" nothing but continuous, one-dimensional bar-space symbol characters.    The only difference between the single and two-row symbols is that the laser scanner decodes the latter with two scans instead of one.    JA1223-1224.    As with other 1D symbologies, barcode

10

scanners measure the bar-space widths to decode each symbol character of a stacked barcode.  JA1223-1224.  Relevant Standards Setting Organizations ("SSOs") confirm this: in multi-row barcode symbols "[e]ach symbol character has the characteristics of a linear bar code symbol character and each row has those of a linear bar code symbol; each row, therefore, may be read by linear symbol scanning techniques."  JA1948.

This dispute centers on the stacked symbology PDF417.  Figure 8 depicts PDF417 with an expanded symbol-character:



*Figure 8*

Developers created PDF417 for use with laser scanners—like OPTO's laser products—that only measure bar-space widths one-dimensionally. Honeywell's laser products also fit this category.  Honeywell describes them

11

as unable to "read 2D symbologies" and "capable of decoding only 1D symbologies."  JA422.

Honeywell incorrectly maintains that OPTO's laser products—which can decode single-row and multi-row symbologies (like PDF417) but not 2D matrix symbologies—are "2D Barcode Products."

## B.    Prior litigation between the parties

In 2019, Honeywell brought two patent infringement actions against OPTO.  The International Trade Commission ("ITC") action sought to exclude certain OPTO products from importation.  The other sought patent infringement damages in the U.S. District Court for the District of Delaware ("Delaware Action"), which was stayed for the ITC Litigation.

Ultimately, the ITC action was limited to six Honeywell patents. JA173-175.  Five of those six contained claims sharing a common requirement: utilizing a 2D image sensor.  Honeywell asserted the five 2D image sensor patents against OPTO's CMOS 2D products only.

Honeywell's sixth asserted patent was U.S. Patent No. 7,159,783 ("'783 patent"), which addresses a scanner's data output formatting unrelated to the scanning technology used.  JA171-172.  Honeywell therefore asserted the

12

'783 patent against both OPTO's CMOS 2D products *and* its laser products. JA175.

During the ITC Litigation, Honeywell produced patent "claim charts" purporting to map each claim limitation to the features of OPTO's products. JA7184-7252. The charts divided OPTO's products into two groups of "Accused Devises": (1) "2D Products," including OPTO's CMOS 2D products; and (2) "1D Products," including OPTO's laser scanners. JA7208-7252; JA7184-7206. Honeywell *now* argues that many of the same laser scanning products that it classified as 1D in the claims chart are actually 2D products. *Compare* JA54 (Honeywell's Complaint in the instant action accusing the following laser scanners of being 2D products: OPN-2006; NLB-1000; NLV-1001; RLB-1000; L-46R; OPR-2001Z; OPR-2001; OPR-3201Z; RS-2006/OPN2006; MDL-1000; MDL-1500; MDL-2001; and OPR-3101), *with* JA7184 (Honeywell's claims chart in the ITC action accusing the identical products of being 1D products). Honeywell eventually dropped the '783 patent from the ITC Litigation, limiting its scope to OPTO's 2D Products. JA202.

In early January 2020, Honeywell filed four European patent infringement actions against OPTO. JA6465. In response, OPTO filed

13

"nullity" actions to invalidate each asserted European patent.   JA6465; JA1169.

### C.   The January 22, 2020 Settlement Agreement

Soon after Honeywell filed the European actions, the parties settled the ITC Litigation and Delaware Action with the Agreement.   Under the Agreement, OPTO paid Honeywell ███████ for its pre-settlement 2D Barcode Product sales in the United States, Japan, and Europe.   JA6437; JA6440-6441.   Honeywell also gave OPTO a ██ royalty-bearing license for its post-settlement U.S. 2D Barcode Product sales, defined in §1.4.   JA6438. The Agreement's Effective Date is January 22, 2020.   JA6432.

The Agreement enabled Honeywell to confirm OPTO's pre-settlement sales representation in §5.1.   JA6438-6439.   Under §5.1, OPTO agreed to provide sales reports to Honeywell's counsel to verify OPTO's pre-settlement sales representation.   JA6440-6441.   Section 5.1 also gave Honeywell the right to audit OPTO's sales.   *See* JA6441.

### D.   OPTO's verification of worldwide sales under §5.1

OPTO provided the sales verification data to Honeywell's counsel in September 2020.   JA7118-7120.   Specifically, OPTO's counsel, Ryan Goldstein, sent Honeywell's counsel, Ben Pleune, three Excel workbooks

14

detailing OPTO's pre-settlement 2D Barcode Product sales in the U.S., Japan, and Europe.  JA7118-7119.  The workbooks calculated OPTO's 2019 gross European 2D Barcode Products sales ██████████████████████████████.  JA7122.

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

Messrs. Pleune and Goldstein communicated at length about OPTO's ███████████ calculation.  *See* JA7175-7183.  Mr. Goldstein explained that the workbook's "2D articles" tab identified the seventy-one OPTO CMOS 2D products included in the calculation.  JA7177; JA7175.  Those CMOS 2D product sales are labeled "2D" throughout the workbook.  ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████  JA7177; JA7175.

### E.  The February 3, 2021 Second Amendment

On February 3, 2021, about one year after the Agreement's Effective Date, the parties signed the Second Amendment to the Agreement.  JA6465-6469.  Honeywell agreed to dismiss its European infringement actions, and

15

OPTO agreed to dismiss the nullity actions, removing any uncertainty about the validity of Honeywell's patents. JA6467. OPTO also agreed to an annual ███████ royalty payment on 2D Barcode Product sales for a license to Honeywell's EX-U.S. Patent Portfolio. JA6467-6468. Section 4.9 explains the basis for that payment: ████████████████████████████████ ████████████████████████████ JA6468 (emphasis added).[1] In Euros, ██████ is ████████████ (the same royalty OPTO pays for U.S. sales). Thus, the Second Amendment ratified the accuracy of OPTO's sales verification data.

### F. Honeywell conducted the §5.1 audit more than a year after the Agreement's effective date.

Section 5.1 entitled Honeywell to audit OPTO's representation of its pre-settlement 2D Barcode Products sales. "Such audit may be conducted no more than one (1) time within one (1) calendar year of the Effective Date." JA6441. The Agreement thus gave Honeywell from January 22, 2020 until January 22, 2021 to conduct the audit. Honeywell, however, failed to invoke

---

[1] Opticon is OPTO's American subsidiary. JA516. The Agreement and this brief use the two names interchangeably.

the audit until December 16, 2020 and extended the audit through at least March 2021.

In June 2021, Honeywell first accused OPTO of breaching the Agreement by not paying royalties on laser product sales. Honeywell asserted that OPTO's laser products were 2D Barcode Products because they decode multi-row symbologies.

### G.    Honeywell's covenant not to sue and OPTO's laser products

Honeywell did not license its entire barcode-scanning patent portfolio to OPTO. Instead, Honeywell covenanted not to sue over part of its patent portfolio. JA6436. Honeywell's covenant not to sue encompasses *all patents* that could be asserted against OPTO's "1D Barcode Products." JA6434.

OPTO contends that its laser products are 1D Barcode Products protected by the covenant regardless of their operability to decode multi-row symbols. Honeywell contends that the covenant applies only when the products' multi-row decoding function is disabled. JA1672. When disabled, Honeywell values OPTO's use of Honeywell's patents at zero dollars.

Yet Honeywell demands a ██ royalty for those *same* zero-value patents in the *same* OPTO laser products whenever the multi-row decoding function is enabled. Honeywell's royalty demand is therefore based solely

17

on the products' multi-row decoding function—a function for which Honeywell owns *no active patent*. JA4622.

### H. Honeywell has no active patents directed to decoding multi-row "stacked" barcode symbologies with a laser scanner.

Honeywell owns no unexpired patents covering either multi-row symbologies or their decoding by laser scanning. And while Honeywell owned U.S. Patent Nos. 7,007,849; 7,325,740; and 8,226,009—claiming laser decoding of multi-row symbologies—those patents *expired* before the Agreement's Effective Date. *See* JA4622.

During discovery, Honeywell identified only the '783 patent to support its royalty demand on OPTO laser products. *See* JA4622-4623. The '783 patent, however, doesn't cover laser decoding of multi-row symbologies. Instead, it addresses post-decoding data-output processing—applicable to *any* decoded barcode data. The '783 patent expired on March 28, 2023. JA4623.

## II. Procedural history

Honeywell sued OPTO, alleging that OPTO breached §5.1 by representing that its pre-settlement gross revenues from 2D Barcode Product sales totaled ███████. JA54-55. Honeywell alleged that its audit found

18

OPTO's revenues from 2D Barcode Products were "tens of millions of dollars more" than represented. JA55.

OPTO's Answer explained that Honeywell's breach of contract claim fails because Honeywell did not strictly comply with §5.1's express condition which required Honeywell to conduct the audit within one-year of the Effective Date. JA3222-3224. OPTO also asserted defenses of quasi-estoppel and unilateral mistake because Honeywell exploited OPTO's reasonable understanding that its laser products were non-royalty-bearing 1D Barcode Products. JA3227-3228.

Finally, OPTO asserted a counterclaim and affirmative defense of patent misuse, explaining that Honeywell's interpretation of the Agreement impermissibly broadens the scope of its patents by conditioning their license on royalty payments for non-patented functions. JA3225-3227; JA3242-3244. "OPTO d[id] not challenge the enforceability of any patent" beyond the operation of Honeywell's covenant not to sue, JA4690, and sought "an order declaring that the Agreement's royalty provisions are unenforceable" due to patent misuse. JA4628; *see also* JA528.

19

**A.   At summary judgment, the district court misconstrued "2D Barcode Products" but properly rejected Honeywell's claim to pre-Agreement royalties under §5.1.**

Honeywell's motion for partial summary judgment made two requests: first, to adopt Honeywell's interpretation of "2D Barcode Products," JA3961; and second, to hold that a §5.1 audit was *not* a condition to recovering for pre-Agreement royalties, JA3967. The district court erred on the first issue, but correctly rejected Honeywell's argument on the second.

First, the court erroneously rejected OPTO's summary judgment motion on the same issue and adopted Honeywell's misinterpretation of §1.4, holding that the Agreement unambiguously defines "2D Barcode Products" "primarily" as a "device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text." JA520. But the court held that it would be "up to a jury" to decide what is a "two-dimensional barcode symbology." JA521. In other words, the district court held that §1.4 was both unambiguous *and* ambiguous.

Second, the district court correctly held that Honeywell's recovery for pre-Agreement royalties was conditioned on a timely audit, rejecting Honeywell's summary judgment argument. JA522-528. Although the

district court agreed with Honeywell that the audit was optional, the district court recognized that strict compliance with §5.1's audit deadline was an express condition for recovering damages for any OPTO breach of its representation of total pre-settlement 2D Barcode Product sales.  JA525-528.

Honeywell undisputedly did not complete the audit until at least March 31, 2021—over two months late.  The district court thus held that Honeywell failed to satisfy §5.1's express condition, and so entered summary judgment against Honeywell on its pre-Agreement royalty claim.[2]

Honeywell then sought reconsideration, contending (1) that the district court improperly granted summary judgment *sua sponte* without notice, and (2) for the first time, that there was a genuine dispute of material fact on the timeliness of Honeywell's audit.  JA4757-4758; JA4760-4766.

The district court again correctly rejected Honeywell's arguments. First, the court noted that *Honeywell's own summary judgment motion* placed

---

[2]  At the summary judgment hearing, Honeywell first argued that it sought *not* §5.1's contractual remedy, but damages equal to 8.8% of the difference between OPTO's represented sales of ███████████ and its actual sales. JA5464-5466.  Honeywell based this theory on the fact that OPTO agreed to make a ███████ payment to Honeywell as an 8.8% royalty for the ███ ███ in revenues OPTO warranted.  The district court rejected this previously unpleaded claim.  JA525-528.

the §5.1 audit at issue.   JA570-571.   It also rejected Honeywell's new "evidence," noting that there was no genuine dispute over the audit's completion date.  JA571-573.

**B.    The district court held as a matter of law that Honeywell did not commit *per se* patent misuse.**

Honeywell and OPTO cross-moved for summary judgment on patent misuse.  JA4576; JA4616.  Honeywell argued that because Honeywell gave OPTO a portfolio license, it did not commit patent misuse.  JA4643-4647.  As OPTO explained, however, Honeywell's conditioning of its portfolio license on OPTO's payment of royalties for functions covered only by expired patents is *per se* patent misuse without any further proof of economic harm.  JA4686-4690.

The district court nevertheless rejected OPTO's arguments, holding that Honeywell's patent portfolio license immunized Honeywell from OPTO's *per se* patent-misuse counterclaim and denying OPTO's motion for summary judgment.  JA531-533.  But the court also denied Honeywell's motion for summary judgment, reserving questions of fact on a rule of reason (i.e. non-*per se*) analysis for trial.  JA533-535.

**C.    After the jury verdict, the district court denied OPTO's post-trial motion.**

At trial, a jury returned a verdict for Honeywell on the breach claim and against OPTO's unilateral mistake and quasi-estoppel defenses. JA781-782. After a bench trial on patent misuse, the district court ruled against OPTO on the rule-of-reason analysis, JA1683, and denied OPTO's renewed post-trial motion for its *per se* patent-misuse counterclaim, JA1799.

After both the jury and bench trials, OPTO renewed its motion for judgment as a matter of law or for a new trial. JA6338-6368. OPTO explained that Honeywell put forth *no* evidence, let alone substantial evidence, that "tested, attacked, or controverted" that Honeywell admitted in §4.9 that OPTO's laser products are not royalty-bearing. OPTO thus could not breach the Agreement by not paying royalties on those products. JA6350. Nor did Honeywell test, attack or controvert OPTO's evidence that, even if it did breach the Agreement, quasi-estoppel or unilateral mistake barred Honeywell from enforcing it. JA6358-6363. Although the district court agreed that OPTO had "persuasive defense[s]" against Honeywell's claims—even noting that the evidence would support a jury verdict in OPTO's favor—it nevertheless held that Honeywell offered enough

23

evidence for a jury verdict, and denied a new trial.  JA1803-1804.

### D. The district court properly denied Honeywell's motion for attorneys' fees.

Last, Honeywell demanded ████████ in attorneys' fees, expert witness fees, and costs.  JA795.  Honeywell relied on §4.7: "In the event a Party must institute an action to collect any overdue payments, that Party shall be entitled to its fees and costs incurred with respect to such an action."  JA795.  The district court correctly held this provision fails to rebut the Delaware presumption that each party bears its own attorneys' fees and denied Honeywell's Motion.  JA1806-1813.

## SUMMARY OF ARGUMENT

I.   The district court correctly granted summary judgment on Honeywell's claim for pre-Agreement damages.  Section 5.1 expressly conditions such damages on Honeywell conducting a timely audit, allowing those damages only "[s]hould an audit show" that OPTO's actual sales exceeded its warranted sales by more than ██████.  And there was no genuine dispute that Honeywell's audit was *not* "conducted … *within* one (1) calendar year of the Effective Date."  The district court properly considered the audit condition on summary judgment after *Honeywell* raised

24

it and after the court gave Honeywell ample opportunity to explain why it either satisfied the condition or wasn't required to.  In any event, none of Honeywell's reasons excuse its failure to satisfy a condition that was well within its control here.

II.  The district court also correctly denied Honeywell's request for attorneys' and expert witness fees under §4.7.  Delaware law requires clear and unequivocal agreement to overcome the American Rule.  Courts applying Delaware law frequently reject the argument that a generic reference to "fees" alone suffices for fee-shifting, and Honeywell offers no Delaware precedent shifting fees based on the contractual language here.  Nor does the Agreement contain "prevailing party" language needed to make such a provision enforceable.

III-IV.  The district court erred, however, in denying OPTO's post-trial motion.  No reasonable jury could find that OPTO's laser products were "2D Barcode Products" as defined in §1.4 and confirmed by §4.9.  Nor was there evidence to reject OPTO's defenses that Honeywell's claim was barred by quasi-estoppel or unilateral mistake based on Honeywell's knowledge of OPTO's understanding of that term.  In any event, the district court erred in denying OPTO's new trial motion by failing to weigh the overwhelming

evidence against Honeywell, even if there were any sufficient evidence in its favor.

V.  The district court's misconstruction of "2D Barcode Products" also requires reversal.  That interpretation overprivileged the first two sentences of the contractual definition at the expense of the pivotal third sentence and produced the absurd result that third-parties have effective control over the definition.  The correct definition incorporates the contractual *means* for decoding 2D barcode symbologies, and so must include a 2D image sensor (which OPTO's laser products lack).

VI.  The district court erred again in holding that Honeywell's misconstruction of the Agreement is not *per se* patent misuse.  Honeywell committed misuse by seeking royalties *only* to the extent OPTO's laser products use features not covered by any active patents.  Because Honeywell's demands constituted patent misuse *per se* directed to subject matter of expired patents, the district court violated controlling Supreme Court precedent by requiring proof of Honeywell's economic power in a rule-of-reason analysis.  The remedy is to invalidate the Agreement's royalty provision as to OPTO's laser products.

## ARGUMENT

**I.**     **The district court properly granted summary judgment on Honeywell's demand for §5.1 damages.**

Honeywell sought damages for OPTO's alleged understatement of its pre-settlement 2D Barcode Product sales. *See* JA6440-6441. But a timely audit by Honeywell was a condition for such damages.[3] The district court correctly held that there is no genuine dispute that Honeywell failed to complete the audit within the one year prescribed by §5.1. That holding was well-justified given Honeywell's ample notice that this issue was ripe for summary judgment.

Under the Delaware law applicable here, JA6444; Honeywell Br. 22, "the plain language of [the] contract is unambiguous i.e., fairly or reasonably susceptible to only one interpretation," so the contract is interpreted "in accordance with that plain meaning." *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012). Determining that "plain meaning" requires an "objective, reasonable third party['s]" understanding.

---

[3] OPTO did not understate sales, per Parts III-V below. If the Court agrees that OPTO is entitled to judgment on post-Agreement royalties for one or more of those reasons, then Honeywell's claim for pre-Agreement royalties likewise fails.

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010). "The proper construction of any contract … is purely a question of law." *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins.*, 616 A.2d 1192, 1195 (Del. 1992).

## A.    Section 5.1 creates a condition.

A condition is "an event which qualifies a duty under a contract." Restatement (Second) of Contracts §224(a) (1981) ("Restatement").[4]    The existence of a condition is a question of law fit for summary judgment.  13 Williston on Contracts §38:16 (4th ed.) ("Williston").

The district court correctly held that "the Agreement precludes a claim of breach related to the reporting of sales in Section 5.1 outside of the agreed detailed process for pursuing additional payments."  JA526.  Section 5.1 makes a timely audit a condition for damages related to OPTO's pre-Agreement sales.

### 1.    "Should" creates a condition.

Under the Agreement, OPTO is only liable for understating its pre-settlement 2D Barcode Products sales "*[s]hould* an audit show" that its sales

---

[4]  "Condition" is synonymous with the older term "condition precedent." Restatement §224, Reporter's Note.

28

exceeded ███████. JA6441 (emphasis added).  This language establishes a condition.

The law requires no "particular form of language … to make an event a condition."  Restatement §226(a).  Instead, "[a]n intention to make a duty conditional may be manifested by the general nature of an agreement, as well as by specific language."  *Id.*; *accord Matter of Est. of Landon*, 2023 WL 5533132, at *3 n.44 (Del. Ch. Aug. 28, 2023).   Words and phrases like "if," "provided," "provided that," and "on condition that" can suffice.   13 Williston §38:16; *see also Matter of Est. of Landon*, 2023 WL 5533132, at *3 n.44.

"Should" is another condition-signifying term.  *See, e.g., Hall v. Ross*, 616 S.E.2d 145, 147-48 (Ga. App. 2005); *Tabe v. Texas Inpatient Consultants, LLLP*, 555 S.W.3d 382, 388 (Tex. App. 2018).  It means "to express condition," just like other condition-creating terms.  *Should*, Merriam-Webster Online Dictionary,   https://www.merriam-webster.com/dictionary/should;   *see also If*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/if ("in the event that, allowing that, on the assumption that, on condition that"); *Provide*, Merriam-Webster Online Dictionary,  https://www.merriam-webster.com/dictionary/provide  ("to have as a condition").

29

By introducing the damages provision with the phrase "should an audit show," the parties created a condition. OPTO only owes damages under this provision if Honeywell completed a timely audit and that audit shows OPTO had pre-settlement sales more than ███████.

### 2. To satisfy the condition, Honeywell must complete the audit within one year of the Effective Date of the Agreement.

The Agreement specifies that the audit must be "*conducted* no more than one (1) time *within* one (1) calendar year of the Effective Date." JA6441 (emphases added). Honeywell argues that it need only *start* the audit within a year of the Effective Date to comply. Honeywell Br. 45. But an audit *concluded* more than one year later is not "conducted . . . within one (1) calendar year." *See* JA524 ("[T]he audit work was required to take place *during* the first calendar year following the Effective Date.").

The parties' choice of "conducted"—rather than "initiated" or "noticed"—forecloses Honeywell's misinterpretation. "Conducted" refers to the process of performing the audit, not just the preliminary steps. It requires that the auditor complete *all* the auditing work during this period.

This reading matches §5.1's other application of "conducted." Section 5.1 likewise requires that "such audit is *conducted* during OPTICON's normal

business hours." JA6441 (emphasis added).  As the district court recognized, this requires the audit to begin *and end* during normal business hours; it forbids Honeywell from beginning the audit at 4:59 pm and continuing until 1:00 am.  JA524.  Honeywell likewise could not start the audit on the eve of the Effective Date and let it drag on for years (as its interpretation implies). *C.A.N. Ent. v. Health & Hum. Servs.*, 373 S.E.2d 584, 587 (S.C. 1988) (rejecting an interpretation of an audit deadline provision allowing the audit to "drag on for an indeterminable number of years").

The Agreement's use of "within" alongside "conducted" reinforces that meaning.  "Within" means "before the end of."  *Within*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/within.  So, all actions required to conduct the audit must take place before the one-year deadline.

### B.    Honeywell failed to satisfy that condition.

Honeywell failed to conduct the audit by January 22, 2021.  Indeed, Honeywell admitted that it first "informed OPTO of the outcome of the audit and its underpayment on" May 21, 2021—four months *after* the deadline. JA4558.  Honeywell also acknowledged that the auditor continued engaging in audit activities and requesting documents from OPTO through spring

2021. Indeed, from January 15 (a week before the audit deadline) to March 31, Honeywell stated that "OPTO and the auditor exchanged nearly one hundred e-mails regarding the audit and numerous iterations of OPTO's sales data." JA4760. There is no dispute—the audit continued well-past the one-year deadline. There were—and are—no other factual questions to decide. By failing to complete the audit by the contractual deadline, Honeywell failed to satisfy the condition.

### C.    The district court properly resolved this question.

Turning from the merits, Honeywell demands immunity from summary judgment, insisting that neither party moved on the audit question. Honeywell Br. 35-37. The district court rightly rejected this argument because Honeywell moved on the issue. JA565-574.

Honeywell insists that the summary judgment order against it was "*sua sponte.*" Honeywell Br. 36-37. That argument is dubious at best. *See* JA567 ("[T]he Court will, for purposes of this motion, consider the Court's entry of summary judgment as *sua sponte* even though strictly viewed it was not."); JA668 ("Not *sua sponte.* You can stop saying that."). OPTO moved for summary judgment as to the entirety of Honeywell's case. JA4255. This sufficed to warn Honeywell that the court could consider the audit question.

32

As this Court holds, when a party moves for summary judgment as to "all claims against [it]," the nonmoving party is "on notice to come forward with all evidence relevant" to any claim. *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 661 (4th Cir. 2017); *accord Moore v. Equitrans, L.P.*, 27 F.4th 211, 227 (4th Cir. 2022).

Anyway, Rule 56 allows "the court," "[a]fter giving notice and a reasonable time to respond," to "(1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f). And, "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Moore*, 27 F.4th at 224. Notice is sufficient if it "provide[s] the losing party with an adequate opportunity to demonstrate a genuine issue of material fact." *Id.* at 224. "[A]dequate notice 'means that the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" *Velasquez v. Salsas and Beer Rest., Inc.*, 735 F. App'x 807, 809 (4th Cir. 2018) (unpublished) (cleaned up).

33

Simply because Honeywell later thought of new arguments does not mean that it did not have ample opportunity to put its "best foot forward" at summary judgment. Honeywell *itself* moved for summary judgment on OPTO's first affirmative defense: "Nonperformance of Condition Precedent." JA3222 (Answer); JA3967 (Honeywell arguing "THE AUDIT WAS NOT A CONDITION PRECEDENT FOR THIS ACTION"). OPTO's Affirmative Defense flagged the timing issue: because "Honeywell neither conducted, nor substantially conducted the audit … within the calendar year ending on January 22, 2021 … [it] therefore failed to perform an express condition precedent to the relief provided for in Section 5.1." JA3223. In opposing Honeywell's motion, OPTO reiterated, "Honeywell was obliged to strictly comply with the one-year deadline." JA4361.

When the losing party is the one that moved for summary judgment, it had sufficient notice that the issue was under consideration and "certainly had the opportunity to put [its] best foot forward." *Velasquez*, 735 F. App'x at 810; *Albino v. Baca*, 747 F.3d 1162, 1177 (9th Cir. 2014).

And Honeywell did present its arguments. It submitted a brief (JA3950-3972) with eight attached exhibits, a reply brief (JA4364-4380) with five, and participated in a three-hour hearing (JA5398-5538). Honeywell

34

knew throughout that the audit's timing was critical.   And the district court asked directly about timing at the hearing.  JA5456-5463.  Honeywell thus had a "full and fair opportunity to present [its] case."  *Karp v. First Conn. Bancorp., Inc.*, 69 F.4th 223, 230-31 (4th Cir. 2023).  Just because Honeywell did not put its best foot forward, does not mean it lacked the opportunity. Honeywell has only itself to blame.

### D. Honeywell's belated attempts to evade the audit condition are unavailing.

#### 1. Honeywell cannot evade the audit requirement by invoking another contractual provision.

As the district court found, Honeywell cannot evade the audit requirement by reconceptualizing this claim under a *different* provision of the Agreement.  Honeywell Br. 23, 29.  Honeywell's Complaint sought these audit damages *only* under §5.1.  When Honeywell tried to amend its Complaint at summary judgment, the district court was well within its discretion to refuse that untimely amendment.  JA527-528.  And even if Honeywell had pled a claim under §9.8, it still could not collect any damages based on OPTO's §5.1 representation without satisfying the audit condition. Honeywell Br. 29-33.  The district court properly refused this "obvious end run around the audit requirement and limitations."  JA525.

First, Honeywell only sought damages for the alleged breach of OPTO's warranty on pre-settlement sales under §5.1.  JA525-526.  Honeywell alleged that "Opticon breached its representation under Section 5.1 of the Agreement" and "[d]ue to Opticon's breach of its Section 5.1 representation, it owes Honeywell the monetary damages set forth in Section 5.1."  JA56; JA54.

At summary judgment, however, Honeywell tried to amend its Complaint to also claim damages under §9.8.  After 18 months of litigation, the district court properly denied that request.  JA528; *see Moore*, 27 F.4th at 218 ("the discretion of the district court to deny leave to amend" "increases at later stages of litigation").

Regardless, OPTO did not and could not breach §9.8.  Section 9.8 merely provides that both parties "shall have all remedies available to them under appliable law."  It does not bypass §5.1's *specific* condition (i.e., a timely audit revealing pre-settlement sales more than ▮▮▮▮▮▮▮) on collecting damages for breach of the warranted ▮▮▮▮▮▮ amount.  To find otherwise would violate "the cardinal rule of construction requiring a court to give effect to all contract terms, where possible."  *BLGH Holdings*, 41 A.3d at 416.  If Honeywell could assert a claim generally for breach of the

warranty, it could collect the full difference between the warranted and the

actual sales.  That reading would render the §5.1 audit and its ███████

buffer "provision[s]…meaningless or illusory."  *Osborn*, 991 A.2d at 1159.

### 2.    Honeywell preserved no other arguments for excusing its failure to conduct a timely audit.

Because Honeywell had adequate notice, *see* Part I.C., the district

court—and this Court—need only consider the evidence in Honeywell's

motion for summary judgment.  *See Continental Casualty Co. v. Winder Labs.,*

*LLC*, 73 F.4th 934, 940 n.8 (11th Cir. 2023); *SPV-LS, LLC v. Transamerica Life*

*Ins. Co.*, 912 F.3d 1106, 1111 (8th Cir. 2019).  By failing to raise substantial

compliance,[5] waiver, frustration of purpose, or prevention at summary

judgment, Honeywell failed to preserve those arguments.   Indeed,

Honeywell had already forfeited these arguments before moving for

summary judgment by failing to disclose them in response to OPTO's

interrogatory requesting all contentions regarding OPTO's "First

Affirmative Defense of Nonperformance of a Condition Precedent."  *See*

---

[5] This omission was especially inexcusable because OPTO's Affirmative
Defense stated that Honeywell "did not conduct, *or even substantially conduct*,
the audit within the January 22, 2021 deadline."  JA3224 (emphasis added).

37

JA4833-4835.  Honeywell responded only that the audit was not a condition to recovery, and it invoked and began the audit before the deadline.  JA4833-4835.

Nor did Honeywell timely raise its nonexclusive-remedy argument, Honeywell Br. 25, even after OPTO opposed summary judgment by explaining that §5.1 created an express condition, JA4359.[6]  In any event, the district court's ruling would not have deprived Honeywell of a related but distinct "common law remedy," such as for equitable relief. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002).  Instead, the district court enforced the bargained-for terms of the contract to determine that a remedy for *breach* of the representation was not available.

Honeywell indeed demands damages purportedly uncovered in discovery, even beyond those claimed based on the audit results.  Honeywell Br. 32-33.  But Honeywell's failure to satisfy the audit condition means that

---

[6] Honeywell misstates that the Court interpreted the Agreement's "audit remedy" to be an "exclusive remedy."  Honeywell Br. 23-26.  As the district court made clear, it reserved its decision for a written opinion.  JA5474 ("I haven't written anything down or … put my name to it.").  The district court then (correctly) held that OPTO owed no damages for any alleged *breach* of its representation of pre-settlement sales *unless* the audit condition was satisfied—not that it was an exclusive remedy.

it is not entitled to *any* pre-Agreement contract damages regardless of their calculation—not that it is free to ignore the express audit condition in §5.1 in asserting a claim for breach of the representation.

### 3. Honeywell's arguments for excusing its failure to conduct a timely audit are meritless.

None of these arguments excuse Honeywell's failure to conduct a timely audit anyway.

### a. Honeywell did not substantially comply with §5.1.

Honeywell argues that its breach is excused because it "[s]ubstantially [c]omplied" with the timing provision. Honeywell Br. 39-41 (emphasis removed). It did not. Section 5.1's timing requirement is a material obligation, so Honeywell's failure to satisfy it cannot be excused for substantial compliance.

The doctrine of "substantial compliance" excuses only an "[im]material" breach. Restatement §241; *see also LPPAS Rep., LLC v. ATH Holding Co.*, 2023 WL 3197819, at *16 (Del. Ch. May 2, 2023) ("Delaware follows the Restatement (Second) of Contracts for determining materiality in the substantial compliance context.").

The timing requirement is also an express condition. As a matter of law, "the doctrine of substantial performance" does not apply "when the duty of one of the parties is subject to an express condition." 15 Williston §44:52; *see also* Restatement §241 cmt. a. Therefore, when it comes to determining compliance with it, "[u]nlike horseshoes or hand grenades, there is no 'close enough.'" *Obsidian Fin. Grp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *8 (Del. Ch. Apr. 22, 2021); *In re NextMedia Grp., Inc.*, 440 B.R. 76, 81 (Bankr. D. Del. 2010), *aff'd,* 2011 WL 4711997 (D. Del. Oct. 6, 2011) ("If … the agreement makes full performance a condition, substantial performance is not sufficient"). Honeywell's failure to perform this express material requirement thus cannot be excused for substantial compliance.

### b.  OPTO did not waive its right to a timely audit.

Honeywell contends that OPTO waived its right to a timely audit by cooperating with the audit past the deadline. Honeywell Br. 41. But OPTO's good-faith cooperation was no waiver.

Waiver is "the voluntary and intentional relinquishment of a known right." *Amirsaleh v. Bd. of Trade of N.Y.*, 27 A.3d 522, 529 (Del. 2011). "[T]he standards for demonstrating waiver … are quite exacting." *Id.* The party

asserting waiver must show "(1) that there is a requirement or condition capable of being waived, (2) that the waiving party knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition." *Id.* at 530 (cleaned up). "[T]he facts relied upon to demonstrate waiver must be unequivocal." *Amirsaleh*, 27 A.3d at 529.

First, the Agreement's no-waiver provision bars Honeywell's argument: "No delay or omission by any Party in exercising any right or power arising from any default by another Party shall be construed as a waiver of such default." JA6443. Delaware courts enforce such provisions, which "give a contracting party some assurance that its failure to require the other party's strict adherence to a contract term will not result in a complete and unintended loss of its contract rights if it later decides that strict performance is desirable." *Rehoboth Mall Ltd. v. NPC Int'l, Inc.,* 953 A.2d 702, 704 (Del. 2008) (cleaned up).

Second, Honeywell fails to show OPTO's *intent* to waive its rights. As to OPTO's continued acquiescence to the audit, "forbearance to assert or insist on a right does not, by itself, constitute a waiver." 13 Williston §39:35. Instead, OPTO engaged in the audit process in good faith. The parties had

41

a mutually beneficial multi-year, multi-million-dollar global deal.  A year into this relationship, in the spirit of cooperation and goodwill, OPTO complied with the auditor's requests to assure Honeywell that it had not, in fact, misrepresented its sales—OPTO accurately represented its worldwide CMOS 2D product sales in §5.1.  *See* JA4940; JA4952; JA4964; JA4980; JA4989; JA5001; JA5012; JA5018.  Honeywell thus failed to present "unequivocal" evidence that OPTO intended to waive the audit condition.

### c. OPTO did not prevent Honeywell from satisfying the requirements of §5.1.

Next, Honeywell argues that OPTO prevented Honeywell from satisfying the requirements of §5.1 by not timely providing its sales reports. Honeywell Br. 38 n.5; JA4758-4759.  But OPTO timely provided the sales reports and cooperated with the auditor.

The Agreement does not specify a deadline for OPTO to provide its sales reports.  Section 5.1 merely states that OPTO "will provide sales reports to HONEYWELL's outside counsel."  Honeywell cannot enforce a deadline it never bargained for.

No one disputes that OPTO had to provide the sales reports within a reasonable time.  And it did.  OPTO provided the sales reports eight months

42

after the Effective Date and only seven days after receiving Honeywell's inquiry.  JA4758.  And during the audit, Honeywell offers no evidence of OPTO failing to fulfill the auditor's requests and providing the requested materials.[7]

Anyway, Honeywell could have invoked the audit provision, with or without OPTO's sales reports, any time after the Effective Date.  And despite admitting that, from the start of the relationship, it "suspected that OPTO may have been underreporting its sales," JA4748, Honeywell waited three months *after* receiving the sales reports and on the eve of the expiration of the deadline to invoke its audit rights.

### d.    OPTO did not frustrate §5.1's purpose.

Honeywell contends that OPTO delayed its sales reports and so frustrated the Agreement's purpose.  Honeywell Br. 37.  That doctrine is ill-

---

[7]  Honeywell accuses OPTO of "dragg[ing] its feet in complying with its audit obligations."  Honeywell Br. 46.  Not so.  Six days after receiving Honeywell's audit notice on December 16, 2020, *see* JA4928, OPTO informed Honeywell that it would seek a Non-Disclosure Agreement (NDA) with the auditor, JA4932-4933.  Through the holidays, counsel negotiated the NDA contents.  JA4930-4933.  OPTO and the auditor signed the NDA on January 7, 2021.  JA4937.  The following week, OPTO provided the first set of documents.  JA4981.

suited to this case. Frustration excuses a party's performance when its "performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement §261; *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006) (citing same). But this defense "is unavailable where a condition precedent cannot be fulfilled due to the fault or action of the other party." 30 Williston §77:5; *see also* Restatement §261 cmt. d. So Honeywell's assertion that OPTO is at fault for the non-fulfillment of the condition is beside the point. Instead, the proper remedy is for breach of contract, but Honeywell asserts no such claim based on any failure to provide reports.

## II.    The district court correctly denied Honeywell's fee request.

The district court rightly held that, because the Agreement contains no attorneys'-fee-shifting provision, Honeywell cannot collect attorneys' or expert witness fees. JA1798.

State law governs contractual claims for attorneys' fees. *See, e.g.*, *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 306, 313 (4th Cir. 2020). "Delaware generally follows the American Rule, under which litigants are responsible for their own attorneys' fees, regardless of the outcome of the

lawsuit." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022). "For a fee-shifting provision to be enforceable," "it must be a 'clear and unequivocal agreement.'" *Baltimore Pile Driving & Marine Constr., Inc. v. Wu & Assocs., Inc.*, 2022 WL 3466066, at *1 (Del. Super. Aug. 18, 2022). Courts review the existence of a contractual fee-shifting provision de novo, and the award of attorneys' fees for abuse of discretion. *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 675 (Del. 2013); *Zoroastrian Ctr. & Darb-E-Mehr of Metro. Washington, D.C. v. Rustam Guiv Found. of New York*, 822 F.3d 739, 754 (4th Cir. 2016).

### A.    The parties did not contract around the American Rule.

Section 4.7 does not overcome the "American Rule" presumption. JA1813. "Parties should not 'expect the Court to deviate from the American rule if care has not been taken in drafting a contract's language.'" *Baltimore Pile Driving & Marine Constr., Inc.*, 2022 WL 3466066, at *1. Fee-shifting provisions are strictly construed: the contract must "make[] the award *explicit*." *Petition of State*, 708 A.2d 983, 989 (Del. 1998) (emphasis added). Section 4.7 does not.

Section 4.7 only entitles the party instituting the action to "its fees and costs incurred." But attorneys' fees are a concept distinct from "fees"

simpliciter.[8]  As the district court noted, "Honeywell has not cited a single case in which attorney[s'] fees were awarded based on a contractual provision that referred only to 'fees' without any reference to 'attorney' fees."  JA1808-1809; *see Bevard v. Farmers Ins. Exch.*, 127 F.3d 1147, 1148 (9th Cir. 1997) (per curiam) (finding that a settlement offer including all "recoverable costs and fees" did not include attorneys' fees).

And this Agreement uses the two terms distinctly.  Outside of §4.7, the parties *did* explicitly reference attorneys' fees.  JA1808-1811.  In fact, the Agreement uses the term attorneys' fees three times.  *First*, the Agreement states that, in the Delaware Action, Honeywell "sought … attorney fees." JA6433.  *Second*, the parties agreed that "Each Party shall bear its own costs, expenses, and attorneys' fees in connection with this Agreement, the ITC INVESTIGATION and the DELAWARE INVESTIGATION."  JA6437.  *Third*, in describing the "Alternative Dispute Resolution Process," the parties agreed that "The Party prevailing at a Step of the Third Party Review shall

---

[8]  Honeywell does not dispute that "costs" do not include attorneys' fees or expert witness fees.  *See Scion Breckenridge*, 68 A.3d at 683, 685; *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019).

recover up to all its reasonable attorneys' fees and costs for work performed in relation to that Step."  JA6458.  In addition, the Second Amendment states: "Each Party shall bear its own costs, expenses, and attorneys' fees in connection with this Second Amendment, the Europe Litigations, and the Nullity Actions."  JA6467.[9]

Each of these provisions uses the specific term "attorneys' fees" rather than the generic term "fees."   That specific usage elsewhere confirms that §4.7 "fees" do not include attorneys' fees.  *See, e.g., Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr.*, 2020 WL 6582958, at *7 (Del. Super. Nov. 10, 2020) (when parties use "fee-shifting language in one section of the agreement and fail to include such language in another, it 'indicates a lack of intent to create a clear and unequivocal agreement to shift fees.'").  Had the parties intended to include "attorneys' fees" in §4.7, they would have clearly said so.

---

[9]  As the district court found, §4.7 unambiguously withholds attorneys' fee shifting.  The extrinsic evidence, cited as an aside, merely confirms that when Honeywell wanted a fee-shifting provision, it knew how to negotiate one. *See* JA1810-1811.

## B.    The purported fee-shifting provision omits necessary "prevailing party" language.

Lacking the key "prevailing party" language, §4.7 is not a fee-shifting provision.  Under Delaware law (*contra* Honeywell Br. 47), "[a fee-shifting provision] *must include* specific language, such as any reference to prevailing parties, a hallmark term of fee-shifting provisions" to be enforceable.  *Braga Inv. & Advisory, LLC v. Yenni*, 2023 WL 3736879, at *18 (Del. Ch. May 31, 2023) (emphasis added); *see also Baltimore Pile Driving & Marine Constr., Inc.*, 2022 WL 3466066, at *2.  Without this "hallmark term," a provision is not "fee-shifting."  The district court rightly denied Honeywell's fee-shifting request.

## III.   OPTO was entitled to judgment as a matter of law because Honeywell agreed that the relevant sales excluded these products.

The district court, however, denied OPTO's renewed motion for judgment as a matter of law.  JA1804.  But there was no evidence for a reasonable jury to find that OPTO's laser products were royalty-bearing 2D Barcode Products as clarified by the Second Amendment.  At a minimum, there was no evidence to reject OPTO's defenses that Honeywell's claim was barred by quasi-estoppel or unilateral mistake.

Rule 50 requires judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable

jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). This Court reviews the denial of Rule 50 motions de novo. *SEC v. Clark*, 60 F.4th 807, 812 (4th Cir. 2023).

### A. OPTO did not breach the Settlement Agreement.

OPTO fulfilled its contractual obligations. The parties agreed that OPTO would pay Honeywell royalties for all sales of 2D Barcode Products. The parties' dispute centers on *which* of OPTO's products are 2D Barcode Products. There was no dispute at trial that OPTO paid royalties on all CMOS 2D product sales. *See* JA1004. And there was no evidence at trial permitting a reasonable jury to ignore Honeywell's contractual admission that OPTO's laser products were not 2D Barcode Products.

The parties defined "2D Barcode Product." *See* JA6434; JA6433 ("the following terms when used herein with initial capital letters, shall have the respective meanings set forth in this Article 1"). When negotiating the Second Amendment to the Agreement, the parties listed all of OPTO's CMOS 2D products and calculated their total European sales revenue in 2019. Before signing the Second Amendment, both parties understood that this total excluded all OPTO laser product sales.

49

The Second Amendment memorializes Honeywell's agreement with this total and, therefore, its agreement that OPTO's laser products are not 2D Barcode Products.    Section 4.9 reads:  ███████████████████

████████████████████████████████████████████████████

███████  JA6468 (emphasis added).  In sum, §1.4 provides the key definition and §4.9 represents an agreed upon *application* of that definition.

### 1.    The Court should read §1.4's definition of "2D Barcode Products" in light of §4.9's calculation.

The district court held that Honeywell "disputed that by entering the Second Amendment … Honeywell intended to make any change to the definition of 2D Barcode Products in Section 1.4."  JA1803-1804.  That is true but irrelevant:   §4.9 never changed §1.4's definition—§4.9 *applied* it.   As Honeywell understood, §4.9's calculation of 2D Barcode Products omits all laser and CCD products.   Neither Honeywell nor the district court marshalled any contrary evidence.

To properly interpret §1.4, the Court must "constru[e] the agreement as a whole and giv[e] effect to all its provisions."  *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).  This includes all amendments.  *See, e.g.*, *CM Com. Realty, Inc. v. Alpha Tr. Real Est., LLC*, 2022 WL 509693, at *8 (Del. Super. Feb.

50

18, 2022) (courts seek to "reconcile" the various provisions between the original agreement and any amendments thereto). Honeywell does not contest this. At trial, Honeywell's own executives agreed that the Agreement and the Second Amendment are "all part of the same agreement." *See* JA1003-1004.

Section 4.9 applies §1.4's definition by reciting the stipulated calculation of "Opticon's revenue from *2D Barcode Products* in Europe." JA6468 (emphasis added). Using the capitalized term "2D Barcode Products," the parties made clear that §4.9 incorporated and applied §1.4's definition. JA6433-6434. As "[t]he parties to an agreement know best what they meant," their application is "the strongest evidence of their meaning." Restatement §202 cmt. g.

### 2.    The ▮▮▮▮▮▮▮ calculation did not include laser or CCD products.

The parties did not pull the ▮▮▮▮▮▮▮ number out of thin air— they pulled it from a spreadsheet. During the negotiation process, OPTO provided Honeywell a comprehensive spreadsheet of all European sales data. JA7122-7135. For each product, OPTO included quantity sold, revenue, net profit and whether the product was "2D." OPTO then pulled

all those products labeled "2D" and calculated their European revenue. JA7133-7135; JA7175.  For 2019, this total was ██████ — the amount in §4.9.  JA7122.

This calculation omitted OPTO's laser products.  Describing the spreadsheet to Honeywell before the Second Amendment was signed, OPTO explained ████████████████████████████████ ██████████████  JA7177.  On another occasion, OPTO reiterated ████ ████████████████████████████████████████ ██████████████████████████  JA7175.

### 3.  No reasonable jury could find that Honeywell was unaware that §4.9's calculation omitted laser and CCD products.

The district court held that Honeywell's witnesses presented sufficient evidence "den[ying] that they 'understood' that OPTO's European sales did not include products which could decode 'two dimensional symbologies.'" JA1803.  No evidence supports that holding, and the law forbids Honeywell's attempt to undo its contractual "understand[ing]."

52

a.   **The language of the Agreement establishes that Honeywell understood that the ███████ calculation omitted OPTO's laser products.**

Honeywell attested, in the Second Amendment itself, that it "understands" the ███████ calculation.  Honeywell cannot evade that contractual concession.

 "[U]nderstands" plainly means that Honeywell comprehended the basis of the ███████ calculation.  A reasonable person would conclude that, by attesting that it "understands" the calculation, Honeywell agreed that the ███████ calculation, and the foundation on which it rested, was correct.

The contract language switched from OPTO "represent[ing] and warrant[ing]" its total global revenue in §5.1 of the Agreement, *see* JA6440, to Honeywell "understand[ing]" OPTO's European revenue in §4.9 of the Second Amendment, *see* JA6468.  That difference reinforces that Honeywell knew which products the §4.9 calculation included.  With the Europe calculations, Honeywell no longer simply relied on OPTO's word; it had actually reviewed OPTO's calculations.

Unlike §5.1, §4.9 imposed no requirement to provide OPTO sales data to Honeywell.  This is because OPTO already had.   When negotiating the

original Agreement, Honeywell adopted a trust-but-verify approach.  *See* JA6440-6441.  But with the Second Amendment, Honeywell did not need future verification of OPTO's already-verified sales.

Finally, Honeywell could not claim ignorance of the document it was signing.  "One of the basic tenets of contract law is that a party is responsible for the terms of a contract they sign, even if unaware of the terms."  *Waters v. Delaware Moving & Storage, Inc.*, 300 A.3d 1, 22 (Del. Super. 2023).  "[A party] cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument that he signed."  *Id.* at 22 n.165.  This is especially true for sophisticated parties, whose "failure to conduct adequate due diligence or to procure express warranties for facts that it supposedly relied upon in entering a transaction … indicated that the sophisticated party made a business decision, which the court would not second-guess."  *Rsrvs. Mgmt., LLC v. Am. Acquisition Prop. I, LLC*, 2014 WL 823407, at *9 n.64 (Del. 2014) (Table).  This Court should hold Honeywell to its avowed "understand[ing]" of the ▮▮▮▮▮ calculation.

     **b.**    **Honeywell presented no evidence from which a reasonable jury could conclude it did not know that the calculation omitted OPTO's laser products.**

No reasonable jury would find that Honeywell did not know that the ▮▮▮▮▮▮▮ calculation excluded laser and CCD products. Before signing the Second Amendment, Honeywell reviewed OPTO's European sales data. OPTO provided Honeywell with both the raw data on which it based its calculation and a detailed explanation of its process, including repeatedly telling Honeywell that its calculation excluded laser and CCD products.

And OPTO did not hide the ball when it came to its calculations. OPTO's counsel, Mr. Goldstein, could not have been clearer—he provided a spreadsheet which listed which products OPTO considered 2D. And he repeatedly stated that the list did *not* include lasers and CCD products. *See* JA7177 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮; JA7175 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

During negotiations, Honeywell had ample opportunity to, but did not, dispute OPTO's calculation or its classification of any products. Honeywell contends that it had no way of knowing which of OPTO's products could decode two-dimensional symbologies (Honeywell's current

definition of "2D Barcode Products").  But when Honeywell signed the Second Amendment, it at least knew that *some* of OPTO's laser products could decode 2D symbologies and that OPTO categorically excluded its laser products from its 2D Barcode Product calculation.  JA1201.  No reasonable jury could have found that Honeywell did not understand what it signed.

### c.    Honeywell is bound by its counsel's knowledge.

Honeywell claims that, because OPTO's revenue sheets were for "attorneys' eyes only," it is not responsible for understanding what it signed. But Honeywell cannot claim ignorance.  Honeywell presents no evidence that its counsel lacked authority to settle the matter.  Simply put, "Honeywell [should] not be heard to claim that its counsel did not have authority to act and did not, in fact, act on its behalf.  Honeywell is, therefore, bound by its counsel's agreement to settle this case."  *Rohm & Haas Elec. Materials, LLC v. Honeywell Int'l, Inc.*, 2009 WL 1033651, at *6 (D. Del. Apr. 16, 2009).[10]

---

[10] The district court thus instructed the jury to "assume that the conduct of Honeywell's attorneys is also the conduct of Honeywell, and…[to] likewise assume that the conduct of OPTO's attorneys is also the conduct of OPTO." JA1408.

## B.    Quasi-estoppel bars Honeywell's claims.

Even if there were any breach, quasi-estoppel would bar Honeywell's claims.  No reasonable jury would find that Honeywell provided sufficient evidence to overcome OPTO's affirmative defense of quasi-estoppel.

That doctrine applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 872-73 (Del. 2015).  "To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another." *Id.* at 873.

By knowingly adopting and ratifying OPTO's §4.9 calculation, Honeywell acquiesced in the position that "2D Barcode Products" did *not* include laser and CCD products.  And Honeywell benefitted from this position in several ways.

First, Honeywell's acquiescence induced OPTO to sign the original Agreement *and* Second Amendment.  Without Honeywell's purported acquiescence, OPTO would not have agreed to the substantial royalties

Honeywell seeks to augment here through its new contrary position maintained in this lawsuit.

Second, Honeywell benefitted from OPTO's agreement to dismiss its European nullity actions. Had OPTO succeeded, Honeywell would have lost substantial European patent power. By inducing OPTO to dismiss those actions through its bait-and-switch "understanding" of 2D Barcode Products, Honeywell eliminated uncertainty around the validity of its European patent portfolio. Honeywell introduced no contrary evidence that it did *not* receive those benefits, nor any evidence that its behavior is anything but unconscionable.

### C.    OPTO is excused from breach because of unilateral mistake.

Regardless, Honeywell's knowledge of OPTO's mistaken belief about the definition of "2D Barcode Products" would bar its claims. Under the unilateral mistake doctrine, a defendant must (1) "show that it was mistaken" and (2) "that the other party knew of the mistake but remained silent." *Scion Breckenridge*, 68 A.3d at 679-80.

If there were breach, OPTO mistakenly understood what products were "2D Barcode Products." Throughout the Agreement, OPTO evinced the same understanding that lasers and CCD products were not "2D Barcode

Products."  It applied this understanding when calculating its global sales of 2D Barcode Products, *see* JA6440-6441; its quarterly payments, *see* JA6438-6439; and its Europe-only sales, *see* JA6467-6468.  OPTO consistently showed its understanding that the Agreement categorized its laser and CCD products as 1D, not 2D.

Honeywell knew of OPTO's belief and remained silent.  While negotiating the Second Amendment, Mr. Goldstein expressly stated that OPTO did not believe that laser or CCD products fell within the definition of "2D Barcode Products."  *See* JA7175-7183.  Honeywell never contested that belief.  In fact, Honeywell *confirmed* OPTO's understanding by reciting its same "understand[ing]" in the Second Amendment.  So no reasonable jury could find that Honeywell was unaware of OPTO's belief that the products in question bore no royalties.

## IV.    A new trial is needed because the verdict contradicts the clear weight of the evidence.

Without judgment as a matter of law, a new trial would be necessary because the Second Amendment renders the verdict "against the clear weight of the evidence."  *Hicks v. Ferreyra*, 64 F.4th 156, 171 (4th Cir. 2023).  The district court erred not only in failing to reach that necessary conclusion,

but also in failing to perform the Rule 59 analysis. JA1804-1805. This Court reviews the denial of a new trial for abuse of discretion. *Hicks*, 64 F.4th at 171. "A court abuses its discretion when it … commits an error of law." *Id.*

In rejecting OPTO's Rule 59 motion, the district court failed to engage in a separate analysis from its Rule 50 findings. Noting that, in support of its Rule 59 motion, "OPTO reprise[d] its arguments made in support of its Rule 50 motion," the district court summarily held that it "declines to find [those arguments] … sufficient" to grant a new trial. JA1804.

That was error—the Rule 50 and 59 analyses are distinct. *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989). First, under Rule 59 (but not Rule 50), "a trial judge *may weigh the evidence and consider the credibility of the witnesses.*" *Id.* (emphasis added). Second, if the district court "finds the verdict is against the clear weight of the evidence, … [it] *must set aside the verdict, even if supported by substantial evidence*, and grant a new trial." *Id.* (emphasis added).

Summarily rejecting OPTO's Rule 59 motion, the district court failed to independently weigh the evidence. In fact, it apparently believed itself *prohibited* from doing so. Even so, the district court expressed sympathy for OPTO's position: "OPTO offered numerous cogent rejoinders to

60

Honeywell's witnesses and arguments.  And, again, had the jury agreed with OPTO, the [district court] would readily find that verdict to be based on sufficient evidence."  JA1804.  That analysis conflated the Rule 50 and 59 analyses and failed to reckon with the latter's "clear evidence" standard.

At a minimum, that failure requires remand.  But this Court can reverse outright because under that standard, the district court would have to grant a new trial.  As shown above, Honeywell failed to offer sufficient evidence in support of its claim.  Thus, even if any reasonable jury could have found for Honeywell, *but see* Part III *supra*, this verdict goes against the clear weight of the evidence and requires a new trial.

## V. The district court erred in construing "2D Barcode Product" not to require "a 2D image sensor."

By agreeing in §4.9 that OPTO's laser products are not "2D Barcode Products," the parties applied the *only* unambiguous interpretation of "2D Barcode Products," which provides (1) a first sentence product category definition confining the third sentence to the scope of the licensed patents, (2) a second sentence non-exclusion clause focusing the definition on defined product structure and function rather than barcode symbology, and (3) a

third sentence broadly but unambiguously defining the requisite product

structure and function as follows:

> **1.4.  2D Barcode Products**.  The term "2D Barcode Products"
> shall mean any device or article of manufacture that is operable
> to decode at least one or more two-dimensional barcode
> symbologies into human-readable text. Two-dimensional ("2D")
> barcode symbologies include, but are not limited to, any two-
> dimensional barcode symbology defined by one or more
> standards settings organizations such as the International
> Organization for Standardization (ISO), International
> Electrotechnical Commission (IEC), and the Association for
> Automatic Identification and Mobility (AIM). For the avoidance
> of doubt, the term "2D Barcode Products" shall include Engines
> and other products that include a 2D image sensor and are
> capable of outputting a 2D image that may be used to decode a
> 2D barcode symbology into human-readable text.

JA6434.

The ▮▮▮▮▮▮ amount in §4.9 totals the revenue from the 71 products

in the "2D Articles" tab of OPTO's European sales spreadsheet.  Despite their

differing functionalities, the parties agreed that all are 2D Barcode Products

because they share a common feature—a "2D image sensor" "capable of

outputting a 2D image that may be used to decode a 2D barcode symbology

into human-readable text."  OPTO's laser products do not have a 2D image

sensor and were not included in that ▮▮▮▮▮▮ total.

62

Selecting those 71 products did not require determining which 2D barcode symbologies each device could decode, because the second sentence contemplates all conceivable 2D barcode symbologies defined by *anyone* at *any time*.

The third sentence clarifies the first sentence's "operable to decode" function by a specifying a function that falls far short of actually decoding symbologies.  As clarified, a 2D Barcode Product is "operable to decode" a 2D symbology if it is merely "capable of outputting" a 2D image of the symbol that "may be used" to decode it.

Because the critical function amounts to taking pictures of barcode symbols, it was not necessary to classify PDF417, for example, as 1D or 2D.  If a product can output 2D images, then it can take a picture of a QR code as easily as a picture of a DataMatrix.  Thus, the requisite 2D image output function does not depend on the structure of the photographed symbology.

This explains a peculiar feature of §1.4—it does *not* define "two-dimensional barcode symbologies."  There was no need to define it.  Because the requisite decoding function begins and ends with photographing a barcode symbol, the actual symbol structure is irrelevant to the "decoding"

required by §1.4.  The term "two-dimensional barcode symbologies" thus does not inform the defined product structure and function.

The term is used instead to limit §1.4 to the licensed patents' subject matter.  In isolation, the defining structure ("2D image sensor") and function ("2D image output") literally apply to any digital camera, smartphone, or other imaging devices "capable of outputting a 2D image of a 2D barcode symbology."  The first sentence confines the *relevant category* of digital imaging products to "devices operable to decode two-dimensional barcode symbologies into human readable text," commensurate with the licensed patents covering the same subject matter but not digital imaging generally. *See Shintom Co., Ltd. v. Audiovox Corp.*, 888 A.2d 225, 230 (Del. 2005) ("the expression of one thing is the exclusion of another").

The text of §1.4 thus logically progresses from defining the relevant product category to specifying precise structure and function to achieve the broadest 2D Barcode Products definition within the scope of the licensed patents.  The second sentence serves as a common "without limitation" provision, ensuring that the definition is not limited by barcode classifications.  That broad definition thus advantages Honeywell by

64

capturing all 71 of OPTO's CMOS 2D imaging products, regardless of their decoding capability.

Section 1.4 demonstrates the parties' ability to unambiguously define 2D Barcode Products by product structure and function. Conspicuously, there is *no* description of any laser scanner structure or function—only descriptions of image capture. Had the parties intended to include OPTO's laser scanners, §1.4 would have unambiguously defined their requisite structure and function. It does not.

Despite that unambiguous interpretation applied by the parties in §4.9, the district court incorrectly concluded that the first sentence of §1.4 *alone* "unambiguously" provides the working definition. JA513. According to that interpretation, "any device … operable to decode … one or more *two-dimensional barcode symbologies* into human-readable text" is a 2D Barcode Product. Recognizing, *as all parties agree*, that the term "two-dimensional barcode symbologies" is undefined, the district court instructed the jury to determine its meaning based on extrinsic evidence. JA513.[11]

––––––––––––––––––––

[11] Because the district court ruled that §1.4 is unambiguous, the parties could not present evidence of the intent behind that definition.

65

That was error, for two reasons. *First*, the court's definition, hinging on the undefined term "two-dimensional symbology," creates both an ambiguous definition and the absurd result that third parties can unilaterally change the parties' royalty obligations. *Second*, the court's construction ignores the definition's text and structure and neglects controlling contract law that compels the interpretation applied by the parties in §4.9.

Because this question involves contract interpretation, the district court's ruling is subject to de novo review. *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 589 (4th Cir. 2023).

## A. The district court's reading produces an absurd result.

The district court's deferral to malleable extrinsic evidence is a recipe for endless litigation.

### 1. The district court wrongly relies on an undefined term.

Recognizing that "two-dimensional barcode symbologies" is not defined, the district court looked to the second sentence. Yet, that sentence's passing reference to any 2D symbologies that "include, but are not limited to" those defined by SSOs neither defines the term nor incorporates any definition by reference.

Delaware law requires "an explicit manifestation of intent" to incorporate extrinsic material, *Town of Cheswold v. C. Del. Bus. Park*, 188 A.3d 810, 819 (Del. 2018), and the extrinsic document must be "specifically set forth or identified by reference," *State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. 1951). Here, there is no incorporation. The second sentence does not "specifically" identify any SSO standard (which are readily identifiable by assigned number and date) or any other document. It literally encompasses the universe of "2D barcode symbologies" defined by *anyone* at *any time*.

The Agreement prohibits any such incorporation. JA6443 ("This Agreement and its Exhibits constitute and contain the entire agreement among the Parties"). The Exhibits include neither SSO standards nor any clarification of the undefined term. *See also* JA6435 (listing the Exhibits). Honeywell acknowledged as much. JA4564 ("[the Agreement] does not specifically incorporate a particular industry standard by reference"). The linchpin of the district court's interpretation is hopelessly ambiguous.

## 2. The district court leaves third parties in control.

Even worse, that interpretation renders the linchpin subject to change at the stroke of a third party's pen, "produc[ing] an absurd result … that no

67

reasonable person would have accepted when entering the contract." *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

Section 1.4 does not even limit "2D barcode symbology" to any current definition, so its meaning can change as the extrinsic evidence evolves. For example, SSOs routinely review, update, and create new standards.[12] An SSO therefore could reclassify "2D barcode symbologies" without the consent of either, much less both, parties. According to the district court, such revisions would change the scope of §1.4. This violates the parties' strict consensus that "[t]his Agreement may be amended … *only by a written instrument signed by the Parties*." JA6443 (emphasis added). Clearly, the second sentence was not intended to be interpreted in this way, beyond its intended role as a common "without limitation" clause.

---

[12] Both ISO/IEC 15415:2011 and 15438:2015, addressed at trial, are subject to mandatory review every five years. https://www.iso.org/standard/54716.html (last visited Apr. 29, 2024); https://www.iso.org/standard/65502.html (last visited Apr. 29, 2024).

**B.     The district court's definition ignores the duties of the third sentence.**

The district court neglected Delaware contract law requiring courts to "read the contract as a whole … [and] endeavor to give each provision and term effect and not render any terms meaningless or illusory." *Weinberg*, 294 A.3d at 1044.  The Restatement cautions, "where an integrated agreement," like this one, "has been negotiated with care … an interpretation is *very strongl*y negated if it would render some provisions superfluous." §203 cmt. b. (1981) (emphasis added).

**1.     The district court over-privileged the first sentence at the expense of the third.**

Fixated on the first sentence, the district court defined "'2D Barcode Products' *primarily* as 'any device or article of manufacture that is operable to decode at least one or more two-dimensional barcode symbologies into human-readable text.'" JA520-521 (emphasis added).  It then held that the second sentence partially defines "two-dimensional barcode symbology," and the third sentence defines a "niche" product, Engines, effectively rendering that sentence "superfluous" to the definition as a whole.  JA520-521.

The district court acknowledged as much, instructing the jury that the third sentence is "inclusive" of the first. JA1405-1406. But §1.3 separately defines "Engines," and the third sentence does not recapitulate §1.3 but instead unambiguously specifies the product structure (2D image sensor) and function (2D image output) satisfying the first sentence's "operable to decode" limitation. JA6433. Without that clarification, the first two sentences are irreparably ambiguous.

### 2. The district court improperly read "For avoidance of doubt" as expansive.

The district court misread "For avoidance of doubt," which expressly acknowledges the ambiguity of the preceding sentences. And the court incorrectly interpreted the clause as *expansive*, to include "niche" products. But that phrase signals *clarification*, not expansion.

"For avoidance of doubt" is "confirmatory." *In re Activision Blizzard, Inc. Litig.*, 124 A.3d 1025, 1059 (Del. Ch. 2015); *see also United States v. Bank of America Corp.*, 753 F.3d 1335 (D.C. Cir. 2014) ("for avoidance of doubt" "conclusively answers" what the parties intended). Here, the phrase performs "as advertised" to eliminate the prior sentences' ambiguity— "operable to decode" means "capable of outputting a 2D image."

This reading follows Delaware's mandate that "[s]pecific language in a contract controls over general language, and … the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). The district court failed to give effect to the specific language in the third sentence which controls the general language in the first.

### 3.    "Shall include" signals an exhaustive list.

The district court misconstrued the phrase "shall include," which demonstrates an *exhaustive* list of criteria satisfying the 2D Barcode Products definition.

The phrase "shall include," without further modifiers, defines the whole where elsewhere in the document the word "include" is followed by "without limitation" or "but not limited to."[13] So too here. In §1.4, "shall include," appears without such modifiers, but the Agreement is elsewhere

---

[13]  *Babcock v. Newton*, 2012 WL 5364579, at *4, 977 N.E.2d 105 (Mass. App. 2012) (Table); *Jones v. Schneiderman*, 974 F. Supp. 2d 322, 346-47 (S.D.N.Y. Sept. 30, 2013); *Covington Square Assocs., LLC v. Ingles Markets, Inc.*, 641 S.E.2d 266, 269-70 (Ga. App. 2007); *see also Brown v. Sylvester*, 56 N.W. 709, 710 (Neb. 1893) ("shall include" is exhaustive); *Morris Friedman & Co. v. United States*, 351 F. Supp. 611, 615 (Cust. Ct. 1972) (collecting cases).

littered with phrases such as "including without limitation" and "including, but not limited to," even in the second sentence of §1.4. JA6433; JA6437; JA6439-6440. By omitting such modifiers here, the parties signaled an exhaustive list of criteria.

The parties' definition of "including" to mean "including without limitation," supports this conclusion. *See* JA6444. The district court, however, surmised that since "includes" and "including" are similar, they share the same definition. JA521-522. Not so. "Include" and "including" have different meanings and preform different grammatical functions. "Include" is a verb, actively defining the whole. "Including" is a preposition, connecting words and phrases.[14] The district court ignored their different grammatical duties.

If an inexhaustive meaning was intended, the parties would have used the defined term "including" or added a modifier such as "without limitation." They did not. By using "shall include" in §1.4 — the only time the phrase appears — the parties signaled that "include" exhaustively defines

---

[14] *Contrast Include*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/include; *with Including*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/including.

72

the requisite structure (2D image sensor) and function (2D image output).  A 2D Barcode Product must have both.

### C.    That misconstruction prejudiced OPTO.

Under the correct interpretation, OPTO was entitled to summary judgment because *none* of the products at issue include a "2D image sensor" nor can they "output[] a 2D image … [of] a 2D barcode symbology."  Indeed, Honeywell did not dispute that OPTO would win on all issues under that construction.  The district court should have adopted the interpretation of §1.4 applied by the parties in §4.9—thereby ending this case at summary judgment.

## VI.   The district court erred in holding that Honeywell did not commit *per se* patent misuse.

At summary judgment, the district court foreclosed OPTO's *per se* patent-misuse defense, holding instead that OPTO could only show misuse under a rule-of-reason analysis by proving the anticompetitive effects of Honeywell's conduct.  JA528-535; JA1684 (same).  That was error.  Whether a patentee's conduct constitutes *per se* patent misuse is a question of law that this Court reviews de novo.  *See, e.g.*, *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868-69 (Fed. Cir. 1997); *see also United States v. Aiyer*, 33 F.4th 97,

113-14 (2d Cir. 2022) ("a threshold determination as to which analytical framework under the Sherman Act—the *per se* rule or the rule of reason—should be applied…[is] a question of law, which we review de novo.").[15]

Patent misuse occurs whenever a patentee licenses a patent beyond "the reach of the monopoly granted by the Government." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136-38 (1969); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456-57 (1940) (patent misuse is "control[ling] conduct by the licensee not embraced in the patent monopoly"). A patentee commits *per se* patent misuse by licensing a patent in a manner that (1) extends the temporal scope of a patent, *e.g, Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964), *or* (2) "extend[s] the monopoly of [the licensed] patent to derive a benefit not attributable to use of the patent's teachings," *Zenith Radio*, 395 U.S. at 136. Honeywell committed both types of *per se* misuse here.

---

[15] Because this issue is "purely legal," the denial of OPTO's summary judgment motion preserved it for appeal. *Dupree v. Younger*, 143 S. Ct. 1382, 1387 (2023). Anyway, OPTO renewed that summary judgment argument in post-trial briefing. JA6338-6368.

### A. Honeywell's demand for royalties on the non-patented multi-row decoding function is *per se* patent misuse.

#### 1. Honeywell's attempt to extend the temporal scope of expired patents is *per se* misuse.

First, Honeywell committed *per se* misuse by trying to control OPTO's use of the non-patented multi-row decoding function based on the teachings of the *expired* '849, '740, and '009 patents. *Brulotte* holds that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*." 379 U.S. at 32. "[W]hen the patent expires, the patentee's prerogatives expire too, and the right to make or use the article, free from all restriction, passes to the public." *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 451 (2015). When enforcing the patent expiration deadline, the Supreme Court "has carefully guarded that cut-off date … *to preclude measures that restrict free access to formerly patented … inventions*." *Id.* at 451-52 (emphasis added). A patentee can avoid *Brulotte* by agreeing to reduce the royalty after the patent expires. *See id.* at 454. But the *per se* rule against conditioning royalties on the post-expiration use of patented technologies "is simplicity itself to apply. A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* at 459.

75

Honeywell's attempt to twist the Agreement to extract royalty payments attributable to expired patents thus is *per se* patent misuse. The district court properly rejected Honeywell's assertion "that under [*Kimble*], 'royalties may run until the latest-running patent covered in the parties' agreement expires;' therefore, because the licensed Honeywell portfolio spans thousands of patents, the majority of which remain unexpired, the Agreement is enforceable." JA531. It recognized that "Honeywell exaggerates the holding of *Kimble*" in such a way that would "allow a patent owner to enforce a license of multiple patents so long as any of those patents remained active, regardless of whether any of the unexpired patents covered the product or practice being licensed." JA531-533.

The district court erred, however, in rejecting OPTO's *per se* patent-misuse claim based on *other* "unexpired Honeywell patents that cover the disputed products." JA531. That holding contradicts *Scott Paper*, *Brulotte*, and *Kimble*, which forbid "any attempted reservation or continuation" of the expired patents "*whatever the legal device employed.*" *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945); *see also Brulotte*, 379 U.S. at 31; *Kimble*, 576 U.S. at 453 (emphasis added). In other words, the Supreme Court's patent-misuse trio requires substantive analysis of the Agreement's

76

royalty provisions and covenant not to sue ("whatever the legal device employed") to determine whether Honeywell sought to recapture any part of its expired patent monopolies.

The district court erred in conflating the Agreement here with the standard portfolio agreement addressed in *Brulotte*. *See* JA533 ("The life of the license in the Agreement has not and will not exceed the life of all the patents covering the products in dispute so no patent misuse (in this regard) has been committed."). *Brulotte* involved a license for seven fully enforceable patents until their expiration. *See* 379 U.S. at 29-30. The *Brulotte* license resembles the Agreement's undisputed licensing of OPTO's CMOS 2D imaging products. The numerous licensed Honeywell imaging patents are unaffected by the Agreement's covenant not to sue and thus remain enforceable against OPTO's CMOS 2D imaging products until their expiration.

OPTO's laser products, however, present a different scenario. For those products, Honeywell conditions royalty payments on OPTO's use of Honeywell's *expired* patents. If OPTO disables the multi-row decoding functions claimed in those expired patents, OPTO pays nothing for use of Honeywell's other general-purpose patents. And the covenant not to sue

makes any applicable Honeywell patent unenforceable against OPTO's laser products. According to Honeywell, OPTO's royalty obligation arises *only* when OPTO uses the teachings of Honeywell's *expired* patents.

Honeywell's gambit thus turns the *Kimble* safe harbor on its head. *Kimble*, 576 U.S. at 454. Rather than *stepping down* the royalty for expired patents, Honeywell seeks to *step up* the royalty from ███ to ███ whenever OPTO enables the expired patents' technology. That stepped-up royalty confirms that Honeywell is exploiting expired patents. Honeywell's asserted interpretation of the Agreement thus "provides royalties for post-expiration use of a patent," and is *per se* patent misuse. *Id*. at 459.

> **2.     Honeywell's attempt to derive a benefit not attributable to the use of its general-purpose patents is *per se* patent misuse.**

Independently, Honeywell committed *per se* patent misuse by conditioning a license to its general-purpose patents on OPTO's products' ability to decode multi-row symbologies—an ability over which Honeywell has no patent rights. Honeywell thus sought to "extend the monopoly of [the licensed] patent to derive a benefit not attributable to use of the patent's teachings." *Zenith Radio*, 395 U.S. at 136. And this is not a scenario where

"the convenience of the parties rather than patent power" dictates the structure of the royalty obligation. *Id.* at 138.

The district court incorrectly excused Honeywell's misuse under *Zenith*, surmising that Honeywell could impose royalties on non-patented product features "'*[i]f convenience of the parties rather than patent power dictates a … royalty provision*." JA534 (quoting *Zenith*, 395 U.S. at 138) (emphasis added). But the district court omitted a crucial part of the Supreme Court's holding—"if convenience of the parties … dictates *the total-sales* royalty provision." 395 U.S. at 138 (omitted words in italics). Thus, in cases involving a "total-sales royalty," courts must entertain the possibility that parties to the patent license "would find it more convenient … to base royalties on total [product] sales than to face the burden of figuring royalties based on actual use" of the patents by each product. *Id.*

That determination was necessary in *Zenith* because the license required royalties on sales of *all products*, whether or not they used the patented technology. Patent misuse therefore turned on whether royalties were paid on unpatented products by coercion or by convenience. *Id.* But here, OPTO only agreed to pay royalties on *some* of its products (i.e., 2D Barcode Products), and the parties agreed that OPTO owed no royalties on

79

others (i.e., 1D Barcode Products). Therefore, *Zenith's* exception does not apply and, at summary judgment, the district court wrongly concluded that there was a factual issue whether the royalty agreement "was the product of … mutual convenience of the parties." JA535.

Instead, the district court should have answered its correctly framed question in the affirmative: "Whether or not Honeywell has unlawfully conditioned the payment of royalties on the ability of OPTO's products to decode stacked barcode symbologies (*a practice over which it has no patent rights*). . . ." JA533 (emphasis added). That conditioning of OPTO's royalty payments on "the ability of [its] products to decode stacked barcode symbologies" is "a condition" that controls "conduct by the licensee not embraced in the patent monopoly." *Ethyl Gasoline*, 309 U.S. at 456-57. Honeywell's asserted interpretation of the Agreement plainly manifests its intent to unlawfully condition a license to its patents on OPTO's payment of royalties for use of the non-patented multi-row decoding function.

According to Honeywell's interpretation, Honeywell agreed not to enforce its general-purpose patents applicable OPTO's laser products if OPTO disables the non-patented decoding function. But if the decoding function is enabled, then Honeywell asserts its patent leverage over *other*

80

product functions to demand a ■ royalty. Honeywell's conditional enforcement depends, therefore, on "conduct by [OPTO] not embraced in the patent monopoly" (enablement or disablement of the non-patented function) and is *per se* misuse of Honeywell's general-purpose patents.

The district court erred in failing to recognize that Honeywell violated the "basic rule of patent misuse"—"that the patentee may exploit his patent *but may not use it to acquire a monopoly not embraced in the patent*." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327 (Fed. Cir. 2010). Here, Honeywell exploited and misused its general-purpose patents "to acquire a monopoly not embraced in [those patents]." *Id.* That suffices for *per se* patent misuse.

## B. The district court wrongly required proof of Honeywell's economic power.

The district court held that the issue of patent misuse "cannot be decided at summary judgment, where there remains (at least) a dispute over Honeywell's economic power over such technology." JA533-534. That was error.

Honeywell's patent misuse unlawfully controls OPTO's use of technology disclosed in expired patents. And *Kimble* rejected mandatory application of the "antitrust law's rule of reason to identify and invalidate

81

those post-expiration royalty clauses with anti-competitive consequences."
576 U.S. at 459. Instead, courts "appl[y] a categorical principle that all
patents, and all benefits from them, must end when their terms expire." *Id.*
at 463. So "post-patent royalty contracts are unenforceable—utterly
'regardless of a demonstrable effect on competition.'" *Id.* (quoting 1 H.
Hovenkamp, et al., IP and Antitrust §3.2d, at 3-10 (2d ed., Supp. 2014)).

*Kimble* noted that Congress imposed a different rule on "*tie-in*"
arrangements where the patent license is conditioned upon the "purchase of
an unpatented product." *Id.* at 458 n.4 (citing 102 Stat. 4676, codified at 35
U.S.C. § 271(d)(5)). But that proof of market power requirement for "tie-in"
cases did not modify the evidentiary requirements under the *Kimble-Brulotte*
*per se* rule of patent misuse, as the district court recognized. *Id.; accord* JA531
(§271(d)(5) "not directly controlling here").

Proof of market power was unnecessary for a second reason.
Honeywell's patent misuse creates an unlawful "*tie-out*" arrangement that
"unreasonably lessens the competition which the public has a right to
expect," here, in the sale of laser scanners capable of decoding multi-row
symbologies. *Compton v. Metal Prod., Inc.*, 453 F.2d 38, 45 (4th Cir. 1971). This
Court previously determined that §271(d)(5) is not applicable to misuse in

tie-out arrangements.  *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 976 n.15 (4th Cir. 1990).  The district court therefore erred in denying OPTO's motion for summary judgment of *per se* patent misuse and in compelling OPTO to prove Honeywell's market power.  Instead, the court should have invalidated the Agreement's royalty provisions as to OPTO's laser products, just as *Kimble* held the royalty provision "unenforceable after the expiration of the *Kimble* patent."[16]  576 U.S. at 450.

## CONCLUSION

For these reasons, the Court should reverse the denial of judgment as a matter of law and remand with instructions to enter judgment for OPTO.  In the alternative, this Court should vacate the judgment and remand for a new trial, or at a minimum for resolution of OPTO's motion for new trial under the correct standard.  Either way, this Court should affirm summary judgment on Honeywell's demand for royalties on pre-Agreement sales and the denial of Honeywell's motion for attorneys' fees and expert witness fees.

---

[16]  There is no patent misuse under the unambiguous interpretation of 2D Barcode Products applied by the parties in §4.9 because there is no royalty obligation on OPTO's laser products *period*, regardless of their decoding capability.

83

Dated: April 30, 2024                    Respectfully submitted,

                                         */s/ Brian D. Schmalzbach*
                                         Brian D. Schmalzbach
                                         MCGUIREWOODS LLP
                                         Gateway Plaza
                                         800 East Canal Street
                                         Richmond, VA 23219
                                         T: (804) 775-4746
                                         bschmalzbach@mcguirewoods.com

                                         York M. Faulkner
                                         YORKMOODYFAULKNER
                                         Tensho Building, 7F, Suite 711
                                         3-17-11 Shibaura, Minato-ku
                                         Tokyo, Japan 108-0023
                                         T: (202) 351-0837
                                         york.faulkner@ymf-law.com

                                         *Counsel for OPTO Electronics Co., Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B) because it contains 15,253 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, 14-point Book Antiqua font using Microsoft Word.


*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2024, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Fourth Circuit using the

appellate CM/ECF system, which will also serve counsel of record.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach
