**Nos. 23-1850, 23-2038**

In the

# United States Court of Appeals

## For the Fourth Circuit

———————————

HONEYWELL INTERNATIONAL INC.; HAND HELD PRODUCTS, INC.; METROLOGIC INSTRUMENTS, INC.,

*Plaintiffs-Appellants,*

v.

OPTO ELECTRONICS CO., LTD.,

*Defendant-Cross-Appellant.*

———————————

On Appeal from the United States District Court
for the Western District of North Carolina
Case No. 3:21-cv-506-KDB-DCK

———————————

**REDACTED REPLY BRIEF OF
DEFENDANT-CROSS-APPELLANT OPTO ELECTRONICS CO., LTD.**

———————————

York M. Faulkner
YORKMOODYFAULKNER
Tensho Building, 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
T: (202) 351-0837
york.faulkner@ymf-law.com

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804)775-4746
bschmalzbach@mcguirewoods.com

*Counsel for OPTO Electronics Co., Ltd.*

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................3

I.      OPTO was entitled to judgment as a matter of law. ...............3

    A.      OPTO's Rule 50(b) motion was procedurally proper. .................3

    B.      OPTO did not breach the Agreement...............................................6

        1.      Because §4.9's application of §1.4 excluded OPTO's laser products, those products are not "2D Barcode Products." .................................................................................6

        2.      As Honeywell understood, the §4.9 calculation omitted *all* OPTO laser product sales. ................................10

        3.      The case and the definition of "2D Barcode Products" do not turn on which symbologies are 2D. .......................14

    C.      In any event, OPTO is excused from breach. ...............................15

        1.      Quasi-estoppel bars Honeywell's claim. ............................15

        2.      The doctrine of unilateral mistake bars Honeywell's claim. ......................................................................................17

II.     OPTO is entitled to a new trial. ................................................19

III.    The district court misconstrued "2D Barcode Products." ...................20

    A.      Section 1.4's first sentence provides the broad universe of products the Agreement applies to. ...............................................21

    B.      Honeywell's reading of the second sentence leads to an absurd result......................................................................................22

    C.      Section 1.4's third sentence, beginning with "[f]or the avoidance of doubt," provides the two vital components required for a 2D Barcode Product..............................................25

IV.     Honeywell committed patent misuse *per se*. ..........................................28

    A.      Honeywell impermissibly conditioned its royalty demand on the use of non-patented features. ..............................................28

B.    Section 271(d)(5) does not excuse Honeywell's
impermissible conditioning on the use of non-patented
features. ........................................................................................31

CONCLUSION ....................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Accenture LLP v. CSDV-MN Limited Partnership*,
2007 WL 4109767 (N.D. Ill. Nov. 19, 2007) ...........................................8, 9, 14

*BLGH Holdings LLC v. enXco LFG Holding, LLC*,
41 A.3d 410 (Del. 2012) .......................................................................10

*Bradley v. Vill. of Univ. Park, Illinois*,
59 F.4th 887 (7th Cir. 2023).................................................................10

*Brulotte v. Thys Co.*,
379 U.S. 29 (1964).................................................................................30

*CM Com. Realty, Inc. v. Alpha Tr. Real Est., LLC*,
2022 WL 509693 (Del. Super. Feb 18, 2022) ......................................7

*Elliott Assocs., L.P. v. Avatex Corp.*,
715 A.2d 843 (Del. 1998) ....................................................................16

*Ethyl Gasoline Corp. v. United States*,
309 U.S. 436 (1940)..............................................................................31

*Gill v. Rollins Protective Servs. Co.*,
773 F.2d 592 (4th Cir. 1985), *opinion amended on denial of reh'g*,
788 F.2d 1042 (4th Cir. 1986)..............................................................19

*Hamer v. Neighborhood Hous. Servs. of Chicago*,
583 U.S. 17 (2017)..................................................................................4

*Harrison v. Edison Bros. Apparel Stores*,
151 F.3d 176 (4th Cir. 1998) .................................................................5

*Hicks v. Ferreyra*,
64 F.4th 156 (4th Cir. 2023)............................................................19, 20

*State ex rel. Hirst v. Black*,
83 A.2d 678 (Del. Super. 1951)............................................................24

*Jacques v. DiMarzio, Inc.*,
  386 F.3d 192 (2d Cir. 2004) ...............................................................21

*Karam v. Sagemark Consulting, Inc.*,
  383 F.3d 421 (6th Cir. 2004) ..............................................................5

*Kimble v. Marvel Ent., LLC*,
  576 U.S. 446 (2015)...........................................................30, 32, 33

*Lasercomb Am., Inc. v. Reynolds*,
  911 F.2d 970 (4th Cir. 1990) ............................................................33

*Miller v. Premier Corp.*,
  608 F.2d 973 (4th Cir. 1979) ..............................................................4

*Nevins v. Bryan*,
  885 A.2d 233 (Del. Ch.), *aff'd*, 884 A.2d 512 (Del. 2005) .............................17

*Osborn ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) ................................................................23

*Pers. Decisions, Inc. v. Bus. Plan. Sys., Inc.*,
  2008 WL 1932404 (Del. Ch. May 5, 2008), *aff'd*, 970 A.2d 256
  (Del. 2009)...................................................................................16

*Pittman by Pittman v. Grayson*,
  149 F.3d 111 (2d Cir. 1998) ...............................................................5

*Pointe on Westshore, LLC v. Certain Underwriters of Lloyd's London*,
  670 F. Supp. 3d 1342 (M.D. Fla. 2023) ................................................8

*Primoff v. Warfield*,
  495 F. App'x 293 (4th Cir. 2012) ......................................................21

*RCN Corp. v. Paramount Pavilion Grp., LLC.*,
  164 F. App'x 291 (3d Cir. 2006) ........................................................7

*Richard Paul, Inc. v. Union Improvement Co.*,
  91 A.2d 49 (Del. 1952) ...................................................................17

*Rohm & Haas Elec. Materials v. Honeywell Int'l*,
  2009 WL 1033651 (D. Del. Apr. 16, 2009) .......................................12

*Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real
  Est. Fund*,
  68 A.3d 665 (Del. 2013) ...................................................................19

*Sea Fare's Am. Café, Inc. v. Brick Mkt. Place Associates*,
  2002 WL 31455563 (R.I. Super. Oct. 25, 2002) ...............................9

*Singer v. Dungan*,
  45 F.3d 823 (4th Cir. 1995) ...............................................................4

*Stinnett v. Colorado Interstate Gas Co.*,
  227 F.3d 247 (5th Cir. 2000) ...........................................................17

*United States v. Bank of Am. Corp.*,
  753 F.3d 1335 (D.C. Cir. 2014)........................................................26

*United States v. Williams*,
  56 F.4th 366 (4th Cir. 2023) ..............................................................4

*In re Viking Pump, Inc.*,
  148 A.3d 633 (Del. 2016) .................................................................20

*Weinberg v. Waystar, Inc.*,
  294 A.3d 1039 (Del. 2023) ...............................................................24

*Weitzner v. Cynosure, Inc.*,
  802 F.3d 307 (2d Cir. 2015) ...............................................................4

*Wells Fargo Bank Wyoming, N.A. v. Hodder*,
  144 P.3d 401 (Wyo. 2006) .................................................................8

*Williams v. Nichols*,
  266 F.2d 389 (4th Cir. 1959).............................................................19

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  395 U.S. 100 (1969)..........................................................................30

**Statutes**

35 U.S.C. § 271(d)(5)................................................................28, 31, 32, 33

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019)...................................................11

## INTRODUCTION

OPTO did not breach the parties' Agreement because in the Second Amendment to the Agreement, the parties confirmed that OPTO's laser products are not royalty-bearing "2D Barcode Products." Honeywell understood as much and signed the Second Amendment, memorializing that understanding. Honeywell presumes it should be excused from that contractual understanding. But the trial established that the parties' express Agreement excluded *all* OPTO laser products from "2D Barcode Products." Honeywell presented *no* defense to that Agreement nor reason to reform it. Honeywell cannot shirk responsibility for its professed understanding by hiding behind outside counsel. The jury's verdict unjustifiably excuses Honeywell from its contractual understanding. The verdict therefore cannot stand, and this Court should enforce the Agreement as written and reverse as required by Rule 50, or, at a minimum, order a new trial.

Anyway, no reasonable jury could have rejected OPTO's affirmative defenses of quasi-estoppel and unilateral mistake. Honeywell's shell-game over what counts as a 2D Barcode Product is indefensible. Those 180-degree swings are facially unconscionable.

The district court erred in adopting Honeywell's definition of "2D Barcode Products." Properly read, the definition requires that a product is operable to decode a 2D symbology by outputting a 2D image of the symbol. That definition excludes OPTO's laser products, which contain no 2D image sensor. Honeywell's interpretation ignores the contract's plain language and contravenes fundamental principles of contract interpretation. And it produces the absurd result that third parties can redefine that term at any time.

Finally, the district court erred in holding that Honeywell does not commit *per se* patent misuse. Honeywell achieved the judgment below by conditioning royalties solely on OPTO's use of an *expired* patent technology. But the Supreme Court has been clear: a licensor cannot continue to exploit that patent past its statutory life. Yet that is exactly what Honeywell does here. The district court contravened Supreme Court precedent expressly holding such conduct is *per se* patent misuse.

## ARGUMENT

**I.     OPTO was entitled to judgment as a matter of law.**

**A.     OPTO's Rule 50(b) motion was procedurally proper.**

The district court wrongly denied OPTO's Rule 50(b) motion.  OPTO

Br. 61.  Sidestepping the void of evidence propping up the verdict,

Honeywell argues that OPTO waived its Rule 50(a) motion.  Honeywell

Response Br. 37.  Not so.  The district court correctly held that OPTO timely

made its motion according to its express order.  JA1801.  At a minimum,

OPTO's reliance on that order was excusable.

That order was no "ambiguous comment[]," Honeywell Response 38,

it was an order:

> Following the close of the evidence, we'll consider any motions
> made, but proceed with the jury.  If folks want to be heard on
> that, once the jury goes out, we'll hear it then.

JA1346.  Complying with that order, OPTO argued its Rule 50(a) motion

directly after the jury began deliberations.  *See* JA1414.

As the district court held, "OPTO cannot properly be faulted for

following *the Court's order* that Rule 50 motions would be 'considered made'

and then arguing its Rule 50 motion while the jury was deliberating."

3

JA1414 (emphasis added).  The notion that OPTO committed waiver by not disobeying the judge is fit for a Kafka novel, not federal practice.

The district court's order made OPTO's motion timely in fact.  Rule 6(b) empowered the court to "extend the time" for performing that act "without motion or notice."  And while Rule 6(b)(2) specifically forbids "extend[ing] the time to act under Rules 50(b) and (d)," it imposes no such restriction on Rule 50(a).

In any event, the district court had, and properly exercised, equitable authority to excuse any delay resulting from its order.  Rule 50(a) is not a jurisdictional or a mandatory claim-processing rule, and so "allows for equitable exceptions."  *Weitzner v. Cynosure, Inc.*, 802 F.3d 307, 312 (2d Cir. 2015).  As a Rule of Civil Procedure, it is not jurisdictional.  *Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 (2017).  And it is not a mandatory claim-processing rule because it is not "singled out by [Rule 6] for inflexible treatment."  *United States v. Williams*, 56 F.4th 366, 372 (4th Cir. 2023).  This Court thus recognizes equitable exceptions to Rule 50(a).  *See Miller v. Premier Corp.*, 608 F.2d 973, 979 n.3 (4th Cir. 1979).[1]

---

[1]*See also Singer v. Dungan*, 45 F.3d 823, 829 (4th Cir. 1995) ("Fourth Circuit precedent also has noted exceptions regarding Rule 50(b)"); *Harrison v.*

4

The Sixth Circuit held that a Rule 50(a) motion should be considered on indistinguishable facts. *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421 (6th Cir. 2004). There, the defendant filed its Rule 50(a) motion after jury deliberation began because "the district court [had] ordered the defendant to defer making its motion and reserved all potential arguments as if the motion had been made." *Id.* at 426. The Sixth Circuit held that a party can hardly be faulted for following a district court's order. *Id.*

Moreover, Honeywell claims no prejudice from the timing of OPTO's motion. *See Pittman by Pittman v. Grayson*, 149 F.3d 111, 119–20 (2d Cir. 1998) (considering prejudice in determining whether an untimely Rule 50(a) motion was procedurally barred). Honeywell identifies no evidence it was prevented from raising in response to OPTO's arguments, nor can it claim any surprise. *See* Honeywell Response Br. 37–38. Since OPTO complied with the district court's order and Honeywell was not prejudiced, the district court properly excused any delay in OPTO's Rule 50(a) motion.

---

*Edison Bros. Apparel Stores, Inc.*, 151 F.3d 176, 179 (4th Cir. 1998) (even if a movant "made the Rule 50(a) motion so late that it did not satisfy as a prerequisite to a Rule 50(b) motion, it is remedied by the liberal application of Rule 50(b).").

**B.** **OPTO did not breach the Agreement.**

OPTO was entitled to judgment as a matter of law because Honeywell agreed to a contract excluding OPTO's laser products from the definition of "2D Barcode Products." OPTO Br. 48. Honeywell disputes this, arguing that because OPTO acknowledged *others* called PDF417 a 2D symbology, OPTO must fail. Honeywell Response at 20–21. Not so. The question for this Court is not what others called a 2D symbology—it is what the parties agreed "2D Barcode Products" means. The parties' contractual application of that definition is conclusive, and no reasonable jury could conclude that OPTO's laser products fall within that definition.

**1.** **Because §4.9's application of §1.4 excluded OPTO's laser products, those products are not "2D Barcode Products."**

As Honeywell "understood," §4.9's calculation of OPTO's European 2D Barcode Products sales excluded OPTO's laser products because they are not 2D Barcode Products. OPTO Br. 51–52. Honeywell misconstrues OPTO's argument. OPTO has never argued that "the Second Amendment provided an amended … definition of '2D Barcode Products' that supplanted the original definition." Honeywell Response 42.

6

Quite the contrary, Section 4.9 applied, rather than amended, §1.4's definition.  OPTO Br. 50.  As Honeywell rightfully points out, "the plain language of the Second Amendment" clarifies that it did not change or amend §1.4's original definition.  Honeywell Response 42–43 (citing JA6466). Rather, the term "2D Barcode Products" has the same meaning throughout the Agreement.  *See* JA6433 ("the following terms when used herein … shall have the respective meanings set forth in this Article"). Even Honeywell's counsel admitted as much.  JA1197 (Adam Doane: "The definition of 2D Barcode Products [in §4.9] is as we saw in the [original] agreement"). Therefore, §4.9's application reflects the parties' contractual understanding of the term.  OPTO's laser products were *never* part of that definition.

This Court must look to §4.9 in interpreting §1.4.  Courts read contracts as a whole, including all amendments.  *CM Com. Realty, Inc. v. Alpha Tr. Real Est., LLC*, 2022 WL 509693, at *8 (Del. Super. Feb 18, 2022); s*ee also RCN Corp. v. Paramount Pavilion Grp., LLC.*, 164 F. App'x 291, 296 (3d Cir. 2006) (under Pennsylvania law, applying an Amendment's definition of a term to the original contract to determine breach).  When uncertainty or the possibility for conflict between provisions arises, courts seek to "reconcile" them.  *CM Com. Realty, Inc.*, 2022 WL 509693, at *8; *see also Wells Fargo Bank Wyoming,*

*N.A. v. Hodder*, 144 P.3d 401, 409 (Wyo. 2006) (under Wyoming law, "[w]e strive to reconcile by reasonable interpretation any provisions [in the original agreement and amendments thereto] which apparently conflict before adopting a construction which would nullify any provision"); *Pointe on Westshore, LLC v. Certain Underwriters of Lloyd's London*, 670 F. Supp. 3d 1342, 1349 (M.D. Fla. 2023) (same under Florida law). So when determining the meaning of "2D Barcode Products," this Court must look to both §4.9 and §1.4 and adopt a reconciliatory reading.

*Accenture LLP v. CSDV-MN Limited Partnership* exemplifies how courts do so. 2007 WL 4109767 (N.D. Ill. Nov. 19, 2007). There, the court addressed whether the term "rentable area" in a commercial lease included the building's parking garage. *Id.* at *4. Looking to the Lease and its amendments, the court observed that they listed the specific 7.539% share of the tenant's percentage of the building's "rentable area." *Id.* The court determined that this percentage omitted the parking garage from the denominator of "rentable area." *Id.* at *4–5. Because "we must interpret the term 'rentable area' so that it is consistent with the specific percentages included in the Schedule and its Amendments," the court concluded that the parking garage unambiguously was not "rentable area." *Id.* The court

emphasized that "[i]f … the parking garage was supposed to be included within the 'rentable area' …, then the specific percentages in the [lease and its amendments] would all be inaccurate." *Id.*; *see also Sea Fare's Am. Café, Inc. v. Brick Mkt. Place Associates*, 2002 WL 31455563, at *2 (R.I. Super. Oct. 25, 2002) (since the parties "knew about the parking lot when they entered into the lease" but "expressly excluded the parking lot from the calculation of the Plaintiff's Percentage Share [of the property's rentable space]," it would be "illogical" to find that "rentable space" included the parking lot).

In the same way, §4.9's recited ████████ of "2D Barcode Product" sales unambiguously exclude all laser product sales. Both parties knew about OPTO's substantial European laser product sales but did not include them in the calculation. Because the Court must reconcile all contract terms and §4.9 applies the term "2D Barcode Products," §4.9's application dictates that term's meaning, otherwise the ████████ computation in the Agreement would be unjustifiably inaccurate.[2]

---

[2] Honeywell accuses OPTO of "trial-by-ambush." Honeywell Response 37. Not so; Honeywell knew OPTO would rely on the Second Amendment for this purpose. *See, e.g.*, JA1130-1131 (discussing the Second Amendment and §4.9's calculations); JA1197-1198 (discussing the definition of 2D Barcode Products in §1.4 and §4.9). Moreover, the district court correctly held that

### 2. As Honeywell understood, the §4.9 calculation omitted *all* OPTO laser product sales.

As Honeywell expressly "understood," §4.9's calculation excluded all laser product sales.  OPTO Br. 55.  Honeywell does not dispute that the calculation excluded those products, it only argues that there was "no evidence presented at trial that any person who signed or ratified the Second Amendment … *understood* § 4.9 … to delineate the universe of 2D Barcode Products."  Honeywell Response 43 (emphasis added).  But the contract's plain language and the evidence, including Honeywell's own witnesses, contradict that assertion.  There is no such ambiguity in §4.9.

The Court need look no further than the contract to reject Honeywell's claim.  *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012) (when "the plain language of [the] contract is unambiguous," it is interpreted "in accordance with that plain meaning.").  In §4.9, Honeywell attested that ███████████████████████████████████████████ ██████████████████████████████  JA6468.  To understand is "to know."

---

"parties are not required to assert all their arguments at summary judgment."  JA1803; *see, e.g.*, *Bradley v. Vill. of Univ. Park, Illinois,* 59 F.4th 887, 898 n.4 (7th Cir. 2023) ("a party does not waive a defense or claim by opting not to file a motion for summary judgment").

Understand, *Black's Law Dictionary* (11th ed. 2019). And the only plain reading of ████████████████████████████████████████████████ ████████████████████████████████████ is that ████████████ represents "the universe of 2D Barcode Products" sales "in Europe in 2019," not just one part. Honeywell ignores the contract's plain language, offering only conjecture to explain this language. *See* Honeywell Response 43.

Beyond the contract's plain language, the evidence at trial, including from Honeywell's own counsel, Adam Doane, refutes Honeywell's claim that it did not understand that the calculation "*excluded* OPTO's European laser/CCD products operable to decode two-dimensional barcodes." Honeywell Response 43–44. Honeywell offers no rejoinder to the emails establishing that OPTO's counsel repeatedly told Honeywell's counsel that the calculation excluded laser products. *See* OPTO Br. 52, 55. Nor could it. At trial, Mr. Doane testified that, when negotiating the Second Amendment,

████████████████████████████████████████████████████

JA1159. And when Honeywell signed the agreement, it ██████████████

████████████████████████████████████████████████████

██████████████████████ calculation of European 2D Barcode Products. JA1159.

Moreover, Honeywell cannot deflect responsibility to its outside counsel. Attempting to fall on his sword for Honeywell, Mr. Doane admitted that "Alston & Bird would have known that OPTO was not including ███████ products in the total" yet asserted that "Honeywell would not have known that." JA1159. Courts have rejected Honeywell's attempted shell-game with its outside counsel. *See Rohm & Haas Elec. Materials v. Honeywell Int'l*, 2009 WL 1033651, at *6 (D. Del. Apr. 16, 2009) ("Honeywell will not be heard to claim that its counsel did not have authority to act and did not, in fact, act on its behalf" in settling the case). Fully informed of Honeywell's contractual understanding in §4.9, those same outside counsel filed this Complaint, alleging that OPTO breached the Agreement by failing to pay royalties on laser products.

Honeywell wrongly insists that the "spreadsheet has nothing to do with the Second Amendment." Honeywell Response 44. The spreadsheet had *everything* to do with §4.9. Prior to the Second Amendment, OPTO sent the spreadsheet to both Brian Rudick, Honeywell General Counsel, and Benjamin Pleune at Alston & Bird. JA7120-7172. At trial, Mr. Doane identified the spreadsheet as the source of the ███████ calculation. *See* JA1156-1159. Honeywell provides no alternative origin for that number.

12

Finally, Honeywell argues that it had no way of knowing whether the products included in the spreadsheet were operable to decode 2D symbologies. Honeywell Response 45. But Honeywell did know.

At trial, Mr. Doane admitted that he knew—before the parties executed the Second Amendment—that *some* of OPTO's laser products could decode 2D symbologies *and* that OPTO's calculation excluded *all* its laser products. JA1114; JA1201. Mr. Doane boasted at trial that Honeywell's team was "very thorough" in its research. JA1164. He personally reviewed "some" of the products' "specifications" before the parties executed the Agreement. JA1140-1141. And as Honeywell points out, OPTO's "marketing materials for its laser products … make clear that they support two-dimensional symbologies." Honeywell Response 22.[3] Honeywell offered no explanation to reconcile its "very thorough" research and its admitted understanding with its agreement to exclude those products from

---

[3] Honeywell deflects that it did not have source code for European products. Honeywell Response 46 & n.8. That is irrelevant. As OPTO's research and development manager for Europe testified, data sheets for those products showed which could decode PDF417. JA1309-1310 & JA1320. He further testified that all of the laser products could decode PDF417 except two products, RS-2006 and OPN-2006, the annual sales for which are separately identified in the spreadsheet. JA1313-1314; JA6960.

the ███████ number. The evidence confirms, not contradicts, Mr. Doane's admissions.

Both the contractual language and the evidence support only one conclusion: Honeywell knew exactly what it was signing.

### 3. The case and the definition of "2D Barcode Products" do not turn on which symbologies are 2D.

Honeywell fails to dispute that its "understand[ing]" in the Second Amendment is a binding contract. Nor does it offer any defense to enforcing that contract. Instead, Honeywell relies on repeated references to statements that PDF417 "is called 2D." Honeywell Response 41–42. Those statements are a red herring that cannot undo Honeywell's contractual admission. The only pertinent question is how the *parties* defined OPTO's products and applied that definition. JA1374.

That others call PDF417 "2D" does not change how Honeywell and OPTO applied §1.4 in §4.9—any more than the tenant's evidence in *Accenture* that it "rented" certain garage spaces, made the garage "rentable area." 2007 WL 4109767, at *5. In rejecting that evidence, the court commented that "the inclusion of specific percentages in the Lease appears to be to avoid just the dispute at issue in this [case]." *Id*. at *5 n.3. In the same way, the ███████

calculation included in the Agreement ends the dispute here, preferencing the parties' mutual "understanding" over others'. Because §4.9's application excluded laser products, the term "2D Barcode Products"—as defined in §1.4 and used throughout the Agreement—does not include them either.

### C. In any event, OPTO is excused from breach.

#### 1. Quasi-estoppel bars Honeywell's claim.

Even if there were breach, "[n]o reasonable jury would find that Honeywell provided sufficient evidence to overcome OPTO's affirmative defense of quasi-estoppel." OPTO Br. 57. Honeywell argues that the evidence failed to prove that it took an inconsistent position, benefitted from its changed position, and its position switch was unconscionable. Honeywell Response 47–48. The evidence is more than legally sufficient on each element.

Honeywell switched positions. One day, it attested to its "understanding" that "2D Barcode Products" excludes laser products to settle the European litigations; the next day it sued OPTO for not paying royalties on the same products. Honeywell's change in position is a "self-interested 180 degree turn" of the sort Delaware law deems unconscionable.

*Pers. Decisions, Inc. v. Bus. Plan. Sys., Inc.*, 2008 WL 1932404, at \*7 (Del. Ch. May 5, 2008), *aff'd,* 970 A.2d 256 (Del. 2009).

At each step, Honeywell gained an advantage at OPTO's expense. Honeywell argues—without any citation to the record or case law—that neither its dismissal of its European infringement actions nor OPTO's dismissal of its European nullity actions were "influenced by comments about OPTO's sales." Honeywell Response 48. The plain language of the contract proves to the contrary. JA6465 ("The parties desire to avoid any further litigation, risks and expenses related to the European Litigations and Nullity Actions …."). The confirmation of the parties' mutual understanding of §1.4 was included in §4.9 as an express term of settlement and "cannot be ignored or wished away as surplusage." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

Finally, Honeywell's "bait-and-switch 'understanding'" was unconscionable as a matter of law. OPTO Br. 58 ("Honeywell introduced no … evidence that its behavior is anything but unconscionable"). Honeywell does not refute this. Instead, it argues that it did not understand what the ▮▮▮▮▮ meant. Honeywell Response 47.

But Honeywell knew that OPTO understood it would not owe royalties on its laser products. JA7175. Yet, Honeywell said nothing. Under Delaware law, a party "who has stood silently aside and watched an innocent defendant dig his own pitfalls" cannot recover. *Nevins v. Bryan*, 885 A.2d 233, 248 (Del. Ch.), *aff'd,* 884 A.2d 512 (Del. 2005) (quoting *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49, 54–55 (Del. 1952)). This "maxim lies in the heart of equity" and applies "irrespective of the nature of the remedy sought." *Id.* Here, Honeywell "stood mute despite [its] knowledge that [OPTO's] actions were—in [Honeywell's] opinion—forming the basis of a … claim against [OPTO]." *Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 259 (5th Cir. 2000) (applying Texas law). In such a circumstance, after "cynically misleading" OPTO on the contract's meaning, Honeywell acted "unconscionabl[y] in asserting [its] present claims." *Id.*

## 2. The doctrine of unilateral mistake bars Honeywell's claim.

If the Court finds OPTO's understanding incorrect, the doctrine of unilateral mistake bars Honeywell's claim. OPTO Br. 58. Honeywell argues that OPTO provided no evidence of a prior understanding of 2D Barcode

Products.  Honeywell Response 48.  To the contrary, Honeywell knew of OPTO's understanding before executing the original Agreement.

As Honeywell's counsel acknowledged, Honeywell knew, ██████ ██████████████████████████████████████████████ that OPTO had a different ██████████████████████████████████████████████ in the original agreement.  JA7175; *see also* JA985 (Jeremy Whitley: "[during mediation] we said this is what we believe to be the right number of revenue, OPTO disagreed and said it's drastically lower than that").  And it knew that OPTO applied this understanding in calculating its global sales of 2D Barcode Products, as memorialized in the original Agreement.  JA6440-6441.  Indeed, throughout the course of performance, OPTO and its attorneys evinced their clear and consistent understanding, without a peep from Honeywell.  *See, e.g.*, OPTO Br. 59; JA1408 (instructing the jury to "assume that the conduct of OPTO's attorneys is also the conduct of OPTO").

Without question, Honeywell knew of OPTO's understanding *before* signing the Second Amendment.  As described above, the evidence shows that Honeywell had "actual knowledge of [OPTO's] error at the time it … ratified the mistake" by signing the Second Amendment.  *Scion Breckenridge*

18

*Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 682 (Del. 2013).

## II.    OPTO is entitled to a new trial.

The district court applied the wrong standard to OPTO's Rule 59 motion, so its denial of that motion was a *per se* abuse of discretion.  OPTO Br. 59–60.  Honeywell tries to lay the blame at OPTO's feet, arguing that OPTO merged the Rules 50 and 59 analyses in its brief.  Honeywell Response 50.  This is simply not the case.  In its post-trial motions, OPTO set forth the correct standards.  JA6349-6350.

Honeywell appears to acknowledge that the district court wrongly applied the Rule 50 standard to the Rule 59 motion.  Honeywell Response at 50; *see also* JA1804.  "To apply the [judgment notwithstanding the verdict] standard to a review of the evidence on a motion for a new trial is reversible error."  *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 594 (4th Cir. 1985), *opinion amended on denial of reh'g*, 788 F.2d 1042 (4th Cir. 1986); *Williams v. Nichols*, 266 F.2d 389, 393 (4th Cir. 1959) (when "the trial court applied the standard applicable to a motion for a directed verdict [to a motion for a new trial] … the application of the wrong standard … amounted to an abdication of the judge's function" and must be reversed); *see also Hicks v. Ferreyra*, 64

F.4th 156, 171 (4th Cir. 2023) ("A court abuses its discretion when it …
commits an error of law.").  Applying the correct standard, the verdict
contradicts the weight of the evidence, and OPTO is entitled to a new trial.

## III.    The district court misconstrued "2D Barcode Products."

2D Barcode Products must be operable to decode a 2D symbology by
outputting a 2D image of the symbol.  OPTO Br. 61.  Honeywell argues that
a 2D Barcode Product need only be operable to decode a 2D symbology by
any means, obviating the 2D image sensor requirement.    Honeywell
Response 30.  Thus, despite accusing OPTO of rendering parts of §1.4
meaningless, it is Honeywell that does so.    Honeywell Response 31.
Comporting with Delaware's requirement that a court must "constru[e] the
agreement as a whole and giv[e] effect to all its provisions," only OPTO's
reading harmonizes §1.4's three sentences. *In re Viking Pump, Inc.*, 148 A.3d
633, 648 (Del. 2016).

Like a funnel, the definition starts by orienting to the broad category
of products and then, in the third sentence, provides the precise structure
and functionality necessary for a 2D Barcode Product.  First, §1.4 defines the
relevant product category—"device[s] … operable to decode … two-
dimensional barcode symbologies."  JA6434.  Then, it clarifies that "two-

dimensional barcode symbologies" is expansive.  Finally, given the prior two sentences, it specifies the precise structures and functions of a 2D Barcode Product.[4]

### A. Section 1.4's first sentence provides the broad universe of products the Agreement applies to.

Section 1.4's first sentence points to the broad category of products to which the Agreement applies, thereby indicating the categories of products to which it does not.  OPTO Br. 64.  Honeywell argues that the first sentence, and the first sentence alone, provides the operative definition.  Honeywell Response 29–31.  But that argument ignores the three-sentence structure of the definition.

---

[4] Honeywell argues that OPTO failed to object to the district court's jury instruction, based on its summary judgment ruling, construing the definition.  Honeywell Response 36.  Having already argued in its summary judgment briefing for its definition of 2D Barcode Products, OPTO need not re-raise that already-rejected interpretation.  *Primoff v. Warfield*, 495 F. App'x 293, 298 n.7 (4th Cir. 2012) (cleaned up) ("failure to specifically object to [jury] instructions [does] not waive the position [a party] had already unsuccessfully presented"); *see also Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004) (a position that "was explicitly considered and rejected by the district court in its decision denying summary judgment" is not waived by a failure to object to jury instructions).

Properly understood, the first sentence is the top of the funnel. It helps orient the Agreement within the broad swath of products OPTO and Honeywell manufacture—*i.e.*, products "operable to decode at least one or more two-dimensional barcode symbologies into human-readable text." JA6434. In doing so, it limits the third sentence, which otherwise would literally include digital cameras.

### B. Honeywell's reading of the second sentence leads to an absurd result.

The second sentence clarifies that the term "2D barcode symbology" is expansive, without limitation by any extrinsic definition. OPTO Br. 64. Honeywell argues that OPTO's reading "nullif[ies] the second sentence," "render[ing] the sentence meaningless." Honeywell Response 31. The opposite is true. OPTO's reading is the only reading that avoids both an ambiguous definition of 2D Barcode Products and an absurd result.

As properly construed, the Agreement leaves the term "two-dimensional barcode symbology" undefined for a simple reason: the scope of "2D Barcode Products" is based on a specific product function and structure, not the symbologies each product decodes. The second sentence places the spotlight on those product features while clarifying that §1.4 is to

be read without limitation by any third-party definitions of "two-dimensional symbologies," from any source.

Honeywell's piecemeal interpretation, on the other hand, produces an absurd result in which the meaning of "two-dimensional barcode symbologies"—an undefined term—is material to the definition of 2D Barcode Products. Under Honeywell's reading, the meaning of that material term is forever susceptible to the whims of third parties.[5]  No rational corporation would accept such an outcome. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

The parties rejected that outcome by agreeing that "[t]his Agreement and its Exhibits, constitute and contain the entire agreement among the Parties respecting the subject matter hereof."  JA6443.  The parties stipulated, "[t]his Agreement may be amended, modified, and/or one or more provisions hereof waived only by written instrument signed by the Parties"—not by industry standards subcommittees or any other third party.

---

[5] Honeywell baselessly claims that OPTO "newly asserts" this argument. Not so.  OPTO fully briefed it below.  *See* JA4563-4569; JA476-478.

Without citation, Honeywell asserts that "reliance on industry standards is accepted and commonplace," but does not show that the contract incorporated *any* standard. Honeywell Response 32. Nor could it: "Honeywell does not contend that the Agreement sought to incorporate industry standards by reference." JA4565. Incorporation requires the extrinsic document to be "specifically set forth or identified by reference." *State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. 1951). There is no incorporation of an industry standard in §1.4 or anywhere else in the Agreement. And the second sentence's role as a "without limitation" provision ensures that extrinsic evidence plays no part in defining 2D Barcode Products.

Nevertheless, under Honeywell's reading, any standard setting organization, at any time, could reclassify a symbology, thus transforming a product from royalty-bearing to not, or vice versa. Honeywell's interpretation violates both long-standing contract interpretation rules and the Agreement's integration clause. The Court should reject such an "absurd" and legally unjustifiable result. *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1044 (Del. 2023).

24

**C.    Section 1.4's third sentence, beginning with "[f]or the avoidance of doubt," provides the two vital components required for a 2D Barcode Product.**

The third sentence contains the two indispensable characteristics of a 2D Barcode Product.  OPTO Br. 70–73.  Honeywell tries to sideline this key provision and argues that it only applies to a "niche" category of products, "undecoded engines."    Honeywell Response 33–34.    According to Honeywell, an "undecoded engine … only includes the reading hardware," for example, "a laser or a camera."  *Id*.  In doing so, Honeywell reveals the intended scope of "2D Barcode Products."  If the parties intended the first sentence to include laser scanners and the third sentence to capture their "niche" "undecoded engines," then the Agreement's definitions of "engines" in §1.3-4 would have described the relevant "reading hardware" for laser engines, i.e. a "laser."  But the Agreement only defines "engines" with image sensors or "cameras," not lasers.  JA6433-6434 (§§1.3 & 1.4).

Thus the third sentence does so much more: it provides the conclusive statement of a 2D Barcode Product's characteristics.  Honeywell ignores the importance of the "[f]or avoidance of doubt" clause introducing the third sentence.  The clause signifies that the following sentence "conclusively answers" the parties' intentions and "avoids" the ambiguity produced by

reading the first two sentences in isolation. *United States v. Bank of Am. Corp.*, 753 F.3d 1335, 1338 (D.C. Cir. 2014).

Honeywell misconstrues the phrase "shall include" as expansive, rather than exhaustive. While accusing OPTO of rewriting §1.4, Honeywell states that "the third sentence ensures that '2D Barcode Products' shall include, ***but not be limited to***, certain products." Honeywell Response 34 (emphasis in original). But the keywords in Honeywell's sentence—"***but not be limited to***"—do not appear in the original. In support of adding them, Honeywell points to §9.4, stating "the term 'including' means 'including without limitation.'" Honeywell Response 34 (citing JA6444). This proves OPTO's reading. Unless defined otherwise, as the parties understood, "including" is exhaustive. By *not* defining "includes," they evinced their intention for "includes" to be exhaustive, which the sentence's use of "shall include"—the Agreement's only such usage of the phrase—reinforces.

Honeywell also misstates that "OPTO asks this Court to treat this [third] sentence as somehow limiting the first." Honeywell Response 32. The third sentence does no such thing—it *expands* the scope of the first sentence by clarifying that the term "operable to decode" means "capable of outputting a 2D image" of a 2D barcode symbol "that may be used to

decode" the symbol. Actual decoding is not required, as might be implied by the first sentence. The third sentence captures not only the so-called "niche" "undecoded engines" but also fully operable "decoded" 2D imaging devices programmed to decode only indisputably 1D symbologies. The third sentence ensures that those devices are 2D Barcode Products, regardless of the symbols they decode.

Finally, OPTO's reading would not render the distinction between 1D and 2D products "meaningless." *See* Honeywell Response 35. Rather, the meaning of §1.4 informs the meaning of §1.5. Just as §1.4's third sentence defines the meaning of "operable to decode" as used in the first sentence, the third sentence informs the meaning of that phrase in §1.5. *See* OPTO Br. 63. In other words, to be a 1D Barcode Product, a product must decode 1D barcode symbologies into human readable text but not be "capable of outputting a 2D image of a 2D barcode symbol." So all of OPTO's barcode products that do *not* output a 2D image, are 1D Barcode Products and thus fall under the covenant not to sue. The Agreement thus accounts for all of OPTO's barcode products.

**IV.    Honeywell committed patent misuse** *per se.*

The district court erred in denying OPTO's motion for summary judgment of Honeywell's *per se* patent misuse even though, as here, Honeywell does not dispute the evidence of its *per se* misuse.  Instead, the district court wrongly required OPTO to prove Honeywell's "market power" under a rule-of-reason analysis.  OPTO Br. 73.  Honeywell attempts to defend the district court's ruling by relying on an inapplicable statute, 35 U.S.C. §271(d)(5), and contending that it is immune to patent misuse because it has unexpired patents covering OPTO's laser products.   Honeywell Response 51.   But Honeywell misuses its unexpired patents to penalize OPTO's use of non-patented barcode scanning technology.

### A.    Honeywell impermissibly conditioned its royalty demand on the use of non-patented features.

Honeywell fails to dispute that, under the Agreement, OPTO pays nothing to use Honeywell's active patents—*unless* OPTO activates the ability to decode stacked symbologies,  a feature for which Honeywell has no active patent.  Then, Honeywell demands a ▮ royalty—*not* for the use of its active patents which is free—but to use this non-patented feature.  OPTO's use, or nonuse of Honeywell's *active* patents is irrelevant to Honeywell's royalty

demand.  Simply put, Honeywell is charging OPTO a toll to use a public road.

Honeywell does not dispute that its covenant not to sue is likewise tied to OPTO's use of the non-patented feature.  Under the covenant not to sue, OPTO owes no royalty and is shielded from the threat of litigation—as long as it does not activate the ability to decode stacked barcodes.  The conditional covenant thus converts the royalty to a ransom—activate the non-patented feature and pay a royalty, or else face litigation unrelated to the non-patented feature.

Nor does Honeywell dispute that it lacks an active patent covering a laser scanner's operability to decode multi-row barcodes.  Honeywell once owned three patents covering laser scanners' operability to decode multi-row symbologies, but each expired before the Agreement's Effective Date. *See* U.S. Patent Nos. 7,007,849; 7,325,740; and 8,226,009.  Honeywell conditions its royalty demand on the function covered by these expired patents.

In short, Honeywell misuses its active patents as a cudgel, not to preclude infringement or to extract value for *their* use, but to control conduct outside the scope of their claims—conduct now in the public domain.

29

This is precisely the kind of conduct *Brulotte v. Thys Co.* prohibits. 379 U.S. 29 (1964). Applying *Brulotte*, the Supreme Court reaffirmed that it "has carefully guarded [patent expirations] … to preclude measures that restrict free access to formerly patented … inventions." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 451 (2015). Such "measures" are *per se* patent misuse. *Id. Kimble* thus reaffirmed *Brulotte*'s uncrossable line—"*any* attempted reservation or continuation" of the expired patents "*whatever the legal device employed*" is *per se* patent misuse. *See Brulotte*, 379 U.S. at 31 (emphasis added). Honeywell failed to dispute that its conditional royalty and covenant concerning its *active* patents are "legal devices" that "attempt reservation or continuation" of its *expired* patents. For those reasons alone, Honeywell committed *per se* patent misuse. That ends the inquiry.

Flouting *Kimble*, Honeywell asserts that its unrelated existing patents give it license to control OPTO's use of non-patented features, regardless of the "legal device employed." But again, long-standing Supreme Court precedent repudiates that assertion: a patentee may not leverage its patents to "extend[] the monopoly of [the licensed] patent to derive a benefit not attributable to use of the patent's teachings." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 136 (1969); OPTO Br. 75. Nor may a patentee

30

leverage its patents "to control conduct by the licensee not embraced in the patent monopoly." *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456-57 (1940); OPTO Br. 80. The district court thus erred in holding that there can be no *per se* patent misuse simply because "a number of unexpired Honeywell patents … cover the disputed products." JA531.

### B. Section 271(d)(5) does not excuse Honeywell's impermissible conditioning on the use of non-patented features.

Section 271(d)(5) does not save Honeywell. In its telling, that 1988 provision "abolishes … tying arrangements as a *per se* violation." Honeywell Response 56–57 n.11. But the statute's two narrow exceptions to *per se* patent misuse statute neither negate that Supreme Court precedent nor excuse Honeywell's *per se* patent misuse here.

First, §271(d)(5) does not apply in the first place. That provision applies only to a "patent owner otherwise entitled to relief for infringement or contributory infringement of a patent." But this lawsuit seeks no infringement relief; it seeks relief under a contract.

Furthermore, although Honeywell's royalty and covenant are conditioned or "tied" to OPTO's disablement of the non-patented feature, §271(d)(5) is not directed to "tying arrangements" generally. Instead, it

31

specifies two discrete types of patent misuse requiring the additional proof of market power. The first involves conditioning a patent license "on the acquisition of a license to rights in another patent"; the second on conditioning a license on the "purchase of a separate product." *Id.*

Honeywell's reliance on §271(d)(5) is misplaced. Honeywell's royalty and covenant are conditioned on the use of technology for which it has *no rights* under "another patent." Nor is Honeywell requiring OPTO to purchase another product.

Even the district court acknowledged that §271(d)(5) is "not directly controlling here." JA531. Yet it erroneously required OPTO to prove market power at trial. JA513.

In *Kimble*, the Supreme Court expressly declined to expand that statute's evidentiary burden beyond its literal scope. In that case, the patentee urged the Supreme Court to apply §271(d)(5)'s market power/rule-of-reason burden of proof to terminate *Brulotte's per se* patent misuse rule. 576 U.S. at 449, 454-55 (describing *Brulotte* as holding that "a patent holder cannot charge royalties for the use of his invention after its patent term has expired."). Recognizing that Congress had repeatedly revised the Patent Act's treatment of patent misuse without disturbing *Brulotte*, the Court

32

refused to expand §271(d)(5) beyond its literal scope. *Id.*; *accord Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 976 n.15 (4th Cir. 1990) ("The primary effect of the Patent Misuse Reform Act is to eliminate the presumption that use of a patent license to create a tie-in is *per se* misuse"). This Court should likewise refuse Honeywell's invitation to affirm the district court's unwarranted expansion of §271(d)(5).

On these undisputed facts, then, Honeywell committed patent misuse *per se* and its market power is irrelevant. The denial of summary judgment on Honeywell's *per se* patent misuse should be reversed.

## CONCLUSION

For these reasons, the Court should reverse the denial of judgment as a matter of law and remand with instructions to enter judgment for OPTO. In the alternative, this Court should vacate the judgment and remand for a new trial, or at a minimum for resolution of OPTO's motion for new trial under the correct standard.

Dated: July 18, 2024

Respectfully submitted,

*/s/ Brian D. Schmalzbach*

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4746
bschmalzbach@mcguirewoods.com

York M. Faulkner
YORKMOODYFAULKNER
Tensho Building, 7F, Suite 711
3-17-11 Shibaura, Minato-ku
Tokyo, Japan 108-0023
T: (202) 351-0837
york.faulkner@ymf-law.com

*Counsel for OPTO Electronics Co., Ltd.*

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(B) because it contains 6,474 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, 14-point Book Antiqua font using Microsoft Word.

/s/ Brian D. Schmalzbach
Brian D. Schmalzbach

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2024, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach